

SUBSCRIBE    DONATE     

MAGAZINE ⌄    COUNTRIES ⌄    U.S. POLICY    CORRUPTION INDEX    EVENTS    PODCAST    CULTURE    ABOUT

## U.S. POLITICS

# How Much of a Threat is Tren de Aragua in the U.S.?

 

**BY CHARLES LARRATT-SMITH AND JOHN POLGA-HECIMOVICH**
**DECEMBER 9, 2024**

The Venezuelan prison gang was a frequent theme in Donald Trump's campaign rhetoric on immigration. But its reach in the U.S. is exaggerated.



*A member of the Tren de Aragua gang in the custody of Peruvian police in Lima in October 2023.*
Cris Bouroncle/AFP via Getty Images

*Reading Time: 8 minutes*

On October 11, Donald Trump held a campaign event in Aurora, Colorado, where the then-Republican party candidate and now president-elect underlined appeared on stage flanked by large placards bearing mugshots of Venezuelan immigrants who had been arrested following their arrival to the United States. These campaign props were adorned with the words "Occupied America: TDA Gang Members in Aurora," while the backdrop of the stage was draped in banners bearing the slogan "Deport Illegals Now." It seemed unusual for the Trump campaign to spend valuable time and energy to organize a rally in a state widely expected to vote Democratic, during the homestretch of what appeared at the time to be a close electoral contest. But the underlined purpose of this campaign event was above all else symbolic.

In late August, underlined video footage had emerged of a group of armed Venezuelan migrants trying to forcibly enter an apartment in a housing

## RELATED CONTENT



**In Ecuador, Mounting Challenges Threaten Noboa's Reelection**



**Is There a Real-World Alternative to Bukele on Crime?**



**Why Sheinbaum May Take a Different Path on Mexico's Security**

### CURRENT ISSUE



SIGN UP FOR OUR NEWSLETTER

at the rate of 50 a race election center but the purpose of the campaign event was above all else symbolic.

In late August, video footage had emerged of a group of armed Venezuelan migrants trying to forcibly enter an apartment in a housing complex in this nondescript suburb of Denver, a city that has at times struggled to accommodate a large wave of migrants from Latin America over the past several years. After the building's out-of-state landlord claimed the building had been taken over by a Venezuelan prison gang, Tren de Aragua (TdA), the mayor of Aurora repeated the claim, before reversing himself as the incident was seized upon by conservative politicians, media pundits, and online influencers to make exaggerated claims that the city had been "taken over" by criminals from Venezuela.

As the election approached, this once largely unknown criminal organization was thrust into the spotlight as an emergent threat to U.S. national security, its "vicious" activities attracting the attention of Republican legislators and executive branch agencies. In the aftermath of a resounding Trump victory at the polls, buoyed in part by the electorate's disapproval with the Biden administration's handling of immigration and border enforcement, an important yet largely unanswered question remains: Does TdA actually pose a legitimate threat to U.S. national security?

Surprisingly little is known about Tren de Aragua, a fact that has given it great power and allowed it to assume the shape of a chimera in the eyes of both law enforcement and other criminal actors. Several governments in the Americas have sounded the alarm about the group, while criminals operating in the Venezuelan diaspora have claimed links to TdA to bolster their reputations and criminal legitimacy. The gang has permanent cells in Peru and in Chile, where it carried out a high-profile assassination in 2023. At the same time, evidence suggests that the TdA has had trouble expanding in places with competitive criminal markets and where state coercive capacity is strong.

Given all of this, the fear and campaign-season rhetoric in the U.S. is overblown. Despite the real threat TdA poses to many Venezuelan migrants, it's unlikely the group has much power or reach in the U.S., where other organized criminal organizations pose much more of a threat to citizens and TdA itself.





NAVIGATING TRUMP
...and three other trends that will define
Latin America in 2025
BY BRIAN WINTER

Latin America faces numerous challenges in 2025, including Donald Trump's return to the White House. Our special report examines four trends to watch.

**Read More**

**Past Issues**

A police officer at a checkpoint in Bogotá, where Tren de Aragua operates in some neighborhoods, in October. Photo by Juancho Torres/Anadolu via Getty Images.

### What we know about Tren de Aragua

The origins of TdA are well documented. The group first emerged in 2005, as a trade union formed to build a railroad during the government of Hugo Chávez. The consortium of workers quickly began embezzling funds, before moving into extorting contractors. By the time the project was abandoned in 2011, this nucleus of ersatz railway workers had metamorphosed into a criminal organization known as el Tren de Aragua. The group quickly developed a formidable presence in the state's notorious Tocorón prison. It was there that its current leader, Héctor Rusthenford Guerrero Flores (alias 'Niño Guerrero'), joined in 2013, quickly becoming the '*pran*'—an incarcerated gang leader who controls prisons from the inside while simultaneously directing criminal organizations outside of them. Under his tutelage, TdA expanded to several neighboring states and became Venezuela's largest criminal organization of its kind, engaging principally in extortion, street-level drug dealing, and human trafficking.

The rise of TdA coincided with the onset of the Venezuelan economic crisis. The implosion of the economy combined with hyperinflation led to the virtual collapse of the country's social safety net, prompting millions of young Venezuelans to migrate. Sensing an opportunity in the crisis, TdA expanded its operations to the porous border region and charged outgoing migrants fees to exit through irregular border crossings, or '*trochas*', while other members reportedly embedded themselves in migrant flows heading to other South American countries to prey on their compatriots. With the worsening of the migrant crisis in 2018, reports began to surface from law enforcement in Colombia, Peru, and Chile that TdA had established chapters and was engaged in widespread criminal activities in those countries.

Still, TdA had limited success setting up operations in Colombia, despite the fact that the two countries share a 1,379 mile-long border. Gang members who tried to make incursions into border enclaves such as Arauca and Cúcuta were met with violent resistance from Colombian insurgent groups such as the Ejército de Liberación Nacional (ELN) and Fuerzas Armadas Revolucionarias de Colombia (FARC) dissident factions, demonstrating the extreme difficulties facing new entrants into Colombia's established criminal market. Other apparent TdA chapters were more successful in establishing a presence elsewhere in less competitive environs, particularly in Bogotá, where they principally devoted themselves to micro-level extortion and drug dealing in poorer

demonstrating the extreme difficulties facing new entrants into Colombia's established criminal market. Other apparent TdA chapters were more successful in establishing a presence elsewhere in less competitive environs, particularly in Bogotá, where they principally devoted themselves to micro-level extortion and drug dealing in poorer neighborhoods. Tellingly, even in these spaces TdA operatives subcontract smaller local gangs and authorize them to use their name to generate fear and compliance with their victims.

TdA found it easier to expand and establish roots in places with large contingents of Venezuelan migrants and fewer local criminal rivals. This is especially true of Chile and Peru, where the group appears to have established permanent cells, from Santiago and Lima to the Peru-Chile and Chile-Bolivia border areas. While the gang makes money from human trafficking, narcotrafficking, and extortion, it has also wielded violence there, particularly against fellow Venezuelan migrants. In a case that made international headlines, TdA allegedly planned and carried out the kidnapping and heinous murder of Ronald Ojeda, a former first lieutenant in Venezuela's armed forces and an opponent of the Venezuelan regime, in March 2023 in Chile. The lack of criminal competitors in these places was decisive in the group's expansion, in contrast to Ecuador or Brazil, where there is little evidence of permanent cells.

The gang's relationship with Venezuelan security forces and government officials is also shrouded in mystery, but hints at organizational weaknesses. TdA's initial growth was driven by the state's unofficial devolution of power to the *pranes* under Prison Minister Iris Varela and the impunity it enjoyed within and outside of Tocorón. Under this agreement, it was allowed to operate out of the prison for years with the government's knowledge and tacit consent. However, in September 2023, perhaps in response to a breakdown in the *pax mafiosa*, the government raided the prison, effectively dismantling the group's headquarters. Nonetheless, TdA's leader, Guerrero, and others appear to have received advanced warning and escaped via tunnel prior to the raid. Telling, this episode illustrates not only TdA's relationship to the Venezuelan state, but how much weaker TdA is compared to Mexico's Sinaloa Cartel and the Cartel Jalisco Nueva Generación (CJNG), Colombia's ELN, EMC, and EGC, Ecuador's Los Choneros, or Brazil's Primeiro Comando da Capital (PCC), none of which could plausibly be dismantled through a single coordinated government raid.

### Transnational threat or electoral bogeyman?

Over the past two decades, criminality in Venezuela skyrocketed largely as a result of the failed security policies of *chavismo*, making it one of the most dangerous countries on the planet. The implosion of the Venezuelan economy coupled with the authoritarian consolidation of Nicolás Maduro's regime led to an unprecedented exodus of largely working class and poorer Venezuelans throughout the Americas. Unsurprisingly, much of the Venezuelan criminal class has similarly fled these worsening conditions during this period with many attempting to re-establish their

SIGN UP FOR OUR NEWSLETTER

Maduro's regime led to an unprecedented exodus of largely working class and poorer Venezuelans throughout the Americas. Unsurprisingly, much of the Venezuelan criminal class has similarly fled these worsening conditions during this period with many attempting to re-establish their illicit careers abroad, generating palpable xenophobia and fervent anti-immigrant sentiment in the process.

Although TdA never achieved a nationwide presence in its home country, the gang has somehow gained notoriety as the most fearsome transnational criminal organization across the Americas from Chile to the United States in the span of a few years. Rather than the TdA expanding its tentacles throughout South and North America from its former base in Tocorón and threatening to destabilize the entire region, it is far more probable that any and all criminal acts committed abroad by a miniscule percentage of the Venezuelan diaspora are now attributed to TdA due to a paucity of real information on the criminal group's structure and organizational culture. Reported factions of the group in Chile and Peru, for example, operate under names such as the Gallegos, the Hijos de Dios, and Dinastía Alayón, making it difficult for law enforcement to determine their exact relationship to the larger group.

Recent investigative reports from InSight Crime highlight several inconvenient truths about this Venezuelan gang that challenge the existing narrative in the United States. Among other things, the tattoos or dress codes ascribed to TdA members in the U.S. has little backing in other places where the gang has been known to operate. The origin of that information is also uncertain, given that U.S. and Venezuelan authorities do not share intelligence. Of course, one consequence of the lack of clear identifiers is the ease with which non-affiliated Venezuelan criminals in the diaspora may claim membership in order to further burnish their credentials in the pursuit of illegal activities.

Of equal importance, nearly no claims made by U.S. law enforcement about crimes committed by purported members of TdA have been substantiated by hard evidence that directly connects the accused with the organization in Venezuela. In fact, none of the national, state, and local law enforcement agencies contacted in the U.S by InSight Crime in April 2024 reported any significant presence of TdA in their jurisdictions.

Despite assertions from some quarters that TdA is conspiring to seize control of criminal rackets in major U.S. cities, the actual organizational potential of Venezuelan criminals to do so is overblown, particularly in the United States. In Venezuela, the gang was only strong until the government decided to combat it, and law enforcement operations have clamped down on supposed structures in other South American countries. For these reasons, it would be difficult for the TdA to establish itself in the U.S. while coordinating with what remains of the organization's fugitive hierarchy in Venezuela. Among other things, the gang lacks control over the migrant smuggling and human trafficking routes in the U.S. that were so vital to its expansion to prisons and urban areas in South America. Instead, small factions of apparent TdA members

Document title: How Much of a Threat is Tren de Aragua in the U.S.?          01052
Capture URL: https://americasquarterly.org/article/how-much-of-a-threat-is-tren-de-aragua-in-the-u-s/
Capture timestamp (UTC): Fri, 21 Feb 2025 01:22:43 GMT

SIGN UP FOR OUR NEWSLETTER

organization's fugitive hierarchy in Venezuela. Among other things, the gang lacks control over the migrant smuggling and human trafficking routes in the U.S. that were so vital to its expansion to prisons and urban areas in South America. Instead, small factions of apparent TdA members have offered their services to more powerful Mexican cartels that dominate the border.

The alarmism over Tren de Aragua in the U.S., in short, does not correspond to the facts on the ground as we know them. The recent assertion in Senator Rubio and Representative Salazar's petition to President Biden that TdA is "an invading criminal army from a prison in Venezuela that has spread their brutality and chaos to U.S. cities and small towns" is emblematic of the exaggeration. Not to be outdone by fellow Republicans from Florida, Texas Governor Greg Abbott officially designated TdA as a "foreign terrorist organization" in mid-September, even though the gang lacks any meaningful political criteria to meet this definition. In the final days of the recent election, the governor further demanded that Vice President and Democratic candidate Kamala Harris follow suit and classify TdA along those same lines.

Some Venezuelan criminals have succeeded in entering the United States in recent years, including perhaps a few full-fledged TdA members with direct links to the Venezuelan hierarchy. But it is highly unlikely that they will be able to mobilize in any meaningful way in the United States. Based on the recent successes of law enforcement in Chile, Peru, and Colombia in capturing and dismantling substantial TdA structures, TdA and other aspiring Venezuelan criminals will likely fare no better in the U.S. when confronted by police with considerably greater resources at their disposal than their Andean counterparts.

### The fallout from the campaign

While perhaps an effective electoral ploy, it's dangerous to exaggerate TdA's threat for several reasons. Paying disproportionate attention to the group takes valuable time and resources away from prosecuting more powerful transnational organized criminal groups, such as the CJNG or the Sinaloa Cartel, that are largely responsible for fueling the opioid crisis in the United States and destabilizing other countries in the region.

And using TdA to support the narrative that immigrants are criminals is damaging to the Venezuelan diaspora in the United States. If the Department of Homeland Security's recent estimation that there are 600 active TdA members in the United States is in fact true, these individuals would still constitute 0.09% of the estimated 700,000 Venezuelans who have been paroled into the United States since the beginning of the humanitarian crisis. But Trump invoked Venezuelans more than any other nationality in his anti-immigrant campaign rhetoric, and his party members followed suit, creating additional risks for those living in stigmatized communities such as Aurora. While the scope, scale, and feasibility of the impending deportation campaign that Trump has promised remains unknown, it is highly probable that Venezuelan migrants will be severely affected by these draconian measures, whether

damaging to the Venezuelan diaspora in the United States. If the Department of Homeland Security's recent estimation that there are 600 active TdA members in the United States is in fact true, these individuals would still constitute 0.09% of the estimated 700,000 Venezuelans who have been paroled into the United States since the beginning of the humanitarian crisis. But Trump invoked Venezuelans more than any other nationality in his anti-immigrant campaign rhetoric, and his party members followed suit, creating additional risks for those living in stigmatized communities such as Aurora. While the scope, scale, and feasibility of the impending deportation campaign that Trump has promised remains unknown, it is highly probable that Venezuelan migrants will be severely affected by these draconian measures, whether they are criminals or not.

---

**ABOUT THE AUTHORS**



### Charles Larratt-Smith

*Larratt-Smith is an assistant professor in the Department of Criminal Justice and Security Studies at the University of Texas at El Paso (UTEP).*

**Follow Charles Larratt-Smith:** 🔗 LinkedIn |



### John Polga-Hecimovich

*Polga-Hecimovich is an associate professor of political science at the U.S. Naval Academy, where he also co-directs the Forum for Latin American Studies.*

**Follow John Polga-Hecimovich:** 🔗 LinkedIn | ✖ X/Twitter

---

**Tags:** Migration, Tren de Aragua, U.S. politics, Venezuela, Venezuelan diaspora

**Like what you've read? Subscribe to AQ for more.**

*Any opinions expressed in this piece do not necessarily reflect those of* Americas Quarterly *or its publishers.*



DONATE    SUBSCRIBE

✖ 🔗 📷 in

Podcast

 🎵 ▶ 🎙

About
Advertise
Contact
Internship

Magazine
Elections
Latest
U.S. Policy

Corruption Index
Events
Podcast
Culture

Americas Quarterly (AQ) is the premier publication on politics, business, and culture in Latin America. We are an independent publication of the Americas Society/Council of the Americas, based in New York City. All Rights Reserved

**AS/COA**
PUBLISHED BY AMERICAS SOCIETY/
COUNCIL OF THE AMERICAS

680 Park Avenue
New York, NY 10065
Phone: (212) 249-8950

# EXHIBIT 35



Immigration

# Relatives and records cast doubt on Guantánamo migrants being 'worst of the worst'

Details on some of the migrants sent to Guantánamo Bay have begun to emerge. They are young Venezuelan men, and relatives say they have been falsely branded Tren de Aragua gang members.

February 16, 2025

🎧 15 min     ↗     🔖     💬 678



The first U.S. military aircraft to carry detained migrants to Guantánamo Bay in Cuba is boarded from an unspecified location on Feb. 4. (U.S. Department of Homeland Security/Reuters)



By Silvia Foster-Frau, Ana Vanessa Herrero and María Luisa Paúl

When the first flight of migrants arrived at Guantánamo Bay, Homeland Security Secretary Kristi L. Noem said they were "the worst of the worst." Defense Secretary Pete Hegseth called them "high-threat" criminals who had crossed the border to bring "violence and mayhem to our communities."

All were members of a Venezuelan gang called Tren de Aragua, the Trump

Document title: Relatives and records cast doubt on Guantanamo migrants being 'worst of the worst' - The Washington Post
Capture URL: https://www.washingtonpost.com/immigration/2025/02/16/trump-guantanamo-migrants-deportations-venezuela/
Capture timestamp (UTC): Fri, 21 Feb 2025 00:56:10 GMT

Defense Secretary Pete Hegseth called them "high-threat" criminals who had crossed the border to bring "violence and mayhem to our communities."

All were members of a Venezuelan gang called Tren de Aragua, the Trump administration said, invoking the name of a group the president mentions frequently to explain why a mass deportation is needed. Officials put them in a prison on the U.S. naval station in Cuba created for suspected terrorists after Sept. 11, 2001.

Little was known about the men when they were initially sent to Cuba. Human rights lawyers called Guantánamo a "legal black hole" and lambasted the U.S. government for not allowing them access to the migrants. But through photos released by DHS and accounts from family members, their names have begun to emerge.

In one of the images is a man with his head bent as a U.S. Immigration and Customs Enforcement officer holds the back of his collar. Relatives have identified him as Luis Alberto Castillo.



Holding tents at the naval station in Guantánamo Bay are seen on Feb. 6. (U.S. Navy/AFP/Getty Images)

In another photo, a bearded man stands in front of a plane and its unfurled ramp. Tilso Gómez's family says that is him. Nearby is a man with a head full of curly auburn hair. His father insists that is Mayfreed Durán.



Advertisement



Resilience is *reinvention.*

Energy is now.    rehlko

---

**Most Read Immigration** ›

1  Appeals court rejects Trump bid to ban birthright citizenship

2  Trump scales back Biden-era TPS extension for Haitian migrants

3  Guantánamo migrants have been flown from Cuba to Honduras, DHS says

4  Refugee aid groups struggling amid halt in federal payments under Trump

5  4.1 million migrants: Where they're from, where they live in the U.S.



5   4.1 million migrants: Where they're
from, where they live in the U.S.

Despite the impression given by Homeland Security officials and others, these
three men were taken into custody after crossing the southern border, according
to court records and family members — not during a targeted immigration
operation in a U.S. city or at a jail or prison while serving a sentence.

🌐 **Follow** World news                                                    +

The Washington Post could not find any violent federal criminal record for
Castillo and Gómez, while Durán was charged with assaulting, resisting or
impeding an officer during a riot at a detention center. An ICE official said that
the agency stands by its assertion that all the migrants aboard the initial flight to
Guantánamo are Tren de Aragua members. Their relatives firmly deny the
accusation.

ICE has now sent at least nine planes carrying migrants to Guantánamo. As of
Friday, 126 migrants were detained at the naval station, according to a Defense
Department official. Trump wants troops to prepare to house as many as 30,000
more.

The Post spoke with family members of six migrants whose relatives said they
have confirmed through photos and lawyers that their loved ones are being held
in Guantánamo. The stories of Castillo, Gómez and Durán, as well as Franyer
Montes, Diuvar Uzcátegui and José Daniel Simancas, share several similarities.
All involve men who fled Venezuela's economic and political crisis and were
detained immediately upon entering the United States, though one was later
released. Nearly all had tattoos that relatives said aroused the suspicion of U.S.
authorities. Families of two of the men said they believed their loved one had
been singled out because they were born in the Venezuelan state of Aragua.

Advertisement

Document title: Relatives and records cast doubt on Guantánamo migrants being 'worst of the worst' - The Washington Post
Capture URL: https://www.washingtonpost.com/immigration/2025/02/16/trump-guantanamo-migrants-deportations-venezuela/
Capture timestamp (UTC): Fri, 21 Feb 2025 00:56:10 GMT

(12 of 167), Page 12 of 167    Case: 25-2120, 04/04/2025, DktEntry: 3.6, Page 12 of 167
Case 3:25-cv-01766-EMC    Document 37-36    Filed 02/21/25    Page 5 of 16
The Washington Post
Democracy Dies in Darkness



Migrants are lined up before being flown to Guantánamo on Feb. 4. (U.S. Department of Homeland Security)

Tren de Aragua has aroused fears throughout the Americas. But experts in the criminal organization say the group has not established a strong foothold in the United States, where its members probably number only in the hundreds — a small fraction of the nearly 800,000 Venezuelans who live in the country. Three analysts who have studied the gang said tattoos are not linked with membership.

Advertisement

Three of the six families who spoke with The Post shared documents showing their relatives have no criminal record in Venezuela.

ICE said in a statement that tattoos were "one of many indicators" that an individual belongs to the gang. The agency did not answer a question regarding how many Tren de Aragua members there are among all the Guantánamo detainees. A DHS official did not respond to a request for details on how it identifies who belongs to the gang.

Families in Venezuela described regular calls with loved ones in detention centers before a sudden silence. They checked ICE's online registry to see an update that their family member was in Florida, with a link to call the detention center — a pattern for those taken to Guantánamo. A WhatsApp group for parents, spouses and siblings of Guantánamo detainees continues to grow.

Advertisement

Advertisement

**Most Read** ›



**Most Read** ›

1  Trump expected to take control of USPS, fire postal board, officials say

2  **Analysis** Aaron Blake
   Trump's honeymoon is over

3  Trump comes close to the red line of openly defying judges, experts say

4  Republicans caught between Trump and farmers pleading for frozen funds

5  **Opinion** Editorial Board
   Musk's mass firings are already backfiring

In one of their last calls together, Mayfreed Durán, 21, told his father that ICE was claiming he had ties to Tren de Aragua. Michel Durán said his son had been detained since crossing the border in 2023. After a year and a half in detention, Mayfreed told his father, he had agreed to sign deportation papers to return to Venezuela. The Trump administration had reached an agreement with the Venezuelan government to resume flights.

Days later, Durán had not heard from his son. Then he saw his signature tuft of curly hair in a Homeland Security photo. Mayfreed was in Guantánamo.

"I can't live in peace thinking about my little boy living there," Michel Durán said. "It's not right. I know my son is a clean man, that he is not a criminal like they said he was."

## A gang from Aragua

Unlike the Latin American crime groups that formed on the streets, Tren de Aragua was born inside one of Venezuela's most infamous penitentiaries in the state of Aragua. Crime bosses within the prison began running kidnapping, drug trafficking and extortion networks from behind bars, while small street gangs outside consolidated and the two began to merge.

Advertisement

By 2014, Tren de Aragua had grown from a prison-based organization to a national criminal syndicate. In 2017, Venezuela's economic and political collapse sparked a massive exodus of people — and presented the gang with a new and highly profitable opportunity: infiltrating migration routes.

Today, it is an "ethereal, elusive and loose" network primarily involved in migrant trafficking, said Elizabeth Dickinson, a senior analyst at the International Crisis Group think tank. The gang has a foothold in South



**CRM**
/,siːarˈem/ abbr.

Customer relationship magic.

*Attio*

**Join the world's leading startups and build your dream CRM.**

Attio          Sign up

Today, it is an "ethereal, elusive and loose" network primarily involved in migrant trafficking, said Elizabeth Dickinson, a senior analyst at the International Crisis Group think tank. The gang has a foothold in South America, particularly in Peru, Ecuador and Chile, where it profits from smuggling and extortion. It has built its empire in part by preying on those fleeing Venezuela's crises.

But Ronna Rísquez, an investigative journalist and expert on organized crime in Latin America, said TDA has faced several obstacles in establishing itself in the United States, including a language barrier, competition from stronger criminal organizations and ongoing arrests by law enforcement.

"The U.S. already has well-established mafia structures, cartels and other groups that have been operating here for decades," she said. "The Tren de Aragua is not going to just take over."



CRM
/sɪ.ɑr ˈɛm/ abbr.

Customer relationship magic.

𝒶 attio

Join the world's leading startups and build your dream CRM.

𝒶 Attio                          Sign up

Nonetheless, Trump seized on the narrative that Tren de Aragua is wreaking havoc to U.S. cities throughout his campaign following several high-profile crimes involving Venezuelan migrants. Multiple studies show Venezuelan migrants are rarely involved in crimes, but those incidents quickly gained widespread attention.

Advertisement

"The Venezuelan gangs are the worst in the world — they're vicious, violent people," Trump said in his first TV network interview after winning the



"The Venezuelan gangs are the worst in the world — they're vicious, violent people," Trump said in his first TV network interview after winning the election. "They're literally taking over apartment complexes and doing it with impunity."

In recent weeks, ICE has shared images of agents arresting people it describes as TDA members. Noem told Fox News in late January that authorities had arrested a "one of the ringleaders of TDA" who had "just been a part of a gun weapons exchange and was trying to buy grenades." The secretary also mentioned the gang in explaining why the Trump administration had removed temporary protective status for hundreds of thousands of Venezuelans.

"The people of this country want these dirtbags out," Noem said.

## 'A lie'

In early February, detained migrants began calling family members. They were being transferred, they said. But many didn't know where, or when, or why.

Advertisement

Durán called his father. Luis Alberto Castillo called his wife.

"He was very nervous and sad and started to cry," said Leidy Calle, Castillo's wife. "I cried, I told him that he should trust God and that he should leave everything in God's hands."

family members spoke to The Post had taken the dangerous journey from Venezuela to the U.S.-Mexico border. They were driven by a desire for a better life, their relatives said, and had goals of opening their own businesses and providing for their families.

One of them was Diuvar Uzcátegui. He grew up in Santa Rita, Aragua — the birthplace of Hector Rusthenford Guerrero Flores, known as "Niño



Luis Alberto Castillo. (Courtesy of Leidy Calle)

Guerrero," the Tren de Aragua boss who built the prison gang into a transnational empire.

By day, the Santa Rita streets filled with the sounds of motorbikes, old men at corner stores sipping malta and children kicking soccer balls. By night, the town changed. Parents told their kids to be home by 9. The wrong kind of people lurked in the shadows — the kind who had turned the city into something else, something dangerous.

Advertisement

Uzcátegui and his best friend, Kevin, hoped to get out of the town to make something bigger of their lives. Kevin spoke to The Post on the condition of partial anonymity because he is also a Venezuelan immigrant and fears he could be targeted for deportation.

Uzcátegui went first. He initially crossed the border and surrendered to U.S. authorities in October 2023, but he was sent back to Mexico. He tried again in December that year. This time, ICE held him in a detention center for six months and then released him with instructions to check in weekly, then monthly. He applied for asylum and began working long hours in El Paso to send money back to his daughter.

"Hermano, estoy viviendo el sueño americano," Uzcátegui told Kevin in January. *I'm living the American Dream.*

Document title: Relatives and records cast doubt on Guantánamo migrants being 'worst of the worst' - The Washington Post
Capture URL: https://www.washingtonpost.com/immigration/2025/02/16/trump-guantanamo-migrants-deportations-venezuela/
Capture timestamp (UTC): Fri, 21 Feb 2025 00:56:10 GMT

months and then released him with instructions to check in weekly, then monthly. He applied for asylum and began working long hours in El Paso to send money back to his daughter.

"Hermano, estoy viviendo el sueño americano," Uzcátegui told Kevin in January. *I'm living the American Dream.*

That was the last time Kevin heard from him.



**Join the world's leading startups and build your dream CRM.**

Attio                                    Sign up

Advertisement

On Jan. 28, ICE agents showed up at Uzcátegui's workplace. His girlfriend said the agents told him that he'd missed a check-in. She said he never missed an appointment and thought he'd be quickly released. Instead, a few days later, ICE put out the news that it had arrested three Venezuelan nationals "including two known Tren de Aragua associates."

One of them was Uzcátegui.

It didn't make sense, Kevin said. Uzcátegui's girlfriend didn't understand it, either. The Post could not locate any records in civil or criminal courts in El Paso with his name. His friends and family wondered if immigration agents had focused on Uzcátegui's tattoos — one of a panther on his hand, another a red rose on his wrist. Maybe that was enough. Maybe coming from Santa Rita, Aragua, was enough.

"We ran from that life," Kevin said. "We ran so far. And now they're saying he's one of them? That's a lie."

## A Bible and tattoos

For ICE, tattoos have long been viewed as potential signs of gang affiliation. The practice was applied and criticized during the rise in the United States of MS-13, a gang that more commonly uses tattoos as a form of identification. But the government response also led to arrests in which family members disputed the migrants' ties to the gang.

Several experts told The Post that the practice is even more concerning when attempting to identify members of Tren de Aragua, which does not even use

the migrants' ties to the gang.

Several experts told The Post that the practice is even more concerning when attempting to identify members of Tren de Aragua, which does not even use tattoos to signal membership.

Tattoos are also the norm for many Venezuelan youths. Narcoculture — a style where people wear symbols that are sometimes used by gangs — has also become popularized in recent years, said Pablo Zeballos, a Chile-based expert on organized crime.

"Tattoos are greatly meaningless unless they are combined with other factors, like prison history or known criminal associations," he said.

In 2017, ICE put out a statement outlining how it confirmed gang membership: if migrants admitted they were in a gang; if they were convicted of a crime or civil offense for gang-related activity; or if they met "certain other criteria such as having tattoos identifying a specific gang or being identified as a gang member by a reliable source."

Bill Hing, a professor of law and migration studies at the University of San Francisco who has represented migrants accused of gang affiliation, said it "usually doesn't take much more than a tattoo."



CRM
/si. ar 'em/ abbr.

Customer
relationship
magic.

attio

Join the world's leading startups and build your dream CRM.

Attio    Sign up

"If they [ICE] have some suspicion, then they will take that person into custody. That doesn't mean they will prevail in front of an immigration judge with that allegation," Hing said. "But if that person is undocumented, that person will get deported anyway."

All six of the migrants in this story had tattoos, their family members said. Five of them expressed concerns that their tattoos were what led to the government's suspicion of the migrants' ties to Tren de Aragua.

On Jan. 19, Castillo, his wife and her 9-year-old son showed up for the appointment they had secured through the Biden administration's CBP One app to plead their case to be allowed into the United States.

All six of the migrants in this story had tattoos, their family members said. Five of them expressed concerns that their tattoos were what led to the government's suspicion of the migrants' ties to Tren de Aragua.

On Jan. 19, Castillo, his wife and her 9-year-old son showed up for the appointment they had secured through the Biden administration's CBP One app to plead their case to be allowed into the United States.

Authorities asked the family for their IDs and stamped their fingerprints. Then, officers began asking Castillo about his tattoos, his wife said. He told them he'd gotten them in his youth. After that, she said, they were separated.

"The police officer no longer let him sit next to us," Calle, his wife, said. Castillo had brought a Bible, and she said officers "told him to start praying because he was from the Tren de Aragua. They made fun of him."

He was separated from his wife and child then. They haven't seen him since.

Two weeks later, an image of him appeared in Homeland Security photos touting their first migrant flight to Guantánamo. His head was bent over as he stood on the tarmac, his tattoo of basketball player Michael Jordan visible on his neck.

## 'American nightmare'

Kevin remembers Uzcátegui as a man whom he'd spent endless afternoons with playing soccer. The friend who turned everything into a joke, who didn't drink and who loved his young daughter "more than anything in the world," Kevin said.

When he saw that his friend was on a list of Guantánamo detainees published by the New York Times, he was in shock.

"I was like, 'Diuvar? A criminal?' I still can't believe it," Kevin said.

He thought back to Uzcátegui's ambitions and his friend's words about his life in Texas: *He was living in the America Dream.*

"American Dream?" Kevin said. "More like American nightmare."

Michel Durán said he similarly can't square the image of his son with that of a hardened Tren de Aragua gang member. He said his son had often criticized his father for drinking beer and smoking.

"He would say 'Ay, papi, that's bad for you,'" he recalled.

Frustrated by Venezuela's



**Join the world's leading startups and build your dream CRM.**

Attio                          Sign up

"He would say 'Ay, papi, that's bad for you,'" he recalled.



Frustrated by Venezuela's deteriorating economy, Michel Durán said his son decided to go to the United States, where he hoped he would open a business and send money back to his family.

He attempted to enter the United States twice and was sent back to Mexico both times. After that, he decided to wait for his CBP One appointment.

It was set for July 7, 2023 — two days after his birthday.

"He said this was the best present he could have gotten," Michel Durán said.

Diuvar Uzcátegui in El Paso. (Obtained by The Post)

His son was detained in El Paso after arriving for his appointment. A few months later, he was part of a hunger strike, his father said. A criminal complaint of the incident states that Durán approached an officer who was trying to restrain another detainee and that a fight ensued.

Michel Durán said his son told him officers had begun to punch a detainee, and that Mayfreed intervened to try to separate them.

"He pushed one of the police so they would stop hitting him," the father said, adding that the officer had sprained or fractured an ankle. "He said he didn't have anything to do with it — he just tried to separate the police so they wouldn't keep punching him."

Michel Durán said the Trump administration should investigate "who are the real delinquents, and who aren't."

"Why are they sending innocent immigrants to those prisons like they're animals?" he said. "They're human beings."

*Ana Herrero reported from Venezuela. Samantha Schmidt, Razzan Nakhlawi and Alice Crites contributed to this report.*

### 4.1 million migrants

The Washington Post analyzed more than 4.1 million U.S. immigration court records from



CRM
/si. ar 'em/ abbr.

Customer relationship magic.

𝒂 attio

**Join the world's leading startups and build your dream CRM.**

◢ Attio      Sign up

## 4.1 million migrants



The Washington Post analyzed more than 4.1 million U.S. immigration court records from the past decade to find out where migrants come from and where they live once they arrive in the country.



CRM
/si: ar 'em/ *abbr.*

Customer relationship magic.

⌀ attio

Join the world's leading startups and build your dream CRM.

⌀ Attio          Sign up

🔗 Share          💬 678 Comments

---

### More On Immigration                    ⚫ HAND CURATED



Deportation at 'light speed': How Trump's crackdown could unfold

January 16, 2025



Federal judge temporarily blocks Trump's birthright citizenship order

January 23, 2025



4.1 million migrants: Where they're from, where they live in the U.S.

June 26, 2024

View 3 more stories ⌄

---



**By Silvia Foster-Frau**
Silvia Foster-Frau is a national investigative reporter for The Washington Post covering immigration. 𝕏 @SilviaElenaFF



**By Ana Vanessa Herrero**
Ana Vanessa Herrero is a reporter covering South America and the Caribbean, focused on politics, human rights and investigative journalism. 𝕏 @AnaVHerrero



**By Maria Luisa Paúl**
Maria Luisa Paúl is a reporter on The Washington Post's Morning Mix team. She joined The Post as an intern on the General Assignment desk and has previously reported at the Miami Herald and el Nuevo Herald. 𝕏 @marialuisapaulr

---

### More For You ›

**Guantánamo migrants have been flown from Cuba to Honduras, DHS says**

Today at 5:26 p.m. EST



**Analysis** Glenn Kessler

**Trump's flood of false claims about Ukraine**

Today at 8:00 a.m. EST



**Refugee aid groups struggling amid halt in federal payments under Trump**

Today at 7:22 p.m. EST



Document title: Relatives and records cast doubt on Guantánamo migrants being 'worst of the worst' - The Washington Post
Capture URL: https://www.washingtonpost.com/immigration/2025/02/16/trump-guantanamo-migrants-deportations-venezuela/
Capture timestamp (UTC): Fri, 21 Feb 2025 00:56:10 GMT

01068

Page 13 of 15

### Refugee aid groups struggling amid halt in federal payments under Trump

Today at 7:22 p.m. EST



### Trump scales back Biden-era TPS extension for Haitian migrants

Today at 5:33 p.m. EST



### How every senator voted on Kash Patel for FBI director

Today at 3:20 p.m. EST

 



NEWSLETTER   DAILY

**Today's Headlines**

The most important news stories of the day, curated by Post editors, delivered every morning.

Sign up

**PAID PROMOTED STORIES**



If You're Over 65, Try This Instead of Gutter Cleaning (It's Genius)

LeafFilter Partner

AD


Sign up


**Join the world's leading startups and build your dream CRM.**
Attio
Sign up

**PAID PROMOTED STORIES**



If You're over 65, Try This Instead of Gutter Cleaning (It's Genius)

LeafFilter Partner

## The Washington Post

**Company**
About The Post
Newsroom Policies & Standards
Diversity & Inclusion
Careers
Media & Community Relations
WP Creative Group
Accessibility Statement

**Sections**
Trending
Politics
Elections
Opinions
National
World
Style
Sports
Business
Climate
Well+Being
D.C., Md., & Va.
Obituaries
Weather
Arts & Entertainments
Recipes

**Get The Post**
Manage Your Subscription
Gift Subscriptions
Newsletters & Alerts
Washington Post Live
Reprints & Permissions
Post Store
Books & E-Books
Print Special Editions Store
Print Archives (Subscribers Only)
Today's Paper
Public Notices

**Contact Us**
Contact the Newsroom
Contact Customer Care
Contact the Opinions Team
Advertise
Licensing & Syndication
Request a Correction
Send a News Tip
Report a Vulnerability

**Terms of Use**
Digital Products Terms of Sale
Print Products Terms of Sale
Terms of Service
Privacy Policy
Cookie Settings
Submissions & Discussion Policy
RSS Terms of Service
Sitemap
Ad Choices
CA Notice of Collection
Your Privacy Choices

washingtonpost.com © 1996-2025 The Washington Post

1  YAAKOV M. ROTH
   Acting Assistant Attorney General
2  Civil Division
   SARAH L. VUONG (CA Bar 258528)
3  Assistant Director
   WILLIAM H. WEILAND (Mass. Bar 661433)
4  Senior Litigation Counsel
   ERIC SNYDERMAN (VA Bar 99563)
5  ANNA DICHTER (NJ Bar 304442019)
6  LAUREN BRYANT (NY Bar No. 5321880)
   CATHERINE ROSS (DC Bar 9007404)
7  LUZ MARIA RESTREPO (NY Bar 4907077)
   Trial Attorneys
8  U.S. Department of Justice, Civil Division
   Office of Immigration Litigation
9  General Litigation and Appeals Section
   P.O. Box 868, Ben Franklin Station
10 Washington, DC 20044
11
12 Attorneys for Defendants

13                 UNITED STATES DISTRICT COURT

14               NORTHERN DISTRICT OF CALIFORNIA

15                    SAN FRANCISCO DIVISION

16
17 NATIONAL TPS ALLIANCE, *et. al.*,

                                          Case No. 3:25-cv-1766-EMC
18                     Plaintiff,
          v.
19                                        **DEFENDANTS' RESPONSE IN OPPOSITION**
   KRISTI NOEM, in her official capacity as   **TO PLAINTIFFS' MOTION TO POSTPONE**
   Secretary of Homeland Security, *et. al.*,  **EFFECTIVE DATE OF AGENCY ACTION**
20
21                     Defendants.         Judge: Hon. Edward M. Chen
22                                         Date:  March 24, 2025
                                           Time:  9:00 a.m.
23                                         Place: Courtroom 5, 17th Floor, San
                                                  Francisco U.S. Courthouse
24
25
26
27
28 Defendants' Opp. To Plaintiffs' Mot. to Postpone
   3:25-cv-1766-EMC

**<u>TABLE OF CONTENTS</u>**

INTRODUCTION ..................................................................................................................1

BACKGROUND ..................................................................................................................3

    A.    Statutory Background ...........................................................................3

    B.    Factual Background ..............................................................................5

STANDARDS OF REVIEW ...............................................................................................7

ARGUMENT .......................................................................................................................7

I.      THIS COURT LACKS JURISDICTION TO GRANT PLAINTIFFS THE RELIEF
      THEY SEEK ............................................................................................................7

    A.    Section 1252(f) Precludes Plaintiffs' Requested Relief..........................7

    B.    The TPS Statute Bars Plaintiffs' Claims .............................................11

II.    PLAINTIFFS HAVE FAILED TO DEMONSTRATE A LIKELIHOOD OF
      SUCCESS ON THE MERITS ................................................................................13

    A.    The Secretary of Homeland Security May Vacate a Prior Extension of a
          Country's TPS Designation ...............................................................13

    B.    The Secretary's Determinations to Vacate and Terminate the TPS Designation
          for Venezuela Did Not Violate the Fifth Amendment Because the Determinations
          were Related to Immigration Policy Objectives and Not Motivated by Racial
          Animus................................................................................................17

III.   ANY HARM PLAINTIFFS MAY SUFFER IS BASED ON THE INHERENT
      NATURE OF THE TPS STATUTE......................................................................22

IV.   THE BALANCE OF THE EQUITIES AND PUBLIC INTEREST WEIGH
      AGAINST PRELIMINARY INJUNCTIVE RELIEF ..........................................24

V.    PLAINTIFFS' REQUESTED RELIEF IS OVERBROAD........................................25

CONCLUSION..................................................................................................................25

# TABLE OF AUTHORITIES

## CASES

Page(s)

*Albertson v. FCC*,
182 F.2d 397 (D.C. Cir. 2014) ................................................................ 14

*Ali v. Fed. Bureau of Prisons*,
552 U.S. 214 (2008) .............................................................................. 12

*All. For the Wild Rockies v. Cottrell*,
632 F.3d 1127 (9th Cir. 2011) .............................................................. 24

*Amgen, Inc. v. Smith*,
357 F.3d 103 (D.C. Cir. 2004) .............................................................. 11

*Arizona v. United States*,
567 U.S. 387 (2012) .............................................................................. 25

*Babb v. Wilkie*,
589 U. S. 399 (2020) ............................................................................. 12

*Biden v. Texas*,
597 U.S. 785 (2022) ................................................................................ 8

*Cal. Tow Truck Ass'n v. City & County of San Francisco*,
807 F.3d 1008 (9th Cir. 2015) .............................................................. 12

*California v. Texas*,
593 U.S. 659 (2021) .............................................................................. 25

*California v. Yamasaki*,
442 U.S. 682 (1979) ................................................................................ 3

*Ctr. for Biological Diversity v. Regan*,
507 F. Supp. 3d 173 (D.D.C. 2022) ..................................................... 10

*Dan's City Used Cars, Inc. v. Pelkey*,
569 U.S. 251 (2013) .............................................................................. 12

*Dep't of Homeland Sec. v. Regents of the Univ. of Cal.*,
591 U.S. 1 (2020) .................................................................................. 19

*DHS v. New York*,
140 S. Ct. 599 (2020) ............................................................................ 25

Defendants' Opp. To Plaintiffs' Mot. to Postpone
3:25-cv-1766-EMC

*DHX Inc. v. Allianz AGF MAT, Ltd.*,
   425 F.3d 1169 (9th Cir. 2005) ........................................................................... 12

*Dollar Rent A Car of Washington, Inc. v. Travelers Indem. Co.*,
   774 F.2d 1371 (9th Cir. 1985) ........................................................................... 22

*Durning v. Citibank, N.A.*,
   950 F.2d 1419 (9th Cir. 1991) ........................................................................... 12

*Fiallo v. Bell*,
   430 U.S. 787 (1977) ............................................................................................ 18

*Florida v. Mayorkas*,
   2023 WL 3567851 (N.D. Fla. May 16, 2023) .................................................. 10

*Galvan v. Press*,
   347 U.S. 522 (1954) ............................................................................................ 18

*Galvez v. Jaddou*,
   52 F.4th 821 (9th Cir. 2022) ................................................................................ 8

*Garland v. Aleman Gonzalez*,
   596 U.S. 543 (2022) .......................................................................................... 8, 9

*Gill v. Whitford*,
   138 S. Ct. 1916 (2018) ....................................................................................... 25

*Gun South, Inc. v. Brady*,
   877 F.2d 858 (11th Cir. 1989) ........................................................................... 14

*Harisiades v. Shaughnessy*,
   342 U.S. 580 (1952) ...................................................................................... 15, 18

*Kelch v. Dir., Nev. Dep't of Prisons*,
   10 F.3d 684 (9th Cir. 1993) ............................................................................... 14

*Kleindienst v. Mandel*,
   408 U.S. 753 (1972) ............................................................................................ 18

*L.A. Lakers, Inc. v. Fed. Ins. Co.*,
   869 F.3d 795 (9th Cir. 2017) ............................................................................. 13

*Lamar, Archer & Cofrin, Llp v. Appling*,
   584 U.S. 709 (2018) ........................................................................................... 12

Defendants' Opp. To Plaintiffs' Mot. to Postpone
3:25-cv-1766-EMC

*Last Best Beef, LLC v. Dudas*,
  506 F.3d 333 (4th Cir. 2007) .................................................................................... 14

*Lewis v. Casey*,
  518 U.S. 343 (1996) ................................................................................................. 25

*Lopez v. Brewer*,
  680 F.3d 1068 (9th Cir. 2012) .................................................................................... 7

*Macktal v. Chao*,
  286 F.3d 822 (5th Cir. 2002) ................................................................................... 14

*Mathews v. Diaz*,
  426 U.S. 67 (1976) .................................................................................................. 18

*Mazaleski v. Treusdell*,
  562 F.2d 701 (D.C. Cir. 1977) ........................................................................... 14, 16

*McNary v. Haitian Refugee Center, Inc.*,
  498 U.S. 479 (1991) ................................................................................................ 12

*Ne. Ohio Coal. for Homeless & Serv. Emps. Int'l Union, Loc. 1199 v. Blackwell*,
  467 F.3d 999 (6th Cir. 2006) .............................................................................. 10, 11

*Nixon v. Fitzgerald*,
  457 U.S. 731 (1982) ................................................................................................ 22

*Nken v. Holder*,
  556 U.S 418 (2009) ................................................................................................. 24

*Off. of Pers. Mgmt. v. Am. Fed'n of Gov't Emps., AFL-CIO*,
  473 U.S. 1301 (1985) .............................................................................................. 11

*Patel v. Garland*,
  596 U.S. 328 (2022) ........................................................................................... 12, 13

*Poursina v. USCIS*,
  936 F.3d 868 (9th Cir. 2019) .................................................................................. 16

*Ramos v. Wolf*,
  975 F.3d 872 (9th Cir. 2020) ........................................................................ 12, *passim*

*Ramos v. Wolf*,
  59 F.4th 1010 (9th Cir. 2023) ................................................................................. 12

*Reno v. Catholic Soc. Servs., Inc.*,
  509 U.S. 43 (1993) .................................................................................................. 12

Defendants' Opp. To Plaintiffs' Mot. to Postpone
3:25-cv-1766-EMC

*Richards v. United States*,
  369 U.S. 1 (1962)........................................................................................... 13

*Safety-Kleen Corp. v. EPA*,
  1996 U.S. App. LEXIS 2324 (D.C. Cir. Jan. 19, 1996)..................................... 10

*S. Yuba River Citizens League v. Nat'l Marine Fisheries Serv.*,
  804 F. Supp. 2d 1045 (E.D. Cal. 2011)........................................................ 22, 23

*Sampson v. Murray*,
  415 U.S. 61 (1974)........................................................................................ 7, 9

*Sanchez v. Mayorkas*,
  593 U.S. 409 (2021)........................................................................................... 4

*Schrill v. Plunkett*,
  760 F. Supp. 1378 (D. Or. 1990) ...................................................................... 23

*Scripps-Howard Radio v. FCC*,
  316 U.S. 4 (1942)............................................................................................... 9

*Sorenson v. Sec'y of Treasury*,
  475 U.S. 851 (1986)......................................................................................... 10

*Stanley v. Illinois*,
  405 U.S. 645 (1972)......................................................................................... 23

*State v. U.S. Bureau of Land Mgmt.*,
  277 F. Supp. 3d 1106 (N.D. Cal. 2017) ........................................................... 10

*Taiebat v. Scialabba*,
  2017 WL 747460 (N.D. Cal. Feb. 27, 2017) .................................................... 23

*Trump v. Hawaii*,
  585 U.S. 667 (2018)................................................................................ 3, 16, 17

*United States R.R. Retirement Bd. v. Fritz*,
  449 U.S. 166 (1980)......................................................................................... 19

*United States v. Nixon*,
  418 U.S. 683 (1974)......................................................................................... 22

*Village of Arlington Heights v. Metro. Hous. Dev. Corp.*,
  429 U.S. 252 (1977)............................................................................. 3, 17, 19, 21

*Washington v. Trump*,
  847 F.3d 1151 (9th Cir. 2017) ......................................................................... 23

Defendants' Opp. To Plaintiffs' Mot. to Postpone
3:25-cv-1766-EMC

*Webster v. Doe*,
    486 U.S. 592 (1988) .................................................................................................... 17

*Winter v. NRDC*,
    555 U.S. 7 (2008) ........................................................................................................ 7

*Youngstown Sheet and Tube Co. v. Sawyer*,
    343 U.S. 579 (1952) .................................................................................................. 15

## **STATUTES**

5 U.S.C. § 701(a)(1) ........................................................................................................ 11

5 U.S.C. § 705 ..................................................................................................... 1, *passim*

6 U.S.C. § 202 ......................................................................................................... 13, 15

6 U.S.C. § 557 .................................................................................................................. 4

8 U.S.C. § 1103 ............................................................................................................... 4

8 U.S.C. § 1103(a) ..................................................................................................... 6, 13

8 U.S.C. § 1103(a)(1) .................................................................................................... 15

8 U.S.C. § 1103(a)(3) .................................................................................................... 15

8 U.S.C. § 1252(f) ...................................................................................................... 2, 9

8 U.S.C. § 1252(f)(1) .......................................................................................... 2, *passim*

8 U.S.C. § 1254a ............................................................................................ 2, 3, 7, 8, 19

8 U.S.C. § 1254a(a) ......................................................................................................... 4

8 U.S.C. § 1254a(b) .................................................................................................... 1, 4

8 U.S.C. § 1254a(b)(1)(B)(i) ........................................................................................ 22

8 U.S.C. § 1254a(b)(1)(B)(ii) ....................................................................................... 22

8 U.S.C. § 1254a(b)(1)(C) ................................................................................ 1, 13, 16, 21

8 U.S.C. § 1254a(b)(2) .................................................................................................... 4

8 U.S.C. § 1254a(b)(2)(B) ............................................................................................ 23

Defendants' Opp. To Plaintiffs' Mot. to Postpone
3:25-cv-1766-EMC

8 U.S.C. § 1254a(b)(3) ........................................................................................................... 6

8 U.S.C. § 1254a(b)(3)(A) ............................................................................................ 4, 14, 15

8 U.S.C. § 1254a(b)(3)(B) ...................................................................................................... 5

8 U.S.C. § 1254a(b)(3)(C) ...................................................................................................... 5

8 U.S.C. § 1254a(b)(5)(A) ............................................................................................. 1, *passim*

8 U.S.C. § 1254a(g) ............................................................................................................... 22

**Illegal Immigration Reform and Immigrant Responsibility Act of 1996 (IIRIRA):**
Pub. L. No. 104-208, 110 Stat. 3009-546

Section § 306 ......................................................................................................................... 8

Section § 308 ......................................................................................................................... 8

## <u>OTHER AUTHORITIES</u>

### **Federal Register Notices**

*Designation of Venezuela for Temporary Protected Status and Implementation of Emp. Authorization for Venezuelans Covered by Deferred Enforced Departure*, 86 Fed. Reg. 13,574 (Mar. 9, 2021) ............... 5

*Exec. Order No. 14159, Protecting the American People Against Invasion, § 16(b)*, 90 Fed. Reg. 8443 (Jan. 20, 2025) .............................................................................. 17, 24

*Extension and Redesignation of Venezuela for Temporary Protected Status*, 88 Fed. Reg. 68,130 (Oct. 3, 2023) ................................................................. 2, 5, 14, 15

*Extension and Redesignation of Venezuela for Temporary Protected Status*, 87 Fed. Reg. 55,024 (Sept. 8, 2022) ......................................................................... 5, 14

*Extension of the 2023 Designation of Venezuela for Temporary Protected Status*, 90 Fed. Reg. 5961 (Jan. 17, 2025) ................................................................... 5, 14, 15

*Reconsideration and Rescission of Termination of the Designation of El Salvador for Temporary Protected Status; Extension of the Temporary Protected Status Designation for El Salvador*, 88 Fed. Reg. 40,282 (June 21, 2023) ............................................................................... 6

*Termination of the October 3, 2023 Designation of Venezuela for Temporary Protected Status*, 90 Fed. Reg. 9040 (Feb. 5, 2025) ............................................................................ 1, *passim*

Defendants' Opp. To Plaintiffs' Mot. to Postpone
3:25-cv-1766-EMC

*Vacatur of 2025 Temporary Protected Status Decision for Venezuela*,
    90 Fed. Reg. 8805 (Feb. 3, 2025) ............................................................................ 2, *passim*

**Dictionaries**

Black's Law Dictionary (12th ed. 2024).................................................................................. 8

Black's Law Dictionary Online (2d ed.)
    https://thelawdictionary.org ........................................................................................ 10

Merriam-Webster Dictionary,
    https://www.merriam-webster.com/dictionary .................................................................. 10

Oxford English Dictionary (2d ed. 1989) ............................................................................. 8

Webster's Third New Int'l Dictionary.................................................................................. 12

Defendants' Opp. To Plaintiffs' Mot. to Postpone
3:25-cv-1766-EMC

**INTRODUCTION**

Defendants Kristi Noem, in her official capacity as Secretary of Homeland Security; the U.S. Department of Homeland Security (DHS); and the United States of America, respectfully submit this response in opposition to Plaintiffs' Motion to Postpone Effective Date of Agency Action.[1] (PI Mot.), ECF 16. In 1990, Congress created the Temporary Protected Status (TPS) program to provide, on a discretionary basis, temporary status to aliens who cannot safely return in the short-term to their home nation because of a natural disaster, armed conflict, or other "extraordinary and temporary conditions in the foreign state." 8 U.S.C. § 1254a(b). The Secretary of Homeland Security may designate a country for TPS only if the Secretary determines that certain statutory criteria justifying the designation are met. When a country is designated, eligible aliens from that country who are present in the United States on the effective date of the designation and register with the federal government are temporarily protected from removal and receive authorization to work in the United States. Consistent with the temporary nature of TPS, Congress dictated that the Secretary must regularly review a country's TPS designation and must terminate that designation if she determines that the conditions giving rise to the designation are no longer met. Congress further provided that "determinations" concerning TPS "with respect to the designation, or termination or extension of a designation, of a foreign state under this subsection" are not subject to "judicial review." 8 U.S.C. § 1254a(b)(5)(A).

Exercising her clear and unreviewable statutory authority, Secretary Noem terminated the TPS designation for Venezuela. *Termination of the October 3, 2023 Designation of Venezuela for Temporary Protected Status*, 90 Fed. Reg. 9040 (Feb. 5, 2025) (hereinafter "2025 Termination"). Venezuela was first designated in 2021 under 8 U.S.C. § 1254a(b)(1)(C) based on former Secretary Mayorkas's determination that there exist in Venezuela "extraordinary and temporary conditions" that prevent Venezuelan nationals from safely returning and that it is not "contrary to the national interest of the United States" to permit the aliens to remain temporarily in the United States. *Id.* at 9041. In 2023, former Secretary Mayorkas newly

---

[1] Plaintiffs style their Motion as one arising under 5 U.S.C. § 705 of the Administrative Procedure Act ("APA"), calling it a Motion to Postpone Effective Date of Agency Action. Yet Plaintiffs cite to the preliminary injunction standard throughout their Motion and effectively ask this Court for prohibited injunctive relief. Defendants will refer to Plaintiffs' Motion as a Preliminary Injunction Motion (PI Mot.).

Defendants' Opp. To Plaintiffs' Mot. to Postpone
3:25-cv-1766-EMC

1    designated Venezuela, creating a parallel designation with the original 2021 designation. *Extension and*

2    *Redesignation of Venezuela for Temporary Protected Status*, 88 Fed. Reg. 68,130 (Oct. 3, 2023)

3    (hereinafter "2023 Designation"). Consistent with her obligation to periodically review whether TPS

4    designations remain appropriate, Secretary Noem, after consulting with other government agencies,

5    determined that the conditions for the 2023 Designation of Venezuela for TPS no longer continue to be

6    met. The Secretary supplied the basis and justification for her determination in the Federal Register notice,

7    where she explained that it is contrary to the U.S. national interest to permit the Venezuelan nationals to

8    remain temporarily in the United States. *See 2025 Termination*, 90 Fed. Reg. at 9042-9044.

9         Notwithstanding the Secretary's clear authority and Congress's decision to commit her

10    determination to her discretion alone, Plaintiffs, the National TPS Alliance, "a member-led organization,"

11    and several TPS beneficiaries, bring this suit challenging the termination and asserting claims under the

12    APA and the Equal Protection Clause. Plaintiffs ask this court to postpone the effective date of Secretary

13    Noem's vacatur of a recently-published decision extending the 2023 designation for Venezuela, *Vacatur*

14    *of 2025 Temporary Protected Status Decision for Venezuela*, 90 Fed. Reg. 21, 8805 (Feb. 3, 2025)

15    (hereinafter "2025 Vacatur"), and the 2025 Termination of TPS for Venezuela. *2025 Termination*, 90 Fed.

16    Reg. at 9040. The Court should reject those extraordinary requests.

17         To start, the Court lacks jurisdiction to issue the requested relief. Although Plaintiffs style their

18    request for relief as a motion to postpone the effective date of the Secretary's determination under 5 U.S.C.

19    § 705, what they actually seek is an injunction enjoining the exercise of her authority. But 8 U.S.C.

20    § 1252(f)—a provision Plaintiffs tellingly ignore—explicitly bars such relief. Section 1252(f)(1) provides:

21    "Regardless of the nature of the action or claim or of the identity of the party or parties bringing the action,

22    no court (other than the Supreme Court) shall have jurisdiction or authority to *enjoin or restrain* the

23    operation of the provisions of part IV of this subchapter … other than with respect to the application of

24    such provisions to an individual alien against whom proceedings … have been initiated." 8 U.S.C.

25    § 1252(f)(1) (emphasis added). Section 1254a is on such a covered provision, and a stay "enjoin[ing] or

26    restrain[ing]" the Secretary's determination from having any legal effect is thus precisely the sort of

27    coercive order § 1252(f) prohibits.

28    Defendants' Opp. To Plaintiffs' Mot. to Postpone
3:25-cv-1766-EMC

Additionally, the TPS statute broadly prohibits judicial review of "any determination of the Secretary with respect to" designations, terminations, or extensions. 8 U.S.C. § 1254a(b)(5)(A). Each of the Secretary's decisions is precisely such a "determination" concerning "termination" of a designation under § 1254a. *Id.* Plaintiffs' claims challenging the basis for Secretary Noem's Vacatur and Termination decisions and seeking to set those decisions aside, fit squarely within the statute's bar on judicial review.

Plaintiffs' claims lack merit too. Plaintiffs' APA claims fail because Congress granted the Secretary broad discretion and authority to review TPS decisions pertaining to the continuing mandate that she ensure the continued designation of a country does not adversely affect the national interest. Plaintiffs' equal protection claim is equally unavailing. Plaintiffs fail to identify any evidence indicating that the Secretary was motivated by discriminatory animus. To the contrary, the evidence demonstrates that Secretary Noem's Vacatur and Termination decisions are immigration policies rationally related to government objectives of national security and are not motivated by racially discriminatory intent. And that is true, regardless of whether the Court applies the deferential standard recognized in *Trump v. Hawaii*, 585 U.S. 667 (2018), as applicable to such claims in the immigration context, or the balancing sometimes applied in other contexts set forth in *Village of Arlington Heights v. Metro. Hous. Dev. Corp.*, 429 U.S. 252 (1977).

Finally, in seeking a nationwide injunction, the scope of Plaintiffs' requested relief is vastly overbroad. The relief sought goes much further than redressing the injuries to the Plaintiffs and contravenes equitable principles that require relief to be no more burdensome to the defendant than is necessary to provide plaintiff relief. *California v. Yamasaki*, 442 U.S. 682, 702 (1979). Should the Court grant Plaintiffs' requested injunction-like "stay", it should be limited to the individual Plaintiffs.

## **BACKGROUND**

### **A.  Statutory Background**

The Immigration Act of 1990 established a program for providing temporary shelter in the United States on a discretionary basis for aliens from designated countries experiencing ongoing armed conflict, environmental disaster, or "extraordinary and temporary conditions" that temporarily prevent the aliens' safe return or, in the case of environmental disasters, temporarily render the country unable to handle

Defendants' Opp. To Plaintiffs' Mot. to Postpone
3:25-cv-1766-EMC

adequately the return of its nationals.  Pub. L. No. 101-649, 104 Stat. 4978. The statute authorizes the

Secretary of Homeland Security,[2] "after consultation with appropriate agencies of the Government," to

designate countries for "Temporary [P]rotected [S]tatus," if she finds:

> (A) … that there is an ongoing armed conflict within the state and, due to such conflict, requiring the return of aliens who are nationals of that state to that state (or to the part of the state) would pose a serious threat to their personal safety;
>
> (B) … that—
>
>> (i) there has been an earthquake, flood, drought, epidemic, or other environmental disaster in the state resulting in a substantial, but temporary, disruption of living conditions in the area affected,
>>
>> (ii) the foreign state is unable, temporarily, to handle adequately the return to the state of aliens who are nationals of the state, and
>>
>> (iii) the foreign state officially has requested designation under this subparagraph; or
>
> (C)  …  there exist extraordinary and temporary conditions in the foreign state that prevent aliens who are nationals of the state from returning to the state in safety, unless the [Secretary] finds that permitting the aliens to remain temporarily in the United States is contrary to the national interest of the United States.

8 U.S.C. § 1254a(b).

When the Secretary designates a country for TPS, eligible aliens who are granted TPS may not be

removed from the United States and are authorized to work for the duration of the country's TPS

designation, so long as they remain in valid temporary protected status. 8 U.S.C. § 1254a(a), (c); *see*

*Sanchez v. Mayorkas*, 593 U.S. 409, 412 (2021). Initial designations may not exceed eighteen months.

8 U.S.C. § 1254a(b)(2). The Secretary must consult with appropriate agencies and review each

designation before it ends to determine whether the conditions for the country's designation continue to

be met.  *Id.* § 1254a(b)(3)(A).  If the Secretary finds that the foreign state "no longer continues to meet

the conditions for designation," she "shall terminate the designation" by publishing notice in the Federal

---

[2] The statute originally vested the Attorney General with the power to make TPS designation, extension and termination decisions. Congress transferred these powers to the Secretary of Homeland Security. *See* 8 U.S.C. § 1103; 6 U.S.C. § 557.

Defendants' Opp. To Plaintiffs' Mot. to Postpone
3:25-cv-1766-EMC

1    Register of the determination and the basis for the termination. *Id.* § 1254a(b)(3)(B). If the Secretary

2    "does not determine" that the foreign state "no longer meets the conditions for designation," then "the

3    period of designation of the foreign state is extended for an additional period of 6 months (or, in the

4    discretion of the [Secretary], a period of 12 or 18 months)." *Id.* § 1254a(b)(3)(C).

5        Finally, the statute makes the Secretary's TPS determinations unreviewable. Section

6    1254a(b)(5)(A) states: "There is no judicial review of any determination of the [Secretary] with respect

7    to the designation, or termination or extension of a designation, of a foreign state under this subsection."

8    **B. Factual Background**

9        On March 9, 2021, then-Secretary of Homeland Security Alejandro Mayorkas designated

10   Venezuela for TPS based on extraordinary and temporary conditions that prevented nationals of

11   Venezuela from returning in safety. *See Designation of Venezuela for Temporary Protected Status and*

12   *Implementation of Emp. Authorization for Venezuelans Covered by Deferred Enforced Departure*, 86 Fed.

13   Reg. 13,574 (Mar. 9, 2021) (hereinafter "2021 Designation"). Following the 2021 Designation, former

14   Secretary Mayorkas extended Venezuela's TPS designation twice. *See Extension of the Designation of*

15   *Venezuela for Temp. Protected Status*, 87 Fed. Reg. 55,024 (Sept. 8, 2022); *see also 2023 Designation*,

16   88 Fed. Reg. 68,130.

17       On October 3, 2023, in addition to extending the 2021 Venezuela TPS status through September

18   2025, former Secretary Mayorkas redesignated Venezuela for TPS, effective from October 3, 2023,

19   through April 2, 2025. *2023 Designation*, 88 Fed. Reg. 68,130. This notice not only provided procedures

20   for initial applicants registering for TPS under the 2023 Designation but also allowed Venezuelan

21   nationals who had previously registered for TPS under the 2021 Designation to re-register for TPS and

22   apply to renew their Employment Authorization Document (EAD) with USCIS. *Id.* Finally, on January

23   10, 2025, former Secretary Mayorkas issued a notice extending the 2023 Designation for 18 months,

24   allowing a consolidation of filing processes such that all eligible Venezuela TPS beneficiaries (whether

25   under the 2021 or 2023 designations) could obtain TPS through October 2, 2026, and extend certain EADs.

26   *See Extension of the 2023 Designation of Venezuela for Temp. Protected Status*, 90 Fed. Reg. 5961 (Jan.

27   17, 2025) (hereinafter "2025 Extension").

28   Defendants' Opp. To Plaintiffs' Mot. to Postpone
     3:25-cv-1766-EMC

On January 28, 2025, Secretary Noem vacated the 2025 Extension, thereby restoring the status quo that preceded that decision. *See 2025 Vacatur*, 90 Fed. Reg. at 8805. In accordance with the Immigration and Nationality Act (INA) and the APA, Secretary Noem explained her reasoning for the Vacatur in the Federal Register Notice (FRN), stating that the 2025 Extension "did not acknowledge the novelty of its approach" or "explain how it is consistent with the TPS statute." *Id.* at 8807; *see* 8 U.S.C. § 1254a(b)(3). Secretary Noem determined that the "lack of clarity" warranted a vacatur to "untangle the confusion and provide an opportunity for informed determinations regarding the TPS designations and clear guidance." *Id.* In considering putative reliance interests, Secretary Noem provided that "Venezuela 2023 registrants will retain their temporary protected status under the pre-existing designation at least until April 2, 2025," and "[w]ith respect to any Venezuela 2021 registrants who elected, pursuant to the 2025 Extension, to register under the Venezuela 2023 designation, USCIS will restore their Venezuela 2021 registration." *Id.* This Vacatur is consistent with an agency's "statutorily implicit" authority to reconsider TPS-related determinations and upon reconsideration, to vacate or amend the determination. *See* 8 U.S.C. § 1103(a), 1254a(b)(3), (b)(5)(A); *see also Reconsideration and Rescission of Termination of the Designation of El Salvador for Temporary Protected Status; Extension of the Temporary Protected Status Designation for El Salvador*, 88 Fed. Reg. 40,282, 40,285 & n.16 (June 21, 2023) ("An agency has inherent (that is, statutorily implicit) authority to revisit its prior decisions unless Congress has expressly limited that authority. The TPS statute does not limit the Secretary's inherent authority to reconsider any TPS-related determination, and upon reconsideration, to change the determination." (citing cases)).

A determination whether to extend the 2023 Venezuela designation was due by February 1, 2025. After reviewing country conditions and consulting with the appropriate U.S. Government agencies, Secretary Noem determined that Venezuela no longer continues to meet the conditions for the 2023 Designation. *See 2025 Termination*, 90 Fed. Reg. at 9040. Specifically, Secretary Noem determined that "it is contrary to the national interest to permit the covered Venezuelan nationals to remain temporarily in the United States." *Id.* at 9041. Therefore, Secretary Noem terminated the 2023 Designation of Venezuela, effective April 7, 2025. *Id.* In making this determination, she examined DHS' review of country conditions, acknowledging that "there are notable improvements in several areas, such as the economy,

Defendants' Opp. To Plaintiffs' Mot. to Postpone
3:25-cv-1766-EMC

public health, and crime," that allow for Venezuelan nationals to be "safely returned to their home country." *Id*. On that basis, she concluded that termination of the 2023 Designation was "required," and further explained that "national interest is an expansive standard that may encompass an array of broad considerations" which "calls upon the Secretary's expertise and discretionary judgment." *Id*. at 9042. Secretary Noem explained that the significant population of TPS holders has resulted in "associated difficulties in local communities where local resources have been inadequate to meet the demands cause by increased numbers," and further underscored that, across the United States, "city shelters, police stations and aid services are at maximum capacity." *Id*. In considering national and immigration interests, she found that this population includes members of Tren de Aragua, a transnational criminal organization recently determined to "pos[e] threats to the United States." *Id*. at 9042-43. Secretary Noem also observed that "U.S. foreign policy interests, particularly in the Western Hemisphere, are best served and protected by curtailing policies that facilitate or encourage illegal and destabilizing migration." *Id*. at 9043.

### STANDARDS OF REVIEW

The standards of review for relief under 5 U.S.C. § 705 and for preliminary injunctions are the same. *See Sampson v. Murray*, 415 U.S. 61, 80 (1974). A preliminary injunction is "an extraordinary and drastic remedy, one that should not be granted unless the movant, by a clear showing, carries the burden of persuasion." *Lopez v. Brewer*, 680 F.3d 1068, 1072 (9th Cir. 2012). To get relief, a party must show "he is likely to succeed on the merits, that he is likely to suffer irreparable harm in the absence of preliminary relief, that the balance of equities tips in his favor, and that an injunction is in the public interest." *Winter v. NRDC*, 555 U.S. 7, 20 (2008).

### ARGUMENT

## I.  THIS COURT LACKS JURISDICTION TO GRANT PLAINTIFFS THE RELIEF THEY SEEK

### A.  Section 1252(f) Precludes Plaintiffs' Requested Relief

Here, the relief Plaintiffs seek would have the effect of enjoining or restraining DHS's implementation of the TPS provisions in section 244 of the INA, 8 U.S.C. § 1254a. But 8 U.S.C. § 1252(f)(1) explicitly bars such relief. It provides: "Regardless of the nature of the action or claim or of

Defendants' Opp. To Plaintiffs' Mot. to Postpone
3:25-cv-1766-EMC

7

the identity of the party or parties bringing the action, no court (other than the Supreme Court) shall have jurisdiction or authority to *enjoin or restrain* the operation of the provisions of part IV of this subchapter … other than with respect to the application of such provisions to an individual alien against whom proceedings … have been initiated." 8 U.S.C. § 1252(f)(1) (emphasis added). Section 1254a is one of the statutory provisions § 1252(f)(1) covers. Illegal Immigration Reform and Immigrant Responsibility Act of 1996 (IIRIRA), div. C, Pub. L. No. 104-208, §§ 306, 308, 110 Stat. 3009-546. Although in the U.S. Code, Section 1254a appears in Part V, the U.S. Code is inconsistent with the INA, wherein the TPS provisions in Section 244 appear in Chapter 4. *Id*. When there is a conflict, the INA prevails. *See Galvez v. Jaddou*, 52 F.4th 821, 830 (9th Cir. 2022) ("[T]he text of the United States Code 'cannot prevail over the Statutes at Large when the two are inconsistent.'"); *see also* Section 244 of the INA lies within chapter 4 of title II of the INA, as amended. Section 1252(f)(1) thus eliminates any court's (other than the Supreme Court's) authority to issue coercive orders enjoining or restraining implementation of 8 U.S.C. § 1254a.

By invoking 5 U.S.C. § 705 and asking this Court to "postpone the effective date of the challenged decisions[,]" Plaintiffs seek the type of coercive order prohibited by 8 U.S.C. § 1252(f)(1). Regardless of how Plaintiffs name their motion or frame their claims, their requested relief is barred. An order pursuant to 5 U.S.C. § 705 prevents – i.e. "enjoin[s] or restrain[s]" – DHS from implementing its determinations about the designation of Venezuela for TPS and is thus jurisdictionally barred under § 1252(f)(1). The Supreme Court has held that 8 U.S.C. § 1252(f)(1) "generally prohibits lower courts from entering injunctions that order federal officials to take or *to refrain from taking* actions to enforce, implement, or otherwise carry out the specified statutory provisions." *Biden v. Texas*, 597 U.S. 785, 797 (2022) (quoting *Garland v. Aleman Gonzalez*, 596 U.S. 543, 544 (2022)) (emphasis added); *see* Black's Law Dictionary (12th ed. 2024) (defining injunction as "[a] court order commanding or preventing an action"). As the Supreme Court held in *Aleman Gonzalez*, to "restrain" means to "check, hold back, or prevent (a person or thing) from some course of action," to "inhibit particular actions," or to "stop (or perhaps compel)" action. 596 U.S. at 549 (quoting 5 Oxford English Dictionary 756 (2d ed. 1989)). An order postponing the effective date of implementation or enforcement of the vacatur and termination determinations would necessarily constitute an order "restraining" federal officials. *Id*. at 550.

Defendants' Opp. To Plaintiffs' Mot. to Postpone
3:25-cv-1766-EMC

1       Plaintiffs' likely rejoinder is that stays differ from injunctions. But that argument relies on the

2   incorrect assumption that 5 U.S.C. § 705 creates a new form of remedy—a district court stay of agency

3   action that is distinct from an injunction. Section 705 does not, however, create any new remedies

4   beyond the traditional equitable relief that existed at the time of the APA's passage. *See Scripps-Howard*

5   *Radio v. FCC*, 316 U.S. 4, 16–17 (1942). When Congress adopted § 705, there is no evidence that it

6   intended to create a wholly new, never-before-seen species of remedy. Instead, Congress simply codified

7   existing equitable remedies. Section 705 allows a court to issue only that "process" that is "necessary

8   and appropriate." And the Supreme Court long ago concluded "[t]he relevant legislative history of that

9   section … indicates that it was primarily intended to reflect existing law" permitting courts of appeals

10  to stay certain agency actions pending direct review authorized by statute in the same manner that

11  appellate courts can in certain circumstances stay a district court decision pending appeal. *Sampson*, 415

12  U.S. at 68 n.15; *see Scripps-Howard Radio*, 316 U.S. at 9-10 ("a federal court can stay the *enforcement of*

13  *a judgment pending the outcome of an appeal*" (emphasis added)). Section 705 was not intended "to fashion

14  new rules of intervention for District Courts." *Id*. Thus, the text, context, legislative history, sources

15  contemporary to the APA's passage, and relevant case law all show 5 U.S.C. § 705 does nothing

16  more than preserve traditional equitable relief—relief that 8 U.S.C. § 1252(f)(1) bars.

17      Plaintiffs do not seek an order that would operate on the individual removal proceedings or

18  some other agency adjudication pending judicial review. Plaintiffs instead ask this Court to

19  "prevent" the government from implementing its chosen "course of action" with respect to 8 U.S.C.

20  § 1254a. *See Aleman Gonzalez*, 596 U.S. at 549, 551 (orders requiring government to "refrain from

21  actions that (again in the Government's view) are allowed" by covered provisions are barred by

22  § 1252(f)). Such an order, even if labeled a stay, is injunctive in effect and barred by 8 U.S.C.

23  § 1252(f)(1). Thus, Plaintiffs' stay request is no different from an injunction – an equivalence

24  underscored by the preliminary-injunction standard applying to it.

25      Even if 8 U.S.C. § 1252(f)(1) did not apply, 5 U.S.C. § 705 by its own terms does not authorize

26  relief here because the challenged actions have already taken effect. Courts construing 5 U.S.C. § 705

27  have concluded that the phrase "postpone the effective date" of an agency action authorizes the

28  Defendants' Opp. To Plaintiffs' Mot. to Postpone
3:25-cv-1766-EMC

1   "postpone[ment of] the effective date of *a not yet effective rule*, pending judicial review"—but not

2   suspension of a policy that is *already in effect. Ctr. for Biological Diversity v. Regan*, 507 F. Supp. 3d

3   173, 204 (D.D.C. 2022) (quoting *Safety-Kleen Corp. v. EPA*, Nos. 92-1629, 92-1639, 1996 U.S. App.

4   LEXIS 2324, at *2–3 (D.C. Cir. Jan. 19, 1996)) (emphasis added); *see also, e.g.*, *State v. U.S. Bureau of*

5   *Land Mgmt.*, 277 F. Supp. 3d 1106, 1118 (N.D. Cal. 2017) (same). While these cases address an agency

6   decision to "postpone the effective date," 5 U.S.C. § 705 uses identical language when referring to "the

7   reviewing court ... postpon[ing] the effective date of an agency action." The use of an identical phrase in

8   the first and second sentences of § 705 must be presumed to be intentional. *See, e.g.*, *Sorenson v. Sec'y of*

9   *Treasury*, 475 U.S. 851, 860 (1986) ("The normal rule of statutory construction assumes that identical

10  words used in different parts of the same act are intended to have the same meaning."). Given its plain

11  meaning, the language in 5 U.S.C. § 705 allowing a court or agency to "postpone the effective date" can

12  only be read to mean that the statute allows the court "to put off until a future time," "defer," or "delay"

13  the "operative" date of the agency action. *See* Merriam-Webster Dictionary, https://www.merriam-

14  webster.com/dictionary/effective (last visited Mar. 2, 2025); *see also* Black's Law Dictionary Online (2d

15  ed.), https://thelawdictionary.org/?s=postpone (last visited Mar. 3, 2025) (defining "postpone" as "to put

16  off; defer; delay; continue"). One cannot "defer" or "put off" an action that has already occurred; thus,

17  the issuance of a stay after the effective date of the challenged policy has already passed is beyond what

18  § 705 permits. *See Florida v. Mayorkas*, No. 3:23-cv-09962-TKW-ZCB, 2023 WL 3567851, at *4 (N.D.

19  Fla. May 16, 2023) (Section 705 stay unavailable because the policy was in effect when the complaint

20  was filed).

21      The 2025 Vacatur Plaintiffs seek to stay was published on February 3, 2025. *2025 Vacatur*, 90

22  Fed. Reg. at 8805. Thus, the publication of that determination means that its effective dates already

23  passed. *See id.* at 8806 ("The vacatur is effective immediately"). That 5 U.S.C. § 705 is disjunctive,

24  permitting reviewing courts to "postpone the effective date of an agency action *or* to *preserve status or*

25  *rights* pending conclusion of the review proceedings" (emphases added), does not change this result. An

26  order staying a policy after it has already gone into effect thus does not preserve the status quo, but rather,

27  *alters* it. *See, e.g.*, *Ne. Ohio Coal. for Homeless & Serv. Emps. Int'l Union, Loc. 1199 v. Blackwell*, 467

28  Defendants' Opp. To Plaintiffs' Mot. to Postpone
    3:25-cv-1766-EMC

1  F.3d 999, 1006 (6th Cir. 2006) (explaining an order "preventing the implementation of new regulations"

2  would "disturb[]" rather than preserve "the status quo"); *Off. of Pers. Mgmt. v. Am. Fed'n of Gov't Emps.,*

3  *AFL-CIO*, 473 U.S. 1301, 1305 (1985) (had the district court issued an order stopping rule from taking

4  effect that would alter the "status quo").

5  ### B.    The TPS Statute Bars Plaintiffs' Claims

6  Additionally, the TPS statute itself unambiguously provides that "[t]here is no judicial review of

7  any determination of the [Secretary] with respect to the designation, or termination or extension of a

8  designation, of a foreign state" for TPS.  8 U.S.C. § 1254a(b)(5)(A). The statute thus makes clear that TPS

9  designation, extension, and termination determinations are committed to the unreviewable authority of the

10  Secretary. Accordingly, APA challenges to such determinations are prohibited.  *See* 5 U.S.C. § 701(a)(1);

11  *Amgen, Inc. v. Smith*, 357 F.3d 103, 113 (D.C. Cir. 2004) ("If a no-review provision shields particular

12  types of administrative action, a court may not inquire whether a challenged agency decision is arbitrary,

13  capricious, or procedurally defective.").

14  Plaintiffs acknowledge that the statutory language of § 1254a(b)(5)(A) clearly applies to "any

15  determination" made "with respect to the designation, or termination, or extension" of TPS. PI Mot. 17.

16  And despite alleging that Secretary Noem's 2025 Termination of the 2023 Designation for Venezuela

17  violates the APA, Plaintiffs only argue in their PI Motion that they are likely to succeed on their APA

18  claim regarding Secretary Noem's 2025 Vacatur determination. PI Mot. 4-11. To avoid the judicial review

19  limitation in 8 U.S.C. § 1254a(b)(5)(A), Plaintiffs argue that the Secretary's decision to vacate the 2025

20  Extension was something other than a "determination."[3] *Id*. Not so.

21  Plaintiffs would have this Court believe that if the Secretary's decision is not one specifically

22  labeled a designation, termination of a designation, or extension of a designation, then the decision falls

23  outside the scope of the statutory language. PI Mot. 17. However, the Court is prohibited from reviewing

24

25  ---

[3] The basis for Plaintiffs' assertion that none of the claims in their Complaint challenge a determination
26  to terminate the 2023 TPS designation by the Secretary is unclear, as Count II of Plaintiffs' Complaint
clearly challenges the "order terminating the 2023 TPS designation for Venezuela." Compl. ¶¶ 150-154.
27  Moreover, in Plaintiffs Motion, they explicitly state that "Secretary Noem's decisions to vacate and
terminate TPS for Venezuelans" violated the Fifth Amendment. PI Mot. 11.

28  Defendants' Opp. To Plaintiffs' Mot. to Postpone
3:25-cv-1766-EMC

1    "*any determination … with respect to* the designation, or termination or extension of a designation" of

2    TPS. 8 U.S.C. § 1254a(b)(5)(A). In its now vacated decision, the Ninth Circuit reviewed the exact statute

3    at issue here. *See Ramos v. Wolf*, 975 F.3d 872, 889 (9th Cir. 2020), *vacated by Ramos v. Wolf*, 59 F.4th

4    1010, 1011 (9th Cir. 2023).[4] Comparing the term "determination" in § 1254a(b)(5)(A) with similar uses

5    of the word in provisions analyzed by the Supreme Court in *McNary v. Haitian Refugee Center, Inc.*, 498

6    U.S. 479, 486 n.6 (1991), and *Reno v. Catholic Soc. Servs., Inc.*, 509 U.S. 43, 53 (1993), the Ninth Circuit

7    stated that the reference to a determination "generally precludes direct review of the secretary's country-

8    specific TPS determinations." *Ramos*, 975 F.3d at 891. The inquiry does not end here, but rather this Court

9    must look to the surrounding text to understand what types of determinations are restricted from review.

10       The word "any," modifying "determination" in § 1254a(b)(5)(A), indicates a broad sweep. *See,*

11   *e.g.*, *Ali v. Fed. Bureau of Prisons*, 552 U.S. 214, 219 (2008) ("Read naturally, the word 'any' has an

12   expansive meaning, that is, 'one or some indiscriminately of whatever kind'" (citation omitted)). The

13   phrase "with respect to" in § 1254a(b)(5)(A) is likewise broad in scope, as that phrase "is generally

14   understood to be synonymous with the phrase 'relating to'" or "'related to.'" *Cal. Tow Truck Ass'n v. City*

15   *& County of San Francisco*, 807 F.3d 1008, 1021 (9th Cir. 2015). And the Supreme Court has underscored

16   that the ordinary meaning of "related to" is "a broad one," meaning "having a connection with or reference

17   to . . ., whether directly or indirectly." *Dan's City Used Cars, Inc. v. Pelkey*, 569 U.S. 251, 260 (2013).

18       The Supreme Court recently undertook a similar review of the phrase "any judgment regarding the

19   granting of relief" under enumerated provisions. *Patel v. Garland*, 596 U.S. 328 (2022). There, the

20   Supreme Court pointed out that it "has repeatedly explained, the word 'any' has an expansive meaning."

21   *Id*. at 338 (quotations omitted) (citing *Babb v. Wilkie*, 589 U. S. 399, 405, n.2 (2020); Webster's Third

22   New Int'l Dictionary, at 97 (defining "any" as "one or some indiscriminately of whatever kind")). The

23   phrase "with respect to" is the equivalent of "regarding" or "concerning." *Lamar, Archer & Cofrin, Llp v.*

24   *Appling*, 584 U.S. 709, 717 (2018); *see also Patel*, 596 U.S. at 339. The use of these phrases "in a legal

25

26   ---
     [4] This decision has been vacated and therefore has no precedential effect. *See, e.g., Durning v. Citibank,*
     *N.A.*, 950 F.2d 1419, 1424 n.2 (9th Cir. 1991) ("[A] decision that has been vacated has no precedential

27   authority whatsoever."). A vacated decision, however, "still carries informational and perhaps even
     persuasive precedential value." *DHX Inc. v. Allianz AGF MAT, Ltd.*, 425 F.3d 1169, 1176 (9th Cir. 2005).

28   Defendants' Opp. To Plaintiffs' Mot. to Postpone
     3:25-cv-1766-EMC

context generally has a broadening effect, ensuring that the scope of a provision covers not only its subject but also matters relating to that subject." *Patel*, 596 U.S. at 339.

Within this framework, Secretary Noem's Vacatur of the 2025 Extension falls well within the statute's "any determination" language and is a country-specific TPS determination relating to the prior extension. For this reason, § 1254a(b)(5)(A) eliminates this Court's jurisdiction to review any APA claim regarding the 2025 Vacatur, including those raised by Plaintiffs regarding the substance of the Federal Register Notice and facts that the Secretary considered. *See* PI Mot. at 8-11.

Plaintiffs' interpretation of the statute also flouts the clear intent of Congress to grant the Secretary broad and unreviewable discretion in the exercise of her responsibilities under the TPS statute, section 103(a) of the INA, 8 U.S.C. § 1103(a), and section 402 of the Homeland Security Act of 2002, 6 U.S.C. § 202. *See L.A. Lakers, Inc. v. Fed. Ins. Co.*, 869 F.3d 795, 802 (9th Cir. 2017) ("We must also 'assum[e] that the legislative purpose is expressed by the ordinary meaning of the words used' by the legislature.") (quoting *Richards v. United States*, 369 U.S. 1, 9 (1962)). The categorical review preclusion language in 8 U.S.C. § 1254a(b)(5)(A) makes clear that Congress did not intend to permit *anyone*, including an alien or organization of aliens, to obtain review of the Secretary's determinations regarding whether a determination was proper. This includes the way the Secretary weighs how the determination impacts that the administration of the program and the security conditions within the United States. 8 U.S.C. § 1254a(b)(1)(C), *see Ramos*, 975 F.3d at 891 ("[T]he Secretary's discretion to consider and weigh various conditions in a foreign country in reaching her TPS determinations is not only broad, but unreviewable.").

## II.   PLAINTIFFS HAVE FAILED TO DEMONSTRATE A LIKELIHOOD OF SUCCESS ON THE MERITS

### A.   The Secretary of Homeland Security May Vacate a Prior Extension of a Country's TPS Designation

Even if this Court had jurisdiction to review the 2025 Vacatur and 2025 Termination, Plaintiffs have not shown a likelihood of success on the merits that either determination violates the APA. When Congress authorized the Secretary to designate foreign countries for TPS, it committed several underlying policy questions to her discretion by statute and explicitly barred judicial review of sensitive foreign relations determinations. The Secretary's continuing border and national security responsibilities and

Defendants' Opp. To Plaintiffs' Mot. to Postpone
3:25-cv-1766-EMC

broad discretionary authority over TPS require her to evaluate any potential threats to the safety and security of the United States and permit her to change position, including vacating an extension which has yet to go into effect. *See* 8 U.S.C. § 1254a(b)(3)(A) (The Secretary "… shall determine whether the conditions for such designation under this subsection *continue to be met*.") (emphasis added); *see also Albertson v. FCC*, 182 F.2d 397, 399 (D.C. Cir. 2014) ("The power to reconsider is inherent in the power to decide.").[5]

Plaintiffs' Motion diverges from the actual claims pleaded within their Complaint and attempts to sever the Secretary's 2025 Vacatur from her 2025 Termination of the 2023 Designation. While the Secretary did issue two determinations, the Vacatur allowed for consideration of whether to terminate or extend the designations for Venezuela. On September 8, 2022, DHS extended the 2021 Designation for 18 months. *See Extension and Redesignation of Venezuela for Temporary Protected Status*, 87 Fed. Reg. 55,024 (Sept. 8, 2022). On October 3, 2023, Secretary Mayorkas extended the 2021 Designation for another 18 months with an expiration date of September 10, 2025. *2023 Designation*, 88 Fed. Reg. at 68,130. In the 2023 notice extending the 2021 Designation, former Secretary Mayorkas also redesignated Venezuela for TPS status. *Id.* This action resulted in there being two separate and concurrent Venezuela TPS designations, the registrations for which Secretary Mayorkas later combined when extending the 2023 Designation for another 18 months. *See 2025 Extension*, 90 Fed. Reg. at 5961 (Jan. 17, 2025). This

---

[5] Circuit courts have long recognized that an administrative agency has inherent or statutorily implicit authority to "reconsider and change a decision if it does so within a reasonable period of time" if Congress has not foreclosed this authority by requiring other procedures. *Mazaleski v. Treusdell*, 562 F.2d 701, 720 (D.C. Cir. 1977); *see, e.g.*, *Kelch v. Dir., Nev. Dep't of Prisons*, 10 F.3d 684, 687 (9th Cir. 1993) (applying Nevada law holding "administrative agencies have an inherent authority to reconsider their own decision, since the power to decide in the first instance carries with it the power to reconsider"); *Albertson*, 182 F.2d at 399 ("The power to reconsider is inherent in the power to decide."); *Macktal v. Chao*, 286 F.3d 822, 825-26 (5th Cir. 2002) (holding agency acted lawfully by exercising inherent authority to reconsider decisions) (collecting cases); *see also The Last Best Beef, LLC v. Dudas*, 506 F.3d 333, 340 (4th Cir. 2007) ("[F]ederal agencies . . . have broad authority to correct their prior errors. Indeed, when federal agencies take erroneous or unlawful action, courts generally should not stand in the way of the agencies' remediation of their own mistakes." (citations omitted)); *Gun South, Inc. v. Brady*, 877 F.2d 858, 862 (11th Cir. 1989) ("[T]he Supreme Court and other courts have recognized an implied authority in other agencies to reconsider and rectify errors even though the applicable statute and regulations do not expressly provide for such reconsideration.").

Defendants' Opp. To Plaintiffs' Mot. to Postpone
3:25-cv-1766-EMC

1  novel approach allowed Venezuelan applicants, who had registered under the 2021 Designation, to re-

2  register under the extended 2023 Designation, which provided the benefit of an additional 13 months of

3  status, without the Secretary making an independent determination regarding the 2021 Designation.

4          Employing Plaintiffs' logic that Secretary Mayorkas's complication of the Venezuela designations

5  was irrevocably binding, no Secretary of Homeland Security could ever vacate a designation or extension

6  of a designation, no matter the type of national security threat posed or the seriousness of the error or legal

7  defect in the prior determination. But the TPS statute itself does not mandate such a severe and unworkable

8  limitation of the Secretary's ability to fulfill her border and national security responsibilities and exercise

9  her broad authority to administer and enforce the immigration laws, *see, e.g.*, 6 U.S.C. § 202(1)-(5), 8

10  U.S.C. § 1103(a)(1), (a)(3), and to do so consistent with the President's Executive Orders. The Secretary

11  is authorized by statute to terminate a designation if she "determine[s]" that a foreign state "*no longer*

12  *continues* to meet the conditions for designation." 8 U.S.C. § 1254a(b)(3)(A) (emphasis added). The

13  statute requires the Secretary to review conditions within foreign states designated for TPS, but any

14  subsequent action turns on the Secretary's findings about whether the conditions for such designation

15  continue to exist. 8 U.S.C. § 1254a(b)(3)(A)-(C). Indeed, the statute inevitably requires the Secretary to

16  make determinations affecting the conduct of United States foreign policy. *See Harisiades v. Shaughnessy*,

17  342 U.S. 580, 588-89 (1952) ("[A]ny policy toward aliens is vitally and intricately interwoven with

18  contemporaneous policies in regard to the conduct of foreign relations [and] the war power."). When the

19  Executive Branch acts in the field of foreign policy "… pursuant to an express or implied authorization of

20  Congress, [its] authority is at its maximum, for it includes all that [it] possesses in [its] own right plus all

21  that Congress can delegate." *Youngstown Sheet and Tube Co. v. Sawyer*, 343 U.S. 579, 635 (1952)

22  (Jackson, J., concurring) (cleaned up).

23          Here, Secretary Noem met all her statutory obligations. The Secretary issued the vacatur notice 17

24  days after the prior extension notice and stated that she would restore the registration of any 2021

25  Venezuela TPS recipients who re-registered in the interim. *See 2025 Vacatur*, 90 Fed. Reg. at 8807; *2025*

26  *Extension*, 90 Fed. Reg. at 5961; *see also 2023 Designation*, 88 Fed. Reg. at 68,132. The 2025 Vacatur

27  notice stated that it was issued to "untangle the confusion" caused by the 2025 Extension, which wove

28  Defendants' Opp. To Plaintiffs' Mot. to Postpone
   3:25-cv-1766-EMC

1   together two prior designations of Venezuela for TPS with different effective dates, "provid[ing] an

2   opportunity for … clear guidance." *2025 Vacatur*, 90 Fed. Reg. at 8807. The Secretary exercised the

3   inherent power of reconsideration she held under the TPS statute within a reasonable time and with the

4   intent to correct significant "deficiencies" in the 2025 Extension.  *Id.*; *see Mazaleski*, 562 F.2d at 720.

5         Two days after she issued the 2025 Vacatur, the Secretary issued a notice terminating one of the

6   two Venezuela TPS designations, based on her finding that the presence of the covered persons *is*

7   "contrary to the national interest of the United States." *2025 Termination*, 90 Fed. Reg. at 9042

8   ("[T]ermination of the 2023 Venezuela TPS designation is required because it is contrary to the national

9   interest to permit the Venezuelan nationals … to remain temporarily in the United States.") (cleaned up).

10   In her termination notice, the Secretary noted that "'[n]ational interest' is an expansive standard that may

11   encompass an array of broad considerations, including foreign policy, public safety, national security,

12   migration factors, immigration policy, and economic considerations." *Id.* (cleaned up); *see id.* n.5 (citing

13   cases). The TPS statute explicitly requires the Secretary to determine whether continuing to permit the

14   temporary presence of TPS beneficiaries from a foreign state designated under 8 U.S.C. § 1254a(b)(1)(C)

15   is "contrary to the national interest of the United States," and she has done so. This national interest finding

16   is of a discretionary nature authorized by statute and clearly sounding in foreign policy. *See* 8 U.S.C.

17   § 1254a(b)(1)(C); *cf. Poursina v. USCIS*, 936 F.3d 868, 874 (9th Cir. 2019) (observing, in an analogous

18   INA context, "that the 'national interest' standard invokes broader economic and national-security

19   considerations, and such determinations are firmly committed to the discretion of the Executive Branch—

20   not to federal courts" (citing *Hawaii*, 585 U.S. at 684-86)).

21         Secretary Noem reasonably explained that the 2023 Designation notice was adopted without a

22   reasoned explanation or express consideration of the operational or legal impacts. *2025 Vacatur*, 90 Fed.

23   Reg. at 8807. This "implicitly negat[ed] the 2021 Venezuela TPS designation by effectively subsuming it

24   within the 2023 Venezuela TPS designation." *Id.* By consolidating the registration processes for both the

25   2021 and 2023 TPS designations, the notice had the practical effect of extending the 2021 Designation by

26   up to 13 months and allowing for employment authorization for that period as well. *See id.* Accordingly,

27   she reasonably concluded that "vacatur is warranted to untangle the confusion and provide an opportunity

28   Defendants' Opp. To Plaintiffs' Mot. to Postpone
3:25-cv-1766-EMC

1  for informed determinations regarding the TPS designations and clear guidance." *Id.*

2      Plaintiffs' argument that the 2025 Vacatur is impermissible because Secretary Noem "failed to

3  account for alternatives short of termination" also fails. PI Mot. at 10. In issuing the Vacatur, Secretary

4  Noem indicated that the decision to vacate provided "an opportunity for informed determinations

5  regarding the TPS designations and clear guidance." *2025 Vacatur*, 90 Fed. Reg. at 8807 (citing Exec.

6  Order No. 14159, *Protecting the American People Against Invasion*, § 16(b), 90 Fed. Reg. 8443 (Jan. 20,

7  2025)). Thus, the alternative of simply deconsolidating the re-registration periods would not meet the

8  stated reasons for the 2025 Vacatur and is neither arbitrary and capricious nor an impermissible decision.

9  The Secretary's 2025 Vacatur of the 2025 Extension complied with the statute, was in accordance with

10  her authority to reconsider prior actions, and was consistent with her continuing obligation to safeguard

11  the border and national security of the United States and to administer and enforce the immigration laws.

12      **B.  The Secretary's Determinations to Vacate and Terminate the TPS Designation for**
13             **Venezuela Did Not Violate the Fifth Amendment Because the Determinations were**
           **Related to Immigration Policy Objectives and Not Motivated by Racial Animus**

14      Plaintiffs cannot bypass the explicit bar on judicial review by framing their claim as a

15  constitutional challenge.[6] *See* 8 U.S.C. § 1254a(b)(5)(A); *supra* § I.B. Even if this Court determines it has

16  jurisdiction to consider Plaintiffs' constitutional claim here, the Secretary's determinations to (1) vacate

17  the 2025 Extension and (2) terminate the 2023 Designation did not violate the Fifth Amendment. Plaintiffs

18  erroneously contend that racially "discriminatory intent was at least one motivating factor" for Secretary

19  Noem's vacatur and termination determinations and that strict scrutiny under *Vill. of Arlington Heights*,

20  429 U.S. at 265, should apply. PI Mot. 11-12. The appropriate standard for any such review, however, is

21  set forth in *Hawaii*, 585 U.S. at 703-05. There, in determining that a rational basis standard should be

22  applied, the Supreme Court explained that "the upshot of [their] cases in this context is clear: 'Any rule

23  of constitutional law that would inhibit the flexibility' of the President 'to respond to changing world

24  conditions should be adopted only with the greatest caution,' and our inquiry into matters of entry and

25  national security is highly constrained." *Id.* at 704.

26

27  ────────────────
[6] Section 1254a(b)(5)(A) provides a far clearer bar on review than the statutory provision at issue in
*Webster v. Doe*, 486 U.S. 592, 603-04 (1988).

28  Defendants' Opp. To Plaintiffs' Mot. to Postpone
3:25-cv-1766-EMC

1    Here, Secretary Noem's 2025 Vacatur and 2025 Termination determinations are immigration

2    policies related to Government objectives of border and national security and foreign policy. The Supreme

3    Court "ha[s] long recognized the power to expel or exclude aliens as a fundamental sovereign attribute

4    exercised by the Government's political departments largely immune from judicial control." *Fiallo v. Bell*,

5    430 U.S. 787, 792 (1977). Because decisions in these matters implicate "relations with foreign powers"

6    and involve "classifications … defined in the light of changing political and economic circumstances,"

7    such judgments "are frequently of a character more appropriate to either the Legislature or the Executive."

8    *Mathews v. Diaz*, 426 U.S. 67, 81 (1976); *see also Galvan v. Press*, 347 U.S. 522, 531 (1954) ("Policies

9    pertaining to the entry of aliens and their right to remain here are peculiarly concerned with the political

10    conduct of government."). The Supreme Court has accordingly made clear that decisions by the political

11    branches about which classes of aliens to exclude or expel will generally be upheld against constitutional

12    challenges so long they satisfy deferential rational-basis review. *Hawaii*, 585 U.S. at 704-05; *see also*

13    *Kleindienst v. Mandel*, 408 U.S. 753, 769-70 (1972) (judicial review of "[p]olicies pertaining to the entry

14    of aliens and their right to remain here" is limited to whether the Executive gave a "facially legitimate and

15    bona fide" reason for its action); *Mathews*, 426 U.S. at 82 (a "narrow standard of review" applies to

16    "decisions made by Congress or the President in the area of immigration and naturalization");

17    *Shaughnessy*, 342 U.S. at 588–89. Although cases such as *Hawaii*, *Mandel*, and *Fiallo* involved policies

18    directed at aliens seeking to enter the country, those decisions equally support applying rational-basis

19    review in the specific context of these TPS determinations to aliens already present in the United States

20    where the basis for the termination is that "permitting the aliens to remain temporarily in the United States

21    is contrary to the national interest of the United States." *2025 Termination*, 90 Fed. Reg. at 9040, 9042;

22    *see Hawaii*, 585 U.S. at 706 (If "there is persuasive evidence that the [policy] has a legitimate grounding

23    in national security concerns … we must accept that independent justification").

24    TPS decisions involve unique country-specific determinations that both "implicate relations with

25    foreign powers" and "involve classifications defined in the light of changing political and economic

26    circumstances," *Hawaii*, 585 U.S. at 702, precisely the situation in which the Supreme Court has

27    repeatedly applied rational-basis review. *See id.*; *Fiallo*, 430 U.S. at 799. Secretary Noem's 2025 Vacatur

28    Defendants' Opp. To Plaintiffs' Mot. to Postpone
3:25-cv-1766-EMC

and 2025 Termination determinations easily pass rational-basis review. In enacting the TPS statute, Congress provided for the availability of a temporary status to aliens who cannot safely return to their home countries because of, *inter alia*, extraordinary and temporary conditions in those countries. *See* 8 U.S.C. § 1254a. Secretary Noem's termination decision is "plausibly related" to the Government's national security interests as well as the objectives of the TPS program. *Hawaii*, 585 U.S. at 704-05; *see also United States R.R. Retirement Bd. v. Fritz*, 449 U.S. 166, 179 (1980). After consulting with other appropriate governmental agencies, including the Department of State, Secretary Noem determined that permitting the Venezuelan nationals to remain temporarily in the United States is contrary to the national interest of the United States. *2025 Termination*, 90 Fed. Reg. at 9040, 9042-43 ("Among these Venezuelan nationals who have crossed into the United States are members of the Venezuelan gang known as Tren de Aragua." Historically, this gang "has been blamed for sex trafficking, drug smuggling, police shootings, kidnappings, and the exploitation of migrants."). Secretary Noem's determination is fully consistent with Congress's goal of providing TPS to eligible aliens until the Secretary determines that the conditions for the country's TPS designation no longer continue to exist, including in this case that permitting such aliens to remain in the United States is contrary to the U.S. national interest. Thus, under the rational basis test, Plaintiffs' equal protection claim fails.

Even under the heightened standard in *Arlington Heights*, Plaintiffs' Equal Protection Claim is likely to fail because they cannot establish racially discriminatory intent. Under the *Arlington Heights* standard, Plaintiffs must prove that a racially "discriminatory purpose has been a motivating factor in the [government's] decision" to show a violation of the Equal Protection Clause. 429 U.S. at 265-266. In 2020, the Ninth Circuit analyzed an almost identical claim and held that under the *Arlington Heights* standard, plaintiffs failed to present "even serious questions on the merits of their claim that the Secretaries' TPS terminations were improperly influenced by the President's" alleged racial animus. *Ramos*, 975 F.3d at 897 (internal quotations omitted); *see also Dep't of Homeland Sec. v. Regents of the Univ. of Cal.*, 591 U.S. 1, 34-35 (2020) (rejecting a similar equal protection claim where plaintiffs did not show racial animus or disparate impact). Although the 2020 *Ramos* decision has since been vacated on other grounds, the analysis is instructive.

Defendants' Opp. To Plaintiffs' Mot. to Postpone
3:25-cv-1766-EMC

The Ninth Circuit held that the plaintiffs' equal protection claim failed "due to the glaring lack of evidence tying the President's alleged discriminatory intent to the specific TPS terminations—such as evidence that the President personally sought to influence the TPS terminations, or that any administration officials involved in the TPS decision-making process were themselves motivated by" racial animus. *Ramos*, 975 F.3d at 897. The Ninth Circuit reasoned that while there was record evidence that the President "expressed racial animus against 'non-white, non-European immigrants'" and "the White House influenced the TPS termination decisions," there was "no evidence linking the President's animus to the TPS terminations." *Id*. Moreover, the panel explained, "[i]t is expected—perhaps even critical to the functioning of the government—for executive officials to conform their decisions to the administration's policies" and the "mere fact that the White House exerted pressure on the Secretaries' TPS decisions does not itself support the conclusion that the President's alleged racial animus was a motivating factor in the TPS decisions." *Id*. at 898. Finally, the Ninth Circuit addressed the plaintiffs' arguments that the circumstantial evidence and the historical background did not demonstrate that racial animus was a motivating factor for the TPS terminations. *Id*. at 898-99.

Plaintiffs disregard the Ninth Circuit's reasoning in *Ramos*, reiterating similar arguments before this Court. As in *Ramos*, here, Secretary Noem provided reasoned explanations for her decision to terminate Venezuela's 2023 TPS Designation, and Plaintiffs have not demonstrated that she harbored racial animus in making the vacatur or termination determinations at issue. Plaintiffs cite a multitude of exhibits, arguing that Secretary Noem "made numerous contemporaneous statements that prove her decisions sprung at least in part from racial animus." PI Mot. at 12. They also assert that the circumstantial evidence and historical background of the TPS determinations show that "improper purposes are playing a role." *Id*. at 13. But Plaintiffs fail to establish any direct link between the evidence they provide and Secretary Noem's determinations. For example, Plaintiffs cite a February 26, 2024, social media post by Secretary Noem about "[n]ations like Venezuela." ECF 37-1. But this post was made nearly a year before the termination decision was published and focuses on the nation itself, not the race of its people. *See also* ECF 37-2, 37-3, 37-4, 37-5 (social media posts from 2024); ECF 37-6 (unrelated social media post); ECF 37-12, 37-14, 37-15 (transcripts of confirmation hearing and interviews where immigration policy is

Defendants' Opp. To Plaintiffs' Mot. to Postpone
3:25-cv-1766-EMC

1  generally discussed). National origin is inherently part of TPS. The express statements that Plaintiffs rely

2  on in an attempt to show racial animus were made long before the TPS termination determination or taken

3  out of context—and importantly, none of the statements pertain to race; rather, they concern the country

4  itself. *See Ramos*, 975 F.3d at 898 ("[W]e find it instructive that these statements occurred primarily in

5  contexts removed from and unrelated to TPS policy or decisions."). The Secretary's various statements

6  reflect an emphasis on immigration policy that focuses on America's economic and security interests, not

7  racial or ethnic animus. An immigration policy that seeks to further American strategic and foreign policy

8  interests cannot be the basis of an equal protection claim and is in fact contemplated by the TPS statute.

9  *See* 8 U.S.C. § 1254a(b)(1)(C).

10      Plaintiffs' conjecture is equally unpersuasive and does not show racial animus. PI Mot. 14-15.

11  Plaintiffs speculate that the sequence of Secretary Noem's determinations are "further evidence of

12  Secretary Noem's improper discriminatory purpose," *id*. at 14, and the first Trump administration's

13  attempts to terminate TPS designations "show[] that the second Trump administration's TPS decisions . .

14  . are motivated by 'invidious purposes.'" *Id*. at 14-15 (citing *Arlington Heights*, 429 U.S. at 267). The

15  timing of Secretary Noem's termination of the 2023 Designation, however, and the fact that the first

16  Trump administration sought to terminate TPS designations for other countries, are not—without more—

17  evidence of an "overarching goal [] motivated by racial animus." *Ramos*, 975 F.3d 899. The Secretary's

18  efficiency is hardly a basis for invalidating her action.

19      Finally, Plaintiffs fall back on their previously rejected "cat's paw" theory, PI Mot. 15, theorizing

20  that Secretary Noem's determinations are unconstitutional because the President's animus directly

21  influenced her decisions. *Id*. But the Ninth Circuit doubted that the "cat's paw" theory would apply in this

22  situation. *Ramos*, 975 F.3d at 897 (plaintiffs failed to "provide any case where such a theory of liability

23  has been extended to governmental decisions in the foreign policy and national security realm"). 

24  Moreover, the "cat's paw" approach would invite judicial second-guessing of an agency official's actions

25  based on mere allegations of discriminatory motive on the part of a different government official who may

26  have played some role in the decision-making process. That would invite impermissible intrusion on

27  privileged Executive Branch deliberations and potential litigant-driven discovery that would disrupt the

28  Defendants' Opp. To Plaintiffs' Mot. to Postpone
3:25-cv-1766-EMC

President's execution of the laws, *see Nixon v. Fitzgerald*, 457 U.S. 731, 749–50 (1982); *United States v. Nixon*, 418 U.S. 683, 708 (1974) ("A President and those who assist him must be free to explore alternatives in the process of shaping policies and making decisions and to do so in a way many would be unwilling to express except privately."). As such, under any review standard, Plaintiffs are unlikely to succeed on the merits of their equal protection claim.

## III.   ANY HARM PLAINTIFFS MAY SUFFER IS BASED ON THE INHERENT NATURE OF THE TPS STATUTE

"An essential element to the granting of a preliminary injunction is a showing of irreparable injury to the moving party in its absence." *Dollar Rent A Car of Washington, Inc. v. Travelers Indem. Co.*, 774 F.2d 1371, 1375 (9th Cir. 1985). Not just any showing of irreparable harm will suffice. A party "is only entitled to an injunction that prevents [the] irreparable harm" that is "likely to occur." *S. Yuba River Citizens League v. Nat'l Marine Fisheries Serv.*, 804 F. Supp. 2d 1045, 1054 (E.D. Cal. 2011) (a party's "showing [of irreparable harm] is required in order to justify the specific measures that [the party] request[s]"). Plaintiffs have failed to make the requisite showing here.

First, Plaintiffs contend that their allegations of APA and Fifth Amendment violations *per se* constitute irreparable harm. Pl. Mot. 19-20. However, the alleged harms only occur if it is determined that Defendants have violated Plaintiffs' constitutional or statutory rights. As explained above, Plaintiffs have not established a likelihood of success on the merits of those claims. *See* § II.

Second, Plaintiffs allege numerous injuries resulting from the 2025 Termination that are inherent in the temporary nature of TPS. For example, Plaintiffs allege that, if they lose their TPS, "many of them will be at immediate risk of detention […] and] deportation," "will be in a state of limbo— undocumented and without legal authorization to live and work in the United States," or "will lose other alternative pathways to permanent status...." Pl. Mot. 20-21. Plaintiffs further allege that the loss of TPS could result in their separation from family members in the United States or having to bring their U.S. citizen children to an unknown country. *Id.* at 21. While Plaintiffs heavily focus on the burden that TPS beneficiaries will face should the termination be permitted to go into effect, the underlying cause of this harm flows from the statute ("temporary" protected status) itself. *See*, 8 U.S.C. § 1254a(b)(1)(B)(i) ("substantial, but

Defendants' Opp. To Plaintiffs' Mot. to Postpone
3:25-cv-1766-EMC

1    temporary"), (b)(1)(B)(ii) ("unable, temporarily"), (b)(1)(C) ("extraordinary and temporary"), (g)

2    ("remain in the United States temporarily"). Undeniably, the alleged harms would exist with or without

3    the termination at issue. As explained, a country's TPS designation must be reviewed at least every 18

4    months, and there is no guarantee of renewal. 8 U.S.C. § 1254a(b)(2)(B). A TPS beneficiary is therefore

5    always subject to the same uncertainties and concerns that Plaintiffs allege here.

6         Because the very nature of TPS is temporary, as dictated by law, the potential for familial

7    separation is not an irreparable harm arising from the termination of TPS for Venezuela, but rather the

8    nature of the status. The cases cited by Plaintiffs in support of their argument that the separation of families

9    constitutes irreparable harm as a matter of law are inapposite because the irreparable harms cited in those

10   cases were not assessed against the backdrop of the inevitable termination of a temporary status. Pl. Mot.

11   22. For example, *Stanley v. Illinois*, 405 U.S. 645, 647 (1972), does not address whether the separation of

12   families is an irreparable harm in the context of a temporary status that must come to an eventual end.

13   *Stanley*, 405 U.S. at 647 ("granting a stay of removal in the context of persecution-based relief, but

14   recognizing that "a noncitizen must show that there is a reason specific to his or her case, as opposed to a

15   reason that would apply equally well to all aliens and all cases, that removal would inflict irreparable

16   harm."); *see also Washington v. Trump*, 847 F.3d 1151, 1169 (9th Cir. 2017) (finding that the potential

17   irreparable harm of separating families did not justify a stay).

18        And even where Plaintiffs' declarations have identified concrete harms, those harms will not be

19   remedied by the requested injunction. The assurances that Plaintiffs seek can only be truly safeguarded

20   through legislative action, not an injunction by this Court. Consequently, Plaintiffs have failed to show a

21   likelihood of irreparable harm that could be remedied by this Court, and their request for a preliminary

22   injunction should be denied. *See Taiebat v. Scialabba*, No. 17-civ-0805-PJH, 2017 WL 747460, at *5

23   (N.D. Cal. Feb. 27, 2017) (denying preliminary injunction where "plaintiff [could not] establish that the

24   mandatory injunction he seeks would address the alleged harm"); *see also S. Yuba River Citizens League*,

25   804 F. Supp. 2d at 1057 ("[T]he court declines to order an interim measure that will provide no benefit . . .

26   in the interim period."); *Schrill v. Plunkett*, 760 F. Supp. 1378, 1384 (D. Or. 1990) ("Granting plaintiffs'

27   requested injunctive relief would not prevent the alleged" harm), *aff'd*, 932 F.2d 973 (9th Cir. 1991).

28   Defendants' Opp. To Plaintiffs' Mot. to Postpone
     3:25-cv-1766-EMC

## IV. THE BALANCE OF THE EQUITIES AND PUBLIC INTEREST WEIGH AGAINST PRELIMINARY INJUNCTIVE RELIEF

Notwithstanding Plaintiffs' failure to establish irreparable harm warranting the extraordinary relief that they seek, Plaintiffs have not shown that the remaining equitable factors tip the balance in their favor. As the Supreme Court has explained in the immigration context, the questions of harm to the defendant and the public interest "merge." *Nken v. Holder*, 556 U.S. 418, 435 (2009). The government and the public share an interest in ensuring that the process established by Congress – under which the Secretary of Homeland Security has unreviewable authority to weigh the statutory factors governing TPS designations – is followed as Congress intended. As Secretary Noem observed, vacatur of the 2025 Extension was needed to "untangle the confusion [created by that Notice] and provide an opportunity for informed determinations regarding the TPS designations and clear guidance." *2025 Vacatur*, 90 Fed. Reg. at 8807.

The government has an "obligation to prioritize the safety, security, and financial and economic well-being of Americans." *Protecting the American People Against Invasion*, Exec. Order No. 14159, § 1, 90 Fed. Reg. at 8443. In this vein, "[e]nforcing [the n]ation's immigration laws is critically important to the national security and public safety of the United States." Among the Venezuelan nationals currently residing in the United States are members of the Tren de Aragua, a Venezuelan gang that poses a threat to the public safety. *See 2025 Termination*, 90 Fed. Reg. at 9040, 9042-43. And, as explained in Secretary Noem's 2025 Termination, Congress expressly required that the national interest of the United States be considered in determining whether to extend or terminate Venezuela's TPS designation. Vacating the 2025 Extension allowed the government to take necessary steps to "ensur[e] that designations of [TPS] are consistent with the provisions of [...] 8 U.S.C. 1254a[], and that such designations are appropriately limited in scope and made for only so long as may be necessary to fulfill the textual requirements of that statute" – in other words, to make certain the TPS designation is not being abused by individuals who threaten national security and public safety. Exec. Order No. 14159, § 16(b), 90 Fed. Reg. at 8446.

Ultimately, the injunctive relief Plaintiffs seek would frustrate Secretary Noem's substantive judgment as to how to implement the TPS statute in line with the government's established interests. *See All. For the Wild Rockies v. Cottrell*, 632 F.3d 1127, 1138 (9th Cir. 2011) ("We will not grant a preliminary

1  injunction unless those public interests outweigh other public interests that cut in favor of *not* issuing the

2  injunction"). Congress has given the Secretary, in consultation with the appropriate agencies, the broad

3  discretion to assess conditions in foreign countries and reach determinations regarding TPS. Where the

4  Secretary follows the statutory requirements, it is the public interest for the Court deny the extraordinary

5  remedy of preliminary injunctive relief and allow this matter to proceed along the ordinary course.

6  **V.    PLAINTIFFS' REQUESTED RELIEF IS OVERBROAD**

7           Even if a preliminary injunction (or "stay" accomplishing the same effect) were warranted here,

8  Plaintiffs have no basis to request universal relief benefitting non-parties. Under settled constitutional and

9  equitable principles, the Court may not issue relief that is broader than necessary to remedy actual harm

10 shown by specific Plaintiffs. *Gill v. Whitford*, 138 S. Ct. 1916, 1934 (2018); *Lewis v. Casey*, 518 U.S. 343,

11 358 n.5 (1996) ("[S]tanding is not dispensed in gross[.]"). A valid remedy "operate[s] with respect to

12 specific parties," not with respect to a law "in the abstract." *California v. Texas*, 593 U.S. 659, 672 (2021)

13 (quotation marks omitted). In this case, where sensitive foreign policy decisions of the Executive Branch

14 are implicated, an injunction should go no further than redressing any cognizable injuries to individual

15 named plaintiffs. *See Arizona v. United States*, 567 U.S. 387, 409 (2012) (holding the federal government

16 must speak "with one voice" in determining "whether it is appropriate to allow a foreign national to

17 continue living in the United States"). Universal injunctive relief here circumvents the requirement to limit

18 relief to the Parties. Plaintiffs, who do not raise class claims in their Complaint and have not moved to

19 certify a class under Rule 23, have made no effort to explain why they should be entitled to such sweeping

20 relief. Granting universal relief in this situation further encourages forum shopping and effectively

21 nullifies the decisions of other district or circuit courts nationwide. *See DHS v. New York*, 140 S. Ct. 599,

22 601 (2020) (Gorsuch, J., concurring); *see also Ramos*, 975 F.3d. at 902–06 (Nelson, J., concurring).

23                                             **CONCLUSION**

24           This Court lacks jurisdiction to review both determinations by Secretary Noem relating to the

25 2023 Designation of Venezuela for TPS and to grant Plaintiffs' requested relief. Even if this Court were

26 to find that neither of the two clear jurisdictional bars applies, Plaintiffs' claims fail on the merits and

27 the remaining factors do no support issuance of equitable relief.

28 Defendants' Opp. To Plaintiffs' Mot. to Postpone
   3:25-cv-1766-EMC

Dated: March 3, 2025                         Respectfully submitted,

                                             YAAKOV M. ROTH
                                             Acting Assistant Attorney General
                                             Civil Division

                                             WILLIAM H. WEILAND (Mass. Bar 661433)
                                             Senior Litigation Counsel

                                             ERIC SNYDERMAN (VA Bar 99563)
                                             ANNA DICHTER (NJ Bar 304442019)
                                             LAUREN BRYANT (NY Bar No. 5321880)
                                             CATHERINE ROSS (DC Bar 9007404)
                                             LUZ MARIA RESTREPO (NY Bar 4907077)
                                             Trial Attorneys

                                             /s/ *Sarah L. Vuong*
                                             SARAH L. VUONG
                                             (CA Bar. 258528)
                                             Assistant Director
                                             U.S. Department of Justice, Civil Division
                                             Office of Immigration Litigation
                                             General Litigation and Appeals Section
                                             P.O. Box 868, Ben Franklin Station
                                             Washington, DC 20044
                                             Tel: (202) 305-1263
                                             Sarah.L.Vuong@usdoj.gov

                                             *Attorneys for the Defendants*

Defendants' Opp. To Plaintiffs' Mot. to Postpone
3:25-cv-1766-EMC

**CERTIFICATE OF SERVICE**

I hereby certify that the foregoing document filed through the ECF system will be sent electronically to the registered participants, as identified on the Notice of Electronic Filing, and that paper copies will be sent to those indicated as non-registered participants.

/s/ *Sarah L. Vuong*
SARAH L. VUONG

Defendants' Opp. To Plaintiffs' Mot. to Postpone
3:25-cv-1766-EMC

27

01106

1    Ahilan T. Arulanantham (SBN 237841)
     arulanantham@law.ucla.edu
2    Stephany Martinez Tiffer (SBN 341254)
     martineztiffer@law.ucla.edu
3    CENTER FOR IMMIGRATION LAW AND
     POLICY, UCLA SCHOOL OF LAW
4    385 Charles E. Young Dr. East
     Los Angeles, CA 90095
5    Telephone: (310) 825-1029

6    Emilou MacLean (SBN 319071)
     emaclean@aclunc.org
7    Michelle (Minju) Y. Cho (SBN 321939)
     mcho@aclunc.org
8    ACLU FOUNDATION
     OF NORTHERN CALIFORNIA
9    39 Drumm Street
     San Francisco, CA 94111-4805
10   Telephone: (415) 621-2493
     Facsimile: (415) 863-7832
11
     Attorneys for Plaintiffs
12   *[Additional Counsel Listed on Next Page]*

13                  UNITED STATES DISTRICT COURT

14                 NORTHERN DISTRICT OF CALIFORNIA

15                    SAN FRANCISCO DIVISION

16   NATIONAL TPS ALLIANCE, MARIELA          Case No.  3:25-cv-01766-EMC
     GONZÁLEZ, FREDDY JOSE ARAPE RIVAS,
17   M.H., CECILIA DANIELA GONZÁLEZ          **PLAINTIFFS' REPLY IN SUPPORT OF**
     HERRERA, ALBA CECILIA PURICA           **THEIR MOTION TO POSTPONE**
18   HERNÁNDEZ, E.R., and HENDRINA VIVAS     **EFFECTIVE DATE OF AGENCY ACTION**
     CASTILLO,
19                                           Assigned to: Hon. Edward M. Chen
                 Plaintiffs,
20                                           Date:   March 24, 2025
           vs.                               Time:   9:00 a.m.
21                                           Place:  Courtroom 5, 17th Floor
     KRISTI NOEM, in her official capacity as
22   Secretary of Homeland Security, UNITED  Complaint filed: February 19, 2025
     STATES DEPARTMENT OF HOMELAND
23   SECURITY, and UNITED STATES OF
     AMERICA,
24
                 Defendants.
25

26

27

28

PLAINTIFFS' REPLY ISO MOT. TO POSTPONE EFFECTIVE DATE – CASE NO. 3:25-CV-01766-EMC

1    Additional Counsel for Plaintiffs

2    Jessica Karp Bansal (SBN 277347)
     jessica@ndlon.org
3    Lauren Michel Wilfong (*pro hac vice*)
     lwilfong@ndlon.org
4    NATIONAL DAY LABORER
     ORGANIZING NETWORK
5    1030 S. Arroyo Parkway, Suite 106
     Pasadena, CA 91105
6    Telephone: (626) 214-5689

7    Eva L. Bitran (SBN 302081)
     ebitran@aclusocal.org
8    ACLU FOUNDATION
     OF SOUTHERN CALIFORNIA
9    1313 West 8th Street
     Los Angeles, CA 90017
10   Telephone: (213) 977-5236

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

# TABLE OF CONTENTS

**Page**

INTRODUCTION ..........................................................................................................1

ARGUMENT ...............................................................................................................1

    I.     This Court Has Jurisdiction and Authority to Grant Relief. ........................ 1

         A.     8 U.S.C. § 1252(f)(1) Does Not Bar Postponement Under 5 U.S.C. § 705...... 1

         B.     Section 705 Authorizes the Relief Plaintiffs Seek. ........................................... 3

         C.     Section 1254a(b)(5)(A) Does Not Bar Plaintiffs' Claims............................... 4

    II.    Plaintiffs Are Likely to Prevail on Their APA Claims. ................................. 6

         A.     DHS Lacks Authority to Vacate TPS Extensions............................................ 6

         B.     The Vacatur Decision Was Arbitrary. .............................................................. 8

    III.   Plaintiffs Are Likely to Prevail on Their Discrimination Claim................................... 9

    IV.   Plaintiffs Have Established Irreparable Harm. ........................................... 11

    V.    The Equities and Public Interest Favor Postponement. ............................... 13

    VI.   The Requested Relief Is Not Overbroad. .................................................... 14

CONCLUSION..........................................................................................................15

PLAINTIFFS' REPLY ISO MOT. TO POSTPONE EFFECTIVE DATE – CASE NO. 3:25-CV-01766-EMC

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Al Otro Lado, Inc. v. Mayorkas*,
  619 F. Supp. 3d 1029 (S.D. Cal. 2022)................................................................2

*Alabama Ass'n of Realtors v. Dep't of Health & Human Servs.*,
  594 U.S. 758 (2021)..............................................................................................15

*Alberston v. FCC*,
  182 F.2d 397 (D.C. Cir. 1951)..............................................................................6

*Am. Trucking Ass'n v. Frisco Transp. Co.*,
  358 U.S. 133 (1958)................................................................................................9

*Arizoni Dream Act Coal. v. Brewer*,
  81 F. Supp. 3d 795 (D. Ariz. 2015) ....................................................................14

*Biden v. Missouri*,
  145 S. Ct. 109 (2024)...........................................................................................15

*Biden v. Texas*,
  597 U.S. 785 (2022)...........................................................................................2, 3

*California v. U.S. Bureau of Land Mgmt.*,
  277 F. Supp. 3d 1106 (N.D. Cal. 2017) ...............................................................4

*Career Colls. & Schs. of Tex. v. Dep't of Educ.*,
  98 F.4th 220 (5th Cir. 2024) ...............................................................................14

*Casa de Md., Inc. v. Trump*,
  355 F. Supp. 3d 307 (D. Md. 2018).....................................................................10

*CASA, Inc. v. Trump*,
  --- F.4th ---, 2025 WL 654902 (4th Cir. Feb. 28, 2025) ....................................15

*Centro Legal de la Raza v. EOIR*,
  524 F. Supp. 3d 919 (N.D. Cal. 2021) ..................................................................3

*Centro Presente v. DHS*,
  332 F. Supp. 3d 393 (D. Mass. 2018) ..................................................................10

*China Unicom (Ams.) Operations Ltd. v. FCC*,
  124 F. 4th 1128 (9th Cir. 2024) ........................................................................1, 6

*COR Clearing, LLC v. Ashira Consulting, LLC*,
  2016 WL 7638177 (C.D. Cal. Jan. 13, 2016) .....................................................13

ii

*Ctr. for Biological Diversity v. Regan*,
   597 F. Supp. 3d 173 (D.D.C. 2022) ........................................................................4

*Demore v. Kim*,
   538 U.S. 510 (2003) ...............................................................................................5

*Dep't of Homeland Sec. v. Regents of the Univ. of Cal.*,
   591 U.S. 1 (2020) ...................................................................................................7

*Doe v. Becerra*,
   704 F. Supp. 3d 1006 (N.D. Cal. 2023) ..............................................................12

*East Bay Sanctuary Covenant v. Biden*,
   993 F.3d 640 (9th Cir. 2021) .................................................................2, 14, 15

*Easyriders Freedom F.I.G.H.T. v. Hannigan*,
   92 F.3d 1486 (9th Cir. 1996) ..............................................................................14

*FDA v. Brown & Williamson Tobacco Corp.*,
   529 U.S. 120 (2000) ...............................................................................................7

*Florida v. Mayorkas*,
   2023 WL 3567851 (N.D. Fla. May 16, 2023) .......................................................4

*Florida. v. United States*,
   660 F. Supp. 3d 1239 (N.D. Fla. 2023).................................................................2

*Garland v. Aleman Gonzalez*,
   596 U.S. 543 (2022) ...............................................................................................1

*Gebhardt v. Nielsen*,
   879 F.3d 980 (9th Cir. 2018) .................................................................................5

*Gorbach v. Reno*,
   219 F.3d 1087 (9th Cir. 2000) ...............................................................................6

*Gun South v. Brady*,
   877 F.2d 858 (11th Cir. 1989) ...............................................................................6

*Harmon v. Thornburgh*,
   878 F.2d 484 (D.C. Cir. 1989) ............................................................................14

*Immigrant Defs. L. Ctr. v. Mayorkas*,
   2023 WL 3149243 (C.D. Cal. Mar. 15, 2023) ......................................................2

*Jennings v. Rodriguez*,
   583 U.S. 281 (2018).................................................................................................5

*Kelch v. Nevada Dep't of Prisons*,
   10 F.3d. 684 (9th Cir. 1993) ..................................................................................6

iii

*Kidd v. Mayorkas*,
  734 F. Supp. 3d 967 (C.D. Cal. 2024) ....................................................................2

*Last Best Beef, LLC v. Dudas*,
  506 F.3d 333 (4th Cir. 2007) .................................................................................6

*Macktal v. Chao*,
  286 F.3d 822 (5th Cir. 2002) .................................................................................6

*Massachusetts v. EPA*,
  549 U.S. 497 (2007)...............................................................................................8

*Mazaleski v. Treusdell*,
  562 F.2d 701 (D.C. Cir. 1977)...............................................................................6

*Monsanto Co. v. Geertson Seed Farms*,
  561 U.S. 139 (2010)...............................................................................................2

*NAACP v. DHS*,
  364 F. Supp. 3d 568 (D. Md. 2019)......................................................................10

*Ne. Ohio Coal. for Homeless & Serv. Emps. Int'l Union, Loc. 1199 v. Blackwell*,
  467 F.3d 999 (6th Cir. 2006) .................................................................................3

*Nken v. Holder*,
  556 U.S. 418 (2009)................................................................................................3

*OPM v. Am. Fed'n of Gov't Emps. AFL-CIO*,
  73 U.S. 1301 (1985)...............................................................................................4

*Patel v. Garland*,
  596 U.S. 328 (2022)................................................................................................5

*Perez v. United States*,
  2024 WL 4772734 (U.S. Nov. 12, 2024)..............................................................15

*Ramos v. Nielsen*,
  321 F. Supp. 3d 1083 (N.D. Cal. 2018) ........................................................4, 5, 10

*Ramos v. Wolf*,
  975 F.3d 872 (9th Cir. 2020) ........................................................................ *passim*

*Reno v. Am.-Arab Anti-Discrimination Comm.*,
  525 U.S. 471 (1999)................................................................................................1

*Rodriguez v. Hayes*,
  591 F.3d 1105 (9th Cir. 2010) ...............................................................................3

*Saget v. Trump*,
  375 F. Supp. 3d 280 (E.D.N.Y. 2019) .................................................................10

*Sampson v. Murray*,
  415 U.S. 61 (1974).................................................................................................3

*Scripps-Howard Radio v. FCC*,
  316 U.S. 4 (1942),...............................................................................................3

*Stanley v. Illinois*,
  405 U.S. 645 (1972)............................................................................................13

*Texas v. Biden*,
  646 F. Supp. 3d 753 (N.D. Tex. 2022) .............................................................2, 3

*Texas v. United States*,
  40 F.4th 205 (5th Cir. 2022) .......................................................................2, 4, 15

*Trump v. Hawaii*,
  585 U.S. 667 (2018)..............................................................................................9

*Tuan Thai v. Ashcroft*,
  366 F.3d 790 (9th Cir. 2004) ..............................................................................10

*United States v. Texas*,
  599 U.S. 670 (2023)............................................................................................15

*Village of Arlington Heights v. Metro. Hous. Dev. Corp.*,
  429 U.S. 252 (1977)......................................................................................10, 11

*Washington v. Trump*,
  --- F.4th ---, 2025 WL 553485 (9th Cir. Feb. 19, 2025) ...................................15

*Washington v. Trump*,
  847 F.3d 1151 (9th Cir. 2017) ............................................................................13

*Youngstown Sheet and Tube Co. v. Sawyer*,
  343 U.S. 579 (1952) (Jackson, J., concurring).....................................................8

**Statutes**

5 U.S.C. § 705 ......................................................................................... *passim*

5 U.S.C. § 706 .....................................................................................................14

8 U.S.C. § 1252(f).........................................................................................1, 2, 3

8 U.S.C. § 1254a ..................................................................................................10

8 U.S.C. § 1254a(b)(3)(B) .....................................................................................8

8 U.S.C. § 1254a(c)(1)(A)(iv).................................................................................8

8 U.S.C. § 1254a(c)(2)................................................................................................9

8 U.S.C. § 1254a(c)(3)(A)...........................................................................................9

8 U.S.C. § 1254a(b)(5)(A)...........................................................................................4

**Other Authorities**

101 Cong. Rec. 25811 (Oct. 25, 1989) .......................................................................7

90 Fed. Reg. 5961-01..................................................................................................8

90 Fed. Reg. 8805-01..............................................................................................7, 8

90 Fed. Reg. 8807.......................................................................................................7

90 Fed. Reg. 9040-01.............................................................................................9, 11

90 Fed. Reg. 9042...............................................................................................10, 11

PLAINTIFFS' REPLY ISO MOT. TO POSTPONE EFFECTIVE DATE – CASE NO. 3:25-CV-01766-EMC

**INTRODUCTION**

The orders Plaintiffs challenge will strip over 350,000 Venezuelan TPS holders of the right to live and work here in *less than a month*, placing them at immediate risk of detention and deportation. Once implemented, no final ruling could unwind their catastrophic social and economic impact. In contrast, Defendants face no concrete harm from relief that preserves the status quo.

Defendants claim "'statutorily implicit' authority to reconsider any TPS-related determination," Opp. 6, but ignore Ninth Circuit precedent that defeats their argument. Mot. 4–8. Agencies do not enjoy unfettered vacatur authority where, as here, Congress establishes a "fixed term" for a benefit. *China Unicom (Ams.) Operations Ltd. v. FCC*, 124 F. 4th 1128, 1148 (9th Cir. 2024). Nor is there a historical basis for such implicit authority. In TPS's thirty-five-year history, no Secretary had ever rescinded an extension before this. Defendants also ignore direct evidence that discrimination animated these decisions: Secretary Noem called Venezuelans "dirt bags" when announcing *this very decision*. Ex. 14 at 3.[1] The direct and circumstantial evidence of the Secretary's animus satisfies any standard for establishing unlawful discrimination.

Defendants insist this Court lacks jurisdiction to review even blatantly illegal agency action, saying this Motion is a disguised request for a preliminary injunction barred by 8 U.S.C. § 1252(f)(1).  But every court to consider that argument has rejected it. Relief under the APA renders agency action ineffective; it does not enjoin persons. Defendants' TPS-specific jurisdictional argument is also meritless. Courts have uniformly recognized that "determination" is a term of art. It does not foreclose claims challenging unlawful processes and discrimination.

**ARGUMENT**

**I.    THIS COURT HAS JURISDICTION AND AUTHORITY TO GRANT RELIEF.**

**A.    8 U.S.C. § 1252(f)(1) Does Not Bar Postponement Under 5 U.S.C. § 705.**

Section 1252(f)(1) "generally prohibits lower courts from entering *injunctions* that order federal officials to take or to refrain from taking actions to enforce, implement, or otherwise carry out" [certain immigration statutes]. *Garland v. Aleman Gonzalez*, 596 U.S. 543, 550 (2022) (emphasis added); *Reno v. Am.-Arab Anti-Discrimination Comm.*, 525 U.S. 471, 481 (1999) (Section

---

[1] All "Ex." and "Exs." references are to the Exhibits attached to Dkt. 37 (MacLean Decl.).

1252(f) "nothing more or less than a limit on injunctive relief").

Every court to consider the question—including the Fifth Circuit and at least five district courts—has rejected Defendants' view that APA relief is functionally an injunction barred by Section 1252(f)(1). *Texas v. United States*, 40 F.4th 205, 219–20 (5th Cir. 2022) (holding Section 1252(f)(1) "does not apply to vacatur" and, thus, DHS "unlikely to demonstrate" a lack of "jurisdiction to vacate unlawful agency action"); *Kidd v. Mayorkas*, 734 F. Supp. 3d 967, 987 (C.D. Cal. 2024) (Section 1252(f) inapplicable because vacating ICE policy neither "compels nor restrains further agency decision-making") (citation omitted); *Florida v. United States*, 660 F. Supp. 3d 1239, 1284–85 (N.D. Fla. 2023) (Section "1252(f)(1) does not strip [the Court] of the authority to vacate either of the challenged policies under the APA."); *Al Otro Lado, Inc. v. Mayorkas*, 619 F. Supp. 3d 1029, 1045–46 (S.D. Cal. 2022) (Section 1252(f)(1) does not prevent "'set[ting] aside' or 'vacating' a policy based upon an APA violation"), *aff'd in part, vacated in part sub nom., Al Otro Lado v. Exec. Off. for Immigr. Rev.*, 120 F.4th 606 (9th Cir. 2024); *Immigrant Defs. L. Ctr. v. Mayorkas*, 2023 WL 3149243, at *14 (C.D. Cal. Mar. 15, 2023) (Section 1252(f)(1) "did not bar" vacatur); *Texas v. Biden*, 646 F. Supp. 3d 753, 768 (N.D. Tex. 2022) (same).

Defendants cite *Biden v. Texas*, 597 U.S. 785 (2022) for support, Opp. 8, but *Biden* explicitly reserved this question; *id.* at 801 n.4; and the district court on remand rejected Defendants' view. *Texas*, 646 F. Supp. 3d at 768. A vacatur under the APA is a "less drastic remedy" than a preliminary injunction, *Monsanto Co. v. Geertson Seed Farms*, 561 U.S. 139, 165 (2010), and in this motion Plaintiffs seek only a "Section 705 stay [which] can … be seen as an interim or lesser form of [relief than] vacatur …." *Texas*, 646 F. Supp. 3d at 768. A postponement (or "stay") under Section 705 "would not 'order federal officials to take or to refrain from taking actions to enforce, implement, or otherwise carry out the specified statutory provisions' at issue"; it merely postpones agency action from taking effect. *Id.* at 769. That is why "[w]hen a reviewing court determines that agency regulations are unlawful, the ordinary result is that the rules are vacated—not that their application to the individual petitioners is proscribed." *East Bay Sanctuary Covenant v. Biden*, 993 F.3d 640, 681 (9th Cir. 2021).

Defendants nonetheless argue that APA relief "would have the effect of enjoining or

1    restraining DHS's implementation" of the TPS statute. Opp. 7. But virtually all orders against the

2    government have the "effect" of restraining federal officials in some sense. If Section 1252(f)(1)

3    prohibited them, it would also bar declaratory relief, which it does not. *Biden*, 597 U.S. at 800

4    (Section 1252(f)(1) preserves "jurisdiction to entertain the plaintiffs' request for declaratory relief.")

5    (internal quotations omitted); *Rodriguez v. Hayes*, 591 F.3d 1105, 1119 (9th Cir. 2010) (same).[2]

6         Finally, even if vacatur under the APA were analogous to an injunction, the stay relief

7    Plaintiffs seek here still would not violate Section 1252(f)(1), because stays are not injunctions. "A

8    stay … temporarily suspend[s] the source of authority to act," it does not "direct[] the actor's

9    conduct." *Nken v. Holder*, 556 U.S. 418, 428–29 (2009).

10        Therefore, under settled law, Section 1252(f)(1) does not prohibit this Court from vacating

11   agency action, and certainly does not render the Court helpless to maintain the status quo by

12   postponing agency action long enough to fully consider the merits.[3]

13        **B.    Section 705 Authorizes the Relief Plaintiffs Seek.**

14        Defendants next attempt to weave together dictionary definitions with inapposite cases to

15   contend that Section 705 "does not authorize relief here because the challenged actions have already

16   taken effect." Opp. 9–10. That is wrong. Under the orders, Plaintiffs' employment authorization

17   documents do not expire until April 3, and they lose legal status on April 8. In any event, "[c]ourts –

18   including the Supreme Court – routinely stay already-effective agency action under Section 705."

19   *Texas*, 646 F. Supp. 3d at 770 (collecting cases); *Centro Legal de la Raza v. EOIR*, 524 F. Supp. 3d

20   919, 980 (N.D. Cal. 2021) (ordering "the effectiveness" of rule stayed after effective date passed).

21   Relief "under Section 705 (even after the effective date) restores the [] status quo *ex ante*," *i.e.*, the

22   conditions that existed before the challenged agency action. *Texas*, 646 F. Supp. 3d at 771.

23        Defendants' cases are not to the contrary. *Ne. Ohio Coal. for Homeless & Serv. Emps. Int'l*

---

[2] Defendants, on page 9 of their brief, also cite a footnote in *Sampson v. Murray*, 415 U.S. 61, 68 n.15 (1974), referencing legislative history suggesting Section 705 codified the remedies described in a pre-APA case, *Scripps-Howard Radio v. FCC*, 316 U.S. 4 (1942), but *Scripps-Howard* held there was no "general legislative policy regarding the power to stay administrative orders pending review" discernible from the statutes governing judicial review of agency actions even at that time. *Id.* at 16.

[3] Many Venezuelan TPS holders could seek relief even under Defendants' expansive reading of Section 1252(f) because proceedings have been initiated against them.

1   *Union, Loc. 1199 v. Blackwell*, 467 F.3d 999, 1006 (6th Cir. 2006), does not address Section 705 at

2   all; it concerned the immediate appealability of a "mandatory injunction" that went "far beyond

3   preserving the status quo." Likewise, *OPM v. Am. Fed'n of Gov't Emps. AFL-CIO*, 73 U.S. 1301,

4   1303–05 (1985) does not address Section 705; it held an *appellate court* lacked authority to stay a

5   regulation following *denial* of a TRO brought "eight months after Congress had finally fixed" the

6   effective date, and where the denial's consequences were not "grave." *Florida v. Mayorkas*, 2023

7   WL 3567851 (N.D. Fla. May 16, 2023) involved a policy actually "in effect," *id.* at *4. Even there,

8   the district court did "not definitively decide" whether Section 705 applied because it granted an

9   injunction. *Id.* at n.7. Finally, *Ctr. for Biological Diversity v. Regan*, 597 F. Supp. 3d 173 (D.D.C.

10  2022) and *California v. U.S. Bureau of Land Mgmt.*, 277 F. Supp. 3d 1106 (N.D. Cal. 2017)

11  concerned *agencies'* authority to postpone rules after an effective date, not judicial authority. The

12  difference matters because an agency's postponement of an already-effective rule is "tantamount to

13  amending or revoking a rule," which requires APA compliance—unlike court orders under Section

14  705. *Texas*, 646 F. Supp. at 771 (quotations and citations omitted).

15      As a "reviewing court," this Court can exercise "all necessary and appropriate process to

16  postpone the effective date … or to preserve status or rights pending conclusion" of judicial review.

17  5 U.S.C. § 705. Nothing about the timing of this Motion deprives the Court of that authority.

18      **C.    Section 1254a(b)(5)(A) Does Not Bar Plaintiffs' Claims.**

19      Defendants next rely on Section 1254a(b)(5)(A) to dispute jurisdiction, but lack the "clear

20  and convincing evidence" required to prove that Congress intended to bar Plaintiffs' claims. *Ramos*

21  *v. Nielsen*, 321 F. Supp. 3d 1083, 1102 (N.D. Cal. 2018) (citing *Abbott Labs v. Gardner*, 387 U.S.

22  136, 141 (1967)). The statute bars review only of "any determination with respect to the designation,

23  or termination or extension" of TPS. That language does not encompass Plaintiffs' claims for two

24  basic reasons. First, "it is evident from the statutory context that this provision refers to the

25  designation, termination, or extension of a country for TPS," not every other kind of agency decision

26  related to TPS. *Ramos*, 321 F. Supp. at 1102. Second, not every agency conclusion is a

27  "determination … under [subsection(b)]." Mot. 17. "Determination" in jurisdiction-stripping statutes

28  refers narrowly to certain conclusions in support of underlying decisions, such as whether a country

1  is safe for return. *Id.* at 17–18. On that basis, the Supreme Court and Ninth Circuit have found

2  jurisdiction in several cases involving statutes using "determination*." Id.* (collecting cases).

3  These limits make clear that Plaintiffs' claims are cognizable. First, they challenge a vacatur,

4  which is not a "designation, or termination or extension" at all. Second, they challenge the agency's

5  statutory authority to issue a vacatur and its flawed reasoning in support of it (which concerned TPS

6  registration rules). Neither of those challenges attack covered "determination[s]." *Id*.

7  Defendants suggest the appearance of "any" before "determination" and the phrase "with

8  respect to" grant them a get-out-of-court-free card. Not so. "Any" cannot expand the meaning of

9  "determination." "[T]he statute's reference to '*any* determination' does not subsume 'any' general

10  policies or practices. Rather, the word 'any' must be understood in its grammatical context." *Ramos*,

11  321 F. Supp. 3d at 1104 (collecting cases). Indeed, courts have consistently read "any" and other

12  open-ended terms in jurisdiction-stripping statutes narrowly. *See*, *e.g.*, *Demore v. Kim*, 538 U.S. 510,

13  516 (2003) (provision stating "No court may set aside *any* action or decision … regarding the

14  detention … of any alien" not broad enough to cover claim that agency lacked statutory and

15  constitutional authority to detain) (citation omitted). For that reason, "with respect to" also cannot

16  broaden the meaning of "determination"; otherwise, this and other jurisdiction-stripping statutes

17  would be virtually limitless. *Jennings v. Rodriguez*, 583 U.S. 281, 293–94 (2018) (construing

18  reference to claims "arising from" detention narrowly, because "when confronted with capacious

19  phrases like 'arising from' we have eschewed 'uncritical literalism'") (plurality) (citation omitted);

20  *see also id.* (collecting cases involving "affected," "related to," and "in connection with").

21  Defendants cite the Supreme Court's reliance on the "broadening effect" of the words "any"

22  and "regarding" in *Patel v. Garland*, 596 U.S. 328, 339 (2022), but the statute there did not contain

23  the word "determination," and the Court relied on other context clues not present here. *Id.* (citing

24  amendment history of 8 U.S.C. § 1252(a)(2)(D)). Unlike in the TPS statute, when Congress sought

25  to write "categorical review preclusion language" into law, Opp. 13, it did so. *See, e.g.*, *Gebhardt v.*

26  *Nielsen*, 879 F.3d 980, 984–85 (9th Cir. 2018) (statute specifying decisions were in Secretary's "sole

27  and unreviewable discretion" barred review of all but constitutional claims).

28  Finally, Defendants assert that exercising jurisdiction would offend the Secretary's broad

1    grant of discretion over TPS, relying on the now-vacated Ninth Circuit panel's jurisdictional

2    analysis. However, that aspect of the decision was particularly weak, as the dissent explained. *Ramos*

3    *v. Wolf*, 975 F.3d 872, 919–24 (9th Cir. 2020) (Christen, J., dissenting), *opinion vacated upon reh'g*

4    *en banc*, 59 F.4th 1010 (9th Cir. 2023). In fact, the TPS statute provides the Secretary broad

5    discretion to designate a country for TPS once the designation is made, however, the statute requires

6    termination where the country conditions "no longer continue[]," and conversely provides TPS "is

7    extended" if unsafe conditions persist. But even under the *Ramos* majority's reasoning, Plaintiffs'

8    APA claims would be cognizable because the vacatur-authority claim turns on the interpretation of

9    the TPS statute, which is "reviewable under *McNary*." *Id.* at 895. Similarly, the claim that the

10    vacatur decision was arbitrary turns on the Secretary's failure to understand the statute's registration

11    process or consider obvious fixes short of vacatur; not her discretion to "consider and weigh various

12    conditions in a foreign country," which the *Ramos* majority held to be "unreviewable." *Id.* at 891.

## II.    PLAINTIFFS ARE LIKELY TO PREVAIL ON THEIR APA CLAIMS.

### A.    DHS Lacks Authority to Vacate TPS Extensions.

15    Defendants claim "[t]he power to reconsider is inherent in the power to decide," Opp. 14 &

16    n.5, but ignore that the en banc Ninth Circuit held the opposite. *Gorbach v. Reno*, 219 F.3d 1087,

17    1095 (9th Cir. 2000) (en banc) ("There is no general principle that what [an agency] can do, [it] can

18    undo"). In particular, the "use of a fixed term" for a benefit (like the fixed length of a TPS extension)

19    "is … inconsistent with … an implied power to revoke … at any time." *China Unicom*, 124 F. 4th at

20    1148. Even Defendants' out-of-circuit authority recognizes that any implied reconsideration

21    authority must yield to statutory limitations. *See Alberston v. FCC*, 182 F.2d 397, 399 (D.C. Cir.

22    1951); *Macktal v. Chao*, 286 F.3d 822, 825–26 (5th Cir. 2002); *Gun South v. Brady*, 877 F.2d 858,

23    862–64 (11th Cir. 1989). Their other cases concern uncontested assertions of reconsideration

24    authority or otherwise involve extraordinary facts not present here, and do not address the statutory

25    schemes at issue. *See Mazaleski v. Treusdell*, 562 F.2d 701, 720 (D.C. Cir. 1977) (considering

26    whether plaintiff's rejection of agency offer to reconsider precluded claims); *Last Best Beef, LLC v.*

27    *Dudas*, 506 F.3d 333, 336, 340 (4th Cir. 2007) (patent office unknowingly approved trademark on

28    same day legislation prohibiting trademark was signed into law). *Kelch* concerns state law. *Kelch v.*

1  *Nevada Dep't of Prisons*, 10 F.3d. 684, 686 (9th Cir. 1993).

2          Defendants protest that, under "Plaintiffs' logic," the Secretary could never vacate a TPS

3  extension, even if she discovered a genuine error or national security threat. Opp. 15. "Plaintiffs'

4  logic" is the law: "Regardless of how serious the problem an administrative agency seeks to address,

5  … it may not exercise its authority in a manner that is inconsistent with the administrative structure

6  that Congress enacted into law." *FDA v. Brown & Williamson Tobacco Corp.*, 529 U.S. 120, 125

7  (2000) (quotations omitted). There is nothing remarkable about denying an agency "implicit"

8  authority to revoke the immigration status of potentially millions of people. The Secretary cannot

9  revoke en masse green cards, H-1B visas, or student visas; such authority resides with Congress.

10  Indeed, Congress established fixed time periods for TPS precisely to eliminate confusion under prior

11  humanitarian programs about "how long [beneficiaries] will be able to stay." 101 Cong. Rec. 25811,

12  25837 (Oct. 25, 1989) (Statement of Rep. Richardson) (debate on precursor to TPS statute).

13          Defendants also cannot support the vacatur order based on serious error or national security

14  concerns. Secretary Noem already gave her "[r]easons for the [v]acatur." 90 Fed. Reg. 8805-01 at

15  8807. She identified no error in the prior determination, no urgent national security or foreign policy

16  matter, and no "threats to the safety and security of the United States." Opp. 13–15. Rather, her

17  concerns were ministerial, namely a potential "lack of clarity" due to "multiple notices, overlapping

18  populations, overlapping dates, and sometimes multiple actions happening in a single document." 90

19  Fed. Reg. 8807; Opp. 6 (describing reasons for vacatur). Defendants complain that Plaintiffs "sever"

20  the vacatur from the termination. Opp. 14. But the vacatur cannot be justified by reasons in a later

21  termination notice. *Dep't of Homeland Sec. v. Regents of the Univ. of Cal.*, 591 U.S. 1, 21 (2020)

22  ("rescission [may] not [be] upheld on the basis of impermissible '*post hoc* rationalization'") (citation

23  omitted).

24          Finally, while Defendants emphasize the Secretary's "border and national security

25  responsibilities," the breadth of the "national interest" standard, and "foreign policy" implications,

26  they do not (and could not) argue these factors authorize vacatur if the TPS statute does not. Opp.

27  13–17. Defendants concede vacatur authority is "foreclosed" if Congress has "require[ed] other

28  procedures." *Id.* at 14 n.14. Congress has. Mot. 5–8. Terminations take effect either: (a) 60 days after

7

1  publication or (b) "*if later*," the "expiration of the most recent previous extension"—here, October 2,

2  2026. 8 U.S.C. § 1254a(b)(3)(B) (emphasis added); 90 Fed. Reg. 5961-01 (Jan. 2025 Extension).

3  Secretary Noem's attempt to erase Venezuela's "most recent previous extension" and then terminate

4  TPS eighteen months before the "expiration of" that extension violates the statute.[4]

5              **B.      The Vacatur Decision Was Arbitrary.**

6              Even if DHS had vacatur authority, the reasons given for this vacatur still violate the APA.

7  Defendants ignore Plaintiffs' argument that the vacatur rests on legal errors. Mot. 8–9. They repeat

8  Secretary Noem's concern about "negat[ing] the 2021 Venezuela TPS designation" by "subsuming it

9  within the 2023 Venezuela designation," Opp. 16–17, but ignore that *all* new designations

10  necessarily subsume earlier ones. Defendants also repeat Secretary Noem's objection to

11  consolidating registration processes, *id.*, but the statute's text permits registration "to the extent and

12  in a manner which the [Secretary] establishes." 8 U.S.C. § 1254a(c)(1)(A)(iv).

13              Instead, they defend the vacatur on two grounds. First, they say Secretary Noem "reasonably

14  explained" that the 2025 extension[5] lacked "a reasoned explanation or express consideration of the

15  operational or legal impacts." Opp. 16. The vacatur notice faults the extension for failing to

16  "acknowledge the novelty of its approach or explain how it is consistent with the TPS statute," and

17  providing an "inadequately developed" "explanation for operational impacts" on registration. 90

18  Fed. Reg. 8805-01 at 8807. But those explanations *prove* Secretary Noem's legal errors. Labeling a

19  decision as "novel" and potentially unlawful when it is plainly neither one, and complaining about a

20  failure to explain non-existent flaws, is *not* reasoned decision-making. *Mass. v. EPA*, 549 U.S. 497,

21  534–35 (2007) (decision based on misinterpretation of agency's own authority violated APA).

22              Second, Defendants claim that simple revisions to the registration process would be

23  insufficient because vacatur provided "an opportunity for informed determinations regarding the

24  TPS designations." Opp. 17. This too is not a reasoned explanation. It is a bald assertion that the

25  Secretary should be allowed to vacate a decision whenever she wants. The statute does not permit

---

26  [4] Because the vacatur is "incompatible with the expressed or implied will of Congress," Defendants'
   reliance on *Youngstown* is misplaced. Opp. 15 (citing *Youngstown Sheet and Tube Co. v. Sawyer*,

27  343 U.S. 579, 635 (1952) (Jackson, J., concurring)).
   [5] Plaintiffs' counsel confirmed with Defendants by email that the Opposition's reference to the

28  "2023 Designation notice," Opp. 16, was instead meant to refer to the 2025 Extension.

1    that result. And even where an agency does have implied reconsideration authority, it may not

2    exercise that authority "as a guise for changing previous decisions because the wisdom of those

3    decisions appears doubtful in the light of changing policies." *Am. Trucking Ass'n v. Frisco Transp.*

4    *Co.*, 358 U.S. 133, 146 (1958). Finally, Defendants suggest the Motion "diverges" from the

5    Complaint, but Plaintiffs pled every APA claim raised here. Compl. ¶¶ 149–149(a)–(f).

6    **III.    PLAINTIFFS ARE LIKELY TO PREVAIL ON THEIR DISCRIMINATION CLAIM.**

7           Defendants never address the most damning direct evidence of race discrimination: Secretary

8    Noem's repeated invocation of false, racist tropes to justify these decisions. When announcing these

9    decisions, she stated "the people of this country … want these dirt bags out." Ex. 14. Similarly,

10   during her confirmation hearing, she called "this extension [of TPS] of over 600,000 Venezuelans …

11   alarming" because of "gangs"—confirming that she equates Venezuelan TPS holders with criminals.

12   Ex. 12. Such fabricated assertions "fit comfortably into [a] historical pattern" of invoking false fears

13   of criminality to stoke racist sentiment against disfavored immigrant populations. Dkt. 22 ¶¶ 20, 27.

14          Even if the deferential standard of review under *Trump v. Hawaii*, 585 U.S. 667 (2018)

15   applied, the Court could consider these contemporaneous statements of animus and related "extrinsic

16   evidence" to prove Defendants' justifications are not "bona fide," *id.* 705–06; *Ramos*, 336 F. Supp.

17   3d at 1108. The evidence of animus connected to these decisions is overwhelming. *See* App'x A

18   hereto (summarizing evidence in the record). Even the Federal Register notice is infused with racial

19   animus. It claims TPS allowed "members of the Venezuelan gang known as Tren de Aragua" to

20   "settle in the interior" of the U.S., and alleges crimes by TdA. 90 Fed. Reg. 9040-01 at 9042. This is

21   false for several reasons: TPS does not allow people to enter the U.S.; TdA "appears to have no

22   substantial U.S. presence and looks unlikely to establish one," Dkt. 26 ¶¶ 16–22; Compl. ¶¶ 95–97;

23   and people who present a national security threat are ineligible for TPS.[6] These blatantly false

24   statements evoking racist tropes cannot be brushed aside as remote in time, "taken out of context," or

25   as about Venezuela "the country itself." *Compare* Opp. 21 *with* Exs. 6, 12, 14, 15, *and* App'x A. Nor

26

27   _____

     [6] 8 U.S.C. § 1254a(c)(2); Dkt. 27 ¶ 15. TPS applicants are subject to searching inquiries about
     potential criminal history anywhere in the world. USCIS, Form I-821 "Application for Temporary
     Protected Status" at 7–10 (Apr. 1, 2024 ed.). Furthermore, the Secretary may withdraw TPS from

28   any person if she later determines the person was not eligible. 8 U.S.C. § 1254a(c)(3)(A).

PLAINTIFFS' REPLY ISO MOT. TO POSTPONE EFFECTIVE DATE – CASE NO. 3:25-CV-01766-EMC

1    does it matter whether the statements reflect animus based on national origin rather than race; both

2    are equally unlawful. Mot. 11 n.3.[7]

3          In any event, this Court and others held that the *Arlington Heights* standard governs TPS

4    decisions.[8] TPS concerns people "already in the United States" with "greater constitutional

5    protections"; *Ramos*, 321 F. Supp. 3d at 1129; and the decisions challenged here were not "intended

6    to induce the cooperation or action of a foreign government," *id.*, and not issued under a statute that

7    "exudes deference to the President in every clause." *Id.* at 1130. And while the Secretary asserted the

8    "national interest" justified the termination (though not the vacatur), her explanations reveal the

9    underlying rationale relates to (unfounded) assumptions about crime and economic harm, not

10   national security as that doctrine is understood. *See Tuan Thai v. Ashcroft*, 366 F.3d 790, 796 (9th

11   Cir. 2004) ("We do not agree that the danger of criminal conduct by an alien is automatically a

12   matter of national security").[9]

13         Defendants suggest the record here is comparable to that in *Ramos*, but, sadly, there is now

14   far more direct proof that "administration officials involved in the TPS decision-making process

15   were themselves motivated by" racial animus. *Ramos*, 975 F.3d at 897. In *Ramos*, the Secretaries

16   made no racist statements, whereas Secretary Noem has used them to explain her decisions, and has

17   also adopted President Trump's racist justifications in the notice itself, 90 Fed. Reg. 9042. For that

18   reason, the Court can rule for Plaintiffs without addressing their "cat's-paw" theory. *Ramos*, 336 F.

19   Supp. 3d at 1098–1101. Defendants also cannot account for Secretary Noem's extraordinary

20   deviations from the normal practice, including the first-ever vacatur of an extension and the

21   dramatically compressed timetable, Mot. 13–14, both of which can be evidence of "improper

22

23   [7] The Notice also cites Executive Order 14150, the "America First Policy Directive," claiming the

24   presence of Venezuelan TPS holders contravenes that order. As was true before, the "America First" slogan itself evokes racial animus. *Ramos*, 336 F. Supp. 3d. at 1104; Compl. ¶ 126 n.82.

25   [8] *Ramos*, 975 F.3d at 896 (rejecting government's contention that *Hawaii* standard of review applies); *Ramos*, 336 F. Supp. 3d at 1105–07; *Centro Presente v. DHS*, 332 F. Supp. 3d 393, 411–12 (D. Mass. 2018); *Saget v. Trump*, 345 Supp. 3d 287, 301–02 (E.D.N.Y. 2018); *Saget v. Trump*, 375

26   F. Supp. 3d 280, 367–68 (E.D.N.Y. 2019); *Casa de Md., Inc. v. Trump*, 355 F. Supp. 3d 307 (D. Md. 2018); *NAACP v. DHS*, 364 F. Supp. 3d 568, 576 (D. Md. 2019).

27   [9] Defendants claim in passing that this Court lacks jurisdiction to consider the constitutional claim, but ignore that Section 1254a never mentions constitutional claims.

28

1    purpose[].” *Village of Arlington Heights v. Metro. Hous. Dev. Corp.*, 429 U.S. 252, 267 (1977).

2          Nor can the termination be substantiated by logic or facts. Aside from the false references to

3    criminality, Secretary Noem asserts that allowing a large number of unauthorized immigrants to

4    settle in the U.S. strains resources of "local communities." 90 Fed. Reg. 9040-01 at 9042. But, given

5    many Venezuelan TPS holders cannot return to Venezuela or travel to a safe third country,

6    terminating TPS will *increase* the number of unauthorized Venezuelans and prevent them from

7    working lawfully, only worsening any strain on local communities. Dkt. 19 ¶¶ 15–16; Dkt. 27 ¶¶ 18–

8    23, 27. Defendants do not dispute that their actions will cost the U.S. economy at least $3.5 billion,

9    including nearly $500 million in lost Social Security taxes. Dkt. 21 ¶ 9. Finally, Secretary Noem

10   cited "pull factors." However, her only source of support concerns *redesignating* a country for TPS,

11   which expands the pool of TPS recipients. 90 Fed. Reg. 9040-01 at 9043 n.18. She cites no evidence

12   that TPS *extensions* "pull" immigrants here, and it defies logic because they do not make more

13   people eligible. Dkt. 27 ¶ 26 ("No 'Magnet Effect.'").

14         Together, this evidence more than suffices to establish a likelihood of success on the claim

15   that race or national origin discrimination was a motivating factor in these TPS decisions.

16   **IV.    PLAINTIFFS HAVE ESTABLISHED IRREPARABLE HARM.**

17         Plaintiffs' record on irreparable harm stands unrebutted. Absent postponement, the

18   challenged decisions will devastate the lives and communities of Plaintiffs and thousands of other

19   Venezuelan TPS holders. Dkts. 17–20, 29–36, 64; Mot. 21–23. TPS is supposed to provide

20   humanitarian protection so long as conditions in a designated country have not improved. Here, the

21   Secretary presumes that "conditions in Venezuela remain … 'extraordinary'" 90 Fed. Reg. 9042, yet

22   her actions will strip hundreds of thousands of people of TPS protection absent judicial intervention.

23         TPS holders are experiencing severe and growing anxiety; many will lose their status,

24   employment authorization, driver's licenses, and right to legally remain here in a matter of weeks.

25   E.R., for instance, is the sole provider for her twelve-year-old daughter, and faces the loss of her

26   work authorization on April 3; she fears that, absent a legal right to remain, she and her daughter

27   could be detained at her June 2025 ICE check-in and deported shortly after. Dkt. 20 ¶¶ 2, 12–13, 17–

28   18. M.H. also fears she will lose TPS in April, and face the possibility of being separated from her

three-year-old U.S. citizen son as soon as her ICE check-in in May. Dkt. 32 ¶¶ 2, 6, 17. Mr. Arape renewed TPS immediately upon the January 17 decision and received an automatic extension of his work authorization; he now fears the imminent loss of both his work authorization and his ability to apply for an H-1B visa, which is contingent on him remaining in status. Dkt. 18 ¶¶ 2, 14–16. A.V. suffered panic attacks at the thought of losing TPS and overdosed on medication; Ms. Guerrero and her husband cry about the loss of TPS every day. Dkt 31 ¶ 18. Ms. Gonzalez Herrera has cancelled plans to pursue graduate education. Dkt. 29 ¶ 15.

Apart from the human tragedy unfolding here, the challenged decisions will cause billions in unrecoverable economic losses, including lost Social Security contributions and other economic benefits that everyone living here reaps from the contributions of this community. Dkts. 21, 23–24, 27. And deprivations of constitutional and statutory rights alone give rise to irreparable injury. *Compare* Mot. 19–20 *with* Opp. 22 (not disputing violations alone represent irreparable harm).

Lacking an iota of competent evidence of harm, Defendants nonetheless urge the Court to close its eyes to these horrors based on an invented exception to irreparable harm. Defendants argue that the massive loss of safety, family, community, healthcare, work, and education resulting from their decisions are "inherent" byproducts of TPS's "temporary nature." Opp. 22. They made the same argument in *Ramos*, and this Court rejected it, explaining that "the shortening of [] time in the United States and acceleration of [] removal if relief is not granted may constitute irreparable injury." *Ramos*, 336 F. Supp. 3d at 1087. Here the difference is at least 18 months, and could be longer if Venezuela remains unsafe. *Doe v. Becerra*, 704 F. Supp. 3d 1006, 1017 (N.D. Cal. 2023), *abrogated on other grounds by Doe v. Garland*, 109 F.4th 1188 (9th Cir. 2024) (explaining that even limited extensions of time at liberty in the U.S. may affect family ties, employment, and educational opportunities).

Defendants do not deny that their decisions exacerbate what they call "inherent" harm. Nor do they dispute that their decisions upended reasonable reliance expectations—in a prior duly adopted extension, especially where there is no precedent in TPS's 35-year history of an extension being vacated and terminated; and in the continuity of TPS so long as the country conditions justify it. Defendants also provide no legal support for their invented exception to irreparable harm. They

1  cite *Stanley v. Illinois*, 405 U.S. 645, 647 (1972), but this case did not consider the *Winter* factors or

2  endorse such an exception. And they badly misread *Washington v. Trump*, 847 F.3d 1151, 1169 (9th

3  Cir. 2017). It ruled that permitting a decision to take effect even "temporarily" *can* cause

4  "substantial injuries and even irreparable harms" when, as here, it threatens to "separate[] families."

5  *Id.* at 1169. That case also reaffirmed the public "interest … in avoiding separation of families …."

6  *Id.* It concluded that the "powerful interest in national security and in the ability of an elected

7  president to enact policies" did *not* outweigh such harms. *Id.* Ultimately, the Ninth Circuit *denied*

8  two attempts by Defendants to set aside a district court order entered to prevent harms like those

9  here. *Id.* at 1156, 1158. The irreparable harm factor thus supports granting relief here.

10  **V.     THE EQUITIES AND PUBLIC INTEREST FAVOR POSTPONEMENT.**

11      Defendants' equities arguments rest on nothing more than unsubstantiated assertions from

12  the challenged termination itself. Opp. 24. For example, Defendants invoke safety concerns over the

13  Tren de Aragua gang, but offer no evidence that TdA members obtained TPS, and ignore the record

14  evidence thoroughly refuting that possibility. *See supra* p.9. Defendants' other arguments about the

15  public interest in enforcing immigration laws similarly fall short. Opp. 24. As one of Defendants'

16  own authorities illustrates, those interests would be served by postponing an unlawful decision

17  pending judicial review to avoid massive harm. *See Washington*, 847 F.3d at 1169.

18      Defendants' nonexistent evidentiary showing on the equities underscores that the balance of

19  hardships tips sharply in Plaintiffs' favor. The parties will face vastly different consequences from

20  an erroneous decision. *See COR Clearing, LLC v. Ashira Consulting, LLC*, 2016 WL 7638177, at *5

21  (C.D. Cal. Jan. 13, 2016) (weighing the equities "assuming the Court's ruling granting the injunction

22  is erroneous"). At most, an erroneous decision in Plaintiffs' favor would allow Venezuelan TPS

23  holders to temporarily retain TPS—an outcome that, until a short while ago, was what the

24  government itself had ordered. In contrast, an erroneous decision in Defendants' favor will cause

25  immediate and irreversible humanitarian harms, *e.g.*, Dkt. 18 ¶¶ 13, 18, 20, 22; Dkt. 20 ¶¶ 19, 22;

26  Dkt. 25 ¶¶ 19, 21; Dkt. 32 ¶ 22; Dkt. 33 ¶¶ 11, 17, 19; Dkt. 33 ¶¶ 15, 17, broad-based economic

27  disruption, *e.g.*, Dkt. 21 ¶ 9; Dkt. 23 ¶¶ 4–8; Dkt. 24 ¶¶ 6–8; Dkt. 27 ¶¶ 15, 20–22, and compromise

28  public health and safety, *e.g.*, Dkt. 19 ¶ 10; Dkt. 27 ¶¶ 15–16. The harms would impact not only TPS

1    holders, but also their American family members, friends, and neighbors.

2    **VI.    THE REQUESTED RELIEF IS NOT OVERBROAD.**

3         The relief Plaintiffs seek is not overbroad. The Ninth Circuit's default rule in APA cases is

4    that orders setting aside administrative agency action apply against the rule itself; only in that sense

5    are they "universal." Opp. 25. "When a reviewing court determines that agency regulations are

6    unlawful, the ordinary result is that the rules are vacated—not that their application to the individual

7    petitioners is proscribed." *East Bay*, 993 F.3d at 681 (cleaned up). Other circuits have long held the

8    same. *Harmon v. Thornburgh*, 878 F.2d 484, 495 n.21 (D.C. Cir. 1989) (same); *Career Colls. &*

9    *Schs. of Tex. v. Dep't of Educ.*, 98 F.4th 220, 255 (5th Cir. 2024) ("Nothing in the text of Section

10   705, nor of Section 706, suggests that either preliminary or ultimate relief under the APA needs to be

11   limited to [the associational plaintiff] or its members").

12        While there may be exceptions to that default rule, the factors *East Bay* identified for

13   purposes of determining the appropriate scope of relief in APA immigration cases strongly favor

14   postponing the agency action universally in this case. First, it is "necessary to give prevailing parties

15   the relief to which they are entitled." *E. Bay*, 993 F.3d at 680. NTPSA has over 84,000 Venezuelan

16   TPS holder members living in all 50 states and the District of Columbia. Dkt. 34 ¶13. "Requiring …

17   officials … to distinguish between [TPS] recipients who are members of the [Alliance] and those

18   who are not is impractical." *Az. Dream Act Coal. v. Brewer*, 81 F. Supp. 3d 795, 810 (D. Ariz.

19   2015), *aff'd*, 855 F.3d 957 (9th Cir. 2017) (relief "should apply to all DACA recipients" where

20   associational plaintiff sought relief for DACA-holder members)*; see also Easyriders Freedom*

21   *F.I.G.H.T. v. Hannigan*, 92 F.3d 1486, 1502 (9th Cir. 1996). Indeed, even under the most restrictive

22   rule for non-APA cases limiting relief narrowly to the parties before the Court, adequate equitable

23   relief would require a remedy for all Venezuelan NTPSA members who hold TPS, rendering circuit-

24   wide relief inadequate. Dkt. 34 ¶ 33.

25        Second, the Ninth Circuit has generally recognized the "need for uniformity in immigration

26   policy," because the INA itself "was designed to implement a uniform federal policy." *East Bay*, 993

27   F.3d at 681 (quotation omitted). That rationale has particular force here, where the statute

28   contemplates only one TPS status per country at a time. Adopting different rules for TPS holders

1    from the same country would create confusion and needlessly complicate agency action in response

2    to the "United States's changing immigration requirements." *Id.* at 681. For these reasons, the Ninth

3    Circuit has "consistently recognized the authority of district courts to grant universal relief" in

4    immigration cases. *Id.* at 681;*see also Texas*, 40 F.4th at 219–20 (Fifth Circuit's similar rule).

5          Defendants' argument against universal relief rests entirely on non-APA cases. Opp. 25.

6    Those cases are about injunctions rather than vacatur or postponement under the APA, and the only

7    immigration case among them states that the federal government must speak with "one voice" in the

8    immigration realm, which supports uniformity here. *Id.* (quoting *Arizona v. United States*, 567 U.S.

9    387, 409 (2012)). Defendants also cite some concurrences expressing concerns about universal

10   relief, Opp. 25, but other judges (including the Chief Justice) have criticized the suggestion that APA

11   relief would not be universal. *See, e.g.*, *United States v. Texas*, 599 U.S. 670 (2023), Tr. at 35:12–25,

12   https://www.supremecourt.gov/oral_arguments/argument_transcripts/2022/22-58_4fc4.pdf (C.J.

13   Roberts) (characterizing government's view that vacatur does not afford universal relief as "fairly

14   radical" because "that's what you do in an APA case"). Whichever view eventually prevails, the

15   concurrences Defendants cite are not the law now. Even on the shadow docket, when the Supreme

16   Court has had ample opportunity to narrow lower court orders that universally vacate—or even

17   enjoin—agency action in both immigration cases and others, it has consistently refused to do so.[10]

18                                  **CONCLUSION**

19         The Court should postpone the effective date of the challenged decisions until it can finally

20   resolve the merits.

21

22   _____

23   [10] *See Texas*, 599 U.S. 670, *supra* (denying request for stay of district court order vacating DHS
     Secretary's enforcement priorities guidance, which applied universally); *Perez v. United States*, 2024
24   WL 4772734 (U.S. Nov. 12, 2024) (refusing to stay district court order halting the federal
     government's Keeping Families Together program for certain noncitizens, which applied
     universally); *Biden v. Missouri*, 145 S. Ct. 109 (2024) (denying request to vacate universal
25   injunction against Biden administration's student loan forgiveness program); *Alabama Ass'n of
     Realtors v. Dep't of Health & Human Servs.,* 594 U.S. 758, 759 (2021) (lifting stay on district court
26   order universally vacating the COVID eviction moratorium); *see also Washington v. Trump*, ---
     F.4th ---, 2025 WL 553485 (9th Cir. Feb. 19, 2025) (affirming universal injunction against birthright
27   citizenship order, and rejecting request to narrow injunction's scope); *CASA, Inc. v. Trump*, --- F.4th
     ---, 2025 WL 654902, at *1–3 (4th Cir. Feb. 28, 2025) (same, based on need for equity, uniformity,
28   and complete relief for associational plaintiff).

Date:  March 7, 2025

Respectfully submitted,

ACLU FOUNDATION
OF NORTHERN CALIFORNIA

 /s/ *Emilou MacLean*
Emilou MacLean
Michelle (Minju) Y. Cho

Ahilan T. Arulanantham
Stephany Martinez Tiffer
CENTER FOR IMMIGRATION LAW AND
POLICY, UCLA SCHOOL OF LAW

Eva L. Bitran
ACLU FOUNDATION
OF SOUTHERN CALIFORNIA

Jessica Karp Bansal
Lauren Michel Wilfong (*pro hac vice*)
NATIONAL DAY LABORER ORGANIZING
NETWORK

Attorneys for Plaintiffs

01130

PLAINTIFFS' REPLY ISO MOT. TO POSTPONE EFFECTIVE DATE – CASE NO. 3:25-cv-01766-EMC

**CERTIFICATE OF SERVICE**

I hereby certify that on March 7, 2025, I caused the foregoing to be electronically filed with the Clerk of Court using the CM/ECF system, which will then send a notification of such filing (NEF) to all counsel of record.

ACLU FOUNDATION
OF NORTHERN CALIFORNIA


 /s/ *Emilou MacLean*
Emilou MacLean

United States District Court
Northern District of California

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| NATIONAL TPS ALLIANCE, et al., | Case No. 25-cv-01766-EMC |
| Plaintiffs, | |
| v. | **ORDER GRANTING PLAINTIFFS' MOTION TO POSTPONE** |
| KRISTI NOEM, et al., | |
| Defendants. | Docket No. 16 |

## I.    INTRODUCTION

At issue is whether this Court should temporarily postpone actions by Kristi Noem, Secretary of the Department of Homeland Security, taken against over 600,000 Venezuelan nationals who have legal status to reside and work temporarily in the United States. The Secretary's actions will shortly strip nearly 350,000 of these residents of their protection under the Temporary Protected Status ("TPS") program, subjecting them to possible imminent deportation back to Venezuela, a country so rife with economic and political upheaval and danger that the State Department has categorized Venezuela as a "Level 4: Do Not Travel" country "due to the high risk of wrongful detentions, terrorism, kidnapping, the arbitrary enforcement of local laws, crime, civil unrest, poor health infrastructure." https://travel.state.gov/content/travel/en/traveladvisories/traveladvisories/venezuela-travel-advisory.html (last visited 3/30/2025). The unprecedented action of vacating existing TPS (a step never taken by any previous administration in the 35 years of the TPS program), initiated just three days after Secretary Noem took office, reverses actions taken by the Biden administration to extend temporary protection of Venezuelan nationals that have been in place since 2021.

1    Although the Secretary's actions appear predicated on negative stereotypes casting class-wide

2    aspersions on their character (insinuating they were released from Venezuelan prisons and mental

3    health facilities and imposed huge financial burdens on local communities), the undisputed record

4    establishes that Venezuelan TPS beneficiaries, in fact, have higher education attainment than most

5    U.S. citizens (40-54% have bachelor degrees), have high labor participation rates (80-96%), earn

6    nearly all their personal income (96%), and annually contribute billions of dollars to the U.S.

7    economy and pay hundreds of millions, if not billions, in social security taxes.  They also have

8    lower rates of criminality than the general U.S. population.

9           Following Secretary Noem's actions, Plaintiffs filed the instant action.  Plaintiffs are seven

10   individuals from Venezuela who are TPS holders, plus the National TPS Alliance ("NTPSA").

11   The NTPSA is "a member-led organization representing Temporary Protected Status ('TPS')

12   holders across the country."  Compl. ¶ 2.  NTPSA's members include over 84,000 Venezuelan

13   TPS holders living in all fifty states and the District of Columbia.  *See* Jimenez Decl. ¶ 13.

14   Among other things, NTPSA "engages in advocacy to defend TPS and win a path to permanent

15   status for TPS holders."[1]  Jimenez Decl. ¶ 21.

16          Having considered the parties' briefs and accompanying submissions, the oral argument of

17   counsel, and the views of Amici (a collection of various states, cities, and counties throughout the

18   United States),[2] the Court hereby **GRANTS** Plaintiffs' motion.  For the reasons stated below, the

19   ─────────────────────

20   [1] NTPSA has submitted a declaration from Jose A. Palma Jimenez, the Co-Coordinator of the
     organization.  In his declaration, Mr. Jimenez explains that NTPSA also

21
             organizes actions to raise public awareness about TPS and the
22           contributions TPS holders make to this country; facilitates
             community and civic engagement by TPS holders; and provides
23           access to timely and accurate TPS-related information and services
             to its members.

24   Jimenez Decl. ¶ 21.  The government has not contested NTPSA's standing to bring suit.  *See
     Students for Fair Admissions, Inc. v. President & Fellows of Harv. Coll.*, 600 U.S. 181, 199
25   (2023) (noting that, "where the plaintiff is an organization, the standing requirements of Article III
     can be satisfied in two ways[:] [e]ither the organization can claim that it suffered an injury in its
26   own right or, alternatively, it can assert 'standing solely as the representative of its members'").

27   [2] There are two sets of Amici: (1) the Amici States and (2) the Amici Cities and Counties.  The
     Amici States are California, New York, Connecticut, Delaware, Hawaii, Illinois, Maine,
28   Maryland, Massachusetts, Michigan, Minnesota, Nevada, New Jersey, Oregon, Rhode Island,

*United States District Court*
*Northern District of California*

United States District Court
Northern District of California

1  Court finds that the Secretary's action threatens to: inflict irreparable harm on hundreds of

2  thousands of persons whose lives, families, and livelihoods will be severely disrupted, cost the

3  United States billions in economic activity, and injure public health and safety in communities

4  throughout the United States.  At the same time, the government has failed to identify any real

5  countervailing harm in continuing TPS for Venezuelan beneficiaries.  Plaintiffs have also shown

6  they will likely succeed in demonstrating that the actions taken by the Secretary are unauthorized

7  by law, arbitrary and capricious, and motivated by unconstitutional animus.  For these reasons, the

8  Court grants Plaintiffs' request to postpone the challenged actions pending final adjudication of

9  the merits of this case.

## II.  FACTUAL & PROCEDURAL BACKGROUND

11  A.  Background on TPS

12  As part of the Immigration Act of 1990, Congress created the TPS program.  The TPS

13  program is a humanitarian program; the governing statute is codified at 8 U.S.C. § 1254a.

14  Under § 1254a, the Secretary of DHS may **designate** a foreign country for TPS when

15  individuals from that country cannot safely return due to armed conflict, natural disaster, or other

16  extraordinary and temporary circumstances.  *See* 8 U.S.C. § 1254a(b).  The initial designation lasts

17  for 6, 12, or 18 months, at the Secretary's discretion.  *See id.* § 1254a(b)(2).

18  Once a foreign country is given a TPS designation, individuals from that country may

19  apply for immigration status.  If granted, they may not be removed from the United States;

20  furthermore, they are given authorization to work in the United States.  *See id.* § 1254a(a)(1).

21  For individuals to become TPS holders, there are specific requirements that must be met.

22  For example, an individual must have "been continuously physically present in the United States

23  since the effective date of the most recent designation of that [foreign] state."  *Id.* §

24  1254a(c)(1)(A)(i).  In addition, an individual must be "admissible as an immigrant."  *Id.* §

25  1254a(c)(1)(A)(iii).  An individual is inadmissible if, *e.g.*, they have been convicted of certain

26  

27  Vermont, Washington, and the District of Columbia.  The Amici Cities and Counties are Denver,
San Francisco, Hartford, Cambridge, San Diego, Chicago, Iowa City, Minneapolis, Saint Paul,

28  Boston, and Santa Clara.  Both Amici have submitted briefs in support of Plaintiffs' motion.

crimes (such as a crime involving moral turpitude or drugs) or are a member of a terrorist organization.[3]  *See id.* § 1182(a)(2)-(3).  Moreover, an individual is expressly deemed ineligible for TPS if they have "been convicted of any felony or 2 or more misdemeanors committed in the United States."  *Id.* § 1254a(c)(2)(B).  The Secretary "shall withdraw [TPS] granted to an alien . . . if [the Secretary] finds that the alien was not in fact eligible for such status."  *Id.* § 1254a(c)(3)(A).

After a foreign country has been given a TPS designation, that designation is subject to periodic review to determine if the TPS designation should be **terminated** or **extended**.

> At least 60 days before end of the initial period of designation, and any extended period of designation, of a foreign state (or part thereof) under this section the [Secretary of DHS[4]], after consultation with appropriate agencies of the Government, shall review the conditions in the foreign state (or part of such foreign state) for which a designation is in effect under this subsection and shall determine whether the conditions for such designation under this subsection continue to be met.

*Id.* § 1254a(b)(3)(A).

- "If the [Secretary] determines . . . that a foreign state (or part of such foreign state) no longer continues to meet the conditions for designation under paragraph (1), the [Secretary] shall terminate the designation . . . ."  *Id.* § 1254a(b)(3)(B).

- "If the [Secretary] does not determine . . . that a foreign state (or part of such foreign state) no longer meets the conditions for designation under paragraph (1), the period of designation of the foreign state is extended for an additional period of 6 months (or, in the discretion of the [Secretary], a period of 12 or 18 months)."  *Id.* § 1254a(b)(3)(C).

///

---

[3] The TPS statute bars the Secretary from waiving certain inadmissibility grounds.  *See* 8 U.S.C. § 1254a(c)(2)(A)(iii).

[4] The TPS statute "originally provided the Attorney General with this authority" but, "[w]ith the Homeland Security Act of 2002 (Pub. L. No. 107-296, 116 Stat. 2135), the former Immigration and Naturalization Service was transferred to the Department of Homeland Security, and the responsibility for administering the TPS was transferred from the Attorney General to the Secretary of DHS."  *Ramos v. Wolf*, 975 F.3d 872, 879 n.1 (9th Cir. 2020), *vacated for rehearing en banc*, 59 F.4th 1010 (9th Cir. 2023).

1    In addition, it is possible for a country to be given more than one TPS designation. As

2    explained by Plaintiffs (with no dispute by the government),

3    [a] TPS designation for a country that is already designated for TPS
     is called a "**redesignation**." When DHS redesignates a country for
4    TPS, it generally has the effect of expanding the pool of potential
     beneficiaries to include individuals who came to the United States
5    after the country was first designated for TPS.

6    Compl. ¶ 26 n.4 (emphasis added).

7    B.    TPS Designation for Venezuela

8         1.    2021 TPS Designation

9    In March 2021, Secretary Mayorkas (the Secretary of DHS under the Biden

10   administration) first designated Venezuela for TPS – specifically, for 18 months, from March 9,

11   2021, through September 9, 2022. *See* 86 Fed. Reg. 13574, 13577 (Mar. 9, 2021). The

12   designation allowed those "who have continuously resided in the United States since March 8,

13   2021, and have been continuously physically present in the United States since March 9, 2021, to

14   apply for TPS." *Id.* at 13575. U.S. Citizenship and Immigration Services ("USCIS") estimated

15   that "approximately 323,000 individuals are eligible to file applications for TPS under the

16   designation of Venezuela." *Id.*

17   The basis for the designation was stated as follows:

18   Venezuela is currently facing a severe humanitarian emergency.
     Under Nicolás Maduro's influence, the country "has been in the
19   midst of a severe political and economic crisis for several years."
     Venezuela's crisis has been marked by a wide range of factors,
20   including: Economic contraction; inflation and hyperinflation;
     deepening poverty; high levels of unemployment; reduced access to
21   and shortages of food and medicine; a severely weakened medical
     system; the reappearance or increased incidence of certain
22   communicable diseases; a collapse in basic services; water,
     electricity, and fuel shortages; political polarization; institutional
23   and political tensions; human rights abuses and repression; crime
     and violence; corruption; increased human mobility and
24   displacement (including internal migration, emigration, and return);
     and the impact of the COVID-19 pandemic, among other factors.
25

26   *Id.* at 13576.

27   The parties refer to this designation as the "2021 Designation."

28

United States District Court
Northern District of California

2.   First and Second Extensions of the 2021 Designation

The 2021 Designation was set to expire, as noted above, in September 2022.  However, on September 8, 2022, before expiration, DHS **extended** the 2021 Designation for 18 months – *i.e.*, from September 10, 2022, through March 10, 2024.  *See* 87 Fed. Reg. 55024, 55027 (Sept. 8, 2022).  The basis for the extension was as follows: "Extraordinary and temporary conditions that prevent Venezuelan nationals from returning in safety include severe economic and political crises ongoing within Venezuela, which have an impact across sectors, including limited access to food, basic services, and adequate healthcare, and the deterioration of the rule of law and protection of human rights."  *Id.* at 55026.  As Plaintiffs point out, "because the decision [here] was only an extension, and not also a re-designation, it did not provide protection to Venezuelans who had arrived in the U.S. *after* March 9, 2021 [*i.e.*, the date of the 2021 Designation]."  Compl. ¶ 42 (emphasis added).

DHS **extended** the 2021 Designation a second time on October 3, 2023, for another 18 months.  The extension ran from March 11, 2024 (when the first extension above would end) to September 10, 2025.  *See* 88 Fed. Reg. 68130, 68131 (Oct. 3, 2023).

3.   2023 TPS Designation

At the same time as the second extension of the 2021 Designation, DHS also **redesignated** Venezuela for TPS.  *See id.*  The redesignation covered an 18-month period, from October 3, 2023, through April 2, 2025.  *See id.*  While the 2021 Designation allowed individuals who had been in the United States since March 2021 to apply, this designation – which the parties refer to as the "2023 Designation" – allowed individuals to apply if they had continuously resided in the United States since July 31, 2023, and had continuously been physically present since October 3, 2023.  *See id.*  DHS estimated that "approximately 472,000 additional individuals may be eligible for TPS under the redesignation of Venezuela."  *Id.* at 68134.

For both (1) the second extension of the 2021 Designation and (2) the 2023 Designation, the basis was the same:

> Venezuela continues to face a severe humanitarian emergency due to a political and economic crisis, as well as human rights violations and abuses and high levels of crime and violence, that impacts

access to food, medicine, healthcare, water, electricity, and fuel, and has led to high levels of poverty. Additionally, Venezuela has recently experienced heavy rainfall in the spring and summer of 2023 which triggered flooding and landslides. Given the current conditions in Venezuela, these issues contribute to the country's existing challenges.

Venezuela is experiencing "an unprecedented political, economic, and humanitarian crisis." "Venezuela is suffering one of the worst humanitarian crises in the history of the Western Hemisphere," which has been characterized by "[h]igh levels of poverty, food insecurity, malnutrition, and infant mortality, together with frequent electricity outages and the collapse of health infrastructure." Though there were some positive developments in Venezuela in 2022 "as the economy stabilized and showed signs of economic growth," the effects of these changes were not felt across the Venezuelan population and did not offset the impact of the large-scale economic contraction which resulted in significant humanitarian challenges that continue today and will take time to address.

*Id.* at 68132.

### 4. Extension of the 2023 Designation

On January 17, 2025, shortly before the second Trump administration was to begin, Secretary Mayorkas **extended** the 2023 Designation by 18 months, through October 2, 2026. *See* 90 Fed. Reg. 5961 (Jan. 17, 2025). As indicated above, without an extension, the 2023 Designation would end on April 2, 2025. The basis for the extension was as follows:

Venezuela is experiencing "a complex, serious and multidimensional humanitarian crisis." The crisis has reportedly disrupted every aspect of life in Venezuela. "Basic services like electricity, internet access, and water are patchy; malnutrition is on the rise; the healthcare system has collapsed; and children receive poor or no education. Inflation rates are also among the highest in the world." Venezuela's "complex crisis" has pushed Venezuelans into "poverty, hunger, poor health, crime, desperation and migration." Moreover, Nicolás Maduro's declaration of victory in the July 28, 2024 presidential election – which has been contested as fraudulent by the opposition – "has been followed by yet another sweeping crackdown on dissent."

*Id.* at 5963.

In the extension, DHS also clarified the relationship between the two designations for Venezuela – (1) the 2021 Designation and (2) the 2023 Designation – both of which had been subject to extensions. DHS addressed the following question:

/ / /

**Will there continue to be two separate filing processes for TPS designations for Venezuela?**

No.  USCIS has evaluated the operational feasibility and resulting impact on stakeholders of having two separate filing processes. Operational challenges in the identification and adjudication of Venezuela TPS filings and confusion among stakeholders exist because of the two separate TPS designations.  To date, USCIS has created operational measures to process Venezuela TPS cases for both designations; however, it can most efficiently process these cases by consolidating the filing processes for the two Venezuela TPS populations.  To decrease confusion among stakeholders, ensure optimal operational processes, and maintain the same eligibility requirements, upon publication of this Notice, **individuals registered under either the March 9, 2021 TPS designation or the October 3, 2023 TPS designation will be allowed to re-register under this extension**.  This would not, however, require that a beneficiary registered under the March 9, 2021 designation to re-register at this time.  Rather, it would provide such individuals with the option of doing so. **Venezuela TPS beneficiaries who appropriately apply for TPS or re-register under this Notice and are approved by USCIS will obtain TPS through the same extension date of October 2, 2026.**

*Id.* at 5964 (some emphasis added).

> 5.      Vacatur of the Extension of the 2023 Designation

On January 20, 2025, President Trump began his second administration.  That same day, President Trump issued an Executive Order titled "Protecting the American People Against Invasion."  *See* https://www.whitehouse.gov/presidential-actions/2025/01/protecting-the-american-people-against-invasion/ (last visited 3/30/2025).  Section 16 of the Executive Order states as follows:

Addressing Actions by the Previous Administration.  The Secretary of State, the Attorney General, and the Secretary of Homeland Security shall promptly take all appropriate action, consistent with law, to rescind the policy decisions of the previous administration that led to the increased or continued presence of illegal aliens in the United States, and align any and all departmental activities with the policies set out by this order and the immigration laws.  Such action should include, but is not limited to:

. . . .

(b)      ensuring that designations of Temporary Protected Status are consistent with the provisions of section 244 of the INA (8 U.S.C. 1254a), and that such designations are appropriately limited in scope and made for only so long as may be necessary to fulfill the textual requirements of that statute . . . .

1  *Id.*

2      Secretary Noem was sworn in as Secretary of DHS on January 25, 2025.  Three days later,

3  on January 28, 2025, the Secretary vacated the extension of the 2023 Designation.  DHS formally

4  published notice of the vacatur on February 3, 2025.  *See* 90 Fed. Reg. 8805 (Feb. 3, 2025).  This

5  is the first time – in TPS's thirty-five-year history – that an extension of a TPS designation has

6  ever been vacated.

7      The notice began by stating that:

8      The Venezuela 2023 TPS designation expires on April 2, 2025, and
   the Secretary must make a decision by February 1, 2025 [*i.e.*, 60
9  days in advance].  The Venezuela 2021 TPS designation expires on
   September 10, 2025, and the Secretary must make a decision by July
10  12, 2025.  Notwithstanding the fact that these are both decisions that
   would lie with new Secretary of Homeland Security Kristi Noem,
11  Secretary Mayorkas [the DHS Secretary under the Biden
   administration] took action with respect to both designations.

12  On January 17, 2025, Secretary Mayorkas issued a notice extending
13  the 2023 designation of Venezuela for TPS for 18 months
   (Mayorkas Notice).  The notice was based on Secretary Mayorkas'
14  January 10, 2025, determination that the conditions for the
   designation continued to be met.  *See* INA 244(b)(3)(A), 8 U.S.C.
15  1254a(b)(3)(A).  In the Mayorkas Notice, Secretary Mayorkas did
   not expressly extend or terminate the 2021 designation.  Instead, the
16  notice allowed for a consolidation of filing processes such that all
   eligible Venezuela TPS beneficiaries (whether under the 2021 or
17  2023 designations) could obtain TPS through the same extension
   date of October 2, 2026.  *See* Extension of the 2023 Designation of
18  Venezuela for Temporary Protected Status, 90 FR 5961 (Jan. 17,
   2025). The notice also extended certain EADs [employment
19  authorization documents].  The effect of Secretary Mayorkas'
   actions, however, resulted in an extension of the 2021 Venezuela
20  TPS designation.

21  *Id.* at 8806.

22      The notice then stated that the extension given by Secretary Mayorkas was vacated:

23      The Secretary of Homeland Security is vacating the January 10,
   2025 decision of Secretary Mayorkas which (1) extended the 2023
24  Venezuela TPS designation and (2) allowed the consolidation of
   filing processes for both designations, which had the effect of
25  extending the 2021 Venezuela TPS designation, and (3) extended
   certain EADs.  An agency has inherent (that is, statutorily implicit)
26  authority to revisit its prior decisions unless Congress has expressly
   limited that authority.  The TPS statute does not limit the Secretary's
27  inherent authority under the INA to reconsider any TPS-related
   determination, and upon reconsideration, to vacate or amend the
28  determination.

*Id.*

The reason for the vacatur was stated as follows: "The Mayorkas Notice adopted a novel approach of implicitly negating the 2021 Venezuela TPS designation by effectively subsuming it within the 2023 Venezuela TPS designation." *Id.* at 8807.

> The Mayorkas Notice did not acknowledge the novelty of its approach or explain how it is consistent with the TPS statute. *See* INA 244(b)(2)(B), 8 U.S.C. 1254a(b)(2)(B) (providing that a TPS country designation "shall remain in effect until the effective date of the termination of the designation under [INA 244(b)(3)(B), 8 U.S.C. 1254a(b)(3)(B)]"). This novel approach has included multiple notices, overlapping populations, overlapping dates, and sometimes multiple actions happening in a single document. While the Mayorkas Notice may have made attempts to address these overlapping populations, the explanations in the Mayorkas Notice, particularly the explanation for operational impacts, are thin and inadequately developed. Given these deficiencies and lack of clarity, vacatur is warranted to untangle the confusion, and provide an opportunity for informed determinations regarding the TPS designations and clear guidance.

*Id.*

The effect of the vacatur was stated as follows:

> As a result of the vacatur, the 2021 Venezuela TPS designation and the 2023 Venezuela designation remain in effect and their associated statutory deadlines remain in effect. The statutory deadline for each of those designations is as follows: The Secretary (1) must determine, by February 1, 2025, whether to extend or terminate the 2023 Venezuela TPS designation and (2) must determine, by July 12, 2025, whether to extend or terminate the 2021 Venezuela TPS designation.

*Id.* In its papers, the government characterizes the vacatur as a "restor[ation] [of] the status quo." Opp'n at 6.

6.  Termination of the 2023 Designation

On February 1, 2025 (*i.e.*, just three days after the vacatur was first announced), Secretary Noem decided to terminate the 2023 Designation, effective in April 2025 (*i.e.*, 60 days after publication of the termination notice). DHS formally published noticed on February 5, 2025. *See* 90 Fed. Reg. 9040 (Feb. 5, 2025).

In explaining the basis for the termination, DHS began by stating as follows:

> Consistent with section 244(b)(3)(A) of the INA, 8 U.S.C.

United States District Court
Northern District of California

1254a(b)(3)(A), after consulting with appropriate U.S. Government agencies, DHS reviewed conditions in Venezuela and considered whether permitting the Venezuelan nationals to remain temporarily in the United States is contrary to the national interest of the United States.

The Department, in consultation with the Department of State, has reviewed conditions in Venezuela and has considered whether permitting Venezuelan nationals to remain temporarily in the United States is contrary to the U.S. national interest. Overall, certain conditions for the 2023 TPS designation of Venezuela may continue; however, there are notable improvements in several areas such as the economy, public health, and crime that allow for these nationals to be safely returned to their home country.

*Id.* at 9042. Although DHS referred to a consultation with other agencies and suggested there was review of a country conditions report, the government failed to provide any evidence in conjunction with the pending motion to support such claims. *See Ramos v. Nielsen*, 336 F. Supp. 3d 1075, 1082 (N.D. Cal. 2018) (noting that the general process for a TPS designation (on periodic review) includes the following: RAIO (a division within USCIS) provides a Country Conditions Memo, OPS (another division within USCIS) drafts a Decision Memo, and the State Department provides further input). It is difficult to imagine how such a considered process could have been accomplished in such a short period.

DHS continued its explanation for the termination as follows:

Based on the Department's review, the Secretary has determined that, even assuming the relevant conditions in Venezuela remain both "extraordinary" and "temporary," termination of the 2023 Venezuela TPS designation is required because it is contrary to the national interest to permit the Venezuelan nationals (or aliens having no nationality who last habitually resided in Venezuela) to remain temporarily in the United States.

In the TPS statute, Congress expressly prohibits the Secretary from designating a country for TPS or extending a TPS designation if she finds that "permitting the aliens to remain temporarily in the United States is contrary to the national interest of the United States." INA 244(b)(1), 8 U.S.C. 1254a(b)(1). . . .

*Id.* at 9042.

The notice continued in relevant part:

"National interest" is an expansive standard that may encompass an array of broad considerations, including foreign policy, public safety (e.g., potential nexus to criminal gang membership), national security, migration factors (e.g., pull factors), immigration policy (e.g., enforcement prerogatives), and economic considerations (e.g.,

adverse effects on U.S. workers, impact on U.S. communities). Determining whether permitting a class of aliens to remain temporarily in the United States is contrary to the U.S. national interest therefore calls upon the Secretary's expertise and discretionary judgment, informed by her consultations with appropriate U.S. Government agencies.

. . . .

[First,] TPS has allowed a significant population of inadmissible or illegal aliens without a path to lawful immigration status to settle in the interior of the United States, and the sheer numbers have resulted in associated difficulties in local communities where local resources have been inadequate to meet the demands caused by increased numbers. Among these Venezuelan nationals who have crossed into the United States are members of the Venezuelan gang known as Tren de Aragua. Tren de Aragua has been blamed for sex trafficking, drug smuggling, police shootings, kidnappings, and the exploitation of migrants. The United States has sanctioned the gang and placed it on a list of transnational criminal organizations. In Executive Order 14157, Designating Cartels and Other Organizations as Foreign Terrorist Organizations and Specially Designated Global Terrorists, the President determined that Tren de Aragua's campaign of violence and terror poses threats to the United States. The Secretary accordingly has considered these important immigration and national interests in terminating the Venezuela parole process.

Second, President Trump observed, referring to CHNV [the parole program known as the "Processes for Cubans, Haitians, Nicaraguans, and Venezuelans"] and other policies and processes, that "[o]ver the last 4 years, the prior administration invited, administered, and oversaw an unprecedented flood of illegal immigration into the United States," including millions who crossed U.S. borders or were allowed to fly to a U.S. airport of entry and allowed to settle in American communities. The prolonged presence of these aliens in the United States "has cost taxpayers billions of dollars at the Federal, State, and local levels." For example, over 180,000 illegal aliens have settled in New York City, approximating that this will cost the city $10.6 billion through the summer of 2025. Additionally, although mayors from cities across the United States are attempting to accommodate Venezuelan illegal aliens, city shelters, police stations, and aid services are at a maximum capacity.

. . . .

Third, President Trump declared a national emergency at the southern border. As the Attorney General and DHS have long understood, the potential "magnet effect" of a TPS determination is a permissible factor under the TPS statute, especially with respect to a redesignation. The same is true for Venezuela. . . .

Fourth, as the President directed in Executive Order 14150, "the foreign policy of the United States shall champion core American interests and always put America and American citizens first." Continuing to permit Venezuelans under the 2023 TPS designation

1

2

3

> to remain in the United States does not champion core American interests or put American interests first. U.S. foreign policy interests, particularly in the Western Hemisphere, are best served and protected by curtailing policies that facilitate or encourage illegal and destabilizing migration.

4    *Id.* at 9042-43.

5          The notice concluded with the statement that "DHS is terminating only the October 3,

6    2023 Venezuela TPS designation. The 2021 Venezuela TPS designation remains in effect until

7    September 10, 2025." *Id.* at 9044. Because of the decision to terminate (which was possible only

8    because of the decision to vacate Secretary Mayorkas's extension in the first place), the 2023

9    Designation will end on April 7, 2025. *See id.*

10   C.      Causes of Action

11          Following the vacatur and termination decisions made by Secretary Noem, Plaintiffs filed

12   suit. In their complaint, Plaintiffs assert three claims for relief:

13                 (1) The government violated the APA because the Secretary's decision to vacate the

14                 extension of the 2023 Designation was arbitrary and capricious. Most

15                 fundamentally, the Secretary did not have inherent authority to reconsider the prior

16                 Secretary's extension. "The TPS statute carefully regulates the length of TPS

17                 extensions, the conditions under which they may be terminated, and the timetable

18                 for doing so. Defendants had no authority to annul a TPS extension under the

19                 timetable and procedures they utilized here." Compl. ¶ 149(a). In addition, the

20                 Secretary "objected to the . . . extension for allowing 2021 TPS holders to re-

21                 register under the 2023 extension, but failed to consider that 2021 TPS holders

22                 were necessarily eligible for TPS under the 2023 designation as well." Compl. ¶

23                 149(b).

24                 (2) The government further violated the APA because the Secretary's decision to

25                 terminate the 2023 Designation was arbitrary and capricious. For example, the

26                 decision assumed that TPS designations are illegal, and "[t]he research,

27                 consultation, and review process leading up to the decision deviated dramatically

28                 from past practice without explanation." Compl. ¶ 153(a), (c).

United States District Court
Northern District of California

United States District Court
Northern District of California

1    (3) The government violated the Equal Protection Clause because the "decisions to

2        vacate the . . . TPS extension for Venezuela, and to terminate the 2023 Venezuela

3        Designation . . . were motivated, at least in part, by intentional discrimination based

4        on race, ethnicity, or national origin." Compl. ¶ 157.

5    In the pending motion, Plaintiffs largely focus on the first and third claims above. To be

6    clear, however, the relief Plaintiffs seek would result in postponement of both (1) Secretary

7    Noem's decision to vacate the extension of the 2023 Designation and (2) the decision to terminate

8    the 2023 Designation.

9                            **III.    DISCUSSION**

10    As indicated by the above, Plaintiffs' case is founded in large part on the APA. The APA

11    provides in relevant part that a court shall "hold unlawful and set aside agency action, findings,

12    and conclusions found to be – (A) arbitrary, capricious, an abuse of discretion, or otherwise not in

13    accordance with law; [or] (B) contrary to constitutional right, power, privilege or immunity . . . .

14    5 U.S.C. § 706(2)." 5 U.S.C. § 706(2). Plaintiffs' present motion seeks temporary relief pursuant

15    to § 705 of the APA. Section 705 provides as follows:

16        When an agency finds that justice so requires, it may postpone the
          effective date of action taken by it, pending judicial review. On
17        such conditions as may be required and to the extent necessary to
          prevent irreparable injury, the reviewing court, including the court to
18        which a case may be taken on appeal from or on application for
          certiorari or other writ to a reviewing court, may issue all necessary
19        and appropriate process to postpone the effective date of an agency
          action or to preserve status or rights pending conclusion of the
20        review proceedings.

21    5 U.S.C. § 705.

22    A.    Jurisdiction

23    Although § 705 expressly authorizes a court to postpone the effective date of any agency

24    action, or to preserve status or rights pending judicial review, the government contends that the

25    Court lacks jurisdiction to grant the relief sought by Plaintiffs. The government raises two

26    jurisdictional arguments, one based on 8 U.S.C. § 1252(f)(1) and the other based on §

27    1254a(b)(5)(A).

28

United States District Court
Northern District of California

1.   Section 1252(f)(1)

According to the government, Plaintiffs are effectively seeking "classwide" injunctive relief in their motion, and thus their motion must be denied pursuant to § 1252(f)(1) which prohibits such relief.  Section 1252(f)(1) provides as follows:

> (f)   Limit on injunctive relief.
>
>> (1)   In general.  Regardless of the nature of the action or claim or of the identity of the party or parties bringing the action, no court (other than the Supreme Court) shall have jurisdiction or authority to enjoin or restrain the operation of the provisions of part IV of this subchapter, as amended by the Illegal Immigration Reform and Immigrant Responsibility Act of 1996 ["IIRIRA"], other than with respect to the application of such provisions to an individual alien against whom proceedings under such chapter have been initiated.

8 U.S.C. § 1252(f)(1).  As the Supreme Court has explained, § 1252(f)(1) "generally prohibits lower courts from entering injunctions that order federal officials to take or to refrain from taking actions to enforce, implement, or otherwise carry out the specified statutory provisions." *Garland v. Aleman Gonzalez*, 596 U.S. 543, 550 (2022).

The government maintains that the TPS statute (§ 1254a) is one of the specified provisions to which § 1252(f)(1) applies – *i.e.*, that the TPS statute falls within "part IV of this subchapter." 8 U.S.C. § 1252(f)(1).  The government acknowledges that the U.S. Code places the TPS statute within part V, not part IV, which is consistent with the statements by a number of courts that part IV covers only §§ 1221-32.[5]  No court has yet to hold that §1252(f)(1) applies to §1254a, which, as a facial matter, is reasonable given that § 1252 is titled "Judicial review of orders of removal" and TPS does not directly involve orders of removal.  *Cf. Bhd. of R.R. Trainmen v. Balt. & Ohio*

---

[5] *See, e.g.*, *Gonzalez v. U.S. Immigration & Customs Enf't*, 975 F.3d 788, 812 (9th Cir. 2020) (stating that "'Part IV' [as used in § 1252(f)(1)] is a reference to the provisions titled 'Inspection, Apprehension, Examination, Exclusion, and Removal,' which currently include 8 U.S.C. §§ 1221-1232 of the INA"); *see also Reno v. Am.-Arab Anti-Discrimination Comm.*, 525 U.S. 471, 481 (1999) (stating that § 1252(f)(1) "prohibits federal courts from granting classwide injunctive relief against the operation of §§ 1221-1231"); *Biden v. Texas*, 597 U.S. 785, 798 (2022) (discussing § 1252(f)(1) and its impact on a court's power to hear claims "brought under sections 1221 through 1232").

1    *R.R.*, 331 U.S. 519, 529 (1947) (noting that "the title of a statute and the heading of a section

2    cannot limit the plain meaning of the text" but they can be of use "when they shed light on some

3    ambiguous word or phrase").

4         Nevertheless, the government argues that the U.S. Code contains an error; that the IIRIRA,

5    when it amended the INA in 1996, designated the TPS statute, among other sections, under part

6    IV, *see* 110 Stat. 3009, at 3009-548, 614-15 (Sept. 30, 1996) (in § 308 of the IIRIRA, amending

7    the table of contents); and that "the text of the United States Code 'cannot prevail over the Statutes

8    at Large [*i.e.*, the IIRIRA/INA] when the two are inconsistent.'"  *Galvez v. Jaddou*, 52 F.4th 821,

9    830 (9th Cir. 2022).  Yet, it appears that the codification of §1254a into part V may well have

10   been consistent with IIRIRA and the INA.  Part IV is titled "Inspection, Apprehension,

11   Examination, Exclusion, and Removal" whereas Part V is titled "Adjustment and Change of

12   Status."  TPS is more akin to an adjustment of status (albeit temporary) than a deportation

13   proceeding.

14        In any event, because Plaintiffs opted at this juncture not to focus on this aspect of the

15   government's argument, the Court shall turn to and analyze in greater depth Plaintiffs' assertion

16   that § 1252(f)(1) has no application where a court is simply called upon to vacate an agency action

17   as opposed to issue an "injunction" that would, *inter alia,* govern the conduct of a government

18   official.  *See Aleman Gonzalez*, 596 U.S. at 548 (noting that "[t]he term 'to enjoin' ordinarily

19   means to 'require,' 'command,' or 'positively direct' an action or to 'require a person to perform, .

20   . . or to abstain or desist from, some act'[;] [w]hen a court 'enjoins' conduct, it issues an

21   'injunction,' which is a judicial order that 'tells someone what to do or not to do'").  In other

22   words, according to Plaintiffs, there is a material distinction between vacatur of a specific agency

23   action under §706 (and likewise postponement of such action under §705) and an injunction under

24   Federal Rule of Civil Procedure 65.  Plaintiffs emphasize that "[e]very court to consider the

25   question – including the Fifth Circuit and at least five district courts – has rejected [the

26   government's] view that APA relief is functionally an injunction barred by Section 1252(f)(1)."

27   Reply at 2.

28   / / /

United States District Court
Northern District of California

United States District Court
Northern District of California

1    In assessing Plaintiffs' position, the Court must begin with the "strong presumption . . .

2  that the actions of federal agencies are reviewable in federal court." *KOLA, Inc. v. United States*,

3  882 F.2d 361, 363 (9th Cir. 1980); *see also Sackett v. E.P.A.*, 566 U.S. 120, 128 (2012) (stating

4  that "[t]he APA . . . creates a presumption favoring judicial review of administrative action").

5  "[O]nly upon a showing of 'clear and convincing evidence' of a contrary legislative intent should

6  the courts restrict access to judicial review." *Abbott Labs. v. Gardner*, 387 U.S. 136, 141 (1967).

7  Moreover, where there is no other forum for a litigant to raise their claim, that should also factor

8  into a court's determination as to whether judicial review is available. *Cf. Veterans for Common*

9  *Sense v. Shinseki*, 678 F.3d 1013, 1034-35 (9th Cir. 2012) (noting that, "because [a veterans

10  organization] cannot bring its suit in the Veterans Court, that court cannot claim exclusive

11  jurisdiction over the suit," and, "[b]ecause [the organization] would be unable to assert its claim in

12  the review scheme established by the [Veterans' Judicial Review Act], that scheme does not

13  operate to divest us of jurisdiction").

14    The Court also bears in mind that the Supreme Court has, to date, declined to address the

15  issue of whether § 1252(f)(1) is a bar to a court issuing relief pursuant to the APA.  For example,

16  in *Aleman Gonzalez*, the Supreme Court held that § 1252(f)(1) barred a lower court from entering

17  an injunction requiring the government to provide bond hearings for not only plaintiffs but also all

18  other class members (all of whom had been detained under 8 U.S.C. § 1231(a)(6)).  But, as Justice

19  Sotomayor pointed out in her concurrence/dissent, the majority decision did

20       not purport to hold that §1252(f)(1) affects courts' ability to "hold
        unlawful and set aside agency action, findings, and conclusions"
21       under the Administrative Procedure Act. 5 U. S. C. §706(2). . . . In
        addition, the Court rightly does not embrace the Government's
22       eleventh-hour suggestion at oral argument to hold that §1252(f )(1)
        bars even classwide declaratory relief, a suggestion that would (if
23       accepted) leave many noncitizens with no practical remedy
        whatsoever against clear violations by the Executive Branch.
24

25  *Aleman Gonzalez*, 596 U.S. at 571-72 (Sotomayor, J., concurring in part and dissenting in part).

26  Justice Barrett made the same point as part of her dissent in *Biden v. Texas*, 597 U.S. at 785

27  (where the Supreme Court held that § 1252(f)(1) did not deprive lower courts of all subject matter

28  jurisdiction but rather simply withdrew the authority to grant a particular form of relief).

1  Specifically, she noted that the majority "reserves the question whether §1252(f)(1) bars

2  declaratory relief, an issue on which there are conflicting views" and further "avoids a position on

3  whether §1252(f)(1) prevents a lower court from vacating or setting aside an agency action under

4  the Administrative Procedure Act." *Id.* 839 (Barrett, J., dissenting).  The Supreme Court,

5  therefore, has not adopted any view of § 1252(f)(1) that would preclude Plaintiffs from obtaining

6  relief.  *See also Biden v. Texas*, 597 U.S. at 801 n.4 ("At our request, the parties briefed several

7  additional questions regarding the operation of section 1252(f)(1), namely, whether its limitation

8  on 'jurisdiction or authority' is subject to forfeiture and whether that limitation extends to other

9  specific remedies, such as declaratory relief and relief under section 706 of the APA.  We express

10 no view on those questions.").

11      No court has adopted the construction of § 1252(f)(1) advanced by the government.

12 Rather, all courts that have addressed the issue have rejected the government's construction of the

13 statute.  For example, in a decision issued after *Aleman Gonzalez* and *Biden v. Texas*, the Fifth

14 Circuit rejected DHS's contention that vacatur of an agency action is a de facto enjoining or

15 restraining of an agency enforcement decision.  The Fifth Circuit explained:

16          There are meaningful differences between an injunction, which is a
           "drastic and extraordinary remedy," and vacatur, which is "a less
17          drastic remedy."  The Supreme Court has indicated that § 1252(f) is
           to be interpreted relatively narrowly.  Indeed, the Court described §
18          1252(f) as "nothing more or less than a limit on injunctive relief."

19 *Texas v. United States*, 40 F.4th 205, 219 (5th Cir. 2022) (addressing DHS's memoranda regarding

20 immigration guidance for the apprehension and removal of noncitizens).  The Fifth Circuit added:

21          [A] vacatur does nothing but re-establish the status quo absent the
           unlawful agency action.  Apart from the constitutional or statutory
22          basis on which the court invalidated an agency action, vacatur
           neither compels nor restrains further agency decision-making.  We
23          decline to extend *Aleman Gonzalez* to such judicial orders,
           especially when doing so would be contrary to the "strong
24          presumption favoring judicial review of administrative action."

25 *Id.* at 220; *see also Texas v. United States*, 126 F.4th 392, 419 n.40 (5th Cir. 2025) (reaffirming the

26 same); *Florida v. United States*, 660 F. Supp. 3d 1239, 1284-85 (N.D. Fla. 2023) (stating that

27 "[v]acatur is 'a less drastic remedy' than an injunction, and the Fifth Circuit concluded in the

28 opinion currently on review at the Supreme Court that §1252(f)(1) does not preclude vacatur

United States District Court
Northern District of California

1  under the APA because vacatur 'does nothing but re-establish the status quo absent the unlawful

2  agency action' and 'neither compels nor restrains further agency decision-making'").

3        Notably, the Fifth Circuit's holding is directly supported by the Supreme Court's decision

4  in *Monsanto Co. v. Geertson Seed Farms*, 561 U.S. 139 (2010).  There, the Supreme Court noted

5  that

6          [a]n injunction is a drastic and extraordinary remedy, which should
           not be granted as a matter of course.  If a less drastic remedy (**such**

7          **as partial or complete vacatur of APHIS's deregulation**
           **decision**) was sufficient to redress respondents' injury, no recourse

8          to the additional and extraordinary relief of an injunction was
           warranted.

9

10  *Id.* at 165-66 (emphasis added).

11        Furthermore, while *Monsanto* itself did not explain why a vacatur is a less drastic remedy,

12  it is clear that there are material differences between a vacatur and an injunction.  While a court

13  may only enter a vacatur to re-establish the status quo absent the unlawful agency action, *see*

14  *Texas v. United States*, 40 F.4th at 220, it has "broad latitude in fashioning equitable relief

15  [through an injunction] when necessary to remedy an established wrong."  *Boardman v. Pac.*

16  *Seafood Grp.*, 822 F.3d 1011, 1024 (9th Cir. 2016) (collecting cases).  Injunctions may apply to

17  parties and nonparties who act "in concert with" named parties.  *See, e.g.*, *SEC v. Wencke*, 622

18  F.2d 1363, 1368 (9th Cir. 1980) ("[Federal Rule of Civil Procedure 65 is] binding only upon the

19  parties to the action, their officers, agents, servants, employees, and attorneys, and upon those

20  persons in active concert or participation with them who receive actual notice of the order by

21  personal service or otherwise."); *Bresgal v. Brock*, 843 F.2d 1163, 1170-71 (9th Cir. 1987) ("[A]n

22  injunction is not necessarily made over-broad by extending benefit or protection to persons other

23  than prevailing parties in the lawsuit – even if it is not a class action – *if such breadth is necessary*

24  *to give prevailing parties the relief to which they are entitled*.") (emphasis in original).  Courts

25  may hold both parties and nonparties in contempt for violating an injunction.  *See Portland*

26  *Feminist Women's Health Ctr. v. Advocs. for Life, Inc.*, 877 F.2d 787, 788-89 (9th Cir. 1989)

27  (affirming a lower court's imposition of sanctions on a nonparty held "in civil contempt for

28  disobeying the injunction by acting in concert with the named defendants"); *Inst. of Cetacean*

United States District Court
Northern District of California

1    *Rsch. v. Sea Shepherd Conservation Soc'y*, 774 F.3d 935, 949-50 (9th Cir. 2014) (affirming courts

2    may hold nonparties in contempt for "aiding and abetting violations" of the injunction, and courts

3    may also hold parties in contempt for "giving a non-party the means to violate an injunction").

4    Injunctions may be mandatory, compelling a wide range of affirmative conduct.  *See Dahl v. HEM*

5    *Pharms. Corp.*, 7 F.3d 1399, 1403 (9th Cir. 1993) (affirming lower court's injunction that required

6    affirmative conduct by drug manufacturer to continue providing drug to participants after clinical

7    trial).  Injunctions may compel or restrain further agency decision-making.  *See Kidd v. Mayorkas*,

8    734 F. Supp. 3d 967, 987 (C.D. Cal. 2024) (noting that although a vacatur or injunction would

9    strike down ICE's "knock and talk" policy, "only an injunction would restrain Defendants from, in

10   the future, attempting to institute a modified or amended version of the "knock and talk" policy

11   that complies with constitutional limitations.").  Injunctions may prohibit "otherwise lawful

12   conduct" as well as unlawful conduct.  *Russian Media Grp., LLC v. Cable Am., Inc.*, 598 F.3d 302,

13   307 (7th Cir. 2010) ("The district court may even enjoin certain otherwise lawful conduct when

14   the defendant's conduct has demonstrated that prohibiting only unlawful conduct would not

15   effectively protect the plaintiff's rights against future encroachment.").  And injunctions may

16   evolve and morph over time.  *See Brown v. Plata*, 563 U.S. 493, 542-43 (2011) ("The three-judge

17   court . . . retains the authority, and the responsibility, to make further amendments to the existing

18   order or any modified decree it may enter as warranted by the exercise of its sound discretion. . . .

19   A court that invokes equity's power to remedy a constitutional violation by an injunction

20   mandating systemic changes to an institution has the continuing duty and responsibility to assess

21   the efficacy and consequences of its order.").  Conversely, none of the above is true of a court's

22   vacatur of unlawful agency action under § 706(2) involved here. *See, e.g.*, *Ctr. for Food Safety v.*

23   *Vilsack*, 734 F. Supp. 2d 948, 954-55 (N.D. Cal. 2010) (finding that a vacatur was more

24   appropriate as to an injunction, but noting that the court's "[o]rder is without prejudice to

25   Plaintiffs seeking further redress if, after the deregulation decision is vacated, Plaintiffs can

26   demonstrate that Defendant-Intervenors or other third parties have in fact violated the vacatur").

27          In addition, as Plaintiffs argued at the hearing, the Supreme Court's decision in *Nken v.*

28   *Holder*, 556 U.S. 418 (2009), lends further support.  In *Nken*, the plaintiff asked the Supreme

United States District Court
Northern District of California

Court to stay his removal pending an adjudication of his petition for a review of a BIA order.  The government argued that the plaintiff could not obtain a stay of removal because of 8 U.S.C. § 1252(f)(2), which provides that "no court shall *enjoin* the removal of any alien pursuant to a final order under this section unless the alien shows by clear and convincing evidence that the entry or execution of such order is prohibited as a matter of law."  8 U.S.C. § 1252(f)(2) (emphasis added). The Supreme Court did not agree with the government, explaining that a stay and an injunction cannot be equated with one another.

> An injunction and a stay have typically been understood to serve different purposes.  The former is a means by which a court tells someone what to do or not to do.  When a court employs "the extraordinary remedy of injunction," it directs the conduct of a party, and does so with the backing of its full coercive powers.
>
> It is true that "'[i]n a general sense, every order of a court which commands or forbids is an injunction; but in its accepted legal sense, an injunction is a judicial process or mandate operating *in personam*.'"  This is so whether the injunction is preliminary or final; in both contexts, the order is directed at someone, and governs that party's conduct.
>
> By contrast, instead of directing the conduct of a particular actor, a stay operates upon the judicial proceeding itself.  It does so either by halting or postponing some portion of the proceeding, or by temporarily divesting an order of enforceability.
>
> A stay pending appeal certainly has some functional overlap with an injunction, particularly a preliminary one.   Both can have the practical effect of preventing some action before the legality of that action has been conclusively determined. But a stay achieves this result by temporarily suspending the source of authority to act – the order or judgment in question – not by directing an actor's conduct.  A stay "simply suspend[s] judicial alteration of the status quo," while injunctive relief "grants judicial intervention that has been withheld by lower courts."

*Nken*, 556 U.S. at 428-49.  Although the instant case concerns § 1252(f)(1), while *Nken* considered § 1252(f)(2), the point that the *Nken* Court made has force in the case at bar: to wit, an injunction has a specific legal meaning, and the fact that a different procedural mechanism can achieve the same result as an injunction does not mean that the two should be deemed the same.  A material distinction still obtains.  The fact that the title of Section 1252(f)(1) is a "limit on *injunctive* relief" (emphasis added) specifically suggests the distinction between an injunction and a vacatur is material.  *Cf. Bhd. of R.R. Trainmen*, 331 U.S. at 529 (noting that "the title of a statute

United States District Court
Northern District of California

1    and the heading of a section cannot limit the plain meaning of the text" but they can be of use

2    "when they shed light on some ambiguous word or phrase").  Moreover, the operative language of

3    § 1252(f)(1) limiting a court's authority "to enjoin or restrain" operations tracks Federal Rule of

4    Civil Procedure 65 which governs preliminary *injunctions* and temporary *restraining* orders.  It

5    does not track §§ 705 and 706(2) of the APA which only grant courts the authority to "set aside"

6    (*i.e.*, vacate) and "postpone" agency action.

7         Finally, the Court takes note that, under binding Ninth Circuit law, § 1252(f)(1)'s bar on

8    classwide injunctive relief does not preclude a court from issuing declaratory relief.  *See Al Otro*

9    *Lado v. Exec. Off. for Immigr. Review*, 120 F.4th 606, 625 (9th Cir. 2024) (stating that "§

10   1252(f)(1) does not 'bar classwide declaratory relief'"); *see also Kidd v. Mayorkas*, 734 F. Supp.

11   3d 967, 986 (C.D. Cal. 2024) (stating that "the Court can issue declaratory relief – which is not

12   precluded by § 1252(f)"); *Immigrant Defenders Law Ctr. v. Mayorkas*, No. CV 20-9893 JGB

13   (SHKx), 2023 U.S. Dist. LEXIS 75206, at *40 (C.D. Cal. Mar. 15, 2023) (stating that "[t]he best

14   reading of *Biden v. Texas* and *Aleman Gonzalez* is that district courts like this one retain

15   jurisdiction to award declaratory relief in immigration class actions").[6]  Here, Plaintiffs do seek

16   declaratory relief.  *See* Compl., Prayer ¶¶ 1-3; FAC, Prayer ¶¶ 1-3.  Thus, if the Court were to

17   deny Plaintiffs' motion to postpone based on § 1252(f)(1) – as the government requests – that

18   would effectively render any declaratory relief moot.  The TPS of the 2023 Designation

19   beneficiaries, if the Secretary's vacatur is not postponed, will expire in early April 2025, long

20   before any final judgment ordering declaratory relief could be obtained herein.

21        Accordingly, the Court rejects the government's contention that § 1252(f)(1) is a bar to

22   Plaintiffs' request for relief.

23

24   _____

[6] The Supreme Court has not yet addressed this issue.  *See Aleman Gonzalez*, 596 U.S. at 551 n.2
25   ("At oral argument, the Government suggested that §1252(f)(1) not only bars class-wide
     injunctive relief but also prohibits any other form of relief that is 'practically similar to an
26   injunction,' including class-wide declaratory relief. . . . Because only injunctive relief was entered
     here, we have no occasion to address this argument."); *Biden v. Texas*, 597 U.S. at 801 n.4 ("At
27   our request, the parties briefed several additional questions regarding the operation of section
     1252(f )(1), namely, whether its limitation on 'jurisdiction or authority' is subject to forfeiture and
28   whether that limitation extends to other specific remedies, such as declaratory relief and relief
     under section 706 of the APA.  We express no view on those questions.").

2.   Section 1254a(b)(5)(A)

The government argues that, even if § 1252(f)(1) is not a bar to Plaintiffs' case, there is another jurisdictional hurdle – specifically, § 1254a(b)(5)(A).  Section 1254a(b)(5)(A) is part of the TPS statute.  It provides that "[t]here is no judicial review of any determination of the Attorney General with respect to the designation, or termination or extension of a designation, of a foreign state under this subsection."  8 U.S.C. § 1254a(b)(5)(A).

In assessing the government's argument based on § 1254a(b)(5)(A), the Court must first separate out the challenges being made by Plaintiffs in the case at bar.  Plaintiffs are contesting (1) Secretary Noem's decision to vacate the extension of the 2023 Designation and (2) her decision to terminate the 2023 Designation.  With respect to (1), Plaintiffs have multiple arguments: (a) the Secretary lacked the inherent authority to vacate the extension; (b) even if she had the authority, the rationale to vacate the extension was arbitrary and capricious; and (c) even if she had the authority, the decision to vacate was motivated at least in part by unconstitutional animus based on race, ethnicity, and/or national origin.  With respect to (2), Plaintiffs assert, *inter alia*, that the decision to terminate (like the decision to vacate) was infected by unconstitutional animus.

At the hearing, the government explicitly conceded that § 1254a(b)(5)(A) does *not* bar the Court from entertaining Plaintiffs' contention that the Secretary lacked the inherent authority to vacate the extension of the 2023 Designation.  The government acknowledged that whether the Secretary had such authority is purely a matter of statutory construction (*i.e.*, of the TPS statute) and is not a "determination" with respect to a TPS designation, termination, or extension.

The government, however, contends that § 1254a(b)(5)(A) bars the other claims asserted by Plaintiffs (*i.e.*, whether the vacatur was arbitrary and capricious and/or whether the vacatur or termination was unconstitutionally motivated).  The Court does not agree.  The Court previously addressed the scope of § 1254a(b)(5)(A) in *Ramos v. Nielsen*, 321 F. Supp. 3d 1083 (N.D. Cal. 2018), another case that involved TPS terminations but during the first Trump administration.  When *Ramos* was appealed, the Ninth Circuit panel also addressed the scope of § 1254a(b)(5)(A), *see Ramos v. Wolf*, 975 F.3d 872 (9th Cir. 2020).  However, the panel decision was later vacated so that the matter could be reheard en banc.  *See Ramos v. Wolf*, 59 F.4th 1010 (9th Cir. 2023).

United States District Court
Northern District of California

United States District Court
Northern District of California

1    Ultimately, the en banc hearing did not take place because the government, having transitioned to

2    the Biden administration, made new decisions regarding the TPS designations and terminations at

3    issue.  *See Ramos v. Nielsen*, 709 F. Supp. 3d 871, 876 (N.D. Cal. 2023) (reviewing history of

4    proceedings).

5          Because the *Ramos* panel decision was vacated and no en banc ruling ever issued, this

6    Court's decision in *Ramos* has not been overturned.  Moreover, although the Ninth Circuit panel in

7    *Ramos* ultimately held that § 1254a(b)(5)(A) did bar Plaintiffs from proceeding based on the

8    particular nature of the claims asserted, the panel basically agreed with this Court that the scope of

9    § 1254a(b)(5)(A)'s bar on judicial review was limited to "inquiring into the underlying

10   considerations and reasoning employed by the Secretary in reach her country-specific TPS

11   determinations."  *Ramos*, 975 F.3d at 891.  It does not apply to, *e.g.*, a pattern or practice that is

12   "collateral to and distinct from the specific [country] TPS decisions and their underlying

13   rationale."[7]  *Id.* at 891-92.

14         Given these circumstances, the Court adheres to its prior views on the scope of §

15   1254a(b)(5)(A).  Nothing in the government's papers or oral arguments presented in the case at

16   bar persuade the Court that § 1252a(b)(5)(A) should be construed differently.[8]  Thus, here, the

17   government's argument that § 1254a(b)(5)(A) is a jurisdictional bar lacks merit for several

18   reasons.

19              a.    Presumption of Judicial Review

20         First, as noted above, there is a "strong presumption . . . that the actions of federal agencies

21   are reviewable in federal court," *KOLA*, 882 F.2d at 363, and "only upon a showing of 'clear and

22   convincing evidence' of a contrary legislative intent should the courts restrict access to judicial

23

24   [7] In her dissent in *Ramos*, Judge Christen agreed that § 1254a(b)(5)(A) "bars review of TPS
     determinations only, not collateral challenges," *Ramos*, 975 F.3d at 911, but she disagreed with the

25   majority that the plaintiffs' claims constituted direct challenges instead of collateral ones.

26   [8] For example, the government argues that, because § 1254a(b)(5)(A) refers to "any
     determination" and "any" is a word with an expansive meaning, *see* Opp'n at 12 (citing *Patel v.*

27   *Garland*, 596 U.S. 328, 338 (2022)), § 1254a(b)(5)(A) must be construed broadly.  But the word
     "any" cannot overcome the fact that, as discussed below, § 1254a(b)(5)(A) refers to "any

28   determination . . . with respect to the designation, or termination or extension of a designation."  8
     U.S.C. § 1254a(b)(5)(A).  The key is what constitutes "determination."

1    review." *Abbott Labs.*, 387 U.S. at 141.

2             b.      <u>Applicability to Plaintiffs' APA Claim</u>

3       Second, Plaintiffs' claim that the Secretary's decision to vacate was arbitrary and

4 capricious does not fall within the scope of § 1254a(b)(5)(A) because the statute bars judicial

5 review of determinations made with respect to TPS designations, terminations, or extensions only.

6 A decision to vacate (a matter not expressly authorized by the TPS statute) is, literally and

7 textually, not a "designation, or termination or extension of a designation, of a foreign state under

8 this subsection." 5 U.S.C. § 1254a(b)(5)(A).

9       Furthermore, as the Court held in *Ramos*, § 1254a(b)(5)(A) was designed to bar judicial

10 review of substantive country-specific conditions in service of TPS designations, terminations, or

11 extensions of a foreign state – not judicial review of general procedures or collateral practices

12 related to such. *See Ramos*, 321 F. Supp. 3d at 1102 (taking note of Supreme Court cases holding

13 that "similar statutes which preclude review of a 'determination' of immigration status did not

14 preclude review of collateral practices and policies"; citing, *e.g.*, *McNary v. Haitian Refugee Ctr.,*

15 *Inc.*, 498 U.S. 479 (1991) (individual denials on the merits were not challenged but rather the

16 process under which denials were determined)). This holding is consistent with the panel decision

17 in *Ramos*. *See Ramos*, 975 F.3d at 891-92 ("[A court] may still have jurisdiction over a broad

18 challenge to the agency's procedures or practices. To the extent a claim purports to challenge an

19 agency pattern or practice rather than a specific TPS determination, we may review it only if the

20 challenged pattern or practice is indeed collateral to, and distinct from, the specific TPS decisions

21 and their underlying rationale, which the statute shields from judicial scrutiny.") (internal

22 quotation marks omitted). It is also consistent with the understanding of multiple district courts

23 who have addressed TPS cases. *See, e.g.*, *Saget v. Trump*, 375 F. Supp. 3d 280, 330-32 (E.D.N.Y.

24 2019) (stating that "the jurisdiction-stripping provision proscribes only direct review of individual

25 TPS determinations" but does not block challenges based on deficiencies in the process employed

26 to terminate TPS); *CASA de Md., Inc. v. Trump*, 355 F. Supp. 3d 307, 317-21 (D. Md. 2018)

27 (concluding that the TPS jurisdiction-stripping provision "is best read as barring judicial review of

28 the merits of the determination itself, but not whether the determination was made through

United States District Court
Northern District of California

1    'unconstitutional practices and policies'"; adding that "Plaintiffs' constitutional and APA claims

2    do not threaten the 'agency's primacy over its core statutory function'"); *Centro Presente v.*

3    *United States Dep't of Homeland Sec.*, 332 F. Supp. 3d 393, 404-09 (D. Mass. 2018) (noting that

4    plaintiffs' "constitutional and statutory claims [are] frame[d] as challenges to Defendants' process

5    of adjudication rather than the content of any particular adjudication").

6         In the case at bar, Plaintiffs' contention that the decision to vacate was arbitrary or

7    capricious – and thus should be set aside – does not dictate how the Secretary should ultimately

8    rule on a TPS designation, termination, or extension.  Indeed, Secretary Noem's vacatur decision

9    was based purely on procedural concerns (*e.g.*, whether Secretary Mayorkas had taken a "novel

10   approach" or caused confusion) and did not turn, *e.g.*, on country conditions in Venezuela or a

11   concern about U.S. interests.  Therefore, Plaintiffs are simply making a collateral challenge, not a

12   direct one, and § 1254a(b)(5)(A) is not implicated.

13        That Plaintiffs' challenge to the vacatur decision is collateral in nature is underscored by

14   *Mace v. Skinner*, 34 F.3d 854 (9th Cir. 1994), where the Ninth Circuit considered the following

15   factors in determining whether a challenge is direct or collateral: (1) whether the plaintiff's claims

16   are based on the "merits of his individual situation" or, instead, a "broad challenge to allegedly

17   [improper agency] practices"; (2) whether the administrative record "for a single [decision] would

18   have . . . relevance" to the plaintiff's claims; and (3) whether the claims raised matters "peculiarly

19   within the agency's 'special expertise'" or "an integral part of its 'institutional competence.'"  *Id.*

20   at 859; *see also Ramos*, 975 F.3d at 892 (panel decision) (considering the above factors); *id.* at

21   912-13 (Christen, J., dissenting) (same).  *City of Rialto v. West Coast Loading Corp.*, 581 F.3d

22   865 (9th Cir. 2009), added a fourth consideration: whether there is another forum where a

23   plaintiff's claim may be heard.  *See id.* at 874 (taking note that, in a prior decision, "we rejected

24   jurisdiction over the plaintiffs' claim in part because we held that the claim 'can be effectively

25   advanced in the context of an appeal from an individual order of deportation'"); *see also Ramos*,

26   975 F.3d at 913 (stating that "*City of Rialto* teaches that we must consider whether another forum

27   exists where plaintiffs' claim may be heard").

28   / / /

United States District Court
Northern District of California

1       In the case at bar, the first factor points to a collateral challenge for the reasons stated

2   above.  The second factor also weighs in favor of a collateral challenge; for instance, whether

3   Secretary Mayorkas had taken a "novel approach," as claimed by Secretary Noem when she

4   vacated the extension, will likely require consideration of matters outside the administrative

5   record.  The same is true for the third factor – *e.g.*, whether Secretary Mayorkas's decision

6   engendered confusion was not something particularly within DHS's expertise.  Finally, there does

7   not appear to be any other forum where Secretary Noem's decision to vacate could be challenged.

8   *Cf. Ramos*, 975 F.3d at 894 (panel decision) ("recogniz[ing] that Plaintiffs cannot raise their APA

9   challenge in another forum or at a different stage in the proceedings"); *id.* at 913 (Christen, J.,

10  dissenting) (noting that "[t]he TPS statute includes an administrative review process for

11  challenging denials of individual noncitizen TPS applications, but it does not include a path for

12  challenging the termination of a foreign state's TPS designation").

13      The Court, therefore, holds that § 1254a(b)(5)(A) does not bar judicial review of Plaintiffs'

14  challenge to the Secretary's decision to vacate.

15              c.      Applicability to Plaintiffs' Equal Protection Claim

16      Finally, § 1254a(b)(5)(A) does not preclude judicial review of Plaintiffs' separate claim for

17  violation of equal protection, whether based on the decision to vacate or the decision to terminate.

18  "The presumption in favor of judicial review [of agency action] is particularly important in regards

19  to constitutional claims."  *CASA de Md.*, 355 F. Supp. 3d at 317.  Here, "there is no 'clear and

20  convincing' evidence that Congress intended to preclude the Court from reviewing constitutional

21  challenges of the nature alleged.  Indeed, as Plaintiffs point out, where Congress otherwise

22  intended to preclude review of all constitutional claims in the INA, it said so explicitly."  *Ramos*,

23  321 F. Supp. 3d at 1105.  As above, the panel decision in *Ramos* is in accord.  *See Ramos*, 975

24  F.3d at 895 (entertaining the equal protection claim on the merits – *i.e.*, not applying a

25  jurisdictional bar under § 1254a(b)(5)(A)).  It is also notable that the APA expressly provides that

26  agency action shall be set aside if unconstitutional.  *See* 5 U.S.C. § 706(2)(B) (providing that a

27  court shall "hold unlawful and set aside agency action . . . found to be . . . contrary to

28  constitutional right, power, privilege, or immunity").

United States District Court
Northern District of California

1    The Court, therefore, rejects the government's contention that jurisdiction is lacking based

2    on § 1254a(b)(5)(A) for both Plaintiffs' APA claim and their equal protection claim.

3    B.    Section 705 of the APA

4    According to the government, even if there is no jurisdictional bar to Plaintiffs' suit, § 705

5    of the APA still cannot provide them with any relief because the statute "by its own terms does not

6    authorize relief [where] the challenged actions *have already taken effect*."  Opp'n at 9 (emphasis

7    added).  The government's position here seems to be that, because the Secretary's vacatur decision

8    took effect *immediately* (as reflected in the Federal Register notice), *see* 90 Fed. Reg. at 8807

9    (stating that "[t]he vacatur is effective immediately"), it is impossible to postpone the effective

10   date of the vacatur pursuant to § 705.  *See* 5 U.S.C. § 705 (providing that "the reviewing court . . .

11   may issue all necessary and appropriate process to postpone the effective date of an agency action

12   or to preserve status or rights pending conclusion of the review proceedings").

13   There are several problems with the government's position.

14   First, although Plaintiffs may technically be asking for postponement of the effective date

15   of the vacatur decision (which enabled the termination decision), what they are ultimately seeking

16   is postponement of the *impact* of the vacatur decision – *i.e.*, the actual termination of the 2023

17   TPS Designation.  As the actual termination of the 2023 Designation has not yet gone into effect,

18   since the challenged actions have yet not changed the status of TPS beneficiaries, Plaintiffs should

19   be able to seek postponement.[9]

20   Second, the government's reliance on *Center for Biological Diversity v. Regan*, 597 F.

21   Supp. 3d 173 (D.D.C. 2022), in support of its position is flawed because that case focused on

22   when an *agency* – and not a *court* – can postpone agency action (*i.e.*, pending judicial review).

23   *See id.* at 204 ("The D.C. Circuit has declared – albeit in a non-precedential order – that Section

24   705 'permits an *agency* to postpone the effective date of a not yet effective rule, pending judicial

25   review,' but 'it does not permit the agency to suspend without notice and comment a promulgated

26

27   ─────────────────────
     [9] Ironically, at the hearing, the government argued that Secretary Noem had the authority to
     reconsider the extension of the 2023 Designation because that extension had not yet gone into
28   effect.

United States District Court
Northern District of California

1   rule.'") (emphasis added).  To be sure, § 705 of the APA does address both postponement by an

2   agency and postponement by a court.[10]  However, that does not mean that postponement by an

3   agency and postponement by a court are treated the same under §705.

4          The district court in *Texas v. Biden*, 646 F. Supp. 3d 753 (N.D. Tex. 2022), made this very

5   point.[11]  In *Texas v. Biden*, as here, the government argued that "Section 705 may only remedy an

6   agency action that has *yet* to take effect."  *Id.* at 769 (emphasis added).  The court disagreed,

7   stating that "[w]hether the effective date of the [DHS's] October 29 Memoranda [which

8   terminated an immigration program] has passed is irrelevant to this *Court's* ability to issue a

9   Section 705 stay.  Courts – including the Supreme Court – routinely stay *already-effective* agency

10  action under Section 705."  *Id.* at 770 (emphasis added).

11         The *Texas v. Biden* court pointed out that

12              [t]he cases Defendants cite [including *Center for Biological
                *Diversity*] preclude *agencies* – not *courts* – from staying the
13              effective date of agency actions after the effective date.  [This was
                reasonable because] [a]uthorizing an agency to stay an already-taken
14              action would allow the agency to evade notice-and-comment
                requirements.  An agency's "order delaying [a] rule's effective date .
15              . . [is] tantamount to amending or revoking a rule."  The APA
                "mandate[s] that agencies use the same procedures when they
16              amend or repeal a rule as they used to issue the rule in the first
                instance."  This includes the general requirement that rules be
17              subject to notice-and-comment procedures.

18              The limitation on agencies contrasts with courts' inherent authority
                to stay agency action to facilitate judicial review.
19

20  _____

21  [10] As stated above, the full text of § 705 is as follows:

22              When an agency finds that justice so requires, it may postpone the
                effective date of action taken by it, pending judicial review.  On
23              such conditions as may be required and to the extent necessary to
                prevent irreparable injury, the reviewing court, including the court to
24              which a case may be taken on appeal from or on application for
                certiorari or other writ to a reviewing court, may issue all necessary
25              and appropriate process to postpone the effective date of an agency
                action or to preserve status or rights pending conclusion of the
26              review proceedings.

27  5 U.S.C. § 705.

28  [11] The case was ultimately appealed the Supreme Court, *see Biden v. Texas*, 597 U.S. at 785, but
    the matter at issue here was not presented as part of the appeal.

United States District Court
Northern District of California

1    *Id.* at 770-71 (emphasis added).  *See, e.g.*, *GB Int'l, Inc. v. Crandall*, No. 19-35866, 2020 U.S.

2    App. LEXIS 20008, at *1 (9th Cir. June 25, 2020) ("The renewed motion to postpone the effective

3    date of agency action is granted.  *See* 5 U.S.C. § 705.  The effective date of the USCIS' denial of

4    appellants' adjustment of status applications is postponed pending resolution of this appeal.").

5            Finally, the government gives short shrift to the fact,

6                [w]hereas an agency may only "postpone the effective date of action
                 taken by it, pending judicial review," a federal court has broader
7                power to "issue all necessary and appropriate process to postpone
                 the effective date of an agency action *or to preserve status or rights*
8                *pending conclusion of the review proceedings*."  5 U.S.C. § 705
                 (emphasis added).  The greater limitation on agencies exists because
9                "agencies are creatures of statute" and, thus, "possess only the
                 authority that Congress has provided."
10

11    *Id.* at 770 (emphasis in original).  In its opposition, the government contends that the latter

12    provision still cannot save Plaintiffs' case because "[a]n order staying a policy after it has already

13    gone into effect . . . does not preserve the status quo, but rather, *alters* it."  Opp'n at 10 (emphasis

14    in original).  This argument, however, is without merit because, traditionally, "[t]he 'status quo' to

15    be restored is 'the last peaceable uncontested status existing between the parties *before* the dispute

16    developed.'"  *Texas v. Biden*, 646 F. Supp. 3d at 771 (emphasis added); *cf. Boardman v. Pac.*

17    *Seafood Grp.*, 822 F.3d 1011, 1024 (9th Cir. 2061) (stating that "[t]he 'purpose of a preliminary

18    injunction is to preserve the status quo ante litem pending a determination of the action on the

19    merits,'" and "'[s]tatus quo ante litem' refers to 'the last uncontested status which *preceded* the

20    pending controversy'") (emphasis added).  Here, the last uncontested status that preceded the

21    pending controversy was the state of the TPS designations at the time Secretary Mayorkas

22    extended the 2023 Designation in January 2025 – *i.e.*, *before* Secretary Noem took the contested

23    action of vacating the extension and then terminating the 2023 Designation.

24    C.    <u>Section 705 Factors in Determining Postponement</u>

25            Having addressed the government's procedural challenges to Plaintiffs' motion to

26    postpone, the Court may now turn to the merits of the motion.  The factors considered in

27    determining whether to postpone pursuant to § 705 "'substantially overlap with the . . . factors for

28    a preliminary injunction.'"  *Immigrant Legal Res. Ctr. v. Wolf*, 491 F. Supp. 3d 520, 529 (N.D.

United States District Court
Northern District of California

1    Cal. 2020); *see also Colorado v. United States EPA*, 989 F.3d 874, 883 (10th Cir. 2021) (stating

2    that the preliminary injunction "factors also determine when a court should grant a stay of agency

3    action under section 705 of the APA"); *Cook Cnty. v. Wolf*, 962 F.3d 208, 221 (7th Cir. 2020)

4    (stating that the standard for a stay under § 705 is "the same" as the standard for a preliminary

5    injunction).

6              The Ninth Circuit has explained the standard for a preliminary injunction as follows:

7                    A party seeking a preliminary injunction must meet one of two
                     variants of the same standard.  Under the original *Winter* standard, a
8                    party must show "that he is likely to succeed on the merits, that he is
                     likely to suffer irreparable harm in the absence of preliminary relief,
9                    that the balance of equities tips in his favor, and that an injunction is
                     in the public interest."  *Winter v. NRDC, Inc.*, 555 U.S. 7, 20, 129 S.
10                   Ct. 365, 172 L. Ed. 2d 249 (2008).  Under the "sliding scale" variant
                     of the *Winter* standard, "if a plaintiff can only show that there are
11                   'serious questions going to the merits' – a lesser showing than
                     likelihood of success on the merits – then a preliminary injunction
12                   may still issue if the 'balance of hardships tips sharply in the
                     plaintiff's favor,' and the other two *Winter* factors are satisfied."
13

14   *All. for the Wild Rockies v. Pena*, 865 F.3d 1211, 1217 (9th Cir. 2017).  Neither party disputed that

15   this framework would also apply to a motion brought pursuant to § 705 of the APA.

16              1.    Irreparable Injury

17              The Court considers first the factor of irreparable injury.  Irreparable injury is particularly

18   important as § 705 explicitly invokes it as a basis to issue relief.  Plaintiffs have submitted a

19   number of declarations establishing that, without postponement of the agency actions, TPS

20   beneficiaries will suffer irreparable injury.  The declarations have been submitted by, *e.g.*, TPS

21   holders (including the named Plaintiffs), experts, and leaders of community organizations.

22              The declarations reflect that TPS beneficiaries feel stuck between a rock and a hard place

23   because of DHS's actions.  Absent relief from the Court, TPS beneficiaries will no longer have

24   authorization to work in the United States and thus will lose their jobs – which in turn imperils

25   their livelihoods, housing, and health care.  Absent relief from the Court, they will no longer have

26   legal status, which means not only loss of, *e.g.*, driver's licenses and educational opportunities, but

27   also – and most significantly – the prospect of removal from the United States.

28   / / /

Removal is a concrete reality because, for many TPS holders, TPS is their only avenue for legal status in the United States. For example, those with asylum cases have been waiting for years for their adjudications. *See* Watson & Veuger Decl. ¶ 11 (Senior Fellow at the Brookings Institution in Economic Studies and Senior Fellow in economic policy studies at American Enterprise Institute) (testifying that, "[a]s of 2024[,] it was estimated that 132,272 Venezuelans had filed asylum cases which had not yet been adjudicated, consistent with the well-documented backlogs in the immigration system"). Even if an individual could obtain asylum – or even parole – these legal mechanisms do not provide the same protections as TPS. *See* Tolchin Decl. ¶ 11 (immigration attorney) (testifying that, "[a]lthough many Venezuelan TPS holders may . . . be eligible for protection from removal and work authorization through other avenues [*e.g.*, asylum and parole], only a small minority will actually receive relief, and it is very likely that many Venezuelans TPS holders would *not* be protected to the same degree by any other statute") (emphasis in original).

Removal presents significant hardship for several reasons. First, removal would mean separation from family, friends, and communities. *See Washington v. Trump*, 847 F.3d 1151, 1168-69 (9th Cir. 2017) (recognizing the separation of families as "substantial injuries and even irreparable harms").[12] Some TPS holders have been in the United States for years; some TPS holders who are children have known or remembered only the United States as their home. *See, e.g.*, M.R. Decl. ¶¶ 3, 7, 18 (arrived in 2015 with her then two-year-old daughter, both of whom

---

[12] In *Washington v. Trump*, the district court temporarily enjoined an executive order that banned entry into the United States of individuals from seven countries. The government moved for an emergency stay of the district court decision pending appeal. In evaluating, *inter alia*, the balance of hardships and the public interest, the Ninth Circuit noted:

> the States have offered ample evidence that if the Executive Order were reinstated even temporarily, it would substantially injure the States and multiple "other parties interested in the proceeding." When the Executive Order was in effect, the States contend that the travel prohibitions harmed the States' university employees and students, separated families, and stranded the States' residents abroad. These are substantial injuries and even irreparable harms.

*Washington v. Trump*, 847 F.3d at 1168-69.

United States District Court
Northern District of California

United States District Court
Northern District of California

have TPS).  Furthermore, separation is particularly complicated because many TPS holders live in

mixed-status families – *i.e.*, some family members, including partners and/or some children, are

U.S. citizens.  *See* Docket No. 62 (Amicus Br. at 4) (noting that, "[i]n 2022, approximately 54,000

U.S. citizen children and 80,000 U.S. citizen adults lived with a Venezuelan TPS holder").

Decisions, therefore, would have to be made about whether families should stay together or split

apart.  Decisions would also have to be made how to provide for families in either scenario, both

in terms of economic and emotional support.  *Cf.* Docket No. 62 (Amicus Br. at 6) (noting that

"parental deportation is a deeply traumatic and disruptive event, linked to extreme psychological

distress, anxiety, depression, post-traumatic stress disorder (PTSD), externalizing behaviors (such

as aggression), and difficulties sleeping").

   Second, removal presents a great deal of uncertainty because it is not clear where TPS

holders stripped of their legal status in the United States can go.  Removal could mean a return to

Venezuela which has been in the throes of a political and economic crisis for years, *see, e.g.*,

Young Decl. ¶¶ 3, 13-18 (opining that "the political and economic crisis that Venezuela has been

experiencing for the last decade continues to this day"; discussing, *inter alia*, political repression

in Venezuela throughout the Hugo Chávez and Nicolás Maduro regimes, fraudulent election in

July 2024, and mismanaged economy and U.S. economic sanctions that have left over 80% of

Venezuelans in poverty and over 50% in extreme poverty); Watson & Veuger Decl. ¶¶ 8-9

(describing economic crisis that began under Hugo Chávez  and worsened under Nicolás Maduro,

Nicolás Maduro's use of anti-democratic means to maintain power, and fraudulent election in

2024) – **and** which is still classified by the U.S. State Department as a "Level 4: Do Not Travel"

country.[13]  *See*

https://travel.state.gov/content/travel/en/traveladvisories/traveladvisories/venezuela-travel-

advisory.html (Venezuela travel advisory reissued in September 2024) (designating Venezuela a

Level 4 country and stating: "Do not travel to Venezuela due to the high risk of wrongful

---

[13] The Watson & Veuger Declaration fairly points out that it is not clear how TPS holders could
return to Venezuela given that this would "require cooperation with the Maduro regime," which
the United States does not recognize and on which the United States has imposed sanctions.
Watson & Veuger Decl. ¶ 24.

1    detentions, terrorism, kidnapping, the arbitrary enforcement of local laws, crime, civil unrest, poor

2    health infrastructure").  Removal to a different country is not a readily available option because

3    there is no Venezuelan consulate in the United States where to update or get passports.  *See* Ferro

4    Decl. ¶ 16 (Executive Director of Venezuelan American Caucus).  And even if there were such an

5    option, the prospect of rebuilding in a new place – finding a job, health care, basic necessities – is

6    no easy task.

7        The declarations detailing hardships are compelling.  For example, Plaintiff M.H. and her

8    seven-year-old daughter are TPS beneficiaries from Venezuela.  *See* M.H. Decl. ¶ 2.  TPS is their

9    only form of legal status because of long waits and delays in the asylum and green card processes.

10   *See id.* ¶¶ 11-16.  M.H.'s Venezuelan passport is expired, and she has no way to renew it because

11   the U.S. severed diplomatic relations with Venezuela, so she cannot travel to another country.  *See*

12   *id.* ¶ 24.  Her husband and two-year-old son are U.S. citizens.  *See id.* ¶ 2.  M.H. left Venezuela

13   because of political repression for working with an opposition party, including facing a warrant for

14   her arrest.  *See id.* ¶¶ 5, 6.  Currently, the family lives in Tennessee, where M.H. cares for the

15   children full-time and volunteers at a local health clinic, while her husband works a full-time job

16   to provide for the family and is gone all day at work.  *See id.* ¶ 7.  Both roles require M.H. to have

17   a driver's license (which is dependent on her having legal status) to drive her severely asthmatic

18   son to the hospital, her daughter to school, and herself to the clinic to volunteer.  *See id.* ¶¶ 7, 8.

19   The son requires M.H.'s daily care because of the risk of asthma attacks.  *See id.* ¶ 18.  Her family

20   in Venezuela tells her about the ongoing political and economic crisis in the country, including

21   facing shortages of basic necessities and water and power shut offs.  *See id.* ¶ 10.  These family

22   members rely on remittances from M.H. to survive.  *See id.*  Without postponement, the DHS

23   actions would result in her TPS expiring on April 7, 2025.  *See id.* ¶ 2.  This prospect has brought

24   M.H. fear and sadness of being separated from her family and traumatizing her children.  *See id.*

25   ¶¶ 19-23.  M.H. would lose her driver's license, crucial to her caring for her son's asthma attacks.

26   *See id.* ¶ 18.  If removed to Venezuela with her daughter, she fears political persecution, hunger,

27   and facing a lack of housing, healthcare, and basic goods.  *See id.* ¶¶ 19-23.  The family would be

28   forced to make the difficult decision of separating or all moving to Venezuela, a country that lacks

the medical infrastructure to meet the son's needs. *See id.* If the husband remains in the United States, he will have to leave his job to care for the son, leaving both sides of the family without income and health insurance. *See id.*

Plaintiff Freddy Jose Arape Rivas has lived in the U.S. since January 2023 and registered for TPS pursuant to the 2023 Designation. *See* Rivas Decl. ¶ 2. TPS is his sole legal authorization to remain and work in the U.S. *See id.* ¶ 14. In Venezuela, he studied computer science in college but was forced to flee Venezuela due to repression for supporting the opposition party and inability to obtain necessities. *See id.* ¶¶ 5-7. In the United States, he has worked an IT job for an energy and technology company in Texas, and the company is so pleased with his performance that that they sponsored him for an H1B visa application, which is still pending. *See id.* ¶ 8. He has filed a tax return for each year he has lived in the U.S. *See id.* ¶ 9. He is the sole source of economic support for his parents, who have chronic health conditions, and other family members still in Venezuela. *See id.* ¶ 10. Based on the extension of the 2023 Designation (in January 2025), he renewed his lease for his house and extended his employment. *See id.* ¶ 11. Without TPS, Mr. Rivas would lose his job, home, and driver's license; live under constant fear of deportation, particularly to Venezuela where he could be tortured for his prior political opposition; and would no longer be able to provide for his parents and family in Venezuela, including paying for life-saving medications. *Id.* ¶¶ 15-17, 19. Mr. Rivas also has many family members in Texas who are TPS holders themselves, including a cousin who works at a hospital and has a seven-year-old child protected by TPS and two young U.S.-born children. For the child who has TPS, the United States is the only country she remembers. *See id.* ¶ 13.

Plaintiff Cecilia Daniela González Herrera has lived her entire adult life in the U.S. and relies on TPS for legal status because her family's asylum application has been pending for eight years. *See* Gonzalez Herrera Decl. ¶ 2. She and her parents fled political persecution in Venezuela in 2017. *See id.* ¶¶ 4-6. She attends university and works as a voting rights advocacy coordinator. *See id.* ¶ 9. TPS allows her to pay in-state tuition and be eligible for scholarships; without TPS, she would likely be forced to abandon her studies. *See id.* ¶ 10. Ms. Herrera feels scared to go outside for fear of being racially profiled and detained by ICE, and a decline in

United States District Court
Northern District of California

1    mental health has caused an inability to focus on schoolwork.  *See id.* ¶¶ 14-16.  She has no family

2    or home in Venezuela and fears returning to Venezuela and facing violence or harm from the

3    government.  *See id.* ¶ 17.

4          The Executive Director of the Venezuelan American Caucus takes note of even more

5    hardships faced by numerous Venezuelan TPS holders to whom she has spoken:

6                small business owners unsure whether to sell their businesses or
             close their doors; employees who will lose their employment
7            authorization, and their livelihood, in a matter of weeks; students
             fearful of the loss of financial aid which guarantees their ability to
8            pursue their education; individuals terrified that they will be
             deported without this essential legal status, and trying to determine
9            whether to stay or flee to avoid this outcome; business owners with
             employees unsure whether to lay them off in preparation for closure;
10           Venezuelans who have taken out significant loans from banks to
             start businesses or buy homes and properties, now unable to sleep at
11           night, wondering what to do and how to resolve these matters; and
             Venezuelans who honestly know they have no grounds to apply for
12           political asylum, and who, wanting to do things the right way, have
             turned to TPS while they wait for a real solution to the political and
13           humanitarian crisis caused by the dictatorship of Nicolás Maduro,
             especially after the largest electoral fraud ever perpetrated in the
14           region in July 2024.

15   Ferro Decl. ¶ 13.

16         Notably, the government offers no evidence to counter Plaintiffs' showing of irreparable

17   injury.  The government conceded at the hearing that it had no counter-evidence and no basis to

18   doubt the bona fides of the factual declarations filed herein.  Its main assertion at the hearing was

19   that most of these facts are not relevant, an assertion the Court rejects.  They are indeed relevant to

20   the issue of irreparable injury, the public interest, and the balance of hardships.

21         At best, the government makes a passing claim that conditions have improved in

22   Venezuela, *see* 90 Fed. Reg. at 9042 (in decision to terminate the 2023 Designation, stating that

23   there was "consultation with the Department of the State," that conditions in Venezuela were

24   reviewed, and that "[o]verall, certain conditions for the 2023 TPS designation of Venezuela may

25   continue; however, there are notable improvements in several areas such as the economy, public

26   health, and crime that allow for these nationals to be safely returned to their home country"), but

27

28

United States District Court
Northern District of California

1  there is no evidence – not even a country conditions report – to support that claim.[14]  The claim is

2  also squarely contradicted by the expert declarations submitted by Plaintiffs, *see, e.g.*, Young

3  Decl. ¶ 3 (opining that "the political and economic crisis that Venezuela has been experiencing for

4  the last decade continues to this day"), and the U.S. State Department's classification of

5  Venezuela as a "Level 4: Do Not Travel" country because of its dangerous conditions.

6        The government also tenders a legal argument – to wit, that the harms identified by

7  Plaintiffs are not cognizable because they are inherent to the temporary nature of TPS.  *See* Opp'n

8  at 22-23 (arguing that, "[w]hile Plaintiffs heavily focus on the burden that TPS beneficiaries will

9  face should the termination be permitted to go into effect, the underlying cause of this harm flows

10 from the statute ('temporary' protected status) itself" – *i.e.*, "the alleged harms would exist with or

11 without the termination at issue" because "a country's TPS designation must be reviewed at least

12 every 18 months, and there is no guarantee of renewal").  The Court previously rejected this

13 argument in *Ramos*, *see Ramos*, 336 F. Supp. 3d at 1087 (noting that, "[a]lthough the TPS

14 program is temporary in nature, that does not mean that Plaintiffs' injuries claimed herein are the

15 purely result of the temporary nature of the program as opposed to the government's actions"), and

16 it fares no better here.  Although the TPS designations for Venezuela are only temporary, they still

17 afford TPS holders with concrete, meaningful relief: for a fixed period of time, TPS holders have

18 both the right to work and the right to be free from removal, which give not only stability but also

19 security in their lives and time with their families otherwise threatened by Secretary Noem's

20 actions.  In short, time matters, even if that time is limited.  Certainly, anyone who, for instance,

21 has experienced the loss of a loved one to a terminal illness understands the preciousness of time,

22 even if short.[15]

23 _____

24 [14] To be clear, the government represents that Secretary Noem found there to be improvements
   after examining DHS's "review of country conditions," Opp'n at 6, but no country conditions
25 report has been provided to the Court in conjunction with the pending motion.  To the extent the
   government suggested at the hearing that Secretary Mayorkas found improved conditions when he
26 extended the 2023 Designation, that is not accurate.  The Federal Register notice for the extension
   stated: "Recently, Venezuela's economy has shown some signs of recovery; however, it is still in a
27 precarious condition."  88 Fed. Reg. at 68133.

28 [15] At the hearing, Plaintiffs also pointed out that time matters in practical terms because some TPS
   holders have, *e.g.*, asylum applications pending which would provide for longer-term relief.  It is

1    Faced with the above, the government's remaining argument is that the interests of TPS

2    holders are outweighed by other interests – in particular, the public interest in national security.

3    The public interest factor is addressed below.  To the extent the government argues the Secretary

4    has an interest in having her actions enforced, that would only be if her actions were lawful.  As

5    discussed below, the Plaintiffs have made a showing that the Secretary has acted unlawfully.

6        2.    Public Interest

7    Contrary to what the government argues, the public interest weighs in favor of, not against,

8    postponement of the agency actions.

9            a.    Economic Impacts

10    As reflected in the declarations submitted by Plaintiffs and the two Amici briefs

11    (representing the views of a number of states, cities, and counties), Venezuelan TPS holders are

12    integrated into the U.S. communities in which they live.  Many are married to, or are parents of,

13    U.S. citizens.  A great number work – and in diverse settings.  *See also* Morten Decl. ¶ 4

14    (Professor of Economics at Stanford University) (noting that employment rates associated with

15    TPS holders generally is estimated to be between 81 and 96%); Ferro Decl. ¶ 11 (noting that, "[i]n

16    the United States, TPS holders work in frontline jobs, hospitality, delivery, customer service,

17    retail, restaurants, transportation, construction, factories, and manufacturing, among many other

18    professional fields").

19    By virtue of their work alone, Venezuelan TPS holders make significant economic

20    contributions to their communities.  For example, if one were to consider only the 360,000

21    Venezuelans who arrived in the United States between 2021 and 2023 (the two TPS designations

22    for Venezuela), "there were approximately 195,000 people age 16 and over who had earnings in

23    the United States in the year before they were interviewed in the [2023 American Community

24    Survey]," and "[t]heir average earnings were $17,981 per person.  Termination of their TPS status

25

26    _____

27    possible that adjudications on such applications could be made during the time TPS holders are
     still present in the United States, *i.e.*, if the Court postpones the agency actions pending judicial
     review.  Removal before the application is acted upon could impact the application, if only as a

28    practical matter.

would result in an estimated 3.5 billion dollar annual loss to the U.S. economy, and an annual loss of 434.8 million dollars in Social Security taxes." Card Decl. ¶ 9(i) (emphasis omitted); *cf.* Watson & Veuger Decl. ¶ 20 ("Economists largely agree that immigration is good for the U.S. economy overall, promoting GDP growth and if anything raising wages for the average U.S. born worker."). If one were to consider the additional 320,000 Venezuelans who were present in the United States in 2023 and who arrived in the country between 2013 (when Nicolás Maduro assumed power) and 2020, there were approximately 230,000 people age 16 and over who had earnings in the United States, and

> [t]heir average earnings were $37,161 per person. Assuming a fraction **x** of this group would lose TPS status as a result of the proposed termination, there would be an estimated 8.55**x** billion dollar[] annual loss to the U.S. economy, and an annual loss of 1.06**x** billion dollars in Social Security taxes.

Card Decl. ¶ 9(ii).[16]

The two Amici briefs underscore the economic contributions made by TPS holders generally, and Venezuelan TPS holders specifically, because they work, spend, and pay taxes. *See, e.g.*, Docket No. 62 (Amici Br. at 8) ("California TPS households earned $2.1 billion in income, paid $291.2 million in federal taxes, $226.5 million in state and local taxes, and contributed $1.6 billion in spending power. In New York, TPS households earned $2.3 billion in income, paid $348.9 million in federal taxes, $305.5 million in state and local taxes, and also contributed $1.6 billion in spending power. Moreover, at least 41 percent of TPS households are homeowners and pay taxes on property having a total value of approximately $19 billion."); Docket No. 71 (Amici Br. at 6) ("It is . . . reasonable to estimate that the 344,335 Venezuelans with approved TPS in 2024 had spending power of approximately $8 billion, if not more given their higher participation in the work force and higher percentage of educational attainment relative to other populations.").

/ / /

---

[16] In his declaration, Professor Card also explains that Venezuelan TPS holders who work do not pose a "significant threat to the labor market opportunities of native workers" (*i.e.*, because they "have about the same education as natives" do). Card Decl. ¶ 9(iv).

United States District Court
Northern District of California

1        The evidence above on the economic contributions of Venezuelan TPS holders is

2   consistent with evidence that Venezuelan TPS holders have a relatively high level of educational

3   attainment and receive only modest public assistance benefits.  *See* Card Decl. ¶ 9(iv) (noting that,

4   with respect to 366,000 Venezuelans who arrived in the United States between 2021 and 2023,

5   40% have bachelor's degrees and that, with respect to 320,000 additional Venezuelans who

6   arrived between 2013 and 2020, 54% have bachelor's degrees); Card Decl. ¶ 9(vi) (testifying that

7   Venezuelans who arrived in the United States between 2021 and 2023 "received an average of

8   $56.9 in public assistance payments over the previous 12 months" and, "[o]n average, over 96% of

9   their personal income was attributable to their own earnings").

10        If TPS holders from Venezuela lose their work authorization under the TPS program, there

11   would be additional economic impacts on the United States and the communities where the TPS

12   holders currently live.  The cost to companies to replace laid-off TPS employees could be as high

13   as $1.3 billion, *see* Morten Decl. ¶ 7(a) (citing in support a 2017 report from the Immigration

14   Legal Resource Center), and "[e]nding TPS would also impose costs on the government due to

15   deportation expenses. . . . Deporting approximately 350,000 Venezuelan TPS holders could . . .

16   cost taxpayers an estimated $4.8 billion."  Morten Decl. ¶ 7(b).  Moreover, if TPS holders no

17   longer have jobs, they or their families may need to seek public assistance.  *See* Watson & Veuger

18   Decl. ¶ 27 ("Terminating TPS will increase, not decrease, the burden on localities by preventing

19   TPS holders from working in the formal sector, thus increasing the number of people needing

20   assistance (*e.g.*, the U.S.-citizen children of deported TPS holders and TPS holders who lose their

21   work permit but are not yet removed).").  Without jobs, TPS holders and their families would also

22   lose employer-sponsored health insurance, which would likely increase health care expenditures

23   for local governments.  *See* Docket No. 62 (Amici Br. at 9) (explaining that health care

24   expenditures for Amici States would increase "both by increasing the proportion of Venezuelan

25   immigrants who are on public health insurance . . . and by increasing public expenditures on

26   emergency care provided to uninsured patients").

27   / / /

28   / / /

United States District Court
Northern District of California

b.   Public Safety

Termination of the Venezuelan TPS designations would also have more than just an

economic impact on the United States and the local communities where TPS holders live.  Public

safety would also be implicated.  Fears of detention and deportation cause undocumented

immigrants to forego medical care, such as diagnostic testing and vaccinations, which increases

health risks to the broader community.  *See, e.g.*, Watson & Veuger Decl. ¶ 16 (stating that public

health would suffer from terminating TPS for Venezuelans because immigrants without legal

status forego healthcare for fear of being apprehended at medical facilities); Docket No. 62 (Amici

Br. at 10-11).  In addition, immigrants without legal status are less likely to report crimes or testify

in court, reducing public safety and making effective law enforcement more difficult.  *See* Docket

No. 62 (Amici Br. at 12); Docket No. 71 (Amici Br. at 7-8).

c.   National Security

Similar to above, the government has offered no evidence to counter that provided by

Plaintiffs and Amici.  The government conceded, at the hearing, that they had no counter-

evidence. [17]  Instead, the government simply contends that the public interest weighs against

postponement of the agency actions because of national security interests.  But the government's

assertion that Venezuelan TPS holders pose some kind of danger to the country or the

communities where they live is entirely unsubstantiated.  In fact, an individual must be

"admissible as an immigrant," 8 U.S.C. § 1254a(c)(1)(A)(iii), in order to be eligible for TPS,

which means, *inter alia*, they cannot have been convicted of certain crimes (*e.g.*, a crime involving

moral turpitude or drugs) or a member of a terrorist organization.  *See id.* § 1182(a)(2)-(3).  In

addition, an individual is expressly deemed ineligible for TPS if they have "been convicted of any

felony or 2 or more misdemeanors committed in the United States."  *Id.* § 1254a(c)(2)(B).  It is not

surprising, therefore, that Amici state and local jurisdictions from across the United States

expressly state they have not faced any "crime wave" because of Venezuelan TPS holders.  *See*

---

[17] At the hearing, the government appeared to refer to the Federal Register notice for the
termination of the 2023 Designation, which stated that "over 180,000 illegal aliens have settled in
New York City, [which will] cost the city [approximately] $10.6 billion through the summer of
2025."  90 Fed. Reg. at 9043.  But TPS holders are not in the United States illegally.

United States District Court
Northern District of California

1    Docket No. 62 (Amici Br. at 13); *see also* Perez Decl. ¶ 7 (noting that "immigrants have had lower

2    incarceration rates than the U.S.-born throughout American history (including lower incarceration

3    rates than U.S. born whites)" and that "immigrants' relative incarceration rates have actually

4    declined since the 1960s in the U.S.") (emphasis omitted).  The government's attempt to cast

5    Venezuelan TPS holders as criminals is also in tension with record evidence reflecting that

6    Venezuelan TPS holders are largely employed and have relatively high education levels.  It is a

7    form of group defamation.

8         To the extent the government contends that there is a threat from the Venezuelan gang

9    Tren de Aragua ("TdA"), it has made no showing that any Venezuelan TPS holders are members

10   of the gang or otherwise have ties to the gang.  In fact, Plaintiffs have submitted evidence that,

11   although the TdA gang is "a powerful criminal organization in Venezuela and some other parts of

12   South America, there is no evidence of a structured or operational presence in the United States."

13   Dudley Decl. ¶ 16 (Co-Director of InSight Crime).  According to the Co-Director of InSight

14   Crime, a think tank that specializes in investigating and analyzing organized crime in the

15   Americas and assessing state efforts to combat these organizations, *see* Dudley Decl. ¶ 4, "local

16   police we have spoken to in the United States have not asserted that [TdA] has any significant

17   criminal operations in the country," and "[t]he few crimes attributed to alleged [TdA] members in

18   the United States appear to have no connection with the larger group or its leadership in

19   Venezuela."  Dudley Decl. ¶ 16; *see also id.* ¶ 20 (stating that "[i]t is rare – indeed, practically

20   unheard of – for foreign street and prison gangs from Latin America to gain a significant foothold

21   in the United States in light of a complex array of factors").  InSight Crime also reports that, "[i]n

22   March 2024, a review of all federal and state court databases found only two criminal cases which

23   even mentioned [TdA]," and,

24         [b]y February 18, 2025, we had identified only five federal cases of
          an alleged [TdA] connection.  However, none of these cases
25        appeared to be connected to each other or the international structure
          of the gang outside of the U.S.  What's more, the details of the cases
26        do not suggest any sophisticated criminal operations or modus
          operandi, and there was no discernable pattern of criminal behavior
27        or indications these individuals were seeking to regroup with [TdA]
          members or other gangs.

28

1    *Id.* ¶ 19.

2         Finally, even assuming a legitimate concern about the presence of TdA gang members in

3    the United States, the government has failed to show that it cannot deal with that specific problem

4    through other means.  As noted above, anyone who is convicted of a felony or two misdemeanors

5    or an act of terrorism will be ineligible for TPS status.  The government has made no showing the

6    traditional law enforcement and immigration measures cannot handle criminal problems that

7    might be caused by the TdA and that *en masse* action stripping all Venezuelan nationals of TPS

8    status is necessary.  In addition, the government has shown no basis for attributing criminality to

9    the entire population of Venezuelans or Venezuelan TPS holders in the United States and seeking

10   their exclusion wholesale instead of focusing on specific TdA gang members.  *Cf. Korematsu v.*

11   *United States*, 323 U.S. 214, 218-19 (1944) (stating that "exclusion of those of Japanese origin

12   [from the West Coast war area] was deemed necessary because of the presence of an

13   unascertained number of disloyal members of the group, most of whom we have no doubt were

14   loyal to this country"), *abrogated by Trump v. Hawaii*, 585 U.S. 667, 710 (2018) (stating that

15   "*Korematsu* was gravely wrong the day it was decided, has been overruled in the court of history,

16   and – to be clear – 'has no place in law under the Constitution'").

17        Indeed, there is uncontradicted evidence in the record that stripping Venezuelan

18   beneficiaries of TPS protection would impede law enforcement and threaten public safety.  As

19   noted above, immigrants without legal status are less likely to report crimes or testify in court,

20   reducing public safety and making effective law enforcement more difficult.  *See* Docket No. 62

21   (Amici Br. at 12); Docket No. 71 (Amici Br. at 7-8).

22        Finally, the government's interest in national security is unclear.  Terminating TPS could

23   actually have adverse ramifications to national security (in addition to impeding domestic

24   prosecutions) because "deporting Venezuelan TPS holders will require cooperation with the

25   Maduro regime."  Watson & Veuger Decl. ¶ 24.  Since taking office in January 2025, the Trump

26   administration has made an agreement with the Maduro government to resume deportations to

27   Venezuela.  *See id.*  And yet, this action would seem to contradict U.S. foreign policies that have

28   refused to recognize Nicolás Maduro as the legitimate president of Venezuela since 2019.  *See id.*

United States District Court
Northern District of California

United States District Court
Northern District of California

¶¶ 8, 24.  Indeed, the U.S. is still offering a $25 million reward for information leading to Nicolás Maduro's arrest and/or conviction.  *See id.* ¶ 8.  Therefore, it would seem that normalizing relations with Nicolás Maduro to deport immigrants "to a place known for human rights abuses may also weaken the standing of the United States in the international community and adversely affect national security."  *See id.* ¶ 24.  It is hard to discern precisely what the U.S. interest is in this instance.

### 3.    Balance of Hardships

As discussed above, Plaintiffs have provided significant evidence that TPS holders and their families would suffer irreparable harm if they are not afforded temporary relief, and the public interest also weighs in favor of Plaintiffs because of the substantial economic, public safety, and humanitarian ramifications.  In contrast, the government's contention that the public interest weighs in its favor is not convincing because the government lacks any evidence of national security harms.  Accordingly, the balance of hardships (including consideration of the public interest) tips sharply in Plaintiffs' favor.

### 4.    Likelihood of Success on the Merits

Because the balance of hardships tips sharply in their favor, Plaintiffs need only show serious questions going to the merits of their claims.  *See All. for the Wild Rockies*, 865 F.3d at 1217.  But as discussed below, Plaintiffs have not only shown that there are such serious questions; they have also established a likelihood of success on the merits, thus entitling them to postponement of the Secretary's vacatur and termination even without the benefit of the sliding scale test.

### a.    Authority to Vacate Extension of 2023 Designation

The threshold question is whether Secretary Noem lacked the authority to vacate the extension of the 2023 Designation.[18]  Plaintiffs are likely to succeed on the merits of this issue.  As noted above, this is the first time that an extension of a TPS designation has ever been vacated

---

[18] As noted above, the government has conceded that § 1254a(b)(5)(A) does not preclude judicial review of Plaintiffs' claim that the Secretary lacked the inherent authority to vacate the extension of the 2023 Designation.

1    in the statute's history.  While the Secretary has the ultimate authority to terminate a TPS

2    designation and can "change her mind," she may do so only under the terms and timeframe set

3    forth in the TPS statute.

i.    <u>Notice of Vacatur</u>

5    In the notice of vacatur, the Secretary stated: "An agency has inherent (that is, statutorily

6    implicit) authority to revisit its prior decisions unless Congress has expressly limited that

7    authority.  The TPS statute does not limit the Secretary's inherent authority under the INA to

8    reconsider any TPS-related determination, and upon reconsideration, to vacate or amend the

9    determination."  90 Fed. Reg. at 8806.  In a footnote, she cited the following:

> *See* INA 103(a), 244(b)(3), (b)(5)(A); 8 U.S.C. 1103(a),
> 1254a(b)(3), (b)(5)(A); Reconsideration and Rescission of
> Termination of the Designation of El Salvador for Temporary
> Protected Status; Extension of the Temporary Protected Status
> Designation for El Salvador, 88 FR 40282, 40285 (June 21, 2023)
> ("An agency has inherent (that is, statutorily implicit) authority to
> revisit its prior decisions unless Congress has expressly limited that
> authority.  The TPS statute does not limit the Secretary's inherent
> authority to reconsider any TPS-related determination, and upon
> reconsideration, to change the determination."); *see also, e.g.*, *Ivy
> Sports Medicine, LLC v. Burwell*, 767 F.3d 81, 86 (D.C. Cir. 2014)
> (Kavanaugh, J.) ("[A]dministrative agencies are assumed to possess
> at least some inherent authority to revisit their prior decisions, at
> least if done in a timely fashion. . . . "[I]nherent authority for timely
> administrative reconsideration is premised on the notion that the
> power to reconsider is inherent in the power to decide." (quotation
> marks and citations omitted)); *Macktal v. Chao*, 286 F.3d 822, 825-
> 26 (5th Cir. 2002) ("It is generally accepted that in the absence of a
> specific statutory limitation, an administrative agency has the
> inherent authority to reconsider its decisions.") (collecting cases);
> *Mazaleski v. Treusdell*, 562 F.2d 701, 720 (D.C. Cir. 1977) ("We
> have many times held that an agency has the inherent power to
> reconsider and change a decision if it does so within a reasonable
> period of time."); *cf. Last Best Beef, LLC v. Dudas*, 506 F.3d 333,
> 340 (4th Cir. 2007) (agencies possess especially "broad authority to
> correct their prior errors").

24    *Id.* at 8806 n.2.

ii.    <u>Authorities Cited by the Secretary</u>

26    As an initial matter, the Court takes note that the statutes cited by the Secretary do not give

27    her the authority to vacate.

28    / / /

United States District Court
Northern District of California

United States District Court
Northern District of California

- 8 U.S.C. § 1103(a)(1) is simply a general provision stating that "[t]he Secretary of Homeland Security shall be charged with the administration and enforcement of this Act and all other laws relating to the immigration and naturalization of aliens . . . ."

- 8 U.S.C. § 1254a(b)(3) is about periodic review, terminations, and extensions of TPS.

- 8 U.S.C. § 1254a(b)(5) is the jurisdictional provision – stating that "[t]here is no judicial review of any determination of the Attorney General with respect to the designation, or termination or extension of a designation, of a foreign state under this subsection."

Thus, ultimately, the Secretary's claim for authority to vacate rests on the concept of inherent authority to reconsider.

As a general matter, the government is correct that "administrative agencies are assumed to possess at least some inherent authority to revisit their prior decisions, at least if done in a timely fashion." *Ivy Sports Med., LLC v. Burwell*, 767 F.3d 81, 86 (D.C. Cir. 2014). But

> the term "inherent" is misleading because "it is 'axiomatic' that 'administrative agencies may act only pursuant to authority delegated to them by Congress.'" Thus, "the more accurate label" for the power EPA describes "is **'statutorily implicit.'**" And although the power to decide is **normally** accompanied by the power to reconsider, **"Congress . . . undoubtedly can limit an agency's discretion to reverse itself."**

*NRDC v. Regan*, 67 F.4th 397, 401 (D.C. Cir. 2023) (emphasis added); *see also Ivy Sports*, 767 F.3d at 86 (stating that "any inherent reconsideration authority does not apply in cases where Congress has spoken"). Thus, the power to reconsider and revoke prior agency decision is not universally inherent, but is "statutorily inherent" – it turns on construction of the governing statute. For instance, "an agency may not rely on inherent reconsideration authority 'when Congress has provided a mechanism capable of rectifying mistaken actions.'" *Id.*; *see also id.* at 87 (stating that "it would be unreasonable under [the] statutory scheme to infer that FDA retains inherent authority to short-circuit or end-run **the carefully prescribed statutory reclassification process** [for a medical device] in order to correct the same mistake") (emphasis added).

United States District Court
Northern District of California

Ninth Circuit authority is consistent with that of the D.C. Circuit.  To determine whether an agency has the statutorily implicit authority to reconsider an earlier agency decision depends on the statute and whether such legislative intent to confer such authority can be inferred.  For example, in *Gorbach v. Reno*, 219 F.3d 1087 (9th Cir. 2000) (en banc), the Ninth Circuit considered whether the Attorney General's "power to confer citizenship through the process of naturalization necessarily includes the power to revoke that citizenship." *Id.* at 1089.  The Ninth Circuit noted that, "[b]ecause 'an agency may not confer power upon itself,' the Attorney General needs some statutory authority to have the power to take away an individual's American citizenship." *Id.* at 1092-93.  The court reviewed the "established and carefully constructed statutory scheme" which provided, *inter alia*, that U.S. attorneys could institute actions to revoke naturalization in federal court and that the Attorney General could cancel "certificates of citizenship"[19] but such cancellations affected only the document and not the citizenship status itself.  The Ninth Circuit held that "implying authority for the Attorney General to take away people's citizenship administratively would gravely upset this carefully constructed legislative arrangement." *Id.* at 1094.

Notably, the court recognized the "heart" of the government's argument was that "the power to denaturalize is 'inherent' in the power to naturalize" but it explicitly rejected that contention.  *Id.* at 1095.

> The formula the government urges, that what one can do, one can undo, is sometimes true, sometimes not. A person can give a gift, but cannot take it back. A minister, priest, or rabbi can marry people, but cannot grant divorces and annulments for civil purposes. A jury can acquit, but cannot revoke its acquittal and convict. Whether the Attorney General can undo what she has the power to do, naturalize citizens, depends on whether Congress said she could.

*Id.* at 1095.  The agency power to revoke prior action was sufficiently circumscribed to preclude an inference of statutorily implicit power to reconsider the grant of citizenship.

/ / /

---

[19] "The certificate of naturalization is issued by the Commissioner of Immigration and Naturalization.  It says, 'the Attorney General having found that' the person is entitled to citizenship and has met the requirements and taken the oath of allegiance, 'such person is admitted as a citizen of the United States of America.'" *Gorbach*, 219 F.3d at 1090.

1    In *China Unicom (Ams.) Ops. Ltd. v. FCC*, 124 F.4th 1128 (9th Cir. 2024) [hereinafter

2  *CUA*], the Ninth Circuit held that the agency *did* have the implicit authority to reconsider the

3  decision at issue but, again, only after reviewing the statutory scheme to determine what was

4  Congress's intent.  *See, e.g.*, *id.* at 1149 (noting that, "[w]here Congress has provided a particular

5  mechanism, with specified procedures, for an agency to make such alterations, 'it is not reasonable

6  to infer' an implied authority that would allow an agency to circumvent those statutory procedural

7  protections").  CUA, the plaintiff in the case, was a California company but ultimately owned by

8  the Chinese government.  It "was authorized to provide domestic and international

9  telecommunications services pursuant to certificates granted to it many years ago" by the FCC

10  under § 214 of the Communications Act of 1934.  *Id.* at 1132.  In 2020, the FCC "issued an order

11  directing CUA to show cause why the FCC should not revoke its § 214 certificates" based on

12  "national security concerns," as articulated during proceedings in which the agency had denied an

13  application for a § 214 authorization submitted by a *different* Chinese government-owned carrier.

14  *Id.*; *see also id.* at 1136 (noting that the other proceedings raised concerns about "the susceptibility

15  of Chinese state-owned enterprises, including subsidiaries, to Chinese government influence,

16  control, and exploitation").  Ultimately, in 2022, the FCC revoked CUA's certificates "on the

17  grounds that CUA's retention of them presented an unreasonable national security risk and,

18  separately, that CUA had exhibited a lack of candor and trustworthiness over the course of the

19  proceedings."  *Id.* at 1132; *see also id.* at 1141.

20    Before the Ninth Circuit, CUA argued that, "as a matter of law, the FCC lacks any

21  statutory authority [including implicit] to revoke a § 214 certificate, except as a penalty imposed in

22  connection with adjudicated violations of applicable law."  *Id.* at 1142.  The court disagreed after

23  reviewing the statutory text and structure.  The Ninth Circuit acknowledged that, in a different title

24  in the Communications Act that dealt with radio licensing, there was an express provision that

25  empowered the FCC to revoke any station license for a variety of reasons.  But,

26        [i]n our view, no negative inference can be drawn from the fact that
        the "radio" licensing provisions in Title III of the Communications
27        Act contain an express revocation provision, while the common-
        carrier certificate provisions in Title II do not.  As the Supreme
28        Court has noted, the two distinct regulatory systems established

United States District Court
Northern District of California

United States District Court
Northern District of California

under Title II and Title III are very different, because, in "contradistinction" to wire-telecommunications carriers, the Act recognizes that "broadcasters are not common carriers and are not to be dealt with as such." *FCC v. Sanders Bros. Radio Station*, 309 U.S. 470, 474 (1940) (footnote omitted). . . . **Indeed, given that broadcast licenses are generally issued for fixed, renewable terms of up to eight years,** *see* **47 U.S.C. § 307(c)(1), the statute reflects a clear temporal expectation that, absent contrary indication in the statutory text, such a license will endure for the length of that term. The use of a fixed term is thus affirmatively inconsistent with positing an implied power to revoke a license at any time, and it is therefore unsurprising that Title III contains a provision expressly recognizing an agency power of revocation.** By contrast, as noted earlier, Title II's silence on the temporal duration of common-carrier certificates, which have traditionally been open-ended in length, is a factor that weighs in favor of an implied power of revocation.

*Id.* at 1147-48 (emphasis added). The court thus held that

the FCC possesses statutory authority to revoke a § 214(a) certificate by invoking grounds that it may properly consider in denying issuance of such a certificate as an original matter. Of course, any actual exercise of such authority must consider the relevant constraints that may be placed upon that action by the Constitution, other statutes, or applicable principles of administrative law. In some cases, such as ones involving substantial reliance interests, those constraints may be significant and may preclude a particular exercise of such authority.

*Id.* at 1150-51; *see also id.* at 1160-61 (Bea, J., dissenting) (noting that carriers may develop reliance interests in their § 214 certificates).[20]

---

[20] As indicated above, Judge Bea issued a dissent in *CUA*. Judge Bea stated that "the specificity of § 214's provision of authority to the FCC to grant a certificate to start, to modify, to change, or to end services only upon a telecommunications carrier's application would normally imply Congress intended not to grant the FCC the authority to take a different course of action with respect to such certificates." *CUA*, 124 F.4th at 1158. He also rejected

the premise that the power to refuse certification is the functional equivalent of the power to revoke certification . . . because it ignores the reliance interests carriers may develop in their § 214 certificates.

A business that is refused a certificate can decide to expend no further capital – money – for its proposed enterprise. But a business that has been granted a certificate is likely to have invested further capital, time, and resources into existing infrastructure in reasonable reliance on the vested right to build a telecommunications line pursuant to its duly granted § 214 certificate. Simply put, there is a material difference between the power to refuse and the power to revoke. It is not reasonable to assume that the power to grant, to refuse, or to condition a grant also encapsulates the power to revoke.

United States District Court
Northern District of California

1    Hence, the critical question in the instant case is whether there is anything in the statutory

2    scheme of the INA suggesting that the Secretary does or does not have the inherent authority to

3    vacate a TPS designation or extension.

4                                    iii.    Statutory Analysis

5    Plaintiffs argue that the Secretary does not have the implicit authority because the TPS

6    statute lays out specific timelines and processes for TPS designations, extensions, and

7    terminations.

> The fixed terms of TPS designations, extensions, and terminations,
> and the statutorily prescribed processes governing how the Secretary
> must proceed after an initial TPS designation, are inconsistent with
> implicit vacatur authority. Unless otherwise specified in the original
> notice, an initial designation "take[s] effect upon the date of
> publication of the designation" and "shall remain in effect until the
> effective date of the termination of the designation." 8 U.S.C. §
> 1254a(b)(2). The same is true of extensions. 8 U.S.C. §
> 1254a(b)(3)(C). "At least 60 days before the end of the initial
> period of designation, and any extended period of designation," the
> Secretary "after consultation with appropriate agencies of the
> Government, shall review the conditions in the foreign state . . . and
> shall determine whether the conditions for such designation under
> this subsection continue to be met." 8 U.S.C. § 1254a(b)(3)(A).
> The Secretary must "provide on a timely basis for the publication of
> notice of such determination . . . in the Federal Register." *Id.* If the
> Secretary determines "that a foreign state . . . no longer continues to
> meet the conditions for designation" the Secretary "shall terminate
> the designation by publishing a notice in the Federal Register." 8
> U.S.C. § 1254a(b)(3)(B). Without such a determination, the
> designation "is extended." 8 U.S.C. § 1254a(b)(3)(A) & (C).
> Extensions take effect immediately, and last for the length of time
> specified in the notice, up to 18 months. *Id.* In contrast, a
> termination "shall not be effective earlier than 60 days after the date
> the notice is published *or, if later, the expiration of the most recent
> previous extension*." 8 U.S.C. § 1254a(b)(3)(B) (emphasis added).

22    Mot. at 6 (italics in original).

23    Plaintiffs' analysis is compelling. Secretary Noem's claim that she had the inherent right

24    to vacate the extension of the 2023 Designation effectively gave her the power to countermand

25    Secretary Mayorkas's decision and in practical terms terminate the TPS designation given to

26    Venezuela is at odds with the structure of the TPS statute. The TPS statute is specifically

27

28    ―――――――――――――
     *Id.* at 1161 (citing *Gorbach*).

United States District Court
Northern District of California

1   prescriptive as to the time frame within which a TPS designation may be terminated. *See* 8 U.S.C.

2   § 1254a(b)(3)(B) (providing that a termination "shall not be effective earlier than 60 days after the

3   date the notice is published or, if later, the expiration of the most recent previous extension"). It

4   expressly provides that termination of TPS designation can be *no earlier* than the *expiration* of the

5   most recent extension. It does not permit the Secretary to terminate a TPS designation

6   "midstream" during the term of the prior designation. Yet, the upshot of the Secretary's action

7   herein does just that. And while the statute carefully and expressly sets forth in detail the process

8   of "designation," "extension," and "termination," it says *nothing* about vacatur.

9       The Ninth Circuit's *CUA* decision is particularly instructive here. As noted above, in

10  *CUA*, the Ninth Circuit reasoned that,

11          **given that broadcast licenses are generally issued for fixed,
            renewable terms of up to eight years,** *see* **47 U.S.C. § 307(c)(1),**

12          **the statute reflects a clear temporal expectation that, absent
            contrary indication in the statutory text, such a license will**

13          **endure for the length of that term. The use of a fixed term is
            thus affirmatively inconsistent with positing an implied power to**

14          **revoke a license at any time, and it is therefore unsurprising that
            Title III [addressing radio licensing] contains a provision**

15          **expressly recognizing an agency power of revocation.** By
            contrast, as noted earlier, Title II's silence on the temporal duration

16          of common-carrier certificates, which have traditionally been open-
            ended in length, is a factor that weighs in favor of an implied power

17          of revocation.

18  *CUA*, 124 F.4th at 1148 (emphasis added). Here, "clear temporal expectations" are reflected in

19  the TPS statute, and the clear stated terms for extensions and terminations of TPS designations are

20  likewise "affirmatively inconsistent with the positing an implied power to revoke" or vacate a

21  prior designation (or extension). *Id.*

22      It is also worth noting that, in the vacated *Ramos* decision, the panel noted that "Congress

23  enacted the TPS statute to curb and control the executive's **previously unconstrained discretion**

24  under the [extended voluntary departure] process . . . ." *Ramos*, 975 F.3d at 890 (emphasis

25  added); *cf. NRDC v. Regan*, 67 F.4th at 401-02 (noting that, "[i]n 2011, EPA determined that

26  perchlorate satisfied the statutory criteria for regulating," and, therefore, "[u]nder the statute, . . .

27  EPA has one authorized course of action: it 'shall' propose and promulgate the MCLG and

28  regulations, and it 'shall' do so by the statutory deadlines"; "[t]o read into the statute another

1    course of action – one that allows EPA to withdraw its regulatory determination entirely and

2    decide that it 'shall not' regulate – would be to contravene the statute's clear language and

3    structure and 'nullif[y] textually applicable provisions **meant to limit [EPA's] discretion**'")

4    (emphasis added).  To permit the Secretary unconstrained discretion to revoke, at any time, a prior

5    TPS designation would not be consistent with Congress's general intent to cabin such discretion.[21]

6           To the extent the government relies on a prior claim by the Biden administration of the

7    implicit authority to reconsider – specifically, when dealing with the TPS designation for El

8    Salvador, *see* 88 Fed. Reg. 40282, 40285 (June 21, 2023) – that reliance is misplaced for several

9    reasons.  First, prior agency practice is not dispositive.  *See New Jersey v. EPA*, 517 F.3d 574, 583

10   (D.C. Cir. 2008) ("[P]revious statutory violations cannot excuse the one now before the court.

11   '[W]e do not see how merely applying an unreasonable statutory interpretation for several years

12   can transform it into a reasonable interpretation.'").  Simply put, the legality of the action by the

13   Biden administration was not tested in court.

14          Second, assuming the action of the Biden administration was legally authorized, the Biden

15   administration reconsidered a decision to *terminate* a TPS designation, not a decision to *extend* a

16   TPS designation.  This difference is significant.  Where a TPS extension is given, it creates

17   important reliance interests.[22]  *See, e.g.*, Rivas Decl. ¶ 12 (testifying that, the day the extension of

18   the 2023 Designation was given, he submitted his renewal application, he thereafter received a

19   receipt that confirmed his work authorization was extended for 540 days, he provided that

20   information to his employer so he could continue to work, and, "[w]ith that assurance, [he]

21   renewed [his] lease on [his] home").[23]  Indeed, the TPS statute itself implicitly recognizes the

22

23   ────────────────────
     [21] To be sure, the *Ramos* panel also stated that, "to the extent the TPS statute places constraints on
24   the Secretary's discretion, it does so in favor of limiting unwarranted designations or extensions of
     TPS." *Ramos*, 975 F.3d at 891.  Nevertheless, the limitations that Congress established by setting
25   forth the specific circumstances under which designations, extensions, *or* terminations evidence a
     more general intent to constrain discretion.

26   [22] *Cf. CUA*, 124 F.4th at 1150-51 (recognizing that, "[i]n some cases, such as ones involving
     substantial reliance interests, . . . constraints [on an agency's authority to revoke] may be
27   significant and may preclude a particular exercise of such authority [to revoke]"); *id.* at 1160-61
     (Bea, J., dissenting) (noting that carriers may develop reliance interests in their § 214 certificates).

28   [23] The government has suggested that there cannot be any real reliance interests in the instant case

United States District Court
Northern District of California

United States District Court
Northern District of California

1  importance of such reliance interests because it provides that, during periodic review of a TPS

2  designation, if the Secretary does not make an express decision that the foreign country "no longer

3  meets the conditions for designation . . . , the period of designation of the foreign [country] is

4  extended for an additional period of 6 months (or, in the discretion of the [Secretary], a period of

5  12 to 18 months)." 8 U.S.C. § 1254a(b)(3)(C).  It essentially provides extension as a default and

6  its effect can be immediate.  In contrast, the TPS statute partially builds in some delay before

7  termination of TPS becomes effective: termination does not take effect until the later of 60 days

8  from the date of notice or the expiration of the most recent previous extension.  *See* 8 U.S.C. §

9  1254a(b)(3)(B).  Thus, given the difference in reliance interests (between extensions and

10  terminations) and the structure of the statute, even if there is room to argue that the Secretary has

11  the implicit authority to vacate a decision to terminate, the same cannot necessarily be said for a

12  decision to extend.

13         Third, as Plaintiffs point out, it is notable that the Biden administration reconsidered

14  terminations only after they had already been

15              *enjoined for five years*; [the terminations] never took effect.
             Agencies have flexibility to undo decisions already found unlawful
16              by courts.  *United Gas Improvement Co. v. Callery Props., Inc.*, 382
             U.S. 223, 229-30 (1965) (agency had power to "undo what is
17              wrongfully done" when original decision never became final and
             was overturned on judicial review).
18

19  Mot. at 7 (emphasis in original).

20         Ultimately, the government's main response to Plaintiffs' position is that it is extreme –

21  *i.e.*, under Plaintiffs' position, "no Secretary of Homeland Security could ever vacate a designation

22  or extension of a designation, no matter the type of national security threat posed or the

23  seriousness of the error or legal defect in the prior determination" (unless the specific timeline

24  under the TPS statute allowed for a new determination to be made).  Opp'n at 15.  The

25  government's argument may have some surface appeal, but it is ultimately unpersuasive.

26

27  _____

28  because Secretary Noem vacated Secretary Mayorkas's extension shortly after it was given.  The
   Rivas Declaration is but one example of why that argument lacks merit.

First, Secretary Noem's decision to vacate the extension of the 2023 Designation was not based on any claimed national security interest. While this rationale may have been one basis of her subsequent decision to terminate (a basis which, as discussed below, is unsupported by any evidence), her decision to vacate the extension was based on her purported belief that Secretary Mayorkas's decision was novel, possibly in violation of the TPS statute, and engendered confusion regarding registration process. It was not based on any claim of national security.

Second, "[r]egardless of how serious the problem an administrative agency seeks to address, . . . it may not exercise its authority in a manner that is inconsistent with the administrative structure that Congress enacted into law." *FDA v. Brown & Williamson Tobacco Corp.*, 529 U.S. 120, 125 (2000) (internal quotation marks omitted). Thus, as Plaintiffs point out, in spite of possible national security interests, the Secretary does not have the ability, *e.g.*, to "revoke en masse green cards, H-1B visas, or student visas; such authority resides with Congress." Reply at 7. Congress did not create a national security exception to the framework it prescribed for the termination of TPS status. Instead, under the TPS statute, national security is an explicit consideration in one circumstance: when granting TPS to a foreign country on the basis of extraordinary and temporary conditions. *See* 8 U.S.C. § 1254a(b)(1)(C) (providing for TPS designation if the Secretary "finds that there exist extraordinary and temporary conditions in the foreign state that prevent aliens who are nationals of the state from returning to the state in safety, unless the [Secretary] finds that permitting the aliens to remain temporarily in the United States is contrary to the national interest of the United States").

Third, to the extent concern for national security comes into play, the TPS statute accounts for that in several ways: (a) TPS is temporary, not permanent, in nature; (b) the Secretary is to consult with other government agencies before making a decision on TPS designations, terminations, or extensions, and, presumably, the agencies would alert her to any potential for concern; and (c) if there are any concerns, the Secretary can issue a TPS designation of short duration (*e.g.*, 6 months instead of 18).

Perhaps more to the point, the Secretary maintains the authority to *withdraw* a TPS holder's status if a beneficiary presents a danger to national security: the Secretary "shall withdraw

United States District Court
Northern District of California

United States District Court
Northern District of California

1  [TPS] granted to an alien . . . if [the Secretary] finds that the alien was not in fact eligible for such

2  status," 8 U.S.C. § 1254a(c)(3)(A), and ineligibility includes, *e.g.*, committing a crime involving

3  moral turpitude, committing a felony, or being a member of a terrorist organization. Moreover,

4  the government, of course, has law enforcement resources to address any such threat posed by an

5  individual or group of individuals. Indeed, the government has already attempted to employ

6  extraordinary means against putative TdA gang members. *See generally J.G.G. v. Trump*, No. 25-

7  766 (JEB) (D.D.C.) (addressing claim brought by Venezuelan noncitizens fearing removal

8  pursuant to the Alien Enemies Act of 1798 instead of the INA). Revocation/vacatur of TPS status

9  en masse because of the suspect acts of a few would be statutory overkill. Nothing in the TPS

10  statute indicates there is an exception to its statutorily imposed temporal limitations and

11  expectations that would implicitly permit the Secretary to vacate at will, in midstream, a TPS

12  designation still in effect.

13       Accordingly, the Court concludes that Plaintiffs have established a likelihood of success on

14  the merits for their claim that Secretary Noem lacked the inherent authority to vacate the extension

15  of the 2023 Designation. And if Secretary Noem lacked the authority to vacate the extension, she

16  necessarily did not have the authority to terminate the 2023 Designation thereafter, which

17  Secretary Mayorkas had extended to October 2026.

18                     b.        Arbitrary and Capricious – Legal Error

19       Given the Secretary did not have the legal right to vacate the 2023 extension, the Plaintiffs

20  have established a likelihood of success on the merits. But even if, contrary to the above analysis,

21  the Secretary had the implicit authority to reconsider and vacate the extension of the 2023

22  Designation (*i.e.*, could supplant Secretary Mayorkas's decision on whether to terminate or extend

23  with her own), Plaintiffs would still be entitled to relief. This is because, as Plaintiffs argue, even

24  if the Secretary had the authority to vacate the extension, her vacatur was founded on legal error

25  and thus was arbitrary and capricious. *See* 5 U.S.C. § 706(2).

26       In vacating the extension of the 2023 Designation, the Secretary claimed that the extension

27  did not simply extend the 2023 Designation to October 2026 but also, in effect, extended the 2021

28  Designation to the same 2026 date. *See* Opp'n at 16 ("By consolidating the registration processes

for both the 2021 and 2023 TPS designations, the notice had the practical effect of extending the

2021 Designation by up to 13 months and allowing for employment authorization for that period

as well."). She characterized this as a "novel approach." 90 Fed. Reg. at 8807 ("The Mayorkas

Notice adopted a novel approach of implicitly negating the 2021 Venezuela TPS designation by

effectively subsuming it within the 2023 Venezuela TPS designation.").

> The Mayorkas Notice did not acknowledge the novelty of its approach or explain how it is consistent with the TPS statute. *See* INA 244(b)(2)(B), 8 U.S.C. 1254a(b)(2)(B) (providing that a TPS country designation "shall remain in effect until the effective date of the termination of the designation under [INA 244(b)(3)(B), 8 U.S.C. 1254a(b)(3)(B)]"). This novel approach has included multiple notices, overlapping populations, overlapping dates, and sometimes multiple actions happening in a single document. While the Mayorkas Notice may have made attempts to address these overlapping populations, the explanations in the Mayorkas Notice, particularly the explanation for operational impacts, are thin and inadequately developed. Given these deficiencies and lack of clarity, vacatur is warranted to untangle the confusion, and provide an opportunity for informed determinations regarding the TPS designations and clear guidance.

*Id.*

But Secretary Noem's stated rationale was legally erroneous. As Plaintiffs argued in their

papers and at the hearing, the Secretary failed to recognize that a TPS beneficiary under the 2021

Designation was necessarily a TPS beneficiary under the 2023 Designation.

> [E]very earlier designation is "subsum[ed]" by a later one because redesignation expands the pool of potential beneficiaries **to include not only those who qualified under an earlier designation, but also those who arrived after their country was first designated**. *See* 8 U.S.C. § 1254a(c)(1)(A)(i) (TPS applicants must have been "continuously physically present in the United States since the effective date of the most recent designation of [their country]"). Thus, TPS holders who initially registered for TPS under Venezuela's 2021 designation had to prove they remained continuously present since March 9, 2021. 86 Fed. Reg. 13575. Accordingly, they **necessarily** also satisfied the later continuous presence requirement in Venezuela's 2023 re-designation."

Mot. at 9 (emphasis added). When Secretary Mayorkas extended the 2023 Designation, he simply

recognized that a TPS holder under the 2021 Designation could choose to register as a TPS holder

under the 2023 Designation:

/ / /

United States District Court
Northern District of California

United States District Court
Northern District of California

1  |  **Will there continue to be two separate filing processes for TPS designations for Venezuela?**

2

3  |  No.  USCIS has evaluated the operational feasibility and resulting impact on stakeholders of having two separate filing processes. Operational challenges in the identification and adjudication of Venezuela TPS filings and confusion among stakeholders exist because of the two separate TPS designations.  To date, USCIS has created operational measures to process Venezuela TPS cases for both designations; however, it can most efficiently process these cases by consolidating the filing processes for the two Venezuela TPS populations.  To decrease confusion among stakeholders, ensure optimal operational processes, and maintain the same eligibility requirements, upon publication of this Notice, **individuals registered under either the March 9, 2021 TPS designation or the October 3, 2023 TPS designation will be allowed to re-register under this extension**.  This would not, however, require that a beneficiary registered under the March 9, 2021 designation to re-register at this time.  Rather, it would provide such individuals with the option of doing so. **Venezuela TPS beneficiaries who appropriately apply for TPS or re-register under this Notice and are approved by USCIS will obtain TPS through the same extension date of October 2, 2026.**

4

5

6

7

8

9

10

11

12

13  |  *Id.* at 5964 (some emphasis added).

14  |  Contrary to what Secretary Noem suggested, streamlining the two tracks for the two

15  |  designations into one (so long as a TPS holder under the 2021 Designation was willing to register

16  |  under the 2023 Designation) would tend to eliminate, not create, confusion – *i.e.*, confusion that

17  |  could arise based on the fact that there are two tracks.  Moreover, contrary to what Secretary

18  |  Noem suggested, as a factual matter, it was not "novel" for different tracks to be streamlined as

19  |  part of a TPS process.  Plaintiffs have pointed out that there has been similar streamlining for both

20  |  the Sudan and Haiti TPS designations.  *See, e.g.*, 79 Fed. Reg. 52027, at 52028-29 (Sept. 2, 2014)

21  |  (extending Sudan's TPS designation and establishing one process for re-registration, regardless of

22  |  which designation individual initially registered under); 88 Fed. Reg. 5022, at 5028 (Jan. 26,

23  |  2023) (permitting "[i]ndividuals who [initially registered for TPS under Haiti's 2010 or 2011

24  |  designation and] currently retain their TPS [through June 30, 2024] under the *Ramos* injunction"

25  |  to "re-register" under a later redesignation to receive TPS through August 3, 2024).

26  |  Furthermore, nothing in the TPS statute prevents the Secretary from extending TPS

27  |  designation of a country well in advance of the natural expiration date of the prior designation.

28  |  The statute only requires that the Secretary review the designation at least 60 days in advance of

1    the expiration.  *See* 5 U.S.C. § 1254a(b)(3)(A) ("*At least* 60 days before end of the initial period of

2    designation, and any extended period of designation, of a foreign state (or part thereof) under this

3    section the Attorney General, after consultation with appropriate agencies of the Government,

4    shall review the conditions in the foreign state (or part of such foreign state) for which a

5    designation is in effect under this subsection and shall determine whether the conditions for such

6    designation under this subsection continue to be met.") (emphasis added).  It does not place a limit

7    on how far in advance the extension may be considered and granted.  Thus, to the extent the

8    extension of the 2023 Designation had the independent effect of extending the status of the 2021

9    Designation 8 months in advance of the September 2025 expiration date, it was entirely consistent

10   with the TPS statute.

11        Thus, the practical operation of the extension of the 2023 Designation was not "novel," did

12   not engender undue confusion as to registration, and was entirely consistent and compliant with

13   the TPS statute.  The Court therefore concludes that Plaintiffs are likely to succeed on their claim

14   that the decision to vacate (assuming the Secretary had implicit authority to vacate) was arbitrary

15   and capricious because it was based on legal (as well as factual) error.

16            c.    Arbitrary and Capricious – Failure to Consider Alternatives Short of

17                  Termination

18        Even if vacatur were permitted and not founded on any legal error, the vacatur was still

19   arbitrary and capricious because, in revoking prior action, the Secretary failed to consider

20   alternatives short of termination.

21        As a general matter, "[a]gencies are free to change their existing policies as long as they

22   provide a reasoned explanation for the change."  *Encino Motorcars, LLC v. Navarro*, 579 U.S.

23   211, 221 (2016).  But "when an agency rescinds a prior policy its reasoned analysis must consider

24   the 'alternative[s]' that are 'within the ambit of the existing [policy].'"  *Dep't of Homeland Sec. v.

25   Regents of the Univ. of Cal.*, 591 U.S. 1, 30 (2020).

26        Here, there were alternatives within the ambit of the existing policy that the Secretary

27   failed to consider.  Most notably, if Secretary Noem was truly concerned about confusion arising

28   from Secretary Mayorkas's decision to allow 2021 TPS holders to register as 2023 TPS holders,

1 | she easily could have chosen to "deconsolidate" the registration process and keep the 2021 and

2 | 2023 Designations on two different tracks – with the 2021 Designation ending in September 2025

3 | and with the 2023 Designation still ending in October 2026.  But Secretary Noem did not so act –

4 | effectively demonstrating that confusion was not her concern so much as the desire to totally undo

5 | Secretary Mayorkas's decision.

6 |      The government admitted as much at the hearing.  The government conceded the

7 | Secretary's ultimate goal extended beyond minimizing registration confusion; it was to revisit and

8 | undo Secretary's Mayorkas's decision to extend the TPS designation for Venezuela to October

9 | 2026.  The government also effectively conceded as much in its papers.  In the opposition brief,

10 | the government asserted:

> In issuing the Vacatur, Secretary Noem indicated that the decision to
> vacate provided "an opportunity for informed determinations
> regarding the TPS designations and clear guidance." 2025 Vacatur,
> 90 Fed. Reg. at 8807 (citing Exec. Order No. 14159, Protecting the
> American People Against Invasion, § 16(b), 90 Fed. Reg. 8443 (Jan.
> 20, 2025)).  Thus, the alternative of simply deconsolidating the re-
> registration periods would not meet the stated reasons for the 2025
> Vacatur and is neither arbitrary and capricious nor an impermissible
> decision.

16 | Opp'n at 17.  The failure to consider the alternative action to address the stated reasons for the

17 | vacatur further renders the vacatur arbitrary and capricious.

18 |         d.     <u>Equal Protection – APA and Constitutional Claims</u>

19 |      Finally, Plaintiffs contend that they are likely to succeed on their equal protection claim[24] –

20 | *i.e.*, that the Secretary's decisions to vacate and terminate TPS for Venezuelans are

21 | unconstitutional because they were motivated at least in part by animus based on race, ethnicity, or

22 | national origin.  Based on the extensive record provided by Plaintiffs, the Court finds that

23 | Plaintiffs have raised a substantial claim of unconstitutional animus.

24 |      "As a general matter, where an equal protection claim is based on membership in a suspect

25 |

26 | ────────────

27 | [24] Plaintiffs' complaint could suggest that the equal protection claim is a constitutional claim alone but, as Plaintiffs noted at the hearing, an APA claim can also be based on a constitutional violation.  *See* 5 U.S.C. § 706(2) (providing that a court may hold unlawful and set aside agency action "contrary to constitutional right, power, privilege, or immunity").

28 |

United States District Court
Northern District of California

1    class such as race [or ethnicity or national origin] or the burdening of a fundamental right, then

2    strict scrutiny is applied; otherwise there is only rational review." *Litmon v. Brown*, No. C-10-

3    3894 EMC, 2012 U.S. Dist. LEXIS 8381, at *4-5 (N.D. Cal. Jan. 25, 2012); *see also Kahawaiolaa*

4    *v. Norton*, 386 F.3d 1271, 1277-78 (9th Cir. 2005) (stating that, "[w]hen no suspect class is

5    involved and no fundamental right is burdened, we apply a rational basis test to determine the

6    legitimacy of the classifications").

7         In spite of this general principle, the government argues that a deferential review should

8    still apply in the instant case because the DHS's actions were based on national security interests.

9    In support, it cites *Trump v. Hawaii*, 585 U.S. 667 (2018).  This Court, however, rejected

10   application of *Trump v. Hawaii* in the *Ramos* case, and so did the Ninth Circuit (vacated) panel

11   decision.  Central to the Court's reasoning was that

12        the TPS-beneficiaries here, unlike those affected by the
         Proclamation in *Trump [v. Hawaii]*, are already in the United States.
13        They are not aliens abroad seeking entry or admission who "have no
         constitutional right of entry"; TPS-beneficiaries have been admitted
14        to the United States.  As Plaintiffs currently reside lawfully in the
         United States, this case is unlike *Trump [v. Hawaii]*; it does not
15        implicate "the admission and exclusion of foreign nationals," who
         have "no constitutional rights regarding [their] application" in light
16        of the "sovereign prerogative" "to admit or exclude aliens."  Hence,
         the basis for invoking broad judicial deference to executive action in
17        excluding aliens does not apply.

18   *Ramos*, 321 F. Supp. 3d at 1129; *see also id.* (adding that "aliens *within* the United States have

19   greater constitutional protections than those *outside* who are seeking admission for the first time")

20   (emphasis added).  The Court also noted that

21        the executive order at issue in *Trump [v. Hawaii]* was issued
         pursuant to a very broad grant of statutory discretion: Section
22        1182(f) "exudes deference to the President in every clause" by
         "entrust[ing] to the President the decisions whether and when to
23        suspend entry . . . ; whose entry to suspend . . . ; for how long . . . ;
         and on what conditions."  In contrast, Congress has not given the
24        Secretary *carte blanche* to terminate TPS for any reason whatsoever.
         Rather, the TPS statute empowers the Secretary of Homeland
25        Security discretion to initiate, extend, and terminate TPS in specific
         enumerated circumstances.  Even though the statute circumscribes
26        judicial review, Congress prescribed the discretion of the Secretary
         in administering TPS.
27

28   *Id.* at 1130.  The Ninth Circuit panel in *Ramos* invoked similar reasoning, stating that "the level of

United States District Court
Northern District of California

1    deference that courts owe to the President in his executive decision to exclude foreign nationals

2    who have not yet entered the United States may be greater than the deference to an agency in its

3    administration of a humanitarian relief program established by Congress for foreign nationals who

4    have lawfully resided in the United States for some time." *Ramos*, 975 F.3d at 896.

5        To be sure, in *Ramos*, there was a further confluence of the fact that the government had

6    asserted "to a lesser extent" national security and foreign policy reasons as a basis to terminate

7    TPS. *Ramos*, 975 F.3d at 896; *cf. Ramos*, 321 F. Supp. at 1129. Here, the government does assert,

8    perhaps more strenuously than in *Ramos*, that the Secretary's decisions in vacating the extension

9    of the 2023 Designation and in terminating the designation were informed by these additional

10   concerns.

11       However, as noted above, the decision to vacate the extension did not cite national security

12   as a rationale therefor. Nor did it cite an interest in effecting foreign relations in connection with

13   the vacatur decision. Thus, the deferential standard of *Trump v. Hawaii* does not apply to

14   Secretary Noem's vacatur decision.

15       As to Secretary's Noem's second decision – to terminate the 2023 Designation – the

16   invocation of national security and foreign relations is insufficient to implicate *Trump v. Hawaii*'s

17   deferential standard.[25] The government does not get a free pass to deferential review under *Trump

18   v. Hawaii* simply because it makes an *ipse dixit* assertion that there is a national security interest.

19   There must be some basis for such a claim, but, as the Court has discussed above, the

20   government's claim of a national security interest is not supported by any concrete evidence. The

21   government has referred to the TdA gang, but (1) "the danger of criminal conduct by an alien is

22   [not] automatically a matter of national security," *Thai v. Ashcroft*, 366 F.3d 790, 796 (9th Cir.

23   2004), and (2) even if the TdA is a foreign terrorist organization that poses a national security

24   threat (as claimed by President Trump in Executive Order 14157 (*see* 90 Fed. Reg. at 9042-93)),

25   _____

26   [25] As discussed above, § 1254a(b)(5)(A) does not bar judicial review of Plaintiffs' equal protection
     claim because "there is no 'clear and convincing' evidence that Congress intended to preclude the
27   Court from reviewing constitutional challenges of the nature alleged." *Ramos*, 321 F. Supp. 3d at
     1105; *see also Ramos*, 975 F.3d at 895 (panel decision entertaining the equal protection claim on
28   the merits); *accord* 5 U.S.C. § 706(2)(B) (providing that a court shall "hold unlawful and set aside
     agency action . . . found to be . . . contrary to constitutional right, power, privilege, or immunity").

1    there is no evidence to tie TPS holders to TdA or even to establish that TdA has a substantial

2    presence in the United States. *See generally* Dudley Decl. ¶ 16. Nor has the government

3    demonstrated that its employment of law enforcement resources cannot handle the criminal threat

4    posed by members of the TdA. *See* page 54, *supra*.

5         Nor is there any basis to the government's claim that the vacatur and termination of

6    Venezuelan TPS status effected relations with Venezuela. The government suggests that there is a

7    "magnet effect" associated with a TPS designation, but that assertion does not address how there

8    is a magnet effect for an *extension* of TPS (not a designation or redesignation) which does not

9    make more people eligible for TPS. *See* Watson & Veuger Decl. ¶ 26 ("We do not see any reason

10   that the extension of an existing TPS designation would act as an immigration magnet. TPS status

11   is not available to those arriving after the 2023 designation.").

12        The government also seems to suggest that there can be no equal protection violation

13   because Secretary Noem's actions were focused on the nation of Venezuela, and not the race of its

14   people, and "[n]ational origin is inherently part of TPS." Opp'n at 21. This argument misses the

15   point. The point is not that a person has been treated on the basis of national origin, which as the

16   government asserts, is inherent in the TPS decisions which are made on a country-by-country

17   basis. Rather, the claim here is that the decisions made against Venezuelan TPS beneficiaries are

18   driven by animus and generalized stereotypes directed against them. Plaintiffs also claim that the

19   decisions made by Secretary Noem are infected by racial animus. Moreover, courts must be

20   mindful of the fact that there can be overlap between national origin and race. *See, e.g.*, *St.*

21   *Francis College v. Al-Khazraji*, 481 U.S. 604, 614 (1987) (Brennan, J., concurring) (noting that

22   "the line between discrimination based on 'ancestry or ethnic characteristics,' and discrimination

23   based on 'place or nation of . . . origin,' is not a bright one"); *Deravin v. Kerik*, 335 F.3d 195, 201

24   (2d Cir. 2003) (stating that "race and national origin discrimination claims may substantially

25   overlap or even be indistinguishable depending on the specific facts of a case" – *e.g.*, "[r]ace and

26   national origin discrimination may present identical factual issues when a victim is "born in a

27   nation whose primary stock is one's own ethnic group"""); *Krowel v. Palm Beach Cnty.*, No. 22-

28   cv-81958, 2023 U.S. Dist. LEXIS 76203, at *7-8 (S.D. Fla. Apr. 27, 2023) (stating that, as

United States District Court
Northern District of California

1    recognized by other courts, "discrimination based on national origin often overlaps with other

2    forms of racial discrimination").

3         Animus and stereotypes based on national origin and/or race trigger strict scrutiny. *See*

4    *Valeria v. Davis*, 320 F.3d 1014, 1020 (9th Cir. 2003) ("[D]iscriminatory intent, by itself, triggers

5    strict scrutiny . . . ."). Strict scrutiny applies if such discriminatory purpose is a motivating factor.

6    *Cf. Cal. v. U.S. Dep't of Homeland Sec.*, 476 F. Supp. 3d 994, 1023 (N.D. Cal. 2020). The

7    framework for discerning whether a discriminatory purpose was a motivating factor is set forth in

8    *Village of Arlington Heights v. Metropolitan Housing Development Corp.*, 429 U.S. 252, 265

9    (1977) (stating that "[p]roof of racially discriminatory intent or purpose is required to show a

10   violation of the Equal Protection Clause."); *id.* at 265-66 (noting that a plaintiff does not have to

11   "prove that the challenged action rested solely on racially discriminatory purposes" or that such

12   was a dominant or primary purpose). That is, *Arlington Heights* provides a methodology for

13   determining whether a discriminatory purpose was a motivating factor.

14        In *Arlington Heights*, the Supreme Court indicated that there could be either direct or

15   circumstantial evidence of a discriminatory purpose and further provided examples of what

16   evidence would support a discriminatory purpose – *e.g.*:

17        • "The impact of the official action – whether it 'bears more heavily on one race than

18           another.'" *Id.* at 266.

19        • "The historical background of the decision . . . , particularly if it reveals a series of

20           official actions taken for invidious purposes." *Id.* at 267.

21        • "The specific sequence of events leading up to the challenged decision," including

22           "[d]epartures from the normal procedural sequence" and "[s]ubstantive departures .

23           . . , particularly if the factors usually considered important by the decisionmaker

24           strongly favor a decision contrary to the one reached." *Id.*

25        • "The legislative or administrative history . . . , especially where there are

26           contemporary statements by members of the decisionmaking body, minutes of its

27           meetings, or reports." *Id.* at 268.

28        In the instant case, there is evidence of discriminatory animus by the decisionmaker at

United States District Court
Northern District of California

1    issue, Secretary Noem.  There is also evidence of discriminatory animus by President Trump and

2    that his intent and actions bore a direct nexus to the actions taken by Secretary Noem in the instant

3    case.

4                              i.        Discriminatory Statements by Secretary Noem

5            Plaintiffs have catalogued a number of discriminatory statements made by Secretary

6    Noem, beginning as early as February 2024 as part of the 2024 presidential race and continuing

7    through early 2025, when she issued her decisions to vacate the extension of the 2023 Designation

8    and then terminate the designation.  *See, e.g.*, MacLean Decl. ¶¶ 2-7, 12, 14-15.  In many of these

9    comments, the Secretary equated Venezuelan immigrants and/or TPS holders with gang members,

10   criminals, mentally unstable persons, and the like.  Such statements play on "longstanding tropes

11   or stereotypes that certain races have inherently immoral traits."  MacLean Decl., Ex. 20, at 19

12   (2020 article titled "The Racialization of Crimes Involving Moral Turpitude); *see also* Young

13   Decl. ¶ 3 (noting that "characterizing Venezuelan TPS holders as dangerous criminals who harm

14   the U.S. economy is a false narrative, and one reflecting racist tropes that have long been wielded

15   against immigrants to the United States"); *cf. United States v. Taveras*, 585 F. Supp. 2d 327, 338

16   (E.D.N.Y. 2008) (stating that, "'[w]hen government officials are permitted to use race [or ethnicity

17   and national origin] as a proxy for gang membership and violence . . . society as a whole

18   suffers'").  Furthermore, as discussed above, there is no evidence that Venezuelan TPS holders are

19   tied to gangs or are criminals.  Indeed, "[i]t is well documented that immigrants are much less

20   likely to commit crimes than U.S.-born Americans, and TPS recipients in particular have passed a

21   criminal background check and have a clear incentive to stay out of legal trouble to maintain their

22   status."  Watson & Veuger Decl. ¶ 15.

23           Examples of discriminatory statements by Secretary Noem include the following.

24           •    MacLean Decl. ¶ 3 & Ex. 2.  A social media post from February 28, 2024, that

25                stated: "Venezuela didn't send us their best.  They emptied their prisons and sent

26                criminals to America.  [¶] Deportations need to start on DAY ONE of [President

27                Trump's] term' in office."

28           •    MacLean Decl. ¶ 13 & Ex. 12 (Tr. at 104-05).  Testimony during her January 15,

United States District Court
Northern District of California

2025, confirmation hearing such as: "[The TPS] program has been abused and manipulated by the Biden administration and that will no longer be allowed to allow that and these extensions going forward the way that they are, the program was intended to be temporary and this extension of over 600,000 Venezuelans as well is alarming when you look at what we've seen in different states, including Colorado with gangs doing damage and harming the individuals and the people that live there."

- MacLean Decl. ¶ 15 & Ex. 14 (Tr. at 3).  A statement during a January 29, 2025, interview on Fox that: "Today we signed an executive order within the Department of Homeland Security in a direction that we were not going to follow through on what he did to tie our hands, that we are to follow the process, evaluate all of these individuals that are in our country, including the Venezuelans that are here and members of [TdA].  Listen, I was in New York City yesterday and the people of this country want these dirt bags out."  This statement is particularly notable because, as Plaintiffs point out, "Secretary Noem called Venezuelans 'dirt bags' when announcing [her] very decision [to vacate the extension of the 2023 Designation]."  Reply at 1.[26]

- MacLean Decl. ¶ 16 & Ex. 15 (Tr. at 18-19).  A statement during a February 2, 2025, interview on Meet the Press that: "[T]he TPP program has been abused, and it doesn't have integrity right now.  And folks from Venezuela that have come into this country are members of [TdA].  And remember, Venezuela purposely emptied out their prisons, emptied out their mental health facilities and sent them to the United States of America.  So we are ending that extension of that program, adding some integrity back to it.  And this administration's evaluating all of our programs to make sure they truly are something that's to the benefit of the United States, so

---

[26] Though the government claims this statement was taken out of context and that Secretary Noem was referring to the TdA, not to Venezuelan TPS beneficiaries generally, there is a reasonable inference that her reference was not so narrowly confined.  The Secretary has not submitted any declaration under oath elucidating her intended message.

that they're not to benefit of criminals."  Similar to above, this statement is notable because it was effectively made contemporaneously with the decision to terminate the 2023 Designation.

It is evident that the Secretary made sweeping negative generalizations about Venezuelan TPS beneficiaries *in toto*.  This is evident not only in what she said, but also in the fact that she decided to take *en masse* actions against all Venezuelan TPS beneficiaries, who number in the hundreds of thousands.  Acting on the basis of a negative group stereotype and generalizing such stereotype to the entire group is the classic example of racism.  *Cf. Hirabayashi v. United States*, 320 U.S. 81, 96-99 (1943) (describing why Japanese Americans as a group, despite the fact that most were American citizens, were susceptible to disloyalty and thus constitute a security threat, relying on assumed stereotypes); *Korematsu*, 323 U.S. at 233, 235 (Murphy, J., dissenting) (characterizing the majority decision upholding the mass internment of Japanese Americans as falling into the "ugly abyss of racism"; noting that the "forced exclusion [of Japanese Americans] was the result in good measure of the erroneous assumption of racial guilt . . .").

ii.    Discriminatory Statements by President Trump

Like Secretary Noem, President Trump also made a number of discriminatory statements – and not only about Venezuelan immigrants and/or TPS holders specifically, but also about non-white immigrants and/or TPS holders generally.  President Trump's statements span years, starting with his first administration when he terminated the TPS designations of Sudan, Haiti, Nicaragua, El Salvador, Honduras, and Nepal, and continuing through the start of his second administration where one of the first actions he endorsed was ending TPS designations to put "America first."

Examples of discriminatory statements by President Trump targeting non-white immigrants generally include the following.

- MacLean Decl. ¶ 17 & Ex. 16.  A Washington Post article from January 12, 2018, indicating that, during a discussion about "protecting immigrants from Haiti, El Salvador and African countries," President Trump stated: "'Why are we having all these people from shithole countries come here?'"  He "then suggested that the United States should instead bring more people from countries such as Norway . . .

United States District Court
Northern District of California

1          ."

2          • MacLean Decl. ¶ 19 & Ex. 18. A New York Times article from May 16, 2018,

3              indicating that President Trump claimed "dangerous people were clamoring to

4              breach the country's borders and brand[ed] such people 'animals.'"

5          • MacLean Decl. ¶ 25 & Ex. 24. A New York Times article from April 7, 2024,

6              reflecting that President Trump stated that "people were not immigrating to the

7              United States from 'nice' countries like 'Denmark'" as well as Switzerland and

8              Norway. President Trump also stated with respect to immigrants from the Southern

9              border that "'[t]hese are people coming in from prisons and jails. They're coming

10             in from just unbelievable places and countries, countries that are a disaster.'"

11         • MacLean Decl. ¶ 9 & Ex. 8 (Tr. at 29, 34-35). Statements during the presidential

12             debate on September 10, 2024, that Haitian immigrants – TPS holders – living in

13             Springfield, Ohio, are "eating the dogs," "eating the cats," and "eating the pets of

14             the people that live' in Springfield, Ohio." President Trump also stated: "They

15             allowed people to come in, drug dealers, to come into our country, and they're now

16             in the United States. And told by their countries like Venezuela don't ever come

17             back or we're going to kill you. Do you know that crime in Venezuela and crime

18             in countries all over the world is way down? You know why? Because they've

19             taken their criminals off the street, and they've given them to her to put into our

20             country. . . . [T]hey're destroying the fabric of our country by what they've done.

21             There's never been anything done like this at all. They've destroyed the fabric of

22             our country. Millions of people let in."

23     Examples of discriminatory statements by President Trump targeting Venezuelan

24 noncitizens specifically include the following.

25         • MacLean Decl. ¶ 10 & Ex. 9 (Tr. at 32-33). Statements during a campaign speech

26             held on October 11, 2024, that: "[E]very day, Americans . . . are living in fear all

27             because Kamala Harris decided to empty the slums and prison cells of Caracas

28             [Venezuela] and many other places happening all over the world. . . . [¶] You

United States District Court
Northern District of California

United States District Court
Northern District of California

1     know, prison populations all over the world are down.  Crime all over the world is

2     down because they take the world's criminals, gang members, drug dealers, and

3     they deposit them into the United States bus after bus after bus.  In Venezuela, their

4     crime rate went down 72 percent.  You know why?  Because they took the

5     criminals out of Caracas and they put them along your border and they said, 'If you

6     ever come back, we're going to kill you.'  [¶] Think of that. And we have to live

7     with these animals, but we're not going to live with them for long, you watch."

8     • MacLean Decl. ¶ 11 & Ex. 10 (Tr. at 6, 12-13).  Statements during a campaign

9     speech held on October 27, 2024, that the Venezuelan gang TdA is "savage."

10    President Trump also stated: "The United States is now an occupied country, but it

11    will soon be an occupied country no longer.  Not going to be happening.  Not going

12    to be happening.  November 5th, 2024, nine days from now will be Liberation Day

13    in America.  It's going to be Liberation Day.  [¶] On day one, I will launch the

14    largest deportation program in American history to get these criminals out.  I will

15    rescue every city and town that has been invaded and conquered, and we will put

16    these vicious and bloodthirsty criminals in jail.  We're going to kick them the hell

17    out of our country as fast as possible."

18    • President Trump's Executive Order, issued on the first day of his second

19    administration, which claimed that Americans needed protection from an

20    immigrant "invasion," stated that "[t]he American people deserve a Federal

21    Government that puts their interests first," and specifically identified the TPS

22    program as a problem.  https://www.whitehouse.gov/presidential-

23    actions/2025/01/protecting-the-american-people-against-invasion/; *cf. Ramos*, 336

24    F. Supp. 3d at 1104 (where plaintiffs argued that "America first" was "a code word

25    for removal of immigrants who are non-white and/or non-European, and counsel

26    for the government could not articulate a "clear and direct response" to what "'an

27    America first view of the TPS decision'" meant).

28    The Court also takes note of an article from Axios, dated October 2024, that analyzed 109

United States District Court
Northern District of California

1   of President Trump's speeches, interviews, debates, and rallies from September 1, 2023, to

2   October 2, 2024, and found that he called Venezuelan migrants "criminals" at least 70 times.  *See*

3   MacLean Decl. ¶ 33 & Ex. 32.

4        Significantly, the vacated panel decision in *Ramos* declined to find that President Trump's

5   statements made in 2018 were not evidence of racial discrimination.  Instead, the panel found

6   there was an insufficient showing of a nexus between President Trump's statements and intent and

7   the specific TPS decisions made by the Secretary of DHS.  *See Ramos*, 975 F.3d at 897 (stating

8   that "Plaintiffs' EPC claim fails predominantly due to the glaring lack of evidence tying the

9   President's alleged discriminatory intent to the specific TPS terminations – such as evidence that

10  the President personally sought to influence the TPS terminations, or that any administration

11  officials involved in the TPS decision-making process were themselves motivated by animus

12  against 'non-white, non-European' countries").

13       Relying on the vacated panel decision in *Ramos*, the government suggests that President

14  Trump's statements cited here should likewise not be given any consideration because (1) the

15  statements were not sufficiently tied or linked to TPS policy or decision-making specifically; (2)

16  there is insufficient evidence that "the President personally sought to influence the TPS

17  terminations"; and (3) even if so, "[t]he mere fact that the White House exerted pressure on the

18  Secretaries' TPS decisions does not in itself support the conclusion that the President's alleged

19  racial animus was a motivating factor in the TPS decisions" because "[i]t is expected – perhaps

20  even critical to the functioning of government – for executive officials to conform their decisions

21  to the administration's policies."  *Id.* at 897-98.

22       None of these arguments is convincing.  First, contrary to what the government suggests,

23  some of President Trump's statements *did* relate to TPS policy or decision-making (*e.g.*,

24  statements about Haitian immigrants present in Springfield because of the TPS program,

25  statements in the Executive Order about an "invasion" and targeting, *inter alia*, the TPS program).

26  Furthermore, even if other statements did not directly relate to TPS policy or decision-making,

27  there is no principled reason to hold that these statements should thereby be ignored, especially

28  when the discriminatory statements still addressed the issue of immigration and, further, were not

1   isolated occurrences but rather comments made repeatedly over time – including in the several

2   months immediately preceding Secretary Noem's decisions to vacate and then terminate.[27]  The

3   length of time over which discriminatory statements were made, including those in close temporal

4   proximity to Secretary Noem's actions, differentiate this case from *Ramos*.

5          More than that, there is evidence *in this case* that President Trump directly influenced TPS

6   policy and/or decision-making at issue.  This is apparent from both his Executive Order addressed

7   above *and* Secretary Noem's decision to terminate, which expressly took note of President

8   Trump's

9          recent, immigration and border-related executive orders and
       proclamations [which] clearly articulated an array of policy
10      imperatives bearing upon the national interest. . . .

11      [A]s the President directed in Executive Order 14150, "the foreign
       policy of the United States shall champion core American interests
12      and always put America and American citizens first."  Continuing to
       permit Venezuelans under the 2023 TPS designation to remain in
13      the United States does not champion core American interests or put
       American interests first.  U.S. foreign policy interests, particularly in
14      the Western Hemisphere, are best served and protected by curtailing
       policies that facilitate or encourage illegal and destabilizing
15      migration.

16   90 Fed. Reg. at 9042 (also stating that "President Trump in his recent, immigration and border-

17   related executive orders and proclamations clearly articulated an array of policy imperatives

18   bearing upon the national interest").  The challenged actions by Secretary Noem were instituted

19   shortly after issuance of the Executive Order and almost immediately upon her taking office.  The

20   inference of a nexus here between President Trump and the TPS vacatur and termination, is, more

21   so than in *Ramos*, compelling.  Thus, the *Ramos* panel's rejection of the "cat's paw" theory, *see*

22

23   ───────────────

   [27] The Ninth Circuit panel in *Ramos* suggested that there must be a close nexus between a
24   discriminatory statement and the challenged action, citing in support *Mendiola-Martinez v.
   Arpaio*, 836 F.3d 1239, 1261 (9th Cir. 2016) (stating that, even if "offensive quotes about Mexican
25   nationals attributed to Sheriff Arpaio and published in newspapers" were admissible, "they do not
   mention the Restraint Policy and do not otherwise lead to any inference that Sheriff Arpaio's 2006
26   Restraint Policy was promulgated to discriminate against Mexican nationals").  But *Mendiola-
   Martinez* is distinguishable because, there, the Restraint Policy at issue was facially neutral,
27   "mandat[ing] that . . . officers restrain all inmates during transport, including those who are 'sick
   or injured.'"  *Id.* at 1245; *see also id.* at 1261 (acknowledging that the Restraint Policy was "a
28   facially neutral policy").  Here, the TPS-related decisions were not facially neutral as they
   specifically targeted Venezuelan TPS holders.

United States District Court
Northern District of California

1   *Ramos*, 975 F.3d at 897-98, applies with far less force to the case at bar. And notably, numerous

2   district courts that considered TPS designations and terminations during the first Trump

3   administration still applied the cat's paw theory and found the plaintiffs' equal protection claims

4   viable. *See, e.g.*, *Saget v. Trump*, 375 F. Supp. 3d 280, 368-69 (E.D.N.Y. 2019) (in TPS case,

5   noting that "the evidence suggests the Secretary was influenced by the White House and White

6   House policy to ignore statutory guidelines, contort data, and disregard objective reason to reach a

7   predetermined decision to terminate TPS and abate the presence of non-white immigrants in the

8   country"); *CASA de Md., Inc. v. Trump*, 355 F. Supp. 3d 307, 326 (D. Md. 2018) (in TPS case,

9   noting that President Trump made racially discriminatory statements about Latino immigrants and

10  he was allegedly "involved in the decision to terminate TPS for El Salvador"; adding that, "if, as

11  alleged, the President influenced the decision to terminate El Salvador's TPS, the discriminatory

12  motivation cannot be laundered through the Secretary"); *Centro Presente v. United States Dep't of*

13  *Homeland Sec.*, 332 F. Supp. 3d 393, 414, 416 (D. Mass. 2018) (in TPS case, stating that

14  "'liability for discrimination will lie when a biased individual manipulates a non-biased decision-

15  maker into taking discriminatory action'"; "find[ing] that the combination of a disparate impact on

16  particular racial groups, statements of animus by people plausibly alleged to be involved in the

17  decision-making process, and an allegedly unreasoned shift in policy sufficient to allege plausibly

18  that a discriminatory purpose was a motivating factor in a decision").

19      Accordingly, the Court rejects the government's attempt to avoid consideration of

20  President Trump's statements. That being said, the Court emphasizes that, even without

21  consideration of these statements, Plaintiffs have sufficiently established animus based on, *inter*

22  *alia*, Secretary Noem's discriminatory statements. That Secretary Noem – the clear decision-

23  maker on the vacatur and termination – made discriminatory comments herself (some

24  contemporaneously with her decisions to vacate and terminate) further distinguishes the instant

25  case from *Ramos*. *See Ramos*, 975 F.3d at 897 (stating there was no evidence that "any

26  administration officials involved in the TPS decision-making process were themselves motivated

27  by animus against 'non-white, non-European' countries").

28  / / /

United States District Court
Northern District of California

iii.    Historical Background

Consistent with the above, the Court also considers the historical background of the first Trump administration and its termination of TPS for non-white, non-European TPS holders from Sudan, Haiti, Nicaragua, El Salvador, Honduras, and Nepal.  As the Court held in *Ramos*, there was "sufficient evidence to raise serious questions as to whether a discriminatory purpose was a motivating factor in the decisions to terminate [these] TPS designations" based on, *e.g.*, President Trump's discriminatory statements, irregular decision making, and departures from prior practice. *See Ramos*, 336 F. Supp. 3d at 1098-105.  *But see Ramos*, 975 F.3d at 896-99 (vacated panel decision disagreeing with this Court's equal protection analysis).  Secretary Noem's decision here to vacate the extension of the 2023 Designation and then terminate the designation continues a pattern of the Trump administration's targeting of non-white, non-European TPS holders.

iv.    Sequence of Events

Even putting aside the general historical background, the sequence of events related to Secretary Noem's decision-making on the TPS designations here is clearly anomalous.  As Plaintiffs note, the decision-making process for the vacatur and termination "took place over a week, at most" and at the very outset of the second Trump administration.  Opp'n at 14.  The Secretary vacated the extension of the 2023 Designation only three days after she was confirmed. Then just a few days later, she terminated the TPS designation for Venezuela (even though, under the TPS statute, she was required to, *e.g.*, consult with other government agencies before making a decision).  This was a clear departure from longstanding prior practice which included obtaining the considered analysis from constituent agencies and the State Department before reaching a decision on TPS status of a particular country.  *See, e.g.*, *Ramos*, 336 F. Supp. 3d at 1082 (taking note that the parties agreed on the general process for a TPS designation (on periodic review): "RAIO (a division within USCIS) provides a Country Conditions Memo [for the Secretary]" while "OP&S (another division within USCIS) drafts a Decision Memo that contains USCIS's recommendation on what to do about the TPS designation"; "[t]he State Department provides further input (e.g., country conditions, recommendations" and, "[a]t times input can also come from other government sources").  Moreover, as noted above, Secretary Noem's vacatur was the

United States District Court
Northern District of California

1    first-ever vacatur of an extension of TPS over the TPS program's thirty-five-year history.

2                   v.       Lack of Support for Both the Vacatur of the Extension and for the

3                            Termination of the 2023 Designation

4            The lack of support for the vacatur – both legal and evidentiary – has already been

5    discussed above.  In addition, the lack of evidentiary support for the termination of the 2023

6    Designation further indicates that the termination was motivated at least in part by animus.  In the

7    Federal Register, Secretary Noem justified the termination of the 2023 Designation on the

8    following grounds: (1) members of the Venezuelan TdA gang have crossed into the United States;

9    (2) the resources of local communities have not been adequate to "meet the demands" of the

10   Venezuelan TPS holders, and their presence has cost local communities billions of dollars; (3) a

11   TPS designation has a potential "magnet effect" – *i.e.*, it is a "pull factor[] driving Venezuelan

12   nationals to the United States"; and (4) an extension of the TPS designation is contrary to the

13   Trump administration's policy of "America first" as it "facilitate[s] or encourage[s] illegal and

14   destabilizing migration."  90 Fed. Reg. at 9042-43.

15           As discussed in other parts of this order, the Secretary's rationale is entirely lacking in

16   evidentiary support.  For example, there is no evidence that Venezuelan TPS holders are members

17   of the TdA gang, have connections to the gang, and/or commit crimes.  Venezuelan TPS holders

18   have lower rates of criminality than the general population.  Generalization of criminality to the

19   Venezuelan TPS population as a whole is baseless and smacks of racism predicated on generalized

20   false stereotypes.  Moreover, Venezuelan TPS holders are critical contributors to both the national

21   and local economies: they work, spend money, and pay taxes.  Barring these TPS beneficiaries

22   from the labor market in which they enjoy higher rates of participation than the general

23   population, *see* Docket No. 71 (Amici Br. at 5), will cost the United States billions in taxes.  *See,*

24   Card Decl. ¶ 9(i) (stating that termination of TPS for just those Venezuelans who arrived in the

25   U.S. between 2021 and 2023 would result in an estimated $3.5 billion annual loss to the U.S.

26   economy and a $434.8 million annual loss in social security taxes); *see also* Docket No. 62 (Amici

27   Br. at 7) (noting that, "[i]n 2023, TPS holders from all countries paid $3.1 billion in federal taxes,

28   contributing to programs like Social Security and Medicare, and paid $2.1 billion in state and local

taxes"); Docket No. 71 (Amici Br. at 6) (noting that, "[i]n 2021, the approximately 354,000 TPS holders in the United States from all countries paid an estimated $966.5 million in state and local taxes"). Far from being a burden, a number of jurisdictions – states, cities, and counties – have emphasized the value that Venezuelan TPS holders bring to their communities. They have documented the adverse impact on the economy, public health, and public safety of terminating TPS status of these beneficiaries. *See generally* Docket No. 62 (Amici Br.); Docket No. 71 (Amici Br.). And as noted above, the purported "magnet effect" of TPS designation makes no sense because a mere *extension* of TPS (not a designation or redesignation) does not make more people eligible for TPS. *See* Watson & Veuger Decl. ¶ 26 ("We do not see any reason that the extension of an existing TPS designation would act as an immigration magnet. TPS status is not available to those arriving after the 2023 designation. The current administration's termination of the parole program makes it clear it is not interested in facilitating additional migration from Venezuela, and a reasonable migrant would not believe that a TPS designation for new Venezuelan immigrants is likely to be issued by this administration. TPS status does not allow individuals to sponsor relatives for migration."). Finally, the Trump administration's invocation of "America first" raises a further inference of animus given the historical connotation of that phrase. *See Ramos*, 336 F. Supp. 3d at 1104 (noting that the government could not articulate a "clear and direct response" to what "'an America first view of the TPS decision'" meant). The lack of bona fides of purported justifications gives rise to an inference of pretext. *See Swackhammer v. Sprint/United Mgmt. Co.*, 493 F.3d 1160, 1168 (10th Cir. 2007) (in Title VII case, noting that "'the fact of pretext alone may allow the inference of discrimination'").

### vi.  Disparate Impact of Agency's Action

Finally, it is clear that the agency's action has a disparate impact, bearing more heavily on one race/ethnicity/national origin than others. *See, e.g.*, *Saget*, 375 F. Supp. 3d at 367 (stating that "it is axiomatic the decision to terminate TPS for Haitians impacts one race, namely non-white Haitians, more than another"). To be sure, this factor is less probative where, by definition, a TPS decision by country will have an inherent disparate impact based on national origin. Any relevance of disparate impact in this context is instead rooted in the racially charged historical

1    context discussed above – the invocation of a pattern of adverse TPS decision directed at non-

2    whites – those from so-called "shithole countries."

3                                    vii.    Summary

4          Taking into account the *Arlington Height* factors, including but not limited to the direct

5    animus of Secretary Noem, the animus of President Trump that appears to have directly influenced

6    the Secretary's decision making, the anomalous procedures followed (the highly compressed time

7    in which the decisions to vacate and then terminate were made and the precedential and unique

8    nature of the decisions made), and the lack of bona fides for the decisions to vacate and then

9    terminate, the Court concludes that Plaintiffs have established a likelihood of success on their

10   equal protection claim directed against both the decision to vacate and the decision to terminate.

11   D.    Nationwide Relief

12         Because the § 705 factors weigh strongly in Plaintiffs' favor, the Court holds that Plaintiffs

13   are entitled to relief.  Although § 705 expressly states that relief that may be afforded is

14   postponement of the effective date of agency action, without limitation, the government asserts

15   that the Court should nevertheless restrict the relief given –  specifically, to only the named

16   individual Plaintiffs.  The government takes the position that "universal relief benefitting non-

17   parties" is "broader than necessary to remedy actual harm shown by specific Plaintiffs."  Opp'n at

18   25.

19          The government's position lacks merit.  As a preliminary matter, its position is predicated

20   on criticisms made of nationwide injunctions but, as discussed above, Plaintiffs are seeking to

21   postpone or set aside agency actions, and vacatur of agency action is not the same thing as an

22   injunction.  More importantly, where agency action is challenged as a violation of the APA,

23   nationwide relief is commonplace.  *See E. Bay Sanctuary Covenant v. Biden*, 993 F.3d 640, 680-

24   81 (9th Cir. 2021) (in APA case, noting that there is "'no general requirement that an injunction

25   affect only the parties in suit'" and, "'[w]hen a reviewing court determines that agency regulations

26   are unlawful, the ordinary result is that the rules are vacated –  not that their application to the

27   individual petitioners is proscribed'"); *see also Cook Cnty. v. Wolf*, 498 F. Supp. 3d 999, 1006-07

28   (N.D. Ill. 2020) (noting that "vacatur will prevent DHS from enforcing the Rule against

United States District Court
Northern District of California

nonparties," but "that is a consequence not of the court's choice to grant relief that is broader than necessary, but of the APA's mandate that flawed agency action must be 'h[e]ld unlawful and set aside'").

Nationwide relief is also warranted because the agency actions here have had a uniform and nationwide impact on all Venezuelan TPS holders located across the United States.  And here, NTPSA – the named organizational plaintiff – advocates for Venezuelan TPS holders nationwide and has more than 84,000 members who are Venezuelan TPS holders *in all fifty states, plus the District of Columbia*.  *See* Jimenez Decl. ¶ 13; *cf. City & Cnty. Of San Francisco v. Trump*, 897 F.3d 1225, 1244 (9th Cir. 2018) (indicating that, to support a nationwide injunction, record must be sufficiently developed on nationwide impact of challenged actions); *E. Bay Sanctuary*, 993 F.3d at 680 (noting that organizational plaintiffs did "'not operate in a fashion that permits neat geographic boundaries'").   Full relief for the NTPSA and its members cannot be obtained absent application to all fifty states and the District of Columbia.  Nor has the government explained how, as a practical matter, relief could be afforded to some subset of all Venezuelan TPS holders, particularly given that NTPSA has tens of thousands of members located across the country.  *See id.* at 680-81 (criticizing the government for failing to propose a workable alternative form of injunction).

Finally, there is an interest in uniformity in the immigration system.  *See id.* at 681 (noting that, "in immigration cases, we 'consistently recognize[] the authority of the district courts to enjoin unlawful policies on a universal basis'"); *Texas v. United States*, 40 F.4th at 229 n.18 ("reject[ing] DHS's contention that the nationwide vacatur is overbroad[;] [i]n the context of immigration law, broad relief is appropriate to ensure uniformity and consistent in enforcement").

Accordingly, consistent with the text of section 705, the Court grants Plaintiffs' motion to postpone the agency actions at issue, and the relief afforded here is nationwide in scope.  The Court acknowledges that there are at least three other recent TPS cases that have been filed against the Trump administration, with at least two related to Venezuela specifically.  *See Casa, Inc. v. Noem*, No. C-25-0525 GLR (D. Md.); *Haitian Ams. United Inc. v. Trump*, No. C-25-10498 RGS (D. Mass.).  How the courts in those cases should proceed in light of the relief that the Court

1    orders here will be up to those courts to decide; the Court is confident these sister courts are aware

2    of the various proceedings and will be mindful of the issues.

3    E.    Motion to Shorten Time to Confer

4        Finally, the Court addresses a motion that Plaintiffs filed shortly before the hearing on their

5    motion to postpone.  In the new motion, Plaintiffs ask that the Court shorten the deadline for the

6    parties to begin their Rule 26(f) conference and/or open discovery now.  The Court holds as

7    follows. (Some of the rulings were made during the hearing on the motion to postpone.)

8        •    Given the Court's ruling on the jurisdictional arguments raised by the government,

9            there is no reason to delay production of the administrative record, even if the

10           government intends to file a motion to dismiss. The parties shall meet and confer

11           regarding production of the administrative record (to the extent they have not

12           already) and the record shall be produced by the government within one week of

13           the date of this order. There is an interest in moving this case forward promptly.

14       •    At this time, the Court does not opine on what discovery, if any, Plaintiffs may be

15           entitled to beyond the administrative record.  The administrative record should be

16           produced in the first instance.  What the administrative record does or does not

17           reveal will likely inform whether additional discovery is warranted.  The Court

18           does not bar Plaintiffs from serving discovery requests on the government now, but

19           the government is not required at this point to respond to those requests.

20       •    Although the Court is not requiring the government to respond to any discovery

21           requests at this juncture, the parties shall meet and confer (if they have not already)

22           and reach agreement on a stipulated document preservation order.

### IV.    CONCLUSION

24       For the foregoing reasons, the Court grants Plaintiffs' motion to postpone the actions taken

25   by Secretary Noem, specifically, her decisions to vacate the extension of the 2023 Designation and

26   to terminate the 2023 Designation.

27       Within one week of the date of this order, the parties shall file a joint status report (after

28   meeting and conferring), addressing (1) whether the government intends to appeal this Court's

United States District Court
Northern District of California

order; (2) whether Plaintiffs will be filing a motion to postpone with respect to agency action related to Haiti's TPS designation (which is within the scope of the newly filed amended complaint); and (3) a proposed date for the initial case management conference in which the Court and the parties will discuss ways in which adjudication of the merits of this case can be expedited.

This order disposes of Docket Nos. 16 and 79.

**IT IS SO ORDERED**.

Dated: March 31, 2025

_____
EDWARD M. CHEN
United States District Judge

United States District Court
Northern District of California

1

2

3

4                      UNITED STATES DISTRICT COURT

5                     NORTHERN DISTRICT OF CALIFORNIA

6

7    NATIONAL TPS ALLIANCE, et al.,            Case No.  25-cv-01766-EMC

8                    Plaintiffs,
                                               **ORDER DENYING DEFENDANTS'**
9          v.                                  **MOTION TO STAY**

10   KRISTI NOEM, et al.,
                                               Docket No. 95
11                  Defendants.

12

13

14         The government has appealed the Court's order granting Plaintiffs' motion to postpone the

15   Secretary's actions.  The government has moved to stay the postponement order pending appeal.

16   The instant motion is being heard on shortened time as requested by the government.

17         Absent the postponement, the Secretary's termination of the 2023 TPS Designation would

18   take effect on April 7, 2025.  In considering the stay motion, the Court considers the following

19   factors:

20                "(1) whether the stay applicant has made a strong showing that he is
                  likely to succeed on the merits; (2) whether the applicant will be
21                irreparably injured absent a stay; (3) whether issuance of the stay
                  will substantially injure the other parties interested in the
22                proceeding; and (4) where the public interest lies."

23   *Nken v. Holder*, 556 U.S. 418, 434 (2009).

24         The Court's analysis in its postponement order effectively addresses the factors above.

25   That analysis weighs against the government and in favor of Plaintiffs – even more so here for two

26   reasons.  First, for a stay pending appeal, the government is required to make a *strong showing* of

27   likelihood of success on the merits.  *See id.*  Second, if the Court were to order a stay of the

28   postponement order pending appeal, that would mean hundreds of thousands of Venezuelan TPS

holders would lose legal status in just a few days and thus be subject to removal – removal would effectively *moot out* the postponement order and the appeal thereof (at least with respect to the 2023 Designation). Any removal likely could not be "undone" should Plaintiffs ultimately prevail. In fact, just recently, the government mistakenly deported an individual, who has legal status to be in the United States, to El Salvador but has essentially taken the position that it cannot do anything to address that mistake.

To the extent the government suggests the loss of legal status does not automatically mean removal, *see* Mot. at 8 (arguing that "neither the 2025 Vacatur nor 2025 Termination is equivalent to requiring Plaintiffs to depart the United States"), that is a disingenuous argument. The entire point of Secretary Noem's vacatur and termination decisions was to enable the removal of Venezuelan TPS holders on a schedule well in advance of the schedule set by Secretary Mayorkas. *See, e.g.*, Docket No. 37 (McLean Decl. ¶ 15 & Ex. 14) (Secretary Noem stating, during an interview where she announced the decision to vacate the extension of the 2023 Designation, that "people of this country want these dirt bags out"). Nor has the government stated that, if the Court were to stay its postponement order, it will not immediately move forward with removal of any Venezuelan TPS holder. In seeking to stay the postponement, even in light of the expedited briefing schedule set by the Ninth Circuit, the government impliedly intends to do so.

Furthermore, in addition to the risk of removal, there is another significant harm that will befall TPS beneficiaries if the stay were granted: the loss of work authorization that follows the loss of legal status. This would jeopardize beneficiaries' ability to sustain themselves and/or their families. It will also cause dislocation and harm to the economy as described in the Court's postponement order.

Although, the Court's postponement order addresses the arguments raised in the pending motion to stay (indeed, the motion to stay reads to a large extent like a motion to reconsider), the Court notes the following.

- With respect to the issue of whether 8 U.S.C. § 1252(f)(1) is a jurisdictional bar, the government asserts that the Court mistakenly relied on *Texas v. United States*, 40 F.4th 205, 219 (5th Cir. 2022), because "the Supreme Court reversed that

United States District Court
Northern District of California

1    decision on expedited review and Justice Gorsuch criticized the district court's

2    evasion of § 1252(f)(1) . . . ."  Mot. at 5.  But the Fifth Circuit reaffirmed its view

3    that a vacatur and an injunction are distinct in *Texas v. United States*, 126 F.4th

4    392, 419 n.40 (5th Cir. 2025) ("Section 1252(f)(1) is inapplicable to vacatur

5    because it is a 'limit on injunctive relief,' and vacatur is different from injunctive

6    relief.").  As for Justice Gorsuch's criticism, that was part of a concurrence and his

7    criticism was rooted in an analysis of standing: the "clever work around" did not

8    "succeed" because "a vacatur order still does nothing to *redress* the States'

9    injuries" and, therefore, standing was still a problem.  *United States v. Texas*, 599

10   U.S. 670, 691 (2023) (Gorsuch, J., concurring) (emphasis added).

11   •   With respect to the issue of whether 8 U.S.C. § 1254a(b)(5)(A) is a jurisdictional

12       bar, the government contends that it did not make any concession – specifically,

13       with respect to Plaintiffs' claim that Secretary Noem lacked the implicit authority

14       to vacate the decision to extend the 2023 Designation.  *See* Mot. at 3 n.3.  But the

15       record of the hearing is clear.  In any event, even if the government could withdraw

16       its concession, the government's asserted argument fails.  As the Court stated in its

17       postponement order, "§ 1254a(b)(A)(A) was designed to bar judicial review of

18       substantive country-specific conditions in service of TPS designations,

19       terminations, or extensions of a foreign state – not judicial review of general

20       procedures or collateral practices related to such."  Docket No. 93 (Order at 25).

21   •   With respect to the issue of whether Secretary Noem had the implicit authority to

22       vacate the extension of the 2023 Designation, the government cites, *inter alia*, *SKF*

23       *USA, Inc. v. United States*, 254 F.3d 1022 (Fed. Cir. 2001).  *See* Mot. at 5.  But

24       *SKF* is not on point (which the government implicitly acknowledges given its use

25       of the "cf." cite), because the issue there was whether an "agency may request [*a*

26       *court* for] a remand because it believes that its original decision was incorrect on

27       the merits and it wishes to change the result."  *Id.* at 1028.  That is not the situation

28       here.  Secretary Noem did not ask a court for relief before vacating and then

terminating the 2023 Designation.

- According to the government, the Court's postponement order is flawed because the Court made "irreconcilable" holdings: to wit, that "the Secretary *could* 'deconsolidate' Secretary Mayorkas's TPS designations for Venezuela and that the TPS statute forbids reconsideration." Mot. at 5 (emphasis in original). This argument ignores the express language in the order that, "*even if vacatur were permitted* and not founded on any legal error, the vacatur was still arbitrary and capricious because, in revoking the prior action, the Secretary failed to consider alternatives short of termination." Docket No. 93 (Order at 58) (emphasis added).

- On the equal protection claim, *even if* the deferential review of *Trump v. Hawaii*, 585 U.S. 667 (2018), were to apply (the Court held it did not), Secretary Noem's decisions would still be subject to rational basis review – *i.e.*, the Court would have to consider whether the Secretary's decisions are "plausibly related to the Government's stated objective[s]." *Id.* at 704-05. Based on the record evidence on the motion to postpone, Plaintiffs have raised at least a serious question whether, in fact, the Secretary's actions are plausibly related to her stated objective. *See, e.g.*, Docket No. 93 (Order at 73-74) (addressing lack of support for the decisions to vacate and terminate).

- Regarding the nationwide scope of relief, Plaintiffs correctly note that the government argued in its opposition to the motion to postpone that relief should be afforded to only the named individual plaintiffs. *See* Docket No. 60 (Opp'n at 25). Thus, the government has waived the argument that it now makes in its motion to stay – *i.e.*, that, at most, relief should be limited to the named individual plaintiffs *and* the "associated members" of NTPSA (the organizational plaintiff). In any event, the government still has not "explained how, as a practical matter, relief could be afforded to some subset of all Venezuelan TPS holders," Docket No. 93 (Order at 76), particularly in light of the number of NTPSA members located in states throughout the country.

United States District Court
Northern District of California

1         •   The government's request to stay discovery pending appeal (so that the government

2            may pursue a stay pending appeal with the Ninth Circuit) is premature. The Court

3            has already held that the first step is for the parties to compile the administrative

4            record. There is no motion before the Court in regard to that compilation. Nor is

5            there any pending motion for discovery beyond the record.

6        For the foregoing reasons, the government's motion to stay the postponement order

7 pending appeal is denied.

8

9       **IT IS SO ORDERED**.

10

11 Dated: April 4, 2025

12

13 _____

14 EDWARD M. CHEN
     United States District Judge

15

16

17

18

19

20

21

22

23

24

25

26

27

28

United States District Court
Northern District of California