# No. 25-2120

## IN THE
## UNITED STATES COURT OF APPEALS
## FOR THE NINTH CIRCUIT

———————

NATIONAL TPS ALLIANCE, MARIELA GONZÁLEZ, FREDDY
JOSE ARAPE RIVAS, M.H., CECILIA DANIELA GONZÁLEZ
HERRERA, ALBA CECILIA PURICA HERNÁNDEZ, E.R.
HENDRINA VIVAS CASTILLO, A.C.A., SHERIKA BLANC, VILES
DORSAINVIL, and G.S.,
*Plaintiffs-Appellees*,

vs.

KRISTI NOEM, in her official capacity as Secretary of Homeland
Security, UNITED STATES DEPARTMENT OF HOMELAND
SECURITY, and UNITED STATES OF AMERICA,
*Defendants-Appellants.*

———————

ON APPEAL FROM THE UNITED STATES DISTRICT COURT FOR THE
NORTHERN DISTRICT OF CALIFORNIA, NO. 3:25-CV-01766-EMC
HONORABLE EDWARD M. CHEN

———————

## RESPONSE IN OPPOSITION TO DEFENDANTS-
## APPELLANTS' MOTION FOR A STAY PENDING APPEAL

Emilou MacLean (SBN 319071)
emaclean@aclunc.org
Michelle (Minju) Y. Cho (SBN 321939)
mcho@aclunc.org
Amanda Young (SBN 359753)
ayoung@aclunc.org
ACLU FOUNDATION
OF NORTHERN CALIFORNIA
39 Drumm Street
San Francisco, CA 94111-4805
Telephone: (415) 621-2493

Ahilan T. Arulanantham (SBN 237841)
arulanantham@law.ucla.edu
Stephany Martinez Tiffer (SBN 341254)
martineztiffer@law.ucla.edu
CENTER FOR IMMIGRATION LAW
AND POLICY, UCLA SCHOOL OF
LAW 385 Charles E. Young Dr. East
Los Angeles, CA 90095
Telephone: (310) 825-1029

*Attorneys for Plaintiffs-Appellees*

Additional Counsel for Plaintiffs-Appellees

Jessica Karp Bansal (SBN 277347)
jessica@ndlon.org
Lauren Michel Wilfong
lwilfong@ndlon.org
NATIONAL DAY LABORER
ORGANIZING NETWORK
1030 S. Arroyo Parkway, Suite 106
Pasadena, CA 91105
Telephone: (626) 214-5689

Eva L. Bitran (SBN 302081)
ebitran@aclusocal.org
ACLU FOUNDATION
OF SOUTHERN CALIFORNIA
1313 West 8th Street
Los Angeles, CA 90017
Telephone: (213) 977-5236

Erik Crew
ecrew@haitianbridge.org
HAITIAN BRIDGE ALLIANCE
4560 Alvarado Canyon Road, Suite 1H
San Diego, CA 92120
Telephone: (949) 603-7411

## TABLE OF CONTENTS

INTRODUCTION ................................................................ 1

JURISDICTIONAL STATEMENT ................................... 4

STANDARD OF REVIEW ............................................... 4

ARGUMENT ..................................................................... 6

    I.    DEFENDANTS CANNOT SHOW A "STRONG
        LIKELIHOOD" OF SUCCESS ON THE MERITS. ...... 6

        A.    Defendants Cannot Show Likely Success on
            the APA Claims. .................................................. 6

            1.    Settled Precedent Supports Plaintiffs'
                Lack-of-Vacatur-Authority Claim. ............. 6

        B.    Plaintiffs' Arbitrary and Capricious Claim
            Stands Unchallenged. ....................................... 13

    II.    DEFENDANTS CANNOT SHOW A "STRONG
        LIKELIHOOD" OF PREVAILING ON THE
        DISCRIMINATION CLAIM. ...................................... 15

    III.    THE COURT GRANTED APPROPRIATE
        RELIEF. .................................................................. 20

        A.    The Order Does Not Violate 8 U.S.C.
            1252(f)(1). ........................................................... 20

        B.    The Requested Relief Is Not Overbroad. ........... 21

    IV.    DEFENDANTS FAIL TO SHOW IRREPARABLE
        HARM, AND THE EQUITIES FAVOR
        POSTPONEMENT. .................................................... 24

CONCLUSION ............................................................... 27

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Al Otro Lado v. Wolf,*
  952 F.3d 999 (9th Cir. 2020) .................................................. 5, 24

*Ala. Ass'n of Realtors v. HHS,*
  594 U.S. 758 (2021) ................................................................... 22

*Am. Trucking Ass'ns v. Frisco Transp. Co.,*
  358 U.S. 133 (1958) ................................................................... 12

*Barr v. East Bay Sanctuary Covenant,*
  140 S. Ct. 3 (2019) ..................................................................... 22

*Biden v. Missouri,*
  145 S. Ct. 109 (2024) ................................................................. 22

*Biden v. Texas,*
  597 U.S. 785 (2022) ................................................................... 21

*Bowen v. Mich. Acad. of Fam. Physicians,*
  476 U.S. 667 (1986) ................................................................... 20

*Career Colls. & Schs. of Tex. v. Dep't of Educ.,*
  98 F.4th 220 (5th Cir. 2024) ..................................................... 21

*CASA, Inc. v. Trump,*
  --- F.4th ---, 2025 WL 654902 (4th Cir. Feb. 28, 2025) ............ 22

*China Unicom (Ams.) Operations Ltd. v. FCC,*
  124 F.4th 1128 (9th Cir. 2024) .................................................. 11

*Cooper v. Harris,*
  581 U.S. 285 (2017) ....................................................... 5, 15, 17

*Corner Post, Inc. v. Bd. of Governors of Fed. Rsrv. Sys.,*
  603 U.S. 799 (2024) ................................................................... 11

*DHS v. Regents of the Univ. of Cal.*,
    591 U.S. 1 (2020) ........................................................................ 14

*Doe #1 v. Trump*,
    957 F.3d 1050 (9th Cir. 2020) .................................. 5, 18, 24, 25

*E. Bay Sanctuary Covenant v. Barr*,
    934 F.3d 1026 (9th Cir. 2019) ...................................... 22

*E. Bay Sanctuary Covenant v. Biden*,
    993 F.3d 640 (9th Cir. 2021) ............................................. 5, 21, 25

*E. Bay Sanctuary Covenant v. Trump*,
    932 F.3d 742 (9th Cir. 2018) ...................................... 25

*Gebhardt v. Nielsen*,
    879 F.3d 980 (9th Cir. 2018) ...................................... 10

*Gorbach v. Reno*,
    219 F.3d 1087 (9th Cir. 2002) (en banc) .................................. 11

*Immigrant Assistance Project of AFL-CIO v. INS*,
    306 F.3d 842 (9th Cir. 2002) ...................................... 9

*Jennings v. Rodriguez*,
    583 U.S. 281 (2018) ...................................... 10

*U.S. ex rel. Knauff v. Shaughnessy*,
    338 U.S. 537 (1950) ...................................... 25

*Magallanes-Damian v. INS*,
    783 F.2d 931 (9th Cir. 1986) ...................................... 8

*McNary v. Haitian Refugee Ctr., Inc.*,
    498 U.S. 479 (1991) ...................................... 8

*Microsoft Corp. v. Motorola, Inc.*,
    696 F.3d 872 (9th Cir. 2012) ...................................... 5

*Nat'l Urb. League v. Ross*,
    977 F.3d 698 (9th Cir. 2020) ................................................ 6, 26

*Nken v. Holder,*
556 U.S. 418 (2009) ....................................................... 4, 21, 26

*Patel v. Garland,*
596 U.S. 328 (2022) .................................................................. 9

*Perez v. United States,*
No. 24A403, 2024 WL 4772734 (U.S. Nov. 12, 2024) .............. 22

*Poursina v. USCIS,*
936 F.3d 868 (9th Cir. 2019) .................................................... 19

*Ramos v. Wolf,*
975 F.3d 872 (9th Cir.) ............................................ 7, 9, 19, 26

*Regents of the Univ. of Cal. v. DHS,*
908 F.3d 476 (9th Cir. 2018) .................................................... 18

*Reno v. Cath. Soc. Servs., Inc.,*
509 U.S. 43 (1993) .................................................................... 9

*Texas v. Biden,*
646 F. Supp. 3d 753 (N.D. Tex. 2022)...................................... 21

*Texas v. United States,*
40 F.4th 205 (5th Cir. 2022)....................................................... 4

*Texas v. United States,*
50 F.4th 498 (5th Cir. 2022)..................................................... 20

*Trump v. Hawaii,*
585 U.S. 667 (2018) .......................................................... 17, 18

*United States v. Texas,*
599 U.S. 670 (2023) ................................................................ 22

*United States v. Yildiz,*
355 F.3d 80 (2d Cir. 2004)......................................................... 8

*Vill. of Arlington Heights v. Metro. Housing Dev. Corp.,*
429 U.S. 252 (1977) .......................................................... 17, 19

iv

*Washington v. Trump*,
  847 F.3d 1151 (9th Cir. 2017) ...................................................... 6

*Washington v. Trump*,
  No. 25-807, 2025 WL 553485 (9th Cir.
  Feb. 19, 2025) ....................................... 4, 21, 22, 24, 25

*Wilkinson v. Garland*,
  601 U.S. 209 (2024) ...................................................... 9

**Statutes**

8 U.S.C. 1252(a)(2)(A)(i) ...................................................... 8, 9

8 U.S.C. 1252(b)(9) ...................................................... 8

8 U.S.C. 1252(f)(1) ...................................................... 3, 4, 20

8 U.S.C. 1254a(b)(3) ...................................................... 12

8 U.S.C. 1254a(b)(5) ...................................................... 6

8 U.S.C. 1254a(c) ...................................................... 13, 25, 26

28 U.S.C. 1292(a)(1) ...................................................... 4

**Other Authorities**

8 C.F.R. 244.14 ...................................................... 26

73 Fed. Reg. 57128 ...................................................... 14

78 Fed. Reg. 32418 ...................................................... 14

79 Fed. Reg. 62170 ...................................................... 14

90 Fed. Reg. 5962 ...................................................... 12

Model Rules of Pro. Conduct r. 3.3(a)(1)–(2). ...................................................... 8

Ninth Cir. R. 27-3 ...................................................... 5

## INTRODUCTION

Defendants demand extraordinary relief that would subvert the status quo and be tantamount to reversal on the merits. If this Court grants their Motion, 350,000 people will lose the right to live and work in this country and face the prospect of deportation to Venezuela, a nation run by a repressive regime the State Department still deems unsafe even to visit.

Defendants cannot obtain that extraordinary relief on the emergency docket. To do so, they must show that the rapid briefing schedule the Court has already set is too slow to prevent irreparable harm. But their primary alleged harm is institutional injury, and this Court has held that such institutional interests can be vindicated on a normal review schedule. No competent evidence establishes any other form of irreparable harm to Defendants.

Defendants also come nowhere close to the requisite "strong showing" of likely success on appeal. They overlook Plaintiffs' arbitrary-and-capricious APA claim—which rests on a distinct jurisdictional basis and detailed factual findings of arbitrary and pretextual decision-making. That claim alone suffices to affirm the order, and Defendants have waived it.

As to Plaintiffs' lack-of-statutory-authority APA claim, Defendants' jurisdictional position rests on a view no court has ever endorsed, and therefore cannot justify relief on the emergency

1

docket. In Defendants' view, federal courts have no power to stop even blatantly lawless agency action made under color of the TPS statute—even if unconstitutional. On their view, no court could review a decision to grant a fifty-year TPS extension, designate Mexico for TPS expressly in response to Congress' inability to pass comprehensive immigration reform, grant (or deny) TPS only to certain religious groups, or even reverse all prior terminations to retroactively confer TPS on everyone who has ever had it.

Defendants' extreme reading of the jurisdictional provision is not settled law *now*, and therefore cannot justify staying the district court's well-reasoned order. A wealth of authority confirms the provision is actually quite narrow, because it bars review only of "determination[s]." "Determination" is a term of art in statutes governing judicial review of administrative action. It does not encompass collateral challenges to agency action, such as questions of statutory interpretation. Defendants never dispute that Plaintiffs' claims are cognizable under that precedent.

Defendants also cannot show likely success on the merits of the lack-of-statutory-authority APA claim. As this Court recently held, agencies lack implied authority to vacate decisions where, as here, a statute constrains both the timing and review processes for agency decision-making. Vacatur authority would render those constraints meaningless.

Defendants' response to Plaintiffs' constitutional discrimination claim is also meritless. Findings of discriminatory intent are reversible only for clear error. Unrebutted evidence establishes that Secretary Noem used racial epithets and falsehoods specifically to explain each decision—first in sworn Congressional testimony, and then on national television the day after each decision was made. Defendants float alternative, less-offensive explanations, but excuses lacking evidentiary support count for nothing under the clear error standard. The district court's extensive findings need only be plausible; in fact they are compelling.

Defendants re-hash their view that APA relief constitutes an injunction barred under 8 U.S.C. 1252(f)(1), and an impermissible so-called universal injunction. This Court and others have consistently rejected such claims. Every court to consider the issue—including the Fifth Circuit—agrees that APA relief is not injunctive for purposes of 1252(f)(1). The APA operates against agency action itself, rather than enjoining persons. Moreover, the default rule in APA immigration cases is that relief operates nationwide. And despite Defendants' ever-shifting position as to the proper scope of relief, they have never explained how feasibly to protect the more than 84,000 Venezuelan TPS holders who are members of the Plaintiff National TPS Alliance without protecting

others.

Finally, the district court did not abuse discretion in finding the equities overwhelmingly favored Plaintiffs. In addition to the humanitarian crisis that would have followed ending Venezuelan TPS last week, the public would suffer billions of dollars in lost economic contributions, and families and communities nationwide would be shattered. Such harms could never be undone were this Court, after more fulsome review, to affirm the district court.

## JURISDICTIONAL STATEMENT

Defendants assert appellate jurisdiction exclusively under 28 U.S.C. 1292(a)(1), for orders with "the same effect as a preliminary injunction." Mot. 5. But stays under 5 U.S.C. 705 are not injunctive in nature; they do not operate against persons or subject anyone to contempt. *Texas v. United States*, 40 F.4th 205, 219–20 (5th Cir. 2022); *cf. Nken v. Holder*, 556 U.S. 418, 429–30 (2009) (stays not injunctions for purposes of 8 U.S.C. 1252(f)(2)). Defendants cite no other basis for interlocutory review. That precludes granting an emergency stay.

## STANDARD OF REVIEW

A stay request on an expedited schedule warrants caution. Deciding "important substantive issues" impacting hundreds of thousands of people on an emergency timetable "turns [the] usual decision-making process on its head." *Washington v. Trump*, No. 25-

4

807, 2025 WL 553485, at *2 (9th Cir. Feb. 19, 2025) (Forrest, J., concurring).

Defendants must prove they will suffer irreparable injury "during the period before the appeal is likely to be decided"—most likely in the next few months. *Al Otro Lado v. Wolf*, 952 F.3d 999, 1007 (9th Cir. 2020). The "burden with regard to irreparable harm is higher than it is on the likelihood of success prong, as [Defendants] must show that an irreparable injury is the more probable or likely outcome." *Id.* (citation omitted); Ninth Cir. R. 27-3. "[P]erceived institutional injury" from pausing a new agency policy "is not 'irreparable.'" *Doe #1 v. Trump*, 957 F.3d 1050, 1059 (9th Cir. 2020) (citation omitted).

Defendants also must make "a strong showing that [they are] likely to succeed" on appeal, *Al Otro Lado*, 952 F.3d at 1006, such that this motions panel can confidently "predict[] the likelihood of success of the appeal." *E. Bay Sanctuary Covenant v. Biden*, 993 F.3d 640, 660 (9th Cir. 2021). Defendants must overcome a "highly deferential" abuse-of-discretion standard, *Microsoft Corp. v. Motorola, Inc.*, 696 F.3d 872, 881 (9th Cir. 2012), as well as the clear error standard for factual findings, under which "we affirm … so long as [a finding] is plausible … even if another [finding] is equally or more so." *Cooper v. Harris*, 581 U.S. 285, 293, 309 (2017).

Finally, a stay is inappropriate where "the status quo would

5

be seriously disrupted." *Nat'l Urb. League v. Ross*, 977 F.3d 698, 701 (9th Cir. 2020); *Washington v. Trump*, 847 F.3d 1151, 1168 (9th Cir. 2017) (denying stay where order "returned the nation temporarily to the position it has occupied").

## ARGUMENT

## I. DEFENDANTS CANNOT SHOW A "STRONG LIKELIHOOD" OF SUCCESS ON THE MERITS.

### A. Defendants Cannot Show Likely Success on the APA Claims.

The district court correctly granted relief on two APA claims: that the Secretary lacked authority to vacate a TPS extension, and that her reasons for vacating the extension based on alleged registration defects were arbitrary.

#### 1. Settled Precedent Supports Plaintiffs' Lack-of-Vacatur-Authority Claim.

***As to jurisdiction***: Defendants argue Plaintiffs' vacatur authority claim is barred by 8 U.S.C. 1254a(b)(5), which provides:

> There is no judicial review of any determination of the Attorney General with respect to the designation, or termination or extension of a designation, of a foreign state under this subsection.

8 U.S.C. 1254a(b)(5)(A). On their view, any "decision reached," or "settling of a question" related to TPS in general, is immune from judicial scrutiny. Mot. 7–8.

No court has accepted that breathtaking proposition. It would

6

insulate all lawless TPS decision-making from judicial review. Defendants suggest the now-vacated *Ramos* panel majority's opinion endorsed their position. Mot. 1. It did the opposite. The majority stated "a claim that an agency has adopted an erroneous interpretation of a governing statute would be reviewable … particularly because the court's resolution of these sorts of challenges turns on a review of the law itself, rather than a review of the merits of any specific agency determinations." *Ramos v. Wolf*, 975 F.3d 872, 895 (9th Cir.), *opinion vacated upon reh'g en banc*, 59 F.4th 1010 (9th Cir. 2023); Order 24–26.

Defendants also ignore binding precedent recognizing "determination" is a term of art in the jurisdictional context. The Supreme Court and this Court consistently construe statutes barring review of "determinations" *not* to preclude collateral challenges to agency action, including about the agency's statutory interpretation, rather than determinations about particular decisions.

Tellingly, Defendants' counsel "*explicitly conceded*" this point below. Order 23 (emphasis added). In the district court, they unequivocally agreed "1254a(b)(5)(A) does *not* bar the Court from entertaining" a lack-of-vacatur-authority APA claim because "whether the Secretary had such authority is purely a matter of statutory construction … not a 'determination' with respect to a

TPS designation, termination, or extension." *Id.* Defendants, like any litigant, cannot disavow such concessions. *United States v. Yildiz*, 355 F.3d 80, 82 (2d Cir. 2004) ("government's attorneys can bind the government with their in-court statements"); *Magallanes-Damian v. INS*, 783 F.2d 931, 934 (9th Cir. 1986) (party bound by counsel's in-court admissions). At a minimum, Defendants cannot make a "strong showing" of success on an issue they freely conceded.

The concession below comported with the duty of candor given binding precedent. *Cf.* Model Rules of Pro. Conduct r. 3.3(a)(1)–(2). "[T]he reference to 'a determination' describes a single act rather than a group of decisions or a practice or procedure employed in making decisions." *McNary v. Haitian Refugee Ctr., Inc.*, 498 U.S. 479, 492 (1991) (challenge to adjudication procedures did not require review of a "determination"). Congress "could easily have used broader statutory language" had it wanted to bar review of "all causes … arising under" the statute, or "all questions of law and fact" in such suits, rather than merely review of a "determination." *Id.* at 492–94. Congress did so when writing broader jurisdictional provisions just a few years after *McNary*, but it left the TPS provision untouched. *See, e.g.*, 8 U.S.C. 1252(a)(2)(A)(i); 1252(b)(9).

Defendants also ignore Supreme Court authority interpreting another jurisdictional provision barring review of a "determination"

8

to preserve review of statutory claims. *Reno v. Cath. Soc. Servs.,
Inc.*, 509 U.S. 43, 56–58 (1993) ("*CSS*") ("determination" did not
encompass challenge to agency rule interpreting statute). This
Court subsequently did the same. *Immigrant Assistance Project of
AFL-CIO v. INS*, 306 F.3d 842, 862–63 (9th Cir. 2002).

Since those decisions, this Court has utilized *McNary*'s
framework to analyze various jurisdictional schemes. *See Ramos*,
975 F.3d at 892 (citing, *inter alia*, *City of Rialto v. W. Coast Loading
Corp.*, 581 F.3d 865, 874 (9th Cir. 2009)). This developed body of
doctrine cannot be disregarded, particularly on the emergency
docket.

Defendants nonetheless ignore it, relying on *Patel v. Garland*,
596 U.S. 328 (2022). The statute there referred to "judgment," not
"determination," *id.* at 339, found review barred for *factual* claims,
not legal ones, *id.* at 347, and relied on other context clues not
present here, *id.* at 339 (citing history of 8 U.S.C. 1252(a)(2)(D)); *cf.
Wilkinson v. Garland*, 601 U.S. 209, 221 (2024) (finding question of
law otherwise subject to same stripping provision reviewable).

Defendants also assert the statute gives the Secretary
substantial discretion, which in turn constrains judicial review.
Mot. 9. In fact, the statute constrains both the timing and review
procedures for TPS decision-making. Order 51–52. In any event,
when Congress actually sought to foreclose all review of statutory

claims arising from exercises of discretion, it did so. *E.g.*, *Gebhardt v. Nielsen*, 879 F.3d 980, 984–85 (9th Cir. 2018) (statute specifying decisions were in Secretary's "sole and unreviewable discretion" barred review of all non-constitutional claims). No comparable language exists here.

Defendants invite this Court to ignore precedent and analyze the text based only on dictionary definitions, Mot. 7, but even utilizing their approach, Defendants' position ignores that Section 1254a(b)(5)(A) bars review only of "any determination … with respect to" three discrete actions: "designation, or termination or extension under [subsection b]." It does not bar review of determinations with respect to *vacaturs*. Order 25. Defendants respond that the agency's legal conclusion asserting vacatur authority is a "determination 'with respect to'" the specified acts. Mot. 8. But such "uncritical literalism" ignores the Supreme Court's instruction to exercise caution when construing potentially-boundless jurisdictional provisions. *Jennings v. Rodriguez*, 583 U.S. 281, 293–94 (2018) (construing "arising from" narrowly, citing cases construing "affected," "related to," and "in connection with" narrowly in jurisdictional statutes) (plurality) (citation omitted). Defendants' view would render the agency's legal conclusions immune from all review, contrary to the "'basic presumption' that anyone injured by agency action should have access to judicial

10

review." *Corner Post, Inc. v. Bd. of Governors of Fed. Rsrv. Sys.*, 603 U.S. 799, 824 (2024) (citation omitted).

***On the merits***: this Court has rejected Defendants' unbounded view of agencies' authority to rescind their prior decisions. *Gorbach v. Reno*, 219 F.3d 1087, 1095 (9th Cir. 2002) (en banc) ("[t]here is no general principle that what [an agency] can do, [it] can undo."); *China Unicom (Ams.) Operations Ltd. v. FCC*, 124 F.4th 1128, 1143 (9th Cir. 2024) ("*CUA*"); Order 44–55. Defendants ignore *Gorbach*, and misread *CUA*, asserting any "[s]tatutory authorization … 'must be understood as carrying with it an implied incidental authority' to revoke." Mot. 10. But *CUA* held implied reconsideration authority "turn[s] … on the details of the statutory scheme," *id*. at 1143–45, and its reasoning precludes finding such authority here.

First, *CUA* found reconsideration "foreclosed … when there is a specific statutory process for altering an agency's grant of … authorization." 124 F.4th at 1149. Second, it found a statute's "use of a fixed term" "affirmatively inconsistent with positing an implied power to revoke … at any time." *Id*. at 1148.

The district court correctly applied *CUA*, as the "specific statutory process" for altering a TPS designation and the statute's "use of a fixed [extension] term" foreclose vacatur. *Id*. at 1148–49; Order 48–51. Defendants contend TPS is not fixed, pointing to

11

discretionary aspects of the process not at issue here, but the statute tightly regulates the *timing* of terminations. 8 U.S.C. 1254a(b)(3)(B) (termination "shall not be effective earlier than 60 days after … the expiration of the most recent previous extension").

Defendants also assert the vacated January 17 extension was not yet effective. Even if that were true, it would not somehow convey vacatur authority foreclosed by statute regardless of timing. Regardless, Defendants are wrong. The January extension was effective immediately, because a designation "is extended" immediately upon the Secretary's determination that conditions for designation continue to exist. 8 U.S.C. 1254a(b)(3)(C). Beneficiaries began re-registering January 17; applications granted after January 17 received TPS "through October 2, 2026;" and everyone's work authorization was automatically extended "without any further action." 90 Fed. Reg. 5962; Order 52–53 (created reliance interests).

Nor was this a "quintessential exercise" of rescission authority. Mot. 10. It did not involve the kind of clerical error that agencies have residual authority to correct in some circumstances. Such authority (when it exists) does not furnish "a guise for changing previous decisions … in the light of changing policies." *Am. Trucking Ass'ns v. Frisco Transp. Co.*, 358 U.S. 133, 146 (1958).

Finally, Defendants contend the absence of a statutory

vacatur process implies discretion to vacate. Mot. 11. Under this Court's law, it proves the opposite. Vacatur is inconsistent with the statute's prescribed review process and fixed terms, and would defeat reliance expectations. Order 50–52.

### B. Plaintiffs' Arbitrary and Capricious Claim Stands Unchallenged.

Defendants entirely ignore Plaintiffs' second APA claim, which rests on a separate jurisdictional and merits basis.

***On jurisdiction***: the stripping provision does not apply to this claim because the parties' dispute concerns the propriety of consolidating TPS *registration* processes, because that was the reason Secretary Noem gave for vacating the January 17 extension. Registration is addressed in subsection 1254a(c) of the statute (specifically, 8 U.S.C. 1254a(c)(1)(A)(iv) and (B)), whereas the stripping provision bars only determinations under "*this* subsection," *i.e.*, subsection 1254a(b). Thus, even if the stripping provision covered virtually every aspect of TPS decision-making with respect to designations, extensions, and terminations, its plain terms do not cover disputes over *registration*, which is the subject of this distinct APA claim.

***On the merits***: the district court addressed this claim at length, Order 55–59, so Defendants have waived any supposed error by entirely ignoring the well-reasoned decision below.

13

Regardless, the district court did not abuse its discretion or commit clear error in finding that, even if the Secretary had vacatur authority, *this* vacatur was arbitrary because it rested on factual and legal errors; failed to consider obvious alternatives; and was pretextual: "confusion was not [Secretary Noem's] concern so much as the desire to totally undo Secretary Mayorkas's decision." *Id.*

Presented with undisputed evidence of past practice, the district found nothing unusual about the mechanics, length, or timing of the January 17 extension. Order 57–58 (consolidation of registration processes is routine); Table A (88% of all TPS extensions over past two decades have been for an 18-month duration); 73 Fed. Reg. 57128 (extension published 159 days before expiration); 78 Fed. Reg. 32418 (102 days); 79 Fed. Reg. 62170 (81 days). Even Defendants conceded that "Plaintiffs are correct that these overlapping registrations can take place ... within the discretion of [a] Secretary ...." Tr. 69:25–70:2.

The district court also committed no abuse of discretion in finding that, even if the Secretary had somehow actually determined (three days after taking office) that the consolidated registration periods were causing a problem, the solution would have been to deconsolidate them, not strip 600,000 people of lawful status. Order 58–59; *DHS v. Regents of the Univ. of Cal.*, 591 U.S. 1, 30 (2020) (reversing DACA rescission for failure to consider

14

alternatives).

Perhaps sensing that they cannot establish that the vacatur decision was rational, Defendants now argue that, even if the vacatur is unlawful the termination somehow retains independent legal force. Mot. 8. Defendants waived this argument below. It also makes no sense. If the vacatur lacks legal force, then the January 17 extension remains in place. It extends TPS protections until October 2026.

## II. DEFENDANTS CANNOT SHOW A "STRONG LIKELIHOOD" OF PREVAILING ON THE DISCRIMINATION CLAIM.

The district court's factual findings on racial discrimination "warrant[] significant deference on appeal" and are "subject to review only for clear error." *Cooper v. Harris*, 581 U.S. 285, 293 (2017). A discrimination finding "that is 'plausible' … —even if another [interpretation] is equally or more so—must govern." *Id.* (citation omitted). Defendants essentially ask for de novo review based on a sliver of the record. That would fail even on appeal, let alone on the emergency docket.

The district court correctly found discriminatory intent was a motivating factor in the decisions. It cited numerous, contemporaneous statements by Secretary Noem specifically to justify these decisions, coupled with evidence within the four corners of the orders themselves. Order 59 (evidence of

"unconstitutional animus" "substantial"). The Secretary "made sweeping negative generalizations about Venezuelan TPS beneficiaries *in toto*," and, on the basis of those generalizations, "decided to take *en masse* actions against all Venezuelan TPS beneficiaries, who number in the hundreds of thousands." Order 66. "Acting on the basis of a negative group stereotype and generalizing such stereotype to the entire group is the classic example of racism." *Id.* (citing *Korematsu v. United States*, 323 U.S. 214, 233, 235 (1944) (Murphy, J., dissenting)).

Defendants claim such statements were "remote in time and taken out of context." Mot. 2. That misrepresents the record. Less than two weeks before the vacatur, Secretary Noem testified:

> [The TPS] program has been abused and manipulated ... [T]his extension of over 600,000 Venezuelans as well is alarming when you look at what we've seen in different states, including Colorado with gangs doing damage and harming the individuals and the people that live there.

Order 65. Then, *the day after the vacatur*, when announcing it on national television, she said, "the people of this country want these dirt bags out." *Id.* Three days later, on *the day after the termination*, again on national television, she proclaimed the "TPP [*sic*] program" has been "abused," and stated, "Venezuela purposely emptied out their prisons, emptied out their mental health facilities

16

and sent them to the United States of America. So we are ending that extension of that program." *Id.*

The district court did not clearly err in finding, based on expert declarations, that because there is "no evidence that Venezuelan TPS holders are tied to gangs or are criminals," these statements reflected "'longstanding tropes or stereotypes that certain races have inherently immoral traits.'" Order 2, 64 ("undisputed record establishes" "lower rates of criminality," "higher education attainment," "a high" labor participation rate, and higher earned income for Venezuelan TPS holders).

Defendants focus only on the "'dirt bags'" slur, claiming it referred to gang members, Mot. 14, but it is "plausible" to read the statement more broadly, particularly because the Secretary used it to explain her decisions. *Cooper*, 581 U.S. at 293; Order 65. And Defendants ignore the other statements, including the baseless claims about crime and the racist "invasion" trope used in the termination decision itself. Order 12, 59.

Thus, on this record, this Court can deny the Motion without resolving whether this case is governed by *Trump v. Hawaii*, 585 U.S. 667 (2018), or instead by *Vill. of Arlington Heights v. Metro. Housing Dev. Corp.*, 429 U.S. 252 (1977). The district court found sufficient support to satisfy the *Hawaii* standard because the overwhelming "record evidence … raised at least a serious question

whether, *in fact*, the Secretary's actions are plausibly related to her stated objective." ECF 102 at 4 (emphasis added).

Defendants ignore this, contending that the Secretary's decisions rationally relate to legitimate interests in "immigration, national security, and foreign policy," citing (with no competent record evidence) "gang activity and public safety concerns, adverse impact on U.S. communities, foreign policy interests, immigration and border policies, and the potential magnet effect of TPS on illegal immigration of Venezuelans." Mot. 12. The district court did not clearly err in finding "no evidence" to support these rationales, as there is none in this record. Order 73–74; *see id.* 38–44, 61–62. This Court cannot credit Defendants' unevidenced assertions. *Doe #1*, 957 F.3d at 1059 (citing *Nken*). Unlike in *Hawaii*, there is no "persuasive *evidence*" these decisions had a "legitimate grounding in national security concerns." *Hawaii*, 585 U.S. at 706 (emphasis added).

In any event, neither the Supreme Court nor this Court have applied *Hawaii*'s deferential standard to claims on behalf of persons lawfully present inside the United States. Moreover, *Hawaii* involved a Presidential Proclamation made in the name of national security, not agency action pursuant to statute. Order 60–62. This Court should not disregard its law on the issue, particularly in this posture. *Regents of the Univ. of Cal. v. DHS*, 908 F.3d 476, 518–20

(9th Cir. 2018) (holding *Arlington Heights* rather than *Hawaii* governed DACA discrimination claim), *rev'd in part*, *vacated in part*, *Regents*, 591 U.S. at 34 (plurality) (assuming *Arlington Heights* governed); *Ramos*, 975 F.3d at 896 (holding *Arlington Heights* governed TPS discrimination claim) (vacated panel majority).

Nor does Defendants' incantation of "national interest" automatically entitle them to deferential review. Order 60–61. "National interest" is a malleable concept limited only by one's creativity. The environment, health care, public education, the economy, and more constitute "national interests." Defendants' position would vitiate judicial review of virtually all agency action.[1]

Defendants obviously cannot prevail under *Arlington Heights*, as the district court found. Order 64–71. They object to consideration of older statements, but under *Arlington Heights* the historical background matters. *Id.* at 63.

Defendants also consider the finding of unconstitutional animus "untenable" because it will "leave virtually any immigration policy adopted by this Administration susceptible to

---

[1] *Poursina v. USCIS*, 936 F.3d 868 (9th Cir. 2019), offers Defendants no support; it held only that the "national interest" element of a statute governing employment visas "lack[ed] a judicially manageable standard of review." *Id.* at 871.

19

an Equal Protection challenge." Mot. 14. There can be no ordered liberty where state action violating the Constitution is permitted to stand because the government would prefer to operate without constitutional constraints. Defendants' stated policy goals of "reduc[ing] illegal immigration and crime," Mot. 14, are goals that many presidential administrations have pursued without legal challenge. This administration, too, could take steps to further those goals, but not out of animus. In any event, the decision below applies only to two TPS decisions, not other policies.

Finally, to the extent Defendants imply this Court lacks jurisdiction to review even constitutional claims, their position is meritless. *See Bowen v. Mich. Acad. of Fam. Physicians*, 476 U.S. 667, 680–81 (1986) (rejecting "extreme" position interpreting statute to foreclose constitutional claims).

## III. THE COURT GRANTED APPROPRIATE RELIEF.

### A. The Order Does Not Violate 8 U.S.C. 1252(f)(1).

Defendants assert that Section 1252(f)(1) bars APA relief. Every court to consider the issue, including the Fifth Circuit and at least five district courts, disagrees. *Texas v. United States*, 50 F.4th 498, 528 (5th Cir. 2022) (Section 1252(f)(1) does not apply to vacatur); Order 22 (collecting cases). Defendants cannot show a likelihood of success by hoping to create a circuit split. And although Defendants fail to acknowledge it, Mot. 16, the Supreme

Court has reserved the question, *Biden v. Texas*, 597 U.S. 785, 801 n.4 (2022), making it doubly inappropriate for resolution on the emergency docket. *Washington*, 2025 WL 553485, at *2 (Forrest, J., concurring).

The district court rightly concluded vacatur under the APA is "a less drastic remedy" than an injunction, because it does not enjoin persons. Order 19 (quoting *Monsanto Co. v. Geertson Seed Farms*, 561 U.S. 139, 165 (2010)). A stay under Section 705 is "an interim … form of vacatur." *Texas v. Biden*, 646 F. Supp. 3d 753, 769 (N.D. Tex. 2022). It "temporarily suspend[s] the source of authority to act"; it does not "direct[] the actor's conduct." *Nken*, 556 U.S. at 428–29. Defendants argue the district court lacked postponement authority because the extension-vacatur had taken effect. Mot. 15. But TPS holders still had status when the district court ruled. Moreover "[c]ourts—including the Supreme Court—routinely stay already-effective agency action under Section 705." *Texas*, 646 F. Supp. 3d at 770 (collecting cases).

### B.    The Requested Relief Is Not Overbroad.

Defendants ask this Court to narrow the scope of relief, but "[w]hen a reviewing court determines that agency regulations are unlawful, the ordinary result is that the rules are vacated—not that their application to the individual petitioners is proscribed." *E. Bay Sanctuary Covenant*, 993 F.3d at 681 (cleaned up); *see also Career*

*Colls. & Schs. of Tex. v. Dep't of Educ.*, 98 F.4th 220, 255 (5th Cir. 2024) ("Nothing in the text of Section 705, nor of Section 706, suggests that either preliminary or ultimate relief under the APA needs to be limited to [the associational plaintiff] or its members"). Defendants cite a different (earlier) *East Bay* case limiting nationwide relief, but the district court reinstated it, and that decision was then stayed on other grounds. Mot. 19–20 (citing *E. Bay Sanctuary Covenant v. Barr*, 934 F.3d 1026, 1029 (9th Cir. 2019); *see Barr v. East Bay Sanctuary Covenant*, 140 S. Ct. 3 (2019)). Defendants also cite a concurrence criticizing nationwide injunctions, *id.* at 19, but the Supreme Court has repeatedly declined to narrow so-called "universal" relief both in APA cases and in cases involving true nationwide injunctions.[2]

Defendants also suggest Plaintiffs' irreparable harm showing

---

[2] *United States v. Texas,* 599 U.S. 670 (2023) (denying request for stay of universal order vacating Secretary's enforcement priorities guidance); *Perez v. United States*, No. 24A403, 2024 WL 4772734 (U.S. Nov. 12, 2024) (refusing to stay order halting federal Keeping Families Together program); *Biden v. Missouri*, 145 S. Ct. 109 (2024) (denying request to vacate universal injunction of student loan program); *Ala. Ass'n of Realtors v. HHS*, 594 U.S. 758, 759 (2021) (lifting stay on order universally vacating eviction moratorium); *Washington v. Trump*, --- F.4th ---, 2025 WL 553485 (9th Cir. Feb. 19, 2025) (affirming universal injunction against birthright citizenship order); *CASA, Inc. v. Trump*, --- F.4th ---, 2025 WL 654902, at *1–3 (4th Cir. Feb. 28, 2025) (same, for associational plaintiff).

justifies limiting the scope of relief, Mot. 19, but ignore the district court's factual findings and voluminous record of harm. *See*, *e.g.*, Order 34–36 (Plaintiff M.H. would be unable to drive severely asthmatic U.S. citizen son to the hospital and daughter to school; Plaintiff Arape Rivas would lose IT job, home, and ability to support family in Venezuela with life-saving medications; Plaintiff González Herrera would be forced to abandon university; small business owners are considering selling businesses or laying off employees; students fear losing financial aid; TPS holders "terrified that they will be deported without this essential legal status").

Defendants also advance a new position—that Plaintiffs must show irreparable harm for each of the 350,000 TPS holders under the 2023 designation—to obtain relief. Mot. 19–20. This argument differs from the ones they raised below. ECF 102 at 4 (finding waiver). *Compare* ECF 60 at 25 (relief should be limited to "individual named plaintiffs") *with* ECF 95 at 10 (relief should be limited to individual plaintiffs and NTPSA members as of complaint date) *with* Mot. 19–20 (no relief "to non-parties"). They have waived this argument too.

It is also unsound. The district court found APA relief warranted because the agency's actions had a "uniform and nationwide impact on all Venezuelan TPS holders located across the United States." Order 76. "[F]or many TPS holders, TPS is their

23

only avenue for legal status in the United States." *Id.* at 32. Moreover, Defendants have not suggested any alternative to protect the more than 84,000 NTPSA members party to this suit. *Id*. at 76 (citing *Ariz. Dream Act Coal. v. Brewer*, 81 F. Supp. 3d 795, 810 (D. Ariz. 2015), *aff'd*, 855 F.3d 957 (9th Cir. 2017)). Defendants' novel arguments certainly cannot justify relief on the emergency docket.

Nor can their new (also waived) argument that deportation to Venezuela is not irreparable harm. Mot. 18. This ignores the State Department's categorization of it as a "Level 4: Do Not Travel" country, Order 1, and the massive economic harm that lost employment authorization would cause, wholly apart from deportation.

## IV.  DEFENDANTS FAIL TO SHOW IRREPARABLE HARM, AND THE EQUITIES FAVOR POSTPONEMENT.

Defendants cannot show "irreparable injury is the more probable … outcome" *during* the pendency of appeal, as required to emergency relief. *Al Otro Lado*, 952 F.3d at 1007. Indeed, Defendants *opposed* Plaintiffs' expedited briefing request below, ECF 45 at 1, and offer no rationale for urgency now that the Order has taken effect. The sky will not fall if this Court decides in the summer rather than by the deadline Defendants set for this Court. *Doe #1*, 957 F.3d at 1058; *Washington*, 2025 WL 553485, at *1 (Forrest, J., concurring).

The primary injury Defendants assert is "supplanting the Secretary's discretion-laden judgment," Mot. 17, but the "Government may pursue and vindicate its [institutional injury] interests in the full course of this litigation." *E. Bay Sanctuary Covenant v. Trump*, 932 F.3d 742, 778 (9th Cir. 2018) (cleaned up). Otherwise, "no act of the executive branch … could be the subject" of interim relief. *Doe #1*, 957 F.3d at 1059; *Washington*, 2025 WL 553485, at *3 (Forrest, J., concurring) ("[J]ust because a district court grants preliminary relief halting a policy advanced by one of the political branches does not in and of itself an emergency make."). That Defendants claim TPS decisions arise from "inherent executive power" does not alter the analysis. TPS comes from a *statute*. Defendants' temporary inability to exercise authority under contested statutory interpretation does not constitute irreparable injury. *Doe #1*, 957 F.3d at 1059.[3]

No injury arises where courts protect "the public['s] interest in ensuring that the [laws] … are not imperiled by executive fiat.'" *E. Bay Sanctuary Covenant*, 993 F.3d at 679, 681 (cleaned up). As for any individualized security concerns, the TPS statute renders individuals with criminal convictions or security threats ineligible. Order 3–4, 41–42; 8 U.S.C. 1254a(c)(2)(B) (rendering ineligible for

---

[3] *U.S. ex rel. Knauff v. Shaughnessy*, 338 U.S. 537, 542 (1950) concerns border admissions, not lawful residents facing removal.

TPS individuals with disqualifying criminal convictions or who are "a danger to the security of the United States"). Defendants can withdraw TPS for ineligible individuals. 8 U.S.C. 1254a(c)(3) (withdrawal of TPS required for ineligible individuals); 8 C.F.R. 244.14.

Finally, Defendants obscure the vast disparity in potential harm each side faces. Here, the "the status quo would be seriously *disrupted* by an immediate stay." *Nat'l Urb. League*, 977 F.3d at 701 (emphasis added). If Defendants lose now but ultimately prevail, Venezuelan TPS holders would retain TPS for a few more months; in contrast, granting this Motion would trigger, catastrophic harm to Plaintiffs. Order 31–38. For many TPS holders, a stay could "*moot out* the postponement order and the appeal thereof." ECF 102 at 2. No final judgment could undo such harms. *Nken*, 556 U.S. at 436.

This harm is not an "inherent" part of this statutory regime. The statute was enacted to *eliminate* unfettered discretion over humanitarian protection for designated periods of time. *See* Mot. 18; Order 51–52 (quoting *Ramos*, 975 F.3d at 890 (TPS "curb[s] and control[s] the executive's previously unconstrained discretion")). And the loss of time in safety, and with children, spouses, and communities constitutes irreparable harm, "even if that time is limited." Order 37.

## CONCLUSION

Defendants' Motion should be denied.


Dated:  April 11, 2025          Respectfully submitted,


By: */s/ Ahilan T. Arulanantham*
    Ahilan T. Arulanantham (SBN 237841)
    arulanantham@law.ucla.edu
    Stephany Martinez Tiffer (SBN 341254)
    martineztiffer@law.ucla.edu
    CENTER FOR IMMIGRATION LAW AND
    POLICY, UCLA SCHOOL OF LAW
    385 Charles E. Young Dr. East
    Los Angeles, CA 90095
    Telephone: (310) 825-1029


By: */s/ Emilou MacLean*
    Emilou MacLean (SBN 319071)
    emaclean@aclunc.org
    Michelle (Minju) Y. Cho (SBN 321939)
    mcho@aclunc.org
    Amanda Young (SBN 359753)
    ayoung@aclunc.org
    ACLU FOUNDATION
    OF NORTHERN CALIFORNIA
    39 Drumm Street
    San Francisco, CA 94111-4805
    Telephone: (415) 621-2493

By: */s/ Jessica Karp Bansal*
    Jessica Karp Bansal (SBN 277347)
    jessica@ndlon.org
    Lauren Michel Wilfong
    lwilfong@ndlon.org
    NATIONAL DAY LABORER

27

ORGANIZING NETWORK
1030 S. Arroyo Parkway, Suite 106
Pasadena, CA 91105
Telephone: (626) 214-5689

Eva L. Bitran (SBN 302081)
ebitran@aclusocal.org
ACLU FOUNDATION
OF SOUTHERN CALIFORNIA
1313 West 8th Street
Los Angeles, CA 90017
Telephone: (213) 977-5236

Erik Crew
ecrew@haitianbridge.org
HAITIAN BRIDGE ALLIANCE
4560 Alvarado Canyon Road, 1H
San Diego, CA 92120
Telephone: (949) 603-7411

*Attorneys for Plaintiffs-Appellees*

## <u>CERTIFICATE OF COMPLIANCE</u>

This brief complies with Circuit Rules 27-1(1)(d) and 32-3 because it contains less than 5,600 words, excluding the parts of the document exempted by Rules 27(a)(2)(B) and 32(f) of the Federal Rules of Appellate Procedure, as well as words in Table A. The brief also complies with the typeface and typestyle requirements of Rules 32(a)(5)–(6) of the Federal Rules of Appellate Procedure because it has been prepared in a proportionally spaced typeface using Microsoft Word in 14-point Century Schoolbook font.

Dated: April 11, 2025                    Respectfully submitted,

By: <u>*/s/Ahilan T. Arulanantham*</u>
            Ahilan T. Arulanantham

# TABLE A

| DURATION OF TPS EXTENSIONS (APRIL 2005-PRESENT) | | | |
|---|---|---|---|
| **Country** | **Date** | **Duration** | **Citation** |
| Afghanistan | 25-Sep-2023 | 18 months | 88 Fed. Reg. 65728-65737 (Sept. 25, 2023) |
| Burma (Myanmar) | 27-Sep-2022 | 18 months | 87 Fed. Reg. 58515-58524 (Sept. 27, 2022) |
| Burma (Myanmar) | 25-Mar-2024 | 18 months | 89 Fed. Reg. 20682-20690 (Mar. 25, 2024) |
| Cameroon | 10-Oct-2023 | 18 months | 88 Fed. Reg. 69945-69953 (Oct. 10, 2023) |
| El Salvador | 21-Aug-2007 | 18 months | 72 Fed. Reg. 46649-46653 (Aug. 21, 2007) |
| El Salvador | 1-Oct-2008 | 18 months | 73 Fed. Reg. 57128-57133 (Oct. 1, 2008) |
| El Salvador | 9-Jul-2010 | 18 months | 75 Fed. Reg. 39556-39559 (July 9, 2010) |
| El Salvador | 11-Jan-2012 | 18 months | 77 Fed. Reg. 1710-1715 (Jan. 11, 2012) |
| El Salvador | 30-May-2013 | 18 months | 78 Fed. Reg. 32418-32424 (May 30, 2013) |
| El Salvador | 7-Jan-2015 | 18 months | 80 Fed. Reg. 893-899 (Jan. 7, 2015) |
| El Salvador | 8-Jul-2016 | 18 months | 81 Fed. Reg. 44645-44651 (July 8, 2016) |
| El Salvador | 21-Jun-2023 | 18 months | 88 Fed. Reg. 40282-40294 (June 21, 2023) |
| El Salvador | 17-Jan-2025 | 18 months | 90 Fed. Reg. 5953-5961 (Jan. 17, 2025) |
| Ethiopia | 15-Apr-2024 | 18 months | 89 Fed. Reg. 26172-26180 (Apr. 15, 2024) |
| Haiti | 19-May-2011 | 18 months | 76 Fed. Reg. 29000-29004 (May 19, 2011) |
| Haiti | 1-Oct-2012 | 18 months | 77 Fed. Reg. 59942-59943 (Oct. 1, 2012) |
| Haiti | 3-Mar-2014 | 18 months | 79 Fed. Reg. 11808-11814 (Mar. 3, 2014) |
| Haiti | 25-Aug-2015 | 18 months | 80 Fed. Reg. 51582-51588 (Aug. 25, 2015) |
| Haiti | 26-Jan-2023 | 18 months | 88 Fed. Reg. 5022-5032 (Jan. 26, 2023) |
| Haiti | 1-Jul-2024 | 18 months | 89 Fed. Reg. 54484-54496 (July 1, 2024) |
| Honduras | 29-May-2007 | 18 months | 72 Fed. Reg. 29529-29534 (May 29, 2007) |
| Honduras | 1-Oct-2008 | 18 months | 73 Fed. Reg. 57133-57138 (Oct. 1, 2008) |
| Honduras | 5-May-2010 | 18 months | 75 Fed. Reg. 24734-24737 (May 5, 2010) |
| Honduras | 4-Nov-2011 | 18 months | 76 Fed Reg. 68488-68493 (Nov. 4, 2011) |
| Honduras | 3-Apr-2013 | 18 months | 78 Fed. Reg. 20123-20128 (Apr. 3, 2013) |
| Honduras | 16-Oct-2014 | 18 months | 79 Fed. Reg. 62170-62176 (Oct. 16, 2014) |
| Honduras | 16-May-2016 | 18 months | 81 Fed. Reg. 30331-30337 (May 16, 2016) |
| Honduras | 21-Jun-2023 | 18 months | 88 Fed. Reg. 40294-40304 (June 21, 2023) |
| Nepal | 26-Oct-2016 | 18 months | 81 Fed. Reg. 74470-74475 (Oct. 26, 2016) |
| Nepal | 21-Jun-2023 | 18 months | 88 Fed. Reg. 40317-40328 (June 21, 2023) |
| Nicaragua | 29-May-2007 | 18 months | 72 Fed. Reg. 29534-29539 (May 29, 2007) |
| Nicaragua | 1-Oct-2008 | 18 months | 73 Fed. Reg. 57138-57143 (Oct. 1, 2018) |
| Nicaragua | 5-May-2010 | 18 months | 75 Fed. Reg. 24737-24740 (May 5, 2010) |
| Nicaragua | 4-Nov-2011 | 18 months | 76 Fed. Reg. 68493-68498 (Nov. 4, 2011) |
| Nicaragua | 3-Apr-2013 | 18 months | 78 Fed Reg. 20128-20133 (Apr. 3, 2013) |
| Nicaragua | 16-Oct-2014 | 18 months | 79 Fed. Reg. 62176-62182 (Oct. 16, 2014) |
| Nicaragua | 16-May-2016 | 18 months | 81 Fed. Reg. 30325-30331 (May 16, 2016) |
| Nicaragua | 21-Jun-2023 | 18 months | 88 Fed. Reg. 40294-40304 (June 21, 2023) |
| Somalia | 27-Jul-2006 | 18 months | 71 Fed. Reg. 42653-42658 (July 27, 2006) |
| Somalia | 12-Mar-2008 | 18 months | 73 Fed. Reg. 13245-13249 (Mar. 12, 2008) |
| Somalia | 27-Jul-2009 | 18 months | 74 Fed. Reg. 37043-37049 (July 27, 2009) |

| Somalia | 2-Nov-2010 | 18 months | 75 Fed. Reg. 67383-67386 (Nov. 2, 2010) |
| Somalia | 1-May-2012 | 18 months | 77 Fed. Reg. 25723-25728 (May 1, 2012) |
| Somalia | 1-Nov-2013 | 18 months | 78 Fed. Reg. 65690-65695 (Nov. 1, 2013) |
| Somalia | 1-Jun-2015 | 18 months | 80 Fed. Reg. 31056-31061 (June 1, 2015) |
| Somalia | 17-Jan-2017 | 18 months | 82 Fed. Reg. 4905-4911 (Jan. 17, 2017) |
| Somalia | 27-Aug-2018 | 18 months | 83 Fed. Reg. 43695-43700 (Aug. 27, 2018) |
| Somalia | 11-Mar-2020 | 18 months | 85 Fed. Reg. 14229-14235 (Mar. 11, 2020) |
| Somalia | 22-Jul-2021 | 18 months | 86 Fed. Reg. 38744-38753 (July 22, 2021) |
| Somalia | 13-Mar-2023 | 18 months | 88 Fed. Reg. 15434-15443 (Mar. 13, 2023) |
| Somalia | 22-Jul-2024 | 18 months | 89 Fed. Reg. 59135-59143 (July 22, 2024) |
| South Sudan | 9-Jan-2013 | 18 months | 78 Fed. Reg. 1866-1872 (Jan. 9, 2013) |
| South Sudan | 2-Sep-2014 | 18 months | 79 Fed. Reg. 52019-52027 (Sept. 2, 2014) |
| South Sudan | 25-Jan-2016 | 18 months | 81 Fed. Reg. 4051-4059 (Jan. 25, 2016) |
| South Sudan | 21-Sep-2017 | 18 months | 82 Fed. Reg. 44205-44211 (Sept. 21, 2017) |
| South Sudan | 5-Apr-2019 | 18 months | 84 Fed. Reg. 13688-13694 (Apr. 5, 2019) |
| South Sudan | 2-Nov-2020 | 18 months | 85 Fed. Reg. 69344-69351 (Nov. 2, 2020) |
| South Sudan | 3-Mar-2022 | 18 months | 87 Fed. Reg. 12190-12201 (Mar. 3, 2022) |
| South Sudan | 21-Aug-2023 | 18 months | 88 Fed. Reg. 56864-56872 (Aug. 21, 2023) |
| Sudan | 2-Sep-2005 | 18 months | 70 Fed. Reg. 52429-52433 (Sept. 2, 2005) |
| Sudan | 8-Mar-2007 | 18 months | 72 Fed. Reg. 10541-10546 (Mar. 8, 2007) |
| Sudan | 14-Aug-2008 | 18 months | 73 Fed. Reg. 47606-47611 (Aug. 14, 2008) |
| Sudan | 31-Dec-2009 | 18 months | 74 Fed. Reg. 69355-69361 (Dec. 31, 2009) |
| Sudan | 13-Oct-2011 | 18 months | 76 Fed. Reg. 63635-63640 (Oct. 13, 2011) |
| Sudan | 9-Jan-2013 | 18 months | 78 Fed. Reg. 1872-1878 (Jan. 9, 2013) |
| Sudan | 2-Sep-2014 | 18 months | 79 Fed. Reg. 52027-52033 (Sept. 2, 2014) |
| Sudan | 25-Jan-2016 | 18 months | 81 Fed. Reg. 4045-4051 (Jan. 25, 2016) |
| Sudan | 21-Aug-2023 | 18 months | 88 Fed. Reg. 56864-56872 (Aug. 21, 2023) |
| Sudan | 17-Jan-2025 | 18 months | 90 Fed. Reg. 5944-5953 (Jan. 17, 2025) |
| Syria | 17-Jun-2013 | 18 months | 78 Fed. Reg. 36223-36229 (June 17, 2013) |
| Syria | 5-Jan-2015 | 18 months | 80 Fed. Reg. 245-252 (Jan. 5, 2015) |
| Syria | 1-Aug-2016 | 18 months | 81 Fed. Reg. 50533-50541 (Aug. 1, 2016) |
| Syria | 5-Mar-2018 | 18 months | 83 Fed. Reg. 9329-9336 (Mar. 5, 2018) |
| Syria | 23-Sep-2019 | 18 months | 84 Fed. Reg. 49751-49757 (Sept. 23, 2019) |
| Syria | 19-Mar-2021 | 18 months | 86 Fed. Reg. 14946-14952 (Mar. 19, 2021) |
| Syria | 1-Aug-2022 | 18 months | 87 Fed. Reg. 46982-46991 (Aug. 1, 2022) |
| Syria | 29-Jan-2024 | 18 months | 89 Fed. Reg. 5562-5571 (Jan. 29, 2024) |
| Ukraine | 21-Aug-2023 | 18 months | 88 Fed. Reg. 56872-56880 (Aug. 21, 2023) |
| Ukraine | 17-Jan-2025 | 18 months | 90 Fed. Reg. 5936-5944 (Jan. 17, 2025) |
| Venezuela | 8-Sep-2022 | 18 months | 87 Fed. Reg. 55024-55032 (Sept. 8, 2022) |
| Venezuela | 3-Oct-2023 | 18 months | 88 Fed. Reg. 68130-68139 (Oct. 3, 2023) |
| Venezuela | 17-Jan-2025 | 18 months | 90 Fed. Reg. 5961-5972 (Jan. 17, 2025) |
| Yemen | 4-Jan-2017 | 18 months | 82 Fed. Reg. 859-866 (Jan. 4, 2017) |
| Yemen | 14-Aug-2018 | 18 months | 83 Fed. Reg. 40307-40313 (Aug. 14, 2018) |
| Yemen | 2-Mar-2020 | 18 months | 85 Fed. Reg. 12313-12319 (Mar. 2, 2020) |

| Yemen | 9-Jul-2021 | 18 months | 86 Fed. Reg. 36295-36302 (July 9, 2021) |
| Yemen | 3-Jan-2023 | 18 months | 88 Fed. Reg. 94-103 (Jan. 3, 2023) |
| Yemen | 10-Jul-2024 | 18 months | 89 Fed. Reg. 56765-56773 (July 10, 2024) |
| Burundi | 2-Sep-2005 | 12 months | 70 Fed. Reg. 52425-52429 (Sept. 2, 2005) |
| Burundi | 14-Sep-2006 | 12 months | 71 Fed. Reg. 54300-54304 (Sept. 14, 2006) |
| El Salvador | 15-Jun-2006 | 12 months | 71 Fed. Reg. 34637-34641 (June 15, 2006) |
| Honduras | 31-Mar-2006 | 12 months | 71 Fed. Reg. 16328-16333 (Mar. 31, 2006) |
| Liberia | 16-Aug-2005 | 12 months | 70 Fed. Reg. 48176-48179 (Aug. 16, 2005) |
| Nicaragua | 31-Mar-2006 | 12 months | 71 Fed. Reg. 16333-16338 (Mar. 31, 2006) |
| Somalia | 29-Jul-2005 | 12 months | 70 Fed. Reg. 43895-43899 (July 29, 2005) |
| Guinea | 22-Mar-2016 | 6 months | 81 Fed. Reg. 15339-15345 (Mar. 22, 2016) |
| Haiti | 24-May-2017 | 6 months | 82 Fed. Reg. 23820-23837 (May 24, 2017) |
| Honduras | 15-Dec-2017 | 6 months | 82 Fed. Reg. 59630-59636 (Dec. 15, 2017) |
| Liberia | 22-Mar-2016 | 6 months | 81 Fed. Reg. 15328-15334 (Mar. 22, 2016) |
| Sierra Leone | 22-Mar-2016 | 6 months | 81 Fed. Reg. 15334-15339 (Mar. 22, 2016) |

33