No. 25-2120

IN THE UNITED STATES COURT OF APPEALS
FOR THE NINTH CIRCUIT

———————————

NATIONAL TPS ALLIANCE, et al.,
Appellees,

v.

KRISTI NOEM, et al.,
Appellants.

———————————

On Appeal from the United States District Court
for the Northern District of California
District Court Case No. 3:25-cv-1766

———————————

EXCERPTS OF RECORD

VOLUME 3
———————————

YAAKOV M. ROTH
**Acting Assistant Attorney General**
**Civil Division**

DREW C. ENSIGN
**Deputy Assistant Attorney General**
**Office of Immigration Litigation**

SARAH L. VUONG
**Assistant Director**
**Office of Immigration Litigation**

WILLIAM H. WEILAND
**Senior Litigation Counsel**
**Office of Immigration Litigation**

ANNA DICHTER
ERIC SNYDERMAN
LAUREN BRYANT
CARLTON F. SHEFFIELD
CATHERINE ROSS
LUZ MARIA RESTREPO
AMANDA SAYLOR
JEFFREY M. HARTMAN
**Trial Attorneys**
**Office of Immigration Litigation**
**P.O. Box 868, Ben Franklin Station**
**Washington, DC 20044**
**Telephone: (202) 532-4404**
**Jeffrey.M.Hartman@usdoj.gov**

ER0204

1   Ahilan T. Arulanantham (SBN 237841)
    arulanantham@law.ucla.edu
2   Stephany Martinez Tiffer (SBN 341254)
    martineztiffer@law.ucla.edu
3   CENTER FOR IMMIGRATION LAW AND
    POLICY, UCLA SCHOOL OF LAW
4   385 Charles E. Young Dr. East
    Los Angeles, CA 90095
5   Telephone: (310) 825-1029

6   Emilou MacLean (SBN 319071)
    emaclean@aclunc.org
7   Michelle (Minju) Y. Cho (SBN 321939)
    mcho@aclunc.org
8   ACLU FOUNDATION
    OF NORTHERN CALIFORNIA
9   39 Drumm Street
    San Francisco, CA 94111-4805
10  Telephone: (415) 621-2493
    Facsimile: (415) 863-7832
11
    Attorneys for Plaintiffs
12  [Additional Counsel Listed on Next Page]

13                  UNITED STATES DISTRICT COURT

14                NORTHERN DISTRICT OF CALIFORNIA

15                    SAN FRANCISCO DIVISION

16  NATIONAL TPS ALLIANCE, MARIELA         Case No. 3:25-cv-01766-EMC
    GONZÁLEZ, FREDDY JOSE ARAPE RIVAS,
17  M.H., CECILIA DANIELA GONZÁLEZ          **PLAINTIFFS' REPLY IN SUPPORT OF**
    HERRERA, ALBA CECILIA PURICA            **THEIR MOTION TO POSTPONE**
18  HERNÁNDEZ, E.R., and HENDRINA VIVAS     **EFFECTIVE DATE OF AGENCY ACTION**
    CASTILLO,
19                                          Assigned to: Hon. Edward M. Chen
                    Plaintiffs,
20                                          Date:   March 24, 2025
            vs.                             Time:   9:00 a.m.
21                                          Place:  Courtroom 5, 17th Floor
    KRISTI NOEM, in her official capacity as
22  Secretary of Homeland Security, UNITED  Complaint filed: February 19, 2025
    STATES DEPARTMENT OF HOMELAND
23  SECURITY, and UNITED STATES OF
    AMERICA,
24
                    Defendants.
25

26

27

28

---

PLAINTIFFS' REPLY ISO MOT. TO POSTPONE EFFECTIVE DATE – CASE NO. 3:25-CV-01766-EMC

1   Additional Counsel for Plaintiffs

2   Jessica Karp Bansal (SBN 277347)
    jessica@ndlon.org
3   Lauren Michel Wilfong (*pro hac vice*)
    lwilfong@ndlon.org
4   NATIONAL DAY LABORER
    ORGANIZING NETWORK
5   1030 S. Arroyo Parkway, Suite 106
    Pasadena, CA 91105
6   Telephone: (626) 214-5689

7   Eva L. Bitran (SBN 302081)
    ebitran@aclusocal.org
8   ACLU FOUNDATION
    OF SOUTHERN CALIFORNIA
9   1313 West 8th Street
    Los Angeles, CA 90017
10  Telephone: (213) 977-5236

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

1

# TABLE OF CONTENTS

2

Page

3    INTRODUCTION ....................................................................................................... 1

4    ARGUMENT ............................................................................................................. 1

5        I.    This Court Has Jurisdiction and Authority to Grant Relief. ........................ 1

6            A.    8 U.S.C. § 1252(f)(1) Does Not Bar Postponement Under 5 U.S.C. § 705...... 1

7            B.    Section 705 Authorizes the Relief Plaintiffs Seek. ............................................ 3

8            C.    Section 1254a(b)(5)(A) Does Not Bar Plaintiffs' Claims................................. 4

9        II.    Plaintiffs Are Likely to Prevail on Their APA Claims. ................................. 6

10           A.    DHS Lacks Authority to Vacate TPS Extensions. ............................................ 6

11           B.    The Vacatur Decision Was Arbitrary. ............................................................... 8

12       III.    Plaintiffs Are Likely to Prevail on Their Discrimination Claim.................................. 9

13       IV.    Plaintiffs Have Established Irreparable Harm. ......................................... 11

14       V.    The Equities and Public Interest Favor Postponement. ............................. 13

15       VI.    The Requested Relief Is Not Overbroad. ................................................... 14

16   CONCLUSION............................................................................................................15

17

18

19

20

21

22

23

24

25

26

27

28

i

1

## <u>TABLE OF AUTHORITIES</u>

2

**Page(s)**

3

**Cases**

4

*Al Otro Lado, Inc. v. Mayorkas,*
    619 F. Supp. 3d 1029 (S.D. Cal. 2022)......................................................................2

5

6

*Alabama Ass'n of Realtors v. Dep't of Health & Human Servs.,*
    594 U.S. 758 (2021)................................................................................................15

7

*Alberston v. FCC,*
    182 F.2d 397 (D.C. Cir. 1951)..................................................................................6

8

9

*Am. Trucking Ass'n v. Frisco Transp. Co.,*
    358 U.S. 133 (1958)..................................................................................................9

10

11

*Arizoni Dream Act Coal. v. Brewer,*
    81 F. Supp. 3d 795 (D. Ariz. 2015) ........................................................................14

12

*Biden v. Missouri,*
    145 S. Ct. 109 (2024)..............................................................................................15

13

14

*Biden v. Texas,*
    597 U.S. 785 (2022)............................................................................................2, 3

15

*California v. U.S. Bureau of Land Mgmt.,*
    277 F. Supp. 3d 1106 (N.D. Cal. 2017) ....................................................................4

16

17

*Career Colls. & Schs. of Tex. v. Dep't of Educ.,*
    98 F.4th 220 (5th Cir. 2024) ..................................................................................14

18

19

*Casa de Md., Inc. v. Trump,*
    355 F. Supp. 3d 307 (D. Md. 2018) ........................................................................10

20

21

*CASA, Inc. v. Trump,*
    --- F.4th ---, 2025 WL 654902 (4th Cir. Feb. 28, 2025) ...........................................15

22

*Centro Legal de la Raza v. EOIR,*
    524 F. Supp. 3d 919 (N.D. Cal. 2021) ......................................................................3

23

24

*Centro Presente v. DHS,*
    332 F. Supp. 3d 393 (D. Mass. 2018) .....................................................................10

25

*China Unicom (Ams.) Operations Ltd. v. FCC,*
    124 F. 4th 1128 (9th Cir. 2024) ............................................................................1, 6

26

27

*COR Clearing, LLC v. Ashira Consulting, LLC,*
    2016 WL 7638177 (C.D. Cal. Jan. 13, 2016) ..........................................................13

28

ii

*Ctr. for Biological Diversity v. Regan,*
  597 F. Supp. 3d 173 (D.D.C. 2022) ........................................................................4

*Demore v. Kim,*
  538 U.S. 510 (2003) .......................................................................................5

*Dep't of Homeland Sec. v. Regents of the Univ. of Cal.,*
  591 U.S. 1 (2020) ...........................................................................................7

*Doe v. Becerra,*
  704 F. Supp. 3d 1006 (N.D. Cal. 2023) ............................................................12

*East Bay Sanctuary Covenant v. Biden,*
  993 F.3d 640 (9th Cir. 2021) ........................................................2, 14, 15

*Easyriders Freedom F.I.G.H.T. v. Hannigan,*
  92 F.3d 1486 (9th Cir. 1996) .........................................................................14

*FDA v. Brown & Williamson Tobacco Corp.,*
  529 U.S. 120 (2000) .......................................................................................7

*Florida v. Mayorkas,*
  2023 WL 3567851 (N.D. Fla. May 16, 2023) ...................................................4

*Florida. v. United States,*
  660 F. Supp. 3d 1239 (N.D. Fla. 2023) ............................................................2

*Garland v. Aleman Gonzalez,*
  596 U.S. 543 (2022) .......................................................................................1

*Gebhardt v. Nielsen,*
  879 F.3d 980 (9th Cir. 2018) ..........................................................................5

*Gorbach v. Reno,*
  219 F.3d 1087 (9th Cir. 2000) ........................................................................6

*Gun South v. Brady,*
  877 F.2d 858 (11th Cir. 1989) ........................................................................6

*Harmon v. Thornburgh,*
  878 F.2d 484 (D.C. Cir. 1989) .......................................................................14

*Immigrant Defs. L. Ctr. v. Mayorkas,*
  2023 WL 3149243 (C.D. Cal. Mar. 15, 2023) .................................................2

*Jennings v. Rodriguez,*
  583 U.S. 281 (2018) .......................................................................................5

*Kelch v. Nevada Dep't of Prisons,*
  10 F.3d. 684 (9th Cir. 1993) ...........................................................................6

iii

*Kidd v. Mayorkas*,
    734 F. Supp. 3d 967 (C.D. Cal. 2024) ...................................................................2

*Last Best Beef, LLC v. Dudas*,
    506 F.3d 333 (4th Cir. 2007) ...............................................................................6

*Macktal v. Chao*,
    286 F.3d 822 (5th Cir. 2002) ...............................................................................6

*Massachusetts v. EPA*,
    549 U.S. 497 (2007) ..............................................................................................8

*Mazaleski v. Treusdell*,
    562 F.2d 701 (D.C. Cir. 1977) ..............................................................................6

*Monsanto Co. v. Geertson Seed Farms*,
    561 U.S. 139 (2010) ..............................................................................................2

*NAACP v. DHS*,
    364 F. Supp. 3d 568 (D. Md. 2019) ...................................................................10

*Ne. Ohio Coal. for Homeless & Serv. Emps. Int'l Union, Loc. 1199 v. Blackwell*,
    467 F.3d 999 (6th Cir. 2006) ................................................................................3

*Nken v. Holder*,
    556 U.S. 418 (2009) ..............................................................................................3

*OPM v. Am. Fed'n of Gov't Emps. AFL-CIO*,
    73 U.S. 1301 (1985) ..............................................................................................4

*Patel v. Garland*,
    596 U.S. 328 (2022) ..............................................................................................5

*Perez v. United States*,
    2024 WL 4772734 (U.S. Nov. 12, 2024) ..........................................................15

*Ramos v. Nielsen*,
    321 F. Supp. 3d 1083 (N.D. Cal. 2018) .....................................................4, 5, 10

*Ramos v. Wolf*,
    975 F.3d 872 (9th Cir. 2020) ...................................................................... *passim*

*Reno v. Am.-Arab Anti-Discrimination Comm.*,
    525 U.S. 471 (1999) ..............................................................................................1

*Rodriguez v. Hayes*,
    591 F.3d 1105 (9th Cir. 2010) ..............................................................................3

*Saget v. Trump*,
    375 F. Supp. 3d 280 (E.D.N.Y. 2019) ...............................................................10

iv

*Sampson v. Murray*,
   415 U.S. 61 (1974)...................................................................................................3

*Scripps-Howard Radio v. FCC*,
   316 U.S. 4 (1942),...............................................................................................3

*Stanley v. Illinois*,
   405 U.S. 645 (1972)............................................................................................13

*Texas v. Biden*,
   646 F. Supp. 3d 753 (N.D. Tex. 2022) ...........................................................2, 3

*Texas v. United States*,
   40 F.4th 205 (5th Cir. 2022) ......................................................................2, 4, 15

*Trump v. Hawaii*,
   585 U.S. 667 (2018)..............................................................................................9

*Tuan Thai v. Ashcroft*,
   366 F.3d 790 (9th Cir. 2004) .............................................................................10

*United States v. Texas*,
   599 U.S. 670 (2023)............................................................................................15

*Village of Arlington Heights v. Metro. Hous. Dev. Corp.*,
   429 U.S. 252 (1977)......................................................................................10, 11

*Washington v. Trump*,
   --- F.4th ---, 2025 WL 553485 (9th Cir. Feb. 19, 2025) ..................................15

*Washington v. Trump*,
   847 F.3d 1151 (9th Cir. 2017) ...........................................................................13

*Youngstown Sheet and Tube Co. v. Sawyer*,
   343 U.S. 579 (1952) (Jackson, J., concurring)....................................................8

**Statutes**

5 U.S.C. § 705 ...................................................................................... *passim*

5 U.S.C. § 706 ....................................................................................................14

8 U.S.C. § 1252(f) .......................................................................................1, 2, 3

8 U.S.C. § 1254a ................................................................................................10

8 U.S.C. § 1254a(b)(3)(B)....................................................................................8

8 U.S.C. § 1254a(c)(1)(A)(iv)..............................................................................8

PLAINTIFFS' REPLY ISO MOT. TO POSTPONE EFFECTIVE DATE – CASE NO. 3:25-CV-01766-EMC

ER0211

8 U.S.C. § 1254a(c)(2) ................................................................................................................9

8 U.S.C. § 1254a(c)(3)(A) .........................................................................................................9

8 U.S.C. § 1254a(b)(5)(A) .........................................................................................................4

**Other Authorities**

101 Cong. Rec. 25811 (Oct. 25, 1989) .......................................................................................7

90 Fed. Reg. 5961-01 ..................................................................................................................8

90 Fed. Reg. 8805-01 ............................................................................................................7, 8

90 Fed. Reg. 8807 .......................................................................................................................7

90 Fed. Reg. 9040-01 ...........................................................................................................9, 11

90 Fed. Reg. 9042 ..............................................................................................................10, 11

**INTRODUCTION**

The orders Plaintiffs challenge will strip over 350,000 Venezuelan TPS holders of the right to live and work here in *less than a month*, placing them at immediate risk of detention and deportation. Once implemented, no final ruling could unwind their catastrophic social and economic impact. In contrast, Defendants face no concrete harm from relief that preserves the status quo.

Defendants claim "'statutorily implicit' authority to reconsider any TPS-related determination," Opp. 6, but ignore Ninth Circuit precedent that defeats their argument. Mot. 4–8. Agencies do not enjoy unfettered vacatur authority where, as here, Congress establishes a "fixed term" for a benefit. *China Unicom (Ams.) Operations Ltd. v. FCC*, 124 F. 4th 1128, 1148 (9th Cir. 2024). Nor is there a historical basis for such implicit authority. In TPS's thirty-five-year history, no Secretary had ever rescinded an extension before this. Defendants also ignore direct evidence that discrimination animated these decisions: Secretary Noem called Venezuelans "dirt bags" when announcing *this very decision*. Ex. 14 at 3.[1] The direct and circumstantial evidence of the Secretary's animus satisfies any standard for establishing unlawful discrimination.

Defendants insist this Court lacks jurisdiction to review even blatantly illegal agency action, saying this Motion is a disguised request for a preliminary injunction barred by 8 U.S.C. § 1252(f)(1). But every court to consider that argument has rejected it. Relief under the APA renders agency action ineffective; it does not enjoin persons. Defendants' TPS-specific jurisdictional argument is also meritless. Courts have uniformly recognized that "determination" is a term of art. It does not foreclose claims challenging unlawful processes and discrimination.

**ARGUMENT**

**I.    THIS COURT HAS JURISDICTION AND AUTHORITY TO GRANT RELIEF.**

**A.    8 U.S.C. § 1252(f)(1) Does Not Bar Postponement Under 5 U.S.C. § 705.**

Section 1252(f)(1) "generally prohibits lower courts from entering *injunctions* that order federal officials to take or to refrain from taking actions to enforce, implement, or otherwise carry out" [certain immigration statutes]. *Garland v. Aleman Gonzalez*, 596 U.S. 543, 550 (2022) (emphasis added); *Reno v. Am.-Arab Anti-Discrimination Comm.*, 525 U.S. 471, 481 (1999) (Section

---

[1] All "Ex." and "Exs." references are to the Exhibits attached to Dkt. 37 (MacLean Decl.).

1

1   1252(f) "nothing more or less than a limit on injunctive relief").

2        Every court to consider the question—including the Fifth Circuit and at least five district

3   courts—has rejected Defendants' view that APA relief is functionally an injunction barred by

4   Section 1252(f)(1). *Texas v. United States*, 40 F.4th 205, 219–20 (5th Cir. 2022) (holding Section

5   1252(f)(1) "does not apply to vacatur" and, thus, DHS "unlikely to demonstrate" a lack of

6   "jurisdiction to vacate unlawful agency action"); *Kidd v. Mayorkas*, 734 F. Supp. 3d 967, 987 (C.D.

7   Cal. 2024) (Section 1252(f) inapplicable because vacating ICE policy neither "compels nor restrains

8   further agency decision-making") (citation omitted); *Florida v. United States*, 660 F. Supp. 3d 1239,

9   1284–85 (N.D. Fla. 2023) (Section "1252(f)(1) does not strip [the Court] of the authority to vacate

10  either of the challenged policies under the APA."); *Al Otro Lado, Inc. v. Mayorkas*, 619 F. Supp. 3d

11  1029, 1045–46 (S.D. Cal. 2022) (Section 1252(f)(1) does not prevent "'set[ting] aside' or 'vacating'

12  a policy based upon an APA violation"), *aff'd in part, vacated in part sub nom., Al Otro Lado v.

13  Exec. Off. for Immigr. Rev.*, 120 F.4th 606 (9th Cir. 2024); *Immigrant Defs. L. Ctr. v. Mayorkas*,

14  2023 WL 3149243, at *14 (C.D. Cal. Mar. 15, 2023) (Section 1252(f)(1) "did not bar" vacatur);

15  *Texas v. Biden*, 646 F. Supp. 3d 753, 768 (N.D. Tex. 2022) (same).

16       Defendants cite *Biden v. Texas*, 597 U.S. 785 (2022) for support, Opp. 8, but *Biden* explicitly

17  reserved this question; *id.* at 801 n.4; and the district court on remand rejected Defendants' view.

18  *Texas*, 646 F. Supp. 3d at 768. A vacatur under the APA is a "less drastic remedy" than a

19  preliminary injunction, *Monsanto Co. v. Geertson Seed Farms*, 561 U.S. 139, 165 (2010), and in this

20  motion Plaintiffs seek only a "Section 705 stay [which] can … be seen as an interim or lesser form

21  of [relief than] vacatur …." *Texas*, 646 F. Supp. 3d at 768. A postponement (or "stay") under Section

22  705 "would not 'order federal officials to take or to refrain from taking actions to enforce,

23  implement, or otherwise carry out the specified statutory provisions' at issue"; it merely postpones

24  agency action from taking effect. *Id.* at 769. That is why "[w]hen a reviewing court determines that

25  agency regulations are unlawful, the ordinary result is that the rules are vacated—not that their

26  application to the individual petitioners is proscribed." *East Bay Sanctuary Covenant v. Biden*, 993

27  F.3d 640, 681 (9th Cir. 2021).

28       Defendants nonetheless argue that APA relief "would have the effect of enjoining or

2

1    restraining DHS's implementation" of the TPS statute. Opp. 7. But virtually all orders against the

2    government have the "effect" of restraining federal officials in some sense. If Section 1252(f)(1)

3    prohibited them, it would also bar declaratory relief, which it does not. *Biden*, 597 U.S. at 800

4    (Section 1252(f)(1) preserves "jurisdiction to entertain the plaintiffs' request for declaratory relief.")

5    (internal quotations omitted); *Rodriguez v. Hayes*, 591 F.3d 1105, 1119 (9th Cir. 2010) (same).[2]

6         Finally, even if vacatur under the APA were analogous to an injunction, the stay relief

7    Plaintiffs seek here still would not violate Section 1252(f)(1), because stays are not injunctions. "A

8    stay … temporarily suspend[s] the source of authority to act," it does not "direct[] the actor's

9    conduct." *Nken v. Holder*, 556 U.S. 418, 428–29 (2009).

10        Therefore, under settled law, Section 1252(f)(1) does not prohibit this Court from vacating

11   agency action, and certainly does not render the Court helpless to maintain the status quo by

12   postponing agency action long enough to fully consider the merits.[3]

13        **B.      Section 705 Authorizes the Relief Plaintiffs Seek.**

14        Defendants next attempt to weave together dictionary definitions with inapposite cases to

15   contend that Section 705 "does not authorize relief here because the challenged actions have already

16   taken effect." Opp. 9–10. That is wrong. Under the orders, Plaintiffs' employment authorization

17   documents do not expire until April 3, and they lose legal status on April 8. In any event, "[c]ourts –

18   including the Supreme Court – routinely stay already-effective agency action under Section 705."

19   *Texas*, 646 F. Supp. 3d at 770 (collecting cases); *Centro Legal de la Raza v. EOIR*, 524 F. Supp. 3d

20   919, 980 (N.D. Cal. 2021) (ordering "the effectiveness" of rule stayed after effective date passed).

21   Relief "under Section 705 (even after the effective date) restores the [] status quo *ex ante*," *i.e.*, the

22   conditions that existed before the challenged agency action. *Texas*, 646 F. Supp. 3d at 771.

23        Defendants' cases are not to the contrary. *Ne. Ohio Coal. for Homeless & Serv. Emps. Int'l*

24   _____

25   [2] Defendants, on page 9 of their brief, also cite a footnote in *Sampson v. Murray*, 415 U.S. 61, 68
     n.15 (1974), referencing legislative history suggesting Section 705 codified the remedies described
26   in a pre-APA case, *Scripps-Howard Radio v. FCC*, 316 U.S. 4 (1942), but *Scripps-Howard* held
     there was no "general legislative policy regarding the power to stay administrative orders pending
27   review" discernible from the statutes governing judicial review of agency actions even at that time.
     *Id*. at 16.
28   [3] Many Venezuelan TPS holders could seek relief even under Defendants' expansive reading of
     Section 1252(f) because proceedings have been initiated against them.

1   *Union, Loc. 1199 v. Blackwell*, 467 F.3d 999, 1006 (6th Cir. 2006), does not address Section 705 at

2   all; it concerned the immediate appealability of a "mandatory injunction" that went "far beyond

3   preserving the status quo." Likewise, *OPM v. Am. Fed'n of Gov't Emps. AFL-CIO*, 73 U.S. 1301,

4   1303–05 (1985) does not address Section 705; it held an *appellate court* lacked authority to stay a

5   regulation following *denial* of a TRO brought "eight months after Congress had finally fixed" the

6   effective date, and where the denial's consequences were not "grave." *Florida v. Mayorkas*, 2023

7   WL 3567851 (N.D. Fla. May 16, 2023) involved a policy actually "in effect," *id.* at *4. Even there,

8   the district court did "not definitively decide" whether Section 705 applied because it granted an

9   injunction. *Id.* at n.7. Finally, *Ctr. for Biological Diversity v. Regan*, 597 F. Supp. 3d 173 (D.D.C.

10  2022) and *California v. U.S. Bureau of Land Mgmt.*, 277 F. Supp. 3d 1106 (N.D. Cal. 2017)

11  concerned *agencies'* authority to postpone rules after an effective date, not judicial authority. The

12  difference matters because an agency's postponement of an already-effective rule is "tantamount to

13  amending or revoking a rule," which requires APA compliance—unlike court orders under Section

14  705. *Texas*, 646 F. Supp. at 771 (quotations and citations omitted).

15          As a "reviewing court," this Court can exercise "all necessary and appropriate process to

16  postpone the effective date … or to preserve status or rights pending conclusion" of judicial review.

17  5 U.S.C. § 705. Nothing about the timing of this Motion deprives the Court of that authority.

18          **C.     Section 1254a(b)(5)(A) Does Not Bar Plaintiffs' Claims.**

19          Defendants next rely on Section 1254a(b)(5)(A) to dispute jurisdiction, but lack the "clear

20  and convincing evidence" required to prove that Congress intended to bar Plaintiffs' claims. *Ramos*

21  *v. Nielsen*, 321 F. Supp. 3d 1083, 1102 (N.D. Cal. 2018) (citing *Abbott Labs v. Gardner*, 387 U.S.

22  136, 141 (1967)). The statute bars review only of "any determination with respect to the designation,

23  or termination or extension" of TPS. That language does not encompass Plaintiffs' claims for two

24  basic reasons. First, "it is evident from the statutory context that this provision refers to the

25  designation, termination, or extension of a country for TPS," not every other kind of agency decision

26  related to TPS. *Ramos*, 321 F. Supp. at 1102. Second, not every agency conclusion is a

27  "determination … under [subsection(b)]." Mot. 17. "Determination" in jurisdiction-stripping statutes

28  refers narrowly to certain conclusions in support of underlying decisions, such as whether a country

1    is safe for return. *Id.* at 17–18. On that basis, the Supreme Court and Ninth Circuit have found

2    jurisdiction in several cases involving statutes using "determination*." Id.* (collecting cases).

3        These limits make clear that Plaintiffs' claims are cognizable. First, they challenge a vacatur,

4    which is not a "designation, or termination or extension" at all. Second, they challenge the agency's

5    statutory authority to issue a vacatur and its flawed reasoning in support of it (which concerned TPS

6    registration rules). Neither of those challenges attack covered "determination[s]." *Id*.

7        Defendants suggest the appearance of "any" before "determination" and the phrase "with

8    respect to" grant them a get-out-of-court-free card. Not so. "Any" cannot expand the meaning of

9    "determination." "[T]he statute's reference to '*any* determination' does not subsume 'any' general

10   policies or practices. Rather, the word 'any' must be understood in its grammatical context." *Ramos*,

11   321 F. Supp. 3d at 1104 (collecting cases). Indeed, courts have consistently read "any" and other

12   open-ended terms in jurisdiction-stripping statutes narrowly. *See*, *e.g.*, *Demore v. Kim*, 538 U.S. 510,

13   516 (2003) (provision stating "No court may set aside *any* action or decision … regarding the

14   detention … of any alien" not broad enough to cover claim that agency lacked statutory and

15   constitutional authority to detain) (citation omitted). For that reason, "with respect to" also cannot

16   broaden the meaning of "determination"; otherwise, this and other jurisdiction-stripping statutes

17   would be virtually limitless. *Jennings v. Rodriguez*, 583 U.S. 281, 293–94 (2018) (construing

18   reference to claims "arising from" detention narrowly, because "when confronted with capacious

19   phrases like 'arising from' we have eschewed 'uncritical literalism'") (plurality) (citation omitted);

20   *see also id.* (collecting cases involving "affected," "related to," and "in connection with").

21        Defendants cite the Supreme Court's reliance on the "broadening effect" of the words "any"

22   and "regarding" in *Patel v. Garland*, 596 U.S. 328, 339 (2022), but the statute there did not contain

23   the word "determination," and the Court relied on other context clues not present here. *Id.* (citing

24   amendment history of 8 U.S.C. § 1252(a)(2)(D)). Unlike in the TPS statute, when Congress sought

25   to write "categorical review preclusion language" into law, Opp. 13, it did so. *See, e.g.*, *Gebhardt v.*

26   *Nielsen*, 879 F.3d 980, 984–85 (9th Cir. 2018) (statute specifying decisions were in Secretary's "sole

27   and unreviewable discretion" barred review of all but constitutional claims).

28        Finally, Defendants assert that exercising jurisdiction would offend the Secretary's broad

5

1    grant of discretion over TPS, relying on the now-vacated Ninth Circuit panel's jurisdictional

2    analysis. However, that aspect of the decision was particularly weak, as the dissent explained. *Ramos*

3    *v. Wolf*, 975 F.3d 872, 919–24 (9th Cir. 2020) (Christen, J., dissenting), *opinion vacated upon reh'g*

4    *en banc*, 59 F.4th 1010 (9th Cir. 2023). In fact, the TPS statute provides the Secretary broad

5    discretion to designate a country for TPS once the designation is made, however, the statute requires

6    termination where the country conditions "no longer continue[]," and conversely provides TPS "is

7    extended" if unsafe conditions persist. But even under the *Ramos* majority's reasoning, Plaintiffs'

8    APA claims would be cognizable because the vacatur-authority claim turns on the interpretation of

9    the TPS statute, which is "reviewable under *McNary*." *Id.* at 895. Similarly, the claim that the

10   vacatur decision was arbitrary turns on the Secretary's failure to understand the statute's registration

11   process or consider obvious fixes short of vacatur; not her discretion to "consider and weigh various

12   conditions in a foreign country," which the *Ramos* majority held to be "unreviewable." *Id.* at 891.

13   **II.    PLAINTIFFS ARE LIKELY TO PREVAIL ON THEIR APA CLAIMS.**

14          **A.    DHS Lacks Authority to Vacate TPS Extensions.**

15          Defendants claim "[t]he power to reconsider is inherent in the power to decide," Opp. 14 &

16   n.5, but ignore that the en banc Ninth Circuit held the opposite. *Gorbach v. Reno*, 219 F.3d 1087,

17   1095 (9th Cir. 2000) (en banc) ("There is no general principle that what [an agency] can do, [it] can

18   undo"). In particular, the "use of a fixed term" for a benefit (like the fixed length of a TPS extension)

19   "is … inconsistent with … an implied power to revoke … at any time." *China Unicom*, 124 F. 4th at

20   1148. Even Defendants' out-of-circuit authority recognizes that any implied reconsideration

21   authority must yield to statutory limitations. *See Alberston v. FCC*, 182 F.2d 397, 399 (D.C. Cir.

22   1951); *Macktal v. Chao*, 286 F.3d 822, 825–26 (5th Cir. 2002); *Gun South v. Brady*, 877 F.2d 858,

23   862–64 (11th Cir. 1989). Their other cases concern uncontested assertions of reconsideration

24   authority or otherwise involve extraordinary facts not present here, and do not address the statutory

25   schemes at issue. *See Mazaleski v. Treusdell*, 562 F.2d 701, 720 (D.C. Cir. 1977) (considering

26   whether plaintiff's rejection of agency offer to reconsider precluded claims); *Last Best Beef, LLC v.*

27   *Dudas*, 506 F.3d 333, 336, 340 (4th Cir. 2007) (patent office unknowingly approved trademark on

28   same day legislation prohibiting trademark was signed into law). *Kelch* concerns state law. *Kelch v.*

1  *Nevada Dep't of Prisons*, 10 F.3d. 684, 686 (9th Cir. 1993).

2          Defendants protest that, under "Plaintiffs' logic," the Secretary could never vacate a TPS

3  extension, even if she discovered a genuine error or national security threat. Opp. 15. "Plaintiffs'

4  logic" is the law: "Regardless of how serious the problem an administrative agency seeks to address,

5  … it may not exercise its authority in a manner that is inconsistent with the administrative structure

6  that Congress enacted into law." *FDA v. Brown & Williamson Tobacco Corp.*, 529 U.S. 120, 125

7  (2000) (quotations omitted). There is nothing remarkable about denying an agency "implicit"

8  authority to revoke the immigration status of potentially millions of people. The Secretary cannot

9  revoke en masse green cards, H-1B visas, or student visas; such authority resides with Congress.

10  Indeed, Congress established fixed time periods for TPS precisely to eliminate confusion under prior

11  humanitarian programs about "how long [beneficiaries] will be able to stay." 101 Cong. Rec. 25811,

12  25837 (Oct. 25, 1989) (Statement of Rep. Richardson) (debate on precursor to TPS statute).

13          Defendants also cannot support the vacatur order based on serious error or national security

14  concerns. Secretary Noem already gave her "[r]easons for the [v]acatur." 90 Fed. Reg. 8805-01 at

15  8807. She identified no error in the prior determination, no urgent national security or foreign policy

16  matter, and no "threats to the safety and security of the United States." Opp. 13–15. Rather, her

17  concerns were ministerial, namely a potential "lack of clarity" due to "multiple notices, overlapping

18  populations, overlapping dates, and sometimes multiple actions happening in a single document." 90

19  Fed. Reg. 8807; Opp. 6 (describing reasons for vacatur). Defendants complain that Plaintiffs "sever"

20  the vacatur from the termination. Opp. 14. But the vacatur cannot be justified by reasons in a later

21  termination notice. *Dep't of Homeland Sec. v. Regents of the Univ. of Cal.*, 591 U.S. 1, 21 (2020)

22  ("rescission [may] not [be] upheld on the basis of impermissible '*post hoc* rationalization'") (citation

23  omitted).

24          Finally, while Defendants emphasize the Secretary's "border and national security

25  responsibilities," the breadth of the "national interest" standard, and "foreign policy" implications,

26  they do not (and could not) argue these factors authorize vacatur if the TPS statute does not. Opp.

27  13–17. Defendants concede vacatur authority is "foreclosed" if Congress has "require[ed] other

28  procedures." *Id.* at 14 n.14. Congress has. Mot. 5–8. Terminations take effect either: (a) 60 days after

1    publication or (b) "*if later*," the "expiration of the most recent previous extension"—here, October 2,

2    2026. 8 U.S.C. § 1254a(b)(3)(B) (emphasis added); 90 Fed. Reg. 5961-01 (Jan. 2025 Extension).

3    Secretary Noem's attempt to erase Venezuela's "most recent previous extension" and then terminate

4    TPS eighteen months before the "expiration of" that extension violates the statute.[4]

5            **B.    The Vacatur Decision Was Arbitrary.**

6            Even if DHS had vacatur authority, the reasons given for this vacatur still violate the APA.

7    Defendants ignore Plaintiffs' argument that the vacatur rests on legal errors. Mot. 8–9. They repeat

8    Secretary Noem's concern about "negat[ing] the 2021 Venezuela TPS designation" by "subsuming it

9    within the 2023 Venezuela designation," Opp. 16–17, but ignore that *all* new designations

10   necessarily subsume earlier ones. Defendants also repeat Secretary Noem's objection to

11   consolidating registration processes, *id.*, but the statute's text permits registration "to the extent and

12   in a manner which the [Secretary] establishes." 8 U.S.C. § 1254a(c)(1)(A)(iv).

13           Instead, they defend the vacatur on two grounds. First, they say Secretary Noem "reasonably

14   explained" that the 2025 extension[5] lacked "a reasoned explanation or express consideration of the

15   operational or legal impacts." Opp. 16. The vacatur notice faults the extension for failing to

16   "acknowledge the novelty of its approach or explain how it is consistent with the TPS statute," and

17   providing an "inadequately developed" "explanation for operational impacts" on registration. 90

18   Fed. Reg. 8805-01 at 8807. But those explanations *prove* Secretary Noem's legal errors. Labeling a

19   decision as "novel" and potentially unlawful when it is plainly neither one, and complaining about a

20   failure to explain non-existent flaws, is *not* reasoned decision-making. *Mass. v. EPA*, 549 U.S. 497,

21   534–35 (2007) (decision based on misinterpretation of agency's own authority violated APA).

22           Second, Defendants claim that simple revisions to the registration process would be

23   insufficient because vacatur provided "an opportunity for informed determinations regarding the

24   TPS designations." Opp. 17. This too is not a reasoned explanation. It is a bald assertion that the

25   Secretary should be allowed to vacate a decision whenever she wants. The statute does not permit

---

26   [4] Because the vacatur is "incompatible with the expressed or implied will of Congress," Defendants'
     reliance on *Youngstown* is misplaced. Opp. 15 (citing *Youngstown Sheet and Tube Co. v. Sawyer*,
27   343 U.S. 579, 635 (1952) (Jackson, J., concurring)).
     [5] Plaintiffs' counsel confirmed with Defendants by email that the Opposition's reference to the
28   "2023 Designation notice," Opp. 16, was instead meant to refer to the 2025 Extension.

1    that result. And even where an agency does have implied reconsideration authority, it may not

2    exercise that authority "as a guise for changing previous decisions because the wisdom of those

3    decisions appears doubtful in the light of changing policies." *Am. Trucking Ass'n v. Frisco Transp.*

4    *Co.*, 358 U.S. 133, 146 (1958). Finally, Defendants suggest the Motion "diverges" from the

5    Complaint, but Plaintiffs pled every APA claim raised here. Compl. ¶¶ 149–149(a)– (f).

6    **III.    PLAINTIFFS ARE LIKELY TO PREVAIL ON THEIR DISCRIMINATION CLAIM.**

7         Defendants never address the most damning direct evidence of race discrimination: Secretary

8    Noem's repeated invocation of false, racist tropes to justify these decisions. When announcing these

9    decisions, she stated "the people of this country … want these dirt bags out." Ex. 14. Similarly,

10   during her confirmation hearing, she called "this extension [of TPS] of over 600,000 Venezuelans …

11   alarming" because of "gangs"—confirming that she equates Venezuelan TPS holders with criminals.

12   Ex. 12. Such fabricated assertions "fit comfortably into [a] historical pattern" of invoking false fears

13   of criminality to stoke racist sentiment against disfavored immigrant populations. Dkt. 22 ¶¶ 20, 27.

14        Even if the deferential standard of review under *Trump v. Hawaii*, 585 U.S. 667 (2018)

15   applied, the Court could consider these contemporaneous statements of animus and related "extrinsic

16   evidence" to prove Defendants' justifications are not "bona fide," *id.* 705–06; *Ramos*, 336 F. Supp.

17   3d at 1108. The evidence of animus connected to these decisions is overwhelming. *See* App'x A

18   hereto (summarizing evidence in the record). Even the Federal Register notice is infused with racial

19   animus. It claims TPS allowed "members of the Venezuelan gang known as Tren de Aragua" to

20   "settle in the interior" of the U.S., and alleges crimes by TdA. 90 Fed. Reg. 9040-01 at 9042. This is

21   false for several reasons: TPS does not allow people to enter the U.S.; TdA "appears to have no

22   substantial U.S. presence and looks unlikely to establish one," Dkt. 26 ¶¶ 16–22; Compl. ¶¶ 95–97;

23   and people who present a national security threat are ineligible for TPS.[6] These blatantly false

24   statements evoking racist tropes cannot be brushed aside as remote in time, "taken out of context," or

25   as about Venezuela "the country itself." *Compare* Opp. 21 *with* Exs. 6, 12, 14, 15, *and* App'x A. Nor

26   _____

27   [6] 8 U.S.C. § 1254a(c)(2); Dkt. 27 ¶ 15. TPS applicants are subject to searching inquiries about
     potential criminal history anywhere in the world. USCIS, Form I-821 "Application for Temporary
     Protected Status" at 7–10 (Apr. 1, 2024 ed.). Furthermore, the Secretary may withdraw TPS from

28   any person if she later determines the person was not eligible. 8 U.S.C. § 1254a(c)(3)(A).

1  does it matter whether the statements reflect animus based on national origin rather than race; both

2  are equally unlawful. Mot. 11 n.3.[7]

3          In any event, this Court and others held that the *Arlington Heights* standard governs TPS

4  decisions.[8] TPS concerns people "already in the United States" with "greater constitutional

5  protections"; *Ramos*, 321 F. Supp. 3d at 1129; and the decisions challenged here were not "intended

6  to induce the cooperation or action of a foreign government," *id.*, and not issued under a statute that

7  "exudes deference to the President in every clause." *Id.* at 1130. And while the Secretary asserted the

8  "national interest" justified the termination (though not the vacatur), her explanations reveal the

9  underlying rationale relates to (unfounded) assumptions about crime and economic harm, not

10  national security as that doctrine is understood. *See Tuan Thai v. Ashcroft*, 366 F.3d 790, 796 (9th

11  Cir. 2004) ("We do not agree that the danger of criminal conduct by an alien is automatically a

12  matter of national security").[9]

13          Defendants suggest the record here is comparable to that in *Ramos*, but, sadly, there is now

14  far more direct proof that "administration officials involved in the TPS decision-making process

15  were themselves motivated by" racial animus. *Ramos*, 975 F.3d at 897. In *Ramos*, the Secretaries

16  made no racist statements, whereas Secretary Noem has used them to explain her decisions, and has

17  also adopted President Trump's racist justifications in the notice itself, 90 Fed. Reg. 9042. For that

18  reason, the Court can rule for Plaintiffs without addressing their "cat's-paw" theory. *Ramos*, 336 F.

19  Supp. 3d at 1098–1101. Defendants also cannot account for Secretary Noem's extraordinary

20  deviations from the normal practice, including the first-ever vacatur of an extension and the

21  dramatically compressed timetable, Mot. 13–14, both of which can be evidence of "improper

22

---

23  [7] The Notice also cites Executive Order 14150, the "America First Policy Directive," claiming the
    presence of Venezuelan TPS holders contravenes that order. As was true before, the "America First"
24  slogan itself evokes racial animus. *Ramos*, 336 F. Supp. 3d. at 1104; Compl. ¶ 126 n.82.
    [8] *Ramos*, 975 F.3d at 896 (rejecting government's contention that *Hawaii* standard of review
25  applies); *Ramos*, 336 F. Supp. 3d at 1105–07; *Centro Presente v. DHS*, 332 F. Supp. 3d 393, 411–12
    (D. Mass. 2018); *Saget v. Trump*, 345 Supp. 3d 287, 301–02 (E.D.N.Y. 2018); *Saget v. Trump*, 375
26  F. Supp. 3d 280, 367–68 (E.D.N.Y. 2019); *Casa de Md., Inc. v. Trump*, 355 F. Supp. 3d 307 (D. Md.
    2018); *NAACP v. DHS*, 364 F. Supp. 3d 568, 576 (D. Md. 2019).
27  [9] Defendants claim in passing that this Court lacks jurisdiction to consider the constitutional claim,
    but ignore that Section 1254a never mentions constitutional claims.
28

PLAINTIFFS' REPLY ISO MOT. TO POSTPONE EFFECTIVE DATE – CASE NO. 3:25-CV-01766-EMC      **ER0222**

1   purpose[].” *Village of Arlington Heights v. Metro. Hous. Dev. Corp.*, 429 U.S. 252, 267 (1977).

2       Nor can the termination be substantiated by logic or facts. Aside from the false references to

3   criminality, Secretary Noem asserts that allowing a large number of unauthorized immigrants to

4   settle in the U.S. strains resources of "local communities." 90 Fed. Reg. 9040-01 at 9042. But, given

5   many Venezuelan TPS holders cannot return to Venezuela or travel to a safe third country,

6   terminating TPS will *increase* the number of unauthorized Venezuelans and prevent them from

7   working lawfully, only worsening any strain on local communities. Dkt. 19 ¶¶ 15–16; Dkt. 27 ¶¶ 18–

8   23, 27. Defendants do not dispute that their actions will cost the U.S. economy at least $3.5 billion,

9   including nearly $500 million in lost Social Security taxes. Dkt. 21 ¶ 9. Finally, Secretary Noem

10  cited "pull factors." However, her only source of support concerns *redesignating* a country for TPS,

11  which expands the pool of TPS recipients. 90 Fed. Reg. 9040-01 at 9043 n.18. She cites no evidence

12  that TPS *extensions* "pull" immigrants here, and it defies logic because they do not make more

13  people eligible. Dkt. 27 ¶ 26 ("No 'Magnet Effect.'").

14      Together, this evidence more than suffices to establish a likelihood of success on the claim

15  that race or national origin discrimination was a motivating factor in these TPS decisions.

16  **IV.    PLAINTIFFS HAVE ESTABLISHED IRREPARABLE HARM.**

17      Plaintiffs' record on irreparable harm stands unrebutted. Absent postponement, the

18  challenged decisions will devastate the lives and communities of Plaintiffs and thousands of other

19  Venezuelan TPS holders. Dkts. 17–20, 29–36, 64; Mot. 21–23. TPS is supposed to provide

20  humanitarian protection so long as conditions in a designated country have not improved. Here, the

21  Secretary presumes that "conditions in Venezuela remain … 'extraordinary'" 90 Fed. Reg. 9042, yet

22  her actions will strip hundreds of thousands of people of TPS protection absent judicial intervention.

23      TPS holders are experiencing severe and growing anxiety; many will lose their status,

24  employment authorization, driver's licenses, and right to legally remain here in a matter of weeks.

25  E.R., for instance, is the sole provider for her twelve-year-old daughter, and faces the loss of her

26  work authorization on April 3; she fears that, absent a legal right to remain, she and her daughter

27  could be detained at her June 2025 ICE check-in and deported shortly after. Dkt. 20 ¶¶ 2, 12–13, 17–

28  18. M.H. also fears she will lose TPS in April, and face the possibility of being separated from her

PLAINTIFFS' REPLY ISO MOT. TO POSTPONE EFFECTIVE DATE – CASE NO. 3:25-CV-01766-EMC

**ER0223**

1    three-year-old U.S. citizen son as soon as her ICE check-in in May. Dkt. 32 ¶¶ 2, 6, 17. Mr. Arape

2    renewed TPS immediately upon the January 17 decision and received an automatic extension of his

3    work authorization; he now fears the imminent loss of both his work authorization and his ability to

4    apply for an H-1B visa, which is contingent on him remaining in status. Dkt. 18 ¶¶ 2, 14–16. A.V.

5    suffered panic attacks at the thought of losing TPS and overdosed on medication; Ms. Guerrero and

6    her husband cry about the loss of TPS every day. Dkt 31 ¶ 18. Ms. Gonzalez Herrera has cancelled

7    plans to pursue graduate education. Dkt. 29 ¶ 15.

8         Apart from the human tragedy unfolding here, the challenged decisions will cause billions in

9    unrecoverable economic losses, including lost Social Security contributions and other economic

10   benefits that everyone living here reaps from the contributions of this community. Dkts. 21, 23–24,

11   27. And deprivations of constitutional and statutory rights alone give rise to irreparable injury.

12   *Compare* Mot. 19–20 *with* Opp. 22 (not disputing violations alone represent irreparable harm).

13        Lacking an iota of competent evidence of harm, Defendants nonetheless urge the Court to

14   close its eyes to these horrors based on an invented exception to irreparable harm. Defendants argue

15   that the massive loss of safety, family, community, healthcare, work, and education resulting from

16   their decisions are "inherent" byproducts of TPS's "temporary nature." Opp. 22. They made the

17   same argument in *Ramos*, and this Court rejected it, explaining that "the shortening of [] time in the

18   United States and acceleration of [] removal if relief is not granted may constitute irreparable

19   injury." *Ramos*, 336 F. Supp. 3d at 1087. Here the difference is at least 18 months, and could be

20   longer if Venezuela remains unsafe. *Doe v. Becerra*, 704 F. Supp. 3d 1006, 1017 (N.D. Cal. 2023),

21   *abrogated on other grounds by Doe v. Garland*, 109 F.4th 1188 (9th Cir. 2024) (explaining that even

22   limited extensions of time at liberty in the U.S. may affect family ties, employment, and educational

23   opportunities).

24        Defendants do not deny that their decisions exacerbate what they call "inherent" harm. Nor

25   do they dispute that their decisions upended reasonable reliance expectations—in a prior duly

26   adopted extension, especially where there is no precedent in TPS's 35-year history of an extension

27   being vacated and terminated; and in the continuity of TPS so long as the country conditions justify

28   it. Defendants also provide no legal support for their invented exception to irreparable harm. They

1    cite *Stanley v. Illinois*, 405 U.S. 645, 647 (1972), but this case did not consider the *Winter* factors or

2    endorse such an exception. And they badly misread *Washington v. Trump*, 847 F.3d 1151, 1169 (9th

3    Cir. 2017). It ruled that permitting a decision to take effect even "temporarily" *can* cause

4    "substantial injuries and even irreparable harms" when, as here, it threatens to "separate[] families."

5    *Id.* at 1169. That case also reaffirmed the public "interest … in avoiding separation of families …."

6    *Id.* It concluded that the "powerful interest in national security and in the ability of an elected

7    president to enact policies" did *not* outweigh such harms. *Id.* Ultimately, the Ninth Circuit *denied*

8    two attempts by Defendants to set aside a district court order entered to prevent harms like those

9    here. *Id.* at 1156, 1158. The irreparable harm factor thus supports granting relief here.

10   **V.      THE EQUITIES AND PUBLIC INTEREST FAVOR POSTPONEMENT.**

11            Defendants' equities arguments rest on nothing more than unsubstantiated assertions from

12   the challenged termination itself. Opp. 24. For example, Defendants invoke safety concerns over the

13   Tren de Aragua gang, but offer no evidence that TdA members obtained TPS, and ignore the record

14   evidence thoroughly refuting that possibility. *See supra* p.9. Defendants' other arguments about the

15   public interest in enforcing immigration laws similarly fall short. Opp. 24. As one of Defendants'

16   own authorities illustrates, those interests would be served by postponing an unlawful decision

17   pending judicial review to avoid massive harm. *See Washington*, 847 F.3d at 1169.

18            Defendants' nonexistent evidentiary showing on the equities underscores that the balance of

19   hardships tips sharply in Plaintiffs' favor. The parties will face vastly different consequences from

20   an erroneous decision. *See COR Clearing, LLC v. Ashira Consulting, LLC*, 2016 WL 7638177, at *5

21   (C.D. Cal. Jan. 13, 2016) (weighing the equities "assuming the Court's ruling granting the injunction

22   is erroneous"). At most, an erroneous decision in Plaintiffs' favor would allow Venezuelan TPS

23   holders to temporarily retain TPS—an outcome that, until a short while ago, was what the

24   government itself had ordered. In contrast, an erroneous decision in Defendants' favor will cause

25   immediate and irreversible humanitarian harms, *e.g.*, Dkt. 18 ¶¶ 13, 18, 20, 22; Dkt. 20 ¶¶ 19, 22;

26   Dkt. 25 ¶¶ 19, 21; Dkt. 32 ¶ 22; Dkt. 33 ¶¶ 11, 17, 19; Dkt. 33 ¶¶ 15, 17, broad-based economic

27   disruption, *e.g.*, Dkt. 21 ¶ 9; Dkt. 23 ¶¶ 4–8; Dkt. 24 ¶¶ 6–8; Dkt. 27 ¶¶ 15, 20–22, and compromise

28   public health and safety, *e.g.*, Dkt. 19 ¶ 10; Dkt. 27 ¶¶ 15–16. The harms would impact not only TPS

1   holders, but also their American family members, friends, and neighbors.

2   **VI.   THE REQUESTED RELIEF IS NOT OVERBROAD.**

3       The relief Plaintiffs seek is not overbroad. The Ninth Circuit's default rule in APA cases

4   is that orders setting aside administrative agency action apply against the rule itself; only in that sense

5   are they "universal." Opp. 25. "When a reviewing court determines that agency regulations are

6   unlawful, the ordinary result is that the rules are vacated—not that their application to the individual

7   petitioners is proscribed." *East Bay*, 993 F.3d at 681 (cleaned up). Other circuits have long held the

8   same. *Harmon v. Thornburgh*, 878 F.2d 484, 495 n.21 (D.C. Cir. 1989) (same); *Career Colls. &*

9   *Schs. of Tex. v. Dep't of Educ.*, 98 F.4th 220, 255 (5th Cir. 2024) ("Nothing in the text of Section

10  705, nor of Section 706, suggests that either preliminary or ultimate relief under the APA needs to be

11  limited to [the associational plaintiff] or its members").

12       While there may be exceptions to that default rule, the factors *East Bay* identified for

13  purposes of determining the appropriate scope of relief in APA immigration cases strongly favor

14  postponing the agency action universally in this case. First, it is "necessary to give prevailing parties

15  the relief to which they are entitled." *E. Bay*, 993 F.3d at 680. NTPSA has over 84,000 Venezuelan

16  TPS holder members living in all 50 states and the District of Columbia. Dkt. 34 ¶13. "Requiring …

17  officials … to distinguish between [TPS] recipients who are members of the [Alliance] and those

18  who are not is impractical." *Az. Dream Act Coal. v. Brewer*, 81 F. Supp. 3d 795, 810 (D. Ariz.

19  2015), *aff'd*, 855 F.3d 957 (9th Cir. 2017) (relief "should apply to all DACA recipients" where

20  associational plaintiff sought relief for DACA-holder members)*; see also Easyriders Freedom*

21  *F.I.G.H.T. v. Hannigan*, 92 F.3d 1486, 1502 (9th Cir. 1996). Indeed, even under the most restrictive

22  rule for non-APA cases limiting relief narrowly to the parties before the Court, adequate equitable

23  relief would require a remedy for all Venezuelan NTPSA members who hold TPS, rendering circuit-

24  wide relief inadequate. Dkt. 34 ¶ 33.

25       Second, the Ninth Circuit has generally recognized the "need for uniformity in immigration

26  policy," because the INA itself "was designed to implement a uniform federal policy." *East Bay*, 993

27  F.3d at 681 (quotation omitted). That rationale has particular force here, where the statute

28  contemplates only one TPS status per country at a time. Adopting different rules for TPS holders

**ER0226**

1   from the same country would create confusion and needlessly complicate agency action in response

2   to the "United States's changing immigration requirements." *Id.* at 681. For these reasons, the Ninth

3   Circuit has "consistently recognized the authority of district courts to grant universal relief" in

4   immigration cases. *Id.* at 681*;see also Texas*, 40 F.4th at 219–20 (Fifth Circuit's similar rule).

5           Defendants' argument against universal relief rests entirely on non-APA cases. Opp. 25.

6   Those cases are about injunctions rather than vacatur or postponement under the APA, and the only

7   immigration case among them states that the federal government must speak with "one voice" in the

8   immigration realm, which supports uniformity here. *Id*. (quoting *Arizona v. United States*, 567 U.S.

9   387, 409 (2012)). Defendants also cite some concurrences expressing concerns about universal

10  relief, Opp. 25, but other judges (including the Chief Justice) have criticized the suggestion that APA

11  relief would not be universal. *See, e.g.*, *United States v. Texas*, 599 U.S. 670 (2023), Tr. at 35:12–25,

12  https://www.supremecourt.gov/oral_arguments/argument_transcripts/2022/22-58_4fc4.pdf (C.J.

13  Roberts) (characterizing government's view that vacatur does not afford universal relief as "fairly

14  radical" because "that's what you do in an APA case"). Whichever view eventually prevails, the

15  concurrences Defendants cite are not the law now. Even on the shadow docket, when the Supreme

16  Court has had ample opportunity to narrow lower court orders that universally vacate—or even

17  enjoin—agency action in both immigration cases and others, it has consistently refused to do so.[10]

## CONCLUSION

19          The Court should postpone the effective date of the challenged decisions until it can finally

20  resolve the merits.

21

22

---

23  [10] *See Texas*, 599 U.S. 670, *supra* (denying request for stay of district court order vacating DHS
    Secretary's enforcement priorities guidance, which applied universally); *Perez v. United States*, 2024
24  WL 4772734 (U.S. Nov. 12, 2024) (refusing to stay district court order halting the federal
    government's Keeping Families Together program for certain noncitizens, which applied
    universally); *Biden v. Missouri*, 145 S. Ct. 109 (2024) (denying request to vacate universal
25  injunction against Biden administration's student loan forgiveness program); *Alabama Ass'n of
    Realtors v. Dep't of Health & Human Servs.,* 594 U.S. 758, 759 (2021) (lifting stay on district court
26  order universally vacating the COVID eviction moratorium); *see also Washington v. Trump*, ---
    F.4th ---, 2025 WL 553485 (9th Cir. Feb. 19, 2025) (affirming universal injunction against birthright
27  citizenship order, and rejecting request to narrow injunction's scope); *CASA, Inc. v. Trump*, --- F.4th
    ---, 2025 WL 654902, at *1–3 (4th Cir. Feb. 28, 2025) (same, based on need for equity, uniformity,
28  and complete relief for associational plaintiff).

---

Date:  March 7, 2025

Respectfully submitted,

ACLU FOUNDATION
OF NORTHERN CALIFORNIA

 /s/ *Emilou MacLean*
Emilou MacLean
Michelle (Minju) Y. Cho

Ahilan T. Arulanantham
Stephany Martinez Tiffer
CENTER FOR IMMIGRATION LAW AND
POLICY, UCLA SCHOOL OF LAW

Eva L. Bitran
ACLU FOUNDATION
OF SOUTHERN CALIFORNIA

Jessica Karp Bansal
Lauren Michel Wilfong (*pro hac vice*)
NATIONAL DAY LABORER ORGANIZING
NETWORK

Attorneys for Plaintiffs

PLAINTIFFS' REPLY ISO MOT. TO POSTPONE EFFECTIVE DATE – CASE NO. 3:25-CV-01766-EMC

1

## CERTIFICATE OF SERVICE

2          I hereby certify that on March 7, 2025, I caused the foregoing to be electronically filed with

3    the Clerk of Court using the CM/ECF system, which will then send a notification of such filing

4    (NEF) to all counsel of record.

5

6                                            ACLU FOUNDATION
                                             OF NORTHERN CALIFORNIA
7

8                                             /s/ *Emilou MacLean*
                                             Emilou MacLean

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

PLAINTIFFS' REPLY ISO MOT. TO POSTPONE EFFECTIVE DATE – CASE NO. 3:25-CV-01766-EMC

**ER0229**

1  YAAKOV M. ROTH
   Acting Assistant Attorney General
2  Civil Division
   SARAH L. VUONG (CA Bar 258528)
3  Assistant Director
   WILLIAM H. WEILAND (Mass. Bar 661433)
4  Senior Litigation Counsel
   ERIC SNYDERMAN (VA Bar 99563)
5  ANNA DICHTER (NJ Bar 304442019)
6  LAUREN BRYANT (NY Bar No. 5321880)
   CATHERINE ROSS (DC Bar 9007404)
7  LUZ MARIA RESTREPO (NY Bar 4907077)
8  Trial Attorneys
   U.S. Department of Justice, Civil Division
9  Office of Immigration Litigation
   General Litigation and Appeals Section
10 P.O. Box 868, Ben Franklin Station
   Washington, DC 20044
11
12 Attorneys for Defendants

13                  UNITED STATES DISTRICT COURT

14                NORTHERN DISTRICT OF CALIFORNIA

15                   SAN FRANCISCO DIVISION

16

17 NATIONAL TPS ALLIANCE, *et. al.*,        Case No. 3:25-cv-1766-EMC

18              Plaintiff,

19      v.                                  **DEFENDANTS' RESPONSE IN OPPOSITION
   KRISTI NOEM, in her official capacity as TO PLAINTIFFS' MOTION TO POSTPONE
   Secretary of Homeland Security, *et. al.*, EFFECTIVE DATE OF AGENCY ACTION**
20
21              Defendants.                 Judge: Hon. Edward M. Chen
                                            Date:  March 24, 2025
22                                          Time:  9:00 a.m.
                                            Place: Courtroom 5, 17th Floor, San
23                                                  Francisco U.S. Courthouse

24

25

26

27

28 Defendants' Opp. To Plaintiffs' Mot. to Postpone
   3:25-cv-1766-EMC

1

## <u>TABLE OF CONTENTS</u>

INTRODUCTION ................................................................................................................ 1

BACKGROUND .............................................................................................................. 3

    A.    Statutory Background ....................................................................... 3

    B.    Factual Background ......................................................................... 5

STANDARDS OF REVIEW ............................................................................................ 7

ARGUMENT ................................................................................................................... 7

I.    THIS COURT LACKS JURISDICTION TO GRANT PLAINTIFFS THE RELIEF
THEY SEEK .......................................................................................................... 7

    A.    Section 1252(f) Precludes Plaintiffs' Requested Relief ..................... 7

    B.    The TPS Statute Bars Plaintiffs' Claims .......................................... 11

II.    PLAINTIFFS HAVE FAILED TO DEMONSTRATE A LIKELIHOOD OF
SUCCESS ON THE MERITS ................................................................................ 13

    A.    The Secretary of Homeland Security May Vacate a Prior Extension of a
Country's TPS Designation ........................................................... 13

    B.    The Secretary's Determinations to Vacate and Terminate the TPS Designation
for Venezuela Did Not Violate the Fifth Amendment Because the Determinations
were Related to Immigration Policy Objectives and Not Motivated by Racial
Animus ........................................................................................ 17

III.    ANY HARM PLAINTIFFS MAY SUFFER IS BASED ON THE INHERENT
NATURE OF THE TPS STATUTE ...................................................................... 22

IV.    THE BALANCE OF THE EQUITIES AND PUBLIC INTEREST WEIGH
AGAINST PRELIMINARY INJUNCTIVE RELIEF ............................................ 24

V.    PLAINTIFFS' REQUESTED RELIEF IS OVERBROAD ..................................... 25

CONCLUSION ................................................................................................................ 25

Defendants' Opp. To Plaintiffs' Mot. to Postpone
3:25-cv-1766-EMC

i

**ER0231**

1

## **TABLE OF AUTHORITIES**

2

### **CASES**

3

**Page(s)**

4

*Albertson v. FCC*,
5       182 F.2d 397 (D.C. Cir. 2014) ................................................................. 14

6

*Ali v. Fed. Bureau of Prisons*,
7       552 U.S. 214 (2008) ................................................................................. 12

*All. For the Wild Rockies v. Cottrell*,
8       632 F.3d 1127 (9th Cir. 2011) ................................................................. 24

9

*Amgen, Inc. v. Smith*,
10      357 F.3d 103 (D.C. Cir. 2004) ................................................................. 11

11

*Arizona v. United States*,
        567 U.S. 387 (2012) ................................................................................. 25
12

*Babb v. Wilkie*,
13      589 U. S. 399 (2020) ................................................................................ 12

14

*Biden v. Texas*,
15      597 U.S. 785 (2022) ................................................................................... 8

16

*Cal. Tow Truck Ass'n v. City & County of San Francisco*,
17      807 F.3d 1008 (9th Cir. 2015) ................................................................. 12

18

*California v. Texas*,
        593 U.S. 659 (2021) ................................................................................. 25
19

*California v. Yamasaki*,
20      442 U.S. 682 (1979) ................................................................................... 3

21

*Ctr. for Biological Diversity v. Regan*,
22      507 F. Supp. 3d 173 (D.D.C. 2022) ......................................................... 10

23

*Dan's City Used Cars, Inc. v. Pelkey*,
        569 U.S. 251 (2013) ................................................................................. 12
24

*Dep't of Homeland Sec. v. Regents of the Univ. of Cal.*,
25      591 U.S. 1 (2020) ..................................................................................... 19

26

*DHS v. New York*,
27      140 S. Ct. 599 (2020) ............................................................................... 25

28

Defendants' Opp. To Plaintiffs' Mot. to Postpone
3:25-cv-1766-EMC

ER0232

*DHX Inc. v. Allianz AGF MAT, Ltd.*,
   425 F.3d 1169 (9th Cir. 2005) .................................................................................... 12

*Dollar Rent A Car of Washington, Inc. v. Travelers Indem. Co.*,
   774 F.2d 1371 (9th Cir. 1985) .................................................................................... 22

*Durning v. Citibank, N.A.*,
   950 F.2d 1419 (9th Cir. 1991) .................................................................................... 12

*Fiallo v. Bell*,
   430 U.S. 787 (1977)..................................................................................................... 18

*Florida v. Mayorkas*,
   2023 WL 3567851 (N.D. Fla. May 16, 2023) ........................................................... 10

*Galvan v. Press*,
   347 U.S. 522 (1954)..................................................................................................... 18

*Galvez v. Jaddou*,
   52 F.4th 821 (9th Cir. 2022) ......................................................................................... 8

*Garland v. Aleman Gonzalez*,
   596 U.S. 543 (2022) ................................................................................................. 8, 9

*Gill v. Whitford*,
   138 S. Ct. 1916 (2018) ................................................................................................ 25

*Gun South, Inc. v. Brady*,
   877 F.2d 858 (11th Cir. 1989) .................................................................................... 14

*Harisiades v. Shaughnessy*,
   342 U.S. 580 (1952)............................................................................................... 15, 18

*Kelch v. Dir., Nev. Dep't of Prisons*,
   10 F.3d 684 (9th Cir. 1993) ........................................................................................ 14

*Kleindienst v. Mandel*,
   408 U.S. 753 (1972)..................................................................................................... 18

*L.A. Lakers, Inc. v. Fed. Ins. Co.*,
   869 F.3d 795 (9th Cir. 2017) ...................................................................................... 13

*Lamar, Archer & Cofrin, Llp v. Appling*,
   584 U.S. 709 (2018)..................................................................................................... 12

Defendants' Opp. To Plaintiffs' Mot. to Postpone
3:25-cv-1766-EMC

ER0233

*Last Best Beef, LLC v. Dudas*,
  506 F.3d 333 (4th Cir. 2007) ...................................................................... 14

*Lewis v. Casey*,
  518 U.S. 343 (1996) ...................................................................................... 25

*Lopez v. Brewer*,
  680 F.3d 1068 (9th Cir. 2012) ........................................................................ 7

*Macktal v. Chao*,
  286 F.3d 822 (5th Cir. 2002) ........................................................................ 14

*Mathews v. Diaz*,
  426 U.S. 67 (1976) ........................................................................................ 18

*Mazaleski v. Treusdell*,
  562 F.2d 701 (D.C. Cir. 1977) .............................................................. 14, 16

*McNary v. Haitian Refugee Center, Inc.*,
  498 U.S. 479 (1991) ...................................................................................... 12

*Ne. Ohio Coal. for Homeless & Serv. Emps. Int'l Union, Loc. 1199 v. Blackwell*,
  467 F.3d 999 (6th Cir. 2006) ................................................................... 10, 11

*Nixon v. Fitzgerald*,
  457 U.S. 731 (1982) ...................................................................................... 22

*Nken v. Holder*,
  556 U.S 418 (2009) ....................................................................................... 24

*Off. of Pers. Mgmt. v. Am. Fed'n of Gov't Emps., AFL-CIO*,
  473 U.S. 1301 (1985) .................................................................................... 11

*Patel v. Garland*,
  596 U.S. 328 (2022) ................................................................................. 12, 13

*Poursina v. USCIS*,
  936 F.3d 868 (9th Cir. 2019) ........................................................................ 16

*Ramos v. Wolf*,
  975 F.3d 872 (9th Cir. 2020) ............................................................ 12, *passim*

*Ramos v. Wolf*,
  59 F.4th 1010 (9th Cir. 2023) ....................................................................... 12

*Reno v. Catholic Soc. Servs., Inc.*,
  509 U.S. 43 (1993) ........................................................................................ 12

*Richards v. United States*,
369 U.S. 1 (1962)........................................................................................................ 13

*Safety-Kleen Corp. v. EPA*,
1996 U.S. App. LEXIS 2324 (D.C. Cir. Jan. 19, 1996).......................................... 10

*S. Yuba River Citizens League v. Nat'l Marine Fisheries Serv.*,
804 F. Supp. 2d 1045 (E.D. Cal. 2011)............................................................. 22, 23

*Sampson v. Murray*,
415 U.S. 61 (1974)................................................................................................. 7, 9

*Sanchez v. Mayorkas*,
593 U.S. 409 (2021).................................................................................................... 4

*Schrill v. Plunkett*,
760 F. Supp. 1378 (D. Or. 1990) ............................................................................ 23

*Scripps-Howard Radio v. FCC*,
316 U.S. 4 (1942)....................................................................................................... 9

*Sorenson v. Sec'y of Treasury*,
475 U.S. 851 (1986)................................................................................................. 10

*Stanley v. Illinois*,
405 U.S. 645 (1972)................................................................................................. 23

*State v. U.S. Bureau of Land Mgmt.*,
277 F. Supp. 3d 1106 (N.D. Cal. 2017) ................................................................. 10

*Taiebat v. Scialabba*,
2017 WL 747460 (N.D. Cal. Feb. 27, 2017) ......................................................... 23

*Trump v. Hawaii*,
585 U.S. 667 (2018)....................................................................................... 3, 16, 17

*United States R.R. Retirement Bd. v. Fritz*,
449 U.S. 166 (1980)................................................................................................. 19

*United States v. Nixon*,
418 U.S. 683 (1974)................................................................................................. 22

*Village of Arlington Heights v. Metro. Hous. Dev. Corp.*,
429 U.S. 252 (1977)................................................................................. 3, 17, 19, 21

*Washington v. Trump*,
847 F.3d 1151 (9th Cir. 2017) ................................................................................ 23

Defendants' Opp. To Plaintiffs' Mot. to Postpone
3:25-cv-1766-EMC

v

*Webster v. Doe,*
    486 U.S. 592 (1988) .................................................................................................. 17

*Winter v. NRDC,*
    555 U.S. 7 (2008) ....................................................................................................... 7

*Youngstown Sheet and Tube Co. v. Sawyer,*
    343 U.S. 579 (1952) ................................................................................................. 15

## STATUTES

5 U.S.C. § 701(a)(1) ....................................................................................................... 11

5 U.S.C. § 705 .................................................................................................... 1, *passim*

6 U.S.C. § 202 ......................................................................................................... 13, 15

6 U.S.C. § 557 .................................................................................................................. 4

8 U.S.C. § 1103 ................................................................................................................ 4

8 U.S.C. § 1103(a) ..................................................................................................... 6, 13

8 U.S.C. § 1103(a)(1) ..................................................................................................... 15

8 U.S.C. § 1103(a)(3) ..................................................................................................... 15

8 U.S.C. § 1252(f) ....................................................................................................... 2, 9

8 U.S.C. § 1252(f)(1) ......................................................................................... 2, *passim*

8 U.S.C. § 1254a ........................................................................................... 2, 3, 7, 8, 19

8 U.S.C. § 1254a(a) .......................................................................................................... 4

8 U.S.C. § 1254a(b) ..................................................................................................... 1, 4

8 U.S.C. § 1254a(b)(1)(B)(i) ......................................................................................... 22

8 U.S.C. § 1254a(b)(1)(B)(ii) ........................................................................................ 22

8 U.S.C. § 1254a(b)(1)(C) ............................................................................. 1, 13, 16, 21

8 U.S.C. § 1254a(b)(2) .................................................................................................... 4

8 U.S.C. § 1254a(b)(2)(B) ............................................................................................. 23

Defendants' Opp. To Plaintiffs' Mot. to Postpone
3:25-cv-1766-EMC

ER0236

8 U.S.C. § 1254a(b)(3) .......................................................................................................... 6

8 U.S.C. § 1254a(b)(3)(A) .............................................................................................. 4, 14, 15

8 U.S.C. § 1254a(b)(3)(B) ..................................................................................................... 5

8 U.S.C. § 1254a(b)(3)(C) ..................................................................................................... 5

8 U.S.C. § 1254a(b)(5)(A) ............................................................................................. 1, *passim*

8 U.S.C. § 1254a(g) .............................................................................................................. 22

**Illegal Immigration Reform and Immigrant Responsibility Act of 1996 (IIRIRA):**
Pub. L. No. 104-208, 110 Stat. 3009-546

Section § 306 .......................................................................................................................... 8

Section § 308 .......................................................................................................................... 8

## **OTHER AUTHORITIES**

### **Federal Register Notices**

*Designation of Venezuela for Temporary Protected Status and Implementation of Emp. Authorization for
Venezuelans Covered by Deferred Enforced Departure*, 86 Fed. Reg. 13,574 (Mar. 9, 2021) ............... 5

*Exec. Order No. 14159, Protecting the American People Against Invasion, § 16(b)*,
90 Fed. Reg. 8443 (Jan. 20, 2025) ................................................................................. 17, 24

*Extension and Redesignation of Venezuela for Temporary Protected Status*,
88 Fed. Reg. 68,130 (Oct. 3, 2023) ............................................................................ 2, 5, 14, 15

*Extension and Redesignation of Venezuela for Temporary Protected Status*,
87 Fed. Reg. 55,024 (Sept. 8, 2022) ................................................................................ 5, 14

*Extension of the 2023 Designation of Venezuela for Temporary Protected Status*,
90 Fed. Reg. 5961 (Jan. 17, 2025) ............................................................................... 5, 14, 15

*Reconsideration and Rescission of Termination of the Designation of El Salvador for Temporary
Protected Status; Extension of the Temporary Protected Status Designation for El Salvador*,
88 Fed. Reg. 40,282 (June 21, 2023) ................................................................................... 6

*Termination of the October 3, 2023 Designation of Venezuela for Temporary Protected Status*,
90 Fed. Reg. 9040 (Feb. 5, 2025) ............................................................................. 1, *passim*

*Vacatur of 2025 Temporary Protected Status Decision for Venezuela*,
90 Fed. Reg. 8805 (Feb. 3, 2025) ............................................................................ 2, *passim*

**Dictionaries**

Black's Law Dictionary (12th ed. 2024)........................................................................ 8

Black's Law Dictionary Online (2d ed.)
https://thelawdictionary.org ....................................................................................... 10

Merriam-Webster Dictionary,
https://www.merriam-webster.com/dictionary ........................................................... 10

Oxford English Dictionary (2d ed. 1989) ...................................................................... 8

Webster's Third New Int'l Dictionary............................................................................ 12

**<u>INTRODUCTION</u>**

Defendants Kristi Noem, in her official capacity as Secretary of Homeland Security; the U.S. Department of Homeland Security (DHS); and the United States of America, respectfully submit this response in opposition to Plaintiffs' Motion to Postpone Effective Date of Agency Action.[1] (PI Mot.), ECF 16. In 1990, Congress created the Temporary Protected Status (TPS) program to provide, on a discretionary basis, temporary status to aliens who cannot safely return in the short-term to their home nation because of a natural disaster, armed conflict, or other "extraordinary and temporary conditions in the foreign state." 8 U.S.C. § 1254a(b). The Secretary of Homeland Security may designate a country for TPS only if the Secretary determines that certain statutory criteria justifying the designation are met. When a country is designated, eligible aliens from that country who are present in the United States on the effective date of the designation and register with the federal government are temporarily protected from removal and receive authorization to work in the United States. Consistent with the temporary nature of TPS, Congress dictated that the Secretary must regularly review a country's TPS designation and must terminate that designation if she determines that the conditions giving rise to the designation are no longer met. Congress further provided that "determinations" concerning TPS "with respect to the designation, or termination or extension of a designation, of a foreign state under this subsection" are not subject to "judicial review." 8 U.S.C. § 1254a(b)(5)(A).

Exercising her clear and unreviewable statutory authority, Secretary Noem terminated the TPS designation for Venezuela. *Termination of the October 3, 2023 Designation of Venezuela for Temporary Protected Status*, 90 Fed. Reg. 9040 (Feb. 5, 2025) (hereinafter "2025 Termination"). Venezuela was first designated in 2021 under 8 U.S.C. § 1254a(b)(1)(C) based on former Secretary Mayorkas's determination that there exist in Venezuela "extraordinary and temporary conditions" that prevent Venezuelan nationals from safely returning and that it is not "contrary to the national interest of the United States" to permit the aliens to remain temporarily in the United States. *Id*. at 9041. In 2023, former Secretary Mayorkas newly

---

[1] Plaintiffs style their Motion as one arising under 5 U.S.C. § 705 of the Administrative Procedure Act ("APA"), calling it a Motion to Postpone Effective Date of Agency Action. Yet Plaintiffs cite to the preliminary injunction standard throughout their Motion and effectively ask this Court for prohibited injunctive relief. Defendants will refer to Plaintiffs' Motion as a Preliminary Injunction Motion (PI Mot.).

Defendants' Opp. To Plaintiffs' Mot. to Postpone
3:25-cv-1766-EMC

1

1    designated Venezuela, creating a parallel designation with the original 2021 designation. *Extension and*

2    *Redesignation of Venezuela for Temporary Protected Status*, 88 Fed. Reg. 68,130 (Oct. 3, 2023)

3    (hereinafter "2023 Designation"). Consistent with her obligation to periodically review whether TPS

4    designations remain appropriate, Secretary Noem, after consulting with other government agencies,

5    determined that the conditions for the 2023 Designation of Venezuela for TPS no longer continue to be

6    met. The Secretary supplied the basis and justification for her determination in the Federal Register notice,

7    where she explained that it is contrary to the U.S. national interest to permit the Venezuelan nationals to

8    remain temporarily in the United States. *See 2025 Termination*, 90 Fed. Reg. at 9042-9044.

9        Notwithstanding the Secretary's clear authority and Congress's decision to commit her

10   determination to her discretion alone, Plaintiffs, the National TPS Alliance, "a member-led organization,"

11   and several TPS beneficiaries, bring this suit challenging the termination and asserting claims under the

12   APA and the Equal Protection Clause. Plaintiffs ask this court to postpone the effective date of Secretary

13   Noem's vacatur of a recently-published decision extending the 2023 designation for Venezuela, *Vacatur*

14   *of 2025 Temporary Protected Status Decision for Venezuela*, 90 Fed. Reg. 21, 8805 (Feb. 3, 2025)

15   (hereinafter "2025 Vacatur"), and the 2025 Termination of TPS for Venezuela. *2025 Termination*, 90 Fed.

16   Reg. at 9040. The Court should reject those extraordinary requests.

17        To start, the Court lacks jurisdiction to issue the requested relief. Although Plaintiffs style their

18   request for relief as a motion to postpone the effective date of the Secretary's determination under 5 U.S.C.

19   § 705, what they actually seek is an injunction enjoining the exercise of her authority. But 8 U.S.C.

20   § 1252(f)—a provision Plaintiffs tellingly ignore—explicitly bars such relief. Section 1252(f)(1) provides:

21   "Regardless of the nature of the action or claim or of the identity of the party or parties bringing the action,

22   no court (other than the Supreme Court) shall have jurisdiction or authority to *enjoin or restrain* the

23   operation of the provisions of part IV of this subchapter … other than with respect to the application of

24   such provisions to an individual alien against whom proceedings … have been initiated." 8 U.S.C.

25   § 1252(f)(1) (emphasis added). Section 1254a is on such a covered provision, and a stay "enjoin[ing] or

26   restrain[ing]" the Secretary's determination from having any legal effect is thus precisely the sort of

27   coercive order § 1252(f) prohibits.

28   Defendants' Opp. To Plaintiffs' Mot. to Postpone
     3:25-cv-1766-EMC

ER0240

1    Additionally, the TPS statute broadly prohibits judicial review of "any determination of the

2    Secretary with respect to" designations, terminations, or extensions. 8 U.S.C. § 1254a(b)(5)(A). Each of

3    the Secretary's decisions is precisely such a "determination" concerning "termination" of a designation

4    under § 1254a. *Id.* Plaintiffs' claims challenging the basis for Secretary Noem's Vacatur and Termination

5    decisions and seeking to set those decisions aside, fit squarely within the statute's bar on judicial review.

6    Plaintiffs' claims lack merit too. Plaintiffs' APA claims fail because Congress granted the

7    Secretary broad discretion and authority to review TPS decisions pertaining to the continuing mandate

8    that she ensure the continued designation of a country does not adversely affect the national interest.

9    Plaintiffs' equal protection claim is equally unavailing. Plaintiffs fail to identify any evidence indicating

10   that the Secretary was motivated by discriminatory animus. To the contrary, the evidence demonstrates

11   that Secretary Noem's Vacatur and Termination decisions are immigration policies rationally related to

12   government objectives of national security and are not motivated by racially discriminatory intent. And

13   that is true, regardless of whether the Court applies the deferential standard recognized in *Trump v.*

14   *Hawaii*, 585 U.S. 667 (2018), as applicable to such claims in the immigration context, or the balancing

15   sometimes applied in other contexts set forth in *Village of Arlington Heights v. Metro. Hous. Dev.*

16   *Corp.*, 429 U.S. 252 (1977).

17   Finally, in seeking a nationwide injunction, the scope of Plaintiffs' requested relief is vastly

18   overbroad. The relief sought goes much further than redressing the injuries to the Plaintiffs and contravenes

19   equitable principles that require relief to be no more burdensome to the defendant than is necessary to

20   provide plaintiff relief. *California v. Yamasaki*, 442 U.S. 682, 702 (1979). Should the Court grant Plaintiffs'

21   requested injunction-like "stay", it should be limited to the individual Plaintiffs.

22                                   **BACKGROUND**

23   **A. Statutory Background**

24   The Immigration Act of 1990 established a program for providing temporary shelter in the United

25   States on a discretionary basis for aliens from designated countries experiencing ongoing armed conflict,

26   environmental disaster, or "extraordinary and temporary conditions" that temporarily prevent the aliens'

27   safe return or, in the case of environmental disasters, temporarily render the country unable to handle

28   Defendants' Opp. To Plaintiffs' Mot. to Postpone
     3:25-cv-1766-EMC

**ER0241**

1    adequately the return of its nationals.  Pub. L. No. 101-649, 104 Stat. 4978. The statute authorizes the

2    Secretary of Homeland Security,[2] "after consultation with appropriate agencies of the Government," to

3    designate countries for "Temporary [P]rotected [S]tatus," if she finds:

4        (A) … that there is an ongoing armed conflict within the state and, due to such conflict,
             requiring the return of aliens who are nationals of that state to that state (or to the

5            part of the state) would pose a serious threat to their personal safety;

6        (B) … that—

7
8            (i) there has been an earthquake, flood, drought, epidemic, or other environmental
                 disaster in the state resulting in a substantial, but temporary, disruption of living
9                conditions in the area affected,

10           (ii) the foreign state is unable, temporarily, to handle adequately the return to the
                 state of aliens who are nationals of the state, and
11

12           (iii) the foreign state officially has requested designation under this subparagraph;
                 or

13
         (C)  …  there exist extraordinary and temporary conditions in the foreign state that
14       prevent aliens who are nationals of the state from returning to the state in safety, unless
         the [Secretary] finds that permitting the aliens to remain temporarily in the United States
15       is contrary to the national interest of the United States.

16   8 U.S.C. § 1254a(b).

17       When the Secretary designates a country for TPS, eligible aliens who are granted TPS may not be

18   removed from the United States and are authorized to work for the duration of the country's TPS

19   designation, so long as they remain in valid temporary protected status. 8 U.S.C. § 1254a(a), (c); *see*

20   *Sanchez v. Mayorkas*, 593 U.S. 409, 412 (2021). Initial designations may not exceed eighteen months.

21   8 U.S.C. § 1254a(b)(2). The Secretary must consult with appropriate agencies and review each

22   designation before it ends to determine whether the conditions for the country's designation continue to

23   be met. *Id.* § 1254a(b)(3)(A). If the Secretary finds that the foreign state "no longer continues to meet

24   the conditions for designation," she "shall terminate the designation" by publishing notice in the Federal

25

26   ───────────────
     [2] The statute originally vested the Attorney General with the power to make TPS designation, extension
27   and termination decisions. Congress transferred these powers to the Secretary of Homeland Security.
     *See* 8 U.S.C. § 1103; 6 U.S.C. § 557.

28   Defendants' Opp. To Plaintiffs' Mot. to Postpone
     3:25-cv-1766-EMC

                                                4

1   Register of the determination and the basis for the termination. *Id.* § 1254a(b)(3)(B). If the Secretary

2   "does not determine" that the foreign state "no longer meets the conditions for designation," then "the

3   period of designation of the foreign state is extended for an additional period of 6 months (or, in the

4   discretion of the [Secretary], a period of 12 or 18 months)." *Id.* § 1254a(b)(3)(C).

5        Finally, the statute makes the Secretary's TPS determinations unreviewable. Section

6   1254a(b)(5)(A) states: "There is no judicial review of any determination of the [Secretary] with respect

7   to the designation, or termination or extension of a designation, of a foreign state under this subsection."

8   **B. Factual Background**

9        On March 9, 2021, then-Secretary of Homeland Security Alejandro Mayorkas designated

10  Venezuela for TPS based on extraordinary and temporary conditions that prevented nationals of

11  Venezuela from returning in safety. *See Designation of Venezuela for Temporary Protected Status and*

12  *Implementation of Emp. Authorization for Venezuelans Covered by Deferred Enforced Departure*, 86 Fed.

13  Reg. 13,574 (Mar. 9, 2021) (hereinafter "2021 Designation"). Following the 2021 Designation, former

14  Secretary Mayorkas extended Venezuela's TPS designation twice. *See Extension of the Designation of*

15  *Venezuela for Temp. Protected Status*, 87 Fed. Reg. 55,024 (Sept. 8, 2022); *see also 2023 Designation*,

16  88 Fed. Reg. 68,130.

17       On October 3, 2023, in addition to extending the 2021 Venezuela TPS status through September

18  2025, former Secretary Mayorkas redesignated Venezuela for TPS, effective from October 3, 2023,

19  through April 2, 2025. *2023 Designation*, 88 Fed. Reg. 68,130. This notice not only provided procedures

20  for initial applicants registering for TPS under the 2023 Designation but also allowed Venezuelan

21  nationals who had previously registered for TPS under the 2021 Designation to re-register for TPS and

22  apply to renew their Employment Authorization Document (EAD) with USCIS. *Id.* Finally, on January

23  10, 2025, former Secretary Mayorkas issued a notice extending the 2023 Designation for 18 months,

24  allowing a consolidation of filing processes such that all eligible Venezuela TPS beneficiaries (whether

25  under the 2021 or 2023 designations) could obtain TPS through October 2, 2026, and extend certain EADs.

26  *See Extension of the 2023 Designation of Venezuela for Temp. Protected Status*, 90 Fed. Reg. 5961 (Jan.

27  17, 2025) (hereinafter "2025 Extension").

28  Defendants' Opp. To Plaintiffs' Mot. to Postpone
    3:25-cv-1766-EMC

5

ER0243

On January 28, 2025, Secretary Noem vacated the 2025 Extension, thereby restoring the status quo that preceded that decision. *See 2025 Vacatur*, 90 Fed. Reg. at 8805. In accordance with the Immigration and Nationality Act (INA) and the APA, Secretary Noem explained her reasoning for the Vacatur in the Federal Register Notice (FRN), stating that the 2025 Extension "did not acknowledge the novelty of its approach" or "explain how it is consistent with the TPS statute." *Id*. at 8807; *see* 8 U.S.C. § 1254a(b)(3). Secretary Noem determined that the "lack of clarity" warranted a vacatur to "untangle the confusion and provide an opportunity for informed determinations regarding the TPS designations and clear guidance." *Id*. In considering putative reliance interests, Secretary Noem provided that "Venezuela 2023 registrants will retain their temporary protected status under the pre-existing designation at least until April 2, 2025," and "[w]ith respect to any Venezuela 2021 registrants who elected, pursuant to the 2025 Extension, to register under the Venezuela 2023 designation, USCIS will restore their Venezuela 2021 registration." *Id*. This Vacatur is consistent with an agency's "statutorily implicit" authority to reconsider TPS-related determinations and upon reconsideration, to vacate or amend the determination. *See* 8 U.S.C. § 1103(a), 1254a(b)(3), (b)(5)(A); *see also Reconsideration and Rescission of Termination of the Designation of El Salvador for Temporary Protected Status; Extension of the Temporary Protected Status Designation for El Salvador*, 88 Fed. Reg. 40,282, 40,285 & n.16 (June 21, 2023) ("An agency has inherent (that is, statutorily implicit) authority to revisit its prior decisions unless Congress has expressly limited that authority. The TPS statute does not limit the Secretary's inherent authority to reconsider any TPS-related determination, and upon reconsideration, to change the determination." (citing cases)).

A determination whether to extend the 2023 Venezuela designation was due by February 1, 2025. After reviewing country conditions and consulting with the appropriate U.S. Government agencies, Secretary Noem determined that Venezuela no longer continues to meet the conditions for the 2023 Designation. *See 2025 Termination*, 90 Fed. Reg. at 9040. Specifically, Secretary Noem determined that "it is contrary to the national interest to permit the covered Venezuelan nationals to remain temporarily in the United States." *Id*. at 9041. Therefore, Secretary Noem terminated the 2023 Designation of Venezuela, effective April 7, 2025. *Id*. In making this determination, she examined DHS' review of country conditions, acknowledging that "there are notable improvements in several areas, such as the economy,

Defendants' Opp. To Plaintiffs' Mot. to Postpone
3:25-cv-1766-EMC

ER0244

1    public health, and crime," that allow for Venezuelan nationals to be "safely returned to their home

2    country." *Id*. On that basis, she concluded that termination of the 2023 Designation was "required," and

3    further explained that "national interest is an expansive standard that may encompass an array of broad

4    considerations" which "calls upon the Secretary's expertise and discretionary judgment." *Id*. at 9042.

5    Secretary Noem explained that the significant population of TPS holders has resulted in "associated

6    difficulties in local communities where local resources have been inadequate to meet the demands cause

7    by increased numbers," and further underscored that, across the United States, "city shelters, police

8    stations and aid services are at maximum capacity." *Id*. In considering national and immigration interests,

9    she found that this population includes members of Tren de Aragua, a transnational criminal organization

10   recently determined to "pos[e] threats to the United States." *Id*. at 9042-43. Secretary Noem also observed

11   that "U.S. foreign policy interests, particularly in the Western Hemisphere, are best served and protected

12   by curtailing policies that facilitate or encourage illegal and destabilizing migration." *Id*. at 9043.

13                                    **STANDARDS OF REVIEW**

14        The standards of review for relief under 5 U.S.C. § 705 and for preliminary injunctions are the

15   same. *See Sampson v. Murray*, 415 U.S. 61, 80 (1974). A preliminary injunction is "an extraordinary and

16   drastic remedy, one that should not be granted unless the movant, by a clear showing, carries the burden

17   of persuasion." *Lopez v. Brewer*, 680 F.3d 1068, 1072 (9th Cir. 2012). To get relief, a party must show

18   "he is likely to succeed on the merits, that he is likely to suffer irreparable harm in the absence of

19   preliminary relief, that the balance of equities tips in his favor, and that an injunction is in the public

20   interest." *Winter v. NRDC*, 555 U.S. 7, 20 (2008).

21                                           **ARGUMENT**

22   **I.    THIS COURT LACKS JURISDICTION TO GRANT PLAINTIFFS THE RELIEF THEY
         SEEK**

23        **A.    Section 1252(f) Precludes Plaintiffs' Requested Relief**

24        Here, the relief Plaintiffs seek would have the effect of enjoining or restraining DHS's

25   implementation   of the TPS provisions in section 244 of the INA, 8 U.S.C. § 1254a.  But 8 U.S.C.

26   § 1252(f)(1) explicitly bars such relief. It provides: "Regardless of the nature of the action or claim or of

27

28   Defendants' Opp. To Plaintiffs' Mot. to Postpone
     3:25-cv-1766-EMC

                                                  7

                                                                                      **ER0245**

1   the identity of the party or parties bringing the action, no court (other than the Supreme Court) shall have

2   jurisdiction or authority to *enjoin or restrain* the operation of the provisions of part IV of this subchapter

3   … other than with respect to the application of such provisions to an individual alien against whom

4   proceedings … have been initiated." 8 U.S.C. § 1252(f)(1) (emphasis added). Section 1254a is one of the

5   statutory provisions § 1252(f)(1) covers.  Illegal Immigration Reform and Immigrant Responsibility Act

6   of 1996 (IIRIRA), div. C, Pub. L. No. 104-208, §§ 306, 308, 110 Stat. 3009-546. Although in the U.S.

7   Code, Section 1254a appears in Part V, the U.S. Code is inconsistent with the INA, wherein the TPS

8   provisions in Section 244 appear in Chapter 4. *Id*. When there is a conflict, the INA prevails. *See Galvez*

9   *v. Jaddou*, 52 F.4th 821, 830 (9th Cir. 2022) ("[T]he text of the United States Code 'cannot prevail over

10   the Statutes at Large when the two are inconsistent.'"); *see also* Section 244 of the INA lies within chapter

11   4 of title II of the INA, as amended. Section 1252(f)(1) thus eliminates any court's (other than the Supreme

12   Court's) authority to issue coercive orders enjoining or restraining implementation of 8 U.S.C. § 1254a.

13        By invoking 5 U.S.C. § 705 and asking this Court to "postpone the effective date of the

14   challenged decisions[,]" Plaintiffs seek the type of coercive order prohibited by 8 U.S.C. § 1252(f)(1).

15   Regardless of how Plaintiffs name their motion or frame their claims, their requested relief is barred. An

16   order pursuant to 5 U.S.C. § 705 prevents – i.e. "enjoin[s] or restrain[s]" – DHS from implementing its

17   determinations about the designation of Venezuela for TPS and is thus jurisdictionally barred under

18   § 1252(f)(1). The Supreme Court has held that 8 U.S.C. § 1252(f)(1) "generally prohibits lower courts

19   from entering injunctions that order federal officials to take or *to refrain from taking* actions to enforce,

20   implement, or otherwise carry out the specified statutory provisions." *Biden v. Texas*, 597 U.S. 785, 797

21   (2022) (quoting *Garland v. Aleman Gonzalez*, 596 U.S. 543, 544 (2022)) (emphasis added); *see* Black's

22   Law Dictionary (12th ed. 2024) (defining injunction as "[a] court order commanding or preventing an

23   action"). As the Supreme Court held in *Aleman Gonzalez*, to "restrain" means to "check, hold back,

24   or prevent (a person or thing) from some course of action," to "inhibit particular actions," or to "stop (or

25   perhaps compel)" action. 596 U.S. at 549 (quoting 5 Oxford English Dictionary 756 (2d ed. 1989)). An

26   order postponing the effective date of implementation or enforcement of the vacatur and termination

27   determinations would necessarily constitute an order "restraining" federal officials. *Id*. at 550.

28   Defendants' Opp. To Plaintiffs' Mot. to Postpone
3:25-cv-1766-EMC

1      Plaintiffs' likely rejoinder is that stays differ from injunctions. But that argument relies on the

2 incorrect assumption that 5 U.S.C. § 705 creates a new form of remedy—a district court stay of agency

3 action that is distinct from an injunction. Section 705 does not, however, create any new remedies

4 beyond the  traditional equitable relief that existed at the time of the APA's passage. *See Scripps-Howard*

5 *Radio v. FCC*, 316 U.S. 4, 16–17 (1942). When Congress adopted § 705, there is no evidence that it

6 intended to create a wholly new, never-before-seen species of remedy. Instead, Congress simply codified

7 existing equitable remedies. Section 705 allows a court to issue only that "process" that is "necessary

8 and appropriate." And the Supreme Court long ago concluded "[t]he relevant legislative history of that

9 section … indicates that it was primarily intended to reflect existing law" permitting courts of appeals

10 to stay certain agency actions pending direct review authorized by statute in the same manner that

11 appellate courts can in certain circumstances stay a district court decision pending appeal. *Sampson*, 415

12 U.S. at 68 n.15; *see Scripps-Howard Radio*, 316 U.S. at 9-10 ("a federal court can stay the *enforcement of*

13 *a judgment pending the outcome of an appeal*" (emphasis added)). Section 705 was not intended "to fashion

14 new rules of intervention for District Courts." *Id*. Thus, the text, context, legislative history, sources

15 contemporary to the APA's passage, and relevant case law all show 5 U.S.C. § 705 does nothing

16 more than preserve traditional equitable relief—relief that 8 U.S.C. § 1252(f)(1) bars.

17      Plaintiffs do not seek an order that would operate on the individual removal proceedings or

18 some other agency adjudication pending judicial review. Plaintiffs instead ask this Court to

19 "prevent" the government from implementing its chosen "course of action" with respect to 8 U.S.C.

20 § 1254a. *See Aleman Gonzalez*, 596 U.S. at 549, 551 (orders requiring government to "refrain from

21 actions that (again in the Government's view) are allowed" by covered provisions are barred by

22 § 1252(f)). Such an order, even if labeled a stay, is injunctive in effect and barred by 8 U.S.C.

23 § 1252(f)(1). Thus, Plaintiffs' stay request is no different from an injunction – an equivalence

24 underscored by the preliminary-injunction standard applying to it.

25      Even if 8 U.S.C. § 1252(f)(1) did not apply, 5 U.S.C. § 705 by its own terms does not authorize

26 relief here because the challenged actions have already taken effect. Courts construing 5 U.S.C. § 705

27 have concluded that the phrase "postpone the effective date" of an agency action authorizes the

28 Defendants' Opp. To Plaintiffs' Mot. to Postpone
3:25-cv-1766-EMC

**ER0247**

1  "postpone[ment of] the effective date of *a not yet effective rule*, pending judicial review"—but not

2  suspension of a policy that is *already in effect*. *Ctr. for Biological Diversity v. Regan*, 507 F. Supp. 3d

3  173, 204 (D.D.C. 2022) (quoting *Safety-Kleen Corp. v. EPA*, Nos. 92-1629, 92-1639, 1996 U.S. App.

4  LEXIS 2324, at *2–3 (D.C. Cir. Jan. 19, 1996)) (emphasis added); *see also, e.g.*, *State v. U.S. Bureau of*

5  *Land Mgmt.*, 277 F. Supp. 3d 1106, 1118 (N.D. Cal. 2017) (same). While these cases address an agency

6  decision to "postpone the effective date," 5 U.S.C. § 705 uses identical language when referring to "the

7  reviewing court ... postpon[ing] the effective date of an agency action." The use of an identical phrase in

8  the first and second sentences of § 705 must be presumed to be intentional. *See, e.g.*, *Sorenson v. Sec'y of*

9  *Treasury*, 475 U.S. 851, 860 (1986) ("The normal rule of statutory construction assumes that identical

10  words used in different parts of the same act are intended to have the same meaning."). Given its plain

11  meaning, the language in 5 U.S.C. § 705 allowing a court or agency to "postpone the effective date" can

12  only be read to mean that the statute allows the court "to put off until a future time," "defer," or "delay"

13  the "operative" date of the agency action. *See* Merriam-Webster Dictionary, https://www.merriam-

14  webster.com/dictionary/effective (last visited Mar. 2, 2025); *see also* Black's Law Dictionary Online (2d

15  ed.), https://thelawdictionary.org/?s=postpone (last visited Mar. 3, 2025) (defining "postpone" as "to put

16  off; defer; delay; continue"). One cannot "defer" or "put off" an action that has already occurred; thus,

17  the issuance of a stay after the effective date of the challenged policy has already passed is beyond what

18  § 705 permits. *See Florida v. Mayorkas*, No. 3:23-cv-09962-TKW-ZCB, 2023 WL 3567851, at *4 (N.D.

19  Fla. May 16, 2023) (Section 705 stay unavailable because the policy was in effect when the complaint

20  was filed).

21      The 2025 Vacatur Plaintiffs seek to stay was published on February 3, 2025. *2025 Vacatur*, 90

22  Fed. Reg. at 8805. Thus, the publication of that determination means that its effective dates already

23  passed. *See id.* at 8806 ("The vacatur is effective immediately"). That 5 U.S.C. § 705 is disjunctive,

24  permitting reviewing courts to "postpone the effective date of an agency action *or* to *preserve status or*

25  *rights* pending conclusion of the review proceedings" (emphases added), does not change this result. An

26  order staying a policy after it has already gone into effect thus does not preserve the status quo, but rather,

27  *alters* it. *See, e.g.*, *Ne. Ohio Coal. for Homeless & Serv. Emps. Int'l Union, Loc. 1199 v. Blackwell*, 467

28  Defendants' Opp. To Plaintiffs' Mot. to Postpone
3:25-cv-1766-EMC

**ER0248**

1    F.3d 999, 1006 (6th Cir. 2006) (explaining an order "preventing the implementation of new regulations"

2    would "disturb[]" rather than preserve "the status quo"); *Off. of Pers. Mgmt. v. Am. Fed'n of Gov't Emps.,*

3    *AFL-CIO*, 473 U.S. 1301, 1305 (1985) (had the district court issued an order stopping rule from taking

4    effect that would alter the "status quo").

5        **B.**    **The TPS Statute Bars Plaintiffs' Claims**

6          Additionally, the TPS statute itself unambiguously provides that "[t]here is no judicial review of

7    any determination of the [Secretary] with respect to the designation, or termination or extension of a

8    designation, of a foreign state" for TPS. 8 U.S.C. § 1254a(b)(5)(A). The statute thus makes clear that TPS

9    designation, extension, and termination determinations are committed to the unreviewable authority of the

10   Secretary. Accordingly, APA challenges to such determinations are prohibited. *See* 5 U.S.C. § 701(a)(1);

11   *Amgen, Inc. v. Smith*, 357 F.3d 103, 113 (D.C. Cir. 2004) ("If a no-review provision shields particular

12   types of administrative action, a court may not inquire whether a challenged agency decision is arbitrary,

13   capricious, or procedurally defective.").

14         Plaintiffs acknowledge that the statutory language of § 1254a(b)(5)(A) clearly applies to "any

15   determination" made "with respect to the designation, or termination, or extension" of TPS. PI Mot. 17.

16   And despite alleging that Secretary Noem's 2025 Termination of the 2023 Designation for Venezuela

17   violates the APA, Plaintiffs only argue in their PI Motion that they are likely to succeed on their APA

18   claim regarding Secretary Noem's 2025 Vacatur determination. PI Mot. 4-11. To avoid the judicial review

19   limitation in 8 U.S.C. § 1254a(b)(5)(A), Plaintiffs argue that the Secretary's decision to vacate the 2025

20   Extension was something other than a "determination."[3] *Id*. Not so.

21         Plaintiffs would have this Court believe that if the Secretary's decision is not one specifically

22   labeled a designation, termination of a designation, or extension of a designation, then the decision falls

23   outside the scope of the statutory language. PI Mot. 17. However, the Court is prohibited from reviewing

24

---

25   [3] The basis for Plaintiffs' assertion that none of the claims in their Complaint challenge a determination

26   to terminate the 2023 TPS designation by the Secretary is unclear, as Count II of Plaintiffs' Complaint
     clearly challenges the "order terminating the 2023 TPS designation for Venezuela." Compl. ¶¶ 150-154.

27   Moreover, in Plaintiffs Motion, they explicitly state that "Secretary Noem's decisions to vacate and
     terminate TPS for Venezuelans" violated the Fifth Amendment. PI Mot. 11.

28   Defendants' Opp. To Plaintiffs' Mot. to Postpone
     3:25-cv-1766-EMC

**ER0249**

1    "*any determination … with respect to* the designation, or termination or extension of a designation" of

2    TPS. 8 U.S.C. § 1254a(b)(5)(A). In its now vacated decision, the Ninth Circuit reviewed the exact statute

3    at issue here. *See Ramos v. Wolf*, 975 F.3d 872, 889 (9th Cir. 2020), *vacated by Ramos v. Wolf*, 59 F.4th

4    1010, 1011 (9th Cir. 2023).[4] Comparing the term "determination" in § 1254a(b)(5)(A) with similar uses

5    of the word in provisions analyzed by the Supreme Court in *McNary v. Haitian Refugee Center, Inc.*, 498

6    U.S. 479, 486 n.6 (1991), and *Reno v. Catholic Soc. Servs., Inc.*, 509 U.S. 43, 53 (1993), the Ninth Circuit

7    stated that the reference to a determination "generally precludes direct review of the secretary's country-

8    specific TPS determinations." *Ramos*, 975 F.3d at 891. The inquiry does not end here, but rather this Court

9    must look to the surrounding text to understand what types of determinations are restricted from review.

10    The word "any," modifying "determination" in § 1254a(b)(5)(A), indicates a broad sweep. *See,*

11    *e.g.*, *Ali v. Fed. Bureau of Prisons*, 552 U.S. 214, 219 (2008) ("Read naturally, the word 'any' has an

12    expansive meaning, that is, 'one or some indiscriminately of whatever kind'" (citation omitted)). The

13    phrase "with respect to" in § 1254a(b)(5)(A) is likewise broad in scope, as that phrase "is generally

14    understood to be synonymous with the phrase 'relating to'" or "'related to.'" *Cal. Tow Truck Ass'n v. City*

15    *& County of San Francisco*, 807 F.3d 1008, 1021 (9th Cir. 2015). And the Supreme Court has underscored

16    that the ordinary meaning of "related to" is "a broad one," meaning "having a connection with or reference

17    to . . ., whether directly or indirectly." *Dan's City Used Cars, Inc. v. Pelkey*, 569 U.S. 251, 260 (2013).

18    The Supreme Court recently undertook a similar review of the phrase "any judgment regarding the

19    granting of relief" under enumerated provisions. *Patel v. Garland*, 596 U.S. 328 (2022). There, the

20    Supreme Court pointed out that it "has repeatedly explained, the word 'any' has an expansive meaning."

21    *Id*. at 338 (quotations omitted) (citing *Babb v. Wilkie*, 589 U. S. 399, 405, n.2 (2020); Webster's Third

22    New Int'l Dictionary, at 97 (defining "any" as "one or some indiscriminately of whatever kind")). The

23    phrase "with respect to" is the equivalent of "regarding" or "concerning." *Lamar, Archer & Cofrin, Llp v.*

24    *Appling*, 584 U.S. 709, 717 (2018); *see also Patel*, 596 U.S. at 339. The use of these phrases "in a legal

25

___

26    [4] This decision has been vacated and therefore has no precedential effect. *See, e.g., Durning v. Citibank, N.A.*, 950 F.2d 1419, 1424 n.2 (9th Cir. 1991) ("[A] decision that has been vacated has no precedential
27    authority whatsoever."). A vacated decision, however, "still carries informational and perhaps even persuasive precedential value." *DHX Inc. v. Allianz AGF MAT, Ltd.*, 425 F.3d 1169, 1176 (9th Cir. 2005).

28    Defendants' Opp. To Plaintiffs' Mot. to Postpone
3:25-cv-1766-EMC

**ER0250**

1    context generally has a broadening effect, ensuring that the scope of a provision covers not only its subject

2    but also matters relating to that subject." *Patel*, 596 U.S. at 339.

3          Within this framework, Secretary Noem's Vacatur of the 2025 Extension falls well within the

4    statute's "any determination" language and is a country-specific TPS determination relating to the prior

5    extension. For this reason, § 1254a(b)(5)(A) eliminates this Court's jurisdiction to review any APA claim

6    regarding the 2025 Vacatur, including those raised by Plaintiffs regarding the substance of the Federal

7    Register Notice and facts that the Secretary considered. *See* PI Mot. at 8-11.

8          Plaintiffs' interpretation of the statute also flouts the clear intent of Congress to grant the Secretary

9    broad and unreviewable discretion in the exercise of her responsibilities under the TPS statute, section

10   103(a) of the INA, 8 U.S.C. § 1103(a), and section 402 of the Homeland Security Act of 2002, 6 U.S.C.

11   § 202. *See L.A. Lakers, Inc. v. Fed. Ins. Co.*, 869 F.3d 795, 802 (9th Cir. 2017) ("We must also 'assum[e]

12   that the legislative purpose is expressed by the ordinary meaning of the words used' by the legislature.")

13   (quoting *Richards v. United States*, 369 U.S. 1, 9 (1962)). The categorical review preclusion language in

14   8 U.S.C. § 1254a(b)(5)(A) makes clear that Congress did not intend to permit *anyone*, including an alien

15   or organization of aliens, to obtain review of the Secretary's determinations regarding whether a

16   determination was proper. This includes the way the Secretary weighs how the determination impacts that

17   the administration of the program and the security conditions within the United States. 8 U.S.C.

18   § 1254a(b)(1)(C), *see Ramos*, 975 F.3d at 891 ("[T]he Secretary's discretion to consider and weigh various

19   conditions in a foreign country in reaching her TPS determinations is not only broad, but unreviewable.").

20   ## II.   PLAINTIFFS HAVE FAILED TO DEMONSTRATE A LIKELIHOOD OF SUCCESS ON
     THE MERITS

21

22   ### A.   The Secretary of Homeland Security May Vacate a Prior Extension of a Country's
     TPS Designation

23         Even if this Court had jurisdiction to review the 2025 Vacatur and 2025 Termination, Plaintiffs

24   have not shown a likelihood of success on the merits that either determination violates the APA. When

25   Congress authorized the Secretary to designate foreign countries for TPS, it committed several underlying

26   policy questions to her discretion by statute and explicitly barred judicial review of sensitive foreign

27   relations determinations. The Secretary's continuing border and national security responsibilities and

28   Defendants' Opp. To Plaintiffs' Mot. to Postpone
     3:25-cv-1766-EMC

**ER0251**

1    broad discretionary authority over TPS require her to evaluate any potential threats to the safety and

2    security of the United States and permit her to change position, including vacating an extension which has

3    yet to go into effect. *See* 8 U.S.C. § 1254a(b)(3)(A) (The Secretary "… shall determine whether the

4    conditions for such designation under this subsection *continue to be met*.") (emphasis added); *see also*

5    *Albertson v. FCC*, 182 F.2d 397, 399 (D.C. Cir. 2014) ("The power to reconsider is inherent in the power

6    to decide.").[5]

7            Plaintiffs' Motion diverges from the actual claims pleaded within their Complaint and attempts to

8    sever the Secretary's 2025 Vacatur from her 2025 Termination of the 2023 Designation. While the

9    Secretary did issue two determinations, the Vacatur allowed for consideration of whether to terminate or

10   extend the designations for Venezuela. On September 8, 2022, DHS extended the 2021 Designation for

11   18 months. *See Extension and Redesignation of Venezuela for Temporary Protected Status*, 87 Fed. Reg.

12   55,024 (Sept. 8, 2022). On October 3, 2023, Secretary Mayorkas extended the 2021 Designation for

13   another 18 months with an expiration date of September 10, 2025. *2023 Designation*, 88 Fed. Reg. at

14   68,130. In the 2023 notice extending the 2021 Designation, former Secretary Mayorkas also redesignated

15   Venezuela for TPS status. *Id.* This action resulted in there being two separate and concurrent Venezuela

16   TPS designations, the registrations for which Secretary Mayorkas later combined when extending the

17   2023 Designation for another 18 months. *See 2025 Extension*, 90 Fed. Reg. at 5961 (Jan. 17, 2025). This

18

19   _____

20   [5] Circuit courts have long recognized that an administrative agency has inherent or statutorily implicit authority to "reconsider and change a decision if it does so within a reasonable period of time" if Congress has not foreclosed this authority by requiring other procedures. *Mazaleski v. Treusdell*, 562 F.2d 701, 720 (D.C. Cir. 1977); *see, e.g.*, *Kelch v. Dir., Nev. Dep't of Prisons*, 10 F.3d 684, 687 (9th Cir. 1993) (applying Nevada law holding "administrative agencies have an inherent authority to reconsider their own decision, since the power to decide in the first instance carries with it the power to reconsider"); *Albertson*, 182 F.2d at 399 ("The power to reconsider is inherent in the power to decide."); *Macktal v. Chao*, 286 F.3d 822, 825-26 (5th Cir. 2002) (holding agency acted lawfully by exercising inherent authority to reconsider decisions) (collecting cases); *see also The Last Best Beef, LLC v. Dudas*, 506 F.3d 333, 340 (4th Cir. 2007) ("[F]ederal agencies . . . have broad authority to correct their prior errors. Indeed, when federal agencies take erroneous or unlawful action, courts generally should not stand in the way of the agencies' remediation of their own mistakes." (citations omitted)); *Gun South, Inc. v. Brady*, 877 F.2d 858, 862 (11th Cir. 1989) ("[T]he Supreme Court and other courts have recognized an implied authority in other agencies to reconsider and rectify errors even though the applicable statute and regulations do not expressly provide for such reconsideration.").

28   Defendants' Opp. To Plaintiffs' Mot. to Postpone
     3:25-cv-1766-EMC

                                  14

ER0252

1    novel approach allowed Venezuelan applicants, who had registered under the 2021 Designation, to re-

2    register under the extended 2023 Designation, which provided the benefit of an additional 13 months of

3    status, without the Secretary making an independent determination regarding the 2021 Designation.

4        Employing Plaintiffs' logic that Secretary Mayorkas's complication of the Venezuela designations

5    was irrevocably binding, no Secretary of Homeland Security could ever vacate a designation or extension

6    of a designation, no matter the type of national security threat posed or the seriousness of the error or legal

7    defect in the prior determination. But the TPS statute itself does not mandate such a severe and unworkable

8    limitation of the Secretary's ability to fulfill her border and national security responsibilities and exercise

9    her broad authority to administer and enforce the immigration laws, *see, e.g.*, 6 U.S.C. § 202(1)-(5), 8

10   U.S.C. § 1103(a)(1), (a)(3), and to do so consistent with the President's Executive Orders. The Secretary

11   is authorized by statute to terminate a designation if she "determine[s]" that a foreign state "*no longer*

12   *continues* to meet the conditions for designation." 8 U.S.C. § 1254a(b)(3)(A) (emphasis added). The

13   statute requires the Secretary to review conditions within foreign states designated for TPS, but any

14   subsequent action turns on the Secretary's findings about whether the conditions for such designation

15   continue to exist. 8 U.S.C. § 1254a(b)(3)(A)-(C). Indeed, the statute inevitably requires the Secretary to

16   make determinations affecting the conduct of United States foreign policy. *See Harisiades v. Shaughnessy*,

17   342 U.S. 580, 588-89 (1952) ("[A]ny policy toward aliens is vitally and intricately interwoven with

18   contemporaneous policies in regard to the conduct of foreign relations [and] the war power."). When the

19   Executive Branch acts in the field of foreign policy "… pursuant to an express or implied authorization of

20   Congress, [its] authority is at its maximum, for it includes all that [it] possesses in [its] own right plus all

21   that Congress can delegate." *Youngstown Sheet and Tube Co. v. Sawyer*, 343 U.S. 579, 635 (1952)

22   (Jackson, J., concurring) (cleaned up).

23       Here, Secretary Noem met all her statutory obligations. The Secretary issued the vacatur notice 17

24   days after the prior extension notice and stated that she would restore the registration of any 2021

25   Venezuela TPS recipients who re-registered in the interim. *See 2025 Vacatur*, 90 Fed. Reg. at  8807; *2025*

26   *Extension*, 90 Fed. Reg. at 5961; *see also 2023 Designation*, 88 Fed. Reg. at 68,132. The 2025 Vacatur

27   notice stated that it was issued to "untangle the confusion" caused by the 2025 Extension, which wove

28   Defendants' Opp. To Plaintiffs' Mot. to Postpone
3:25-cv-1766-EMC

15

1  together two prior designations of Venezuela for TPS with different effective dates, "provid[ing] an

2  opportunity for … clear guidance." *2025 Vacatur*, 90 Fed. Reg. at 8807. The Secretary exercised the

3  inherent power of reconsideration she held under the TPS statute within a reasonable time and with the

4  intent to correct significant "deficiencies" in the 2025 Extension.  *Id.*; *see Mazaleski*, 562 F.2d at 720.

5  Two days after she issued the 2025 Vacatur, the Secretary issued a notice terminating one of the

6  two Venezuela TPS designations, based on her finding that the presence of the covered persons *is*

7  "contrary to the national interest of the United States." *2025 Termination*, 90 Fed. Reg. at 9042

8  ("[T]ermination of the 2023 Venezuela TPS designation is required because it is contrary to the national

9  interest to permit the Venezuelan nationals … to remain temporarily in the United States.") (cleaned up).

10 In her termination notice, the Secretary noted that "'[n]ational interest' is an expansive standard that may

11 encompass an array of broad considerations, including foreign policy, public safety, national security,

12 migration factors, immigration policy, and economic considerations." *Id.* (cleaned up); *see id.* n.5 (citing

13 cases). The TPS statute explicitly requires the Secretary to determine whether continuing to permit the

14 temporary presence of TPS beneficiaries from a foreign state designated under 8 U.S.C. § 1254a(b)(1)(C)

15 is "contrary to the national interest of the United States," and she has done so. This national interest finding

16 is of a discretionary nature authorized by statute and clearly sounding in foreign policy. *See* 8 U.S.C.

17 § 1254a(b)(1)(C); *cf. Poursina v. USCIS*, 936 F.3d 868, 874 (9th Cir. 2019) (observing, in an analogous

18 INA context, "that the 'national interest' standard invokes broader economic and national-security

19 considerations, and such determinations are firmly committed to the discretion of the Executive Branch—

20 not to federal courts" (citing *Hawaii*, 585 U.S. at 684-86)).

21 Secretary Noem reasonably explained that the 2023 Designation notice was adopted without a

22 reasoned explanation or express consideration of the operational or legal impacts. *2025 Vacatur*, 90 Fed.

23 Reg. at 8807. This "implicitly negat[ed] the 2021 Venezuela TPS designation by effectively subsuming it

24 within the 2023 Venezuela TPS designation." *Id*. By consolidating the registration processes for both the

25 2021 and 2023 TPS designations, the notice had the practical effect of extending the 2021 Designation by

26 up to 13 months and allowing for employment authorization for that period as well. *See id.* Accordingly,

27 she reasonably concluded that "vacatur is warranted to untangle the confusion and provide an opportunity

28 Defendants' Opp. To Plaintiffs' Mot. to Postpone
3:25-cv-1766-EMC

ER0254

1   for informed determinations regarding the TPS designations and clear guidance." *Id.*

2       Plaintiffs' argument that the 2025 Vacatur is impermissible because Secretary Noem "failed to

3   account for alternatives short of termination" also fails. PI Mot. at 10. In issuing the Vacatur, Secretary

4   Noem indicated that the decision to vacate provided "an opportunity for informed determinations

5   regarding the TPS designations and clear guidance." *2025 Vacatur*, 90 Fed. Reg. at 8807 (citing Exec.

6   Order No. 14159, *Protecting the American People Against Invasion*, § 16(b), 90 Fed. Reg. 8443 (Jan. 20,

7   2025)). Thus, the alternative of simply deconsolidating the re-registration periods would not meet the

8   stated reasons for the 2025 Vacatur and is neither arbitrary and capricious nor an impermissible decision.

9   The Secretary's 2025 Vacatur of the 2025 Extension complied with the statute, was in accordance with

10   her authority to reconsider prior actions, and was consistent with her continuing obligation to safeguard

11   the border and national security of the United States and to administer and enforce the immigration laws.

12      **B.**    **The Secretary's Determinations to Vacate and Terminate the TPS Designation for Venezuela Did Not Violate the Fifth Amendment Because the Determinations were Related to Immigration Policy Objectives and Not Motivated by Racial Animus**

14       Plaintiffs cannot bypass the explicit bar on judicial review by framing their claim as a

15   constitutional challenge.[6] *See* 8 U.S.C. § 1254a(b)(5)(A); *supra* § I.B. Even if this Court determines it has

16   jurisdiction to consider Plaintiffs' constitutional claim here, the Secretary's determinations to (1) vacate

17   the 2025 Extension and (2) terminate the 2023 Designation did not violate the Fifth Amendment. Plaintiffs

18   erroneously contend that racially "discriminatory intent was at least one motivating factor" for Secretary

19   Noem's vacatur and termination determinations and that strict scrutiny under *Vill. of Arlington Heights*,

20   429 U.S. at 265, should apply. PI Mot. 11-12. The appropriate standard for any such review, however, is

21   set forth in *Hawaii*, 585 U.S. at 703-05. There, in determining that a rational basis standard should be

22   applied, the Supreme Court explained that "the upshot of [their] cases in this context is clear: 'Any rule

23   of constitutional law that would inhibit the flexibility' of the President 'to respond to changing world

24   conditions should be adopted only with the greatest caution,' and our inquiry into matters of entry and

25   national security is highly constrained." *Id*. at 704.

---

27   [6] Section 1254a(b)(5)(A) provides a far clearer bar on review than the statutory provision at issue in *Webster v. Doe*, 486 U.S. 592, 603-04 (1988).

28   Defendants' Opp. To Plaintiffs' Mot. to Postpone
3:25-cv-1766-EMC

**ER0255**

1       Here, Secretary Noem's 2025 Vacatur and 2025 Termination determinations are immigration

2  policies related to Government objectives of border and national security and foreign policy. The Supreme

3  Court "ha[s] long recognized the power to expel or exclude aliens as a fundamental sovereign attribute

4  exercised by the Government's political departments largely immune from judicial control." *Fiallo v. Bell*,

5  430 U.S. 787, 792 (1977). Because decisions in these matters implicate "relations with foreign powers"

6  and involve "classifications … defined in the light of changing political and economic circumstances,"

7  such judgments "are frequently of a character more appropriate to either the Legislature or the Executive."

8  *Mathews v. Diaz*, 426 U.S. 67, 81 (1976); *see also Galvan v. Press*, 347 U.S. 522, 531 (1954) ("Policies

9  pertaining to the entry of aliens and their right to remain here are peculiarly concerned with the political

10  conduct of government."). The Supreme Court has accordingly made clear that decisions by the political

11  branches about which classes of aliens to exclude or expel will generally be upheld against constitutional

12  challenges so long they satisfy deferential rational-basis review. *Hawaii*, 585 U.S. at 704-05; *see also*

13  *Kleindienst v. Mandel*, 408 U.S. 753, 769-70 (1972) (judicial review of "[p]olicies pertaining to the entry

14  of aliens and their right to remain here" is limited to whether the Executive gave a "facially legitimate and

15  bona fide" reason for its action); *Mathews*, 426 U.S. at 82 (a "narrow standard of review" applies to

16  "decisions made by Congress or the President in the area of immigration and naturalization");

17  *Shaughnessy*, 342 U.S. at 588–89. Although cases such as *Hawaii*, *Mandel*, and *Fiallo* involved policies

18  directed at aliens seeking to enter the country, those decisions equally support applying rational-basis

19  review in the specific context of these TPS determinations to aliens already present in the United States

20  where the basis for the termination is that "permitting the aliens to remain temporarily in the United States

21  is contrary to the national interest of the United States." *2025 Termination*, 90 Fed. Reg. at 9040, 9042;

22  *see Hawaii*, 585 U.S. at 706 (If "there is persuasive evidence that the [policy] has a legitimate grounding

23  in national security concerns … we must accept that independent justification").

24       TPS decisions involve unique country-specific determinations that both "implicate relations with

25  foreign powers" and "involve classifications defined in the light of changing political and economic

26  circumstances," *Hawaii*, 585 U.S. at 702, precisely the situation in which the Supreme Court has

27  repeatedly applied rational-basis review. *See id.*; *Fiallo*, 430 U.S. at 799. Secretary Noem's 2025 Vacatur

28  Defendants' Opp. To Plaintiffs' Mot. to Postpone
3:25-cv-1766-EMC

18

1  and 2025 Termination determinations easily pass rational-basis review. In enacting the TPS statute,

2  Congress provided for the availability of a temporary status to aliens who cannot safely return to their

3  home countries because of, *inter alia*, extraordinary and temporary conditions in those countries. *See*

4  8 U.S.C. § 1254a. Secretary Noem's termination decision is "plausibly related" to the Government's

5  national security interests as well as the objectives of the TPS program. *Hawaii*, 585 U.S. at 704-05; *see*

6  *also United States R.R. Retirement Bd. v. Fritz*, 449 U.S. 166, 179 (1980). After consulting with other

7  appropriate governmental agencies, including the Department of State, Secretary Noem determined that

8  permitting the Venezuelan nationals to remain temporarily in the United States is contrary to the national

9  interest of the United States. *2025 Termination*, 90 Fed. Reg. at 9040, 9042-43 ("Among these Venezuelan

10  nationals who have crossed into the United States are members of the Venezuelan gang known as Tren de

11  Aragua." Historically, this gang "has been blamed for sex trafficking, drug smuggling, police shootings,

12  kidnappings, and the exploitation of migrants."). Secretary Noem's determination is fully consistent with

13  Congress's goal of providing TPS to eligible aliens until the Secretary determines that the conditions for

14  the country's TPS designation no longer continue to exist, including in this case that permitting such aliens

15  to remain in the United States is contrary to the U.S. national interest. Thus, under the rational basis test,

16  Plaintiffs' equal protection claim fails.

17  　　　　Even under the heightened standard in *Arlington Heights*, Plaintiffs' Equal Protection Claim is

18  likely to fail because they cannot establish racially discriminatory intent. Under the *Arlington Heights*

19  standard, Plaintiffs must prove that a racially "discriminatory purpose has been a motivating factor in the

20  [government's] decision" to show a violation of the Equal Protection Clause. 429 U.S. at 265-266. In

21  2020, the Ninth Circuit analyzed an almost identical claim and held that under the *Arlington Heights*

22  standard, plaintiffs failed to present "even serious questions on the merits of their claim that the

23  Secretaries' TPS terminations were improperly influenced by the President's" alleged racial animus.

24  *Ramos*, 975 F.3d at 897 (internal quotations omitted); *see also Dep't of Homeland Sec. v. Regents of the*

25  *Univ. of Cal.*, 591 U.S. 1, 34-35 (2020) (rejecting a similar equal protection claim where plaintiffs did not

26  show racial animus or disparate impact). Although the 2020 *Ramos* decision has since been vacated on

27  other grounds, the analysis is instructive.

28  Defendants' Opp. To Plaintiffs' Mot. to Postpone
3:25-cv-1766-EMC

ER0257

1    The Ninth Circuit held that the plaintiffs' equal protection claim failed "due to the glaring lack of

2    evidence tying the President's alleged discriminatory intent to the specific TPS terminations—such as

3    evidence that the President personally sought to influence the TPS terminations, or that any administration

4    officials involved in the TPS decision-making process were themselves motivated by" racial animus.

5    *Ramos*, 975 F.3d at 897. The Ninth Circuit reasoned that while there was record evidence that the President

6    "expressed racial animus against 'non-white, non-European immigrants'" and "the White House

7    influenced the TPS termination decisions," there was "no evidence linking the President's animus to the

8    TPS terminations." *Id.* Moreover, the panel explained, "[i]t is expected—perhaps even critical to the

9    functioning of the government—for executive officials to conform their decisions to the administration's

10    policies" and the "mere fact that the White House exerted pressure on the Secretaries' TPS decisions does

11    not itself support the conclusion that the President's alleged racial animus was a motivating factor in the

12    TPS decisions." *Id.* at 898. Finally, the Ninth Circuit addressed the plaintiffs' arguments that the

13    circumstantial evidence and the historical background did not demonstrate that racial animus was a

14    motivating factor for the TPS terminations. *Id.* at 898-99.

15    Plaintiffs disregard the Ninth Circuit's reasoning in *Ramos*, reiterating similar arguments before

16    this Court. As in *Ramos*, here, Secretary Noem provided reasoned explanations for her decision to

17    terminate Venezuela's 2023 TPS Designation, and Plaintiffs have not demonstrated that she harbored

18    racial animus in making the vacatur or termination determinations at issue. Plaintiffs cite a multitude of

19    exhibits, arguing that Secretary Noem "made numerous contemporaneous statements that prove her

20    decisions sprung at least in part from racial animus." PI Mot. at 12. They also assert that the circumstantial

21    evidence and historical background of the TPS determinations show that "improper purposes are playing

22    a role." *Id.* at 13. But Plaintiffs fail to establish any direct link between the evidence they provide and

23    Secretary Noem's determinations. For example, Plaintiffs cite a February 26, 2024, social media post by

24    Secretary Noem about "[n]ations like Venezuela." ECF 37-1. But this post was made nearly a year before

25    the termination decision was published and focuses on the nation itself, not the race of its people. *See also*

26    ECF 37-2, 37-3, 37-4, 37-5 (social media posts from 2024); ECF 37-6 (unrelated social media post); ECF

27    37-12, 37-14, 37-15 (transcripts of confirmation hearing and interviews where immigration policy is

28    Defendants' Opp. To Plaintiffs' Mot. to Postpone
3:25-cv-1766-EMC

20

1   generally discussed). National origin is inherently part of TPS. The express statements that Plaintiffs rely

2   on in an attempt to show racial animus were made long before the TPS termination determination or taken

3   out of context—and importantly, none of the statements pertain to race; rather, they concern the country

4   itself. *See Ramos*, 975 F.3d at 898 ("[W]e find it instructive that these statements occurred primarily in

5   contexts removed from and unrelated to TPS policy or decisions."). The Secretary's various statements

6   reflect an emphasis on immigration policy that focuses on America's economic and security interests, not

7   racial or ethnic animus. An immigration policy that seeks to further American strategic and foreign policy

8   interests cannot be the basis of an equal protection claim and is in fact contemplated by the TPS statute.

9   *See* 8 U.S.C. § 1254a(b)(1)(C).

10          Plaintiffs' conjecture is equally unpersuasive and does not show racial animus. PI Mot. 14-15.

11  Plaintiffs speculate that the sequence of Secretary Noem's determinations are "further evidence of

12  Secretary Noem's improper discriminatory purpose," *id*. at 14, and the first Trump administration's

13  attempts to terminate TPS designations "show[] that the second Trump administration's TPS decisions . .

14  . are motivated by 'invidious purposes.'" *Id*. at 14-15 (citing *Arlington Heights*, 429 U.S. at 267). The

15  timing of Secretary Noem's termination of the 2023 Designation, however, and the fact that the first

16  Trump administration sought to terminate TPS designations for other countries, are not—without more—

17  evidence of an "overarching goal [] motivated by racial animus." *Ramos*, 975 F.3d 899. The Secretary's

18  efficiency is hardly a basis for invalidating her action.

19          Finally, Plaintiffs fall back on their previously rejected "cat's paw" theory, PI Mot. 15, theorizing

20  that Secretary Noem's determinations are unconstitutional because the President's animus directly

21  influenced her decisions. *Id*. But the Ninth Circuit doubted that the "cat's paw" theory would apply in this

22  situation. *Ramos*, 975 F.3d at 897 (plaintiffs failed to "provide any case where such a theory of liability

23  has been extended to governmental decisions in the foreign policy and national security realm").

24  Moreover, the "cat's paw" approach would invite judicial second-guessing of an agency official's actions

25  based on mere allegations of discriminatory motive on the part of a different government official who may

26  have played some role in the decision-making process. That would invite impermissible intrusion on

27  privileged Executive Branch deliberations and potential litigant-driven discovery that would disrupt the

28  Defendants' Opp. To Plaintiffs' Mot. to Postpone
3:25-cv-1766-EMC

1   President's execution of the laws, *see Nixon v. Fitzgerald*, 457 U.S. 731, 749–50 (1982); *United States v.*

2   *Nixon*, 418 U.S. 683, 708 (1974) ("A President and those who assist him must be free to explore

3   alternatives in the process of shaping policies and making decisions and to do so in a way many would be

4   unwilling to express except privately."). As such, under any review standard, Plaintiffs are unlikely to

5   succeed on the merits of their equal protection claim.

6   **III.    ANY HARM PLAINTIFFS MAY SUFFER IS BASED ON THE INHERENT NATURE
        OF THE TPS STATUTE**

7
8        "An essential element to the granting of a preliminary injunction is a showing of irreparable injury

    to the moving party in its absence." *Dollar Rent A Car of Washington, Inc. v. Travelers Indem. Co.*, 774
9
    F.2d 1371, 1375 (9th Cir. 1985). Not just any showing of irreparable harm will suffice. A party "is only
10
    entitled to an injunction that prevents [the] irreparable harm" that is "likely to occur." *S. Yuba River*
11
    *Citizens League v. Nat'l Marine Fisheries Serv.*, 804 F. Supp. 2d 1045, 1054 (E.D. Cal. 2011) (a party's
12
    "showing [of irreparable harm] is required in order to justify the specific measures that [the party]
13
    request[s]"). Plaintiffs have failed to make the requisite showing here.
14
15       First, Plaintiffs contend that their allegations of APA and Fifth Amendment violations *per se*

    constitute irreparable harm. Pl. Mot. 19-20. However, the alleged harms only occur if it is determined that
16
    Defendants have violated Plaintiffs' constitutional or statutory rights. As explained above, Plaintiffs have
17
    not established a likelihood of success on the merits of those claims. *See* § II.
18
19       Second, Plaintiffs allege numerous injuries resulting from the 2025 Termination that are inherent

    in the temporary nature of TPS. For example, Plaintiffs allege that, if they lose their TPS, "many of them
20
    will be at immediate risk of detention [… and] deportation," "will be in a state of limbo— undocumented
21
    and without legal authorization to live and work in the United States," or "will lose other alternative
22
    pathways to permanent status...." Pl. Mot. 20-21. Plaintiffs further allege that the loss of TPS could result
23
    in their separation from family members in the United States or having to bring their U.S. citizen children
24
    to an unknown country. *Id.* at 21. While Plaintiffs heavily focus on the burden that TPS beneficiaries will
25
    face should the termination be permitted to go into effect, the underlying cause of this harm flows from
26
    the statute ("temporary" protected status) itself. *See*, 8 U.S.C. § 1254a(b)(1)(B)(i) ("substantial, but
27
28  Defendants' Opp. To Plaintiffs' Mot. to Postpone
    3:25-cv-1766-EMC

1    temporary"), (b)(1)(B)(ii) ("unable, temporarily"), (b)(1)(C) ("extraordinary and temporary"), (g)

2    ("remain in the United States temporarily"). Undeniably, the alleged harms would exist with or without

3    the termination at issue. As explained, a country's TPS designation must be reviewed at least every 18

4    months, and there is no guarantee of renewal. 8 U.S.C. § 1254a(b)(2)(B). A TPS beneficiary is therefore

5    always subject to the same uncertainties and concerns that Plaintiffs allege here.

6          Because the very nature of TPS is temporary, as dictated by law, the potential for familial

7    separation is not an irreparable harm arising from the termination of TPS for Venezuela, but rather the

8    nature of the status. The cases cited by Plaintiffs in support of their argument that the separation of families

9    constitutes irreparable harm as a matter of law are inapposite because the irreparable harms cited in those

10   cases were not assessed against the backdrop of the inevitable termination of a temporary status. Pl. Mot.

11   22. For example, *Stanley v. Illinois*, 405 U.S. 645, 647 (1972), does not address whether the separation of

12   families is an irreparable harm in the context of a temporary status that must come to an eventual end.

13   *Stanley*, 405 U.S. at 647 ("granting a stay of removal in the context of persecution-based relief, but

14   recognizing that "a noncitizen must show that there is a reason specific to his or her case, as opposed to a

15   reason that would apply equally well to all aliens and all cases, that removal would inflict irreparable

16   harm."); *see also Washington v. Trump*, 847 F.3d 1151, 1169 (9th Cir. 2017) (finding that the potential

17   irreparable harm of separating families did not justify a stay).

18         And even where Plaintiffs' declarations have identified concrete harms, those harms will not be

19   remedied by the requested injunction. The assurances that Plaintiffs seek can only be truly safeguarded

20   through legislative action, not an injunction by this Court. Consequently, Plaintiffs have failed to show a

21   likelihood of irreparable harm that could be remedied by this Court, and their request for a preliminary

22   injunction should be denied. *See Taiebat v. Scialabba*, No. 17-civ-0805-PJH, 2017 WL 747460, at *5

23   (N.D. Cal. Feb. 27, 2017) (denying preliminary injunction where "plaintiff [could not] establish that the

24   mandatory injunction he seeks would address the alleged harm"); *see also S. Yuba River Citizens League*,

25   804 F. Supp. 2d at 1057 ("[T]he court declines to order an interim measure that will provide no benefit . . .

26   in the interim period."); *Schrill v. Plunkett*, 760 F. Supp. 1378, 1384 (D. Or. 1990) ("Granting plaintiffs'

27   requested injunctive relief would not prevent the alleged" harm), *aff'd*, 932 F.2d 973 (9th Cir. 1991).

28   Defendants' Opp. To Plaintiffs' Mot. to Postpone
     3:25-cv-1766-EMC

## IV.    THE BALANCE OF THE EQUITIES AND PUBLIC INTEREST WEIGH AGAINST PRELIMINARY INJUNCTIVE RELIEF

Notwithstanding Plaintiffs' failure to establish irreparable harm warranting the extraordinary relief that they seek, Plaintiffs have not shown that the remaining equitable factors tip the balance in their favor. As the Supreme Court has explained in the immigration context, the questions of harm to the defendant and the public interest "merge." *Nken v. Holder*, 556 U.S. 418, 435 (2009). The government and the public share an interest in ensuring that the process established by Congress – under which the Secretary of Homeland Security has unreviewable authority to weigh the statutory factors governing TPS designations – is followed as Congress intended. As Secretary Noem observed, vacatur of the 2025 Extension was needed to "untangle the confusion [created by that Notice] and provide an opportunity for informed determinations regarding the TPS designations and clear guidance." *2025 Vacatur*, 90 Fed. Reg. at 8807.

The government has an "obligation to prioritize the safety, security, and financial and economic well-being of Americans." *Protecting the American People Against Invasion*, Exec. Order No. 14159, § 1, 90 Fed. Reg. at 8443. In this vein, "[e]nforcing [the n]ation's immigration laws is critically important to the national security and public safety of the United States." Among the Venezuelan nationals currently residing in the United States are members of the Tren de Aragua, a Venezuelan gang that poses a threat to the public safety. *See 2025 Termination*, 90 Fed. Reg. at 9040, 9042-43. And, as explained in Secretary Noem's 2025 Termination, Congress expressly required that the national interest of the United States be considered in determining whether to extend or terminate Venezuela's TPS designation. Vacating the 2025 Extension allowed the government to take necessary steps to "ensur[e] that designations of [TPS] are consistent with the provisions of […] 8 U.S.C. 1254a[], and that such designations are appropriately limited in scope and made for only so long as may be necessary to fulfill the textual requirements of that statute" – in other words, to make certain the TPS designation is not being abused by individuals who threaten national security and public safety. Exec. Order No. 14159, § 16(b), 90 Fed. Reg. at 8446.

Ultimately, the injunctive relief Plaintiffs seek would frustrate Secretary Noem's substantive judgment as to how to implement the TPS statute in line with the government's established interests. *See All. For the Wild Rockies v. Cottrell*, 632 F.3d 1127, 1138 (9th Cir. 2011) ("We will not grant a preliminary

Defendants' Opp. To Plaintiffs' Mot. to Postpone
3:25-cv-1766-EMC

**ER0262**

1    injunction unless those public interests outweigh other public interests that cut in favor of *not* issuing the

2    injunction"). Congress has given the Secretary, in consultation with the appropriate agencies, the broad

3    discretion to assess conditions in foreign countries and reach determinations regarding TPS. Where the

4    Secretary follows the statutory requirements, it is the public interest for the Court deny the extraordinary

5    remedy of preliminary injunctive relief and allow this matter to proceed along the ordinary course.

6    **V.    PLAINTIFFS' REQUESTED RELIEF IS OVERBROAD**

7          Even if a preliminary injunction (or "stay" accomplishing the same effect) were warranted here,

8    Plaintiffs have no basis to request universal relief benefitting non-parties. Under settled constitutional and

9    equitable principles, the Court may not issue relief that is broader than necessary to remedy actual harm

10   shown by specific Plaintiffs. *Gill v. Whitford*, 138 S. Ct. 1916, 1934 (2018); *Lewis v. Casey*, 518 U.S. 343,

11   358 n.5 (1996) ("[S]tanding is not dispensed in gross[.]"). A valid remedy "operate[s] with respect to

12   specific parties," not with respect to a law "in the abstract." *California v. Texas*, 593 U.S. 659, 672 (2021)

13   (quotation marks omitted). In this case, where sensitive foreign policy decisions of the Executive Branch

14   are implicated, an injunction should go no further than redressing any cognizable injuries to individual

15   named plaintiffs. *See Arizona v. United States*, 567 U.S. 387, 409 (2012) (holding the federal government

16   must speak "with one voice" in determining "whether it is appropriate to allow a foreign national to

17   continue living in the United States"). Universal injunctive relief here circumvents the requirement to limit

18   relief to the Parties. Plaintiffs, who do not raise class claims in their Complaint and have not moved to

19   certify a class under Rule 23, have made no effort to explain why they should be entitled to such sweeping

20   relief. Granting universal relief in this situation further encourages forum shopping and effectively

21   nullifies the decisions of other district or circuit courts nationwide. *See DHS v. New York*, 140 S. Ct. 599,

22   601 (2020) (Gorsuch, J., concurring); *see also Ramos*, 975 F.3d at 902–06 (Nelson, J., concurring).

                                    **<u>CONCLUSION</u>**

23         This Court lacks jurisdiction to review both determinations by Secretary Noem relating to the

24   2023 Designation of Venezuela for TPS and to grant Plaintiffs' requested relief. Even if this Court were

25   to find that neither of the two clear jurisdictional bars applies, Plaintiffs' claims fail on the merits and

26   the remaining factors do no support issuance of equitable relief.

27

28   Defendants' Opp. To Plaintiffs' Mot. to Postpone
     3:25-cv-1766-EMC

**ER0263**

Dated: March 3, 2025

Respectfully submitted,

YAAKOV M. ROTH
Acting Assistant Attorney General
Civil Division

WILLIAM H. WEILAND (Mass. Bar 661433)
Senior Litigation Counsel

ERIC SNYDERMAN (VA Bar 99563)
ANNA DICHTER (NJ Bar 304442019)
LAUREN BRYANT (NY Bar No. 5321880)
CATHERINE ROSS (DC Bar 9007404)
LUZ MARIA RESTREPO (NY Bar 4907077)
Trial Attorneys

/s/ *Sarah L. Vuong*
SARAH L. VUONG
(CA Bar. 258528)
Assistant Director
U.S. Department of Justice, Civil Division
Office of Immigration Litigation
General Litigation and Appeals Section
P.O. Box 868, Ben Franklin Station
Washington, DC 20044
Tel: (202) 305-1263
Sarah.L.Vuong@usdoj.gov

*Attorneys for the Defendants*

Defendants' Opp. To Plaintiffs' Mot. to Postpone
3:25-cv-1766-EMC

26

**ER0264**

**CERTIFICATE OF SERVICE**

I hereby certify that the foregoing document filed through the ECF system will be sent electronically to the registered participants, as identified on the Notice of Electronic Filing, and that paper copies will be sent to those indicated as non-registered participants.

/s/ *Sarah L. Vuong*
SARAH L. VUONG

Defendants' Opp. To Plaintiffs' Mot. to Postpone
3:25-cv-1766-EMC

27

ER0265

1  Ahilan T. Arulanantham (SBN 237841)
   arulanantham@law.ucla.edu
2  Stephany Martinez Tiffer (SBN 341254)
   martineztiffer@law.ucla.edu
3  CENTER FOR IMMIGRATION LAW AND
   POLICY, UCLA SCHOOL OF LAW
4  385 Charles E. Young Dr. East
   Los Angeles, CA 90095
5  Telephone: (310) 825-1029

6  Emilou H. MacLean (SBN 319071)
   emaclean@aclunc.org
7  Michelle (Minju) Y. Cho (SBN 321939)
   mcho@aclunc.org
8  ACLU FOUNDATION
   OF NORTHERN CALIFORNIA
9  39 Drumm Street
   San Francisco, CA 94111-4805
10 Telephone: (415) 621-2493
   Facsimile: (415) 863-7832

11
12 Attorneys for Plaintiffs
   *[Additional Counsel Listed on Next Page]*

13                UNITED STATES DISTRICT COURT

14              NORTHERN DISTRICT OF CALIFORNIA

15                 SAN FRANCISCO DIVISION

16 NATIONAL TPS ALLIANCE, MARIELA          Case No. 25-cv-1766
   GONZÁLEZ, FREDDY JOSE ARAPE
17 RIVAS, M.H., CECILIA DANIELA            **PLAINTIFFS' NOTICE OF MOTION**
   GONZÁLEZ HERRERA, ALBA CECILIA          **AND MOTION TO POSTPONE**
18 PURICA HERNÁNDEZ, E.R., and             **EFFECTIVE DATE OF AGENCY ACTION;**
   HENDRINA VIVAS CASTILLO,                **MEMORANDUM OF POINTS AND**
19                                         **AUTHORITIES IN SUPPORT THEREOF**
            *Plaintiffs,*
20                                         Date:    March 27, 2025
        v.                                 Time:    TBD
21                                         Place:   TBD
   KRISTI NOEM, in her official capacity as
22 Secretary of Homeland Security, UNITED
   STATES DEPARTMENT OF HOMELAND
23 SECURITY, and UNITED STATES OF
   AMERICA,
24
            *Defendants.*
25
26
27
28

Additional Counsel for Plaintiffs

Jessica Karp Bansal (SBN 277347)
jessica@ndlon.org
Lauren Michel Wilfong (pro hac vice pending*)
lwilfong@ndlon.org
NATIONAL DAY LABORER ORGANIZING NETWORK
1030 S. Arroyo Parkway, Suite 106
Pasadena, CA 91105
Telephone: (626) 214-5689

Eva L. Bitran (SBN 302081)
ebitran@aclusocal.org
ACLU FOUNDATION
OF SOUTHERN CALIFORNIA
1313 West 8th Street
Los Angeles, CA 90017
Telephone: (213) 977-5236

PLAINTIFFS' NOTICE OF MOT. & MOT. TO POSTPONE EFFECTIVE DATE – CASE NO. 25-CV-1766

## NOTICE OF MOTION AND MOTION TO POSTPONE
## EFFECTIVE DATE OF AGENCY ACTION

PLEASE TAKE NOTICE THAT, on March 27, 2025, or as soon thereafter as this matter may be heard, before the district judge of the United States District Court for the Northern District of California assigned to this matter, Plaintiffs move under 5 U.S.C. § 705 of the Administrative Procedure Act ("APA") to "postpone the effective date of agency action."[1]

Plaintiffs seek an order postponing the effective date of Defendants' decision of February 3, 2025 at 90 Fed. Reg. 8805. That decision purports to "vacate" the extension of Temporary Protected Status ("TPS") for Venezuela issued on January 17, 2025. Plaintiffs also seek an order postponing the effective date of Defendants' order of February 5, 2025 at 90 Fed. Reg. 9040, purporting to issue a new decision terminating TPS for Venezuela.

To prevent irreparable harm, Plaintiffs request that the Court act **_no later than April 2, 2025_** to postpone the effective date of these decisions, and that it postpone them until such time as the Court can resolve at trial whether the above orders are unlawful. In the alternative, and at a minimum, Plaintiffs request that the Court act **_no later than April 2, 2025_** to postpone the effective date of these decisions until such time as the Court can resolve Plaintiffs' forthcoming motion for summary judgment. Absent postponement of the effective date, the challenged orders will go into effect on April 3, 2025, when employment authorization documents for nearly 350,000 Venezuelan TPS holders who initially registered for TPS under Venezuela's 2023 designation will expire. Those TPS holders will lose their legal status and become subject to deportation (and in some cases detention and summary deportation) on April 7, 2025.

This Motion is based upon this Notice of Motion and Motion; the accompanying Memorandum of Points and Authorities; the supporting declarations and evidence filed concurrently herewith; pleadings and filings in this case; any additional matter of which the Court may take judicial notice; and such further evidence or argument as may be presented before, at, or after the

---

[1] Plaintiffs intend to pursue negotiations with the government to shorten the time for hearing on this motion, and if no agreement can be reached to a motion to shorten time.

1    hearing. Unless otherwise specified, all citations in the Memorandum of Points and Authorities to an

2    "Exhibit," "Exhibits," "Ex." or "Exs." refer to exhibits attached to the Declaration of Emi MacLean.

3

4    Date:  February 20, 2025                    Respectfully submitted,

5
                                                 ACLU FOUNDATION
6                                                OF NORTHERN CALIFORNIA

7                                                 /s/ *Emilou MacLean*
8                                                Emilou MacLean
                                                 Michelle (Minju) Y. Cho
9
                                                 Ahilan T. Arulanantham
10                                               Stephany Martinez Tiffer
                                                 CENTER FOR IMMIGRATION LAW AND
11                                               POLICY, UCLA SCHOOL OF LAW

12                                               Eva L. Bitran
13                                               ACLU FOUNDATION
                                                 OF SOUTHERN CALIFORNIA
14
                                                 Jessica Karp Bansal
15                                               Lauren Michel Wilfong (pro hac vice pending*)
                                                 NATIONAL DAY LABORER ORGANIZING
16                                               NETWORK

17                                               Attorneys for Plaintiffs

18

19

20

21

22

23

24

25

26

27

28

## <u>TABLE OF CONTENTS</u>

MEMORANDUM OF POINTS AND AUTHORITIES ................................................................1

INTRODUCTION ...............................................................................................................1

STATEMENT OF THE ISSUE..............................................................................................2

STATEMENT OF THE RELEVANT FACTS ............................................................................3

ARGUMENT .....................................................................................................................4

I.      PLAINTIFFS ARE LIKELY TO SUCCEED ON THE MERITS. ......................................4

      A.    The Secretary Lacked Authority to Vacate the Extension for Venezuela. ..................4

      B.    Even if DHS Had Vacatur Authority, the Vacatur Violated the APA for at Least Three Separate and Independent Reasons, Each of Which Warrants Postponement. ...8

            1.    The vacatur is founded upon legal errors..........................................................8

            2.    The vacatur failed to account for alternatives short of termination. ................10

      C.    The Vacatur and Termination Decisions Violated The Fifth Amendment..................11

            1.    Strict scrutiny applies to Plaintiffs' Equal Protection claims. .........................11

            2.    Discriminatory intent was at least one motivating factor here. .......................12

      D.    The Court Has Jurisdiction to Consider Plaintiffs' Claims. ........................................16

II.     VENEZUELAN TPS HOLDERS FACE PROFOUND AND IRREPARABLE HARM...........................................................................................................................19

III.    THE BALANCE OF EQUITIES AND PUBLIC INTEREST WEIGH HEAVILY IN FAVOR OF POSTPONEMENT. ......................................................................................24

CONCLUSION................................................................................................................25

## <u>TABLE OF AUTHORITIES</u>

**Page(s)**

**Cases**

*Adarand Constructors, Inc. v. Pena*,
   515 U.S. 200 (1995).................................................................................................11

*Am. Methyl Corp. v. EPA*,
   749 F.2d 826 (D.C. Cir. 1984)................................................................................5

*Am. Trucking Ass'ns v. Frisco Transp. Co.*,
   358 U.S. 133 (1958)................................................................................................5

*Arce v. Douglas*,
   793 F.3d 968 (9th Cir. 2015) ................................................................................11

*Ariz. Dream Act Coal. v. Brewer*,
   757 F.3d 1053 (9th Cir. 2014) .......................................................................22, 24

*Ariz. Dream Act Coal. v. Brewer*,
   855 F.3d 957 (9th Cir. 2017) ................................................................................22

*Ave. 6E Invs., LLC v. City of Yuma, Ariz.*,
   818 F.3d 493 (9th Cir. 2016) .........................................................................12, 13

*Bakersfield City Sch. Dist. of Kern Cnty. v. Boyer*,
   610 F.2d 621 (9th Cir. 1979) ..................................................................................1

*Biden v. Nebraska*,
   600 U.S. ____, 143 S. Ct. 2355 (2023)................................................................17

*Bolling v. Sharpe*,
   347 U.S. 497 (1954)..............................................................................................11

*Bowen v. Mich. Acad. of Fam. Physicians*,
   476 U.S. 667 (1986).........................................................................................18, 19

*California v. HHS*,
   281 F. Supp. 3d 806 (N.D. Cal. 2017) ...........................................................20, 24

*CASA de Md., Inc. v. Trump*,
   355 F. Supp. 3d 307 (D. Md. 2018) .....................................................................14

*Centro Legal de la Raza v. Exec. Off. for Immigr. Rev.*,
   524 F. Supp. 3d 919 (N.D. Cal. 2021) ...................................................................1

*Centro Presente v. DHS*,
   332 F. Supp. 3d 393 (D. Mass. 2018) ..................................................................14

*Chalk v. United States Dist. Ct.*,
840 F.2d 701 (9th Cir. 1988) ........................................................................................23

*China Unicom (Ams) Operations Ltd. v. FCC*,
124 F.4th 1128 (9th Cir. 2024) ..................................................................................5, 6

*City of Cleburne v. Cleburne Living Ctr.*,
473 U.S. 432 (1985).....................................................................................................11

*Civil Aeronautics Bd. v. Delta Airlines Inc.*,
367 U.S. 316 (1961).......................................................................................................5

*Cuozzo Speed Techs., LLC v. Lee*,
579 U.S. 261 (2016).....................................................................................................19

*DHS v. Regents*,
591 U.S. 1 (2020).....................................................................................10, 12, 17, 18

*FEC v. Akins*,
524 U.S. 11 (1998)...................................................................................................8, 10

*Gorbach v. Reno*,
219 F.3d 1087 (9th Cir. 2000) ......................................................................................4

*Grand Canyon Univ. v. Cardona*,
121 F.4th 717 (9th Cir. 2024) .......................................................................................8

*Hernandez v. Sessions*,
872 F.3d 976 (9th Cir. 2017) .................................................................................19, 24

*Immigr. Legal Res. Ctr. v. Wolf*,
491 F. Supp. 3d 520 (N.D. Cal. 2020) ......................................................................2, 19

*Immigrant Assistance Project of AFL-CIO v. I.N.S.*,
306 F.3d 842 (9th Cir. 2002) ......................................................................................18

*Jean v. Nelson*,
472 U.S. 846 (1985).....................................................................................................17

*Johnson v. Robison*,
415 U.S. 361 (1974).....................................................................................................19

*League of Wilderness Defs./Blue Mountains Biodiversity Project v. Connaughton*,
752 F.3d 755 (9th Cir. 2014) ......................................................................................24

*Leiva-Perez v. Holder*,
640 F.3d 962 (9th Cir. 2011) ......................................................................................22

*McAllister v. United States*,
3 Cl. Ct. 394 (1983) .......................................................................................................7

*McGinest v. GTE Serv. Corp.*,
   360 F.3d 1103 (9th Cir. 2004) ..................................................................................13

*Motor Vehicle Mfrs. Ass'n of U.S., Inc. v. State Farm Mut. Auto. Ins. Co.*,
   463 U.S. 29 (1983)....................................................................................................10

*N. Mariana Islands v. United States*,
   686 F. Supp. 2d 7 (D.D.C. 2009) .............................................................................20

*Norsworthy v. Beard*,
   87 F. Supp. 3d 1164 (N.D. Cal. 2015) ......................................................................23

*NRDC v. Regan*,
   67 F.4th 397 (D.C. Cir. 2023) ....................................................................................5

*Nw. Env't Defense Ctr. v. Bonneville Power Admin.*,
   477 F.3d 668 (9th Cir. 2007) ......................................................................................8

*Padilla v. Kentucky*,
   559 U.S. 356 (2010)..................................................................................................21

*Petties v. D.C.*,
   881 F. Supp. 63 (D.D.C. 1995) ................................................................................23

*Poland v. Chertoff*,
   494 F.3d 1174 (9th Cir. 2007) ..................................................................................15

*Proyecto San Pablo v. I.N.S.*,
   189 F.3d 1130 (9th Cir. 1999) ..................................................................................18

*Ramos v. Nielsen*,
   336 F. Supp. 3d 1075 (N.D. Cal. 2018) ............................................................ *passim*

*Reno v. Catholic Soc. Servs., Inc.*,
   509 U.S. 43 (1993)....................................................................................................18

*Rodriguez v. Robbins*,
   715 F.3d 1127 (9th Cir. 2013) ..................................................................................25

*Saget v. Trump*,
   375 F. Supp. 3d 280 (E.D.N.Y. 2019) ......................................................................14

*Stanley v. Illinois*,
   405 U.S. 645 (1972)..................................................................................................22

*The Anti-Defamation League, et. al, Ramos v. Nielson*,
   Case No. 18-16981 (9th Cir Feb. 7, 2019).................................................................15

*Trump v. Hawaii*,
   585 U.S. 667 (2018)..................................................................................................11

*United Gas Improvement Co. v. Callery Props., Inc.*,
    382 U.S. 223 (1965)..................................................................................................7

*United States v. Carrillo-Lopez*,
    68 F.4th 1133 (9th Cir. 2023), *cert. denied*, 144 S. Ct. 703 (2024)........................11, 12

*United States v. Seatrain Lines, Inc.*,
    329 U.S. 424 (1947)..................................................................................................4

*United States v. Virginia*,
    518 U.S. 515 (1996)................................................................................................11

*Vargas v. Meese*,
    682 F. Supp. 591 (D.D.C. 1987)........................................................................21, 22

*Vill. of Arlington Heights v. Metro. Hous. Dev. Corp.*,
    429 U.S. 252 (1977)................................................................................12, 13, 14, 15

*Warsoldier v. Woodford*,
    418 F.3d 989 (9th Cir. 2005) ..................................................................................20

*Washington v. Davis*,
    426 U.S. 229 (1976)................................................................................................11

*Washington v. Trump*,
    847 F.3d 1151 (9th Cir. 2017) ................................................................................22

*Winter v. Nat. Res. Def. Council, Inc.*,
    555 U.S. 7 (2008)..........................................................................................1, 2, 19

**Statutes**

5 U.S.C. § 702................................................................................................................16

5 U.S.C. § 705.......................................................................................................*passim*

28 U.S.C. § 1331...................................................................................................16, 19

**Other Authorities**

8 C.F.R. § 244.2...........................................................................................................3, 9

8 C.F.R. § 244.17.........................................................................................................3, 9

8 CFR § 244.14 ...............................................................................................................9

62 Fed. Reg. 16608-1......................................................................................................9

64 Fed. Reg. 61123 .........................................................................................................9

66 Fed. Reg. 18111 ..................................................................................................................9

73 Fed. Reg. 57128 ..................................................................................................................8

76 Fed. Reg. 29000 ..................................................................................................................9

77 Fed. Reg. 76503 ................................................................................................................11

78 Fed. Reg. 1872 ............................................................................................................9, 10

78 Fed. Reg. 32418 ..................................................................................................................8

79 Fed. Reg. 52027 ................................................................................................................10

86 Fed. Reg. 13575 ..................................................................................................................9

86 Fed. Reg. 13694 ..................................................................................................................3

87 Fed. Reg. 55024 ..................................................................................................................3

88 Fed. Reg. 5028 ................................................................................................................10

88 Fed. Reg. 68130 ..................................................................................................................3

88 Fed. Reg. 68134 ..................................................................................................................9

90 Fed. Reg. 5961 ....................................................................................................................3

90 Fed. Reg. 5962 ....................................................................................................................6

90 Fed. Reg. 8806 ........................................................................................................4, 5, 7

90 Fed. Reg. 8807 ....................................................................................................................8

90 Fed. Reg. at 8807 ..........................................................................................................9, 10

90 Fed. Reg. 9040 ..........................................................................................................4, 24

90 Fed. Reg. 9042 ................................................................................................................15

U.S. Const., amend. V............................................................................................11, 15, 16, 19

U.S. Const., amend XIV ......................................................................................................11

PLAINTIFFS' NOTICE OF MOT. & MOT. TO POSTPONE EFFECTIVE DATE – CASE NO. 3:18-cv-1554-EMC

1
## MEMORANDUM OF POINTS AND AUTHORITIES

2
## INTRODUCTION

3      This case challenges an unlawful decision to "vacate" the January 17, 2025 extension of

4  Temporary Protected Status ("TPS") for Venezuela seventeen days after it became effective via

5  publication in the Federal Register. The vacatur disregards applicable law and procedure, and

6  springs from racial animus against Venezuelan TPS holders—labeled "dirtbags" by the Secretary of

7  Homeland Security. It would rob approximately 600,000 individuals of their lawful right to live and

8  work here for at least the next 18 months, shattering families and communities, including those of

9  the Individual Plaintiffs and members of the National TPS Alliance, an Associational Plaintiff.

10  Absent relief from this Court by April 2, 2025, nearly 350,000 of the targeted Venezuelan TPS

11  holders will lose employment authorization, and face deportation (including in some cases detention

12  and summary deportation) as soon as April 7, 2025. The rest of the Venezuelan TPS community

13  could lose status and employment authorization on September 10, 2025.

14      The vacatur is illegal for a host of reasons. This motion addresses three, any one of which

15  warrants postponement. Congress has empowered federal courts to step in when reviewing

16  administrative decisions alleged to be lawless, irrational, and arbitrary, and when allowing them to

17  go into effect would cause irreparable harm. The Administrative Procedure Act ("APA") authorizes

18  district courts to "postpone" agency actions:

19              On such conditions as may be required and to the extent necessary to
                prevent irreparable injury, the reviewing court … may issue all

20              necessary and appropriate process to postpone the effective date of an
                agency action or to preserve status or rights pending conclusion of the

21              review proceedings.

22  5 U.S.C. § 705 ("Section 705"); *Bakersfield City Sch. Dist. of Kern Cnty. v. Boyer*, 610 F.2d 621,

23  624 (9th Cir. 1979) (under Section 705 "the court may postpone or stay agency action pending such

24  judicial review"); *Centro Legal de la Raza v. Exec. Off. for Immigr. Rev.*, 524 F. Supp. 3d 919, 980

25  (N.D. Cal. 2021) (staying "effectiveness" of rule under Section 705). The factors courts consider for

26  a stay under Section 705 "substantially overlap with the *Winter* factors for a preliminary injunction":

27  likelihood of success on the merits, irreparable harm, balance of the equities, and public interest.

28

1  *Immigr. Legal Res. Ctr. v. Wolf*, 491 F. Supp. 3d 520, 529 (N.D. Cal. 2020) ("*ILRC*") (staying

2  effective date under Section 705 based on *Winter* factors).

3        The Court should exercise that authority here. *First*, DHS has no authority to "vacate" a TPS

4  extension. Congress established fixed time periods and procedures for terminations, which can occur

5  only after "***the expiration*** of the most recent previous extension," not at the whim of Secretaries. 8

6  U.S.C. § 1254a(b)(3)(B) (emphasis added). *Second*, the asserted reason for the vacatur—that the

7  registration process established by the extension violated the TPS statute because TPS holders who

8  initially applied under Venezuela's 2021 designation were permitted to re-register pursuant to the

9  2023 designation—is irrational. The consolidation of registration processes for TPS recipients under

10  both designations was perfectly lawful. Secretary Noem's manifest misunderstanding about how

11  TPS works cannot justify the draconian "remedy" of stripping every beneficiary of the protections

12  they received under the January 17, 2025 extension. *Third*, the evidence already confirms that

13  discriminatory intent played a role in Secretary Noem's decisions, and decisions grounded even in

14  part on racial animus cannot stand.

15        The Court should postpone the agency's lawless action to preserve the rights of nearly

16  600,000 TPS holders who would otherwise suffer irreparable harm. The balance of equities and

17  public interest overwhelmingly favor preserving the status quo. *ILRC*, 491 F. Supp. at 528–29. A

18  decision declaring the vacatur unlawful *after* it has gone into effect—after massive economic harms

19  from lost employment authorizations and an as-yet-unknown number of illegal deportations—could

20  never restore families and communities. In contrast, postponing the decision to allow judicial review

21  in an orderly fashion will work no discernable harm to the government. Nor could it when, less than

22  a month ago, DHS concluded on the ***very same facts*** that designating Venezuela advanced the public

23  interest. For all of these reasons, relief is warranted.

24                    **STATEMENT OF THE ISSUE**

25        Should the Court postpone the vacatur of the TPS extension for Venezuela and the

26  subsequent termination of Venezuela's 2023 designation under Section 705 in light of Plaintiff's

27  showing of unlawful conduct and manifest irreparable harm?

28

### STATEMENT OF THE RELEVANT FACTS

Created in 1990, TPS allows the Secretary to designate disaster-stricken countries for protected status for renewable periods of up to eighteen months. DHS must review the designations at least sixty days before the end of each designation period, and extend so long as the conditions for designation continue to be met. Designations remain operative until terminated under procedures specified in the statute. 8 U.S.C. § 1254a(b). Nationals of designated countries are eligible for lawful status and work authorization, provided they prove their presence in the United States as of the designation's effective date, establish continuous residence from a date set by the Secretary, and pass a criminal background check, with more than a single misdemeanor disqualifying. 8 U.S.C. §§ 1254a(c)(1)(A), (2)(B). Applicants must register "during the initial registration period," 8 C.F.R. § 244.2(f)(1), and periodically thereafter "in accordance with USCIS instructions." 8 C.F.R. § 244.17(a); *see also* 8 U.S.C. § 1254a(c)(1)(A)(iv).

The Secretary first designated Venezuela in March 2021, enabling Venezuelans already residing in the U.S. as of that date to apply. 86 Fed. Reg. 13694. In September 2022, Venezuela's designation was extended through March 2024. 87 Fed. Reg. 55024. In October 2023, then Secretary Mayorkas simultaneously announced an extension of the 2021 designation (through September 2025), and a re-designation which granted TPS protection for more recently arrived Venezuelans (effective October 3, 2023 through April 2, 2025). 88 Fed. Reg. 68130. The Secretary instructed eligible applicants—namely, Venezuelans who had resided in the U.S. since July 2023 "who currently do not have TPS"—to file initial applications under the re-designation. *Id.* The October 2023 decision thus created two different tracks for Venezuelan TPS holders: (a) those who initially registered under the 2021 designation, who could re-register under the October 2023 extension to receive TPS protections through September 2025, and (b) those who initially registered under the 2023 redesignation, who would receive TPS protections through April 2025. *Id.*

On January 17, 2025, Secretary Mayorkas announced an extension of the 2023 re-designation, along with a modification to the registration process. 90 Fed. Reg. 5961. To "ensure optimal operational processes" while "maintain[ing] the same eligibility requirements," Secretary Mayorkas permitted Venezuelans who had filed initial applications under either the 2021 or 2023

1    designations to re-register under the extension and receive lawful status and work permits through

2    October 2026. *Id.* at 5963. Secretary Mayorkas's decision was published in the Federal Register and

3    became effective immediately. *Id.* at 5962, 5967; 8 U.S.C. § 1254a(b)(3)(C).

4         On January 28, 2025, three days after being sworn in as DHS Secretary, Secretary Noem

5    announced her intention to "vacate" the entire extension decision due to concerns about the

6    "consolidation of filing processes." 90 Fed. Reg. at 8807, 9041. There is neither precedent nor

7    statutory authorization for such a vacatur. Days later, she published a new decision terminating

8    Venezuela's 2023 designation. 90 Fed. Reg. 9040. Her purported justification was that permitting

9    Venezuelan TPS holders to remain in the country is "contrary to the national interest," citing

10   President Trump's directives and allegations about Venezuelan gang activities. *Id.* at 9042.

11                                          <u>**ARGUMENT**</u>

12   **I.    PLAINTIFFS ARE LIKELY TO SUCCEED ON THE MERITS.**

13        Secretary Noem lacked authority to vacate the extension, and her stated reason for the

14   vacatur is arbitrary. The decision is also infected by racism. And the Court has jurisdiction to take

15   measures to prevent lawless agency action from inflicting irreparable harm.

16        **A.    The Secretary Lacked Authority to Vacate the Extension for Venezuela.**

17        Secretary Noem asserts "inherent authority under the INA to reconsider any TPS-related

18   determination, and upon reconsideration, to vacate or amend the determination." 90 Fed. Reg. at

19   8806. On that basis, she purported to replace an 18-month extension with a termination that takes

20   effect immediately upon the end of the prior designation period. But DHS has no "inherent

21   authority" to vacate TPS extensions. It contravenes the plain language of the TPS statute, which

22   specifies precisely how long extensions must last and when termination decisions take effect.

23        Contrary to the Secretary's assertions, "[t]here is no general principle that what [an agency]

24   can do, [it] can undo." *Gorbach v. Reno*, 219 F.3d 1087, 1095 (9th Cir. 2000) (en banc) (Attorney

25   General lacked inherent authority to denaturalize people allegedly granted citizenship in error). It is

26   "sometimes" true that Congress grants agencies such authority; it is "sometimes not." *Id.*; *United*

27   *States v. Seatrain Lines*, *Inc.,* 329 U.S. 424 (1947) (agency lacked authority to modify shipping

28   certificate already issued). Whether it is always turns on the statutory scheme.

                                               4

No provision of the TPS statute explicitly grants DHS authority to reconsider a TPS

extension. Secretary Noem relies on three provisions as implicitly granting such authority: Sections

1103(a), 1254a(b)(3), and 1254a(b)(5)(A). 90 Fed. Reg. at 8806 n.2. None even references vacaturs.

For instance, Section 1103(a) is just a general grant "for carrying out [Secretary Noem's] authority

under the provisions of" the immigration laws. By its terms, Section 1103(a) provides no *additional*

authority to do anything. At most, such "broad enabling statute[s]" provide authority to correct

"inadvertent ministerial errors." *Am. Trucking Ass'ns v. Frisco Transp. Co.*, 358 U.S. 133, 145–46

(1958). As a result, Secretary Noem must establish that the structure of the TPS statute necessarily

grants inherent authority to prematurely vacate extensions. As the Ninth Circuit recently explained:

> An agency's assertion of an implied general revocation authority may
> . . . be sharply limited, or even foreclosed, when the statutory structure
> negates that assertion of implied authority. That may be the case, for
> example, when there is a specific statutory process for altering an
> agency's grant of a certificate, waiver, or other authorization. Where
> Congress has provided a particular mechanism, with specified
> procedures, for an agency to make such alterations, it is not reasonable
> to infer an implied authority that would allow an agency to circumvent
> those statutory procedural protections.

*China Unicom (Ams) Operations Ltd. v. FCC*, 124 F.4th 1128, 1149 (9th Cir. 2024) (cleaned up).

Applying this legal framework, courts have consistently rejected power grabs by agencies

asserting implied authority to undo decisions without regard to statutory procedures. Pertinent here,

where statutes provide "specific instructions," those instructions "are to be followed scrupulously"

and "should not be modified by resort to such generalities as 'administrative flexibility' and 'implied

powers'...." *Civil Aeronautics Bd. v. Delta Airlines Inc.*, 367 U.S. 316, 325 (1961); *NRDC v. Regan*,

67 F.4th 397 (D.C. Cir. 2023) (holding EPA lacked implicit authority to rescind its position that a

contaminant should be regulated where, by statute, that conclusion trigged specific periodic review

process); *Am. Methyl Corp. v. EPA*, 749 F.2d 826, 835 (D.C. Cir. 1984) (holding EPA lacked

implicit authority to revoke waiver permitting sale of fuel additive where statute established

mechanism for prohibiting sale of dangerous additives, including those "mistakenly waived into

commerce"). In particular, where a statute authorizes an agency to issue a license or benefit for a

"fixed term," it "reflects a clear temporal expectation that, absent contrary indication in the statutory

ER0280

1   text, such a license will *endure* for the length of that term. The use of a fixed term is []inconsistent

2   with []an implied power to revoke a license at any time." *China Unicom*, 124 F.4th at 1148.

3          The fixed terms of TPS designations, extensions, and terminations, and the statutorily

4   prescribed processes governing how the Secretary must proceed after an initial TPS designation, are

5   inconsistent with implicit vacatur authority. Unless otherwise specified in the original notice, an

6   initial designation "take[s] effect upon the date of publication of the designation" and "shall remain

7   in effect until the effective date of the termination of the designation." 8 U.S.C. § 1254a(b)(2). The

8   same is true of extensions. 8 U.S.C. § 1254a(b)(3)(C). "At least 60 days before the end of the initial

9   period of designation, and any extended period of designation," the Secretary "after consultation

10  with appropriate agencies of the Government, shall review the conditions in the foreign state . . . and

11  shall determine whether the conditions for such designation under this subsection continue to be

12  met." 8 U.S.C. § 1254a(b)(3)(A). The Secretary must "provide on a timely basis for the publication

13  of notice of such determination . . . in the Federal Register." *Id.* If the Secretary determines "that a

14  foreign state . . . no longer continues to meet the conditions for designation" the Secretary "shall

15  terminate the designation by publishing a notice in the Federal Register." 8 U.S.C. § 1254a(b)(3)(B).

16  Without such a determination, the designation "is extended." 8 U.S.C. § 1254a(b)(3)(A) & (C).

17  Extensions take effect immediately, and last for the length of time specified in the notice, up to 18

18  months. *Id.* In contrast, a termination "shall not be effective earlier than 60 days after the date the

19  notice is published *or, if later, the expiration of the most recent previous extension*." 8 U.S.C.

20  § 1254a(b)(3)(B) (emphasis added).

21         DHS cannot circumvent TPS's clear statutory strictures by pretending to erase the January

22  17, 2025 extension from the books and proceeding as though it never existed. Under the TPS

23  scheme, there is only one way to terminate a TPS designation: the process described in

24  subsection (b)(3)(B). Moreover, because a termination "shall not be effective earlier than 60 days

25  after the date the notice is published *or, if later, the expiration of the most recent previous

26  extension*," 8 U.S.C. § 1254a(b)(3)(B) (emphasis added), the "expiration of the [January 17, 2025]

27  extension" can occur no earlier than October 2, 2026. *Id.*; 90 Fed. Reg. 5962; 8 U.S.C.

28  § 1254a(b)(3)(B). Thus, the statute's plain language prohibits any attempt to terminate Venezuela's

1    TPS designation before October 2, 2026.

2        The purported vacatur offends still other provisions of the TPS regime. The vacatur purports

3    to negate an extension duly published in the Federal Register, which had already become effective.

4    *See* 8 U.S.C. § 1254a(b)(3)(A) (requiring publication of an extension in the Federal Register). Once

5    DHS published Secretary Mayorkas's decision to extend Venezuela's designation on January 17,

6    2025, the designation was *immediately* extended through October 2, 2026. The re-registration period

7    began *that day*. 90 Fed. Reg. 5962 (re-registration period "runs from January 17, 2025"). The notice

8    instructed TPS holders that "this Federal Register notice automatically extends [certain identified

9    EADs] through April 2, 2026 *without any further action on your part*." *Id.* at 5967 (emphasis added).

10   It likewise instructed employers to "accept" an expired EAD accompanied by a copy of the January

11   17, 2025 Federal Register Notice as proof of work authorization through April 2, 2026. *Id.* at 5969–

12   70. Secretary Noem had no authority to countermand these duly-issued agency notices without

13   regard to TPS's statutorily mandated timetables and procedures.

14       Secretary Noem may point to the fact that her predecessor rescinded a decision terminating

15   TPS for El Salvador. 90 Fed. Reg. 8806 n.2. Of course, even a consistent prior agency practice of

16   vacatur could not render it lawful if it violates express statutory requirements, but there is no such

17   regular practice here. The Biden-era rescissions of June 21, 2023 were the first and only such

18   decisions in the statute's thirty year history, and they rescinded terminations, not extensions.

19   Moreover, those terminations had been *enjoined for five years*; they never took effect. Agencies have

20   flexibility to undo decisions already found unlawful by courts. *United Gas Improvement Co. v.*

21   *Callery Props., Inc.*, 382 U.S. 223, 229–30 (1965) (agency had power to "undo what is wrongfully

22   done" when original decision never became final and was overturned on judicial review). Equally

23   important, those rescissions set aside terminations, which do not implicate the reliance interests

24   underlying TPS. *Cf. McAllister v. United States*, 3 Cl. Ct. 394, 398 (1983) (agency lacked

25   reconsideration authority to correct error where plaintiff relied on initial decision).

26       Finally, any assertion by Defendants that their vacatur was permissible on the theory that the

27   January 17, 2025, extension was premature misreads the statute. The statute required a decision "at

28   least 60 days before" the end of the prior period, which was February 1, 2025. 90 Fed. Reg. 8806; 8

1   U.S.C. § 1254a(b)(3). DHS has historically published TPS decisions as early as 159 days before

2   expiration of a previous extension. *See, e.g.*, 73 Fed. Reg. 57128 (Oct. 1, 2008) (publishing

3   extension 159 days before expiration); 78 Fed. Reg. 32418 (May 30, 2013) (publishing extension

4   102 days before expiration). Nor is it unusual to extend protections shortly before a new

5   Administration starts. Indeed, President Trump designated Venezuela for DED on the last day of his

6   first term. *See* Presidential Memo. on Deferred Enforced Departure for Certain Venezuelans (Jan.

7   19, 2021), *available at* https://trumpwhitehouse.archives.gov/presidential-actions/memorandum-

8   deferred-enforced-departure-certain-venezuelans/.

9        In short, no matter how one construes the TPS statute, Secretary Noem exceeded her

10  authority by purporting to vacate a duly adopted, and already effective, extension. For this reason

11  alone, Plaintiffs have established a likelihood of prevailing on the merits.

12       **B.    Even if DHS Had Vacatur Authority, the Vacatur Violated the APA for at Least
13              Three Separate and Independent Reasons, Each of Which Warrants
                Postponement.**

14       In her "Reasons for the Vacatur," the Secretary found no error in Secretary Mayorkas's

15  January 17, 2025 determination that Venezuela met the conditions for TPS designation. 90 Fed. Reg.

16  8807. Instead, she took issue with the registration process he established, relying on reasoning that is

17  contrary to the law and fails to account for obvious and less draconian alternatives. Each of these

18  defects shows that Plaintiffs will likely prevail on their APA claims.

19              *1.    The vacatur is founded upon legal errors.*

20       "If a reviewing court agrees that the agency misinterpreted the law, it will set aside the

21  agency's action and remand the case." *FEC v. Akins*, 524 U.S. 11, 25 (1998); *Grand Canyon Univ. v.*

22  *Cardona*, 121 F.4th 717 (9th Cir. 2024) (setting aside agency action due to legal error); *Nw. Env't*

23  *Defense Ctr. v. Bonneville Power Admin.*, 477 F.3d 668 (9th Cir. 2007) (agency decision based on

24  misinterpretation of its own legal authority violated APA). The vacatur rests on two legal errors,

25  which individually and collectively warrant postponement.

26       *First*, Secretary Noem's order misunderstands TPS redesignations. She objects that "[t]he

27  Mayorkas Notice adopted a novel approach of implicitly negating the 2021 Venezuela TPS

28  designation by effectively subsuming it within the 2023 Venezuela TPS designation." 90 Fed. Reg.

1    8807. But there is nothing novel about a country being designated for TPS multiple times, and every

2    earlier designation is "subsum[ed]" by a later one because redesignation *expands* the pool of

3    potential beneficiaries to include not only those who qualified under an earlier designation, but also

4    those who arrived *after* their country was first designated. *See* 8 U.S.C. § 1254a(c)(1)(A)(i) (TPS

5    applicants must have been "continuously physically present in the United States since the effective

6    date *of the most recent designation* of [their country]").[2] Thus, TPS holders who initially registered

7    for TPS under Venezuela's 2021 designation had to prove they remained continuously present since

8    March 9, 2021. 86 Fed. Reg. 13575. Accordingly, they necessarily also satisfied the later continuous

9    presence requirement in Venezuela's 2023 re-designation. 88 Fed. Reg. 68134 (setting October 3,

10   2023 continuous presence date); 8 CFR § 244.14(a)(2) (TPS holders must maintain continuous

11   physical presence to remain eligible for TPS).

12       *Second*, Secretary Noem's order misunderstands the TPS registration process. Secretary

13   Noem critiques Secretary Mayorkas's decision to allow 2021 TPS recipients to register under the

14   2023 designation as not "consistent with the TPS statute." 90 Fed. Reg. at 8807. But in contrast to

15   the TPS statute's strict, mandatory instructions for designating countries for TPS, the statute gives

16   the Secretary broad flexibility regarding how to register individuals for TPS. It requires only that

17   TPS holders register "during the initial registration period announced by public notice," 8 C.F.R.

18   § 244.2(f)(1), and then periodically thereafter "in accordance with USCIS instructions." 8 C.F.R.

19   § 244.17(a); *see also* 8 U.S.C. 1254a(c)(1)(A)(iv) (requiring that applicants register "to the extent

20   and in a manner which the [Secretary] establishes"). Moreover, all Venezuela 2021 TPS recipients

21   necessarily filed initial applications during the initial registration period established by the 2021

22   designation. The January 2025 extension merely provided new instructions for *re*-registrations.

23       Secretary Mayorkas's decision in the January 2025 Extension to instruct beneficiaries who

24   initially registered under the 2021 designation to re-register under the 2023 designation was thus

25   entirely consistent with the statute. Indeed, it is DHS's standard practice to have a single re-

26   _____

27   [2] The statute "explicitly contemplates more than one designation" for a country. 62 Fed. Reg. 16608-1. *See, e.g.*, 64 Fed. Reg. 61123 (1999 redesignation of Burundi); 66 Fed. Reg. 18111 (2001 redesignation of Angola); 76 Fed. Reg. 29000 (2011 redesignation of Haiti); 78 Fed. Reg. 1872

28   (2013 redesignation of Sudan).

1   registration process for TPS beneficiaries who initially registered under different designations of

2   their country. *See, e.g.*, 78 Fed. Reg. 1872 (re-designating Sudan for TPS); 79 Fed. Reg. 52027

3   (establishing one re-registration process for all TPS beneficiaries from Sudan, regardless which

4   designation they initially registered under); 88 Fed. Reg. 5028 (permitting "[i]ndividuals who

5   [initially registered for TPS under Haiti's 2010 or 2011 designation and] currently retain their TPS

6   [through June 30, 2024] under the *Ramos* injunction" to "re-register" under a later re-designation to

7   receive TPS through August 3, 2024).

8          That those instructions resulted in an extension of some beneficiaries' TPS beyond the end

9   date of the designation under which they initially registered (and through the end date of the later re-

10  designation) remained "consistent with the TPS statute." 90 Fed. Reg. at 8807. The statute's fixed 6,

11  12, and 18 month time periods are for country designations, not individual benefits, 8 U.S.C.

12  § 1254a(b), and the statute explicitly authorizes the Secretary to "stagger the periods of validity of

13  [TPS holders'] documentation and authorization in order to provide for an orderly renewal of such

14  documentation," 8 U.S.C. § 1254a(d)(2).

15         Because the Secretary erred in assuming that the registration procedures in the January 17,

16  2025 extension were unlawful, her decision must be set aside. *FEC*, 524 U.S. at 25.

17                    **2.    The vacatur failed to account for alternatives short of termination.**

18         "[W]hen an agency rescinds a prior policy its reasoned analysis must consider the

19  alternatives that are within the ambit of the existing policy," particularly when "serious reliance

20  interests" are implicated. *DHS v. Regents*, 591 U.S. 1, 30 (2020) (cleaned up) (holding DACA

21  recission arbitrary and capricious where reason given was alleged illegality of one aspect of the

22  program and Secretary failed to consider whether agency could rescind just that aspect of it); *Motor*

23  *Vehicle Mfrs. Ass'n of U.S., Inc. v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983) (agency

24  acted arbitrarily when it addressed problems with automatic seatbelts by rescinding airbag-or-

25  seatbelt requirement without considering airbag-only requirement; agency must articulate a "rational

26  connection between the facts found and the choice made").

27         Secretary Noem, however, failed to consider whether her objections to consolidation of the

28  registration processes could be resolved by *de-consolidating the registration processes*, leaving

1    undisturbed other aspects of the extension. Even assuming there was a problem with consolidating

2    the registration periods for both cohorts of Venezuelan TPS holders, the Secretary should have

3    considered this obvious alternative, rather than vacating the whole extension, and for both cohorts.

4    This error was particularly egregious because DHS regularly revises TPS registration processes via

5    Federal Register notice. *See, e.g.*, 77 Fed. Reg. 76503 (Dec. 12, 2018) (extending registration

6    period). This defect also independently shows Plaintiffs are likely to prevail.

7              C.    **The Vacatur and Termination Decisions Violated The Fifth Amendment.**

8              Secretary Noem's decisions to vacate and terminate TPS for Venezuelans are

9    unconstitutional because they were motivated at least in part by impermissible animus against

10   Venezuelan immigrants, including TPS beneficiaries. The Fifth Amendment's Due Process Clause

11   "contains an equal protection component" prohibiting federal government officials from

12   discriminating on the basis of race, ethnicity, or national origin. *Washington v. Davis*, 426 U.S. 229,

13   239 (1976); *Bolling v. Sharpe*, 347 U.S. 497, 499 (1954).[3] Courts' "approach to Fifth Amendment

14   equal protection claims has always been precisely the same as to equal protection claims under the

15   Fourteenth Amendment," so cases that analyze equal protection claims under one context apply with

16   identical force to the other. *United States v. Carrillo-Lopez*, 68 F.4th 1133, 1139 (9th Cir. 2023),

17   *cert. denied*, 144 S. Ct. 703 (2024) (internal quotation marks omitted).

18              1.    ***Strict scrutiny applies to Plaintiffs' Equal Protection claims.***

19              Courts utilize strict scrutiny to assess plausible allegations of official decisions motivated,

20   even in part, by a discriminatory purpose. *Arce v. Douglas*, 793 F.3d 968, 977 (9th Cir. 2015)

21   (decision that "is not facially discriminatory" is still "unconstitutional if its enactment or the manner

22   in which it [is] enforced were motivated by a discriminatory purpose"); *City of Cleburne v. Cleburne*

23   *Living Ctr.*, 473 U.S. 432, 440 (1985) (action subject to strict scrutiny "will be sustained only if [it

24   is] suitably tailored to serve a compelling state interest"). The limited exception for deferential

25   review adopted in *Trump v. Hawaii*, 585 U.S. 667 (2018) does not apply to TPS. *Ramos v. Nielsen*,

---

[3] The doctrinal and factual analysis is the same whether this claim is viewed as about race, ethnicity, or national origin discrimination. *See, e.g.*, *United States v. Virginia*, 518 U.S. 515, 532 n.6 (1996) (strict scrutiny applies to classifications based on national origin); *Adarand Constructors, Inc. v. Pena*, 515 U.S. 200, 223–24 (1995) (strict scrutiny applies to classifications by ethnicity).

11

1    336 F. Supp. 3d 1075, 1105–06 (N.D. Cal. 2018) (rejecting deferential review as to TPS); *cf.*

2    *Regents*, 591 U.S. at 34 (plurality) (applying *Arlington Heights* for equal protection claim about

3    DACA).

4            To prove an Equal Protection violation, plaintiffs must offer "[p]roof of racially

5    discriminatory intent or purpose." *Vill. of Arlington Heights v. Metro. Hous. Dev. Corp.*, 429 U.S.

6    252, 265 (1977). It suffices if "direct or circumstantial evidence" indicates a "discriminatory

7    purpose" was merely one "motivating factor," not the "sole purpose." *Ave. 6E Invs., LLC v. City of*

8    *Yuma, Ariz.*, 818 F.3d 493, 504 (9th Cir. 2016). Courts "[c]onsider the totality of the evidence,"

9    *Carrillo-Lopez*, 68 F.4th at 1140, and evidence of discriminatory intent can include the sequence of

10   events leading to a decision, departures from normal procedures or substantive conclusions, the

11   background of a decision, and disparate impact. *Arlington Heights*, 429 U.S. at 266–67. The

12   "administrative history may be highly relevant, especially where there are contemporary statements

13   by" decisionmakers. *Id.* at 268. Even when decisionmakers did not "expressly refer[] to race or

14   national origin," their use of "code words," "racially-loaded" comments, or "veiled" references can

15   "demonstrate discriminatory intent"; such statements can still "send a clear message and carry the

16   distinct tone of racial motivations and implications" and "convey[] the message that members of a

17   particular race are disfavored." *Ave. 6E*, 818 F.3d at 505–07 (internal quotation marks omitted).

18   Extensive social science corroborates the common-sense conclusion that racial animus often is

19   conveyed via code-word and stereotypes. Young Dec. ¶¶ 20–33; *see also* Ex. 20 at 22 (documenting

20   use of racialized stereotypes about "depraved criminal[s] and rapist[s]"); Ex. 21 at 308 (explaining

21   the use of "code words" to justify the "oppression of Racial/Ethnic Minorities and immigrants").

22                **2.    *Discriminatory intent was at least one motivating factor here.***

23           Even without discovery, Plaintiffs already have compelling direct and circumstantial

24   evidence of discriminatory intent for each and every *Arlington Heights* factor.

25           *First*, Secretary Noem made numerous contemporaneous statements that prove her decisions

26   sprung at least in part from racial animus. *Arlington Heights*, 429 U.S. at 266. She has justified

27   expelling Venezuelan immigrants with racial stereotypes, labeling them as "dirt bags," "criminals,"

28   and "vicious," supposedly rendering the U.S. unsafe, on the assumption that many, if not all, are

1    gang members, ex-convicts, or escaped from mental institutions, even though there is no evidence

2    for these assertions and the TPS statute effectively forecloses them through its criminal history bars.

3    Exs. 1-6; Ex. 12; Ex. 14 at 2–3, 5; Ex. 15 at 18–19. Courts have not hesitated to find equivalent

4    statements labeling people "drug dealer[s]," *McGinest v. GTE Serv. Corp.*, 360 F.3d 1103, 1117 (9th

5    Cir. 2004), or about "large families, unattended children, parking, and crime," as adequate to prove

6    racial animus, *id.*; *accord Ave. 6E*, 818 F.3d at 505–07 (internal quotation marks omitted).

7         Secretary Noem did not bother with "code words" or "veiled" language. She lumped 600,000

8    Venezuelan TPS beneficiaries with "members of [the] TdA [gang]," Ex. 15 at 18; *see also* Ex. 12 at

9    104–105, despite the vanishingly small number of alleged TdA members in the U.S., dearth of

10   evidence that TdA has a "substantial U.S. presence," and not a shred of proof that any TPS holders

11   have ties to the gang. Dudley Dec. ¶ 22 (organized crime expert finding that TdA "appears to have

12   no substantial US presence and looks unlikely to establish one"); Watson & Veuger Dec. ¶ 15 (no

13   evidence of connection to TPS holders); *see also* Exs. 23, 30, 34. Nonetheless, Noem characterized

14   the decision to extend TPS for "600,000 Venezuelans" as "alarming when you look at what we've

15   seen in different states . . . with gangs doing damage and harming the individuals and the people that

16   live there." Ex. 12 at 104–105. And she asserted that Venezuelan immigrants came straight from

17   prisons or "mental health facilities," Ex. 15 at 18, despite, again, no evidence whatsoever to support

18   that claim. Ex. 26 (fact check). Nor did she attempt to reconcile these false claims with the fact that

19   TPS applicants must undergo criminal background checks and are disqualified if they have more

20   than a single misdemeanor. 8 U.S.C. § 1254a(c)(2)(B)(i).

21        *Second*, the "specific sequence of events" leading to the vacatur and termination decisions,

22   including Secretary Noem's "[d]epartures from the normal procedural sequence" and "[s]ubstantive

23   departures," further "afford evidence that improper purposes are playing a role." *Arlington Heights*,

24   429 U.S. at 267. Ordinarily, periodic review of a TPS designation for extension or termination takes

25   months and involves the input of numerous career specialists. *See Ramos*, 336 F. Supp. 3d at 1082.

26   Typically, the Refugee, Asylum and International Operations Directorate of USCIS prepares a

27   Country Conditions Memo, and the Office of Policy and Strategy of USCIS prepares a Decision

28   Memo containing USCIS's recommendation. The DHS Secretary, who also receives input and

1   recommendations from the State Department and other government sources, reviews this work

2   product and makes a final decision. *Id.*

3          In contrast, Secretary Noem's TPS vacatur and termination decision-making process took

4   place over a week, at most. On January 17, 2025, presumably following months of factual input and

5   analysis, Secretary Mayorkas extended TPS for all Venezuelan beneficiaries until October 2026. On

6   January 28, 2025, only three days after she was confirmed, Secretary Noem vacated the extensions

7   (after stating in her confirmation hearing that the extensions were "alarming," Ex. 12 at 104, and, the

8   previous year, that deportations of Venezuelans should start on "DAY ONE" of President Trump's

9   term, Ex. 2). The January 28, 2025 decision was memorialized in the February 3, 2025 vacatur order.

10  Then, on February 5, 2025, she terminated TPS for Venezuelans whose TPS will expire in April

11  2025. Compressing a process that usually takes months to mere days is an unprecedented

12  "departure[] from the normal procedural sequence. *Arlington Heights*, 429 U.S. at 267. This charade

13  of a decision-making process constitutes further evidence of Secretary Noem's improper

14  discriminatory purpose.

15         *Third*, the "historical background of the decision" shows the elimination of TPS for

16  Venezuelans is the latest in "a series of official actions taken for invidious purposes." *Id.* As this

17  court and others found, during the first Trump administration the White House relentlessly pressured

18  DHS Secretaries to terminate TPS for virtually all recipients. This reflected President Trump's view

19  that TPS beneficiaries were "people from shithole countries," as opposed to people from countries

20  "such as Norway"—remarks he continues to defend. *Ramos*, 336 F. Supp. 3d at 1098, 1100

21  (concluding after extensive discovery that Trump "has expressed animus against non-white, non-

22  European immigrants" and, through surrogates in the White House, sought to influence DHS

23  decision-makers); Ex. 16 ("shithole countries" comment); Ex. 24 (defending comparisons between

24  "nice countries . . . like Denmark, Switzerland" and "Norway" and "unbelievable places and

25  countries"). Other courts to consider the merits also found the decisions pretextual or otherwise

26  arbitrary. *Centro Presente v. DHS*, 332 F. Supp. 3d 393, 417 (D. Mass. 2018); *Saget v. Trump*, 375

27  F. Supp. 3d 280, 354–59 (E.D.N.Y. 2019); *CASA de Md., Inc. v. Trump*, 355 F. Supp. 3d 307, 327–

28  28 (D. Md. 2018). This historical context further shows that the second Trump administration's TPS

1    decisions, like those of the first, are motivated by "invidious purposes." *Arlington Heights*, 429 U.S.
2    at 267.

3        *Fourth*, the disparate "impact of the official action," and "whether it bears more heavily on
4    one race," is relevant in assessing discriminatory intent. *Id.* at 266 (internal quotation marks
5    omitted). Here, Secretary Noem's decision to vacate and terminate TPS for hundreds of thousands of
6    Venezuelans with that status "bears more heavily" on people perceived in this country as non-white.
7    Every one of the *Arlington Heights* factors thus demonstrate Secretary Noem's vacatur and
8    termination decisions were motivated at least in part by discriminatory animus against Venezuelan
9    immigrants, violating the anti-discrimination guarantee of the Fifth Amendment, and establishing a
10    likelihood of prevailing on the merits.

11        *Finally*, were the evidence of Secretary Noem's own animus insufficient, the decision would
12    still be unconstitutional in light of direct evidence that President Trump's animus directly influenced
13    her decision. *See, e.g.*, *Poland v. Chertoff*, 494 F.3d 1174, 1182 (9th Cir. 2007) (holding "cat's paw"
14    doctrine recognizes that one official's animus may improperly infect a decisionmaker's action). Her
15    termination order relies almost entirely on President Trump's directives—his Executive Order,
16    "Protecting the American People Against Invasion"; his "recent, immigration and border-related
17    executive orders and proclamations [which] clearly articulated an array of policy imperatives bearing
18    upon the national interest"; his declaration of a "national emergency at the southern border"; and his
19    directive to put "America and American citizens first." 90 Fed. Reg. 9042–43. The upshot is clear:
20    President Trump expected Secretary Noem to terminate TPS for Venezuelans and other non-white
21    immigrants, and she was all too glad to comply, and indeed to adopt President Trump's animus as
22    her own. Accordingly, whether President Trump harbors discriminatory animus against Venezuelan
23    TPS beneficiaries properly bears on this Court's equal protection analysis.

24        Like Secretary Noem, President Trump has championed racial animus against TPS holders
25    generally and Venezuelans in particular. *See generally* Exs. 7–11, 13, 16–19. The phrase "America
26    First" itself invokes a tragic history of racial hatred..[4] For nearly a decade, he has denigrated non-

27    ───────────────
28    [4] This history is well-documented. *See* Brief of Amici Curiae, *The Anti-Defamation League, et. al*,
*Ramos v. Nielson*, Case No. 18-16981, ECF No. 31 at 21 (9th Cir Feb. 7, 2019). Defendants could

1   white, non-European immigrants and expressed his interest in encouraging migration instead from

2   overwhelmingly white countries. One federal court in this district found at least serious questions as

3   to whether his prior administration's attempt to terminate TPS was motivated by racial animus.

4   *Ramos v. Nielsen*, 336 F. Supp. 3d 1075, 1097 (N.D. Cal. 2018), *vacated and remanded sub nom.*,

5   *Ramos v. Wolf*, 975 F.3d 872 (9th Cir. 2020), *reh'g en banc granted, op. vacated*, 59 F.4th 1010 (9th

6   Cir. 2023).

7          President Trump has continued making such statements since that finding. He too has falsely

8   claimed, repeatedly, that Venezuela and other countries had "emptied out" their "jails and mental

9   institutions" into the Ex. 9 at 9–10, 32; Ex. 11 at 11; Ex. 13 at 4–5, 22–23; Young Dec ¶ 30. He has

10  repeatedly referred to Venezuelan immigrants as "animals," and labeled them all as criminals. Ex. 9

11  at 32–34; Exs. 17, 18, 19, 32,. Unfortunately, such statements follow in a long tradition of racist

12  statements by government officials seeking to justify attacks on immigrant communities, and they

13  plainly reveal President Trump's racial animus against Venezuelans. Young Dec ¶ 31. Because—as

14  recounted in her termination order—Secretary Noem acknowledged that she terminated TPS for

15  Venezuelans under President Trump's influence, his discriminatory purpose supports Plaintiffs'

16  equal protection challenge, giving rise to an independent basis to postpone those decisions as

17  infected by racial animus.

18          **D.    The Court Has Jurisdiction to Consider Plaintiffs' Claims.**

19          Defendants may argue that this Court lacks subject matter jurisdiction to consider Plaintiffs'

20  claims, but such arguments would be meritless. Plaintiffs assert (1) DHS exceeded its statutory

21  authority in purporting to "vacate" a prior TPS extension decision, because the statute provides no

22  such authority; (2) even if DHS had such authority, DHS acted arbitrarily because its reasons do not

23  support the vacatur decision; and (3) the DHS Secretary was motivated by racial animus in violation

24  of the Fifth Amendment. Those claims are cognizable under the Administrative Procedure Act's

25  general provision for judicial review of agency action, 5 U.S.C. § 702; the general grant of federal

26  question jurisdiction, 28 U.S.C. § 1331; and, as to the constitutional claim, under the Constitution

27  _____

28  not identify any other meaning in response to questions from this Court in prior litigation concerning
    TPS terminations which were justified by the same reasoning. *Ramos*, 336 F. Supp. 3d at 1104.

1   itself. Federal courts have consistently exercised jurisdiction over challenges to agency action on

2   these bases. *See Biden v. Nebraska*, 600 U.S. ____, 143 S. Ct. 2355, 2375 (2023) (holding agency

3   acted in excess of statutory authority); *Regents*, 591 U.S. at, 33 (holding agency decision arbitrary

4   because not supported by adequate reasoning); *Jean v. Nelson*, 472 U.S. 846 (1985) (addressing

5   challenge to race discrimination in border enforcement).

6          The government may argue that Congress stripped this Court of jurisdiction to hear cases like

7   this one in the TPS statute, which provides:

8                    There is no judicial review of any determination of the Attorney
9                    General with respect to the designation, or termination or extension of
                     a designation, of a foreign state under this subsection.

10  8 U.S.C. § 1254a(b)(5)(A). But that provision bars review only of certain "determination[s]"—those

11  respecting designation, termination, or extension of TPS. By its terms the February 3, 2025 order is

12  none of those, but instead a "vacatur" based on implicit statutory authority.

13         Even if the February 3, 2025 order were one of the actions specified in Section

14  1254a(b)(5)(A), it would still be reviewable because Plaintiffs' claims do not challenge any

15  "determination." Determination is a term of art in the jurisdiction-stripping context. Both the

16  Supreme Court and the Ninth Circuit have consistently read that term to preserve review over claims

17  like those Plaintiffs raise. Plaintiffs' first APA claim challenges the agency's asserted authority to

18  vacate prior extension decisions, while the second challenges the rationality of this particular

19  vacatur, and the third challenges the Secretary's motivation on constitutional grounds. None of those

20  claims challenges any "determination" made "with respect to the designation, or termination, or

21  extension" of TPS. Indeed, the conclusions they challenge did not take place in a termination at all,

22  but rather in a purported "vacatur," which the Secretary claims implicit authority to issue.

23         Governing caselaw confirms that the statute's bar on review of "determinations" does not

24  foreclose Plaintiffs' APA claims. In four separate immigration cases, the Supreme Court and this

25  Court have read jurisdiction stripping statutes that constrain review over "determinations" to not

26  preclude claims challenging agency action that is collateral to the determinations themselves.

27  As *McNary v. Haitian Refugee Ctr.*, the first of these cases, explained, "the reference to 'a

28

1  determination' describes a single act rather than a group of decisions or a practice or procedure

2  employed in making decisions …." 498 U.S. 479, 492 (1991) (challenge to adjudication procedures

3  did not require review of a "determination"); Congress "could easily have used broader language"

4  had it wanted to bar "all causes … arising under" the statute, or "on all questions of law and fact" in

5  such suits, rather than merely review of a "determination." *Id.* at 492–94; *Reno v. Catholic Soc.*

6  *Servs., Inc.*, 509 U.S. 43, 56–58 (1993) ("*CSS*") (applying *McNary* to find jurisdiction over

7  challenges to practice governing legalization applications); *Immigrant Assistance Project of AFL-*

8  *CIO v. I.N.S.*, 306 F.3d 842, 862–63 (9th Cir. 2002) ("*IAP*") (challenge to rule interpreting the

9  statute cognizable); *Proyecto San Pablo v. I.N.S.*, 189 F.3d 1130, 1138 (9th Cir. 1999) (challenge to

10  pre-adjudication practices cognizable).

11       *McNary* and its progeny confirm this Court has jurisdiction. Under the principle they

12  establish, a claim does not challenge a "determination" unless it seeks relief that would *dictate the*

13  *substantive outcome* of the underlying agency decision. Here, nothing in the relief Plaintiffs seek

14  would bar the Secretary from making a termination decision, provided she follows the timeline and

15  procedures required by the statute and acts with permissible motives. Moreover, the claims Plaintiffs

16  raise concern the legality of the Secretary's vacatur order, which is not itself a decision to terminate

17  TPS status at all. In addition, the substance of the vacatur decision focuses on alleged defects in the

18  TPS registration process, which is addressed in subsection (c) of the statute, whereas the jurisdiction-

19  stripping provision concerns determinations made under subsection (b). 8 U.S.C. § 1254a(b)(5)(A)

20  (prohibiting review of certain determinations "under this subsection"). Plaintiffs' claims thus do not

21  challenge any determination made in a designation, extension, or termination decision, but rather

22  only collateral legal defects in the Secretary's TPS decision-making process.

23       Were there any doubt, it would be resolved in Plaintiffs' favor by an important background

24  principle: "The APA establishes a basic presumption of judicial review [for] one suffering legal

25  wrong because of agency action." *Regents*, 591 U.S. at 16 (internal quotation marks omitted). The

26  Court has applied that "strong presumption" to find review available even under statutes with

27  language far more preclusive than that here. *See, e.g.*, *Bowen v. Mich. Acad. of Fam. Physicians*, 476

28  U.S. 667, 678–79, 681 (1986) (construing statute stating "[n]o action … shall be brought under

1    section 1331 or 1346 of title 28 to recover on any claim arising under this subchapter," as

2    inapplicable to general statutory and constitutional challenges) (quoting 42 U.S.C. § 405(h)). Even if

3    Plaintiffs' claims could be understood to challenge a "determination" under Section 1254a(b)(5)(A),

4    that provision still would not bar Plaintiffs' claims because they are not brought "under this

5    subsection," but instead under the APA and the Fifth Amendment. *Johnson v. Robison*, 415 U.S.

6    361, 367 (1974) ("A decision of law or fact 'under' a statute" means only a decision regarding "the

7    interpretation or application of a particular provision of the statute ***to a particular set of facts***.")

8    (emphasis added); *Cuozzo Speed Techs., LLC v. Lee*, 579 U.S. 261, 274–75 (2016) (APA claim did

9    not arise "under" analogous provision) (quoting 35 U.S.C. § 314(d)).

10          Finally, Plaintiffs' constitutional claim is cognizable for the additional reason that Section

11    1254a(b)(5)(A) does not mention constitutional claims. The Supreme Court has applied an extremely

12    stringent clear statement rule in this respect; it has *never* read a stripping provision to entirely

13    foreclose review of a colorable constitutional claim. Reading this statute to accomplish that result

14    could well render it unconstitutional. *See Bowen*, 476 U.S. at 680–81 (rejecting "extreme" position

15    interpreting statute to foreclose constitutional claims). Section 1252(a)(2)(B)(ii) also does not

16    foreclose review because the TPS statute does not "specif[y]" that the Secretary has discretionary

17    authority to vacate TPS decisions—it makes no reference to vacatur at all. Nor does it specify the

18    Secretary has discretion to issue terminations. Rather, it mandates termination if the criteria for

19    designation no longer exist, and mandates extension if the Secretary determines that the criteria

20    remain satisfied. 8 U.S.C. § 1254a(b)(3).

21    **II.    VENEZUELAN TPS HOLDERS FACE PROFOUND AND IRREPARABLE HARM.**

22          The factors bearing on whether to grant a postponement under Section 705 "substantially

23    overlap with the *Winter* factors for a preliminary injunction," *ILRC*, 491 F. Supp. 3d at 529, which

24    focuses on the likelihood of "irreparable harm in the absence of preliminary relief," *Winter v. Nat.*

25    *Res. Def. Council, Inc.*, 555 U.S. 7, 20 (2008). "It is well established that the deprivation of

26    constitutional rights 'unquestionably constitutes irreparable injury.'" *Hernandez v. Sessions*, 872

27    F.3d 976, 994 (9th Cir. 2017) (quoting *Melendres v. Arpaio*, 695 F.3d 990, 1002 (9th Cir. 2012)).

28    "When an alleged deprivation of a constitutional right is involved, most courts hold that no further

1   showing of irreparable injury is necessary." *Warsoldier v. Woodford*, 418 F.3d 989, 1001–02 (9th

2   Cir. 2005) (cleaned up). A procedural injury may also "serve as a basis for a finding of irreparable

3   harm . . . ." *California v. HHS*, 281 F. Supp. 3d 806, 829–30 (N.D. Cal. 2017). A party "experiences

4   actionable harm when 'depriv[ed] of a procedural protection to which he is entitled' under the

5   APA." *N. Mariana Islands v. United States*, 686 F. Supp. 2d 7, 17 (D.D.C. 2009) (quoting *Sugar

6   Cane Growers Coop. of Fla. v. Veneman*, 289 F.3d 89, 94–95 (D.C. Cir. 2002)). For the reasons

7   discussed above, Defendants have violated Plaintiffs' constitutional and statutory rights.

8         But the irreparable injury here extends far beyond the harms associated with ordinary

9   constitutional violations. Defendants' actions will upend the lives of more than 600,000 Venezuelan

10   TPS holders. In a matter of weeks, nearly 350,000 Venezuelan TPS holders will lose their

11   immigration status and work authorizations. Shortly afterward, another 250,000 Venezuelan TPS

12   holders expect to face a similar fate. These TPS holders live lawfully in this country—working,

13   paying taxes, obeying the law, and contributing to society. *See generally* Pérez Dec. Defendants'

14   actions have already inflicted irreparable injury on thousands of TPS holders and their families who

15   fear what will happen to them in the coming weeks and months. As shown below and in Plaintiffs'

16   declarations, they will suffer significant further irreparable harm if this Court does not issue

17   preliminary relief. *Id.*

18         If TPS holders lose their legal status, many of them will be at immediate risk of detention at

19   the hands of ICE officials and, potentially, immediate deportation. *See* Tolchin Dec. ¶ 23; *see, e.g.*,

20   E.R. Dec. ¶¶ 2, 18; M.R. Dec. ¶¶ 13, 18; M.H. Dec. ¶¶ 11, 16–17, 20; Arape Rivas Dec. ¶ 14; Vivas

21   Castillo Dec. ¶ 21. Those not arrested will be in a state of limbo—undocumented and without legal

22   authorization to live and work in the United States, but with nowhere to go. *See, e.g.*, Guerrero Dec.

23   ¶ 20; E.R. Dec. ¶ 20; Palma Dec. ¶ 33. Many Venezuelan TPS holders simply cannot safely return to

24   Venezuela because they will suffer severe harm at the hands of the Maduro regime, while others

25   could not return even if they wanted to because they cannot renew their passports. *See, e.g.*, Vivas

26   Castillo Dec. ¶¶ 7–9; E.R. Dec. ¶ 20; Guerrero Dec. ¶¶ , 17; Arape Rivas Dec. ¶ 2; M.H. Dec. ¶ 24;

27   Purica Hernandez Dec. ¶ 10.

28         Many Venezuelan TPS holders who face grave harm if returned have sought asylum, but

1    those applications have been pending for years due to a severe asylum backlog. Ex. 22 (estimated

2    wait time of over six years for claims before USCIS, and over four years for claims before EOIR).

3    *See, e.g.*, Guerrero Dec. ¶¶ 6, 14 (sought asylum one month after arrival, application has been

4    pending for nine years); González Herrera Dec. ¶ 6; M. González Dec. ¶ 7. Those applications will

5    not protect such individuals from being arrested and jailed by ICE officers, and those who applied

6    affirmatively remain vulnerable to both detention and deportation (including possibly even summary

7    deportation). Tolchin Dec. ¶ 23. Some will lose other alternative pathways to permanent status as a

8    result of their TPS termination. *See, e.g.*, Arape Rivas ¶ 5; Tolchin ¶ 21.

9         Many other Venezuelan TPS holders fled in recent years not due to targeted threats to their

10   life and safety that would qualify them for asylum, but because their country was in economic and

11   political ruin. Young Dec. ¶¶ 16, 19; Ferro Dec. ¶ 9; Greenslade Dec. ¶ 7; Ex. 27. TPS provides

12   humanitarian protection for such individuals, as people can benefit from it if they cannot safely

13   return, even if they do not fit the stringent legal requirements of asylum. *See* Tolchin Dec. ¶¶ 16–19,

14   23. Such individuals face the imminent loss of legal status and work authorization as a result of

15   Defendants' actions. These injuries are severe and irreparable. *See Padilla v. Kentucky*, 559 U.S.

16   356, 373 (2010) (describing "[t]he severity of deportation" as "the equivalent of banishment or

17   exile" (citation omitted)); *Vargas v. Meese*, 682 F. Supp. 591, 595 (D.D.C. 1987) (recognizing denial

18   of "the benefits of protection from deportation and work authorization, as well as the right to travel

19   outside this country without forfeiting these benefits" is irreparable harm).

20        Most devastating to many TPS holders is the prospect of family separation. Many

21   Venezuelan TPS holders could be separated from their U.S. citizen children and other family

22   members, while others will be forced to bring their U.S. citizen children to an unknown country

23   facing political and economic collapse. M.R., for example, shares custody of her youngest

24   daughter—a U.S. citizen in kindergarten—with her father. Were she to lose TPS status and be forced

25   to leave, she and her daughter's father would face an impossible choice—either separate the girl

26   from her mother or send her to Maduro's Venezuela. M.R. Dec. ¶¶ 17, 19. Many other Venezuelan

27   TPS holders will face similarly impossible choices if the decisions take effect. M.H. Dec. ¶¶ 19, 21–

28   23; Arape Rivas ¶¶ 13, 20; M. Gonazález Dec. ¶¶ 9, 12; Guerrero Dec. ¶ 12. The Ninth Circuit has

1  repeatedly found family separation constitutes irreparable harm. *See, e.g.*, *Stanley v. Illinois*, 405

2  U.S. 645, 647 (1972) ("[P]etitioner suffers from the deprivation of h[er] child[], and the child[]

3  suffer[s] from uncertainty and dislocation."); *Washington v. Trump*, 847 F.3d 1151, 1169 (9th Cir.

4  2017) (identifying "separated families" as irreparable harm); *Leiva-Perez v. Holder*, 640 F.3d 962,

5  969–70 (9th Cir. 2011); *Ms. L v. ICE*, No. 3:18-cv-00428, Dkt. 83 (S.D. Cal. June 26, 2018).

6      The TPS terminations will also inflict severe economic harm on TPS holders. Without

7  employment authorization from TPS, many will no longer be able to support themselves or their

8  families. M.R., for example, lives with her two daughters and mother. She, her mother, and her older

9  daughter hold TPS, while her younger daughter is a U.S. citizen. She supports the whole family by

10  holding down two jobs, one of which is a full-time job in health care. If she loses TPS, and along

11  with it her work authorization, the whole family will face financial ruin. Her mother suffers from

12  high blood pressure, while her elder daughter has diabetes. Both rely on M.R.'s income for their

13  healthcare needs. M.R. Dec. ¶¶ 7-12, 16. She has suffered increasing anxiety as the TPS termination

14  date nears. Thousands of other TPS holders feel the same way. *See, e.g.*, E.R. Dec. ¶ 17; Vivas

15  Castillo Dec. ¶ 25; Guerrero Dec. ¶ 14; Purica Hernandez Dec. ¶ 9; A.V. Dec. ¶ 14. Others will lose

16  the ability to pursue higher education or job training. *See, e.g.*, González Herrera Dec. ¶¶ 9, 14;

17  Guerrero Dec. ¶¶ 15, 22. Without stable employment, some will lose homes or other material assets.

18  *See, e.g.*, M.R. Dec. ¶ 16; E.R. Dec. ¶ 17; Guerrero Dec. ¶ 24; Arape Rivas ¶ 16; M. González Dec.

19  ¶ 13. The "loss of opportunity to pursue one's chosen profession constitutes irreparable harm." *Ariz.*

20  *Dream Act Coal. v. Brewer*, 855 F.3d 957, 978 (9th Cir. 2017); *see also Meese*, 682 F. Supp. at 595

21  (recognizing denial of work authorization as irreparable harm).

22      TPS holders will also, in many cases, lose drivers' licenses, which are tied to legal status in

23  many states. M.H. Dec. ¶ 18; Tolchin Dec. ¶ 23. The loss of the legal right to drive limits their

24  ability to work, care for children, and do basic tasks like shop for groceries. *See, e.g.*, Arape Rivas

25  ¶ 17; M.H. Dec. ¶ 18; A.V. Dec. ¶ 14; Vivas Castillo Dec. ¶¶ 15–17, 25. Others will lose access to

26  essential health care. *See, e.g.*, M.R. Dec. ¶¶ 4, 15; M.H. Dec. ¶¶ 8, 22–23; E.R. Dec. ¶ 22; Palma

27  Dec. ¶ 39. Lost freedom of movement and access to health care are irreparable harms. *Ariz. Dream*

28  *Act Coal. v. Brewer*, 757 F.3d 1053, 1068 (9th Cir. 2014) (loss of driver's licenses as irreparable

1    harm).

2         Lastly, Defendants' termination of TPS for Venezuelans is inflicting severe, continuing

3    emotional harm on TPS holders and their family-members. For both TPS holders and their families,

4    the consequences of the TPS terminations are enormous and multi-faceted. TPS holders have lost the

5    security of knowing they will be able to live and work safely and freely in the United States so long

6    as conditions in Venezuela remain unsafe. As a result, they are already experiencing resulting

7    anxiety, depression, and fear. *See, e.g.*, A.V. Dec. ¶¶ 12–13; M.R. Dec. ¶¶ 14, 18; M.H. ¶¶ 19–20;

8    E.R. Dec. ¶¶ 15–16, 19; Guerrero Dec. ¶¶ 18–20, 23; Arape Rivas Dec. ¶ 21; Vivas Castillo Dec.

9    ¶¶ 20, 24; González Herrera Dec. ¶¶ 11–13, 15–16; Purica Hernandez Dec. ¶ 7; M. González Dec.

10   ¶¶ 12, 16; Palma Dec. ¶¶ 32, 36–37. The U.S. citizen children of TPS-holders are likewise suffering

11   severe emotional stress from the possibility of being uprooted from the only country they have

12   known or being forcibly separated from one or both parents. *See, e.g.*, M.R. Dec. ¶ 19.

13        These harms are compounded because Venezuelan TPS holders recognize that the

14   government's actions against them are motivated by animus. Many describe being fearful of leaving

15   the house, speaking Spanish, or disclosing their nationality due to the stream of racist invective

16   President Trump and others have spewed against them. *See, e.g.*, Guerrero Dec. ¶¶ 19, 26; Arape

17   Rivas Dec. ¶ 23; E.R. Dec. ¶ 23; Purica Hernandez Dec. ¶ 7; González Herrera Dec. ¶ 17. These

18   emotional and psychological injuries indisputably constitute irreparable harm. *See, e.g.*, *Chalk v.*

19   *United States Dist. Ct.*, 840 F.2d 701, 709–10 (9th Cir. 1988) (explaining "emotional stress,

20   depression and reduced sense of well-being" can constitute irreparable injury); *Norsworthy v. Beard*,

21   87 F. Supp. 3d 1164, 1192 (N.D. Cal. 2015) ("Emotional distress, anxiety, depression, and other

22   psychological problems can constitute irreparable injury."); *Petties v. D.C.*, 881 F. Supp. 63, 68

23   (D.D.C. 1995) (recognizing stress, anxiety, and deteriorating scholastic performance caused by

24   uncertainty about government action constitutes irreparable harm).

25        Defendants' unlawful termination of TPS imposes and will continue to impose irreparable

26   harms on Venezuelan TPS holders, their families, and their communities. Absent judicial

27   intervention, the severity of the harms Venezuelan TPS holders face will grow.

28

## III.    THE BALANCE OF EQUITIES AND PUBLIC INTEREST WEIGH HEAVILY IN FAVOR OF POSTPONEMENT.

The final two considerations—the balance of the equities and the public interest—merge when the government is a party. *League of Wilderness Defs./Blue Mountains Biodiversity Project v. Connaughton*, 752 F.3d 755, 766 (9th Cir. 2014). In assessing these factors, courts consider the impacts of the relief sought on nonparties as well. *Id.* Where plaintiffs establish "a likelihood that Defendants' policy violates the U.S. Constitution, they also "establish[] that both the public interest and the balance of the equities favor" interim relief. *Brewer*, 757 F.3d at 1069. So too for APA violations: the "public interest is served when administrative agencies comply with their obligations under the APA." *HHS*, 281 F. Supp. 3d at 831–32 (finding "the public interest favors the granting of a preliminary injunction") (quoting *N. Mariana Islands*, 686 F. Supp. 2d at 21).

Other public interests and equities overwhelmingly support Plaintiffs' motion. The harms resulting from the termination of TPS extend well beyond the TPS holders and their families, causing myriad social and economic harms to communities across the United States. *See, e.g.*, Ferro Dec. ¶¶ 13–15, 18–19. Venezuelan TPS holders pay millions of dollars in tax and contribute millions more to Social Security every year. Lost employment alone could cost the national economy $3.5 billion dollars annually. Card Dec. ¶ 9(i); *see also* Watson & Veuger Dec. ¶¶ 20–22; Perez Dec. ¶¶ 5–6; Morten Dec. ¶¶ 4–8. Courts may consider "indirect hardship" when issuing injunctive relief. *Hernandez*, 872 F.3d at 996.

In contrast, Defendants will suffer no material harm. Any assertion that the continued presence of TPS holders in the United States causes harm to the national interest[5] is undercut by the recognition that all TPS applications are individually reviewed by USCIS and all applicants submit to a background check.[6] Defendants' reliance on assertions that Venezuelan TPS holders are, or are associated with, a Venezuelan gang rests on a lie. No evidence supports that specious claim. Dudley Dec. ¶¶ 13–19 (TdA "appears to have no substantial U.S. presence and looks unlikely to establish one," and no evidence of TPS holders' involvement with TdA); *see also* Watson & Veuger Dec.

---

[5] Termination of the October 3, 2023 Designation of Venezuela for Temporary Protected Status, 90 Fed. Reg. 9040-01, 9041 (Feb. 5, 2025).

[6] 8 U.S.C. § 1254a(c)(2)(B)(i).

¶ 15; Young Dec. ¶¶ 3, 11–12 ("characteriz[ation of] Venezuelan TPS holders as dangerous criminals . . . is a false narrative"). Indeed, local government officials pleaded for TPS to be granted more broadly to ensure that the many Venezuelans who had fled to the United States could work legally and would not become dependent on public benefits or private handouts. Defendants' actions would create several hundred thousand new undocumented people in a matter of weeks, thus damaging the public's interest in the economic and social benefits that come with lawful immigration status. *See e.g.*, Watson & Veuger Dec. ¶ 16 (adverse health consequences); Ferro Dec. ¶ 10 (TPS allows Venezuelans to work rather than rely on government benefits, and enhances public safety by reducing fear of interacting with authorities).

Most important for purposes of the equity analysis, if this Court orders a postponement to preserve the status quo, then Defendants' ability to enforce the relevant TPS decisions will merely be delayed pending resolution of this case on the merits. Put another way, if Defendants' conduct was lawful, then the termination decisions will go into effect after a slight delay. In contrast, if Plaintiffs prevail on the merits, then the public interest will have favored them, as Defendants have no interest in enforcing unlawful or unconstitutional decisions. *Rodriguez v. Robbins*, 715 F.3d 1127, 1145 (9th Cir. 2013) ("[The government] cannot suffer harm from an injunction that merely ends an unlawful practice.").

## CONCLUSION

The Court should postpone the effective date of the challenged decisions.

Date:  February 20, 2025                    Respectfully submitted,

                                            ACLU FOUNDATION
                                            OF NORTHERN CALIFORNIA

                                             /s/ *Emilou MacLean*
                                            Emilou MacLean
                                            Michelle (Minju) Y. Cho

                                            Ahilan T. Arulanantham
                                            Stephany Martinez Tiffer
                                            CENTER FOR IMMIGRATION LAW AND
                                            POLICY, UCLA SCHOOL OF LAW

ER0300

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

Eva L. Bitran
ACLU FOUNDATION
OF SOUTHERN CALIFORNIA

Jessica Karp Bansal
Lauren Michel Wilfong (pro hac vice pending *)
NATIONAL DAY LABORER ORGANIZING
NETWORK

Attorneys for Plaintiffs