No. 25-2120

IN THE UNITED STATES COURT OF APPEALS
FOR THE NINTH CIRCUIT

———————————

**NATIONAL TPS ALLIANCE, et al.,**
Appellees,

v.

**KRISTI NOEM, et al.,**
Appellants.

———————————

On Appeal from the United States District Court
for the Northern District of California
District Court Case No. 3:25-cv-1766

———————————

**EXCERPTS OF RECORD**

**VOLUME 7**

———————————

| | |
|---|---|
| **YAAKOV M. ROTH** | **ANNA DICHTER** |
| **Acting Assistant Attorney General** | **ERIC SNYDERMAN** |
| **Civil Division** | **LAUREN BRYANT** |
| | **CARLTON F. SHEFFIELD** |
| **DREW C. ENSIGN** | **CATHERINE ROSS** |
| **Deputy Assistant Attorney General** | **LUZ MARIA RESTREPO** |
| **Office of Immigration Litigation** | **AMANDA SAYLOR** |
| | **JEFFREY M. HARTMAN** |
| **SARAH L. VUONG** | **Trial Attorneys** |
| **Assistant Director** | **Office of Immigration Litigation** |
| **Office of Immigration Litigation** | **P.O. Box 868, Ben Franklin Station** |
| | **Washington, DC 20044** |
| **WILLIAM H. WEILAND** | **Telephone: (202) 532-4404** |
| **Senior Litigation Counsel** | **Jeffrey.M.Hartman@usdoj.gov** |
| **Office of Immigration Litigation** | |

ER1163

# EXHIBIT
# 21

ER1164

*Law & Society Review* (2024), **58**, 294–328
doi:10.1017/lsr.2024.19



ARTICLE

# Deconstructing racial code words

Deirdre Pfeiffer[1]  and Xiaoqian Hu[2]

[1]School of Geographical Sciences & Urban Planning, Arizona State University, Tempe, AZ, USA and
[2]University of Arizona James E. Rogers College of Law, Tucson, AZ, USA
**Corresponding author:** Deirdre Pfeiffer; Email: deirdre.pfeiffer@asu.edu

(Received 23 March 2023; revised 14 March 2024; accepted 28 March 2024)

## Abstract
Racism has become more covert in post-civil rights America. Yet, measures to combat it are hindered by inadequate general knowledge on what "colorblind" race talk says and does and what makes it effective. We deepen understanding of covert racism by investigating one type of discourse – racial code words, which are (1) indirect signifiers of racial or ethnic groups that contain (2) at least one positive or negative value judgment and (3) contextually implied or salient meanings. Through a thematic analysis of 734 racial code words from 97 scholarly texts, we develop an interpretive framework that explains their tropes, linguistic mechanisms and unique roles in perpetuating racism, drawing from race, linguistic and cultural studies. Racial code words promote tropes of White people's respectability and privilege and Racial/Ethnic Minorities' pathology and inferiority in efficient, adaptable, plausibly deniable and almost always racially stratifying ways, often through euphemism, metonymy and othering. They construct a "colorblind" discursivity and propel both "epistemic racism" (racism in knowledge) and systemic racism (racism in action). We further strengthen applications of Critical Race Theory in sociolegal studies of race by presenting a "racial meaning decoding tool" to assist legal and societal measures to detect coded racism.

**Keywords:** racial code words; covert racism; critical race theory; epistemic racism

## Introduction

Racism has become more covert in post-civil rights America (Omi and Winant 2014; Bonilla-Silva 2022; Haney López 2014).[1] A few examples illustrate this trend. A city council denies rezoning to accommodate multifamily housing based on fears of *crime*. A nightclub owner instructs his bouncer to turn away anyone in *big chains*. A tech company rejects a minority applicant who *cannot fit our corporate culture*. Nowhere are specific references to race made. Yet, attributes like dress and cultural fitness can be seemingly race-neutral proxies or codes for members of specific racial groups (Carbado and Gulati 2013; Rich 2004). Similarly, concerns about crime may mask residents' racially motivated fears about their future neighbors and convey a subtext that equates Racial/Ethnic Minorities[2] with poverty, pollution and criminality (Beckett 1997; Carlson 2020; Fleury-Steiner and Fleury-Steiner 2009; Gonzalez Van Cleve and

© The Author(s), 2024. Published by Cambridge University Press on behalf of Law and Society Association. This is an Open Access article, distributed under the terms of the Creative Commons Attribution licence (http://creativecommons.org/licenses/by/4.0), which permits unrestricted re-use, distribution and reproduction, provided the original article is properly cited.

**ER1165**

(4 of 175), Page 4 of 175
Case 4:25-2750, 04/30/2025, DktEntry: 23.8, Page 4 of 175
Case 3:25-cv-01766-EMC    Document 37-21    Filed 02/21/25    Page 3 of 36

*Law & Society Review*    295

Mayes 2015; Longazel 2012). Denying rezoning, employment or club entry based on these concerns may bar Racial/Ethnic Minorities from housing and labor markets and social networking. Practices that transmit racial narratives, like use of stereotypes, work together with practices that exclude racial groups from domains of social life, like markets and networks, to perpetuate racial hierarchy and inequality.

Although the Equal Protection Clause and civil rights laws (broadly termed antidiscrimination law) prohibit racially discriminatory practices, their operating logic is poorly equipped to address the deleterious effects of coded language (Rich 2004; Onwuachi-Willig and Barnes 2005; Haney López 2006; Carbado and Gulati 2013; Murakawa and Beckett; Obasogie 2010; Edelman et al. 2016). Contemporary race scholars have examined practices of covert racism in diverse settings and proposed various theories to better understand it (e.g., Bobo 2017; Bonilla-Silva 2022; Haney López 2003; Kinder and Sears 1981; Levinson and Smith 2012). However, comprehensive knowledge is lacking on what codes "colorblind" race talk deploys, how these codes propel racism in post-civil rights America and ultimately how to confront them in law and social practice. We help to fill this knowledge gap by focusing on one instrument of "colorblind" race talk: racial code words, which we define as (1) indirect signifiers of racial or ethnic groups that contain (2) at least one positive or negative value judgment and (3) contextually implied or salient meanings.

We create a novel corpus of 734 racial code words through a systematic literature review (Xiao and Watson 2019) of 97 scholarly texts that document race talk in post-civil rights America. We then conduct thematic analysis of these code words and develop an interpretive framework that explains their tropes, linguistic mechanisms and unique roles in perpetuating racism, drawing from race, linguistic and cultural studies. We find that racial code words promote tropes of White people's respectability and privilege and Racial/Ethnic Minorities' pathology and inferiority in efficient, adaptable, plausibly deniable and almost always racially stratifying ways, often through euphemism, metonymy and othering. Racial code words construct a "colorblind" discursivity and propel both epistemic racism (racism in knowledge) and systemic racism (racism in action). We narrow a disciplinary divide between sociolegal studies of race and Critical Race Theory (CRT) by integrating CRT insights with our findings into a "racial meaning decoding tool" to assist researchers, legal professionals and social justice advocates in detecting coded race talk. We conclude by highlighting the major contributions and notable limits of our study and reflecting on future research needed to help further deconstruct racial code words and update the right to nondiscrimination for a "colorblind" society.

## Covert racism in law and social theory

The U.S. civil rights movement delegitimized blatant, biologically based, segregationist racism and ushered in new legislation and stronger application of constitutional equal protection to address racism. However, these victories were partial because the legal definition of racism fails to match the social reality of racism. Antidiscrimination law largely treats race as biologically derived, racism as rooted in individual bigotry and racial discrimination as based on immutable traits possessed by all group members (Carbado and Gulati 2013; Freeman 1990; Haney López 2006; Onwuachi-Willig and Barnes 2005; Rich 2004). Yet, race is socially constructed through ever-evolving

**ER1166**

296    Deirdre Pfeiffer and Xiaoqian Hu

meaning systems, and racism results from diffuse, multiscalar and intersecting forces that organize American life in racially stratifying ways (Bonilla-Silva 2022; Haney López 2006; Lawrence 1987; Omi and Winant 2014). As a result, a chasm exists between race and racism operating on the ground and race and racism recognized by antidiscrimination law.

Racial/Ethnic Minorities (particularly Black people) experience the criminal justice system as an expansive, accumulating and mighty apparatus of oppression where law emboldens racism, legal professionals "do racism" as they "do justice," and a "street law" is created for "street people" (Murakawa and Beckett 2010; Gonzalez Van Cleve 2016: 13, 53).[3] Conversely, they experience antidiscrimination law as a narrow, disaggregating and weakened shield of protection that is more promissory than real (Murakawa and Beckett 2010). The "social regime of strict scrutiny" omnipresently surveils, disciplines and traps Black people in a liminal space of life and death and safety and punishment, while the legal regime of strict scrutiny narrowly constricts racially conscious remediation efforts and naturalizes and reinforces their racial subordination (Carbado 2022). Hence, although antidiscrimination law vows to eliminate racism, it takes a formalist and skin-deep approach to race, "aggressively disaggregates" systemic racism and racial causation and is "a jurisprudence of racial *non*recognition" rather than the supposed opposite (Murakawa and Beckett 2010; Obasogie 2010: 612; Edelman et al. 2016).

Law partakes and is a central site of the social construction of race (Haney López 2006). This jurisprudence of racial nonrecognition is in essence a special form of legal construction of race. Similar to how courts in past prerequisite cases constructed racial categories by determining who was and was not White (ibid), courts in racial discrimination cases construct racial boundaries by determining whether a justification is racial or not. In prerequisite cases, courts constructed race by drawing boundaries between races, with classification as White entailing legal protections and advantages. In antidiscrimination cases, courts construct race by drawing boundaries between racial and nonracial explanations, with classification as racial entailing (equal treatment) legal protections and advantages. In both settings, the law demarcates racial boundaries and creates a prized classification (Whiteness and raciality, respectively), courts narrowly guard eligibility for the prize, and plaintiffs are forced to simultaneously abide by and perpetuate the classification to receive legal protection.

Racial codes arise from the chasm between race and racism on the ground and in antidiscrimination law. They give the user "plausible deniability" of race-based decision making (i.e., the ability to deny that actions were racially motivated, Bilotta et al. 2019; Edelman et al. 2016; Liu and Mills 2006). Hence, redress for victims of coded racial discrimination depends on whether they succeed or fail to uncloak plausible deniability. If they succeed, courts recognize the accused act as illegal racial discrimination (e.g., *Dews v. Town of Sunnyvale, Texas*, 2000). If they fail, courts classify the accused act as nonracial and the code provides a legal hack for discrimination with impunity (e.g., *Hallmark Development Inc. v. Fulton County, Georgia*, 2006). Antidiscrimination law's inability to crack racial codes is a major cause of their ascent.

Various theories illuminate how covert racism works. Covert racism spreads a narrative that American society is fair and justifies racial inequality on ostensibly nonracial grounds, such as White cultural/ideological values of individualism, meritocracy and free-market competition (e.g., "symbolic racism" in Kinder and Sears (1981);

**ER1167**

"modern racism" in McConahay (1986); "laissez-faire racism" in Bobo (2017); "color-blind racism" in Bonilla-Silva (2022)). These values are so pervasive and hegemonic that they form part of commonsense knowledge about race and racial inequality, to the point of making racist beliefs and actions "automatic," "unconsidered" and even "unconscious" (e.g., "unconscious racism" in Lawrence (1987); "commonsense racism" in Haney López (2003); "implicit bias" in Levinson and Smith (2012)). A smaller, though sizable, literature investigates mechanisms, processes and effects of covert racial discourses. Beckett (1997) exposes how political and media elites socially constructed the *war on crime* and the *war on drugs* in the latter 20th century to stoke racial anxieties and advance a conservative agenda. Mendelberg (2001), Haney López (2014) and Bennett and Walker (2018) show how strategic actors imbue race-neutral words like *fundamental rights, gun ownership, welfare, crime* and *criminal justice*, and *states' rights* with racial meaning to seek political, economic and ideological gains. López-Espino (2023) exposes how legal professionals create covert discourses to racialize and coerce obedience from parents in child welfare cases through techniques of silencing, voicing figures of disbelief and labeling their speech as lies and excuses.

Despite these vibrant and growing studies of covert racism, comprehensive knowledge on tropes, mechanisms, evolving processes, and individual and systemic effects of covert racial discourses is lacking. Our research seeks to narrow this gap. We analyze one type of discourse – racial code words. We ask: What forms do contemporary racial code words take? What tropes do they convey? What functions do they perform and with what mechanisms? What knowledge, if any, can we gain about racial code words that could help researchers, legal professionals and social justice advocates detect coded race talk?

We also seek to narrow a disciplinary gap between sociolegal studies and CRT. On the one hand, we respond to sociolegal race scholars' calls to study race capaciously, operationally and systemically (Gómez 2012; Murakawa and Beckett 2010). We investigate micro-instances of racial code word use and examine their tropes, individual and systemic effects, and linguistic mechanisms. On the other hand, we bring CRT to bear on sociolegal studies of race. The legal realist movement in the early 20th century and the law and society movement in the latter 20th century have made it a common and honored practice to apply social science insights to legal issues (Currie 1951; Macaulay 1963). In recent decades, in the context of race, the neutrality and necessity of applying social science insights to adjudication have been challenged from the left (CRT) and the right (legal formalists), respectively (Moran 2010). We deploy CRT insights to inform, energize and stimulate debate in sociolegal studies of race and racism, a practice explicitly advocated by former Law and Society Association President Laura Gómez (2012).

More concretely, we integrate CRT scholars' insights as we search for ways to deconstruct the hack of racial code words. CRT scholars have long lamented how antidiscrimination law programmatically denies redress to victims of discrimination based on racially salient features such as housing patterns, hairstyles, names or accents and proposed innovative doctrinal solutions (Carbado and Gulati 2013; Lawrence 1987; Onwuachi-Willig and Barnes 2005; Rich 2004). Lawrence (1987) introduces a cultural meaning test for equal protection adjudication. The test asks courts to act "much like a cultural anthropologist" and investigate whether the government defendant's conduct conveys "a symbolic message to which the culture

**ER1168**

298   Deirdre Pfeiffer and Xiaoqian Hu

attaches racial significance" (ibid: 356). If the court determines that more likely than not "a significant portion of the population thinks of the governmental action in racial terms," the court will assume that unconscious racism has influenced the decision-maker and thereby "apply heightened scrutiny" (ibid). Rich (2004) shows how race/ethnicity is embodied in various socially coded racial/ethnic markers and offers a racial/ethnic performativity test to better address modern forms of employment discrimination. Under this test, the plaintiff must establish that the performative act on which discrimination is based carries racial/ethnic significance and that the association between the act and the racial/ethnic identity is too strong to require the individual to change. The defendant then must offer a race-neutral value or justification and specifically explain how the plaintiff's performance thwarts that value. Lastly, Onwuachi-Willig and Barnes (2005) propose a creative transplant of the "regarded as" verbiage in the Americans with Disabilities Act to employment discrimination law to address racial discrimination by proxy. If an employer uses a racial proxy (name, hairstyle, voice, etc.) to determine that a job applicant belongs to a certain race and denies the latter a job based on that determination, the employer has conducted illegal discrimination. Our study integrates these CRT insights into a "racial meaning decoding tool" to support researchers, legal professionals and social justice advocates in detecting racial code words in varied settings.

## Canvassing racial code words from scholarly literature

Studying racial code words in empirical settings, particularly those relevant to antidiscrimination law, is essential to understanding and combating covert racism. Yet, such studies face immediate challenges. Researchers lack a framework informed by knowledge of the common features and functions of racial code words to determine whether words might be racially coded in a particular setting. Incomplete and inconsistent if not arbitrary findings may result in the absence of this foundation. Racial code words' plausible deniability and political sensitivity may expose researchers to accusations of carelessness or subjectivity at best and stoking racial hatred or racism at worst.

A general framework of what racial code words are and how they function is needed to help researchers avoid these pitfalls. Ideally, such a framework would come from repeated empirical investigations into racial code words within and across diverse settings, like local housing or workplace decision making, court cases or police reports. However, this approach would be time- and resource-intensive. Such commitments would be imprudent absent some general knowledge on the forms and functions of racial code words, especially their harmfulness and intractability.

Our research provides this starting foundation by mining a corpus of racial code words from a rich but under-synthesized data source: existing cross-disciplinary scholarly literature on real-life race talk in post-civil rights America. We use a rigorous method of sampling, data extraction and analysis – a systematic literature review (Xiao and Watson 2019). This method draws findings from scholarly texts by identifying relevant texts through keyword searches, applying inclusion criteria to sample texts most able to answer the research questions, recording and validating data extracted from these texts through iterative review processes involving multiple researchers and drawing findings through qualitative methods of analysis, like thematic coding (ibid).

**ER1169**

https://doi.org/10.1017/lsr.2024.19 Published online by Cambridge University Press

*Law & Society Review*    299

We used these methods to synthesize the rich, contemporary empirical scholarly literature on how people talk about race in diverse settings, canvass the code words used and develop an interpretive framework and later a decoding tool broadly applicable across social settings.

A key strength of studying racial code words through this data is that they have been vetted twice: first as race talk by the authors of the texts reviewed and second as racial code words by our research team. This quality helps to weaken their plausible deniability and counteract claims of researchers' subjectivity. The interdisciplinarity of this body of literature also helps to uncover common patterns of racial code words across diverse settings and build global insights on their forms and functions.

Studying racial code words from scholarly literature also has drawbacks. The data are filtered at least once and sometimes twice or more through others' interpretations. This limits the universe of race talk available for analysis within a particular setting. For example, researchers selectively extract instances of race talk from their participant interviews and integrate them into their findings. Instances from news media are filtered first through the perceptions of journalists and then through researchers who analyze the media. Selective filtering also reduces available contextual information on race talk, such as its setting or participant characteristics. This not only creates possibilities for interpretive errors but also limits insight into whether discourse is motivated by racial antipathy. Additionally, the settings studied in this data are shaped by authors' disciplinary orientations (e.g., political speeches for political scientists and schools for education scholars). Settings that are not strongly connected to a specific discipline are underrepresented (e.g., covert race talk at children's summer camps). These qualities of our data increase the risk that our findings fail to capture the broad use of racial code words in post-civil rights America and may misrepresent or misinterpret those that are captured.

Our sample of 734 racial code words comes from 97 texts published between 2000 and 2020 that address race and verbal language in real-life environments in post-civil rights America (see Appendix 1 for their references). These texts were drawn from a larger pool of 1,356 texts identified through a systematic keyword search using Google Scholar and our university library databases, which integrate large repositories, including HeinOnline, JSTOR, Web of Science, EBSCO, ProQuest and others. A text was included in the pool if (1) it had at least one keyword anywhere for each of the four dimensions of our research: race, communication, code and bias (see Appendix 2 for the keyword list) and (2) appeared in the first 200 results of our university library search engines (combining all of the keywords below in a Boolean string) or first 10 results in 190 iterations of searching in Google Scholar (due to limitations in combining keywords in a Boolean string), both sorted by relevance. This approach resulted in an initial sample that was broadly related to these dimensions but also had some blind spots (e.g., Gonzalez Van Cleve 2016; Nguyen et al. 2013; Tighe 2010). It captured texts that addressed race talk, even if their main topic was not explicitly about it.

We next identified texts most able to answer our research questions by retaining those that met the following criteria, which only 97 of the 1,356 texts met:

(1) Published on or after January 1, 2000 in English in an academically recognized press/journal,
(2) Used empirical data to answer questions about race or ethnicity and verbal language in real-world environments that were:

**ER1170**

300    Deirdre Pfeiffer and Xiaoqian Hu

- In the United States,
- After 1967 and
- Not from fictional, simulated or other controlled experimental settings and
(3)  Contained racial code words identified:
  - By the research team as:
    - Indirect signifiers of racial or ethnic groups that
    - Contain at least one positive or negative value judgment and
    - Contextually implied or salient meanings or
  - By the author(s) of the text.

Words were indirect signifiers of racial groups when they were embedded in discourse that was identified as race talk by the author(s) of the text or our research team but did not explicitly name the referred to racial or ethnic group in the sentence in which they appeared. They contained at least one positive or negative value judgment when the words, sentence or discourse in which they were embedded expressed positive or negative valence or affect (see Mohammad 2018). The meanings were contextually implied or salient when the speaker and the audience within a particular setting shared an understanding of the words during the exchange. An example is a White woman's recounting of conversations with neighbors in a mixed-race Chicago neighborhood who told her to "Be careful when you go down that street' and, where there was, you know, sort of a seemingly *rougher clientele* living on certain streets …' (Burke 2017: 289–290). We identified *rougher clientele* as a racial code word, because it (1) was an indirect signifier of Black people (as suggested by the author and indicated by the lack of explicit reference to Black people in the discourse), (2) contained a negative value judgment (*rougher* has negative valence) and (3) was understood as such by the speaker and the listener in a conversation about safety in a particular Chicago neighborhood.

Evaluating whether texts contained racial code words was challenging. Meanings of words (especially coded words) are context-dependent and fluid (Hall 2013). They are constructed through not only convention but also dynamic, ongoing interactions between people with different identities and societal positionalities. The socially constructed nature of race additionally dictates that racial meanings are contested and even embattled (Omi and Winant 2014). For example, although we interpreted a bouncer's instruction to turn away anyone in *big chains* as coded language for Black people, someone with a different positionality (e.g., a White teenager who wears big chains to "look cool") may reach a different conclusion. These challenges manifested in our research, as our two-person research team carries internal differences in racial, disciplinary and linguistic positioning.

We took several measures to address interpretive challenges. First, we independently extracted code words from a pool of 30 texts selected from our initial sample, discussed and resolved discrepancies and enhanced our inclusion criteria. Then, we sorted the initial sample by author last names, divided it between us alphabetically and independently extracted potential code words fitting the inclusion criteria. We recorded them in a database along with the following contextual elements: the (1) lines of text encompassing the code word, (2) temporal and geographic setting, (3) motivating event and (4) characteristics of the referred-to subject, user and audience, including racial identity if available. We then independently evaluated each other's

**ER1171**

data, discussed and resolved discrepancies and iteratively revised our criteria and reevaluated the code words until no further changes were made. This resulted in a final sample of 734 code words from an initially extracted pool of 1,197 code words, testimony once again to difficulties in discerning racial meaning.

We explicitly embrace the malleability and contestability of racial meaning in our decoding tool, which we present in a later section. We follow a practice in CRT of treating words as racially coded when community norms or a plurality of parties – in our case, our research team and often the authors of the examined scholarship – believe that race is being signaled (Lawrence 1987; Rich 2004). Our approach also is informed by the logic of dealing with contested or otherwise uncertain facts in the law, such as hearing from opposing sides and making findings based on a preponderance of evidence.

Henceforth, the code words extracted from scholarly texts are italicized and referred to as the "sample"; their citations are denoted by "S" (i.e., sample) and a number representing the order in which their references appear in Appendix 1 (e.g., S2). Virtually all of the racial code words came from data referenced in the texts; they most often appeared in quotes from the data (e.g., from interview participants or news media, as indicated by the use of singular quotation marks) but in some instances they appeared in an author's synthesis of observations from their data (e.g., a list of racial code words commonly used in a political campaign, as indicated by the use of double quotation marks). We found only a few instances of an author using racially coded language to interpret their data or build an argument, mostly to convey personal experiences or illustrate common examples of coded racism (e.g., S76; S89; S66).

Table 1 shows the sampled code words' temporal, racial and contextual dimensions. Most appeared between the 40-year span of 1968–2008 and the 8-year span of the Obama Presidencies (36% and 35%, respectively). Code words for Black people were most prevalent (45%), followed by White (25%) and Latinx (11%) people. A sizable proportion referred to people from other racial and ethnic groups (henceforth called "Other people"). A small number of these referred to Middle Eastern, Asian, Native American or Jewish people ($n = 34, 18, 3, 3$, respectively); most referred to Mixed Race people or Racial/Ethnic Minorities in general. The user and audience were most often White people when race was known (56% and 31% of code words, respectively), but often the race of the user was unknown (e.g., a police officer) or the race of the audience was irrelevant, because it was the public in general (e.g., American voters). The sampled code words occurred across a range of settings but mostly in the media, politics or research; only a small portion occurred in settings with some potential for antidiscrimination protection (e.g., schools, workplaces, marketplaces and law enforcement).

We used thematic analysis to discover and record the sampled code words' explicit and implicit qualities in a codebook (Gaber 2020). Our approach was abductive, meaning it was informed by categories and theories from existing scholarship and new divergent ones found through systematic and iterative data engagement (Timmermans and Tavory 2012). Tropes from covert racism and sociolegal studies were foundational, including perceptions of Racial/Ethnic Minorities' criminality, deviance from American cultural values like individualism and White possessiveness of American property, economy, governance and citizenship (e.g., Beckett 1997; Bonilla-Silva 2022; Carlson 2020; Moreton-Robinson 2015). We discovered their nuances and

**ER1172**

302     Deirdre Pfeiffer and Xiaoqian Hu

**Table 1.** Characteristics of sampled code words ($n = 734$)

| Characteristic | % | Characteristic | % |
|---|---|---|---|
| *Period* | | *Subject of code word* | |
| Pre-Obama (<2008) | 36 | Black people | 45 |
| Obama (2008–2015) | 35 | White people | 25 |
| Trump (2016–2020) | 15 | Latinx people | 11 |
| Multiple periods | 8 | Other people | 28 |
| Unknown | 6 | | |
| *User* | | *Audience* | |
| White people | 56 | White people | 31 |
| Black people | 11 | Black people | 9 |
| Latinx people | 2 | Latinx people | 8 |
| Other people | 7 | Other people | 4 |
| Unknown | 28 | General public | 40 |
| | | Unknown | 25 |
| *Settings with little potential for antidiscrimination protection* | 83 | *Settings with some potential for antidiscrimination protection* | 18 |
| Research | 28 | Schools | 5 |
| Politics | 27 | Workplaces | 2 |
| Media | 23 | Marketplaces | 3 |
| Traditional | 17 | Housing | 0 |
| Social | 6 | Law enforcement | 8 |
| Other | 6 | | |

*Source*: Authors' own work.
*Notes*: Code words' subjects, users and audiences may be of multiple racial groups. Other race refers to Asian, Native American, Middle Eastern, Mixed Race, Jewish or Racial/Ethnic Minorities in general. Code words in a few cases have multiple settings.

identified additional categories, like White people's tactics of responding to perceived threats, by iteratively reviewing the data through the lens of theories of covert racism and sociolegal studies (e.g., Beckett 1997; Carlson 2020; Haney López 2014). Finally, we stratified the code words based on their racial subjects and examined trends in their forms and functions, drawing from linguistic, cultural and race theory.

We tell a laboriously researched story about contemporary racial code words. The data are drawn from empirical studies in sociology, communication, education, law and political science and settings as diverse as politics, media, law enforcement, schools and workplaces (see Appendix 1). Our research approach was careful and conservative; the racial code words in our corpus have been twice vetted as race talk, as

**ER1173**

https://doi.org/10.1017/lsr.2024.19 Published online by Cambridge University Press

previously noted. The disciplinary and situational range of our data and the rigor of our methods enables us to identify common ways that racial code words are functioning across settings and offer a new interpretive framework and decoding tool to assist investigations in particular settings.

Nonetheless, the story we tell is imperfect. In addition to the limitations outlined above, we do not bolster the originally sampled texts with texts from their references and citations or conduct parallel data collection by multiple researchers due to the initial sample's large size and our team's limited capacity. Taken together, these issues leave some bias unresolved. The racial code words in our sample do not represent the full range of coded racial speech in post-1968 America. There almost certainly are gaps in the forms, tropes and functions of code words revealed by those sampled. The lack of contextual information for some code words, the fluid and contested nature of racial meaning, and our positionality may have led us to misinterpret racial signaling and meaning in some cases. Deconstructing racial code words will take time. Our research offers starting resources, ones that are rigorously grounded in prior literature, existing norms and careful coding but intended to be discussed, verified and refined.

## Reverse engineering racial code words in contemporary America

This section disassembles the machinery of the sampled racial code words. We reveal how they integrate tropes that create narratives about racial/ethnic groups with linguistic mechanisms that offer efficient, adaptable and plausibly deniable communication, often to racially stratifying ends.

### Forms and tropes

Figure 1 shows the range and relative frequencies of sampled code words for White, Black, Latinx and Other people. The format of the words conveys frequency, with bolded black words appearing ten times or more in our sample, unbolded black words appearing two to nine times and gray words appearing only once. Font size conveys frequency but also code word length, with shorter ones also appearing larger. Parentheticals show the variation of similar code words, including singular and plural versions and qualifications. For example, *America, American, Americans* and *most Americans* are shown as *(most) America(n(s))*. Brackets capture contextually understood but unstated elements, like '*no people walking around with their pants [down]*' (S56: 562).

*America* and *American, suburb* and *suburbanite*, and *law and order*[4] were the most frequent code words for White people; *diversity* was the most common for Black, Latinx and Other people. *Welfare* and *thug* also commonly referred to Black people; *illegal* commonly referred to Latinx people and *fobby* and *terrorist* commonly referred to Asian and Middle Eastern people, respectively. Most code words appeared only once, indicating a rich mosaic of contemporary coded race talk. Notably, none of the code words for White people appeared 10 times or more (bolded black), while multiple code words for Black and Latinx people had this quality. This may indicate that stereotypes for White people are more nuanced and individualized than those for Black or Latinx people.[5] A few of the code words are racial and ethnic slurs ("*towel head*," '*banana*,' '*twinkie*,' '*Coconut*,' '*Uncle Tom*,' '*nappy-headed hos*' and '*Dindu Nuffins*') (S79: 1818; S81: 118; S40: 234; S25: 8; S16: 160); others have explicitly racist elements ('*camel-riding*,'

**ER1174**

https://doi.org/10.1017/lsr.2024.19 Published online by Cambridge University Press

304    Deirdre Pfeiffer and Xiaoqian Hu



**Figure 1.** Forms of code words by the race of their subjects (*n* = 734). *Source*: Authors' own work.
*Notes*: Code words' formatting reveals their frequencies. Those in bolded black appeared at least ten times; those in unbolded black appeared between two and nine times and those in gray appeared once. Font size is mostly a function of frequency, with more common code words appearing larger, but also of length, with shorter code words also appearing larger. People of Other Races & Ethnicities refers to Asian, Native American, Middle Eastern, Mixed Race, Jewish or Racial/Ethnic Minorities in general.

'*jungle*,' '*eat dog*,' '*strapping young buck*' and '*young buck*') (S52: 33; S23: 288; S82: 195; S65: 59; S14: 707) (Wikipedia Contributors n.d; Wiktionary n.d). These have been fully or partly decoded over their lifecycle, a theme we revisit later.

### Code words for White people and Whiteness

Sampled code words for White people were mostly expressed by White people to other White people or the public at large. They convey beliefs about White people's respectability and privilege and their possession of American lifeways see Table 2). The "White Respectability and Privilege" trope conveys that White people are deserving of their high position in the American social structure, because they create community affluence and fulfill their economic and civic duties (Mills 1951; Urciuoli 1994). One example is a White man referring to the segregation of White people and Racial/Ethnic Minorities in local schools as 'they didn't want the sort of *lower areas* to assimilate with the *upper areas*' (S18: 109). Here, '*upper areas*' and '*lower areas*' refer to where White people and Racial/Ethnic Minorities lived, respectively. Code words expressing the affluence of White communities often ground it in suburban single-family homeownership, such as when newspaper managers justified redirecting their investment away from their traditional central city circulation areas as merely trying to serve "*affluent readers [in] the suburbs*" (S97: 27). Those about White people's economic citizenship reference their knack for generating and consuming goods and services, as well as their perceived higher human capital. This is evident in a Chicago computer software employer's view that 'you do not *talk street talk* to the *buying public*,'

**ER1175**

**Table 2.** Tropes of sampled code words for White people and Whiteness

| Trope | Main narrative | Sub-narratives | Example code words | Example decoding |
|---|---|---|---|---|
| White Respectability and Privilege | Whites are deserving of their high position in the American social structure, because they create community affluence and fulfill their economic and civic duties. | (1) Community affluence: The affluence of White communities is grounded in suburban single-family homeownership.<br><br>(2) Economic duties: White people have (a) a knack for generating and consuming goods and services and (b) higher human capital.<br><br>(3) Civic duties: White people follow laws and pay taxes, which create safer and better resourced communities. | 'they didn't want the sort of *lower areas* to assimilate with the *upper areas*' (S18:109) | *upper areas:* Where White people live<br>*lower areas:* Where Racial/Ethnic Minorities live |
| White Possessiveness | America belongs to White people, as opposed to America belonging also to Racial/Ethnic Minorities or White people belonging to America. Being American requires being from or adopting what is considered White male European Protestant culture – values like individualism; property acquisition, control and extraction; advancement through merit and being hardworking and calm. | (1) Citizenship: White male European Protestant culture is equated with American citizenship.<br><br>(2) Governance: White male European Protestant culture is the basis for American governance.<br><br>(3) Nostalgia: Longing for a time when White male European Protestant culture dominated American society, to the detriment of Racial/Ethnic Minorities and other marginalized groups. | '*Make America Great Again*' (S49: 211; S39: 36) | *America:* White people<br>*Make … Great Again:* Revert to time when White male European Protestant culture dominated American society |
| White Defense | Racial/Ethnic Minorities pose threats to White people's respectability, privilege or possession of American lifeways. These conditions are maintained through "colorblind" governance that weakens Racial/Ethnic Minorities' societal power and success. | (1) Resentment: Resentment of policies perceived to benefit Racial/Ethnic Minorities, implying a need for action but not directly calling for it.<br><br>(2) Response: Calls for a response to modify or eliminate policies perceived to benefit Racial/Ethnic Minorities to benefit White people. | '*competency based education*' (S30: 223–224) | *competency based education:* Advantage White people by ending affirmative action |

*(Continued)*

**ER1176**

306    Deirdre Pfeiffer and Xiaoqian Hu

**Table 2.** (Continued.)

| Trope | Main narrative | Sub-narratives | Example code words | Example decoding |
|---|---|---|---|---|
| Passing | Racial/Ethnic Minorities are succeeding or not to various degrees in adopting White male European Protestant cultural traits. | (1) Acting White: Racial/Ethnic Minorities are succeeding or not in temporarily adopting White male European Protestant cultural traits. (2) Becoming White: Racial/Ethnic Minorities are succeeding or not in permanently adopting White male European Protestant cultural traits. | 'While my family eats *jollibee* for breakfast I'm over here *having Starbucks* #whitewashed' (575: 515) | *eats jollibee*: Becoming a Filipino person *having Starbucks*: Becoming a White person *whitewashed*: Becoming assimilated into White culture |

Sources: Authors' own work. Tropes adapted from Mills (1951); Urciuoli (1994); Moreton-Robinson (2015); Dudas (2005); Haney López (2014); Anderson (2016) and Drakulich et al. (2021).
Note: See Appendix 1 for the example code word sources.

**ER1177**

*Law & Society Review* 307

where the employees who'*talk street talk*' are Black and Latinx people and the'*buying public*' is White people (S46: 298–299). Code words about White people's stronger perceived civic citizenship address their tendency to follow laws and pay taxes, which create safer and better resourced communities. This language is present in a Ku Klux Klan recruitment flier distributed to '*[l]aw abiding citizens*' in the Houston area (S88: 53).

Another category is "White Possessiveness," which expresses that America belongs to White people, as opposed to America belonging also to Racial/Ethnic Minorities or White people belonging to America (Moreton-Robinson 2015). Being American requires being from or adopting what is considered White male European Protestant culture – values like individualism; property acquisition, control and extraction; advancement through merit and being hardworking and calm. The subcategory Citizenship equates this culture with American citizenship. Journalist Bill O'Reilly expressed this in comparing the 'non-tradition … constituency' of 'single-women, Hispanic Americans, African Americans, whatever' that reelected Obama in 2012 and the '*[t]raditional American voters*' that didn't (S57: 153–154). The subcategory Governance identifies this culture as the basis for American governance, such as when Senate Majority Leader Trent Lott told the Council of Conservative Citizens (a right-wing, pro-White people political group): 'The people in this room stand for the *right principles* and the *right philosophy*' (S21: 54). Nostalgia conveys longing for a time when this culture dominated American society, to the detriment of Racial/Ethnic Minorities and other marginalized groups, a sentiment often expressed by President Trump and his supporters in calls to '*Make America Great Again*' (S49: 211; S39: 36).

Many code words link to Whiteness but do not exclusively refer to White people. Some reflect a trope that we call "White Defense," borrowing from historical and sociolegal studies of White people's responses to civil rights actions (e.g., Anderson 2016; Drakulich et al. 2021; Dudas 2005; Haney López 2014). These mostly convey White people's reaction to supposed threats posed by Racial/Ethnic Minorities to their respectability, privilege or possession of American lifeways. They refer to subjects of all races, though they most commonly refer to White people, followed by Latinx and Black people. Government policies that sought to foster racial equality or that were racialized to defend racial power asymmetries, like busing during the Nixon election and the war on terror during the George W. Bush and Obama administrations, often were subjects. Some convey White people's resentment of policies perceived to benefit Racial/Ethnic Minorities, implying a need for action but not directly calling for it. For example, one author expresses her resentment of law schools' use of affirmative action to admit Black people by arguing that it "flatters their own egos, so that [law schools] can gaze upon their '*diverse*' realm and bask in their noblesse oblige" (S66: 59). Others call for a response to modify or eliminate these policies to benefit White people, such as some politicians' and journalists' advocacy for '*competency based education*' as a strategy to advantage White people by ending affirmative action (S30: 223–224). These code words reflect desires to maintain White respectability, privilege and possession of America through "colorblind" governance that weakens Racial/Ethnic Minorities' societal power and success.

Other code words link to Whiteness but refer to Racial/Ethnic Minorities. These reflect the trope of "Passing," namely perceptions of Black, Latinx, Asian or Middle Eastern people succeeding or not to various degrees in adopting what is recognized as White male European Protestant cultural traits (Urciuoli 1994). They are relatively

**ER1178**

rare in our sample and were variously spoken by White people and Racial/Ethnic Minorities. One subcategory is "Acting White," such as when an Iranian American man debated whether to '*wear a baseball cap*' representing an American sports team to the airport to emphasize the Whiteness of his racially ambiguous appearance and avoid being perceived as a '*terrorist*' (i.e., a Middle Eastern person) (S67: 120). Another is "Becoming White," such as a Filipino Twitter user's deployment of the hashtag '*whitewashed*' to make a self-deprecating joke about being assimilated into White culture, because she is '*having Starbucks*' when her family '*eats jollibee*' (a fast-food restaurant serving Filipino cuisine) (S75: 515).

### Code words for racial/ethnic minorities

Sampled code words referring to Racial/Ethnic Minorities, like those for White people, were often expressed by White people to other White people or to the public at large. They mostly convey that Racial/Ethnic Minorities cause indirect, direct or possible future harm to White people and to society more broadly (see Table 3). This is especially evident in the "Parasite," "Contagion" and "Villain" categories. These well-studied tropes evolved from stereotypes for immigrants (particularly Chinese) in the latter 19th century and Black people in the slavery and post-Reconstruction eras; subsequently, they fueled cultural and economic opposition to civil rights, welfare programs and (particularly Latinx) immigration and justified the expansion of the carceral state and oppression of Racial/Ethnic Minorities and immigrants (e.g., Anderson 2016; Beckett 1997; Beckett and Ming Francis 2020; Carlson 2020; Dvorak 2000; Gold 2012; Haney López 2014; Lens 2009; Russell-Brown 1998; Santa Ana 2002; Santa Ana et al. 1998; Shabazz 2015).

Sampled code words expressing Parasite convey that Racial/Ethnic Minorities exploit communities, institutions, services, amenities or other aspects of the U.S. social system. They close to equally refer to Black, Latinx and Other people. Most present Racial/Ethnic Minorities as "Takers not Makers," as exploitative recipients of and not contributors to social welfare programs who have deep personal and cultural deficiencies within economic spheres. The most pervasive example of Taking is '*welfare queen,*' which Presidential Candidate Ronald Reagan famously used to refer to Black women living extravagantly on public benefits (S65: 58). Another is a news commentator defending the War on Drugs (which disproportionately criminalized Black people) by describing those targeted as '*living on welfare, food stamps, Medicaid, and Section 8*'; the commentator goes on to use Not Making code words by arguing that their communities '*don't promote a strong work ethic* because most … *don't work* themselves' (S84: 258). A small portion presents Racial/Ethnic Minorities as "Cheaters," conveying their perceived exploitation of job markets and higher education through biased hiring, promotion and admissions processes (e.g., calling a Person of Color in the workplace an '*affirmative action hire*' (S76: 113)). Closely related to Parasite is the category "Deficiency," which expresses anxieties that Racial/Ethnic Minorities (particularly low-income and working-class children and their parents) lack personal traits necessary to contribute to the economy, which may eventually threaten White people and society when they become a Parasite (Valles 2021; López-Espino 2023). High school teachers referring to Racial/Ethnic Minority students as '*at-risk* kids' is an example (S80: 124–125). Parasite and Deficiency code words echo Gonzalez Van Cleve (2016)'s observation of "mope" – a lazy, incompetent degenerate who drains

**ER1179**

**Table 3.** Tropes of sampled code words for racial/ethnic minorities

| Trope | Main narrative | Sub-narratives | Example code words | Example decoding |
|---|---|---|---|---|
| Parasite | Racial/Ethnic Minorities exploit communities, institutions, services, amenities or other aspects of the U.S. social system. | (1) Takers not Makers: Racial/Ethnic Minorities are exploitative recipients of and not contributors to social welfare programs who have deep personal and cultural deficiencies within economic spheres.<br><br>(2) Cheaters: Racial/Ethnic Minorities exploit job markets and higher education through biased hiring, promotion and admissions processes. | 'welfare queen' (S65: 58) | *welfare queen:* Black woman living extravagantly on public benefits |
| Deficiency | Racial/Ethnic Minorities lack personal traits necessary to contribute to the economy, which may eventually threaten White people and society when they become a Parasite (see above). | N/A | 'at-risk kids' (S80: 124–125) | *at-risk:* Racial/Ethnic Minority person |
| Contagion | Racial/Ethnic Minorities spread something harmful within communities, institutions or other societal domains. Agents of harm include attitudes, values, behaviors and conditions. | (1) Invasion: Racial/Ethnic Minorities physically invade White and potentially other communities.<br><br>(2) Corruption: Racial/Ethnic Minorities corrupt White and potentially other communities through conditions associated with Racial/Ethnic Minorities. | 'The [Local] High School kids, they're good kids. However, when they come in and out, the *bad element* hides and mixes in between with them.' (S23: 289) | *bad element:* Black and Latinx people |
| Villain | Racial/Ethnic Minorities cause direct harm to White people and potentially others by threatening personal safety or private property. | (1) Suspect: Racial/Ethnic Minorities are suspected of engaging in crime based on their comportment, place of residence or behaviors.<br><br>(2) Offender: Racial/Ethnic Minorities commit violent or property crimes against White people. | 'Shut up, *terrorist.*' (S67: 85) | *terrorist:* A Middle Eastern person |

*Sources:* Authors' own work. Tropes adapted from Bonilla-Silva (2022); Gold (2012); Beckett (1997); Russell-Brown (1998); Dvorak (2000); Lens (2009); Haney López (2014); Shabazz (2015); Beckett and Francis (2020); Anderson (2016); Carlson (2020); Santa Ana (1998; 2002); Valles (2021); Gonzalez Van Cleve (2016); Flores et al. (2019); Fleury-Steiner et al. (2009); Longazel (2012) and Gonzalez Van Cleve and Mayes (2015).
*Note:* See Appendix 1 for the example code word sources.

**ER1180**

societal resources – as a racially coded term that prosecutors, judges and defense attorneys construct to describe poor Black and Latinx defendants charged with nonviolent crimes and frame them as undeserving of legal protection (ibid: 57–61, 69).

Contagion expresses that Racial/Ethnic Minorities spread something harmful within communities, institutions or other societal domains. Agents of harm include attitudes, values, behaviors and conditions. These most refer to Latinx people in our sample – echoing Santa Ana's studies of public discourse about Latinx people in 1990s California (Santa Ana 2002; Santa Ana et al. 1998), followed by Black and Other people. Like Parasite, Contagion code words exist within socioeconomic spheres of life, but the object of harm is geographic: (1) the physical "Invasion" of White and potentially other racial and ethnic communities by Racial/Ethnic Minorities and (2) the "Corruption" of these communities by conditions associated with Racial/Ethnic Minorities. Invasion code words often use deixis like "these" or "those" to differentiate outsiders from insiders, such as White neighbors referring to Black people on their block as '*these people*' in expressing safety concerns (S23: 290). *Illegal* and variants were common Invasion code words for Latinx people. An example is the Tea Party rally sign 'Freeloading *Illegals* are Raping U.S. Taxpayers,' which derives additional potency from its integration of Parasite ('*Freeloading*') and White Respectability and Privilege ('*Taxpayers*') code words (and seeds the trope of Villain described below) in '*Raping*') (S65: 152). An example of a Corruption code word is referring to Black and Latinx students attending a White neighborhood high school as the '*bad element*' (S23: 289). Contagion code words often reflect users' "legal-spatial consciousness" of how race shapes rights to occupy and behave in space, their attention to transgressions of these norms and their role in reinforcing them (Flores et al. 2019; Shabazz 2015).

Villain expresses that Racial/Ethnic Minorities cause direct harm to White people and potentially others by threatening personal safety or private property. These sampled code words most refer to Black people, followed by Middle Eastern and Latinx people. They commonly convey fear that Racial/Ethnic Minorities will commit crimes against White people. The subcategory "Suspect" expresses concern about Racial/Ethnic Minorities engaging in crime based on their comportment, place of residence or behaviors, such as when a juror in a bank robbery case observed about the Latinx defendant, 'I guess we're profiling but they *cause all the trouble*' (S3: 1135). The subcategory "Offender" addresses perceptions that Racial/Ethnic Minorities commit violent or property crimes against White people. One example is politicians and journalists calling Black people protesting the death of a young Black man in police custody '*thugs*' (S26: 350). Another is a White high school student telling a Middle Eastern peer, 'Shut up, *terrorist*' (S67: 85). Like Contagion, Villain implies a moral-legal cartography that creates "new forms of knowledge of space, self, and other" and calls for White defense and harsher criminalization of minorities, particularly Black and Latinx people (Fleury-Steiner and Fleury-Steiner 2009: 6; Longazel 2012; Gonzalez Van Cleve and Mayes 2015; Shabazz 2015).

## Functions

Most of the sampled racial code words have racist effects. Some perpetuate common-sense racism and contribute to a "racial episteme" (a total system of knowledge and knowing about race) that portrays White people and communities as respectable and

**ER1181**

https://doi.org/10.1017/lsr.2024.19 Published online by Cambridge University Press

duly privileged and Racial/Ethnic Minorities and their communities as pathological and duly inferior.[6] Others contribute to systemic racism by supplying the substantive justifications for policies and practices that perpetuate racial inequality. The linguistic mechanisms of euphemism, metonymy and othering enable code words to imbue racial meaning and perpetuate these forms of racism by giving users varying degrees of efficient, adaptable and plausibly deniable race talk (see Table 4). Some evolve, assisted by a technique we call compounding.

### From covert race talk to racist effects

Santa Ana observes that discourse "antecedes society" and "speaks society into existence" by creating categories, conceptual mappings, worldviews and institutions (2002: 317). Our findings affirm his insight. Most of the sampled code words intentionally or unintentionally contributed to racist effects. Many perpetuated commonsense racism by promoting White people's respectability or Racial/Ethnic Minorities' pathology (Haney López 2003; Obasogie 2010). Examples include high school teachers and administrators referring to Black students as '*Special Ed kids*,' a journalist referring to a White murder victim as an '*upstanding citizen*,' and Newt Gingrich referring to Black people as those who have '*no habit of showing up on Monday*' (S80: 182–183; S44: 11; S57: 102). These examples, and the eight common tropes that our sample of racial code words conveys, show how racial code words contribute to epistemic racism – routine and automatic discursive practices that link Racial/Ethnic Minorities (and other minoritized groups like women and people from the Global South) with inferior characteristics like unintelligence, animality and irrationality and link White people (mostly "Western" White men) with superior qualities like higher intelligence, civility and rationality (Beagan et al. 2024; Bhimull et al. 2022; Grosfoguel 2010; 2013; Kubota 2020). Although racial code words in our sample rarely rely on metaphors for creation, the narratives they tell about Racial/Ethnic Minorities are mostly metaphors: Parasite, Contagion and Villain.[7] These vivid, rich and familiar metaphors perform powerful "conceptualizing and signaling functions" (Santa Ana 2002: 59), enabling the production of a racial episteme that portrays White people and their spaces as superior and Racial/Ethnic Minorities and their spaces as inferior. These findings indicate that racial code words have become building blocks of a "colorblind" epistemic racism in post-civil rights America.

Other racial code words were used to endorse a policy or practice that perpetuated racial inequality and White privilege. These speakers were frequently a White person advocating for a supposedly pro-White policy or practice or opposing a supposedly pro-Racial/Ethnic Minorities policy or practice. The most common was harsher policing and penalization of Racial/Ethnic Minorities, particularly Black people. Examples include a neighbor advocating for increased policing to stop '*hooligans*' and a gun rights group calling for '*responsible gun ownership*' to intimidate Black people – kinds of discourse that Carlson (2020) labels "gun militarism" and "gun populism," respectively (S23: 289; S14: 701). Use of racial code words to support harsher penalization of Racial/Ethnic Minorities affirms existing studies on how mainstream discourse on crime perpetuates racial power and control by creating state apparatuses that, instead of governing crime, govern through crime (Fleury-Steiner and Fleury-Steiner 2009;

**ER1182**

312    Deirdre Pfeiffer and Xiaoqian Hu

Table 4. Mechanisms of sampled code words

| Mechanism | Qualities | Effects | Subcategories | Example code words | Example decoding |
|---|---|---|---|---|---|
| Euphemism | Use of agreeable, milder or inoffensive language to refer to something disagreeable, harsher or potentially offensive about a racial group or its members. | Makes conversation polite by downplaying racial dimensions and protects speakers from experiencing personal stress and adverse social consequences that might stem from naming race. | (1) Understatement: Use of fuzzy language to lighten a serious topic. (2) Under-specification: Use of general language to refer to something more specific. (3) Overstatement: Use of upbeat exaggerations to highlight something desirable about the referent. | 'Apple products are for the *premium market*' (S85: 28) | *premium market*: people who are not Black people |
| Metonymy | Use of a contextually understood closely associated feature of a racial group to refer to the group or its members. Has two parts: the descriptor (a racially salient feature) and the described (a member; the entirety or another feature of a racial group). The descriptor-described may be part-whole, whole-part or part-part. The relationship linking the descriptor and the described may be physical or conceptual. | Achieves plausible deniability through racial proxies. Reduces the informational, emotional and reputational costs of communication. Relieves speakers from experiencing personal stress and adverse social consequences that might stem from naming race. | (1) Racializing the Location: Use of a closely associated geography to refer to a racial group. (2) Inflating the Social Member or Subgroup: Use of a notable member or closely associated subgroup to refer to a racial group. | 'no *Timberlands* at the door' (S47: 135) | *Timberlands*: a Black man |

(Continued)

**ER1183**

*Law & Society Review*     313

Table 4. (*Continued.*)

| Mechanism | Qualities | Effects | Subcategories | Example code words | Example decoding |
|---|---|---|---|---|---|
| Othering | Use of disagreeable, harsh or potentially offensive language to forge racial difference. | Creates a qualitative difference and ideological distance between two racial groups, placing them on the opposing sides of a contextually salient binary of us vs. them. Reduces the informational, emotional and reputational costs of communication. Weakens plausible deniability. | (1) Total and insurmountable: Involves dehumanization. (2) Moral: Relates to morality. (3) Legal: Relates to legal status. (4) Cultural: Relates to cultural traits. (5) Interpersonal: Involves microaggressions. | 'anchor babies' (S22: 35) | anchor babies; Latinx people |

*Sources:* Authors' own work. Mechanisms adapted from Cameron (2012); Crespo-Fernández (2018); Rich (2004); Onwuachi-Willig and Barnes (2005); Carbado and Gulati (2013); Shabazz (2015); Littlemore (2015); Plumwood (1993); Pandey (2004); Hall (2013) and Lens (2009).

*Note:* See Appendix 1 for the example code word sources.

**ER1184**

314    Deirdre Pfeiffer and Xiaoqian Hu

Gonzalez Van Cleve and Mayes 2015; Murakawa and Beckett 2010; Simon 2007).
Other common policy-positions included:

(1) Delegitimizing or sabotaging policies, initiatives or individuals that sought to
empower minorities. For example, conservative critic Craig Smith referred to
Barack Obama as a '*hip-hop president*' (S4: 138).
(2) Opposing welfare programs. For example, White politicians referred to welfare
recipients as '*welfare queen[s]*,' '*people on food stamps*' and '*people who are on crack*'
(S35: 2125; S72: 1164; S57: 60).
(3) Opposing affirmative action programs. For example, White research partici-
pants highlighted that affirmative action beneficiaries '*don't keep the averages
up*' and are '*destined to fail*' (S13: 19; S52: 30).
(4) Advocating stricter immigration policy. For example, Republican politicians
argued that '*bad hombres*' and '*illegal aliens*' stem from "open borders" (S35:
2125; S9: 131).

Most private practices involved race-based exclusion, such as from a bar,
shopping mall, neighborhood, newspaper, job, intimate relationship or educa-
tional or medical resource, such as school children avoiding a '*terrorist*' peer
(S67: 85).

Notably, many code words both perpetuated commonsense racism and supported
a racist policy or practice. This shows how covert racism and institutional racism
are mutually constituted and reinforced (e.g., Gonzalez Van Cleve and Mayes 2015;
Murakawa and Beckett 2010). Code words that perpetuate commonsense racism sus-
tain a racist cultural/epistemic ecology, supplying the substantive justifications for
policies and practices that perpetuate racial inequality. In turn, these policies and
practices produce appearances of White people's respectability and privilege and
Racial/Ethnic Minorities' pathology and inferiority, thus justifying commonsense
and epistemic racism (see also Haney López 2006; Lawrence 1987). Like overt race
talk, racial code words direct attention away from racist systems and structures and
toward the racial difference of the disadvantaged subject (Gonzalez et al. 2022, cit-
ing Fields and Fields). However, more convenient than overt race talk, racial code
words cloak the co-dependent cultural and systemic racism with plausible denia-
bility and racial innocence and open a new space for cultural/epistemic and sys-
temic racism to co-evolve in a "colorblind" society (Bonilla-Silva 2022; Omi and
Winant 2014).

*Euphemism, metonymy and othering: mechanisms for efficient, adaptable and plausibly
deniable race talk*
Linguistic mechanisms are instrumental to overt and covert racial discourses (e.g.,
metaphor in Santa Ana 2002; "metapragmatic dismissals" in López-Espino 2023). Santa
Ana (2002, 1998) analyzes how use of metaphors such as "immigration as dangerous
waters," "immigrant as animal," "affirmative action as disease" and "nonEnglish lan-
guage as barrier" shaped public discourses on immigration, affirmative action and
bilingual education and contributed to the passing of anti-Latinx referenda on these
issues in 1990s California. We found that metaphors were used mostly to explicitly

**ER1185**

racialize a subject in our research and hence were not codes, with a few exceptions, such as referring to Latinx immigrants as '*anchor babies*' (e.g., S22: 35; S57: 42; S14: 712).

Speakers in our sample of racial code words commonly used euphemism, metonymy and othering to covertly racialize a subject and, in turn, perpetuate epistemic and/or systemic racism. Euphemism is the use of agreeable, milder or inoffensive language to refer to something disagreeable, harsher or potentially offensive about a racial group or its members (Cameron 2012). An example is a master's student using '*not diverse*' to refer to the harsher fact that Racial/Ethnic Minorities are absent from her classes (S8: 165). Euphemist code words in our sample exhibit three, often overlapping forms: understatement, under-specification and overstatement (Crespo-Fernández 2018). Understatements use fuzzy language to lighten a serious topic, such as an online news commentator using '*old boys network*' to refer to practices of hiring only White men (S53: 197). Under-specifications use general language to refer to something more specific, like an online news commentator using '*certain group of people*' to refer to Black male athletes perceived to have "foul mouths" at a local mall (S64: 245). Overstatements use upbeat exaggerations to highlight something desirable about the referent, such as an Apple supervisor reminding his employee that 'Apple products are for the *premium market*' (i.e., not Black people) when asked whether "African American English" should be incorporated into Siri speech recognition software (S85: 28).

Euphemism makes conversation polite by downplaying racial dimensions and protects from charges of racism. For example, a Southern politician criticized the growing struggle for racial justice in America with a remark that had the rest of the country voted for Strom Thurmond (a presidential candidate who campaigned on racial segregation) like his state did, 'we wouldn't have had *all these problems* over all these years' (S48: 203). This latter scenario also exhibits "dog whistle racism," where politicians knowingly convey racial meaning while denying race talk (Bennett and Walker 2018; Haney López 2014). Other examples include calls for '*law and order*' and '*states' rights*' and to '*Make America Great Again*' in the Nixon, Reagan and Trump Presidential Campaigns and Presidencies, respectively (S14: 690; S59: 72; S39: 36).

Metonymic racial code words refer to a racial group or its members using a contextually understood closely associated feature (Littlemore 2015; Radden and Kövecses 1999). They have two parts: the descriptor (a racially salient feature) and the described (a member, the entirety or another feature of a racial group). The descriptor-described may be part-whole, whole-part or part-part. Timberland, a shoe brand, is a part that represents the whole of a Black man in a bar's rule of 'no *Timberlands* at the door' (S47: 135). People, a word for society as a whole, represents the part of White people in a White woman's observation that '*people*' get mad at 'people of other races' for competing for jobs (S47: 158). Bussing, a part of school racial desegregation, represents another part – Black students going to White schools – in Nixon's rhetoric against the practice during his presidential campaign (S87: 124). The relationship linking the descriptor and the described may be physical (e.g., police officers referring to a Muslim peer as "*towel head*") or conceptual (e.g., high school teachers referring to White students as '*Gifted and Talented*') (S79: 1818; S80: 124–125). CRT scholars have analyzed various types of coded racism through metonymy, such as discrimination by proxy (Onwuachi-Willig and Barnes 2005; Rich 2004) and intra-racial discrimination directed against a racial subgroup sharing a common feature, e.g., unassimilated Black people (Carbado and Gulati 2013).

**ER1186**

316    Deirdre Pfeiffer and Xiaoqian Hu

The variants Racializing the Location and Inflating the Social Member or Subgroup metonymy were common in our sample. Racializing the Location metonymy refers to a racial group through a closely associated geography. Sampled code words for Black people and White people most frequently convey this. Examples include generalized geographies like '*inner city*' and '*urban*' (racialized as Black) and '*suburban*' (racialized as White) and specific geographies like "*Chicago*," "*Compton*," '*Detroit*' and '*the Bronx*' (racialized as Black) and '*the West Coast*' (racialized as White) (e.g., S65: 214; S78: 480; S8: 165; S76: 96; S97: 27; S80: 128; S61: 182). Others include a healthcare case worker's reference to their Black and other Racial/Ethnic Minority clientele as 'the *inner city kids* that we deal with' and a White fraternity mocking Black History Month by hosting a gathering called '*Compton* Cookout' (S37: 477; S90: 63). The utility of Racializing the Location metonymy stems from enduring imagined and real spatial racial segregation in America, through housing types (e.g., the '*projects*' racialized as Black), city sections (e.g., '*South Side*' racialized as Black), entire cities (e.g., '*West Sierra Linda*' racialized as Racial/Ethnic Minorities in general) and regions (e.g., '*rural*' racialized as White) (S38: 115; S41: 97-98; S15: 21; S85: 22; Shabazz 2015).

Inflating the Social Member or Subgroup metonymy refers to a racial group using a notable member or a subgroup. Notable members in our sample include real persons (e.g., '*Osama*' racialized as Middle Eastern and '*Jefferson Davis*' racialized as White), stereotypes of real persons (e.g., '*welfare queen*' racialized as Black), archetypical fictional individuals (e.g., '*Uncle Tom*' as a Black person who betrays other Black people to curry favor with White people) and generic fictional individuals (e.g., '*Alice Tang*' racialized as Asian, '*Tyrone Jackson*' racialized as Black and '*Joe*' racialized as White) (e.g., S67: 81; S57: 41; S35: 2125; S40: 234; S85: 10; S28: 62). Subgroups often convey racial stereotypes. For instance, a White woman moving into a racially "mixed neighborhood" received advice to stick to streets with '*university or professional looking people*,' a code word conveying respectable White people in the neighborhood (S23: 290). Other examples are '*people on food stamps*' (racialized as Black and conveying Parasitism) and "*terrorists*" (racialized as Middle Eastern and conveying Villainy) (S72: 1164; S65: 36).

Metonymies facilitate race talk not only by achieving plausible deniability through racial proxies but also by reducing the informational, emotional and reputational costs of communication. They pare a "large amount of information" down into a simplified "manageable form," enabling speakers to use this skeletal form to access the complex concept (Littlemore 2015: 4–5). For example, wearing '*big chains*' congeals the perceived pathologies of a young Black man: criminality, irresponsibility, poverty and hypersexuality (S47: 135). Like euphemism, they also relieve speakers from experiencing personal stress and adverse social consequences, like cancellation, that might stem from naming race.

Othering, like metonymy, also contributes to efficient race talk (Santa Ana 2002; Santa Ana et al. 1998). It creates a qualitative difference and ideological distance between two racial groups, placing them on the opposing sides of a contextually salient binary of us vs. them (Hall 2013; Lens 2009; Pandey 2004; Plumwood 1993). Othering contrasts sharply with euphemism by explicitly using disagreeable, harsh or potentially offensive language to forge racial difference. Stereotyping is an important tool of othering. It ignores the internal differences among the otherized group, makes them "appear suitably homogeneous" and creates categorical differences that place

**ER1187**

https://doi.org/10.1017/lsr.2024.19 Published online by Cambridge University Press

them in a position of inferiority, which "ground[s] hierarchy" (Plumwood 1993: 53–55). Otherizing differences in our sample include:

(1) Total and insurmountable. Black and Latinx people were dehumanized through words such as '*animal*' and '*demon*' (S89: 237; S40: 56).
(2) Moral. Some politicians portrayed Latinx people as foreigners who took advantage of America's social services through producing '*anchor babies*' (S22: 35).
(3) Legal. Latinx and Asian people's citizenship and belonging were questioned through words such as '*illegals*' and '*fobby*,' respectively (S97: 118; S75: 519).
(4) Cultural. '*eat dog*' was racialized as an Asian practice, and "*towel head*" was a racial proxy for Middle Eastern men (S82: 195; S79: 1818).
(5) Interpersonal. '*rude*,' '*angry*,' '*loud*' and '*opinionated*' were microaggressions against Black people (S47: 81; S76: 205, 109).

These examples reveal that othering is frequently deployed to target Latinx immigrants, a phenomenon also noted by Santa Ana (2002, 1998). While euphemism cloaks race and value judgments in nicer-sounding substitutes, othering amplifies value judgment but avoids direct connections to race. Othering weakens plausible deniability, which makes decoding easier. Yet, it is commonly used despite this risk because, like metaphor and metonymy, it is fundamental to how we think, communicate and form a cultural community. Cultural formation and order depend on sensemaking through differentiation and categorization and marking boundaries against intruding or impure symbolisms (Hall 2013).

Othering often was present among sampled code words that contributed to racist effects, which reveals its potency as a discursive craft of racism (Gonzalez et al. 2022; Hall 2013; Pandey 2004). An example is Tea Party activists' conception of society as made up of '*workers*' and '*nonworkers*,' '*productive citizens*' and 'the *freeloaders*,' which creates a binary of socioeconomic virtue and vice to oppose poverty assistance programs and perpetuate commonsense racism (S1: 14). When stereotype infuses with law, othering is amplified. For example, a Tea Party-backed candidate claimed that 'waves of *illegal aliens* [stream] across our border, joining violent gangs, forcing families to live in fear' (S9: 131). Here, '*illegal aliens*' conveys legal and moral difference; the law's making and marking of human beings as citizens, legal immigrants and illegal aliens and the trope of Villain cross fertilize to produce powerful racist effects (Gonzalez Van Cleve 2016; Longazel 2012).

### Compounding: a catalyst in the lifecycle of racial code words

Racial code words are birthed through the marriage of tropes and linguistic mechanisms like those described above, which enable users to realize complex meaning in an efficient, adaptable and plausibly deniable way. Yet their codedness may wax and wane, with some becoming decoded and transitioning to explicit race talk and others becoming coded and decoded again.

Heavily scrutinized racial code words sit at a crossroads. One path is to become recoded through the discursive practice we call compounding. This technique capitalizes on the syntactic versatility of language by enabling users to stack multiple code words together, graft one code word to a racially neutral expression or remix parts of code words into a new expression to create a new code word. Stacking enables

**ER1188**

318    Deirdre Pfeiffer and Xiaoqian Hu

users to efficiently communicate richer or more precise racial meaning, such as a business leader referring to White areas as '*suburbs in the more affluent communities [that have] college-going culture and much more academically rich environment*' in explaining reasons for enduring social inequality in education (S15: 18–19). Stacking also allows users to recode language decoded in public and academic discourse, like *terrorist* and *street gangs* becoming '*domestic terrorist street gangs*' in a news article commentator advocating for the continuation of the war on drugs (S84: 257). Grafting and remixing enable users to create new code words to racialize new phenomena, like '*political thug*,' '*food stamp president*' and '*gangster government*,' which evolved after the election of President Obama, the first Black President (S26: 351; S14: 707; S57: 48–49). Similarly, a White House staff member's remixing of '*kung flu*' cleverly implicates Chinese people in the spread of the 2020 coronavirus pandemic, which first broke out in China (S50: 654). Compounding responds to the inherently unstable qualities of coded race talk, a dynamic that sociolegal scholars also attribute to "rights talk" (Dudas 2005).

Another path is for the racial code word gradually to become more exposed as explicitly racist. Haney López (2014) traces the political life of code words like *bussing, law and order* and *welfare queen* by showing how their racial meanings become uncloaked by scholars, media and others through their overuse by politicians and pundits during election cycles and political administrations. It is at this stage that the race talk might become fully decoded and enter the lexicon of explicitly racial words (e.g., *towel head*).

The birth and death of individual racial code words do not affect the continuous construction of the racial episteme, because these individual building blocks are perfectly dispensable and replaceable. Like in metaphors, what makes the building block effective is not the particular string of words used, but the conceptual linkages that the words invoke (Santa Ana 2002: 30). Other strings of words can invoke the same linkages. Hence, while individual racial code words are dispensable, racial code words as building material are inherently regenerative and indestructible. They are "[s]mall acts of cunning," endowed with diffused power, subtle arrangements and apparent innocence, and must be subject to profound suspicion (Foucault 1995: 139).

### Detecting the codes: a racial meaning decoding tool

We now present a "racial meaning decoding tool" to assist researchers, legal professionals and social justice advocates in detecting coded race talk. The tool integrates our empirical insights – that racial code words deploy tropes and linguistic mechanisms to convey racially stratifying narratives in efficient, adaptable and plausibly deniable ways, often to racially stratifying effects – with a synthesis of CRT insights discussed earlier from Lawrence (1987), Rich (2004) and Onwuachi-Willig and Barnes (2005). The tool can assist in evaluating whether words suspected to fit our definition of racial code words – indirect signifiers of racial or ethnic groups that contain at least one positive or negative value judgment and contextually implied or salient meanings (see our explanation in "Canvassing Racial Code Words from Scholarly Literature") – are potentially racially coded and used for disequalizing purposes. Application involves conducting three analyses and scoring the words in question based on their outcomes.

**ER1189**

**Table 5.** The racial meaning decoding tool

| Step | Purpose | Task | Scoring |
|---|---|---|---|
| Thematic analysis | Evaluates whether the words might have racial meaning. | Determine whether any of the common tropes of racial code words are present (see Tables 2 and 3). | 1: At least one trope is present <br><br> 0: No tropes are present, or the presence of tropes is uncertain or debated |
| Effect analysis | Evaluates whether the words might lead to a disequalizing effect on racial power relations. | Determine whether the words might contribute to: <br> 1) Commonsense racism by promoting White people's superiority or Racial/Ethnic Minorities' inferiority. <br> 2) A policy or practice that perpetuates racial inequality and White privilege. <br> 3) Another racially disequalizing effect. | 1: At least one of these outcomes is possible <br><br> 0: None of these outcomes are possible, or the possibility of these outcomes is uncertain or debated |
| Linguistic analysis | Evaluates whether the words might have qualities that help to obscure or efficiently convey racial meaning. | Determine whether any of the common mechanisms of racial code words are present (see Table 4). | 1: At least one mechanism is present <br><br> 0: No mechanisms are present, or the presence of mechanisms is uncertain or debated |
| Decision | Evaluates the probability of the words exhibiting racial coding and being used for disequalizing purposes. | Tally the scores for the thematic, effect and linguistic analyses. | 0–1: Words are likely not racially coded and used for disequalizing purposes <br><br> 2–3: Words are potentially racially coded and used for disequalizing purposes |

*Sources*: Authors' own work. Steps adapted from Lawrence (1987); Rich (2004) and Onwuachi-Willig and Barnes (2005).
*Note*: The tool should be applied to words suspected to be indirect signifiers of racial or ethnic groups that contain at least one positive or negative value judgment and contextually implied or salient meanings.

Higher scores imply a higher probability of racial coding and use for disequalizing purposes (see Table 5).

The first step is *thematic analysis*. This involves assessing whether the words might have racial meaning by determining whether at least one of the eight common tropes of racial code words shown in Tables 2 and 3 is present. The second step is *effect analysis.* This requires evaluating whether the use of the words could lead to a disequalizing effect on racial power relations. Examples of disequalizing effects include (1) commonsense racism by promoting White people's respectability or Racial/Ethnic Minorities' pathology, (2) a policy or practice that perpetuates racial inequality and White privilege and (3) other disequalizing effects. The third step is *linguistic analysis.*

**ER1190**

320   Deirdre Pfeiffer and Xiaoqian Hu

This involves assessing whether the words might have qualities that help to obscure or efficiently convey racial meaning by discerning whether at least one of the three common mechanisms of racial code words shown in Table 4 is present. Words receive a score of 1 for each analysis passed and 0 for each analysis not passed or with unclear outcomes. The final step is to tally the scores of the three analyses. Words scoring between two to three are potentially racially coded and used for disequalizing purposes, while those scoring zero or one are likely not.

Taking two additional steps can help to strengthen the rigor of the tool's application. First, the user should try to apply shared societal understandings of the words in question, particularly those from the speaker's and audience's communities (Rich 2004). Integrating local contextual data can help to clarify shared understandings. For instance, demographic data showing disproportionate tendencies of particular racial and ethnic groups to have particular conditions can help illuminate the use of metonymy (e.g., data on differences in geographic location for Racializing the Location metonymy or housing tenure for Inflating the Social Member or Subgroup metonymy). Second, ideally at least two people should conduct the analyses and cross-validate their outcomes. Scores of 1 should be given only when their outcomes agree; scores of 0 should be given when their outcomes are unclear or disagree.

We illustrate the utility of the tool through two examples of words reflecting grounds for opposition to allowing for denser housing development in Arizona (Eland 2022; Rosequist 2022). In the first example, a resident of a predominately White and single-family home suburb opposes updating a plan to allow for denser mixed-use development, because they '*didn't move here to be in an urban city*.'

*Thematic analysis*: The region's racially segregated housing patterns (higher concentration of Racial/Ethnic Minorities and denser housing in the central city and higher concentration of White people and single-family housing in the suburbs) establish a plausible link between race and geography, with the city imagined as Minority and the suburb imagined as White. In this context, the resident's invocation of *urban city* plausibly reflects a Contagion theme that the planning change would bring Racial/Ethnic Minorities (and presumed negative consequences) to the suburb. Scoring = 1.

*Effect analysis*: The ground for opposition is expected to hinder Racial/Ethnic Minorities from living in the suburb, given that they are disproportionately likely to live in denser, multifamily housing in the region. Scoring = 1.

*Linguistic analysis*: The geographic and racial correlations shown in the thematic analysis reveal that the speaker may be using the linguistic mechanism of metonymy, referring to Racial/Ethnic Minorities by a closely associated geography (*urban city*). Scoring = 1.

*Decision*: Total score = 3. The ground for opposition is potentially racially coded and used for disequalizing purposes.

In the second example, residents of a predominately White small town of large lot homes oppose a denser and mixed-use modular housing project targeted to mining workers because it will increase the '*transient*' population.

*Thematic analysis*: Most workers employed in occupations related to mining in the region identify as White. The ground for opposition reflects none of the common tropes about White people. However, a sizable minority of these workers identify as Racial/Ethnic Minorities. The ground for opposition may reflect the trope of Contagion if it references miners who are Racial/Ethnic Minorities, since the residents perceive

**ER1191**

that transient workers may bring harm to the town. Overall, the presence of tropes is uncertain. Scoring = 0.

*Effect analysis*: It is uncertain whether excluding mining workers from a predominately White town would have a racially disequalizing effect, since it is likely that the mining workers who would live in the proposed housing would be mostly White people. Scoring = 0.

*Linguistic analysis*: Transiency is a characteristic of miners; thus, metonymy is present. Scoring = 1.

*Decision*: Total score = 1. The ground for opposition is likely not racially coded and used for disequalizing purposes.

A strength of the tool is that it is designed to deal with the uncertainty and contestability of coded language. It evaluates the possibility of racial coding by investigating multiple dimensions of the words in question and placing them on a spectrum. The deniability of racial meaning is less plausible for words placed higher on the spectrum (i.e., with scores closer to 3) and vice versa for those placed lower (i.e., with scores closer to 0).

The tool has academic as well as practical utility. Researchers can use it to study coded race talk in particular social settings and verify, challenge and refine it for these settings. The tool also encourages legal professionals and social justice advocates to continue inquiry into race-based discrimination claims where antidiscrimination law has so far left off and to update the right to nondiscrimination for a "colorblind" society. In antidiscrimination lawsuits/investigations, legal and other advocates can apply the tool to scrutinize clients' encounters with suspicious words or proffered justifications and analyze whether they encoded plausible racial meaning in their particular context and were used to produce racially disequalizing effects.

Applying the tool will be challenging and risky. Discerning racial coding is a delicate and fraught process. People's positionalities influence how they perceive meaning, as previously noted. Racial coding can take myriad forms and no words are indispensable to conveying a racial message. If one word is decoded, others can take its place. Racial code words can adapt to changed circumstances and be invented spontaneously by drawing on potential cues that appear in a discourse. If evidence to support a particular decoding falls short of being incontrovertible, researchers are vulnerable to accusations of being racist (Haney López 2014). Sharing Lawrence's assessment about his cultural meaning test, the tool "will be beset by the complexities and inadequacies of social interpretation and buffeted by the head winds of political resistance" (1987: 388). While deconstructing the edifice of coded racism one building block at a time is slow and laborious, each of the numerous, diffuse, local and quotidian settings of racial discourse is a potential site of discursive and power remaking. Similar to Santa Ana's call to invent "insurgent metaphors" (2002), to the extent an ever-evolving and regenerative reservoir of racial codes is perpetuating racial domination, society should build a counter-reservoir and systemically, programmatically and ceaselessly uncloak the codes to equalize racial power. Our tool is a first effort in this direction.

## Building knowledge to further deconstruct racial code words

Despite claims by the Supreme Court and others that colorblindness is equal treatment and that race-based remediation efforts are a form of racial discrimination

**ER1192**

https://doi.org/10.1017/lsr.2024.19 Published online by Cambridge University Press

322    Deirdre Pfeiffer and Xiaoqian Hu

(*Students for Fair Admissions v. Harvard* 2023; Dershowitz 2021), racism and racial strat-
ification continue in post-civil rights America, partly under the disguise of color-
blindness (Bonilla-Silva 2022; Powell 2023). Coded language is an instrument of this
"colorblind racism." Through a thematic analysis of 734 racial code words from 97
scholarly texts, this research introduced a new interpretive framework and decoding
tool to inform and stimulate future investigations of racially coded language.

   We identified eight common tropes of racial code words, four for White people
and Whiteness and four for Racial/Ethnic Minorities. Tropes for White people and
Whiteness (White Respectability and Privilege, White Possessiveness, White Defense
and Passing) convey that White people (1) are respectable and duly privileged and
have exclusive possession of America and (2) must conduct self-defense against threats
from Racial/Ethnic Minorities, who in turn must strive to assimilate to White norms
and values. Tropes for Racial/Ethnic Minorities (Parasite, Deficiency, Contagion and
Villain) convey that they are socially, economically, morally and developmentally defi-
cient people who cause indirect, direct or possible future harm to White people and
communities and society more broadly. Through these tropes, racial code words fuel
commonsense racism and a racial episteme that portrays White people and their
spaces as superior and Racial/Ethnic Minorities and their spaces as inferior. They
also contribute to systemic racism by supplying the substantive justifications for poli-
cies and practices that perpetuate racial inequality. These policies and practices, in
turn, produce appearances of White people's superiority and Racial/Ethnic Minorities'
inferiority, thus justifying commonsense racism (Haney López 2006; Lawrence
1987).

   Certain linguistic mechanisms enable racial code words to perpetuate both epis-
temic and systemic racism. Euphemism and metonymy obscure the racial nature of
the discourse, creating a "colorblind discursivity." The ensuing plausible deniabil-
ity helps to neutralize, normalize and legitimize an otherwise troubled discourse of
knowledge production (Foucault 1990). This enables speakers to engage in disavowal,
"a strategy by means of which a powerful fascination or desire is both *indulged* and
at the same time *denied*" (Hall 2013: 257). Mechanisms like metonymy and othering
also decrease the costs of racial communication by reducing complex meanings into
a succinct code. Metonymy allows speakers to use a low information-cost concept to
access high information-cost concepts. Othering further lowers these costs by reduc-
ing the complexity, fluidity and temporality of a person or a group to a few objectified
traits (ibid: 247). As a code word gets exposed, or repeated use unravels its congealed
meaning, or a new circumstance demands a new code, compounding allows speakers to
creatively reconfigure racial code words to convey new and evolving racial meanings.
Techniques of syntactic stacking, grafting or remixing re-fix an unraveling meaning
(e.g., *inner city crime*) or reinvent meaning for new purposes (e.g., *political thug*), fueling
their evolution (Dudas 2005). The creation of racial codes from tropes, the acceptance
of codes as commonsense, the unraveling or delegitimization of coded meanings and
the eventual destruction and recreation of codes form the life cycles of racial code
words.

   Our research informs and extends empirical studies of racially coded language.
Theoretically, we narrow a disciplinary gap between sociolegal studies of race and CRT.
Our interpretive framework reflects sociolegal scholars' calls to study race and racism

**ER1193**

https://doi.org/10.1017/lsr.2024.19 Published online by Cambridge University Press

as processes in social systems (Gómez 2012; Murakawa and Beckett 2010) by showing how use of racial code words in micro-instances constructs race and perpetuates epistemic and systemic racism in society. Our decoding tool integrates insights of CRT scholars (Lawrence 1987; Rich 2004; Onwuachi-Willig and Barnes 2005) with our findings to assist researchers, legal professionals and social justice advocates in examining multiple dimensions of suspected words and placing them on a scored spectrum of possible coding. Practically, our tool can aid legal professionals and social justice advocates in confronting covert racism and uncloaking its various disguises, as recent retrenchments in civil rights by the Supreme Court and some state legislatures and courts exemplify the current battles over meaning and authority of interpretation.

We stress that our framework and tool are only the first steps in a long journey of developing more rigorous methods to detect racial code words, discern their mechanisms and understand how they contribute to epistemic and systemic racism. Discerning meaning from language – particularly indirect, contextually dependent and plausibly deniable language like racial code words – is difficult. This task is made harder in our research by our use of secondary data from scholarly literature, data that has been filtered at least once and sometimes twice or more by others' perceptions. This quality leads to an iterative loss of contextual information valuable in studying race talk and increases the risk of misrepresenting and misinterpreting it. Our data also are biased by practical challenges encountered in comprehensively capturing and conveying racial code words in a large sample of scholarly literature. Our research is a necessary but incomplete attempt at muddling through these challenges to offer preliminary insights on a topic as timely and harmful as racial code words.

Our larger aim is for our framework and decoding tool to spark more research in sociolegal studies on how racial code words facilitate unequal power relations through epistemic and systemic racism. First, research is needed on how racially coded speech in distinct contexts shapes specific policies and practices, and how these in turn entrench racial power hierarchies and complicate remediation efforts. Researchers can use our tool to help discern which words might be racially coded in particular settings, such as legal education, jury deliberations, police officer testimony and local government decision making, and help refine the tool's use for these settings. More case studies of racial code words in particular places, like Gonzalez Van Cleve (2016)'s investigation of Chicago area criminal courts, would help to not only understand their racially stratifying functions but also conceptualize how they vary across different geographic, demographic, situational and discursive contexts. There also is an opportunity to uncover how these contexts relate to one another thematically and temporally within places (e.g., how code words are reinforced, complemented or contradicted among traditional and social media and public meeting contexts). Research on the ecologies and modes of functioning of racial codes in settings regulated by antidiscrimination law especially is warranted, as our sample features only a small number of code words in these settings.

Second, research into racial code words' life cycles and continuums of harm is needed. Why do some retain their coding while others become decoded? Racial code words may have thresholds of efficacy; as they are widely adopted, their effectiveness may first grow but later shrink due to increased exposure and scrutiny. Why are some more effective in achieving racist outcomes than others? Discursive practices

**ER1194**

324    Deirdre Pfeiffer and Xiaoqian Hu

like othering may play a role. Code words that exhibit total and insurmountable forms of othering and thematic dimensions of Villain are most harmful, while those that convey thematic dimensions of Passing are less harmful, though there is harm in how they function to codify White normality and erase racial and ethnic differences. Why do some persist after decoding while others perish or evolve? While racial meanings and codes change over time, some may change faster than others, including in particular social contexts and historical periods. There is opportunity to marry historical, sociological and discourse analysis in building continuums of harm and tracing pathways of codedness in various settings, particularly those relevant to antidiscrimination law. Despite its limitations, antidiscrimination law can be a more powerful tool for positive social change if we invest in developing, applying and refining methods to expose racial codes and their functions in the reproduction of racism and racial stratification.

**Supplementary material.**  The supplementary material for this article can be found at https://doi.org/10.1017/lsr.2024.19.

**Acknowledgements.**  We thank Andrew Coan, Robert Glennon, Toni Massaro and Carol Rose for their insights on the viability of racial code words as a research topic and Carolyn Rouse for her engaging and thoughtful comments on an earlier draft of this paper. We also thank participants at our presentations given at the Law and Society Association, Association of American Law Schools, Association of Collegiate Schools of Planning, and Urban Affairs Association conferences and to the Arizona State University Equitable Places Lab and the SouthWest Fair Housing Council. We are grateful to the editorial team and four anonymous reviewers, whose comments pushed us to deepen our research contributions and scholarly engagement. We also recognize the support of Jordyn Hitzeman, an ASU undergraduate student, who assisted in synthesizing scholarship that informed our articulation of the Parasite and Villain tropes present in racial code words for Racial/Ethnic Minorities.

## Notes

**1.**  We define post-civil rights America as starting in 1968, the year that the last race-related civil rights law, the Fair Housing Act, was passed.
**2.**  We follow Rouse (2021)'s suggestion to articulate how racial descriptors work. We capitalize terms referring to racial groups to emphasize how race is socially constructed through discourse. We use Racial/Ethnic Minorities to refer to both People of Color and Jewish people, given the increasing anti-Semitism in recent years and the ambivalence of some Jewish people regarding their positionality in the White-Color dichotomy. Further, this was a better term than BIPOC to refer to people who identify as Black, Indigenous and People of Color, since our data offers little insight into Indigenous peoples' experiences (see Table 2).
**3.**  A similar dynamic exists in child welfare cases. *See* López-Espino 2023.
**4.**  The referred-to subject of policy-oriented racial code words is the racial group that the speaker assumes is the beneficiary. For example, *law and order* is a code word for White people even though it mostly targets Black people, because they are the perceived beneficiaries.
**5.**  We owe this insight to an anonymous reviewer of the manuscript. Another possibility is that scholars have focused more on studying stereotypes for Black and Latinx people than White people. This latter possibility is not convincing, because the sample features more than twice as many code words for White people (25%) than for Latinx people (11%).
**6.**  Although "cultural racism," "commonsense racism" and "epistemic racism" are distinct concepts, we use them interchangeably, since they focus on cultural meanings and epistemic roots of racism.
**7.**  Interestingly, tropes about White people in our sample are more literal than metaphoric. We are not sure how to explain this difference. One possibility is that participants in the racial episteme assume that White people are normal, human and moral, and metaphors are an effective tool to conceptualize Racial/Ethnic Minorities as deviant, non- or sub-human and immoral.

**ER1195**

## References

Anderson, Carol. 2016. *White Rage: The Unspoken Truth of Our Racial Divide*. New York: Bloomsbury.

Beagan, Brenda L., Stephanie R. Bizzeth, Kaitlin R. Sibbald and Josephine B. Etowa. 2024. "Epistemic Racism in the Health Professions: A Qualitative Study with Black Women in Canada." *Health* 28 (2): 203–15.

Beckett, Katherine. 1997. *Making Crime Pay: Law and Order in Contemporary American Politics*. New York: Oxford University Press.

Beckett, Katherine and Megan Ming Francis. 2020. "The Origins of Mass Incarceration: The Racial Politics of Crime and Punishment in the Post–Civil Rights Era." *Annual Rev. of Law and Social Science* 16: 433–52.

Bennett, Dylan and Hannah Walker. 2018. "Cracking the Racial Code: Black Threat, White Rights and the Lexicon of American Politics." *American J. of Economics and Sociology* 77 (3-4): 689–727.

Bhimull, Chandra, Gabrielle Hecht, Edward Jones-Imhotep, Chakanetsa Mavhunga, Lisa Nakamura and Asif Siddiqi. 2022. "Systemic and Epistemic Racism in the History of Technology." *Technology and Culture* 63 (4): 935–52.

Bilotta, Isabel, Abby Corrington, Saaid A. Mendoza, Ivy Watson and Eden King. 2019. "How Subtle Bias Infects the Law." *Annual Rev. of Law and Social Science* 15: 227–45.

Bobo, Lawrence D. 2017. "Racism in Trump's America: Reflections on Culture, Sociology, and the 2016 US Presidential Election." *The British J. of Sociology* 68 (S1): S85–S104.

Bonilla-Silva, Eduardo. 2022. *Racism without Racists: Color-Blind Racism and the Persistence of Racial Inequality in the United States (6th ed.)*. Lanham, MD: Rowman & Littlefield.

Burke, Meghan A. 2017. "Racing Left and Right: Color-Blind Racism's Dominance across the U.S. Political Spectrum." *The Sociological Quarterly* 58 (2): 277–94.

Cameron, Deborah. 2012. *Verbal Hygiene*. New York: Routledge.

Carbado, Devon W. 2022. "Strict Scrutiny & The Black Body." *UCLA Law Rev.* 69: 2–79.

Carbado, Devon W. and Mitu Gulati. 2013. *Acting White?: Rethinking Race in "Post-Racial" America*. Oxford: Oxford University Press.

Carlson, Jennifer. 2020. *Policing the Second Amendment: Guns, Law Enforcement, and the Politics of Race*. Princeton, NJ: Princeton University Press.

Crespo-Fernández, Eliecer. 2018. "Euphemism as a Discursive Strategy in US Local and State Politics." *J. of Language and Politics* 17 (6): 789–811.

Currie, Brainerd. 1951. "The Materials of Law Study." *J. of Legal Education* 3 (3): 331–83.

Dershowitz, Alan. 2021. *The Case for Color-Blind Equality in an Age of Identity Politics*. New York: Hot Books.

Drakulich, Kevin, Kevin H. Wozniak, John Hagan and Devon Johnson. 2021. "Whose Lives Mattered? How White and Black Americans Felt about Black Lives Matters in 2016." *Law & Society Rev.* 55: 227–51.

Dudas, Jeffery R. 2005. "In the Name of Equal Rights: 'Special' Rights and the Politics of Resentment in Post–Civil Rights America." *Law & Society Rev.* 39 (4): 723–58.

Dvorak, Richard. 2000. "Cracking the Code: 'Decoding' Colorblind Slurs during the Congressional Crack Cocaine Debates." *Michigan J. of Race & Law* 5: 611–63.

Edelman, Lauren B., Aaron C. Smyth and Asad Rahim. 2016. "Legal Discrimination: Empirical Sociolegal and Critical Race Perspectives on Antidiscrimination Law." *Annual Rev. of Law and Social Science* 12: 395–415.

Eland, Ron. 2022. "Strong Opposition to Mine's Proposed 'Man Camp'." *The Wickenburg Sun*. August 16.

Fleury-Steiner, Benjamin D. Kerry Dunn and Ruth Fleury-Steiner. 2009. "Governing through Crime as Commonsense Racism: Race, Space, and Death Penalty 'Reform' in Delaware." *Punishment & Society* 11 (1): 5–24.

Flores, Andrea, Kevin Escudero and Edelina Burciaga. 2019. "Legal–Spatial Consciousness: A Legal Geography Framework for Examining Migrant Illegality." *Law & Policy* 41 (1): 12–33.

Foucault, Michel. 1990. *The History of Sexuality: Volume 1: An Introduction*. New York: Vantage Books.

Foucault, Michel. 1995. *Discipline & Punish: The Birth of the Prison*. New York: Vantage Books.

Freeman, Alan. 1990. "Antidiscrimination Law: The View from 1989." *Tulane Law Rev.* 64: 1407–42.

Gaber, John. 2020. *Qualitative Analysis for Planning & Policy: Beyond the Numbers*, 2nd ed. New York: Routledge.

Gold, Martin B. 2012. *Forbidden Citizens; Chinese Exclusion and the U.S. Congress: A Legislative History*. Alexandria, VA: TheCapitol.Net.

Gómez, Laura E. 2012. "Looking for Race in All the Wrong Places." *Law & Society Rev.* 46 (2): 221–45.

**ER1196**

https://doi.org/10.1017/lsr.2024.19 Published online by Cambridge University Press

Gonzalez, Shannon M, Samantha J. Simon and Katie K. Rogers. 2022. "The Diversity Officer: Police Officers' and Black Women Civilians' Epistemologies of Race and Racism in Policing." *Law & Society Rev.* 56: 477–99.

Gonzalez Van Cleve, Nicole. 2016. *Crook County: Racism and Injustice in America's Largest Criminal Court.* Stanford: Stanford Law Books.

Gonzalez Van Cleve, Nicole and Lauren Mayes. 2015. "Criminal Justice through 'Colorblind' Lenses: A Call to Examine the Mutual Constitution of Race and Criminal Justice." *Law & Social Inquiry* 40 (2): 406–32.

Grosfoguel, Ramón. 2010. "Epistemic Islamophobia and Colonial Social Sciences." *Human Architecture: J. of the Sociology of Self-Knowledge* VIII (2): 29–38.

Grosfoguel, Ramón. 2013. "The Structure of Knowledge in Westernized Universities Epistemic Racism/Sexism and the Four Genocides/Epistemicides of the Long 16th Century." *Human Architecture: J. of the Sociology of Self-Knowledge* XI (1): 73–90.

Hall, Stuart. 2013. "The Spectacle of the 'Other'." In *Representation: Cultural Representations and Signifying Practices*, 2nd ed. edited by Stuart Hall, et al., 223–79. Los Angeles: Sage.

Haney López, Ian. 2003. *Racism on Trial: The Chicago Fight for Justice*. Cambridge, MA: Harvard University Press.

Haney López, Ian. 2006. *White by Law: The Legal Construction of Race*. New York: New York University Press.

Haney López, Ian. 2014. *Dog Whistle Politics: How Coded Racial Appeals Have Reinvented Racism & Wrecked the Middle Class*. New York: Oxford University Press.

Kinder, Donald R. and David O. Sears. 1981. "Prejudice and Politics: Symbolic Racism versus Racial Threats to the Good Life." *J. of Personality and Social Psychology* 40 (3): 414–31.

Kubota, Ryuko. 2020. "Confronting Epistemological Racism, Decolonizing Scholarly Knowledge: Race and Gender in Applied Linguistics." *Applied Linguistics* 41 (5): 712–32.

Lawrence, Charles II. 1987. "The Id, the Ego, and Equal Protection: Reckoning with Unconscious Racism." *Stanford Law Rev.* 39 (2): 317–88.

Lens, Vicki. 2009. "Confronting Government after Welfare Reform: Moralists, Reformers, and Narratives of (Ir)responsibility at Administrative Fair Hearings." *Law & Society Rev.* 43 (3): 563–92.

Levinson, Justin D. and Robert J. Smith. 2012. *Implicit Racial Bias across the Law*. Cambridge: Cambridge University Press.

Littlemore, Jeannette. 2015. *Metonymy: Hidden Shortcuts in Language, Thought and Communication*. Cambridge: Cambridge University Press.

Liu, James H. and Duncan Mills. 2006. "Modern Racism and Neo-Liberal Globalization: The Discourses of Plausible Deniability and Their Multiple Functions." *J. of Community & Applied Social Psychology* 16: 83–99.

Longazel, Jamie G. 2012. "Moral Panic as Racial Degradation Ceremony: Racial Stratification and the Local-Level Backlash against Latino/a Immigrants." *Punishment & Society* 15 (1): 96–119.

López-Espino, Jessica. 2023. "Giving and Taking Voice: Metapragmatic Dismissals of Parents in Child Welfare Court Cases." *Law & Social Inquiry*: 1–26. doi:10.1017/lsi.2023.50.

Macaulay, Stewart. 1963. "Non-Contractual Relations in Business: A Preliminary Study." *American Sociological Rev.* 28 (1): 55–67.

McConahay, John B. 1986. "Modern Racism, Ambivalence, and the Modern Racism Scale." In *Prejudice, Discrimination, and Racism*, edited by J. F. Dovidio and S. L. Gaertner, 91–125. New York: Academic Press.

Mendelberg, Tali. 2001. *The Race Card: Campaign Strategy, Implicit Messages, and the Norm of Equality*. Princeton: Princeton University Press.

Mills, C. Wright. 1951. *White Collar: The American Middle Classes*. New York: Oxford University Press.

Mohammad, Saif. 2018. "Obtaining Reliable Human Ratings of Valence, Arousal, and Dominance for 20,000 English Words." In *Proceedings of the 56th Annual Meeting of the Association for Computational Linguistics*, 174–84.

Moran, Rachel F. 2010. "What Counts as Knowledge? A Reflection on Race, Social Science, and the Law." *Law & Society Rev.* 44: 515–52.

Moreton-Robinson, Aileen. 2015. *The White Possessive: Property, Power, and Indigenous Sovereignty*. Minneapolis: University of Minnesota Press.

Murakawa, Naomi and Katherine Beckett. 2010. "The Penology of Racial Innocence: The Erasure of Racism in the Study and Practice of Punishment." *Law & Society Rev.* 44 (3-4): 695–730.

**ER1197**

Nguyen, Mai Thi, Victoria Basolo and Abhishek Tiwari. 2013. "Opposition to Affordable Housing in the USA: Debate Framing and the Responses of Local Actors." *Housing, Theory and Society* 30 (2): 107–30.

Obasogie, Osagie K. 2010. "Do Blind People See Race? Social, Legal, and Theoretical Considerations." *Law & Society Rev.* 44 (3-4): 585–616.

Omi, Michael and Howard Winant. 2014. *Racial Formation in the United States*. 3rd ed. New York: Routledge.

Onwuachi-Willig, Angela and Mario L. Barnes. 2005. "By Any Other Name: On Being Regarded as Black, and Why Title VII Should Apply Even if Lakisha and Jamal are White." *Wisconsin Law Rev.* 2005 (5): 1283–344.

Pandey, Anjali. 2004. "Constructing Otherness: A Linguistic Analysis of the Politics of Representation and Exclusion in Freshmen Writing." *Issues in Applied Linguistics* 14 (2): 153–84.

Plumwood, Val. 1993. *Feminism and the Mastery of Nature*. New York: Routledge.

Powell, Cedric M. 2023. *Post-Racial Constitutionalism and the Roberts Court: Rhetorical Neutrality and the Perpetuation of Inequality*. Cambridge: Cambridge University Press.

Radden, Günter and Zoltán Kövecses. 1999. "Towards a Theory of Metonymy." In *Metonymy in Language and Thought*, edited by Klaus-Uwe Panther, and Günter Radden, 17–59, Amsterdam: John Benjamins Publishing Company.

Rich, Camille G. 2004. "Performing Racial and Ethnic Identity: Discrimination by Proxy and the Future of Title VII." *NYU Law Rev.* 79: 1134–270.

Rosequist, Melissa. 2022. "Little Participation Recorded in Old Town Planning." *Town of Paradise Valley Independent* January 5.

Rouse, Carolyn. 2021. "Capital Crimes: 'Language is a Moving Target'." *Princeton Alumni Weekly*, December: 35–37.

Russell-Brown, Katheryn. 1998. *The Color of Crime Racial Hoaxes, White Fear, Black Protectionism, Police Harassment, and Other Macroaggressions*. New York: New York University Press.

Santa Ana, Otto. 2002. *Brown Tide Rising: Metaphors of Latinos in Contemporary American Public Discourse*. Austin: University of Texas Press.

Santa Ana, Otto, Morán Juan and Cynthia Sanchez. 1998. "Awash under a Brown Tide: Immigration Metaphors in California Print and Public Media Discourse." *Aztlán* 23 (2): 137–74.

Shabazz, Rashad. 2015. *Spatializing Blackness: Architectures of Confinement and Black Masculinity in Chicago*. Urbana, IL: University of Illinois Press.

Simon, Jonathan. 2007. *Governing through Crime: How the War on Crime Transformed American Democracy and Created a Culture of Fear*. New York: Oxford University Press.

Tighe, J. Rosie. 2010. "Public Opinion and Affordable Housing: A Review of the Literature." *J. Planning Literature* 25 (1): 3–17.

Timmermans, Stefan and Iddo Tavory. 2012. "Theory Construction in Qualitative Research: From Grounded Theory to Abductive Analysis." *Sociological Theory* 30 (3): 167–86.

Urciuoli, Bonnie. 1994. "Acceptable Difference: The Cultural Evolution of the Model Ethnic American Citizen." *Political and Legal Anthropology Rev.* 17 (2): 19–36.

Valles, Dario. 2021. "Chill Pills Panic: Legal Constructions of Play, Race, and the Policing of Care in California's Administrative Courts." *PoLAR* 44 (1): 156–71.

Wikipedia Contributors. 2023. "List of Ethnic Slurs." *Wikipedia, The Free Encyclopedia*, https://en.wikipedia.org/w/index.php?title=List_of_ethnic_slurs&oldid=1175110837 (accessed September 12, 2023).

Wiktionary. 2023. "Category: English Ethnic Slurs." *Wikipedia, The Free Encyclopedia*, https://en.wiktionary.org/wiki/Category:English_ethnic_slurs (accessed September 12, 2023).

Xiao, Yu and Maria Watson. 2019. "Guidance on Conducting a Systematic Literature Review." *J. of Planning Education and Research* 39 (1): 93–112.

**Cases Cited**

*Dews v. Town of Sunnyvale, Tex.*, 109 F.Supp.2d 526 (N.D. Tex. 2000).

*Hallmark Developers, Inc. v. Fulton Cty., Ga.*, 466 F.3d 1276 (11th Cir. 2006).

*Students for Fair Admissions, Inc. v. President and Fellows of Harvard College*, 600 US _ (2023).

**Dr. Deirdre Pfeiffer's** scholarship, teaching, and community engagement address housing strategies to advance social equity, the relationship between housing and wellbeing, and the socioeconomic impacts of housing market disruptions. She has a PhD in Urban Planning from UCLA and is a member of the American Institute of Certified Planners.

**ER1198**

328    Deirdre Pfeiffer and Xiaoqian Hu

**Dr. Xiaoqian Hu** researches how property law shapes racial and class inequality and what legal changes might be realizable to advance structural equity. She also studies how in China property law shapes and is shapes by the country's socioeconomic transformation and how state actions and discourses affect class dynamics and government legitimacy. She has a SJD from Harvard Law School and a PhD in comparative law and law and economics from the University of Turin.

_____

**Cite this article:** Pfeiffer, Deirdre and Xiaoqian Hu. 2024. "Deconstructing racial code words." *Law & Society Review* 58(2): 294–328. https://doi.org/10.1017/lsr.2024.19

**ER1199**

# EXHIBIT 22

ER1200



Our Vision ⌄    Policy ⌄    News ⌄    Events ⌄    About ⌄    Get Updates    Donate Now    🔍 Search

EXPLAINER

# Explainer: Asylum Backlogs



January 23, 2024

SHARE

f  𝕏  in  ✉  🖨

RELATED TOPICS

Humanitarian

Refugees/Asylees

(**Versión en español**)

This explainer details how an ever-shifting policy landscape and extensive backlogs impact the **asylum process** in the United States. It describes what asylum is, how people apply, why such cumbersome backlogs exist, and what can be done in terms of solutions.

# What Is Asylum?

**Asylum** is a discretionary form of legal relief for someone who seeks safety in the U.S. based on "persecution or a well-founded fear of persecution on account of race, religion, nationality, membership in a particular social group, or political opinion." This definition is identical to the one used for determining who qualifies as a refugee, but unlike refugees who are resettled stateside, asylum seekers arrive in the U.S. *before* seeking protection.

Asylees who win their cases gain access to a pathway to lawful permanent residence — and eventual citizenship — in the U.S.

# Applying for Asylum

People can apply for asylum either through an affirmative or defensive process.

## *Affirmative Asylum*

The affirmative asylum process is handled by **U.S. Citizenship and Immigration Services (USCIS)**. USCIS is part of a trifecta of immigration agencies within the Department of Homeland Security (DHS), and unlike the other two agencies that are primarily focused on enforcement, its role is mostly to adjudicate immigration benefits.

Asylum seekers typically have one year from entering the country to file an **asylum application.** That said, there are some **exceptions** to this one-year deadline, including



Document title: Explainer: Asylum Backlogs - National Immigration Forum
Capture URL: https://immigrationforum.org/article/explainer-asylum-backlogs/
Capture timestamp (UTC): Fri, 14 Feb 2025 21:19:09 GMT

**ER1201**

enforcement, its role is mostly to adjudicate immigration benefits.

Asylum seekers typically have one year from entering the country to file an **asylum application.** That said, there are some **exceptions** to this one-year deadline, including instances that involve changed or extraordinary circumstances.

Applicants for affirmative asylum start by submitting an I-589 form with USCIS. Supporting documentation — including birth certificates, passports, police or court records, witness information, country conditions reports, and other evidence — can strengthen the application.

The **affirmative asylum process** then requires individuals to be interviewed by an asylum officer, when the asylum seeker can bring an attorney and a translator. After that, the asylum officer decides the claim. Affirmative asylum interviews are conducted in a **non-adversarial** manner, which means the asylum officer is supposed to be a neutral decisionmaker and there is no party arguing against the asylum seeker.

If someone files an affirmative asylum application, USCIS decides they do not qualify, and the noncitizen does not otherwise have legal immigration status in the U.S., the agency will refer them to an immigration judge. The asylum seeker then has another opportunity to raise their protection claim, as a defense from removal.

### *Defensive Asylum*

An individual files a **defensive asylum** claim when they are already facing removal from the U.S. Most defensive asylum cases go before an immigration judge who is part of the Executive Office for Immigration Review (EOIR), under the U.S. Department of Justice (DOJ). During these proceedings, an attorney from U.S. Immigration and Customs Enforcement (ICE) argues on behalf of the federal government. The asylum seeker, in turn, can access legal representation at their own expense (at no expense to the government), or they can represent themselves.

After an asylum seeker is apprehended within the U.S., at a port of entry, or while trying to enter the country without proper documentation or status, they can claim asylum as a defense to removal — a process that often happens at the U.S.-Mexico border. Some migrants may be placed **in a fast-tracked deportation mechanism called expedited removal,** where if they express a need for protection, an asylum officer will screen them for a **credible fear of persecution or torture**. If the asylum seeker **passes this preliminary hurdle,** they are generally referred to an immigration judge within EOIR for full removal proceedings, including a merits hearing to decide whether they qualify for asylum. However, under a Biden administration **program**, some asylum seekers may instead have their cases referred to an asylum officer for a non-adversarial interview and adjudication, much like under the affirmative asylum process.

# Asylum by the Numbers



however, under a Biden administration **program**, some asylum seekers may instead have their claims referred to an asylum officer for a non-adversarial merits-first adjudication, much like under the affirmative asylum process.

# Asylum by the Numbers

Amid a global increase in forced migration over the last decade, the U.S. has experienced a significant uptick in the number of people seeking asylum. In fiscal year (FY) **2022** alone, USCIS received around 239,000 affirmative asylum applications, a historic high and a major jump from FY **2021**, when USCIS received approximately 62,800 affirmative applications. This shift was driven by changing migration patterns, as well as the lifting of pandemic-related restrictions that affected migration levels in FY 2020 and 2021. Yet the record levels from FY 2022 were soon eclipsed in FY 2023, when USCIS received roughly **454,000** Form I-589 applications.

At the same time, in FY **2022,** there were approximately 230,389 defensive asylum applications filed with immigration judges. This continued pre-pandemic trends, with defensive asylum applications increasing "**nearly** fivefold between FY 2014 (31,517) and FY 2019 (154,368)." Such dramatic upticks have made it difficult for federal agencies to promptly process claims.

As a result, there are serious backlogs of cases for asylum seekers in both the immigration court system and within USCIS. According to the Transactional Records Access Clearinghouse (**TRAC**) at Syracuse University, by late 2022, there were 1,565,966 people waiting for their asylum cases to be heard. Back then, approximately 778,084 applicants were waiting for a resolution to their asylum claims in front of USCIS. The remaining 787,882 petitioners were in line to go before immigration judges to present defensive asylum claims. By August 20, 2023, the number of pending affirmative asylum cases alone had reached a whopping **974,571.**

With so many asylum seekers stuck in backlogs, delays can be long. If someone is before USCIS, their estimated wait time is **more than 6 years.** For claims in front of EOIR, asylum seekers are looking at an average wait time of approximately **4.3 years.** That said, variations may exist depending on the court where an asylum seeker filed their claim. Recently, the longest delays were at the immigration court in Omaha, Nebraska, where the average wait time was approaching 6 years – 2,168 days.

If justice delayed is justice denied, then the U.S.'s asylum system poses serious concerns. Such extensive delays can manifest as extreme challenges for asylum seekers, making it harder for them to win their cases. Key witnesses may die. Applicants may move. Country conditions may change. And, as asylum seekers struggle with the uncertainty of whether they'll be returned to danger, **research indicates** that longer adjudication timelines can negatively affect their health.

# Why Do Asylum Backlogs Exist?



negatively affect their health.

# Why Do Asylum Backlogs Exist?

One primary reason for the massive asylum backlogs is the sheer number of people
escaping violence and political instability around the globe. Conflicts throughout various
regions in the world — many of them within the Western Hemisphere — have contributed.
People who come to the U.S. in search of protection may be **fleeing** persecution, gang
activity, war, extreme poverty, or natural disasters. In some countries, certain individuals
may be targeted because of their race, ethnicity, political beliefs, gender, or other defining
characteristics.

According to **TRAC,** "during October and November 2022..., the Immigration Court's
asylum case backlog grew by more than the growth during the entire last year of the
Obama administration in FY 2016." As more humanitarian migrants arrive, they file more
asylum applications. Many of them will be eligible for asylum. Others who do not end up
qualifying nevertheless are escaping difficult conditions and/or **believe in good faith** that
they have viable claims. For a large portion of these newcomers, asylum is their only
potential pathway to permanent status — a limitation of the U.S.'s outdated immigration
system that overburdens asylum backlogs.

Then, these backlogs have been further impacted by agency staffing, which has not kept up
with the demand for asylum adjudications. An inadequate number of immigration judge
teams at EOIR — composed of judges, attorneys, and supporting staff — as well as **funding
shortfalls** and **difficulties filling job vacancies** at USCIS have compromised the U.S.
government's ability to make timely asylum decisions.

Beyond these overarching challenges, the sheer level of complexity involved in asylum
petitions and the ever-changing policy landscape affecting asylum seekers continue to
contribute to backlogs as well.

## *Asylum Applications Take Time, Expertise*

Asylum applications are a time-consuming and byzantine process. According to the
**American Immigration Lawyers Association** (AILA), for experienced immigration
attorneys, an average asylum application takes between 50 to 75 hours to prepare — a
major commitment, particularly for lawyers who often have sizable caseloads. Moreover,
the time required to complete an asylum application can dramatically increase if the
applicant has experienced trauma or is being held in a detention facility.

Asylum seekers with legal representation are much more successful in winning asylum
than those forced to represent themselves. In FY 2022, only **18%** of pro se asylum
petitioners had their asylum applications granted, compared to 49% of those with
representation, according to TRAC. Without counsel, would-be asylum seekers with strong
claims struggle to navigate the U.S.'s complex immigration system and may even fail to

Asylum seekers with legal representation are much more successful in winning asylum than those forced to represent themselves. In FY 2022, only **18%** of pro se asylum petitioners had their asylum applications granted, compared to 49% of those with representation, according to TRAC. Without counsel, would-be asylum seekers with strong claims struggle to navigate the U.S.'s complex immigration system and may even fail to discern how to file the necessary paperwork to ask for protection in the first place.

## Changes in Federal Immigration Policy Foster Confusion

While the asylum process is complex in and of itself, the ever-changing policy landscape at the U.S.-Mexico border has further contributed to confusion and has created obstacles to fair, efficient adjudications. A labyrinth of constant policy changes can lead to a lack of credibility surrounding asylum decisions and motivate time-consuming appeals that further backlog the system.

Ultimately, Congress is responsible for making immigration laws. However, since laws are enforced through the executive branch, administrative agencies issue regulations and policy guidance implementing those laws. This means asylum policy may be drastically different from one presidential administration to the next, and over the last decade, such differences have fostered uncertainty that in turn has exacerbated dysfunction. Some policy changes have restricted asylum eligibility, so that people who would have qualified before are suddenly ineligible. Others have forced migrants into situations that limit their access to due process and representation, providing reasonable arguments for the federal government to have to reconsider cases — which in turn deepens backlogs.

Although President Biden has taken a more nuanced approach than his predecessor did to irregular migration at the U.S.-Mexico border, he has still implemented policies that seriously impact and unsettle the asylum process. Many of these practices were designed to expedite fair asylum decisions and deter irregular border crossings, though evidence suggests they have fallen short in achieving either goal.

In May 2022, the Biden administration began implementing an **interim final rule** that permits USCIS asylum officers to hear certain defensive asylum claims. If the USCIS officer does not grant asylum, the case is then referred to an immigration court. The rule, which is slowly being incorporated, represents an attempt to unburden immigration judges and more quickly adjudicate cases. However, some advocates have expressed concerns about its shorter timelines and their impact on due process. Once someone receives a positive credible fear determination, they're given an asylum merits interview between **21 and 45 days** later. In this truncated timeframe, the asylum applicant must travel to their destination city, find an attorney to assist in their case (if they are able to locate and afford one), and prepare for an often life-altering interview, albeit in a non-adversarial setting.

The Biden administration likewise implemented what is known as the **Dedicated Docket**, with the intention of decreasing the amount of time that families spend in immigration proceedings to at most **300 days.** The Dedicated Docket may apply to families who arrive in the U.S. between ports of entry, who are "**placed** in removal proceedings, and enrolled in Alternatives to Detention (ATD)." But in practice, this new docket has had little impact



the **Dedicated Docket**, with the intention of decreasing the amount of time that families spend in immigration proceedings to at most **300 days.** The Dedicated Docket may apply to families who arrive in the U.S. between ports of entry, who are "**placed** in removal proceedings, and enrolled in Alternatives to Detention (ATD)." But in practice, this new docket has had little impact on speeding up adjudications, while **critics** have highlighted its due process shortcomings.

In May 2023, **the Biden administration** also invoked a new regulation called the "**Circumvention of Lawful Pathways**" rule, which presumes someone is ineligible for asylum unless they can meet one of several narrow exceptions, such as scheduling an appointment to enter the nation through the government's CBP One phone app or being denied protection in another country of transit. This regulation, which resembles a **Trump-era rule**, has been **challenged in court** but remains in place for now.

These varied asylum-related policy changes in recent years — including some intended to tackle backlogs — have created even more complication and turmoil that have often proved difficult for asylum seekers, attorneys, and U.S. officials to navigate. The confusion that has ensued, in turn, has led to inefficiencies that have further clogged the asylum system.

# Solutions

To improve the asylum process and reduce backlogs, the U.S. government would need to surge resources and personnel to bolster its immigration system, while also taking important steps to ensure fair, efficient adjudications. Many of these reforms would require congressional action, which has proved challenging in recent decades.

To start, Congress could greenlight new funding for additional **immigration judge** teams, asylum officers, and financial support for communities responding to the needs of newcomers. In particular, USCIS is primarily funded through fees for immigration services, even though the agency's caseload is increasingly devoted to humanitarian applications that do not involve fees or may allow for fee waivers. In this context, **in FY 2022**, Congress provided USCIS with a supplementary $275 million to tackle the affirmative asylum backlog. But legislators **could appropriate** far more funding to help the agency access the personnel and resources it needs to process protection claims more quickly.

Another possibility to restore faith in the defensive asylum process could be to **make the immigration courts independent**, instead of under the purview of one of the executive branch's law enforcement components, the Department of Justice. Advocates and **experts** have **called** for the immigration courts to be re-established under Article I of the U.S. Constitution, **much like** tax courts, bankruptcy courts, and veterans' claims courts. While it is **unclear** whether a shift to an independent immigration court system alone would make a significant impact on backlogs, supporters of this reform have argued that by depoliticizing the system and encouraging stability, it could prevent steps by future administrations that would add to existing difficulties, and it could lend credibility to the

is **unclear** whether a shift to an independent immigration court system alone would make a significant impact on backlogs, supporters of this reform have argued that by depoliticizing the system and encouraging stability, it could prevent steps by future administrations that would add to existing difficulties, and it could lend credibility to the system that would **preempt appeals** and remands.

More generally, Congress could mitigate asylum backlogs by **opening orderly, humane immigration pathways** that respond to 21st-century challenges. Through a combination of work-based visas to fill chronic labor shortages in the U.S. and various **complementary humanitarian vehicles**, policymakers could preempt the need for many people to take dangerous journeys to the U.S.-Mexico border and request asylum in the first place.

Outside of congressional action, **immigration judges** and U.S. Immigration and Customs Enforcement (ICE) attorneys should use **their discretion** to administratively close or terminate low-priority cases and reduce the defensive asylum backlog that way — particularly when asylum seekers consent and have other legal pathways to remain in the U.S. long-term.

# Conclusion

As people flee violence and instability around the world, the U.S.'s existing asylum process is meant to protect those escaping persecution. However, newcomers applying for asylum today join extensive backlogs, and many will wait years before their adjudications, even as their evidence grows stale.

The sheer number of people asking for protection is one reason for pending backlogs. But the U.S.'s asylum system has simultaneously been hindered by a lack of funding, resources, and personnel, much of which could be shored up through lawmakers' action. It also has been plagued by administrative policy changes that have fostered instability and confusion, at times further lengthening backlogs.

Congress can take steps to better resource USCIS and the immigration court system, so that federal agencies can more effectively tackle their backlogs. Lawmakers should also pass legislation creating an independent immigration court system, and immigration judges and government attorneys should use their discretion to administratively close low-priority cases. At the same time, policymakers should devise new legal immigration pathways for people to reach the U.S. in a safe, orderly manner, outside of the asylum system.

*Thanks to Forum Policy intern Summer Scovil for extensive contributions to this explainer.*

★

# Download Resources



Document title: Explainer: Asylum Backlogs - National Immigration Forum
Capture URL: https://immigrationforum.org/article/explainer-asylum-backlogs/
Capture timestamp (UTC): Fri, 14 Feb 2025 21:19:09 GMT

**ER1207**

Congress can take steps to better resource USCIS and the immigration court system, so that federal agencies can more effectively tackle their backlogs. Lawmakers should also pass legislation creating an independent immigration court system, and immigration judges and government attorneys should use their discretion to administratively close low-priority cases. At the same time, policymakers should devise new legal immigration pathways for people to reach the U.S. in a safe, orderly manner, outside of the asylum system.

*Thanks to Forum Policy intern Summer Scovil for extensive contributions to this explainer.*

★



# Download Resources

⬇ **Explainer_ Asylum Backlogs_NOW FINALIZED** (application/pdf)



## Learn More

PRESS RELEASE

**Unique Border Voice, National Security Leader Join Forum as Fellows**

LEGISLATIVE BULLETIN

**Legislative Bulletin — Friday, February 14, 2025**

LEGISLATIVE BULLETIN

**Legislative Bulletin — Friday, February 7, 2025**

**Stay Connected**
Sign up for email updates

GET UPDATES

**Make a Donation**
Help us advocate for the value of immigrants and immigration to our country

DONATE NOW

**Follow Us**
Join our cause

(f) (X) (▶) (in)

© 2014-2025 National Immigration Forum. All rights reserved.

# EXHIBIT 23

ER1209



☰  InSight Crime

About Us    Newsletter    Donate

Investigations    Countries    Criminal Economies    Criminal Dynamics    Public Policy    Criminal Profiles    🔍    EN  ES






News    Tren de Aragua

# Is Venezuela's Tren de Aragua 'Invading' the US?

by *Venezuela Investigative Unit*    1 Apr 2024

Venezuela's Tren de Aragua gang is causing increasing concern in the United States, even though the group appears to have no substantial US presence and looks unlikely to establish one.

US federal lawmakers recently asked President Joe Biden to declare Tren de Aragua a transnational criminal organization, calling the group "an invading criminal army" and claiming the gang's members have spread "brutality and chaos" in the United States.

"It is clear that most state and local law enforcement agencies are not yet prepared to handle the magnitude of this grave threat," the group of nearly two dozen lawmakers, all from the opposition Republican Party, wrote in a March 14 letter.

> SEE ALSO: *Tren de Aragua: From Prison Gang to Transnational Criminal Enterprise*

The request follows a smattering of reports in recent months suggesting the possible presence of Tren de Aragua members in the United States, some with links to isolated crimes.

But the few crimes attributed to alleged Tren de Aragua members in the United States appear to have no connection with the larger group or its leadership in Venezuela. And none of more than a dozen national, state, and local law enforcement agencies contacted by InSight Crime has reported any significant presence of Tren de Aragua.

## Flimsy Ties

Two recent murders with tenuous links to Tren de Aragua attracted
Manage consent    read media attention and featured prominently in the Republican

## Related Content



**Tren de Aragua, Venezuela's Most Dangerous Gang, Spotted in Chile**
*21 Oct 2021*



**Venezuela's Tren de Aragua Gang Muscling into Colombia Border Area**
*10 Jul 2019*



Document title: Is Venezuela's Tren de Aragua 'Invading' the US?
Capture URL: https://insightcrime.org/news/is-venezuelas-tren-de-aragua-invading-us/
Capture timestamp (UTC): Fri, 21 Feb 2025 01:29:24 GMT

ER1210

## Flimsy Ties

Two recent murders with tenuous links to Tren de Aragua attracted widespread media attention and featured prominently in the Republican lawmakers' letter, though neither killing had any apparent connection to gang activities.

The most recent was the February 2024 murder of Laken Riley, a university student in the southeastern state of Georgia. Federal prosecutors said in a court filing that the alleged killer had tattoos, wore clothes, and flashed hand signs that suggested an affiliation with Tren de Aragua, though they did not suggest gang ties motivated the murder. But tattoos are not an identification symbol for Tren de Aragua members, as they are for groups such as the MS13 and Barrio 18.

A search of the powerful CourtLink legal database found no other US criminal cases mentioning Tren de Aragua, either at the state or federal level.

The head of the Georgia Bureau of Investigation's gang task force, Ken Howard, told InSight Crime that relatively little is known about the gang's presence and activities in the United States.

"We know they're here in the state of Georgia," Howard said. "But as far as building out an intelligence database on the group that's well documented and identified, I wouldn't say we're there yet."

Previously, Tren de Aragua was linked to the November 2023 murder of a Venezuelan ex-police officer near Miami. But Detective Alvaro Zabaleta of the Miami-Dade Police Department told InSight Crime that the suspect in that case had denied belonging to the gang, and investigators had found no evidence indicating his membership.

"This individual has knowledge of members of this organization ... But that's all they have," Zabaleta said. "We don't have any crimes that we can say are associated to them."

The Republican lawmakers' letter accused Tren de Aragua of "rapes of multiple children." But InSight Crime could not find any reports of such incidents in the United States, and the main authors of the letter, Sen. Marco Rubio and Rep. María Elvira Salazar, both of Florida, did not respond to requests for comment.

Police agencies in major urban areas across the United States – including Los Angeles, Phoenix, Dallas, San Antonio, and Denver – told InSight Crime that they had no reports of crimes committed by Tren de Aragua in their jurisdictions.

The New York Police Department has told local media outlets that Tren de Aragua is responsible for a series of cell phone robberies in New York City, but the agency did not respond to InSight Crime's requests for comment.

Manage consent



**Venezuela's Tren de Aragua Gang Seeks to Grow Inside Brazil Prisons**

*26 Sep 2019*

The New York Police Department has told local media outlets that Tren de
Aragua is responsible for a series of cell phone robberies in New York City, but
the agency did not respond to InSight Crime's requests for comment.

## Vague Reports

Information about the presence of Tren de Aragua in the United States is
limited and vague.

In August 2023, US Border Patrol Chief Jason Owens said on X, formerly
Twitter, that his agency had arrested a Tren de Aragua member attempting to
enter the United States. A few months later, in November, the Border Patrol
told CNN en Español that the agency had arrested 38 possible Tren de Aragua
members between October 2022 and October 2023.

US Immigration and Customs Enforcement (ICE) recently announced what
appears to be the first apprehension of an alleged Tren de Aragua member
away from the border. The arrest happened near Chicago on March 11, 2024 –
days before the lawmakers' letter to Biden – though ICE did not announce it
publicly until March 25.

It is not clear how ICE verified the suspect's membership in the gang. The
Border Patrol, ICE, and their parent agency, the Department of Homeland
Security (DHS) did not respond to InSight Crime's requests for comment.

A special agent of the US Federal Bureau of Investigation recently told the New
York Post that Tren de Aragua members are entering the United States and
potentially teaming up with other gangs like the MS13.

But a spokesperson for the FBI's parent agency, the US Department of Justice,
told InSight Crime the agency does not have "any public cases involving Tren de
Aragua to provide to you." The FBI declined InSight Crime's requests for
comment.

## Barriers to Entry

Tren de Aragua has successfully expanded beyond Venezuela to establish
operations in other South American countries by following and preying off the
huge migrant flows generated in recent years by Venezuela's economic and
political struggles. But the gang is unlikely to be able to replicate its model in
the United States, despite the country's large Venezuelan diaspora
communities.

Tren de Aragua lacks control over US migrant smuggling and human
trafficking routes. Control of such routes was key to the gang's expansion in
South America. Tren de Aragua's smuggling operations helped build a strong
presence in border areas of Colombia and Chile, giving it a base from which to
branch out to other crimes with low barriers to entry. From there, the gang
expanded to urban areas and prisons in those countries.

Manage consent

South America. Tren de Aragua's smuggling operations helped build a strong presence in border areas of Colombia and Chile, giving it a base from which to branch out to other crimes with low barriers to entry. From there, the gang further expanded to urban areas and prisons in those countries.

**SEE ALSO:** High-Profile Chile Murder Shows Tren de Aragua's Sophistication

But human smuggling and trafficking routes along the US-Mexico border are dominated by Mexican groups, leaving little room for Tren de Aragua to establish a foothold.

Similarly, Tren de Aragua would likely struggle to break into other criminal markets in the United States, many of which are controlled by well established gangs. The lack of criminal competitors was decisive in Tren de Aragua's ability to expand into Chile, whereas it has had less success in Ecuador's more competitive criminal landscape.

While Tren de Aragua appears unlikely to make substantial inroads in the United States, inflating the threat posed by the gang could encourage imposters. This phenomenon has occurred in countries throughout Latin America as the gang's reputation has grown.

Zabaleta, the Miami-Dade detective, said his agency is wary of stoking unnecessary fear about the group.

"It gives them notoriety, it gives them credibility, it makes them grow," he said. "You start to create that panic and that noise on something that perhaps is not even there."

*Featured Image: Image from a Fox News broadcast showing a map of the alleged migration of Tren de Aragua to the United States. Credit: Fox News*

## Tagged:

( Chile )  ( Colombia )  ( Criminal Migration )  ( Featured )  ( Homicides )  ( Migration and Crime )

( Tren de Aragua )  ( USA )  ( Venezuela )



Manage consent

Document title: Is Venezuela's Tren de Aragua 'Invading' the US?
Capture URL: https://insightcrime.org/news/is-venezuelas-tren-de-aragua-invading-us/
Capture timestamp (UTC): Fri, 21 Feb 2025 01:29:24 GMT

**ER1213**

Chile    Colombia    Criminal Migration    Featured    Homicides    Migration and Crime

Tren de Aragua    USA    Venezuela

## Stay Informed With InSight Crime

Subscribe to our newsletter to receive a weekly digest of the latest organized crime news and stay up-to-date on major events, trends, and criminal dynamics from across the region.

Email Address    Sign up

Donate today to empower research and analysis about organized crime in Latin America and the Caribbean, from the ground up.

Donate



We go into the field to interview, report, and investigate. We then verify, write, and edit, providing the tools to generate real impact.

Our work is costly and high risk. Please support our mission investigating organized crime.

Donate

About Us

Work With Us

Investigations

Latest News Analysis

Special Series

Multimedia

Audio

Events

Countries

Criminal Economies

Criminal Dynamics

Public Policy

Criminal Profiles

Information Processing Policies

Privacy policy

Refund policy

Contact us

Sponsored by




Member of


Manage consent    Powered by Newspack



# EXHIBIT 24

ER1215



**≡** **The New York Times**

U.S. Immigration | Birthright Citizenship Order   View From the Border   Detention at Guantánamo   Deportation Flights to Venezuela   Immigration Deal in Florida

# Trump, at Fund-Raiser, Says He Wants Immigrants From 'Nice' Countries

At rallies, Donald Trump frequently laments migrants from a list of countries from Africa, Asia and the Middle East as he stokes fears around the surge at the border.

 Share full article   ↗   🔖



Former President Donald J. Trump and his wife, Melania, in Palm Beach, Fla., on Saturday. Lynne Sladky/Associated Press

 **By Maggie Haberman** and **Michael Gold**
Maggie Haberman reported from New York, and Michael Gold from Palm Beach, Fla.

April 7, 2024
Leer en español

Former President Donald J. Trump, speaking at a multimillion-dollar fund-raiser on Saturday night, lamented that people were not immigrating to the United States from "nice" countries "like

Former President Donald J. Trump, speaking at a multimillion-dollar fund-raiser on Saturday night, lamented that people were not immigrating to the United States from "nice" countries "like Denmark" and suggested that his well-heeled dinner companions were temporarily safe from undocumented immigrants nearby, according to an attendee.

Mr. Trump, the presumptive Republican presidential nominee, made the comments during a roughly 45-minute presentation at a dinner at a mansion owned by the billionaire financier John Paulson in Palm Beach, Fla., a rarefied island community.

Guests were seated outdoors at white-clothed tables under a white tent, looking out on the waterway that divides the moneyed town from the more diverse West Palm Beach, a mainland city, according to the attendee, who was not authorized to speak publicly about the private event but provided an extensive readout of Mr. Trump's remarks.

Dozens of wealthy donors helped write checks that the Trump campaign and the Republican National Committee claim totaled more than $50 million, an amount that would set a record but had not been verified. Campaign finance reports encompassing the date of the event won't be available for months.



Document title: Trump, at Fund-Raiser, Says He Wants Immigrants From 'Nice' Countries - The New York Times
Capture URL: https://www.nytimes.com/2024/04/07/us/politics/trump-immigrants-nice-countries.html
Capture timestamp (UTC): Fri, 21 Feb 2025 01:21:23 GMT

ER1217

Page 2 of 8

Some of Mr. Trump's comments were standard fare from his stump speeches, while other parts of the speech were tailored to his wealthy audience.

About midway through his remarks, the attendee said, Mr. Trump began an extensive rant about migrants entering the United States, at a time when President Biden has been struggling with an intensified crisis at the Southern border.

"These are people coming in from prisons and jails. They're coming in from just unbelievable places and countries, countries that are a disaster," Mr. Trump told his guests, according to the attendee. The former president has made a similar claim the heart of his campaign speeches.

He then appeared to refer to an episode during his presidency when he drew significant criticism after an Oval Office meeting with federal lawmakers about immigration during which he described Haiti and some nations in Africa as "shithole countries," compared with places like Norway.

"And when I said, you know, Why can't we allow people to come in from nice countries, I'm trying to be nice," Mr. Trump said at the dinner, to chuckles from the crowd. "Nice countries, you know like Denmark, Switzerland? Do we have any people coming in from Denmark? How about Switzerland? How about Norway?"

He continued, "And you know, they took that as a very terrible comment, but I felt it was fine."

Mr. Trump went on to say that there were people coming from Yemen, "where they're blowing each other up all over the place."

During his rallies, Mr. Trump frequently laments migrants from a list of countries from Africa, Asia and the Middle East as he stokes

**Editors' Picks**



Jane Fonda, Sneakerhead



Meet the Champion Who Memorized 80 Numbers in 13.5 Seconds



Making Her Homebuying Debut in Manhattan With $475,000 to Spend



Mr. Trump went on to say that there were people coming from Yemen, "where they're blowing each other up all over the place."

During his rallies, Mr. Trump frequently laments migrants from a list of countries from Africa, Asia and the Middle East as he stokes fears around the surge at the border, which he blames for a spike in crime, blame that has not been supported by available data.

At the dinner, Mr. Trump also lamented the surge of migrants, particularly from Latin America, saying that gang members "make the Hells Angels look like extremely nice people."

"They've been shipped in, brought in, deposited in our country, and they're with us tonight," Mr. Trump said.

"In fact, I don't think they're on this island, but I know they're on that island right there. That's West Palm," Mr. Trump said, gesturing across the water, according to the attendee. "Congratulations over there. But they'll be here. Eventually, they'll be here."

ADVERTISEMENT

Asked to comment, a Trump campaign official pointed to an official readout of the former president's event, including that he had discussed the border crisis and the tax cuts that he enacted while in office. The official did not address the specific quotes and did not respond to a question about whether the campaign was disputing them.

Mr. Paulson's estate sits along the waterway that separates the town of Palm Beach — a wealthy community on a barrier island that, according to the Census Bureau, is 93.8 percent white — from West Palm Beach, where nearly a third of residents are Black and a quarter are Hispanic.

Mr. Trump blamed his successor, Mr. Biden, for the influx of migrants and mocked him and aides for what Mr. Trump said were bad decisions made around the Resolute Desk, which has been used by two dozen presidents.

"The Resolute Desk is beautiful," Mr. Trump said. "Ronald Reagan



Document title: Trump, at Fund-Raiser, Says He Wants Immigrants From 'Nice' Countries - The New York Times
Capture URL: https://www.nytimes.com/2024/04/07/us/politics/trump-immigrants-nice-countries.html
Capture timestamp (UTC): Fri, 21 Feb 2025 01:21:23 GMT

ER1219

immigrants and mocked him and aides for what Mr. Trump said were bad decisions made around the Resolute Desk, which has been used by two dozen presidents.

"The Resolute Desk is beautiful," Mr. Trump said. "Ronald Reagan used it, others used it."

He then denigrated Mr. Biden, sounding disgusted, according to the attendee: "And he's using it. I might not use it the next time. It's been soiled. And I mean that literally, which is sad."

The attendee who witnessed the moment said that dinner guests laughed and that Mr. Trump's remark was interpreted as the former president saying that Mr. Biden had defecated on the desk.

Mr. Trump also sought to point to parts of his record that could appeal to the wealthy donors in attendance. He highlighted the tax cuts under his administration and asked attendees about whether they had a preference for that measure or his regulations that allowed them to take advantage of specific write-offs, according to the attendee.

"The most successful people in the whole country are in this room," Mr. Trump said.

He ended his remarks with a grave assessment of America's future that has characterized his campaigns for the presidency, but with a more apocalyptic tenor in 2024.

"This could very well be the last election this country ever has," Mr. Trump said, using a line that has become standard at his rallies. "July 4 is not as important as this as far as I'm concerned."

**Maggie Haberman** is a senior political correspondent reporting on the 2024 presidential campaign, down ballot races across the country and the investigations into former President Donald J. Trump. More about Maggie Haberman

**Michael Gold** is a political correspondent for The Times covering the campaigns of Donald J. Trump and other candidates in the 2024 presidential elections. More about Michael Gold

A version of this article appears in print on April 8, 2024, Section A, Page 16 of the New York edition with the

Document title: Trump, at Fund-Raiser, Says He Wants Immigrants From 'Nice' Countries - The New York Times
Capture URL: https://www.nytimes.com/2024/04/07/us/politics/trump-immigrants-nice-countries.html
Capture timestamp (UTC): Fri, 21 Feb 2025 01:21:23 GMT

**ER1220**



**Michael Gold** is a political correspondent for The Times covering the campaigns of Donald J. Trump and other candidates in the 2024 presidential elections. More about Michael Gold

A version of this article appears in print on April 8, 2024, Section A, Page 16 of the New York edition with the headline: At Fund-Raiser, Trump Says He Wants More Immigrants From 'Nice' Countries. Order Reprints | Today's Paper | Subscribe

See more on: Donald Trump, U.S. Politics, 2024 Elections: News, Polls and Analysis

Share full article

---

## Our Coverage of U.S. Immigration

- **Guantánamo Bay:** The Trump administration has said little about the Venezuelan men who were transferred from Texas to the U.S. military base in Cuba. Here's what we know.

- **Deported to Panama:** More than half of the migrants from Asian nations sent to the country by the U.S. have agreed to return to their home countries, Panama said. The roughly 150 migrants who refused have been sent to a camp near the jungle.

- **Kristi Noem:** In a biting rejoinder, the F.B.I. called comments by the secretary of homeland security "deeply irresponsible" after she accused the agency of corruption and suggested agents had leaked details ahead of immigration arrests.

- **Migrant Children:** The Trump administration toughened security requirements for sponsors of migrant children, which could make it more difficult for minors to be released from federal custody.

- **ICE Agents at Rikers:** After meeting President Trump's border czar, Mayor Eric Adams said he would issue an executive order to allow federal immigration authorities into the Rikers Island jail complex, a significant shift in New York City's sanctuary policies.



Document title: Trump, at Fund-Raiser, Says He Wants Immigrants From 'Nice' Countries - The New York Times
Capture URL: https://www.nytimes.com/2024/04/07/us/politics/trump-immigrants-nice-countries.html
Capture timestamp (UTC): Fri, 21 Feb 2025 01:21:23 GMT

**ER1221**

Resigns After Remarks About Barron Trump

Octogenarian Who Shot Teen in Kansas City Dies Days After Pleading Guilty

Scientists Describe Rare Syndrome Following Covid Vaccinations

Trump's Latest Target: A Nancy Pelosi Achievement in San Francisco

Trump Targets a Growing List of Those He Sees as Disloyal

'The Eastern Gate' Is a Lean and Mean Spy Drama

A New Hotel Perched in the Hills of Florence

Alexander Brothers Face More Lawsuits Accusing Them of Sexual Assault

Former N.F.L. Player Arrested for Protest Against MAGA Plaque

Finding Nirvana in a Pair of Socks

A Leading Anti-Trump Voice Returns to Democrats' Top Think Tank

In Private Remarks on Russia, Rubio Tries to Reassure Europeans

A Lonely Holdout Where Republicans Still Resist Trump: Utah

Former N.F.L. Player Is Arrested After Protest Over MAGA Plaque

**Editors' Picks**



Love in This Tub

Making Her Homebuying Debut in Manhattan With $475,000 to Spend

For These 20-Somethings, Trump 'Is Making It Sexy' to Be Republican



to Democrats' Top Think Tank

Tries to Reassure Europeans

Republicans Still Resist Trump: Utah

**Editors' Picks**

Love in This Tub

Making Her Homebuying Debut in Manhattan With $475,000 to Spend

For These 20-Somethings, Trump 'Is Making It Sexy' to Be Republican

© 2025 The New York Times Company NYTCo Contact Us Accessibility Work with us Advertise T Brand Studio Your Ad Choices Privacy Policy Terms of Service Terms of Sale Site Map Help Subscriptions

Your Privacy Choices California Notices





# EXHIBIT
# 25

ER1224



ADVERTISEMENT

**CAMPAIGNS**

# 'Dumping ground': Trump echoes conservative 'Project 2025' at first rally as a felon

U.S. has 'a dysfunctional asylum system,' Democratic lawmaker says



Republican presidential candidate Donald Trump dances upon arrival at a campaign rally at Sunset Park in Las Vegas on Sunday. (Brandon Bell/Getty Images)

By John T. Bennett
Posted June 10, 2024 at 3:45pm

Republican presidential candidate Donald Trump dances upon arrival at a campaign rally at Sunset Park in Las Vegas on Sunday. (Brandon Bell/Getty Images)

**By John T. Bennett**
Posted June 10, 2024 at 3:45pm

   

Donald Trump used his first rally since his criminal conviction to rail against migrants entering the United States illegally, echoing harsh characterizations in the "Project 2025" policy blueprint for a second term drafted by some of his allies.

The political world was watching the former president and presumptive Republican presidential nominee closely Sunday as he rallied loyalists in sweltering Las Vegas for the first time since a jury in New York found him guilty on 34 counts of falsifying business records. Trump, at an outdoor rally in the desert city with temperatures over 100 degrees, mostly played his hits — but he also dropped clues about a potential second term.

Trump and President Joe Biden are locked in a tight battle nationally and in battleground states such as Nevada. Biden won the Silver State four years ago, capturing 50.06 percent of the vote to Trump's 47.67 percent. A Beacon Research-Shaw & Company Research poll conducted for Fox News June 1-3 showed Trump leading there by 5 percentage points; a RealClearPolitics average of six recent polls put Trump up 5.3 percentage points.

In a throwback to his successful 2016 White House bid, the likely GOP presidential nominee hit one issue harder than others on Sunday: immigration.

"The illegal immigrants are turning [up] at a level that nobody's ever seen before, they're fighting our families," Trump told his sun-bathed loyalists. "They're totally destroying our Black population, they're totally destroying our Hispanic population."

Those were themes he preached repeatedly during his first run for the presidency, but he added a new layer Sunday that was tailored for Nevada, which has a large unionized service industry workforce.

"And you know what else they're destroying? And for you, it means a little bit less, but it means quite a bit in this state. They're killing unions. They're killing unions because the unions are not able to survive," he contended.

"They're not able to survive this onslaught, it's making them impossible. They've worked hard, they've worked long to get their salaries up a little bit," Trump said of Nevada unions. "They're not able to do it."

Union members made up 12.4 percent of the state's wage and salaried workers in 2023, according to the Labor Department's Bureau of Labor Statistics, up from 11.3 percent in 2022. That compares with 10 percent nationwide in 2023. Nevada's union membership rate has trended above the national average each year since 1989, according to BLS data.

Trump's Sunday immigration remarks were in sync with policy proposals laid out in the "Project 2025" blueprint, the effort by a collaboration of Trump backers and Republican opinion-makers to scope out what a second Trump term might look like. On the whole, the document calls for a substantial expansion in the power of the Executive Office of the President, and it has been decried by Democrats.

Trump's Sunday immigration remarks were in sync with policy proposals laid out in the "Project 2025" blueprint, the effort by a collaboration of Trump backers and Republican opinion-makers to scope out what a second Trump term might look like. On the whole, the document calls for a substantial expansion in the power of the Executive Office of the President, and it has been decried by Democrats.

On immigration, the blueprint calls for the Department of Homeland Security to be replaced with a new "stand-alone border and immigration agency at the Cabinet level," with the remaining parts of DHS to be distributed among other departments.

"Illegal immigration should be ended, not mitigated; the border sealed," the document says, accusing "today's progressive left" of seeking "to purge the very concept of the nation-state from the American ethos, no matter how much crime increases or resources drop for schools and hospitals, or wages decrease for the working class."

Trump on Sunday endorsed the anti-immigration policies of one of his favorite global hard-liners.

"The world is laughing at us ... Viktor Orban, the great prime minister of Hungary, strong country, took no illegal aliens. None, zero," Trump said. "But he made a statement the other day, he said ... 'What's going on? The whole world is collapsing,' he said. 'The only thing that's gonna save the world is Donald Trump has to get reelected as president and the whole world is going to be saved.'"

## 'A dumping ground'

In another 2016 throwback, Trump pulled from his suit jacket breast pocket a printout of a poem that is popular in anti-immigration circles. Egged on by the midday crowd, he recited "The Snake," which warns against taking in beings that are unlike oneself. According to Trump, undocumented immigrants entering the U.S. would be the snake, which in the poem gave a woman that took him in "a vicious bite."

"And that's happening at our border. You see, because we're taking in people that are a disaster for our country. So it's all happening at our border. ... And we're not going to let it happen, we're not going to let them ruin our country, we're not going to let them destroy our country," he said. "So Nevada's being turned into a dumping ground, and you are. The whole country is being turned into an absolute dumping ground for what's happening."

Biden last week issued an executive order aimed at limiting migrants' asylum claims at the U.S.-Mexico border and allowing immigration officials to swiftly deport individuals who illegally enter the United States. Trump and other Republicans have criticized the president's move since the new restrictions would only kick in after people entering illegally exceeded 2,500 in a day.

"If an individual chooses not to use our legal pathways, if they choose to come without permission and against the law, they'll be restricted from receiving asylum and staying in the United States," Biden said during June 4 remarks at the White House. "This action will help us to gain control of our border and restore order to the process. This ban will remain in place until the number of people trying to enter illegally is reduced to a level that our system can effectively manage."

Document title: 'Dumping ground': Trump echoes conservative 'Project 2025' at first rally as a felon - Roll Call
Capture URL: https://rollcall.com/2024/06/10/dumping-ground-trump-echoes-conservative-project-2025-at-first-rally-as-a-felon/
Capture timestamp (UTC): Sat, 15 Feb 2025 09:27:20 GMT

**ER1227**

they'll be restricted from receiving asylum and staying in the United States," Biden said during June 4 remarks at the White House. "This action will help us to gain control of our border and restore order to the process. This ban will remain in place until the number of people trying to enter illegally is reduced to a level that our system can effectively manage."

Biden's order came after pressure from Republicans — and some vulnerable Democratic congressional candidates — for him to take action on an issue that resonates with many voters and Congress, after Trump came out against a bipartisan Senate plan.

Sixty-two percent of registered voters said they would support a federal government initiative to deport all migrants who are in the United States illegally, according to a CBS News-YouGov poll of likely voters conducted June 5-7. Trump has drawn the outrage of Democrats by proposing the largest deportation program in American history, first proposing to use military troops before recently saying local law enforcement entities would take the lead — even though they are under the command of mayors and city and county councils.

The same poll found 70 percent of registered voters supported Biden's border executive order.

"Look, we in the United States have a dysfunctional asylum system. Anyone, anywhere can cross the border, claim asylum, enter the country, and Border Patrol has no emergency authority to limit crossings in the event of a surge. And so that's the gap that the President's executive order is filling," Rep. Ritchie Torres, D-N.Y., told Fox News on Sunday.

"But in the end, an executive order is no substitute for an act of Congress," he added. "Only Congress can fix what is broken in our asylum system."



PROMOTED CONTENT 



**Brainberries**
**Priceless Pieces Of Cargo That Were Lost Forever**



**Brainberries**
**Jennifer Aniston Cool Roles After Her Fame In Friends**



**Brainberries**
**8 Amazing Movies You Need To Watch On Amazon Prime**

RECENT STORIES





"But in the end, an executive order is no substitute for an act of Congress," he added. "Only Congress can fix what is broken in our asylum system."

Ad

## PROMOTED CONTENT







Brainberries

**Priceless Pieces Of Cargo That Were Lost Forever**

Brainberries

**Jennifer Aniston Cool Roles After Her Fame In Friends**

Brainberries

**8 Amazing Movies You Need To Watch On Amazon Prime**

### RECENT STORIES







**Food, and Nazis, for thought — Congressional Hits and Misses**

**The pro wrestlers the Democratic Party needs to emulate**

**Judge orders temporary end to freeze on foreign aid spending**







**Photos of the week ending February 14, 2025**

**GOP budget framework gets over initial hurdle in House**

**Takeaways: White House visit by India's Modi becomes mini trade summit**



THE SOURCE FOR NEWS ON CAPITOL HILL SINCE 1955

| About | Contact Us | Advertise |
| Events | Privacy | RC Jobs |
| Newsletters | The Staff | Subscriptions |

CQ and Roll Call are part of FiscalNote, a leading provider of political and business risk solutions. Copyright 2025 CQ and Roll Call. All rights reserved.

# EXHIBIT 26

ER1230

FactCheck.org
*A Project of The Annenberg Public Policy Center*

DONATE

HOME    ARTICLES ▾    ASK A QUESTION ▾    DONATE    TOPICS ▾    ABOUT US ▾    SEARCH    MORE ▾

FACTCHECK POSTS > FEATURED POSTS

# Crime Drop in Venezuela Does Not Prove Trump's Claim the Country Is Sending Criminals to U.S.

*By Robert Farley and Catalina Jaramillo*

*Posted on June 14, 2024*

THIS ARTICLE IS AVAILABLE IN BOTH ENGLISH AND ESPAÑOL    English ▾

    

*Para leer en español, vea esta traducción de El Tiempo Latino.*

Anyone who has heard a speech by former President Donald Trump in the last few years has certainly heard his unsubstantiated claim that countries around the world are emptying their prisons and mental institutions and sending those people to the U.S.

Trump has offered scant support for this claim, but in virtually all of his recent speeches, he has been citing a reported drop in crime in Venezuela as evidence that the economically and politically beleaguered country is sending its criminals to the U.S.

Experts in and out of Venezuela told us there is no evidence to back up Trump's claim. Reported crime is trending down in Venezuela — though not nearly as dramatically as Trump claims — but crime experts in the country say there are numerous reasons for that and they have nothing to do with sending criminals to the U.S.

Nonetheless, it's hard to prove a negative, and those who follow Venezuelan politics say such a tactic is not beyond Venezuelan President Nicolás Maduro, who has been in power since 2013 and is seeking another six-year term. The FBI acknowledges some Venezuelan criminals have migrated to the U.S., but there's no indication they were purposefully released from prison to come to this country.

When Trump makes such an explosive and sweeping claim — and makes it a hallmark of his case to return to office — the onus is on him to provide evidence. He hasn't. (His press office did not respond to our inquires about it.) And the argument that Venezuelan crime is down is not the proof Trump suggests it is.

## Trump's Claim

In recent speeches, Trump has sometimes said that crime is down "a staggering 67%" in Venezuela, while at other times he has put the drop in crime at "72% in a year."

But in each case, as he did in a video posted to social media on June 4, he cited the statistics to support his claim, "They're taking their drug dealers and their people in jail, lots of people in jail, they're taking their murderers, their killers, they're taking them all and they're sending them into the United States."

"Venezuela was crime ridden," Trump said in remarks on May 31 after his conviction in the hush money case. "Caracas, their cities, crime ridden two years ago, three years ago. They just reported a 72% drop in crime in the last year because all of their criminals, most of them, and the rest are coming in now, the ones that didn't come in. In Venezuela, their prisons have been emptied into the United States. Their criminals and drug dealers have been taken out of the cities and brought into the United States, and that's true with many other countries."

## Ask FactCheck

**Q: Did former President Joe Biden issue a statement saying that he thought the Equal Rights Amendment should be considered part of the Constitution?**

**A: Yes. On one of his last days in office, Biden published a statement supporting the ERA, but it has no legal effect.**

Read the full question and answer
View the Ask FactCheck archives
Have a question? Ask us.

## Donate Now
Because facts matter.


### SciCheck's COVID-19/Vaccination Project
Preempting and exposing vaccination and COVID-19 misinformation.


### Proyecto de Vacunación/COVID-19
Precaviendo y exponiendo la desinformación sobre el COVID-19 y sus vacunas


### SciCheck
Fact-checking science-based claims.


### Facebook Initiative
Debunking viral claims.


### Players Guide 2024
The special interest groups behind the TV ads.

hush money case. "Caracas, their cities, crime hidden two years ago, three years ago. They
just reported a 72% drop in crime in the last year because all of their criminals, most of
them, and the rest are coming in now, the ones that didn't come in. In Venezuela, their
prisons have been emptied into the United States. Their criminals and drug dealers have
been taken out of the cities and brought into the United States, and that's true with many
other countries."

In this report, we'll focus on Venezuela because that's the country most often cited by
Trump.

Carlos Nieto of the Venezuelan nongovernmental organization A Window to Freedom is, of
course, well aware of Trump's relentless insistence that Venezuelan officials have been
systematically emptying their prisons and mental institutions and sending those people to
the U.S.

Nieto, whose group has been monitoring the prison situation in Venezuela for more than 25
years, told us he has observed no evidence that supports Trump's claim. He added that there
definitely is no official state policy to that effect.

Some criminals have emigrated from Venezuela, he told us in Spanish, and some have made
their way to the U.S. But, he said, "there is nothing that can be affirmed that establishes that
there is an agreement, or that the Venezuelan government is helping criminals leave
Venezuela to go to the United States."

But neither can he rule out that it could be happening "under the hood."

"I do not doubt that it could be happening, nor do I doubt that it can be done," Nieto said. "I
mean, these people, I'm talking about Maduro and his clique, are capable of that and many
more things."

But that's pure speculation. And again, Nieto and other experts say they have seen no
evidence of it.

## Venezuelan Crime Stats

Reliable crime statistics in Venezuela are notoriously difficult to obtain. The government
hasn't provided dependable crime reports in many years, Mike LaSusa, deputy director of
content at InSight Crime, a think tank focused on crime and security in the Americas, told us
via email.

Although Venezuelan security officials in May reported a 25% drop in crime this year
compared with the same period in 2023, "the absence of official reports makes it impossible
to verify the data," LaSusa said in a May 28 report.

In the absence of reliable government reporting, media and nongovernmental organizations
have become the most trusted sources for documenting and tracking crime, LaSusa said.

One such NGO, the independent Venezuelan Observatory of Violence, in December reported a
25% decrease in violent deaths between 2022 and 2023. (Violent deaths include homicides,
deaths by police intervention and suspected violent deaths under investigation.) That drop
was widely reported in U.S. media. If Trump is citing the murder tally as a proxy for overall
crime, he is vastly overstating the one-year drop.

But the number of violent deaths has been declining for years in Venezuela, according to the
group's tallies, and is nearly 70% lower than it was in 2018, according to Roberto Briceño-
León, the founder and director of the OVV (the acronym for Venezuelan Observatory of
Violence in Spanish). That corresponds with Trump's figure, but, of course, that is a much
longer time frame that predates the Biden administration.

LaSusa said the OVV's murder rate estimates track with InSight's observation about "a
reduction in the intensity of criminal violence in certain areas of the country." But, he said,
InSight has not seen a reduction in crime of 67% in a year, as Trump claimed.

"Additionally, the reductions that we have observed seem to respond largely to changes in
criminal dynamics, rather than the effectiveness of the government's security policies,"
LaSusa said. "Basically, criminal groups seem to be seeking new opportunities outside of
Venezuela due to the lack of opportunities in the country."

Debunking viral claims.



### Players Guide 2024
The special interest groups
behind the TV ads.



### Viral Spiral
Don't get spun by internet
rumors.



### Sign Up
Get free email alerts.



### Mailbag
Letters from our readers.



### On the Air
Our staff on TV and radio.



### NewsFeed Defenders
A media literacy game to
detect misinformation.

LaSusa said the OVV's murder rate estimates track with InSight's observation about a reduction in the country's prisons, but that InSight is uncertain about the extent of the reduction, he said.

InSight has not seen a reduction in crime of 67% in a year, as Trump claimed.

"Additionally, the reductions that we have observed seem to respond largely to changes in criminal dynamics, rather than the effectiveness of the government's security policies," LaSusa said. "Basically, criminal groups seem to be seeking new opportunities outside of Venezuela due to the lack of opportunities in the country."

# What's Driving the Crime Drop?

In its Annual Report on Violence 2023, OVV documented 6,973 violent deaths in 2023, about 14% of which resulted from police enforcement. That's down from 9,447 and 9,367 in 2021 and 2022, respectively. That's a decline of 26% in the reported number of violent deaths between 2021 and 2023.

While the violent death rate may have dropped, a national survey conducted by OVV in mid-2023 found that about 78% of residents believed crime had stayed the same or gotten worse.

Briceño-León shared with us via email in Spanish some of the causes OVV identified for the drop in murders — none of which includes a government program to ship convicts to the U.S.

"We have no evidence that the Venezuelan government is emptying the prisons or mental hospitals to send them out of the country, whether to the USA or any other country," Briceño-León said.

Rather, he said, the drop in crime is due to worsening economic and living conditions in the country, which has led to a massive out-migration of nearly 8 million people since 2014.

"Crime is reduced in Venezuela due to a reduction in crime opportunities: bank robberies disappear because there is no money to steal; kidnappings are reduced because there is no cash to pay ransoms; robberies on public transportation cease because travelers have no money in their pockets and old, worthless cell phones; and assaults on bank money dispensers disappear because the cash they can give to their clients has not exceeded twenty U.S. dollars," Briceño-León said.

There has also been a consolidation of gang activity, which has led to a reduction in crime. In its report, OVV wrote that the drop in crime "can be attributed to the reduction of disorganized criminal activities and the growing concentration and monopolization of violence by powerful criminal organizations. These criminal organizations are now focusing on specific niches of criminal opportunities, which has led to a decreased overall level of violence in the country."

"The decrease in 'disorganized' violence, which causes high lethality, has been reduced by the notable emigration of young people and the loss of opportunities for crime," the report stated. "In recent years, there has been a reduction in the lethality of violence in certain parts of the country. This trend has been attributed to agreements made between criminal gangs regarding the distribution of tasks during business operations, as well as the demarcation of areas of operation, which has allowed for their expansion and consolidation. However, in municipalities where there are no such agreements or where criminal control has not been fully established, violent events continue to occur."

The consolidation of organized crime has led to "a kind of mafia peace" in areas they control, Ronna Rísquez, a Venezuelan investigative journalist, told us in Spanish.

The "humanitarian emergency" in Venezuela has also had implications for criminals as well. Venezuela, she said, "stopped being attractive for crime, because it no longer made sense to kidnap. ... It made no sense to steal, because everyone was poor. In Venezuela ... no one had money, people were starving and then for crime, for criminals, it was no longer profitable to have criminal activities."

Rísquez said another reason for the decrease in crime is that Venezuelan authorities, sometime between 2015 and 2021, began "a large number of alleged extrajudicial executions" of people accused of belonging to criminal groups.

The OVV report notes that some criminals have also left Venezuela "seeking to continue their criminal life in other places where they find greater opportunities for profit," Briceño-

Rísquez said another reason for the decrease in crime is that Venezuelan authorities, sometime between 2015 and 2021, began "a large number of alleged extrajudicial executions" of people accused of belonging to criminal groups.

The OVV report notes that some criminals have also left Venezuela "seeking to continue their criminal life in other places where they find greater opportunities for profit," Briceño-León said. But, he said, the vast majority of emigrants from Venezuela are "honest workers fleeing the country's poverty, looking for a job and a better future."

The vast majority of those fleeing Venezuela have settled in nearby South American countries. But more and more are making their way to the U.S. Prior to President Joe Biden taking office, relatively few Venezuelan emigrants were intercepted by U.S. Border Patrol. For most of the 2010s, less than 100 Venezuelans a year were caught trying to cross the southwest border illegally. The number grew to more than 2,000 in fiscal year 2019. But beginning in 2021 the numbers began to swell, and topped 187,000 and 200,000 in the 2022 and 2023 fiscal years, respectively.



*A Venezuelan asylum seeker carries his daughter before they cross the Rio Grande into Brownsville, Texas, in December 2022. The U.S. has seen a surge of migrants from Venezuela since 2021. Photo by Veronica G. Cardenas/ AFP via Getty Images.*

As of January, the U.S. had the third-largest number of Venezuelan emigrants in the world (545,000) — though Colombia remained by far the largest destination (2.9 million), followed by Peru (1.5 million). Brazil, Ecuador, Chile and Spain each had roughly the same number as the U.S.

Criminal groups with origins in Venezuela have quickly spread to neighboring South American countries where most Venezuelans have settled. According to a U.S. State Department trafficking report for Colombia released in 2023, "El Tren de Aragua – Venezuela's most powerful criminal gang – and the National Liberation Army (ELN) operate sex trafficking networks in the border town of Villa del Rosario in the Norte de Santander department. These groups exploit Venezuelan migrants and internally displaced Colombians in sex trafficking and take advantage of economic vulnerabilities and subject them to debt bondage."

And some criminals from Venezuela have come to the U.S.

Nieto, of the Venezuelan nongovernmental organization A Window to Freedom, attributed the decrease in crimes to the mass emigration from the country in recent years, a number, he said, that "undoubtedly does not exclude criminals."

There is some evidence Tren de Aragua gang members have also made their way to the U.S. The U.S. Border Patrol told CNN en Español that 38 potential members of Tren de Aragua were arrested at the border between October 2022 and October 2023.

On April 5, U.S. Border Patrol Chief Jason Owens posted on social media to "[w]atch out for this gang. It is the most powerful in Venezuela, known for murder, drug trafficking, sex crimes, extortion, & other violent acts."

And suspected members of the Venezuelan gang have been linked to a number of crimes in the U.S., including the murder of a former Venezuelan police officer in Miami in November, and a spate of cell phone robberies in New York City.

In March, Sen. Marco Rubio and Rep. María Elvira Salazar led a group of 23 federal legislators petitioning Biden to formally designate Tren de Aragua as a transnational criminal organization, which would allow the U.S. to freeze assets its members have in the U.S. In a Senate subcommittee hearing on April 11, Chris Landberg, deputy assistant

and a spate of cell phone robberies in New York City.

In March, Sen. Marco Rubio and Rep. María Elvira Salazar led a group of 23 federal legislators petitioning Biden to formally designate Tren de Aragua as a transnational criminal organization, which would allow the U.S. to freeze assets its members have in the U.S. In a Senate subcommittee hearing on April 11, Chris Landberg, deputy assistant secretary of the Bureau of International Narcotics and Law Enforcement Affairs at the U.S. Department of State, told Rubio that "we're closely tracking Tren De Aragua and have similar concerns to you," though he declined to discuss internal deliberations about its designation.

Rísquez, author of "The Aragua Train: The gang that revolutionized organized crime in Latin America," said that while some criminals are inevitably among those who have emigrated from Venezuela to the U.S., "There is no element, no evidence, nothing that indicates that in Venezuela prisoners are being released to leave or to be sent to the United States to commit crimes. There is no plan from the Venezuelan government that points toward that."

# Prison Releases

Complicating the issue is that Venezuela has, in fact, been actively trying to reduce its prison population.

Venezuela has been seeking to address severe overcrowding in its preventive detention centers, which were only designed to hold inmates for 48 hours but have become the de facto prisons of the country, Nieto said.

In March, the Presidential Commission for Judicial Revolution announced the release of 100 inmates from such a facility as part of a directive issued by Maduro to evaluate the preventive detention facilities and address overcrowding.

Preventive detention centers were designed to be temporary holding cells for people awaiting a court date. But that's not what they became, Nieto said.

"The Ministry for the Penitentiary Service many years ago gave the order not to allow the entry of new people [to the traditional prisons] if they did not authorize it," Nieto said. "This ministry prohibited the entry of new inmates into Venezuelan prisons, which is where they should be. This caused the preventive care centers to collapse and the preventive care centers to become, as they are today, the new prisons of Venezuela."

Nieto estimates there are as many as 70,000 people held in these preventive care centers, far greater than they were designed to house.

In response, the government created two commissions to review the cases of prisoners and to determine if they should be "granted freedom," Nieto said. "In fact, there are many who have been released."

While some in the U.S. have claimed the Venezuelan government is releasing its most violent criminals, the Venezuelan government doesn't disclose the charges against those released, so there's no way of knowing, he said.

"Look, people are released, first, in many cases because they have been detained there for several years and a trial has not even been initiated against them," Nieto said. "Also because in many cases they are minor crimes that do not merit such heavy penalties. So, well, that frees people. There are cases [of those] that have even already served the sentence established at that time."

In addition, the Venezuelan government under Maduro has attempted recently to militarily regain control of traditional prisons, whose operation had previously been ceded to criminal groups. The leader of the Tren de Aragua gang, Héctor Rusthenford Guerrero Flores, and hundreds of others escaped from the prison where the gang originated shortly before the prison was raided by government authorities in September, CNN en Español reported. He remains at large, and InSight reported that it is believed he is being protected by criminal associates in a mining town in Venezuela near the border with Guyana.

According to the World Prison Brief website maintained by Helen Fair of the Institute for

hundreds of others escaped from the prison where the gang originated shortly before the prison was raided by government authorities in September, CNN en Español reported. He remains at large, and InSight reported that it is believed he is being protected by criminal associates in a mining town in Venezuela near the border with Guyana.

According to the World Prison Brief website maintained by Helen Fair of the Institute for Crime and Justice Police Research, Venezuela's prison population (not including pre-trial detainees) declined from 37,543 in 2020 to 32,200 in 2022 (and had been declining for the four years before that as well).

The government's efforts to retake control of the prisons "has involved relocating some prisoners from one prison to another, and there are some prisoners who are unaccounted for," LaSusa, of InSight, said. "However, the Venezuelan government has no known policy of selecting particular inmates to send them outside the country."

# Speculation

Again, Trump has provided no evidence to back up his claim that the Venezuelan government is emptying its prisons and sending inmates to the U.S.

Some supporters of Trump's immigration policy say that, while perhaps speculative, there is good reason to believe Trump *may* be right.

Andrew Arthur of the Center for Immigration Studies, which advocates lower immigration, wrote a column noting that Cuba did something like that in the 1980s, and he argued that since there are ideological and political ties between Cuba and Venezuela, "the idea may not be as specious as some have claimed."

In 1980, Cuban leader Fidel Castro allowed the mass migration of some 125,000 Cubans to the U.S. in what was known as the Mariel boatlift.

"Most were true refugees, many had families here, and the great majority has settled into American communities without mishap," the Washington Post wrote in 1983. "But the Cuban dictator played a cruel joke. He opened his jails and mental hospitals and put their inmates on the boats too."

According to the Post, about 22,000 of the new arrivals "freely admitted that they were convicts." Some were political prisoners, but others were convicts who had committed serious felonies, including violent crimes.

Arthur pointed to a drop in Venezuelan crime, the close alignment between the Cuban and Venezuelan governments, and anecdotal evidence of Venezuelans committing crimes in the U.S.

"None of this is evidence of anything," Arthur told us, but "all of this does raise some questions."

But the bar is higher than that for such a definitive and repeated claim by Trump, and numerous officials say they have seen no evidence to support Trump's claim. (Not to mention the fact that Trump claims the emptying of prisons and mental institutions is happening "with many other countries.")

"This claim has come up repeatedly about various countries, Venezuela is just the latest example," Julia Gelatt, associate director of the U.S. Immigration Policy Program at the Migration Policy Institute, told us. "While the actions of institutions in Venezuela is not our specialty, we are unaware of any action by Venezuelan authorities (or those of any other country) to empty its jails and prisons or its mental-health institutions to send criminals or people with mental-health issues to the U.S."

"They are neither emptying the prisons nor the mental shelters to send people to the United States, nor is the reduction in crime associated with [Trump's claim]," Rísquez, the Venezuelan investigative journalist, told us. "Those statements by former President Trump, it seems to me that they have no basis, that they are political, that they have to do with, well, some intention to criminalize migration or the processes that are occurring in the United States with migrants."

In an interview with CBS News in March, Owens, the U.S. Border Patrol chief, was asked if it

Venezuelan investigative journalist, told us. "Those statements by former President Trump, it seems to me that they have no basis, that they are political, that they have to do with, well, some intention to criminalize migration or the processes that are occurring in the United States with migrants."

In an interview with CBS News in March, Owens, the U.S. Border Patrol chief, was asked if it was accurate — as Trump has said — that "we have millions and millions of people coming from jails and prisons."

"I don't know," Owens said. "I don't know if other countries are releasing people from jails and those folks that got released are making their way up, or not, I don't know what the numbers would be. It's the unknown that scares us. I can tell you that there are at least 140,000 that we know about that have gotten away [since October], that we have detected but have not been able to apprehend. And I know there's a good likelihood that there's plenty more that we have not detected that also got away. Is it possible that at least a portion of them come from violent criminal backgrounds or served time in prison in other countries? Absolutely."

But among the large number of Venezuelan migrants who are crossing illegally into the U.S. and then seeking asylum status, "I think they absolutely are by and large good people," Owens said.

Nonetheless, he said, there is "a very small amount" among those apprehended that have criminal backgrounds, including "convicted sexual predators" and "convicted gang members." Owens said it is only logical that there is a "higher incidence" of criminals among the so-called gotaways, because they are afraid to turn themselves in for CBP scrutiny.

"Most of the folks who we're encountering that are turning themselves in, they're coming across because they're either fleeing terrible conditions or they're economic migrants looking for a better way of life," Owens said. "It doesn't make them bad people. It's just that they're not being respectful of the laws that we've established as a country and they're actually putting people in this country in harm's way because they're pulling the border security apparatus off of task."

---

*Editor's note: FactCheck.org does not accept advertising. We rely on grants and individual donations from people like you. Please consider a donation. Credit card donations may be made through our "Donate" page. If you prefer to give by check, send to: FactCheck.org, Annenberg Public Policy Center, 202 S. 36th St., Philadelphia, PA 19104.*

| | |
|---|---|
| **Categories** | FactCheck Posts   Featured Posts |
| **Tags** | 2024 Elections   Presidential Election 2024 |
| **Location** | Venezuela |
| **Issue** | Crime   Illegal Immigration |
| **People** | Donald Trump |

PREVIOUS STORY
Posts Make Unsupported Claim About
Kansas City Chiefs and Pride Month

NEXT STORY
Posts Misrepresent Old Video of Missile
Test as Russian Ships Visit Cuba

ARCHIVES     PRIVACY     COPYRIGHT POLICY     CONTACT US     REPORT ACCESSIBILITY ISSUES AND GET HELP

© Copyright 2025 FactCheck.org ®
A Project of The Annenberg Public Policy Center of the University of Pennsylvania

# EXHIBIT
# 27

ER1238



COUNCIL *on* FOREIGN RELATIONS

*Foreign Affairs*    CFR Education    Newsletters

Experts    Transition 2025    Topics ▾    Regions ▾    Explainers ▾    Research & Analysis ▾    Communities ▾    Events ▾

*Backgrounder*

# Venezuela: The Rise and Fall of a Petrostate

Venezuela's ongoing descent into economic and political chaos is a cautionary tale of the dangerous influence that resource wealth can have on developing countries.



*Venezuelans protest against the results of the country's July 2024 presidential election, in Caracas.* Maxwell Briceno/Reuters

**WRITTEN BY**
Diana Roy *and* Amelia Cheatham

**UPDATED**
*Last updated July 31, 2024 2:55 pm (EST)*



Introduction

What is a petrostate?

What's behind the petrostate paradigm?

How does Venezuela fit the category?

How did Venezuela get here?

What has been the impact of U.S. sanctions?

Is there a path away from the oil curse?

Recommended Resources

**Summary**

- Venezuela is an example of a petrostate, where the government is highly dependent on fossil fuel income, power is concentrated, and corruption is widespread.

- Petrostates are vulnerable to what economists call Dutch disease, in which a government develops an unhealthy dependence on natural resource exports to the detriment of other sectors.

- Venezuela continues to grapple with economic and political hardship under President Nicolás Maduro, but U.S. sanctions relief in exchange for democratic reforms have sparked hope for a revival of the oil industry.

## Introduction

Venezuela, home to the world's largest oil reserves, is a case study in the perils of becoming a petrostate. Since it was discovered in the country in the 1920s, oil has taken Venezuela on an exhilarating but dangerous boom-and-bust ride that offers lessons for other resource-rich states. Decades of poor governance have driven what

**RELATED**



Lessons from the Failure of Democracy Promotion in Venezuela
*by* Elliott Abrams



Do U.S. Sanctions on Venezuela Work?
*by* Diana Roy







Introduction

What is a petrostate?

What's behind the petrostate paradigm?

How does Venezuela fit the category?

How did Venezuela get here?

What has been the impact of U.S. sanctions?

Is there a path away from the oil curse?

Recommended Resources

in the perils of becoming a petrostate. Since it was discovered in the country in the 1920s, oil has taken Venezuela on an exhilarating but dangerous boom-and-bust ride that offers lessons for other resource-rich states. Decades of poor governance have driven what was once one of Latin America's most prosperous countries to economic and political ruin.

In recent years, Venezuela has suffered economic collapse, with output shrinking significantly and rampant hyperinflation contributing to a scarcity of basic goods, such as food and medicine. Meanwhile, government mismanagement and U.S. sanctions have led to a drastic decline in oil production and severe underinvestment in the sector. Though Washington eased some sanctions on Venezuela's oil and gas sector in 2023, signaling a potential détente, Caracas's failure to meet conditions for a fair election prompted the U.S. government to reimpose sanctions in 2024.

## What is a petrostate?

Petrostate is an informal term used to describe a country with several interrelated attributes:

- government income is deeply reliant on the export of oil and natural gas,

- economic and political power are highly concentrated in an elite minority, and

- political institutions are weak and unaccountable, and corruption is widespread.

Countries often described as petrostates include Algeria, Cameroon, Chad, Ecuador, Indonesia, Iran, Kazakhstan, Libya, Mexico, Nigeria, Oman, Qatar, Russia, Saudi Arabia, the United Arab Emirates, and Venezuela.

**Daily News Brief**

A summary of global news developments with CFR analysis delivered to your inbox each morning. *Weekdays.*

I'm not a robot

reCAPTCHA
Privacy - Terms

Email Address

Subscribe

View all newsletters ›

## What's behind the petrostate paradigm?

Petrostates are thought to be vulnerable to what economists call Dutch disease, a term coined during the 1970s after the Netherlands discovered natural gas in the North Sea.

Synchronizing With Europe on the Venezuela Crisis
*by* Paul J. Angelo

Dutch disease, a term coined during the 1970s after the
Netherlands discovered natural gas in the North Sea.

In an afflicted country, a resource boom attracts large inflows of
foreign capital, which leads to an appreciation of the local currency
and a boost for imports that are now comparatively cheaper. This
sucks labor and capital away from other sectors of the economy,
such as agriculture and manufacturing, which economists say are
more important for growth and competitiveness. As these labor-
intensive export industries lag, unemployment could rise, and the
country could develop an unhealthy dependence on the export of
natural resources. In extreme cases, a petrostate forgoes local oil
production and instead derives most of its oil wealth through high
taxes on foreign drillers. Petrostate economies are then left highly
vulnerable to unpredictable swings in global energy prices and
capital flight.

The so-called resource curse also takes a toll on governance. Since
petrostates depend more on export income and less on taxes, there
are often weak ties between the government and its citizens.
Timing of the resource boom can exacerbate the problem. "Most
petrostates became dependent on petroleum while, or immediately
after, they were establishing a democracy, state institutions, an
independent civil service and private sector, and rule of law," says
Terry Lynn Karl, a professor of political science at Stanford
University and author of *The Paradox of Plenty*, a seminal book on
the dynamics of petrostates. Leaders can use the country's resource
wealth to repress or co-opt political opposition.

## How does Venezuela fit the category?

Venezuela is the archetype of a failed petrostate, experts say. Oil
continues to play the dominant role in the country's fortunes more
than a century after it was discovered there. The oil price plunge
from more than $100 per barrel in 2014 to under $30 per barrel in
early 2016 sent Venezuela into an economic and political spiral, and
despite rising prices since then, conditions remain bleak.

A number of grim indicators tell the story:

*Oil dependence.* In recent years, oil exports have financed almost
two-thirds of the government's budget. Estimates for 2024 place
this figure slightly lower, at 58 percent.

*Falling production. Starved of adequate investment and*

Introduction

What is a petrostate?

What's behind the petrostate
paradigm?

How does Venezuela fit the
category?

How did Venezuela get here?

What has been the impact of
U.S. sanctions?

Is there a path away from the
oil curse?

Recommended Resources

**two-thirds** of the government's budget. Estimates for 2024 place this figure slightly lower, at **58 percent**.

*Falling production*. Starved of adequate investment and maintenance, oil output has continued to generally decline, hitting its **lowest level in decades**. However, exports increased by some **12 percent** in 2023, due in part to an easing of U.S. sanctions on the country's oil and gas sector.

*Turbulent economy*. Venezuela's gross domestic product (GDP) shrank by **roughly three-quarters** [PDF] between 2014 and 2021. However, the economy **grew by 5 percent** in 2023, and the government forecasts it will reach 8 percent in 2024.

*Soaring debt*. Venezuela has an estimated debt burden of **$150 billion or higher**.

*Hyperinflation*. Annual inflation skyrocketed to just over 130,000 percent in 2018, and though it has since slowed, it remained at **190 percent** in 2023, according to the central bank.

**Venezuela's Economy Is Growing Again After Steep Decline**
Annual percent change of real gross domestic product (GDP)



Source: International Monetary Fund.

COUNCIL ON FOREIGN RELATIONS

*Growing autocracy*. Over the last decade, President Nicolás Maduro and his allies have **violated basic tenets of democracy** to maintain power. This includes restricting internet access and arbitrarily prosecuting and detaining political opponents and critics.

Introduction

What is a petrostate?

What's behind the petrostate paradigm?

How does Venezuela fit the category?

How did Venezuela get here?

What has been the impact of U.S. sanctions?

Is there a path away from the oil curse?

Recommended Resources

Document title: Venezuela: The Rise and Fall of a Petrostate | Council on Foreign Relations
Capture URL: https://www.cfr.org/backgrounder/venezuela-crisis
Capture timestamp (UTC): Fri, 14 Feb 2025 21:21:27 GMT

ER1242

Introduction

What is a petrostate?

What's behind the petrostate paradigm?

How does Venezuela fit the category?

How did Venezuela get here?

What has been the impact of U.S. sanctions?

Is there a path away from the oil curse?

Recommended Resources

power. This includes restricting internet access and arbitrarily prosecuting and detaining political opponents and critics.

These issues—coupled with international sanctions and the ongoing repercussions of the COVID-19 pandemic—have fueled a devastating humanitarian crisis, with severe shortages of basic goods such as food, drinking water, gasoline, and medical supplies. According to a November 2022 survey, 50 percent of Venezuela's 28 million residents live in poverty, though that is down from 65 percent the year before.

Since 2014, nearly eight million Venezuelan refugees have fled to neighboring countries and beyond, where some governments have granted them temporary residency. Venezuela's Ministry of Foreign Affairs says that more than three hundred thousand Venezuelan migrants have returned home since September 2020.

### The Exodus From Venezuela

Estimated refugees and migrants in 2024 or the most recent year available



*Source: Regional Inter-Agency Coordination Platform for Refugees and Migrants From Venezuela (R4V).*

COUNCIL₀ₙ

Document title: Venezuela: The Rise and Fall of a Petrostate | Council on Foreign Relations
Capture URL: https://www.cfr.org/backgrounder/venezuela-crisis
Capture timestamp (UTC): Fri, 14 Feb 2025 21:21:27 GMT

**ER1243**

|  | Chile | Argentina |  |
|---|---|---|---|
|  | 533K | 164K | 40K |

Source: Regional Inter-Agency Coordination Platform for Refugees and Migrants From Venezuela (R4V).

COUNCIL ON
FOREIGN
RELATIONS

Introduction

What is a petrostate?

What's behind the petrostate
paradigm?

How does Venezuela fit the
category?

How did Venezuela get here?

What has been the impact of
U.S. sanctions?

Is there a path away from the
oil curse?

Recommended Resources

## How did Venezuela get here?

A number of economic and political milestones mark Venezuela's
path as a petrostate.

*Discovering oil.* In 1922, Royal Dutch Shell geologists at La Rosa, a
field in the Maracaibo Basin, struck oil, which blew out at what was
then an extraordinary rate of one hundred thousand barrels per
day. In a matter of years, more than one hundred foreign
companies were producing oil, backed by dictator General Juan
Vicente Gómez (1908–1935). Annual production exploded during
the 1920s [PDF], from just over a million barrels to 137 million,
making Venezuela second only to the United States in total output
by 1929. By the time Gómez died in 1935, Dutch disease had settled
in: the Venezuelan bolívar had ballooned, and oil shoved aside
other sectors to account for over 90 percent of total exports.

*Reclaiming oil rents.* By the 1930s, just three foreign companies—
Gulf, Royal Dutch Shell, and Standard Oil—controlled 98 percent
of the Venezuelan oil market. Gómez's successors sought to reform
the oil sector to funnel funds into government coffers. The
Hydrocarbons Law of 1943 was the first step in that direction,
requiring foreign companies to give half of their oil profits to the
state. Within five years, the government's income had increased
sixfold.

*Punto Fijo pact.* In 1958, after a succession of military dictatorships,
Venezuela elected its first stable democratic government. That
year, Venezuela's three major political parties signed the Punto Fijo
pact, which guaranteed that state jobs and, notably, oil rents would
be parceled out to the three parties in proportion to voting results.
While the pact sought to guard against dictatorship and usher in
democratic stability, it ensured that oil profits would be
concentrated in the state.

Document title: Venezuela: The Rise and Fall of a Petrostate | Council on Foreign Relations
Capture URL: https://www.cfr.org/backgrounder/venezuela-crisis
Capture timestamp (UTC): Fri, 14 Feb 2025 21:21:27 GMT

ER1244

Introduction

What is a petrostate?

What's behind the petrostate
paradigm?

How does Venezuela fit the
category?

How did Venezuela get here?

What has been the impact of
U.S. sanctions?

Is there a path away from the
oil curse?

Recommended Resources

While the pact sought to guard against dictatorship and usher in democratic stability, it ensured that oil profits would be concentrated in the state.

*OPEC.* Venezuela joined Iran, Iraq, Kuwait, and Saudi Arabia as a founding member of the Organization of the Petroleum Exporting Countries (OPEC) in 1960. Through the group, which would later include Qatar, Indonesia, Libya, the United Arab Emirates, Algeria, Nigeria, Ecuador, Gabon, Angola, Equatorial Guinea, and the Republic of Congo, the world's largest producers coordinated prices and gave states more control over their national industries. That same year, Venezuela established its first state oil company, the Venezuelan Petroleum Corporation, and increased oil companies' income tax to 65 percent of profits.

*The 1970s boom.* In 1973, a five-month OPEC embargo on countries backing Israel in the Yom Kippur War quadrupled oil prices and made Venezuela the country with the highest per-capita income in Latin America. Over two years, the windfall added $10 billion to state coffers, giving way to rampant graft and mismanagement. Analysts estimate that as much as $100 billion was embezzled between 1972 and 1997 alone.

*PDVSA.* In 1976, amid the oil boom, President Carlos Andrés Pérez nationalized the oil industry, creating state-owned Petróleos de Venezuela, S.A. (PDVSA) to oversee all exploring, producing, refining, and exporting of oil. Pérez allowed PDVSA to partner with foreign oil companies as long as it held 60 percent equity in joint ventures and, critically, structured the company to run as a business with minimal government regulation.

*The 1980s oil glut.* As global oil prices plummeted in the 1980s, Venezuela's economy contracted and inflation soared; at the same time, it accrued massive foreign debt by purchasing foreign refineries, such as Citgo in the United States. In 1989, Pérez—reelected months earlier—launched a fiscal austerity package as part of a financial bailout by the International Monetary Fund. The measures provoked deadly riots. In 1992, Hugo Chávez, a military officer, launched a failed coup and rose to national fame.



Document title: Venezuela: The Rise and Fall of a Petrostate | Council on Foreign Relations
Capture URL: https://www.cfr.org/backgrounder/venezuela-crisis
Capture timestamp (UTC): Fri, 14 Feb 2025 21:21:27 GMT

**ER1245**



*Timeline*

# Venezuela's Chavez Era

*1958–2013*

View Timeline

*Chávez's Bolivarian revolution.* Chávez was elected president in 1998 on a socialist platform, pledging to use Venezuela's vast oil wealth to reduce poverty and inequality. While his costly "Bolivarian missions" expanded social services and reduced poverty by some 20 percent, he also took several steps that precipitated a long and steady decline in the country's oil production, which peaked in the late 1990s and early 2000s. His decision to fire thousands of experienced PDVSA workers who had taken part in an industry strike in 2002–2003 gutted the company of important technical expertise. Beginning in 2005, Chávez provided subsidized oil to several countries in the region, including Cuba, through an alliance known as Petrocaribe. Over the course of Chávez's presidency, which lasted until 2013, strategic petroleum reserves dwindled and government debt more than doubled [PDF].

Chávez also harnessed his popularity among the working class to expand the powers of the presidency and edged the country toward authoritarianism: he ended term limits, effectively took control of the Supreme Court, harassed the press and closed independent outlets, and nationalized hundreds of private businesses and foreign-owned assets, such as oil projects run by ExxonMobil and ConocoPhillips. The reforms paved the way for Maduro to establish a dictatorship years after Chávez's death.

*Descent into dictatorship.* In mid-2014, global oil prices tumbled and Venezuela's economy went into free fall. As unrest brewed, Maduro consolidated power through political repression, censorship, and electoral manipulation. In 2018, he secured reelection in a race widely condemned as unfair and undemocratic. Nearly sixty

Introduction

What is a petrostate?

What's behind the petrostate paradigm?

How does Venezuela fit the category?

How did Venezuela get here?

What has been the impact of U.S. sanctions?

Is there a path away from the oil curse?

Recommended Resources

Venezuela's economy went into free fall. As unrest brewed, Maduro consolidated power through political repression, censorship, and electoral manipulation. In 2018, he secured reelection in a race widely condemned as unfair and undemocratic. Nearly sixty countries, including the United States, subsequently recognized opposition figure Juan Guaidó, head of the National Assembly, as Venezuela's interim leader.

**Venezuela's Oil Output Has Been Dropping for Years**

Crude oil production (barrels per day)



Source: Organization of the Petroleum Exporting Countries.

COUNCIL on FOREIGN RELATIONS

## What has been the impact of U.S. sanctions?

For almost two decades, Washington has imposed sweeping sanctions against Caracas, the most significant of which have blocked oil imports from PDVSA and prevented the government from accessing the U.S. financial system. Still, Venezuela has retained oil-trading partners, and analysts say that support from China, Cuba, Iran, Russia, and Turkey has helped keep the Maduro regime afloat.

In January 2021, Maduro and his allies took leadership of what was the last opposition-controlled power center in the government, the National Assembly, after claiming victory in legislative elections. The opposition, including Guaidó, boycotted the vote, alleging that it was fraudulent, a charge reaffirmed by the Joe Biden administration and other foreign governments and international bodies, including Canada, the European Union, and the Organization of American States. However, regional elections that November further cemented Maduro's power and saw the fractured opposition win only three of twenty-three available governorships. After years of waning support, the opposition voted to remove Guaidó and dissolve his government in December 2022

Introduction

What is a petrostate?

What's behind the petrostate paradigm?

How does Venezuela fit the category?

How did Venezuela get here?

What has been the impact of U.S. sanctions?

Is there a path away from the oil curse?

Recommended Resources

November further cemented Maduro's power and saw the fractured opposition win only three of twenty-three available governorships. After years of waning support, the opposition voted to remove Guaidó and dissolve his government in December 2022.

Meanwhile, U.S.-Venezuela relations have begun seeing signs of a thaw. In November 2022, in part to help offset rising global energy prices due to the war in Ukraine, the United States permitted U.S. oil giant Chevron to resume limited operations in the country. In exchange, the Maduro government and the opposition agreed to continue dialogue following a yearlong stalemate. The following October, Caracas agreed to a roadmap for a free and fair presidential election in 2024.

Washington rewarded the move by further easing sanctions on Venezuela's oil and gas sector, allowing it to export oil and gas products for six months. However, after the Venezuelan government's failure to meet conditions for a fair vote and the revival of a centuries-old territorial dispute with Guyana over control of the oil-rich Essequibo region, Washington reimposed oil sanctions in April 2024. Relations have become further strained in the wake of Venezuela's July 2024 presidential election, which saw the Maduro government and opposition both claim victory, with the United States among the many countries voicing concerns.

## Is there a path away from the oil curse?

A country that discovers a resource after it has formed robust democratic institutions is usually better able to avoid the resource curse, analysts say. For example, strong institutions in Norway have helped the country enjoy steady economic growth since the 1960s, when vast oil reserves were discovered in the North Sea, Karl writes in her book. In 2024, officials project that the petroleum sector will account for just 20 percent of Norway's GDP. Strong democracies with an independent press and judiciary help curtail classic petrostate problems by holding government and energy companies to account.

If a country strikes oil or another resource before it develops its state infrastructure, the curse is much harder to avoid. However, there are remedial measures that low-income and developing countries can try, provided they are willing. For instance, a government's overarching objective should be to use the oil earnings in a responsible manner "to finance outlays on public

Introduction

What is a petrostate?

What's behind the petrostate paradigm?

How does Venezuela fit the category?

How did Venezuela get here?

What has been the impact of U.S. sanctions?

Is there a path away from the oil curse?

Recommended Resources

countries can try, provided they are willing. For instance, a government's overarching objective should be to use the oil earnings in a responsible manner "to finance outlays on public goods that serve as the platform for private investment and long-term growth," says Columbia University's Jeffrey Sachs, an expert on economic development. This can be done financially, with broad-based investing in international assets, or physically, by building infrastructure and educating workers. Transparency is essential in all of this, Sachs says.

Many countries with vast resource wealth, such as Norway and Saudi Arabia, have established sovereign wealth funds (SWF) to manage their investments. As of 2023, SWFs managed more than $11 trillion worth of assets, and some analysts predict that figure will grow to nearly $13 trillion by 2025.

Analysts anticipate that a global shift from fossil fuel energy to renewables such as solar and wind will force petrostates to diversify their economies. Nearly two hundred countries, including Venezuela, have joined the Paris Agreement, a binding treaty that requires states to make specific commitments to mitigate climate change.

Economic diversification will be an especially difficult climb for Venezuela given the scale of its economic and political collapse over the last decade. The country would likely need to revitalize its oil sector before it could cultivate and develop other important industries. But this would take enormous investment, which analysts say would be hard to come by given Venezuela's unstable political environment, trends in oil demand, and rising concerns about climate change.

### Recommended Resources

CFR's Center for Preventive Action tracks instability in Venezuela.

Bloomberg's Andreina Itriago Acosta and Nicolle Yapur lay out why recent U.S.-Venezuela talks can be seen as a step toward restoring Venezuela's democracy.

For *Foreign Affairs*, Jose Ignacio Hernández argues there is still a path to democracy in Venezuela despite Maduro's claim of victory.

Freedom House's 2023 Freedom in the World report ranks Venezuela as one of the least free countries in Latin America.

For *Americas Quarterly*, Luisa Palacios writes about how Venezuela's election has implications for the country's global energy transition and climate goals.

one of the least free countries in Latin America.

For *Americas Quarterly*, Luisa Palacios writes about how Venezuela's election has implications for the country's global energy transition and climate goals.

This 2023 report [PDF] by Abraham F. Lowenthal for the Wilson Center discusses why negotiations between the government and opposition are important for resolving Venezuela's prolonged political crisis.

———

 Creative Commons: Some rights reserved.

Venezuela    Latin America    Geopolitics of Energy

Oil and Petroleum Products

OPEC (Organization of the Petroleum Exporting Countries)    Economic Crises

Authoritarianism

———

William Rampe and Rocio Cara Labrador contributed to this report. Will Merrow helped create the graphics.

**For media inquiries on this topic, please reach out to communications@cfr.org.**

———

## More From Our Experts

### How Will the EU Elections Results Change Europe?

*by* Liana Fix
*June 10, 2024*

### Iran Attack Means an Even Tougher Balancing Act for the U.S. in the Middle East

*by* Steven A. Cook
*April 14, 2024*

### Iran Attacks on Israel Spur Escalation Concerns

*by* Ray Takeyh
*April 14, 2024*

———

## Top Stories on CFR

  

## More From Our Experts

**How Will the EU Elections Results Change Europe?**

*by* Liana Fix

*June 10, 2024*

**Iran Attack Means an Even Tougher Balancing Act for the U.S. in the Middle East**

*by* Steven A. Cook

*April 14, 2024*

**Iran Attacks on Israel Spur Escalation Concerns**

*by* Ray Takeyh

*April 14, 2024*

## Top Stories on CFR



**Securing Space: A Plan for U.S. Action**

*by* Nina M. Armagno, Jane Harman, Esther Brimmer *and* Anya Schmemann

*February 11, 2025*



**The Ishiba-Trump Era**

*by* Sheila A. Smith

*February 10, 2025*



**How Polarization Undermines Democracy in South Korea**

*with* Yul Sohn and Won-Taek Kang

*via Council of Councils*
*February 6, 2025*

COUNCIL on
FOREIGN
RELATIONS

About

Support

Membership

Member Programs

For Media

Careers

Contact

Newsletters

©2025 Council on Foreign Relations. All rights reserved. **Privacy Policy** and **Terms of Use**.

    

# EXHIBIT 28

ER1252

# MISSOURI INDEPENDENT

CANNABIS   CRIMINAL JUSTICE   ELECTIONS   ENERGY + ENVIRONMENT   HEALTH CARE   EDUCATION

DC BUREAU   ELECTION 2024   IMMIGRATION

# Trump promises mass deportations of undocumented people. How would that work?

BY: **ARIANA FIGUEROA** - AUGUST 23, 2024   2:17 PM





📷 A person holds a sign that reads "Mass Deportation Now" on the third day of the Republican National Convention at the Fiserv Forum on July 17, 2024 in Milwaukee, Wisconsin (Leon Neal/Getty Images).

WASHINGTON — "Mass deportation now!" is a catchphrase for the Trump presidential campaign, as the Republican nominee proposes a crackdown on immigration that would oust thousands of undocumented people.

Often citing a deportation operation enacted by former President Dwight Eisenhower in the 1950s, former President Donald Trump has repeatedly vowed in campaign rallies that he plans to not only go back to the tough immigration policies of his first term in office, but expand them greatly.

"We're going to have the largest deportation," Trump said at a June campaign rally in Racine, Wisconsin. "We have no choice."

The crowd responded chanting: "Send them back, Send them back, Send them back."

the 1790s, former President Donald Trump has repeatedly vowed in campaign rallies that he would enforce and use them, as well as to tighten immigration policies already in place and expand them greatly.

"We're going to have the largest deportation," Trump said at a June campaign rally in Racine, Wisconsin. "We have no choice."

The crowd responded with a chant: "Send them back. Send them back. Send them back."

Mass deportation would be a broad, multipronged effort under Trump's vision. The plan includes invoking an 18th-century law; reshuffling law enforcement at federal agencies; transferring funds within programs in the Department of Homeland Security; and forcing greater enforcement of immigration laws.

But whether a Trump administration could accomplish a mass deportation is doubtful. Historians, lawyers and immigration and economic experts interviewed by States Newsroom said removal of the more than 11 million undocumented people in the country would require enormous amounts of resources and overcoming legal hurdles. The effects on the U.S. economic and social fabric would be profound, they said.

"I don't think it will happen," Donald Kerwin, a senior researcher on migration at the University of Notre Dame, said of mass deportations. "But what it can do is it can make the lives of the undocumented and their families miserable."

## GOP support

Trump repeatedly has pledged mass deportation.

At the Republican National Convention in Milwaukee in July, delegates waved "Mass Deportation Now" signs as Trump said "to keep our families safe, the Republican platform promises to launch the largest deportation operation in the history of our country."

In a March rally in Dayton, Ohio, Trump said some undocumented immigrants were not "people."

"I don't know if you call them people," Trump said. "In some cases they're not people, in my opinion, but I'm not allowed to say that because the radical left says that's a terrible thing to say."

Trump's campaign message comes as the Biden administration has dealt with the largest number of migrant encounters at the southern border in 20 years and immigration remains a top issue for voters.

However, since President Joe Biden signed a recent executive order, border crossings have fallen to their lowest level since he took office.

The GOP and Trump have now set their sights on the Democratic presidential nominee, Vice President Kamala Harris.

House Republicans already led a resolution disapproving of Harris' handling of the southern border and labeling her the "Border Czar," a title she was given by the media. Her campaign has argued she never had such an official title and her involvement with immigration has been focused on root causes of migration in Central and South America, rather than domestic immigration.

Even though Biden is no longer in the race, and has undertaken his own crackdown on immigration, he warned in mid-June, during an announcement of protections offered for the spouses of long-term undocumented people, that Trump would undertake mass deportations.

"Now he's proposing to rip spouses and children from their families and homes and communities and place them in detention camps," Biden said of Trump. "He's actually

immigration, he warned in mid-June, during an announcement of protections offered for the spouses of long-term undocumented people, that Trump would undertake mass deportations.

"Now he's proposing to rip spouses and children from their families and homes and communities and place them in detention camps," Biden said of Trump. "He's actually saying these things out loud, and it's outrageous."

## How does the public feel?

Polls have found Americans are split on the idea of mass deportations but Republicans are more supportive.

A recent CBS News poll that found nearly 6 in 10 voters favor a new government agency that would deport all undocumented immigrants. Of those voters, one-third were Democrats and 9 in 10 were Republicans.

The Trump campaign did not respond to multiple requests from States Newsroom for comment on the specifics of how a second Trump administration would plan to carry out mass deportations.

The massive deportation campaign that Trump often cites in his campaign rallies was conducted under the Eisenhower administration in the summer of 1954, with a pejorative, racist name attached to it.

"Following the Eisenhower model, we will carry out the largest domestic deportation operation in American history," Trump said at a September rally last year in Ankeny, Iowa.

But what the Trump campaign is proposing is not an Eisenhower-style crackdown, said Michael Clemens, a professor in the Department of Economics at George Mason University.

"That policy was instituted hand-in-hand with a crucial other arm of the policy," he said — which was that lawful work pathways for Mexicans to the U.S. were nearly tripled at the same time as the mass deportations.

"We've heard zero about substantial increases in lawful migration pathways from the people who are now talking about an Eisenhower-style crackdown," Clemens said. "What they're proposing is not an Eisenhower-style crackdown — it is something that the Eisenhower administration understood would not work and therefore it did not do."

Additionally, the Eisenhower program was not as successful as thought.

The Einshower administration claimed that it deported 1 million people back to Mexico, but the real number is a couple hundred thousand, said Eladio Bobadilla, an assistant history professor at the University of Pittsburgh.

"It wasn't really about getting rid of immigrants in any real sense," he said. "It was a way to sell to the American public that the problem had been solved."

While one agency of the Eisenhower administration was deporting Mexicans — and often U.S. citizens of Mexican descent — another agency was sometimes bringing those same workers back in through the so-called Bracero program, which was created through an executive order by President Franklin Delano Roosevelt in 1942.

States and local governments also worked in tandem with the 1950s deportation operation, something unlikely to happen under a second Trump administration, said David Bier, the director of immigration studies at the Cato Institute, a libertarian think tank.

"You also had the cooperation of the employers in those areas, because the Eisenhower

States and local governments also worked in tandem with the 1950s deportation operation, something unlikely to happen under a second Trump administration, said David Bier, the director of immigration studies at the Cato Institute, a libertarian think tank.

"You also had the cooperation of the employers in those areas, because the Eisenhower administration was totally explicit that all the people that we're deporting, you're gonna get workers back legally through the Bracero guest worker program," said Bier.

## Obama deportation

The most recent mass deportation campaign came during the Obama administration, said Clemens, who studies the economic effects of migration.

That was the Secure Communities program, which was a set of agreements between local law enforcement and federal level immigration enforcement officials such as Immigration and Customs Enforcement and Customs and Border Protection. Localities shared information about noncitizens who were encountered by local law enforcement, such as at traffic stops.

"Our most recent experience with mass deportation at the federal level, mostly under the Obama administration, directly harmed U.S. workers," Clemens said.

The program was slowly rolled out, from 2008 to 2014, but over those six years nearly half a million workers were deported.

For every 10 workers who were deported, one U.S. job was eliminated, Clemens said.

"The net effect is that Secure Communities cost jobs for Americans across the country," he said.

In a recent paper for the Center for Migration Studies of New York, Kerwin and Robert Warren found that mass deportations would financially harm U.S. families, especially the more than 3 million mixed-status families.

"The household income in those households plunges, and drops all of these families, or a high percentage of them, into poverty," Kerwin said.

Of those mixed-status families, meaning some family members have different citizenship or immigration status, about 6.6 million members are U.S. citizens, said Warren, a senior visiting fellow at the center, a think tank that studies domestic and international migration patterns.

"So you say, 'We took out one undocumented immigrant,' but you damaged a family of U.S. citizens," Warren said.

## Expanded executive authority

The early architects of the Trump administration's immigration policies such as Steven Miller and Ken Cuccinelli have laid out a second term that would expand the use of executive authority to carry out mass deportations and curtail legal immigration.

Such policies include limiting humanitarian visas and parole and moving to end Temporary Protected Status, known as TPS, said ManoLasya Perepa, policy and practice counsel with the American Immigration Lawyers Association.

Like the first Trump administration, Perepa anticipates that there will be a slew of lawsuits to file injunctions, such as preventing the ending of TPS.

The Trump administration dealt with a flurry of lawsuits over an order to end the Deferred Action for Childhood Arrivals program, which protects a little over half a million

Document title: Trump promises mass deportations of undocumented people. How would that work? • Missouri Independent
Capture URL: https://missouriindependent.com/2024/08/23/trump-promises-mass-deportations-of-undocumented-people-how-would-that-work/
Capture timestamp (UTC): Sat, 15 Feb 2025 00:44:36 GMT

**ER1256**

Like the first Trump administration, Perepa anticipates that there will be a slew of lawsuits to file injunctions, such as preventing the ending of TPS.

The Trump administration dealt with a flurry of lawsuits over an order to end the Deferred Action for Childhood Arrivals program, which protects a little over half a million undocumented people brought into the United States as children without authorization.

The Supreme Court eventually blocked it and kept the program, but DACA is still at risk of being deemed unlawful in a separate suit that is likely to head again to the high court.

"I think anybody with a status that keeps getting renewed is really, really at risk," she said. "All you're doing is driving people into the shadows."

With the courts likely to get involved, Trump has said he wants to go back to his policy that expanded expedited removals, which means if an undocumented person is in the country for two years without a court hearing or any type of authorization, they can be deported without a hearing before a judge.

That type of removal is limited to 100 miles from a border zone, but the Trump administration expanded that to the rest of the country.

"The reality is, if the (Trump) administration increases interior enforcement, technically, all of these people could be detained," Perepa said.

The Migration Policy Institute, a think tank that researches migration, has estimated that "the expansion of expedited removal to the U.S. interior could apply to as many as 288,000 people."

Miller, a senior White House adviser during the Trump administration, said on the right-wing podcast "The Charlie Kirk Show" in November 2023 that the U.S. military would need to be involved for those mass deportations to Mexico, which is "why Trump has talked about invoking the Alien Enemies Act."

"Because of the logistical challenges involved in removing...you would need to build an extremely large holding area for illegal immigrants that at any given points in time, you know, could hold upwards of 50, 60, 70,000 illegal aliens while you are waiting to send them someplace, somewhere that would be willing to accept them," Miller said.

The Alien and Sedition Act, an 18th-century wartime law, allows the executive branch to deport any noncitizen from a country that the U.S. is at war with and deport any noncitizen deemed dangerous.

The law can also be used for extraordinary measures that are not deportation, including the last time it was invoked after the bombing of Pearl Harbor. It led to the internment camps of more than 120,000 people of Japanese descent, more than half of whom were U.S. citizens, as well as German and Italian nationals, during World War II.

Trump has vowed to use a title within the Alien and Sedition Acts to target drug dealers, gang members and cartel members.

"I will invoke the Alien Enemy Act, to remove all known or suspected gang members from the United States ending the scourge of illegal alien gang violence once and for all," Trump said at a campaign stop in Reno, Nevada.

Cuccinelli, a former attorney general of Virginia and acting director of U.S. Citizenship and Immigration Services during the Trump administration, wrote the policy section for the Department of Homeland Security for the Heritage Foundation's Project 2025 – a conservative "battle plan" for the next Republican president.

Cuccinelli, a former attorney general of Virginia and acting director of U.S. Citizenship and Immigration Services during the Trump administration, wrote the policy section for the Department of Homeland Security for the Heritage Foundation's Project 2025 – a conservative "battle plan" for the next Republican president.

In that section, he laid out recommendations for an incoming Republican administration to curtail the use of temporary work visas for workers in agriculture, construction and hospitality; prevent U.S. citizens from qualifying for federal housing subsidies if they live with someone who is a noncitizen; and require driver's license information to be shared with federal authorities; among other policies.

The Heritage Foundation did not respond to a request for comment.

## Punishing states

In a lengthy interview Trump conducted with Time magazine, he said he would withhold federal funding from states and local governments that don't cooperate in deportation proceedings.

That could violate the 10th Amendment in the Constitution, said Mae Ngai, a historian and Asian American studies professor at Columbia University.

"States and municipalities cannot be coerced to enforcing federal laws," she said, adding that immigration law is a federal matter. "You cannot force the police department or sheriffs ... to pick up immigrants."

State and local cooperation in detaining immigrants could be a challenge, said Julia Gelatt, associate director of the U.S. Immigration Policy Program at the Migration Policy Institute.

Legal challenges make it costly for local law enforcement to detain people solely to wait for immigration proceedings, and many local governments have decided not to hold people beyond their criminal detentions.

## Funding issues

Deploying the military for immigration enforcement and constructing detention camps would also come with a large price tag.

Those large expenses would have to be approved by Congress, which may not be a willing partner.

There are ways to get around the legislative branch, such as reshuffling money within the Department of Homeland Security, but they come with downsides, Bier of the Cato Institute said.

"That's politically risky because if there's any kind of natural disaster, and you're using money to deport people that can have some big blowbacks in the affected areas," he said.

The Trump administration did this in 2019, when it transferred $271 million from the Federal Emergency Management Association to Immigration and Customs Enforcement. It also transferred $23.8 million from the Transportation Security Administration to ICE.

Trump could also reassign law enforcement agencies to tackle immigration enforcement, Bier said, but he would face pushback from affected agencies that have their own priorities.

"They're not going to want to cooperate with just giving up on everything they're trying to do," Bier said.

Those large expenses would have to be approved by Congress, which may not be a willing partner.

There are ways to get around the legislative branch, such as reshuffling money within the Department of Homeland Security, but they come with downsides, Bier of the Cato Institute said.

"That's politically risky because if there's any kind of natural disaster, and you're using money to deport people that can have some big blowbacks in the affected areas," he said.

The Trump administration did this in 2019, when it transferred $271 million from the Federal Emergency Management Association to Immigration and Customs Enforcement. It also transferred $23.8 million from the Transportation Security Administration to ICE.

Trump could also reassign law enforcement agencies to tackle immigration enforcement, Bier said, but he would face pushback from affected agencies that have their own priorities.

"They're not going to want to cooperate with just giving up on everything they're trying to do," Bier said.

 REPUBLISH

*Our stories may be republished online or in print under Creative Commons license CC BY-NC-ND 4.0. We ask that you edit only for style or to shorten, provide proper attribution and link to our website. AP and Getty images may not be republished. Please see our republishing guidelines for use of any other photos and graphics.*



### ARIANA FIGUEROA 

Ariana covers the nation's capital for States Newsroom. Her areas of coverage include politics and policy, lobbying, elections and campaign finance.

Missouri Independent is part of States Newsroom, the nation's largest state-focused nonprofit news organization.

**MORE FROM AUTHOR**

## MORE FROM OUR NEWSROOM



**Abortion foes strategize to get Trump to ban some abortions while keeping his pledge**
BY SOFIA RESNICK
November 22, 2024



**Where do Harris and Trump stand on 10 major policy issues?**
BY ARIANA FIGUEROA
November 1, 2024



**Both Harris and Trump campaigns display confidence as Election Day approaches**
BY SHAUNEEN MIRANDA
November 1, 2024

## WE SHOW YOU THE STATE

**Democracy Toolkit //** Register to vote | Find your polling place | Find your legislators | Election results and statistics



© Missouri Independent, 2025
v.1.74.4

**ABOUT US**

The Missouri Independent is a nonprofit, nonpartisan news organization dedicated to relentless investigative journalism and daily reporting that sheds light on state government and its impact on the lives of Missourians. This service is free to readers and other news outlets.

We're part of States Newsroom, the nation's largest state-focused nonprofit news organization.



Our stories may be republished online or in print under Creative Commons license CC BY-NC-ND 4.0. We ask that you edit only for style or to shorten, provide proper attribution and link to our website. (See full republishing guidelines.)

DEIJ Policy | Ethics Policy | Privacy Policy

## STATES NEWSROOM                    FAIR. FEARLESS. FREE.

# EXHIBIT
# 29

ER1260

GIVE THE TIMES



# How the False Story of a Gang 'Takeover' in Colorado Reached Trump

The claim that Aurora, Colo., has been overrun by gun-toting migrants stemmed from the city's fight with a landlord. Now it is central to one of former President Donald J. Trump's anti-immigrant campaign promises.

# 'Takeover' in Colorado Reached Trump

The claim that Aurora, Colo., has been overrun by gun-toting migrants stemmed from the city's fight with a landlord. Now it is central to one of former President Donald J. Trump's anti-immigrant campaign promises.

Dilapidated apartment complexes in Aurora, Colo., have become a cause célèbre for right-wing media and former President Donald J. Trump, after the landlord claimed a Venezuelan street gang had taken over.

▷   Listen to this article · 11:14 min   Learn more          🎁 Share full article   ⤴   🔖

By Jonathan Weisman   Photographs by Michael Ciaglo
Reporting from Aurora and Denver, Colo.

Sept. 15, 2024

Mike Coffman, the conservative Republican mayor of Aurora, Colo., said he was at home on Tuesday night watching the presidential debate and bracing for the worst.

And then there it was again, before tens of millions of viewers: former President Donald J. Trump, describing Mr. Coffman's Aurora, a sprawling suburb just east of Denver, as a city under siege, terrorized by migrants.

"They're taking over buildings," Mr. Trump said. "They're going in violently."

Mr. Coffman was contrite on Thursday as he told that story. After all, he had helped create the tall tale now sullying his city's reputation.

Before Springfield, Ohio, before the misinformation about devoured pets and the memes of Mr. Trump rescuing ducks and kittens, there was Aurora, pop. 404,219, supposedly overrun by the violent Venezuelan street gang, Tren de Aragua. Those claims became a cause célèbre for the right-wing media, and ultimately a key focus of Mr. Trump's anti-immigration repertoire as he escalated his attacks on immigrants as part of his campaign's effort to capitalize on voter concerns about the southern border crisis.

Document title: How the False Story of a Gang 'Takeover' in Colorado Reached Trump - The New York Times
Capture URL: https://www.nytimes.com/2024/09/15/us/politics/trump-aurora-colorado-immigration.html
Capture timestamp (UTC): Fri, 21 Feb 2025 01:26:39 GMT

**ER1262**

U.S. Immigration and Customs Enforcement (ICE) from the removal of people rights of Venezuelan and transportal in Florida

Caught in the middle are a number of migrants, living in dilapidated apartments that Aurora officials now call squalor, amid "criminal elements," not widespread gang activity, and unable to find or afford better. The buildings are nonetheless at the center of a national firestorm.



"Because of one or two Venezuelans who wanted to do something wrong, we are now all accused of something," said Yorman Fernandez on Friday. Mr. Fernandez, 29, lives in one of the troubled complexes.

"Because of one or two Venezuelans who wanted to do something wrong, we are now all accused of something," Yorman Fernandez, a 29-year-old Venezuelan who lives at one of the properties, said on Friday, between jobs painting and roofing. "We are not all the same."

And Mr. Coffman has had to reverse his own rhetoric as he watches Mr. Trump, the presidential candidate he still said he would reluctantly vote for in November, continue to stoke fear in his community. Meantime, the mayor has started a crusade to try to undo the damage Mr. Trump is inflicting.

"I mean, I agree with him on a lot of policies as it pertains to immigration," Mr. Coffman said in City Hall on Thursday. "But I'm also the mayor of the City of Aurora, and my job is not only to make sure that the city is safe, but also to protect the image of the city.

Document title: How the False Story of a Gang 'Takeover' in Colorado Reached Trump - The New York Times
Capture URL: https://www.nytimes.com/2024/09/15/us/politics/trump-aurora-colorado-immigration.html
Capture timestamp (UTC): Fri, 21 Feb 2025 01:26:39 GMT

**ER1263**

also the mayor of the City of Aurora, and my job is not only to make sure that the city is safe, but also to protect the image of the city. This narrative out there is exaggerated, and it's our responsibility to correct it."

## How the claims about Aurora began



Mike Coffman, the mayor of Aurora, initially helped spread the misleading claims that Venezuelan gangs had taken over parts of the city. He has since backtracked, trying to rehabilitate Aurora's image.

As far back as May 2023, Aurora officials had been trying to force an out-of-state landlord to fix up three blighted apartment complexes in the downtrodden East Colfax Corridor, which connects the cities of Denver and Aurora.

In July 2024, the landlord, CBZ Management, which says it is based



Document title: How the False Story of a Gang 'Takeover' in Colorado Reached Trump - The New York Times
Capture URL: https://www.nytimes.com/2024/09/15/us/politics/trump-aurora-colorado-immigration.html
Capture timestamp (UTC): Fri, 21 Feb 2025 01:26:39 GMT

U.S. Immi...

complexes in the downtrodden East Colfax Corridor, which connects the cities of Denver and Aurora.

In July 2024, the landlord, CBZ Management, which says it is based in Colorado and Brooklyn, offered a new argument for why it couldn't repair the buildings: Venezuelan gangs had taken over, and the property managers had been forced to flee.

Mr. Coffman and a Republican City Council member, Danielle Jurinsky, quickly repeated CBZ's unverified claim in interviews.

"We have areas in our city, unfortunately, that have been taken, and we have to take back," Mr. Coffman told a local talk radio host on July 31.

On Aug. 5, a public relations agent, Sara Lattman, hired by CBZ, pitched a "tip" to the local Fox television network affiliate in Denver.

"An apartment building and its owners in Aurora, Colorado have become the most recent victims of the Venezuelan Gang Tren de Aragua's violence, which has taken over several communities in the Denver area," she wrote on Fox 31's tip line, according to an email obtained by The Times. "The residents and building owners of these properties have been left in a state of fear and chaos."

But it was a viral video that began circulating in late August that shows armed men in the hallway of one of the complexes that ultimately caught Mr. Trump's attention. The incident was reported as a connection to gang violence, particularly the Venezuelan gang Tren de Aragua, though documentation was scarce.

On Tuesday, the Aurora Police Department announced it had arrested 10 members of Tren de Aragua on charges of "felony menacing," attempted first-degree murder, assault, child abuse, domestic abuse and others. But Todd Chamberlain, Aurora's new police chief, could not say whether any of those men were among those seen in the video, or whether any in the video had actually done anything criminal.

Still, the clip, taken by a resident and played on endless loops on

those seen in the video, or whether any in the video had actually done anything criminal.

Still, the clip, taken by a resident and played on endless loops on Fox News Channel and the website of The New York Post, metastasized into grandiose stories of whole buildings, whole sections of town and, in Mr. Trump's telling, the whole city of Aurora being taken over by migrants carrying weapons of war.

"And getting them out will be a bloody story," Mr. Trump said of Aurora at a rally in Mosinee, Wis., last Saturday, adding that it was "not going to be easy, but we'll do it."

Mr. Coffman and Ms. Jurinsky have both since backtracked.

"The overstated claims fueled by social media and through select news organizations are simply not true," they wrote in a joint statement released Wednesday that appeared aimed at pushing back on Mr. Trump's debate comments.

### A false story, fueled by real problems



Document title: How the False Story of a Gang 'Takeover' in Colorado Reached Trump - The New York Times
Capture URL: https://www.nytimes.com/2024/09/15/us/politics/trump-aurora-colorado-immigration.html
Capture timestamp (UTC): Fri, 21 Feb 2025 01:26:39 GMT

**ER1266**

Case 3:25-cv-01766-EMC    Document 37-29    Filed 02/21/25    Page 8 of 14



Star Lopez, left, and her husband Luis, who live in the complex where the viral video was filmed, spoke of roach infestations, long stretches without electricity or running water, a refrigerator that barely works and no landlord to communicate with or even pay rent to.

The claims about Aurora were spun out of real issues.

The Denver area has struggled to deal with an influx of about 40,000 migrants, many of whom had been sent inland by Gov. Greg Abbott of Texas. The soaring cost of housing, acute in Denver, had brought many of those new arrivals to Aurora looking for somewhere cheaper to live — right to those same ramshackle apartments the city was already fighting to get cleaned up.

On Thursday, one resident of the complex, Star Lopez, 29, was gingerly walking her three dogs through a tiny stretch of dirt and weeds — and piles of dog feces — between two of the buildings where the video was captured. Inside the nondescript three-story brick structures, flies swarmed. Most apartments had broken windows, no screens, and doors ajar with no functioning locks or even doorknobs.

Nadeen Ibrahim, organizing director for the nonprofit East Colfax Community Collective, a social service organization in the area, warned of bedbug infestations and rats.

But there were no armed men blocking passage or extorting rent or protection money, Ms. Lopez said, despite what conservative

Document title: How the False Story of a Gang 'Takeover' in Colorado Reached Trump - The New York Times
Capture URL: https://www.nytimes.com/2024/09/15/us/politics/trump-aurora-colorado-immigration.html
Capture timestamp (UTC): Fri, 21 Feb 2025 01:26:39 GMT

warned of bedbug infestations and rats.

But there were no armed men blocking passage or extorting rent or protection money, Ms. Lopez said, despite what conservative media has said. Most of the residents at this point are squatters.

"Oh, it's taken over, but it's taken over by everybody," Ms. Lopez said, freely admitting she hadn't paid rent since November, and adding that most of the neighbors hadn't either. "It's survival of the fittest."

Ms. Lopez is pregnant, hoping for a Christmas baby, she said. Her husband, Luis Lopez, 22, said he works in a warehouse and won't let his wife walk the dogs at night until he comes home from the late shift. It's too dangerous. They spoke of roach infestations, long stretches without electricity or running water, a refrigerator that barely works and no landlord to communicate with or even pay.

Nearby, an onlooker from Colorado Springs who declined to give his name gawked and took pictures. He was at the Department of Veterans Affairs hospital nearby and "thought I'd stop by," he said. "I was expecting to see vigilantes all over the place, people on the rooftops with machine guns."

## The effects



Document title: How the False Story of a Gang 'Takeover' in Colorado Reached Trump - The New York Times
Capture URL: https://www.nytimes.com/2024/09/15/us/politics/trump-aurora-colorado-immigration.html
Capture timestamp (UTC): Fri, 21 Feb 2025 01:26:39 GMT



The Fitzsimons Place apartment complex, run by CBZ Management, is one of three that Aurora officials had tried to force the company to fix up as far back as May 2023. The complex, which sits on 1568 Nome Street, is now closed, its windows and doors boarded up.

After the video of armed men went viral in August, Mr. Coffman recalled strapping on a bulletproof vest — "I looked like the Michelin Man" — to pay his first visit to the building where it was filmed. He saw nothing but frustrated renters pleading with him to intervene. When he next held a town-hall meeting with renters from the apartment complexes, he didn't bother with security.

But the story has taken on a life of its own. Mr. Trump placed Aurora front and center on Friday in his plans for mass deportations if elected.

"We're going to have the largest deportation in the history of our country," Mr. Trump said at a news conference at Trump National Golf Club in Rancho Palos Verdes, Calif. "And we're going to start with Springfield and Aurora."

There have already been real-world consequences to the fear-mongering, exaggerations and outright lies spreading on the internet and the campaign trail about the situation. Last month, the city shut down one of the buildings, Fitzsimons Place apartments, at the center of the controversy, emptying it of nearly 200 inhabitants — many, but not all, of them migrants and recent arrivals. City officials and police officers arrived at 7 a.m. Aug. 7, the first day of school, to announce that the residents of 1568 Nome Street had six days to clear out.

Document title: How the False Story of a Gang 'Takeover' in Colorado Reached Trump - The New York Times
Capture URL: https://www.nytimes.com/2024/09/15/us/politics/trump-aurora-colorado-immigration.html
Capture timestamp (UTC): Fri, 21 Feb 2025 01:26:39 GMT

Rehousing people has been a struggle.

Fear and negative publicity have pushed landlords to stop renting to Venezuelan migrants, said Crystal Murillo, a city councilwoman. Legal aid groups representing tenants and social service nonprofits struggling to house whole families say they are overwhelmed. YouTube personalities and TikTok stars prowl city slums. A white supremacist called into the City Council's public comment period on Monday evening, spewing hate against Venezuelans and Jews.



Legal aid groups representing tenants and social service nonprofits struggling to house whole families say they are overwhelmed.

"This doesn't compare to any crisis that we've ever experienced," said Emily Goodman, senior manager for housing assistance at the nonprofit East Colfax Community Collective, a social service organization in the area.

The mayor blames his initial statements on information from the Aurora police that was too credulous in repeating the property owner's excuses.

"The pattern of problems are with one — really, I'm going to be real blunt, I guess — out-of-state slumlord," he said.

Document title: How the False Story of a Gang 'Takeover' in Colorado Reached Trump - The New York Times
Capture URL: https://www.nytimes.com/2024/09/15/us/politics/trump-aurora-colorado-immigration.html
Capture timestamp (UTC): Fri, 21 Feb 2025 01:26:39 GMT

The city has now filed several civil and criminal actions against CBZ and the man officials identified as the landlord of the apartments, Zev Baumgarten.

Stan Garnett, Mr. Baumgarten's lawyer, insisted that Mr. Baumgarten had no ownership of the property and no management role and was merely a consultant for CBZ.

A lawyer for CBZ, Matthew C. Arentsen, said that his "clients believe that, at its core, this case is not about property mismanagement but about government failures."

Mr. Chamberlain, the police chief, said he believed that the situation at the properties was now under control. The department is shifting to supporting the Venezuelan community with youth programs and safety outreach — and trying to ensure that its law enforcement efforts do not target the entire migrant community.

"We cannot get myopic or get focused based upon a knee-jerk reaction to something that is very titillating or very out there in the public right now," he said.

ADVERTISEMENT

Across the street from one of the properties, Whispering Pines, three men sat on their front porch Thursday afternoon shouting at a reporter and a photographer not to believe the "fake news" about the place. Sure, there is crime and probably some gangs, they said, but in this neighborhood those had been there well before the Venezuelans arrived and will be there long after they depart. What they wouldn't do is give their names.

"I'm not messing with Donald Trump," one man said, shooing the reporter off the property.



reporter off the property.



City of Aurora code enforcement officers walking through an unlit hallway in one of the apartment buildings at the center of the national firestorm.

**Jonathan Weisman** is a politics writer, covering campaigns with an emphasis on economic and labor policy. He is based in Chicago. More about Jonathan Weisman

A version of this article appears in print on Sept. 16, 2024, Section A, Page 12 of the New York edition with the headline: The Real Consequences Of Trump's False Claims About Colorado's Gangs. Order Reprints | Today's Paper | Subscribe

See more on: Donald Trump, 2024 Elections: News, Polls and Analysis, Republican Party, U.S. Politics

Share full article

Trump's Latest Target: A Nancy Pelosi Achievement in San Francisco

Trump Targets a Growing List of Those He Sees as Disloyal

'The Eastern Gate' Is a Lean and Mean Spy Drama

Traveling Abroad? If You're Paying With Dollars, Your Trip Is on Sale.

Alexander Brothers Face More Lawsuits Accusing Them of Sexual Assault

Former N.F.L. Player Arrested for Protest Against MAGA Plaque

10 Ways to Turn Store-Bought Rotisserie Chicken Into a Healthy Dinner

A Leading Anti-Trump Voice Returns to Democrats' Top Think Tank

In Private Remarks on Russia, Rubio Tries to Reassure Europeans

A Lonely Holdout Where Republicans Still Resist Trump: Utah

Maher Knocks Trump's Gutting of the Federal Work Force

**Editors' Picks**

This City's Sewer System Is Full of Alligators, but It's Not New York

For These 20-Somethings, Trump 'Is Making It Sexy' to Be Republican

Inside the Oscar-Nominated Film That No Studio Will Touch

## The New York Times

**NEWS**
Home Page
U.S.
World
Politics
New York
Education
Sports
Business
Tech
Science
Weather
The Great Read
Obituaries
Headway
Visual Investigations
The Magazine

**ARTS**
Book Review
Best Sellers Book List
Dance
Movies
Music
Pop Culture
Television
Theater
Visual Arts

**LIFESTYLE**
Health
Well
Food
Restaurant Reviews
Love
Travel
Style
Fashion
Real Estate
T Magazine

**OPINION**
Today's Opinion
Columnists
Editorials
Guest Essays
Op-Docs
Letters
Sunday Opinion
Opinion Video
Opinion Audio

**MORE**
Audio
Games
Cooking
Wirecutter
The Athletic
Jobs
Video
Graphics
Trending
Live Events
Corrections
Reader Center
TimesMachine
The Learning Network
School of The NYT
inEducation

**ACCOUNT**
Subscribe
Manage My Account
Home Delivery
Gift Subscriptions

Group Subscriptions
Gift Articles
Email Newsletters

NYT Licensing
Replica Edition
Times Store

© 2025 The New York Times Company   NYTCo   Contact Us   Accessibility   Work with us   Advertise   T Brand Studio   Your Ad Choices   Privacy Policy   Terms of Service   Terms of Sale   Site Map   Help   Subscriptions

Your Privacy Choices   California Notices

Document title: How the False Story of a Gang 'Takeover' in Colorado Reached Trump - The New York Times
Capture URL: https://www.nytimes.com/2024/09/15/us/politics/trump-aurora-colorado-immigration.html
Capture timestamp (UTC): Fri, 21 Feb 2025 01:26:39 GMT

ER1273

# EXHIBIT 30

ER1274

≡  InSight Crime

About Us    Newsletter  Donate

Investigations    Countries    Criminal Economies    Criminal Dynamics    Public Policy    Criminal Profiles    🔍    EN  ES



News    Tren de Aragua

# What We Know About Tren de Aragua's US Presence

by *Venezuela Investigative Unit*    4 Oct 2024

  

Tren de Aragua's supposed expansion into the United States has received national media coverage and attention from the country's most prominent politicians, fueling questions about the extent of the group's presence and activities.

The criminal group took advantage of the large-scale migration of Venezuelans across South America to evolve from a prison gang into a transnational criminal empire, establishing its presence abroad from around 2018 onwards, especially in Colombia, Peru, and Chile.

> SEE ALSO:   *Three Stages in the Construction of the Tren de Aragua's Transnational Empire*

Ahead of the US presidential election in November, the issues of migration and crime have pushed Tren de Aragua to the forefront of political discussion, making it expedient for both Democrats and Republicans to take a tough stance against the organization.

The US Treasury sanctioned Venezuela's most significant criminal export as a transnational criminal organization in July, and Texas governor Greg Abbott recently designated it a terrorist organization.

US authorities have identified suspected members of Tren de Aragua across the country in recent months and made a number of arrests.

But the gang's reputation appears to have grown more quickly than its actual presence in the United States.

InSight Crime has been tracking the group for years. Here's what we know.

### Are They?

## Related Content



**Tren de Aragua, Venezuela's Most Dangerous Gang, Spotted in Chile**

*21 Oct 2021*



**Venezuela's Tren de Aragua Gang Muscling into Colombia Border Area**

*10 Jul 2019*



Manage consent

presence in the United States.

InSight Crime has been tracking the group for years. Here's what we know.

## Who Are They?

The lack of any major identifying characteristics among Tren de Aragua
members makes it difficult to know when a criminal is truly part of the
organization.

Certain US law enforcement authorities have put out warnings about Tren de
Aragua-related tattoos, such as rifles or Michael Jordan logos, and have even
arrested suspects based on their tattoos. While a Chilean regional prosecutor
found that multiple members of one Tren de Aragua-linked cell there bore the
same tattoo, members do not consistently identify themselves using specific
tattoos or adopt tattoos as part of an initiation process.

The lack of information sharing between US and Venezuelan authorities
means law enforcement officials cannot easily discover if an individual is a
former prisoner or suspected Tren de Aragua member, nor will such
information be flagged for any individuals crossing the border into the country.

"As a federal agent, we have no way of vetting these people other than the
honor system," US Border Patrol Council Vice President Chris Cabrera told
reporters at a press conference in September. "If they tell us their name, we
can't check against Venezuela's database."

Additionally, the infamy Tren de Aragua has developed has led to imposters
adopting its name as a method of instilling fear and ensuring compliance from
their victims, further complicating efforts to establish whether a suspect is a
genuine member or not.

## Where Are They?

Although authorities' methods of identifying Tren de Aragua members or their
links to the wider organization remain unclear, reports of alleged Tren de
Aragua activity have arisen in at least ten US states. Cases in Colorado, Texas,
and New York have received prominent attention, alongside others in Illinois,
Florida, Louisiana, Indiana, Georgia, Virginia, and New Jersey.

Police in Aurora, Colorado, have identified several individuals officials referred
to as "documented Tren de Aragua members," but have not explained the
specific documentation linking them to the gang.

Texas governor Abbott stated that many of the more than 20 individuals
arrested at a hotel in El Paso in early September were suspected Tren de
Aragua members, and that officials arrested more than 100 suspected
members during a disturbance at the El Paso border in March.

Manage consent     not clarify how officials identified the suspected members. Officials in



**Venezuela's Tren de Aragua Gang Seeks to Grow Inside Brazil Prisons**
*26 Sep 2019*

arrested as a unit. Five in in early September were suspected from de
Aragua members, and that officials arrested more than 100 suspected
members during a disturbance at the El Paso border in March.

He did not clarify how officials identified the suspected members. Officials in
both Texas and Colorado have also created dedicated task forces aimed at
tackling the gang.

## What Do They Do?

Some of the crimes committed by alleged members in the United States align
with Tren de Aragua's most common crimes. The group is known for human
trafficking and human smuggling, in particular, which it adopted during its
expansion across South America.

> SEE ALSO:  Is Venezuela's Tren de Aragua Behind Surge in Chile Kidnappings?

Other cases in the US involve petty crimes like burglary or robbery, which are
not as closely associated with the organization's international cells. And there
have been few reported cases of extortion, a central pillar of the group's
criminal portfolio.

Additionally, there is no evidence, thus far, of cells in the United States
cooperating with one another or with other criminal groups. Authorities have
also not revealed any proof of criminals receiving specific instructions from
the organization's leadership or sending money to Venezuela or other foreign
countries.

*Featured image: Texas governor Greg Abbott giving a press conference on Tren de
Aragua Credit: @GregAbbott_TX / X*

## Tagged:

( Human Smuggling )    ( Tren de Aragua )    ( USA )    ( Venezuela )

## Stay Informed With InSight Crime

Manage consent

Donate today to empower research and analysis about

Case 3:25-cv-01766-EMC    Document 37-30    Filed 02/21/25    Page 5 of 5

Tagged:

Human Smuggling    Tren de Aragua    USA    Venezuela

## Stay Informed With InSight Crime

Subscribe to our newsletter to receive a weekly digest of the latest organized crime news and stay up-to-date on major events, trends, and criminal dynamics from across the region.

Email Address    Sign up

Donate today to empower research and analysis about organized crime in Latin America and the Caribbean, from the ground up.

Donate



We go into the field to interview, report, and investigate. We then verify, write, and edit, providing the tools to generate real impact.

Our work is costly and high risk. Please support our mission investigating organized crime.

Donate

About Us

Work With Us

Investigations

Latest News Analysis

Special Series

Multimedia

Audio

Events

Countries

Criminal Economies

Criminal Dynamics

Public Policy

Criminal Profiles

Information Processing Policies

Privacy policy

Refund policy

Contact us

Sponsored by





Member of



Manage consent    Powered by Newspack

# EXHIBIT
# 31

ER1279




START YOUR 7-DAY FREE TRIAL · discovery+ · sign up now

Free trial is for new customers only. Terms apply.

Advertisement    □ Ad Feedback

☰    **Politics**    SCOTUS    Congress    Facts First    2024 Elections        ⊙ Watch    🎧 Listen    ● Live TV    Q    **Subscribe**    Sign in

# JD Vance defends baseless rumor about Haitian immigrants eating pets

 By Kit Maher and Chris Boyette, CNN

⊙ 4 minute read · Updated 1:57 PM EDT, Sun September 15, 2024





□ Video Ad Feedback

(←)     Dana Bash and JD Vance clash over baseless claims abou...    02:57     MTG says Trump told her to 'be nice' to Speaker Johnson    01:48     Watch Biden's speech on Im at the border    08:44    (→)


Vance turns on European allies in blistering speech that downplayed ...


Group that defended undocumented migrants cuts ...


The US welcomed them. Now they're living in fear as Trump changes ...


Sponsored by Ubigi

**Save on international data plans with this code**

Read more

Advertisement    □ Ad Feedback

**MORE FROM CNN**

**(CNN)** — Republican vice presidential candidate JD Vance on Sunday reiterated false claims about Haitian immigrants eating the pets of residents in Springfield, Ohio.

Asked to support his claims in an interview with CNN's Dana Bash on "State of the Union," Vance pointed to what he said are firsthand accounts from constituents who have told him this is happening, though he didn't provide the evidence.

"The American media totally ignored this stuff until Donald Trump and I started talking

 **New!** Follow topics to get updates in your inbox and personalized feed.    **Follow topics**    ✕





"The American media totally ignored this stuff until Donald Trump and I started talking about cat memes. If I have to create stories so that the American media actually pays attention to the suffering of the American people, then that's what I'm going to do," the Ohio senator said.

Bash replied, "You just said that this is a story that you created."

Vance said, "It comes from firsthand accounts from my constituents. I say that we're creating a story, meaning we're creating the American media focusing on it. I didn't create 20,000 illegal migrants coming into Springfield thanks to Kamala Harris' policies. Her policies did that. But yes, we created the actual focus that allowed the American media to talk about this story and the suffering caused by Kamala Harris' policies."

**RELATED ARTICLE**
Fear and frustration in Ohio city as political debate seizes on growing Haitian population



Springfield mayor: 'No verifiable' claim about Haitian immigrants eating pets
04:52

The city of Springfield notes on its website that approximately 12,000 to 15,000 immigrants live in Clark County, and that Haitian immigrants are there legally as part of a parole program that allows citizens and lawful residents to apply to have their family members from Haiti come to the United States.

Ohio Gov. Mike DeWine, a Republican, flatly denied the rumor on Sunday and praised the immigrants for their positive influence on the community.

"No. Absolutely not," DeWine said on ABC's "This Week" when asked whether he'd seen any evidence of immigrants eating pets.

"Let me tell you what we do know, though. What we know is that the Haitians who are in Springfield are legal," the governor said. "They came to Springfield to work."

On Tuesday, Vance said it was possible the claim about Haitian immigrants might not be true, but he encouraged his followers to continue posting "cat memes."

Springfield Mayor Rob Rue said Sunday that the city is going through "a very difficult time," adding that it would be helpful if politicians who amplified plainly untrue rumors "understood the weight of their words." He said city officials, including city commissioners, have received threats for the past three consecutive days.

"We have been shined under a spotlight that is so bright that it's hard to see some of the things that we actually need to be focusing on, and that's been difficult for sure," the mayor

Sponsored by Ubigi

Save on international data plans with this code

Read more

Advertisement                    ⬜ Ad Feedback

## NEWS & BUZZ


CNN Poll: Americans worried by Trump's push to expand power


Walmart warns of a slower 2025. That's a bad sign for America's economy


Hamas stages macabre ceremony to release bodies of four Israeli …


New! Follow topics to get updates in your inbox and personalized feed.

Follow topics

"Let me tell you what we do know, though. What we know is that the Haitians who are in Springfield are legal," the governor said. "They came to Springfield to work."

On Tuesday, Vance said it was possible the claim about Haitian immigrants might not be true, but he encouraged his followers to continue posting "cat memes."

Springfield Mayor Rob Rue said Sunday that the city is going through "a very difficult time," adding that it would be helpful if politicians who amplified plainly untrue rumors "understood the weight of their words." He said city officials, including city commissioners, have received threats for the past three consecutive days.

"We have been shined under a spotlight that is so bright that it's hard to see some of the things that we actually need to be focusing on, and that's been difficult for sure," the mayor told Bash on "State of the Union," adding that "we're concerned about the security in our community, and we're focused on that right now."

The city hall in Springfield was forced to close due to a bomb threat on Thursday. Two elementary schools were evacuated Friday "based on information received from the Springfield Police Division," the Springfield City School District announced. Two local hospitals were also forced into lockdown due to bomb threats Saturday, according to statements sent to CNN.

Vance rejected the idea that his rhetoric has led to bomb threats.



Springfield father calls out JD Vance for politicizing his son's death. Hear Vance's reaction
02:14

"There is nothing that I have said that has led to threats against these hospitals, these hospitals, the bomb threats and so forth," Vance said.

"The Springfield mayor, he's dealing with a lot of terrible things. I certainly sympathize with the guy, and we're going to try to help him out. But he did not accuse me of inciting a bomb threat. He just didn't," Vance said later in the interview.

"All that I've done is surface the complaints of my constituents, people who are suffering because of Kamala Harris' policies. Are we not allowed to talk about these problems because some psychopaths are threatening violence?" he added.

Rue said he has not heard from Vance directly, "and that's fine," but said the senator and others propagating the rumors should know authorities in Springfield are telling the truth.

DeWine acknowledged that Springfield was having some issues adjusting to the influx of mostly Haitian immigrants through the federal immigration program, but he said officials were working on them.

RECOMMENDED FOR YOU



Joe Rogan Recommends: 5 Books For Turning Your Life Around
*Blinkist: Joe Rogan's Reading List*



Collagen Tip: Make Sure This 10-Letter Word is on the Label
*nativepath.com*



The Surprising Link Between Your Pillowcase and Aging
*Blissy*

 New! Follow topics to get updates in your inbox and personalized feed.     Follow topics

Subscribe    Sign In



**RELATED VIDEO**
Haitian-American
congresswoman reacts to
Trump's anti-immigrant claims

"When you go from a population of 58,000 and add 15,000 people onto that, you're going to have some challenges and some problems," the Ohio governor said in his ABC interview. "And we're addressing those. We're working on those every single day."

Vance said that he is hearing directly from constituents about these concerns, bringing up one specifically about geese.

"My constituents have brought approximately a dozen separate concerns to me. Ten of them are verifiable and confirmable, and a couple of them I talk about because my constituents are telling me firsthand that they're seeing these things. So I have two options, Dana, I can ignore them, which is what the American media has done for years to this community, or I can actually talk about what people are telling me," Vance said.

"My attitude is, listen to my constituents. Sometimes they're going to say things that people don't like, but they're saying things that people don't like because their town has been overwhelmed, and it's my job to try to fight for them and to protect them," Vance said.

*This story has been updated with additional developments.*

**PAID CONTENT**                                                                      ▷



**A Professional Engineer Designed this Nail Clipper for Seniors All Over the...**
Sponsored: zikeey.com

**How To Break The Cycle Of Urinary Tract Issues? Try This at Home**
Sponsored: nationhealthurobliss.com



**Analysis: Trump's 13 biggest lies of his first month back in office**
Politics



**Fired FAA employee who was working on missile defense says Americans...**
Politics



**Trump and Musk set their sights on Social Security by spreading rumors**
Politics



**New!** Follow topics to get updates in your inbox and personalized feed.        **Follow topics**        ✕

Document title: JD Vance defends baseless rumor about Haitian immigrants eating pets | CNN Politics
Capture URL: https://www.cnn.com/2024/09/15/politics/vance-immigrants-pets-springfield-ohio-cnntv/index.html
Capture timestamp (UTC): Fri, 21 Feb 2025 01:25:24 GMT

**ER1283**

Page 4 of 10

 

▶ VIDEO

**RELATED VIDEO**
Haitian-American
congresswoman reacts to
Trump's anti-immigrant claims

"When you go from a population of 58,000 and add 15,000 people onto that, you're going to have some challenges and some problems," the Ohio governor said in his ABC interview. "And we're addressing those. We're working on those every single day."

Vance said that he is hearing directly from constituents about these concerns, bringing up one specifically about geese.

"My constituents have brought approximately a dozen separate concerns to me. Ten of them are verifiable and confirmable, and a couple of them I talk about because my constituents are telling me firsthand that they're seeing these things. So I have two options, Dana, I can ignore them, which is what the American media has done for years to this community, or I can actually talk about what people are telling me," Vance said.

"My attitude is, listen to my constituents. Sometimes they're going to say things that people don't like, but they're saying things that people don't like because their town has been overwhelmed, and it's my job to try to fight for them and to protect them," Vance said.

*This story has been updated with additional developments.*

**PAID CONTENT**





**A Professional Engineer Designed this Nail Clipper for Seniors All Over the...**
Sponsored: zikeey.com

**How To Break The Cycle Of Urinary Tract Issues? Try This at Home**
Sponsored: nationhealthurobliss.com



**Analysis: Trump's 13 biggest lies of his first month back in office**
Politics

**Fired FAA employee who was working on missile defense says Americans...**
Politics



**Trump and Musk set their sights on Social Security by spreading rumors**
Politics



**New!** Follow topics to get updates in your inbox and personalized feed.

[Follow topics]

✕

---



### Cardiologist: How To Quickly Lose a Hanging Belly

1/2 Cup Of This (Before Bed) Can Melt Your Belly Fat Like Never Before!

Sponsored: nomorfat.com



### Urologist: Frequent Urination & Weak Stream? Do this Before Bed

Sponsored: Natural Healthy Way



**Why are US seniors snapping up...**

Sponsored: Nature...



**Finally Legal: It's like a Vaccine for...**

Sponsored: Truth...



**US: Why are people excited about this $59...**

Sponsored:...



**High Glucose Levels Might Not Be From...**

Sponsored:...



**Costco Shoppers Say This Wrinkle...**

Sponsored:...



**Shop Face S Find th**

Sponsored



### The 1 Household Item Helps Visibly Tighten Saggy Skin

Sponsored: wrinkles.pro



### Surgeon's Three-Second Sciatica Trick: Do This Before the Pain Gets Worse

Sponsored: usahealthclinic.pro





IS IT TIME TO SWITCH?

AXOS ONE®

4.86 % APY ⓘ

START EARNING

Member FDIC

synchrony

13 - MONTH CD

4.35 % APY

OPEN ACCOUNT

Member FDIC

Sponsors of BankingRates    Advertiser Disclosure



CONTENT BY SIDESTAGE



**Check out these amazing trips:**

See the Mercado de Motores in Madrid -- a must do!

Tried a Chinese egg tart in Portugal? We will show you more.



**New!** Follow topics to get updates in your inbox and personalized feed.

Follow topics

Document title: JD Vance defends baseless rumor about Haitian immigrants eating pets | CNN Politics
Capture URL: https://www.cnn.com/2024/09/15/politics/vance-immigrants-pets-springfield-ohio-cnntv/index.html
Capture timestamp (UTC): Fri, 21 Feb 2025 01:25:24 GMT

ER1285

Subscribe

Sign in

**3 Toxic Foods For Dogs: The One Meat You Should Never Feed Your Dog**
Sponsored: Pet Health Gurus

**Take Charge of Fungus-Affected Nails**
Use this LLLT device daily for 15-20 minutes to help clear fungus and promote healthy nails.
Sponsored: Okita Nail Fungus Light



**Elon Musk's private security detail gets deputized by US Marshal...**
Politics

**Communication expert has theory on Trump's strategy behind...**
Politics

**'Breathtaking reversal in US foreign policy': Fareed Zakaria reacts to Trump'...**
Politics

Search CNN...

| US | World | Politics | Business | Markets | Health | Entertainment |
|---|---|---|---|---|---|---|
| Crime + Justice | Africa | SCOTUS | Tech | Pre-markets | Life, But Better | Movies |
| | Americas | Congress | Media | After-Hours | Fitness | Television |
| | Asia | Facts First | Calculators | Fear & Greed | Food | Celebrity |
| | Australia | 2024 Elections | Videos | Investing | Sleep | |
| | China | | | Markets Now | Mindfulness | |
| | Europe | | | Nightcap | Relationships | |
| | India | | | | | |
| | Middle East | | | | | |
| | United Kingdom | | | | | |

| Tech | Style | Travel | Sports | Science | Climate | Weather |
|---|---|---|---|---|---|---|
| Innovate | Arts | Destinations | Pro Football | Space | Solutions | Video |
| Foreseeable Future | Design | Food & Drink | College Football | Life | Weather | Climate |
| Mission: Ahead | Fashion | Stay | Basketball | Unearthed | | |
| Work Transformed | Architecture | News | Baseball | | | |
| Innovative Cities | Luxury | Videos | Soccer | | | |
| | Beauty | | Olympics | | | |
| | Video | | Hockey | | | |

| Ukraine-Russia War | Israel-Hamas War | Watch | Listen | CNN Underscored | Games | About CNN |
|---|---|---|---|---|---|---|
| | | Live TV | CNN 5 Things | Electronics | CNN Crossword | Subscribe |
| | | CNN Headlines | Chasing Life with Dr. Sanjay Gupta | Fashion | Jumble Crossword | Photos |
| | | CNN Shorts | The Assignment with Audie Cornish | Beauty | Photo Shuffle | Investigations |
| | | Shows A-Z | One Thing | Home | Sudoblock | CNN Profiles |
| | | CNN10 | Tug of War | Reviews | Sudoku | CNN Leadership |
| | | CNN Max | CNN Political Briefing | Deals | 5 Things Quiz | CNN Newsletters |
| | | CNN TV Schedules | The Axe Files | Gifts | | Work for CNN |
| | | FlashDocs | All There is with Anderson Cooper | Travel | | |
| | | | All CNN Audio podcasts | Outdoors | | |
| | | | | Pets | | |


**New!** Follow topics to get updates in your inbox and personalized feed.

Follow topics



**In The Market For A New SUV? Take A Look At This One Before You Decide.**
Sponsored: BestSearchNow | Search Ads



**Resorts & Overwater Bungalows All-Included**
Sponsored: GoSearches | Search Ads



**Taylor Swift Reportedly Eyes $1 Billion Move as Relationship with Travis...**
Sponsored: TMSPN



**Tom Brady's NFL Broadcast Career in Jeopardy as New Info...**
Sponsored: TipHero



**Meghan Markle's Bold Demands: Will Kate Middleton and Prince...**
Sponsored: TipHero



**Analyst explains what Hegseth's desired DOD cuts may mean**
Politics



**MAGA melts down over 'SNL' skit**
Politics



**Trump offers key concessions to Putin ahead of Ukraine peace...**
Politics

·

Search CNN...

| US | World | Politics | Business | Markets | Health | Entertainment |
|---|---|---|---|---|---|---|
| Crime + Justice | Africa | SCOTUS | Tech | Pre-markets | Life, But Better | Movies |
| | Americas | Congress | Media | After-Hours | Fitness | Television |
| | Asia | Facts First | Calculators | Fear & Greed | Food | Celebrity |
| | Australia | 2024 Elections | Videos | Investing | Sleep | |
| | China | | | Markets Now | Mindfulness | |
| | Europe | | | Nightcap | Relationships | |
| | India | | | | | |
| | Middle East | | | | | |
| | United Kingdom | | | | | |

| Tech | Style | Travel | Sports | Science | Climate | Weather |
|---|---|---|---|---|---|---|
| Innovate | Arts | Destinations | Pro Football | Space | Solutions | Video |
| Foreseeable Future | Design | Food & Drink | College Football | Life | Weather | Climate |
| Mission: Ahead | Fashion | Stay | Basketball | Unearthed | | |
| Work Transformed | Architecture | News | Baseball | | | |
| Innovative Cities | Luxury | Videos | Soccer | | | |



**New!** Follow topics to get updates in your inbox and personalized feed.

Follow topics

### The 2025 Outlander Is Close To Perfection (Take A Look)
Sponsored: Search Ads

### Finally Legal: It's Like a 'Vaccine' Against Chronic Joint Pain
Sponsored: Pain News Today



**Southwest pilot forcibly removed from cockpit for being too drunk**
Sponsored: JPost

**Extra-Large Headed Human Species Found in China's Woodlands**
Sponsored: JPost

### Trump can't end birthright citizenship, appeals court says, setting up Suprem...
Politics

### Hegseth could fire some senior generals and admirals soon, sources say
Politics

### DOGE's claim that it saved $8 billion by canceling an $8 million contract raises...
Politics

### Bladder Always Feeling Full? Try This Before Bed
Sponsored: nationhealthurobliss.com

### Eat 1 Teaspoon Every Night, See What Happens A Week Later [Video]
Try it & watch this step-by-step video
Sponsored: coffeeloophole.pro



Search CNN...

| US | World | Politics | Business | Markets | Health | Entertainment |

**New!** Follow topics to get updates in your inbox and personalized feed.

**Follow topics**

---



**Bladder Always Feeling Full? Try This Before Bed**

Sponsored: nationhealthurobliss.com



**Eat 1 Teaspoon Every Night, See What Happens A Week Later [Video]**

Try it & watch this step-by-step video

Sponsored: coffeeloophole.pro



Search CNN...

**US**

Crime + Justice

**World**

Africa
Americas
Asia
Australia
China
Europe
India
Middle East
United Kingdom

**Politics**

SCOTUS
Congress
Facts First
2024 Elections

**Business**

Tech
Media
Calculators
Videos

**Markets**

Pre-markets
After-Hours
Fear & Greed
Investing
Markets Now
Nightcap

**Health**

Life, But Better
Fitness
Food
Sleep
Mindfulness
Relationships

**Entertainment**

Movies
Television
Celebrity

**Tech**

Innovate
Foreseeable Future
Mission: Ahead
Work Transformed
Innovative Cities

**Style**

Arts
Design
Fashion
Architecture
Luxury
Beauty
Video

**Travel**

Destinations
Food & Drink
Stay
News
Videos

**Sports**

Pro Football
College Football
Basketball
Baseball
Soccer
Olympics
Hockey

**Science**

Space
Life
Unearthed

**Climate**

Solutions
Weather

**Weather**

Video
Climate

**Ukraine-Russia War**

**Israel-Hamas War**

**Watch**

Live TV
CNN Headlines
CNN Shorts
Shows A-Z
CNN10
CNN Max
CNN TV Schedules
FlashDocs

**Listen**

CNN 5 Things
Chasing Life with Dr. Sanjay Gupta
The Assignment with Audie Cornish
One Thing
Tug of War
CNN Political Briefing
The Axe Files
All There Is with Anderson Cooper
All CNN Audio podcasts

**CNN Underscored**

Electronics
Fashion
Beauty
Health & Fitness
Home
Reviews
Deals
Gifts
Travel
Outdoors
Pets

**Games**

CNN Crossword
Jumble Crossword
Photo Shuffle
Sudoblock
Sudoku
5 Things Quiz

**About CNN**

Subscribe
Photos
Investigations
CNN Profiles
CNN Leadership
CNN Newsletters
Work for CNN

CNN Politics

Watch   Listen   Live TV   FOLLOW CNN POLITICS   Subscribe   Sign In

Terms of Use   Privacy Policy   Do Not Sell Or Share My Personal Information   Ad Choices   Accessibility & CC   About   Subscribe   Newsletters   Transcripts   Help Center

**New!** Follow topics to get updates in your inbox and personalized feed.

Follow topics

Document title: JD Vance defends baseless rumor about Haitian immigrants eating pets | CNN Politics
Capture URL: https://www.cnn.com/2024/09/15/politics/vance-immigrants-pets-springfield-ohio-cnntv/index.html
Capture timestamp (UTC): Fri, 21 Feb 2025 01:25:24 GMT

**ER1289**

# EXHIBIT
# 32

ER1290



All topics ⌄



Search 🔍



A message from Axios HQ

**Reserve your seat:** Our next Smart Brevity course is coming up. Axios readers get $75 off with code AXIOSVIP.

Oct 5, 2024 - Politics & Policy

# Trump keeps calling Venezuelan and Congolese migrants criminals

  Russell Contreras, Delano Massey, Erin Davis

(f) (𝕏) (in) (✉)



**Number of times Trump has called migrants from select countries "criminals"**

From 109 speeches, interviews, debates and rallies held between Sept. 1, 2023, and Oct. 2, 2024

| Country | Count |
| --- | --- |
| Venezuela | 70 |
| Congo (Likely refers to DRC) | 29 |
| El Salvador | 22 |
| Honduras | 20 |
| Mexico | 13 |
| Guatemala | 10 |

Data: Axios analysis of rev.com transcripts; Note: Multiple mentions in a single paragraph are counted as one instance; Chart: Axios Visuals

Former President Trump has referred to Venezuelan and Congolese migrants as criminals dozens of times since September 2023, an Axios analysis has found.

**The big picture:** In a 13-month span, Trump's speeches about migrants have become darker and apocalyptic with baseless claims the migrants have criminal records, are eating pets and could start "World War III."

- The unfounded accusations about migrants from African, Asian, Middle Eastern and Latin American countries come as the GOP presidential nominee pushes for mass deportations of immigrants.

**By the numbers:** An Axios analysis of 109 of Trump's speeches, debates and interviews

Document title: Trump keeps calling Venezuelan and Congolese migrants criminals
Capture URL: https://www.axios.com/2024/10/05/trump-migrants-venezuelan-congolese-rhetoric
Capture timestamp (UTC): Fri, 21 Feb 2025 01:12:23 GMT

**ER1291**

- The unfounded accusations about migrants from African, Asian, Middle Eastern and Latin American countries come as the GOP presidential nominee pushes for [mass deportations](#) of immigrants.

**By the numbers:** An Axios analysis of 109 of Trump's speeches, debates and interviews found that he has called Venezuelan migrants criminals 70 times and Congolese migrants criminals 29 times from Sept. 1, 2023, to Oct. 2, 2024.

- He's also called migrants from El Salvador criminals 22 times and those from Honduras criminals 20 times. Trump called migrants from Mexico criminals 13 times and migrants from Guatemala criminals 10 times.

- Of the remarks analyzed by Axios, no European countries appeared on the list.

**Karoline Leavitt,** national press secretary for the Trump campaign, failed to directly answer why Trump has referred to migrants from various countries as criminals.

- In a statement, Leavitt said the Biden-Harris administration reversed many of the former president's immigration policies, creating a national security crisis on our southern border.

- Leavitt said Trump will restore his policies and launch "crackdowns that will send shockwaves to all the world's criminal smugglers, and marshal every federal and state power necessary" for his deportation plan.

**State of play:** Trump's comments about migrants (in the country illegally or with temporary status) with criminal records usually follow his promise to remove many migrants from cities with changing demographics.

- He repeatedly has [shared false claims](#) about Haitian [immigrants eating pets](#) in [Springfield, Ohio](#) and vowed to revoke the [immigration status for Haitian migrants](#) who are living legally in the U.S.

- Trump also has promised to end [birthright citizenship](#) for American-born children of migrants as outlined in the [14th Amendment](#) of the U.S. Constitution.

- [Trump](#) has repeatedly said undocumented immigrants are ["poisoning the blood of our country,"](#) language echoing the rhetoric of white supremacists and fascist dictator [Adolf Hitler.](#)

**Reality check:** [Study](#) after [study](#) has found that immigrants commit less crime than their American-born counterparts, despite the elevation of individual cases like the death of Georgia nursing student [Laken Riley.](#)

- [A three-year Axios analysis](#) of violent crime on the U.S.-Mexico border, home to millions of immigrants, found that cities there have lower violent crime rates than the rest of the nation.

**Zoom in:** Per the Migration Policy Institute, there is no evidence that any country is emptying prisons to allow violent criminals to come to the U.S. border as migrants despite Trump's repeated claims "the Congo" is doing so.

Advertisement





- The governments of both the Democratic Republic of Congo and the neighboring Republic of Congo [told](#) CNN Trump's assertions are false.

**What they're saying:** Donald Tomaskovic-Devey, a sociology professor at UMass Amherst, says using such rhetoric is a strategy that has lived on for decades.

- Tomaskovic-Devey points out that this was an issue in 2016, when "it was the Mexicans and then terrorists from the Middle East."

- "Now it's basically every part of the world outside of Western Europe and the US," he said, adding that these narratives reinforce a longstanding trope, collapsing internal and external threats into one overarching fear of "the other."

- If we go back to the 1950s in the US, Tomaskovic-Devey said the political recipe was "the threat of Black labor and the threat of the Russians," which mobilized voters in the South.

**Context:** Some of the migrants from countries targeted by Trump are here in the country legally under Temporary Protected Status.

- TSP is a federal program that allows migrants from some countries to legally live in the United States for a certain period when the conditions in their home country are unsafe.

- Migrants from Haiti, Afghanistan, Ukraine and Venezuela are among some countries eligible for the program, requiring participants to re-register with the Department of Homeland Security each year.

Want more stories like this? Sign up for [Axios Hill Leaders](#)



A message from Axios HQ

# Is your org bogged down by corporate speak?

All topics ⌄                        **AXIOS**                        Search 🔍

# Is your org bogged down by corporate speak?



**Smart Brevity forces simplicity** — and our six-step checklist can put any leader on the path to clearer, more relevant internal updates.

- The co-founders of Axios HQ developed it.
- Global execs put it to work.
- Better engagement and business results followed.

**Get the checklist**

---

## Go deeper



**Russell Contreras, Avery Lotz**
Jan 28, 2025 - Politics & Policy

# All undocumented immigrants are "criminals," Trump administration says



Document title: Trump keeps calling Venezuelan and Congolese migrants criminals
Capture URL: https://www.axios.com/2024/10/05/trump-migrants-venezuelan-congolese-rhetoric
Capture timestamp (UTC): Fri, 21 Feb 2025 01:12:23 GMT

**ER1294**

All topics ⌄    **/\XIOS**    Search 🔍



Karoline Leavitt, White House press secretary, during a news conference in the White House in Washington, D.C., on Jan. 28, 2025. Photo: Samuel Corum/Politico/Bloomberg via Getty Images

White House press secretary Karoline Leavitt confirmed immigrant rights groups' fears that the Trump administration sees all undocumented immigrants as "criminals" and isn't just seeking to deport those who commit violent acts.

**Driving the news:** In her first White House briefing, Leavitt falsely labeled all 3,500 immigrants arrested for suspicion of being in the country illegally "criminals." Being in the country illegally is a civil violation, not a criminal one, and the individuals who were arrested have not been convicted of a crime.

Go deeper (2 min. read) ⟶

   

Advertisement



Axios Daily Essentials
Start and end your day with the stories that matter

Subscribe for free

 Donica Phifer
Oct 3, 2024 - Politics & Policy

## Trump floats deporting legal Haitian migrants living in Ohio



All topics ⌄

 **AXIOS**    Search Q

Former President and Republican presidential nominee Donald Trump speaks at a press conference Oct. 1 in Milwaukee. Photo: Jim Vondruska/Getty Images

[Former President Trump](#) said Wednesday he would revoke immigration status for Haitian migrants who are living legally in the U.S.

**Why it matters:** The comments mark yet another escalation in the GOP presidential nominee's rhetoric about immigration — this time targeting legal immigrants — and come after he repeatedly [shared false claims](#) about Haitian [immigrants eating pets](#) in [Springfield, Ohio](#).

Go deeper (1 min. read)  ⟶

   


**Russell Contreras**
Jan 27, 2025 - Politics & Policy

# Why Trump won't be deporting "millions" of criminals



Illustration: Allie Carl/Axios

[President Trump](#) claims that his administration will quickly deport ["millions and millions"](#) of "illegal aliens" with criminal records.

- Those millions don't exist.

**The big picture:** Less than 1% of immigrants deported last fiscal year were kicked out of the U.S. for crimes other than immigration violations. In the past 40 years, federal officials have documented about [425,000](#) noncitizens with criminal convictions on the ICE's "non-

---

Document title: Trump keeps calling Venezuelan and Congolese migrants criminals
Capture URL: https://www.axios.com/2024/10/05/trump-migrants-venezuelan-congolese-rhetoric
Capture timestamp (UTC): Fri, 21 Feb 2025 01:12:23 GMT

**ER1296**

All topics ∨                                                                  Search Q

Go deeper (1 min. read) ⟶                                                

---

**Russell Contreras**
Jan 27, 2025 - Politics & Policy

## Why Trump won't be deporting "millions" of criminals



Illustration: Allie Carl/Axios

President Trump claims that his administration will quickly deport "millions and millions" of "illegal aliens" with criminal records.

- Those millions don't exist.

**The big picture:** Less than 1% of immigrants deported last fiscal year were kicked out of the U.S. for crimes other than immigration violations. In the past 40 years, federal officials have documented about 425,000 noncitizens with criminal convictions on the ICE's "non-detained docket."

Go deeper (2 min. read) ⟶                                                

---



## Smarter, faster on what matters.

Explore Axios Newsletters ⟶

| | | |
|---|---|---|
| About Axios | Newsletters | Privacy policy |
| Advertise with us | Axios Live | Terms of use |
| Careers | Axios Entertainment | Your Privacy Choices ✅✗ |
| Contact us | Axios HQ | |

**AXIOS**   Copyright Axios Media, 2024

# EXHIBIT
# 33

ER1298



**EXCLUSIVE**

IMMIGRATION

# DHS is seeking more than 600 migrants for possible ties to Venezuelan gang

So far 100 have been identified as gang members. The rest remain under investigation and could later be found to be victims, witnesses or members of the gang.



Officials warn about rising threat from Venezuelan gang members illegally crossing border
02:25

Get more news LIVE on NBC NEWS NOW.



Create your free profile or log in to save this article

Oct. 23, 2024, 10:30 AM UTC

**By Julia Ainsley**

The Department of Homeland Security has identified more than 600 migrants in the U.S. who may have connections to a notorious Venezuelan gang that is drawing growing concern from local and federal law enforcement officials, according to data obtained exclusively by NBC News.

**Sponsored Stories**          by Taboola



ENERGY BILL CRUNCHER      Learn More

**Virginia: Gov May Cover Your Cost To Install Solar If You Live In These Zip Codes**

Document title: DHS is seeking more than 600 migrants for possible ties to Venezuelan gang
Capture URL: https://www.nbcnews.com/news/dhs-identified-600-migrants-possible-ties-venezuelan-gang-rcna176020
Capture timestamp (UTC): Fri, 14 Feb 2025 21:32:21 GMT

**ER1299**

Page 1 of 15





ENERGY BILL CRUNCHER    [Learn More]

Virginia: Gov May Cover Your Cost To Install
Solar If You Live In These Zip Codes

TURBOTAX    [Learn More]

Should Married Couples File Jointly or
Separately?



NBC NEWS

TRUST THE SOURCE.
CHOOSE THE SCREEN.

NBC NEWS    NBC NEWS    NBC NEWS
NOW          APP          COM

STREAMING     APP         ONLINE

**DHS is seeking more than 600 migrants for possible ties to Venezuelan gang**

Venezuelan gang that is drawing growing concern from local and
federal law enforcement officials, according to data obtained
exclusively by NBC News.

Roughly 100 of the 600 migrants DHS has deemed "subjects of
interest" were confirmed members of the gang whom the
department recommended be placed on an FBI watchlist, officials
said. The others could be found after a review to be victims,
witnesses or members of the gang.

The Venezuelan gang, known as Tren de Aragua, or TDA, has a
known presence in 15 states and a possible presence in eight others,
according to the data.

Homeland Security officials began working to compile the data on
TDA this spring after they saw a spike in crime by gang members in
New York and other cities across the U.S. Crimes tied to the gang
include sex trafficking in Louisiana and the point-blank shooting of
two New York City police officers.

U.S. Immigration and Customs Enforcement has arrested more than
100 people suspected of being associated with TDA in connection
with crimes since October 2022, the data said, and 75 have been
arrested for immigration violations. More than 20 have been
referred for federal prosecution.

"DHS has an ongoing operation to crack down on gang members
through re-screening certain individuals previously encountered, in
addition to the rigorous screening and vetting at the border," a DHS
spokesperson said. "All individuals confirmed or suspected to be
gang members are referred for criminal prosecution or detained and
placed into expedited removal."

Determining the exact number of TDA members who have crossed
into the U.S. is an enormous challenge, because, unlike most
countries, Venezuela does not share its criminal histories or other
information with U.S. officials. That also makes it difficult for border
agents to identify who among the Venezuelans crossing the border
might be TDA members.

Law enforcement experts say the figure of 600 illustrates the gap in
intelligence about the gang's presence in the U.S. due to the lack of
information provided by the Venezuelan government.

"The number is almost disturbingly low," said Frank Figliuzzi, a
former FBI assistant director for counterintelligence and an NBC
News contributor. "It should be higher."

But Figliuzzi said TDA has not yet reached the size or sophistication
levels of larger gangs that have existed in the U.S. for years.

"Most gang experts would say that TDA is not yet exhibiting signs of
sophistication and advanced organization within the United States,"
he said.

"Most gang experts would say that TDA is not yet exhibiting signs of sophistication and advanced organization within the United States," he said.

MS-13, which emerged in Los Angeles but grew into a transnational gang based in El Salvador, has roughly 10,000 members in the U.S., according to the Justice Department.

The 18th Street gang, also from Central America, once had an estimated 30,000 to 50,000 members, according to the Justice Department, though its numbers have weakened after a nationwide crackdown in El Salvador.



——— Peruvian police transfer a member of the Venezuelan gang Tren de Aragua in Lima on Oct. 5, 2023.  Cris Bouroncle / AFP via Getty Images file

## A 2024 campaign issue

The exact size of TDA in the U.S. has become an issue in the presidential campaign.

Former President Donald Trump has claimed that TDA members have "invaded and conquered" Aurora, Colorado, a Denver suburb that's the state's third-largest city.



Recommended

GUNS IN AMERICA
86-year-old white man accepts plea deal in wrong-door shooting of Black teen Ralph Yarl

U.S. NEWS
NYC art dealer's fatal stabbing was murder-for-hire plotted by estranged husband, officials say

But Aurora's police chief and its mayor, Mike Coffman, a Republican, told NBC News last month that Trump's claims about the gang are grossly exaggerated.



NBC NEWS
TRUST THE SOURCE. CHOOSE THE SCREEN.

NBC NEWS NOW.          NBC NEWS          NBC NEWS .COM
STREAMING          APP          ONLINE



But Aurora's police chief and its mayor, Mike Coffman, a Republican, told NBC News last month that Trump's claims about the gang are grossly exaggerated.

Coffman said TDA members have not taken over the city of 400,000 people. Instead, several apartment buildings neglected by their landlord for years have a crime problem.

"The problems with the landlord really go back prior to the migrant crisis," Coffman said.

And while Trump has highlighted crimes TDA members have committed against Americans, a DHS official said the vast majority of TDA victims are Venezuelan migrants.

"They prey first and foremost on Venezuelans," the official said, noting that many of the recently arrived migrants had to pay TDA to come to the U.S. "We know that they control human smuggling routes out of Venezuela and into Colombia and into Panama. And they are controlling more of these passages as individuals move north through Mexico."

More than 20 of the more than 140 investigations ICE launched into TDA since October 2022 involve suspected human smuggling or trafficking, according to the data. And the majority are investigations based on suspected gang affiliation.

Ammon Blair, a former Border Patrol agent who now advocates for stronger security at the border as a senior fellow at the Texas Public Policy Foundation, said the 600 figure tells him that DHS does not know the full number of TDA members actually inside the U.S.

Blair said that when he retired from the Border Patrol in November, the agency was not scrutinizing migrants crossing the border heavily enough.

"When you look at the process, unfortunately, they're just steamrolled through," he said. "The Border Patrol has created a conveyor belt, an automated system to process them and release them as fast as possible into the United States. We were not asking questions."

The data obtained by NBC News showed that fewer than 30 of the more than 600 subjects of interest regarding TDA are in ICE custody.

A DHS official said many of the 600 people have not been detained by ICE because they are in the custody of other law enforcement organizations. The officials said that ICE may also not know where they are or that their connections to TDA or crimes may not be confirmed or that arresting them might interfere with ongoing criminal investigations.

Venezuelan nationals can be released from custody if they have served their time for committing crimes. But because Venezuela


NBC NEWS
TRUST THE SOURCE.
CHOOSE THE SCREEN.

NBC NEWS NOW    NBC    NBC NEWS .COM
STREAMING    APP    ONLINE

confirmed or that arresting them might interfere with ongoing criminal investigations.

Venezuelan nationals can be released from custody if they have served their time for committing crimes. But because Venezuela refuses to take back nationals who have emigrated to the U.S., ICE has to release them because of a federal court ruling that bars it from detaining migrants indefinitely.

If a migrant in ICE custody is deemed to be a true risk to public safety, a separate DHS official said, ICE will find a way to keep the person detained, even if it is by another law enforcement organization. 


Julia Ainsley

Julia Ainsley is the homeland security correspondent for NBC News and covers the Department of Homeland Security for the NBC News Investigative Unit.


SPONSORED / MCLUCK | PLAY NOW    [Install Now]

## Jackpot! Ashburn Men Won a Record Bonus On an Online Slot Machine
60 Seconds to Uncover the Reason Behind America's Casinos: Play and Be Hooked


SPONSORED / HEALTH WELLNESS JOURNAL    [Learn more]

## Cardiologists: Teaspoon On an Empty Stomach Slims Waist from 36 To 22


SPONSORED / SUPER-SAVINGS-ONLINE

## Why Amazon Is Powerless Against This Hack
Amazon Driver Warns: If you order Amazon every day, use this device.


SPONSORED / GUNDRYMD

## Top Doctor: If You Eat Eggs Every Day, This Is What Happens


SPONSORED / WELLNESSGUIDE

## Cinnamon: Could Be the Greatest Enemy Of Blood Sugar (See How T...






day, use this device.



SPONSORED / GUNDRYMD    [Learn More]

### Top Doctor: If You Eat Banana Every Day, This Is What Happens



SPONSORED / BOOKSI    [Learn More]

### Paris Las Vegas Hotel Flash Deal: 3 Nights Down to Just $99

Limited time deal. 3 nights at the Paris Las Vegas Hotel at an unbelievable price. This deal is breaking the internet.



SPONSORED / HEALTH WELLNESS JOURNAL

### Eat 1 Teaspoon Every Night, See What Happens a Week Later

Cardiologists: How Older Women Are Slimming Down Quickly



SPONSORED / WELLNESSGUIDE

### Forget Furosemide, Use This Household Item To Help Drain...



SPONSORED / GARAGE FLOORING USA

### Virginia Homeowners Are Raving About This 1-Day Garage Floor...

Homeowners and Businesses Alike Are Installing This Concrete Coating That is Installed In 1 Day, ...



SPONSORED / HOME VALUE LOOKUP

### See The Value Of Anyone's Home By Searching Address (Take a Look)

SPONSORED / SAVINGSPRO

### Three Ashburn Banks Are Paying Record High Interest Rates - See the List

---

**More From NBC News**



Document title: DHS is seeking more than 600 migrants for possible ties to Venezuelan gang
Capture URL: https://www.nbcnews.com/news/dhs-identified-600-migrants-possible-ties-venezuelan-gang-rcna176020
Capture timestamp (UTC): Fri, 14 Feb 2025 21:32:21 GMT

**ER1304**



NBC NEWS / NEWS

**Tennessee man sentenced to life in prison for murdering his wife during their Fiji honeymoon**

NBC NEWS / POLITICS

White House says about 75K federa...



NBC NEWS / SHOP

How to store eggs to keep them fresh as long as possible



SPONSORED / FINANCE WALLET        Learn More

**Virginia Introduces New Benefit for "Senior Drivers"**

SPONSORED / ULTIMATE PET NUTRITION

**Dog Dad Rob Lowe Reveals: "Itchy Dogs Should Not Be Eating This"**

Most dog owners don't know this.





SPONSORED / EXPERTSINPETHEALTH.COM        Learn More

**Cesar Millan Warns Owners: 'Stop Feeding These 3 Ingredients To Your Dog'**

SPONSORED / TOP2OGADGETDEALS        Learn More

**Sleep Apnea: Ingenious Pillow Takes the US By Storm**

The exact same pillow found in luxury hotels that charge $1,000 per night, now available for your bedroom.







Document title: DHS is seeking more than 600 migrants for possible ties to Venezuelan gang
Capture URL: https://www.nbcnews.com/news/dhs-identified-600-migrants-possible-ties-venezuelan-gang-rcna176020
Capture timestamp (UTC): Fri, 14 Feb 2025 21:32:21 GMT

Case 3:25-cv-01766-EMC Document 67-9 Filed 02/21/25 Page 9 of 15



NBC NEWS / POLITICS

**Trump administration tells federal agencies to fire probationary employees**

NBC NEWS / NOW

Trump admin tells federal agencies...

NBC NEWS / POLITICS

Elon Musk says DOGE staffer who...



SPONSORED / BEVERLY HILLS MD — Learn more

**Plastic Surgeon Tells: If You Have Wrinkles, Do This Immediately (It's Genius!)**
The 1 Household Item That Visibly Tightens Saggy Skin

SPONSORED / SAVINGS ACCOUNTS | TOP SEARCHER NOW — Learn More

**CD Rates Are Soaring Into 2025 (Take A Look)**



SPONSORED / SAVINGS ACCOUNTS | TOP SEARCH NOW — Learn More

**Ashburn: Three Banks Introduce 5% Interest Rates on Savings**

SPONSORED / HYUNDAI PALISADE — Learn More

**Hyundai's New 2024 Palisade Is Turning Heads (Take a Look)**
Packed with advanced safety technology, including lane-keeping assist and blind-spot monitoring, Palisade ensures peace of mind for drivers and their ...











NBC NEWS / VIDEO

**Trump says he will speak to Hegseth about his comments on Ukraine**

NBC NEWS / POLITICS

**Trump says he is cutting off Biden's...**

NBC NEWS / NEWS

**Trump orders mass firings and...**



SPONSORED / IMPRINT.COM

Shop Now

**How Custom Promos Boost Your Brand**

Design your own unique promotional items with ease. Trusted by over 1,000,000 customers. Shop now!

SPONSORED / ARIAT

**Best Cowboy Boots for Line Dancing**



SPONSORED / CSOONLINE | MIMECAST

Learn More

**A dashboard's value in cybersecurity awareness training**

SPONSORED / GEORGETOWN

Learn More

**Future of Careers in Urban Planning**

Are you thinking about a master's in a rewarding field? Here's a closer look at your future career as an Urban Planner.













NBC NEWS / POLITICS

**Federal prosecutors in New York and Washington resign after refusing to drop Adams charges**

NBC NEWS / NEWS

**U.S. deports nearly 120 Asian...**



NBC NEWS / NOW

**List of highest-paid athletes for 202...**

SPONSORED / HYUNDAI PALISADE AMAZING FOR SENIORS     Learn More

**All New Hyundai Palisade For Seniors Simply Amazes - See The Cost**

See These New Seniors Hyundai Palisade Prices! You Won´t Believe It! Click To See Here

SPONSORED / GRAMMARLY     Install Now

**Write Better, Work Smarter With This Desktop App**

Improve grammar, word choice, and sentence structure everywhere you work. Write better with Grammarly.




SPONSORED / SMART LIFESTYLE TRENDS     Learn More

**Remodeling Star: Cheapest Way To Get A Walk In Shower In Virginia**

Homeowners can save thousands on a 1-day bathroom remodel using this one tip.

SPONSORED / OTTO QUOTES     Click Here

**Who Charges the Most for Car Insurance in Virginia? (Check Zip Code)**






Document title: DHS is seeking more than 600 migrants for possible ties to Venezuelan gang
Capture URL: https://www.nbcnews.com/news/dhs-identified-600-migrants-possible-ties-venezuelan-gang-rcna176020
Capture timestamp (UTC): Fri, 14 Feb 2025 21:32:21 GMT







NBC NEWS / POLITICS

## Trump is 'angry' that deportation numbers are not higher

NBC NEWS / NEWS

27 religious groups sue Trump...

NBC NEWS / NEWS

Russia says U.S. relations are on...



SPONSORED / URBAN FURNISHED

Learn More

## Urban Furnished | Corporate Apartments | Min 30 days Stays



SPONSORED / TRUESEARCHES | SEARCH ADS

## 2024 Family SUV is A True Head Turner (You'll Love The Price)





SPONSORED / SEARCHTOPICS | SEARCH ADS

Learn More

## 2024 Buick's Are Turning Heads



SPONSORED / GOODRX

## What Is Taltz Used for? - GoodRx





NBC NEWS / POLITICS

## When the pain hits home, Republicans balk at

NBC NEWS / NOW

AG Pam Bondi announces charges...

NBC NEWS / NEWS

At least four dead after suspected...



NBC NEWS / POLITICS
**When the pain hits home, Republicans balk at Trump's spending cuts and tariffs**

NBC NEWS / NOW
AG Pam Bondi announces charges...

NBC NEWS / NEWS
At least four dead after suspected...



SPONSORED / BESTSEARCHES | SEARCH ADS
**Average Cost to Charter A Private Jet May Surprise You (See Prices)**



SPONSORED / TRAIN PACKAGES | TOP SEARCH NOW          Learn More
**Sleeper Train Vacations at Unbeatable Prices (Take a Look)**



SPONSORED / COMMONSEARCHES | SEARCH ADS
**New Electric SUVs Come with Tiny Price Tags (Take a Look)**



SPONSORED / RIU HOTELS          Learn More
**Beachfront hotels with All Inclusive 24/7 service**
Book direct to unlock RIU Class members' benefits



NBC NEWS / POLITICS
**Trump administration preparing to restart immigrant family detention**



NBC NEWS / POLITICS
Trump's anti-media rhetoric turns t...



NBC NEWS / NEWS
Six dead at resort construction...







**Trump administration preparing to restart immigrant family detention**





SPONSORED / HOME VALUE BY ADDRESS

**Unbelievable: Calculator Shows The Value Of Your House Instantly [Take a Look]**

SPONSORED / TWO TIER SPA

**Two Tier Swim Spa Keeps Selling Out (Take a Look)**





SPONSORED / HOMEBUDDY

Learn More

**Here's What Gutter Guards Should Cost You In 2025**

The actual cost might surprise you

SPONSORED / FASTEST SEARCH

Search Now

**Type In Any Name, Wait 127 Seconds, See Instant Results**

Enter any name here. View results on the next page.



NBC NEWS / POLITICS

**Trump's border czar tells NYC mayor he'll be 'up his butt' if he breaks vow to help ICE**



NBC NEWS / POLITICS

Pennsylvania Gov. Josh Shapiro sue...



NBC NEWS / NOW

Canadians raise fears of 'war' and...

Document title: DHS is seeking more than 600 migrants for possible ties to Venezuelan gang
Capture URL: https://www.nbcnews.com/news/dhs-identified-600-migrants-possible-ties-venezuelan-gang-rcna176020
Capture timestamp (UTC): Fri, 14 Feb 2025 21:32:21 GMT



SPONSORED / ELECTRIC CARS FOR SENIORS

**Learn More**

### New Sleek Low-Cost Tiny Electric Cars Ideal for Pensioners: Take a Look

These new electric cars are fantastic, and the prices are incredible. Click here to see them now!

SPONSORED / FAVORITESEARCHES | SEARCH ADS

### The All New Mind Blowing Honda CRV Is Finally Here (Take a Look)



SPONSORED / WELLNESSGUIDE

**Learn more**

### Blood Sugar Over 100? Try This Cinnamon Ritual Now!

SPONSORED / POPULARSEARCHES | SEARCH ADS

**View Deals**

### Least Expensive Electric Car



NBC NEWS / POLITICS

### Trump's presence looms as Florida GOP passes immigration deal after weeks of infighting

NBC NEWS / NEWS

Haitian migrants share harrowing...

NBC NEWS / NOW

86-year-old Missouri man pleads...



ABOUT

CONTACT

HELP

PRIVACY POLICY

✓✗ YOUR PRIVACY CHOICES

CA NOTICE

CLOSED CAPTIONING

ADVERTISE

SELECT SHOPPING



SPONSORED / ELECTRIC CARS FOR SENIORS

**New Sleek Low-Cost Tiny Electric Cars Ideal for Pensioners: Take a Look**

These new electric cars are fantastic, and the prices are incredible. Click here to see them now!

Learn More

SPONSORED / FAVORITESEARCHES | SEARCH ADS

**The All New Mind Blowing Honda CRV Is Finally Here (Take a Look)**



SPONSORED / WELLNESSGUIDE

**Blood Sugar Over 100? Try This Cinnamon Ritual Now!**

Learn more

SPONSORED / POPULARSEARCHES | SEARCH ADS

**Least Expensive Electric Car**

View Deals



NBC NEWS / POLITICS

**Trump's presence looms as Florida GOP passes immigration deal after weeks of infighting**

NBC NEWS / NEWS

**Haitian migrants share harrowing...**

NBC NEWS / NOW

**86-year-old Missouri man pleads...**



ABOUT

CONTACT

HELP

CAREERS

AD CHOICES

PRIVACY POLICY

YOUR PRIVACY CHOICES

CA NOTICE

TERMS OF SERVICE (UPDATED JULY 7, 2023)

NBC NEWS SITEMAP

CLOSED CAPTIONING

ADVERTISE

SELECT SHOPPING

© 2025 NBCUniversal Media, LLC

NBC NEWS    MSNBC    TODAY

# EXHIBIT 34

ER1314

 

**DONATE**

# Americas
## QUARTERLY

MAGAZINE ⌄    COUNTRIES ⌄    U.S. POLICY    CORRUPTION INDEX    EVENTS    PODCAST    CULTURE    ABOUT

**U.S. POLITICS**

# How Much of a Threat is Tren de Aragua in the U.S.?

 

BY CHARLES LARRATT-SMITH AND JOHN POLGA-HECIMOVICH
DECEMBER 9, 2024

The Venezuelan prison gang was a frequent theme in Donald Trump's campaign rhetoric on immigration. But its reach in the U.S. is exaggerated.



*A member of the Tren de Aragua gang in the custody of Peruvian police in Lima in October 2023.*
Cris Bouroncle/AFP via Getty Images

*Reading Time: 8 minutes*

On October 11, Donald Trump held a campaign event in Aurora, Colorado, where the then-Republican party candidate and now president-elect appeared on stage flanked by large placards bearing mugshots of Venezuelan immigrants who had been arrested following their arrival to the United States. These campaign props were adorned with the words "Occupied America: TDA Gang Members in Aurora," while the backdrop of the stage was draped in banners bearing the slogan "Deport Illegals Now." It seemed unusual for the Trump campaign to spend valuable time and energy to organize a rally in a state widely expected to vote Democratic, during the homestretch of what appeared at the time to be a close electoral contest. But the purpose of this campaign event was above all else symbolic.

In late August, video footage had emerged of a group of armed Venezuelan migrants trying to forcibly enter an apartment in a housing

## RELATED CONTENT



**In Ecuador, Mounting Challenges Threaten Noboa's Reelection**



**Is There a Real-World Alternative to Bukele on Crime?**



**Why Sheinbaum May Take a Different Path on Mexico's Security**

### CURRENT ISSUE



*Americas*
**NAVIGATING TRUMP**
*...and three other trends that will define
Latin America in 2025*
BY BRIAN WINTER

SIGN UP FOR OUR NEWSLETTER



NAVIGATING TRUMP

...and those who travels that will define
Latin America in 2025
BY BRIAN WINTER

Latin America faces numerous
challenges in 2025, including
Donald Trump's return to the
White House. Our special
report examines four trends to
watch.

**Read More**

**Past Issues**

r, the data to ca certain election remmittal. But the purpose of the
campaign event was above all else symbolic.

In late August, video footage had emerged of a group of armed
Venezuelan migrants trying to forcibly enter an apartment in a housing
complex in this nondescript suburb of Denver, a city that has at times
struggled to accommodate a large wave of migrants from Latin America
over the past several years. After the building's out-of-state landlord
claimed the building had been taken over by a Venezuelan prison gang,
Tren de Aragua (TdA), the mayor of Aurora repeated the claim, before
reversing himself as the incident was seized upon by conservative
politicians, media pundits, and online influencers to make exaggerated
claims that the city had been "taken over" by criminals from Venezuela.

As the election approached, this once largely unknown criminal
organization was thrust into the spotlight as an emergent threat to U.S.
national security, its "vicious" activities attracting the attention of
Republican legislators and executive branch agencies. In the aftermath of
a resounding Trump victory at the polls, buoyed in part by the electorate's
disapproval with the Biden administration's handling of immigration and
border enforcement, an important yet largely unanswered question
remains: Does TdA actually pose a legitimate threat to U.S. national
security?

Surprisingly little is known about Tren de Aragua, a fact that has given it
great power and allowed it to assume the shape of a chimera in the eyes
of both law enforcement and other criminal actors. Several governments
in the Americas have sounded the alarm about the group, while criminals
operating in the Venezuelan diaspora have claimed links to TdA to bolster
their reputations and criminal legitimacy. The gang has permanent cells in
Peru and in Chile, where it carried out a high-profile assassination in
2023. At the same time, evidence suggests that the TdA has had trouble
expanding in places with competitive criminal markets and where state
coercive capacity is strong.

Given all of this, the fear and campaign-season rhetoric in the U.S. is
overblown. Despite the real threat TdA poses to many Venezuelan
migrants, it's unlikely the group has much power or reach in the U.S.,
where other organized criminal organizations pose much more of a threat
to citizens and TdA itself.



(155 of 175) Page 155 of 175 Case: 25-2120, 04/30/2025, DktEntry: 23.8, Page 155 of 175
Case 3:25-cv-01766-EMC   Document 37-34   Filed 02/21/25   Page 4 of 8
SIGN UP FOR OUR NEWSLETTER



A police officer at a checkpoint in Bogotá, where Tren de Aragua operates in some neighborhoods, in October. Photo by Juancho Torres/Anadolu via Getty Images.

**What we know about Tren de Aragua**

The origins of TdA are well documented. The group first emerged in 2005, as a trade union formed to build a railroad during the government of Hugo Chávez. The consortium of workers quickly began embezzling funds, before moving into extorting contractors. By the time the project was abandoned in 2011, this nucleus of ersatz railway workers had metamorphosed into a criminal organization known as el Tren de Aragua. The group quickly developed a formidable presence in the state's notorious Tocorón prison. It was there that its current leader, Héctor Rusthenford Guerrero Flores (alias 'Niño Guerrero'), joined in 2013, quickly becoming the '*pran*'—an incarcerated gang leader who controls prisons from the inside while simultaneously directing criminal organizations outside of them. Under his tutelage, TdA expanded to several neighboring states and became Venezuela's largest criminal organization of its kind, engaging principally in extortion, street-level drug dealing, and human trafficking.

The rise of TdA coincided with the onset of the Venezuelan economic crisis. The implosion of the economy combined with hyperinflation led to the virtual collapse of the country's social safety net, prompting millions of young Venezuelans to migrate. Sensing an opportunity in the crisis, TdA expanded its operations to the porous border region and charged outgoing migrants fees to exit through irregular border crossings, or '*trochas*', while other members reportedly embedded themselves in migrant flows heading to other South American countries to prey on their compatriots. With the worsening of the migrant crisis in 2018, reports began to surface from law enforcement in Colombia, Peru, and Chile that TdA had established chapters and was engaged in widespread criminal activities in those countries.

Still, TdA had limited success setting up operations in Colombia, despite the fact that the two countries share a 1,379 mile-long border. Gang members who tried to make incursions into border enclaves such as Arauca and Cúcuta were met with violent resistance from Colombian insurgent groups such as the Ejército de Liberación Nacional (ELN) and Fuerzas Armadas Revolucionarias de Colombia (FARC) dissident factions, demonstrating the extreme difficulties facing new entrants into Colombia's established criminal market. Other apparent TdA chapters were more successful in establishing a presence elsewhere in less competitive environs, particularly in Bogotá, where they principally devoted themselves to micro-level extortion and drug dealing in poorer

demonstrating the extreme difficulties facing new entrants into Colombia's established criminal market. Other apparent TdA chapters were more successful in establishing a presence elsewhere in less competitive environs, particularly in Bogotá, where they principally devoted themselves to micro-level extortion and drug dealing in poorer neighborhoods. Tellingly, even in these spaces TdA operatives subcontract smaller local gangs and authorize them to use their name to generate fear and compliance with their victims.

TdA found it easier to expand and establish roots in places with large contingents of Venezuelan migrants and fewer local criminal rivals. This is especially true of Chile and Peru, where the group appears to have established permanent cells, from Santiago and Lima to the Peru-Chile and Chile-Bolivia border areas. While the gang makes money from human trafficking, narcotrafficking, and extortion, it has also wielded violence there, particularly against fellow Venezuelan migrants. In a case that made international headlines, TdA allegedly planned and carried out the kidnapping and heinous murder of Ronald Ojeda, a former first lieutenant in Venezuela's armed forces and an opponent of the Venezuelan regime, in March 2023 in Chile. The lack of criminal competitors in these places was decisive in the group's expansion, in contrast to Ecuador or Brazil, where there is little evidence of permanent cells.

The gang's relationship with Venezuelan security forces and government officials is also shrouded in mystery, but hints at organizational weaknesses. TdA's initial growth was driven by the state's unofficial devolution of power to the *pranes* under Prison Minister Iris Varela and the impunity it enjoyed within and outside of Tocorón. Under this agreement, it was allowed to operate out of the prison for years with the government's knowledge and tacit consent. However, in September 2023, perhaps in response to a breakdown in the *pax mafiosa*, the government raided the prison, effectively dismantling the group's headquarters. Nonetheless, TdA's leader, Guerrero, and others appear to have received advanced warning and escaped via tunnel prior to the raid. Telling, this episode illustrates not only TdA's relationship to the Venezuelan state, but how much weaker TdA is compared to Mexico's Sinaloa Cartel and the Cartel Jalisco Nueva Generación (CJNG), Colombia's ELN, EMC, and EGC, Ecuador's Los Choneros, or Brazil's Primeiro Comando da Capital (PCC), none of which could plausibly be dismantled through a single coordinated government raid.

### Transnational threat or electoral bogeyman?

Over the past two decades, criminality in Venezuela skyrocketed largely as a result of the failed security policies of *chavismo*, making it one of the most dangerous countries on the planet. The implosion of the Venezuelan economy coupled with the authoritarian consolidation of Nicolás Maduro's regime led to an unprecedented exodus of largely working class and poorer Venezuelans throughout the Americas. Unsurprisingly, much of the Venezuelan criminal class has similarly fled these worsening conditions during this period with many attempting to re-establish their

(157 of 175) Page 157 of 175 Case: 25-2120, 04/30/2025, DktEntry: 23.8, Page 157 of 175
Case 3:25-cv-01766-EMC   Document 37-34   Filed 02/21/25   Page 6 of 8
SIGN UP FOR OUR NEWSLETTER   Q

Maduro's regime led to an unprecedented exodus of largely working class and poorer Venezuelans throughout the Americas. Unsurprisingly, much of the Venezuelan criminal class has similarly fled these worsening conditions during this period with many attempting to re-establish their illicit careers abroad, generating palpable xenophobia and fervent anti-immigrant sentiment in the process.

Although TdA never achieved a nationwide presence in its home country, the gang has somehow gained notoriety as the most fearsome transnational criminal organization across the Americas from Chile to the United States in the span of a few years. Rather than the TdA expanding its tentacles throughout South and North America from its former base in Tocorón and threatening to destabilize the entire region, it is far more probable that any and all criminal acts committed abroad by a miniscule percentage of the Venezuelan diaspora are now attributed to TdA due to a paucity of real information on the criminal group's structure and organizational culture. Reported factions of the group in Chile and Peru, for example, operate under names such as the Gallegos, the Hijos de Dios, and Dinastía Alayón, making it difficult for law enforcement to determine their exact relationship to the larger group.

Recent investigative reports from InSight Crime highlight several inconvenient truths about this Venezuelan gang that challenge the existing narrative in the United States. Among other things, the tattoos or dress codes ascribed to TdA members in the U.S. has little backing in other places where the gang has been known to operate. The origin of that information is also uncertain, given that U.S. and Venezuelan authorities do not share intelligence. Of course, one consequence of the lack of clear identifiers is the ease with which non-affiliated Venezuelan criminals in the diaspora may claim membership in order to further burnish their credentials in the pursuit of illegal activities.

Of equal importance, nearly no claims made by U.S. law enforcement about crimes committed by purported members of TdA have been substantiated by hard evidence that directly connects the accused with the organization in Venezuela. In fact, none of the national, state, and local law enforcement agencies contacted in the U.S by InSight Crime in April 2024 reported any significant presence of TdA in their jurisdictions.

Despite assertions from some quarters that TdA is conspiring to seize control of criminal rackets in major U.S. cities, the actual organizational potential of Venezuelan criminals to do so is overblown, particularly in the United States. In Venezuela, the gang was only strong until the government decided to combat it, and law enforcement operations have clamped down on supposed structures in other South American countries. For these reasons, it would be difficult for the TdA to establish itself in the U.S. while coordinating with what remains of the organization's fugitive hierarchy in Venezuela. Among other things, the gang lacks control over the migrant smuggling and human trafficking routes in the U.S. that were so vital to its expansion to prisons and urban areas in South America. Instead, small factions of apparent TdA members

(158 of 175) Page 158 of 175 Case: 25-2120 04/30/2025 DktEntry: 23.8 Page 158 of 175
Case 3:25-cv-01766-EMC Document 37-34 Filed 02/21/25 Page 7 of 8
SIGN UP FOR OUR NEWSLETTER

organization's fugitive hierarchy in Venezuela. Among other things, the gang lacks control over the migrant smuggling and human trafficking routes in the U.S. that were so vital to its expansion to prisons and urban areas in South America. Instead, small factions of apparent TdA members have offered their services to more powerful Mexican cartels that dominate the border.

The alarmism over Tren de Aragua in the U.S., in short, does not correspond to the facts on the ground as we know them. The recent assertion in Senator Rubio and Representative Salazar's petition to President Biden that TdA is "an invading criminal army from a prison in Venezuela that has spread their brutality and chaos to U.S. cities and small towns" is emblematic of the exaggeration. Not to be outdone by fellow Republicans from Florida, Texas Governor Greg Abbott officially designated TdA as a "foreign terrorist organization" in mid-September, even though the gang lacks any meaningful political criteria to meet this definition. In the final days of the recent election, the governor further demanded that Vice President and Democratic candidate Kamala Harris follow suit and classify TdA along those same lines.

Some Venezuelan criminals have succeeded in entering the United States in recent years, including perhaps a few full-fledged TdA members with direct links to the Venezuelan hierarchy. But it is highly unlikely that they will be able to mobilize in any meaningful way in the United States. Based on the recent successes of law enforcement in Chile, Peru, and Colombia in capturing and dismantling substantial TdA structures, TdA and other aspiring Venezuelan criminals will likely fare no better in the U.S. when confronted by police with considerably greater resources at their disposal than their Andean counterparts.

### The fallout from the campaign

While perhaps an effective electoral ploy, it's dangerous to exaggerate TdA's threat for several reasons. Paying disproportionate attention to the group takes valuable time and resources away from prosecuting more powerful transnational organized criminal groups, such as the CJNG or the Sinaloa Cartel, that are largely responsible for fueling the opioid crisis in the United States and destabilizing other countries in the region.

And using TdA to support the narrative that immigrants are criminals is damaging to the Venezuelan diaspora in the United States. If the Department of Homeland Security's recent estimation that there are 600 active TdA members in the United States is in fact true, these individuals would still constitute 0.09% of the estimated 700,000 Venezuelans who have been paroled into the United States since the beginning of the humanitarian crisis. But Trump invoked Venezuelans more than any other nationality in his anti-immigrant campaign rhetoric, and his party members followed suit, creating additional risks for those living in stigmatized communities such as Aurora. While the scope, scale, and feasibility of the impending deportation campaign that Trump has promised remains unknown, it is highly probable that Venezuelan migrants will be severely affected by these draconian measures, whether

(159 of 175) Page 159 of 175 Case: 25-2120, 04/30/2025, DktEntry: 23.8, Page 159 of 175
Case 3:25-cv-01766-EMC   Document 37-34   Filed 02/21/25   Page 8 of 8

SIGN UP FOR OUR NEWSLETTER  Q

damaging to the Venezuelan diaspora in the United States. If the Department of Homeland Security's <u>recent estimation</u> that there are 600 active TdA members in the United States is in fact true, these individuals would still constitute 0.09% of the estimated <u>700,000 Venezuelans</u> who have been paroled into the United States since the beginning of the humanitarian crisis. But Trump <u>invoked Venezuelans</u> more than any other nationality in his anti-immigrant campaign rhetoric, and his party members followed suit, creating additional risks for those living in <u>stigmatized communities</u> such as Aurora. While the scope, scale, and feasibility of the impending deportation campaign that Trump has promised remains unknown, it is highly probable that Venezuelan migrants will be severely affected by these draconian measures, whether they are criminals or not.

**ABOUT THE AUTHORS**



**Charles Larratt-Smith**

*Larratt-Smith is an assistant professor in the Department of Criminal Justice and Security Studies at the University of Texas at El Paso (UTEP).*

**Follow Charles Larratt-Smith:** 🔗 LinkedIn |



**John Polga-Hecimovich**

*Polga-Hecimovich is an associate professor of political science at the U.S. Naval Academy, where he also co-directs the Forum for Latin American Studies.*

**Follow John Polga-Hecimovich:** 🔗 LinkedIn | ✖ X/Twitter

**Tags:** Migration, Tren de Aragua, U.S. politics, Venezuela, Venezuelan diaspora

**Like what you've read? Subscribe to AQ for more.**

*Any opinions expressed in this piece do not necessarily reflect those of* Americas Quarterly *or its publishers.*



DONATE   SUBSCRIBE

✖ 🔗 📷 🔗

Podcast
🍎 🔗 ▶ 🔗

About          Magazine        Corruption Index
Advertise      Elections        Events
Contact        Latest           Podcast
Internship     U.S. Policy      Culture

Americas Quarterly (AQ) is the premier publication on politics, business, and culture in Latin America. We are an independent publication of the Americas Society/Council of the Americas, based in New York City. All Rights Reserved

**AS/COA**
PUBLISHED BY AMERICAS SOCIETY/
COUNCIL OF THE AMERICAS

680 Park Avenue
New York, NY 10065
Phone: (212) 249-8950

# EXHIBIT
# 35

ER1322



Offering non-surgical orthopedic injections for arthritis, joint injuries and spine pain.

STEMCELLARTS

Decrease pain and improve function with Regenexx® at Stem Cell ARTS.   **LEARN MORE**

Immigration

# Relatives and records cast doubt on Guantánamo migrants being 'worst of the worst'

Details on some of the migrants sent to Guantánamo Bay have begun to emerge. They are young Venezuelan men, and relatives say they have been falsely branded Tren de Aragua gang members.

February 16, 2025

🎧 15 min   ↗   🔖   💬 678



The first U.S. military aircraft to carry detained migrants to Guantánamo Bay in Cuba is boarded from an unspecified location on Feb. 4. (U.S. Department of Homeland Security/Reuters)



By Silvia Foster-Frau, Ana Vanessa Herrero and María Luisa Paúl

When the first flight of migrants arrived at Guantánamo Bay, Homeland Security Secretary Kristi L. Noem said they were "the worst of the worst." Defense Secretary Pete Hegseth called them "high-threat" criminals who had crossed the border to bring "violence and mayhem to our communities."

All were members of a Venezuelan gang called Tren de Aragua, the Trump

Defense Secretary Pete Hegseth called them "high-threat" criminals who had crossed the border to bring "violence and mayhem to our communities."

All were members of a Venezuelan gang called Tren de Aragua, the Trump administration said, invoking the name of a group the president mentions frequently to explain why a mass deportation is needed. Officials put them in a prison on the U.S. naval station in Cuba created for suspected terrorists after Sept. 11, 2001.

Little was known about the men when they were initially sent to Cuba. Human rights lawyers called Guantánamo a "legal black hole" and lambasted the U.S. government for not allowing them access to the migrants. But through photos released by DHS and accounts from family members, their names have begun to emerge.

In one of the images is a man with his head bent as a U.S. Immigration and Customs Enforcement officer holds the back of his collar. Relatives have identified him as Luis Alberto Castillo.



Holding tents at the naval station in Guantánamo Bay are seen on Feb. 6. (U.S. Navy/AFP/Getty Images)

In another photo, a bearded man stands in front of a plane and its unfurled ramp. Tilso Gómez's family says that is him. Nearby is a man with a head full of curly auburn hair. His father insists that is Mayfreed Durán.



Resilience is reinvention.

**Most Read Immigration** >

1 Appeals court rejects Trump bid to ban birthright citizenship

2 Trump scales back Biden-era TPS extension for Haitian migrants

3 Guantánamo migrants have been flown from Cuba to Honduras, DHS says

4 Refugee aid groups struggling amid halt in federal payments under Trump

5 4.1 million migrants: Where they're from, where they live in the U.S.

Advertisement

5  4.1 million migrants: Where they're from, where they live in the U.S.

Despite the impression given by Homeland Security officials and others, these three men were taken into custody after crossing the southern border, according to court records and family members — not during a targeted immigration operation in a U.S. city or at a jail or prison while serving a sentence.

🌐 **Follow** World news                                                          +

Advertisement

The Washington Post could not find any violent federal criminal record for Castillo and Gómez, while Durán was charged with assaulting, resisting or impeding an officer during a riot at a detention center. An ICE official said that the agency stands by its assertion that all the migrants aboard the initial flight to Guantánamo are Tren de Aragua members. Their relatives firmly deny the accusation.

ICE has now sent at least nine planes carrying migrants to Guantánamo. As of Friday, 126 migrants were detained at the naval station, according to a Defense Department official. Trump wants troops to prepare to house as many as 30,000 more.

The Post spoke with family members of six migrants whose relatives said they have confirmed through photos and lawyers that their loved ones are being held in Guantánamo. The stories of Castillo, Gómez and Durán, as well as Franyer Montes, Diuvar Uzcátegui and José Daniel Simancas, share several similarities. All involve men who fled Venezuela's economic and political crisis and were detained immediately upon entering the United States, though one was later released. Nearly all had tattoos that relatives said aroused the suspicion of U.S. authorities. Families of two of the men said they believed their loved one had been singled out because they were born in the Venezuelan state of Aragua.

Document title: Relatives and records cast doubt on Guantánamo migrants being 'worst of the worst' - The Washington Post
Capture URL: https://www.washingtonpost.com/immigration/2025/02/16/trump-guantanamo-migrants-deportations-venezuela/
Capture timestamp (UTC): Fri, 21 Feb 2025 00:56:10 GMT



Migrants are lined up before being flown to Guantánamo on Feb. 4. (U.S. Department of Homeland Security)

Tren de Aragua has aroused fears throughout the Americas. But experts in the criminal organization say the group has not established a strong foothold in the United States, where its members probably number only in the hundreds — a small fraction of the nearly 800,000 Venezuelans who live in the country. Three analysts who have studied the gang said tattoos are not linked with membership.

Advertisement

Advertisement

Three of the six families who spoke with The Post shared documents showing their relatives have no criminal record in Venezuela.

ICE said in a statement that tattoos were "one of many indicators" that an individual belongs to the gang. The agency did not answer a question regarding how many Tren de Aragua members there are among all the Guantánamo detainees. A DHS official did not respond to a request for details on how it identifies who belongs to the gang.

Families in Venezuela described regular calls with loved ones in detention centers before a sudden silence. They checked ICE's online registry to see an update that their family member was in Florida, with a link to call the detention center — a pattern for those taken to Guantánamo. A WhatsApp group for parents, spouses and siblings of Guantánamo detainees continues to grow.

**Most Read** >

Advertisement

Document title: Relatives and records cast doubt on Guantánamo migrants being 'worst of the worst' - The Washington Post
Capture URL: https://www.washingtonpost.com/immigration/2025/02/16/trump-guantanamo-migrants-deportations-venezuela/
Capture timestamp (UTC): Fri, 21 Feb 2025 00:56:10 GMT

ER1326

In one of their last calls together, Mayfreed Durán, 21, told his father that ICE was claiming he had ties to Tren de Aragua. Michel Durán said his son had been detained since crossing the border in 2023. After a year and a half in detention, Mayfreed told his father, he had agreed to sign deportation papers to return to Venezuela. The Trump administration had reached an agreement with the Venezuelan government to resume flights.

Days later, Durán had not heard from his son. Then he saw his signature tuft of curly hair in a Homeland Security photo. Mayfreed was in Guantánamo.

"I can't live in peace thinking about my little boy living there," Michel Durán said. "It's not right. I know my son is a clean man, that he is not a criminal like they said he was."

## A gang from Aragua

Unlike the Latin American crime groups that formed on the streets, Tren de Aragua was born inside one of Venezuela's most infamous penitentiaries in the state of Aragua. Crime bosses within the prison began running kidnapping, drug trafficking and extortion networks from behind bars, while small street gangs outside consolidated and the two began to merge.


Advertisement

By 2014, Tren de Aragua had grown from a prison-based organization to a national criminal syndicate. In 2017, Venezuela's economic and political collapse sparked a massive exodus of people — and presented the gang with a new and highly profitable opportunity: infiltrating migration routes.

Today, it is an "ethereal, elusive and loose" network primarily involved in migrant trafficking, said Elizabeth Dickinson, a senior analyst at the International Crisis Group think tank. The gang has a foothold in South

**Most Read** ›



1  Trump expected to take control of USPS, fire postal board, officials say

2  **Analysis** Aaron Blake
   Trump's honeymoon is over

3  Trump comes close to the red line of openly defying judges, experts say

4  Republicans caught between Trump and farmers pleading for frozen funds

5  **Opinion** Editorial Board
   Musk's mass firings are already backfiring


CRM
/si'ar em/ ater.
Customer relationship magic.
𝒶 attio
**Join the world's leading startups and build your dream CRM.**
𝒶 Attio    Sign up

Today, it is an "ethereal, elusive and loose" network primarily involved in migrant trafficking, said Elizabeth Dickinson, a senior analyst at the International Crisis Group think tank. The gang has a foothold in South America, particularly in Peru, Ecuador and Chile, where it profits from smuggling and extortion. It has built its empire in part by preying on those fleeing Venezuela's crises.

But Ronna Rísquez, an investigative journalist and expert on organized crime in Latin America, said TDA has faced several obstacles in establishing itself in the United States, including a language barrier, competition from stronger criminal organizations and ongoing arrests by law enforcement.

"The U.S. already has well-established mafia structures, cartels and other groups that have been operating here for decades," she said. "The Tren de Aragua is not going to just take over."



**Join the world's leading startups and build your dream CRM.**

Nonetheless, Trump seized on the narrative that Tren de Aragua is wreaking havoc to U.S. cities throughout his campaign following several high-profile crimes involving Venezuelan migrants. Multiple studies show Venezuelan migrants are rarely involved in crimes, but those incidents quickly gained widespread attention.



Advertisement

"The Venezuelan gangs are the worst in the world — they're vicious, violent people," Trump said in his first TV network interview after winning the



**CRM**
/βɛ̩ or ɛm/ˈeɪbɛ
Customer
relationship
magic.
€ attio
**Join the world's leading startups
and build your dream CRM.**
Attio    Sign up

"The Venezuelan gangs are the worst in the world — they're vicious, violent people," Trump said in his first TV network interview after winning the election. "They're literally taking over apartment complexes and doing it with impunity."

In recent weeks, ICE has shared images of agents arresting people it describes as TDA members. Noem told Fox News in late January that authorities had arrested a "one of the ringleaders of TDA" who had "just been a part of a gun weapons exchange and was trying to buy grenades." The secretary also mentioned the gang in explaining why the Trump administration had removed temporary protective status for hundreds of thousands of Venezuelans.

"The people of this country want these dirtbags out," Noem said.

## 'A lie'

In early February, detained migrants began calling family members. They were being transferred, they said. But many didn't know where, or when, or why.



Advertisement

Durán called his father. Luis Alberto Castillo called his wife.

"He was very nervous and sad and started to cry," said Leidy Calle, Castillo's wife. "I cried, I told him that he should trust God and that he should leave everything in God's hands."

Document title: Relatives and records cast doubt on Guantánamo migrants being 'worst of the worst' - The Washington Post
Capture URL: https://www.washingtonpost.com/immigration/2025/02/16/trump-guantanamo-migrants-deportations-venezuela/
Capture timestamp (UTC): Fri, 21 Feb 2025 00:56:10 GMT

**ER1329**

family members spoke to The Post
had taken the dangerous journey
from Venezuela to the U.S.-
Mexico border. They were driven
by a desire for a better life, their
relatives said, and had goals of
opening their own businesses and
providing for their families.

One of them was Diuvar
Uzcátegui. He grew up in Santa
Rita, Aragua — the birthplace of
Hector Rusthenford Guerrero
Flores, known as "Niño



Luis Alberto Castillo. (Courtesy of Leidy Calle)

Guerrero," the Tren de Aragua boss who built the prison gang into a
transnational empire.

By day, the Santa Rita streets filled with the sounds of motorbikes, old men at
corner stores sipping malta and children kicking soccer balls. By night, the
town changed. Parents told their kids to be home by 9. The wrong kind of
people lurked in the shadows — the kind who had turned the city into
something else, something dangerous.



Advertisement

Uzcátegui and his best friend, Kevin, hoped to get out of the town to make
something bigger of their lives. Kevin spoke to The Post on the condition of
partial anonymity because he is also a Venezuelan immigrant and fears he could
be targeted for deportation.

Uzcátegui went first. He initially crossed the border and surrendered to U.S.
authorities in October 2023, but he was sent back to Mexico. He tried again in
December that year. This time, ICE held him in a detention center for six
months and then released him with instructions to check in weekly, then
monthly. He applied for asylum and began working long hours in El Paso to
send money back to his daughter.

"Hermano, estoy viviendo el sueño americano," Uzcátegui told Kevin in
January. *I'm living the American Dream.*



CRM
[pɪ ɑː ɛm/ ɑːbiː]

Customer
relationship
magic.

attio

Join the world's leading startups
and build your dream CRM.

Attio     Sign up

months and then released him with instructions to check in weekly, then monthly. He applied for asylum and began working long hours in El Paso to send money back to his daughter.

"Hermano, estoy viviendo el sueño americano." Uzcátegui told Kevin in January. *I'm living the American Dream.*

That was the last time Kevin heard from him.



**CRM**
[pl. or kin/ atee

Customer
relationship
magic.

*éi* attio

**Join the world's leading startups
and build your dream CRM.**

*A* Attio     Sign up

Advertisement

On Jan. 28, ICE agents showed up at Uzcátegui's workplace. His girlfriend said the agents told him that he'd missed a check-in. She said he never missed an appointment and thought he'd be quickly released. Instead, a few days later, ICE put out the news that it had arrested three Venezuelan nationals "including two known Tren de Aragua associates."

One of them was Uzcátegui.

It didn't make sense, Kevin said. Uzcátegui's girlfriend didn't understand it, either. The Post could not locate any records in civil or criminal courts in El Paso with his name. His friends and family wondered if immigration agents had focused on Uzcátegui's tattoos — one of a panther on his hand, another a red rose on his wrist. Maybe that was enough. Maybe coming from Santa Rita, Aragua, was enough.

"We ran from that life," Kevin said. "We ran so far. And now they're saying he's one of them? That's a lie."

## A Bible and tattoos

For ICE, tattoos have long been viewed as potential signs of gang affiliation. The practice was applied and criticized during the rise in the United States of MS-13, a gang that more commonly uses tattoos as a form of identification. But the government response also led to arrests in which family members disputed the migrants' ties to the gang.

Several experts told The Post that the practice is even more concerning when attempting to identify members of Tren de Aragua, which does not even use

the migrants' ties to the gang.

Several experts told The Post that the practice is even more concerning when attempting to identify members of Tren de Aragua, which does not even use tattoos to signal membership.

Tattoos are also the norm for many Venezuelan youths. Narcoculture — a style where people wear symbols that are sometimes used by gangs — has also become popularized in recent years, said Pablo Zeballos, a Chile-based expert on organized crime.

"Tattoos are greatly meaningless unless they are combined with other factors, like prison history or known criminal associations," he said.

In 2017, ICE put out a statement outlining how it confirmed gang membership: if migrants admitted they were in a gang; if they were convicted of a crime or civil offense for gang-related activity; or if they met "certain other criteria such as having tattoos identifying a specific gang or being identified as a gang member by a reliable source."

Bill Hing, a professor of law and migration studies at the University of San Francisco who has represented migrants accused of gang affiliation, said it "usually doesn't take much more than a tattoo."



Join the world's leading startups and build your dream CRM.

"If they [ICE] have some suspicion, then they will take that person into custody. That doesn't mean they will prevail in front of an immigration judge with that allegation," Hing said. "But if that person is undocumented, that person will get deported anyway."

All six of the migrants in this story had tattoos, their family members said. Five of them expressed concerns that their tattoos were what led to the government's suspicion of the migrants' ties to Tren de Aragua.

On Jan. 19, Castillo, his wife and her 9-year-old son showed up for the appointment they had secured through the Biden administration's CBP One app to plead their case to be allowed into the United States.

Document title: Relatives and records cast doubt on Guantánamo migrants being 'worst of the worst' - The Washington Post
Capture URL: https://www.washingtonpost.com/immigration/2025/02/16/trump-guantanamo-migrants-deportations-venezuela/
Capture timestamp (UTC): Fri, 21 Feb 2025 00:56:10 GMT

**ER1332**



**Join the world's leading startups and build your dream CRM.**

All six of the migrants in this story had tattoos, their family members said. Five of them expressed concerns that their tattoos were what led to the government's suspicion of the migrants' ties to Tren de Aragua.

On Jan. 19, Castillo, his wife and her 9-year-old son showed up for the appointment they had secured through the Biden administration's CBP One app to plead their case to be allowed into the United States.

Authorities asked the family for their IDs and stamped their fingerprints. Then, officers began asking Castillo about his tattoos, his wife said. He told them he'd gotten them in his youth. After that, she said, they were separated.

"The police officer no longer let him sit next to us," Calle, his wife, said. Castillo had brought a Bible, and she said officers "told him to start praying because he was from the Tren de Aragua. They made fun of him."

He was separated from his wife and child then. They haven't seen him since.

Two weeks later, an image of him appeared in Homeland Security photos touting their first migrant flight to Guantánamo. His head was bent over as he stood on the tarmac, his tattoo of basketball player Michael Jordan visible on his neck.

## 'American nightmare'

Kevin remembers Uzcátegui as a man whom he'd spent endless afternoons with playing soccer. The friend who turned everything into a joke, who didn't drink and who loved his young daughter "more than anything in the world," Kevin said.

When he saw that his friend was on a list of Guantánamo detainees published by the New York Times, he was in shock.

"I was like, 'Diuvar? A criminal?' I still can't believe it," Kevin said.

He thought back to Uzcátegui's ambitions and his friend's words about his life in Texas: *He was living in the America Dream.*

"American Dream?" Kevin said. "More like American nightmare."

Michel Durán said he similarly can't square the image of his son with that of a hardened Tren de Aragua gang member. He said his son had often criticized his father for drinking beer and smoking.

"He would say 'Ay, papi, that's bad for you,'" he recalled.

Frustrated by Venezuela's

"He would say 'Ay, papi, that's bad for you,'" he recalled.



Diuvar Uzcátegui in El Paso. (Obtained by The Post)

Frustrated by Venezuela's deteriorating economy, Michel Durán said his son decided to go to the United States, where he hoped he would open a business and send money back to his family.

He attempted to enter the United States twice and was sent back to Mexico both times. After that, he decided to wait for his CBP One appointment.

It was set for July 7, 2023 — two days after his birthday.

"He said this was the best present he could have gotten," Michel Durán said.



CRM
/pɑ: ɑ: t.m/ abbr.

Customer relationship magic.

ꙮ attio

**Join the world's leading startups and build your dream CRM.**

ꙮ Attio                          Sign up

His son was detained in El Paso after arriving for his appointment. A few months later, he was part of a hunger strike, his father said. A criminal complaint of the incident states that Durán approached an officer who was trying to restrain another detainee and that a fight ensued.

Michel Durán said his son told him officers had begun to punch a detainee, and that Mayfreed intervened to try to separate them.

"He pushed one of the police so they would stop hitting him," the father said, adding that the officer had sprained or fractured an ankle. "He said he didn't have anything to do with it — he just tried to separate the police so they wouldn't keep punching him."

Michel Durán said the Trump administration should investigate "who are the real delinquents, and who aren't."

"Why are they sending innocent immigrants to those prisons like they're animals?" he said. "They're human beings."

*Ana Herrero reported from Venezuela. Samantha Schmidt, Razzan Nakhlawi and Alice Crites contributed to this report.*

**4.1 million migrants**

The Washington Post analyzed more than 4.1 million U.S. immigration court records from

## 4.1 million migrants



The Washington Post analyzed more than 4.1 million U.S. immigration court records from the past decade to find out where migrants come from and where they live once they arrive in the country.



CRM
/sē, er, em/ abbr.

Customer
relationship
magic.

attio

Join the world's leading startups and build your dream CRM.

Attio        Sign up

⇗ Share        💬 678 Comments

**More On Immigration**                    📝 HAND CURATED



Deportation at 'light speed': How Trump's crackdown could unfold

January 16, 2025



Federal judge temporarily blocks Trump's birthright citizenship order

January 23, 2025



4.1 million migrants: Where they're from, where they live in the U.S.

June 28, 2024

View 3 more stories  ⌄



By Silvia Foster-Frau

Silvia Foster-Frau is a national investigative reporter for The Washington Post covering immigration. 𝕏 @SilviaElenaFF



By Ana Vanessa Herrero

Ana Vanessa Herrero is a reporter covering South America and the Caribbean, focused on politics, human rights and investigative journalism. 𝕏 @AnaVHerrero



By Maria Luisa Paúl

Maria Luisa Paúl is a reporter on The Washington Post's Morning Mix team. She joined The Post as an intern on the General Assignment desk and has previously reported at the Miami Herald and el Nuevo Herald. 𝕏 @marialuisapaulr

**More For You** ›

## Guantánamo migrants have been flown from Cuba to Honduras, DHS says

Today at 5:26 p.m. EST



**Analysis** Glenn Kessler

## Trump's flood of false claims about Ukraine

Today at 8:00 a.m. EST



## Refugee aid groups struggling amid halt in federal payments under Trump

Today at 7:22 p.m. EST



Document title: Relatives and records cast doubt on Guantánamo migrants being 'worst of the worst' - The Washington Post
Capture URL: https://www.washingtonpost.com/immigration/2025/02/16/trump-guantanamo-migrants-deportations-venezuela/
Capture timestamp (UTC): Fri, 21 Feb 2025 00:56:10 GMT

**ER1335**

Page 13 of 15

Refugee aid groups struggling amid halt in federal payments under Trump

Today at 7:22 p.m. EST



Trump scales back Biden-era TPS extension for Haitian migrants

Today at 5:33 p.m. EST



How every senator voted on Kash Patel for FBI director

Today at 3:20 p.m. EST





NEWSLETTER  DAILY

**Today's Headlines**

The most important news stories of the day, curated by Post editors, delivered every morning.

Sign up

**PAID PROMOTED STORIES**



If You're over 65, Try This Instead of Gutter Cleaning (It's Genius)

LeafFilter Partner

Sign up

**PAID PROMOTED STORIES**



If You're over 65, Try This Instead of Gutter Cleaning (It's Genius)

LeafFilter Partner



Join the world's leading startups and build your dream CRM.

Attio    Sign up

The Washington Post

| Company | Sections | Get The Post | Contact Us | Terms of Use |
|---|---|---|---|---|
| About The Post | Trending | Manage Your Subscription | Contact the Newsroom | Digital Products Terms of Sale |
| Newsroom Policies & Standards | Politics | Gift Subscriptions | Contact Customer Care | Print Products Terms of Sale |
| Diversity & Inclusion | Elections | Newsletters & Alerts | Contact the Opinions Team | Terms of Service |
| Careers | Opinions | Washington Post Live | Advertise | Privacy Policy |
| Media & Community Relations | National | Reprints & Permissions | Licensing & Syndication | Cookie Settings |
| WP Creative Group | World | Post Store | Request a Correction | Submissions & Discussion Policy |
| Accessibility Statement | Style | Books & E-Books | Send a News Tip | RSS Terms of Service |
|  | Sports | Print Special Editions Store | Report a Vulnerability | Sitemap |
|  | Business | Print Archives (Subscribers Only) |  | Ad Choices |
|  | Climate | Today's Paper |  | CA Notice of Collection |
|  | Well+Being | Public Notices |  | Your Privacy Choices |
|  | D.C., Md., & Va. |  |  |  |
|  | Obituaries |  |  |  |
|  | Weather |  |  |  |
|  | Arts & Entertainments |  |  |  |
|  | Recipes |  |  |  |

washingtonpost.com © 1996-2025 The Washington Post

Document title: Relatives and records cast doubt on Guantánamo migrants being 'worst of the worst' - The Washington Post
Capture URL: https://www.washingtonpost.com/immigration/2025/02/16/trump-guantanamo-migrants-deportations-venezuela/
Capture timestamp (UTC): Fri, 21 Feb 2025 00:56:10 GMT

**ER1337**

Page 15 of 15