## No. 25-2120

---

**IN THE**
**UNITED STATES COURT OF APPEALS**
**FOR THE NINTH CIRCUIT**

---

NATIONAL TPS ALLIANCE, MARIELA GONZÁLEZ, FREDDY
JOSE ARAPE RIVAS, M.H., CECILIA DANIELA GONZÁLEZ
HERRERA, ALBA CECILIA PURICA HERNÁNDEZ, E.R.
HENDRINA VIVAS CASTILLO, A.C.A., SHERIKA BLANC, VILES
DORSAINVIL, and G.S.,
*Plaintiffs-Appellees*,

vs.

KRISTI NOEM, in her official capacity as Secretary of Homeland
Security, UNITED STATES DEPARTMENT OF HOMELAND
SECURITY, and UNITED STATES OF AMERICA,
*Defendants-Appellants.*

---

ON APPEAL FROM THE UNITED STATES DISTRICT COURT FOR THE
NORTHERN DISTRICT OF CALIFORNIA, NO. 3:25-CV-01766-EMC
HONORABLE EDWARD M. CHEN

---

## RESPONSE BRIEF OF PLAINTIFFS-APPELLEES

Emilou MacLean (SBN 319071)
emaclean@aclunc.org
Michelle (Minju) Y. Cho (SBN 321939)
mcho@aclunc.org
Amanda Young (SBN 359753)
ayoung@aclunc.org
ACLU FOUNDATION
OF NORTHERN CALIFORNIA
39 Drumm Street
San Francisco, CA 94111-4805
Telephone: (415) 621-2493

Ahilan T. Arulanantham (SBN 237841)
  *Counsel of Record*
arulanantham@law.ucla.edu
CENTER FOR IMMIGRATION LAW &
POLICY, UCLA SCHOOL OF LAW
385 Charles E. Young Dr. East
Los Angeles, CA 90095
Telephone: (310) 825-1029

*Attorneys for Plaintiffs-Appellees*

Additional Counsel for Plaintiffs-Appellees

Jessica Karp Bansal (SBN 277347)
jessica@ndlon.org
Lauren Michel Wilfong
lwilfong@ndlon.org
NATIONAL DAY LABORER
ORGANIZING NETWORK
1030 S. Arroyo Parkway, Suite 106
Pasadena, CA 91105
Telephone: (626) 214-5689

Eva L. Bitran (SBN 302081)
ebitran@aclusocal.org
ACLU FOUNDATION
OF SOUTHERN CALIFORNIA
1313 West 8th Street
Los Angeles, CA 90017
Telephone: (213) 977-5236

Erik Crew
ecrew@haitianbridge.org
HAITIAN BRIDGE ALLIANCE
4560 Alvarado Canyon Road, Suite 1H
San Diego, CA 92120
Telephone: (949) 603-7411

i

## TABLE OF CONTENTS

**Page**

INTRODUCTION ..................................................................... 1

STATEMENT OF THE CASE AND RELEVANT FACTS ............. 3

    A.    Congress's Statutory Scheme for TPS ................. 3

    B.    The TPS Designation for Venezuela .................... 8

    C.    Vacatur and Termination of Venezuelan TPS ................................................ 10

    D.    Procedural History ............................................. 12

SUMMARY OF ARGUMENT ........................................... 14

STANDARD OF REVIEW ............................................... 18

ARGUMENT ................................................................. 18

I.    THE DISTRICT COURT PROPERLY EXERCISED JURISDICTION OVER PLAINTIFFS' APA CLAIMS ...................................... 18

    A.    Section 1254a(b)(5)(A) Does Not Bar Plaintiffs' APA Claims ....................................... 19

    B.    The District Court's Postponement Order Is Not Injunctive for Purposes of Section 1252(f)(1) ............................ 33

II.    DEFENDANTS ARE UNLIKELY TO PREVAIL ON THE MERITS OF PLAINTIFFS' APA CLAIMS ...................................... 35

    A.    The Vacatur Order Contravened the Plain Terms of the TPS Statute .................. 35

ii

B.    The Vacatur was Arbitrary and Capricious....... 44

III.   THE DISTRICT COURT DID NOT ABUSE
ITS DISCRETION IN GRANTING
PRELIMINARY RELIEF ON PLAINTIFFS'
DISCRIMINATION CLAIM ........................ 46

A.    *Arlington Heights* Supplies the Correct
Standard of Review ............................. 47

B.    The District Court Did Not Err in Finding
Animus Under Either Standard ........................ 52

IV.   THE DISTRICT COURT DID NOT ABUSE
ITS DISCRETION IN CONCLUDING THAT
THE BALANCE OF HARDSHIPS TIPS
SHARPLY IN FAVOR OF POSTPONEMENT............ 61

V.    THE DISTRICT COURT DID NOT ABUSE
ITS DISCRETION IN CRAFTING A REMEDY
UNDER SECTION 705.................................. 64

CONCLUSION.................................................... 67

CERTIFICATE OF COMPLIANCE.............................70

CERTIFICATE OF SERVICE........................................71

iii

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Abbott Labs v. Gardner,*
    387 U.S. 136 (1967) ...................................................... 31

*Alberston v. FCC,*
    182 F.2d 397 (D.C. Cir. 1951) .................................... 38

*Allen v. Milligan,*
    599 U.S. 1 (2023) ........................................................ 1

*Am. Trucking Ass'ns v. Frisco Transp. Co.,*
    358 U.S. 133 (1958) ............................................... 39, 40

*Amgen, Inc. v. Smith,*
    357 F.3d 103 (D.C. Cir. 2004) .................................. 29

*Anderson v. City of Bessemer City,*
    470 U.S. 564 (1985) ................................................. 46

*Ave. 6E Invs., LLC v. City of Yuma, Ariz.,*
    818 F.3d 493 (9th Cir. 2016) .................................... 57

*Axon Enter., Inc. v. FTC,*
    598 U.S. 175 (2023) (Gorsuch, J., concurring) .......... 31

*Barr v. East Bay Sanctuary Covenant,*
    140 S. Ct. 3 (2019) ................................................... 65

*Biden v. Texas,*
    597 U.S. 785 (2022) ............................................... 32, 33

*Bowen v. Mich. Acad. of Family Physicians,*
    476 U.S. 667 (1986) ................................................. 46

*Britkovyy v. Mayorkas,*
    60 F.4th 1024 (7th Cir. 2023) ................................... 28

iv

*Career Colls. & Schs. of Tex. v. Dep't of Educ.*,
  98 F.4th 220 (5th Cir. 2024)................................................. 33, 65

*China Unicom (Ams.) Operations Ltd. v. FCC*,
  124 F.4th 1128 (9th Cir. 2024)....................................... 16, 36, 37

*City of Rialto v. W. Coast Loading Corp.*,
  581 F. 3d 865 (9th Cir. 2009) ...................................................... 24

*Civ. Aeronautics Bd. v. Delta Air Lines, Inc.*,
  367 U.S. 316 (1961) ............................................................. 36, 38

*Cooper v. Harris*,
  581 U.S. 285 (2017) ..........................................................passim

*Dep't of Commerce v. New York*,
  588 U.S. 752 (2019) ...................................................................... 45

*DHS v. Regents of the Univ. of Cal.*,
  591 U.S. 1 (2020) ....................................................... 16, 32, 45, 54

*District of Columbia v. USDA*,
  444 F. Supp. 3d 1 (D.D.C. 2020) ............................................... 65

*Doe #1 v. Trump*,
  957 F.3d 1050 (9th Cir. 2020) .............................................. 54, 63

*E. Bay Sanctuary Covenant v. Barr*,
  934 F.3d 1026 (9th Cir. 2019) ................................................... 65

*E. Bay Sanctuary Covenant v. Biden*,
  993 F.3d 640 (9th Cir. 2021) ..........................................passim

*Fiallo v. Bell*,
  430 U.S. 787 (1977) ...................................................................... 51

*Galvan v. Press*,
  347 U.S. 522. (1954) .................................................................... 52

*Gorbach v. Reno*,
  219 F.3d 1087 (9th Cir. 2000) ....................................... 15, 35, 36

*Gun S., Inc. v. Brady,*
    877 F.2d 858 (11th Cir. 1989) .................................................... 38

*Harisiades v. Shaughnessy,*
    342 U.S. 580 (1952) ........................................................... 51, 52

*Hotel & Rest. Emps. Union, Local 25 v. Smith,*
    846 F.2d 1499 (D.C. Cir. 1988) ............................................... 4, 5

*Immigrant Assistance Project of AFL-CIO v. INS,*
    306 F.3d 842 (9th Cir. 2002) ......................................... 14, 24, 27

*Ivy Sports Medicine v. Burwell,*
    767 F.3d 81 (D.C. Cir. 2014) ............................................... 38, 43

*Jennings v. Rodriguez,*
    583 U.S. 281 (2018) .................................................................. 31

*Kelch v. Dir., Nev. Dep't of Prisons,*
    10 F.3d 684 (9th Cir. 1993) ..................................................... 39

*Kleindienst v. Mandel,*
    408 US 753 (1972) ................................................................... 51

*United States ex rel. Knauff v. Shaughnessy,*
    338 U.S. 537 (1950) ................................................................. 51

*Korematsu v. United States,*
    323 U.S. 214 (1944) ................................................................. 58

*Last Best Beef, LLC v. Dudas,*
    506 F.3d 333 (4th Cir. 2007) ................................................... 39

*Leedom v. Kyne,*
    358 U.S. 184 (1958) ................................................................. 31

*Macktal v. Chao,*
    286 F.3d 822 (5th Cir. 2002) ................................................... 38

*Mathews v. Diaz,*
    426 U.S. 67 (1976) ................................................................... 51

*Mazaleski v. Treusdell,*
    562 F.2d 701 (D.C. Cir. 1977) ................................... 39

*McGinest v. GTE Serv. Corp.,*
    360 F.3d 1103 (9th Cir. 2004) ................................. 57

*McNary v. Haitian Refugee Ctr., Inc.,*
    498 U.S. 479 (1991) ..........................................passim

*Mexichem Specialty Resins, Inc. v. EPA,*
    787 F.3d 544 (D.C. Cir. 2015) ................................ 65

*Monsanto Co. v. Geertson Seed Farms,*
    561 U.S. 139 (2010) ................................... 34

*Nakka v. USCIS,*
    111 F.4th 995 (9th Cir. 2024).......................... 28

*Nat. Res. Def. Council v. Regan,*
    67 F.4th 397 (D.C. Cir. 2023)........................ 39

*Nichols v. United States,*
    633 F.2d 829 (9th Cir. 1980) .................... 29

*Nken v. Holder,*
    556 U.S. 418 (2009) ................................... 34

*Patel v. Garland,*
    596 U.S. 328 (2022) .................................. 28

*Rajah v. Mukasey,*
    544 F.3d 427 (2d Cir. 2008)............................ 49, 50

*Ramos v. Nielsen,*
    336 F. Supp. 3d 1075 (N.D. Cal. 2018) ...................... 6

*Ramos v. Nielsen,*
    709 F. Supp. 3d 871 (N.D. Cal 2023) ........................ 8

*Ramos v. Wolf,*
    975 F.3d 872 (9th Cir. 2020) ............................passim

*Reeb v. Thomas,*
  636 F.3d 1224 (9th Cir. 2011) ................................... 29

*Regents of the Univ. of Cal. v. DHS,*
  908 F.3d 476 (9th Cir. 2018) ................................... 45, 47, 50, 54

*Reno v. Am. Arab Anti-Discrimination Comm.,*
  525 U.S. 471 (1999) ................................................ 50

*Reno v. Catholic Soc. Servs., Inc.,*
  509 U.S. 47 (1993) ...........................................passim

*Richards v. United States,*
  369 U.S. 1 (1962) ............................................... 21, 26

*Rodriguez v. Hayes,*
  591 F.3d 1105 (9th Cir. 2009) ................................ 34

*Romer v. Evans,*
  517 U.S. 620 (1996) ............................................. 53

*Shaughnessy v. United States ex rel. Mezei,*
  345 U.S. 206 (1953) ............................................. 51

*SKF USA Inc. v. United States,*
  254 F.3d 1022 (Fed. Cir. 2001) ............................... 38

*Smith v. Berryhill,*
  587 U.S. 471 (2019) ............................................. 31

*Students for Fair Admissions, Inc. v. Pres. & Fellows of*
  *Harvard Coll.,*
  600 U.S. 181 (2023) ............................................. 66

*Texas v. Biden,*
  646 F. Supp. 3d 753 (N.D. Tex. 2022)................... 18, 34

*Texas v. United States,*
  40 F.4th 205 (5th Cir. 2022)................................... 33

*Trump v. Hawaii,*
  585 U.S. 667 (2018) ..........................................passim

*Tuan Thai v. Ashcroft,*
366 F.3d 790 (9th Cir. 2004) ..................................................... 49

*United Food & Com. Workers Union Local 751 v.*
*Brown Grp., Inc.,*
517 U.S. 544 (1996) ..................................................... 66

*United Gas Improvement Co. v. Callery Props., Inc.,*
382 U.S. 223 (1965) ..................................................... 40

*United States v. Susquilanda,*
116 F.4th 129 (2d Cir. 2024) ............................................... 48, 50

*United States v. Texas,*
599 U.S. 670 (2023) ..................................................... 1, 34, 44

*United States v. Texas,*
143 S. Ct. 51 (2022) ..................................................... 1

*United States v. Tohono O'odham Nation,*
563 U.S. 307 (2011) ..................................................... 29

*Village of Arlington Heights v. Metro. Hous. Dev. Corp.,*
429 U.S. 252 (1977) ............................................... 46, 47, 52, 59

*Washington v. DHS,*
598 F. Supp. 3d 1051 (E.D. Wash. 2020) .................................. 48

*Washington v. Trump,*
No. 25-807, 2025 WL 553485 (9th Cir. Feb. 19, 2025).............. 63

*Wilkinson v. Garland,*
601 U.S. 209 (2024) ..................................................... 28

*Wong v. INS,*
373 F.3d 952 (9th Cir. 2004) ..................................................... 50

**Statutes**

5 U.S.C. § 705........................................................................passim

5 U.S.C. § 706........................................................................ 33, 65

8 U.S.C. § 1160 ............................................................... 23

8 U.S.C. § 1252 ................................... 15, 24, 28, 33, 34

8 U.S.C. § 1254a ..................................................passim

8 U.S.C. § 1326 ............................................................... 50

Pub. L. 101-649, Title III, § 303 (1990) ............................ 5

**Federal Register Notices**

35 Fed. Reg. 10,511 (Feb. 24, 2025) ................................ 42

73 Fed. Reg. 57,128 (Oct. 1, 2008) .................................... 9

78 Fed. Reg. 32,418 (May 30, 2013) ................................... 9

86 Fed. Reg. 6,845 (Jan. 19, 2021) ..................................... 8

86 Fed. Reg. 13,574 (Mar. 9, 2021)...................................... 8

87 Fed. Reg. 55,024 (Sept. 8, 2022) ................................... 9

88 Fed. Reg. 40,282 (June 21, 2023) ................................... 7

88 Fed. Reg. 40,294 (June 21, 2023) ................................... 7

88 Fed. Reg. 40,304 (June 21, 2023) ................................... 7

88 Fed. Reg. 40,317 (June 21, 2023) ................................... 7

88 Fed. Reg. 68,130 (Oct. 3, 2023) ............................... 9, 41

88 Fed. Reg 80,327 (Nov. 17, 2023) ................................... 39

90 Fed. Reg. 5,961 (Jan. 17, 2025) ............................passim

90 Fed. Reg. 8,805 (Feb. 3, 2025) .............................passim

90 Fed. Reg. 9,040 (Feb. 5, 2025) .......................... 12, 54, 59, 60, 64

## Other Authorities

101 Cong. Rec. H25811 (daily ed. Oct. 25, 1989)
    (statement of Rep. Sander Levine) ......................................... 4, 5

Ahilan Arulanantham, *Reversing Racist Precedent*,
    112 Geo. L.J. 439 (2024) ............................................................. 52

Antonin Scalia & Bryan A. Garner,
    *Reading Law* (2012) ................................................................... 26

Daniel Bress, *Administrative Reconsideration*,
    91 Va. L. Rev. 1737 (2013) ......................................................... 36

GAO, *Temporary Protected Status: Steps Taken to
    Inform and Communicate Secretary of Homeland
    Security's Decisions* (Apr. 2020) ............................................... 5, 6

Lynda J. Oswald, *Extended Voluntary Departure:
    Limiting the Attorney General's Discretion in
    Immigration Matters*, 85 Mich. L. Rev. 152 (1986).................... 4

# INTRODUCTION

This appeal arises in an unusual posture, as the Supreme Court stayed the district court's order after Defendants filed their opening brief. *See* App. Ct. Dkt. 39.1. Its ruling provides no reasoning and has no precedential effect. In recent years the Court has affirmed rulings after staying them, *see Allen v. Milligan*, 599 U.S. 1, 16-19 (2023), and reversed rulings it declined to stay. *E.g.*, *United States v. Texas*, 143 S. Ct. 51 (2022) (denying stay of district court order halting Secretary's enforcement priorities guidance); 599 U.S. 670 (2023) (reversing that same order). It does however make clear this Court should address the substantive issues in this appeal, as it contemplates a "disposition of the appeal in the [Ninth Circuit]" from which either side could seek certiorari. App. Ct. Dkt. 39.1.

This Court should affirm the district court's well-reasoned order. Plaintiffs' APA claims assert the Department of Homeland Security acted outside the scope of its delegated authority, both by exercising statutory powers it does not have in purporting to vacate a TPS extension for the first time in the 35-year history of the TPS statute, and by providing arbitrary and pretextual reasons for that vacatur decision. Despite what Defendants suggest, the district court's order did not set our nation's national security or foreign policy. It merely exercised traditional federal court authority to say

1

what the law is regarding the agency's powers in the TPS context.

Defendants assert the federal courts have no such authority. On their view, the agency's legal conclusions about the extent of its own power are entirely unreviewable, even if contrary to the plain text of its governing statute and settled agency practice. That view cannot be reconciled with the text of the jurisdictional provisions at issue, controlling precedent interpreting them, or basic background principles governing judicial review of agency action. Indeed, Defendants' view would leave federal courts powerless to stop even blatantly lawless agency action—whether to restrict TPS or expand it. Future administrations could grant TPS protection lasting decades, even for countries that face no humanitarian crisis. They could also cancel already-issued documents conferring legal status and work authorization, undermining trust in the government's word. On Defendants' view, such blatantly unlawful actions would be unreviewable.

This Court should also affirm the district court's ruling that both the vacatur and termination were motivated by racial animus. The district court clearly had jurisdiction over that claim. On its merits, the district court's detailed findings of discrimination need only be "plausible in light of the full record" to be upheld. *Cooper v. Harris*, 581 U.S. 285, 293 (2017). The overwhelming unrebutted evidence of discriminatory animus underlying these decisions

2

justifies interim relief under any governing standard, including rational basis review.

The scope of relief the district court ordered was also appropriate given this Court's law governing APA violations and the massive disparity in likely harms. That harm is already happening now that the Supreme Court ordered the vacatur and termination decisions to take effect. Thousands of Venezuelan TPS holders will lose their jobs and face detention, deportation, and family separation while this case proceeds. The only exception has arisen from the second paragraph of the Supreme Court's stay ruling which invited a narrow challenge to the vacatur's attempt to invalidate TPS-related documentation already issued to TPS holders pursuant to the January 17, 2025 extension. Plaintiffs have now sought that relief from the district court, but that particular claim is not at issue in this appeal. This Court should affirm as to the claims on which the district court ruled in the decision below.

## STATEMENT OF THE CASE AND RELEVANT FACTS

### A.    Congress's Statutory Scheme for TPS

Since 1990, the TPS statute has given the Executive Branch authority to provide nationality-based humanitarian relief to certain citizens of countries stricken by war, natural disaster, or other catastrophe, if they are already in the United States. 8 U.S.C. § 1254a. While a country is designated for TPS, qualified

3

beneficiaries receive employment authorization and protection from immigration detention and removal, *id.* sections 1254a(a)(1), (d)(4), regardless of whether they meet the requirements for asylum or other immigration relief. *Id.* § 1254a(b)(1).

Congress created TPS in response to unconstrained executive discretion in humanitarian relief programs. Prior to 1990, the executive used "extended voluntary departure" (EVD) to confer blanket nationality-based humanitarian relief. *See* Lynda J. Oswald, *Extended Voluntary Departure: Limiting the Attorney General's Discretion in Immigration Matters*, 85 Mich. L. Rev. 152, 157-60 (1986). This practice lacked "any specific … criteria." *Id.* at 178 n.153 (quoting Letter from Att'y Gen. W.F. Smith to Rep. L.J. Smith (July 19, 1983)). Arbitrary, overtly political results ensued, creating congressional pressure for reform, particularly in the wake of the Attorney General's refusal to grant EVD for Salvadoran refugees. *See Hotel & Rest. Emps. Union, Local 25 v. Smith*, 846 F.2d 1499, 1510-11 (D.C. Cir. 1988) (separate opinion of Mikva, J.).

Congress designed TPS to ensure future decisions would be based on "identifiable conditions" rather than "the vagaries of our domestic politics," 101 Cong. Rec. H25811, 25838 (daily ed. Oct. 25, 1989) (statement of Rep. Sander Levine) (debating Central American Studies and Temporary Relief Act of 1989, immediate precursor to the TPS statute); replace the "ad hoc, haphazard …

4

procedures" that existed before, *id.* at 25837 (statement of Rep. Richardson); and provide beneficiaries with certainty about "what [their] rights are, how the Justice Department determines what countries merit EVD status [and] how long they will be able to stay," *id.* While establishing criteria to govern countrywide humanitarian protection, Congress also designated El Salvador for TPS by statute, which Executive Branch officials had refused to do, Pub. L. 101-649, Title III, § 303 (1990). That law effectively overruled *Smith, supra*, and further demonstrated congressional intent to limit unbridled executive discretion.

A clear statutory framework now governs TPS decisionmaking. The Secretary of Homeland Security must consult with "appropriate" agencies, after which she "may designate" a country based on armed conflict, environmental disaster, or other extraordinary conditions. 8 U.S.C. § 1254a(b)(1). Designations can last between 6 and 18 months, effective upon notice in the Federal Register or "such later date as [the Secretary] may specify." *Id.* § 1254a(b)(2). The Secretary also has discretion, commonly exercised, to *re*designate countries for TPS so later-arriving nationals may apply.[1] The Secretary has substantial discretion over initial

---

[1] GAO, *Temporary Protected Status: Steps Taken to Inform and Communicate Secretary of Homeland Security's Decisions*, 5, 9, 12 (Apr. 2020) ("GAO Report").

designations. So long as she determines certain country conditions exist, she may choose whether and when to designate a country for TPS.

In contrast, the statute strictly limits agency discretion *after* a country is designated, both as to the timing of the review process and what criteria the Secretary must use in deciding whether to extend or terminate TPS protection. *See* GAO Report at 16-18, 27 (differentiating between discretion afforded before and after initial designation). "At least 60 days before" the end of a designation, "after consultation with appropriate agencies," the Secretary "shall review the conditions in the foreign state" and "determine whether the conditions for such designation … continue to be met." 8 U.S.C. § 1254a(b)(3)(A). The review process typically begins months before the 60-day deadline and involves USCIS and the State Department preparing country conditions memoranda and recommendations for the Secretary.[2] GAO Report at 15-16, 20-21; *see also Ramos v. Nielsen*, 336 F. Supp. 3d 1075, 1082 (N.D. Cal. 2018) (describing process).

The statute "essentially provides extension as a default." 1-

---

[2] The Certified Administrative Record ("CAR") for the vacatur decision, produced subsequent to the district court's postponement order, shows sharp deviations from this typical review process. *See* Arulanantham Decl. ISO Mot. to Take Jud. Not., Ex. 1.

6

ER.54. Unless the Secretary determines the country "no longer continues to meet the conditions for designation," the designation "is extended" automatically for 6 months or "in [her] discretion ... a period of 12 or 18 months." 8 U.S.C. § 1254a(b)(3)(C). If the Secretary determines conditions for designation are no longer met, she "shall terminate the designation." *Id.* § 1254a(b)(3)(B). As to timing, because an extension serves to push back the expiration date of a designation that is already in effect, it is effective "immediate[ly];" in contrast, the statute "builds in some delay before termination of TPS becomes effective." 1-ER-54. Termination "shall not be effective earlier than 60 days after the date the notice is published or, if later, the expiration of the most recent previous extension." 8 U.S.C. § 1254a(b)(3)(B).

Nowhere does the statute grant the Secretary authority to vacate an extension. Secretary Noem's vacatur of Secretary Mayorkas's January 17, 2025 extension of TPS for Venezuela was the first vacatur of an extension in the statute's history. Her partial vacatur of Secretary Mayorkas's July 1, 2024 extension of TPS for Haiti was the second. Secretary Mayorkas's June 21, 2023 rescissions of the first Trump administration's TPS terminations were the first rescissions of any kind in the program's history, and the terminations he purported to rescind were enjoined before taking effect. 88 Fed. Reg. 40,282, 40,294, 40,304, 40,317 (June 21,

7

2023) ("FR"). *See Ramos v. Nielsen*, 709 F. Supp. 3d 871, 876-80 (N.D. Cal 2023) (describing history of *Ramos* litigation challenging those terminations).

After a country is designated, the statute requires DHS to make individualized eligibility determinations. Applicants must show they have "been continuously physically present in the United States since the effective date of the most recent designation," and are ineligible if they have been "convicted of any felony or 2 or more misdemeanors" or could reasonably be regarded as a danger to the security of the United States. 8 U.S.C. §§ 1254a(c)(1), (c)(2)(B). If a TPS recipient becomes ineligible after approval, the Secretary "shall withdraw" their status. *Id.* § 1254a(c)(3). All beneficiaries must register "to the extent and in a manner which the [Secretary] establishes." *Id.* § 1254a(c)(1)(A)(iv).

## B.    The TPS Designation for Venezuela

On the last day of his first term, President Trump designated Venezuela for Deferred Enforced Departure,[3] citing "the worst humanitarian crisis in the Western Hemisphere." 86 FR 6,845 (Jan. 19, 2021). On March 9, 2021, Secretary Mayorkas designated Venezuela for TPS. 86 FR 13,574 (Mar. 9, 2021). On September 8,

---

[3] DED is a form of discretionary executive action not specifically governed by statute. Cong. Res. Serv., *Temporary Protected Status and Deferred Enforced Departure*, 4 (Sept. 23, 2024), https://sgp.fas.org/crs/homesec/RS20844.pdf.

2022, he extended the designation for 18 months. 87 FR 55,024 (Sept. 8, 2022).

On October 3, 2023, Secretary Mayorkas again extended Venezuela's designation, and also redesignated Venezuela, expanding eligibility to Venezuelans in the United States as of October 3, 2023. 88 FR 68,130 (Oct. 3, 2023). Because beneficiaries of the 2021 designation necessarily were in the United States as of that later date, they were also eligible under the 2023 designation. The Secretary established two registration tracks: one for those who already had TPS, and one for new applicants. *Id.* at 68,130.

Venezuela's 2023 designation was set to expire April 2, 2025. *Id.* Secretary Mayorkas announced an extension on January 10,[4] and published it on January 17—75 days before expiration. 90 FR 5,961 (Jan. 17, 2025). This was well within the normal timeframe for TPS decisionmaking and consistent with the statute, which requires that a periodic review be completed "[a]t least 60 days before" the end of a designation. 8 U.S.C. § 1254a(b)(3)(A). *See, e.g.*, 73 FR 57,128 (Oct. 1, 2008) (extension published 159 days before expiration); 78 FR 32,418 (May 30, 2013) (102 days). The Secretary

---

[4] Press Release, DHS, *DHS to Extend Temporary Protected Status for Venezuela* (Jan. 10, 2025), https://www.dhs.gov/archive/news/2025/01/10/dhs-extend-temporary-protected-status-venezuela.

set an extension period of 18 months, the most common duration. App. Ct. Dkt. 11.1 at 14 & Table A (88% of extensions over past two decades have been for 18 months). He established a consolidated re-registration process for all beneficiaries, given that "a TPS beneficiary under the 2021 Designation was necessarily a TPS beneficiary under the 2023 Designation." 1-ER-57. "[A]s a factual matter" consolidating re-registration "was not 'novel,'" but rather standard agency practice. 1-ER-58.

The extension took effect immediately. 90 FR at 5,962. *See also* 8 U.S.C. § 1254a(b)(3)(C) (designation "is extended" if periodic review does not result in termination); 1-ER-54. The re-registration period began January 17. Applicants who filed, including Plaintiff Freddy Jose Arape Rivas, received a Notice of Action confirming their work authorization was extended for 540 days (approximately 18 months). 4-ER-317 ¶ 12. The Federal Register notice also "automatically extend[ed] [certain work permits] ... without any further action," advising employers to "accept" the notice and facially expired permits as proof of work authorization. 90 FR at 5,967-70.

## C.    Vacatur and Termination of Venezuelan TPS

On January 15, then-Governor Noem testified at her confirmation hearing that the "extension [of TPS] of over 600,000 Venezuelans" was "alarming" due to alleged (but debunked) gang

10

activity by individuals in Colorado. 6-ER-977; 8-ER-1377 ¶ 131. She was confirmed on January 25. Three days later, she vacated Venezuela's TPS extension.

In the Federal Register, Secretary Noem justified the vacatur based solely on concerns about the registration process. 90 FR 8,805, 8,807 (Feb. 3, 2025). She described the consolidated process as "novel" and possibly not "consistent with the TPS statute."[5] *Id.* at 8,807. Defendants now concede the process was neither novel nor contrary to statute. 2-ER-149-50 ("Plaintiffs are correct that these overlapping registrations … [are] within the discretion of the Secretary…."). The decision does not refer to conditions in Venezuela, national interests, national security, or foreign-policy concerns.

Secretary Noem also directed USCIS to undo the immediate effects of the extension. 90 FR at 8,807 ("USCIS will invalidate" TPS-related documents "that *have been issued* with October 2, 2026 expiration dates" and vacate "the EADs that *were extended*") (emphases added). Finally, she noted that because of the vacatur she would have to "determine, by February 1, 2025, whether to extend or terminate the 2023 Venezuela TPS designation." *Id.*

Three days later, on February 1, she terminated the 2023

---

[5] The CAR includes no evidence that the Secretary considered the extension "novel" or "confusing." *See* Arulanantham Decl., Ex. 1.

designation, finding that "even assuming" conditions in Venezuela warranted it, extension was "contrary to the national interest." 90 FR 9,040, 9,042 (Feb. 5, 2025). Secretary Noem appeared on national television the day after each decision and explained each using derogatory language and false tropes about immigrant criminality and mental illness. *See infra* at 55-56.

### D.    Procedural History

Plaintiffs filed suit challenging the vacatur and subsequent termination of the prior administration's extension of TPS for Venezuela and moved for interim relief.

The district court found it had jurisdiction, holding 8 U.S.C. section 1254a(b)(5)(A)'s bar on review of certain TPS-related "determinations" does not preclude judicial review of claims like those here, based on governing Supreme Court and Ninth Circuit precedent, its own prior opinion (and the three other district courts to reach the question) during the first Trump administration, as well as the now-vacated Ninth Circuit panel decision in *Ramos*. 1-ER-24-28.

The court found Plaintiffs would be irreparably harmed absent an order preserving the status quo, finding many Venezuelan TPS holders have no other protection from deportation, that tens of thousands of American children would be separated from their parents by the government's action, and that Venezuela

12

remains extremely dangerous according to the State Department and other experts. 1-ER-32-37. The district court also credited economists' estimates that termination would cause several billion dollars in economic losses and hundreds of millions in lost tax revenue. 1-ER-39-41. The court further found Defendants' assertions that Venezuelan TPS holders are dangerous "entirely unsubstantiated." 1-ER-42-44.

On the merits, the court ruled for Plaintiffs on both of their APA claims against the vacatur. 1-ER-45-56 (Secretary lacked vacatur authority); 1-ER-56-60 (reasons "founded on legal error," failed to consider obvious alternatives, and pretextual). The district court also held Defendants violated the Constitution's anti-discrimination prohibition under any standard. 1-ER-60-76. Finally, it determined that "consistent with the text of section 705," the relief should run nationwide, insofar as it operates against the agency action itself. 1-ER-76-77.

Defendants sought a stay of the district court's order from the district court and then from this Court, both of which rejected their request. Two weeks after this Court ruled, Defendants sought a stay from the Supreme Court, which granted their request on May 19, 2025 "pending the disposition of the appeal ... and disposition of a petition for a writ of certiorari, if such a writ is timely sought." App. Ct. Dkt. 39.1.

## SUMMARY OF ARGUMENT

This Court should affirm the district court's well-reasoned opinion. As to jurisdiction, Plaintiffs' first claim—that the Secretary reached an erroneous *legal conclusion* when she asserted authority to vacate prior TPS extensions in any manner she sees fit, even though Congress enacted specific procedures and timelines governing TPS extensions and terminations—is plainly reviewable. Every court to consider the issue, including in the vacated panel majority opinion in *Ramos v. Wolf*, 975 F.3d 872, 895 (9th Cir. 2020), *opinion vacated upon reh'g en banc*, 59 F.4th 1010 (9th Cir. 2023), concluded that 8 U.S.C. section 1254a(b)(5)(A) does not bar judicial review of such pure legal questions concerning issues collateral to any particular TPS decision. Defendants' contrary reading contravenes the statute's text as well as caselaw construing the term "determination" in the immigration context. *See McNary v. Haitian Refugee Ctr., Inc.*, 498 U.S. 479, 492 (1991) (bar on review of "determinations" did not cover collateral challenges); *Reno v. Catholic Soc. Servs., Inc.*, 509 U.S. 47, 56–58 (1993) ("*CSS*") (same, as applied to statutory interpretation claim); *Immigrant Assistance Project of AFL-CIO v. INS*, 306 F.3d 842, 862–63 (9th Cir. 2002) ("*IAP*") (same, as to claim about proof requirements). Defendants' reading of Section 1254a(b)(5)(A) would leave federal courts powerless to stop even blatantly lawless agency action. *See infra*

14

Section I.A.

Defendants separately argue that the district court's relief was injunctive, and therefore ran afoul of the prohibition on injunctions at 8 U.S.C. section 1252(f)(1). But every court to consider the issue (including the Fifth Circuit) has held relief under the APA like that issued here is not injunctive for purposes of Section 1252(f)(1). *See infra* Section I.B.

On the merits, Defendants repeatedly make one overarching mistake: they conflate the vacatur and termination decisions. The district court "never analyzed the reviewability of the 2025 Termination," OB 16, because Plaintiffs *did not challenge it* on APA grounds in this motion. The district court found the *vacatur* unlawful on APA grounds, and then stayed the termination because the vacatur order "enabled the termination decision," and without the former the latter could not go into effect. 1-ER-28. Relatedly, Defendants ignore that Plaintiffs' discrimination claim challenges both decisions; to reverse this Court must find that both survive constitutional scrutiny.

Plaintiffs' first APA claim is that the Secretary lacked legal authority to vacate a TPS extension. Defendants' position cannot be reconciled with this Court's controlling APA law. *See Gorbach v. Reno*, 219 F.3d 1087, 1095 (9th Cir. 2000) (en banc) ("[t]here is no general principle that what [an agency] can do, [it] can undo.");

15

*China Unicom (Ams.) Operations Ltd. v. FCC*, 124 F.4th 1128, 1143 (9th Cir. 2024) ("*CUA*"). Under those cases, agencies cannot unilaterally "vacate" decisions where, as here, Congress constrained both the timing and review processes for decisions. Recognizing the extraordinary authority Defendants seek—which the agency has never before exercised—would render the statute's constraints meaningless. *See infra* Section II.A.

Plaintiffs' second APA claim is that the vacatur order was arbitrary and capricious because its reasoning—disagreeing with the extension's approach to TPS registration processes—rested on legal error, failed to consider obvious alternatives to vacatur, and was a pretextual attempt to justify ending Venezuela's TPS extension. This is an independent basis on which to affirm the district court's order, *see* 1-ER-56-60 (citing *DHS v. Regents of the Univ. of Cal.*, 591 U.S. 1, 30 (2020) (reversing DACA rescission as arbitrary)). Moreover, Section 1254a(b)(5)(A) clearly does not bar review of this claim, because it applies only to matters within the scope of Section 1254a(b), whereas TPS registration is addressed in Section 1254a(c). Nonetheless, Defendants have entirely ignored this independent APA argument. *See infra* Section II.B.

As to Plaintiffs' discrimination claim, the district court made detailed findings, based on unrebutted evidence, that the animus underlying both the vacatur and termination decisions justified

interim relief under any governing standard, including rational basis review. 1-ER-74-75; Dkt. 102 at 4. The Secretary explicitly relied on false racial stereotypes—like the myth that Venezuela emptied its prisons to send migrants here—and derogatory language in her public statements explaining both the vacatur and termination decisions. This tracked her confirmation hearing testimony, in which she expressed "alarm[]" about all "600,000" Venezuelan TPS holders due to alleged gang activity by a small number of individuals.

While the Secretary conflated Venezuelan TPS holders with "dirt bags" and gang members, the unrebutted record evidence shows that Venezuelan TPS holders have lower crime rates and higher labor force participation rates than the general population. It also shows that Venezuela never emptied its prisons; that is an age-old anti-immigrant myth. This Court should not disturb the detailed findings of discrimination here, which need only be "plausible in light of the full record" to be upheld. *Cooper*, 581 U.S. at 293. *See infra* Section III.

*Finally*, Defendants' arguments against the scope of relief are foreclosed by this Court's precedent. "When a reviewing court determines that agency regulations are unlawful, the ordinary result is that the rules are vacated—not that their application to the individual petitioners is proscribed." *E. Bay Sanctuary*

17

*Covenant v. Biden*, 993 F.3d 640, 681 (9th Cir. 2021) (citations omitted). The district court's order was not a universal preliminary injunction, but instead a postponement of agency action under 5 U.S.C. section 705, i.e., "an interim … form of vacatur." *Texas v. Biden*, 646 F. Supp. 3d 753, 768–69 (N.D. Tex. 2022). And despite Defendants' ever-shifting position as to the proper scope of relief, they have never explained how the district court could have feasibly protected the more-than-84,000 Venezuelan TPS holders who are members of the Plaintiff National TPS Alliance without protecting others.

## STANDARD OF REVIEW

A district court's postponement of agency action is reviewed under the same abuse of discretion standard as a preliminary injunction, with legal questions reviewed *de novo* and findings of fact reviewed for clear error. *E. Bay Sanctuary Covenant*, 993 F.3d at 668; *id.* at 681 (applying same standard for review of terms and scope of relief).

## ARGUMENT

## I.  THE DISTRICT COURT PROPERLY EXERCISED JURISDICTION OVER PLAINTIFFS' APA CLAIMS

Plaintiffs pled two distinct APA claims in the motion at issue here, both of which challenge only the vacatur, not the separate termination.

18

*First*, Plaintiffs raise a question of pure statutory interpretation: whether the Secretary has implicit power to vacate a TPS extension even though the statute provides fixed time limits and procedures for altering TPS designations. The federal courts can undoubtedly decide whether the statute's text and structure permit such authority.

*Second*, Plaintiffs claim the reasons provided for the vacatur—alleged defects in the extension's registration process—were arbitrary and capricious. Defendants entirely ignore this second claim, even though it is obviously not barred by Section 1254a(b)(5)(A) because it concerns TPS registration rather than the decision to designate, extend, or terminate.

## A. Section 1254a(b)(5)(A) Does Not Bar Plaintiffs' APA Claims

Defendants argue Section 1254a(b)(5)(A) bars Plaintiffs' first claim—that the agency has no authority to vacate a TPS extension—but engage only selectively with the statute's text. Section 1254a(b)(5)(A) provides:

> There is no judicial review of any determination of the [Secretary] with respect to the designation, or termination or extension of a designation, of a foreign state under this subsection [i.e., subsection (b)].

Review of *the rest of subsection (b)* makes clear that "determination"

19

in this provision refers to the Secretary's conclusion that a nation satisfies certain country conditions requirements relevant to TPS decisionmaking. "Determination" does *not* refer to predicate legal judgments such as whether the agency has inherent authority to vacate prior extensions. Nor does "determination … under *this* subsection" in Section 1254a(b)(5)(A) refer to issues addressed in *other* subsections, such as TPS registration processes—which are discussed in subsection (c) rather than (b).

The TPS statute uses "determine" and "determination" in several other provisions, none of which Defendants bothered to analyze. Most important, the sub-provisions that immediately precede Section 1254a(b)(5)(A) require the Secretary to "determine" that country conditions meet the requirements for designation, extension, or termination of its TPS status. During the periodic review process, the Secretary must:

> "*determine* whether the conditions for … designation … continue to be met" and publish "*such determination* (including the basis for *the determination*, and, in the case of *an affirmative determination*, the period of extension of designation …."

8 U.S.C. § 1254a(b)(3)(A) (emphases added). The provision authorizing termination also uses "determination" to refer to an assessment of country conditions, as does the provision requiring

20

extensions. *See* 8 U.S.C. § 1254a(b)(3)(B) (referring to "*the determination*" that a country no longer meets conditions for designation); 8 U.S.C. § 1254a(b)(3)(A) (mandating extension if Secretary "does not *determine*" that country no longer meets conditions for designation). *See also* 8 U.S.C. § 1254a(d)(3) (referring to "the *determination*" that country conditions require termination).

In contrast, nowhere does the TPS statute use "determination" to refer to predicate legal judgments about the scope of the Secretary's statutory authority. Indeed, none of the many other actions, decisions, and judgments the Secretary can take with respect to TPS constitute "determinations" under this statute; if Congress thought they did, it would have called them that. While "determination" theoretically could, in other statutes, refer broadly to any kind of decision or judgment, in Section 1254a(b) it refers to the Secretary's country conditions assessments. Thus, the Secretary's legal conclusion that she had authority to vacate an extension is not a "determination[]" under Section 1254a(b)(5)(A). *See Richards v. United States*, 369 U.S. 1, 11 (1962) ("We believe it fundamental that a section of a statute should not be read in isolation from the context of the whole Act.").

The vacatur notice itself is consistent with this reading of "determination." The Secretary does not refer to any of the reasons

she gives for the vacatur as a "determination." *Compare* 90 FR at 8807 (providing reasons for the vacatur without describing any as a "determination") *with* 90 FR at 5963 (explaining extension is warranted because Secretary "*determined* ... extraordinary and temporary conditions supporting Venezuela's TPS designation remain") (emphasis added). The term appears in the vacatur order only to reference Secretary Mayorkas's "determination to extend" Venezuela's TPS designation and her own forthcoming decision regarding whether conditions for designation are met. 90 FR at 8807 (noting vacatur will "provide an opportunity for informed *determinations* regarding the TPS designations") (emphasis added).

Plaintiffs' second APA claim challenges the vacatur order because the rationale provided—that the TPS registration procedures contained within the extension notice were somehow improper—was arbitrary and capricious. That claim, too, is not barred by Section 1254a(b)(5)(A), not only because it does not challenge a country conditions "determination," but also because it concerns the exercise of *registration* authority, which is addressed in subsection 1254a(c) of the statute. *See* 8 U.S.C. §§ 1254a(c)(1)(A)(iv), (B). Section 1254a(b)(5)(A) withdraws jurisdiction only over determinations under "*this* subsection," i.e., subsection 1254a(b) (emphasis added). Thus, even if Section 1254a(b)(5)(A) barred review of all decisions, actions, and

22

judgments under subsection (b), and even if all of the Secretary's conclusions about alleged registration defects constituted "determinations"—neither of which is true—Plaintiffs' second APA claim still would not be barred because Section 1254a(b)(5)(A) reaches only determinations under subsection (b), not (c).

Plaintiffs' interpretation comports with both the Supreme Court's and this Court's cases construing "determination" in other immigration statutes that withdraw Article III jurisdiction. For instance, *McNary*, 498 U.S. 479, considered whether a claim alleging unconstitutional agency practices in processing legalization applications was barred by a provision stating "[t]here shall be no administrative or judicial review of a determination respecting an application for adjustment of status under this section." *Id*. at 499 (Rehnquist, C.J. dissenting, citing 8 U.S.C. § 1160(e)). The Supreme Court held the claim not barred because "the reference to 'a determination' describes a single act rather than a group of decisions or a practice or procedure employed in making decisions," and because the phrase "respecting an application" refers to "an individual application." *Id*. at 492. Congress "could easily have used broader statutory language" had it wanted to bar review of "all causes ... arising under" the statute, or "all questions of law and fact" in such suits, rather than merely review of a "determination." *Id*. at 492-94. It did not.

23

Two years later, *CSS*, 509 U.S. at 56, applied *McNary* to hold that a similar provision did not bar review of a claim challenging the agency's interpretation of a statutory phrase—like Plaintiffs' first APA claim here. This Court subsequently did the same. *IAP*, 306 F.3d at 862-63. Since those decisions, this Court has utilized *McNary*'s framework to analyze various jurisdictional schemes. *See Ramos*, 975 F.3d at 892 (Christen, J., dissenting) (citing, *inter alia*, *City of Rialto v. W. Coast Loading Corp.*, 581 F. 3d 865, 874 (9th Cir. 2009)).

Congress has legislated against the backdrop of these rulings, enacting and amending various jurisdictional provisions in the immigration code, and sometimes using *McNary*'s language. *See* 8 U.S.C. § 1252(a)(2)(A)(i) (barring review of "any individual determination" or "any other cause or claim"); *id.* § 1252(a)(2)(B) ("any judgment … or any other decision or action"); *id.* § 1252(b)(9) (channeling review of "all questions of law or fact"). But it has left Section 1254a(b)(5)(A) untouched.

*McNary*, *CSS*, and Congress's subsequent amendments to jurisdictional provisions of the immigration code confirm what Section 1254a(b)(5)(A) says. Like the statutes in *McNary* and *CSS*, it refers to a precise set of "determination[s]," rather than a broader set of actions, decisions, or judgments. The agency's determination—a single decision that conditions in a particular

24

country warrant designation, extension, or termination—is analogous to the determination to deny a benefits application in *McNary* or *CSS*. The agency's unlawful assertion of novel authority to vacate TPS extensions is akin to the unlawful practices and interpretive rules challenged in those cases. As in *McNary*, Plaintiffs here "do not seek a substantive declaration that they are entitled to [TPS] status," 498 U.S. at 495, but rather a legal ruling about the Secretary's vacatur authority. Later statutes barring review over broader agency decisionmaking, such as its "judgment[s]," "actions," "decisions," or "all questions of law and fact" arising from them, confirm Congress meant for Section 1254a(b)(5)(A) to be narrow in scope.

No judge has ever accepted Defendants' extraordinarily broad interpretation of Section 1254a(b)(5)(A). To the contrary, in prior litigation, a panel of this Court, though divided as to the claim in that case, agreed that Section 1254a(b)(5)(A) does not bar review of claims about interpretation of the statute collateral to the ultimate determination at issue. *Ramos*, 975 F.3d at 895 (citing *McNary*) ("[A] claim that an agency has adopted an erroneous interpretation of a governing statute would be reviewable … particularly because the court's resolution of these sorts of challenges turns on a review of the law itself, rather than a review of the merits of any specific agency determinations."); *id.* at 907 (Christen, J., dissenting)

25

(finding claim reviewable because "Plaintiffs did not ask the district court to reweigh the factors the Secretary considered when she terminated TPS … nor did they seek a ruling that [their countries] are entitled to TPS designations"). All three judges agreed that *McNary* and its progeny controlled.

Defendants never analyze how the statute uses the term "determination." Instead, they rely on dictionaries defining "determination" to refer generally to virtually all "decision[s] or pronouncement[s]," OB 13-14. But that definition is inconsistent with the way this statute uses "determination." Congress did *not* use that term to refer to the various other decisions and pronouncements authorized within the TPS governing scheme. Among other decisions and pronouncements, the Secretary must "grant" TPS to eligible individuals, "authorize" their employment, "notify" recipients of certain TPS-related information, "provide" them with benefits, "extend" or "terminate" countries' TPS status, "establish" registration procedures, and "require" fees for them (if she so chooses). 8 U.S.C. §§ 1254a(a)(1-4), 1254a(b)(1-3), 1254a(c). All of these would be "determinations" in Defendants' use of the term, but the statute does not call them that. *See Richards, supra*; *see also* Antonin Scalia & Bryan A. Garner, *Reading Law* 167 (2012) (the "Whole Act" canon "establishes that only one of the possible meanings that a word or phrase can bear is compatible with use of

26

the same word or phrase elsewhere in the statute").

Defendants also assert the TPS statute uses "determination" more broadly than in *McNary*, *CSS*, *IAP*, and other cases construing that term because the statute here uses the terms "any" and "with respect to." OB 18-19. But those terms also have clear meanings when understood within the context of this statute. The TPS statute uses "any" to refer to the various determinations within its scope—including country conditions assessments required for any of the three possible bases for a TPS designation and corresponding determinations supporting extensions or terminations. *See generally* 8 U.S.C. § 1254a(b)(1) (describing different bases for designation); *id.* §§ 1254a(b)(3)(A), (B), (C) (setting forth detailed criteria and procedures for TPS status review for each discrete decision). And "with respect to" distinguishes determinations that pertain to designation, extension, and termination under subsection (b) from determinations that concern eligibility for benefits and physical presence, which are addressed under different subsections—and therefore beyond the scope of Section 1254a(b)(5)(A)'s bar. *See* 8 U.S.C. §§ 1254a(a)(4)(B), 1254a(c)(2)(A), 1254a(e) (all referring to other "determinations"). Defendants also ignore that the statutes in *McNary*, *CSS*, and *IAP* used "respecting" much as this statute uses "with respect to," but those cases never read it to preclude collateral statutory authority

27

claims like the one raised here.[6]

Defendants seek support from *Patel v. Garland*, 596 U.S. 328 (2022), which read a statute barring review of "any judgment regarding the granting of relief" to bar a factual claim. OB 14. But the statute in *Patel* referred to "judgment," not "determination," 596 U.S. at 339; found review barred for *factual* claims, not legal ones, *id.* at 347; and relied on other context clues not present here. 596 U.S. at 339 (citing history of 8 U.S.C. § 1252(a)(2)(D)); *cf. Wilkinson v. Garland*, 601 U.S. 209, 221 (2024) (finding reviewable a question of law otherwise subject to the same stripping provision); *Britkovyy v. Mayorkas*, 60 F.4th 1024, 1030 (7th Cir. 2023) (distinguishing *McNary* and *CSS* because they concerned "determination" rather than "judgment").[7]

None of the other cases Defendants cite reads a jurisdiction-stripping provision to bar review of a pure *legal* claim, let alone a pure legal claim that the agency has exceeded its statutory

---

[6] Defendants also suggest Section 1252(a)(5) independently bars "'statutory or nonstatutory' *challenge[s]*," OB 17, but it refers only to "statutory or nonstatutory" *sources* of review authority for purposes of defining what constitutes "judicial review." That provision does not enlarge the scope of a "determination," — it never mentions the term.

[7] This Court has read the statute construed in *Britkovyy* as preserving jurisdiction over collateral challenges to generally applicable policies, citing *McNary*. *Nakka v. USCIS*, 111 F.4th 995, 1009 (9th Cir. 2024).

28

authority. *Reeb v. Thomas*, 636 F.3d 1224, 1226 (9th Cir. 2011) found an individual prisoner's APA challenge to his expulsion from a drug treatment program barred by a statute that said "the provisions of [the APA] do not apply to the making of any determination, decision, or order under" treatment program decisions. *Id.* (cleaned up). The provision actually changed the applicable substantive law, rather than merely limiting jurisdiction, and barred review of any "decision, or order," which this Court read as barring review of "any substantive decision" concerning placement. *Id.* at 1227. In contrast, Section 1254a(b)(5)(B) nowhere states the APA is inapplicable, and bars review only of "determinations." *Nichols v. United States*, 633 F.2d 829 (9th Cir. 1980) is even farther afield. The tax assessment review scheme there *permitted* judicial review in district court; it barred only appeals, and therefore implicated none of the jurisdiction-stripping doctrine at issue in this case. *Id.* at 831. *See also United States v. Tohono O'odham Nation*, 563 U.S. 307, 316 (2011) (relief available in either of two courts, just not both). Finally, *Amgen, Inc. v. Smith*, 357 F.3d 103, 112-113 (D.C. Cir. 2004), held the opposite of what Defendants argue, reading the statute to *preserve* review of agency authority claims.

Ultimately, the question this Court must address is whether Plaintiffs' claims against the vacatur order—that the agency lacks

29

free-standing vacatur authority and that its reasoning concerning the registration requirements was arbitrary—are conceptually distinct from whether country conditions supported designation, extension, or termination for Venezuela. Because they clearly are, this Court retains jurisdiction to consider them.[8]

Finally, were this a close call as to whether Plaintiffs' claims fall within the stripping provision, two background principles justify rejecting Defendants' view. *First*, reading Section 1254a(b)(5)(A) to bar review over any TPS-related decision of any kind—including those purely legal and collateral to the Secretary's ultimate decision—would leave a wide range of lawless agency behavior entirely unreviewable. For example, if Defendants were correct, a decision granting TPS to Mexico for fifty years explicitly to accomplish mass legalization, or to India or China to sweeten a trade deal, would be unreviewable "determinations" to designate TPS. Though such actions would be contrary to the statute's terms—because TPS designations cannot last longer than 18

---

[8] The reviewability of the agency's legal conclusion regarding vacatur authority does not turn on whether it was set forth in the termination notice or the vacatur notice, but rather on whether it constitutes a "determination … under [subsection (b)]." Nonetheless, the fact that the conclusion was placed in a document labeled a "vacatur," in which the agency expressly did not decide to terminate TPS, further shows it was a collateral legal conclusion rather than a "determination."

months or be made for reasons not specified in the statute—no court could review it. Similarly, there could be no review of decisions to cancel arbitrarily already-issued documents attesting to TPS status, upon which individuals and employers rely.

That is not what any rational Congress could intend, let alone one enacting a statute to *constrain* executive discretion. *See* pp. 4-5, *supra*. It is not sensible, for instance, to conclude that Congress would statutorily proscribe TPS decisions to 18 months if the Secretary actually had unfettered power to ignore the statute at her whim. When faced with results "no sensible person could have intended," the Supreme Court has eschewed "uncritical literalism" and instead read jurisdiction-limiting statutes more narrowly, both in the immigration code and elsewhere. *Jennings v. Rodriguez*, 583 U.S. 281, 293–94 (2018) (plurality) (construing "arising from" narrowly, citing cases construing "affecting," "related to," and "in connection with" narrowly in jurisdictional statutes).

*Second*, Congress drafts legislation against a "strong presumption" favoring "judicial review of administrative action." *Smith v. Berryhill*, 587 U.S. 471, 483 (2019); *Abbott Labs v. Gardner*, 387 U.S. 136, 141 (1967)) (total preclusion disfavored absent "clear and convincing" evidence); *Axon Enter., Inc. v. FTC*, 598 U.S. 175, 207-08 (2023) (Gorsuch, J., concurring). *See also Leedom v. Kyne,* 358 U.S. 184, 190 (1958) (presumption particularly

31

strong where claim alleges agency acted in excess of delegated authority). Here, Defendants' reading would bar review of important statutory challenges affecting hundreds of thousands of people. This Court should not adopt that extreme position absent clear and convincing evidence the statute requires it.

In keeping with those principles, the Supreme Court has consistently found APA claims like these reviewable in the immigration context. *Biden v. Texas*, 597 U.S. 785, 806–07 (2022), rejected the government's justiciability arguments and reached both a statutory interpretation claim and other APA claims against DHS's border policies. It held that "under the APA, DHS's exercise of discretion within [immigration law's] statutory framework must be reasonable and reasonably explained." *Id*. at 805–07. Two years earlier, the Supreme Court found jurisdiction to consider an APA claim challenging another agency decision affecting several hundred thousand immigrants. *Regents*, 591 U.S. at 30 (reversing DACA rescission for failure to consider alternatives).

Like in those cases, Plaintiffs claim an administrative agency has acted in excess of authority conferred by Congress and has exercised its vast power arbitrarily. The federal courts have consistently recognized their authority to adjudicate such claims.

### B.    The District Court's Postponement Order Is Not Injunctive for Purposes of Section 1252(f)(1)

Defendants also assert that 8 U.S.C. section 1252(f)(1) bars APA relief, but every court to consider the issue, including the Fifth Circuit and at least five district courts, disagrees. *Texas v. United States*, 40 F.4th 205, 219–20 (5th Cir. 2022) (Section 1252(f)(1) does not apply to vacatur); 1-ER-23 (collecting cases). And although Defendants fail to acknowledge it, OB 43, the Supreme Court has reserved the question, *Biden v. Texas*, 597 U.S. 785, 801 n.4 (2022).

The district court committed no abuse of discretion in following this Circuit's normal rule, which is that "[w]hen a reviewing court determines that agency regulations are unlawful, the ordinary result is that the rules are vacated—not that their application to the individual petitioners is proscribed." *E. Bay Sanctuary Covenant*, 993 F.3d at 681 (cleaned up); *see also Career Colls. & Schs. of Tex. v. Dep't of Educ.*, 98 F.4th 220, 255 (5th Cir. 2024) ("Nothing in the text of Section 705, nor of Section 706, suggests that either preliminary or ultimate relief under the APA needs to be limited to [the associational plaintiff] or its members.").

Defendants suggest that even if "set aside" relief under Section 706 can operate directly against the agency's action, interim relief under Section 705 does not. OB 43. But the district court rightly concluded that vacatur under the APA is "a less

33

drastic remedy" than an injunction because it does not enjoin persons. 1-ER-20 (quoting *Monsanto Co. v. Geertson Seed Farms*, 561 U.S. 139, 165 (2010)). Given that a stay under Section 705 is "an interim … form of vacatur," there is no basis for treating the two differently. *Texas*, 646 F. Supp. 3d at 768–69. A stay too merely "temporarily suspend[s] the source of authority to act"; it does not "direct[] the actor's conduct." *Nken v. Holder*, 556 U.S. 418, 428–29 (2009).

Defendants remaining arguments are meritless. They argue the district court lacked postponement authority because the vacatur had taken effect, OB 43-44, but TPS holders still had status when the district court ruled. Moreover "[c]ourts—including the Supreme Court—routinely stay already-effective agency action under Section 705." *Texas*, 646 F. Supp. 3d at 770 (collecting cases). Defendants' argument that "restrain" in Section 1252(f)(1) encompasses declaratory relief is foreclosed by *Rodriguez v. Hayes*, 591 F.3d 1105, 1119 (9th Cir. 2009). And, contrary to Defendants' claim, the district court did not hold the TPS statute falls outside the scope of Section 1252(f)(1)'s coverage. Rather, it did not decide the question. *Compare* OB 40-41 *with* 1-ER-16-17. Plaintiffs do not press that thorny issue here, and this Court should not address it without the benefit of briefing.

## II.  DEFENDANTS ARE UNLIKELY TO PREVAIL ON THE MERITS OF PLAINTIFFS' APA CLAIMS

The district court correctly granted relief on two APA claims: that the Secretary lacked authority to vacate a TPS extension, and that the rationale for vacating the extension based on alleged registration defects was arbitrary. Defendants conflate the two claims, OB 20-26, but they provided separate and independent bases for the district court's decision.

### A.  The Vacatur Order Contravened the Plain Terms of the TPS Statute

Plaintiffs' first APA claim presents a question of pure statutory construction concerning agency power: Does the Secretary have implicit authority to vacate a TPS extension and replace it with a termination, even though the statute sets fixed time limits and procedures for terminating TPS? Under the statute's plain text and structure, the answer must be "no." The statute never mentions this vacatur authority, and the agency has never previously exercised it.

Defendants' assertion of "inherent" agency authority to undo prior decisions contravenes controlling precedent. "There is no general principle that what [an agency] can do, [it] can undo." *Gorbach*, 219 F.3d at 1095. "The determinative question" in assessing agency reconsideration authority "is not what the [agency] thinks it should do but what Congress has said it can do."

35

*Civ. Aeronautics Bd. v. Delta Air Lines, Inc.*, 367 U.S. 316, 322-25 (1961). *See also CUA*, 124 F.4th at 1143; 1-ER-45-56.[9]

Defendants ignore this controlling precedent and misread *CUA,* asserting any "statutory authorization to issue a benefit 'must be understood as carrying with it an implied incidental authority' to revoke the benefit." OB 20 (quoting *CUA*, 124 F.4th at 1143). But *CUA* held that whether implied reconsideration authority exits "turn[s] … on the details of the statutory scheme," *id.* at 1143-45, and its reasoning precludes finding such authority here.

First, *CUA* found reconsideration "foreclosed when there is a specific statutory process for altering an agency's grant of authorization." 124 F.4th at 1149. *See also Civ. Aeronautics Bd.*, 367 U.S. at 322-25 ("[S]pecific instructions set out in the statute should not be modified by resort to such generalities as 'administrative flexibility' and 'implied powers'"); *Gorbach*, 219 F.3d at 1098 (Attorney General lacked implied authority to revoke naturalization because the "statutory denaturalization procedure

---

[9] *See generally* Daniel Bress, *Administrative Reconsideration*, 91 Va. L. Rev. 1737, 1774-83 (2013) (reading Supreme Court precedent on reconsideration authority to indicate "with the possible exception of reconsiderations that address clerical error or perhaps fraud, agencies may not reconsider their decisions in the absence of express statutory or regulatory authorization.").

exhausts the field"). Second, it found a statute's "use of a fixed term" "affirmatively inconsistent with positing an implied power to revoke at any time." *CUA,* 124 F.4th at 1148. Applying *CUA,* the district court correctly held the TPS statute's "specific statutory process" for altering a designation and its "use of a fixed [extension] term" foreclose vacatur. *Id.* at 1148-49; 1-ER-52.

Defendants agree that vacatur authority is "foreclosed" if Congress has "require[d] other procedures," OB 20, but fail to explain how the vacatur authority they assert is consistent with the procedures Congress has required here. They stress the Secretary's discretion over the length of a TPS designation and the timing of periodic review.[10] OB 22. But Defendants ignore the statute's clear mandate that a termination "shall not be effective" before "the expiration of the most recent previous extension …." 8 U.S.C. § 1254a(b)(3)(B). If the Secretary could vacate "the most recent previous extension," *id.,* and then terminate a designation before its expiration, Section 1254a(b)(3)(B)'s timing rules would be meaningless. Indeed, "the power the [Secretary] asks for in this case seems nothing more or less than the power to do indirectly

---

[10] Even with respect to these decisions, the Secretary's discretion is more constrained than Defendants acknowledge. *See* 8 U.S.C. § 1254a(b)(3)(C) (extension may last 6, 12, or 18 months); *id.* § 1254a(b)(3)(A) (periodic review must occur "at least 60 days before the end of the" designation period).

what [she] cannot do directly." *Civil Aeronautics Bd.*, 367 U.S. at 328. To grant it would be to provide "the lever for nullify(ing) an express provision of the Act." *Id.* (quotation marks omitted) (alteration in original).

Defendants' out-of-circuit precedent is not to the contrary. *Ivy Sports Medicine v. Burwell*, 767 F.3d 81, 86 (D.C. Cir. 2014) (Kavanaugh, J.), supports Plaintiffs. OB 21. The court there *rejected* FDA's assertion of inherent authority to rescind its determination that a medical device was substantially equivalent to others on the market. It held that "[b]ecause Congress created a procedure for FDA to reclassify medical devices, FDA may not short-circuit that process through what it calls its inherent authority to reverse its substantial equivalence determinations for those devices." *Ivy Sports Med.*, 767 F.3d at 89. Defendants' other cases, OB 20-21, similarly confirm that "any inherent reconsideration authority does not apply in cases where Congress has spoken." *Ivy Sports Med.*, 767 F.3d at 86. *See Macktal v. Chao*, 286 F.3d 822, 825-26 (5th Cir. 2002); *Gun S., Inc. v. Brady*, 877 F.2d 858, 862-64 (11th Cir. 1989); *Alberston v. FCC*, 182 F.2d 397, 399 (D.C. Cir. 1951). *SKF USA Inc. v. United States*, says only that *a court* may remand an agency decision if the agency "believes that its original decision is incorrect on the merits and wishes to change

38

the result." 254 F.3d 1022, 1029 (Fed. Cir. 2001).[11] More recent D.C. Circuit precedent clarifies that "[w]hile we have often referred to agencies' inherent authority, the term inherent is misleading because it is axiomatic that administrative agencies may act only pursuant to authority delegated to them by Congress." *Nat. Res. Def. Council v. Regan*, 67 F.4th 397, 401 (D.C. Cir. 2023) (cleaned up).

Defendants argue the Secretary has authority to reconsider a decision to correct a mistake. OB 21. But the Secretary identified no mistake in Secretary Mayorkas's extension. And, as Defendants concede, the true purpose of the vacatur was ultimately to allow the Secretary to make a new decision. OB 25; 1-ER-60 ("[T]he Secretary's ultimate goal ... was to revisit and undo Secretary Mayorkas's decision."). No doubt, the Secretary has authority to correct "inadvertent ministerial errors."[12] *Am. Trucking Ass'ns v.*

---

[11] *Last Best Beef, LLC v. Dudas* concerns extraordinary facts not present here. 506 F.3d 333, 336, 340 (4th Cir. 2007) (patent office unknowingly approved trademark on same day legislation prohibiting trademark was signed into law). *Kelch v. Dir., Nev. Dep't of Prisons*, 10 F.3d 684, 687 (9th Cir. 1993), concerns state law. And *Mazaleski v. Treusdell*, 562 F.2d 701 (D.C. Cir. 1977), concerned whether an agency's offer to reconsider precluded Plaintiffs' challenge to its decision; neither side contested reconsideration authority.

[12] *See, e.g.*, 88 FR 80,327 (Nov. 17, 2023) (correcting "a technical error" that resulted in "two incorrect references").

*Frisco Transp. Co.*, 358 U.S. 133, 146 (1958). But that power "may not be used as a guise for changing previous decisions because the wisdom of those decisions appears doubtful in the light of changing policies." *Id.*

Defendants also point to former Secretary Mayorkas's recission of TPS terminations to support their assertion of reconsideration authority, but these do not justify an exception to the rules established by this Court's precedent. Those 2023 decisions were the first recissions of any kind in the program's history, and they were extraordinary—they rescinded *terminations* that had already been enjoined by court order for five years. *See supra* Background A. *Cf. United Gas Improvement Co. v. Callery Props., Inc.*, 382 U.S. 223, 229-30 (1965) (agency had power to "undo what is wrongfully done" when original decision was overturned on judicial review). Of course, even a consistent prior agency practice of vacatur could not render a vacatur lawful if it violates express statutory requirements, but there is no such practice here.

To the extent Defendants argue that the Secretary had authority to vacate Venezuela's TPS extension because it had not yet taken effect, OB 22-23, they are wrong for three reasons. *First*, the extension *was* in effect. The TPS statute provides that a designation "take[s] effect upon the date of publication" unless the Secretary selects a later date. 8 U.S.C. § 1254a(b)(2)(A). Here,

40

Venezuela's 2023 TPS designation took effect on October 3, 2023. 88 FR 68,130 (Oct. 3, 2023). Once in effect, a designation "shall remain in effect until the effective date of the termination." 8 U.S.C. § 1254a(b)(2)(B). Extensions serve to *immediately* change the expiration date of an active designation. 8 U.S.C. § 1254a(b)(3)(C) (if Secretary does not determine following periodic review that conditions for designation are no longer met, designation "is extended"). Thus, the *day* the January 17 extension was published, applicants were advised to begin re-registering to receive TPS status and work authorization valid through October 2, 2026. 90 FR at 5962 (re-registration period opened January 17, 2025). And they did. Applicants who filed that day and the days afterward, including Plaintiff Freddy Arape Rivas, received a Notice of Action confirming their applications had been received and their work authorization had been automatically extended. 4-ER-317 ¶ 12. The Federal Register notice also "automatically extend[ed] [certain work permits] ... without any further action," advising employers to "accept" the notice itself and facially expired permits as proof of work authorization. 90 FR at 5,967-70. As a result, when Secretary Noem decided to vacate the extension, she had to direct the agency to invalidate already-issued documents and rescind automatic extensions of employment authorization—something she would not have had to do had the extension truly not taken effect until April

41

3 as Defendants claim. OB 23.

*Second*, even assuming the extension had not yet taken effect, Defendants fail to explain why that should grant the Secretary reconsideration authority. Nothing about the TPS statutory scheme implies authority to reconsider a decision published in the Federal Register, whether it is "in effect" or not.

*Third*, Defendants' suggestion that the agency properly asserted limited vacatur authority because it did so shortly after the extension is unconvincing, because the agency has already exceeded those bounds. In February, Secretary Noem "partially vacate[d]" the July 1, 2024 extension of Haiti's TPS designation *seven months* after its publication, and *six months* after the end date of the prior Haiti designation. *See* 35 FR 10,511 (Feb. 24, 2025). Defendants never explain how one might discern when it is too late to vacate an extension under their countertextual interpretation of the statute.

*Finally*, Defendants protest that Plaintiffs' position is "extreme" because it would prohibit vacatur even in the face of national security threats. OB 24. But there is nothing "extreme" about denying an agency unbounded authority to revoke the immigration status of hundreds of thousands of people on an unreviewable whim, particularly where Congress sought to provide TPS beneficiaries and their families with certainty about how long

42

protections would last. *See supra* Background A. The agency also lacks authority to rescind en masse all green cards, employment-based visas, and many other forms of lawful status, including citizenship. While the agency may prefer to have such draconian "inherent power" to reconsider, OB 24, Congress wisely declined to provide such authority. *Cf. Ivy Sports Med.*, 767 F.3d at 87-88 (statutory reclassification process, "while somewhat burdensome, serve[s] important purposes, both generally and in [the governing] statute"). Further, the statute provides other mechanisms to manage security threats—it affords only time-limited (renewable) protections and renders ineligible for status individuals who pose security threats. *See supra* Background A.

In any event, by its terms the vacatur here was not based on such weighty concerns. The Federal Register notice explains the "[r]easons for the [v]acatur" in terms of the need to resolve a potential "lack of clarity" due to "multiple notices, overlapping populations, overlapping dates, and sometimes multiple actions happening in a single document." 90 FR at 8807. The vacatur notice does not mention "national security, U.S. foreign policy, or border security interests." OB 24. And even if it had, the Supreme Court recently reaffirmed that even in the face of obvious "foreign affairs consequences," "under the APA, DHS's exercise of discretion within [immigration law's] statutory framework must be reasonable and

43

reasonably explained." *Texas*, 597 U.S. at 806–07.

### B.    The Vacatur was Arbitrary and Capricious

Plaintiffs' second APA claim is that the vacatur was arbitrary and capricious because the reasons provided—that the extension's consolidated registration process somehow justified vacating a TPS extension for 600,000 people—rested on legal error and were irrational. The district court addressed this claim at length, 1-ER-56-60, but Defendants ignore it entirely.

The district court acted well within its discretion to find that, even if the Secretary had vacatur authority, *this* vacatur was arbitrary. *First*, it rests on legal error. Secretary Noem asserted the extension's consolidated registration process, under which beneficiaries of the 2021 designation could re-register under the 2023 extension, was "novel" and "not consistent with the TPS statute." 90 FR at 8,807. But "the Secretary failed to recognize that a TPS beneficiary under the 2021 Designation was necessarily a TPS beneficiary under the 2023 Designation." 1-ER-57. The extension simply allowed 2021 registrants to re-register under either designation given that they met all eligibility requirements for both. 1-ER-56-57; 90 FR at 5963 (2021 beneficiaries had the "option" of re-registering pursuant to the extension). The Secretary also failed to recognize that streamlining registration is typical, 1-ER-57; and that Secretary Mayorkas's registration process "was

44

entirely consistent and compliant with the TPS statute." 1-ER-57-58.

*Second*, the Secretary failed to consider an obvious alternative to vacatur: deconsolidating the registration process and leaving other aspects of the extension undisturbed. The district court correctly held that oversight alone rendered her decision arbitrary under *Regents*. *See* 1-ER-59-60 (citing *Regents*, 591 U.S. at 30 ("[W]hen an agency rescinds a prior policy its reasoned analysis must consider the alternatives that are within the ambit of the existing policy ….")) (cleaned up). Third, *Defendants conceded* the real reason for the Secretary's decision was not the registration process: "[C]onfusion was not [the Secretary's] concern so much as the desire to totally undo Secretary Mayorkas's decision." 1-ER-60. The APA forbids such pretextual decisionmaking. *Cf. Dep't of Commerce v. New York*, 588 U.S. 752, 785 (2019) ("[W]e cannot ignore the disconnect between the decision made and the explanation given …. The reasoned explanation requirement of administrative law, after all, is meant to ensure that agencies offer genuine justifications for important decisions.").

This independent ground—left unaddressed by Defendants—suffices to affirm the district court's order.

45

## III.  THE DISTRICT COURT DID NOT ABUSE ITS DISCRETION IN GRANTING PRELIMINARY RELIEF ON PLAINTIFFS' DISCRIMINATION CLAIM

The district court's plausible factual findings that both the vacatur and termination decisions were motivated by animus amply support preliminary relief on Plaintiffs' discrimination claim. To reverse, this Court must hold that *both* decisions survive constitutional scrutiny, even affording "significant deference" and reviewing "only for clear error." *Cooper*, 581 U.S. at 293. If a district court's discrimination finding is "plausible," "even if another is equally or more so," it "must govern." *Id.* (quoting *Anderson v. City of Bessemer City*, 470 U.S. 564, 574 (1985)).

The court correctly held Plaintiffs' claim is governed by *Village of Arlington Heights v. Metro. Hous. Dev. Corp.*, 429 U.S. 252, 265-66 (1977) rather than *Trump v. Hawaii*, 585 U.S. 667 (2018). 1-ER-61-64. Nevertheless, this Court can affirm without deciding the issue because the district court found the evidence of animus substantial enough to warrant relief under either standard.[13]

---

[13] Defendants' "extreme" suggestion that courts lack jurisdiction to review even Plaintiffs' constitutional claim, OB 26, is meritless. 1-ER-27; *Bowen v. Mich. Acad. of Family Physicians*, 476 U.S. 667, 680-81 (1986).

## A. *Arlington Heights* Supplies the Correct Standard of Review

The district court correctly held claims alleging government policy motivated by animus based on race, ethnicity, or national origin are governed by *Arlington Heights*. 1-ER-61-64.

In *Regents*, this Court held *Arlington Heights* governed a race discrimination challenge to the rescission of immigration benefits for individuals in the United States—like the challenged conduct here. *Regents of the Univ. of Cal. v. DHS*, 908 F.3d 476, 518-20 (9th Cir. 2018), *rev'd in part, vacated in part sub nom.*, *Regents*, 591 U.S. at 34 (plurality) (assuming *Arlington Heights* governed). Every judge to consider discrimination challenges in TPS cases— including in the vacated *Ramos* decision—also held *Arlington Heights* governs. *See, e.g.*, *Ramos*, 975 F.3d at 896 (vacated panel majority) (noting "the similarities between the [equal protection] challenge in this case and *Regents*," where this Court applied *Arlington Heights*), *id.* at 925 (Christen, J., dissenting) (applying *Arlington Heights*).

Defendants assert this Court's precedent is wrong because *Hawaii*'s deferential standard must govern all "challenges to immigration policy choices." OB 27. But courts have consistently rejected Defendants' position. "Contrary to the government's assertion, there is no general rule that federal immigration laws

challenged for violating the Constitution should receive rational basis review." *United States v. Susquilanda*, 116 F.4th 129, 140 (2d Cir. 2024); *Washington v. DHS*, 598 F. Supp. 3d 1051, 1070 (E.D. Wash. 2020) (collecting cases).

*Hawaii* is distinguishable for at least four reasons: *First*, it concerned the exclusion of non-citizens from abroad, where the government's immigration powers are at their zenith. *Hawaii*, 585 U.S. at 705 n.5 ("such a circumscribed inquiry applies to any constitutional claim concerning *the entry of foreign nationals*") (emphasis added). Rational basis review does not govern animus claims by "person[s]" in the United States, who are presumptively entitled to the Fifth Amendment's full protections.

*Second*, whereas *Hawaii* involved a *Presidential* proclamation issued under an expansive delegation of congressional authority which "exudes deference to the President in every clause," 585 U.S. at 683–85, this case involves the *Secretary* acting under a statute that *constrains* agency discretion. *See supra*, Background A; 1-ER-53.

*Third*, *Hawaii*'s deference rested on a reluctance to disturb the President's conclusion that certain noncitizens' entry posed "national security concerns." 585 U.S. at 706-710. Here, in contrast, the vacatur never mentions even "national interest," let alone "national security." To win reversal Defendants must show *both*

48

decisions are constitutional.

Even as to the termination, the invocation of "national interest" cannot immunize agency decisions from constitutional scrutiny. If it could, then policies concerning the environment, health care, public education, the economy, and more would be largely immune from judicial review. Here, the Secretary's asserted "national interest" rests on claims about crime and economic harm, *not* national security as that concept is generally understood. *Cf. Tuan Thai v. Ashcroft*, 366 F.3d 790, 796 (9th Cir. 2004) ("We do not agree that the danger of criminal conduct by an alien is automatically a matter of national security[.]").

*Fourth*, whereas *Hawaii* found evidence to "support the Government's claim of a legitimate national security interest," 585 U.S. at 708, here the district court found any "assertion that Venezuelan TPS holders pose some kind of danger … entirely unsubstantiated." 1-ER-42, 43, 44, 74. This is unsurprising given the strict eligibility requirements for TPS. *See supra* Background A. Where, as here, a "national interest" invocation is itself infected by negative racial stereotypes, it would be perverse to permit Defendants to avoid meaningful scrutiny on that basis.

*Rajah v. Mukasey*, 544 F.3d 427 (2d Cir. 2008), is not to the contrary. *Rajah* applied deferential review to a *selective enforcement* claim in the national security context. *Id*. at 438.

49

Courts have narrowed review in selective enforcement cases—both in criminal and immigration contexts—because they involve people who have concededly lost their right to liberty. *See Reno v. Am. Arab Anti-Discrimination Comm.*, 525 U.S. 471, 491 (1999) (selective enforcement claim would permit "*an ongoing violation* of United States law") (emphasis in original); *Wong v. INS*, 373 F.3d 952, 964, 970 (9th Cir. 2004) (distinguishing discrimination claim not challenging selective enforcement).

Here, in contrast, Plaintiffs are lawfully present and raise no selective enforcement claim. They are not "making an equal protection argument … to avoid [their] own deportation." *Regents*, 908 F.3d at 519 (distinguishing selective enforcement claims from claim challenging denial of immigration benefits).

Moreover, even *Rajah* recognized "that a selective prosecution based on [discriminatory] animus … would call for some remedy," 544 F.3d at 438.[14] The Second Circuit itself has rejected Defendants' expansive reading of *Rajah*. *See Susquilanda*, 116 F.4th at 139-40 (applying strict scrutiny to challenge to 8 U.S.C. § 1326 because "it

---

[14] *Rajah* rejected that claim in a challenge to a post-9/11 deportation program where it found the only evidence of animus was the fact that the program was directed at people from predominantly-Muslim countries, and there was substantial other evidence that animus did *not* motivate the program. 544 F.3d at 439.

is certainly not the case that immigration laws challenged for violating the Constitution will receive short shrift by courts simply because immigration policy can be closely associated with national security or committed to the discretion of the political branches of government").

The other cases Defendants cite do not raise discriminatory *animus* claims, but rather challenge congressional line-drawing in the substantive rules governing admission and deportation. OB 26-30, 33 (citing *Fiallo v. Bell*, 430 U.S. 787, 791-92 (1977) (gender discrimination claim challenging Congress's "exceptionally broad" power to legislate "the admission of [noncitizens]"); *Mathews v. Diaz*, 426 U.S. 67 (1976) (challenge to congressional rules providing benefits to some classes of non-citizens but not others, raising no animus claim); *Kleindienst v. Mandel*, 408 US 753, 769-70 (1972) (no discrimination claim; non-citizen was abroad); *Shaughnessy v. United States ex rel. Mezei*, 345 U.S. 206, 211-12 (1953) (plaintiff raised no discrimination claim and stood "on the threshold of initial entry"); *United States ex rel. Knauff v. Shaughnessy*, 338 U.S. 537, 542 (1950) (same)). *Harisiades v. Shaughnessy* provides no support for the additional reason that it relies on the Japanese internment

cases. 342 U.S. 580, 589-91 & nn. 16, 17 (1952).[15]

For all these reasons, the district court correctly concluded Plaintiffs' discriminatory animus claim is governed by *Arlington Heights*.

### B. The District Court Did Not Err in Finding Animus Under Either Standard

Although *Arlington Heights* governs, this Court need not decide the issue to affirm the district court because it found ample evidence of discriminatory animus even under *Hawaii*, 585 U.S. 704-05 (assessing whether challenged action is "plausibly related to the Government's stated objective"). *See* Dkt. 102 at 4. The district court's findings are firmly supported by the record, 1-ER-56-58, 64, 73-74, and neither clearly erroneous nor implausible. *Cooper*, 581 U.S. at 293.

Although Defendants conflate them, the vacatur and termination were distinct actions with different stated objectives, so each must be analyzed separately under *Hawaii*. The district court found the record evidence raised a serious question about whether *either* decision could survive *Hawaii's* deferential review. Dkt. 102 at 4.

---

[15] *See also* Ahilan Arulanantham, *Reversing Racist Precedent*, 112 Geo. L.J. 439, 496 (2024); *Galvan v. Press*, 347 U.S. 522, 529. (1954) relied primarily on *Harisiades* for the deferential review it afforded as well.

52

That is clearest as to the vacatur, where the district court found the Secretary's stated objective—to "untangle the confusion" allegedly caused by the extension's consolidated registration process—was a blatantly pretextual basis on which to reverse the TPS extension. 1-ER-59-60. *See Hawaii*, 585 U.S. at 705 (considering whether challenged decision is "divorced from any factual context") (quoting *Romer v. Evans*, 517 U.S. 620 (1996)). Undisputed record evidence showed that consolidating re-registration processes was standard practice, 1-ER-59-60, and "if Secretary Noem was truly confused about confusion arising from" the consolidated registration process "she could have chosen to 'deconsolidate' the registration process." *Id*. But instead, she undid humanitarian protections for 600,000 Venezuelans—an action whose "sheer breadth was … discontinuous with the reasons offered." *Hawaii*, 585 U.S. at 705-06 (quoting *Romer*, 517 U.S. at 632, 636).

As to the termination, the district court found the Secretary's stated reasons "entirely lacking in evidentiary support," 1-ER 74-75. Defendants never contest, even now, the district court's findings based on unrebutted expert testimony that Venezuelan TPS holders are not tied to gangs, have lower rates of criminal activity than the general population, higher levels of educational attainment, "high labor participation rates," and "annually

contribute billions of dollars to the U.S. economy." 1-ER-2, 64. Nor do they dispute that the Secretary's reliance on immigration policies that plainly invoke racist tropes—for example, characterizing immigrants as an "[i]nvasion" against which Americans need "[p]rotecting"—is further evidence of animus. 90 FR at 9042-43 & nn.2, 10, 14. That the reasons were in an official agency notice cannot absolve them of the obligation to have some basis in reality. *See Doe #1 v. Trump*, 957 F.3d 1050, 1059-60 (9th Cir. 2020) (declining to credit "conclusory factual assertions … unsupported in the record" in a Presidential Proclamation). The district court did not clearly err in concluding the Secretary's termination decision, which rested on false and negative stereotypes entirely "divorced from any factual context," *Hawaii*, 585 U.S. at 705-06, manifested discriminatory intent.[16]

Defendants suggest courts must uphold any policy purportedly based on a legitimate purpose, OB 32, but *Hawaii* and the rational basis cases on which it relies do not require officials to *say* they are acting with discriminatory purpose. *Hawaii*, 585 U.S.

---

[16] Defendants suggest the Court's rejection of the discrimination claim in *Regents* supports them, OB 35, but the record there contained no discriminatory statements by the decisionmakers in question, and any statements by President Trump, even if discriminatory, were "remote in time and made in unrelated contexts." 591 U.S. at 35.

at 705-06. The court may also "look behind the face" of the challenged decision and consider "extrinsic evidence." *Id.* at 704-05.

Defendants ignore or misrepresent damning evidence that both decisions were motived by "irrational prejudice." *Id.* at 705-06 (citations omitted). The Secretary repeatedly justified *both the termination and the vacatur decisions* by repeating the false stereotype that Venezuelans in the U.S. are responsible for criminal gang activity and the related myth that Venezuelan officials deliberately sent prisoners and psychiatric patients to this country. On January 15, Secretary Noem testified in Congress during her confirmation hearing that continuing TPS for

> over 600,000 Venezuelans ... is alarming when you look at what we've seen in different states, including Colorado with gangs doing damage and harming the individuals and the people that live there.

6-ER-977; 1-ER-65.[17]

Three days after her confirmation she vacated the TPS extension for Venezuela. The next day she justified her decision on national television by conflating Venezuelan TPS holders with gang members:

---

[17] Local law enforcement officials had already debunked the Colorado gang takeover myth at the time Secretary Noem repeated it. See Background B.

55

> [W]e were not going to follow through on
> what [Secretary Mayorkas] did to tie our
> hands .... [W]e are going to ... evaluate all of
> these individuals that are in our country,
> including the Venezuelans that are here and
> members of [Tren de Aragua] .... [T]he people
> of this country want these dirt bags out.

6-ER-1062; 1-ER-65. The fact that Secretary Noem *also* talked
about Tren de Aragua ("TdA") in connection with her labeling of
Venezuelans as "dirt bags," *see* OB 35, does not undermine the
court's animus finding. Quite the opposite. The Secretary's repeated
conflation of TPS holders with gang members, contrary to all
evidence, further substantiates this finding.

Three days after that, she issued the termination decision.
Again, she appeared on television the next day to explain the
decision, saying:

> [R]emember, Venezuela purposely emptied
> out their prisons, emptied out their mental
> health facilities and sent them to the United
> States of America. *So we are ending that
> extension* of [the TPS] program.

6-ER-1076 (emphasis added); 1-ER-65.[18] Defendants' attempt to
recharacterize the Secretary's contemporaneous statements of
animus as "out-of-context statements with no connection" to her

---

[18] Both President Trump and Secretary Noem had repeated the
racist myth about Venezuela emptying its prisons and mental
health facilities for months, despite its having been repeatedly
debunked. *See* Dkt. 59-1 ¶¶ 2-5, 10, 12, 16, 25, 27.

TPS decisions, OB 11, is baseless.[19]

Defendants claim these statements referenced only criminals and rested on "public safety concerns." OB 34-35. But the Secretary made them, including the "dirtbag" slur, *to explain her TPS decisions*. Dkt. 102 at 2 (citing 5-ER-593 ¶ 15 & 6-ER-1062). It was not "[im]plausible" for the district court to reject Defendants' speculative alternative explanation. *Cooper*, 581 U.S. at 293; 1-ER-66. Nor is it implausible to credit unrebutted expert testimony establishing that false tropes about immigrant criminality, mental illness, and their "invading" the country are textbook racist stereotypes. *See* 1-ER-64-65. *See also* 5-ER-770 ("They're poisoning the blood of our country"). Such "code words" "may demonstrate discriminatory intent." *Ave. 6E Invs., LLC v. City of Yuma, Ariz.*, 818 F.3d 493, 505 (9th Cir. 2016); *see also McGinest v. GTE Serv. Corp.*, 360 F.3d 1103, 1117 (9th Cir. 2004) (treating "drug dealer" as racist "code word" in context).

The district court did not clearly err in concluding the Secretary "made sweeping negative generalizations about Venezuelan TPS beneficiaries *in toto*," and took "*en masse* actions

---

[19] Defendants incorrectly suggest the district court relied only on four statements. The court reproduced in its order four statements as specific "[e]xamples of discriminatory statements by Secretary Noem," but relied on at least nine statements it found were "discriminatory." 1-ER-65.

against all Venezuelan TPS beneficiaries, who number in the hundreds of thousands;" and that "[a]cting on the basis of a negative group stereotype and generalizing such stereotype to the entire group is the classic example of racism." 1-ER-67.

Defendants also suggest Plaintiffs cannot raise a discrimination challenge here because "national origin is inherently part of TPS." OB 33-34. That argument contravenes even the most extreme, restricted view of the constitution's anti-discrimination constraints. Since the Civil War, courts have recognized that government action *based on animus* is unconstitutional, even where nationality-based distinctions are otherwise permitted. *E.g. Korematsu v. United States*, 323 U.S. 214, 216 (1944) ("all legal restrictions which curtail the civil rights of a single racial group are immediately suspect … Pressing public necessity may sometimes justify the existence of such restrictions; racial antagonism never can"), *overruled*, *Hawaii*, 585 U.S. at 710; *see also* 1-ER-67 (citing *Korematsu*, 323 U.S. at 233, 235 (Murphy, J., dissenting)).

Defendants imply the district court's order rests on statements President Trump made in his first term. OB 35-36. Not so. "[E]ven without consideration of [President Trump's] statements … Plaintiffs have sufficiently established animus." 1-ER-71. Nonetheless, the district court recognized that Secretary Noem adopted President Trump's discriminatory statements: she

expressly noted—in the published notices officially explaining her actions—that she curtailed TPS at the President's direction. *See, e.g.*, 90 FR at 9043 (stating "Invasion" Executive Order "direct[ed]" her to limit TPS designations). The court did not err in finding "evidence *in this case* that President Trump directly influenced TPS policy and/or decision-making at issue." 1-ER-71.[20]

While the foregoing evidence suffices to affirm under *Hawaii*, the district court also analyzed other evidence relevant under *Arlington Heights*. As to the vacatur, the district court found the unprecedented nature of the Secretary's action and her extraordinarily compressed decision-making process "clearly anomalous." 1-ER-74. Defendants claim this only shows the Secretary "acted promptly," OB 37, but the district court was not required to accept that implausible assertion. Nor did the district court "reweigh the evidence" underlying the Secretary's decision, OB 38. The vacatur order asserted the Secretary's goal was to ameliorate "lack of clarity" and "confusion" purportedly caused by her predecessor's decision to streamline the registration process. 90 FR at 8807. But Defendants introduced no evidence of any such confusion, nor does the subsequently disclosed CAR provide any

---

[20] Defendants object that some of President Trump's statements are months or years old, but "historical background" is relevant under *Arlington Heights*, 429 U.S. at 267.

59

support for this assertion: and Defendants have never disputed that Secretary Mayorkas's decision to streamline registration was not novel and likely *reduced* confusion.

As to the termination, Secretary Noem asserted four goals: (1) addressing unlawful immigration by Venezuelans, especially members of TdA; (2) ameliorating the strain on federal, state, and local resources caused by the presence of unauthorized migrants; (3) avoiding a "potential 'magnet effect' of a TPS determination"; and (4) putting "American interests first" by curtailing "illegal and destabilizing migration." 90 FR 9042-43; 1-ER-74. The court correctly found these justifications "entirely lacking in evidentiary support," giving "rise to an inference of pretext." 1-ER-74-75; Dkt. 102 at 4. Terminating TPS does not rationally address any goals related to gang membership and crime as criminal conduct renders individuals ineligible for TPS, 1-ER-42, and Venezuelan TPS holders have lower crime rates than the general population and are not TdA members. 1-ER-3, 43, 74.

Similarly, concerns about a purported "magnet effect" are irrational because TPS extension (unlike redesignation) does not make anyone newly eligible. 1-ER-75. Moreover, any interest in discouraging "illegal and destabilizing migration" cannot justify a policy that terminates the legal status of a lawfully present population that makes overwhelmingly positive contributions to

60

society. *See* 1-ER-74-75.

Finally, as to disparate impact, Defendants simply repeat their disagreement with the court's factual finding, claiming it is "documented fact that at least some Venezuelans in the United States are members of TdA." OB 39. But there is no evidence that *Venezuelan TPS holders* are members of the gang, let alone that enough of them are to somehow justify stripping *all of them* of status on that basis, particularly given the unrebutted record evidence that TdA itself has no operational presence in the U.S. 1-ER-43, 74; 4-ER-456.

## IV.  THE DISTRICT COURT DID NOT ABUSE ITS DISCRETION IN CONCLUDING THAT THE BALANCE OF HARDSHIPS TIPS SHARPLY IN FAVOR OF POSTPONEMENT

The district court concluded that "the balance of hardships ... tips sharply in Plaintiffs' favor" because "Plaintiffs have provided significant evidence that TPS holders and their families would suffer irreparable harm if they are not afforded temporary relief, and the public interest also weighs in favor of Plaintiffs." 1-ER-45. This conclusion was based on seven expert declarations, amicus briefs by state and local governments, declarations by individual TPS holders, and numerous exhibits—all unrebutted. 1-ER-32-45, 65, 74-75 ("billions" of economic losses, including Social Security and other tax revenue). Defendants conceded they had "no sort of

counter-declarations." 2-ER-88. While the Supreme Court obviously reached a contrary conclusion, it provided no reasons, making it impossible to assess what if any defects it identified in Plaintiffs' harm analysis. Therefore, Plaintiffs address harm as though it remains part of the governing standard.

Defendants contend Plaintiffs' irreparable harm—potential removal to a dangerous country, family separation, lost work authorizations, educational opportunities, healthcare, and more— is merely "an outgrowth of the temporary status afforded by the TPS statute itself." OB 47. In other words, anyone with TPS should always be ready to lose everything on the agency's whim.

The district court correctly rejected this argument. 1-ER-38. It contravenes the statutory framework and legislative intent, as Congress created TPS to "curb and control the executive's previously unconstrained discretion" over humanitarian protection, if only for time-limited periods. *See* Background A; 1-ER-52-53 (quoting *Ramos*, 975 F.3d at 890).

Defendants suggest removal itself does not constitute irreparable harm. OB 46-47. This ignores that Venezuela remains (concededly) unsafe. 1-ER-2 (citing State Department advisory of March 2025). Defendants suggest Plaintiffs might seek asylum or other immigration status, OB 47, but that fails to address the economic harm of lost employment authorization in the interim,

and the undisputed record evidence shows "only a small minority" would actually obtain such status. 1-ER-33. And the district court found the loss of protected time with families and communities constitutes irreparable harm, "even if that time is limited." 1-ER-38.

In contrast, the primary injury Defendants assert is "supplanting the Secretary's discretion-laden judgment." OB 47. But the "Government may pursue and vindicate its [institutional injury] interests in the full course of this litigation." *E. Bay Sanctuary Covenant*, 932 F.3d at 778 (cleaned up).

Defendants' claim that TPS decisions arise from "inherent executive power," OB 48, is wrong. TPS comes from a *statute* that affords limited discretion to an *agency*. Requiring the Secretary to follow the statute creates no Article II injury, irreparable or otherwise. *Doe #1*, 957 F.3d at 1059; *Washington v. Trump*, No. 25-807, 2025 WL 553485, at *3 (9th Cir. Feb. 19, 2025) (Forrest, J., concurring).

Moreover, Defendants' argument assumes they are right on the law. No "sovereign injury," OB 49, arises where courts protect "the public['s] interest in ensuring that the [laws] … are not imperiled by executive fiat.'" *E. Bay Sanctuary Covenant*, 993 F.3d at 679, 681 (cleaned up). In fact, it is Defendants' attempts to illegally terminate TPS that would be a "continuing violation of

immigration law," OB 49, not the continued presence of TPS holders who lawfully obtained status.

Defendants cite "serious public safety concerns, strained local resources, and … illegal immigration," OB 47, but not a shred of *evidence* supports them. Assertions in the Federal Register concededly unsupported by "any evidence," 2-ER-88, cannot establish harm. And contrary to Defendants' assertions, OB 10, even the Federal Register notices do not assert that any *TPS holders* are gang members. *See* 90 FR at 8,805-07 (vacatur notice) (not mentioning gangs); 90 FR at 9,042 (termination notice) (alleging Venezuelan migrants generally include TdA members, but not saying any TPS holders are).

Finally, Defendants obscure the vast disparity in potential harm each side faces. Because the district court's Section 705 order has now been stayed, TPS holders are suffering catastrophic harm that will be irreparable if Defendants' orders are found unlawful. 1-ER-4, 32-38.

## V.   THE DISTRICT COURT DID NOT ABUSE ITS DISCRETION IN CRAFTING A REMEDY UNDER SECTION 705

Defendants ask this Court to narrow the scope of relief to "the parties of the lawsuit," but "[w]hen a reviewing court determines that agency regulations are unlawful, the ordinary result is that the rules are vacated—not that their application to the individual

petitioners is proscribed." *E. Bay Sanctuary Covenant*, 993 F.3d at 681 (cleaned up); *see also Career Colls. & Schs*, 98 F.4th at 255 (same as to Sections 705 and 706). Defendants cite a different (earlier) *East Bay* case limiting nationwide relief, but the district court reinstated that relief, and it was then stayed on other grounds. OB 49 (citing *E. Bay Sanctuary Covenant v. Barr*, 934 F.3d 1026, 1029 (9th Cir. 2019)); *see Barr v. East Bay Sanctuary Covenant*, 140 S. Ct. 3 (2019). Moreover, uniformity is particularly important for TPS because the statute contemplates only one country conditions determination per nation, and because Defendants' TPS decisions necessarily impact private employers and state agencies. 1-ER-32.

Further, the district court correctly held postponement under Section 705 is not injunctive. "Section 705 of the APA authorizes courts to stay agency rules *pending judicial review*." *Mexichem Specialty Resins, Inc. v. EPA*, 787 F.3d 544, 549, 562 (D.C. Cir. 2015) (Kavanaugh, J., dissenting on other grounds) (emphasis in original). Section 705 "must be read to authorize relief from agency action for any person otherwise subject to the action, not just as to plaintiffs." *District of Columbia v. USDA*, 444 F. Supp. 3d 1, 48 (D.D.C. 2020). The Government recently acknowledged that APA relief raises questions distinct from those concerning nationwide injunctions. *Trump v. CASA, Inc.*, No. 24A884, May 15, 2025 Hrg.

65

Tr. at 73 (government conceding that, "under the APA," "the remedy that Congress has provided as a condition of its delegation to the agency is, if one part of the . . . regulation is unlawful," the resulting judicial vacatur is necessarily an "indivisible remedy that benefits others").

Defendants also make the novel argument that, because Section 705 allows courts to grant postponement "to the extent necessary to prevent irreparable injury," the district court should have granted relief to only the parties to this lawsuit, including NTPSA members, that have shown "actual, concrete injury in fact." OB 50-51. But the district court correctly found the agency's actions had a "uniform and nationwide impact on all Venezuelan TPS holders located across the United States." 1-ER-77.

Defendants' position is also contrary to existing standing doctrine. "Where … an organization has identified members and represents them in good faith … [it] complies with the standing requirements demanded of organizational plaintiffs." *Students for Fair Admissions, Inc. v. Pres. & Fellows of Harvard Coll.*, 600 U.S. 181, 201 (2023). Relief is not limited to only those members who show injury. *United Food & Com. Workers Union Local 751 v. Brown Grp., Inc.*, 517 U.S. 544, 546 (1996). Here, the associational plaintiff has over 84,000 Venezuelan TPS members, in every state. Defendants have never identified a feasible way to protect them

66

other than through staying the agency action itself.

Defendants also contend the district court's postponement order "stifled novel legal challenges and robust debate arising in different judicial districts" because two other district courts denied similar postponement motions as moot after Judge Chen's order. OB 52 (citation omitted). That concern is obviously moot now that the district court's order is stayed. But even before that, the district court's order did not stop those cases from continuing onward towards their own merits determinations.

## CONCLUSION

Defendants' interlocutory appeal should be denied.

Dated:  May 28, 2025            Respectfully submitted,

By: */s/ Ahilan T. Arulanantham*

Ahilan T. Arulanantham (SBN 237841)
*Counsel of Record*
arulanantham@law.ucla.edu
CENTER FOR IMMIGRATION LAW AND POLICY, UCLA SCHOOL OF LAW
385 Charles E. Young Dr. East
Los Angeles, CA 90095
Telephone: (310) 825-1029

Emilou MacLean (SBN 319071)
emaclean@aclunc.org
Michelle (Minju) Y. Cho (SBN 321939)
mcho@aclunc.org
Amanda Young (SBN 359753)
ayoung@aclunc.org
ACLU FOUNDATION
OF NORTHERN CALIFORNIA
39 Drumm Street
San Francisco, CA 94111-4805
Telephone: (415) 621-2493

Jessica Karp Bansal (SBN 277347)
jessica@ndlon.org
Lauren Michel Wilfong
lwilfong@ndlon.org
NATIONAL DAY LABORER
ORGANIZING NETWORK
1030 S. Arroyo Parkway, Suite 106
Pasadena, CA 91105
Telephone: (626) 214-5689

Eva L. Bitran (SBN 302081)
ebitran@aclusocal.org
ACLU FOUNDATION
OF SOUTHERN CALIFORNIA
1313 West 8th Street
Los Angeles, CA 90017
Telephone: (213) 977-5236

Erik Crew
ecrew@haitianbridge.org
HAITIAN BRIDGE ALLIANCE
4560 Alvarado Canyon Road, 1H
San Diego, CA 92120
Telephone: (949) 603-7411

*Attorneys for Plaintiffs-Appellees*

## <u>CERTIFICATE OF COMPLIANCE</u>

This brief complies with Circuit Rule 32-1(a) because it contains 13,986 words, excluding the parts of the document exempted by Rule 32(f) of the Federal Rules of Appellate Procedure. The brief also complies with the typeface and typestyle requirements of Rules 32(a)(5)–(6) of the Federal Rules of Appellate Procedure because it has been prepared in a proportionally spaced typeface using Microsoft Word in 14-point Century Schoolbook font.

Dated: May 28, 2025

By: <u>*/s/Ahilan T. Arulanantham*</u>
      Ahilan T. Arulanantham

70

## <u>CERTIFICATE OF SERVICE</u>

I certify that on May 28, 2025, I electronically filed this brief with the Clerk of the Court for the United States Court of Appeals for the Ninth Circuit using the ACMS system. All parties were served electronically through the ACMS system.

Dated: May 28, 2025

By: <u>*/s/Ahilan T. Arulanantham*</u>
Ahilan T. Arulanantham
