DOCUMENT 1.2

**Federal Register** / Vol. 90, No. 21 / Monday, February 3, 2025 / Notices  **8805**

0805, may be submitted to FDA using Forms FDA 3913 and FDA 3914, respectively.

Patent infringement notifications are also included in the scope of collection activity. Section 351(l) of the PHS Act provides for the exchange of patent information and resolution of patent disputes between a 351(k) biosimilar applicant and the holder of the 351(a) BLA reference product. If a biosimilar applicant is served with a complaint in an action for a patent infringement described in section 351(l)(6) of the PHS Act, the biosimilar applicant is required to provide the Secretary of HHS with notice and a copy of the complaint within 30 days of service. FDA is required to publish notice of a complaint received under section 351(l)(6)(C) of the PHS Act in the **Federal Register**.

Relevant information regarding applicable statutory requirements is discussed in topical guidance documents, issued consistent with our BsUFA Commitment Letter and Agency Good Guidance Practice regulations in 21 CFR 10.115, which provide for public comment at any time. The following draft and final guidance documents include instructional and procedural information on communicating with FDA regarding the BsUFA program:

• ''Assessing User Fees Under the Biosimilar User Fee Amendments of 2022'' (July 2023), available at *https://www.fda.gov/regulatory-information/search-fda-guidance-documents/assessing-user-fees-under-biosimilar-user-fee-amendments-2022.* The guidance document instructs respondents on requesting discontinuation from the BPD program, as well as requesting to move products to the discontinued section of the biosimilar list. The guidance document also provides information on the consequences of failing to pay BsUFA III fees as well as processes for submitting reconsideration and appeal requests.

• ''Formal Meetings Between the FDA and Sponsors or Applicants of BsUFA Products'' (August 2023), available at: *https://www.fda.gov/regulatory-information/search-fda-guidance-documents/formal-meetings-between-fda-and-sponsors-or-applicants-bsufa-products-guidance-industry.* The guidance document explains standardized procedures for requesting, preparing, scheduling, conducting, and documenting formal meetings with FDA, and discusses good meeting management practices.

• As listed on our Center for Drug Evaluation and Research 2023 and 2024 Annual Guidance agenda (available at: *https://www.fda.gov/media/134778/*

*download*), we are planning to issue a draft guidance for industry entitled ''Pediatric Study Plans for Biosimilar Products,'' to help implement provisions of the Pediatric Research Equity Act, codified in section 505B of the FD&C Act (21 U.S.C. 355c). For more information regarding FDA guidance documents, including ways to participate, please visit *https://www.fda.gov/drugs/guidance-compliance-regulatory-information/guidances-drugs.*

*Description of Respondents:* Sponsors and applicants who have or intend to submit an application for a biosimilar product for licensure under section 351(k) of the PHS Act or who intend to submit an initial pediatric study plan (iPSP) as described in section 505B(e) of the FD&C Act for those products intended to be licensed under section 351(k) of the PHS Act and being developed as a proposed biosimilar to a reference product.

In the **Federal Register** of September 23, 2024 (89 FR 77531), we published a 60-day notice requesting public comment on the proposed collection of information. No comments were received.

We estimate the burden of this information collection as follows:

TABLE 1—ESTIMATED ANNUAL REPORTING BURDEN

| FDA form; survey | Number of respondents | Number of responses per respondent | Total annual responses | Average burden per response | Total hours |
|---|---|---|---|---|---|
| Biosimilar User Fee Cover Sheet (Form FDA 3792) | 30 | 2 | 60 | 0.5 (30 minutes). | 30 |
| Request for discontinuation from BPD program or to move products to discontinued section of Biosimilar List. | 6 | 1 | 6 | 1 | 6 |
| Biosimilar product & interchangeable product applications (351(k)); patent infringement notifications (351(l)). | 16 | 1.94 | 31 | 610.90 | 18,938 |
| Formal meeting requests as recommended in FDA guidance | 135 | 2.30 | 311 | 21.42 | 6,661 |
| Submission of Pediatric Assessment; iPSP template information, including deferrals of pediatric assessments for proposed biosimilar products; iPSP amendments as recommended in FDA guidance. | 11 | 1 | 11 | 38.18 | 420 |
| Total | | | 419 | | 26,055 |

Our estimated burden for the information collection reflects an overall increase of 13,069 hours and 105 responses annually. Although part of the increase may be attributed to the inclusion of burden associated with the submission of pediatric study plans, the majority of adjustments correspond with an increase in submissions we are receiving.

Dated: January 28, 2025.

**P. Ritu Nalubola,**

*Associate Commissioner for Policy.*

[FR Doc. 2025–02153 Filed 1–30–25; 11:15 am]

**BILLING CODE 4164–01–P**

**DEPARTMENT OF HOMELAND SECURITY**

**U.S. Citizenship and Immigration Services**

**[CIS No. 2803–25]**

**Vacatur of 2025 Temporary Protected Status Decision for Venezuela**

**AGENCY:** U.S. Citizenship and Immigration Services (USCIS), Department of Homeland Security (DHS).

**ACTION:** Notice of Temporary Protected Status (TPS) vacatur.

**SUMMARY:** Through this notice, the Department of Homeland Security (DHS) announces that the Secretary of Homeland Security (Secretary) has decided to vacate the January 10, 2025, decision of former Secretary of Homeland Security Alejandro Mayorkas regarding TPS for Venezuela. Former Secretary Mayorkas extended the 2023 designation of Venezuela for TPS for 18 months, allowed a consolidation of filing processes such that all eligible Venezuela TPS beneficiaries (whether under the 2021 or 2023 designations) may obtain TPS through the same extension date of October 2, 2026, and extended certain Employment Authorization Documents (EADs). All of this also had the effect of extending the 2021 designation. This notice vacates Mayorkas' notice immediately.

**DATES:** The vacatur is effective immediately.

**FOR FURTHER INFORMATION CONTACT:** Samantha Deshommes, Chief, Regulatory Coordination Division, Office of Policy and Strategy, U.S. Citizenship and Immigration Services, Department of Homeland Security, 800–375–5283.

**SUPPLEMENTARY INFORMATION:**

## I. Temporary Protected Status (TPS) Generally

The Immigration and Nationality Act (INA) authorizes the Secretary, after consultation with appropriate U.S. Government agencies, to designate a foreign state (or part thereof) for TPS if the Secretary determines that certain country conditions exist. INA 244(b)(1), 8 U.S.C. 1254a(b)(1).[1] The determination whether to designate any foreign state (or part thereof) for TPS is discretionary, and there is no judicial review of "any determination of the

[Secretary] with respect to the designation, or termination or extension of a designation, of a foreign state" for TPS. INA 244(b)(5)(A), 8 U.S.C. 1254a(b)(5)(A). The Secretary, in the Secretary's discretion, may then grant TPS to eligible nationals of that foreign state (or individual aliens having no nationality who last habitually resided in the designated foreign state). *See* INA 244(a)(1)(A), 8 U.S.C. 1254a(a)(1)(A).

At least 60 days before the expiration of a foreign state's TPS designation or extension, the Secretary, after consultation with appropriate U.S. Government agencies, must review the conditions in the foreign state designated for TPS to determine whether they continue to meet the conditions for the TPS designation. *See* INA 244(b)(3)(A), 8 U.S.C. 1254a(b)(3)(A). If the Secretary determines that the conditions in the foreign state continue to meet the conditions for TPS designation, the designation will be extended for an additional period of 6 months or, in the Secretary's discretion, 12 or 18 months. *See* INA 244(b)(3)(A), (C), 8 U.S.C. 1254a(b)(3)(A), (C). If the Secretary determines that the foreign state no longer meets the conditions for TPS designation, the Secretary must terminate the designation. *See* INA 244(b)(3)(B), 8 U.S.C. 1254a(b)(3)(B).

## II. Background

On March 9, 2021, Secretary Mayorkas designated Venezuela for TPS on the basis of extraordinary and temporary conditions in Venezuela that prevented nationals of Venezuela from returning in safety (2021 designation). *See Designation of Venezuela for Temporary Protected Status and Implementation of Employment Authorization for Venezuelans Covered by Deferred Enforced Departure,* 86 FR 13574 (Mar. 9, 2021).

On September 8, 2022, DHS extended the Venezuela 2021 TPS designation for 18 months. *See Extension of the Designation of Venezuela for Temporary Protected Status,* 87 FR 55024 (Sept. 8, 2022). On October 3, 2023, DHS extended the Venezuela 2021 TPS designation for another 18 months with an expiration date of September 10, 2025, and separately newly designated Venezuela, which then Secretary Mayorkas called a "redesignation," for 18 months (the Venezuela 2023 designation) with an expiration of April 2, 2025, resulting in two separate and concurrent Venezuela TPS designations. *See Extension and Redesignation of Venezuela for Temporary Protected Status,* 88 FR 68130 (Oct. 3, 2023).

The Venezuela 2023 TPS designation expires on April 2, 2025, and the Secretary must make a decision by February 1, 2025. The Venezuela 2021 TPS designation expires on September 10, 2025, and the Secretary must make a decision by July 12, 2025. Notwithstanding that these are both decisions that would lie with new Secretary of Homeland Security Kristi Noem, Secretary Mayorkas took action with respect to both designations.

On January 17, 2025, Secretary Mayorkas issued a notice extending the 2023 designation of Venezuela for TPS for 18 months (Mayorkas Notice). The notice was based on Secretary Mayorkas' January 10, 2025, determination that the conditions for the designation continued to be met. *See* INA 244(b)(3)(A), 8 U.S.C. 1254a(b)(3)(A). In the Mayorkas Notice, Secretary Mayorkas did not expressly extend or terminate the 2021 designation. Instead, the notice allowed for a consolidation of filing processes such that all eligible Venezuela TPS beneficiaries (whether under the 2021 or 2023 designations) could obtain TPS through the same extension date of October 2, 2026. *See Extension of the 2023 Designation of Venezuela for Temporary Protected Status,* 90 FR 5961 (Jan. 17, 2025). The notice also extended certain EADs. The effect of Secretary Mayorkas' actions, however, resulted in an extension of the 2021 Venezuela TPS designation.

## III. Vacatur of the 2025 Decision

The Secretary of Homeland Security is vacating the January 10, 2025 decision of Secretary Mayorkas which (1) extended the 2023 Venezuela TPS designation and (2) allowed the consolidation of filing processes for both designations, which had the effect of extending the 2021 Venezuela TPS designation, and (3) extended certain EADs. An agency has inherent (that is, statutorily implicit) authority to revisit its prior decisions unless Congress has expressly limited that authority. The TPS statute does not limit the Secretary's inherent authority under the INA to reconsider any TPS-related determination, and upon reconsideration, to vacate or amend the determination.[2]

---

[1] Although section 244(b)(1) of the INA continues to refer to the Attorney General, this authority now resides with the Secretary of Homeland Security by operation of the Homeland Security Act of 2002, Public Law 107–296, 116 Stat. 2135, as amended. *See, e.g.,* 6 U.S.C. 557; 8 U.S.C. 1103(a)(1). The Secretary may designate a country (or part of a country) for TPS on the basis of (1) an ongoing armed conflict such that returning would pose a serious threat to the personal safety of the country's nationals, (2) an environmental disaster (including an epidemic), or (3) extraordinary and temporary conditions in the country that prevent the safe return of the country's nationals. For environmental disaster-based designations, certain other statutory requirements must be met, including that the foreign government must officially request a TPS designation. A designation based on extraordinary and temporary conditions cannot be made if the Secretary finds that allowing the country's nationals to remain temporarily in the United States is contrary to the U.S. national interest. INA sec. 244(b)(1), 8 U.S.C. 1254a(b)(1).

[2] *See* INA 103(a), 244(b)(3), (b)(5)(A); 8 U.S.C. 1103(a), 1254a(b)(3), (b)(5)(A); *Reconsideration and Rescission of Termination of the Designation of El Salvador for Temporary Protected Status; Extension of the Temporary Protected Status Designation for El Salvador,* 88 FR 40282, 40285 (June 21, 2023) ("An agency has inherent (that is, statutorily implicit) authority to revisit its prior decisions unless Congress has expressly limited that authority. The TPS statute does not limit the Secretary's inherent authority to reconsider any

**Federal Register**/Vol. 90, No. 21/Monday, February 3, 2025/Notices

## A. Reason for the Vacatur

The Mayorkas Notice adopted a novel approach of implicitly negating the 2021 Venezuela TPS designation by effectively subsuming it within the 2023 Venezuela TPS designation. As described above, Secretary Mayorkas explicitly made a determination to extend the 2023 designation. While he did not make an explicit determination to extend the 2021 designation, he did allow consolidated filing processes for both the 2021 and 2023 designations, which in effect extended the 2021 designation by up to 13 months. Furthermore, he allowed extensions for certain EADs.

The Mayorkas Notice states that *Existing TPS beneficiaries, including those registered under the October 3, 2023 TPS designation or the prior March 9, 2021 TPS designation, who wish to extend their status through October 2, 2026, must re-register during the re-registration period described in* the January 2025 decision. This, and other language in the Mayorkas Notice, indicate that the practical effect of Secretary Mayorkas' decision was to combine both designations and to provide an extension until October 2, 2026, for the population of *both* designations.

The Mayorkas Notice did not acknowledge the novelty of its approach or explain how it is consistent with the TPS statute. *See* INA 244(b)(2)(B), 8 U.S.C. 1254a(b)(2)(B) (providing that a TPS country designation ''shall remain in effect until the effective date of the termination of the designation under [INA 244(b)(3)(B), 8 U.S.C. 1254a(b)(3)(B)]''). This novel approach has included multiple notices, overlapping populations, overlapping dates, and sometimes multiple actions happening in a single document. While the Mayorkas Notice may have made

attempts to address these overlapping populations, the explanations in the Mayorkas Notice, particularly the explanation for operational impacts, are thin and inadequately developed. Given these deficiencies and lack of clarity, vacatur is warranted to untangle the confusion, and provide an opportunity for informed determinations regarding the TPS designations and clear guidance.[3]

Given the exceedingly brief period in which the January 17, 2025 extension notice has been in effect and the fact that the effect of this vacatur will restore the status quo preceding that notice, any putative reliance interests on the extension notice are negligible. Venezuela 2023 registrants will retain their temporary protected status under the pre-existing designation at least until April 2, 2025. With respect to any Venezuela 2021 registrants who elected, pursuant to the Mayorkas Notice, to register under the Venezuela 2023 designation, USCIS will restore their Venezuela 2021 registration. And, in any event, any putative reliance interests arguably engendered by the Mayorkas Notice are outweighed by the overriding interests and concerns articulated in this notice.

## B. Effect of the Vacatur

As a result of the vacatur, the 2021 Venezuela TPS designation and the 2023 Venezuela designation remain in effect and their associated statutory deadlines remain in effect. The statutory deadline[4] for each of those designations is as follows: The Secretary (1) must determine, by February 1, 2025, whether to extend or terminate the 2023 Venezuela TPS designation and (2) must determine, by July 12, 2025, whether to extend or terminate the 2021 Venezuela TPS designation.

If the Secretary does not make a timely determination (for example, if the Secretary were *not* to make determination by February 1, 2025 whether to extend or terminate the 2023 Venezuela TPS designation), then the statute provides for an automatic extension of the designation for an

additional period of 6 months. INA 244(b)(3)(C), 8 U.S.C. 1254a(b)(3)(C).

Pursuant to this vacatur, USCIS will no longer accept Venezuela TPS re-registration applications (Form I–821) and associated Applications for Employment Authorization (Form I–765) filed under the Mayorkas Notice. For TPS beneficiaries who have already filed applications to re-register for TPS pursuant to the Mayorkas Notice and paid any fees associated with their applications, USCIS will cease processing their applications, and issue refunds of any fees paid by those aliens.[5] Additionally, USCIS will invalidate EADs; Forms I–797, Notice of Action (Approval Notice); and Forms I–94, Arrival/Departure Record (collectively known as TPS-related documentation) that have been issued with October 2, 2026 expiration dates under the Mayorkas Notice. USCIS will provide refunds to any fees paid by these aliens as well.

Additionally, pursuant to this vacatur the automatic EAD extensions provided in the Mayorkas Notice are hereby rescinded. USCIS will provide additional guidance regarding the two Venezuela TPS designations on a future date in accordance with applicable laws.

## IV. Notice of Vacatur of Secretary Mayorkas' 2025 Decision

By the authority vested in me as Secretary under section 244 of the Immigration and Nationality Act, 8 U.S.C. 1254a, I am vacating the decisions announced in the January 17, 2025 notice titled *Extension of the 2023 Designation of Venezuela for TPS*. In doing so, I am vacating the (1) extension of the Venezuela 2023 TPS designation, (2) the consolidation of filing processes for both designations, which, in effect, resulted in the extension of the 2021 TPS designation, and (3) the EADs that were extended. As a result, the Venezuela 2023 TPS designation and the Venezuela 2021 TPS designation remain in effect and their associated statutory deadlines remain in effect.

**Kristi Noem,**

*Secretary, U.S. Department of Homeland Security.*

[FR Doc. 2025–02183 Filed 1–30–25; 11:15 am]

**BILLING CODE 9111–97–P**

---

[3] *See* Exec. Order, *Protecting the American People Against Invasion*, sec. 16(b) (Jan. 20, 2025), *available at https://www.whitehouse.gov/presidential-actions/2025/01/protecting-the-american-people-against-invasion/*.

[4] If there is an existing TPS designation for a foreign state, the Secretary must review country conditions in consultation with appropriate U.S. Government agencies and make a determination— at least 60 days before the designation is set to expire—whether to extend or terminate that country's TPS designation (*i.e.*, whether the conditions for the designation continue to be met). INA 244(b)(3), 8 U.S.C. 1254a(b)(3).

[5] As noted above, any Venezuela 2021 registrants who elected, pursuant to the Mayorkas Notice, to register under the Venezuela 2023 designation will have their Venezuela 2021 registration restored.

TPS-related determination, and upon reconsideration, to change the determination.''); *see also, e.g., Ivy Sports Medicine, LLC v. Burwell*, 767 F.3d 81, 86 (D.C. Cir. 2014) (Kavanaugh, J.) (''[A]dministrative agencies are assumed to possess at least some inherent authority to revisit their prior decisions, at least if done in a timely fashion. . . . ''[I]nherent authority for timely administrative reconsideration is premised on the notion that the power to reconsider is inherent in the power to decide.'' (quotation marks and citations omitted)); *Macktal* v. *Chao*, 286 F.3d 822, 825–26 (5th Cir. 2002) (''It is generally accepted that in the absence of a specific statutory limitation, an administrative agency has the inherent authority to reconsider its decisions.'') (collecting cases); *Mazaleski* v. *Treusdell*, 562 F.2d 701, 720 (D.C. Cir. 1977) (''We have many times held that an agency has the inherent power to reconsider and change a decision if it does so within a reasonable period of time.''); *cf. Last Best Beef, LLC* v. *Dudas*, 506 F.3d 333, 340 (4th Cir. 2007) (agencies possess especially ''broad authority to correct their prior errors'').

Decision Document

## USCIS Notice: Determination re Venezuela's 2023 Temporary Protected Status Designation

(1) Terminate Venezuela's 2023 Temporary Protected Status Designation and (2) Direct an appropriate ESEC office to use the DAC-Federal Register Signature Card to electronically sign the document for publication in the Federal Register

FEB 0 1 2025

Date.

Decision Document

## USCIS Notice: Vacatur of 2025 Temporary Protected Status Decision for Venezuela

(1) Vacate the decisions announced in the January 17, 2025 notice titled *Extension of the 2023 Designation of Venezuela for Temporary Protected Status* and (2) Approve publication in the *Federal Register.*

JAN 2 3 2025

Date.

9111-97

**DEPARTMENT OF HOMELAND SECURITY**

**U.S. Citizenship and Immigration Services**

**[CIS No. 2803-25]**

**Vacatur of 2025 Temporary Protected Status Decision for Venezuela**

**AGENCY:** U.S. Citizenship and Immigration Services (USCIS), Department of Homeland Security (DHS).

**ACTION:** Notice of Temporary Protected Status (TPS) vacatur.

**SUMMARY:** Through this notice, the Department of Homeland Security (DHS) announces that the Secretary of Homeland Security (Secretary) has decided to vacate the January 10, 2025 decision of former Secretary of Homeland Security Alejandro Mayorkas regarding TPS for Venezuela. Former Secretary Mayorkas (1) extended the 2023 designation of Venezuela for TPS for 18 months, (2) allowed a consolidation of filing processes such that all eligible Venezuela TPS beneficiaries (whether under the 2021 or 2023 designations) may obtain TPS through the same extension date of October 2, 2026, and (3) extended certain Employment Authorization Documents (EADs). All of this also had the effect of extending the 2021 designation. This notice vacates Mayorkas' notice immediately.

**DATES:** The vacatur is effective immediately.

**FOR FURTHER INFORMATION CONTACT:** Samantha Deshommes, Chief, Regulatory Coordination Division, Office of Policy and Strategy, U.S. Citizenship and Immigration Services, Department of Homeland Security, 800-375-5283.

**SUPPLEMENTARY INFORMATION:**

1

I.      **Temporary Protected Status (TPS) Generally**

The Immigration and Nationality Act (INA) authorizes the Secretary, after consultation

with appropriate U.S. Government agencies, to designate a foreign state (or part thereof) for TPS

if the Secretary determines that certain country conditions exist. INA 244(b)(1), 8 U.S.C.

1254a(b)(1)[1].  The determination whether to designate any foreign state (or part thereof) for TPS

is discretionary, and there is no judicial review of "any determination of the [Secretary] with

respect to the designation, or termination or extension of a designation, of a foreign state" for

TPS.  INA 244(b)(5)(A), 8 U.S.C. 1254a(b)(5)(A).  The Secretary, in the Secretary's discretion,

may then grant TPS to eligible nationals of that foreign state (or individual aliens having no

nationality who last habitually resided in the designated foreign state).  *See* INA 244(a)(1)(A), 8

U.S.C. 1254a(a)(1)(A).

At least 60 days before the expiration of a foreign state's TPS designation or extension,

the Secretary, after consultation with appropriate U.S. Government agencies, must review the

conditions in the foreign state designated for TPS to determine whether they continue to meet the

conditions for the TPS designation.  *See* INA 244(b)(3)(A), 8 U.S.C. 1254a(b)(3)(A).  If the

Secretary determines that the conditions in the foreign state continue to meet the conditions for

TPS designation, the designation will be extended for an additional period of 6 months or, in the

---

[1] Although section 244(b)(1) of the INA continues to refer to the Attorney General, this authority now resides with
the Secretary of Homeland Security by operation of the Homeland Security Act of 2002, Pub. L. 107-296, 116 Stat.
2135, as amended. *See, e.g.*, 6 U.S.C. 557; 8 U.S.C. 1103(a)(1). The Secretary may designate a country (or part of a
country) for TPS on the basis of (1) an ongoing armed conflict such that returning would pose a serious threat to the
personal safety of the country's nationals, (2) an environmental disaster (including an epidemic), or (3)
extraordinary and temporary conditions in the country that prevent the safe return of the country's nationals. For
environmental disaster-based designations, certain other statutory requirements must be met, including that the
foreign government must officially request a TPS designation. A designation based on extraordinary and temporary
conditions cannot be made if the Secretary finds that allowing the country's nationals to remain temporarily in the
United States is contrary to the U.S. national interest. INA sec. 244(b)(1), 8 U.S.C. 1254a(b)(1).

2

Secretary's discretion, 12 or 18 months.  *See* INA 244(b)(3)(A), (C), 8 U.S.C. 1254a(b)(3)(A),

(C).  If the Secretary determines that the foreign state no longer meets the conditions for TPS

designation, the Secretary must terminate the designation.  *See* INA 244(b)(3)(B), 8 U.S.C.

1254a(b)(3)(B).

## II.    Background

On March 9, 2021, Secretary Mayorkas designated Venezuela for TPS on the basis of

extraordinary and temporary conditions in Venezuela that prevented nationals of Venezuela from

returning in safety (2021 designation).  *See Designation of Venezuela for Temporary Protected*

*Status and Implementation of Employment Authorization for Venezuelans Covered by Deferred*

*Enforced Departure*, 86 FR 13574 (Mar. 9, 2021).

On September 8, 2022, DHS extended the Venezuela 2021 TPS designation for 18

months.  *See Extension of the Designation of Venezuela for Temporary Protected Status*, 87 FR

55024 (Sept. 8, 2022).  On October 3, 2023, DHS extended the Venezuela 2021 TPS designation

for another 18 months with an expiration date of September 10, 2025, and separately newly

designated Venezuela, which then Secretary Mayorkas called a "redesignation," for 18 months

(the Venezuela 2023 designation) with an expiration of April 2, 2025, resulting in two separate

and concurrent Venezuela TPS designations.  *See Extension and Redesignation of Venezuela for*

*Temporary Protected Status*, 88 FR 68130 (Oct. 3, 2023).

The Venezuela 2023 TPS designation expires on April 2, 2025, and the Secretary must

make a decision by February 1, 2025.  The Venezuela 2021 TPS designation expires on

September 10, 2025, and the Secretary must make a decision by July 12, 2025.  Notwithstanding

the fact that these are both decisions that would lie with new Secretary of Homeland Security

Kristi Noem, Secretary Mayorkas took action with respect to both designations.

VZ Vacatur_0008

On January 17, 2025, Secretary Mayorkas issued a notice extending the 2023 designation of Venezuela for TPS for 18 months (Mayorkas Notice). The notice was based on Secretary Mayorkas' January 10, 2025 determination that the conditions for the designation continued to be met. *See* INA 244(b)(3)(A), 8 U.S.C. 1254a(b)(3)(A). In the Mayorkas Notice, Secretary Mayorkas did not expressly extend or terminate the 2021 designation. Instead, the notice allowed for a consolidation of filing processes such that all eligible Venezuela TPS beneficiaries (whether under the 2021 or 2023 designations) could obtain TPS through the same extension date of October 2, 2026. *See Extension of the 2023 Designation of Venezuela for Temporary Protected Status*, 90 FR 5961 (Jan. 17, 2025). The notice also extended certain EADs. The effect of Secretary Mayorkas' actions, however, resulted in an extension of the 2021 Venezuela TPS designation.

## III.    Vacatur of the 2025 Decision

The Secretary of Homeland Security is vacating the January 10, 2025 decision of Secretary Mayorkas which (1) extended the 2023 Venezuela TPS designation and (2) allowed the consolidation of filing processes for both designations, which had the effect of extending the 2021 Venezuela TPS designation, and (3) extended certain EADs. An agency has inherent (that is, statutorily implicit) authority to revisit its prior decisions unless Congress has expressly limited that authority. The TPS statute does not limit the Secretary's inherent authority under the INA to reconsider any TPS-related determination, and upon reconsideration, to vacate or amend the determination.[2]

---

[2] *See* INA 103(a), 244(b)(3), (b)(5)(A); 8 U.S.C. 1103(a), 1254a(b)(3), (b)(5)(A); *Reconsideration and Rescission of Termination of the Designation of El Salvador for Temporary Protected Status; Extension of the Temporary*

4

## A.    Reason for the Vacatur

The Mayorkas Notice adopted a novel approach of implicitly negating the 2021 Venezuela TPS designation by effectively subsuming it within the 2023 Venezuela TPS designation.  As described above, Secretary Mayorkas explicitly made a determination to extend the 2023 designation.  While he did not make an explicit determination to extend the 2021 designation, he did allow consolidated filing processes for both the 2021 and 2023 designations, which in effect extended the 2021 designation by up to 13 months.  Furthermore, he allowed extensions for certain EADs.

The Mayorkas Notice states that *Existing TPS beneficiaries, including those registered under the October 3, 2023 TPS designation or the prior March 9, 2021 TPS designation, who wish to extend their status through October 2, 2026, must re-register during the re-registration period described in* the January 2025 decision.  This, and other language in the Mayorkas Notice, indicate that the practical effect of Secretary Mayorkas' decision was to combine both designations and to provide an extension until October 2, 2026, for the population of *both* designations.

---

*Protected Status Designation for El Salvador*, 88 FR 40282, 40285 (June 21, 2023) ("An agency has inherent (that is, statutorily implicit) authority to revisit its prior decisions unless Congress has expressly limited that authority. The TPS statute does not limit the Secretary's inherent authority to reconsider any TPS-related determination, and upon reconsideration, to change the determination."); *see also, e.g.*, *Ivy Sports Medicine, LLC v. Burwell*, 767 F.3d 81, 86 (D.C. Cir. 2014) (Kavanaugh, J.) ("[A]dministrative agencies are assumed to possess at least some inherent authority to revisit their prior decisions, at least if done in a timely fashion. . . . "[I]nherent authority for timely administrative reconsideration is premised on the notion that the power to reconsider is inherent in the power to decide." (quotation marks and citations omitted)); *Macktal v. Chao*, 286 F.3d 822, 825-26 (5th Cir. 2002) ("It is generally accepted that in the absence of a specific statutory limitation, an administrative agency has the inherent authority to reconsider its decisions.") (collecting cases); *Mazaleski v. Treusdell*, 562 F.2d 701, 720 (D.C. Cir. 1977) ("We have many times held that an agency has the inherent power to reconsider and change a decision if it does so within a reasonable period of time."); *cf. Last Best Beef, LLC v. Dudas*, 506 F.3d 333, 340 (4th Cir. 2007) (agencies possess especially "broad authority to correct their prior errors").

VZ Vacatur_0010

The Mayorkas Notice did not acknowledge the novelty of its approach or explain how it is consistent with the TPS statute.  *See* INA 244(b)(2)(B), 8 U.S.C. 1254a(b)(2)(B) (providing that a TPS country designation "shall remain in effect until the effective date of the termination of the designation under [INA 244(b)(3)(B), 8 U.S.C. 1254a(b)(3)(B)]").  This novel approach has included multiple notices, overlapping populations, overlapping dates, and sometimes multiple actions happening in a single document.  While the Mayorkas Notice may have made attempts to address these overlapping populations, the explanations in the Mayorkas Notice, particularly the explanation for operational impacts, are thin and inadequately developed.  Given these deficiencies and lack of clarity, vacatur is warranted to untangle the confusion, and provide an opportunity for informed determinations regarding the TPS designations and clear guidance.[3]

Given the exceedingly brief period in which the January 17, 2025 extension notice has been in effect and the fact that the effect of this vacatur will restore the status quo preceding that notice, any putative reliance interests on the extension notice are negligible.  Venezuela 2023 registrants will retain their temporary protected status under the pre-existing designation at least until April 2, 2025.  With respect to any Venezuela 2021 registrants who elected, pursuant to the Mayorkas Notice, to register under the Venezuela 2023 designation, USCIS will restore their Venezuela 2021 registration.  And, in any event, any putative reliance interests arguably engendered by the Mayorkas Notice are outweighed by the overriding interests and concerns articulated in this notice.

### B.  Effect of the Vacatur

---

[3] *See* Exec. Order, *Protecting the American People Against Invasion*, sec. 16(b) (Jan. 20, 2025), *available at* https://www.whitehouse.gov/presidential-actions/2025/01/protecting-the-american-people-against-invasion/.

6

As a result of the vacatur, the 2021 Venezuela TPS designation and the 2023 Venezuela designation remain in effect and their associated statutory deadlines remain in effect.  The statutory deadline[4] for each of those designations is as follows:  The Secretary (1) must determine, by February 1, 2025, whether to extend or terminate the 2023 Venezuela TPS designation and (2) must determine, by July 12, 2025, whether to extend or terminate the 2021 Venezuela TPS designation.

If the Secretary does not make a timely determination (for example, if the Secretary were *not* to make determination by February 1, 2025 whether to extend or terminate the 2023 Venezuela TPS designation), then the statute provides for an automatic extension of the designation for an additional period of 6 months.  INA 244(b)(3)(C), 8 U.S.C. 1254a(b)(3)(C).

Pursuant to this vacatur, USCIS will no longer accept Venezuela TPS re-registration applications (Form I-821) and associated Applications for Employment Authorization (Form I-765) filed under the Mayorkas Notice.  For TPS beneficiaries who have already filed applications to re-register for TPS pursuant to the Mayorkas Notice and paid any fees associated with their applications, USCIS will cease processing their applications, and issue refunds of any fees paid by those aliens.[5]  Additionally, USCIS will invalidate EADs; Forms I-797, Notice of Action (Approval Notice); and Forms I-94, Arrival/Departure Record (collectively known as TPS-related documentation) that have been issued with October 2, 2026 expiration dates under the Mayorkas Notice.  USCIS will provide refunds to any fees paid by these aliens as well.

---

[4] If there is an existing TPS designation for a foreign state, the Secretary must review country conditions in consultation with appropriate U.S. Government agencies and make a determination—at least 60 days before the designation is set to expire—whether to extend or terminate that country's TPS designation (i.e., whether the conditions for the designation continue to be met).  INA 244(b)(3), 8 U.S.C. 1254a(b)(3).

[5] As noted above, any Venezuela 2021 registrants who elected, pursuant to the Mayorkas Notice, to register under the Venezuela 2023 designation will have their Venezuela 2021 registration restored.

7

Additionally, pursuant to this vacatur the automatic EAD extensions provided in the

Mayorkas Notice are hereby rescinded.  USCIS will provide additional guidance regarding the

two Venezuela TPS designations on a future date in accordance with applicable laws.

## IV.    Notice of Vacatur of Secretary Mayorkas' 2025 Decision

By the authority vested in me as Secretary under section 244 of the Immigration and

Nationality Act, 8 U.S.C. 1254a, I am vacating the decisions announced in the January 17, 2025

notice titled *Extension of the 2023 Designation of Venezuela for TPS*.  In doing so, I am vacating

the (1) extension of the Venezuela 2023 TPS designation, (2) the consolidation of filing

processes for both designations, which, in effect, resulted in the extension of the 2021 TPS

designation, and (3) the EADs that were extended.  As a result, the Venezuela 2023 TPS

designation and the Venezuela 2021 TPS designation remain in effect and their associated

statutory deadlines remain in effect.


_____

**Kristi Noem**
Secretary,
U.S. Department of Homeland Security


8

# Matter of DHANASAR, Petitioner

*Decided December 27, 2016*

U.S. Department of Homeland Security
U.S. Citizenship and Immigration Services
Administrative Appeals Office

USCIS may grant a national interest waiver if the petitioner demonstrates: (1) that the foreign national's proposed endeavor has both substantial merit and national importance; (2) that he or she is well positioned to advance the proposed endeavor; and (3) that, on balance, it would be beneficial to the United States to waive the job offer and labor certification requirements. *Matter of New York State Dep't of Transp.*, 22 I&N Dec. 215 (Acting Assoc. Comm'r 1998), vacated.

ON BEHALF OF PETITIONER: Gerard M. Chapman, Esquire, Greensboro, North Carolina

In this decision, we have occasion to revisit the analytical framework for assessing eligibility for "national interest waivers" under section 203(b)(2)(B)(i) of the Immigration and Nationality Act, 8 U.S.C. § 1153(b)(2)(B)(i) (2012). The self-petitioner, a researcher and educator in the field of aerospace engineering, filed an immigrant visa petition seeking classification under section 203(b)(2) of the Act as a member of the professions holding an advanced degree. The petitioner also sought a "national interest waiver" of the job offer otherwise required by section 203(b)(2)(A).

The Director of the Texas Service Center denied the petition under the existing analytical framework, concluding that the petitioner qualifies for classification as a member of the professions holding an advanced degree but that a waiver of the job offer requirement would not be in the national interest of the United States. Upon de novo review, and based on the revised national interest standard adopted herein, we will sustain the appeal and approve the petition.

## I. LEGAL BACKGROUND

Subparagraph (A) of section 203(b)(2) of the Act makes immigrant visas available to "qualified immigrants who are members of the professions holding advanced degrees or their equivalent or who because of their exceptional ability in the sciences, arts, or business, will substantially benefit prospectively the national economy, cultural or educational

Cite as 26 I&N Dec. 884 (AAO 2016)                    Interim Decision #3882

interests, or welfare of the United States."  Under subparagraph (A), immigrant visas are available to such individuals only if their "services in the sciences, arts, professions, or business are sought by an employer in the United States."

Before hiring a foreign national under this immigrant classification, an employer must first obtain a permanent labor certification from the United States Department of Labor ("DOL") under section 212(a)(5)(A)(i) of the Act, 8 U.S.C. § 1182(a)(5)(A)(i) (2012).  *See also* 8 C.F.R. § 204.5(k)(4)(i) (2016).  A labor certification demonstrates that DOL has determined that there are not sufficient workers who are able, willing, qualified, and available at the place where the alien is to perform such skilled or unskilled labor, and the employment of such alien will not adversely affect the wages and working conditions of workers in the United States similarly employed. In its labor certification application, the employer must list the position's job requirements consistent with what is normally required for the occupation.  *See* 20 C.F.R. § 656.17(h)(1) (2016).  Moreover, the job requirements described on the labor certification application must represent the actual minimum requirements for the job opportunity.  *See* 20 C.F.R. § 656.17(i)(1).  That is, the employer may not tailor the position requirements to the foreign worker's qualifications; it may only list the position's minimum requirements, regardless of the foreign worker's additional skills that go beyond what is normally required for the occupation.  The employer must then test the labor market to determine if able, willing, or qualified U.S. workers are available with the advertised minimum qualifications.  If such U.S. workers are found, the employer may not hire the foreign worker for the position, even if the foreign worker clearly has more skills (beyond the advertised qualifications).  If the employer does not identify such U.S. workers and DOL determines that those workers are indeed unavailable, DOL will certify the labor certification.  After securing the DOL-approved labor certification, the employer may then file a petition with DHS requesting the immigrant classification.

Under subparagraph (B) of section 203(b)(2), however, the Secretary of Homeland Security may waive the requirement of a "job offer" (namely, that the beneficiary's services are sought by a U.S. employer) and, under the applicable regulations, of "a labor certification."  8 C.F.R. § 204.5(k)(4)(ii).[1]  That subparagraph states, in pertinent part, that the

---

[1]  While appearing to limit national interest waivers to only aliens possessing exceptional ability in the sciences, arts, or business, 8 C.F.R. § 204.5(k)(4)(ii) was superseded in part by section 302(b)(2) of the Miscellaneous and Technical Immigration and Naturalization Amendments of 1991, Pub. L. No. 102-232, 105 Stat. 1733, 1743

(continued . . .)

885

Secretary "may, when the [Secretary] deems it to be in the national interest, waive the requirements of subparagraph (A) that an alien's services in the sciences, arts, professions, or business be sought by an employer in the United States."[2] Section 203(b)(2)(A) of the Act.

USCIS may grant a national interest waiver as a matter of discretion if the petitioner satisfies both subparagraphs (A) and (B). Thus, a petitioner who seeks a "national interest waiver" must first satisfy subparagraph (A) by demonstrating that the beneficiary qualifies as a member of the professions holding an advanced degree or as an individual of exceptional ability. *See* 8 C.F.R. § 204.5(k)(1)–(3) (providing definitions and considerations for making such determinations); *see also* section 203(b)(2)(C) of the Act (providing that possession of requisite academic degree or professional license "shall not by itself be considered sufficient evidence of exceptional ability"). The petitioner must then satisfy subparagraph (B) by establishing that it would be in the national interest to waive the "job offer" requirement under subparagraph (A).[3] *See* 8 C.F.R. § 204.5(k)(4)(ii). This two-part statutory scheme is relatively straightforward, but the term "national interest" is ambiguous. Undefined by statute and regulation, "national interest" is a broad concept subject to various interpretations.

In 1998, under the legacy Immigration and Naturalization Service, we issued a precedent decision establishing a framework for evaluating national interest waiver petitions. *Matter of New York State Dep't of Transp.* ("*NYSDOT*"), 22 I&N Dec. 215 (Acting Assoc. Comm'r 1998).

------------------------------------------------------------

("MTINA"). Section 302(b)(2) of MTINA amended section 203(b)(2)(B)(i) of the Act by inserting the word "professions" after the word "arts," and thereby made the national interest waiver available to members of the professions holding advanced degrees in addition to individuals of exceptional ability.

[2] Pursuant to section 1517 of the Homeland Security Act ("HSA") of 2002, Pub. L. No. 107-296, 116 Stat. 2135, 2311 (codified at 6 U.S.C. § 557 (2012)), any reference to the Attorney General in a provision of the Act describing functions that were transferred from the Attorney General or other Department of Justice official to the Department of Homeland Security by the HSA "shall be deemed to refer to the Secretary" of Homeland Security. *See also* 6 U.S.C. § 542 note (2012); 8 U.S.C. § 1551 note (2012).

[3] To do so, a petitioner must go beyond showing the individual's expertise in a particular field. The regulation at 8 C.F.R. § 204.5(k)(2) defines "exceptional ability" as "a degree of expertise significantly above that ordinarily encountered" in a given area of endeavor. By statute, individuals of exceptional ability are generally subject to the job offer/labor certification requirement; they are not exempt by virtue of their exceptional ability. Therefore, whether a given petitioner seeks classification as an individual of exceptional ability, or as a member of the professions holding an advanced degree, that individual cannot qualify for a waiver just by demonstrating a degree of expertise significantly above that ordinarily encountered in his field of expertise.

Cite as 26 I&N Dec. 884 (AAO 2016)                    Interim Decision #3882

The *NYSDOT* framework looks first to see if a petitioner has shown that the area of employment is of "substantial intrinsic merit." *Id.* at 217. Next, a petitioner must establish that any proposed benefit from the individual's endeavors will be "national in scope." *Id.* Finally, the petitioner must demonstrate that the national interest would be adversely affected if a labor certification were required for the foreign national. *Id.*

Based on our experience with that decision in the intervening period, we believe it is now time for a reassessment. While the first prong has held up under adjudicative experience, the term "intrinsic" adds little to the analysis yet is susceptible to unnecessary subjective evaluation.[4] Similarly, the second prong has caused relatively few problems in adjudications, but occasionally the term "national in scope" is construed too narrowly by focusing primarily on the geographic impact of the benefit. While *NYSDOT* found a civil engineer's employment to be national in scope even though it was limited to a particular region, that finding hinged on the geographic connections between New York's bridges and roads and the national transportation system. Certain locally or regionally focused endeavors, however, may be of national importance despite being difficult to quantify with respect to geographic scope.

What has generated the greatest confusion for petitioners and adjudicators, however, is *NYSDOT*'s third prong. First, this prong is explained in several different ways within *NYSDOT* itself, leaving the reader uncertain what ultimately is the relevant inquiry. We initially state the third prong as requiring a petitioner to "demonstrate that the national interest would be adversely affected if a labor certification were required." *NYSDOT*, 22 I&N Dec. at 217. We then alternatively describe the third prong as requiring the petitioner to demonstrate that the individual "present[s] a national benefit so great as to outweigh the national interest inherent in the labor certification process." *Id.* at 218. Immediately thereafter, we restate the third prong yet again: the petitioner must establish that the individual will "serve the national interest to a substantially greater degree than would an available U.S. worker having the same minimum qualifications."[5] *Id.* Finally, in what may be construed as either a fourth restatement of prong three or as an explanation of how to satisfy it, we state that "it clearly must be established that the alien's past record justifies projections of future benefit to the national interest." *Id.* at 219. A footnote

---

4  *Cf., e.g.*, *24/7 Records, Inc. v. Sony Music Entm't, Inc.*, 514 F. Supp. 2d 571, 575 (S.D.N.Y. 2007) ("'Intrinsic value' is an inherently subjective and speculative concept.").
5  Other, slight variations of the third prong emerge later in the decision. *See NYSDOT*, 22 I&N at 220 ("to a greater extent than U.S. workers"); *see also id.* at 221 ("considerably outweigh").

to this statement clarifies that USCIS seeks "a past history of demonstrable achievement with some degree of influence on the field as a whole." *Id.* at 219 n.6. Although residing in footnote 6, this "influence" standard has in practice become the primary yardstick against which petitions are measured.[6]

Second, and a more fundamental challenge than parsing its several restatements, *NYSDOT*'s third prong can be misinterpreted to require the petitioner to submit, and the adjudicator to evaluate, evidence relevant to the very labor market test that the waiver is intended to forego. The first iteration of prong three, that the national interest would be adversely affected if a labor certification were required, implies that petitioners should submit evidence of harm to the national interest. The third iteration, that the individual will serve the national interest to a substantially greater degree than would an available U.S. worker having the same minimum qualifications, suggests that petitioners should submit evidence comparing foreign nationals to unidentified U.S. workers. These concepts have proven to be difficult for many qualified individuals to establish or analyze in the abstract. It has proven particularly ill-suited for USCIS to evaluate petitions from self-employed individuals, such as entrepreneurs. In *NYSDOT*, we even "acknowledge[d] that there are certain occupations wherein individuals are essentially self-employed, and thus would have no U.S. employer to apply for a labor certification." *Id.* at 218 n.5. Nonetheless, we did not modify the test to resolve this scenario, which continues to challenge petitioners and USCIS adjudicators. Lastly, this concept of harm-to-national-interest is not required by, and unnecessarily narrows, the Secretary's broad discretionary authority to grant a waiver when he "deems it to be in the national interest."

## II. NEW ANALYTICAL FRAMEWORK

Accordingly, our decision in *NYSDOT* is ripe for revision. Today, we vacate *NYSDOT* and adopt a new framework for adjudicating national interest waiver petitions, one that will provide greater clarity, apply more flexibly to circumstances of both petitioning employers and self-petitioning

---

[6]   While this "influence" standard rests upon the reasonable notion that past success will often predict future benefit, our adjudication experience in the years since *NYSDOT* has revealed that there are some talented individuals for whom past achievements are not necessarily the best or only predictor of future success.

Cite as 26 I&N Dec. 884 (AAO 2016)                    Interim Decision #3882

individuals, and better advance the purpose of the broad discretionary waiver provision to benefit the United States.[7]

Under the new framework, and after eligibility for EB-2 classification has been established, USCIS may grant a national interest waiver if the petitioner demonstrates by a preponderance of the evidence:[8] (1) that the foreign national's proposed endeavor has both substantial merit and national importance; (2) that the foreign national is well positioned to advance the proposed endeavor; and (3) that, on balance, it would be beneficial to the United States to waive the requirements of a job offer and thus of a labor certification. If these three elements are satisfied, USCIS may approve the national interest waiver as a matter of discretion.[9]

The first prong, substantial merit and national importance, focuses on the specific endeavor that the foreign national proposes to undertake. The endeavor's merit may be demonstrated in a range of areas such as business, entrepreneurialism, science, technology, culture, health, or education. Evidence that the endeavor has the potential to create a significant economic impact may be favorable but is not required, as an endeavor's merit may be established without immediate or quantifiable economic impact. For example, endeavors related to research, pure science, and the furtherance of human knowledge may qualify, whether or not the potential accomplishments in those fields are likely to translate into economic benefits for the United States.

In determining whether the proposed endeavor has national importance, we consider its potential prospective impact. An undertaking may have national importance for example, because it has national or even global implications within a particular field, such as those resulting from certain improved manufacturing processes or medical advances. But we do not evaluate prospective impact solely in geographic terms. Instead, we look for broader implications. Even ventures and undertakings that have as their focus one geographic area of the United States may properly be considered to have national importance. In modifying this prong to assess "national

---

[7]   Going forward, we will use "petitioners" to include both employers who have filed petitions on behalf of employees and individuals who have filed petitions on their own behalf (namely, self-petitioners).

[8]   Under the "preponderance of the evidence" standard, a petitioner must establish that he or she more likely than not satisfies the qualifying elements. *Matter of Chawathe*, 25 I&N Dec. 369, 376 (AAO 2010). We will consider not only the quantity, but also the quality (including relevance, probative value, and credibility) of the evidence. *Id.*

[9]   Because the national interest waiver is "purely discretionary," *Schneider v. Chertoff*, 450 F.3d 944, 948 (9th Cir. 2006), the petitioner also must show that the foreign national otherwise merits a favorable exercise of discretion. *See Zhu v. Gonzales*, 411 F.3d 292, 295 (D.C. Cir. 2005); *cf. Matter of Jean*, 23 I&N Dec. 373, 383 (A.G. 2002).

importance" rather than "national in scope," as used in *NYSDOT*, we seek to avoid overemphasis on the geographic breadth of the endeavor. An endeavor that has significant potential to employ U.S. workers or has other substantial positive economic effects, particularly in an economically depressed area, for instance, may well be understood to have national importance.

The second prong shifts the focus from the proposed endeavor to the foreign national. To determine whether he or she is well positioned to advance the proposed endeavor, we consider factors including, but not limited to: the individual's education, skills, knowledge and record of success in related or similar efforts; a model or plan for future activities; any progress towards achieving the proposed endeavor; and the interest of potential customers, users, investors, or other relevant entities or individuals.

We recognize that forecasting feasibility or future success may present challenges to petitioners and USCIS officers, and that many innovations and entrepreneurial endeavors may ultimately fail, in whole or in part, despite an intelligent plan and competent execution. We do not, therefore, require petitioners to demonstrate that their endeavors are more likely than not to ultimately succeed. But notwithstanding this inherent uncertainty, in order to merit a national interest waiver, petitioners must establish, by a preponderance of the evidence, that they are well positioned to advance the proposed endeavor.

The third prong requires the petitioner to demonstrate that, on balance, it would be beneficial to the United States to waive the requirements of a job offer and thus of a labor certification. On the one hand, Congress clearly sought to further the national interest by requiring job offers and labor certifications to protect the domestic labor supply. On the other hand, by creating the national interest waiver, Congress recognized that in certain cases the benefits inherent in the labor certification process can be outweighed by other factors that are also deemed to be in the national interest. Congress entrusted the Secretary to balance these interests within the context of individual national interest waiver adjudications.

In performing this analysis, USCIS may evaluate factors such as: whether, in light of the nature of the foreign national's qualifications or proposed endeavor, it would be impractical either for the foreign national to secure a job offer or for the petitioner to obtain a labor certification;[10]

---

[10] For example, the labor certification process may prevent a petitioning employer from hiring a foreign national with unique knowledge or skills that are not easily articulated in a labor certification. *See generally* 20 C.F.R. § 656.17(i). Likewise, because of the nature of the proposed endeavor, it may be impractical for an entrepreneur or

(continued . . .)

Cite as 26 I&N Dec. 884 (AAO 2016)                    Interim Decision #3882

whether, even assuming that other qualified U.S. workers are available, the United States would still benefit from the foreign national's contributions; and whether the national interest in the foreign national's contributions is sufficiently urgent to warrant forgoing the labor certification process. We emphasize that, in each case, the factor(s) considered must, taken together, indicate that on balance, it would be beneficial to the United States to waive the requirements of a job offer and thus of a labor certification.

We note that this new prong, unlike the third prong of *NYSDOT*, does not require a showing of harm to the national interest or a comparison against U.S. workers in the petitioner's field. As stated previously, *NYSDOT*'s third prong was especially problematic for certain petitioners, such as entrepreneurs and self-employed individuals. This more flexible test, which can be met in a range of ways as described above, is meant to apply to a greater variety of individuals.

## III. ANALYSIS

The director found the petitioner to be qualified for the classification sought by virtue of his advanced degrees. We agree that he holds advanced degrees and therefore qualifies under section 203(b)(2)(A). The remaining issue before us is whether the petitioner has established, by a preponderance of the evidence, that he is eligible for and merits a national interest waiver.

The petitioner proposes to engage in research and development relating to air and space propulsion systems, as well as to teach aerospace engineering, at North Carolina Agricultural and Technical State University ("North Carolina A&T"). The petitioner holds two master of science degrees, in mechanical engineering and in applied physics, as well as a Ph.D. in engineering, from North Carolina A&T. At the time of filing the instant petition, he also worked as a postdoctoral research associate at the university. The record reflects that the petitioner's graduate and postgraduate research has focused on hypersonic propulsion systems (systems involving propulsion at speeds of Mach 5 and above) and on computational fluid dynamics. He has developed a validated computational model of a high-speed air-breathing propulsion engine, as well as a novel numerical method for accurately calculating hypersonic air flow. The petitioner intends to continue his research at the university.

The extensive record includes: reliable evidence of the petitioner's credentials; copies of his publications and other published materials that

_____

self-employed inventor, when advancing an endeavor on his or her own, to secure a job offer from a U.S. employer.

VZ Vacatur_0021

cite his work; evidence of his membership in professional associations; and documentation regarding his research and teaching activities.    The petitioner also submitted several letters from individuals who establish their own expertise in aerospace, describe the petitioner's research in detail and attest to his expertise in the field of hypersonic propulsion systems.

We determine that the petitioner is eligible for a national interest waiver under the new framework.    First, we conclude that the petitioner has established both the substantial merit and national importance of his proposed endeavor.  The petitioner demonstrated that he intends to continue research into the design and development of propulsion systems for potential use in military and civilian technologies such as nano-satellites, rocket-propelled ballistic missiles, and single-stage-to-orbit vehicles.    In letters supporting the petition, he describes how research in this area enhances our national security and defense by allowing the United States to maintain its advantage over other nations in the field of hypersonic flight. We find that this proposed research has substantial merit because it aims to advance scientific knowledge and further national security interests and U.S. competitiveness in the civil space sector.

The record further demonstrates that the petitioner's proposed endeavor is of national importance.  The petitioner submitted probative expert letters from individuals holding senior positions in academia, government, and industry that describe the importance of hypersonic propulsion research as it relates to U.S. strategic interests.  He also provided media articles and other evidence documenting the interest of the House Committee on Armed Services in the development of hypersonic technologies and discussing the potential significance of U.S. advances in this area of research and development.    The letters and the media articles discuss efforts and advances that other countries are currently making in the area of hypersonic propulsion systems and the strategic importance of U.S. advancement in researching and developing these technologies for use in missiles, satellites, and aircraft.

Second, we find that the record establishes that the petitioner is well positioned to advance the proposed endeavor.    Beyond his multiple graduate degrees in relevant fields, the petitioner has experience conducting research and developing computational models that support the mission of the United States Department of Defense ("DOD") to develop air superiority and protection capabilities of U.S. military forces, and that assist in the development of platforms for Earth observation and interplanetary exploration.  The petitioner submitted detailed expert letters describing U.S. Government interest and investment in his research, and the record includes documentation that the petitioner played a significant role in projects funded by grants from the National Aeronautics and Space

Cite as 26 I&N Dec. 884 (AAO 2016)                Interim Decision #3882

Administration ("NASA") and the Air Force Research Laboratories ("AFRL") within DOD. [11]   Thus, the significance of the petitioner's research in his field is corroborated by evidence of peer and government interest in his research, as well as by consistent government funding of the petitioner's research projects.  The petitioner's education, experience, and expertise in his field, the significance of his role in research projects, as well as the sustained interest of and funding from government entities such as NASA and AFRL, position him well to continue to advance his proposed endeavor of hypersonic technology research.

Third and finally, we conclude that, on balance, it would be beneficial to the United States to waive the requirements of a job offer and thus of a labor certification.  As noted above, the petitioner holds three graduate degrees in fields tied to the proposed endeavor, and the record demonstrates that he possesses considerable experience and expertise in a highly specialized field.  The evidence also shows that research on hypersonic propulsion holds significant implications for U.S. national security and competitiveness.  In addition, the repeated funding of research in which the petitioner played a key role indicates that government agencies, including NASA and the DOD, have found his work on this topic to be promising and useful.  Because of his record of successful research in an area that furthers U.S. interests, we find that this petitioner offers contributions of such value that, on balance, they would benefit the United States even assuming that other qualified U.S. workers are available.

In addition to conducting research, the petitioner proposes to support teaching activities in science, technology, engineering, and math ("STEM") disciplines.  He submits letters favorably attesting to his teaching abilities at the university level and evidence of his participation in mentorship programs for middle school students.   While STEM teaching has substantial merit in relation to U.S. educational interests, the record does not indicate by a preponderance of the evidence that the petitioner would be engaged in activities that would impact the field of STEM education more broadly.  Accordingly, as the petitioner has not established by a preponderance of the evidence that his proposed teaching activities meet the "national importance" element of the first prong of the new framework, we do not address the remaining prongs in relation to the petitioner's teaching activities.

---

[11]  Although the director of North Carolina A&T's Center for Aerospace Research ("CAR") is listed as the lead principal investigator on all grants for CAR research, the record establishes that the petitioner initiated or is the primary award contact on several funded grant proposals and that he is the only listed researcher on many of the grants.

Cite as 26 I&N Dec. 884 (AAO 2016)                    Interim Decision #3882

## IV.  CONCLUSION

The record demonstrates by a preponderance of the evidence that: (1) the petitioner's research in aerospace engineering has both substantial merit and national importance; (2) the petitioner is well positioned to advance his research; and (3) on balance, it is beneficial to the United States to waive the requirements of a job offer and thus of a labor certification.  We find that the petitioner has established eligibility for and otherwise merits a national interest waiver as a matter of discretion.

In visa petition proceedings, it is the petitioner's burden to establish eligibility for the immigration benefit sought.  Section 291 of the Act, 8 U.S.C. § 1361 (2012).  The petitioner has met that burden.

**ORDER:**  The appeal is sustained and the petition is approved.

894

 

MEXICO · CHINA · LATEST NEWS

◀           ▶

VENEZUELA >

# Venezuela calls on retired teachers to return to school amid staff shortages

Emigration and low salaries for education workers have resulted in the loss of over 100,000 teaching professionals in recent years

VZ Vacatur_0025



A school in Caracas, Venezuela.
**RAYNER PENA R (EFE)**

**ALONSO MOLEIRO**

Caracas   OCT 10, 2024   13:18 EDT

Venezuela's Education Minister Héctor Rodríguez has signed a resolution inviting retired teachers and professors to return to the classroom, just over a week before the start of the school year. This initiative aims to address a significant number of vacancies, particularly in the public sector, caused by the collapse of the salary structure and the mass emigration of educators.

Rodríguez also announced that teachers currently on "service commissions" — working in administrative roles rather than teaching — must return to their teaching positions. In making this announcement, he acknowledged the challenges in filling subjects such as mathematics, physics, and chemistry within

3/7/25, 12:21 PM    Case 3:25-cv...Venezuela calls on retired teachers to return to school amid staff shortages | International | EL PAÍS English

national public education and emphasized the urgent need to ensure that students have full-time teachers in place.

"The primary task we face is to ensure quality, inclusive education for all. However, the biggest challenge in achieving this goal lies within our own bureaucracy and the functioning of the Ministry," said Rodríguez.

The hyperinflationary crisis and severe economic contraction experienced by the country from 2014 to 2020 triggered a mass exodus of teachers at the end of the previous decade, leading to a significant deterioration of the Venezuelan educational system     once a cornerstone of Chavista propaganda regarding social investment and the achievements of its administration. The Venezuelan Federation of Teachers, an educational union, estimates that approximately 100,000 teachers left the profession between 2015 and 2020.

The Maduro government has spent several years denying this reality, asserting that "not a single school has closed in Venezuela" despite the ongoing crisis. Currently, the government blames the situation on international sanctions, claiming these measures restrict their ability to manage budgets effectively. A public school teacher in Venezuela now earns approximately $25 a month, a stark decline from over $400 in 2010, when they were already underpaid. While teachers receive some additional bonuses deposited into their digital wallets amounting to around $150 — they often seek supplemental income by offering private lessons.

Many teachers have turned to alternative trades, becoming motorcycle taxi drivers or accepting loans from public banks     after nearly seven years of limited access to financing — to start micro-enterprises. While the public education sector serves the majority of Venezuela's lower-income populations, private education caters primarily to the middle and upper classes, representing about 30% of the population. Although private institutions face challenges in retaining teachers who wish to emigrate and have also scaled back their services, they generally offer significantly better working conditions.

As the school year begins, Venezuelan President Nicolás Maduro announced a plan aimed at providing socio-economic aid and improvements for impoverished Venezuelan teachers, who are among the poorest in South

VZ Vacatur_0027

3/7/25, 12:21 PM    Case 3:25-cv...    Venezuela calls on retired teachers to return to school amid staff shortages | International | EL PAÍS English

America. This initiative includes a digital credit-based purchasing program for acquiring goods, a new healthcare plan, coverage for urban transportation, and a monthly subsidy that includes food bags. Additionally, the country's network of public schools, which have deteriorated significantly in recent years, will undergo a comprehensive maintenance plan, for which Maduro has requested logistical assistance from the Armed Forces.

The Venezuelan teachers' union, one of the largest in the country, has long expressed frustration over the executive's salary arrears and has become a focal point of social unrest, evidenced by street protests over the past two years. Many of these demonstrations have faced harsh repression from the government, with organizers facing prosecution. Since the era of Hugo Chávez, the Bolivarian Revolution has invested heavily in health and education, yielding some encouraging results in its early years. However, these efforts eventually gave way to catastrophic administrative mismanagement and significant failures.

Chavista educational projects initially enjoyed success, particularly with the establishment of Bolivarian Schools and initiatives aimed at combating poverty, such as the School Feeding Program. Notable progress was made in preschool education, and alternative pathways to higher education were expanded through the Sucre Mission.

However, these achievements began to unravel amidst the national socioeconomic collapse that took hold during the currency crisis of 2013, which led to the disappearance of goods and skyrocketing prices. Structural corruption undermined nearly all social programs, and the rapid devaluation of the currency severely eroded teachers' salaries and the funding available for maintenance.

Following significant advancements in education from the 1940s to the 1980s during which illiteracy was nearly eradicated and access to primary education became widespread    Venezuela's educational system, particularly in the public sector, has entered a decline from which it has yet to recover.

*Sign up for our weekly newsletter to get more English-language news coverage from EL PAÍS USA Edition*

(30 of 59), Page 30 of 59   Case: 25-2120, 05/28/2025, DktEntry: 49.3, Page 30 of 59

3/7/25, 12:21 PM    Case 3:25-cv-...   Venezuela calls on retired teachers to return to schools amid staff shortages | International | EL PAÍS English

Sign up to EL PAÍS US Edition bulletin

 

**MORE INFORMATION**



### It's Christmas in Venezuela as Maduro tries to turn page on political and economic crisis

FLORANTONIA SINGER | CARACAS



### Venezuela digs in its heels as US sanctions mount

MIGUEL JIMÉNEZ / JUAN DIEGO QUESADA | WASHINGTON / BOGOTÁ

**ARCHIVED IN**

Venezuela · Hugo Chávez · Nicolás Maduro                          ⌄

Adheres to                                                      [T] The Trust Project
More information >

If you are interested in licensing this content, click here

(31 of 59), Page 31 of 59    Case: 25-2120, 05/28/2025, DktEntry: 49.3, Page 31 of 59

3/7/25, 12:21 PM    Case 3:25-cv-Venezuela calls on retired teachers to return to school amid staff shortages | International | EL PAÍS English

## ÚLTIMAS NOTICIAS

**19:18**  Trump claims to have sent a letter to Iran to negotiate a nuclear deal

**17:15**  Daylight Saving Time 2025: When to change the clocks and everything you need to know

**17:03**  Zelenskiy's adviser Mykhailo Podolyak: 'I think Trump will succeed where previous US administrations failed with Russia'

**16:21**  The price of opposing Maduro's power

## MOST VIEWED

**1.** New inheritance mechanism unrelated to DNA is discovered by chance

**2.** Disappearance of eight young people and the silence of three states highlights opacity of crime in Mexico

**3.** EU explores sending military and civilian missions to Ukraine to guarantee security

**4.** 'El Mencho' and 'Don Rodo,' a life of evading justice: From small time dealers to heads of the most powerful cartel in Mexico

**5.** Judith Butler, philosopher: 'If you sacrifice a minority like trans people, you are operating within a fascist logic'

VZ Vacatur_0032



☰ **EL PAÍS**                                                SUBSCRIBE  👤

## International

MEXICO · CHINA · LATEST NEWS

◄                        ►

VENEZUELA >

# Venezuela grapples with economic collapse

The modest recovery of recent years fails to mask Venezuela's crisis: a shattered productive
structure, poverty levels nearly three times the regional average, and profound inequality



A fuel processing plant in Falcón (Venezuela).
**MIGUEL GUTIERREZ HENRY CHIRINOS (EFE)**

### ALONSO MOLEIRO

Caracas - JAN 17, 2025 - 23:30 EST

The [inauguration of Nicolás Maduro](#) last Friday ushers in a new chapter for Venezuela, marked by deep socioeconomic wounds. The ongoing financial crisis — arguably the population's greatest source of discontent — persists despite a modest reactivation of consumption. Crisis and political conflict remain intertwined, and after a decade of catastrophic governance and escalating tensions between the ruling party and the opposition, the Maduro government now faces an especially turbulent period.

The evidence of electoral fraud, which Maduro has been unable to convincingly refute, have [heightened international pressure](#). Both the United States and the European Union have stepped up sanctions, and Maduro is bracing for a new wave of isolation. As in the past, this isolation is likely to exacerbate the nation's economic struggles.

The start of Maduro's new mandate follows three years of moderate economic recovery, a relative improvement considering the depths from which Venezuela has emerged. This recovery was preceded by a historic economic contraction that drastically altered the nation's landscape over the past decade. Amid this unprecedented economic crisis — exacerbated by the political isolation of Chavismo — in 2020, the Maduro government began to distance itself from the statist orthodoxy outlined in the *Plan de la Patria*, its flagship economic program. Instead, it adopted a series of market-oriented reforms in an effort to [stabilize the economy.](#)

The partial dollarization of the monetary system, the introduction of new exchange and fiscal policies, a more business-friendly stance, and a shift in the treatment of international capital have led to a reduction in year-on-year inflation, a recovery in purchasing power, and some improvement in trade. However, the damage to Venezuela's productive and social fabric had already been done. The socioeconomic collapse experienced between 2014 and 2020, during Maduro's presidency, delivered a devastating blow to the nation's economic framework. This trauma has left many Venezuelans struggling to fully recover from its far-reaching effects.

During the years of strict economic controls, company takeovers, conflicts with capital, and excessive bureaucratization, Venezuela's economy contracted by more than 80%. The local industrial sector was decimated, and now operates at just 30% of its capacity. Thousands of businesses went bankrupt. A wave of nationalizations severely undermined the country's ability to respond to economic challenges. Hyperinflation, which peaked at an [astronomical 9,500% in 2019,](#) wreaked havoc on the economy, devastating the financial stability of millions. Meanwhile, the oil industry, once the backbone of Venezuela's economy, collapsed under the weight of a fixed exchange rate policy and [pervasive corruption](#) in the state-owned oil company Petróleos de Venezuela (PDVSA). Income poverty doubled, and now affects an estimated 80% of the population, according to the Venezuelan Academy of Economic Sciences (ANCE).

The crisis of the past decade left profound scars: wages were decimated, prices soared, shortages of essential goods became widespread, and public services deteriorated dramatically. This collapse triggered a mass exodus of millions of Venezuelans, many of whom fled the country on foot, seeking refuge across South America.

In 2015, the Central Bank of Venezuela, under Maduro's control, stopped publishing monthly economic data. Media censorship also worsened. The ruling party's popularity, which began to decline in 2014, has not recovered since. In 2019 and 2020, the national economy displayed metrics comparable to those of a war-torn nation, with GDP contracting by a staggering 30 percentage points, according to estimates from private consulting firms.

The popular social assistance programs created by the Chavista government — such as the Barrio Adentro preventive health initiative, the Mi Casa Bien Equipada goods transfer program, Mercal's cheap food markets, and the Cuban-assisted Comprehensive Diagnostic Centers — collapsed during the crisis, largely due to widespread corruption among government officials.

The minimum monthly wage, traditionally around $400, has dropped to just $3. The government provides periodic bonuses every four weeks, but without retroactive benefits, these only raise the effective minimum wage to $150 per month.

International sanctions, particularly from the United States, were introduced in 2016 in response to the political crisis driven by popular discontent. These sanctions significantly restricted Maduro's ability to explore alternative trade options or revitalize the oil industry. The global search for new markets, spurred by Russia's war in Ukraine, fostered a period of cautious détente between Caracas and Washington, leading to a modest revival in the oil sector. However, with the return of Donald Trump to the White House, it is likely that sanctions on Venezuelan oil will tighten further.

National revenues, heavily reliant on crude oil extraction, hit a critical low point in the last decade, with production dropping from nearly 3 million barrels per day to just 300,000 in 2019. Today, after significant challenges, production is slowly approaching the 1 million mark again.

Since 2016, for the first time in its history, remittances from emigrants have become a significant source of Venezuelan tax revenues. The exodus of between seven and eight million people, according to United Nations estimates, represents an unprecedented event in recent Latin American history, highlighting the severity of Venezuela's economic collapse and the erosion of its citizens' political rights. Despite implementing measures like food rationing based on the last digit of each citizen's identity card, the Maduro government has refused to acknowledge its responsibility for the crisis or the existence of a Venezuelan diaspora.

The disastrous performance of the Chavista administration triggered a political shift. In December 2015, the Venezuelan opposition achieved a decisive victory in the parliamentary elections, sending shockwaves through Chavismo. In response, Chavismo moved quickly to consolidate control over all state institutions. This led to the absolute concentration of power in the hands of Maduro and a select group of loyalists, while the government implemented social programs aimed at maintaining Chavista support and building networks of loyalty.

VZ Vacatur_0036

(38 of 59), Page 38 of 59     Case: 25-2120, 05/28/2025, DktEntry: 49.3, Page 38 of 59

3/7/25, 12:05 PM     Case 3:25-cv-01766-EMC Venezuela grapples with economic collapse | International | EL PAÍS English 37 of 99

consistently show a sharp decline in popularity. However, any assistance remains inadequate given the collapse of the country's productive activity. In the meantime, Venezuelans are facing a period marked by political uncertainty and looming economic instability.

*Sign up for <u>our weekly newsletter</u> to get more English-language news coverage from EL PAÍS USA Edition*

Sign up to EL PAÍS US Edition bulletin

f  X

**MORE INFORMATION**



**Latin America turns its back on Maduro's 'fraudulent' inauguration as president of Venezuela**

MAR CENTENERA | BUENOS AIRES



**Nicolás Maduro is inaugurated in Venezuela despite failing to present official voting records**

JUAN DIEGO QUESADA / ALONSO MOLEIRO | BOGOTÁ / CARACAS

**ARCHIVED IN**

Venezuela · Nicolás Maduro

Adheres to
More information ›

[T] The Trust Project

If you are interested in licensing this content, click here

(39 of 59), Page 39 of 59     Case: 25-2120, 05/28/2025, DktEntry: 49.3, Page 39 of 59

3/7/25, 12:05 PM     Case 3:25-cv-01766-EMC   Venezuela grapples with economic collapse | International | EL PAÍS English   of 99



**ÚLTIMAS NOTICIAS**

19:18   **Trump claims to have sent a letter to Iran to negotiate a nuclear deal**

17:15   **Daylight Saving Time 2025: When to change the clocks and everything you need to know**

17:03   **Zelenskiy's adviser Mykhailo Podolyak: 'I think Trump will succeed where previous US administrations failed with Russia'**

16:21   **The price of opposing Maduro's power**

**MOST VIEWED**

1. New inheritance mechanism unrelated to DNA is discovered by chance

2. Disappearance of eight young people and the silence of three states highlights opacity of crime in Mexico

3. EU explores sending military and civilian missions to Ukraine to guarantee security

4. 'El Mencho' and 'Don Rodo,' a life of evading justice: From small-time dealers to heads of the most powerful cartel in Mexico

VZ Vacatur_0038

VZ Vacatur_0039

(41 of 59), Page 41 of 59     Case: 25-2120, 05/28/2025, DktEntry: 49.3, Page 41 of 59

3/7/25, 12:05 PM     Case 3:25-cv-01766-EMC Venezuela grapples with economic collapse | International | EL PAÍS English   Page 40 of 99

VZ Vacatur_0040

3/7/25, 12:05 PM    Case 3:25-cv-01766-EMC    Venezuela grapples with economic collapse | International | EL PAÍS English



VZ Vacatur_0041

VZ Vacatur_0042

**Federal Register** / Vol. 90, No. 18 / Wednesday, January 29, 2025 / Presidential Documents       **8337**

## Presidential Documents

Executive Order 14150 of January 20, 2025

## America First Policy Directive to the Secretary of State

By the authority vested in me as President by the Constitution and the laws of the United States of America, it is hereby ordered:

**Section 1.** *Purpose.* From this day forward, the foreign policy of the United States shall champion core American interests and always put America and American citizens first.

**Sec. 2.** *Policy.* As soon as practicable, the Secretary of State shall issue guidance bringing the Department of State's policies, programs, personnel, and operations in line with an America First foreign policy, which puts America and its interests first.

**Sec. 3.** *General Provisions.* (a) Nothing in this order shall be construed to impair or otherwise affect:

(i) the authority granted by law to an executive department or agency; or

(ii) the functions of the Director of the Office of Management and Budget relating to budgetary, administrative, or legislative proposals.

(b) This order shall be implemented consistent with applicable law and subject to the availability of appropriations.

(c) This order is not intended to, and does not, create any right or benefit, substantive or procedural, enforceable at law or in equity by any party against the United States, its departments, agencies, or entities, its officers, employees, or agents, or any other person.

THE WHITE HOUSE,
*January 20, 2025.*

[FR Doc. 2025–01952
Filed 1–28–25; 8:45 am]
Billing code 3395–F4–P

WORLD NEWS

# Tren de Aragua gang started in Venezuela's prisons and now spreads fear in the US



FILE - Soldiers raid the Tocorón Penitentiary Center, in Tocorón, Venezuela, Sept. 20, 2023. The Tren de Aragua gang originated at th    Read More



BY JOSHUA GOODMAN
Updated 8:54 PM EST, September 24, 2024

MIAMI (AP) — Former federal agent Wes Tabor says his phone has been lighting up with calls from police departments around the U.S. for advice on how to combat the growing threat from the Venezuelan gang Tren de Aragua.

Tabor was in charge of the U.S. Drug Enforcement Administration's office in the Venezuelan capital of Caracas in 2012 when the gang was still new and when Tabor had barely heard of it.

ADVERTISEMENT

VZ V██▬█_0044

AP

Live updates: Trump administration    Bitcoin reserve    SpaceX    Pope Francis    Walgreens    Daylight saving time        •

AP SETS THE STANDARD FOR POLITICAL REPORTING,
SUPPORT INDEPENDENT, FACT-BASED JOURNALISM.    DONATE

western hemisphere tied to a mass exodus of Venezuelan migrants.

"What sets this group apart is the level of violence," said Tabor, now retired from the DEA. "They're aggressive, they're hungry and they don't know any boundaries because they've been allowed to spread their wings without any confrontation from law enforcement until now."

## RELATED STORIES



**US deports immigrants to Venezuela after judge blocked transfer to Guantanamo Bay**



**Venezuela sends 2 planes to US to return migrants, signaling a potential improvement in relations**



**Court grants request to block detained Venezuelan immigrants from being sent to Guantanamo**

That's starting to change.

VZ Vacatur_0046

In July, the Biden administration sanctioned the gang, placing it alongside MS-13 from El Salvador and the Mafia-styled Camorra from Italy on a list of transnational criminal organizations and offering $12 million in rewards for the arrest of three leaders. Then, this month, Texas Gov. Greg Abbott declared Tren de Aragua a Tier 1 threat, directing state police to target the gang and paving the way for stiffer penalties for members. Other states may soon follow suit.

## Gang gains notoriety in the US

Focus on the gang jumped after footage from a security camera surfaced on social media showing a group of heavily armed men brazenly entering an apartment in the Denver suburb of Aurora, Colorado.

That prompted former President Donald Trump to vow to " liberate Aurora " from Venezuelans he falsely said were "taking over the whole town."

Police have called the reports exaggerated but nonetheless acknowledged that it is investigating 10 gang members for involvement in several crimes, including a July homicide.

Among them is a Venezuelan who was arrested in another Denver suburb and accused of helping someone else steal a motorcycle and pointing an AR-15 at a tow truck driver who had asked him to move his car. Another was suspected of stealing designer Gucci sunglasses in Boulder and has a multi-state criminal record, including for carjacking and vehicular assault.

Elsewhere, from the heartland to major cities like New York and Chicago, the gang has been blamed for sex trafficking, drug smuggling and police shootings as well as the exploitation of migrants.

The size of the gang and the extent to which its actions are coordinated across state lines and with leaders believed to be outside the U.S. are unclear.

## The Tren originated in an infamous prison

The Tren, which means "train" in Spanish, traces its origin more than a decade ago to an infamously lawless prison with hardened criminals in the central state of Aragua. It nonetheless has expanded in recent years as more than 8 million desperate Venezuelans fled economic turmoil under President Nicolás Maduro's rule and migrated to other parts of Latin America or the U.S.

One of the founders is Hector Guerrero, who was jailed years ago for killing a police officer, according to InSight Crime, a think tank that monitors organized crime in the Americas. Guerrero, better known by his alias El Nino, Spanish for the "boy," later escaped and then was recaptured in 2013. He fled prison again more recently, as Venezuela's government tried to reassert control over its prison population, and is believed to be residing in Colombia.

Authorities in countries such as Chile, Peru and Colombia — all with large populations of Venezuelan migrants — have accused the group of being behind a spree of violence in a region that has long had some of the highest murder rates in the world. Some of its more sensationalist crimes, including the beheading and burying alive of victims, have spread panic in poor neighborhoods where the gang extorts local businesses and illegally charges residents for "protection."

## Republican lawmakers make an issue of the gang

Now there are concerns about its ruthless tactics reaching U.S. shores as members infiltrate the nearly 1 million Venezuelan migrants who have crossed into the U.S. in recent years.

Eleven Republicans led by Sen. Marco Rubio of Florida, the vice chair of the Senate Select Committee on Intelligence, wrote in a letter to Attorney General Merrick Garland last week calling for a coordinated strategy from the Biden administration to combat the gang.

"The administration's weak enforcement of immigration laws allows gangs, like Tren de Aragua, to control routes and exploit migrants," the letter said.

## Venezuelan officials express bafflement

Meanwhile, back in Venezuela, officials have watched the attention on Tren de Aragua in the U.S. and have expressed their bafflement.

A year ago, President Nicolas Maduro's government claimed it had dismantled the gang after retaking control of the prison where the group was born. In July, Foreign Minister Yván Gil declared that the Tren de Aragua is a "fiction created by the international media."

More recently, Diosdado Cabello, a longtime ruling party-leader, linked the criminal group to an alleged plot backed by the U.S. and the opposition to kill Maduro and some of his allies following the July 28 presidential election.

"The United States knows how to carry out destabilization operations," Cabello said Friday when he announced the arrest of several people, including a U.S. citizen, for their alleged roles in the foiled anti-Maduro plan. "Why don't they stop them?"

—

AP writers Colleen Slevin in Denver, Regina Garcia Cano in Caracas, Venezuela, and Astrid Suarez in Bogota, Colombia, contributed to this report.

—

This version has corrected the retired DEA agent's first name to Wes not Was.



### JOSHUA GOODMAN

Goodman is a Miami-based investigative reporter who writes about the intersection of crime, corruption, drug trafficking and politics in Latin America. He previously spent two decades reporting from South America.

X ✉

(51 of 59), Page 51 of 59    Case: 25-2120, 05/28/2025, DktEntry: 49.3, Page 51 of 59

3/7/25, 2:35 PM    Case 3:25-cv-01766-FAB Tren de Aragua gang Glabbin Venezuela's prisons and now spreads fear in the US, UFO News

ADVERTISEMENT

**MOST READ**



1    If you're thinking about selling your stocks, you might want to think twice

2    Trump changes course and delays some tariffs on Mexico and Canada

3    Thrust into unemployment, axed federal workers face relatives who celebrate their firing

4    Pamela Bach, actor and ex-wife of David Hasselhoff, dies at 62

5    Canada's tariffs to remain despite Trump postponing tariffs on many imports from Canada for a month

WORLD NEWS

# US sanctions a Venezuela gang for spreading criminal activity across Latin America



 BY **JOSHUA GOODMAN**
Updated 6:07 PM EST, July 11, 2024

MIAMI (AP) — The Biden administration on Thursday sanctioned a Venezuelan gang allegedly behind a spree of kidnappings, extortion and other violent crimes tied to migrants that have spread across Latin America and the United States.

The U.S. also offered a $12 million reward for the arrest of three leaders of Tren de Aragua, which now joins the MS-13 gang from El Salvador and the Mafia-styled Camorra from Italy on a list of transnational criminal organizations banned from doing business in the U.S.

"Tren de Aragua poses a deadly criminal threat across the region," the U.S. Treasury Department said in a statement, adding that it often preys on vulnerable populations such as migrant women and girls for sex trafficking.

"When victims seek to escape this exploitation, Tren de Aragua members often kill them and publicize their deaths as a threat to others," the statement added.

AP SETS THE STANDARD FOR POLITICAL REPORTING.
SUPPORT INDEPENDENT, FACT-BASED JOURNALISM.

DONATE

The Tren de Aragua traces its origins to more than a decade ago, to an infamously lawless prison in the central state of Aragua where a number of hardened criminals were held. But it has expanded in recent years as millions of desperate Venezuelans fled President Nicolás Maduro's rule and migrated to other parts of Latin America or the U.S.

### RELATED STORIES



**Chile seeks to extradite a suspect from the US over the killing of a Venezuelan dissident**



**Trump administration in talks to send Venezuelan gang members to El Salvador prisons**



**Venezuela frees 6 Americans after meeting between President Maduro and Trump's envoy**

Authorities in countries such as Colombia, Peru and Ecuador — with large populations of Venezuelan migrants — have accused the group of being behind a spree of violent crimes in a region that has long had some of the highest murder rates in the world.

Initially its focus was exploiting Venezuelan migrants through loan sharking, human trafficking and the smuggling of contraband goods to and from Venezuela.

But as the Venezuelan diaspora has settled more permanently abroad, it has joined — and sometimes clashed — with homegrown criminal syndicates engaged in drug trafficking, extortion of local businesses and murders for hire.

VZ Vacatur_0054

(56 of 59), Page 56 of 59    Case: 25-2120, 05/28/2025, DktEntry: 49.3, Page 56 of 59

3/7/25, 2:54 PM    Case 3:25-cv-01766    US sanctions a Venezuela gang for spreading crime and fear across Latin America | AP News

Among the groups the Treasury Department said the gang has teamed up with is Primeiro Comando da Capital, a notorious organized crime group out of Brazil that has also been sanctioned by the U.S.

Earlier this year, prosecutors in Chile blamed the gang, whose name means "train" in Spanish, for the killing of a Venezuelan army official who had sought refuge in that country after partaking in a failed plot to overthrow Maduro.

"The Tren de Aragua is not a vertically integrated criminal structure, but rather a federation of different gangs," said Jeremy McDermott, the Colombia-based co-director of InSight Crime, which this month published a report on the gang's expansion.

"It has now become a franchise name for Venezuelan criminal structures operating in the region, with weakening coherence now that its home prison base is no more," McDermott said,

The group is led by Hector Guerrero, who was jailed years ago for killing a police officer, according to InSight Crime. Guerrero, better known by his alias El Nino, or Spanish for the "boy," later escaped and then was recaptured in 2013, returning to the prison in Aragua where the criminal enterprise was then headquartered.

He fled prison again more recently, as Venezuelan authorities tried to reassert control over its prison population.

His current whereabouts are unknown but the U.S. State Department, which has offered up to $12 million for his arrest and that of two other gang leaders, said it believes Guerrero and Giovanny San Vicente, another target of the U.S. bounty, are believed to be living in Colombia.

Sen. Marco Rubio, a Florida Republican who co-chairs the Senate Select Committee on Intelligence, has warned that if left unchecked, the Tren de Aragua could also start terrorizing American cities.

Among the nearly 1 million Venezuelan migrants that have crossed into the U.S. in recent years are suspected gang members tied to police shootings, human trafficking and other crimes although there's no evidence that the gang has set up an organizational structure in the U.S., McDermott said.

"Now we are seeing evidence that they have made it into the United States. Every single day, we're seeing reports from Chicago, South Florida, and New York that these gang members are here," Rubio said at a Senate hearing in April.

VZ Vacatur_0055

The White House, in a statement on Thursday said the Department of Homeland Security has implemented enhanced screening to vet and better identify known or suspected gang members, including Tren de Aragua members.

Maduro's government has accused opponents of exaggerating the reach of Tren de Aragua to tarnish its reputation and said that authorities dismantled the group last year when security forces retook control of the prison that had served as its hub of illicit activity.

Hours after the U.S. sanctioned the gang, the government announced that a brother of the gang's leader, who was arrested in Barcelona earlier this year, arrived home pursuant to a Venezuelan extradition request to Spain.

Attorney General Tarek William Saab said that Gerso Guerrero, who was arrested earlier this year in Barcelona, faces up to 30 years in prison — the maximum in Venezuela — on multiple criminal charges including extortion, money laundering, weapons trafficking and terrorism.

———

Follow AP's coverage of Latin America and the Caribbean at https://apnews.com/hub/latin-america

**JOSHUA GOODMAN**
Goodman is a Miami-based investigative reporter who writes about the intersection of crime, corruption, drug trafficking and politics in Latin America. He previously spent two decades reporting from South America.

X ✉

ADVERTISEMENT

**MOST READ**

VZ Vacatur_0057



1  Pamela Bach, actor and ex-wife of David Hasselhoff, dies at 62

2  If you're thinking about selling your stocks, you might want to think twice

3  Canada's tariffs to remain despite Trump postponing tariffs on many imports from Canada for a month

4  Trump changes course and delays some tariffs on Mexico and Canada

5  War heroes and military firsts are among 26,000 images flagged for removal in Pentagon's DEI purge

ADVERTISEMENT