DOCUMENT 1.9

(2 of 5), Page 2 of 5  Case: 25-2120, 05/28/2025, DktEntry: 49.10, Page 2 of 5  Case 3:25-cv-01766-EMC   Document 103-2   Filed 04/07/25   Page 32 of 35

Federal Register / Vol. 87, No. 201 / Wednesday, October 19, 2022 / Notices  63515

domestic and foreign policy priorities in the region. It will couple a meaningful incentive to seek a lawful, orderly means of traveling to the United States with the imposition of consequences for those who seek to enter irregularly. The goal of this process is to reduce the irregular migration of Venezuelan nationals throughout the hemisphere while we, together with partners in the region, work to improve conditions in sending countries and create more lawful immigration and refugee pathways in the region, including to the United States.

### B. Urgent Humanitarian Reasons

The case-by-case temporary parole of individuals pursuant to this process will address the urgent humanitarian reasons faced by so many Venezuelans subject to the repressive regime of Nicolás Maduro. This process provides a safe and orderly mechanism for Venezuelan nationals who seek to leave their home country to enter the United States without having to make the dangerous journey to the United States.

## IV. Eligibility To Participate in the Process and Processing Steps

### A. Supporters

U.S.-based supporters will initiate an application on behalf of a Venezuelan national [48] by submitting a Form I–134, Declaration of Financial Support, to USCIS for each beneficiary. Supporters can be sole individuals, individuals filing on behalf of a group, or individuals representing an entity. To serve as a supporter under the process, an individual must:

• be a U.S. citizen, national, or lawful permanent resident; hold a lawful status in the United States; or be a parolee or recipient of deferred action or Deferred Enforced Departure;
• pass security and background vetting, including for public safety, national security, human trafficking, and exploitation concerns; and
• demonstrate sufficient financial resources to receive, maintain, and support the intended beneficiary whom they commit to support for the duration of their parole period.

### B. Beneficiaries

In order to be eligible to request and ultimately be considered for a discretionary issuance of advance authorization to travel to the United States to seek a discretionary grant of parole at the POE, such individuals must:

• be outside the United States;
• be a national of Venezuela or be a non-Venezuelan immediate family member [49] of and traveling with a Venezuelan principal beneficiary;
• have a U.S.-based supporter who filed a Form I–134 on their behalf that USCIS has vetted and confirmed;
• possess a passport valid for international travel;
• provide for their own commercial travel to an air POE and final U.S. destination;
• undergo and pass required national security and public safety vetting;
• comply with all additional requirements, including vaccination requirements and other public health guidelines; and
• demonstrate that a grant of parole is warranted based on significant public benefit or urgent humanitarian reasons, as described above, and that a favorable exercise of discretion is otherwise merited.

A Venezuelan national is ineligible to be considered for parole under this process if that person is a permanent resident or dual national of any country other than Venezuela, or currently holds refugee status in any country.[50]

In addition, a potential beneficiary is ineligible for advance authorization to travel to the United States as well as parole under this process if that person:

• failed to pass national security and public safety vetting or is otherwise deemed not to merit a favorable exercise of discretion;
• has been ordered removed from the United States within the prior five years or is subject to a bar based on a prior removal order; [51]
• has crossed irregularly into the United States, between the POEs, after October 19, 2022;
• has irregularly crossed the Mexican or Panamanian borders after October 19, 2022; or
• is under 18 and not traveling through this process accompanied by a parent or legal guardian, and as such is a child whom the inspecting officer would determine to be an unaccompanied child.[52]

---

[49] See the preceding footnote.
[50] This limitation does not apply to immediate family members traveling with a Venezuelan national.
[51] *See, e.g.,* INA sec. 212(a)(9)(A), 8 U.S.C. 1182(a)(9)(A).
[52] As defined in 6 U.S.C. 279(g)(2). Children under the age of 18 must be traveling to the United States in the care and custody of their parent or legal guardian to be considered for parole at the POE under the process.

*Travel requirements:* Beneficiaries who receive advance authorization to travel to the United States to seek parole into the United States will be responsible for arranging and funding their own commercial air travel to the United States.

*Health Requirements:* Beneficiaries must follow all applicable requirements, as determined by DHS's Chief Medical Officer, in consultation with CDC, with respect to health and travel, including vaccination and/or testing requirements for diseases including COVID–19, polio, and measles. The most up-to-date public health requirements applicable to this process will be available at *https://www.uscis.gov/venezuela.*

### C. Processing Steps

Step 1: Financial Support

A U.S.-based supporter will submit a Form I–134, Declaration of Financial Support with USCIS through the online myUSCIS web portal to initiate the process. The Form I–134 identifies and collects information on both the supporter and the beneficiary. The supporter must submit a separate Form I–134 for each beneficiary they are seeking to support, including Venezuelans' immediate family members and minor children. The supporter will then be vetted by USCIS to protect against exploitation and abuse, and to ensure that the supporter is able to financially support the individual and any immediate family members whom they agree to support. Supporters must be vetted and confirmed by USCIS, at USCIS' discretion, before moving forward in the process.

Step 2: Submit Biographic Information

If a supporter is confirmed by USCIS, the listed beneficiary will receive an email from USCIS on how to create an account with myUSCIS and instructions on next steps for completing the application. The beneficiary will be required to confirm their biographic information in myUSCIS and attest to meeting the eligibility requirements.

As part of confirming eligibility in their myUSCIS account, individuals who seek authorization to travel to the United States will need to confirm that they meet public health requirements, including certain vaccination requirements.

Step 3: Submit Request in CBP One Mobile Application

After confirming biographic information in myUSCIS and completing required eligibility attestations, the beneficiary will receive

---

[48] Certain non-Venezuelans may use this process if they are an immediate family member of a Venezuelan beneficiary and traveling with that Venezuelan beneficiary. For purposes of this process, immediate family members are limited to a spouse, common-law partner, and/or unmarried child(ren) under the age of 21.

(3 of 5), Page 3 of 5    Case: 25-2120, 05/28/2025, DktEntry: 49.10, Page 3 of 5
Case 3:25-cv-01766-EMC    Document 103-2    Filed 04/07/25    Page 33 of 35

**63516**    **Federal Register** / Vol. 87, No. 201 / Wednesday, October 19, 2022 / Notices

instructions through myUSCIS on how to access the CBP One mobile application. The beneficiary must then enter limited biographic information into CBP One and submit a live photo.

Step 4: Approval To Travel to the United States

After completing Step 3, the beneficiary will receive a notice to their myUSCIS account confirming whether CBP has, in CBP's discretion, provided the beneficiary advance authorization to travel to the United States to seek a discretionary grant of parole on a case-by-case basis. If approved, this authorization is generally valid for 90 days, and beneficiaries are responsible for securing their own travel via commercial air to the United States.[53] Approval of advance authorization to travel does not guarantee parole into the United States at a U.S. POE. That parole is a discretionary determination made by CBP at the POE.

All of the steps in this process, including the decision to grant or deny advance travel authorization and the parole decision at the POE, are entirely discretionary and not subject to appeal on any grounds.

Step 5: Seeking Parole at the POE

Upon their arrival at a POE, each individual arriving under this process will be inspected by CBP and considered for a grant of discretionary parole for a period of up to two years on a case-by-case basis.

As part of the inspection, beneficiaries will undergo additional screening and vetting, to include additional fingerprint biometric vetting consistent with the CBP inspectional process. Individuals who are determined to pose a national security or public safety threat or otherwise do not warrant parole pursuant to section 212(d)(5)(A) of the INA, 8 U.S.C. 1182(d)(5)(A), and as a matter of discretion upon inspection, will be processed under an appropriate processing pathway and may be referred to U.S. Immigration and Customs Enforcement (ICE) for detention.

Step 6: Parole

If granted parole pursuant to this process, each individual generally will be paroled into the United States for a period of up to two years, subject to applicable health and vetting requirements, and will be eligible to apply for employment authorization under existing regulations. Individuals may request authorization to work from USCIS. USCIS is leveraging technological and process efficiencies to minimize processing times for requests for work authorization. All individuals two years of age or older will be required to complete a medical screening for tuberculosis, including an IGRA test, within 90 days of arrival to the United States.

D. Sunset, Renewal, and Termination

The process is capped at 24,000 beneficiaries. After this cap is reached, the program will sunset absent a decision by the Secretary to continue the process, based on the Secretary's sole discretion. The Secretary also retains the sole, unreviewable discretion to terminate the process at any point.

E. Administrative Procedure Act (APA)

This process is exempt from notice-and-comment rulemaking requirements on multiple grounds, and is therefore amenable to immediate issuance and implementation.

*First,* the Department is merely adopting a general statement of policy,[54] *i.e.,* a "statement[ ] issued by an agency to advise the public prospectively of the manner in which the agency proposes to exercise a discretionary power." [55] As section 212(d)(5)(A) of the INA, 8 U.S.C. 1182(d)(5)(A), provides, parole decisions are made by the Secretary of Homeland Security "in his discretion."

*Second,* even if this process were considered to be a legislative rule that would normally be subject to requirements for notice-and-comment rulemaking and a delayed effective date, the process is exempt from such requirements because it involves a foreign affairs function of the United States.[56] In addition, although under the APA, invocation of this exemption from notice-and-comment rulemaking does not require the agency to show that such procedures may result in "definitely undesirable international consequences," some courts have required such a showing,[57] and DHS can make one here.

As described above, this process is directly responsive to requests from key foreign partners—including the GOM—to provide a lawful process for Venezuelan nationals to enter the United States. The United States will not implement the new parole process without the ability to return Venezuelan nationals who enter irregularly to Mexico, and the United States' ability to execute this process thus requires the GOM's willingness to accept into Mexico those who bypass this new process and enter the United States irregularly between POEs. Thus, initiating and managing this process will require careful, deliberate, and regular assessment of the GOM's responses to this unilateral U.S. action and ongoing, sensitive diplomatic engagements.

Delaying issuance and implementation of this process to undertake rulemaking would undermine the foreign policy imperative to act now and result in definitely undesirable international consequences. It also would complicate broader discussions and negotiations about migration management. For now, Mexico has indicated it is prepared to make a unilateral decision to accept a substantial number of Venezuela returns. That willingness to accept the returns could be impacted by the delay associated with a public rulemaking process involving advance notice and comment and a delayed effective date. Additionally, making it publicly known that we plan to return nationals of Venezuela to Mexico at a future date would likely result in a surge in migration, as migrants rush to the border to enter before the rule becomes final—which would adversely impact each country's border security and further strain their personnel and resources deployed to the border.

Moreover, this process is not only responsive to the request of Mexico and key foreign partners—and necessary for addressing migration issues requiring coordination between two or more governments—it is also fully aligned with larger and important foreign policy objectives of this Administration and fits within a web of carefully negotiated actions by multiple governments (for instance in the L.A. Declaration). It is the view of the United States that the implementation of this process will advance the Administration's foreign policy goals by demonstrating U.S. partnership and U.S. commitment to the shared goals of addressing migration through the hemisphere, both of which are essential to maintaining a strong bilateral relationship.

The invocation of the foreign affairs exemption here is also consistent with Department precedent. For example, in 2017 DHS published a notice eliminating an exception to expedited removal for certain Cuban nationals, which explained that the change in

---

[53] Air carriers can validate an approved and valid travel authorization submission using the same mechanisms that are currently in place to validate that a traveler has a valid visa or other documentation to facilitate issuance of a boarding pass for air travel.

[54] 5 U.S.C. 553(b)(A).

[55] *Lincoln* v. *Vigil,* 508 U.S. 182, 197 (1993) (quoting *Chrysler Corp.* v. *Brown,* 441 U.S. 281, 302 n.31 (1979)).

[56] 5 U.S.C. 553(a)(1).

[57] *See, e.g., Rajah* v. *Mukasey,* 544 F.3d 427, 437 (2d Cir. 2008).

(4 of 5), Page 4 of 5  Case: 25-2120, 05/28/2025, DktEntry: 49.10, Page 4 of 5
Case 3:25-cv-01766-EMC  Document 103-2  Filed 04/07/25  Page 34 of 35

Federal Register / Vol. 87, No. 201 / Wednesday, October 19, 2022 / Notices  63517

policy was consistent with the foreign affairs exemption because the change was central to ongoing negotiations between the two countries.[58]

Third, DHS assesses that there is good cause to find that the delay associated with implementing this process through notice-and-comment rulemaking would be impracticable and contrary to the public interest because of the need for coordination with the GOM described above, and the urgent border and national security and humanitarian interests in reducing and diverting the flow of irregular migration.[59] It would be impracticable to delay issuance in order to undertake such procedures because—as noted above—maintaining the status quo, which involves record numbers of Venezuelan nationals currently being encountered attempting to enter irregularly at the SWB, coupled with DHS's extremely limited options for processing, detaining, or quickly removing such migrants, unduly impedes DHS's ability to fulfill its critical and varied missions. At current rates, a delay of just a few months to conduct notice-and-comment rulemaking would effectively forfeit an opportunity to reduce and divert migrant flows in the near term, harm border security, and potentially result in scores of additional migrant deaths. Undertaking such procedures would also be contrary to the public interest because an advance announcement of this process would seriously undermine a key goal of the policy by incentivizing even more irregular migration of Venezuelan nationals seeking to enter the United States before the process would take effect.

*F. Paperwork Reduction Act (PRA)*

Under the Paperwork Reduction Act (PRA), 44 U.S.C. chapter 35, all Departments are required to submit to the Office of Management and Budget (OMB), for review and approval, any new reporting requirements they impose. The process announced by this notice requires changes to two collections of information, as follows.

First, OMB has approved a revision to USCIS Form I-134, *Declaration of Financial Support* (OMB control number 1615-0014) under the PRA's emergency processing procedures at 5 CFR 1320.13. USCIS is making some changes to the online form in connection with the implementation of the process described above. These changes include: requiring two new data elements for U.S.-based supporters ("Sex" and "Social Security Number");

---
[58] See 82 FR 4902 (Jan. 17, 2017).
[59] 5 U.S.C. 553(b)(B).

adding a third marker ("X") in addition to "M" and "F" in accordance with this Administration's stated gender equity goals; and adding Venezuela as an acceptable option for the beneficiary's country of origin. USCIS has submitted and OMB has approved a request for emergency authorization of the required changes (under 5 CFR 1320.13) for a period of 6 months. Within the next 90 days, USCIS will immediately begin normal clearance procedures under the PRA.

Second, OMB has approved an emergency request under 5 CFR 1320.13 for a new information collection from CBP entitled *Advance Travel Authorization*. OMB has approved the emergency request for a period of 6 months and will assign a control number to the collection. This new information collection will allow certain noncitizens from Venezuela, and their qualifying immediate family members, who lack United States entry documents to submit information through the newly developed CBP ATA capability within the CBP One™ application as part of the process to request an advance authorization to travel to the United States to seek parole. Within the next 90 days, CBP will immediately begin normal clearance procedures under the PRA. More information about both collections can be viewed at *www.reginfo.gov*.

Alejandro N. Mayorkas,
*Secretary of Homeland Security.*
[FR Doc. 2022–22739 Filed 10–18–22; 8:45 am]
**BILLING CODE 9110–9M–P**

---

**DEPARTMENT OF HOUSING AND URBAN DEVELOPMENT**

**[Docket No. FR-7050-N-52]**

**30-Day Notice of Proposed Information Collection: Debt Resolution Program, OMB Control No.: 2502–0483**

**AGENCY:** Office of Policy Development and Research, Chief Data Officer, HUD.
**ACTION:** Notice.

---

**SUMMARY:** HUD is seeking approval from the Office of Management and Budget (OMB) for the information collection described below. In accordance with the Paperwork Reduction Act, HUD is requesting comment from all interested parties on the proposed collection of information. The purpose of this notice is to allow for an additional 30 days of public comment.
**DATES:** *Comments Due Date:* November 18, 2022.
**ADDRESSES:** Interested persons are invited to submit comments regarding this proposal. Written comments and recommendations for the proposed information collection should be sent within 30 days of publication of this notice to *OIRA_submission@omb.eop.gov* or *www.reginfo.gov/public/do/PRAMain*. Find this particular information collection by selecting "Currently under 30-day Review—Open for Public Comments" or by using the search function.

**FOR FURTHER INFORMATION CONTACT:** Colette Pollard, Reports Management Officer, QDAM, Department of Housing and Urban Development, 451 7th Street SW, Room 4176, Washington, DC 20410–5000; email Colette Pollard at *Colette.Pollard@hud.gov* or telephone 202–402–3400. This is not a toll-free number. HUD welcomes and is prepared to receive calls from individuals who are deaf or hard of hearing, as well as individuals with speech and communication disabilities. To learn more about how to make an accessible telephone call, please visit: *https://www.fcc.gov/consumers/guides/telecommunications-relay-service-trs*.

Copies of available documents submitted to OMB may be obtained from Ms. Pollard.

**SUPPLEMENTARY INFORMATION:** This notice informs the public that HUD is seeking approval from OMB for the information collection described in Section A.

The **Federal Register** notice that solicited public comment on the information collection for a period of 60 days was published on March 23, 2022 at 87 FR 1479.

**A. Overview of Information Collection**

*Title of Information Collection:* Debt Resolution Program.
*OMB Approval Number:* 2502–0483.
*OMB Expiration Date:* November 30, 2022.
*Type of Request:* Revision of a currently approved collection.
*Form Number:* HUD–56141, HUD–56142, HUD–56146.
*Description of the need for the information and proposed use:* HUD is required to collect debt owed to the agency. As part of the collection process, demand for repayment is made on the debtor(s).
*Respondents:* Individuals or Households, Business or other For-Profit.
*Estimated Number of Respondents:* 648.
*Estimated Number of Responses:* 2,159.
*Frequency of Response:* 1.
*Average Hours per Response:* 1.
*Total Estimated Burden:* 590 hours.

(5 of 5), Page 5 of 5    Case: 25-2120, 05/28/2025, DktEntry: 49.10, Page 5 of 5
Case 3:25-cv-01766-EMC    Document 103-2    Filed 04/07/25    Page 35 of 35

Federal Register / Vol. 88, No. 5 / Monday, January 9, 2023 / Notices    1279

One™. OMB has approved the emergency request for a period of 6 months. Within the next 90 days, CBP will immediately begin normal clearance procedures under the PRA.

More information about both collections can be viewed at *www.reginfo.gov*.

**Alejandro N. Mayorkas,**
*Secretary of Homeland Security.*
[FR Doc. 2023–00252 Filed 1–5–23; 4:15 pm]
**BILLING CODE 9110–09–P**

## DEPARTMENT OF HOMELAND SECURITY

### Implementation of Changes to the Parole Process for Venezuelans

**ACTION:** Notice

**SUMMARY:** This notice announces that the Secretary of Homeland Security (Secretary) has authorized updates to the Parole Process for Venezuelans that was initiated in October 2022. The Venezuela process provides a safe and orderly pathway for certain individuals to seek authorization to travel to the United States to be considered for parole at an interior port of entry, contingent on the Government of Mexico (GOM) making an independent decision to accept the return or removal of Venezuelan nationals who bypass this new process and enter the United States without authorization. Pursuant to this notice, the Secretary has removed the limit of 24,000 total travel authorizations and replaced it with a monthly limit of 30,000 travel authorizations spread across this process and the separate and independent Parole Process for Cubans, Parole Process for Haitians, and Parole Process for Nicaraguans (as described in separate notices published concurrently in today's edition of the **Federal Register**). The Secretary also has updated the eligibility criteria for the Venezuela process by including an exception that will enable Venezuelans who cross without authorization into the United States at the Southwest Border (SWB) and are subsequently permitted a one-time option to voluntarily depart or voluntarily withdraw their application for admission to maintain eligibility to participate in this parole process. DHS believes that these changes are needed to ensure that the Venezuela process continues to deliver the already-realized benefits of reducing the number of Venezuelan nationals crossing our border without authorization and the surge in migration throughout the hemisphere and channels migrants into a safe and orderly process that enables them to enter the United States without making the dangerous journey to the SWB.

**DATES:** DHS will begin using the Form I–134A, Online Request to be a Supporter and Declaration of Financial Support, for this process on January 6, 2023. DHS will apply the changes to the process beginning on January 6, 2023.

**FOR FURTHER INFORMATION CONTACT:** Daniel Delgado, Acting Director, Border and Immigration Policy, Office of Strategy, Policy, and Plans, Department of Homeland Security, 2707 Martin Luther King Jr. Ave. SE, Washington, DC 20528–0445; telephone (202) 447–3459 (not a toll-free number).

**SUPPLEMENTARY INFORMATION:**

### I. Background—Venezuelan Parole Process

On October 19, 2022, DHS published a **Federal Register** Notice describing a new effort to address the high number of Venezuelans encountered at the SWB.[1] Since the announcement of that process, Venezuelans who have not availed themselves of the process, and instead entered the United States without authorization, have been expelled to Mexico pursuant to the Centers for Disease Control and Prevention (CDC) Title 42 public health Order or, if not expelled, processed for removal or the initiation of removal proceedings.

Once the Title 42 public health Order is lifted, DHS will no longer expel noncitizens to Mexico, but rather all noncitizens will be processed pursuant to DHS's Title 8 immigration authorities. The United States' continued operation of this process will continue to be contingent on the GOM's independent decision to accept the return of removal of individuals, including under Title 8 authorities.

*Eligibility To Participate in the Process*

As described in the October 19 **Federal Register** Notice, the Department of Homeland Security (DHS) implemented a process—modeled on the successful Uniting for Ukraine (U4U) parole process—for certain Venezuelan nationals to lawfully enter the United States in a safe and orderly manner. To be eligible, individuals must have a supporter in the United States who agrees to provide financial support, such as housing and other needs; must pass national security and public safety vetting; and must agree to fly at their own expense to an interior U.S. port of entry (POE), rather than entering at a land POE.

Individuals are ineligible if they have been ordered removed from the United States within the prior five years or have entered unauthorized into the United States, Mexico, or Panama after October 19, 2022. Venezuelan nationals also are generally ineligible if they are a permanent resident or dual national of any country or hold refugee status in any country other than Venezuela, though per the conforming change described below, they will now remain eligible to be considered for parole under this process if DHS operates a similar parole process for nationals of that other country. Only those who meet all specified criteria will be eligible to receive advance authorization to travel to the United States and be considered for parole, on a case-by-case basis, under this process. The process originally limited the number of Venezuelans who could receive travel authorization to 24,000.

### II. Assessment of Venezuela Parole Process to Date

The success of the Venezuela process demonstrates that combining a clear and meaningful consequence for unauthorized entry along the SWB with a significant incentive for migrants to wait where they are and use a lawful process to come to the United States can change migratory flows. Within a week of the October 12, 2022 announcement of that process, the number of Venezuelans encountered at the SWB fell from over 1,100 per day to under 200 per day, and as of the week ending December 4, to an average of 86 per day.[2] The new process and accompanying consequence for unauthorized entry also led to a precipitous decline in Venezuelan irregular migration [3] throughout the Western Hemisphere. The number of Venezuelans attempting to enter Panama through the Darién was down from 40,593 in October 2022 to just 668 in November.[4] DHS provided the new parole process for Venezuelans who are backed by supporters in the United States to come to the United States by

---

[1] 87 FR 63507 (Oct. 19, 2022).

[2] Office of Immigration Statistics (OIS) analysis of data pulled from CBP Unified Immigration Portal (UIP) December 5, 2022. Data are limited to USBP encounters to exclude those being paroled in through ports of entry.

[3] In this notice, irregular migration refers to the movement of people into another country without authorization.

[4] Servicio Nacional de Migración de Panamá, Irregulares en Tránsito Frontera Panamá-Colombia 2022, *https://www.migracion.gob.pa/images/img2022/PDF/IRREGULARES_%20POR_%20DARI%C3%89N_NOVIEMBRE_2022.pdf* (last viewed Dec. 11, 2022).