DOCUMENT 1.11

 

# REASONED VOTE OF COMMISSIONER CARLOS BERNAL PULIDO ON CHAPTER IV.B - VENEZUELA OF THE 2023 ANNUAL REPORT

With all due respect for my colleagues and in accordance with Article 19.1 of the Rules of Procedure of the Inter-American Commission on Human Rights ("the Commission" or "the IACHR"), I hereby submit a partial reasoned vote on certain points raised by the majority of the plenary of the Commission in Chapter IV.B-Venezuela ("the Chapter") of the 2023 Annual Report (the "Report" or the "Annual Report").  Although in this document I present my disagreements, I cannot fail to mention that I support the Commission's monitoring of the human rights situation in Venezuela.

Regarding the discrepancies, I will state in particular that Chapter IV-A on Venezuela: (i) contains considerations that pose a risk to pregnant women and ignore the integral needs of women; (ii) raises requirements not derived from the Convention, regarding so-called gender identity; (iii) openly ignores the views that the ACHR incorporated on marriage; (iv) requires more information and academic and scientific rigor regarding  gender affirmation therapies and hormone treatments; and (v) has significant gaps regarding the right of parents to choose the education of their children.

1.    **Chapter IV-A contains considerations that pose a risk to pregnant women and ignore women's overall needs (*necesidades integrales de las mujeres*)**

Paragraph 118 of the Report mentions that: "Along the same lines, the persistent almost absolute **criminalization** of persons seeking to voluntarily terminate a pregnancy, allowing exceptions only in cases where the life of the pregnant person is at risk, together with the lack of medical protocols for the provision of abortion services and postabortion care, represented greater risks to the life and health of **persons capable of becoming pregnant (with gestational capacity)**." (Bold added)

The recommendations also included "**Reviewing domestic legislation on the voluntary interruption of pregnancy, so as to guarantee the effective exercise of the sexual and reproductive rights** of girls, women, and pregnant women of all ages." (Bold added).

As regard these assertions, I will address the following issues: (i) the non-existence of the right to abortion and the State's leeway with respect to the criminalization of abortion; (ii) the lack of protection for the unborn derived from the considerations of the report; and (iii) the inadequate curtailment of women's rights.

1.1.    **The non-existence of the right to abortion and state leeway with respect to the criminalization of abortion**

I reiterate that there are no binding sources in international law -and especially in the American Convention or other treaties that make up the inter-American system- that contemplate (i) the so-called right to abortion or (ii) alleged duties related to the decriminalization of abortion. Under this framework, states have a wide margin of configuration - by virtue of the principles of subsidiarity or complementarity and representative democracy - to take measures to protect prenatal life - which is indeed protected by the American Convention[255]- including, although it is not the only means, the use of criminal law.

Regarding the non-existence of the right to abortion, former I/A Court H.R. Judge Eduardo Vio Grossi (R.I.P.), established in his partially dissenting opinion in the judgment in the case of Manuela et al. v.  El Salvador that:

---

[255] ACHR. Article 4




"In this regard, it is indisputable that (...) **there is no inter-American or international legal norm** , whether conventional, international custom, or general principle of law, **that recognizes abortion as a right** There are only resolutions of international bodies, most of which are made up of international officials and not representatives of States, decisions which, in addition to not being binding, are not interpretative of current international law but rather reflect aspirations for it to change in the direction they suggest."[256] (Bold added)

I emphasize that this leeway derived from the non-existence of a right to abortion and the convergence of competing rights is increased thanks to the fact that it is incumbent upon States to define punishable conducts and their consequences, and to the automatic referral that, according to the IACHR Court, Article 7.2 of the American Convention makes to domestic law in matters related to deprivation of liberty -legal exception principle (*principio de reserva de ley*).[257]

In addition, I also emphasize that the sections in which such assessments are formulated do not sufficiently support derivation of the indisputable existence, in the Inter-American System, of a clear and binding parameter that could serve as a basis for assessing abortion criminalization as negative. The conventional parameter that does exist and that is mandatory is Article 4 of the ACHR which, as I have said on other occasions, contemplates protection of the right to life from conception and demands the existence of regulatory frameworks that do not leave a fetus totally unprotected.

This is relevant if one bears in mind that, from a systematic reading of Articles 31, 76, and 77 of the American Convention, it is only through consensus -which the States express by signing and ratifying amendments or treaties- that international obligations can arise for all States, different from those already contemplated in the ACHR.

In this sense, I conclude that, in the absence of a right to abortion in the IHRS and the absence of clear rules regarding criminalization models, States have considerable leeway in this regard. I emphasize that the challenges of the States and the concerns of the Commission should reflect a more comprehensive approach that allows for the protection of the unborn child and the pregnant woman. In this sense, these discussions should lead to the revision of policies on sexual and reproductive education; support and protection for pregnant women; security, and health.

### 1.2.    Lack of protection for the unborn derived from the report's considerations

I emphasize that the references to abortion in the Report on Venezuela ignore the other person whose right to life is also conventionally protected: the unborn person and ignore the necessary balancing that must exist between these competing rights (*derechos en tensión*). In this regard, it should be noted that pregnant women are also subjects of law and holders of the right to life.

A pronouncement on abortion always implies a position on a practice that necessarily implies the termination of the life of a dignified human being and that Article 4 of the ACHR protects, so it is necessary to expressly recognize the rights of the unborn person as part of the weighing up of considerations required in any case of abortion.

In this regard, I emphasize that Article 1.2 of the ACHR clearly establishes that, for the purposes of the Convention, a "person" is every human being.[258] Thus, in light of the Convention, human rights are not only recognized for persons who have already been born, but must be protected for all individuals from conception, who are to be considered human beings.  Moreover, the I/A Court H.R. itself, in its advisory opinion 22,

---

[256] Partially Dissenting Opinion of Judge Eduardo Vio Grossi, Inter-American Court of Human Rights, Case of Manuela et al. v. El Salvador, Judgement of November 2, 2021, (Preliminary Objections, Merits, Reparations, and Costs). Paragraph 13

[257] I/A Court H.R. Case of Romero Feris v. Argentina. Merits, Reparations, and Costs. Judgment of October 15, 2019. Series C No. 391. Par. 77.

[258] ACHR. Article 1.2 "For the purposes of this Convention, person means every human being."





indicated that, without being a matter open to interpretation, the term "person" is equivalent to the term "human being."[259]

In view of this, it is clear that the unborn person (*persona en gestación*) is a human being.[260] Furthermore, the Universal Declaration on the Human Genome and Human Rights states that "the human genome underlies the fundamental unity of all members of the human family, as well as the recognition of their inherent dignity and diversity. In a symbolic sense, it is the heritage of humanity."[261]

The consequence of recognizing the unborn as a person as a human being is that he/she becomes a holder of rights. Thus, the ACHR establishes in the articles that develop rights the formula "Everyone (...)"[262]. Likewise, the instruments for the protection of human rights generally recognize the ownership of rights by members of the human species, especially the right to life.[263]

Furthermore, in the Artaviara Murillo judgment, the I/A Court H.R. determined that "the protection of the right to life is not absolute, but gradual and incremental as the development of the fetus progresses" Which implies that without prejudice to the concepts of gradualness and incrementality (with which I take issue), the Court has already established that persons in gestation must be protected by the State in their "right to life." In the same vein, in the Cuscul Pivaral case,[264] the I/A Court H.R. applied the ACHR to a fetus (persona en gestación) and also applied Article 19 of the ACHR, thus recognizing the legal status of the fetus as a child.

In the same vein, I emphasize that the preamble of the Convention on the Rights of the Child states that the child needs protection and care both before and after birth. This implies that in light of the Convention on the Rights of the Child (CRC), the unborn child is a child in need of special care. This was reiterated in the preparatory work for the International Covenant on Civil and Political Rights[265]

In conclusion, this Chapter completely ignores the rights of the unborn, especially their right to life, recognized not only in the IHRS but also in multiple instruments of international law.

### 1.3.    Inadequate curtailment of women's rights

I call attention to the importance of not limiting so-called sexual and reproductive rights to access to abortion. This is not only because there is no law that establishes abortion as a guarantee of those rights, but also because this vision simplifies and detracts attention from the problems faced by women in the region and, in so doing, discourages debates that promote the formulation of comprehensive and integral proposals to address the structural problems faced by women in the region.

In addition, I call attention to the fact that the report refers to "persons capable of becoming pregnant" (with

---

[259] I/A Court H.R. OC-22/16. Ownership of rights of legal persons in the Inter-American Human Rights System. Advisory Opinion of February 26, 2016. Series A. No. 22, Par. 48.

[260] Kaluger, G., and Kaluger, M., Human Development: The Span of Life, The C.V. Mosby Co., St. Louis, 1974, pp. 28-29.

[261] Universal Declaration on the Human Genome and Human Rights. Article 1.

[262] American Convention on Human Rights, Articles 4, 5, 7, 8, 10, 11, 12, 13, 14, 16, 18, 20, 21, 22, 24, and 25.

[263] International Covenant on Civil and Political Rights. Preamble, par. 3; American Convention on Human Rights, par. 3. Preamble; African Charter on Human and Peoples' Rights: Preamble, par. 6; on the Geneva Declaration Rapporteur on the Rights of Children. Preamble, par. 1; American Declaration of the Rights and Duties of Man. Article 1; Universal Declaration of Human Rights. Preamble, par. 1; Declaration of the Rights of the Child. Preamble, par. 2 European Convention on Human Rights. Preamble, par. 2

[264] I/A Court H.R. Case of Cuscul Pivaral v. Guatemala. Judgment of August 23, 2018. "That said, the Court has indicated that extreme poverty and the lack of adequate medical care for women during pregnancy and postpartum are causes of high maternal mortality and morbidity. Therefore, States must implement appropriate health policies that allow it to provide assistance with suitably qualified personnel during births; policies to prevent maternal mortality by providing adequate prenatal and postpartum controls, and legal and administrative instruments relating to health policies that record cases of maternal mortality adequately. Thus, the Court has recognized that, by virtue of article 19, the State must assume its special position of guarantor with greater care and responsibility and take special measures focused on the principle of the best interest of the child."

[265] "The main reason for providing in paragraph 4 [now Article 6(5)] of the original text that the death penalty should not be applied to pregnant women was to save the innocent life of the unborn child." United Nations. General Assembly Report of the Third Committee on the Draft International Covenants on Human Rights. A/3764. P. 40.

VZ Vacatur_0188




gestational capacity), thereby defining a whole category of human beings solely by their reproductive function, generating an even more reductionist vision drawing attention away from women's rights.

On this point, I would like to take advantage of this explanation of my vote to make an appeal not only to my other colleagues on the Commission, but also to different international bodies: we cannot fall into reductionist narratives that, under the protection of women's rights -a completely legitimate and necessary purpose- end up, in fact, affecting those rights.

In this regard, I find it very troubling that the Commission focuses its efforts on scrutinizing the regulation **of States in the area of abortion**, where they have leeway and must necessarily be consistent with the protection of the right to life of the unborn child, and omits, for example, the barriers faced by women in the exercise of their maternity -conditions that in practice may be affecting their ability to make free decisions-.

### 2. Absence of basic requirements for recognition of the adequacy of gender identity documents.

Paragraph 142 states that "trans persons are often assigned to facilities according to the sex marked on their identity documents, rather than their gender identity."

In this regard, **on the one hand**, the American Convention does not expressly contemplate a right to gender identity, nor is there a binding instrument in the inter-American system that establishes an obligation to adapt identification documents to gender identity.

As I have indicated, recognizing new rights that are not in the Convention through an interpretation that does not follow the procedures established in the Convention itself would undermine Articles 31, 76, and 77, ignoring the original will of the States that ratified the Convention.

Therefore, any pronouncement in which any of the organs of the IHRS applies a right that is not established in the binding instruments of international law that govern its activity will be an act violating the literal meaning of the American Convention and will exceed the scope of the competencies of the IACHR or the I/A Court H.R., as the case may be. Such an irregular constitutive act would also undermine the principles of good faith and *pacta sunt servanda*.[266]

**On the other hand**, although I am not unaware that OC-24/17 asserted the existence of the so-called "right to gender identity" and of the obligation to adapt identification documents to gender identity in the terms indicated in this Chapter, I emphasize that the Advisory Opinions of the I/A Court H.R. are not binding in international law nor do they have the capacity to contemplate rights or obligations other than those expressly contemplated by the American Convention.[267]

I point this out, first, because Article 68 of the Convention is clear in stating that the States are obliged to comply with the decisions rendered by the Court, "in any case in which they are parties." **[TRANSLATOR: correct Spanish "*hayan sean*"]** This provision is of great relevance in that (i) it is the only one that refers to the legal value of the Tribunal's pronouncements and (ii) it limits the binding nature of its decisions expressly for the States party to a case, thus limiting the addressee of the obligations -the State party to a case- and the context in which the pronouncement is issued -that is, the litigation-. This position has also been supported by some doctrinal sectors (*sectores de la doctrina*) also based on the principle of State consent as the basis of conventional law.[268]

---

[266] Vienna Convention on the Law of Treaties. Article 26.

[267] I/A Court H.R. Gender identity, and equality and non-discrimination of same-sex couples. State obligations in relation to name change, gender identity, and rights derived from a same-sex relationship (interpretation and scope of Articles 1(1), 3, 7, 11(2), 13, 17, 18, and 24, in relation to Article 1 of the American Convention on Human Rights). Advisory Opinion OC-24/17, November 24, 2017. Series A, No. 24.

[268] Systematization of the criticisms in: González Domínguez, p. (2017). The doctrine of conventionality control in light of the principle of subsidiarity. Constitutional Studies 15(1), 55-98.





Second, there is no provision establishing an extent to which the Tribunal's interpretations in the framework of the Advisory Opinions are binding. This is reinforced when Article 64 of the ACHR limits the competence of the Court to issue advisory opinions regarding the Convention or treaties of the inter-American system. Thus, if a pronouncement derived from an AO is not binding in itself, much less could it be one that addresses so-called rights or obligations not contemplated in the Convention or interpretations that are also contrary to its text.

Third, to derive obligations or so-called rights not contemplated in the Convention, based exclusively on an advisory opinion, would be, as I have already said, contrary to the principle of *pacta sunt servanda* that governs international treaty law, by virtue of which States are only bound to comply with that to which they have expressed their consent.[269]

Fourth, although the I/A Court H.R. has affirmed that advisory opinions are parameters of conventionality control,[270] I emphasize that an open and transparent inter-American dialogue is still necessary to further discuss this position, which is not expressly derived from the American Convention. I call attention to the fact that there is still no consensus on the matter, neither in the States of the region nor in academic circles; thus, important constitutional courts still refrain from invoking the notion of conventionality control and from incorporating advisory opinions as a parameter.[271]

Likewise, I note that some authors have indicated that the extension of the effects of advisory opinions could contribute to a disruption of the functions of the inter-American system and, thus, weaken it, since (i) it results in equating the decisions issued in the advisory function of the Court with the text of the convention itself,[272] and (ii) it blurs the differences between the jurisdictional and advisory functions of the Court. Some have even indicated that these interpretations by the Court generate legal uncertainty, since there is no certainty as to the impacts associated with the issuance of advisory opinions.[273]

In light of the above, given that there is no conventional right to gender identity that is binding on States, it is possible to affirm that there are no correlative obligations to recognize this right either. Hence, the non-existence of conventional law leads to one conclusion: it is not possible to require States to ensure that identity documents match gender identity.

Furthermore, I reiterate that international human rights law should not erase the biological sexes, and therefore should not erase categories with special inter-American protection, such as women. Therefore, I insist that the criterion of self-perception or self-determination of gender identity requires further debate, and that it is associated with a risk of disproportionate impacts to the detriment of persons with special protection in the inter-American system.

In this sense, it is important that the protection of women (in terms of their biological sex) also be promoted, since, as has been demonstrated in several comparative experiences, women may also run risks to their life and integrity if they do not have separate facilities for them in prisons: a rule reiterated by international human rights law. Thus, Article 5.5 of the American Convention establishes the principle of separation of places of detention for men and women and the Court has considered, based on the Convention and the pronouncements of other human rights bodies, "that all women deprived of their liberty should be housed physically separate

---

[269] Vienna Convention on the Law of Treaties. Article 26.

[270] I/A Court H.R. Rights and Guarantees of Children in the Context of Migration and/or in Need of International Protection, Advisory Opinion OC-21/14 of August 19, 2014. Series A No. par. 41. 31.

[271] Ramírez, F. G. (2023). A critical look at the conventionality control Journal of Law and Social Sciences, (28), 101-142; Palacios, D. L. (2017). Inter-American conventionality control at the national level: a notion still under construction. Revista Direito e Práxis, 8, 1389-1418.

[272] Colombo, I. (2022). A critical analysis of the doctrine of conventionality control. Omnia. Law and Society, 5 (1), pp. 83-116.

[273] Colombo, I. (2022). A critical analysis of the doctrine of conventionality control. Omnia. Law and Society, 5 (1), pp. 83-116.

VZ Vacatur_0190




from men and, in addition, in less restrictive and less secure wards or sections that take into account the low level of risk they represent and with sufficient space in which to meet their specific needs."[274]

### 3.    Same-sex couples: disregard for the ACHR's views on marriage

Paragraph 143 of the report states that "with respect to conjugal visits, despite the right of detainees to receive these visits, the LGBTI population encounters obstacles to exercising this right due to the absence of regulations that protect their relationships, **such as the recognition of equal marriage**" (Bold added).

In this regard, I reiterate that there is no conventional provision that obliges States to recognize same-sex marriages. As I have mentioned on several occasions, the treaties that are part of the inter-American human rights system and grant jurisdiction to the Inter-American Commission to address contentious cases do not contemplate any obligation with respect to the recognition of marriage between same-sex couples. This lack of obligation derives from the literal wording of the American Convention, which clearly establishes that marriage is a right reserved for "men and women":

> Section 2) provides, "**The right of men and women of** marriageable age to marry and to raise a family shall be recognized, if they meet the conditions required by domestic laws, insofar as such conditions do not affect the principle of nondiscrimination established in this Convention."[275]  (Bold added).

Therefore, in accordance with the hermeneutic principle that calls for a literal and good faith interpretation,[276] the State is only obliged to recognize the right to marriage for the couples specifically mentioned in Article 17(2) of the American Convention.

It is essential to underline that, according to the jurisprudence of the International Court of Justice, the good faith interpretation of a treaty should not result in changes to the literal wording of the treaties or in inferring what is not expressly contained in the text. This approach implies that the interpreter must assume that the parties intended what is apparent from the ordinary meaning of the terms used in the international agreement.[277] The text-centric approach to treaty interpretation is not only accepted in the field of international law, but is also highly recommended, as it is based on the only empirically verifiable evidence of state intentions: the text of the treaty itself.[278]

Following these rules of interpretation, the European Court of Human Rights has considered the conception of marriage as that concluded between a man and a woman - as established in the European Convention on Human Rights, in a provision similar to that of the ACHR-.[279] In this sense, the European Court supports the idea that there is no binding obligation for States to recognize marriage between same-sex couples, which leaves a wide margin for States to regulate on this matter.[280] Likewise, in the words of the European Court of Human Rights:

> "The Court reiterates that, according to Article 14 in conjunction with Article 8, States are free to restrict marriage only to opposite-sex couples and have some leeway ("a certain margin of

---

[274]I/A Court H.R. Advisory Opinion OC-29 of 2022; Bangkok Rules, supra, Rules 12 and 41.d., and Report of the United Nations Special Rapporteur on Violence against Women, Rashida Manjoo, Pathways to, conditions and consequences of incarceration for women, A/68/340, supra, par.  85.

[275] American Convention on Human Rights, Article 17.1.

[276] Vienna Convention on the Law of Treaties. Article 31.

[277] International Court of Justice. Case concerning rights of nationals of the United States of America in Morocco. France v. United States of America. ICJ Reports 1952, pp. 196-199. International Court of Justice. Interpretation of peace treaties with Bulgaria, Hungary, and Romania (Second Phase). ICJ Reports 1950, pp.229 -230.

[278] International Court of Justice. Question of the Delimitation of the Continental Shelf between Nicaragua and Colombia beyond 200 Nautical Miles from the Nicaraguan Coast (Nicaragua v. Colombia), Preliminary Objections, Judgment, I.C.J. Reports 2016, pp.116-123, paras. 34-38, 46. Although the International Court of Justice did not rely exclusively on the literal criterion of interpretation, this was one of the first criteria taken into account by the Court to reject the interpretation of the Colombian party.

[279] European Convention on Human Rights. Article 12. "Men and women of marriageable age have the right to marry and to found a family, according to the national laws governing the exercise of this right."

[280]ECHR. Oliari et al. v. Italy. July 21, 2015, Par. 193.

VZ Vacatur_0191





configuration") to decide the exact nature of the legal status granted by other means of legal recognition."[281]

On this point, it is worth noting that this same approach is supported by the European Court in the cases Orlandi v. *Italy*[282] and *Fedotova et al. v.* Russia.[283] Indeed, in both cases, the European Court held that, although States must provide mechanisms for the protection of same-sex unions, this protection does not necessarily derive from the recognition of same-sex marriages.

Within this framework, I fully agree that the leeway available to the States in this regard concerns both the form of recognition and the content of the protection to be granted to same-sex couples, **which cannot be translated into an absolute absence of protection**.

### 4. The need for more information and academic and scientific rigor regarding gender affirming therapies and hormonal treatments

Paragraph 143 mentioned that "Challenges in accessing respectful health services for LGBTI people **are evidenced in the obstacles to obtaining hormone treatments**" (Bold added).

In this regard, I reiterate that there is a need for the Commission to deepen these discussions with scientific arguments in order to address them comprehensively. In particular, there are studies that indicate the harm that may result from having undergone hormone treatments in adolescence.[284]

In addition, in the case of children and young people, it is essential that their capacity to consent to hormone treatments be taken into account and assessed. Indeed, it is necessary to have an in-depth discussion on the negative effects linked to these treatments and to align this information with the statements made by the Commission.

Indeed, scholars argue that there are long-term studies that show - in individuals who have undergone gender affirming or hormonal treatments - an increase in morbidity and mortality and a risk of suicide after transition.[285]

These elements cannot be ignored by the Commission; especially when this body has the mandate to promote and defend human rights in the region, including the right to health.

### 5. Gaps regarding parents' rights to choose their children's education

Paragraph 118 mentions "In addition to the above, challenges remained in the implementation of comprehensive sexual education and gender equality programs in schools, which is linked to the high dropout rates of girls and adolescents due to pregnancies."

[281] ECHR. Chapin and Charpentier vs. France. September 9, 2016. Par. 48.

[282] ECHR. Orlandi v Italy. "The Court reiterates that States are still free, under Article 12 of the Convention as well as under Article 14 taken in conjunction with Article 8, to restrict access to marriage to different sex. The same holds for Article 14 taken in conjunction with Article 12 (see *Oliari and Others* cited above, § 193)." (Spanish text: El Tribunal reitera que **los Estados siguen siendo libres**, de acuerdo con el Artículo 12 de la Convención, así como con el Artículo 14 en conjunción con el Artículo 8, **de restringir el acceso al matrimonio a parejas de distinto sexo**. Lo mismo se aplica al Artículo 14 en conjunción con el Artículo 12.) Par. 192.

[283] In this case, the Court analyzed -only- the possible violation of Article 8 of the ECHR, which refers to the right of individuals not to be subjected to arbitrary interference by the State in their private life. In the case of same-sex couples, the Court established that the lack of a legal framework allowing same-sex couples to have their relationship recognized and protected under national law may generate significant obstacles in the daily lives of these couples. Without prejudice to the foregoing, it established that the State may enjoy some leeway to determine the way in which same-sex unions are registered, which implies that this registration need not necessarily involve the notion of marriage.

[284] 'Trust the Experts' Is Not Enough: U.S. Medical Groups Get the Science Wrong on Pediatric 'Gender Affirming' Care. https://media4.manhattan-institute.org/sites/default/files/how-to-respond-to-medical-authorities_claiming_gender_affirming_care_safe.pdf.

[285] Levine, S.B., Abbruzzese, E. Current Concerns About Gender-Affirming Therapy in Adolescents. *Curr Sex Health Rep* **15**, 113-123 (2023). https://doi-org.ez.unisabana.edu.co/10.1007/s11930-023-00358-x.

VZ Vacatur_0192

 

In this regard, I draw attention to the wording of Article 12.4 of the ACHR, which states that "**[p]arents and, where appropriate, guardians, have** the right to ensure that their children or wards **receive a** religious and **moral education** in accordance with their own convictions." (Bold added)

Within this framework, the content of Article 12.4, which guarantees parents the right to ensure that their children receive a moral education in accordance with their convictions, cannot be overlooked. Thus, parental disagreement with certain content should not be seen as a threat in itself, in as much as it represents a materialization not only of Article 12 of the Convention, but also, for example, of the right to freedom of expression: fundamental element of any democratic system.

According to the ECHR, the right of parents to choose their children's education, including sex education, is an aspect of the right to respect for private and family life protected by the ECHR.[286] Therefore, sex education, like any other type of education, must be framed within the scope of protection of conventional law, recognized by international human rights law, which grants parents the right to choose the religious and moral education of their children, in accordance with Article 12.4 of the Convention.

---

[286] ECHR, Kjeldsen, Busk Madsen and Pedersen, par. 53; Dojan et al, cited above, paras. 78-83.

VZ Vacatur_0193

THE SECRETARY OF STATE
WASHINGTON

September 24, 2024

The Honorable
Alejandro N. Mayorkas
Secretary of the Department of Homeland Security
Washington, DC  20528

Dear Secretary Mayorkas:

The Department of State assesses that extraordinary and temporary conditions currently exist in Venezuela that prevent Venezuelan nationals, or noncitizens having no nationality who last habitually resided in Venezuela, from returning in safety.  Therefore, the Department of State supports the extension and redesignation of Temporary Protected Status (TPS) for 18 months based on extraordinary and temporary conditions.

A complex political, humanitarian, and economic crisis, as well as activities of non-state armed groups, repression, and crumbling infrastructure, mean Venezuelans still cannot return to their country in safety.  Many individuals in Venezuela face the possibility of physical abuse, unlawful killings, disappearances, human trafficking, unjust detentions, and politically motivated reprisals.  High rates of gender-based violence threaten the safe return of women and LGBTQI+ individuals.  The UNHRC's independent fact-finding mission determined the Maduro authorities have dramatically intensified efforts to crush all peaceful opposition, creating one of the most acute human rights crises in recent history.

NGOs report repression by Maduro and his representatives in the pre and post July 28-electoral context, negatively impacting political participation and the freedoms of expression and association.  Venezuela suffers from ongoing endemic violence perpetrated by organized criminal groups throughout the country, including narcotrafficking and terrorist groups that repress, sometimes violently, populations in areas under their control.

-2-

Some 7.7 million people, roughly 26 percent of the country's total population, require humanitarian assistance. Persistent operational constraints inside Venezuela imposed by Maduro's representatives include harassment and open hostility toward NGO workers and obstruction of relief efforts, hindering humanitarian actors' ability to provide aid to the most vulnerable populations. In addition, Venezuela's economy remains in shambles following years of mismanagement, corruption, and hyperinflation. Large numbers of Venezuelans lack access to adequate, affordable, and nutritious food and lifesaving health services.

Redesignation would demonstrate solidarity with the Venezuelan people and the many Western Hemisphere countries that generously host Venezuelan refugees and migrants. Given TPS is only available to applicants already present in the United States, State views redesignation as complementary to the expansion of lawful pathways for Venezuelans, including the Venezuelan humanitarian parole program and increased refugee resettlement through the U.S. Refugee Admissions Program.

Such actions send an important signal to other countries the United States has urged to grant temporary protection or other forms of legal status. The United States continues to coordinate with states hosting large Venezuelan displaced populations, including Brazil, Chile, Colombia, Ecuador, and Peru, to support access to international protection and legal status in order to foster the socio-economic integration of Venezuelan migrants and refugees.

Based on the aforementioned factors, I recommend you extend and redesignate TPS for Venezuela for 18 months beyond the current expiration date on the basis of extraordinary and temporary conditions.

Sincerely,

Antony J. Blinken

SENSITIVE BUT UNCLASSIFIED

## (U) Department of State Recommendation Regarding
## Temporary Protected Status (TPS) for Venezuela -- (September 2024)

## I. Statutory Basis for Designation

**(U) Have the conditions under which the foreign state was designated for TPS ceased to exist?**

(U) No.  The conditions under which Venezuela was designated for TPS continue to exist.

## A. Armed conflict

**1. (U) Is the foreign state still involved in an ongoing, internal, armed conflict?**

(U) N/A.

**2. (U) If so, would the return of nationals of the foreign state to that state (or to the part of the state) still pose a serious threat to their personal safety?**

(U) N/A.

## B. Environmental Disaster

**1. (U) Does there continue to be a substantial, but temporary, disruption of living conditions in the foreign state affected by an earthquake, flood, drought, epidemic, or other environmental disaster?**

(U) N/A.

**2. (U) Is the foreign state still unable, temporarily, to handle adequately the return to the state of nationals of the state?**

(U) N/A.

**3. (U) Does the foreign state continue to support the TPS designation for its nationals in the United States?**

(U) N/A.

**C. Extraordinary and Temporary Conditions**

**1. (U) Has the foreign state continued to experience extraordinary and temporary conditions that prevent nationals of the state from returning to the state in safety?**

(SBU) Yes.  The complex emergency induced and perpetuated by Nicolás Maduro and his representatives has forced more than seven million Venezuelans to flee their country.  In 2023, more than 300,000 Venezuelans crossed the Darién, double the crossings recorded in 2022.  In 2024, as of mid-August, more than 150,000 have crossed.  The political, humanitarian, and economic crises, complicated by the presence of non-state armed groups, unjustified arrests of members of the opposition, repression by Maduro's security services, food insecurity, and crumbling infrastructure mean Venezuelans still cannot return to their country in safety.  The U.S. Chief of Mission issued a re-declaration of humanitarian need based on the complex emergency in Venezuela for Fiscal Year 2024.  Many individuals in Venezuela, particularly human rights defenders, journalists, students, members of various democratically aligned political parties, internally displaced persons, and members of marginalized ethnic groups are at risk of abuses, such as torture, unlawful killings, disappearances, human trafficking, unjust detentions, and politically motivated reprisals.

(U) On July 28, more than 12 million Venezuelans voted in a historic presidential election.  On July 29, the Maduro-controlled National Electoral Council (CNE) declared Maduro the winner by a narrow margin without publishing precinct-level official tally sheets (*actas*) or presenting other evidence to substantiate its claim.  On August 13, the UN Panel of Experts

published an interim report that reviewed publicly available vote tallies collected and posted online by opposition political parties, found them genuine, and called for the release of tabulated results.  The Department agreed with the findings from independent assessments of the Carter Center and the UN Panel of Experts that this election lacked transparency and integrity and failed to meet basic democratic standards.  The democratic opposition published precinct-level results which verified that opposition unity candidate Edmundo González Urrutia received 67 percent (7.2 million votes) to Maduro's 30 percent (3.2 million votes).  Secretary Blinken publicly affirmed González received the most votes.  On August 22, the Maduro-controlled Supreme Court (TSJ) certified the CNE'S claim Maduro won but failed to cite evidence.  The TSJ's findings lacked all credibility, given the overwhelming evidence that González received the most votes.  As discussed in further detail below, the efforts of Maduro's representatives to undermine the election have involved violence, repression, and human rights abuses throughout the country.

**(U) Violence:**  Citizens of Venezuela continued to experience ongoing violence perpetrated by organized non-state armed groups.  According to InsightCrime, homicides increased by 3.2 percent in 2023 over 2022 figures, accumulating to a total of 6,973 violent deaths. This is the second highest homicide rate in South America.  In 2023, the highest numbers of murders were recorded in the states of Miranda with 279 victims, the Capital District with 223, and Zulia with 205 deaths.

(U) Episodes of localized violence are frequent, unpredictable, and are not adequately prevented or addressed.  Parts of the country experience violence from armed groups because of a deterioration of the rule of law and the participation of non-state armed groups in illicit economic activities.

(U) Terrorist groups largely based in Colombia, including the Revolutionary Armed Forces of Colombia – People's Army (FARC-EP), Segunda Marquetalia, and the National Liberation Army (ELN) operate unimpeded in Venezuela.  The ELN continues to expand its presence beyond its historic base in the border zone with Colombia and consolidate its control over

individuals in the areas it already dominates.  These narcotrafficking and terrorist groups repress, sometimes violently, populations in areas that fall under their control.  These groups engage in sex trafficking and forced labor while operating with impunity.  In other areas, Venezuelan security forces confront narcotrafficking and terrorist groups, creating more violence and instability.

(U) The criminal influence of Venezuelan transnational-gang Tren de Aragua (TdA) continues to threaten the security of Venezuelans.  TdA exploits Venezuela's migrant crisis by targeting Venezuelans in country and Venezuelan migrant communities in the Western Hemisphere for extortion, human trafficking, and migrant smuggling.

**(U) Human Rights Abuses:**  NGOs and international organizations continue to report severe human rights abuses committed by Maduro's representatives, their associates, and Maduro-aligned armed groups.  According to credible NGO reports, security forces regularly engage in physical abuse, unlawful killings, disappearances, unjust detentions, and politically motivated reprisals.  The UN Human Rights Council's Independent International Fact-Finding Mission on the Bolivarian Republic of Venezuela (FFM) found in its September 2024 report, "During the period covered by the present report and, in particular, after the presidential election of 28 July 2024, the State reactivated and intensified the harshest and most violent mechanisms of its repressive apparatus. As part of that repression, the authorities carried out, in a conscious and deliberate manner, actions aimed at dismantling and demobilizing organized political opposition, inhibiting the dissemination of independent information and opinions critical of the Government and preventing peaceful citizen protests. The brutality of the repression continues to generate a widespread climate of fear among the population."  ""We are witnessing an intensification of the State's repressive machinery in response to what it perceives as critical views, opposition or dissent," said Marta Valiñas, chair of the Fact-Finding Mission. "Additionally, in November 2021, the Prosecutor of the International Criminal Court opened an investigation into the situation in Venezuela after concluding there was a "reasonable basis to believe that

crimes against humanity," particularly in the context of detention were committed.  According to the NGO *Foro Penal*, there were 1,780 political prisoners in custody as of August 26.

(U) Targets of violence include opposition politicians, journalists, students, unionists, civil society activists, and anyone perceived to be at odds with Maduro and his representatives.  It is common for journalists to be beaten or threatened particularly during pre-electoral or political conflict periods. High rates of gender-based violence threaten women and LGBTQI+ individuals.  NGOs reported repression by Maduro's representatives leading up to and following the July 28 presidential election negatively impacting political participation and freedoms of expression and association.  On July 31, the FFM warned that "We are witnessing the accelerated reactivation of the repressive machinery that was never dismantled and is now being used to undermine the public freedoms of citizens and their right to political participation and free expression of ideas."  In condemning this repression, the FFM said "the vast majority of those detained were simply individuals who voiced their rejection of the presidential election results announced by the authorities."

(U) Human trafficking remains a serious concern.  Traffickers often subject Venezuelans, including those fleeing the country, to forms of exploitation, including sex trafficking and forced labor.  Traffickers allegedly recruit Venezuelan migrants and refugees, particularly women and girls, into trafficking networks using false promises of safe migration.  Venezuelan trafficking victims have been identified in 24 countries over the last five years.  Non-state armed groups that operate in the country with impunity subject Venezuelans to forced labor and forced criminality and forcibly recruit and use child soldiers in combat.  These groups lure vulnerable children in dire economic circumstances with gifts and promises of basic sustenance for themselves and their families to later recruit them into their ranks.  Sex and labor trafficking victims from South America, Caribbean, Asian, and African countries have also been identified in Venezuela.

**(U) Post-Election Violence:**  Following the July 28 presidential election, the democratic opposition called for nationwide demonstrations in which large numbers of protesters peacefully supported González's victory.  Maduro representatives responded with political repression of opposition members and journalists and violence against demonstrators by Maduro-backed security forces and non-state armed groups.  Maduro called for the arrest of opposition leader María Corina Machado and presidential candidate González, and Maduro's attorney general opened a criminal investigation against both.  Regime-led repression continues with 1,780 total detentions and 24 deaths reported from July 28 to the end of August, according to reputable Venezuelan NGO *Foro Penal*.

**(SBU) Extrajudicial and Unlawful Killings:**  The NGO Monitor of the Use of Lethal Force (MUFLVEN) recorded 361 deaths involving security forces from January 1 to August 22, including 292 killings committed by police.  MUFLVEN reported the Bolivarian National Police (PNB) was involved in the largest percentage of cases, closely followed by the Scientific, Penal, and Criminal Investigative Corps (CICPC), the armed forces, and regional and local police.  *Provea* reported a total of 25 deaths in the days after the July 28 presidential election to mid-September.  *Provea* said they recorded many of the 25 deaths as extrajudicial killings, identifying a lack of pre-existing judicial order and state security forces as perpetrators in these cases.

**(U) Criminal Armed Groups:**  Maduro's representatives condone or support criminal non-state armed groups throughout the country, including in areas in which they do not have territorial control.  Their tolerance of these groups leads to high levels of physical insecurity, human trafficking, and environmental degradation, with outsized impacts on members of vulnerable populations such as women, children, and Indigenous persons.

**(SBU) Underlying Economic Crisis:**  Venezuela's economy remains in shambles following years of mismanagement and corruption, a hollowing out of the private sector, and hyperinflation from 2018 through 2021.  With more than 80 percent of Venezuelans living in poverty according to two 2023 U.S. government surveys (SURVEY-23 and ENCOVI), the poverty rate is

still among the highest in the region.  According to the IMF, Venezuela's GDP declined from $373 billion in 2012 to $102 billion in 2024, a 73 percent decrease from its 2012 peak.  While the regime has had relative success in lowering and stabilizing inflation since January 2024 to the lowest rates in nearly 10 years, economic growth is stifled through Maduro's anti-inflationary policies.  Many families have not seen the benefits of lower inflation as the food basket for a family of four averages $550 per month, while the average minimum salary in the private sector is $250 and only $130 in the public sector.  Meanwhile, about 48 percent of the Venezuelan population is self-employed and works in the informal economy.

(SBU) Oil revenues remain Maduro's largest source of income, and according to estimates revenues have fallen more than 90 percent from their 2012 highs of $94 billion in oil export revenue.  U.S. sanctions relief on Venezuela's oil and gas industry beginning in October 2023 provided some additional revenues but General License 44, which authorized transactions, expired in April and reduced revenue estimates for 2024 to around $9 billion according to analysts.  Since January, Maduro has used about $3 billion in oil revenues to stabilize the bolivar's exchange rate and moderate cost and price increases in local currency.  Declines in oil revenues have also dropped the Venezuelan Central Bank's accessible reserves by 89 percent since 2013 and reserves now hover just below $3 billion with no indication of major increases for 2024.  Venezuela has one of the highest levels of government debt as a percentage of GDP of any country in the world.  The IMF estimated in April the country's external debt is $152 billion, equivalent to 158 percent of GDP.

**(U) Deteriorating Humanitarian Situation:**  Because of the economic collapse and political crisis, in 2019, the UN and humanitarian organizations launched and have been implementing a Venezuela Humanitarian Response Plan and established a humanitarian cluster system in Venezuela.  According to the UN, some 7.7 million people in Venezuela (approximately 26 percent of a total population of 28 million) require humanitarian assistance.

SENSITIVE BUT UNCLASSIFIED
-8-

(U) Persistent operational constraints inside Venezuela imposed by Maduro's representatives, including harassment and open hostility toward NGO workers, obstruct international community relief efforts and the acquisition of up-to-date and accurate data on humanitarian needs, impeding humanitarian actors' ability to reach the most vulnerable populations.  Maduro has created a constrained humanitarian space, leading to the freezing of NGO registration, obstruction of import permits, and refusal to grant visas for humanitarian workers.  State and USAID implementing partners report ad hoc harassment by Maduro and his supporters which hinders humanitarian efforts in Venezuela.  These growing political and economic crises exacerbate the dire conditions faced by the estimated 7.7 million people who require humanitarian assistance.

**(U) Food Insecurity and Malnutrition**:  Access to adequate, affordable, and nutritious food continues to be a challenge for vulnerable Venezuelans due to continued high inflation, low wages, and limited purchasing power. Venezuela's primarily urban and peri-urban population relies heavily on food imports, making it especially vulnerable to supply and price shocks. Imported food items remain available in supermarkets but are priced in dollars and unaffordable for most Venezuelans.  World Food Programme's (WFP's) Humanitarian Response Plan (HRP) from mid-2024 seeks to support 5.2 million people of 7.7 million in need of humanitarian assistance, with 2 million of these needing special food security support.  As of July, WFP provides food assistance to nearly 116,000 school children in Venezuela each month.  Remittances have declined as the diaspora's employment levels and purchasing power decreased, further exacerbating humanitarian needs among Venezuelans in country, as well as among Venezuelan refugees and migrants.

(U) Despite a marginal economic recovery, the cost of food continues to rise, with food inflation registering in July at 70 percent year-on-year.  Higher food costs, despite slight income growth in 2023, meant 85 percent of Venezuelans could not afford the basic food basket ($183 per capita). Women and girls in Venezuela face major protection risks and often resort to negative coping strategies – including reducing meal size and selling

critical assets, exchanging sex for money or food, or engaging in theft to survive.

(U) As Maduro's representatives have imposed restrictive visa measures on humanitarian workers and imposed onerous financial auditing and logistical burdens on aid groups inside Venezuela, these groups have been unable to conduct a comprehensive assessment of the state of hunger in Venezuela. However, humanitarian organizations report families increasingly cannot meet their daily food needs.  Given the macroeconomic context, the population of concern – spread across urban and peri-urban areas – continues to be very poor household that lack income sources in USD and that have limited access to international remittances and/or social programs.

**(U) Lack of Access to Lifesaving Health Services**:  The 2024-2025 extension of the 2023 UN Humanitarian Response Plan indicates that the state of health infrastructure in Venezuela remains poor, and there continues to be a lack of qualified health professionals, medicine, and essential supplies. According to the Venezuelan Medical Federation, as of March 2023, 42,000 Venezuelan healthcare workers left the country.  Health workers who stay in Venezuela earn inadequate wages and frequently protest poor labor conditions.  Many must walk long distances to work, sometimes for more than 10 kilometers, as they cannot afford transport.

(U) Health infrastructure in Venezuela is primarily managed by Maduro's representatives and has therefore been subject to years of neglect and disrepair.  According to the Venezuelan Medical Federation, many hospitals remain unable to offer services because they only have three percent of necessary medicines available.  Outbreaks of communicable diseases, including yellow fever, measles, and diphtheria are persistent threats due to chronic childhood vaccine shortages and poor infrastructure to transport and administer vaccines.  Human Rights Watch reports that 8.4 million gravely ill people were having trouble obtaining medical services, and more than 9 million people could not afford the medications and healthcare they

needed.  A combined shortage of access to contraception and prenatal care further endangers women and girls.

## 2. Would permitting nationals of the foreign state to remain temporarily in the United States be contrary to the national interest of the United States?

(U) No.  Permitting eligible Venezuelan nationals to remain temporarily in the United States advances the national interest by demonstrating solidarity with the Venezuelan people fleeing Maduro and his representatives in Venezuela, and with the many countries across the Western Hemisphere generously hosting Venezuelan refugees and migrants.  Such actions send an important signal to other countries that the United States has urged to grant temporary protection or other forms of legal status to Venezuelan refugees and migrants.  The United States is the largest single donor to the response to the Venezuela regional crisis, providing more than $3.1 billion in humanitarian assistance since fiscal year 2017.

## II. Discretionary Factors

**What, if any, additional information relevant to this decision should be brought to the attention of the Department of Homeland Security?**

N/A

## III. Recommendation

(SBU) For the reasons described herein, the Department (1) recommends that Venezuela's TPS designation be extended for 18 months on the basis of extraordinary and temporary conditions and (2) recommends a redesignation of TPS for Venezuela based on extraordinary and temporary conditions.



 

GPB - Georgia Public Broadcasting
On Air Now

MY PLAYLIST

**npr** 🔵gpb                                                      DONATE

 THE INDICATOR FROM PLANET MONEY   LISTEN & FOLLOW ⌄

# ‹ Why Venezuela is no longer in freefall

MAY 8, 2024 · 8:08 PM ET

**8-Minute Listen**                              PLAYLIST      TRANSCRIPT

SYLVIE DOUGLIS, BYLINE: NPR.

(SOUNDBITE OF DROP ELECTRIC SONG, "WAKING UP TO THE FIRE")

DARIAN WOODS, HOST:

This is THE INDICATOR FROM PLANET MONEY. I'm Darian Woods.

WAILIN WONG, HOST:

And I'm Wailin Wong. Venezuela's economy has been in freefall for over a decade.
It's an oil rich country that struggles to drill oil. Its currency, the bolivar, has
suffered brain bending levels of hyperinflation. We're talking 65,000% in 2018.
Bolivares just crumbling in your hands.

WOODS: The seeds of the trouble began under President Hugo Chavez around 25
years ago. He was a leftist populist who made decisions that had some benefits,
like boosting education and reducing poverty. But some of his actions slowly
chipped away at the country's prosperity. He seized control of farms and oil
company's assets. He weakened Congress and suppressed his opponents. Towards

3/7/25, 12:00 PM    Case 3:25-CV... With impending election, Venezuela's children bear brunt of economic woe : The Indicator from Planet Money : NPR

the end of his rule, the economy faltered, and it then nosedived under his successor Nicolas Maduro, who doubled down as a kind of hapless authoritarian.

WONG: U.S. sanctions haven't helped the economy either. The South American country has had one of the largest outflows of refugees in modern history. More than seven million people left the country in the last decade. That's about one in five Venezuelans.

WOODS: Back in 2019, we at THE INDICATOR started calling in to one Venezuelan economist, Gabriela Saade. She told us stories about what it was like in the capital of Caracas, which were often grim.

GABRIELA SAADE: You go to the streets, and people in Venezuela, they are very skinny. Yeah, it's very, very shocking to see that.

WONG: That was a few years ago when we last spoke with Gabriela. Now, Venezuela and the United States are even more commingled. At the U.S.-Mexican border, about one in seven intercepted migrants are Venezuelan. So today on the show, we check in with Gabriela again and learn about some surprising developments in the Venezuelan economy.

(SOUNDBITE OF MUSIC)

WOODS: Gabriela Saade is a regular guest on THE INDICATOR, updating us on the Venezuelan economy.

SAADE: Well, I don't know if regular 'cause the last time I was here...

WOODS: That's true.

SAADE: ...Was three years ago.

WOODS: Sorry. We haven't been in touch with you for quite a while.

SAADE: It's OK.

WONG: Oh. Call Dad. It's like, who's...

WOODS: Yeah.

WONG: ...Gabriela, my mom?

(LAUGHTER)

WOODS: A little. Why didn't you call me? And the last time Gabriela spoke to THE INDICATOR, she was speaking about how hard grocery shopping was in Caracas.

SAADE: Probably 60% of the shelves of the supermarket would be empty. I remember there was this deodorant, this brand called Mum. It was really bad, and it was the only option available.

WONG: There were also more serious problems than deodorant selection blackouts, poverty. Gabriela, as a young professional, was making $300 a month. Not enough, she felt, which is why Gabriela made the hard decision to leave and come to the United States.

SAADE: I have the opportunity to actually save money, and I can also, like, support my family who is living there.

WOODS: Gabriela is an advisor at the Behavioural Insights Team now. That's a behavioral economics consultancy. Now every month she sends back $650 back to Venezuela to her mother. But she hadn't been back to visit the country until December last year.

SAADE: It was a totally different country. It was pretty wild to see it almost as an observer. It was very weird.

WONG: Caracas had been a ghost town when she left. Now, it was full with honking traffic. And because it was Christmas...

SAADE: People just blasting music and, like, making hallacas, which is a traditional dish.

WONG: That's a special type of tamale.

WOODS: Gabriela said she even saw some tourists from Europe. She asked them why they'd come. And they said they'd heard it was nice from TikTok.

SAADE: There was this ongoing joke in 2022. People would say, oh, Venezuela (speaking Spanish), which means Venezuela, like, got fixed, like, it recovered, right? But that's far from the truth.

WONG: One sign of perhaps a superficial fix was in the supermarket.

3/7/25, 12:00 PM    Full, Improbably Election Documentary of Venezuela... could Inflation | Planet Money : NPR

SAADE: The prices were in dollars. So the prices were not in bolivares. It's like the price tax for those goods, they said R-E-F, REF, which is, like, a reference price, and it would be in dollars.

WOODS: This is called de facto dollarization. What happens is you'd go to the counter, and you could either pay in U.S. dollars or if you only had bolivares...

SAADE: You would just take out your calculator, use the exchange rate and know what it's    yeah, how much it is in bolivares.

WOODS: Yeah. I see that inflation is 200%, which is actually low for recent history in...

SAADE: Yeah.

WOODS: ...Venezuela. But even then, I guess the shops don't want to be changing their prices too much.

SAADE: Yeah, yeah, yeah. So it's just easier just to have the dollar as a reference for prices.

WONG: An estimated 45% of transactions in the main cities are now made in foreign currencies, mostly the U.S. dollar.

WOODS: De facto dollarization is basically just a Band-Aid over the core problem of the declining currency. Jesus Palacios is an economist at the Venezuelan economic firm, Ecoanalitica. He says other reforms have been associated with some growth.

JESUS PALACIOS: In last years, Venezuela has had an average annual growth of 4% in 2021 to 2023.

WONG: Alongside that 4% growth, Jesus says that shortages have eased over the last few years. That's because Maduro's government has loosened the restrictions on imports and price controls he and Chavez had overseen. We know that price controls lead to shortages when more people want something like a deodorant, but the supplier doesn't have the incentive to bring that deodorant into the country. U.S. sanctions relief during this time probably helped, too.

PALACIOS: The economy is growing, but is more and more unequal in the last years. The poorest people earn 30 or 35 times less than those with the highest income. This is facts.

WONG: Jesus says more than 80% of Venezuelans are still in poverty. You can kind of view the economy of Venezuela as falling off a cliff 12 years ago, and now it's made some small crawls upward, but unevenly. Inequality is worsening.

WOODS: I saw that there was a Ferrari dealership that opened in Caracas.

PALACIOS: Yeah, yeah. This is amazing in this context, no?

WOODS: That dealership is for the wealthier Venezuelans who are often plugged into the government apparatus. It's not for ordinary people like Jennifer Ontiveros (ph). Jennifer is a housekeeper in Caracas, and as a mother of two young kids, she needs to multitask, like she was doing on this call.

JENNIFER ONTIVEROS: (Through interpreter) I am ironing right now.

WONG: Jennifer says her income has improved over the last couple of years. She says she's lucky to be on $350 a month, whereas other working Venezuelans get paid as little as $4, but it's still not enough.

ONTIVEROS: (Through interpreter) The country doesn't get better. We don't get any benefits from being Venezuelan. You can't do anything with your money, like, renovate your home, take your kids out to do something    nothing. We can't enjoy anything. Faith is the only thing that keeps us going.

WOODS: A lot of people have left Venezuela over the last decade. Do you want to leave Venezuela?

ONTIVEROS: (Through interpreter) Yes. Yes, I would like to leave. This year, we have a presidential election. I wouldn't leave if Maduro lost and was no longer president. But if he stays and gets elected again, which means five more years of this government, five more years like this, five more years of not having enough, not being able to build your own home, not being able to give a better life to your kids.

WONG: The election is marked for July. But beneath the economic carnage, Jennifer still loves Venezuela.

3/7/25, 12:00 PM    Case 3:25-cv-01766    Will impending 'Baction Documents bring back Venezuela' economy? Filed 04/10/25 indicatorage Planet Money: NPR

ONTIVEROS: (Through interpreter) The music, the culture, the beaches, all of it. All of the country.

WOODS: And that's a sentiment shared by Gabriela.

SAADE: If things actually, like, get better, and there are more opportunities for people like myself, I know for a fact that I won't be alone in returning.

WONG: This episode was produced by Angel Carreras, with engineering by Neal Rauch. It was fact checked by Sierra Juarez. Kate Concannon edits the show, and THE INDICATOR's a production of NPR.

(SOUNDBITE OF MUSIC)

WOODS: Was the deodorant selection better when you went back?

SAADE: Yes, definitely. Yeah.

WOODS: What's your brand?

SAADE: That was - Secret.

WOODS: It's a secret. OK, yeah.

SAADE: No, I mean, it's called Secret. I think it's...

WOODS: Oh, right.

SAADE: ...Like a - yeah (laughter).

WOODS: It's called Secret. I was like, wow...

SAADE: No, but...

WOODS: ...This must be kind of a private question.

*Copyright © 2024 NPR. All rights reserved. Visit our website terms of use and permissions pages at www.npr.org for further information.*

*NPR transcripts are created on a rush deadline by an NPR contractor. This text may not be in its final form and may be updated or revised in the future. Accuracy and availability may vary. The authoritative record of NPR's programming is the audio record.*

(28 of 69), Page 28 of 69    Case: 25-2120, 05/28/2025, DktEntry: 49.12, Page 28 of 69

3/7/25, 12:00 PM    Case 3:25-cv-01766-EMC    Document 102    Venezuela could lose TPS. The Indicator : Planet Money : NPR    Filed 04/07/25    Page 78 of 148

## More Stories From NPR



**THE INDICATOR FROM PLANET MONEY**

### Can ... we still trust the monthly jobs report?

VZ Vacatur_0212

THE INDICATOR FROM PLANET MONEY
**What to make of the Ukraine minerals deal**

THE INDICATOR FROM PLANET MONEY
**Is the Panama Canal a rip-off?**

VZ Vacatur_0213

THE INDICATOR FROM PLANET MONEY
**Can the Federal Reserve stay independent?**

THE INDICATOR FROM PLANET MONEY
**How tourist destinations recover after terrorism**

THE INDICATOR FROM PLANET MONEY
**Slender Starbucks, Medicaid at risk, and the gold card visa**

## Popular on NPR.org

VZ Vacatur_0215

SHOTS - HEALTH NEWS

### She got her dream job at CDC back. But she's already moving on

RACE

### War heroes are among 26,000 images flagged for removal in Pentagon's DEI purge

ASIA

**5 takeaways: China's foreign minister slams Trump's 'two-faced' policies**

HEALTH

**Amid a growing measles outbreak, doctors worry RFK Jr. is sending the wrong message**

CODE SWITCH: PERSPECTIVES

3/7/25, 12:00 PM   Case 3.25-cv-Will imposing elections Document on U.S. Venezuela Filed 04/07/25 Indicate a Page 34 of 148 : NPR

## If you see something (woke), say something



**BUSINESS**

## Did tariffs contribute to the Great Depression? Here's what to know

## NPR Editors' Picks

CULTURE

**TOKiMONSTA's new album is a 'love letter' to close friend Regina Biondo**

MOVIE REVIEWS

**Live, die, repeat: Bong Joon Ho offers a farcical vision of the future in 'Mickey 17'**

ECONOMY

**The job market is still pretty solid -- but there are warning signs ahead**

BUSINESS

**A look at some of the creative ways companies try to dodge high tariffs**

3/7/25, 12:00 PM   Case 3:25-cv-...   Will important elections count on Docurveezuelaeto countify U.S. indication alle PlaneOf Money: NPR

UP FIRST NEWSLETTER

**Monthly jobs report to be released. And, the White House to host a crypto event**

NATIONAL

**How a measles outbreak overwhelmed a small West Texas town**

(38 of 69), Page 38 of 69    Case: 25-2120, 05/28/2025, DktEntry: 49.12, Page 38 of 69

3/7/25, 12:00 PM    Case 3:25-cv-01766-EMC Trump ended a program that allowed 532,000 people to fly to the U.S. Here's what could happen next : NPR Page 38 of 148

READ & LISTEN

Home

News

Culture

Music

Podcasts & Shows

CONNECT

Newsletters

Facebook

Instagram

Press

Public Editor

Corrections

Contact & Help

ABOUT NPR

Overview

Diversity

NPR Network

Accessibility

Ethics

Finances

GET INVOLVED

Support Public Radio

Sponsor NPR

NPR Careers

NPR Shop

NPR Events

NPR Extra

terms of use

privacy

your privacy choices

text only

© 2025 npr

(39 of 69), Page 39 of 69   Case: 25-2120, 05/28/2025, DktEntry: 49.12, Page 39 of 69

3/7/25, 12:08 PM   Case: 25-2120, Situation of human rights in the Bolivarian Republic of Venezuela - Report of the United Nations High Commissioner for Human Rig…

**Venezuela(/country/ven)**

# Situation of human rights in the Bolivarian Republic of Venezuela - Report of the United Nations High Commissioner for Human Rights (A/HRC/56/63) (Advance Unedited Version)

UN Document

**Source:** UN HRC(/organization/un-hrc)

**Posted:** 1 Jul 2024

**Originally published:** 28 Jun 2024

**Origin:** View original



**Download Report**

(PDF | 717.78 KB)
(/attachments/7d8295fe-57ca-4b3b-85c7-f03f9a1bc4fd/a-hrc-56-63-auv.pdf)

**Human Rights Council**

**Fifty-sixth session**

18 June−12 July 2024

VZ Vacatur_0223

Agenda items 2 and 4

**Annual report of the United Nations High Commissioner
for Human Rights and reports of the Office of the
High Commissioner and the Secretary-General**

**Human rights situations that require the Council's attention**

*Summary*

Pursuant to Human Rights Council resolution 51/29, in the present report, the United Nations High Commissioner for Human Rights focuses on the latest developments related to economic, social and cultural rights and the right to a healthy environment, rule of law and civic space, and the level of implementation of the corresponding recommendations previously issued by his Office to the Bolivarian Republic of Venezuela.

I. Introduction and methodology

1. The present report is submitted pursuant to Human Rights Council resolution 51/29, in which the Council requested the United Nations High Commissioner for Human Rights to submit a comprehensive report on the situation of human rights in the Bolivarian Republic of Venezuela (Venezuela), containing a detailed assessment of the implementation of the recommendations made in previous reports and to present it to the Council at its fifty-sixth session.

2. The present report covers the period from 1 May 2023 to 30 April 2024 and focuses on the latest developments related to economic, social, and cultural rights, the right to a healthy environment, gender, and LGBTIQ+ rights, civic space, and the rule of law. The report is based on information gathered and analysed by the Office of the United Nations High Commissioner for Human Rights (OHCHR), including through interviews with victims and witnesses and meetings with Government officials and civil society organizations. It also considers official information from State institutions. On 15 February 2024, the Government of Venezuela announced the suspension of the Letter of Understanding signed with OHCHR, requesting OHCHR personnel to leave Venezuela within 72 hours. OHCHR regrets this development.

3. The findings in the present report have been documented and corroborated in strict compliance with OHCHR methodology. OHCHR exercised due diligence to assess the credibility and reliability of sources and cross-checked the information gathered to verify its validity. It sought informed consent from the interviewees and took appropriate measures to protect their identities and to ensure confidentiality, as appropriate. OHCHR assessed the information collected and domestic legislation, in the light of international human rights norms and standards.

**II. Economic, social, and cultural rights and the right to a healthy environment**

4. Deficiencies in access to and supply of utilities such as water, electricity and fuel, continued to be exacerbated inter alia by the impact of sectoral sanctions during the reporting period.1 On 18 October 2023, following the signing of the Barbados Agreements, six licences were issued relaxing these sanctions, including

in the oil and gas sector.2 On 17 April 2024, the general licence to the oil and gas sector was replaced by a limited licence to reduce operations for 45 days. According to State institutions, as well as humanitarian and human rights organizations, sanctions and overcompliance hindered the receipt of funds and imports of essential goods, including for food and medicine.

5. Despite official figures indicating a five per cent gross domestic product growth in 2023,3 economic challenges such as high inflation4 and devaluation of Venezuelan currency, the bolivar, persisted,5 and continued to restrict purchasing powers, disproportionately affecting groups and communities in vulnerable situations, including the urban poor, those living in rural areas, and particularly women from these populations.

6. Reportedly, structural underfunding and understaffing continued to weaken health and education sectors.6 A report indicated that between July and August 2023, 74.6 per cent of health centres nationwide lacked medical staff, and 73.5 per cent lacked nursing staff,7 thus affecting accessibility, quality and availability of healthcare.8 The national education sector union indicated 80 per cent absenteeism from students at the resumption of the school year in October 2023, due to unaffordability of travel, uniforms, and other needs.9

7. Between 1 and 14 February 2024, the United Nations Special Rapporteur on the right to food carried out his first official visit to Venezuela. This visit highlighted the State's actions to address food insecurity. The Special Rapporteur expressed concern that "[Unilateral] coercive measures significantly limit the Venezuelan government and people's ability to realize the right to food,"10 contributing to the large scale of food insecurity in Venezuela, and disproportionately affecting women and girls. Concluding his visit, the Special Rapporteur also expressed concerns regarding allegations of political instrumentalization of State welfare.11

8. OHCHR reiterates its recommendation to authorities to take all necessary measures, including programmes for improved access to food, to ensure the availability and accessibility of food in sufficient quantity and quality.12

---

**Primary country:**

Venezuela (Bolivarian Republic of)(/country/ven)

**Source:**

UN Human Rights Council(/organization/un-hrc)

**Format:**

UN Document(/updates?list=UN%20Document%20Updates&advanced-search=%28F11%29)

**Themes:**

Climate Change and Environment(/updates?
list=Climate%20Change%20and%20Environment%20Updates&advanced-search=%28T4588%29)  /

Food and Nutrition(/updates?list=Food%20and%20Nutrition%20Updates&advanced-

search=%28T4593%29) / Gender(/updates?list=Gender%20Updates&advanced-search=%28T4594%29) / Health(/updates?list=Health%20Updates&advanced-search=%28T4595%29) / Peacekeeping and Peacebuilding(/updates?list=Peacekeeping%20and%20Peacebuilding%20Updates&advanced-search=%28T4599%29) / Protection and Human Rights(/updates?list=Protection%20and%20Human%20Rights%20Updates&advanced-search=%28T4600%29) / Water Sanitation Hygiene(/updates?list=Water%20Sanitation%20Hygiene%20Updates&advanced-search=%28T4604%29)

**Language:**

English(/updates?list=English%20Updates&advanced-search=%28L267%29)

---

# Related Content

**Venezuela(/country/ven)** **Situación de los derechos humanos en la República Bolivariana de Venezuela - Informe del Alto Comisionado de las Naciones Unidas para los Derechos Humanos (A/HRC/56/63) (Unofficial spanish version) (https://reliefweb.int/report/venezuela-bolivarian-republic/situacion-de-los-derechos-humanos-en-la-republica-bolivariana-de-venezuela-informe-del-alto-comisionado-de-las-naciones-unidas-para-los-derechos-humanos-ahrc5663-unofficial-spanish-version)**

UN Document

**Source:** UN HRC(/organization/un-hrc)

**Posted:** 1 Jul 2024

**Originally published:** 28 Jun 2024

---

**World(/country/wld)** **Asia and the Pacific SDG Progress Report: Engaging communities to close the evidence gap 2025(https://reliefweb.int/report/world/asia-and-pacific-sdg-progress-report-engaging-communities-close-evidence-gap-2025)**

VZ Vacatur_0226

Analysis

**Source:** ESCAP(/organization/escap)

**Posted:** 19 Feb 2025

**Originally published:** 18 Feb 2025

---

Colombia(/country/col)   **Marco de Cooperación para el Desarrollo Sostenible, Colombia 2024 -2027(https://reliefweb.int/report/colombia/marco-de-cooperacion-para-el-desarrollo-sostenible-colombia-2024-2027)**

Analysis

**Sources:** Govt. Colombia(/organization/govt-colombia), UNCT Colombia(/organization/unct-colombia)

**Posted:** 17 Dec 2024

**Originally published:** 19 Jun 2024

---

World(/country/wld)   **Informe Global 2023 - Resumen ejecutivo(https://reliefweb.int/report/world/informe-global-2023-resumen-ejecutivo)**

Other

**Source:** UNHCR(/organization/unhcr)

**Posted:** 11 Dec 2024

**Originally published:** 1 Jul 2024



English | Español

    # Health in the Americas+

Health in the Americas

# Venezuela - Country Profile



By PAHO/OPS, 24 September, 2024

| Determinants | Digital Coverage | Health Situation | Mortality | Prospects |

The Health in the Americas+ country profiles are based on the interagency indicators available as of the dates referenced. In some cases, the values of the indicators may differ from the most recent data available in the country.

## Environmental and social determinants of health

In 2000 the total population of Venezuela (Bolivarian Republic of) was 24 526 708 inhabitants; by 2024 this figure had risen to 28 405 543, representing a 15.8% increase. Regarding the country's demographic profile, in 2024 people over 65 years of age accounted for 9.7% of the total population, an increase of 5.0 percentage points compared to the year 2000. In 2024, there were 102.4 women per 100 men and 37.9 older people (65 years or older) per 100 children under 15 years of age, as can be seen in the country's population pyramids, distributed by age group and sex (Figure 1). Considering the population between 15 and 64 years of age to be potentially active (i.e., potential participants in the labor force), this group represented 64.8% of the total population of the country in 2024 (18 405 026 people). When we add these figures to the potentially passive population (7 251 085 under 15 years of age and 2 749 433 over 65 years of age), the result is a dependency ratio of 54.3 potentially passive people per 100 potentially active people. This ratio was 63.1 in 2000.

Life expectancy at birth in 2024 was 72.7 years, lower than the average for the Region of the Americas and 0.3 years higher that in 2000 (72.4).

Figure 1. Population pyramids of Venezuela, years 2000 and 2024

Microsoft Power BI

3/7/25, 12:07 PM

Between 2001 and 2016, the average number of years of schooling in Venezuela (Bolivarian Republic of) increased by 27.9%, reaching an average of 10.3 years in the latest year for which information is available. The unemployment rate in 2023 was 5.9%. Disaggregated by sex, the rate was 6.5% for women and 5.5% for men. The literacy rate was 98.7% in 2022. In men, this figure was 99.1%; in women, 98.4%. In addition, 33.1% of the population were below the national poverty line in 2015, a decrease from 41.6% in 2000. In 2006, 7.1% of the population was living in poverty, defined as the percentage of the population with an income of less than US$ 2.15 per day; this is below the regional average of 2.6%.

Between 2000 and 2022, the country's Human Development Index score remained unchanged at 0.699. During the same period, the index increased by 14.6% globally and 11.2% in Latin America (Figure 2).

**Figure 2. Human Development Index in the Region of the Americas, 2022**



In 2021, public expenditure on health accounted for 1.35% of gross domestic product (GDP) (Figure 3) and 5.46% of total public expenditure, while out-of-pocket spending on health accounted for 28.06% of total health expenditure.

**Figure 3. Domestic general government health expenditure as percentage of gross domestic product, 2021**

VZ Vacatur_0229

Case: 25-2120, 05/28/2025, DktEntry: 49.12, Page 46 of 69

Case 3:25-cv-01766-EMC    Document 103-9    Filed 04/07/25    Page 96 of 148

## Digital coverage

In 2017, 61.6% of the population had an internet connection, representing a considerable increase from 2000, when 3.4% of the population had an internet connection.

## Health situation

### Maternal and child health

Between 2000 and 2018, infant mortality in the Bolivarian Republic of Venezuela decresed from 19.4 to 18.28 deaths per 1000 live births, a decrease of 5.7% (Figure 4). The percentage of low-weight births (less than 2500 g) increased from 8.7% to 9.5% between 2003 and 2017.

Regarding the immunization strategy, measles vaccination coverage was 68% in 2021, a decrease of 16 percentage points from 2000.

**Figure 4. Infant mortality per 1000 live births, 1995–2018**

VZ Vacatur_0230



The maternal mortality ratio in 2020 was estimated at 259.2 deaths per 100 000 live births, representing a 180.5% increase compared to the estimated value in 2000 (Figure 5). In relation to fertility, it is estimated that in 2024 women had an average of 2.1 children throughout their reproductive lives. In the specific case of adolescent fertility, there was a 24.3% decrease, from 96.7 live births per 1000 women aged 15 to 19 years in 2000 to 73.2 in 2024. In 2017, 99.1% of births were attended by skilled birth personnel. Between 2011 and 2018, the percentage of pregnant people who received antenatal care increased from 47.0% to 82.6%.

**Figure 5. Maternal mortality per 100 000 live births, 2000–2020**

## Communicable diseases

In 2022, there were 35 new cases of tuberculosis per 100 000 population in Venezuela (Bolivarian Republic of). In 2019, the overall tuberculosis mortality rate (age-adjusted and per 100 000 population) was 2.7 (1.5 in women and 4.2 in men).

VZ Vacatur_0231

3/7/25, 12:07 PM

In 2020, the estimated human immunodeficiency virus (HIV) infection incidence rate (new diagnoses) was 17.5 per 100 000 population. The age-adjusted mortality rate for HIV was 26.1 per 100 000 population in 2019. It should be noted that during the 2000-2019 period this indicator decreased by 215.6%. There were no reported cases of human rabies in the country in 2022.

## Noncommunicable diseases and risk factors

In the same age group, the prevalence of overweight and obesity was 53.5% in 2022. Also in 2016, 31.4% of the population reported insufficient physical activity.

In 2015, the reported prevalence of arterial hypertension (high blood pressure) among people aged 18 years or older was 18.6%, a decrease of 6.9 percentage points compared to 2000 (25.5%). The prevalence of diabetes mellitus, which stood at 8.8% in 2000, increased to 9.5% in 2014.

# Mortality

In 2019, the adjusted rate of potentially avoidable premature mortality in Venezuela (Bolivarian Republic of) was 337.9 deaths per 100 000 population, a decrease of 2.3% from a rate of 330.2 in 2000. This meant that, in 2019, the rate in the country was 10.4% lower than the average rate reported for the Region of the Americas as a whole. Among potentially avoidable premature mortality, the rate for preventable causes was 124.3 per 100 000 population in 2019, which is 2.1% lower than the regional average rate.

The overall age-adjusted mortality rate was 6.3 per 1000 population in 2019, a decrease of 2.6% compared to 2000 (5.6 deaths per 1000 population).

When deaths are categorized into three main groups, it is observed that, in 2019, the age-adjusted mortality rate from communicable diseases was 102.3 per 100 000 population (116.4 per 100 000 in men and 29.8 per 100 000 in women), while the age-adjusted mortality rate from noncommunicable diseases was 413.8 per 100 000 population (488.3 per 100 000 in men and 355.3 per 100 000 in women). The rate of age-adjusted mortality from external causes was 119.4 per 100 000 population (214.4 per 100 000 in men and 21.3 per 100 000 in women). In 2000, the percentage distribution of causes was 63.6% for noncommunicable diseases, 16% for communicable diseases, and 20.3% for external causes; in 2019, the percentages were 65.1%, 15.6%, y 19.4%, respectively (Figure 6).

**Figure 6. Proportional mortality in Venezuela, 2000 and 2019**



## Cancer mortality

Regarding cancer mortality from tumors, in 2019, the adjusted mortality rate from prostate cancer was 25.5 per 100 000 men; lung cancer, 16.0 per 100 000; and colorectal cancer, 7.7 per 100 000. In women, these values were 16.8 deaths per 100 000 for breast cancer, 11.4 per 100 000 for lung cancer, and 7.1 per 100 000 for colorectal cancer.

VZ Vacatur_0232

The sources of the interagency indicators used in this profile can be found in this table.

 For the latest data on health indicators for the Region of the Americas, be sure to visit the **PAHO Core Indicators portal**.

## COUNTRY/TERRITORY PROFILES

Anguilla

Antigua and Barbuda

Argentina

Aruba

Bahamas

Barbados

Belize

Bermuda

Bolivia

Bonaire, Sint Eustatius, and Saba

Brazil (English) (Português)

Canada

Cayman Islands

Chile

Colombia

Costa Rica

Cuba

Curaçao

Dominica

Dominican Republic

Ecuador

El Salvador

French Guiana, Guadeloupe and Martinique

Grenada

Guatemala

Guyana

Haiti (English) (Français)

Honduras

Jamaica

Mexico

Montserrat

Nicaragua

Panama

Paraguay

Peru

Puerto Rico

Saint Kitts and Nevis

Saint Lucia

Saint Vincent and the Grenadines

Sint Maarten

Suriname

Trinidad and Tobago

Turks and Caicos Islands

United States of America

Uruguay

Venezuela

Virgin Islands (British)

Virgin Islands (U.S.)

## CURRENT TOPIC

Accelerating Disease Elimination

VZ Vacatur_0233

(50 of 69), Page 50 of 69

Case: 25-2120, 05/28/2025, DktEntry: 49.12, Page 50 of 69

3/7/25, 12:07 PM        Case 3:25-cv-01766-EMC        Document 102-4        Filed 02/26/25        Venezuela Country Profile Health in the Americas        Page 100 of 148

  

Health in the Americas was created in 1954, and since its groundbreaking first edition in 1956 has been published fifteen times. Since its inception, it has been recognized as the flagship publication of the Pan American Health Organization (PAHO), being a unique report on the great advances, challenges, and trends in the field of health in the Region of the Americas.

---

## LATEST

**U.S. Virgin Islands - Territory Profile**
Oct 26, 2024

**French Guyana - Profile**
Oct 25, 2024

---

## SEARCH

| Enter the terms you wish to search for | Go |

---

## TAGS

_ Data sources        _ Perfile de país        _ Bibliography        _ Recommended resources

Health in the Americas+ © 2021 Pan American Health Organization. All rights reserved.





Venezuelan family on the move after being evicted from their house in Soacha, Colombia. © NRC/Nadège Mazars

*"Despite several complexities posed by the uncertainty and deepening of the humanitarian crisis, thanks to the sustained engagement and work of all partners, the RMRP 2021 provides a clear articulation of how to complement host government's efforts."*
*Eduardo Stein, UNHCR and IOM Joint Special Representative for Refugees and Migrants from Venezuela*

The exodus of Venezuelans is the largest in the recent history of Latin America and the Caribbean. As of November 2020, more than 5.4 million refugees and migrants from Venezuela are outside their country of origin, with 4.6 million in the region alone.

In this context, the **Refugee and Migrant Response Plan 2021** is the result of field-driven planning, bringing together 159 appealing organizations in 17 countries, in consultation with host governments, civil society and faith-based organizations, local communities, donors, as well as the refugees and migrants themselves, with the common objective of addressing the overarching humanitarian, protection and socioeconomic integration needs of refugees and migrants from Venezuela.



Download

# REGIONAL RMRP AT A GLANCE

(53 of 69), Page 53 of 69    Case: 25-2120, 05/28/2025, DktEntry: 49.12, Page 53 of 69

3/7/25, 12:32 PM    Case 3:25-cv-01766-EMC    RMRP 2021 — Document 49-12    REFUGEES AND MIGRANTS FROM VENEZUELA — R4V    Filed 03/20/25    Page 103 of 148



### POPULATION PROJECTION 2021
## 8.13 M

⬆ 34.2%
🚶 15.2%
⬆ 34.0%
🚶 16.6%

| | |
|---|---|
| VENEZUELANS IN DESTINATION | 5.28 M |
| VENEZUELANS PENDULAR | 1.87 M |
| COLOMBIAN RETURNEES | 980 K |
| * IN TRANSIT | 331 K |

### PEOPLE IN NEED
## 7.20 M

⬆ 35.6%
🚶 14.9%
⬆ 34.4%
🚶 15.1%

| | |
|---|---|
| VENEZUELANS IN DESTINATION | 3.84 M |
| VENEZUELANS PENDULAR | 992 K |
| COLOMBIAN RETURNEES | 625 K |
| HOST COMMUNITY | 1.75 M |
| * IN TRANSIT | 285 K |

### PEOPLE TARGETED
## 3.30 M

⬆ 37.5%
🚶 17.9%
⬆ 27.8%
🚶 16.8%

| | |
|---|---|
| VENEZUELANS IN DESTINATION | 2.27 M |
| VENEZUELANS PENDULAR | 188 K |
| COLOMBIAN RETURNEES | 174 K |
| HOST COMMUNITY | 660 K |
| * IN TRANSIT | 212 K |

### TOTAL REQUIREMENTS
## $1.44 B



### RMRP PARTNERS
## 159

*Figures for refugees and migrants in-transit to other countries are not included in the totals on the left as they can be – by definition – recipients of services in more than one country. However, the total budget and sector specific requirements include activities targeting this population group, including as refugees and migrants in-transit will have specific needs to be addressed.

# REQUESTED FUNDING AND BENEFICIARIES TARGETED

UNITED STATES

VZ Vacatur_0237



BY NATIONAL AND SUB-REGIONAL
PLATFORM

© NRC/Nadège Mazars

f

t

# WHERE DO WE STAND

Olivia holds her daughter Eva, who is tired after not sleeping well from months of homelessness, not having enough to eat and lacking healthcare. ©Save the Children/Glenna Gordon

VZ Vacatur_0240

The political, human rights and socio-economic developments in Venezuela have led to the largest movement of refugees and migrants in the recent history of Latin America and the Caribbean. As of November 2020, of the approximately 5.4 million refugees and migrants from Venezuela outside of their country of origin, some 4.6 million are hosted in the region alone, including an estimated 1 million with an irregular status. Despite the devastating and ongoing socioeconomic and human impact of COVID-19, countries in Latin America and the Caribbean have continued to show great solidarity towards Venezuelans and to facilitate access to basic rights and lifesaving services as well as supporting their integration.

The already precarious situation of many refugees and migrants from Venezuela and affected host communities is reaching alarming levels, as national and local capacities have been dangerously strained due to the continued impact of COVID-19, threatening the overall social fabric in the 17 countries covered by the Regional Refugee and Migrant Response Plan. In a region characterized by high levels of informal labour, the implementation of measures aiming to curb the spread of COVID-19 (including border closures, lockdowns, curfews and other quarantine measures) has had a disproportionately grave impact on refugees and migrants. Without savings or alternative social safety nets, the loss of employment has resulted in many being unable to cover basic needs or access vital services.

VZ Vacatur_0241

# THE REGIONAL RESPONSE

Humanitarian worker teaches Venezuelan child and his mother how to wash hands to prevent COVID-19 in Bucaramanga, Colombia. ©Oxfam/Mario Niño

As a result of the complex economic and political outlook, increased dependency on emergency humanitarian assistance in the areas of health, shelter, food, Water, Sanitation and Hygiene (WASH), as well as access to education, protection and integration is reflected in the increased needs outlined in the RMRP 2021. The COVID-19 pandemic has also resulted in a dramatic increase of reported cases of gender-based violence (GBV) and mental health needs, while leading to widespread food insecurity, rising levels of malnutrition and growing destitution especially among the most vulnerable, namely unaccompanied and separated children (UASC), single-headed households, women and girls at risk of GBV and trafficking, the elderly, those with chronic diseases, the LGBTQI+ community and those in situations of irregularity.

Xenophobia and stigmatization are on the rise, often based on negative perceptions associated with fear of the spreading virus and rising rates of evictions and homelessness, leading to a vicious cycle of irregularity, vulnerability, and stigmatisation.

VZ Vacatur_0242



# WHAT'S THE RMRP?

Orliannis Sophia and Jesuatny look through the contents of their hygiene kit.
©Plan International/Gina Piñeros

The RMRP was first developed in 2018 (implemented throughout 2019) as a strategic regional response plan and advocacy tool to support country and sub-regional operations and to ensure the most pressing humanitarian, protection and integration needs of refugees and migrants from Venezuela, as well as those of host communities, were met.

The RMRP 2021 intends to build upon the best practices and lessons learned from 2020, presenting a more comprehensive plan, for an even more effective, coordinated and holistic response for refugees and migrants from Venezuela in Latin America and the Caribbean.

As in previous years, the RMRP 2021 provides a comprehensive analysis of the population movement dynamics to be expected for 2021 and the corresponding needs of refugees and migrants from Venezuela as well as of affected host communities. It further describes the response strategies and priority activities and indicates the financial needs of all partners of the Inter-Agency Coordination Platform to be able to continue assisting the population in need in an effective and coordinated manner.



Carmen is one of the many coronavirus heroes. After she left Venezuela, Carmen spent more than two years working as a waitress, a receptionist and a sales attendant until she was able to validate her medical qualifications in Peru. © UNHCR/ Carmen Parra



VZ Vacatur_0244

(61 of 69), Page 61 of 69    Case: 25-2120, 05/28/2025, DktEntry: 49.12, Page 61 of 69

3/7/25, 12:32 PM        Case 3:25-cv-01766-EMC    RMRP 2021 | RESPONSE FOR REFUGEES AND MIGRANTS FROM VENEZUELA - R4V    Page 614 of 148

Reflective of its inter-agency and multisectoral character, the RMRP 2021 is based on joint needs assessments carried out by RMRP partners at national and sub-regional levels on an ongoing basis, and on continuous exchanges with host governments, civil society actors and affected populations. The planning phase started in August 2020 after consultations with key strategic partners of the Platform, host governments, as well as the donor community. The RMRP 2021 is the result of an intra-regional field-driven strategic planning process, bringing together 159 appealing organizations, in consultation with all host governments, local communities and authorities, United Nations agencies, civil society, including international and national non-governmental organizations and faith-based organizations, the Red Cross Movement, the donor community, as well as consultations with refugees and migrants from Venezuela.

The structure of the RMRP 2021 reflects the sectoral set-up of the Regional Inter-Agency Coordination Platform (R4V) and all strategies and activities articulated in this Plan have been reviewed and cleared by the different Platforms and Sectors, both at regional and national/sub-regional levels, and have been elaborated in complementarity with the work of host governments.

VZ Vacatur_0245

# WHAT ARE WE FOCUSING ON IN 2021?

An elder Venezuelan woman digitally signing after receiving information and assistance on COVID-19 prevention. ©MercyCorps/Sol Torres

VZ Vacatur_0246

The RMRP 2021 strives to maintain a balance between responses focusing on immediate humanitarian and protection assistance, and activities that bridge the humanitarian-development-peace nexus by responding to the longer-term resilience and integration needs of affected populations and host communities.

To enhance this complementarity between humanitarian action and development support, the Regional, Sub-regional and National Platforms will serve as a forum for convening humanitarian and development partners for efficiently coordinated assistance. This approach is in line with the UN Secretary-General's Agenda for Humanity, the UN Development System Reform, the Grand Bargain global commitments and the principles of the New Way of Working, calling for collective and coherent support to reduce people's needs and vulnerabilities, based on comparative advantages of 159 humanitarian and development RMRP actors across the region.

RMRP partners at the regional and national levels have continued to show commitment and dedication throughout the preparation of this Plan. The RMRP 2021 intends to build upon the best practices and lessons learned from 2020, presenting a more comprehensive plan for 2021, for an even more effective, coordinated and holistic response for refugees and migrants from Venezuela in Latin America and the Caribbean.

## Population flows in Latin America & the Caribbean



Source: R4V

✳ A Flourish chart

Bearing in mind the various political and socioeconomic developments unfolding in Venezuela as well as in numerous host states, and the ongoing impact of the COVID-19 pandemic, the outlook for 2021 remains particularly complex and fragile. These dynamics have been reflected throughout the planning exercise and in all chapters of this RMRP.

In this spirit, RMRP partners will continue to regularly and transparently report on implementation of activities under the RMRP dedicated monitoring and reporting framework and will continue to be highly responsive to newly arising challenges or changes impacting on refugees and migrants from Venezuela as well as affected host communities.

In 2021, the RMRP also seeks to complement and further strengthen the national and regional responses of governments, including specifically the Quito Process as the main technical regional intergovernmental coordination forum in which key policies towards refugees and migrants from Venezuela are discussed and adopted.

## BUDGET REQUIREMENT PER SECTOR

Source: RMRP 2021

✳ A Flourish sankey chart

## NATIONAL/SUB-REGIONAL AND SECTORIAL DOWNLOADS

VZ Vacatur_0248

## REGIONAL

RMRP 2021 Regional Summary
[ENG] [ESP]

## BRAZIL

RMRP 2021 Brazil – Two pagers
[ENG] [ESP]

## CHILE

RMRP 2021 Chile – Two pagers
[ENG] [ESP]

## COLOMBIA

RMRP 2021 Colombia – Two pagers
[ENG] [ESP]

## ECUADOR

RMRP 2021 Ecuador – Two pagers
[ENG] [ESP]

## PERU

RMRP 2021 Peru – Two pagers
[ENG] [ESP]

## CARIBBEAN

RMRP 2021 Caribbean – Two pagers
[ENG] [ESP]

## CENTRAL AMERICA & MEXICO

RMRP 2021 Central America & Mexico – Two pagers
[ENG] [ESP]

## SOUTHERN CONE

RMRP 2021 Southern Cone – Two pagers
[ENG] [ESP]

## RMRP 2021 PARTNER ORGANIZATIONS

VZ Vacatur_0249

(66 of 69), Page 66 of 69    Case: 25-2120, 05/28/2025, DktEntry: 49.12, Page 66 of 69

3/7/25, 12:32 PM    Case 3:25-cv-01766-EMC    Document 64-7 RMRP 2021 – COORDINATION PLATFORM FOR REFUGEES AND MIGRANTS FROM VENEZUELA    Filed 04/24/25    Page 116 of 148

100% Diversidad y Derechos
ACAPS
Acción contra el Hambre
Adventist Development and Relief Agency (ADRA)
AID FOR AIDS
Alianza por la Solidaridad
Americares Foundation
Asociación Civil Venezolana en Paraguay
Asociación Construyendo Caminos de Esperanza Frente a la Injusticia, el Rechazo y el Olvido (CCEFIRO)
1Asociación de Apoyo al Desarrollo  APOYAR
Asociación de Jubilados y Pensionados Venezolanos en Argentina
Asociación de venezolanos en la República argentina (ASOVEN)
Asociación ILLARI-AMANECER
Asociación Manos Veneguayas
Asociación Mutual Israelita Argentina
Asociación Profamilia
Asociación Venezolana en Chile
Ayuda en Acción
Bethany Christian Services
Blumont
CAM
CARE
Cáritas Alemania
Caritas Brazil
Caritas Ecuador
Caritas Manaus
Caritas Rio de Janeiro
Caritas São Paulo
Caritas Switzerland
Center for Integrated Studies and Programs for Sustainable Development (CIEDS)
Center for Migration and Human Rights of the Diocese of Roraima (CMDH)
Centro de Atencion Psicosocial (CAPS)
Centro de Estudios y Solidaridad con América Latina (CESAL)
Cesvi
ChildFund Internacional
Churún Merú Association
Colonia Foundation of Venezuelans in the Dominican Republic (FUNCOVERD)
Comisión Argentina para Refugiados y Migrantes (CAREF)
Comité Internacional para el Desarrollo de los Pueblos (CISP)
Comité permanente por la defensa de los derechos humanos (CDH)
Compassiva
Consejo Interreligioso del Perú – Religiones por la Paz
COOPI – Cooperación Internacional
Cruz Roja Argentina
Cruz Roja Colombia
Cruz Roja Ecuador
Cuso Internacional
Danish Refugee Council (DRC)
Deutsche Gesellschaft für Internationale Zusammenarbeit (GIZ)
Diakonie Katastrophenhilfe
Diálogo Diverso
Dominican Institute for Integrated Development
Duendes y Ángeles Foundation

Famia Planea
Federación Luterana Mundial
Foro Salud Callao
Foundation of the Americas (FUDELA)
Foundation of Venezuelan Emigrants (FEV)
Fundación Alas de Colibrí
Fundación AVSI
Fundación Comisión Católica Argentina de Migraciones (FCCAM)
Fundación CRISFE
Fundación FIDAL
Fundación Halú Bienestar Humano (HALU)
Fundación Scalabrini Bolivia

VZ Vacatur_0250

(67 of 69), Page 67 of 69     Case: 25-2120, 05/28/2025, DktEntry: 49.12, Page 67 of 69

3/7/25, 12:32 PM     RMRP 2021 DOCED REFUGEES AND MIGRANTS FROM VENEZUELA - RMRP     Case 3:25-cv-01766-EMC     Document 63-5     Filed 02/25/25     Page 117 of 148

Fundación SES

Fundación Tarabita

Globalize Radio

Guarulhos Human Rights Defense Center (CDDH)

Heartland Alliance International (HAI)

Hebrew Immigrant Aid Society (HIAS)

HELVETAS Swiss Intercooperation

Human Rights Defence Curaçao

Humanity & Inclusion

Humans Analytic

I know my rights

iMMAP

IMPACT Initiatives (REACH)

Inmigrante Feliz Association

Institute for Migration and Human Rights (IMDH)

Instituto Félix Guattari

International Federation of the Red Cross (IFRC)

International Labour Organization (ILO)

International Organization for Migration (IOM)

International Rescue Committee (IRC)

INTERSOS

IPANC

Jesuit Service for Migrants and Refugees (JSMR)

Joint United Nations Programme on HIV/AIDS (UNAIDS)

Kimirina

Latin American Network of Non-Governmental Organizations of Persons with Disabilities and their Families (RIADIS)

LGBT+ Movement Brazil

Malteser International

MedGlobal

Medical Teams International

Médicos del Mundo

Mercy Corps

Mirares

Misión Scalabriniana – Ecuador

Nice Institute

Norwegian Refugee Council (NRC)

Organización de Estados Iberoamericanos para la Educación, la Ciencia y la Cultura (OEI)

Organización de las Naciones Unidas para la Alimentación y la Agricultura (FAO)

Organización Fuerza Internacional de Capellanía DDHH y DIH OFICA ICC

OXFAM

Panamerican Development Foundation (FUPAD)

Panamerican Health Organization/World Health Organization (PAHO/WHO)

Parroquia Ntra Sra Asunción y Madre de los Migrantes

Pastoral de Movilidad Humana – Conferencia Episcopal Peruana

Peace for Development

Plan International

Project HOPE

Red de Investigaciones Orientadas a la Solución de Problemas en Derechos Humanos (RIOSP DDHH)

Red regional LGTBI+

RET International

Salú pa Tur Foundation

Samaritan's Purse

Save the Children International (SCI)

Scalabrini International Migration Network

Sección Peruana de Amnistía Internacional

VZ Vacatur_0251

Servicio Jesuita a Migrantes (SJM)

Servicio Jesuita a Refugiados (SJR)

Solidarites International/Premiere Urgence Internationale (Consorcio de SI y PUI)

SOS Children's Villages

SPM – Serviço Pastoral dos Migrantes Nacional

SPM-NE – Serviço Pastoral dos Migrantes do Nordeste

Stichting Slachtofferhulp Curaçao

Stima Foundation

Swisscontact

Tearfund

Terre des hommes Lausanne

United Nations Children's Fund (UNICEF)

United Nations Development Programme (UNDP)

United Nations Educational, Scientific and Cultural Organization (UNESCO)

United Nations Entity for Gender Equality and the Empowerment of Women (UNWOMEN)

United Nations High Commissioner for Refugees (UNHCR)

United Nations Office for Project Services (UNOPS)

United Nations Office of the High Commissioner for Human Rights (OHCHR)

United Nations Office on Drugs and Crime (UNODC)

United Nations Population Fund (UNFPA)

United Nations Programme for Human Settlements (UN Habitat)

Universidad Católica del Uruguay (UCU)

Vale da Benção Educational and Charitable Association (AEBVB)

VenAruba Solidaria

VenEuropa

Venex Curacao Foundation

Vicaría de Pastoral Social Caritas

War Child

World Council of Credit Unions

World Food Programme (WFP)

World Vision (WV)

ZOA

We World GVC

Sesame Workshop

Servicio Ecuménico para la Dignidad Humana

Fundación de Ayuda Social de Las Iglesias Cristianas

Cruz Roja Uruguay

Cruz Roja Perú

Asociación Misioneros de San Carlos Scalabrinianos

## Más información

Visite nuestro sitio web principal

R4V.info

## Síguenos en X

@Plataforma_R4V

Plataforma R4V

## Vea nuestros últimos vídeos

Visite el canal YouTube de R4V

R4V YouTube

## Manténgase informado

Suscríbase al boletín R4V

Regístrese

VZ Vacatur_0252

Esta es una página web de operación interagencial, administrada y sostenida por la Plataforma Regional de Coordinación Interagencial para Refugiados y Migrantes de Venezuela, liderada en conjunto por ACNUR y OIM. Esta página busca ser un sitio de entrada común, que facilite la comunicación, mejore la coordinación de las operaciones en la región y la incidencia basada en hechos, para satisfacer las necesidades de los refugiados y migrantes de Venezuela. Los documentos, cifras y contenidos relacionados publicados en este portal por parte de los participantes de la Plataforma, están acompañados de las fuentes de donde provienen, y las opiniones expresadas en el mismo no reflejan necesariamente el punto de vista o aprobación de ACNUR y OIM.

About    Contact

© R4V 2024