# DOCUMENT 2.2

**9040**     **Federal Register** / Vol. 90, No. 23 / Wednesday, February 5, 2025 / Notices

| Heading/ subheading | Article description | Rates of duty | | |
| --- | --- | --- | --- | --- |
| | | 1 | | 2 |
| | | General | Special | |
| "9903.01.22 ................ | Articles the product of China and Hong Kong that are informational materials, including but not limited to, publications, films, posters, phonograph records, photographs, microfilms, microfiche, tapes, compact disks, CD ROMs, artworks, and news wire feeds. | The duty provided in the applicable subheading. | The duty provided in the applicable subheading. | No change". |

4. by inserting the following new heading 9903.01.23 in numerical sequence, with the material in the new heading inserted in the columns of the HTSUS labeled "Heading/ Subheading", "Article Description", "Rates of Duty 1—General", "Rates of Duty 1— Special" and "Rates of Duty 2", respectively:

| Heading/ subheading | Article description | Rates of duty | | |
| --- | --- | --- | --- | --- |
| | | 1 | | 2 |
| | | General | Special | |
| "9903.01.23 ................ | Except for products described in headings 9903.01.21 and 9903.01.22, and other than products for personal use included in accompanied baggage of persons arriving in the United States, articles the product of China and Hong Kong that: (1) were loaded onto a vessel at the port of loading, or in transit on the final mode of transport prior to entry into the United States, before 12:01 a.m. eastern standard time on February 1, 2025; and (2) are entered for consumption, or withdrawn from warehouse for consumption, on or after 12:01 a.m. eastern standard time on February 4, 2025, and before 12:01 a.m. eastern standard time on March 7, 2025. | The duty provided in the applicable subheading. | The duty provided in the applicable subheading. | No change". |

5. by inserting the following new U.S. note 2(s) to subchapter III of chapter 99 of the HTSUS in numerical sequence:

"2. (s) For the purposes of heading 9903.01.20, products of China and Hong Kong, other than products described in heading 9903.01.21, heading 9903.01.22, heading 9903.01.23, and other than products for personal use included in accompanied baggage of persons arriving in the United States, shall be subject to an additional 10% *ad valorem* rate of duty. Notwithstanding U.S. note 1 to this subchapter, all products of China and Hong Kong that are subject to the additional *ad valorem* rate of duty imposed by heading 9903.01.20 shall also be subject to the general rates of duty imposed on products of China and Hong Kong entered under subheadings in chapters 1 to 97 of the tariff schedule. Products of China and Hong Kong that are eligible for temporary duty exemptions or reductions under subchapter II to chapter 99 shall be subject to the additional *ad valorem* rate of duty imposed by heading 9903.01.20.

The additional duties imposed by heading 9903.01.20 shall not apply to goods for which entry is properly claimed under a provision of chapter 98 of the tariff schedule pursuant to applicable regulations of U.S. Customs and Border Protection ("CBP"), and whenever CBP agrees that entry under such a provision is appropriate, except for goods entered under heading 9802.00.80; and subheadings 9802.00.40, 9802.00.50, and 9802.00.60. For subheadings 9802.00.40, 9802.00.50, and 9802.00.60, the additional duties apply to the value of repairs, alterations, or processing performed (in China and Hong Kong), as described in the applicable subheading. For heading 9802.00.80, the additional duties apply to the value of the article assembled abroad (in China and Hong Kong), less the cost or value of such products of the United States, as described.

Products of China and Hong Kong that are provided for in heading 9903.01.20 shall continue to be subject to antidumping, countervailing, or other duties, taxes, fees, exactions and charges that apply to such products, as well as to the additional *ad valorem* rate of duty imposed by heading 9903.01.20.

Products of China and Hong Kong that are provided for in heading 9903.01.20 shall not be eligible for the administrative exemption from duty and certain taxes at 19 U.S.C. 1321(a)(2)(C)—the so-called "de minimis" exemption.

(t) Heading 9903.01.21 covers only products of China and Hong Kong, that are donations, by persons subject to the jurisdiction of the United States, of articles, such as food, clothing, and medicine, intended to be used to relieve human suffering, except to the extent that the President determines that such donations (A) would seriously impair his ability to deal with any national emergency declared under section 1701 of title 19 of the U.S. Code, (B) are in response to coercion against the proposed recipient or donor, or (C) would endanger Armed Forces of the United States which are engaged in hostilities or are in a situation where imminent involvement in hostilities is clearly indicated by the circumstances."

[FR Doc. 2025–02293 Filed 2–3–25; 1:15 pm]

BILLING CODE 9111–14–P

# DEPARTMENT OF HOMELAND SECURITY

## U.S. Citizenship and Immigration Services

[CIS No. 2804–25]

### Termination of the October 3, 2023 Designation of Venezuela for Temporary Protected Status

**AGENCY:** U.S. Citizenship and Immigration Services, U.S. Department of Homeland Security.

**ACTION:** Notice.

**SUMMARY:** On October 3, 2023, Venezuela was newly designated for Temporary Protected Status (TPS) based on the determination that there were extraordinary and temporary conditions in that country that prevented the safe return of Venezuelan nationals, and that permitting such Venezuelan nationals to remain temporarily in the United States is not contrary to the U.S. national interest. The 2023 designation of Venezuela for TPS is set to expire on April 2, 2025. After reviewing country

**Federal Register** / Vol. 90, No. 23 / Wednesday, February 5, 2025 / Notices     **9041**

conditions and considering whether permitting Venezuelan nationals covered by the 2023 designation is contrary to the national interest of the United States, in consultation with the appropriate U.S. Government agencies, the Secretary of Homeland Security has determined that Venezuela no longer continues to meet the conditions for the 2023 designation. In particular, the Secretary has determined it is contrary to the national interest to permit the covered Venezuelan nationals to remain temporarily in the United States. The Secretary therefore is terminating the 2023 TPS designation of Venezuela. This termination is effective April 7, 2025. After April 7, 2025, nationals of Venezuela (and aliens having no nationality who last habitually resided in Venezuela) who have been granted TPS under the 2023 Venezuela designation will no longer have TPS. This termination determination does not apply to the 2021 designation of Venezuela for TPS, which remains in effect until September 10, 2025, or to individuals who are registered for TPS under the 2021 designation.

**DATES:** The October 3, 2023 designation of Venezuela for TPS is terminated effective at 11:59 p.m., local time, on April 7, 2025.

**FOR FURTHER INFORMATION CONTACT:** Samantha Deshommes, Chief, Regulatory Coordination Division, Office of Policy and Strategy, U.S. Citizenship and Immigration Services, Department of Homeland Security, 800–375–5283.

**SUPPLEMENTARY INFORMATION:**

## What is Temporary Protected Status (TPS)?

The Immigration and Nationality Act (INA) authorizes the Secretary of Homeland Security, after consultation with appropriate agencies of the U.S. Government, to designate a foreign state (or part thereof) for TPS if the Secretary determines that certain country conditions exist. INA 244(b)(1), 8 U.S.C. 1254a(b)(1). The determination whether to designate any foreign state (or part thereof) for TPS is discretionary, and there is no judicial review of "any determination of the [Secretary] with respect to the designation, or termination or extension of a designation, of a foreign state" for TPS. INA 244(b)(5)(A), 8 U.S.C. 1254a(b)(5)(A). The Secretary, in the Secretary's discretion, may then grant TPS to eligible nationals of that foreign state (or individuals having no nationality who last habitually resided in the designated foreign state). *See* INA 244(a)(1)(A), 8 U.S.C. 1254a(a)(1)(A).

At least 60 days before the expiration of a foreign state's TPS designation or extension, the Secretary, after consultation with appropriate U.S. Government agencies, must review the conditions in the foreign state designated for TPS to determine whether they continue to meet the conditions for the TPS designation. *See* INA 244(b)(3)(A), 8 U.S.C. 1254a(b)(3)(A). If the Secretary determines that the conditions in the foreign state continue to meet the specific statutory criteria for TPS designation, TPS will be extended for an additional period of 6 months or, in the Secretary's discretion, 12 or 18 months. *See* INA 244(b)(3)(A), (C), 8 U.S.C. 1254a(b)(3)(A), (C). If the Secretary determines that the foreign state no longer meets the conditions for TPS designation, the Secretary must terminate the designation. *See* INA 244(b)(3)(B), 8 U.S.C. 1254a(b)(3)(B).

TPS is a temporary immigration benefit granted to eligible nationals of a country designated for TPS under the INA, or to eligible aliens without nationality who last habitually resided in the designated country. During the TPS designation period, TPS beneficiaries are eligible to remain in the United States, may not be removed, and are authorized to work and obtain an Employment Authorization Document (EAD) so long as they continue to meet the requirements of TPS. TPS beneficiaries may also apply for and be granted travel authorization as a matter of discretion. The granting of TPS does not result in or lead to lawful permanent resident status or any other immigration status. To qualify for TPS, beneficiaries must meet the eligibility standards at INA section 244(c)(2), 8 U.S.C. 1254a(c)(2). When the Secretary terminates a country's TPS designation, beneficiaries return to the same immigration status or category that they maintained before TPS, if any (unless that status or category has since expired or been terminated), or any other lawfully obtained immigration status or category they received while registered for TPS, as long as it is still valid on the date TPS terminates.

## Designation of Venezuela for TPS

On March 9, 2021, then Secretary of Homeland Security Alejandro Mayorkas designated Venezuela for TPS based on his determination that there existed "extraordinary and temporary conditions" in Venezuela that prevented nationals of Venezuela from returning in safety and that permitting such aliens to remain temporarily in the United States is not contrary to the U.S. national interest (Venezuela 2021 designation).

*See Designation of Venezuela for Temporary Protected Status and Implementation of Employment Authorization for Venezuelans Covered by Deferred Enforced Departure,* 86 FR 13574 (Mar. 9, 2021).

On September 8, 2022, then Secretary Mayorkas extended the Venezuela 2021 TPS designation for 18 months. *See Extension of the Designation of Venezuela for Temporary Protected Status,* 87 FR 55024 (Sept. 8, 2022). On October 3, 2023, Secretary Mayorkas extended the Venezuela 2021 TPS designation for another 18 months with an expiration date of September 10, 2025, and separately newly designated Venezuela for 18 months, a decision the former Secretary called a "redesignation" (Venezuela 2023 designation) with an expiration of April 2, 2025, resulting in two separate and concurrent Venezuela TPS designations. *See Extension and Redesignation of Venezuela for Temporary Protected Status,* 88 FR 68130 (Oct. 3, 2023).

On January 17, 2025, Secretary Mayorkas issued a notice extending the 2023 designation of Venezuela for TPS for 18 months. The notice was based on then Secretary Mayorkas's January 10, 2025 determination that the conditions for the designation continued to be met. *See* INA 244(b)(3)(A), (C), 8 U.S.C. 1254a(b)(3)(A), (C). In the January 2025 notice, Secretary Mayorkas did not expressly extend or terminate the 2021 Venezuela designation. Instead, the notice allowed for a consolidation of filing processes such that all eligible Venezuela TPS beneficiaries (whether under the 2021 or 2023 designations) could obtain TPS through the same extension date of October 2, 2026. *See Extension of the 2023 Designation of Venezuela for Temporary Protected Status,* 90 FR 5961 (Jan. 17, 2025).

On January 28, 2025, Secretary of Homeland Security Kristi Noem vacated former Secretary Mayorkas's January 10, 2025 decision, restoring the status quo that preceded that decision.[1] Accordingly, a determination whether to extend the 2023 Venezuela designation was due by February 1, 2025. The Department of Homeland Security (DHS or Department) estimates that approximately 348,202 aliens are eligible for TPS under the 2023 Venezuela designation.

## Secretary's Authority To Terminate the 2023 Designation of Venezuela for TPS

At least 60 days before the expiration of a country's TPS designation or extension, the Secretary, after

---

[1] *See Vacatur of 2025 Temporary Protected Status Decision for Venezuela,* 88 FR 8805 (Feb. 3, 2025).

**9042**    **Federal Register** / Vol. 90, No. 23 / Wednesday, February 5, 2025 / Notices

consultation with appropriate Government agencies, must review the conditions in a foreign state designated for TPS to determine whether the conditions for the TPS designation continue to be met. *See* INA section 244(b)(3)(A), 8 U.S.C. 1254a(b)(3)(A). If the Secretary determines that the foreign state no longer meets the conditions for TPS designation, the Secretary must terminate the designation, but such termination may not take effect earlier than 60 days after the date the **Federal Register** notice of termination is published, or if later, the expiration of the most recent previous extension of the country designation. *See* INA section 244(b)(3)(B), 8 U.S.C. 1254a(b)(3)(B). The Secretary may determine the appropriate effective date of the termination and the expiration of any TPS-related documentation, such as EADs. *See id.; see also* INA 244(d)(3), 8 U.S.C. 1254a(d)(3) (providing the Secretary the discretionary "option" to allow for a certain "orderly transition" period if she determines it to be appropriate).

## Reasons for the Secretary's Termination of the 2023 TPS Designation for Venezuela

Consistent with section 244(b)(3)(A) of the INA, 8 U.S.C. 1254a(b)(3)(A), after consulting with appropriate U.S. Government agencies, DHS reviewed conditions in Venezuela and considered whether permitting the Venezuelan nationals to remain temporarily in the United States is contrary to the national interest of the United States.[2]

The Department, in consultation with the Department of State, has reviewed conditions in Venezuela and has considered whether permitting Venezuelan nationals to remain temporarily in the United States is contrary to the U.S. national interest. Overall, certain conditions for the 2023 TPS designation of Venezuela may continue; however, there are notable improvements in several areas such as the economy, public health, and crime that allow for these nationals to be safely returned to their home country.

Based on the Department's review, the Secretary has determined that, even assuming the relevant conditions in Venezuela remain both "extraordinary" and "temporary," termination of the

2023 Venezuela TPS designation is required because it is contrary to the national interest to permit the Venezuelan nationals (or aliens having no nationality who last habitually resided in Venezuela) to remain temporarily in the United States.[3]

In the TPS statute, Congress expressly prohibits the Secretary from designating a country for TPS or extending a TPS designation if she finds that "permitting the aliens to remain temporarily in the United States is contrary to the national interest of the United States." INA 244(b)(1), 8 U.S.C. 1254a(b)(1). Accordingly, as the Department and the Attorney General have long recognized, such a "national interest" assessment is an essential element of a determination whether to extend or terminate the 2023 Venezuela designation, which was based on "extraordinary and temporary conditions."[4]

"National interest" is an expansive standard that may encompass an array of broad considerations, including foreign policy, public safety (*e.g.*, potential nexus to criminal gang membership), national security, migration factors (*e.g.*, pull factors), immigration policy (*e.g.*, enforcement prerogatives), and economic considerations (*e.g.*, adverse effects on U.S. workers, impact on U.S. communities).[5] Determining whether permitting a class of aliens to remain temporarily in the United States is contrary to the U.S. national interest therefore calls upon the Secretary's expertise and discretionary judgment,

---

[2] *See also* E.O. 14159, *Protecting the American People Against Invasion*, sec. 16(b), 90 FR 8443, 8446 (Jan. 20, 2025) (directing that the Secretary should "ensur[e] that designations of Temporary Protected Status are consistent with the provisions of section 244 of the INA (8 U.S.C. 1254a), and that such designations are appropriately limited in scope and made for only so long as may be necessary to fulfill the textual requirements of that statute").

[3] *See INS* v. *Bagamasbad*, 429 U.S. 24, 25 (1976) (per curiam) ("As a general rule courts and agencies are not required to make findings on issues the decision of which is unnecessary to the results they reach.").

[4] *Cf.*, *e.g.*, *Termination of Designation of Liberia Under Temporary Protected Status Program After Final 6-Month Extension*, 63 FR 15437, 15438 (Mar. 31, 1998) (terminating Liberia TPS designation after "consultations with the appropriate agencies of the U.S. Government concerning (a) the conditions in Liberia; and (b) whether permitting nationals of Liberia . . . to remain temporarily in the United States is contrary to the national interest of the United States").

[5] *See, e.g.*, *Poursina* v. *USCIS*, 936 F.3d 868, 874 (9th Cir. 2019) (observing, in an analogous INA context, "that the 'national interest' standard invokes broader economic and national-security considerations, and such determinations are firmly committed to the discretion of the Executive Branch—not to federal courts" (citing *Trump* v. *Hawaii*, 585 U.S. 667, 684–86 (2018)); *Flores* v. *Garland*, 72 F.4th 85, 89–90 (5th Cir. 2023) (same); *Brasil* v. *Sec'y, Dep't of Homeland Sec.*, 28 F.4th 1189, 1193 (11th Cir. 2022) (same); *cf. Matter of D–J–*, 23 I&N Dec. 572, 579–81 (A.G. 2003) (recognizing that taking measures to stem and eliminate possible incentives for potential large-scale migration from a given country is "sound immigration policy" and an "important national security interest"); *Matter of Dhanasar*, 26 I&N Dec. 884, 890–91 (AAO 2016) (taking into account impact on U.S. workers in "national interest" assessments).

---

informed by her consultations with appropriate U.S. Government agencies.

President Trump in his recent, immigration and border-related executive orders and proclamations clearly articulated an array of policy imperatives bearing upon the national interest. First, the President directed the Secretary to terminate, as contrary to the policy of the United States, the parole program known as the "Processes for Cubans, Haitians, Nicaraguans, and Venezuelans" (CHNV). The parole process for Venezuelans had been in effect since October 19, 2022, allowing hundreds of thousands of inadmissible Venezuelans to enter the United States at interior ports of entry and remain in this country, generally for a period of two years, with employment authorization eligibility.[6] DHS estimates that 33,600 CHNV parolees from Venezuela availed themselves of TPS. Venezuelan CHNV parolees, along with Venezuelan nationals who crossed illegally into the United States, who had been continuously residing in the United States since July 31, 2023, and continuously present in the United States since October 3, 2023, were able to secure TPS and TPS-based employment authorization under the 2023 Venezuela designation.

TPS has allowed a significant population of inadmissible or illegal aliens without a path to lawful immigration status to settle in the interior of the United States, and the sheer numbers have resulted in associated difficulties in local communities where local resources have been inadequate to meet the demands caused by increased numbers. Among these Venezuelan nationals who have crossed into the United States are members of the Venezuelan gang known as Tren de Aragua.[7] Tren de Agua has been blamed for sex trafficking, drug smuggling, police shootings, kidnappings, and the exploitation of migrants. The United States has sanctioned the gang and placed it on a list of transnational criminal organizations.[8] In Executive Order 14157, *Designating Cartels and Other*

---

[6] *See Implementation of a Parole Process for Venezuelans*, 87 FR 63507 (Oct. 19, 2022); *see also Implementation of Changes to the Parole Process for Venezuelans*, 88 FR 1279 (Jan. 9, 2023).

[7] Joshua Goodman, Tren de Aragua gang started in Venezuela's prisons and now spreads fear in the US, Associated Press, Sept. 24, 2024, available at: *https://apnews.com/article/tren-de-aragua-gang-venezuela-us-a12c8fee9dc4a0ca73769ea893e09e53* (last accessed Jan. 28, 2025).

[8] Joshua Goodman, US sanctions a Venezuela gang for spreading criminal activity across Latin America, Associated Press, July 11, 2024, available at: *https://apnews.com/article/washington-venezuela-gang-sanctions-f742f6966d160ee80b703ed419dfdac3* (last accessed Jan. 30, 2025).

**Federal Register** / Vol. 90, No. 23 / Wednesday, February 5, 2025 / Notices     **9043**

*Organizations as Foreign Terrorist Organizations and Specially Designated Global Terrorists,* the President determined that Tren de Aragua's campaign of violence and terror poses threats to the United States.[9] The Secretary accordingly has considered these important immigration and national interests in terminating the Venezuela parole process.

Second, President Trump observed, referring to CHNV and other policies and processes, that ''[o]ver the last 4 years, the prior administration invited, administered, and oversaw an unprecedented flood of illegal immigration into the United States,'' including millions who crossed U.S. borders or were allowed to fly to a U.S. air port of entry and allowed to settle in American communities.[10] The prolonged presence of these aliens in the United States ''has cost taxpayers billions of dollars at the Federal, State, and local levels.'' [11] For example, over 180,000 illegal aliens have settled in New York City, approximating that this will cost the city $10.6 billion through the summer of 2025.[12] Additionally, although mayors from cities across the United States are attempting to accommodate Venezuelan illegal aliens, city shelters, police stations, and aid services are at a maximum capacity.[13]

The President underscored that enforcing the immigration laws ''is critically important to the national security and public safety of the United States.'' [14] In furtherance of that objective, the President directed the Secretary, along with the Attorney General and Secretary of State, to promptly take all appropriate action, consistent with law, to rescind policies that led to increased or continued presence of illegal aliens in the United States.[15] Among the directed actions to ensure that the TPS designations are consistent with the TPS statute and ''are

appropriately limited in scope and made for only so long as may be necessary to fulfill the textual requirements of that statute.'' [16] The Department accordingly has reappraised the national interest factors and given strong consideration to the serious national security, border enforcement, public safety, immigration policy, and economic and public welfare concerns engendered by illegal immigration of Venezuelans, which the President, DHS, and other federal agencies are seeking to stem through other policy actions.

Third, President Trump declared a national emergency at the southern border.[17] As the Attorney General and DHS have long understood, the potential ''magnet effect'' of a TPS determination is a permissible factor under the TPS statute, especially with respect to a redesignation.[18] The same is true for Venezuela.[19] The anticipated designation or extension for TPS and resulting benefit to access EAD have been pull factors driving Venezuelan nationals to the United States.[20] In October 2023, DHS stated that there were approximately 243,000 Venezuela TPS beneficiaries, while also estimating that approximately *472,000 additional aliens* may be eligible under the October 3, 2023 designation.[21] Currently, DHS estimates that 348,202 aliens are registered under the 2023 designation.

Fourth, as the President directed in Executive Order 14150, ''the foreign policy of the United States shall champion core American interests and always put America and American citizens first.'' [22] Continuing to permit Venezuelans under the 2023 TPS designation to remain in the United States does not champion core American interests or put American interests first. U.S. foreign policy

interests, particularly in the Western Hemisphere, are best served and protected by curtailing policies that facilitate or encourage illegal and destabilizing migration.[23]

In making this finding and determination regarding the national interest, the Secretary also has taken into account the national-interest-related factors that were presented to former Secretary Mayorkas for his consideration for purposes of his now-vacated January 10, 2025 decision. However, especially in view of President Trump's Executive Orders relating to immigration and after consulting with the Department of State, the Secretary has reached a different conclusion and has determined that permitting such Venezuelan nationals (and aliens with no nationality who last habitually resided in Venezuela) to remain in the United States is in fact contrary to the national interest, as is the Secretary's authority and prerogative under the statute.[24]

**Effective Date of Termination of 2023 Designation**

The TPS statute provides that the termination of a country's TPS designation may not be effective earlier than 60 days after the **Federal Register** notice is published or, if later, the expiration of the most recent previous extension. *See* INA 244(b)(3)(B), 8 U.S.C. 1254a(b)(3)(B). As noted, the expiration date of the 2023 Venezuela designation is 60 days from the date of publication of this notice.

The Secretary may determine the appropriate effective date of the termination and the expiration of any TPS-related documentation, such as EADs, for the purpose of providing for an orderly transition. *See id.;* INA 244(d)(3), 8 U.S.C. 1254a(d)(3). Given the Secretary's finding that continuing to permit such Venezuelan nationals to remain temporarily in the United States is contrary to the U.S. national interest, and considering the relative recency of the designation (Oct. 3, 2023), the Secretary has determined that it is not

---

[9] 90 FR 8439 (Jan. 20, 2025).

[10] E.O. 14159, *Protecting the American People Against Invasion,* sec. 1, 90 FR 8443, 8443 (Jan. 20, 2025).

[11] *Id.*

[12] *The Cost of the Border Crisis,* Testimony before the House Budget Committee of Julie Kirchner the Executive Director, Federation for American Immigration Reform (May 8, 2024), available at: *https://www.congress.gov/118/meeting/house/117257/witnesses/HHRG-118-BU00-Wstate-KirchnerJ-20240508.pdf* (last accessed Jan. 30, 2025).

[13] Center for Strategic & International Studies, *The Persistence of the Venezuelan Migrant and Refugee Crisis* (Nov. 27, 2023), available at: *https://www.csis.org/analysis/persistence-venezuelan-migrant-and-refugee-crisis* (last accessed Jan. 30, 2025).

[14] E.O. 14159, *Protecting the American People Against Invasion,* sec. 1, 90 FR 8443, 8443 (Jan. 20, 2025).

[15] *Id.,* sec. 16, 90 FR 8446.

[16] *Id.,* sec. 16(b), 90 FR 8446.

[17] Proc. 10886, *Declaring a National Emergency at the Southern Border of the United States,* 90 FR 8327 (Jan. 20, 2025).

[18] *See Extension and Redesignation of Liberia Under Temporary Protected Status Program,* 62 FR 16608, 16609 (Apr. 7, 1997) (''One factor in determining whether redesignation is appropriate is whether it will create a 'magnet effect' for nationals of the country under consideration. In cases where the Attorney General contemplates redesignation, she may consider this possible magnet effect and any other factors weighing against redesignation, together with any discretionary factors in favor of redesignation.'').

[19] *See, e.g.,* Center for Strategic & International Studies, *The Persistence of the Venezuelan Migrant and Refugee Crisis* (Nov. 27, 2023), available at: *https://www.csis.org/analysis/persistence-venezuelan-migrant-and-refugee-crisis* (last accessed Jan. 30, 2025).

[20] *See id.*

[21] 88 FR 68134.

[22] *America First Policy Directive to the Secretary of State,* 90 FR 8337 (Jan. 20, 2025).

[23] *See* U.S. Dep't of State, *Priorities and Mission of the Second Trump Administration's Department of State* (Jan. 24, 2025), available at *https://pa.usembassy.gov/priorities-and-mission-of-the-second-trump-administrations-department-of-state/.*

[24] *See Motor Vehicle Mfrs. Ass'n of U.S., Inc.* v. *State Farm Mut. Auto. Ins. Co.,* 463 U.S. 29, 59 (Rehnquist, J., concurring in part) (''A change in administration brought about by the people casting their votes is a perfectly reasonable basis for an executive agency's reappraisal of the costs and benefits of its programs and regulations. As long as the agency remains within the bounds established by Congress, it is entitled to assess administrative records and evaluate priorities in light of the philosophy of the administration.'').

**9044**    **Federal Register** / Vol. 90, No. 23 / Wednesday, February 5, 2025 / Notices

appropriate to allow for a further transition period. Accordingly, the termination of the October 3, 2023 Venezuela TPS designation will be effective 60 days from the date of publication of this notice.[25]

The Secretary has considered putative reliance interests in the 2023 Venezuela TPS designation, especially when considering whether to allow for an additional transition period akin to that allowed under certain previous TPS terminations. Temporary Protected Status, as the name itself makes clear, is an inherently temporary status, TPS designations are time-limited and must be periodically reviewed, TPS notices clearly notify aliens of the designations' expiration dates, and whether to allow for an orderly transition period is left to the Secretary's unfettered discretion. *See* INA 244(b)(3), (d)(3); 8 U.S.C. 1254a(b)(3), (d)(3). Any putative reliance interests of registrants under the Venezuela 2023 designation therefore merit only diminished weight. Moreover, any such putative reliance interests are outweighed by the overriding, important national interest considerations described in this notice.[26]

---

[25] *See* 8 CFR 244.19 ("Upon the termination of designation of a foreign state, those nationals afforded temporary Protected Status shall, upon the sixtieth (60th) day after the date notice of termination is published in the **Federal Register**, or on the last day of the most recent extension of designation by the [Secretary of Homeland Security], automatically and without further notice or right of appeal, lose Temporary Protected Status in the United States. Such termination of a foreign state's designation is not subject to appeal.").

[26] DHS recognizes that certain previous TPS terminations allowed for an extended transition, especially in the case of TPS designations that had been extended numerous times over the course of many years. *See, e.g., Termination of the Designation of El Salvador for Temporary Protected Status,* 83 FR 2654 (Jan. 18, 2018) (nearly 17 years, with 18-month transition period); *Termination of the Designation of Sudan for Temporary Protected Status,* 82 FR 47228 (Oct. 11, 2017) (20 years, with 12-month orderly transition period); *Termination of the Designation of Sierra Leone Under the Temporary Protected Status Program; Extension of Employment Authorization Documentation,* 68 FR 52407 (Sept. 3, 2003) (nearly 6 years, with 6-month orderly transition period); *Six-Month Extension of Temporary Protected Status Benefits for Orderly Transition Before Termination of Liberia's Designation for Temporary Protected Status,* 81 FR 66059 (Sept. 26, 2016) (nearly 2 years, with 6-month orderly transition period). Those countries, however, generally had been designated for TPS for longer periods, and none of those terminations were based on a determination that allowing the aliens to remain temporarily in the United States is contrary to the U.S. national interest. At the same time, certain other TPS designations were terminated without allowing for an extended transition period. *See, e.g., Termination of Designation of Angola Under the Temporary Protected Status Program,* 68 FR 3896 (Jan. 27, 2003) (nearly 3 years, no orderly transition period); *Termination of Designation of Lebanon Under Temporary Protected Status Program,* 58 FR 7582 (Feb. 8, 1993) (2 years, no extended transition period).

## Venezuelan Nationals Registered Under the 2021 Venezuela Designation

Although unorthodox, the prior Administration issued two separate designations of Venezuela. *See* 88 FR 68130 (Oct. 3, 2023); 86 FR 13574 (Mar. 9, 2021). In this notice, DHS is terminating only the October 3, 2023 Venezuela TPS designation. The 2021 Venezuela TPS designation remains in effect until September 10, 2025.

## Notice of Termination of the 2023 TPS Designation of Venezuela

By the authority vested in the Secretary of Homeland Security under section 244(b)(3) of the INA, 8 U.S.C. 1254a(b)(3), I have reviewed, in consultation with appropriate agencies of the U.S. Government, (a) conditions in Venezuela; and (b) whether permitting the nationals of Venezuela (and aliens having no nationality who last habitually resided in Venezuela) to remain temporarily in the United States is contrary to the national interest of the United States. Based on my review, I have determined that Venezuela no longer continues to meet the conditions for the October 3, 2023 designation for Temporary Protected Status (TPS) under section 244(b)(1)(C) of the Act, 8 U.S.C. 1254a(b)(1)(C).

Accordingly, I order as follows:

(1) Pursuant to INA section 244(b)(3)(B), 8 U.S.C. 1254a(b)(3)(B), and considering INA section 244(d)(3), 8 U.S.C. 1254a(d)(3), the October 3, 2023 designation of Venezuela for TPS is terminated effective at 11:59 p.m., local time, on April 7, 2025.

(2) This notice supersedes the January 17, 2025 notice at 90 FR 5961, the underlying decision for which was vacated on January 28, 2025.

(3) Information concerning the termination of TPS for nationals of Venezuela (and aliens having no nationality who last habitually resided in Venezuela) under the October 3, 2023 designation will be available at local USCIS offices upon publication of this notice and through the USCIS National Customer Service Center at 1–800–375–5283. This information will be published on the USCIS website at *www.USCIS.gov.*

**Kristi Noem,**
*Secretary of Homeland Security.*
[FR Doc. 2025–02294 Filed 2–3–25; 12:15 pm]
**BILLING CODE 9111–97–P**

## INTERNATIONAL TRADE COMMISSION

[Investigation Nos. 701–TA–453 and 731–TA–1136–1137 (Third Review)]

## Sodium Nitrite From China and Germany

### Determinations

On the basis of the record [1] developed in the subject five-year reviews, the United States International Trade Commission ("Commission") determines, pursuant to the Tariff Act of 1930 ("the Act"), that revocation of the antidumping and countervailing duty orders on sodium nitrite from China and the antidumping duty order on sodium nitrite from Germany would be likely to lead to continuation or recurrence of material injury to an industry in the United States within a reasonably foreseeable time.[2]

### Background

The Commission instituted these reviews on July 1, 2024 (89 FR 54536) and determined on October 4, 2024 that it would conduct expedited reviews (89 FR 85986, October 29, 2024).

The Commission made these determinations pursuant to section 751(c) of the Act (19 U.S.C. 1675(c)). It completed and filed its determinations in these reviews on January 31, 2025. The views of the Commission are contained in USITC Publication 5582 (January 2025), entitled *Sodium Nitrite from China and Germany: Investigation Nos. 701–TA–453 and 731–TA–1136–1137 (Third Review).*

By order of the Commission.

Issued: January 31, 2025.

**Lisa Barton,**
*Secretary to the Commission.*
[FR Doc. 2025–02260 Filed 2–4–25; 8:45 am]
**BILLING CODE 7020–02–P**

## DEPARTMENT OF JUSTICE

## Notice of Cancellation of Task Force on Research on Violence Against American Indian and Alaska Native Women Meeting

**AGENCY:** Office on Violence Against Women, United States Department of Justice.

**ACTION:** Notice; cancellation of meeting.

The Office on Violence Against Women (OVW), U.S. Department of

---

[1] The record is defined in § 207.2(f) of the Commission's Rules of Practice and Procedure (19 CFR 207.2(f)).

[2] Commissioner Rhonda K. Schmidtlein not participating.

Decision Document

## USCIS Notice: Determination re Venezuela's 2023 Temporary Protected Status Designation

(1) Terminate Venezuela's 2023 Temporary Protected Status Designation and (2) Direct an appropriate ESEC office to use the DAC-Federal Register Signature Card to electronically sign the document for publication in the Federal Register

FEB 0 1 2025

Date.

**Decision Document**

USCIS Notice: Extension of the 2023 Designation of Venezuela for Temporary Protected Status.

Approve. (1) Extend the 2023 Designation of Venezuela for TPS for 18 months, (2) approve the notice for formal submission to the Office of Information and Regulatory Affairs, (3) direct an appropriate ESEC official to use the Federal Register Signature Card to electronically sign the notice for publication in the *Federal Register*, and (4) approve the consolidation of filing processes such that all eligible Venezuela TPS beneficiaries may obtain TPS through the same extension date of October 2, 2026.

1-10-25

Date.

9111-97

# DEPARTMENT OF HOMELAND SECURITY

## U.S. Citizenship and Immigration Services

[CIS No. 2803-25]

**Vacatur of 2025 Temporary Protected Status Decision for Venezuela**

**AGENCY:** U.S. Citizenship and Immigration Services (USCIS), Department of Homeland Security (DHS).

**ACTION:** Notice of Temporary Protected Status (TPS) vacatur.

**SUMMARY:** Through this notice, the Department of Homeland Security (DHS) announces that the Secretary of Homeland Security (Secretary) has decided to vacate the January 10, 2025 decision of former Secretary of Homeland Security Alejandro Mayorkas regarding TPS for Venezuela. Former Secretary Mayorkas (1) extended the 2023 designation of Venezuela for TPS for 18 months, (2) allowed a consolidation of filing processes such that all eligible Venezuela TPS beneficiaries (whether under the 2021 or 2023 designations) may obtain TPS through the same extension date of October 2, 2026, and (3) extended certain Employment Authorization Documents (EADs). All of this also had the effect of extending the 2021 designation. This notice vacates Mayorkas' notice immediately.

**DATES:** The vacatur is effective immediately.

**FOR FURTHER INFORMATION CONTACT:** Samantha Deshommes, Chief, Regulatory Coordination Division, Office of Policy and Strategy, U.S. Citizenship and Immigration Services, Department of Homeland Security, 800-375-5283.

**SUPPLEMENTARY INFORMATION:**

VZ Termination_0008

I.    **Temporary Protected Status (TPS) Generally**

The Immigration and Nationality Act (INA) authorizes the Secretary, after consultation

with appropriate U.S. Government agencies, to designate a foreign state (or part thereof) for TPS

if the Secretary determines that certain country conditions exist. INA 244(b)(1), 8 U.S.C.

1254a(b)(1)[1]. The determination whether to designate any foreign state (or part thereof) for TPS

is discretionary, and there is no judicial review of "any determination of the [Secretary] with

respect to the designation, or termination or extension of a designation, of a foreign state" for

TPS. INA 244(b)(5)(A), 8 U.S.C. 1254a(b)(5)(A). The Secretary, in the Secretary's discretion,

may then grant TPS to eligible nationals of that foreign state (or individual aliens having no

nationality who last habitually resided in the designated foreign state). *See* INA 244(a)(1)(A), 8

U.S.C. 1254a(a)(1)(A).

At least 60 days before the expiration of a foreign state's TPS designation or extension,

the Secretary, after consultation with appropriate U.S. Government agencies, must review the

conditions in the foreign state designated for TPS to determine whether they continue to meet the

conditions for the TPS designation. *See* INA 244(b)(3)(A), 8 U.S.C. 1254a(b)(3)(A). If the

Secretary determines that the conditions in the foreign state continue to meet the conditions for

TPS designation, the designation will be extended for an additional period of 6 months or, in the

---

[1] Although section 244(b)(1) of the INA continues to refer to the Attorney General, this authority now resides with the Secretary of Homeland Security by operation of the Homeland Security Act of 2002, Pub. L. 107-296, 116 Stat. 2135, as amended. *See, e.g.*, 6 U.S.C. 557; 8 U.S.C. 1103(a)(1). The Secretary may designate a country (or part of a country) for TPS on the basis of (1) an ongoing armed conflict such that returning would pose a serious threat to the personal safety of the country's nationals, (2) an environmental disaster (including an epidemic), or (3) extraordinary and temporary conditions in the country that prevent the safe return of the country's nationals. For environmental disaster-based designations, certain other statutory requirements must be met, including that the foreign government must officially request a TPS designation. A designation based on extraordinary and temporary conditions cannot be made if the Secretary finds that allowing the country's nationals to remain temporarily in the United States is contrary to the U.S. national interest. INA sec. 244(b)(1), 8 U.S.C. 1254a(b)(1).

2

Secretary's discretion, 12 or 18 months. *See* INA 244(b)(3)(A), (C), 8 U.S.C. 1254a(b)(3)(A), (C). If the Secretary determines that the foreign state no longer meets the conditions for TPS designation, the Secretary must terminate the designation. *See* INA 244(b)(3)(B), 8 U.S.C. 1254a(b)(3)(B).

## II.    Background

On March 9, 2021, Secretary Mayorkas designated Venezuela for TPS on the basis of extraordinary and temporary conditions in Venezuela that prevented nationals of Venezuela from returning in safety (2021 designation). *See Designation of Venezuela for Temporary Protected Status and Implementation of Employment Authorization for Venezuelans Covered by Deferred Enforced Departure*, 86 FR 13574 (Mar. 9, 2021).

On September 8, 2022, DHS extended the Venezuela 2021 TPS designation for 18 months. *See Extension of the Designation of Venezuela for Temporary Protected Status*, 87 FR 55024 (Sept. 8, 2022). On October 3, 2023, DHS extended the Venezuela 2021 TPS designation for another 18 months with an expiration date of September 10, 2025, and separately newly designated Venezuela, which then Secretary Mayorkas called a "redesignation," for 18 months (the Venezuela 2023 designation) with an expiration of April 2, 2025, resulting in two separate and concurrent Venezuela TPS designations. *See Extension and Redesignation of Venezuela for Temporary Protected Status*, 88 FR 68130 (Oct. 3, 2023).

The Venezuela 2023 TPS designation expires on April 2, 2025, and the Secretary must make a decision by February 1, 2025. The Venezuela 2021 TPS designation expires on September 10, 2025, and the Secretary must make a decision by July 12, 2025. Notwithstanding the fact that these are both decisions that would lie with new Secretary of Homeland Security Kristi Noem, Secretary Mayorkas took action with respect to both designations.

3

On January 17, 2025, Secretary Mayorkas issued a notice extending the 2023 designation of Venezuela for TPS for 18 months (Mayorkas Notice). The notice was based on Secretary Mayorkas' January 10, 2025 determination that the conditions for the designation continued to be met. *See* INA 244(b)(3)(A), 8 U.S.C. 1254a(b)(3)(A). In the Mayorkas Notice, Secretary Mayorkas did not expressly extend or terminate the 2021 designation. Instead, the notice allowed for a consolidation of filing processes such that all eligible Venezuela TPS beneficiaries (whether under the 2021 or 2023 designations) could obtain TPS through the same extension date of October 2, 2026. *See Extension of the 2023 Designation of Venezuela for Temporary Protected Status*, 90 FR 5961 (Jan. 17, 2025). The notice also extended certain EADs. The effect of Secretary Mayorkas' actions, however, resulted in an extension of the 2021 Venezuela TPS designation.

## III. Vacatur of the 2025 Decision

The Secretary of Homeland Security is vacating the January 10, 2025 decision of Secretary Mayorkas which (1) extended the 2023 Venezuela TPS designation and (2) allowed the consolidation of filing processes for both designations, which had the effect of extending the 2021 Venezuela TPS designation, and (3) extended certain EADs. An agency has inherent (that is, statutorily implicit) authority to revisit its prior decisions unless Congress has expressly limited that authority. The TPS statute does not limit the Secretary's inherent authority under the INA to reconsider any TPS-related determination, and upon reconsideration, to vacate or amend the determination.[2]

---

[2] *See* INA 103(a), 244(b)(3), (b)(5)(A); 8 U.S.C. 1103(a), 1254a(b)(3), (b)(5)(A); *Reconsideration and Rescission of Termination of the Designation of El Salvador for Temporary Protected Status; Extension of the Temporary*

4

## A.    Reason for the Vacatur

The Mayorkas Notice adopted a novel approach of implicitly negating the 2021 Venezuela TPS designation by effectively subsuming it within the 2023 Venezuela TPS designation. As described above, Secretary Mayorkas explicitly made a determination to extend the 2023 designation. While he did not make an explicit determination to extend the 2021 designation, he did allow consolidated filing processes for both the 2021 and 2023 designations, which in effect extended the 2021 designation by up to 13 months. Furthermore, he allowed extensions for certain EADs.

The Mayorkas Notice states that *Existing TPS beneficiaries, including those registered under the October 3, 2023 TPS designation or the prior March 9, 2021 TPS designation, who wish to extend their status through October 2, 2026, must re-register during the re-registration period described in* the January 2025 decision. This, and other language in the Mayorkas Notice, indicate that the practical effect of Secretary Mayorkas' decision was to combine both designations and to provide an extension until October 2, 2026, for the population of *both* designations.

---

*Protected Status Designation for El Salvador*, 88 FR 40282, 40285 (June 21, 2023) ("An agency has inherent (that is, statutorily implicit) authority to revisit its prior decisions unless Congress has expressly limited that authority. The TPS statute does not limit the Secretary's inherent authority to reconsider any TPS-related determination, and upon reconsideration, to change the determination."); *see also, e.g., Ivy Sports Medicine, LLC v. Burwell*, 767 F.3d 81, 86 (D.C. Cir. 2014) (Kavanaugh, J.) ("[A]dministrative agencies are assumed to possess at least some inherent authority to revisit their prior decisions, at least if done in a timely fashion. . . . "[I]nherent authority for timely administrative reconsideration is premised on the notion that the power to reconsider is inherent in the power to decide." (quotation marks and citations omitted)); *Macktal v. Chao*, 286 F.3d 822, 825-26 (5th Cir. 2002) ("It is generally accepted that in the absence of a specific statutory limitation, an administrative agency has the inherent authority to reconsider its decisions.") (collecting cases); *Mazaleski v. Treusdell*, 562 F.2d 701, 720 (D.C. Cir. 1977) ("We have many times held that an agency has the inherent power to reconsider and change a decision if it does so within a reasonable period of time."); *cf. Last Best Beef, LLC v. Dudas*, 506 F.3d 333, 340 (4th Cir. 2007) (agencies possess especially "broad authority to correct their prior errors").

5

The Mayorkas Notice did not acknowledge the novelty of its approach or explain how it is consistent with the TPS statute. *See* INA 244(b)(2)(B), 8 U.S.C. 1254a(b)(2)(B) (providing that a TPS country designation "shall remain in effect until the effective date of the termination of the designation under [INA 244(b)(3)(B), 8 U.S.C. 1254a(b)(3)(B)]"). This novel approach has included multiple notices, overlapping populations, overlapping dates, and sometimes multiple actions happening in a single document. While the Mayorkas Notice may have made attempts to address these overlapping populations, the explanations in the Mayorkas Notice, particularly the explanation for operational impacts, are thin and inadequately developed. Given these deficiencies and lack of clarity, vacatur is warranted to untangle the confusion, and provide an opportunity for informed determinations regarding the TPS designations and clear guidance.[3]

Given the exceedingly brief period in which the January 17, 2025 extension notice has been in effect and the fact that the effect of this vacatur will restore the status quo preceding that notice, any putative reliance interests on the extension notice are negligible. Venezuela 2023 registrants will retain their temporary protected status under the pre-existing designation at least until April 2, 2025. With respect to any Venezuela 2021 registrants who elected, pursuant to the Mayorkas Notice, to register under the Venezuela 2023 designation, USCIS will restore their Venezuela 2021 registration. And, in any event, any putative reliance interests arguably engendered by the Mayorkas Notice are outweighed by the overriding interests and concerns articulated in this notice.

### B.    Effect of the Vacatur

---

[3] *See* Exec. Order, *Protecting the American People Against Invasion*, sec. 16(b) (Jan. 20, 2025), *available at* https://www.whitehouse.gov/presidential-actions/2025/01/protecting-the-american-people-against-invasion/.

6

As a result of the vacatur, the 2021 Venezuela TPS designation and the 2023 Venezuela designation remain in effect and their associated statutory deadlines remain in effect. The statutory deadline[4] for each of those designations is as follows: The Secretary (1) must determine, by February 1, 2025, whether to extend or terminate the 2023 Venezuela TPS designation and (2) must determine, by July 12, 2025, whether to extend or terminate the 2021 Venezuela TPS designation.

If the Secretary does not make a timely determination (for example, if the Secretary were *not* to make determination by February 1, 2025 whether to extend or terminate the 2023 Venezuela TPS designation), then the statute provides for an automatic extension of the designation for an additional period of 6 months. INA 244(b)(3)(C), 8 U.S.C. 1254a(b)(3)(C).

Pursuant to this vacatur, USCIS will no longer accept Venezuela TPS re-registration applications (Form I-821) and associated Applications for Employment Authorization (Form I-765) filed under the Mayorkas Notice. For TPS beneficiaries who have already filed applications to re-register for TPS pursuant to the Mayorkas Notice and paid any fees associated with their applications, USCIS will cease processing their applications, and issue refunds of any fees paid by those aliens.[5] Additionally, USCIS will invalidate EADs; Forms I-797, Notice of Action (Approval Notice); and Forms I-94, Arrival/Departure Record (collectively known as TPS-related documentation) that have been issued with October 2, 2026 expiration dates under the Mayorkas Notice. USCIS will provide refunds to any fees paid by these aliens as well.

---

[4] If there is an existing TPS designation for a foreign state, the Secretary must review country conditions in consultation with appropriate U.S. Government agencies and make a determination—at least 60 days before the designation is set to expire—whether to extend or terminate that country's TPS designation (i.e., whether the conditions for the designation continue to be met). INA 244(b)(3), 8 U.S.C. 1254a(b)(3).

[5] As noted above, any Venezuela 2021 registrants who elected, pursuant to the Mayorkas Notice, to register under the Venezuela 2023 designation will have their Venezuela 2021 registration restored.

7

Additionally, pursuant to this vacatur the automatic EAD extensions provided in the Mayorkas Notice are hereby rescinded. USCIS will provide additional guidance regarding the two Venezuela TPS designations on a future date in accordance with applicable laws.

**IV.   Notice of Vacatur of Secretary Mayorkas' 2025 Decision**

By the authority vested in me as Secretary under section 244 of the Immigration and Nationality Act, 8 U.S.C. 1254a, I am vacating the decisions announced in the January 17, 2025 notice titled *Extension of the 2023 Designation of Venezuela for TPS*. In doing so, I am vacating the (1) extension of the Venezuela 2023 TPS designation, (2) the consolidation of filing processes for both designations, which, in effect, resulted in the extension of the 2021 TPS designation, and (3) the EADs that were extended. As a result, the Venezuela 2023 TPS designation and the Venezuela 2021 TPS designation remain in effect and their associated statutory deadlines remain in effect.

**Kristi Noem**
Secretary
U.S. Department of Homeland Security

8

[9111-97]

## DEPARTMENT OF HOMELAND SECURITY

## U.S. Citizenship and Immigration Services

## [CIS No. 2804-25]

## Termination of the October 3, 2023 Designation of Venezuela for

## Temporary Protected Status

**AGENCY:** U.S. Citizenship and Immigration Services, U.S. Department of Homeland Security.

**ACTION:** Notice.

**SUMMARY:** On October 3, 2023, Venezuela was newly designated for Temporary Protected Status (TPS) based on the determination that there were extraordinary and temporary conditions in that country that prevented the safe return of Venezuelan nationals, and that permitting such Venezuelan nationals to remain temporarily in the United States is not contrary to the U.S. national interest. The 2023 designation of Venezuela for TPS is set to expire on April 2, 2025. After reviewing country conditions and considering whether permitting Venezuelan nationals covered by the 2023 designation is contrary to the national interest of the United States, in consultation with the appropriate U.S. Government agencies, the Secretary of Homeland Security has determined that Venezuela no longer continues to meet the conditions for the 2023 designation. In particular, the Secretary has determined it is contrary to the national interest to permit the covered Venezuelan nationals to remain temporarily in the United States. The Secretary therefore is terminating the 2023 TPS designation of Venezuela.

1

This termination is effective **[INSERT DATE 60 DAYS FROM THE DATE OF PUBLICATION IN THE FEDERAL REGISTER]**.

After **[INSERT DATE 60 DAYS FROM THE DATE OF PUBLICATION IN THE FEDERAL REGISTER]**, nationals of Venezuela (and aliens having no nationality who last habitually resided in Venezuela) who have been granted TPS under the 2023 Venezuela designation will no longer have TPS. This termination determination does not apply to the 2021 designation of Venezuela for TPS, which remains in effect until September 10, 2025, or to individuals who are registered for TPS under the 2021 designation.

**EFFECTIVE DATE:** The October 3, 2023 designation of Venezuela for TPS is terminated effective at 11:59 p.m., local time, on **[INSERT DATE 60 DAYS FROM THE DATE OF PUBLICATION IN THE FEDERAL REGISTER]**.

**FOR FURTHER INFORMATION CONTACT:** Samantha Deshommes, Chief, Regulatory Coordination Division, Office of Policy and Strategy, U.S. Citizenship and Immigration Services, Department of Homeland Security, 800-375-5283.

**SUPPLEMENTARY INFORMATION:**

**What Is Temporary Protected Status (TPS)?**

The Immigration and Nationality Act (INA) authorizes the Secretary of Homeland Security, after consultation with appropriate agencies of the U.S. Government, to designate a foreign state (or part thereof) for TPS if the Secretary determines that certain country conditions exist. INA 244(b)(1), 8 U.S.C. 1254a(b)(1). The determination whether to designate any foreign state (or part thereof) for TPS is discretionary, and there is no judicial review of "any determination of the [Secretary]

with respect to the designation, or termination or extension of a designation, of a foreign state" for TPS. INA 244(b)(5)(A), 8 U.S.C. 1254a(b)(5)(A). The Secretary, in the Secretary's discretion, may then grant TPS to eligible nationals of that foreign state (or individuals having no nationality who last habitually resided in the designated foreign state). *See* INA 244(a)(1)(A), 8 U.S.C. 1254a(a)(1)(A).

At least 60 days before the expiration of a foreign state's TPS designation or extension, the Secretary, after consultation with appropriate U.S. Government agencies, must review the conditions in the foreign state designated for TPS to determine whether they continue to meet the conditions for the TPS designation. *See* INA 244(b)(3)(A), 8 U.S.C. 1254a(b)(3)(A). If the Secretary determines that the conditions in the foreign state continue to meet the specific statutory criteria for TPS designation, TPS will be extended for an additional period of 6 months or, in the Secretary's discretion, 12 or 18 months. *See* INA 244(b)(3)(A), (C), 8 U.S.C. 1254a(b)(3)(A), (C). If the Secretary determines that the foreign state no longer meets the conditions for TPS designation, the Secretary must terminate the designation. *See* INA 244(b)(3)(B), 8 U.S.C. 1254a(b)(3)(B).

TPS is a temporary immigration benefit granted to eligible nationals of a country designated for TPS under the INA, or to eligible aliens without nationality who last habitually resided in the designated country. During the TPS designation period, TPS beneficiaries are eligible to remain in the United States, may not be removed, and are authorized to work and obtain an Employment Authorization Document (EAD) so long as they continue to meet the requirements of TPS. TPS beneficiaries may also apply for and be granted travel authorization as a matter of discretion. The granting of TPS does

VZ Termination_0018

not result in or lead to lawful permanent resident status or any other immigration status.
To qualify for TPS, beneficiaries must meet the eligibility standards at INA section
244(c)(2), 8 U.S.C. 1254a(c)(2).  When the Secretary terminates a country's TPS
designation, beneficiaries return to the same immigration status or category that they
maintained before TPS, if any (unless that status or category has since expired or been
terminated), or any other lawfully obtained immigration status or category they received
while registered for TPS, as long as it is still valid on the date TPS terminates.

**Designation of Venezuela for TPS**

On March 9, 2021, then Secretary of Homeland Security Alejandro Mayorkas
designated Venezuela for TPS based on his determination that there existed
"extraordinary and temporary conditions" in Venezuela that prevented nationals of
Venezuela from returning in safety and that permitting such aliens to remain temporarily
in the United States is not contrary to the U.S. national interest (Venezuela 2021
designation). *See Designation of Venezuela for Temporary Protected Status and
Implementation of Employment Authorization for Venezuelans Covered by Deferred
Enforced Departure*, 86 FR 13574 (Mar. 9, 2021).

On September 8, 2022, then Secretary Mayorkas extended the Venezuela 2021
TPS designation for 18 months.  *See Extension of the Designation of Venezuela for
Temporary Protected Status*, 87 FR 55024 (Sept. 8, 2022).  On October 3, 2023,
Secretary Mayorkas extended the Venezuela 2021 TPS designation for another 18
months with an expiration date of September 10, 2025, and separately newly designated
Venezuela for 18 months, a decision the former Secretary called a "redesignation"
(Venezuela 2023 designation) with an expiration of April 2, 2025, resulting in two

4

separate and concurrent Venezuela TPS designations.  *See Extension and Redesignation of Venezuela for Temporary Protected Status*, 88 FR 68130 (Oct. 3, 2023).

On January 17, 2025, Secretary Mayorkas issued a notice extending the 2023 designation of Venezuela for TPS for 18 months.  The notice was based on then Secretary Mayorkas's January 10, 2025 determination that the conditions for the designation continued to be met.  *See* INA 244(b)(3)(A), (C), 8 U.S.C. 1254a(b)(3)(A), (C).  In the January 2025 notice, Secretary Mayorkas did not expressly extend or terminate the 2021 Venezuela designation.  Instead, the notice allowed for a consolidation of filing processes such that all eligible Venezuela TPS beneficiaries (whether under the 2021 or 2023 designations) could obtain TPS through the same extension date of October 2, 2026.  *See Extension of the 2023 Designation of Venezuela for Temporary Protected Status*, 90 FR 5961 (Jan. 17, 2025).

On January 28, 2025, Secretary of Homeland Security Kristi Noem vacated former Secretary Mayorkas's January 10, 2025 decision, restoring the status quo that preceded that decision.[1]  Accordingly, a determination whether to extend the 2023 Venezuela designation was due by February 1, 2025.  The Department of Homeland Security (DHS or Department) estimates that approximately 348,202 aliens are eligible for TPS under the 2023 Venezuela designation.

**Secretary's Authority to Terminate the 2023 Designation of Venezuela for TPS**

At least 60 days before the expiration of a country's TPS designation or extension, the Secretary, after consultation with appropriate Government agencies, must

---

[1] *See Vacatur of 2025 Temporary Protected Status Decision for Venezuela*, available at https://www.federalregister.gov/public-inspection/2025-02183/vacatur-of-2025-temporary-protected-status-decision-for-venezuela.

review the conditions in a foreign state designated for TPS to determine whether the conditions for the TPS designation continue to be met. *See* INA section 244(b)(3)(A), 8 U.S.C. 1254a(b)(3)(A). If the Secretary determines that the foreign state no longer meets the conditions for TPS designation, the Secretary must terminate the designation, but such termination may not take effect earlier than 60 days after the date the *Federal Register* notice of termination is published, or if later, the expiration of the most recent previous extension of the country designation. *See* INA section 244(b)(3)(B), 8 U.S.C. 1254a(b)(3)(B). The Secretary may determine the appropriate effective date of the termination and the expiration of any TPS-related documentation, such as EADs. *See id.*; *see also* INA 244(d)(3), 8 U.S.C. 1254a(d)(3) (providing the Secretary the discretionary "option" to allow for a certain "orderly transition" period if she determines it to be appropriate).

**Reasons for the Secretary's Termination of the 2023 TPS Designation for Venezuela**

Consistent with section 244(b)(3)(A) of the INA, 8 U.S.C. 1254a(b)(3)(A), after consulting with appropriate U.S. Government agencies, DHS reviewed conditions in Venezuela and considered whether permitting the Venezuelan nationals to remain temporarily in the United States is contrary to the national interest of the United States.[2]

The Department, in consultation with the Department of State, has reviewed conditions in Venezuela and has considered whether permitting Venezuelan nationals to remain temporarily in the United States is contrary to the U.S. national interest. Overall,

---

[2] *See also* Exec. Order 14159, *Protecting the American People Against Invasion*, sec. 16(b), 90 FR 8443, 8446 (Jan. 20, 2025) (directing that the Secretary should "ensur[e] that designations of Temporary Protected Status are consistent with the provisions of section 244 of the INA (8 U.S.C. 1254a), and that such designations are appropriately limited in scope and made for only so long as may be necessary to fulfill the textual requirements of that statute").

certain conditions for the 2023 TPS designation of Venezuela may continue; however, there are notable improvements in several areas such as the economy, public health, and crime that allow for these nationals to be safely returned to their home country.

Based on the Department's review, the Secretary has determined that, even assuming the relevant conditions in Venezuela remain both "extraordinary" and "temporary," termination of the 2023 Venezuela TPS designation is required because it is contrary to the national interest to permit the Venezuelan nationals (or aliens having no nationality who last habitually resided in Venezuela) to remain temporarily in the United States.[3]

In the TPS statute, Congress expressly prohibits the Secretary from designating a country for TPS or extending a TPS designation if she finds that "permitting the aliens to remain temporarily in the United States is contrary to the national interest of the United States." INA 244(b)(1), 8 U.S.C. 1254a(b)(1). Accordingly, as the Department and the Attorney General have long recognized, such a "national interest" assessment is an essential element of a determination whether to extend or terminate the 2023 Venezuela designation, which was based on "extraordinary and temporary conditions."[4]

"National interest" is an expansive standard that may encompass an array of broad considerations, including foreign policy, public safety (e.g., potential nexus to criminal gang membership), national security, migration factors (e.g., pull factors), immigration

---

[3] *See INS v. Bagamasbad*, 429 U.S. 24, 25 (1976) (per curiam) ("As a general rule courts and agencies are not required to make findings on issues the decision of which is unnecessary to the results they reach.").

[4] *Cf., e.g., Termination of Designation of Liberia Under Temporary Protected Status Program After Final 6-Month Extension*, 63 FR 15437, 15438 (Mar. 31, 1998) (terminating Liberia TPS designation after "consultations with the appropriate agencies of the U.S. Government concerning (a) the conditions in Liberia; and (b) whether permitting nationals of Liberia . . . to remain temporarily in the United States is contrary to the national interest of the United States").

policy (e.g., enforcement prerogatives), and economic considerations (e.g., adverse effects on U.S. workers, impact on U.S. communities).[5]  Determining whether permitting a class of aliens to remain temporarily in the United States is contrary to the U.S. national interest therefore calls upon the Secretary's expertise and discretionary judgment, informed by her consultations with appropriate U.S. Government agencies.

President Trump in his recent, immigration and border-related executive orders and proclamations clearly articulated an array of policy imperatives bearing upon the national interest.  First, the President directed the Secretary to terminate, as contrary to the policy of the United States, the parole program known as the "Processes for Cubans, Haitians, Nicaraguans, and Venezuelans" (CHNV).  The parole process for Venezuelans had been in effect since October 19, 2022, allowing hundreds of thousands of inadmissible Venezuelans to enter the United States at interior ports of entry and remain in this country, generally for a period of two years, with employment authorization eligibility.[6]  DHS estimates that 33,600 CHNV parolees from Venezuela availed themselves of TPS. Venezuelan CHNV parolees, along with Venezuelan nationals who crossed illegally into the United States, who had been continuously residing in the United States since July 31, 2023 and continuously present in the United States since October 3,

---

[5] *See, e.g.*, *Poursina v. USCIS*, 936 F.3d 868, 874 (9th Cir. 2019) (observing, in an analogous INA context, "that the 'national interest' standard invokes broader economic and national-security considerations, and such determinations are firmly committed to the discretion of the Executive Branch—not to federal courts" (citing *Trump v. Hawaii*, 585 U.S. 667, 684-86 (2018)); *Flores v. Garland*, 72 F.4th 85, 89-90 (5th Cir. 2023) (same); *Brasil v. Sec'y, Dep't of Homeland Sec.*, 28 F.4th 1189, 1193 (11th Cir. 2022) (same); *cf. Matter of D-J-*, 23 I&N Dec. 572, 579-81 (A.G. 2003) (recognizing that taking measures to stem and eliminate possible incentives for potential large-scale migration from a given country is "sound immigration policy" and an "important national security interest"); *Matter of Dhanasar*, 26 I&N Dec. 884, 890-91 (AAO 2016) (taking into account impact on U.S. workers in "national interest" assessments).

[6] *See Implementation of a Parole Process for Venezuelans*, 87 FR 63507 (Oct. 19, 2022); *see also Implementation of Changes to the Parole Process for Venezuelans*, 88 FR 1279 (Jan. 9, 2023).

2023 were able to secure TPS and TPS-based employment authorization under the 2023 Venezuela designation.

TPS has allowed a significant population of inadmissible or illegal aliens without a path to lawful immigration status to settle in the interior of the United States, and the sheer numbers have resulted in associated difficulties in local communities where local resources have been inadequate to meet the demands caused by increased numbers. Among these Venezuelan nationals who have crossed into the United States are members of the Venezuelan gang known as Tren de Aragua.[7]  Tren de Agua has been blamed for sex trafficking, drug smuggling, police shootings, kidnappings, and the exploitation of migrants.  The United States has sanctioned the gang and placed it on a list of transnational criminal organizations.[8]  In Executive Order 14157, *Designating Cartels and Other Organizations as Foreign Terrorist Organizations and Specially Designated Global Terrorists*, the President determined that Tren de Aragua's campaign of violence and terror poses threats to the United States.[9]  The Secretary accordingly has considered these important immigration and national interests in terminating the Venezuela parole process.

Second, President Trump observed, referring to CHNV and other policies and processes, that "[o]ver the last 4 years, the prior administration invited, administered, and oversaw an unprecedented flood of illegal immigration into the United States," including

---

[7] Joshua Goodman, Tren de Aragua gang started in Venezuela's prisons and now spreads fear in the US, Associated Press, Sept. 24, 2024, available at: https://apnews.com/article/tren-de-aragua-gang-venezuela-us-a12c8fee9dc4a0ca73769ea893e09e53 (last accessed Jan. 28, 2025).

[8] Joshua Goodman, US sanctions a Venezuela gang for spreading criminal activity across Latin America, Associated Press, July 11, 2024, available at: https://apnews.com/article/washington-venezuela-gang-sanctions-f742f6966d160ee80b703ed419dfdac3 (last accessed Jan. 30, 2025).

[9] 90 FR 8439 (Jan. 20, 2025).

VZ Termination_0024

millions who crossed U.S. borders or were allowed to fly to a U.S. air port of entry and allowed to settle in American communities.[10]  The prolonged presence of these aliens in the United States "has cost taxpayers billions of dollars at the Federal, State, and local levels."[11]  For example, over 180,000 illegal aliens have settled in New York City, approximating that this will cost the city $10.6 billion through the summer of 2025.[12]  Additionally, although mayors from cities across the United States are attempting to accommodate Venezuelan illegal aliens, city shelters, police stations, and aid services are at a maximum capacity.[13]

The President underscored that enforcing the immigration laws "is critically important to the national security and public safety of the United States."[14]  In furtherance of that objective, the President directed the Secretary, along with the Attorney General and Secretary of State, to promptly take all appropriate action, consistent with law, to rescind policies that led to increased or continued presence of illegal aliens in the United States.[15]  Among the directed actions are to ensure that the TPS designations are consistent with the TPS statute and "are appropriately limited in scope and made for only

---

[10] Exec. Order 14159, *Protecting the American People Against Invasion*, sec. 1, 90 FR 8443, 8443 (Jan. 20, 2025).

[11] *Id.*

[12] *The Cost of the Border Crisis*, Testimony before the House Budget Committee of Julie Kirchner the Executive Director, Federation for American Immigration Reform (May 8, 2024), available at: https://www.congress.gov/118/meeting/house/117257/witnesses/HHRG-118-BU00-Wstate-KirchnerJ-20240508.pdf (last accessed Jan. 30, 2025).

[13] Center for Strategic & International Studies, *The Persistence of the Venezuelan Migrant and Refugee Crisis* (Nov. 27, 2023), available at: https://www.csis.org/analysis/persistence-venezuelan-migrant-and-refugee-crisis (last accessed Jan. 30, 2025).

[14] Exec. Order 14159, *Protecting the American People Against Invasion*, sec. 1, 90 FR 8443, 8443 (Jan. 20, 2025).

[15] *Id.*, sec. 16, 90 FR at 8446.

VZ Termination_0025

so long as may be necessary to fulfill the textual requirements of that statute."[16]  The Department accordingly has reappraised the national interest factors and given strong consideration to the serious national security, border enforcement, public safety, immigration policy, and economic and public welfare concerns engendered by illegal immigration of Venezuelans, which the President, DHS, and other federal agencies are seeking to stem through other policy actions.

Third, President Trump declared a national emergency at the southern border.[17] As the Attorney General and DHS have long understood, the potential "magnet effect" of a TPS determination is a permissible factor under the TPS statute, especially with respect to a redesignation.[18]  The same is true for Venezuela.[19]  The anticipated designation or extension for TPS and resulting benefit to access EAD have been pull factors driving Venezuelan nationals to the United States.[20]  In October 2023, DHS stated that there were approximately 243,000 Venezuela TPS beneficiaries, while also estimating that approximately *472,000 additional aliens* may be eligible under the October 3, 2023 designation.[21]  Currently, DHS estimates that 348,202 aliens are registered under the 2023 designation.

---

[16] *Id.*, sec. 16(b), 90 FR at 8446.

[17] Proc. 10886, *Declaring a National Emergency at the Southern Border of the United States*, 90 FR 8327 (Jan. 20, 2025).

[18] *See Extension of Designation and Redesignation of Liberia Under Temporary Protected Status Program*, 62 FR 16608, 16609 (Apr. 7, 1997) ("One factor in determining whether redesignation is appropriate is whether it will create a 'magnet effect' for nationals of the country under consideration. In cases where the Attorney General contemplates redesignation, she may consider this possible magnet effect and any other factors weighing against redesignation, together with any discretionary factors in favor of redesignation.").

[19] *See, e.g.*, Center for Strategic & International Studies, *The Persistence of the Venezuelan Migrant and Refugee Crisis* (Nov. 27, 2023), available at: https://www.csis.org/analysis/persistence-venezuelan-migrant-and-refugee-crisis (last accessed Jan. 30, 2025).

[20] *See id.*

[21] 88 FR at 68134.

11

Fourth, as the President directed in Executive Order 14150, "the foreign policy of the United States shall champion core American interests and always put America and American citizens first."[22]  Continuing to permit Venezuelans under the 2023 TPS designation to remain in the United States does not champion core American interests or put American interests first.  U.S. foreign policy interests, particularly in the Western Hemisphere, are best served and protected by curtailing policies that facilitate or encourage illegal and destabilizing migration.[23]

In making this finding and determination regarding the national interest, the Secretary also has taken into account the national-interest-related factors that were presented to former Secretary Mayorkas for his consideration for purposes of his now-vacated January 10, 2025 decision.  However, especially in view of President Trump's Executive Orders relating to immigration and after consulting with the Department of State, the Secretary has reached a different conclusion and has determined that permitting such Venezuelan nationals (and aliens with no nationality who last habitually resided in Venezuela) to remain in the United States is in fact contrary to the national interest, as is the Secretary's authority and prerogative under the statute.[24]

---

[22] *America First Policy Directive to the Secretary of State*, 90 FR 8337 (Jan. 20, 2025).

[23] *See* U.S. Dep't of State, *Priorities and Mission of the Second Trump Administration's Department of State* (Jan. 24, 2025), available at https://pa.usembassy.gov/priorities-and-mission-of-the-second-trump-administrations-department-of-state/.

[24] *See Motor Vehicle Mfrs. Ass'n of U.S., Inc. v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 59 (Rehnquist, J., concurring in part) ("A change in administration brought about by the people casting their votes is a perfectly reasonable basis for an executive agency's reappraisal of the costs and benefits of its programs and regulations. As long as the agency remains within the bounds established by Congress, it is entitled to assess administrative records and evaluate priorities in light of the philosophy of the administration.").

12

**Effective Date of Termination of 2023 Designation**

The TPS statute provides that the termination of a country's TPS designation may not be effective earlier than 60 days after the Federal Register notice is published or, if later, the expiration of the most recent previous extension. *See* INA 244(b)(3)(B), 8 U.S.C. 1254a(b)(3)(B). As noted, the expiration date of the 2023 Venezuela designation is 60 days from the date of publication of this notice.

The Secretary may determine the appropriate effective date of the termination and the expiration of any TPS-related documentation, such as EADs, for the purpose of providing for an orderly transition. *See id.*; INA 244(d)(3), 8 U.S.C. 1254a(d)(3). Given the Secretary's finding that continuing to permit such Venezuelan nationals to remain temporarily in the United States is contrary to the U.S. national interest, and considering the relative recency of the designation (Oct. 3, 2023), the Secretary has determined that it is not appropriate to allow for a further transition period. Accordingly, the termination of the October 3, 2023 Venezuela TPS designation will be effective 60 days from the date of publication of this notice.[25]

The Secretary has considered putative reliance interests in the 2023 Venezuela TPS designation, especially when considering whether to allow for an additional transition period akin to that allowed under certain previous TPS terminations. Temporary Protected Status, as the name itself makes clear, is an inherently temporary status, TPS designations are time-limited and must be periodically reviewed, TPS notices

---

[25] *See* 8 CFR 244.19 ("Upon the termination of designation of a foreign state, those nationals afforded temporary Protected Status shall, upon the sixtieth (60th) day after the date notice of termination is published in the Federal Register, or on the last day of the most recent extension of designation by the [Secretary of Homeland Security], automatically and without further notice or right of appeal, lose Temporary Protected Status in the United States. Such termination of a foreign state's designation is not subject to appeal.").

13

clearly notify aliens of the designations' expiration dates, and whether to allow for an orderly transition period is left to the Secretary's unfettered discretion.  *See* INA 244(b)(3), (d)(3); 8 U.S.C. 1254a(b)(3), (d)(3).  Any putative reliance interests of registrants under the Venezuela 2023 designation therefore merit only diminished weight. Moreover, any such putative reliance interests are outweighed by the overriding, important national interest considerations described in this notice.[26]

**Venezuelan Nationals Registered Under the 2021 Venezuela Designation**

Although unorthodox, the prior Administration issued two separate designations of Venezuela.  *See* 88 FR 68130 (Oct. 3, 2023); 86 FR 13574 (Mar. 9, 2021).  In this notice, DHS is terminating only the October 3, 2023 Venezuela TPS designation.  The 2021 Venezuela TPS designation remains in effect until September 10, 2025.

**Notice of Termination of the 2023 TPS Designation of Venezuela**

By the authority vested in the Secretary of Homeland Security under section 244(b)(3) of the INA, 8 U.S.C. 1254a(b)(3), I have reviewed, in consultation with appropriate agencies of the U.S. Government, (a) conditions in Venezuela; and (b)

---

[26] DHS recognizes that certain previous TPS terminations allowed for an extended transition, especially in the case of TPS designations that had been extended numerous times over the course of many years.  *See, e.g.*, *Termination of the Designation of El Salvador for Temporary Protected Status*, 83 FR 2654 (Jan. 18, 2018) (nearly 17 years, with 18-month transition period); *Termination of the Designation of Sudan for Temporary Protected Status*, 82 FR 47228 (Oct. 11, 2017) (20 years, with 12-month orderly transition period); *Termination of the Designation of Sierra Leone Under the Temporary Protected Status Program; Extension of Employment Authorization Documentation*, 68 FR 52407 (Sept. 3, 2003) (nearly 6 years, with 6-month orderly transition period); *Six-Month Extension of Temporary Protected Status Benefits for Orderly Transition Before Termination of Liberia's Designation for Temporary Protected Status*, 81 FR 66059 (Sept. 26, 2016) (nearly 2 years, with  6-month orderly transition period).  Those countries, however, generally had been designated for TPS for longer periods, and none of those terminations were based on a determination that allowing the aliens to remain temporarily in the United States is contrary to the U.S. national interest.  At the same time, certain other TPS designations were terminated without allowing for an extended transition period.  *See. e.g.*, *Termination of Designation of Angola Under the Temporary Protected Status Program*, 68 FR 3896 (Jan. 27, 2003) (nearly 3 years, no orderly transition period); *Termination of Designation of Lebanon Under Temporary Protected Status Program*, 58 FR 7582 (Feb. 8, 1993) (2 years, no extended transition period).

14

whether permitting the nationals of Venezuela (and aliens having no nationality who last habitually resided in Venezuela) to remain temporarily in the United States is contrary to the national interest of the United States.  Based on my review, I have determined that Venezuela no longer continues to meet the conditions for the October 3, 2023 designation for Temporary Protected Status (TPS) under section 244(b)(1)(C) of the Act, 8 U.S.C. 1254a(b)(1)(C).

Accordingly, I order as follows:

(1) Pursuant to INA section 244(b)(3)(B), 8 U.S.C. 1254a(b)(3)(B), and considering INA section 244(d)(3), 8 U.S.C. 1254a(d)(3), the October 3, 2023 designation of Venezuela for TPS is terminated effective at 11:59 p.m., local time, on **[INSERT DATE 60 DAYS FROM THE DATE OF PUBLICATION IN THE FEDERAL REGISTER]**.

(2) This notice supersedes the January 17, 2025 notice at 90 FR 5961, the underlying decision for which was vacated on January 28, 2025.

(3) Information concerning the termination of TPS for nationals of Venezuela (and aliens having no nationality who last habitually resided in Venezuela) under the October 3, 2023 designation will be available at local USCIS offices upon publication of this Notice and through the USCIS National Customer Service Center at 1-800-375-5283.  This information will be published on the USCIS Web site at www.USCIS.gov.

_____

**Kristi Noem,**
Secretary of Homeland Security.

15

Cite as 26 I&N Dec. 884 (AAO 2016)                    Interim Decision #3882

# Matter of DHANASAR, Petitioner

*Decided December 27, 2016*

U.S. Department of Homeland Security
U.S. Citizenship and Immigration Services
Administrative Appeals Office

USCIS may grant a national interest waiver if the petitioner demonstrates: (1) that the foreign national's proposed endeavor has both substantial merit and national importance; (2) that he or she is well positioned to advance the proposed endeavor; and (3) that, on balance, it would be beneficial to the United States to waive the job offer and labor certification requirements. *Matter of New York State Dep't of Transp.*, 22 I&N Dec. 215 (Acting Assoc. Comm'r 1998), vacated.

ON BEHALF OF PETITIONER: Gerard M. Chapman, Esquire, Greensboro, North Carolina

In this decision, we have occasion to revisit the analytical framework for assessing eligibility for "national interest waivers" under section 203(b)(2)(B)(i) of the Immigration and Nationality Act, 8 U.S.C. § 1153(b)(2)(B)(i) (2012). The self-petitioner, a researcher and educator in the field of aerospace engineering, filed an immigrant visa petition seeking classification under section 203(b)(2) of the Act as a member of the professions holding an advanced degree. The petitioner also sought a "national interest waiver" of the job offer otherwise required by section 203(b)(2)(A).

The Director of the Texas Service Center denied the petition under the existing analytical framework, concluding that the petitioner qualifies for classification as a member of the professions holding an advanced degree but that a waiver of the job offer requirement would not be in the national interest of the United States. Upon de novo review, and based on the revised national interest standard adopted herein, we will sustain the appeal and approve the petition.

## I. LEGAL BACKGROUND

Subparagraph (A) of section 203(b)(2) of the Act makes immigrant visas available to "qualified immigrants who are members of the professions holding advanced degrees or their equivalent or who because of their exceptional ability in the sciences, arts, or business, will substantially benefit prospectively the national economy, cultural or educational

884

interests, or welfare of the United States." Under subparagraph (A), immigrant visas are available to such individuals only if their "services in the sciences, arts, professions, or business are sought by an employer in the United States."

Before hiring a foreign national under this immigrant classification, an employer must first obtain a permanent labor certification from the United States Department of Labor ("DOL") under section 212(a)(5)(A)(i) of the Act, 8 U.S.C. § 1182(a)(5)(A)(i) (2012). *See also* 8 C.F.R. § 204.5(k)(4)(i) (2016). A labor certification demonstrates that DOL has determined that there are not sufficient workers who are able, willing, qualified, and available at the place where the alien is to perform such skilled or unskilled labor, and the employment of such alien will not adversely affect the wages and working conditions of workers in the United States similarly employed. In its labor certification application, the employer must list the position's job requirements consistent with what is normally required for the occupation. *See* 20 C.F.R. § 656.17(h)(1) (2016). Moreover, the job requirements described on the labor certification application must represent the actual minimum requirements for the job opportunity. *See* 20 C.F.R. § 656.17(i)(1). That is, the employer may not tailor the position requirements to the foreign worker's qualifications; it may only list the position's minimum requirements, regardless of the foreign worker's additional skills that go beyond what is normally required for the occupation. The employer must then test the labor market to determine if able, willing, or qualified U.S. workers are available with the advertised minimum qualifications. If such U.S. workers are found, the employer may not hire the foreign worker for the position, even if the foreign worker clearly has more skills (beyond the advertised qualifications). If the employer does not identify such U.S. workers and DOL determines that those workers are indeed unavailable, DOL will certify the labor certification. After securing the DOL-approved labor certification, the employer may then file a petition with DHS requesting the immigrant classification.

Under subparagraph (B) of section 203(b)(2), however, the Secretary of Homeland Security may waive the requirement of a "job offer" (namely, that the beneficiary's services are sought by a U.S. employer) and, under the applicable regulations, of "a labor certification." 8 C.F.R. § 204.5(k)(4)(ii).[1] That subparagraph states, in pertinent part, that the

---

[1] While appearing to limit national interest waivers to only aliens possessing exceptional ability in the sciences, arts, or business, 8 C.F.R. § 204.5(k)(4)(ii) was superseded in part by section 302(b)(2) of the Miscellaneous and Technical Immigration and Naturalization Amendments of 1991, Pub. L. No. 102-232, 105 Stat. 1733, 1743

(continued . . .)

Cite as 26 I&N Dec. 884 (AAO 2016)                    Interim Decision #3882

Secretary "may, when the [Secretary] deems it to be in the national interest, waive the requirements of subparagraph (A) that an alien's services in the sciences, arts, professions, or business be sought by an employer in the United States."[2] Section 203(b)(2)(i) of the Act.

USCIS may grant a national interest waiver as a matter of discretion if the petitioner satisfies both subparagraphs (A) and (B). Thus, a petitioner who seeks a "national interest waiver" must first satisfy subparagraph (A) by demonstrating that the beneficiary qualifies as a member of the professions holding an advanced degree or as an individual of exceptional ability. *See* 8 C.F.R. § 204.5(k)(1)–(3) (providing definitions and considerations for making such determinations); *see also* section 203(b)(2)(C) of the Act (providing that possession of requisite academic degree or professional license "shall not by itself be considered sufficient evidence of exceptional ability"). The petitioner must then satisfy subparagraph (B) by establishing that it would be in the national interest to waive the "job offer" requirement under subparagraph (A).[3] *See* 8 C.F.R. § 204.5(k)(4)(ii). This two-part statutory scheme is relatively straightforward, but the term "national interest" is ambiguous. Undefined by statute and regulation, "national interest" is a broad concept subject to various interpretations.

In 1998, under the legacy Immigration and Naturalization Service, we issued a precedent decision establishing a framework for evaluating national interest waiver petitions. *Matter of New York State Dep't of Transp.* ("*NYSDOT*"), 22 I&N Dec. 215 (Acting Assoc. Comm'r 1998).

_____

("MTINA"). Section 302(b)(2) of MTINA amended section 203(b)(2)(B)(i) of the Act by inserting the word "professions" after the word "arts," and thereby made the national interest waiver available to members of the professions holding advanced degrees in addition to individuals of exceptional ability.

[2]  Pursuant to section 1517 of the Homeland Security Act ("HSA") of 2002, Pub. L. No. 107-296, 116 Stat. 2135, 2311 (codified at 6 U.S.C. § 557 (2012)), any reference to the Attorney General in a provision of the Act describing functions that were transferred from the Attorney General or other Department of Justice official to the Department of Homeland Security by the HSA "shall be deemed to refer to the Secretary" of Homeland Security. *See also* 6 U.S.C. § 542 note (2012); 8 U.S.C. § 1551 note (2012).

[3]  To do so, a petitioner must go beyond showing the individual's expertise in a particular field. The regulation at 8 C.F.R. § 204.5(k)(2) defines "exceptional ability" as "a degree of expertise significantly above that ordinarily encountered" in a given area of endeavor. By statute, individuals of exceptional ability are generally subject to the job offer/labor certification requirement; they are not exempt by virtue of their exceptional ability. Therefore, whether a given petitioner seeks classification as an individual of exceptional ability, or as a member of the professions holding an advanced degree, that individual cannot qualify for a waiver just by demonstrating a degree of expertise significantly above that ordinarily encountered in his field of expertise.

886

Cite as 26 I&N Dec. 884 (AAO 2016)                    Interim Decision #3882

The *NYSDOT* framework looks first to see if a petitioner has shown that the area of employment is of "substantial intrinsic merit." *Id.* at 217. Next, a petitioner must establish that any proposed benefit from the individual's endeavors will be "national in scope." *Id.* Finally, the petitioner must demonstrate that the national interest would be adversely affected if a labor certification were required for the foreign national. *Id.*

Based on our experience with that decision in the intervening period, we believe it is now time for a reassessment. While the first prong has held up under adjudicative experience, the term "intrinsic" adds little to the analysis yet is susceptible to unnecessary subjective evaluation.[4] Similarly, the second prong has caused relatively few problems in adjudications, but occasionally the term "national in scope" is construed too narrowly by focusing primarily on the geographic impact of the benefit. While *NYSDOT* found a civil engineer's employment to be national in scope even though it was limited to a particular region, that finding hinged on the geographic connections between New York's bridges and roads and the national transportation system. Certain locally or regionally focused endeavors, however, may be of national importance despite being difficult to quantify with respect to geographic scope.

What has generated the greatest confusion for petitioners and adjudicators, however, is *NYSDOT*'s third prong. First, this prong is explained in several different ways within *NYSDOT* itself, leaving the reader uncertain what ultimately is the relevant inquiry. We initially state the third prong as requiring a petitioner to "demonstrate that the national interest would be adversely affected if a labor certification were required." *NYSDOT*, 22 I&N Dec. at 217. We then alternatively describe the third prong as requiring the petitioner to demonstrate that the individual "present[s] a national benefit so great as to outweigh the national interest inherent in the labor certification process." *Id.* at 218. Immediately thereafter, we restate the third prong yet again: the petitioner must establish that the individual will "serve the national interest to a substantially greater degree than would an available U.S. worker having the same minimum qualifications."[5] *Id.* Finally, in what may be construed as either a fourth restatement of prong three or as an explanation of how to satisfy it, we state that "it clearly must be established that the alien's past record justifies projections of future benefit to the national interest." *Id.* at 219. A footnote

---

[4]  *Cf., e.g.*, *24/7 Records, Inc. v. Sony Music Entm't, Inc.*, 514 F. Supp. 2d 571, 575 (S.D.N.Y. 2007) ("'Intrinsic value' is an inherently subjective and speculative concept.").
[5]  Other, slight variations of the third prong emerge later in the decision. *See NYSDOT*, 22 I&N at 220 ("to a greater extent than U.S. workers"); *see also id.* at 221 ("considerably outweigh").

VZ Termination_0034

Cite as 26 I&N Dec. 884 (AAO 2016)                     Interim Decision #3882

to this statement clarifies that USCIS seeks "a past history of demonstrable achievement with some degree of influence on the field as a whole." *Id.* at 219 n.6. Although residing in footnote 6, this "influence" standard has in practice become the primary yardstick against which petitions are measured.[6]

Second, and a more fundamental challenge than parsing its several restatements, *NYSDOT*'s third prong can be misinterpreted to require the petitioner to submit, and the adjudicator to evaluate, evidence relevant to the very labor market test that the waiver is intended to forego. The first iteration of prong three, that the national interest would be adversely affected if a labor certification were required, implies that petitioners should submit evidence of harm to the national interest. The third iteration, that the individual will serve the national interest to a substantially greater degree than would an available U.S. worker having the same minimum qualifications, suggests that petitioners should submit evidence comparing foreign nationals to unidentified U.S. workers. These concepts have proven to be difficult for many qualified individuals to establish or analyze in the abstract. It has proven particularly ill-suited for USCIS to evaluate petitions from self-employed individuals, such as entrepreneurs. In *NYSDOT*, we even "acknowledge[d] that there are certain occupations wherein individuals are essentially self-employed, and thus would have no U.S. employer to apply for a labor certification." *Id.* at 218 n.5. Nonetheless, we did not modify the test to resolve this scenario, which continues to challenge petitioners and USCIS adjudicators. Lastly, this concept of harm-to-national-interest is not required by, and unnecessarily narrows, the Secretary's broad discretionary authority to grant a waiver when he "deems it to be in the national interest."

## II. NEW ANALYTICAL FRAMEWORK

Accordingly, our decision in *NYSDOT* is ripe for revision. Today, we vacate *NYSDOT* and adopt a new framework for adjudicating national interest waiver petitions, one that will provide greater clarity, apply more flexibly to circumstances of both petitioning employers and self-petitioning

---

[6]  While this "influence" standard rests upon the reasonable notion that past success will often predict future benefit, our adjudication experience in the years since *NYSDOT* has revealed that there are some talented individuals for whom past achievements are not necessarily the best or only predictor of future success.

VZ Termination_0035

Cite as 26 I&N Dec. 884 (AAO 2016)                Interim Decision #3882

individuals, and better advance the purpose of the broad discretionary waiver provision to benefit the United States.[7]

Under the new framework, and after eligibility for EB-2 classification has been established, USCIS may grant a national interest waiver if the petitioner demonstrates by a preponderance of the evidence:[8] (1) that the foreign national's proposed endeavor has both substantial merit and national importance; (2) that the foreign national is well positioned to advance the proposed endeavor; and (3) that, on balance, it would be beneficial to the United States to waive the requirements of a job offer and thus of a labor certification. If these three elements are satisfied, USCIS may approve the national interest waiver as a matter of discretion.[9]

The first prong, substantial merit and national importance, focuses on the specific endeavor that the foreign national proposes to undertake. The endeavor's merit may be demonstrated in a range of areas such as business, entrepreneurialism, science, technology, culture, health, or education. Evidence that the endeavor has the potential to create a significant economic impact may be favorable but is not required, as an endeavor's merit may be established without immediate or quantifiable economic impact. For example, endeavors related to research, pure science, and the furtherance of human knowledge may qualify, whether or not the potential accomplishments in those fields are likely to translate into economic benefits for the United States.

In determining whether the proposed endeavor has national importance, we consider its potential prospective impact. An undertaking may have national importance for example, because it has national or even global implications within a particular field, such as those resulting from certain improved manufacturing processes or medical advances. But we do not evaluate prospective impact solely in geographic terms. Instead, we look for broader implications. Even ventures and undertakings that have as their focus one geographic area of the United States may properly be considered to have national importance. In modifying this prong to assess "national

---

[7]   Going forward, we will use "petitioners" to include both employers who have filed petitions on behalf of employees and individuals who have filed petitions on their own behalf (namely, self-petitioners).

[8]   Under the "preponderance of the evidence" standard, a petitioner must establish that he or she more likely than not satisfies the qualifying elements. *Matter of Chawathe*, 25 I&N Dec. 369, 376 (AAO 2010). We will consider not only the quantity, but also the quality (including relevance, probative value, and credibility) of the evidence. *Id.*

[9]   Because the national interest waiver is "purely discretionary," *Schneider v. Chertoff*, 450 F.3d 944, 948 (9th Cir. 2006), the petitioner also must show that the foreign national otherwise merits a favorable exercise of discretion. *See Zhu v. Gonzales*, 411 F.3d 292, 295 (D.C. Cir. 2005); *cf. Matter of Jean*, 23 I&N Dec. 373, 383 (A.G. 2002).

VZ Termination_0036

importance" rather than "national in scope," as used in *NYSDOT*, we seek to avoid overemphasis on the geographic breadth of the endeavor. An endeavor that has significant potential to employ U.S. workers or has other substantial positive economic effects, particularly in an economically depressed area, for instance, may well be understood to have national importance.

The second prong shifts the focus from the proposed endeavor to the foreign national. To determine whether he or she is well positioned to advance the proposed endeavor, we consider factors including, but not limited to: the individual's education, skills, knowledge and record of success in related or similar efforts; a model or plan for future activities; any progress towards achieving the proposed endeavor; and the interest of potential customers, users, investors, or other relevant entities or individuals.

We recognize that forecasting feasibility or future success may present challenges to petitioners and USCIS officers, and that many innovations and entrepreneurial endeavors may ultimately fail, in whole or in part, despite an intelligent plan and competent execution. We do not, therefore, require petitioners to demonstrate that their endeavors are more likely than not to ultimately succeed. But notwithstanding this inherent uncertainty, in order to merit a national interest waiver, petitioners must establish, by a preponderance of the evidence, that they are well positioned to advance the proposed endeavor.

The third prong requires the petitioner to demonstrate that, on balance, it would be beneficial to the United States to waive the requirements of a job offer and thus of a labor certification. On the one hand, Congress clearly sought to further the national interest by requiring job offers and labor certifications to protect the domestic labor supply. On the other hand, by creating the national interest waiver, Congress recognized that in certain cases the benefits inherent in the labor certification process can be outweighed by other factors that are also deemed to be in the national interest. Congress entrusted the Secretary to balance these interests within the context of individual national interest waiver adjudications.

In performing this analysis, USCIS may evaluate factors such as: whether, in light of the nature of the foreign national's qualifications or proposed endeavor, it would be impractical either for the foreign national to secure a job offer or for the petitioner to obtain a labor certification;[10]

---

[10] For example, the labor certification process may prevent a petitioning employer from hiring a foreign national with unique knowledge or skills that are not easily articulated in a labor certification. *See generally* 20 C.F.R. § 656.17(i). Likewise, because of the nature of the proposed endeavor, it may be impractical for an entrepreneur or
(continued . . .)

whether, even assuming that other qualified U.S. workers are available, the United States would still benefit from the foreign national's contributions; and whether the national interest in the foreign national's contributions is sufficiently urgent to warrant forgoing the labor certification process. We emphasize that, in each case, the factor(s) considered must, taken together, indicate that on balance, it would be beneficial to the United States to waive the requirements of a job offer and thus of a labor certification.

We note that this new prong, unlike the third prong of *NYSDOT*, does not require a showing of harm to the national interest or a comparison against U.S. workers in the petitioner's field. As stated previously, *NYSDOT*'s third prong was especially problematic for certain petitioners, such as entrepreneurs and self-employed individuals. This more flexible test, which can be met in a range of ways as described above, is meant to apply to a greater variety of individuals.

## III. ANALYSIS

The director found the petitioner to be qualified for the classification sought by virtue of his advanced degrees. We agree that he holds advanced degrees and therefore qualifies under section 203(b)(2)(A). The remaining issue before us is whether the petitioner has established, by a preponderance of the evidence, that he is eligible for and merits a national interest waiver.

The petitioner proposes to engage in research and development relating to air and space propulsion systems, as well as to teach aerospace engineering, at North Carolina Agricultural and Technical State University ("North Carolina A&T"). The petitioner holds two master of science degrees, in mechanical engineering and in applied physics, as well as a Ph.D. in engineering, from North Carolina A&T. At the time of filing the instant petition, he also worked as a postdoctoral research associate at the university. The record reflects that the petitioner's graduate and postgraduate research has focused on hypersonic propulsion systems (systems involving propulsion at speeds of Mach 5 and above) and on computational fluid dynamics. He has developed a validated computational model of a high-speed air-breathing propulsion engine, as well as a novel numerical method for accurately calculating hypersonic air flow. The petitioner intends to continue his research at the university.

The extensive record includes: reliable evidence of the petitioner's credentials; copies of his publications and other published materials that

_____

self-employed inventor, when advancing an endeavor on his or her own, to secure a job offer from a U.S. employer.

VZ Termination_0038

Cite as 26 I&N Dec. 884 (AAO 2016)                    Interim Decision #3882

cite his work; evidence of his membership in professional associations; and documentation regarding his research and teaching activities. The petitioner also submitted several letters from individuals who establish their own expertise in aerospace, describe the petitioner's research in detail and attest to his expertise in the field of hypersonic propulsion systems.

We determine that the petitioner is eligible for a national interest waiver under the new framework. First, we conclude that the petitioner has established both the substantial merit and national importance of his proposed endeavor. The petitioner demonstrated that he intends to continue research into the design and development of propulsion systems for potential use in military and civilian technologies such as nano-satellites, rocket-propelled ballistic missiles, and single-stage-to-orbit vehicles. In letters supporting the petition, he describes how research in this area enhances our national security and defense by allowing the United States to maintain its advantage over other nations in the field of hypersonic flight. We find that this proposed research has substantial merit because it aims to advance scientific knowledge and further national security interests and U.S. competitiveness in the civil space sector.

The record further demonstrates that the petitioner's proposed endeavor is of national importance. The petitioner submitted probative expert letters from individuals holding senior positions in academia, government, and industry that describe the importance of hypersonic propulsion research as it relates to U.S. strategic interests. He also provided media articles and other evidence documenting the interest of the House Committee on Armed Services in the development of hypersonic technologies and discussing the potential significance of U.S. advances in this area of research and development. The letters and the media articles discuss efforts and advances that other countries are currently making in the area of hypersonic propulsion systems and the strategic importance of U.S. advancement in researching and developing these technologies for use in missiles, satellites, and aircraft.

Second, we find that the record establishes that the petitioner is well positioned to advance the proposed endeavor. Beyond his multiple graduate degrees in relevant fields, the petitioner has experience conducting research and developing computational models that support the mission of the United States Department of Defense ("DOD") to develop air superiority and protection capabilities of U.S. military forces, and that assist in the development of platforms for Earth observation and interplanetary exploration. The petitioner submitted detailed expert letters describing U.S. Government interest and investment in his research, and the record includes documentation that the petitioner played a significant role in projects funded by grants from the National Aeronautics and Space

VZ Termination_0039

Cite as 26 I&N Dec. 884 (AAO 2016)                    Interim Decision #3882

Administration ("NASA") and the Air Force Research Laboratories ("AFRL") within DOD. [11]    Thus, the significance of the petitioner's research in his field is corroborated by evidence of peer and government interest in his research, as well as by consistent government funding of the petitioner's research projects. The petitioner's education, experience, and expertise in his field, the significance of his role in research projects, as well as the sustained interest of and funding from government entities such as NASA and AFRL, position him well to continue to advance his proposed endeavor of hypersonic technology research.

Third and finally, we conclude that, on balance, it would be beneficial to the United States to waive the requirements of a job offer and thus of a labor certification. As noted above, the petitioner holds three graduate degrees in fields tied to the proposed endeavor, and the record demonstrates that he possesses considerable experience and expertise in a highly specialized field. The evidence also shows that research on hypersonic propulsion holds significant implications for U.S. national security and competitiveness. In addition, the repeated funding of research in which the petitioner played a key role indicates that government agencies, including NASA and the DOD, have found his work on this topic to be promising and useful. Because of his record of successful research in an area that furthers U.S. interests, we find that this petitioner offers contributions of such value that, on balance, they would benefit the United States even assuming that other qualified U.S. workers are available.

In addition to conducting research, the petitioner proposes to support teaching activities in science, technology, engineering, and math ("STEM") disciplines. He submits letters favorably attesting to his teaching abilities at the university level and evidence of his participation in mentorship programs for middle school students. While STEM teaching has substantial merit in relation to U.S. educational interests, the record does not indicate by a preponderance of the evidence that the petitioner would be engaged in activities that would impact the field of STEM education more broadly. Accordingly, as the petitioner has not established by a preponderance of the evidence that his proposed teaching activities meet the "national importance" element of the first prong of the new framework, we do not address the remaining prongs in relation to the petitioner's teaching activities.

---

[11] Although the director of North Carolina A&T's Center for Aerospace Research ("CAR") is listed as the lead principal investigator on all grants for CAR research, the record establishes that the petitioner initiated or is the primary award contact on several funded grant proposals and that he is the only listed researcher on many of the grants.

VZ Termination_0040

Cite as 26 I&N Dec. 884 (AAO 2016)                    Interim Decision #3882

## IV. CONCLUSION

The record demonstrates by a preponderance of the evidence that: (1) the petitioner's research in aerospace engineering has both substantial merit and national importance; (2) the petitioner is well positioned to advance his research; and (3) on balance, it is beneficial to the United States to waive the requirements of a job offer and thus of a labor certification. We find that the petitioner has established eligibility for and otherwise merits a national interest waiver as a matter of discretion.

In visa petition proceedings, it is the petitioner's burden to establish eligibility for the immigration benefit sought. Section 291 of the Act, 8 U.S.C. § 1361 (2012). The petitioner has met that burden.

**ORDER:** The appeal is sustained and the petition is approved.

VZ Termination_0041

(43 of 51), Page 43 of 51    Case: 25-2120, 05/28/2025, DktEntry: 49.22, Page 43 of 51

3/7/25, 12:05 PM    Case 3:25-cv-01766-EMC    Venezuela grapples with economic collapse    Filed 04/07/25    EL PAÍS English    Page 42 of 95



                                                                    SUBSCRIBE  👤

## International

MEXICO · CHINA · LATEST NEWS

◄                                      ►

VENEZUELA >

# Venezuela grapples with economic collapse

The modest recovery of recent years fails to mask Venezuela's crisis: a shattered productive structure, poverty levels nearly three times the regional average, and profound inequality



A fuel processing plant in Falcón (Venezuela).
**MIGUEL GUTIERREZ HENRY CHIRINOS (EFE)**

### ALONSO MOLEIRO

Caracas - JAN 17, 2025 - 23:30 EST

⊙ ⨍ ✕ ✣ in ⌕

The inauguration of Nicolás Maduro last Friday ushers in a new chapter for Venezuela, marked by deep socioeconomic wounds. The ongoing financial crisis — arguably the population's greatest source of discontent — persists despite a modest reactivation of consumption. Crisis and political conflict remain intertwined, and after a decade of catastrophic governance and escalating tensions between the ruling party and the opposition, the Maduro government now faces an especially turbulent period.

The evidence of electoral fraud, which Maduro has been unable to convincingly refute, have heightened international pressure. Both the United States and the European Union have stepped up sanctions, and Maduro is bracing for a new wave of isolation. As in the past, this isolation is likely to exacerbate the nation's economic struggles.

The start of Maduro's new mandate follows three years of moderate economic recovery, a relative improvement considering the depths from which Venezuela has emerged. This recovery was preceded by a historic economic contraction that drastically altered the nation's landscape over the past decade. Amid this unprecedented economic crisis — exacerbated by the political isolation of Chavismo — in 2020, the Maduro government began to distance itself from the statist orthodoxy outlined in the *Plan de la Patria*, its flagship economic program. Instead, it adopted a series of market-oriented reforms in an effort to stabilize the economy.

The partial dollarization of the monetary system, the introduction of new exchange and fiscal policies, a more business-friendly stance, and a shift in the treatment of international capital have led to a reduction in year-on-year inflation, a recovery in purchasing power, and some improvement in trade. However, the damage to Venezuela's productive and social fabric had already been done. The socioeconomic collapse experienced between 2014 and 2020, during Maduro's presidency, delivered a devastating blow to the nation's economic framework. This trauma has left many Venezuelans struggling to fully recover from its far-reaching effects.

During the years of strict economic controls, company takeovers, conflicts with capital, and excessive bureaucratization, Venezuela's economy contracted by more than 80%. The local industrial sector was decimated, and now operates at just 30% of its capacity. Thousands of businesses went bankrupt. A wave of nationalizations severely undermined the country's ability to respond to economic challenges. Hyperinflation, which peaked at an astronomical 9,500% in 2019, wreaked havoc on the economy, devastating the financial stability of millions. Meanwhile, the oil industry, once the backbone of Venezuela's economy, collapsed under the weight of a fixed exchange rate policy and pervasive corruption in the state-owned oil company Petróleos de Venezuela (PDVSA). Income poverty doubled, and now affects an estimated 80% of the population, according to the Venezuelan Academy of Economic Sciences (ANCE).

The crisis of the past decade left profound scars: wages were decimated, prices soared, shortages of essential goods became widespread, and public services deteriorated dramatically. This collapse triggered a mass exodus of millions of Venezuelans, many of whom fled the country on foot, seeking refuge across South America.

In 2015, the Central Bank of Venezuela, under Maduro's control, stopped publishing monthly economic data. Media censorship also worsened. The ruling party's popularity, which began to decline in 2014, has not recovered since. In 2019 and 2020, the national economy displayed metrics comparable to those of a war-torn nation, with GDP contracting by a staggering 30 percentage points, according to estimates from private consulting firms.

The popular social assistance programs created by the Chavista government — such as the Barrio Adentro preventive health initiative, the Mi Casa Bien Equipada goods transfer program, Mercal's cheap food markets, and the Cuban-assisted Comprehensive Diagnostic Centers — collapsed during the crisis, largely due to widespread corruption among government officials.

The minimum monthly wage, traditionally around $400, has dropped to just $3. The government provides periodic bonuses every four weeks, but without retroactive benefits, these only raise the effective minimum wage to $150 per month.

International sanctions, particularly from the United States, were introduced in 2016 in response to the political crisis driven by popular discontent. These sanctions significantly restricted Maduro's ability to explore alternative trade options or revitalize the oil industry. The global search for new markets, spurred by Russia's war in Ukraine, fostered a period of cautious détente between Caracas and Washington, leading to a modest revival in the oil sector. However, with the return of Donald Trump to the White House, it is likely that sanctions on Venezuelan oil will tighten further.

National revenues, heavily reliant on crude oil extraction, hit a critical low point in the last decade, with production dropping from nearly 3 million barrels per day to just 300,000 in 2019. Today, after significant challenges, production is slowly approaching the 1 million mark again.

Since 2016, for the first time in its history, remittances from emigrants have become a significant source of Venezuelan tax revenues. The exodus of between seven and eight million people, according to United Nations estimates, represents an unprecedented event in recent Latin American history, highlighting the severity of Venezuela's economic collapse and the erosion of its citizens' political rights. Despite implementing measures like food rationing based on the last digit of each citizen's identity card, the Maduro government has refused to acknowledge its responsibility for the crisis or the existence of a Venezuelan diaspora.

The disastrous performance of the Chavista administration triggered a political shift. In December 2015, the Venezuelan opposition achieved a decisive victory in the parliamentary elections, sending shockwaves through Chavismo. In response, Chavismo moved quickly to consolidate control over all state institutions. This led to the absolute concentration of power in the hands of Maduro and a select group of loyalists, while the government implemented social programs aimed at maintaining Chavista support and building networks of loyalty.

consistently show a sharp decline in popularity. However, any assistance remains inadequate given the collapse of the country's productive activity. In the meantime, Venezuelans are facing a period marked by political uncertainty and looming economic instability.

*Sign up for <u>our weekly newsletter</u> to get more English-language news coverage from EL PAÍS USA Edition*

Sign up to EL PAÍS US Edition bulletin

f   X

## MORE INFORMATION



### Latin America turns its back on Maduro's 'fraudulent' inauguration as president of Venezuela
MAR CENTENERA | BUENOS AIRES



### Nicolás Maduro is inaugurated in Venezuela despite failing to present official voting records
JUAN DIEGO QUESADA / ALONSO MOLEIRO | BOGOTÁ / CARACAS

## ARCHIVED IN

Venezuela  ·  Nicolás Maduro                                                                 ⌄

Adheres to                                                                     The Trust Project
More information ›

If you are interested in licensing this content, click **here**



**ÚLTIMAS NOTICIAS**

19:18   **Trump claims to have sent a letter to Iran to negotiate a nuclear deal**

17:15   **Daylight Saving Time 2025: When to change the clocks and everything you need to know**

17:03   **Zelenskiy's adviser Mykhailo Podolyak: 'I think Trump will succeed where previous US administrations failed with Russia'**

16:21   **The price of opposing Maduro's power**

**MOST VIEWED**

1. New inheritance mechanism unrelated to DNA is discovered by chance

2. Disappearance of eight young people and the silence of three states highlights opacity of crime in Mexico

3. EU explores sending military and civilian missions to Ukraine to guarantee security

4. 'El Mencho' and 'Don Rodo,' a life of evading justice: From small-time dealers to heads of the most powerful cartel in Mexico

VZ Termination_0046

3/7/25, 12:05 PM    Case 3:25-cv-01766-EMC Venezuela Document 104 Public collapse Filed 04/07/25L Press Page 48 of 95



3/7/25, 12:05 PM    Case 3:25-cv-01766-EMC   Venezuela grapples with economic collapse   Filed 04/07/25   EL PAIS English   Page 49 of 95

(51 of 51), Page 51 of 51   Case: 25-2120, 05/28/2025, DktEntry: 49.22, Page 51 of 51
3/7/25, 12:05 PM   Case 3:25-cv-01766-EMC   Venezuela grapples with economic collapse | International | EL PAÍS English
Document 104-1   Filed 04/07/25   Page 50 of 95

VZ Termination_0050