DOCUMENT 2.4

Cite as 23 I&N Dec. 572 (A.G. 2003)                    Interim Decision #3488

# In re D-J-, Respondent

## *Decided April 17, 2003*

## U.S. Department of Justice
## Office of the Attorney General

(1)  The Attorney General has broad discretion in bond proceedings under section 236(a) of the Immigration and Nationality Act, 8 U.S.C. § 1226(a) (2000), to determine whether to release an alien on bond.

(2)  Neither section 236(a) of the Act nor the applicable regulations confer on an alien the right to release on bond.

(3)  In determining whether to release on bond undocumented migrants who arrive in the United States by sea seeking to evade inspection, it is appropriate to consider national security interests implicated by the encouragement of further unlawful mass migrations and the release of undocumented alien migrants into the United States without adequate screening.

(4)  In bond proceedings involving aliens seeking to enter the United States illegally, where the Government offers evidence from sources in the Executive Branch with relevant expertise establishing that significant national security interests are implicated, Immigration Judges and the Board of Immigration Appeals shall consider such interests.

(5)  Considering national security grounds applicable to a category of aliens in denying an unadmitted alien's request for release on bond does not violate any due process right to an individualized determination in bond proceedings under section 236(a) of the Act.

(6)  The denial of the respondent's release on bond does not violate international law.

(7)  Release of the respondent on bond is unwarranted due to considerations of sound immigration policy and national security that would be undercut by the release of the respondent and other similarly situated undocumented alien migrants who unlawfully crossed the borders of the United States on October 29, 2002; further, the respondent failed to demonstrate adequately that he does not present a risk of flight if released and should be denied bond on that basis as well.

## IN BOND PROCEEDINGS

The respondent is an undocumented alien from Haiti who was taken into custody and detained by the Immigration and Naturalization Service ("INS") on October 29, 2002, while attempting to evade lawful immigration procedures and enter the United States illegally.  He arrived aboard a vessel that sailed into Biscayne Bay, Florida, on that date, carrying 216 undocumented aliens from Haiti and the Dominican Republic.  He and other passengers on the vessel were apprehended ashore after the vessel sought to

572

Cite as 23 I&N Dec. 572 (A.G. 2003)                    Interim Decision #3488

evade coastal interdiction by the United States Coast Guard and after many of the aliens sought to evade law enforcement authorities ashore. *See* INS Brief in Support of Bond Appeal, Exh. A ("INS Brief"). Respondent was placed in removal proceedings and charged as being an inadmissible alien under section 212(a)(6)(A)(i) of the Immigration and Nationality Act, 8 U.S.C. § 1182(a)(6)(A)(i) (2002) ("INA"). He is now seeking asylum in the United States and has applied for bond, which would allow his release into the community pending disposition on removal or asylum.

On November 6, 2002, an Immigration Judge ("IJ") granted respondent's application for release on bond (set at $2,500) over the objections of the INS. The INS argued, inter alia, that the release of respondent, and of other members of the undocumented migrant group of October 29, would stimulate further surges of such illegal migration by sea and threaten important national security interests. The INS then appealed the IJ's decision to the Board of Immigration Appeals ("BIA"). The BIA dismissed the appeal, concluding, inter alia, that the broad national interests invoked by INS were not appropriate considerations for the IJ or the BIA in making the bond determination, "[a]bsent contrary direction from the Attorney General." Decision of the Board of Immigration Appeals, *In re D-J-*, at 2 (March 13, 2003) ("BIA Dec."). Exercising authority transferred to the Department of Homeland Security ("DHS") by the Homeland Security Act of 2002 ("HSA"), and pursuant to the provisions of 8 C.F.R. § 1003.1(h)(1)(iii), the Under Secretary for Border and Transportation Security has now referred the BIA's decision to me for review.[1] This referral automatically stayed the BIA's order pending my decision. *See* 8 C.F.R. § 1003.19(i)(2).

On February 12, 2003, the IJ denied respondent's application for asylum. His appeal of that decision is pending before the BIA.

Although authority to enforce and administer the INA and other laws related to the immigration and naturalization of aliens has recently been transferred to the Secretary of Homeland Security by the HSA, the Attorney General retains his authority to make controlling determinations with respect

---

[1]  On March 1, 2003, the INS was transferred from the Department of Justice to the Department of Homeland Security pursuant to the Homeland Security Act of 2002, Pub. L. No. 107-296, 116 Stat. 2135, 2178. The Executive Office for Immigration Review, however, remains in the Department of Justice. On February 28, 2003, the Attorney General published a technical rule that moved 8 C.F.R. § 3.1(h) (2002) to 8 C.F.R. § 1003.1(h). *See* Aliens and Nationality; Homeland Security; Reorganization of Regulations, 68 Fed. Reg. 9824, 9332 (Feb. 28, 2003) (to be codified at 8 C.F.R. § 1003.1(h)). The authority of the INS Commissioner to refer Board decisions to the Attorney General is now vested in the Secretary of Homeland Security, or in "specific officials of the Department of Homeland Security designated by the Secretary with the concurrence of the Attorney General." 8 C.F.R. § 1003.1(h)(iii).

VZ Termination_0065

Cite as 23 I&N Dec. 572 (A.G. 2003)                    Interim Decision #3488

to questions of law arising under those statutes.[2] This statutory framework is consistent with the Attorney General's traditional role as the primary interpreter of the law within the Executive Branch. *See generally* 28 U.S.C. §§ 511-13 (2000).

Pursuant to the authority and discretion vested in me under the provisions of section 236(a) of the INA, 8 U.S.C. § 1226(a) (2000),[3] I have determined that the release of respondent on bond was and is unwarranted due to considerations of sound immigration policy and national security that would be undercut by the release of respondent and other undocumented alien migrants who unlawfully crossed the borders of the United States on October 29, 2002. I further determine that respondent has failed to demonstrate adequately that he does not present a risk of flight if released on bond and that he should be denied bond on that basis as well. *See* 8 C.F.R. § 236.1(c)(8) (2002). Accordingly, I order that the BIA's decision and order be vacated, and that respondent be denied bond and detained pending appropriate disposition and proceedings respecting his status under the immigration laws.

---

[2] *See* section 103(a)(1) of the INA, 8 U.S.C. § 1103(a)(1), *as amended by* Homeland Security Act of 2002 Amendments, Division L of Pub. L. No. 108-7, § 105(a)(1), 117 Stat. 531 (2003), which provides:

> The Secretary of Homeland Security shall be charged with the administration and enforcement of this chapter and all other laws relating to the immigration and naturalization of aliens, except insofar as this chapter or such laws relate to the powers, functions, and duties conferred upon the President, Attorney General, the Secretary of State, the officers of the Department of State, or diplomatic or consular officers: *Provided, however,* That determination and ruling by the Attorney General with respect to all questions of law shall be controlling.

[3] Section 1102 of the HSA, 116 Stat. at 2274, added a new subsection (g) to section 103 of the INA, providing as follows:

> The Attorney General shall have such authorities and functions under this Act and all other laws relating to the immigration and naturalization of aliens as were exercised by the Executive Office for Immigration Review, or by the Attorney General with respect to the Executive Office for Immigration Review, on the day before the effective date of the Immigration Reform, Accountability and Security Enhancement Act of 2002.

The Attorney General's authority to detain, or authorize bond for aliens under section 236(a) of the INA is one of the authorities he retains pursuant to this provision, although this authority is shared with the Secretary of Homeland Security because officials of that department make the initial determination whether an alien will remain in custody during removal proceedings. *See* sections 103(a), (g) of the INA, *as amended*; 8 C.F.R. §§ 236.1(c), (d), 287.3(d) (2002).

574

Cite as 23 I&N Dec. 572 (A.G. 2003)          Interim Decision #3488

## I.

My review of the BIA's decision in this case is *de novo*; it is not confined to reviewing the decisions of the BIA or the IJ for legal or factual error. *See Deportation Proceedings of Joseph Patrick Thomas Doherty*, 12 Op. O.L.C. 1, 4 (1988) ("[W]hen the Attorney General reviews a case pursuant to 8 C.F.R. § 3.1(h), he retains full authority to receive additional evidence and to make de novo factual determinations."). In making their decisions in this matter, both the IJ and the BIA were exercising limited authority that is dependent upon delegation from the Attorney General. *See id.* at 4. When I undertake review of such decisions pursuant to a referral under 8 C.F.R. § 1003.1(h), the delegated authorities of the IJ and BIA are superseded and I am authorized to make the determination based on my own conclusions on the facts and the law. The recent promulgation of 8 C.F.R. § 1003.l(d)(3), which precludes the BIA from engaging in de novo review of an IJ's findings of fact, does not affect the de novo standard articulated in *Doherty* because that regulation does not govern the authority of the Attorney General to review BIA decisions.

I now turn to the question of whether respondent should have been detained or released on bond under the authority of section 236(a) of the INA.

## II.

### A.

The law governing the detention or release of aliens such as respondent (i.e., aliens arrested and detained pending a decision on removal) is set forth in section 236(a) of the INA. It provides that the Attorney General may (1) continue to detain the alien; or (2) release the alien on bond or conditional parole. *See* section 236(a) of the INA.[4] Conditional parole is not placed in issue here, so the only question is whether the respondent should be detained or released on bond.

As recognized by the Supreme Court, section 236(a) does not give detained aliens any *right* to release on bond. *See Carlson v. Landon*, 342 U.S. 524, 534 (1952). Rather, the statute merely gives the Attorney General the authority to grant bond *if* he concludes, in the exercise of broad discretion, that the alien's release on bond is warranted. The extensive discretion granted the Attorney General under the statute is confirmed by its further provision that "[t]he Attorney General's discretionary judgment regarding the application of this section shall not be subject to review." Section 236(c) of the INA. Even apart from that provision, the courts have consistently recognized that the Attorney General has extremely broad discretion in

---

[4] *See supra* n.3.

Cite as 23 I&N Dec. 572 (A.G. 2003)                    Interim Decision #3488

determining whether or not to release an alien on bond under this and like provisions. *E.g.*, *Carlson*, 342 U.S. at 540; *United States ex rel. Barbour v. District Dir. of INS*, 491 F.2d 573, 577-78 (5th Cir.), *cert. denied*, 419 U.S. 873 (1974). Further, the INA does not limit the discretionary factors that may be considered by the Attorney General in determining whether to detain an alien pending a decision on asylum or removal. *See, e.g.*, *Carlson*, 342 U.S. at 534 (Attorney General's denial of bail to alien is within his lawful discretion as long as it has a "reasonable foundation"); *Barbour*, 491 F.2d at 578 (INS finding that alien was a threat to national security warranted denial of bond, applying "reasonable foundation" standard); *see also Sam Andrews' Sons v. Mitchell*, 457 F.2d 745, 748 (9th Cir. 1972) (Attorney General's exercise of discretionary authorities under the INA must be upheld if they are founded "on considerations rationally related to the statute he is administering").

Further discretionary authority for the release on bond of aliens such as respondent is found in subpart A, section 236.1 of the INS regulations governing "Detention of Aliens Prior to Order of Removal." *See* 8 C.F.R. § 236.l(c)(8). This regulation provides:

> Any officer authorized to issue a warrant of arrest *may, in the officer's discretion*, release an alien not described in section 236(c)(1) of the Act, under the conditions at section 236(a)(2) and (3) of the Act; provided that the alien must demonstrate to the satisfaction of the officer that such release would not pose a danger to property or persons, and that the alien is likely to appear for any future proceeding.

*Id.* (emphasis added). This provision gives the DHS discretionary authority to release a covered alien on bond if, and only if, the alien makes a satisfactory demonstration with respect to the stated criteria. Like section 236(a), it does not establish any right to release on bond.

## B.

I will now briefly summarize the pertinent facts and contentions of the parties indicated in the record.

As noted above, respondent arrived off the shores of Florida in an overloaded vessel with 216 undocumented aliens from Haiti and the Dominican Republic on October 29, 2002. After the vessel sought to evade the orders and interdiction efforts of a U.S. Coast Guard ("USCG") vessel, some of the alien passengers jumped from the vessel and swam ashore. After the migrant vessel ran aground, the remaining passengers disembarked and, despite the order of USCG officers to stop, ran ashore and fled from law enforcement officers before they were apprehended. *See* INS Brief, Exh. A (Declaration of Captain Mark J. Kerski, USCG) ("Kerski Declaration"). I find nothing in the record showing that respondent was not among the alien

VZ Termination_0068

Cite as 23 I&N Dec. 572 (A.G. 2003)                    Interim Decision #3488

migrants who disobeyed the orders of, and sought to evade, USCG or law enforcement officers ashore in an effort to enter the United States unlawfully.

The respondent offered limited evidence and information in the proceedings below in support of his claims that he did not present a danger to the community, a risk of flight, or a threat to national security. Respondent testified that he has not been arrested or convicted of a crime; and that, if released, he would live with an uncle residing in New York, New York, who would provide him with food, shelter, and transportation while he applied for asylum. Memorandum Decision of the Immigration Judge, *In re D-J-*, at 2 (Dec. 12, 2002) ("IJ Dec.").

Respondent's brief before the BIA asserts that he was "willingly taken into INS custody." Respondent's Brief in Support of the Immigration Judge's Custody Determination at 3 ("Respondent's Brief"). That assertion, however, does not address whether the respondent was among the migrants who sought to evade USCG and other law enforcement officers after coming ashore, as indicated in the USCG's Kerski Declaration. Respondent's brief further asserts that, because he does not speak or understand English, he could not be expected to obey any orders from English-speaking law enforcement officers at the time he came ashore. That assertion, however, does not address the likelihood, indicated by the content of the Kerski Declaration, that the circumstances in which those orders were issued were such that their meaning would have been clear in context, without regard to the particular words uttered by the officers. *See* INS Brief, Exh. A, ¶¶ 4-6.

In opposing respondent's contentions, the INS submitted declarations from officers of the Coast Guard, the Department of State, and the Department of Defense ("DOD") as exhibits before the IJ and the BIA.[5] INS maintains that these declarations show that there are strong concerns of national security requiring the continued detention of the respondent and similarly situated undocumented migrants pending removal proceedings. Two general areas of concern are implicated. First, there is a concern that the release of aliens such as respondent and the other October 29 migrants would tend to encourage further surges of mass migration from Haiti by sea, with attendant strains on national and homeland security resources. Such mass migrations would also place the lives of the aliens at risk. Second, in light of the terrorist attacks of September 11, 2001, there is increased necessity in preventing undocumented aliens from entering the country without the screening of the immigration inspections process.

---

[5] The exhibits submitted with the INS brief included: Declaration of Captain Mark J. Kerski, USCG (Exhibit A); Memorandum from the United States Department of State (Exhibit B); Declaration of Captain Kenneth A. Ward, USCG (Exhibit C); Declaration of Johnny Williams (Exhibit D); Supplemental Declaration of Captain Kenneth A. Ward, USCG (Exhibit E); and Declaration of Joseph J. Collins, Deputy Assistant Secretary of Defense for Stability Operations (Exhibit F).

VZ Termination_0069

Cite as 23 I&N Dec. 572 (A.G. 2003)                    Interim Decision #3488

The first area of national security concern advanced by INS is the threat of further mass migration. INS asserts that reports and rumors of successful entry into the United States by Haitian migrants have fueled recent migration surges and the perception of further successful entries could encourage further mass migration attempts.[6] In support of this contention, INS has submitted a memorandum issued by the State Department supporting detention of the migrants who landed in Florida on October 29, 2002, in order to prevent further mass migrations. The memorandum states in relevant part:

> The disposition of those detained in the October 29 arrival will spur further migration if they are released into the U.S. Such treatment would create a perception in Haiti of an easing in U.S. policy with respect to admission of migrants. For this reason, the Department of State strongly recommends that the 216 migrants (207 Haitians, 9 Dominicans) from the boat which reached Key Biscayne on October 29 be detained while they undergo processing. The migrants should be detained unless and until they demonstrate a well-founded fear of persecution. Those who cannot do so should continue to be held, absent a compelling humanitarian reason for release, until they can be expeditiously repatriated.

INS Brief, Exh. B (State Department Memorandum). The State Department memorandum sets forth extensive and detailed information documenting the relationship between perceptions in Haiti of successful U.S. entry by seagoing migrants and the likelihood of further mass migrations. *Id.*

The declarations submitted from the Coast Guard (*see supra* n.6) and the Defense Department express corroborating statements regarding this concern. The Coast Guard states that "[a]necdotal reporting and operational experience strongly suggests that detaining and swiftly repatriating those who illegally and unsafely attempt to enter the United States by sea is a significant deterrent to surges in illegal immigration and mass migration." INS Brief, Exh. C, ¶ 9 (Declaration of Captain Kenneth A. Ward, USCG). Similarly, the Department of Defense declaration states that "[a]ctual or even *perceived* changes in U.S. immigration policy can trigger mass migration events by encouraging other potential illegal migrants." *See* INS Brief, Exh. F, ¶ 5 (Declaration of Joseph J. Collins, Deputy Assistant Secretary of Defense for Stability Operations).

The INS submissions also outline an additional national security implication of encouraging future mass migrations by sea from Haiti. The Coast Guard declaration asserts that continued mass migrations from Haiti have "heavily taxed Coast Guard capacity and capabilities," while "reducing

---

[6]  Following the successful landing of more than 200 Haitians on October 29, 2002, on November 7, 2002, and again on November 9, 2002, the USCG successfully interdicted three groups of undocumented Haitian migrants attempting to transit to the United States via the Bahamas. In all, 264 Haitian migrants were interdicted on these dates. Such incidents are "typical of a surge in Haitian migrant departures following similar successful landings and demonstrates the 'pull' factor that successful landing can have." INS Brief, Exh. E, ¶ 3 (Supplemental Declaration of Captain Kenneth A. Ward, USCG).

responsiveness in other mission areas." INS Brief, Exh. C, ¶ 7. The Department of Defense, which is also involved in efforts to contain such overseas migrations, also asserts that the demands of mass migrations from Haiti "would create a drain on scarce assets that are being used in or supporting operations elsewhere." INS Brief, Exh. F, ¶ 8.

The declarations submitted by INS also substantiate a national security concern raised by the prospect of undocumented aliens from Haiti being released within the United States without adequate verification of their background, associations, and objectives. Thus, the State Department declaration asserts that it has "noticed an increase in third country nations (Pakistanis, Palestinians, etc.) using Haiti as a staging point for attempted migration to the United States. This increases the national security interest in curbing use of this migration route." INS Brief, Exh. B, ¶ 11. Relatedly, the Coast Guard's supplemental declaration asserts that the boatloads of interdicted Haitians have included persons previously deported for drug trafficking and subject to outstanding felony warrants. INS Brief, Exh. E, ¶ 4 (Supplemental Declaration of Captain Kenneth A. Ward, USCG). The Coast Guard further asserts that "because maritime migrants are typically undocumented and carry little or no identification, it is often difficult to ascertain the identity and background of interdicted persons, particularly in large groups, which presents potential threats to officer safety, as well as national security." *Id.*

## III.

Having considered the record and the briefs of the parties, and exercising my authority under section 236(a) of the INA, I have determined that the release of respondent on bond is unwarranted.

I conclude that releasing respondent, or similarly situated undocumented seagoing migrants, on bond would give rise to adverse consequences for national security and sound immigration policy. As demonstrated by the declarations of the concerned national security agencies submitted by INS, there is a substantial prospect that the release of such aliens into the United States would come to the attention of others in Haiti and encourage future surges in illegal migration by sea. Encouraging such unlawful mass migrations is inconsistent with sound immigration policy and important national security interests. As substantiated by the government declarations, surges in such illegal migration by sea injure national security by diverting valuable Coast Guard and DOD resources from counterterrorism and homeland security responsibilities. Such national security considerations clearly constitute a "reasonable foundation" for the exercise of my discretion to deny release on bond under section 236(a). *See Carlson*, 342 U.S. at 534; *Barbour*, 491 F.2d at 578.

Cite as 23 I&N Dec. 572 (A.G. 2003)                Interim Decision #3488

I have noted the BIA's suggestion that the INS's recent adoption of a policy placing certain aliens (including many undocumented aliens who arrive by sea and are not admitted or paroled) in expedited removal proceedings in which affected aliens, with limited exceptions, would be automatically detained without review by an IJ or the BIA tends to negate the INS's concern regarding the encouragement of migration surges. BIA Dec. at 2 n.3; *see* Notice Designating Aliens Subject to Expedited Removal Under Section 235(b)(1)(A)(iii) of the Immigration and Nationality Act, 67 Fed. Reg. 68,924-26 (Nov. 13, 2002). The offsetting effect suggested by the BIA would presumably be due to the prospect that the new expedited removal policy will be so restrictive that potential Haitian migrants would learn of that and be deterred from future migration attempts, regardless of respondent's fate and that of the other October 29 migrants. While the expedited removal policy may reduce the incidence of seagoing Haitian migrants being released on bond pending removal, it hardly provides airtight assurance against future successful entries by such migrants through legal and extra-legal maneuvers, or the encouragement of additional maritime migrations likely to arise from such entries. I note, for example, that the policy's strict detention provision is entirely inapplicable to aliens who are admitted or paroled. In any event, even if the new policy somewhat reduced the expectations of further successful U.S. entries, the release of respondent and hundreds of others from the October 29 migrant group would strongly undercut any resultant deterrent effect arising from the policy. The persistent history of mass migration from Haiti, in the face of concerted statutory and regulatory measures to curtail it, confirms that even sporadic successful entries fuel further attempts. I therefore am not persuaded that the new expedited removal policy negates the migration "surge" consideration.

I further conclude that the release on bond of undocumented seagoing migrant aliens from Haiti without adequate background screening or investigation presents a risk to national security that provides additional grounds for denying respondent's release on bond. This consideration is fortified by the State Department's assertion that it has observed an increase in aliens from countries such as Pakistan using Haiti as a staging point for migration to the United States. Under the current circumstances of a declared National Emergency, the Government's capacity to promptly undertake an exhaustive factual investigation concerning the individual status of hundreds of undocumented aliens is sharply limited and strained to the limit. Under these circumstances, it is reasonable to make a determination that aliens arriving under the circumstances presented by the October 29 influx should be detained rather than released on bond. There is substantial risk that granting release on bond to such large groups of undocumented aliens may include persons who present a threat to the national security, as well as a

VZ Termination_0072

Cite as 23 I&N Dec. 572 (A.G. 2003)                    Interim Decision #3488

substantial risk of disappearance into the alien community within the United States.

I note that the BIA has acknowledged the seriousness of INS's arguments that the detention or release of these aliens implicates important national security interests. *See* BIA Dec. at 2. The BIA determined, however, that such considerations fall "outside the scope of Immigration Judge bond proceedings as such proceedings are currently constituted," except where individual considerations show that the respondent is not likely to appear or presents a danger to the community. The BIA then stated: "Absent contrary direction from the Attorney General, we therefore agree with the Immigration Judge's focus on the respondent's individual likelihood to appear and individual danger to the community." *Id.* This opinion provides the BIA and Immigration Judges with the "contrary direction" to which the BIA referred. In future proceedings involving similarly situated aliens, this opinion constitutes binding precedent, requiring the BIA and IJs to apply the standards set forth herein, including consideration of national security interests. *See generally Iran Air v. Kugelman*, 996 F.2d 1253, 1260 (D.C. Cir. 1993) (administrative judges "are entirely subject to the agency on matters of law"). Further, in all future bond proceedings involving aliens seeking to enter the United States illegally, where the Government offers evidence from sources in the Executive Branch with relevant expertise establishing that significant national security interests are implicated, IJs and the BIA shall consider such interests.

Finally, I conclude that respondent has not individually demonstrated that he satisfies the prerequisites to discretionary release on bond under the provisions of 8 C.F.R. § 236.l(c)(8). INS may (but is not required to) grant release under that provision if the alien demonstrates to its satisfaction that such release would not pose a danger to property or persons, and that the alien is likely to appear for any future proceeding. I do not find that respondent has adequately demonstrated that he is likely to appear at future proceedings for purposes of granting release on bond pursuant to section 236(a)(2) of the INA or 8 C.F.R. § 236.l(c)(8). There are strong indications in the record that respondent was among those aliens who sought to evade Coast Guard and law enforcement officers in a determined effort to effect illegal entry into the United States. Because such evasive behavior does not provide reassuring evidence of respondent's likely reliability in appearing for future proceedings, it was incumbent upon respondent to produce substantial countervailing evidence as to that criterion. I conclude that the minimal showing made by respondent on this point was insufficient to demonstrate the likelihood of his appearance for future proceedings.[7]

---

[7] The INS also offered evidence disputing respondent's claim that, individually, he does not
(continued...)

Cite as 23 I&N Dec. 572 (A.G. 2003)                    Interim Decision #3488

In addition, I note that the respondent was denied asylum by the Immigration Judge on February 12, 2003. The respondent appealed that decision to the BIA on March 14, 2003, and that appeal remains pending. The IJ's denial of the respondent's application for asylum increases the risk that the respondent will flee if released from detention. "A respondent with a greater likelihood of being granted relief from deportation has a greater motivation to appear for a deportation hearing than one who, based on a criminal record or otherwise, has less potential of being granted such relief." *Matter of Andrade*, 19 I&N Dec. 488, 490 (BIA 1987).

IV

Although neither the IJ nor the BIA chose to address the issue, respondent contends that he is constitutionally entitled on due process grounds to an "individualized determination" of his request for release on bond and that denying bond on broad national security grounds that are generally applicable to the October 29 migrants would somehow violate such a right. Respondent's Brief at 6-8. In that regard, I note that several federal appellate courts have recently held that a *lawful permanent resident alien* has a due process right to an individualized hearing and determination on whether he poses a risk of flight or a danger to the community when subjected to the mandatory detention provisions of section 236(c) of the INA. *See Kim v. Ziglar*, 276 F.3d 523 (9th Cir.), *cert. granted sub nom. Demore v. Hyung Joon Kim*, 536 U.S. 956 (2002); *Patel v. Zemski*, 275 F.3d 299, 314-15 (3d Cir. 2001); *see also Hoang v. Comfort*, 282 F.3d 1247, 1256 (10th Cir. 2002). Another federal appeals court has reached a contrary conclusion on that issue, *see Parra v. Perryman*, 172 F.3d 954, 958 (7th Cir. 1999), and the Supreme Court has granted the Government's petition for a writ of certiorari and heard oral argument in *Kim*.

I first note that the decisions in *Kim* and *Patel* were specifically addressed to the *mandatory* detention provisions of section 236(c) of the INA and are therefore fundamentally distinguishable from the procedures afforded under section 236(a). Section 236(c) requires nondiscretionary detention as a categorical statutory mandate for those aliens covered by it, whereas section 236(a) affords aliens to whom it applies the opportunity to seek discretionary relief (bond or conditional parole) in a hearing before an Immigration Judge. *See Kim*, 276 F.3d at 533.

More significantly, however, the holdings in *Kim* and *Patel* were premised upon the petitioner's status as a lawful permanent resident alien. *See Kim*, 276 F.3d at 528, 534; *Patel*, 275 F.3d at 307. In contrast, respondent has not

---

[7] (...continued)
pose a danger to the community and is likely to appear in future proceedings. *See* INS Brief at 14-15.

VZ Termination_0074

even been admitted to the United States, let alone acquired the status of a lawful permanent resident alien. Respondent's status is that of an undocumented alien, charged as being inadmissible as an alien present in the United States without having first been admitted or paroled. *See* section 212(a)(6)(A)(i) of the INA. As an alien who has "not yet gained initial admission to the United States," he does not qualify for the limited due process protection extended to "admitted" aliens under the sharply distinguishable circumstances presented in *Zadvydas v. Davis*, 533 U.S. 678, 682 (2001) ("We deal here with aliens who were admitted to the United States but subsequently ordered removed. Aliens who have not yet gained initial admission to this country would present a very different question."). As explained by the court in *Gisbert v. United States Attorney General*, 988 F.2d 1437, 1440 (5th Cir.), *amended on other grounds*, 997 F.2d 1122 (5th Cir. 1993): "Although aliens seeking admission into the United States may physically be allowed within its borders pending a determination of admissibility, such aliens are legally considered to be detained at the border and hence as never having effected entry into this country." *Accord United States v. Lopez-Vasquez*, 227 F.3d 476, 484-85 (5th Cir. 2000); *Zheng v. INS*, 207 F.Supp.2d 550, 552 (E.D. La. 2002) ("The detention of aliens who have been denied initial admission into the United States does not implicate the Fifth Amendment, even if such aliens were subsequently paroled or released within the country.").

Even if the respondent *were* entitled to an individualized hearing, however, such a conclusion would not support a contention that this respondent's request for release on bond must be determined exclusively on the basis of his individual situation, rather than on the basis of general considerations applicable to a category of migrants, as a matter of constitutional due process. The mere fact that general considerations are introduced does not negate the individual nature of the hearing. The Attorney General is broadly authorized to detain respondent, and deny his request for bond, based on any reasonable consideration, individualized or general, that is consistent with the Attorney General's statutory responsibilities. *See Reno v. Flores*, 507 U.S. 292, 313-14 & n.9 (1993) (rejecting juvenile aliens' demands for an "individualized custody hearing" and upholding INS use of "reasonable presumptions and generic rules" in such cases).

In any event, I have given full consideration to the individual aspects of respondent's claim for bond based on the record in this proceeding. I find nothing in respondent's individual case that warrants granting him release on bond when balanced against the above-described compelling factors that militate against such release in the case of undocumented aliens attempting illegal entry into the United States under the circumstances presented by the October 29 influx.

VZ Termination_0075

Cite as 23 I&N Dec. 572 (A.G. 2003)          Interim Decision #3488

Finally, I note that respondent argued to the BIA that an INS policy of detaining Haitian migrants in order to deter other Haitians from migrating to the United States seeking asylum violates international law. *See* Respondent's Brief at 8-9. In support of his argument, he invokes the right to asylum protected by Article 14 of the Universal Declaration of Human Rights ("UDHR") and an advisory opinion of the United Nations High Commission for Refugees stating that "asylum seekers should not be detained for purposes of deterrence." *Id.* at 8. The BIA did not address respondent's arguments on this point in its decision.

This argument is without merit. First, the UDHR is merely a nonbinding expression of aspirations and principles, rather than a legally binding treaty. *See Haitian Refugee Center v. Gracey*, 809 F.2d 794, 816 n.17 (D.C. Cir. 1987) (UDHR "is merely a nonbinding resolution, not a treaty"). In any event, the application of U.S. law to protect the nation's borders against mass migrations by hundreds of undocumented aliens violates no right protected by the UDHR or any other applicable rule of international law. As the Supreme Court has recognized, "'[T]he power to expel or exclude aliens [is] a fundamental sovereign attribute exercised by the Government's political departments . . . .'" *Fiallo v. Bell*, 430 U.S. 787, 792 (1977) (quoting *Shaughnessy v. United States ex rel. Mezei*, 345 U.S. 206, 210 (1953)). The authority to expel aliens is meaningless without the authority to detain those who pose a danger or a flight risk during the process of determining whether they should be expelled. The national security interests invoked in this opinion are directed at unlawful and dangerous mass migrations by sea, not the right to seek asylum. Aliens who do arrive in the United States, including the respondent himself, are afforded the right to apply for asylum and have those applications duly considered.[8]

---

[8]  I note that a regional official of the United Nations High Commissioner for Refugees ("UNHCR") has sent me a letter volunteering certain comments on this proceeding. Letter for The Honorable John Ashcroft, Attorney General of the United States, from Guenet Guebre-Christos, Regional Representative, United Nations High Commissioner for Refugees, *Re: Matter of D-J-, Advisory Opinion on Detention of Asylum Seekers* (March 28, 2003). In brief, the UNHCR letter makes certain arguments invoking purported obligations arising under the 1967 Protocol Relating to the Status of Refugees, 19 U.S.T. 6223, T.I.A.S. No. 6577 (Jan. 31, 1967) ("Protocol"), and the 1951 United Nations Convention Relating to the Status of Refugees, 189 U.N.T.S. 150 (1954), 19 U.S.T. 6259, 6278, T.I.A.S. No. 6577 (1968) ("Convention"). The United States is not a party to the Convention, but it is a party to the Protocol, which incorporates by reference Articles 2 through 34 of the Convention. The Protocol is not self-executing, but Congress has incorporated into the INA, through the Refugee Act of 1980, the appropriate requirements of the Protocol. Consequently, the Protocol does not afford respondent any rights beyond what he is afforded under the federal immigration laws, as applied in this decision. *See Abdelwahed v. INS*, 22 Fed.Appx. 811, 815, 2001 WL 1480651 (9th Cir. 2001) (stating that "the Protocol does not give [the petitioner] any rights beyond what he already enjoys under the immigration statutes"); *Legal Obligations of*

(continued...)

Cite as 23 I&N Dec. 572 (A.G. 2003)                    Interim Decision #3488

## CONCLUSION

I have determined that respondent's release on bond under the provisions of section 236(a) of the INA is unwarranted. The BIA's Order of March 13, 2003, is hereby vacated and respondent is to be detained pending decision on removal.

---

[8] (...continued)
*the United States under Article 33 of the Refugee Convention*, 15 Op. O.L.C. 86, 87 (1991) ("[T]he Protocol by which the United States adhered to the Convention is not self-executing for domestic law purposes. Accordingly, the Protocol itself does not create rights or duties that can be enforced by a court.").

VZ Termination_0077

# The Persistence of the Venezuelan Migrant and Refugee Crisis



Photo: LUIS ACOSTA/AFP via Getty Images

Commentary by **Betilde Muñoz-Pogossian** and **Alexandra Winkler**

Published November 27, 2023

The outflow of refugees and migrants from Venezuela is the largest displacement crisis in the world, with almost 7.7 million migrants and refugees as of August 2023. This is an even greater number than the displacement of Syrians or Ukrainians outside of their countries. Despite these numbers, the Venezuelan migrant and refugee crisis, quite unfortunately, has climbed down the list of political and policy priorities, with fewer headlines in the media and sporadic policy conversations in Washington.

On one hand, there is a sense that this is the new normal for the region and that host countries in Latin America and the Caribbean will have to continue to manage the influx of 6.4 million Venezuelans and counting as best as they can. On the other hand,

it seems that neighboring countries across the region are willing to continue discussions on how best to address migration and forced displacement, but by removing the Venezuelan political focus from the center of the migrant and refugee discussion. The truth is, however, that this is a crisis that persists, and is likely to continue as long as the root causes are not addressed.

The efforts from the region to respond have been commendable thus far. They have varied but have generally followed a spirit of regional solidarity as well as pragmatism in the wake of large-scale Venezuelan inflows. Important regional innovations have also characterized this recent period. Receiving countries in the Americas have extended options to displaced Venezuelans to regularize their status (often with financial support and encouragement from the United States), and other policies have also sought to ensure access to the labor market, health services, and basic education.

Despite these efforts, the reality is that the region is still recovering from Covid-19 setbacks. Venezuelan migrants are now leaving countries like Colombia, Ecuador, Peru, and Chile, where they had originally migrated, due to low salaries, inflation, and lack of jobs, and are making the dangerous trek to reach the U.S. border. To understand the scale of these flows, going by the number of Venezuelans crossing the Darién Gap, the remote stretch of rainforest located between Colombia and Panama, a record 400,000 migrants have crossed during the first nine months of this year, according to Panamanian officials, and Venezuelans account for an estimated 60 percent of those, namely around 240,000, the most of any nationality. In search of the American dream, record numbers of migrants have also reached the U.S.-Mexico border, with 262,633 Venezuelans having crossed just in 2023, up from 189,520 in 2022.

The root causes that generated this unprecedented flow of migrants and refugees, including democratic breakdown, repression, and a lack of basic human rights, remain unchanged in Venezuela. There is also a deep economic crisis driven by devastating policies and a kleptocracy that has characterized the political landscape during the last 20 years. There are also challenges for Venezuelans in receiving countries, such as limited access to legal documentation, basic services, economic opportunities, and rising xenophobia. In addition, with the sometimes tumultuous

changes in governments in Latin America, Venezuelans <u>prefer to leave receiving countries</u> than to go through another national crisis. All these elements will remain throughout 2023, and therefore migration flows should be expected to continue, and even increase in 2024.

The Venezuelan migrant and refugee crisis is still a crisis, and it does not look like it will fix itself anytime soon. Here are some reasons why.

## Venezuelans continue to migrate, even if it means risking their own lives.

The challenges faced by the <u>7,710,887 displaced Venezuelans throughout the world</u>, and the <u>stories of so many of them</u> moving throughout the Americas demonstrates the danger they are in–especially when they attempt to cross the harrowing Darién Gap. This 575,000 hectares of jungle between Panama and Colombia has become one of <u>the Western Hemisphere's most pressing focal points of the crisis</u>. According to the <u>United Nations Office of the High Commissioner for Human Rights</u> (UNHCR), migrants are exposed to "multiple human rights violations, including sexual violence, murders, disappearances, trafficking, robbery and intimidation by organized criminal groups."

Despite this life-threatening journey  which can take almost 10 days  the numbers, as reported by Panamanian authorities, have gone up exponentially, from the almost unthinkable record of nearly 250,000 in 2022 to more than 330,000 in 2023. A gut-wrenching element is that <u>one in five of these migrants were children</u>. Regardless of initiatives such as the <u>Humanitarian Parole for Venezuelans</u> in the United States, and the <u>Safe Mobility</u> initiative (which was announced by the United States government to provide legal pathways to the United States for refugees and migrants in South and Central America) migrants continue to cross the jungle. In August alone, <u>almost 82,000 people made the trek through the Darién</u>, by far the largest single-month total on record. The United States has also tried joint efforts with the Colombian and Panamanian authorities to end the "irregular movement of people" by signing an ambitious <u>agreement</u> in April. But the countries' expectations to end migration through the Darién Gap, reduce poverty, and create jobs and new legal pathways, all in just 60 days, only confirmed they were unrealistic from the start. Unless more comprehensive and impactful action to address this humanitarian crisis is prioritized,

3/7/25, 11:18 AM    Case 3:25-cv-01766-EMC    The Persistence of the Venezuelan Migrant and Refugee Crisis    Page 81 of 95

also focusing on addressing the root causes, other political and criminal interests will continue to make a profit from the desperation of these Venezuelans.

## Latin American countries cannot take on the burden of providing humanitarian assistance alone.

According to the International Organization for Migration and UNHCR's Regional Refugee and Migrant Response Plan (RMRP), by the end of 2023, it is projected that there will be 6.83 million Venezuelan refugees and migrants in Latin America, with over 5 million of them in need of humanitarian assistance. This is simply too large a number for a region that has not recovered from preexisting social inequalities that Covid-19 worsened, or structural problems fueled by economic recession and political upheaval.

Although Latin America has been an example of migrant integration with its open-door policy from countries like Colombia, this year, more than 4 million displaced Venezuelans throughout the region cannot fully access food, shelter, healthcare, education and formal employment, according to the Regional Inter-Agency Coordination Platform for Refugees and Migrants from Venezuela (R4V) platform. Under these conditions, Venezuelans in receiving countries with jobs in the informal labor market will have a harder time becoming self-sufficient.

For example, according to the Jesuit Refugee Service in Chile, almost 70,000 Venezuelans have left Chile since 2021. The high cost of living and lack of economic opportunities are among the top reasons for leaving the country. In the case of Colombia, while no official data is available on the number of Venezuelans with temporary protection status (TPS) who have migrated, many of those going to the United States say they decided to leave Colombia because they did not earn enough to support their families. Considering almost all countries in Central America and Mexico require visas for Venezuelans, the only viable option for migrants is to continue heading north.

With the Biden administration's announcement redesignating Venezuela as continuing to be eligible for TPS for all who arrived in the United States before July 31, 2023, and with over 472,000 potentially benefiting from the measure and quickly

3/7/25, 11:18 AM       Case 3:25-cv-01766-EMC     The Persistence of the Venezuelan Migrant and Refugee Crisis     Document 114     Page 82 of 95

allowing them to work legally, the magnetic pull north continues to be a factor. A recent more restrictive measure, however, to resume removals of Venezuelans at the border who do not have a legal basis to remain in the United States may serve to slow down the growth in numbers. This move also sheds light on what seems to be continued quiet U.S. negotiations with Venezuela, suggesting a sense of normalcy is being sought and that indicate that the country is "safe enough" to deport its citizens back to the undemocratic regime that forced them to leave. After the announcement, between October 18 and 23, the United States has already deported over 220 Venezuelans in two flights, and they were alarmingly received in country by Maduro's security and intelligence forces: SEBIN, PNB and GNB.

The bottom line here is that there is an urgent need for more international support. Only 12 percent of the $1.72 billion the R4V requested for the 2023 2024 Regional Refugee and Migrant Response Plan has been collected. In 2022, that number was 27 percent, confirming that the lack of funds this year is directly proportional to the reduced attention this crisis has across the international community. Without a doubt, humanitarian aid is critical to ease Venezuelan suffering across the region. Although the 2.7 billion dollars that the U.S. government has provided since 2017 has been very generous, it is unfortunately not enough to support the Venezuelans who have had to leave their country nor to address the underlying conditions that caused them to migrate in the first place. The Venezuelan migrant and refugee crisis is probably the most underfunded displacement crisis in the world, even beyond the Rohingya or the South Sudanese.

The repercussions of this migration crisis are also being felt in cities across the United States. The fact that the situation has worsened is evidenced by recent declarations by New York mayor Eric Adams who has said that the ongoing migrant crisis "will destroy New York City." Adams said 110,000 asylum seekers have passed through New York city since April 2022 and the issue is creating a 12 billion-dollar budget deficit. Other cities such as Chicago and Washington, D.C. are also reaching breaking points. Despite efforts from mayors to accommodate Venezuelan migrants, city shelters, police stations, and aid services are at maximum capacity. Hopefully all authorities, especially at the state and local level, can find longer-term solutions, such as requesting an increase in federal funding to attend to this influx, expediting

mechanisms to grant work authorizations so that migrants can escape informal labor, and advocating for a more permanent extension of temporary protective status for all Venezuelans.

## The longer the Maduro regime stays in power, the more people will flee.

Opposition primaries held on October 22, with the participation of over 2.3 million people, show that Venezuelans have not lost hope in the electoral route to regain democracy in Venezuela, especially when the candidate María Corina Machado won with over 90 percent of the votes. Over 132,000 votes came from the powerful force of the Venezuelan diaspora. If the diaspora is considered as a "state," Venezuelans abroad are in first place in participation in percentage terms (37.35 percent), well above the national average (12.83 percent) placing the diaspora among the five "electoral states" with the highest participation in terms of absolute numbers. This amply demonstrates that allowing migrants and refugees to register to vote will be an important condition to enable free and fair elections in 2024. Even though the U.S. administration agreed to broadly lift sanctions on the oil sector in exchange for democratic conditions for the 2024 electoral process, the regime still needs to keep their part of the deal. Unfortunately, today, that seems far-fetched when Maduro is calling the primaries a fraud and the Supreme Tribunal is opening investigations to persecute the members of the National Primary Committee who organized the event.

If no indication of regime change seems in sight and the 2024 presidential elections are not free or fair, upticks in migration should be expected, as Venezuelans will continue to leave the country in search of better opportunities. Therefore, it is critical not to overlook this migrant crisis nor normalize it, as it is evidence of the persistence of the democratic and economic breakdown in this country, which continues to be a threat to the stability of the region and the world.

*Betilde Muñoz-Pogossian is a senior associate (non-resident) with the Americas Program at the Center for Strategic and International Studies (CSIS) in Washington, D.C. Alexandra Winkler is a senior associate (non-resident) with the CSIS Americas Program.*

*The views expressed are those of the authors and do not represent official positions of the Organization of American States (OAS).*

---

*Commentary* is produced by the Center for Strategic and International Studies (CSIS), a private, tax-exempt institution focusing on international public policy issues. Its research is nonpartisan and nonproprietary. CSIS does not take specific policy positions. Accordingly, all views, positions, and conclusions expressed in this publication should be understood to be solely those of the author(s). © 2023 by the Center for Strategic and International Studies. All rights reserved.

---

## Tags

Americas, Human Rights, Humanitarian Assistance, and Conflict and Humanitarian Crises

---

Center for Strategic and International Studies

1616 Rhode Island Avenue, NW

Washington, DC 20036

Tel: 202.887.0200

Fax: 202.775.3199

MEDIA INQUIRIES

**H. Andrew Schwartz**

Chief Communications Officer

   202.775.3242

   aschwartz@csis.org

**Samuel Cestari**

Media Relations Coordinator, External Relations

   202.775.7317

   scestari@csis.org

See Media Page for more interview, contact, and citation details.

©2025 Center for Strategic & International Studies. All Rights Reserved.





Updated January 13, 2025

# Venezuela: Political Crisis and U.S. Policy

Over the past decade, some Members of Congress have expressed concerns about the erosion of democracy in Venezuela under President Nicolás Maduro (2013-present). Maduro took office after garnering a narrow electoral victory following the death of Hugo Chávez (in office 1999-2013), the founder of the United Socialist Party of Venezuela. Maduro has remained in power following elections in 2018 and 2024 that were both deemed fraudulent by international observers, the United States, and most U.S.-aligned democracies. After the July 28, 2024, election, Maduro claimed victory even though precinct-level vote tabulations published by the opposition indicated that opposition candidate Edmundo González Urrutia, a retired diplomat, won with 67% of the vote. Those vote tabulations comprised nearly 84% of all votes cast. Nevertheless, Maduro began a third term on January 10, 2025, with the support of Venezuelan security forces and allies including China, Cuba, Iran, and Russia.

The Trump Administration sought to promote democracy and human rights in Venezuela by using a "maximum pressure" sanctions strategy to try to compel Maduro to cede power. Sanctions proved insufficient to achieve that end and may have exacerbated an ongoing economic crisis that contributed to massive emigration, including to the United States. The Biden Administration offered limited sanctions relief to try to incentivize Maduro to convene freer and fairer elections in 2024 and to allow U.S. companies to operate in Venezuela's energy sector. The Biden Administration recognized Edmundo González as president-elect in November 2024.

The 119th Congress may assess U.S. policies toward the Maduro government, including whether and how to support the democratic opposition and the efficacy of sanctions, while also considering other U.S. interests. Such interests include U.S. energy companies' desire to operate in Venezuela, which has the world's largest proven oil reserves. They also include preventing irregular migration and compelling the Maduro government to agree to receive Venezuelan migrants removed from the United States. Opposition leader Maria Corina Machado (who was barred from running in the 2024 election) has urged President-elect Trump to focus on promoting democracy and human rights in Venezuela. Some analysts have urged the incoming Administration to negotiate with Maduro on discrete issues in the U.S. interest, such as migration or energy.

## Political Situation

Venezuela, which the nongovernmental organization Freedom House ranked "partly free" under President Hugo Chávez (1999-2013), has deteriorated to "not free" under Maduro. Chávez, a charismatic politician, benefited from high oil prices and won most elections by a large majority. In contrast, Maduro has experienced narrow wins and some electoral defeats (including in the 2015 legislative elections in which his party lost control for the first time since 1999). The opposition, once weak and divided, has remained united since 2022 as the Unitary Platform (PUD).

Maduro has relied on security forces buoyed by corrupt courts to quash dissent. He has allowed security forces to enrich themselves through illicit gold mining, drug trafficking, extortion, and other crimes. The International Criminal Court is investigating whether Venezuelan forces committed crimes against humanity.

Security forces have detained and reportedly abused Maduro's opponents, including dissidents in the military, opposition politicians, and protesters. As of January 9, 2025, the government held 1,700 detainees, including 79 prisoners detained thus far in January 2025, according to Venezuelan human rights group Foro Penal. After the attorney general issued an arrest warrant for González, he fled into exile in September 2024. González visited several countries in January 2025 and met with President Biden in Washington, DC, but reportedly could not return to Venezuela. Machado led protests on January 9, but returned to hiding after Maduro's forces briefly detained her.

## Economic and Humanitarian Crisis

By most accounts, Maduro's government has mismanaged the economy and engaged in massive corruption. Between 2014 and 2021, Venezuela's economy contracted by 80%, according to estimates by the International Monetary Fund (IMF), due to low global oil prices and declines in the country's oil production. According to a February 2021 Government Accountability Office report, sanctions imposed by the United States from 2017 to 2019, particularly those targeting Venezuela's oil industry, contributed to the economic crisis. Hyperinflation declined from 337% in 2023 to 59.6% in 2024, according to the IMF, but income levels remain insufficient for most households to purchase basic necessities. According to one national survey by a Venezuelan university, roughly 82.8% of the population of 26.5 million lived in income poverty in 2023, particularly outside the capital of Caracas.

In 2024, an estimated 7.6 million Venezuelans (28% of the population) required humanitarian assistance, according to the United Nations. Many households lack reliable access to potable water, and interruptions in electrical service and gas supplies persist. With a collapsed health system, overall health indicators, particularly infant and maternal mortality rates, remain poor. Previously eradicated diseases such as measles are a major concern.

As of December 2024, UN agencies estimated there were some 7.9 million Venezuelan refugees and migrants globally. Some 6.6 million of these individuals reside in other Latin American and Caribbean countries. Venezuelan refugees and migrants reportedly face obstacles to keeping jobs and accessing health care; they may be vulnerable to

VZ_Termination_0086

(25 of 33), Page 25 of 33    Case: 25-2120, 05/28/2025, DktEntry: 49.24, Page 25 of 33
Case 3:25-cv-01766-EMC    Document 104-1    Filed 04/07/25    Page 87 of 95

Venezuela: Political Crisis and U.S. Policy

human trafficking and other abuses. These factors have contributed to secondary migration to the United States.

## U.S. Policy

The U.S. government ceased recognizing Maduro as Venezuela's legitimate president in January 2019. The U.S. government recognizes the democratically elected, opposition-controlled 2015 National Assembly as "the only legitimate branch of the Government of Venezuela," even though most of its members are in exile. From January 2019 through December 2022, the 2015 National Assembly backed an interim government led by its former speaker, Juan Guaidó. The Guaidó government received recognition from the United States and nearly 60 governments but never exerted power in Venezuela. The 2015 National Assembly dissolved the interim government in late 2022.

In November 2022, the Biden Administration sought to support Maduro-PUD talks by offering limited sanctions relief. After the flawed July 2024 elections, the Department of the Treasury's Office of Foreign Assets Control (OFAC) imposed sanctions on 37 Maduro officials for undemocratic actions and repression. President Biden reiterated U.S. support for the opposition at a January 6, 2025, meeting with González. On January 10, 2025, OFAC imposed sanctions on eight Maduro officials (in coordination with the European Union, the United Kingdom, and Canada). The State Department revoked visas of Maduro officials and raised the bounty on Maduro and two other top officials facing U.S. indictments. OFAC thus far has maintained specific licenses issued since 2022 allowing certain companies to conduct business with Petróleos de Venezuela, S.A. (PdVSA), Venezuela's state oil company.

**Sanctions and Indictments.** Sanctions are a key part of U.S. policy toward Venezuela. They are based in various legislated authorities, including the Venezuela Defense of Human Rights and Civil Society Act of 2014, and include the following:

- **Individual sanctions** for terrorism, drug trafficking, antidemocratic actions, human rights violations, or corruption (see Executive Order [E.O.] 13692; P.L. 113-278; P.L. 114-194)
- **Financial sanctions** restricting access to U.S. financial markets by the Maduro government and PdVSA (E.O. 13808); prohibiting transactions using Maduro-issued cryptocurrency (E.O. 13827); and prohibiting the purchase of Venezuelan debt (E.O. 13835)
- **Sectoral sanctions** blocking assets and prohibiting unlicensed transactions with PdVSA, Venezuela's central bank, and the state gold mining company, among other entities (E.O. 13850)
- **Sanctions on the Maduro government** blocking assets in the United States and prohibiting transactions with the Maduro government unless authorized as part of efforts to aid the Venezuelan people (E.O. 13884)

In March 2020, the Department of Justice indicted Maduro and 14 top officials for narco-terrorism, drug trafficking, and other crimes.

**Migration.** On January 10, 2025, the Biden Administration announced an 18-month extension and redesignation of the temporary protected status (TPS) for Venezuelans, initially announced in 2021. As of September 30, 2024, an estimated 505,400 Venezuelans were covered by TPS, which provides work authorization and relief from removal. These protections are set to expire in 2026 unless extended by the Secretary of the Department of Homeland Security (DHS). From January 2023 through September 2024, 117,000 Venezuelans arrived in the United States via a parole program for Cubans, Haitians, Nicaraguans, and Venezuelans (the CHNV program). In October 2024, DHS announced it would not extend the two-year parole status for CHNV beneficiaries. Venezuela is a top country of origin for irregular migrants encountered at the U.S. border. The Maduro government does not cooperate with U.S. removals, a barrier for U.S. immigration enforcement.

**U.S. Assistance.** The United States has supported a regional response to the migration crisis. From FY2017 to FY2024, the United States provided over $3.5 billion in humanitarian aid to Venezuela and countries sheltering Venezuelans. From FY2017 to FY2024, U.S. democracy, development, and health assistance allocated from annual appropriations for Venezuela totaled around $336.2 million. FY2024 estimated aid allocations are not yet available.

## Congressional Action

Congress has supported efforts at restoring democracy in Venezuela through foreign assistance and targeted sanctions, but Members have disagreed on whether broad sanctions should have been imposed and under what circumstances sanctions relief should be granted. The last legislation guiding U.S. policy in Venezuela, the VERDAD Act of 2019 (P.L. 116-64), expired in December 2023. The act aimed to hasten a negotiated solution to the crisis. Bills to reauthorize individual sanctions in the VERDAD Act were ordered to be reported in the House (H.R. 6831) and introduced in the Senate (S. 3363); the 118th Congress did not take further action on them. In the Further Consolidated Appropriations Act, 2024 (P.L. 118-47), Congress appropriated $50 million in democracy assistance for Venezuela subject to election-related restrictions.

The 119th Congress may influence U.S. policy toward Venezuela through the appropriations process. The 118th Congress did not complete action on FY2025 appropriations. U.S. assistance programs are continuing at FY2024 enacted levels under a continuing resolution (P.L. 118-158) scheduled to expire on March 14, 2025. The Biden Administration requested $50 million for democracy programs and $3.8 million for global health programs in Venezuela for FY2025. Both the House-passed (H.R. 8771/H.Rept. 118-554) and Senate-introduced versions of the FY2025 Department of State, Foreign Operations, and Related Programs Appropriations act (S. 4797/S.Rept. 118-204) would have met the $50 million request. H.R. 8771 would have placed conditions on that assistance.

The 119th Congress could consider broad legislation to shape U.S. policy toward Venezuela that could include sanctions guidelines, tools to address Maduro's foreign allies and illicit activities, and authorizations for U.S. assistance. Congress also could consider narrow measures to authorize, maintain, expand, loosen, or otherwise alter sanctions. Oversight could examine the degree to which sanctions have advanced U.S. policy goals, and other U.S. policy options.

Venezuela: Political Crisis and U.S. Policy

**Clare Ribando Seelke**, Specialist in Latin American Affairs

IF10230

## Disclaimer

This document was prepared by the Congressional Research Service (CRS). CRS serves as nonpartisan shared staff to congressional committees and Members of Congress. It operates solely at the behest of and under the direction of Congress. Information in a CRS Report should not be relied upon for purposes other than public understanding of information that has been provided by CRS to Members of Congress in connection with CRS's institutional role. CRS Reports, as a work of the United States Government, are not subject to copyright protection in the United States. Any CRS Report may be reproduced and distributed in its entirety without permission from CRS. However, as a CRS Report may include copyrighted images or material from a third party, you may need to obtain the permission of the copyright holder if you wish to copy or otherwise use copyrighted material.

VZ Termination 0088

Act Manager, U.S. Coast Guard, 2703 Martin Luther King Jr. Ave. SE, Stop 7710, Washington, DC 20593–7710.

**FOR FURTHER INFORMATION CONTACT:** A.L. Craig, Office of Privacy Management, telephone 202–475–3528, or fax 202–372–8405, for questions on these documents.

**SUPPLEMENTARY INFORMATION:**

**Public Participation and Request for Comments**

This notice relies on the authority of the Paperwork Reduction Act of 1995; 44 U.S.C. chapter 35, as amended. An ICR is an application to OIRA seeking the approval, extension, or renewal of a Coast Guard collection of information (Collection). The ICR contains information describing the Collection's purpose, the Collection's likely burden on the affected public, an explanation of the necessity of the Collection, and other important information describing the Collection. There is one ICR for each Collection.

The Coast Guard invites comments on whether this ICR should be granted based on the Collection being necessary for the proper performance of Departmental functions. In particular, the Coast Guard would appreciate comments addressing: (1) The practical utility of the Collection; (2) the accuracy of the estimated burden of the Collection; (3) ways to enhance the quality, utility, and clarity of information subject to the Collection; and (4) ways to minimize the burden of the Collection on respondents, including the use of automated collection techniques or other forms of information technology.

In response to your comments, we may revise this ICR or decide not to seek an extension of approval for the Collection. We will consider all comments and material received during the comment period.

We encourage you to respond to this request by submitting comments and related materials. Comments must contain the OMB Control Number of the ICR and the docket number of this request, [USCG–2021–0175], and must be received by May 10, 2021.

**Submitting Comments**

We encourage you to submit comments through the Federal eRulemaking Portal at *https://www.regulations.gov*. If your material cannot be submitted using *https://www.regulations.gov,* contact the person in the **FOR FURTHER INFORMATION CONTACT** section of this document for alternate instructions. Documents mentioned in this notice, and all public

comments, are in our online docket at *https://www.regulations.gov* and can be viewed by following that website's instructions. Additionally, if you go to the online docket and sign up for email alerts, you will be notified when comments are posted.

We accept anonymous comments. All comments received will be posted without change to *https://www.regulations.gov* and will include any personal information you have provided. For more about privacy and submissions in response to this document, see DHS's eRulemaking System of Records notice (85 FR 14226, March 11, 2020).

**Information Collection Request**

*Title:* Outer Continental Shelf Activities—Title 33 CFR Subchapter N.

*OMB Control Number:* 1625–0044.

*Summary:* The Outer Continental Shelf Lands Act, as amended, authorizes the Coast Guard to promulgate and enforce regulations promoting the safety of life and property on Outer Continental Shelf (OCS) facilities. These regulations are located in 33 CFR subchapter N.

*Need:* The information is needed to ensure compliance with the safety regulations related to OCS activities. The regulations contain reporting and recordkeeping requirements for annual inspections of OCS facilities, employee citizenship reports, station bills, and emergency evacuation plans.

*Forms:*

• CG–5432, Fixed OCS Facility Inspection Report.

*Respondents:* Operators of facilities and vessels engaged in activities on the OCS.

*Frequency:* On occasion.

*Hour Burden Estimate:* The estimated burden remains 9,582 hours a year.

*Authority:* The Paperwork Reduction Act of 1995; 44 U.S.C. chapter 35, as amended.

Dated: March 3, 2021.

**Kathleen Claffie,**
*Chief, Office of Privacy Management, U.S. Coast Guard.*

[FR Doc. 2021–04845 Filed 3–8–21; 8:45 am]

**BILLING CODE 9110–04–P**

**DEPARTMENT OF HOMELAND SECURITY**

**U.S. Citizenship and Immigration Services**

[CIS No. 2682–21; DHS Docket No. USCIS–2021–0003]

RIN 1615–ZB86

**Designation of Venezuela for Temporary Protected Status and Implementation of Employment Authorization for Venezuelans Covered by Deferred Enforced Departure**

**AGENCY:** U.S. Citizenship and Immigration Services (USCIS), Department of Homeland Security.

**ACTION:** Notice.

**SUMMARY:** Through this notice, the Department of Homeland Security (DHS) announces that the Secretary of Homeland Security (Secretary) is designating Venezuela for Temporary Protected Status (TPS) for 18 months, effective March 9, 2021, through September 9, 2022. This notice also provides procedures for individuals who believe they are eligible for TPS under the designation of Venezuela to apply. This notice also provides information about Deferred Enforced Departure (DED) for eligible Venezuelan nationals (and persons without nationality who last habitually resided in Venezuela), and provides information on how eligible individuals may apply for DED-related EADs with USCIS, based on the January 19, 2021 memorandum from former President Donald Trump directing the Secretary to take appropriate measures for the implementation of DED for Venezuelan nationals for 18 months, through July 20, 2022 (see 86 FR 6845, dated January 25, 2021).

**Note:** Individuals who apply for and receive TPS and who are also covered by DED do not need to apply for employment authorization under both programs. Individuals who apply for an EAD pursuant to their TPS application will receive an EAD with an expiration date of September 9, 2022, that is eligible for renewal if the Secretary extends TPS for Venezuela after September 9, 2022, after determining that Venezuela continues to meet the conditions supporting its designation for TPS. Individuals who apply for an EAD pursuant to DED will receive an EAD with an expiration date of July 20, 2022. If the President does not direct an extension of the DED authorization, DED, and associated employment authorization, will end on July 20, 2022. USCIS encourages individuals who

**Federal Register** / Vol. 86, No. 44 / Tuesday, March 9, 2021 / Notices    **13575**

believe they are eligible for TPS to file for the benefit during the initial registration period announced in this Notice, even if they are also covered by DED, in case they cannot qualify for TPS late initial filing under 8 CFR 244.2(f)(2) after DED has expired.

**DATES:** The designation of Venezuela for TPS is effective on March 9, 2021, and will remain in effect for 18 months, through September 9, 2022. The 180-day registration period for eligible individuals to submit TPS applications begins March 9, 2021, and will remain in effect through September 5, 2021. DED and employment authorization for noncitizens covered under DED for Venezuela is effective through July 20, 2022.

**FOR FURTHER INFORMATION CONTACT:**
• You may contact Maureen Dunn, Division Chief, Office of Policy and Strategy, U.S. Citizenship and Immigration Services, Department of Homeland Security, by mail at 5900 Capital Gateway Drive, Camp Springs, MD 20746, or by phone at 800–375–5283.

• For further information on TPS, including guidance on the registration process and additional information on eligibility, please visit the USCIS TPS web page at *uscis.gov/tps*. You can find specific information about Venezuela's TPS designation by selecting "Venezuela" from the menu on the left side of the TPS web page.

• For further information on DED, including additional information on eligibility, please visit the USCIS DED web page at *uscis.gov/humanitarian/ temporary-protected-status/deferred-enforced-departure*. You can find specific information about DED for Venezuela by selecting "DED Granted Country: Venezuela" from the menu on the left of the DED web page.

• If you have additional questions about DED or TPS, please visit *uscis.gov/tools*. Our online virtual assistant, Emma, can answer many of your questions and point you to additional information on our website. If you are unable to find your answers there, you may also call our USCIS Contact Center at 800–375–5283 (TTY 800–767–1833).

• Applicants seeking information about the status of their individual cases may check Case Status Online, available on the USCIS website at *uscis.gov*, or visit the USCIS Contact Center at *uscis.gov/contactcenter*.

• Further information will also be available at local USCIS offices upon publication of this notice.

**SUPPLEMENTARY INFORMATION:** Under section 244(b)(1)(C) of the Immigration and Nationality Act (INA), 8 U.S.C. 1254a(b)(1)(C), the Secretary is authorized to designate a foreign state (or any part thereof) for TPS upon finding that extraordinary and temporary conditions in the foreign state prevent its nationals from returning safely, unless permitting the foreign state's nationals to remain temporarily in the United States is contrary to the national interest of the United States. Regardless of an individual's country of birth, this designation allows eligible Venezuelan nationals (and noncitizens having no nationality who last habitually resided in Venezuela) who have continuously resided in the United States since March 8, 2021, and have been continuously physically present in the United States since March 9, 2021, to apply for TPS. This notice also describes the other eligibility criteria applicants must meet. Individuals who believe they may qualify for TPS under this designation may apply within the 180-day registration period that begins on March 9, 2021, and ends on September 5, 2021. They may also apply for TPS-related Employment Authorization Documents (EADs) and for travel authorization.

This notice also provides information about Deferred Enforced Departure (DED) for eligible Venezuelan nationals (and persons without nationality who last habitually resided in Venezuela), and provides information on how eligible individuals may apply for DED-related EADs with USCIS, based on the January 19, 2021 memorandum from former President Donald Trump directing the Secretary to take appropriate measures for the implementation of DED for Venezuelan nationals for 18 months, through July 20, 2022 (see 86 FR 6845, dated January 25, 2021).

**Table of Abbreviations**

BIA—Board of Immigration Appeals
CFR—Code of Federal Regulations
DED—Deferred Enforced Departure
DHS—U.S. Department of Homeland Security
DOS—U.S. Department of State
EAD—Employment Authorization Document
FNC—Final Nonconfirmation
Form I–765—Application for Employment Authorization
Form I–797—Notice of Action (Approval Notice)
Form I–821—Application for Temporary Protected Status
Form I–9—Employment Eligibility Verification
Form I–912—Request for Fee Waiver
Form I–94—Arrival/Departure Record
FR—Federal Register
Government—U.S. Government
IER—U.S. Department of Justice Civil Rights Division, Immigrant and Employee Rights Section
IJ—Immigration Judge
INA—Immigration and Nationality Act
SAVE—USCIS Systematic Alien Verification for Entitlements Program
Secretary—Secretary of Homeland Security
TNC—Tentative Nonconfirmation
TPS—Temporary Protected Status
TTY—Text Telephone
USCIS—U.S. Citizenship and Immigration Services
U.S.C.—United States Code

**Purpose of This Action (TPS)**

Through this notice, DHS sets forth procedures necessary for eligible nationals of Venezuela (or individuals having no nationality who last habitually resided in Venezuela) to submit an initial registration application under the designation of Venezuela for TPS and apply for an EAD. Under the designation, individuals must submit an initial Venezuela TPS application (Form I–821) and they may also submit an application for Employment Authorization (Form I–765), during the 180-day initial registration period that runs from March 9, 2021, through September 5, 2021. In addition to demonstrating continuous residence in the United States since March 8, 2021, and meeting other eligibility criteria, initial applicants for TPS under this designation must demonstrate that they have been continuously physically present in the United States since March 9, 2021, the effective date of this designation of Venezuela, before USCIS may grant them TPS. USCIS estimates that approximately 323,000 individuals are eligible to file applications for TPS under the designation of Venezuela.

**What is Temporary Protected Status (TPS)?**

• TPS is a temporary immigration status granted to eligible nationals of a country designated for TPS under the INA, or to eligible persons without nationality who last habitually resided in the designated country.

• During the TPS designation period, TPS beneficiaries are eligible to remain in the United States, may not be removed, and are authorized to obtain EADs so long as they continue to meet the requirements of TPS.

• TPS beneficiaries may also apply for and be granted travel authorization as a matter of discretion. Upon return from such authorized travel, TPS beneficiaries retain the same immigration status they had before the travel.

○ The granting of TPS does not result in or lead to lawful permanent resident status.

**13576**        **Federal Register** / Vol. 86, No. 44 / Tuesday, March 9, 2021 / Notices

• To qualify for TPS, beneficiaries must meet the eligibility standards at INA section 244(c)(1)–(2), 8 U.S.C. 1254a(c)(1)–(2).

• When the Secretary terminates a country's TPS designation, beneficiaries return to one of the following:

○ The same immigration status or category that they maintained before TPS, if any (unless that status or category has since expired or been terminated); or

○ Any other lawfully obtained immigration status or category they received while registered for TPS, as long as it is still valid beyond the date TPS terminates.

## Why was Venezuela designated for TPS?

### Overview

Venezuela is currently facing a severe humanitarian emergency.[1] Under Nicolás Maduro's influence,[2] the country ''has been in the midst of a severe political and economic crisis for several years.'' [3] Venezuela's crisis has been marked by a wide range of factors, including: Economic contraction; inflation and hyperinflation; deepening poverty; high levels of unemployment; reduced access to and shortages of food and medicine; a severely weakened medical system; the reappearance or increased incidence of certain communicable diseases; a collapse in basic services; water, electricity, and fuel shortages; political polarization; institutional and political tensions; human rights abuses and repression; crime and violence; corruption; increased human mobility and displacement (including internal migration, emigration, and return); and the impact of the COVID–19 pandemic, among other factors.[4]

### Economic Crisis

Venezuela continues to suffer from a severe economic crisis. The Congressional Research Service (CRS) reported in August 2020 that ''Venezuela's economy has collapsed.'' With the largest proven oil reserves in the world, Venezuela had long been ''one of the most prosperous countries in South America.'' However, in 2014, the country entered into an ongoing ''economic recession marked by hyperinflation, shortages of basic goods and a collapse in public services such as electricity and water.'' Sources attribute Venezuela's economic crisis to a variety of factors, including: The crash of global oil prices; economic mismanagement; heavy government regulation of the economy and the private sector; corruption; and the impact of the COVID–19 pandemic.

### Political Crisis

Venezuela continues to be impacted by a prolonged political crisis. Following a May 2018 electoral process that lacked legitimacy, but which Nicolás Maduro claimed to have won, the United States and many other democracies recognized Juan Guaidó as the interim President of Venezuela. Maduro continued to exert control over all Venezuelan institutions after January 2019, aside from the legitimately elected, opposition-controlled 2015 National Assembly. In elections held on December 6, 2020—which were rejected by the Organization of American States, many governments, and other international organizations as fraudulent [5]—supporters of Maduro won a vast majority of seats in the National Assembly under manipulated electoral conditions. Maduro installed a new illegitimate purported National Assembly on January 5, 2021.

### Human Rights

While concerns about ''the deterioration of democratic institutions and threats to freedom of speech and press in Venezuela'' have been expressed by human rights organizations for over a decade, CRS reported in August 2020 that human rights conditions are even worse under Maduro than under former President

Chávez.[6] The Independent International Fact-Finding Mission created by the UN Human Rights Council to investigate allegations of atrocities since 2014 concluded that there were reasonable grounds to believe that pro-government groups and high-level authorities, including Maduro, had committed violations amounting to crimes against humanity. The mission found the judiciary contributed to arbitrary arrests, impunity for egregious abuses, and denial of justice to victims.[7]

### Health Crisis

Venezuela was facing a significant health crisis even before the start of the COVID–19 pandemic. According to CRS, ''overall health indicators, particularly infant and maternal mortality rates,'' had deteriorated well before the impact of the COVID–19 pandemic. In April 2019, Human Rights Watch and the Johns Hopkins Bloomberg School of Public Health reported that ''Venezuela's health system has been in decline since 2012, with conditions worsening drastically since 2017.'' Human Rights Watch reported in May 2020 that ''Venezuela's health system has collapsed. Shortages of medications and health supplies, interruptions of basic utilities at healthcare facilities, and the emigration of healthcare workers have led to a progressive decline in healthcare operational capacity.'' Venezuelans also face ''severe shortages of medicines and medical supplies'' [8] and ''a complex situation in which access to basic services, especially health services remain critical.'' [9]

### Food Insecurity

In an October 2020 report, the Food and Agriculture Organization of the United Nations (FAO) and the World Food Programme (WFP) identified Venezuela (and Venezuelan migrants in neighboring countries) as one of 20 ''acute food insecurity hotspots'' [10] in

---

[1] World Report 2021—Venezuela, Human Rights Watch, Jan. 2021.

[2] Ribando Seelke, Clare, Nelson, Rebecca M., Brown, Phillip, Margesson, Rhoda, Venezuela: Background and U.S. Relations, Congressional Research Service (CRS), Summary, Aug. 26, 2020.

[3] Venezuelan Humanitarian and Refugee Crisis, Center for Disaster Philanthropy, Jan. 18, 2021.

[4] Ribando Seelke, Clare, Nelson, Rebecca M., Brown, Phillip, Margesson, Rhoda, Venezuela: Background and U.S. Relations, Congressional Research Service (CRS), Summary, Aug. 26, 2020; Venezuelan Humanitarian and Refugee Crisis, Center for Disaster Philanthropy, Jan. 18, 2021; Venezuela: Complex Crisis—Overview, ACAPS, Jul. 27, 2020, https://www.acaps.org/country/venezuela/crisis/complex-crisis (last visited Feb. 2, 2021); Venezuela: Humanitarian Response Plan with Humanitarian Needs Overview 2020, United Nations Office for the Coordination of Humanitarian Affairs (UNOCHA), p.7–9, Jul. 2020; Detailed findings of the independent international factfinding mission on the Bolivarian Republic of Venezuela, United Nations Human Rights Council, p.27, Sep. 15, 2020; Conflictividad Social 2020 [Social Conflict 2020], Observatorio Venezolano de

Conflictividad Social (OVCS), Jan. 25, 2021; Asmann, Parker, and Jones, Katie, InSight Crime's 2020 Homicide Round-Up, InSight Crime, Jan. 29, 2021; Venezuela 2020 Crime & Safety Report, Overseas Security Advisory Council (OSAC), U.S. Department of State, Jul. 21, 2020.

[5] See Remarks by Bradley A. Freden, Deputy Permanent Representative of the United States OAS Permanent Council, OAS Resolution Condemns the Fraudulent Elections in Venezuela (Dec 9, 2020).

[6] Ribando Seelke, Clare, Nelson, Rebecca M., Brown, Phillip, Margesson, Rhoda, Venezuela: Background and U.S. Relations, Congressional Research Service (CRS), p.7, Aug. 26, 2020.

[7] OHCHR | Venezuela: UN report urges accountability for crimes against humanity (Sep 16, 2020).

[8] Venezuela: Country Focus, European Asylum Support Office (EASO), p.41, Aug. 2020.

[9] United Nations Office for the Coordination of Humanitarian Affairs (OCHA), Venezuela: Health Emergency 12-month update, https://reliefweb.int/report/venezuela-bolivarian-republic/venezuela-health-emergency-12-month-update-mdrve004, May 20, 2020.

[10] FAO–WFP early warning analysis of acute food insecurity hotspots: October 2020, Food and Agriculture Organization of the United Nations (FAO) and the World Food Programme (WFP), p.6, Nov. 2020.

**Federal Register** / Vol. 86, No. 44 / Tuesday, March 9, 2021 / Notices   **13577**

the world.[11] In an April 2019 report, Human Rights Watch and the Johns Hopkins Bloomberg School of Public Health reported that "[h]unger, malnutrition, and severe shortages of food are widespread" in Venezuela.[12] Despite a lack of nationwide nutrition data—last published by the government in 2007—the report asserted that "available evidence suggests malnutrition is high." [13] Moreover, Human Rights Watch reported in January 2021 that, "[b]ased on data collected prior to the pandemic, the 2020 National Survey of Life Conditions reported 8 percent of children under five acutely malnourished and 30 percent chronically malnourished, or stunted."

To help address shortages of food, the Venezuelan government established the Local Committees for Supply and Production (Comités Locales de Abastecimiento y Producción—CLAP) in 2016. According to the European Asylum Support Office (EASO), the CLAP "are responsible for the delivery of food and other government aid to the communities." However, CLAP food boxes "do not meet the basic nutritional needs," and their delivery is reportedly "inconsistent and discretionary." Furthermore, EASO noted that the CLAP are reportedly used to monitor the population—including the political activity of beneficiaries—and "as a tool to discriminate and harass those who oppose the government or are involved in human rights advocacy." There have also been allegations that certain Venezuelans have been "excluded from the list of CLAP beneficiaries because they were not government supporters."

*Access to Basic Services (Electricity, Water, Gas, etc.)*

Venezuela has seen a "collapse of basic services." [14] In a July 2020 report, OHCHR stated that "Access and quality of basic services, such as transportation, electricity, water and sanitation, and gas, continued to deteriorate, undermining the right to an adequate standard of living." [15] Venezuela also faces "severe shortages of water." Further, "an estimated 86% of Venezuelans reported unreliable water service, including 11% who have none at all", according to an April 2020 survey of 4,500 residents by the non-profit Venezuelan Observatory of Public Services.[16]

*Crime and Insecurity*

Sources reported in mid-2020 that Venezuela has "among the highest homicide and crime victimization rates in Latin America and the Caribbean," and "one of the highest number [sic] of violent deaths in the region and in the world." While Venezuela recorded "a substantial decrease in homicides in 2020," InSight Crime noted in January 2021 that "violence is indeed still rampant" in the country. InSight Crime also reported that—per the Venezuelan Violence Observatory (Observatorio Venezolano de Violencia or OVV)—"a violence epidemic continues to plague every single state, as well as the capital district of Caracas." Sources have attributed recent declines in the homicide rate to a variety of factors, including: A decrease in violence among armed structures that engage in territorial control; fewer opportunities to engage in criminal behavior due to rising poverty, emigration, and economic deterioration, among other factors; and the impact of quarantines and restrictions on movement related to the COVID–19 pandemic. In its 2020 report, the U.S. Department of State's Overseas Security Advisory Council (OSAC) stated that "[h]eavily armed criminals have used grenades and assault rifles to commit crimes at banks, shopping malls, public transportation stations, and universities." [17]

**What authority does the Secretary have to designate Venezuela for TPS?**

Section 244(b)(1) of the INA, 8 U.S.C. 1254a(b)(1), authorizes the Secretary, after consultation with appropriate agencies of the U.S. Government (Government), to designate a foreign state (or part thereof) for TPS if the Secretary determines that certain country conditions exist. The decision to designate any foreign state (or part thereof) is a discretionary decision, and there is no judicial review of any determination with respect to the designation, or termination of or extension of a designation. *See* INA section 244(b)(5)(A); 8 U.S.C. 1254a(b)(5)(A). The Secretary, in his/her discretion, may then grant TPS to eligible nationals of that foreign state (or noncitizens having no nationality who last habitually resided in the designated country). See INA section 244(a)(1)(A), 8 U.S.C. 1254a(a)(1)(A).

At least 60 days before the expiration of a country's TPS designation or extension, the Secretary, after consultation with appropriate Government agencies, must review the conditions in the foreign state designated for TPS to determine whether the conditions for the TPS designation continue to be met. See INA section 244(b)(3)(A), 8 U.S.C. 1254a(b)(3)(A). If the Secretary does not determine that the foreign state no longer meets the conditions for TPS designation, the designation will be extended for an additional period of 6 months or, in the Secretary's discretion, 12 or 18 months. See INA section 244(b)(3)(A), (C), 8 U.S.C. 1254a(b)(3)(A), (C). If the Secretary determines that the foreign state no longer meets the conditions for TPS designation, the Secretary must terminate the designation. See INA section 244(b)(3)(B), 8 U.S.C. 1254a(b)(3)(B).

**Notice of the Designation of Venezuela for TPS**

By the authority vested in me as Secretary under INA section 244, 8 U.S.C. 1254a, I have determined, after consultation with the appropriate U.S. Government agencies, the statutory conditions supporting Venezuela's designation for TPS on the basis of extraordinary and temporary conditions are met. See INA section 244(b)(1)(C), 8 U.S.C. 1254a(b)(1)(C). On the basis of this determination, I am designating Venezuela for TPS for 18 months, from March 9, 2021 through September 9, 2022. See INA section 244(b)(1)(C) and (b)(2); 8 U.S.C. 1254a(b)(1)(C), and (b)(2).

**Alejandro N. Mayorkas,**
*Secretary, U.S. Department of Homeland Security.*

**Eligibility and Employment Authorization for TPS**

**Required Application Forms and Application Fees To Register for TPS**

To register for TPS based on the designation of Venezuela, you must submit an Application for Temporary Protected Status (Form I–821) and pay

---

[11] FAO–WFP early warning analysis of acute food insecurity hotspots: October 2020, Food and Agriculture Organization of the United Nations (FAO) and the World Food Programme (WFP), p.5–6,12, Nov. 2020.

[12] Venezuela's Humanitarian Emergency: Large-Scale UN Response Needed to Address Health and Food Crises, Human Rights Watch & Johns Hopkins Bloomberg School of Public Health, p.4, Apr. 4, 2019.

[13] Venezuela's Humanitarian Emergency: Large-Scale UN Response Needed to Address Health and Food Crises, Human Rights Watch & Johns Hopkins Bloomberg School of Public Health, p.4, Apr. 4, 2019.

[14] Venezuela: Country Focus, European Asylum Support Office (EASO), p.41, Aug. 2020.

[15] Outcomes of the investigation into allegations of possible human right violations of the human rights to life, liberty and physical and moral integrity in the Bolivarian Republic of Venezuela, Office of the United Nations High Commissioner for Human Rights (OHCHR), p.4, Jul. 2, 2020.

[16] Latest on Water Shortage in Venezuela, Hispanic Oulook Magazine, June 2020.

[17] Venezuela 2020 Crime & Safety Report, Department of State Overseas Security Advisory Council, July 21, 2020.

**13578**  **Federal Register** / Vol. 86, No. 44 / Tuesday, March 9, 2021 / Notices

the filing fee (or submit a Request for a Fee Waiver (Form I–912)). You may be required to pay the biometric services fee. Please see additional information under the ''Biometric Services Fee'' section of this notice.

Although not required to do so, if you want to obtain an EAD valid through September 7, 2021, you must file an Application for Employment Authorization (Form I–765) and pay the Form I–765 fee (or submit a Request for a Fee Waiver (Form I–912)). If you do not want to request an EAD now, you may also file Form I–765 at a later date and pay the fee (or request a fee waiver), provided that you still have TPS or a pending TPS application.

For more information on the application forms and fees for TPS, please visit the USCIS TPS web page at *uscis.gov/tps*. Fees for the Form I–821, the Form I–765, and biometric services are also described in 8 CFR 103.7(b)(1)(i).

### Biometric Services Fee for TPS

Biometrics (such as fingerprints) are required for all applicants 14 years of age and older. Those applicants must submit a biometric services fee. As previously stated, if you are unable to pay the biometric services fee, you may complete a Request for Fee Waiver

(Form I–912). For more information on the application forms and fees for TPS, please visit the USCIS TPS web page at *uscis.gov/tps*. If necessary, you may be required to visit an Application Support Center to have your biometrics captured. For additional information on the USCIS biometric screening process, please see the USCIS Customer Profile Management Service Privacy Impact Assessment, available at *dhs.gov/privacy*.

### Refiling a TPS Registration Application After Receiving a Denial of a Fee Waiver Request

You should file as soon as possible within the 180-day registration period so USCIS can process your application and issue any EAD promptly. Properly filing early will also allow you to have time to refile your application before the deadline, should USCIS deny your fee waiver request. If, however, you receive a denial of your fee waiver request and are unable to refile by the registration deadline, you may still refile your Form I–821 with the biometrics fee. USCIS will review this situation to determine whether you established good cause for late TPS registration. However, you are urged to refile within 45 days of the date on any USCIS fee waiver denial notice, if possible. See INA section 244(c)(3)(C);

8 U.S.C. 1254a(c)(3)(C); 8 CFR 244.17(b). For more information on good cause for late initial registration, visit the USCIS TPS web page at *uscis.gov/tps*. Following denial of your fee waiver request, you may also refile your Form I–765, with fee, either with your Form I–821 or at a later time, if you choose.

*Note:* Although a registering TPS beneficiary age 14 and older must pay the biometric services fee (but not the Form I–821 fee) when filing a TPS registration application, you may decide to wait to request an EAD. Therefore, you do not have to file the Form I–765 or pay the associated Form I–765 fee (or request a fee waiver) at the time of registration, and could wait to seek an EAD until after USCIS has approved your TPS registration application. If you choose to do this, to register for TPS you would only need to file the Form I–821 with the biometric services fee, if applicable (or request a fee waiver).

### Mailing Information

Mail your application for TPS to the proper address in Table 1.

Table 1-Mailing Addresses:

Mail your completed Application for Employment Authorization (Form I–765) and supporting documentation to the proper address in Table 1.

TABLE 1—MAILING ADDRESSES

| If . . . | Mail to . . . |
| --- | --- |
| You are applying through the U.S. Postal Service and you live in Florida. | USCIS, Attn: TPS Venezuela, P.O. Box 20300, Phoenix, AZ 85036. |
| You are using FedEx, UPS, or DHL and you live in Florida | USCIS, Attn: TPS Venezuela, 1820 E. Skyharbor Circle S, Suite 100, Phoenix, AZ 85034 |
| You are applying through U.S. Postal Service and you live in any other state. | USCIS Attn: TPS Venezuela, P.O. Box 805282, Chicago, IL 60690. |
| You are using FedEx, UPS, or DHL and you live in any other state | USCIS, Attn: TPS Venezuela (805282), 131 South Dearborn—3rd Floor, Chicago, IL 60603–5517. |

If you were granted TPS by an immigration judge (IJ) or the Board of Immigration Appeals (BIA) and you wish to request an EAD or are registering for the first time following a grant of TPS by an IJ or the BIA, please mail your application to the appropriate mailing address in Table 1. When registering and requesting an EAD based on an IJ/BIA grant of TPS, please include a copy of the IJ or BIA order granting you TPS with your application. This will help us to verify your grant of TPS and process your application.

### Supporting Documents

The filing instructions on the Form I–821 list all the documents needed to establish eligibility for TPS. You may also find information on the acceptable

documentation and other requirements for applying or registering for TPS on the USCIS website at *uscis.gov/tps* under ''Venezuela.''

### Purpose of this Action (DED)

Pursuant to the President's constitutional authority to conduct the foreign relations of the United States, foreign policy considerations warrant implementing DED for Venezuela through July 20, 2022.[18] Through this notice, DHS is establishing procedures for individuals covered by DED for Venezuela to apply for employment authorization through July 20, 2022.

---

[18] *See* Deferred Enforced Departure for Certain Venezuelans, 86 FR 6845, January 25, 2021, available at **Federal Register**: Deferred Enforced Departure for Certain Venezuelans.

### What is Deferred Enforced Departure (DED)?

• DED is an administrative stay of removal ordered by the President. The authority to grant DED arises from the President's constitutional authority to conduct the foreign relations of the United States. The President can authorize DED for any reason related to this authority. DED has been authorized in situations where foreign nationals may face danger if required to return to countries experiencing political instability, conflict, or other unsafe conditions, or when there are other foreign policy reasons for allowing a designated group of foreign nationals to remain in the United States.

• Although DED is not a specific immigration status, individuals covered

**Federal Register** / Vol. 86, No. 44 / Tuesday, March 9, 2021 / Notices    **13579**

by DED are not subject to removal from the United States, usually for a designated period of time. Furthermore, the President may direct that certain benefits, such as employment authorization or travel authorization, be available to foreign nationals covered by the DED directive.

• If the President provides for employment or travel authorization, USCIS administers those benefits. USCIS publishes a **Federal Register** notice to instruct the covered population on how to apply for any benefits provided.

• The President issues directives regarding DED and who is covered via presidential memorandum. The qualification requirements for individuals who are covered under DED are based on the terms of the President's directive regarding DED and any relevant implementing requirements established by DHS. Since DED is a directive not to remove particular individuals, rather than a specific immigration status like TPS, there is no DED application form required to obtain DED coverage.

The Presidential Memorandum ordering DED for Venezuelans can be found at: *https:// www.federalregister.gov/documents/ 2021/01/25/2021-01718/deferred-enforced-departure-for-certain-venezuelans*

### Eligibility and Employment Authorization for DED

#### How will I know if I am eligible for employment authorization under the DED Presidential Memorandum for eligible Venezuelans?

The procedures for employment authorization in this notice apply only to noncitizens who are Venezuelan nationals, and persons without nationality who last habitually resided in Venezuela, who are present in the United States as of January 20, 2021, and except for noncitizens:

• Who have voluntarily returned to Venezuela or their country of last habitual residence outside the United States;

• Who have not continuously resided in the United States since January 20, 2021;

• Who are inadmissible under section 212(a)(3) of the Immigration and Nationality Act (INA) (8 U.S.C. 1182(a)(3)) or removable under section 237(a)(4) of the INA (8 U.S.C. 1227(a)(4));

• Who have been convicted of any felony or two or more misdemeanors committed in the United States, or who meet the criteria set forth in section 208(b)(2)(A) of the INA (8 U.S.C. 1158(b)(2)(A));

• Who were deported, excluded, or removed, before January 20, 2021;

• Who are subject to extradition;

• Whose presence in the United States the Secretary of Homeland Security has determined is not in the interest of the United States or presents a danger to public safety; or

• Whose presence in the United States the Secretary of State has reasonable grounds to believe would have potentially serious adverse foreign policy consequences for the United States.

#### What will I need to file if I am covered by DED and would like to obtain employment authorization?

If you are covered under DED for Venezuela and would like to work, you must apply for an EAD by filing an Application for Employment Authorization (Form I–765). Please carefully follow the Application for Employment Authorization (Form I–765) instructions when completing the application for an EAD. When filing the Application for Employment Authorization (Form I–765), you must:

• Indicate that you are eligible for DED by entering ''(a)(11)'' in response to Question 27 on the Application for Employment Authorization (Form I–765); and

• Submit the fee for the Application for Employment Authorization (Form I–765).

The regulations require individuals covered under DED who request an EAD to pay the fee prescribed in 8 CFR 103.7 for the Application for Employment Authorization (Form I–765). *See also* 8 CFR 274a.12(a)(11) (employment authorization for DED-covered individuals); and 8 CFR 274a.13(a) (requirement to file EAD application if EAD desired). If you are unable to pay the fee, you may apply for an application fee waiver by completing a Request for Fee Waiver (Form I–912) or submitting a personal letter requesting a fee waiver, and providing satisfactory supporting documentation.

#### How will I know if USCIS will need to obtain biometrics?

If biometrics are required to produce your EAD, you will be notified by USCIS and scheduled for an appointment at a USCIS Application Support Center.

#### Where do I submit my completed DED-based Application for Employment Authorization (Form I–765)?

For DED, mail your completed Application for Employment Authorization (Form I–765) and supporting documentation to the proper address in Table 2.

TABLE 2—MAILING ADDRESSES

| If . . . | Mail to . . . |
| --- | --- |
| You are applying through the U.S. Postal Service ................................... | USCIS, Attn: DED Venezuela, PO Box 805283, Chicago, IL 60680–6943] |
| You are using FedEx, UPS, or DHL ....................................................... | USCIS, Attn: DED Venezuela, 131 South Dearborn—3rd Floor, ≤Chicago, IL 60603–5517 |

#### Can I file my DED-based Application for Employment Authorization (Form I–765) electronically?

No. Electronic filing is not available when filing an Application for Employment Authorization (Form I–765) based on DED.

#### What happens after July 20, 2022, for purposes of DED-based employment authorization?

This DED authorization is set to end on July 20, 2022. After that date, employers will no longer accept EADs with a category code of A11 and a July 20, 2022, expiration date, and employees will need to present other evidence of continued work authorization.

**13580**    **Federal Register** / Vol. 86, No. 44 / Tuesday, March 9, 2021 / Notices

### General Employment-Related Information for TPS Applicants and Individuals With DED-Based Employment Authorization and Their Employers

#### How can I obtain information on the status of my EAD request?

To get case status information about your TPS application, as well as the status of your TPS or DED-based EAD request, you can check Case Status Online at *uscis.gov*, or visit the USCIS Contact Center at *uscis.gov/ contactcenter*. If your Form I–765 has been pending for more than 90 days, and you still need assistance, you may ask a question about your case online at *egov.uscis.gov/e-request/Intro.do* or call the USCIS Contact Center at 800–375–5283 (TTY 800–767–1833).

#### When hired, what documentation may I show to my employer as evidence of identity and employment authorization when completing Form I–9?

You can find the Lists of Acceptable Documents on the third page of Form I–9, Employment Eligibility Verification, as well as the Acceptable Documents web page at *uscis.gov/i-9-central/ acceptable-documents*. Employers must complete Form I–9 to verify the identity and employment authorization of all new employees. Within three days of hire, employees must present acceptable documents to their employers as evidence of identity and employment authorization to satisfy Form I–9 requirements.

You may present any document from List A (which provides evidence of both identity and employment authorization) or one document from List B (which provides evidence of your identity) together with one document from List C (which provides evidence of employment authorization), or you may present an acceptable receipt as described in the Form I–9 Instructions. Employers may not reject a document based on a future expiration date. You can find additional information about Form I–9 on the I–9 Central web page at *uscis.gov/I–9Central*. An EAD is an acceptable document under List A.

#### If I have an EAD based on another immigration status, can I obtain a new EAD?

Yes, if you are eligible for DED or TPS, you can obtain a new EAD, regardless of whether you have an EAD based on another immigration status. If you want to obtain a new TPS-based EAD valid through September 9, 2022, then you must file Form I–765, Application for Employment Authorization, and pay the associated fee. If you want to obtain a new DED-based EAD valid through July 20, 2022, then you must file Form I–765, Application for Employment Authorization, and pay the associated fee.

#### Can my employer require that I provide any other documentation to prove my status, such as proof of my Venezuelan citizenship?

No. When completing Form I–9, employers must accept any documentation that appears on the Form I–9 Lists of Acceptable Documents that reasonably appears to be genuine and that relates to you, or an acceptable List A, List B, or List C receipt. Employers need not reverify List B identity documents. Employers may not request documentation that does not appear on the "Lists of Acceptable Documents." Therefore, employers may not request proof of Venezuelan citizenship when completing Form I–9 for new hires or reverifying the employment authorization of current employees. Refer to the "Note to Employees" section of this **Federal Register** notice for important information about your rights if your employer rejects lawful documentation, requires additional documentation, or otherwise discriminates against you based on your citizenship or immigration status, or your national origin.

#### Note to All Employers

Employers are reminded that the laws requiring proper employment eligibility verification and prohibiting unfair immigration-related employment practices remain in full force. This **Federal Register** notice does not supersede or in any way limit applicable employment verification rules and policy guidance, including those rules setting forth reverification requirements. For general questions about the employment eligibility verification process, employers may call USCIS at 888–464–4218 (TTY 877–875–6028) or email USCIS at *I-9Central@ dhs.gov*. USCIS accepts calls and emails in English and many other languages. For questions about avoiding discrimination during the employment eligibility verification process (Form I–9 and E-Verify), employers may call the U.S. Department of Justice's Civil Rights Division, Immigrant and Employee Rights Section (IER) Employer Hotline at 800–255–8155 (TTY 800–237–2515). IER offers language interpretation in numerous languages. Employers may also email IER at *IER@usdoj.gov*.

#### Note to Employees

For general questions about the employment eligibility verification process, employees may call USCIS at 888–897–7781 (TTY 877–875–6028) or email USCIS at *I-9Central@dhs.gov*. USCIS accepts calls in English, Spanish and many other languages. Employees or applicants may also call the IER Worker Hotline at 800–255–7688 (TTY 800–237–2515) for information regarding employment discrimination based upon citizenship, immigration status, or national origin, including discrimination related to Form I–9 and E-Verify. The IER Worker Hotline provides language interpretation in numerous languages.

To comply with the law, employers must accept any document or combination of documents from the Lists of Acceptable Documents if the documentation reasonably appears to be genuine and to relate to the employee, or an acceptable List A, List B, or List C receipt as described in the Form I–9 Instructions. Employers may not require extra or additional documentation beyond what is required for Form I–9 completion. Further, employers participating in E-Verify who receive an E-Verify case result of "Tentative Nonconfirmation" (TNC) must promptly inform employees of the TNC and give such employees an opportunity to contest the TNC. A TNC case result means that the information entered into E-Verify from Form I–9 differs from records available to DHS.

Employers may not terminate, suspend, delay training, withhold or lower pay, or take any adverse action against an employee because of the TNC while the case is still pending with E-Verify. A Final Nonconfirmation (FNC) case result is received when E-Verify cannot confirm an employee's employment eligibility. An employer may terminate employment based on a case result of FNC. Work-authorized employees who receive an FNC may call USCIS for assistance at 888–897–7781 (TTY 877–875–6028). For more information about E-Verify-related discrimination or to report an employer for discrimination in the E-Verify process based on citizenship, immigration status, or national origin, contact IER's Worker Hotline at 800–255–7688 (TTY 800–237–2515). Additional information about proper nondiscriminatory Form I–9 and E-Verify procedures is available on the IER website at *justice.gov/ ierandtheUSCISandE-Verifywebsitesatuscis.gov/i-9-central* and *e-verify.gov*.