# DOCUMENT 2.7

**Federal Register** / Vol. 87, No. 173 / Thursday, September 8, 2022 / Notices      **55025**

**Table of Abbreviations**

BIA—Board of Immigration Appeals
CFR—Code of Federal Regulations
DHS—U.S. Department of Homeland Security
DOS—U.S. Department of State
EAD—Employment Authorization Document
FNC—Final Nonconfirmation
Form I–765—Application for Employment Authorization
Form I–797—Notice of Action (Approval Notice)
Form I–821—Application for Temporary Protected Status
Form I–9—Employment Eligibility Verification
Form I–912—Request for Fee Waiver
Form I–94—Arrival/Departure Record
FR—Federal Register
Government—U.S. Government
IER—U.S. Department of Justice, Civil Rights Division, Immigrant and Employee Rights Section
IJ—Immigration Judge
INA—Immigration and Nationality Act
SAVE—USCIS Systematic Alien Verification for Entitlements Program
Secretary—Secretary of Homeland Security
TNC—Tentative Nonconfirmation
TPS—Temporary Protected Status
TTY—Text Telephone
USCIS—U.S. Citizenship and Immigration Services
U.S.C.—United States Code

**Purpose of This Action (TPS)**

Through this notice, DHS sets forth procedures necessary for nationals of Venezuela (or individuals having no nationality who last habitually resided in Venezuela) to re-register for TPS and to apply for renewal of their EADs with USCIS. Re-registration is limited to individuals who have previously registered for TPS under the designation of Venezuela and whose applications have been granted. Failure to re-register properly within the 60-day re-registration period may result in the withdrawal of your TPS following appropriate procedures. *See* 8 CFR 244.14. Individuals who have a Venezuelan TPS application (Form I–821) pending as of September 8, 2022 do not need to file to re-register. If USCIS approves an individual's pending Form I–821, USCIS will grant the individual TPS through March 10, 2024. Certain nationals of Venezuela (or individuals having no nationality who last habitually resided in Venezuela) who have not previously applied for TPS may be eligible to apply under the late initial registration provisions, if they meet: (1) At least one of the late initial filing criteria; and, (2) all TPS eligibility criteria (including continuous residence in the United States since March 8, 2021, and continuous physical presence in the United States since March 9, 2021). For more information on late initial filing please see 8 CFR 244.2(f) and (g); and *https://www.uscis.gov/humanitarian/temporary-protected-status* under Late Filing.

For individuals who have already been granted TPS under Venezuela's designation, the 60-day re-registration period runs from September 8, 2022 through November 7, 2022. USCIS will issue new EADs with a March 10, 2024 expiration date to eligible Venezuelan TPS beneficiaries who timely re-register and apply for EADs. Given the time frames involved with processing TPS re-registration applications, DHS recognizes that not all re-registrants may receive new EADs before their current EADs expire on September 9, 2022. Accordingly, through this **Federal Register** notice, DHS automatically extends the validity of these EADs previously issued under the TPS designation of Venezuela through September 9, 2023.

Therefore, as proof of continued employment authorization through September 9, 2023, TPS beneficiaries can show their EADs that have the notation A–12 or C–19 under Category and a ''Card Expires'' date of September 9, 2022. This notice explains how TPS beneficiaries and their employers may determine which EADs are automatically extended and how this affects the Form I–9, Employment Eligibility Verification, E-Verify, and USCIS Systematic Alien Verification for Entitlements (SAVE) processes.

Individuals who have a Venezuelan TPS application (Form I–821) and/or Application for Employment Authorization (Form I–765) that was still pending as of September 8, 2022 do not need to file either application again. If USCIS approves an individual's pending Form I–821, USCIS will grant the individual TPS through March 10, 2024. Similarly, if USCIS approves a pending TPS-related Form I–765, USCIS will issue the individual a new EAD that will be valid through the same date.

**What is temporary protected status (TPS)?**

• TPS is a temporary immigration status granted to eligible nationals of a foreign state designated for TPS under the INA, or to eligible individuals without nationality who last habitually resided in the designated foreign state, regardless of their country of birth.
• During the TPS designation period, TPS beneficiaries are eligible to remain in the United States, may not be removed, and are authorized to work so long as they continue to meet the requirements of TPS. They may apply for and receive EADs as evidence of employment authorization.
• TPS beneficiaries may also apply for and be granted travel authorization as a matter of DHS discretion.
• To qualify for TPS, beneficiaries must meet the eligibility standards at INA section 244(c)(1)–(2), 8 U.S.C. 1254a(c)(1)–(2).
• When the Secretary terminates a foreign state's TPS designation, beneficiaries return to one of the following:
  ○ The same immigration status or category that they maintained before TPS, if any (unless that status or category has since expired or terminated); or
  ○ Any other lawfully obtained immigration status or category they received while registered for TPS, as long as it is still valid beyond the date TPS terminates.

**When was Venezuela designated for TPS?**

Secretary of Homeland Security, Alejandro N. Mayorkas, initially designated Venezuela for TPS on March 9, 2021, on the basis of extraordinary and temporary conditions that prevented nationals of Venezuela from returning in safety. *See Designation of Venezuela for Temporary Protected Status and Implementation of Employment Authorization for Venezuelans Covered by Deferred Enforced Departure,* 86 FR 13574 (Mar. 9, 2021).

**What authority does the Secretary have to extend the designation of Venezuela for TPS?**

Section 244(b)(1) of the INA, 8 U.S.C. 1254a(b)(1), authorizes the Secretary, after consultation with appropriate agencies of the U.S. Government, to designate a foreign state (or part thereof) for TPS if the Secretary determines that certain country conditions exist.[1] The decision to designate any foreign state (or part thereof) is a discretionary

---

[1] INA section 244(b)(1) ascribes this power to the Attorney General. Congress transferred this authority from the Attorney General to the Secretary of Homeland Security. *See* Homeland Security Act of 2002, Public Law 107–296, 116 Stat. 2135. The Secretary may designate a country (or part of a country) for TPS on the basis of ongoing armed conflict such that returning would pose a serious threat to the personal safety of the country's nationals and habitual residents, environmental disaster (including an epidemic), or extraordinary and temporary conditions in the country that prevent the safe return of the country's nationals. For environmental disaster-based designations, certain other statutory requirements must be met, including that the foreign government must request TPS. A designation based on extraordinary and temporary conditions cannot be made if the Secretary finds that allowing the country's nationals to remain temporarily in the United States is contrary to the U.S. national interest. *Id.,* at § 244(b)(1).

**55026** Federal Register / Vol. 87, No. 173 / Thursday, September 8, 2022 / Notices

decision, and there is no judicial review of any determination with respect to the designation, termination, or extension of a designation. *See* INA section 244(b)(5)(A); 8 U.S.C. 1254a(b)(5)(A).[2] The Secretary, in his or her discretion, may then grant TPS to eligible nationals of that foreign state (or individuals having no nationality who last habitually resided in the designated foreign state). *See* INA section 244(a)(1)(A), 8 U.S.C. 1254a(a)(1)(A).

At least 60 days before the expiration of a foreign state's TPS designation or extension, the Secretary, after consultation with appropriate U.S. Government agencies, must review the conditions in the foreign state designated for TPS to determine whether they continue to meet the conditions for the TPS designation. *See* INA section 244(b)(3)(A), 8 U.S.C. 1254a(b)(3)(A). If the Secretary determines that the foreign state continues to meet the conditions for TPS designation, the designation will be extended for an additional period of 6 months or, in the Secretary's discretion, 12 or 18 months. *See* INA section 244(b)(3)(A), (C), 8 U.S.C. 1254a(b)(3)(A), (C). If the Secretary determines that the foreign state no longer meets the conditions for TPS designation, the Secretary must terminate the designation. *See* INA section 244(b)(3)(B), 8 U.S.C. 1254a(b)(3)(B).

### Why is the Secretary extending the TPS designation for Venezuela through March 10, 2024?

The Secretary has determined that an 18-month TPS extension is warranted because the extraordinary and temporary conditions supporting TPS designation remain based on DHS's review of country conditions in Venezuela, including input received from the Department of State (DOS) and other U.S. Government agencies.

### Overview

Extraordinary and temporary conditions that prevent Venezuelan nationals from returning in safety include severe economic and political crises ongoing within Venezuela, which have an impact across sectors, including limited access to food, basic services, and adequate healthcare, and the deterioration of the rule of law and protection of human rights.

Venezuela remains in a humanitarian emergency due to economic and political crises. The Congressional Research Service (CRS) reported in April 2021 that "Venezuela's economy has collapsed"[3] and noted that Venezuela was "in the throes of a multiyear economic crisis, one of the worst economic crises in the world since World War II," with its economy contracting by "more than 75% since 2014 [. . .], estimated as the single largest economic collapse outside of war in at least 45 years and more than twice the magnitude of the Great Depression in the United States."[4] More recently, the CRS reported, "Between 2014 and 2021, Venezuela's economy contracted by 80%."[5] Though the CRS indicates that "hyperinflation has abated and higher oil prices driven by Russia's invasion of Ukraine appear to be driving a nascent economic recovery," the economic situation, which negatively impacts access to food, purchasing power, and social services, has created a humanitarian crisis.[6]

Moreover, Venezuela has experienced more than "two decades of political tumult."[7] The European Asylum Support Office (EASO) also reported that this political polarization contributed to the emergence of institutional duality in Venezuela, in which neither side, those allied with Nicolas Maduro and those allied with Juan Guaidó, recognizes the validity of the other's institutions.[8] Though the Venezuelan constitution provides citizens the ability to change their government through free and fair elections, the Maduro regime has restricted the exercise of this right and arbitrarily banned key opposition figures from participating, maintained hundreds of political prisoners, used judicial processes to steal the legal personages of political parties, and denied opposition political representatives equal access to media coverage and freedom of movement in the country.[9]

The resulting impact of the economic and political crises spreads across various sectors in Venezuela. Reuters reported on a 2020–2021 National Survey of Living Conditions (ENCOVI) that found that of the country's 28 million residents, 76.6% live in extreme poverty, which was an almost 10% increase from the previous year.[10]

Moreover, Human Rights Watch reports that one out of three Venezuelans is food insecure and in need of assistance.[11] Based on data collected prior to the pandemic, 8 percent of children under age 5 were acutely malnourished and 30 percent chronically malnourished or stunted.[12] The United Nations Children's Fund (UNICEF) estimates that 116,596 Venezuelan children could suffer from global acute malnutrition in 2022.[13] Estimates suggest that Venezuelans would require 136 times the minimum wage of $1.71 per month to access a basic food basket.[14]

---

[2] This issue of judicial review is the subject of litigation. *See, e.g., Ramos* v. *Wolf,* 975 F.3d 872 (9th Cir. 2020), *petition for en banc rehearing* filed Nov. 30, 2020 (No. 18–16981); *Saget* v. *Trump,* 375 F. Supp. 3d 280 (E.D.N.Y. 2019).

[3] Clare Ribando Seelke, Rebecca M. Nelson, Rhoda Margesson, Phillip Brown, Venezuela: Background and U.S. Relations, Congressional Research Service (CRS), Summary, Apr. 28, 2021, *https://sgp.fas.org/crs/row/R44841.pdf* (last visited: Aug. 18, 2022).

[4] *Id.*

[5] *Id.*

[6] Clare Ribando Seelke, Venezuela: Political Crisis and U.S. Policy, CRS, p. 1, Aug. 1, 2022, chrome-extension://efaidnbmnnnibpcajpcglclefindmkaj/ *https://sgp.fas.org/crs/row/IF10230.pdf* (last visited Aug. 18, 2022).

[7] Overcoming the Global Rift on Venezuela, International Crisis Group, p. i, Feb. 17, 2022, *https://d2071andvip0wj.cloudfront.net/093-overcoming-the-global-rift-on-venezuela.pdf* (last visited Aug. 18, 2022).

[8] Venezuela: Country Focus, European Asylum Support Office (EASO), p.21, Aug. 2020, *https://coi.easo.europa.eu/administration/easo/PLib/2020_08_EASO_COI_Report_Venezuela.pdf* (last visited Aug. 18, 2022).

[9] 2021 Country Reports of Human Rights Practices: Venezuela, U.S. Department of State, Apr. 12, 2022, available at: *https://www.state.gov/reports/2021-country-reports-on-human-rights-practices/venezuela/* (last visited: Aug. 18, 2022).

[10] Reuters, Extreme Poverty in Venezuela Rises to 76.6%—study, Sept. 29, 2021, *https://www.reuters.com/world/americas/extreme-poverty-venezuela-rises-766-study-2021-09-29/* (last visited Aug. 18, 2022).

[11] Human Rights Watch, World Report 2021, Venezuela, *https://www.hrw.org/world-report/2021/country-chapters/venezuela* (last visited Aug. 18, 2022).

[12] *Id.*

[13] UNICEF, Humanitarian Action for Children 2022—Venezuela, (Dec. 7, 2021), *https://reliefweb.int/report/venezuela-bolivarian-republic/humanitarian-action-children-2022-venezuela* (last visited Aug. 18, 2022).

[14] *Id.* The UN's Food and Agriculture Organization (FAO) issues a monthly food price index, a measure of change in international prices of a basket of food commodities. See United Nations, "Global Issues: Food" (last visited 7/25/2022), *https://www.un.org/en/global-issues/food.* A national food basket is a group of essential food commodities.

(4 of 10), Page 4 of 10    Case: 25-2120, 05/28/2025, DktEntry: 49.27, Page 4 of 10
Case 3:25-cv-01766-EMC    Document 104-3    Filed 04/07/25    Page 3 of 17

Federal Register / Vol. 87, No. 173 / Thursday, September 8, 2022 / Notices     55027

Additionally, sources have described Venezuela's health system as "run-down," [15] "overloaded and crumbling," [16] and "collapsed." [17] Human Rights Watch noted that millions of Venezuelans are unable to access basic healthcare.[18] Moreover, Venezuela's "collapsed health system has led to the resurgence of vaccine-preventable and infectious diseases. Shortages of medications and supplies, interruptions of utilities at healthcare centers, and the emigration of healthcare workers have led to a decline in operational capacity." [19] Venezuela is currently experiencing an outbreak of yellow fever, and other vaccine-preventable diseases such as measles and polio are at risk of re-emerging.[20] Three quarters of households experience irregular water service provision, while 8.4% do not have access, factors which exacerbate health and nutrition problems.[21]

Human Rights Watch reports that "As of October 28 [2021], Venezuela has confirmed 403,318 cases of COVID–19 and 4,848 deaths. Given limited availability of reliable testing, lack of government transparency, and persecution of medical professionals and journalists who report on the pandemic, the actual numbers are probably much higher." [22] Reports further indicate that "Venezuela's COVID–19 vaccination has been marred by corruption allegations and opacity regarding the acquisition and distribution of vaccines and other medical supplies." [23] Human Rights Watch reports that ". . . only 21.6 percent of Venezuelans were fully vaccinated as of that date [October 27, 2021], according to the Pan American Health Organization, and 25 to 28 percent of health professionals were still waiting for their second vaccine shot in August." [24]

The political and economic crises also impact respect for human rights in Venezuela. In a February 2022 report, Amnesty International noted that "[c]rimes under international law and human rights violations, including politically motivated arbitrary detentions, torture, extrajudicial executions and excessive use of force have been systematic and widespread, and could constitute crimes against humanity." [25] Amnesty International further reported that "trends of repression in Venezuela have been directed against a specific group of people: those perceived as dissidents or opponents" of Nicolás Maduro.[26] While the "people belonging to this group are all different," Amnesty International noted that it is nevertheless "possible to identify particular groups that have been especially targeted by the policy of repression, namely students, political activists, and human rights defenders." [27]

It is estimated that "more than 6 million refugees and migrants have left Venezuela as a result of the political turmoil, socio-economic instability, and the ongoing humanitarian crisis." [28] The New Humanitarian reports that "The vast majority of the 6 million Venezuelans who have escaped poverty, insecurity, and economic collapse . . . have tried to start new lives in South America. But two years after COVID–19 led governments to close borders and enforce quarantines, many are discovering that the region is becoming a less welcoming place." [29]

In summary, Venezuela continues to be in a humanitarian emergency. Venezuela continues to face economic contraction, poverty, high levels of unemployment, reduced access to and shortages of food and medicine, a severely weakened medical system, a collapse in basic services, political polarization, institutional and political tensions, human rights abuses and repression, crime and violence, corruption, and increased human mobility and displacement. The continuing extraordinary and temporary conditions supporting Venezuela's TPS designation remain.

Based upon this review and after consultation with appropriate U.S. Government agencies, the Secretary has determined that:

• The conditions supporting Venezuela's designation for TPS continue to be met. *See* INA section 244(b)(1)(C), 8 U.S.C. 1254a(b)(1)(C).

• There continue to be extraordinary and temporary conditions in Venezuela that prevent Venezuelan nationals (or individuals having no nationality who last habitually resided in Venezuela) from returning to Venezuela in safety, and it is not contrary to the national interest of the United States to permit Venezuelan TPS beneficiaries to remain in the United States temporarily. *See* INA section 244(b)(1)(C), 8 U.S.C. 1254a(b)(1)(C).

• The designation of Venezuela for TPS should be extended for an 18-month period, from September 10, 2022, through March 10, 2024. *See* INA section 244(b)(3)(C), 8 U.S.C. 1254a(b)(3)(C).

---

[15] Vivian Sequera, Venezuela COVID patients, exhausted doctors get mental health help from medical charity, Reuters, Feb. 2, 2022, *https://web.archive.org/web/20220217023626/https://www.reuters.com/world/asia-pacific/venezuela-covid-patients-exhausted-doctors-get-mental-health-help-medical-2022-02-02/* (last visited Aug. 18, 2022).

[16] Venezuelans rely on the kindness of strangers to pay for COVID–19 treatment, Reuters, Oct. 4, 2021, *https://web.archive.org/web/202211004193653/https:/www.reuters.com/world/americas/venezuelans-rely-kindness-strangers-pay-covid-19-treatment-2021-10-04/* (last visited Aug. 18, 2022).

[17] Ribando Seelke, Clare, Nelson, Rebecca M., Brown, Phillip, Margesson, Rhoda, Venezuela: Background and U.S. Relations, CRS, p.11, Apr. 28, 2021, *https://sgp.fas.org/crs/row/R44841.pdf;* World Report 2022—Venezuela, Human Rights Watch, Jan. 2022, *https://www.hrw.org/world-report/2022/country-chapters/venezuela* (last visited Aug. 18, 2022).

[18] Human Rights Watch, World Report 2021, Venezuela, *https://www.hrw.org/world-report/2021/country-chapters/venezuela* (last visited Aug. 18, 2022).

[19] World Report 2022—Venezuela, Human Rights Watch, Jan. 2022, *https://www.hrw.org/world-report/2022/country-chapters/venezuela* (last visited Aug. 18, 2022).

[20] UNICEF, Humanitarian Action for Children 2022—Venezuela (Dec. 7, 2021), *https://reliefweb.int/report/venezuela-bolivarian-republic/humanitarian-action-children-2022-venezuela* (last visited Aug. 18, 2022).

[21] *Id.*

[22] Human Rights Watch, World Report 2022, Venezuela, *https://www.hrw.org/world-report/2022/country-chapters/venezuela* (last visited Aug. 18, 2022).

[23] *Id.*

[24] *Id.*

[25] Venezuela: Calculated repression: Correlation between stigmatization and politically motivated arbitrary detentions, Amnesty International, p.11, Feb. 10, 2022, *https://www.amnesty.org/en/documents/amr53/5133/2022/en/* (last visited Aug. 18, 2022).

[26] Venezuela: Calculated repression: Correlation between stigmatization and politically motivated arbitrary detentions, Amnesty International, p.52, Feb. 10, 2022, *https://www.amnesty.org/en/documents/amr53/5133/2022/en/* (last visited Aug. 18, 2022).

[27] *Id.*

[28] International Organization for Migration, UN Migration, Venezuelan Refugee and Migrant Crisis, *https://www.iom.int/venezuelan-refugee-and-migrant-crisis* (last visited Aug. 15, 2022).

[29] Paula Dupraz-Dobias, The New Humanitarian, Nowhere left to turn, part 2: In a region hit hard by COVID, the welcome for Venezuelan migrants wears thin, July 12, 2022, *https://www.thenewhumanitarian.org/analysis/2022/07/14/South-America-Venezuelan-migrants-COVID* (last visited Aug. 18, 2022).

(5 of 10), Page 5 of 10    Case: 25-2120, 05/28/2025, DktEntry: 49.27, Page 5 of 10
Case 3:25-cv-01766-EMC    Document 104-3    Filed 04/07/25    Page 4 of 17

**55028** Federal Register / Vol. 87, No. 173 / Thursday, September 8, 2022 / Notices

### Notice of the Extension of the TPS Designation of Venezuela

By the authority vested in me as Secretary under INA section 244, 8 U.S.C. 1254a, I have determined, after consultation with the appropriate U.S. Government agencies, the statutory conditions supporting Venezuela's designation for TPS on the basis of extraordinary and temporary conditions continue to be met. *See* INA section INA section 244(b)(1)(C), 8 U.S.C. 1254a(b)(1)(C). On the basis of this determination, I am extending the existing designation of TPS for Venezuela for 18 months, from September 10, 2022, through March 10, 2024. *See* INA section 244(b)(1)(C) and (b)(2); 8 U.S.C. 1254a(b)(1)(C), and (b)(2).

**Alejandro N. Mayorkas**
*Secretary, U.S. Department of Homeland Security.*

### Eligibility and Employment Authorization for TPS

### Required Application Forms and Application Fees To Re-Register for TPS

To re-register for TPS based on the designation of Venezuela, you must submit an Application for Temporary Protected Status (Form I–821). There is no Form I–821 fee for re-registration. *See* 8 CFR 244.17. You may be required to pay the biometric services fee. If you can demonstrate an inability to pay the biometric services fee, you may request to have the fee waived. Please see additional information under the ''Biometric Services Fee'' section of this notice.

Through this **Federal Register** notice, your existing EAD issued under the TPS designation of Venezuela with the expiration date of September 9, 2022, is automatically extended through September 9, 2023. Although not required to do so, if you want to obtain a new EAD valid through March 10, 2024, you must file an Application for Employment Authorization (Form I–765) and pay the Form I–765 fee (or request a fee waiver, which you may submit on Form I–912, Request for Fee Waiver). If you do not want a new EAD, you do not have to file Form I–765 and pay the Form I–765 fee. If you do not want to request a new EAD now, you may file Form I–765 at a later date and pay the fee (or request a fee waiver) at that time, provided that you still have TPS or a pending TPS application.

If you have a Form I–821 and/or Form I–765 that was still pending as of September 8, 2022, then you do not need to file either application again. If USCIS approves your pending TPS application, USCIS will grant you TPS through March 10, 2024. Similarly, if USCIS approves your pending TPS-related Form I–765, it will be valid through the same date.

You may file the application for a new EAD either prior to or after your current EAD has expired. However, you are strongly encouraged to file your application for a new EAD as early as possible to avoid gaps in the validity of your employment authorization documentation.

For more information on the application forms and fees for TPS, please visit the USCIS TPS web page at *www.uscis.gov/tps.* Fees for the Form I–821, the Form I–765, and biometric services are also described in 8 CFR 103.7(b)(1)(i).

### Refiling a TPS Re-Registration Application After Receiving a Denial of a Fee Waiver Request

You should file as soon as possible within the 60-day re-registration period so USCIS can process your application and issue your EAD promptly. Properly filing early will also allow you to have time to refile your application before the deadline, should USCIS deny your fee waiver request. If, however, you receive a denial of your fee waiver request and are unable to refile by the re-registration deadline, you may still refile your Form I–821 with the biometrics fee. USCIS will review this situation to determine whether you established good cause for late TPS re-registration. However, you are urged to refile within 45 days of the date on any USCIS fee waiver denial notice, if possible. *See* INA section 244(c)(3)(C); 8 U.S.C. 1254a(c)(3)(C); 8 CFR 244.17(b). For more information on good cause for late re-registration, visit the USCIS TPS web page at *www.uscis.gov/tps.* Following denial of your fee waiver request, you may also refile your Form I–765 with fee either with your Form I–821 or at a later time, if you choose.

*Note:* A re-registering TPS beneficiary age 14 and older must pay the biometric services fee (but not the Form I–821 fee), or request a fee waiver, when filing a TPS re-registration application. However, if you decide to wait to request an EAD, you do not have to file the Form I–765 or pay the associated Form I–765 fee (or request a fee waiver) at the time of re-registration. You may wait to seek an EAD until after USCIS has approved your TPS re-registration application or at any later date you decide you want to request an EAD. To re-register for TPS, you only need to file the Form I–821 with the biometrics services fee, if applicable, (or request a fee waiver).

### Filing Information

USCIS offers the option to re-registrants for TPS under the extension of Venezuela's designation to file Form I–821 and related requests for EADs online or by mail. When filing a TPS application, applicants can also request an EAD by submitting a completed Form I–765, Request for Employment Authorization, with their Form I–821.

*Online filing:* Form I–821 and I–765 are available for concurrent filing online.[30] To file these forms online, you must first create a USCIS online account.[31]

*Mail filing:* Mail your application for TPS to the proper address in Table 1.

### Table 1—Mailing Addresses

Mail your completed Form I–821, Application for Temporary Protected Status; Form I–765, Application for Employment Authorization; Form I–912, Request for Fee Waiver (if applicable); and supporting documentation to the proper address in Table 1.

TABLE 1—MAILING ADDRESSES

| If . . . | Mail to . . . |
|---|---|
| You are a beneficiary re-registering under the TPS designation for Venezuela and you live in Florida. | *U.S. Postal Service (USPS):* USCIS, Attn: TPS Venezuela, P.O. Box 20300, Phoenix, AZ 85036–0300.<br>*FedEx, UPS, and DHL deliveries:* USCIS, Attn: TPS Venezuela (Box 20300), 1820 E Skyharbor Circle S, Suite 100, Phoenix, AZ 85034–4850. |
| You are a beneficiary re-registering under the TPS designation for Venezuela and you live in any other state. | *U.S. Postal Service (USPS):* USCIS, Attn: TPS Venezuela, P.O. Box 805282, Chicago, IL 60680–5285.<br>*FedEx, UPS, and DHL deliveries:* USCIS, Attn: TPS Venezuela (Box 805282), 131 South Dearborn—3rd Floor, Chicago, IL 60603–5517. |

---

[30] Find information about online filing at ''Forms Available to File Online,'' *https://www.uscis.gov/file-online/forms-available-to-file-online.*

[31] *https://myaccount.uscis.gov/users/sign_up.*

(6 of 10), Page 6 of 10      Case: 25-2120, 05/28/2025, DktEntry: 49.27, Page 6 of 10
Case 3:25-cv-01766-EMC    Document 104-3    Filed 04/07/25    Page 5 of 17

Federal Register / Vol. 87, No. 173 / Thursday, September 8, 2022 / Notices    55029

If you were granted TPS by an immigration judge (IJ) or the Board of Immigration Appeals (BIA) and you wish to request an EAD, please mail your Form I–765 application to the appropriate mailing address in Table 1. When you are requesting an EAD based on an IJ/BIA grant of TPS, please include a copy of the IJ or BIA order granting you TPS with your application. This will help us verify your grant of TPS and process your application.

**Supporting Documents**

The filing instructions on the Form I–821 list all the documents needed to establish eligibility for TPS. You may also find information on the acceptable documentation and other requirements for applying (that is, registering) for TPS on the USCIS website at *uscis.gov/tps* under ''Venezuela.''

**Travel**

TPS beneficiaries may also apply for and be granted travel authorization as a matter of discretion. You must file for travel authorization if you wish to travel outside of the United States. If granted, travel authorization gives you permission to leave the United States and return during a specific period. To request travel authorization, you must file Form I–131, Application for Travel Document, available at *www.uscis.gov/i-131*. You may file Form I–131 together with your Form I–821 or separately. When filing the Form I–131, you must:

• Select Item Number 1.d. in Part 2 on the Form I–131; and

• Submit the fee for the Form I–131, or request a fee waiver, which you may submit on Form I–912, Request for Fee Waiver.

If you are filing Form I–131 together with Form I–821, send your forms to the address listed in Table 1. If you are filing Form I–131 separately based on a pending or approved Form I–821, send your form to the address listed in Table 2 and include a copy of Form I–797 for the approved or pending Form I–821.

TABLE 2—MAILING ADDRESSES

| If you are . . . | Mail to . . . |
|---|---|
| Filing Form I–131 together with a Form I–821, Application for Temporary Protected Status. | The address provided in Table 1. |
| Filing Form I–131 based on a pending or approved Form I–821, and you are using the U.S. Postal Service (USPS): You must include a copy of the receipt notice (Form I–797C) showing we accepted or approved your Form I–821. | USCIS, Attn: I–131 TPS, P.O. Box 660167, Dallas, TX 75266–0867. |
| Filing Form I–131 based on a pending or approved Form I–821, and you are using FedEx, UPS, or DHL: You must include a copy of the receipt notice (Form I–797C) showing we accepted or approved your Form I–821. | USCIS, Attn: I–131 TPS, 2501 S State Hwy. 121 Business, Ste. 400, Lewisville, TX 75067. |

**Biometric Services Fee**

Biometrics (such as fingerprints) are required for all applicants 14 years of age and older. Those applicants must submit a biometric services fee. As previously stated, if you are unable to pay the biometric services fee, you may request a fee waiver, which you may submit on Form I–912, Request for Fee Waiver. For more information on the application forms and fees for TPS, please visit the USCIS TPS web page at *www.uscis.gov/tps*. If necessary, you may be required to visit an Application Support Center to have your biometrics captured. For additional information on the USCIS biometrics screening process, please see the USCIS Customer Profile Management Service Privacy Impact Assessment, available at *www.dhs.gov/privacy*.

**General Employment-Related Information for TPS Applicants and Their Employers**

*How can I obtain information on the status of my TPS application and EAD request?*

To get case status information about your TPS application, as well as the status of your TPS-based EAD request, you can check Case Status Online at uscis.gov, or visit the USCIS Contact Center at *uscis.gov/contactcenter*. If your Form I–765 has been pending for more than 90 days, and you still need assistance, you may ask a question about your case online at *egov.uscis.gov/e-request/Intro.do* or call the USCIS Contact Center at 800–375–5283 (TTY 800–767–1833).

*Am I eligible to receive an automatic extension of my current EAD through September 9, 2023, using this **Federal Register** notice?*

Yes. Regardless of your country of birth, provided that you currently have a Venezuela TPS-based EAD that has the notation A–12 or C–19 under Category and a ''Card Expires'' date of September 9, 2022, this **Federal Register** notice automatically extends your EAD through September 9, 2023. Although this **Federal Register** notice automatically extends your EAD through September 9, 2023, you must re-register timely for TPS in accordance with the procedures described in this **Federal Register** notice to maintain your TPS and employment authorization.

*When hired, what documentation may I show to my employer as evidence of identity and employment authorization when completing Form I–9?*

You can find the Lists of Acceptable Documents on the Form I–9, Employment Eligibility Verification, as well as the Acceptable Documents web page at *uscis.gov/i-9-central/acceptable-documents*. Employers must complete Form I–9 to verify the identity and employment authorization of all new employees. Within three days of hire, employees must present acceptable documents to their employers as evidence of identity and employment authorization to satisfy Form I–9 requirements.

You may present any document from List A (which provides evidence of both identity and employment authorization) or one document from List B (which provides evidence of your identity) together with one document from List C (which provides evidence of employment authorization), or you may present an acceptable receipt as described in the Form I–9 Instructions. Employers may not reject a document based on a future expiration date. You can find additional information about Form I–9 on the I–9 Central web page at *uscis.gov/I-9Central*. An EAD is an acceptable document under List A. See the section ''How do my employer and I complete Form I–9 using my automatically extended EAD for a new job?'' of this **Federal Register** notice for further information. If your EAD states A–12 or C–19 under Category and has a Card Expires date of September 9, 2022, it has been extended

(7 of 10), Page 7 of 10     Case: 25-2120, 05/28/2025, DktEntry: 49.27, Page 7 of 10
Case 3:25-cv-01766-EMC    Document 104-3    Filed 04/07/25    Page 6 of 17

**55030**  **Federal Register** / Vol. 87, No. 173 / Thursday, September 8, 2022 / Notices

automatically by virtue of this **Federal Register** notice and you may choose to present your EAD to your employer as proof of identity and employment eligibility for Form I–9 through September 9, 2023, unless your TPS has been withdrawn or your request for TPS has been denied. Your country of birth notated on the EAD does not have to reflect the TPS designated country of Venezuela for you to be eligible for this extension.

*What documentation may I present to my employer for Form I–9 if I am already employed but my current TPS-related EAD is set to expire?*

Even though we have automatically extended your EAD, your employer is required by law to ask you about your continued employment authorization. Your employer may need to re-inspect your automatically extended EAD to check the ''Card Expires'' date and Category code if your employer did not keep a copy of your EAD when you initially presented it. Once your employer has reviewed the ''Card Expires'' date and Category code, your employer should update the EAD expiration date in Section 2 of Form I–9. See the section ''What updates should my current employer make to Form I–9 if my EAD has been automatically extended?'' of this **Federal Register** notice for further information. You may show this **Federal Register** notice to your employer to explain what to do for Form I–9 and to show that USCIS has automatically extended your EAD through September 9, 2023, but you are not required to do so. The last day of the automatic EAD extension is September 9, 2023. Before you start work on September 10, 2023, your employer is required by law to reverify your employment authorization on Form I–9. By that time, you must present any document from List A or any document from List C on Form I–9 Lists of Acceptable Documents, or an acceptable List A or List C receipt described in the Form I–9 instructions to reverify employment authorization.

Your employer may not specify which List A or List C document you must present and cannot reject an acceptable receipt.

*If I have an EAD based on another immigration status, can I obtain a new TPS-based EAD?*

Yes, if you are eligible for TPS, you can obtain a new TPS-based EAD, regardless of whether you have an EAD or work authorization based on another immigration status. If you want to obtain a new TPS-based EAD valid through March 10, 2024, then you must file Form I–765, Application for Employment Authorization, and pay the associated fee (unless USCIS grants your fee waiver request).

*Can my employer require that I provide any other documentation such as evidence of my status or proof of my Venezuelan citizenship or a Form I–797C showing that I registered or re-registered for TPS for Form I–9 completion?*

No. When completing Form I–9, employers must accept any documentation you choose to present from the Form I–9 Lists of Acceptable Documents that reasonably appears to be genuine and that relates to you, or an acceptable List A, List B, or List C receipt. Employers need not reverify List B identity documents. Employers may not request proof of Venezuelan citizenship or proof of registration or re-registration for TPS when completing Form I–9 for new hires or reverifying the employment authorization of current employees. If you present an EAD that USCIS has automatically extended, employers should accept it as a valid List A document so long as the EAD reasonably appears to be genuine and to relate to you. Refer to the ''Note to Employees'' section of this **Federal Register** notice for important information about your rights if your employer rejects lawful documentation, requires additional documentation, or otherwise discriminates against you based on your citizenship or immigration status, or your national origin.

*How do my employer and I complete Form I–9 using my automatically extended EAD for a new job?*

When using an automatically extended EAD to complete Form I–9 for a new job before September 10, 2023:
  1. For Section 1, you should:
  a. Check ''An alien authorized to work until'' and enter September 9, 2023, as the ''expiration date''; and
  b. Enter your USCIS number or A-Number where indicated. (Your EAD or other document from DHS will have your USCIS number or A-Number printed on it; the USCIS number is the same as your A-Number without the A prefix.)
  2. For Section 2, employers should:
  a. Determine if the EAD is auto-extended by ensuring it is in category A–12 or C–19 and has a ''Card Expires'' date of September 9, 2022;
  b. Write in the document title;
  c. Enter the issuing authority;
  d. Provide the document number; and
  e. Write September 9, 2023, as the expiration date.

Before the start of work on September 10, 2023, employers must reverify the employee's employment authorization on Form I–9.

*What updates should my current employer make to Form I–9 if my EAD has been automatically extended?*

If you presented a TPS-related EAD that was valid when you first started your job and USCIS has now automatically extended your EAD, your employer may need to re-inspect your current EAD if they do not have a copy of the EAD on file. Your employer should determine if your EAD is automatically extended by ensuring that it contains Category A–12 or C–19 on the front of the card and has a ''Card Expires'' date of September 9, 2022. The employer may not rely on the country of birth listed on the card to determine whether you are eligible for this extension.

If your employer determines that USCIS has automatically extended your EAD, your employer should update Section 2 of your previously completed Form I–9 as follows:
  1. Write EAD EXT and September 9, 2023, as the last day of the automatic extension in the Additional Information field; and
  2. Initial and date the correction.
  *Note:* This is not considered a reverification. Employers do not reverify the employee until either the one-year automatic extension has ended, or the employee presents a new document to show continued employment authorization, whichever is sooner. By September 10, 2023, when the employee's automatically extended EAD has expired, employers are required by law to reverify the employee's employment authorization on Form I–9.

*If I am an employer enrolled in E-Verify, how do I verify a new employee whose EAD has been automatically extended?*

Employers may create a case in E-Verify for a new employee by entering the number from the Document Number field on Form I–9 into the document number field in E-Verify. Employers should enter September 9, 2023, as the expiration date for an EAD that has been extended under this **Federal Register** notice.

*If I am an employer enrolled in E-Verify, what do I do when I receive a ''Work Authorization Documents Expiring'' alert for an automatically extended EAD?*

E-Verify automated the verification process for TPS-related EADs that are automatically extended. If you have employees who provided a TPS-related

(8 of 10), Page 8 of 10    Case: 25-2120, 05/28/2025, DktEntry: 49.27, Page 8 of 10
Case 3:25-cv-01766-EMC    Document 104-3    Filed 04/07/25    Page 7 of 17

Federal Register / Vol. 87, No. 173 / Thursday, September 8, 2022 / Notices    55031

EAD when they first started working for you, you will receive a "Work Authorization Documents Expiring" case alert when the auto-extension period for this EAD is about to expire. Before this employee starts work on September 10, 2023, you must reverify their employment authorization on Form I–9. Employers may not use E-Verify for reverification.

**Note to All Employers**

Employers are reminded that the laws requiring proper employment eligibility verification and prohibiting unfair immigration-related employment practices remain in full force. This **Federal Register** notice does not supersede or in any way limit applicable employment verification rules and policy guidance, including those rules setting forth reverification requirements. For general questions about the employment eligibility verification process, employers may call USCIS at 888–464–4218 (TTY 877–875–6028) or email USCIS at *I-9Central@uscis.dhs.gov.* USCIS accepts calls and emails in English and many other languages. For questions about avoiding discrimination during the employment eligibility verification process (Form I–9 and E-Verify), employers may call the U.S. Department of Justice, Civil Rights Division, Immigrant and Employee Rights Section (IER) Employer Hotline at 800–255–8155 (TTY 800–237–2515). IER offers language interpretation in numerous languages. Employers may also email IER at *IER@usdoj.gov.*

**Note to Employees**

For general questions about the employment eligibility verification process, employees may call USCIS at 888–897–7781 (TTY 877–875–6028) or email USCIS at *I-9Central@uscis.dhs.gov.* USCIS accepts calls in English, Spanish and many other languages. Employees or job applicants may also call the IER Worker Hotline at 800–255–7688 (TTY 800–237–2515) for information regarding employment discrimination based on citizenship, immigration status, or national origin, including discrimination related to Form I–9 and E-Verify. The IER Worker Hotline provides language interpretation in numerous languages.

To comply with the law, employers must accept any document or combination of documents from the Lists of Acceptable Documents if the documentation reasonably appears to be genuine and to relate to the employee, or an acceptable List A, List B, or List C receipt as described in the Form I–9 Instructions. Employers may not require extra or additional documentation beyond what is required for Form I–9 completion. Further, employers participating in E-Verify who receive an E-Verify case result of "Tentative Nonconfirmation" (TNC) must promptly inform employees of the TNC and give such employees an opportunity to contest the TNC. A TNC case result means that the information entered into E-Verify from Form I–9 differs from records available to DHS.

Employers may not terminate, suspend, delay training, withhold or lower pay, or take any adverse action against an employee because of a TNC while the case is still pending with E-Verify. A Final Nonconfirmation (FNC) case result is received when E-Verify cannot confirm an employee's employment eligibility. An employer may terminate employment based on a case result of FNC. Work-authorized employees who receive an FNC may call USCIS for assistance at 888–897–7781 (TTY 877–875–6028). For more information about E-Verify-related discrimination or to report an employer for discrimination in the E-Verify process based on citizenship, immigration status, or national origin, contact IER's Worker Hotline at 800–255–7688 (TTY 800–237–2515). Additional information about proper nondiscriminatory Form I–9 and E-Verify procedures is available on the IER website at *justice.gov/ierandtheUSCISandE-Verifywebsitesatuscis.gov/i-9-central* and e-verify.gov.

**Note Regarding Federal, State, and Local Government Agencies (Such as Departments of Motor Vehicles)**

For Federal purposes, TPS beneficiaries presenting an automatically extended EAD referenced in this **Federal Register** notice do not need to show any other document, such as an I–797C Notice of Action or this **Federal Register** notice, to prove that they qualify for this extension. While Federal Government agencies must follow the guidelines laid out by the Federal Government, State and local government agencies establish their own rules and guidelines when granting certain benefits. Each state may have different laws, requirements, and determinations about what documents you need to provide to prove eligibility for certain benefits. Whether you are applying for a Federal, State, or local government benefit, you may need to provide the government agency with documents that show you are a TPS beneficiary, show you are authorized to work based on TPS or other status, or may be used by DHS to determine if you have TPS or another immigration status. Examples of such documents are:

• Your current EAD with a TPS category code of A12 or C19, even if your country of birth noted on the EAD does not reflect the TPS designated country of Venezuela;

• Your Form I–94, Arrival/Departure Record;

• Your Form I–797, Notice of Action, reflecting approval of your Form I–765; or

• Form I–797, Notice of Action, reflecting approval or receipt of a past or current Form I–821.

Check with the government agency regarding which document(s) the agency will accept. Some benefit-granting agencies use the SAVE program to confirm the current immigration status of applicants for public benefits.

While SAVE can verify when an individual has TPS, each agency's procedures govern whether they will accept an unexpired EAD, Form I–797, or Form I–94, Arrival/Departure Record. If an agency accepts the type of TPS-related document you are presenting, such as an EAD, the agency should accept your automatically extended EAD, regardless of the country of birth listed on the EAD. It may assist the agency if you:

a. Present the agency with a copy of the relevant **Federal Register** notice showing the extension of your EAD in addition to your recent TPS-related document with your A-Number, or USCIS number;

b. Explain that SAVE will be able to verify the continuation of your TPS using this information; and

c. Ask the agency to initiate a SAVE query with your information and follow through with additional verification steps, if necessary, to get a final SAVE response verifying your TPS.

You can also ask the agency to look for SAVE notices or contact SAVE if they have any questions about your immigration status or automatic extension of TPS-related documentation. In most cases, SAVE provides an automated electronic response to benefit-granting agencies within seconds, but occasionally verification can be delayed. You can check the status of your SAVE verification by using CaseCheck at *save.uscis.gov/casecheck/.* CaseCheck is a free service that lets you follow the progress of your SAVE verification case using your date of birth and one immigration identifier number (A-Number, USCIS number, or Form I–94 number) or Verification Case Number. If an agency has denied your application based solely or in part on a SAVE

(9 of 10), Page 9 of 10    Case: 25-2120, 05/28/2025, DktEntry: 49.27, Page 9 of 10
Case 3:25-cv-01766-EMC    Document 104-3    Filed 04/07/25    Page 8 of 17

**55032** Federal Register / Vol. 87, No. 173 / Thursday, September 8, 2022 / Notices

response, the agency must offer you the opportunity to appeal the decision in accordance with the agency's procedures. If the agency has received and acted on or will act on a SAVE verification and you do not believe the SAVE response is correct, the SAVE website, *www.uscis.gov/save,* has detailed information on how to make corrections or update your immigration record, make an appointment, or submit a written request to correct records.

[FR Doc. 2022–19527 Filed 9–7–22; 8:45 am]

**BILLING CODE 9111–97–P**

---

# DEPARTMENT OF THE INTERIOR

## Fish and Wildlife Service

[Docket No. FWS–HQ–IA–2022–0120; FXIA16710900000–223–FF09A30000]

### Foreign Endangered Species; Receipt of Permit Applications

**AGENCY:** Fish and Wildlife Service, Interior.

**ACTION:** Notice of receipt of permit applications; request for comments.

---

**SUMMARY:** We, the U.S. Fish and Wildlife Service, invite the public to comment on applications to conduct certain activities with foreign species that are listed as endangered under the Endangered Species Act (ESA). With some exceptions, the ESA prohibits activities with listed species unless Federal authorization is issued that allows such activities. The ESA also requires that we invite public comment before issuing permits for any activity otherwise prohibited by the ESA with respect to any endangered species.

**DATES:** We must receive comments by October 11, 2022.

**ADDRESSES:**
 *Obtaining Documents:* The applications, application supporting materials, and any comments and other materials that we receive will be available for public inspection at *https://www.regulations.gov* in Docket No. FWS–HQ–IA–2022–0120.
 *Submitting Comments:* When submitting comments, please specify the name of the applicant and the permit number at the beginning of your comment. You may submit comments by one of the following methods:
 • *Internet: https://www.regulations.gov.* Search for and submit comments on Docket No. FWS–HQ–IA–2022–0120.
 • *U.S. mail:* Public Comments Processing, Attn: Docket No. FWS–HQ–IA–2022–0120; U.S. Fish and Wildlife Service Headquarters, MS: PRB/3W; 5275 Leesburg Pike; Falls Church, VA 22041–3803.

For more information, see Public Comment Procedures under **SUPPLEMENTARY INFORMATION**.

**FOR FURTHER INFORMATION CONTACT:** Brenda Tapia, by phone at 703–358–2185 or via email at *DMAFR@fws.gov.* Individuals in the United States who are deaf, deafblind, hard of hearing, or have a speech disability may dial 711 (TTY, TDD, or TeleBraille) to access telecommunications relay services. Individuals outside the United States should use the relay services offered within their country to make international calls to the point-of-contact in the United States.

**SUPPLEMENTARY INFORMATION:**

## I. Public Comment Procedures

*A. How do I comment on submitted applications?*

We invite the public and local, State, Tribal, and Federal agencies to comment on these applications. Before issuing any of the requested permits, we will take into consideration any information that we receive during the public comment period.

You may submit your comments and materials by one of the methods in **ADDRESSES**. We will not consider comments sent by email, or to an address not in **ADDRESSES**. We will not consider or include in our administrative record comments we receive after the close of the comment period (see **DATES**).

When submitting comments, please specify the name of the applicant and the permit number at the beginning of your comment. Provide sufficient information to allow us to authenticate any scientific or commercial data you include. The comments and recommendations that will be most useful and likely to influence agency decisions are: (1) Those supported by quantitative information or studies; and (2) those that include citations to, and analyses of, the applicable laws and regulations.

*B. May I review comments submitted by others?*

You may view and comment on others' public comments at *https://www.regulations.gov,* unless our allowing so would violate the Privacy Act (5 U.S.C. 552a) or Freedom of Information Act (5 U.S.C. 552).

*C. Who will see my comments?*

If you submit a comment at *https://www.regulations.gov,* your entire comment, including any personal identifying information, will be posted on the website. If you submit a hardcopy comment that includes personal identifying information, such as your address, phone number, or email address, you may request at the top of your document that we withhold this information from public review. However, we cannot guarantee that we will be able to do so. Moreover, all submissions from organizations or businesses, and from individuals identifying themselves as representatives or officials of organizations or businesses, will be made available for public disclosure in their entirety.

## II. Background

To help us carry out our conservation responsibilities for affected species, and in consideration of section 10(c) of the Endangered Species Act of 1973, as amended (ESA; 16 U.S.C. 1531 *et seq.*), we invite public comments on permit applications before final action is taken. With some exceptions, the ESA prohibits certain activities with listed species unless Federal authorization is issued that allows such activities. Permits issued under section 10(a)(1)(A) of the ESA allow otherwise prohibited activities for scientific purposes or to enhance the propagation or survival of the affected species. Service regulations regarding prohibited activities with endangered species, captive-bred wildlife registrations, and permits for any activity otherwise prohibited by the ESA with respect to any endangered species are available in title 50 of the Code of Federal Regulations in part 17.

## III. Permit Applications

We invite comments on the following applications.

*Applicant: Florida State University Robert K. Godfrey Herbarium, Tallahassee, FL; Permit No. PER0050556*

The applicant requests the renewal of their permit to export and re-import herbarium specimens of endangered and threatened species (excluding animals) previously legally accessioned into the permittee's collection for scientific research. This notification covers activities to be conducted by the applicant over a 5-year period.

*Applicant: Duke University, Durham, NC; Permit No. PER0050971*

The applicant requests authorization to export and reimport nonliving museum specimens of endangered animal species previously accessioned into the applicant's collection for scientific research. This notification

Federal Register / Vol. 87, No. 201 / Wednesday, October 19, 2022 / Notices  63507

**SUPPLEMENTARY INFORMATION:** The United States is signatory to the International Maritime Organization's International Regulations for Preventing Collisions at Sea, 1972 (72 COLREGS), as amended. The special construction or purpose of some vessels makes them unable to comply with the light, shape, or sound signal provisions of the 72 COLREGS. Under statutory law, however, specified 72 COLREGS provisions are not applicable to a vessel of special construction or purpose if the Coast Guard determines that the vessel cannot comply fully with those requirements without interfering with the special function of the vessel.[1]

The owner, builder, operator, or agent of a special construction or purpose vessel may apply to the Coast Guard District Office in which the vessel is being built or operated for a determination that compliance with alternative requirements is justified,[2] and the Chief of the Prevention Division would then issue the applicant a certificate of alternative compliance (COAC) if he or she determines that the vessel cannot comply fully with 72 COLREGS light, shape, and sound signal provisions without interference with the vessel's special function.[3] If the Coast Guard issues a COAC, it must publish notice of this action in the **Federal Register**.[4]

The Chief of Prevention Division, Eighth District, U.S. Coast Guard, certifies that the HAYDEN GRACE, O.N. 1326783 is a vessel of special construction or purpose, and that, with respect to the position of the mast lights, stern light, and sidelights, it is not possible to comply fully with the requirements of the provisions enumerated in the 72 COLREGS, without interfering with the normal operation, construction, or design of the vessel. The Chief of Prevention Division, Eighth District, U.S. Coast Guard, further finds and certifies that the mast lights, stern light, and sidelights are in the closest possible compliance with the applicable provisions of the 72 COLREGS.[5]

This notice is issued under authority of 33 U.S.C. 1605(c) and 33 CFR 81.18.

Dated: October 13, 2022.

**A.H. Moore, Jr.,**
*Captain, U.S. Coast Guard, Chief, Prevention Division, Eighth Coast Guard District.*
[FR Doc. 2022–22712 Filed 10–18–22; 8:45 am]
**BILLING CODE 9110–04–P**

---

[1] 33 U.S.C. 1605.
[2] 33 CFR 81.5.
[3] 33 CFR 81.9.
[4] 33 U.S.C. 1605(c) and 33 CFR 81.18.
[5] 33 U.S.C. 1605(a); 33 CFR 81.9.

## DEPARTMENT OF HOMELAND SECURITY

### Implementation of a Parole Process for Venezuelans

**AGENCY:** Department of Homeland Security.
**ACTION:** Notice.

**SUMMARY:** This notice describes a new effort designed to immediately address the increasing number of encounters of Venezuelan nationals along the southwest border (SWB), as the Administration continues to implement its broader, multi-pronged and regional strategy to address the challenges posed by irregular migration. Venezuelans who do not avail themselves of this process, and instead enter the United States without authorization between POEs, will be subject to expulsion or removal. As part of this effort, the Department of Homeland Security (DHS) will implement a process—modeled on the successful *Uniting for Ukraine* (U4U) parole process—for certain Venezuelan nationals to lawfully enter the United States in a safe and orderly manner. To be eligible, individuals must have a supporter in the United States who agrees to provide housing and other supports as needed; must pass national security and public safety vetting; and must agree to fly at their own expense to an interior U.S. port of entry (POE), rather than entering at a land POE. Individuals are ineligible if they have been ordered removed from the United States within the prior five years or have entered unauthorized into the United States between POEs, Mexico, or Panama after the date of this notice's publication.

**DATES:** DHS will begin accepting online applications for this process on October 18, 2022.

**FOR FURTHER INFORMATION CONTACT:** Ihsan Gunduz, Office of Strategy, Policy, and Plans, Department of Homeland Security, 2707 Martin Luther King Jr. Ave. SE, Washington, DC 20528–0445, (202) 282–9708.

**SUPPLEMENTARY INFORMATION:**

### I. Background—Venezuela Parole Process

This notice describes the implementation of a new parole process for certain Venezuelan nationals announced by the Secretary of Homeland Security on October 12, 2022,[1] including the eligibility criteria and filing process. The parole process is intended to enhance border security by reducing the record levels of Venezuelan nationals entering the United States between POEs, while also providing a process for certain such nationals to lawfully enter the United States in a safe and orderly manner.

The Secretary's announcement followed detailed consideration of a wide range of relevant facts and alternatives, as reflected in the Secretary's decision memorandum dated October 12, 2022.[2] The complete reasons for the Secretary's decision are included in that memorandum. This **Federal Register** notice is intended to provide appropriate context and guidance for the public regarding the policy and relevant procedures associated with this policy.

### A. Overview

The U.S. Government is engaged in a multi-pronged, regional strategy to address the challenges posed by irregular migration. The strategy—a shared endeavor with partner countries—focuses on addressing the root causes of migration, which currently are fueling unprecedented levels of irregular migration, and creating safe and orderly processes for migration throughout the region. This strategy will reduce regional irregular migration in the mid- to long-term, but we anticipate continued substantial pressures along the southwest border over the coming months.

In light of this reality, DHS is implementing an immediate effort to address the increasing number of encounters of Venezuelan nationals at the SWB as we continue to implement the broader and long-term strategy. We anticipate that this new effort would reduce the record levels of Venezuelan nationals seeking to irregularly enter the United States between POEs along the SWB, while also providing a process for certain such nationals to lawfully enter the United States in a safe and orderly manner.

With the cooperation of the Government of Mexico (GOM), and potentially other governments, this effort is intended to serve as a deterrent to irregular migration by providing a meaningful alternative to irregular migration and by imposing immediate consequences on Venezuelan nationals who choose to not avail themselves of the new process and instead seek to irregularly enter the United States

---

[1] DHS Announces New Migration Enforcement Process for Venezuelans, October 12, 2022, available at: https://www.dhs.gov/news/2022/10/12/dhs-announces-new-migration-enforcement-process-venezuelans.

[2] *See* Memorandum for the Secretary from U.S. Customs and Border Protection Commissioner and U.S. Citizenship and Immigration Services Director, Parole Process for Certain Venezuelan Nationals (Oct. 12, 2022).