# DOCUMENT 2.8

(2 of 9), Page 2 of 9      Case: 25-2120, 05/28/2025, DktEntry: 49.28, Page 2 of 9
Case 3:25-cv-01766-EMC    Document 104-3    Filed 04/07/25    Page 10 of 17

**63508** **Federal Register** / Vol. 87, No. 201 / Wednesday, October 19, 2022 / Notices

between POEs. It will also provide an incentive for Venezuelans to avoid the often dangerous journey to the border altogether, by putting in place a safe and orderly process for Venezuelan nationals to travel to the United States to seek a discretionary, case-by-case grant of parole into the United States, based on significant public benefit and urgent humanitarian reasons.[3] Venezuelan nationals who irregularly enter the United States between POEs after October 19, 2022 are subject to expulsion or removal from the United States; those who enter irregularly into the United States, Mexico, or Panama will also be found ineligible for a discretionary grant of parole under this process. Only those who meet specified criteria and pass national security and public safety vetting would be eligible for consideration for parole under this process.

Implementation of the parole process is conditioned on Mexico continuing to accept the expulsion or removal of Venezuelan nationals seeking to irregularly enter the United States between POEs. As such, this new process will couple a meaningful incentive to seek a lawful, safe and orderly means of traveling to the United States with the imposition of consequences for those who seek to enter irregularly.

The new policy is modeled on *Uniting for Ukraine* (U4U), the successful parole process that was put in place in the wake of Russia's unprovoked invasion of Ukraine, when thousands of Ukrainian migrants spontaneously arrived at SWB POEs. Once U4U was implemented, such spontaneous arrivals fell sharply, and travel shifted to a safe and orderly process. This new process is procedurally similar to U4U, in which certain Ukrainians with U.S.-based supporters who meet specified eligibility criteria have been able to travel to the United States to seek a discretionary, case-by-case grant of parole for up to two years. As in U4U, applications using this parole process will be initiated by a supporter in the United States who would apply on behalf of a Venezuelan individual and commit to providing the beneficiary housing and other financial support, as needed, for the duration of their parole.

In addition to the supporter requirement, Venezuelan nationals are required to meet several eligibility criteria, as outlined in more detail later in this notice, to receive advance authorization to travel to the United States and be considered for parole, on a case-by-case basis. Importantly, individuals are ineligible if they have been ordered removed from the United States within the prior five years; they are also ineligible if they have crossed into the United States between POEs, or entered Mexico or Panama without authorization, after October 19, 2022. Only those who pass national security and public safety vetting and agree to fly to an interior POE, as opposed to entering between POEs, and who meet all specified criteria below will be eligible to receive advance authorization to travel to the United States and be considered for parole, on a case-by-case basis, under this process.

Any discretionary grants of parole will be for a temporary period of up to two years. During this two-year period, the United States will continue to build on the multi-pronged and long-term strategy and engage with our foreign partners throughout the region. These efforts are intended to support conditions that would decrease irregular migration, work to improve refugee processing and other lawful immigration pathways in the region, and allow for increased removals of those who continue to migrate irregularly and lack a valid claim of asylum or other lawful basis to remain in the United States. The two-year period will also enable individuals to seek humanitarian relief or other immigration benefits for which they may be eligible, and to work and contribute to the U.S. economy as they do so. Those who are not granted asylum or other immigration benefits will need to leave the United States at the expiration of their authorized period of parole or will generally be placed in removal proceedings after the period of parole expires.

The temporary, case-by-case parole of qualifying Venezuelan nationals pursuant to this process will provide a significant public benefit for the United States, while also addressing the urgent humanitarian reasons that Venezuelan nationals are fleeing, to include repression and unsafe conditions in their home country. Most significantly, we anticipate that parole will: (i) enhance the security of our SWB by reducing irregular migration of Venezuelan nationals; (ii) enhance border security and national security by vetting individuals prior to their arrival at a United States POE; (iii) reduce the strain on DHS personnel and resources; (iv) minimize the domestic impact of Venezuelan irregular migration; (v) disincentivize a dangerous irregular journey that puts migrant lives and safety at risk and enriches smuggling networks; and (vi) fulfill important foreign policy goals to manage migration collaboratively in the hemisphere. The process is capped at 24,000 beneficiaries. After this cap is reached, DHS will not approve additional beneficiaries, absent a Secretary-level decision, at the Secretary's sole discretion, to continue the process.

*B. Conditions at the Border*

1. Trends and Flows: Increase of Venezuelan Nationals Arriving at the Southwest Border

The last decades have yielded a dramatic increase in encounters at the SWB and a dramatic shift in the demographics of those encountered. Throughout the 1980s and into the first decade of the 2000s, encounters along the SWB routinely numbered in the millions per year. By the early 2010s, three decades of investments in border security and strategy contributed to reduced border flows, with border encounters averaging fewer than 400,000 per year from 2011–2017.[4] These gains were subsequently reversed, however, as border encounters more than doubled between 2017 and 2019, and—following a steep drop in the first months of the COVID–19 pandemic—continued to increase at a similar pace in 2021 and 2022.

Shifts in demographics have also had a significant effect on irregular migration. Border encounters in the 1980s and 1990s consisted overwhelmingly of single adults from Mexico, most of whom were migrating for economic reasons. Beginning in the 2010s, a growing share of migrants have been from Northern Central America [5] (NCA) and, since the late 2010s, from countries throughout the Americas. Migrant populations from these newer source countries have included large numbers of families and children, many of whom are traveling to escape violence and political oppression and for other non-economic reasons.[6]

The most recent rise in the numbers of encounters at the border has been driven in significant part by a surge in

---

[3] *See* INA sec. 212(d)(5)(A), 8 U.S.C. 1182(d)(5)(A).

[4] Office of Immigration Statistics (OIS) analysis of historic CBP data.

[5] Northern Central America refers to El Salvador, Guatemala, and Honduras.

[6] Prior to 2013, the overall share of encounters who were processed for expedited removal and claimed fear averaged less than 2 percent annually. Between 2013 and 2018, the share rose from 8 to 20 percent, before dropping with the surge of family unit encounters in 2019 (most of whom were not placed in expedited removal) and the onset of Title 42 expulsions in 2020. As the same time, between 2013 and 2021, among those placed in expedited removal, the share making fear claims increased from 16 to 82 percent. OIS analysis of historic CBP and USCIS data and OIS Enforcement Lifecycle through June 30, 2022.

(3 of 9), Page 3 of 9    Case: 25-2120, 05/28/2025, DktEntry: 49.28, Page 3 of 9
Case 3:25-cv-01766-EMC    Document 104-3    Filed 04/07/25    Page 11 of 17

Federal Register / Vol. 87, No. 201 / Wednesday, October 19, 2022 / Notices    63509

migration of Venezuelan nationals. Unique encounters of Venezuelan nationals increased throughout fiscal year (FY) 2021, totaling 47,328. More than 25% of Venezuela's population has left the country. The United States is seeing a rising rate of Venezuelans encountered at our border over the past two years, which has surged in the last few months. Average monthly unique encounters of Venezuelan nationals at the land border totaled 15,494 in FY 2022,[7] rising further to over 25,000 in August and 33,000 in September, compared to a monthly average of 127 unique encounters from FY 2014–2019.[8] Of note, unique encounters of Venezuelan nationals rose 293 percent between FY 2021 and FY 2022, while unique encounters of all other nationalities combined increased by 45 percent. Panama is currently seeing more than 3,000 people, mostly Venezuelan nationals, crossing into its territory from Colombia via the Darién jungle each day.

In recent months, this surge in irregular migration of Venezuelan nationals has been accelerating. Nationals from Venezuela accounted for 25,130 unique encounters in August 2022, and the Office of Immigration Statistics (OIS) estimates that there were 33,500 unique encounters in September, more than Mexico and more than all three NCA countries combined.[9]

2. Push and Pull Factors

DHS assesses that the high—and rising—number of Venezuelan encounters has three key causes: First, the deteriorating conditions in Venezuela, including repression, instability, and violence, are pushing large numbers to leave their home country. Second, the lack of safe and orderly migration alternatives throughout the entire region, including to the United States, means that those seeking refuge outside of Venezuela have few lawful options. Third, the United States faces significant limits on the ability to return Venezuelan nationals to Venezuela or elsewhere, as described below; absent such a return ability, more individuals are willing to take a chance that they can come—and stay.

a. Factors Pushing Migration From Venezuela

A complex political, humanitarian, and economic crisis; the widespread presence of non-state armed groups; crumbling infrastructure; and the repressive tactics of Nicolás Maduro have caused nearly 7 million Venezuelans to flee their country.[10] Maduro has arbitrarily banned key opposition figures from participating in the political process, detained hundreds of political prisoners, employed judicial processes to circumscribe political parties, and denied opposition political representatives equal access to media coverage and freedom of movement in the country.[11] In a February 2022 report, Amnesty International reported that "[c]rimes under international law and human rights violations, including politically motivated arbitrary detentions, torture, extrajudicial executions and excessive use of force have been systematic and widespread, and could constitute crimes against humanity."[12] Amnesty International further reported that "trends of repression in Venezuela have been directed against a specific group of people: those perceived as dissidents or opponents" of Nicolás Maduro.[13]

According to the United Nations High Commissioner for Refugees, Venezuela has become the second-largest external displacement crisis in the world, following Syria.[14] At least in the short term, the crisis is expected to continue, thus continuing to push Venezuelans to seek alternatives elsewhere. As described above, Panama is currently seeing more than 3,000 people, mostly Venezuelan nationals, crossing into its territory from Colombia via the Darién jungle each day.

b. Return Limitations

At this time, there are significant limits in DHS's ability to expel or return Venezuelans who enter the United States without authorization in between POEs. DHS is currently under a court-ordered obligation to implement the Centers for Disease Control and Prevention's (CDC) Title 42 public health Order, under which covered noncitizens may be prevented entry or expelled to prevent the spread of communicable disease.[15] But Venezuela does not presently allow repatriations via charter flights, which significantly limits DHS's ability to return those subject to the Title 42 Order or who are ordered removed. To date, other countries, including Mexico, have generally been reluctant to accept Venezuelans as well. As a result, DHS was only able to repatriate a small number of Venezuelan nationals to Venezuela in FY 2022.

c. Overall Effect

DHS assesses that the combination of the country conditions in Venezuela, the lack of safe and orderly lawful pathways, and the present inability to expel or remove Venezuelan nationals engaged in irregular migration, has significantly led to the significant increase in irregular migration among Venezuelan nationals. Conversely, DHS assesses that the return of a significant portion of Venezuelans who enter irregularly at the border, coupled with an alternative process pursuant to which Venezuelans could enter the United States lawfully, would meaningfully change the incentives for those intending to migrate—leading to a decline in the numbers of Venezuelans seeking to irregularly cross the SWB.

This prediction is based on prior experience: CBP saw rapidly increasing numbers of encounters of Guatemalan and Honduran nationals from January 2021 until August 2021, when these countries began accepting the direct return of their nationals. In January 2021, CBP encountered an average of 424 Guatemalan nationals and 362 Honduran nationals a day. By August 4, 2021, the 30-day average daily encounter rates had climbed to 1,249 Guatemalan nationals and 1,502 Honduran nationals—an increase of 195 percent and 315 percent, respectively. In the 60 days immediately following the resumption of routine flights, average daily encounters fell by 37

---

[7] FY 2022 CBP data cited in this notice is based on internal reporting to date. CBP releases official data in regular intervals; final FY 2022 figures may differ to some degree from the figures cited here.

[8] OIS analysis of OIS Persist Dataset based on data through August 31, 2022 and OIS analysis of U.S. Customs and Border Protection (CBP) data from Unified Immigration Portal (UIP) as of October 6, 2022. Unique encounters include encounters of persons at the Southwest Border who were not previously encountered in the prior 12 months. Throughout this notice unique encounter data are defined to also include OFO parolees and other OFO administrative encounters.

[9] OIS Persist Dataset based on data through August 31, 2022 and OIS analysis of CBP UIP data as of October 6, 2022.

[10] UNHCR, Venezuela Situation, available at: https://www.unhcr.org/en-us/venezuela-emergency.html (last visited Sept. 24, 2022).

[11] 2021 Country Reports of Human Rights Practices: Venezuela, U.S. Department of State, Apr. 12, 2022, available at: https://www.state.gov/reports/2021-country-reports-on-human-rights-practices/venezuela/ (last visited Sept. 24, 2022).

[12] Venezuela: Calculated repression: Correlation between stigmatization and politically motivated arbitrary detentions, Amnesty International, p. 11, Feb. 10, 2022, available at: https://www.amnesty.org/en/documents/amr53/5133/2022/en/ (last visited Sept. 25, 2022).

[13] Venezuela: Calculated repression: Correlation between stigmatization and politically motivated arbitrary detentions, Amnesty International, p.52, Feb. 10, 2022, available at: https://www.amnesty.org/en/documents/amr53/5133/2022/en/ (last visited Sept. 25, 2022).

[14] UNHCR, Venezuela Situation, available at: https://www.unhcr.org/en-us/venezuela-emergency.html (last visited Sept. 24, 2022).

[15] *Louisiana* v. *CDC*,—F. Supp. 3d—, 2022 WL 1604901 (W.D. La. May 20, 2022).

(4 of 9), Page 4 of 9    Case: 25-2120, 05/28/2025, DktEntry: 49.28, Page 4 of 9
Case 3:25-cv-01766-EMC    Document 104-3    Filed 04/07/25    Page 12 of 17

**63510** **Federal Register** / Vol. 87, No. 201 / Wednesday, October 19, 2022 / Notices

percent for Guatemala and 42 percent for Honduras, as shown in Figure 1 below.[16]

Figure 1: Daily Encounters of Guatemalan and Honduran Nationals, May 1–November 1, 2021.



**NOTE:** Figure depicts 30-day average of daily encounters.
Source: OIS analysis of OIS Persist Dataset.

Returns alone, however, are not sufficient. While the numbers of encounters of Guatemalan and Honduran nationals have fallen, CBP is currently encountering a total of around 1,000 nationals from these two countries each day. The process thus seeks to *combine* a consequence for Venezuelan nationals who seek to enter the United States irregularly at the land border with an incentive to use the lawful process to request authorization to travel by air to and enter the United States, without making the dangerous journey to the border.

This effort is informed by the way that similar incentives and disincentives worked in the U4U process. In the two weeks prior to U4U's implementation, DHS encountered a daily average of 940 nationals of Ukraine at the U.S.-Mexico land border seeking to enter the United States. After the new parole process launched and approved Ukrainians could fly directly into the United States—whereas those who sought to enter irregularly were subject to expulsion pursuant to the Title 42 public health Order—daily encounters dropped to fewer than twelve per day.[17] Mexican officials also reported seeing a similar decline in the number of inbound Ukrainian air passengers.

3. Impact on DHS Resources and Operations

To respond to the increase in encounters along the SWB since FY 2021—an increase that has accelerated in FY 2022, driven in significant part by the number of Venezuelan nationals encountered—DHS has taken a series of extraordinary steps. Largely since FY 2021, DHS has built and now operates 10 soft-sided processing facilities, which cost $688 million in FY 2022. It has detailed 3,770 officers and agents from CBP and ICE to the SWB. In FY 2022, DHS had to utilize its above threshold reprogramming authority to identify approximately $281 million from elsewhere in the Department to address SWB needs, to include facilities, transportation, medical care, and personnel costs.

The Federal Emergency Management Agency (FEMA) has spent $260 million in FYs 2021 and 2022 on grants to non-governmental organizations (NGO) and state and local entities through the Emergency Food and Shelter Program—Humanitarian (EFSP—H) to assist with the reception and onward travel of irregular migrants arriving at the SWB. This spending is in addition to $1.4 billion in FY 2022 one-year surge funding for SWB enforcement and processing capacities.[18]

The impact has been particularly acute in certain border sectors. The increased flows of Venezuelan nationals are disproportionately occurring within the remote Del Rio, El Paso, and Yuma sectors, all of which are at risk of operating, or are currently operating, over capacity. In FY 2022, 93 percent of unique encounters of Venezuelan nationals occurred in these three sectors, with the trend rising to 98 percent in September 2022.[19] In FY 2022, the Del Rio, El Paso, and Yuma sectors encountered almost double the number of migrants as compared to FY 2021 (an 87 percent increase), and a ten-fold increase over the average for FY 2014–FY 2019, primarily as a result of increases in Venezuelans and other non-traditional sending countries.[20]

The focused increase in encounters in those three sectors is particularly challenging. Yuma and Del Rio sectors are geographically remote, and because—until the past two years—they have never been a focal point for large numbers of individuals entering irregularly, they have limited infrastructure and personnel in place to safely process the elevated encounters

---

[16] OIS analysis of OIS Persist Dataset based on data through August 31, 2022.

[17] OIS Persist Dataset based on data through August 31, 2022.

[18] DHS Plan for Southwest Border Security and Preparedness, DHS Memorandum for Interested Parties, Alejandro N. Mayorkas, Secretary of Homeland Security, Apr. 26, 2022.

[19] OIS analysis of OIS Persist Dataset through August 31, 2022 and CBP UIP data for September 1–30, 2022.

[20] OIS analysis of OIS Persist Dataset through August 31, 2022.

(5 of 9), Page 5 of 9   Case: 25-2120, 05/28/2025, DktEntry: 49.28, Page 5 of 9
Case 3:25-cv-01766-EMC   Document 104-3   Filed 04/07/25   Page 13 of 17

Federal Register / Vol. 87, No. 201 / Wednesday, October 19, 2022 / Notices  63511

that they are seeing. El Paso sector has relatively modern infrastructure for processing noncitizens encountered at the border, but is far away from other CBP sectors, which makes it challenging to move individuals elsewhere for processing during surges.

In an effort to decompress sectors that are experiencing surges, DHS deploys lateral transportation, using buses and flights to move noncitizens to other sectors with capacity to process. In just one week (between September 22–September 28), El Paso and Yuma sectors operated a combined 79 decompression buses staffed by Border Patrol agents to neighboring sectors.[21] In that same week, El Paso and Yuma sectors also operated 29 combined lateral decompression flights, redistributing noncitizens to other sectors with additional capacity.[22]

Because these assets are finite, using DHS air resources to operate lateral flights impacts DHS's ability to operate international repatriation flights to receiving countries, leaving noncitizens in custody for longer and further taxing DHS resources. This is concerning given the correlation between DHS's ability to operate return flights to non-contiguous home countries and encounters at the border, as described above. DHS assesses that a reduction in the flow of Venezuelans arriving at the SWB would reduce pressure on overstretched resources and enable the Department to more quickly process and, as appropriate, return or remove those who do not have a lawful basis to stay.

## II. DHS Parole Authority

The Immigration and Nationality Act (INA or Act) provides the Secretary of Homeland Security with discretionary authority to parole noncitizens into the United States temporarily, under such reasonable conditions that the Secretary may prescribe, on a case-by-case basis for ''urgent humanitarian reasons or significant public benefit.'' [23] Parole is not an admission of the individual to the United States, and a parolee remains an ''applicant for admission'' during the period of parole in the United States.[24] DHS may set the duration of the parole based on the purpose for granting the parole request and may impose reasonable conditions on parole.[25] Individuals may be granted advance authorization to travel to the United States to seek parole.[26] DHS may terminate parole in its discretion at any time.[27] Individuals who are paroled into the United States generally may apply for employment authorization.[28]

This effort will combine a consequence for those who seek to enter the United States irregularly between POEs with a significant incentive for Venezuelan nationals to remain where they are and use a lawful process to request authorization to travel by air to and ultimately enter the United States for the purpose of seeking a discretionary grant of parole for up to two years.

## III. Justification for the Process

### A. Significant Public Benefit

The case-by-case parole of Venezuelan nationals pursuant to this process—which combines consequences for those who seek to enter the United States irregularly between POEs with an opportunity for eligible Venezuelan nationals to seek advance authorization to travel to the United States to seek discretionary parole, on a case-by-case basis, in the United States—will serve a significant public benefit for multiple, intersecting reasons. Specifically, as noted above, we assess that the parole of eligible individuals pursuant to this process will result in the following: (i) enhancing the security of our border by reducing irregular migration of Venezuelan nationals; (ii) enhancing border security and national security by vetting individuals before they arrive at our border; (iii) reducing the strain on DHS personnel and resources; (iv) minimizing the domestic impact of Venezuelan irregular migration; (v) disincentivizing a dangerous irregular journey that puts migrant lives and safety at risk and enriches smuggling networks; and (vi) fulfilling important foreign policy goals to manage migration collaboratively in the hemisphere and, as part of those efforts, to establish additional processing pathways from within the region to discourage irregular migration.

1. Enhancing the Security of Our Border by Reducing Irregular Migration of Venezuelan Nationals

Implementation of the parole process is contingent on the GOM agreeing to accept the return of Venezuelan nationals encountered irregularly entering the United States without authorization between POEs. While DHS remains under the court order to implement the CDC's Title 42 public health Order, these returns will take the form of expulsions. Once Title 42 is no longer in place, DHS will engage the GOM to effectuate Title 8 removals of individuals subject to expedited removal who cannot be returned to Venezuela or elsewhere. The ability to effectuate returns to Mexico will impose a consequence on irregular entry that currently does not exist.

As described above, Venezuelan nationals make up a significant and growing number of those encountered seeking to cross between POEs irregularly. We assess that without additional and more immediate consequences imposed on those who seek to do so, together with a safe and orderly parole process, the numbers will continue to grow. By pairing a consequence on those seeking to irregularly cross between the POEs with the incentive provided by the opportunity to apply for advance authorization to travel to the United States to seek a discretionary grant of parole, this process will create a combination of incentives and disincentives that will lead to a substantial decline in irregular migration by Venezuelans to the SWB.

As also described above, this expectation is informed, in part, by past experience with respect to the ways that flows of irregular migration decreased from NCA countries once nationals from those countries were returned to their home countries and shifts that took place once the U4U process was initiated. These experiences provide compelling evidence of the importance of coupling effective disincentives for irregular entry with incentives for lawful entry as a way of addressing migratory surges.

2. Enhance Border Security and National Security by Vetting Individuals Before They Arrive at Our Border

The Venezuelan parole process described above will allow DHS to vet potential beneficiaries for national security and public safety purposes *before* they travel to the United States. It is important to note that all noncitizens DHS encounters at the border undergo thorough vetting against national security and public safety databases during their processing, and that individuals who are determined to pose a national security or public safety threat are detained pending removal. Venezuelan nationals seeking parole via this process will still be subject to this vetting upon their arrival at the POE. That said, there are distinct advantages to being able to conduct some vetting actions *before* an individual arrives at the border to prevent individuals who

---

[21] Data from SBCC, as of September 29, 2022.
[22] Data from SBCC, as of September 29, 2022.
[23] INA sec. 212(d)(5)(A), 8 U.S.C. 1182(d)(5)(A); *see also* 6 U.S.C. 202(4) (charging the Secretary with the responsibility for ''[e]stablishing and administering rules . . . governing . . . parole'').
[24] INA sec. 212(d)(5)(A), 8 U.S.C. 1182(d)(5)(A).
[25] INA sec. 212(d)(5)(A), 8 U.S.C. 1182(d)(5)(A).
[26] *See* 8 CFR 212.5(f).
[27] *See* 8 CFR 212.5(e).
[28] *See* 8 CFR 274a.12(c)(11).

(6 of 9), Page 6 of 9    Case: 25-2120, 05/28/2025, DktEntry: 49.28, Page 6 of 9
Case 3:25-cv-01766-EMC    Document 104-3    Filed 04/07/25    Page 14 of 17

**63512** **Federal Register**/Vol. 87, No. 201/Wednesday, October 19, 2022/Notices

could pose threats to national security or public safety from even traveling to the United States.

As described above, the vetting will require prospective beneficiaries to upload a live photograph via a mobile application. This will substantially enhance the scope of the pre-travel vetting—thereby enabling DHS to better identify those with criminal records or other disqualifying information of concern and deny them an advance authorization to travel before they arrive at our border.

3. Reduce the Burden on DHS Personnel and Resources

As discussed above, the impact of the increased migratory flows has strained the DHS workforce in ways that have been particularly concentrated in certain sectors along the SWB. By reducing encounters of Venezuelan nationals at the SWB, and channeling decreased flows of Venezuelan nationals to interior POEs through this streamlined process, we anticipate the process will relieve some of this burden. This will free up resources, including those focused on decompression of border sectors, which in turn could enable an increase in removal flights—enabling the removal of more noncitizens with final orders of removal faster and reducing the number of days in DHS custody. While the process will also draw on DHS resources within USCIS and CBP to process requests for discretionary parole on a case-by-case basis and conduct vetting, these requirements involve different parts of DHS and require minimal resources as compared to the status quo.

4. Minimize the Domestic Impact

The increase in irregular migration, including the change in demographics, has put a strain on domestic resources, which is felt most acutely by border communities. As the number of arrivals increases, thus necessitating more conditional releases, the strains are shared by others as well. Given the current inability to return or repatriate Venezuelans in substantial numbers, Venezuelan nationals account for a significant percentage of the individuals being conditionally released pending their removal proceedings or the initiation of such proceedings after being encountered and processed along the SWB.

State and local governments, along with NGOs, are providing services and assistance to the Venezuelans and other noncitizens who have arrived at our border, including by building new administrative structures, finding additional housing facilities, and constructing tent shelters to address the increased need.[29] DHS also has worked with Congress to make approximately $290 million available since FY 2019 through FEMA's EFSP to support NGOs and local governments that provide initial reception for migrants entering through the SWB. This funding has allowed DHS to support building significant NGO capacity along the SWB, including a substantial increase in available shelter beds in key locations.

Despite these efforts, local communities have reported strain on their ability to provide needed social services.[30] Local officials and NGOs report that the temporary shelters that house migrants are quickly reaching capacity due to the high number of arrivals,[31] and stakeholders in the border region have expressed concern that shelters will eventually reach full bed space capacity and not be able to host any new arrivals.[32] The parole process will address these concerns by diverting flows of Venezuelan nationals to interior POEs through a safe and orderly process and ensuring that those who do arrive in the United States have support during their period of parole. The effort is intended to yield a decrease in the numbers arriving at the SWB.

Moreover, and critically, beneficiaries will be required to fly to the interior, rather than arriving at the SWB, absent extraordinary circumstances. They will only be authorized to come to the United States if they have a supporter who has agreed to receive them and provide basic needs, including housing support. Beneficiaries also will be eligible to apply for work authorization, thus enabling them to support themselves. We anticipate that this process will help reduce the burden on communities, state and local governments, and NGOs that currently support the reception and onward travel of migrants arriving at the SWB.

5. Disincentivize a Dangerous Journey That Puts Migrant Lives and Safety at Risk and Enriches Smuggling Networks

In FY 2022, more than 750 migrants died attempting to enter the United States across the SWB,[33] an estimated 32 percent increase from FY 2021 (568 deaths) and a 195 percent increase from FY 2020 (254 deaths).[34] The approximate number of migrants rescued by CBP in FY 2022 (almost 19,000 rescues)[35] increased 48 percent from FY 2021 (12,857 rescues), and 256 percent from FY 2020 (5,336 rescues).[36] Although exact figures are unknown, experts estimate that about 30 bodies have been taken out of the Rio Grande River each month since March 2022.[37] CBP attributes these rising trends to increasing numbers of migrants, as evidenced by increases in overall U.S. Border Patrol encounters.[38] The increased rates of both migrant deaths and those needing rescue at the SWB demonstrate the perils of the journey.

Meanwhile, these numbers do not account for the countless incidents of death, illness, and exploitation migrants experience during the perilous journey north. Migrants are increasingly traveling to the SWB from South America through the Darién Gap, an incredibly dangerous and grueling 100-kilometer stretch of dense jungle between Colombia and Panama. Women and children are particularly vulnerable. Children are particularly at risk for diarrhea, respiratory diseases, dehydration, and other ailments that

---

[29] Aya Elamroussi and Adrienne Winston, Washington, DC, approves creation of new agency to provide services for migrants arriving from other states, CNN, Sept. 21, 2022, available at: https://www.cnn.com/2022/09/21/us/washington-dc-migrant-services-office (last visited Sept. 29, 2022).

[30] Lauren Villagran. El Paso struggles to keep up with Venezuelan migrants: 5 key things to know. Sep. 14, 2022, available at: https://www.elpasotimes.com/story/news/2022/09/14/venezuelan-migrants-el-paso-what-to-know-about-their-arrival/69493289007/ (last visited Sept. 29, 2022); Uriel J. Garcia. El Paso scrambles to move migrants off the streets and gives them free bus rides as shelters reach capacity. Sept. 20, 2022, available at: https://www.texastribune.org/2022/09/20/migrants-el-paso-texas-shelter/ (last visited Sept. 29, 2022).

[31] Email from City of San Diego Office of Immigration Affairs to DHS, Sept. 23, 2022.

[32] Denelle Confair, Local migrant shelter reaching max capacity as it receives hundreds per day, KGUN9 Tucson, Sept. 23, 2022, available at: https://www.kgun9.com/news/local-news/local-migrant-shelter-reaching-max-capacity-as-it-receives-hundreds-per-day (last visited Sept. 29, 2022).

[33] Priscilla Alvarez, First on CNN: A record number of migrants have died crossing the US-Mexico border, Sept. 7, 2022, available at: https://www.cnn.com/2022/09/07/politics/us-mexico-border-crossing-deaths/index.html (last visited Sept. 30, 2022).

[34] Rescue Beacons and Unidentified Remains, Fiscal Year 2022 Report to Congress, U.S. Customs and Border Protection.

[35] Priscilla Alvarez, First on CNN: A record number of migrants have died crossing the US-Mexico border, Sept. 7, 2022, available at: https://www.cnn.com/2022/09/07/politics/us-mexico-border-crossing-deaths/index.html (last visited Sept. 30, 2022).

[36] Rescue Beacons and Unidentified Remains, Fiscal Year 2022 Report to Congress, U.S. Customs and Border Protection.

[37] Valerie Gonzalez, The Guardian, Migrants risk death crossing treacherous Rio Grande river for 'American dream,' Sept. 5, 2022, available at: https://www.theguardian.com/us-news/2022/sep/05/migrants-risk-death-crossing-treacherous-rio-grande-river-for-american-dream (last visited Oct. 11, 2022).

[38] Rescue Beacons and Unidentified Remains, Fiscal Year 2022 Report to Congress, U.S. Customs and Border Protection.

(7 of 9), Page 7 of 9   Case: 25-2120, 05/28/2025, DktEntry: 49.28, Page 7 of 9
Case 3:25-cv-01766-EMC   Document 104-3   Filed 04/07/25   Page 15 of 17

Federal Register / Vol. 87, No. 201 / Wednesday, October 19, 2022 / Notices    63513

require immediate medical attention.[39] According to Panama migration authorities, of the over 31,000 migrants passing through the Darién Gap in August 2022, 23,600 were Venezuelan.[40]

These migration movements are in many cases facilitated by numerous human smuggling organizations that treat the migrants as pawns.[41] These organizations exploit migrants for profit, often bringing them through across inhospitable jungles, rugged mountains, and raging rivers, often with small children in tow. Upon reaching the border area, noncitizens seeking to cross the United States generally pay transnational criminal organizations (TCOs) to coordinate and guide them along the final miles of their journey. Tragically, a significant number of individuals perish along the way. The trailer truck accident that killed 55 migrants in Chiapas, Mexico last December, and the tragic incident in San Antonio, Texas on June 27, 2022, in which 53 migrants died of the heat in appalling conditions, are just two examples of many in which TCOs engaged in human smuggling prioritize profit over safety.[42]

This new process, which will incentivize intending migrants to use a safe and orderly means to access the United States via commercial air flights, cuts out the smuggling networks. DHS anticipates it will save lives and undermine the profits and operations of the dangerous TCOs that put migrants' lives at risk for profit.

6. Fulfill Important Foreign Policy Goals To Manage Migration Collaboratively in the Hemisphere

Promoting a safe, orderly, legal, and humane migration strategy throughout the Western Hemisphere has been a top foreign policy priority for the Administration. This is reflected in three policy-setting documents: the U.S. Strategy for Addressing the Root Causes of Migration in Central America (Root Causes Strategy); the Collaborative Migration Management Strategy (CMMS); and the Los Angeles Declaration on Migration and Protection (L.A. Declaration), which was endorsed in June 2022 by 21 countries. The CMMS and the L.A. Declaration call for a collaborative and regional approach to migration. Countries that have endorsed the L.A. Declaration are committed to implementing programs and processes to stabilize communities that host migrants, or that have high outward migration. They commit to humanely enforcing existing laws regarding movements across international boundaries, especially when minors are involved, taking actions to stop migrant smuggling by targeting the criminals involved in these activities, and providing increased regular pathways and protections for migrants residing in or transiting through the 21 countries. The L.A. Declaration specifically lays out the goal of collectively "expand[ing] access to regular pathways for migrants and refugees."[43]

This new process helps achieve these goals by providing an immediate and temporary safe and orderly process for Venezuelan nationals to lawfully enter the United States while we work to improve conditions in sending countries and expand more permanent lawful immigration pathways in the region, including refugee processing, and other lawful pathways into the United States and other Western Hemisphere countries. It thus enables the United States to lead by example.

The process also responds to an acute foreign policy need. The current surge of Venezuelan nationals transiting the Darién Gap is impacting every country between Colombia and the SWB. Colombia, Peru, and Ecuador are now hosting almost 4 million displaced Venezuelans among them. The Government of Panama has repeatedly signaled that it is overwhelmed with the number of migrants, a significant portion of whom are Venezuelan, emerging from harrowing journeys through the Darién Gap.

Reporting indicates that in the first six months of 2022, 85 percent more migrants, primarily Venezuelans, crossed from Colombia into Panama through the Darién Gap than during the same period in 2021—including approximately 40,000 Venezuelans in September alone.[44] Again, Darién Gap migrant encounters now average more than 3,000 each day, predominantly comprised of Venezuelan nationals.

Figure 2 shows that the number of Venezuelan nationals processed by Panama after entering irregularly from Colombia increased by almost 30-fold from the week of April 1, 2022 to the week of October 1, 2022.

Figure 2: Panamanian Encounters of Venezuelan Nationals in the Darién Gap, February–September 2022

---

[39] UNICEF, 2021 Records Highest Ever Number of Migrant Children Crossing the Darien Towards the U.S., Oct. 11, 2021, available at: https://www.unicef.org/lac/en/press-releases/2021-records-highest-ever-number-migrant-children-crossing-darien-towards-us (last visited Sept. 29, 2022).

[40] Panamá Migración, Irregulares en Tránsito Frontera Panamá—Colombia 2022, available at: https://www.migracion.gob.pa/inicio/estadisticas

[41] DHS Plan for Southwest Border Security and Preparedness, DHS Memorandum for Interested Parties, Alejandro N. Mayorkas, Secretary of Homeland Security, Apr. 26, 2022.

[42] Jacob Garcia, Reuters, Migrant truck crashes in Mexico killing 54, available at: https://www.reuters.com/article/uk-usa-immigration-mexico-accident-idUKKBN2IP01R (last visited Sept. 29, 2022); Mica Rosenberg, Kristina Cooke, Daniel Trotta, The border's toll: Migrants increasingly die crossing into U.S. from Mexico, July 25, 2022, available at: https://www.reuters.com/article/usa-immigration-border-deaths/the-borders-toll-migrants-increasingly-die-crossing-into-u-s-from-mexico-idUSL4N2Z247X (last visited Oct. 2, 2022).

[43] L.A. Declaration.

[44] The Department of State Cable, 22 Panama 624.

(8 of 9), Page 8 of 9   Case: 25-2120, 05/28/2025, DktEntry: 49.28, Page 8 of 9
Case 3:25-cv-01766-EMC   Document 104-3   Filed 04/07/25   Page 16 of 17

**63514** **Federal Register** / Vol. 87, No. 201 / Wednesday, October 19, 2022 / Notices



**Note:** September figure is a preliminary estimate.
Source: Panama Migration Report, September 24, 2022.

Key allies throughout the region—including the Governments of Mexico, Costa Rica, and Panama, all of which are also affected by the increased movement of Venezuelan nationals—have been seeking greater action to address these challenging flows for some time. Meanwhile, the GOM has consistently expressed concerns with policies, programs, and trends that contribute to large populations of migrants, many of whom are Venezuelan, entering Mexico. These entries strain local governmental and civil society resources in Mexican border communities in both the south and north, and have at times led to violence, crime, and unsafe and unhealthy encampments.

The United States is already taking key steps to address some of these concerns. On June 10, 2022, the Department of State's Bureau of Population, Refugees, and Migration (PRM) and the U.S. Agency for International Development (USAID) announced $314 million in new funding for humanitarian and development assistance for refugees and vulnerable migrants across the hemisphere, including support for socio-economic integration and humanitarian aid for Venezuelans in 17 countries of the region.[45] And on September 22, 2022, PRM and USAID announced nearly $376 million in additional humanitarian assistance, which will provide essential support for vulnerable Venezuelans inside Venezuela, as well as urgently needed assistance for migrants, refugees, and host communities across the region. This funding will further address humanitarian needs in the region.[46]

This new process adds to these efforts and enables the United States to lead by example. It is a key mechanism to advance the larger domestic and foreign policy goals of this Administration to promote a safe, orderly, legal, and humane migration strategy throughout our hemisphere. It also lays the foundation for the United States to press regional partners to undertake additional actions with regards to these populations, many of which are already taking important steps. Colombia, for example, is hosting more than 2.4 million displaced Venezuelans and has provided temporary protected status for more than 1.5 million of them. Costa Rica is developing plans to renew temporary protection for Venezuelans. And on June 1, 2022, the Government of Ecuador—which is hosting more than 500,000 Venezuelans—authorized a second regularization process that would provide certain Venezuelans a two-year temporary residency visa.[47] Any effort to meaningfully address the crisis in Venezuela will require continued efforts by these and other regional partners.

Importantly, the United States will not implement the new parole process without the ability to return Venezuelan nationals to Mexico who enter irregularly. The United States' ability to execute this process thus requires the GOM to accept the return of Venezuelan nationals who bypass this new process and enter the United States irregularly between POEs.

For its part, the GOM has made clear that in order to effectively manage the migratory flows that are impacting both countries, the United States needs to provide additional safe and orderly processes for migrants who seek to enter the United States. As the GOM makes a unilateral decision whether to accept returns of third country nationals at the border and how best to manage migration within Mexico, it is closely watching the United States' approach to migration management and whether the United States is delivering on its plans in this space. Initiating and managing this process—which is dependent on the GOM's actions—will require careful, deliberate, and regular assessment of the GOM's responses to unilateral U.S. actions and ongoing, sensitive diplomatic engagements.

This process is responsive to the GOM's desire to see more lawful pathways to the United States and is aligned with broader Administration

---

[45] The United States Announces More Than $314 Million in New Stabilization Efforts and Humanitarian Assistance for Venezuelans and Other Migrants at the Summit of the Americas, June 10, 2022, available at: *https://www.usaid.gov/news-information/press-releases/jun-10-2022-united-states-announces-more-314-million-new-stabilization-efforts-venezuela* (last visited Oct. 11, 2022).

[46] The United States Announces Nearly $376 Million in Additional Humanitarian Assistance for People Affected by the Ongoing Crisis in Venezuela and the Region, Sept. 22, 2022, available at: *https://www.usaid.gov/news-information/press-releases/sep-22-2022-the-us-announces-nearly-376-million-additional-humanitarian-assistance-for-people-affected-by-ongoing-crisis-in-venezuela* (last visited Sept. 30, 2022).

[47] Venezuela Regional Crisis—Complex Emergency, June 14, 2022, available at: *https://www.usaid.gov/sites/default/files/documents/2022-06-14_USG_Venezuela_Regional_Crisis_Response_Fact_Sheet_3.pdf* (last visited Sept. 29, 2022).

(9 of 9), Page 9 of 9   Case: 25-2120, 05/28/2025, DktEntry: 49.28, Page 9 of 9
Case 3:25-cv-01766-EMC   Document 104-3   Filed 04/07/25   Page 17 of 17

Federal Register / Vol. 87, No. 201 / Wednesday, October 19, 2022 / Notices          63515

domestic and foreign policy priorities in the region. It will couple a meaningful incentive to seek a lawful, orderly means of traveling to the United States with the imposition of consequences for those who seek to enter irregularly. The goal of this process is to reduce the irregular migration of Venezuelan nationals throughout the hemisphere while we, together with partners in the region, work to improve conditions in sending countries and create more lawful immigration and refugee pathways in the region, including to the United States.

### B. Urgent Humanitarian Reasons

The case-by-case temporary parole of individuals pursuant to this process will address the urgent humanitarian reasons faced by so many Venezuelans subject to the repressive regime of Nicolás Maduro. This process provides a safe and orderly mechanism for Venezuelan nationals who seek to leave their home country to enter the United States without having to make the dangerous journey to the United States.

## IV. Eligibility To Participate in the Process and Processing Steps

### A. Supporters

U.S.-based supporters will initiate an application on behalf of a Venezuelan national [48] by submitting a Form I–134, Declaration of Financial Support, to USCIS for each beneficiary. Supporters can be sole individuals, individuals filing on behalf of a group, or individuals representing an entity. To serve as a supporter under the process, an individual must:

• be a U.S. citizen, national, or lawful permanent resident; hold a lawful status in the United States; or be a parolee or recipient of deferred action or Deferred Enforced Departure;
• pass security and background vetting, including for public safety, national security, human trafficking, and exploitation concerns; and
• demonstrate sufficient financial resources to receive, maintain, and support the intended beneficiary whom they commit to support for the duration of their parole period.

### B. Beneficiaries

In order to be eligible to request and ultimately be considered for a discretionary issuance of advance authorization to travel to the United States to seek a discretionary grant of parole at the POE, such individuals must:

• be outside the United States;
• be a national of Venezuela or be a non-Venezuelan immediate family member [49] of and traveling with a Venezuelan principal beneficiary;
• have a U.S.-based supporter who filed a Form I–134 on their behalf that USCIS has vetted and confirmed;
• possess a passport valid for international travel;
• provide for their own commercial travel to an air POE and final U.S. destination;
• undergo and pass required national security and public safety vetting;
• comply with all additional requirements, including vaccination requirements and other public health guidelines; and
• demonstrate that a grant of parole is warranted based on significant public benefit or urgent humanitarian reasons, as described above, and that a favorable exercise of discretion is otherwise merited.

A Venezuelan national is ineligible to be considered for parole under this process if that person is a permanent resident or dual national of any country other than Venezuela, or currently holds refugee status in any country.[50]

In addition, a potential beneficiary is ineligible for advance authorization to travel to the United States as well as parole under this process if that person:

• failed to pass national security and public safety vetting or is otherwise deemed not to merit a favorable exercise of discretion;
• has been ordered removed from the United States within the prior five years or is subject to a bar based on a prior removal order; [51]
• has crossed irregularly into the United States, between the POEs, after October 19, 2022;
• has irregularly crossed the Mexican or Panamanian borders after October 19, 2022; or
• is under 18 and not traveling through this process accompanied by a parent or legal guardian, and as such is a child whom the inspecting officer would determine to be an unaccompanied child.[52]

*Travel requirements:* Beneficiaries who receive advance authorization to travel to the United States to seek parole into the United States will be responsible for arranging and funding their own commercial air travel to the United States.

*Health Requirements:* Beneficiaries must follow all applicable requirements, as determined by DHS's Chief Medical Officer, in consultation with CDC, with respect to health and travel, including vaccination and/or testing requirements for diseases including COVID–19, polio, and measles. The most up-to-date public health requirements applicable to this process will be available at *https://www.uscis.gov/venezuela.*

### C. Processing Steps

Step 1: Financial Support

A U.S.-based supporter will submit a Form I–134, Declaration of Financial Support with USCIS through the online myUSCIS web portal to initiate the process. The Form I–134 identifies and collects information on both the supporter and the beneficiary. The supporter must submit a separate Form I–134 for each beneficiary they are seeking to support, including Venezuelans' immediate family members and minor children. The supporter will then be vetted by USCIS to protect against exploitation and abuse, and to ensure that the supporter is able to financially support the individual and any immediate family members whom they agree to support. Supporters must be vetted and confirmed by USCIS, at USCIS' discretion, before moving forward in the process.

Step 2: Submit Biographic Information

If a supporter is confirmed by USCIS, the listed beneficiary will receive an email from USCIS on how to create an account with myUSCIS and instructions on next steps for completing the application. The beneficiary will be required to confirm their biographic information in myUSCIS and attest to meeting the eligibility requirements.

As part of confirming eligibility in their myUSCIS account, individuals who seek authorization to travel to the United States will need to confirm that they meet public health requirements, including certain vaccination requirements.

Step 3: Submit Request in CBP One Mobile Application

After confirming biographic information in myUSCIS and completing required eligibility attestations, the beneficiary will receive

---

[48] Certain non-Venezuelans may use this process if they are an immediate family member of a Venezuelan beneficiary and traveling with that Venezuelan beneficiary. For purposes of this process, immediate family members are limited to a spouse, common-law partner, and/or unmarried child(ren) under the age of 21.

[49] See the preceding footnote.
[50] This limitation does not apply to immediate family members traveling with a Venezuelan national.
[51] *See, e.g.,* INA sec. 212(a)(9)(A), 8 U.S.C. 1182(a)(9)(A).
[52] As defined in 6 U.S.C. 279(g)(2). Children under the age of 18 must be traveling to the United States in the care and custody of their parent or legal guardian to be considered for parole at the POE under the process.