**No. 25-2120**
**(calendared for oral argument in July 2025 by ACMS No. 18)**

---

**IN THE UNITED STATES COURT OF APPEALS**
**FOR THE NINTH CIRCUIT**

---

**NATIONAL TPS ALLIANCE, et al.,**
*Appellees,*

v.

**KRISTI NOEM, et al.,**
*Appellants.*

---

On Appeal from the United States District Court
for the Northern District of California
District Court Case No. 3:25-cv-1766

---

### REPLY BRIEF FOR APPELLANTS

---

**BRETT A. SHUMATE**
**Assistant Attorney General**
**Civil Division**

**YAAKOV M. ROTH**
**Principal Deputy Assistant**
**Attorney General**

**DREW C. ENSIGN**
**Deputy Assistant Attorney General**
**Office of Immigration Litigation**

**SARAH L. VUONG**
**Assistant Director**
**Office of Immigration Litigation**

**WILLIAM H. WEILAND**
**Senior Ligation Counsel**
**ANNA DICHTER**
**ERIC SNYDERMAN**
**LAUREN BRYANT**
**JEFFREY M. HARTMAN**
**CATHERINE ROSS**
**AMANDA SAYLOR**
**CARLTON F. SHEFFIELD**
**Trial Attorneys**
**Office of Immigration Litigation**
**P.O. Box 868, Ben Franklin Station**
**Washington, DC 20044**
**Telephone: (202) 353-9822**
**Carlton.f.sheffield2@usdoj.gov**

# **TABLE OF CONTENTS**

INTRODUCTION ........................................................................ 1

ARGUMENT............................................................................. 4

I.  THE TPS STATUTE BARS JUDICIAL REVIEW OF
    PLAINTIFFS' CLAIMS ......................................................4

II.  PLAINTIFFS' APA CLAIMS WILL FAIL ON THE MERITS.................11

    A.  The Secretary Lawfully Vacated a Premature Extension................. 11

    B.  Plaintiffs' Arbitrary and Capricious Claim Lacks Merit .................. 17

III.  PLAINTIFFS ARE UNLIKELY TO SUCCEED ON THEIR
      EQUAL PROTECTION CLAIMS ...........................................18

    A.  At Most, Rational Basis Review Applies ......................................... 18

    B.  Plaintiffs' Constitutional Claim Fails Even Under the
        *Arlington Heights* Standard................................................ 20

IV.  SECTION 1252(f)(1) DEPRIVES THE DISTRICT COURT OF
     JURISDICTION TO ENTER ITS ORDER................................................24

V.  THE DISTRICT COURT ABUSED ITS DISCRETION BY GRANTING
    UNIVERSAL RELIEF ..................................................... 26

    A.  The Balance of Equities Weigh Against Postponement ...................... 26

    B.  Universal Relief Was Unwarranted....................................... 28

CONCLUSION ..........................................................................29

BRIEF FORMAT CERTIFICATION

CERTIFICATE OF SERVICE

i

# TABLE OF AUTHORITIES

## CASES

*Abbott v. Perez*,
   585 U.S. 579 (2018)........................................................23, 25

*Arizona v. Biden*,
   40 F.4th 375 (6th Cir. 2022)............................................28

*CASA de Maryland, Inc. v. Trump*,
   971 F.3d 220 (4th Cir. 2020) ...........................................1

*Chen v. INS*,
   95 F.3d 801 (9th Cir. 1996)..............................................13

*China Unicom (Ams.) Ops. Ltd. v. FCC*,
   124 F.4th 1128 (9th Cir. 2024)...............................12, 13, 14

*Cooper v. Harris*,
   581 U.S. 285 (2017)........................................................22

*Cuozzo Speed Techs., LLC v. Lee*,
   579 U.S. 261 (2016)........................................................10

*DCH Reg'l Med. Ctr.* v. *Azar*,
   925 F.3d 503 (D.C. Cir. 2019) .........................................10

*E. Bay Sanctuary Covenant v. Trump*,
   932 F.3d 742 (9th Cir. 2018)............................................26

*Fiallo* v. *Bell*,
   430 U.S. 787 (1977)........................................................4, 23

*Gebhardt v. Nielsen*,
   879 F.3 980 (9th Cir. 2018)..............................................8

*Harisiades v. Shaughnessy*,
   342 U.S. 580 (1952)........................................................18

*Hernandez-Mancilla v. Holder,*
    633 F.3d 1182 (9th Cir. 2011) ...............................................................20

*Hollingsworth v. Perry,*
    558 U.S. 183 (2010) ........................................................................... 1

*Hotel & Rest. Emps. Union, Loc. 25 v. Smith,*
    846 F.2d 1499 (D.C. Cir. 1988) ......................................................4, 11

*Ivy Sports Med., LLC v. Burwell,*
    767 F.3d 81 (D.C. Cir. 2014) .....................................................11, 13

*Korematsu v. United States,*
    323 U.S. 214 (1944) ...........................................................................23

*Maryland v. King,*
    567 U.S. 1301 (2012) .........................................................................27

*Masnauskas v. Gonzales,*
    432 F.3d 1067 (9th Cir. 2005) .....................................................20, 23

*McNary v. Haitian Refugee Center, Inc.,*
    498 U.S. 479 (1991) .........................................................................9, 10

*Mt. St. Helens Mining and Recovery Ltd. P'ship v. United States,*
    384 F.3d 721 (9th Cir. 2004) .......................................................17, 18

*Noem v. Nat'l TPS Alliance,*
    No. 24A1059, 2025 WL 1427560 (U.S. May 19, 2025) ..................... 1

*Patel v. Garland,*
    596 U.S. 328 (2022) ........................................................................... 6

*Rajah v. Muka*sey,
    544 F.3d 427 (2d Cir. 2008) ...............................................................19

*Ram v. INS,*
    243 F.3d 510 (9th Cir. 2001) ...........................................................20

*Ramos* v. *Wolf,*
    975 F.3d 872 (9th Cir. 2020) .............................................6, passim

*Regents of the Univ. of Cal.,*
    591 U.S. 1 (2020) .............................................................................23

*Reno v. Catholic Social Servs., Inc.,*
    509 U.S. 43 (1993) ........................................................................... 9

*Starbucks Corp. v. McKinney,*
    602 U.S. 339 (2024) .........................................................................25

*United States v. Chemical Found., Inc.,*
    272 U.S. 1 (1926) .............................................................................22

*United States v. Morgan,*
    313 U.S. 409 (1941) .........................................................................22

*United States v. Seatrain Lines, Inc.,*
    329 U.S. 424 (1947) .........................................................................14

## STATUTES

### Immigration and Nationality Act of 1952, as amended:

8 U.S.C. § 1252(f)(1) ............................................................................24

8 U.S.C. § 1254a(a)(1)(A) ..................................................................... 2

8 U.S.C. § 1254a(b)(2) ........................................................................... 2

8 U.S.C. § 1254a(a)(2) ...........................................................................27

8 U.S.C. § 1254a(b)(1) ........................................................................... 2

8 U.S.C. § 1254a(b)(1)(C) ...................................................2, 6, 26, 28

iv

8 U.S.C. § 1254a(b)(2)(B) .................................................................18

8 U.S.C. § 1254a(b)(3)..............................................................2, 12, 14

8 U.S.C. § 1254a(b)(3)(B) .............................................6, 12, 13, 28

8 U.S.C. § 1254a(b)(3)(C) ..................................................................15, 16

8 U.S.C. § 1254a(b)(5)(A) .......................................................2, passim

## OTHER STATUTES

5 U.S.C. § 705 .................................................................................. 25

## FEDERAL REGISTER NOTICES

*2023 Extension and Redesignation of Venezuela for Temporary Protected Status,*
   88 Fed. Reg. 68,130 (Oct. 3, 2023) ....................................................16

*Extension of the 2023 Designation of Venezuela for Temporary Protected Status,*
   90 Fed. Reg. 5961 (Jan. 17, 2025)...........................................12, 16

*Vacatur of 2025 TPS Decision for Venezuela,*
   90 Fed. Reg. 8805 (Feb. 3, 2025) ........................................2, 5, 7, 17

*Termination of the October 3, 2023 Designation of Venezuela for Temporary Protected Status,*
   90 Fed. Reg. 9040 (Feb. 5, 2025) ...............................2, 20, 21, 26, 27

## INTRODUCTION

The Supreme Court's stay order in this case underscores the strength of the Government's position. *See Noem v. Nat'l TPS Alliance*, No. 24A1059, 2025 WL 1427560 (U.S. May 19, 2025). With only one justice noting dissent, the Court ruled that the Government met the standard for a stay of preliminary relief, which requires an applicant to show *both* a likelihood of success on the merits *and* a likelihood of irreparable harm. *See Hollingsworth v. Perry*, 558 U.S. 183, 190 (2010) (per curiam). By the same measure, this Court should reverse the district court's order.

Plaintiffs effectively ask this Court to disregard that lopsided ruling. Their reasoning does not hold water. That the Supreme Court has sometimes affirmed after granting a stay and reversed after denying one does not give this Court license to ignore the Supreme Court's recent, near-unanimous decision in this very case. *See CASA de Maryland, Inc. v. Trump*, 971 F.3d 220, 230 (4th Cir. 2020) ("[E]very maxim of prudence suggests that we should decline to take the aggressive step of ruling that the plaintiffs here are in fact likely to succeed on the merits right upon the heels of the Supreme Court's stay order necessarily concluding that they were unlikely to do so.").

In all events, the Supreme Court was correct that the district court's reasoning was badly flawed. As its name suggests, the Temporary Protected Status ("TPS") program allows the Secretary of Homeland Security to provide "temporary"—not

permanent—relief to aliens whom she determines cannot safely return to their countries, or whose countries are unable, temporarily, to adequately accept their return. 8 U.S.C. § 1254a(a)(1)(A), (b)(1). Country designations that are intended to be temporary must, at some point, come to an end. With that in mind, Congress explicitly committed the determination whether to extend or terminate a TPS designation to the judgment of the Secretary of Homeland Security, in consultation with appropriate federal agencies. 8 U.S.C. § 1254a(b)(3), (5)(A).

For decades, Secretaries across administrations have terminated TPS designations when they determined, in their judgment, that the country no longer continues to meet the conditions for the designation. That is precisely what Secretary Noem did here: she vacated the prior administration's eleventh-hour determination to extend the 2023 Designation of Venezuela for TPS. *Vacatur of 2025 TPS Decision for Venezuela*, 90 Fed. Reg. 8805 (Feb. 3, 2025) ("2025 Vacatur"). She later terminated that designation upon determining that permitting Venezuelan nationals to remain temporarily in the United States was "contrary to the national interest of the United States, which was a condition for Venezuela's TPS designation. 8 U.S.C.§ 1254a(b)(1)(C), (3)(B). *Termination of the October 3, 2023 Designation of Venezuela for Temporary Protected Status*, 90 Fed. Reg. 9040 (Feb. 5, 2025) ("2025 Termination").

2

Congress could hardly have spoken more clearly in foreclosing judicial review of those decisions: "There is no judicial review of any determination of the [Secretary] with respect to the designation, or termination, or extension of a designation, of a foreign state" for TPS. 8 U.S.C. § 1254a(b)(5)(A). The district court nevertheless indulged Plaintiffs' claims under the Administrative Procedure Act ("APA") and the Constitution, and then compounded its error by supplanting the political branches' control of immigration policy. In so doing, the district court impermissibly peered behind a policy-laden, discretionary determination by the Secretary and effectively extended the 2023 Designation on its own, notwithstanding the Secretary's judgment that such an extension is not in the national interest.

Plaintiffs downplay the consequences of the district court's universal relief based on the prospect that the Government may, at some point, vindicate its rights later in the litigation. But the Secretary has determined that continuing to permit Venezuelan nationals to remain temporarily in the United States—even by an extension of six months—is "contrary to the national interest." Requiring a different status quo in the interim, potentially for far longer, inflicts a manifest form of irreparable harm. Plaintiffs admit that the Supreme Court reached a contrary conclusion regarding the balance of the equities, yet invite this Court to join with the district court in opposition to the Supreme Court. Again, the Court should reject that

invitation to disregard the Supreme Court's recent and near-unanimous assessment of the equities in this very case and should vacate the district court's order.

## ARGUMENT

### I.     THE TPS STATUTE BARS JUDICIAL REVIEW OF PLAINTIFFS' CLAIMS

It is difficult to conceive of a clearer or more explicit bar to judicial review than the one provided in the statute governing TPS designations: "There is *no judicial review* of *any determination* of the [Secretary] with respect to the designation, or termination or extension of a designation, of a foreign state under this subsection." 8 U.S.C. § 1254a(b)(5)(A) (emphasis added). The statute thus commits to the Secretary's unreviewable authority any and all determinations concerning TPS designations, extensions, and terminations.

Obedience to Congress' carefully designed immigration regime, including statutory limitations on judicial review, accords with the broad deference courts generally offer "political departments" in the immigration context. *Fiallo* v. *Bell*, 430 U.S. 787, 792 (1977). Indeed, the Executive Branch exercised inherent authority to afford temporary protection from removal based on its assessment of conditions in foreign states even before there was any "specific statutory authority" for such relief. *See Hotel & Rest. Emps. Union, Loc. 25 v. Smith*, 846 F.2d 1499, 1510 (D.C. Cir. 1988). And that authority includes the discretion "*not* to extend [protected] status to a particular class of aliens," which the D.C. Circuit has recognized as

4

"unreviewable" by courts. *Id*. Congress legislated against that backdrop when it enacted the TPS program, and codified in Section 1254a(b)(5)(A) the understanding that "[t]here is no judicial review" of such determinations. 8 U.S.C. § 1254a(b)(5)(A).

The Secretary's vacatur plainly qualifies as a "determination . . . with respect to" a TPS extension. The Secretary determined that her predecessor's extension was improper and vacated it. 8 U.S.C. § 1254a(b)(5)(A). Rather than accepting Section 1254a(b)(5)(A)'s plain meaning, Plaintiffs maintain that their challenges to the Secretary's vacatur do not seek judicial review of a "determination" within the meaning of Section 1254a(b)(5)(A). Plaintiffs first urge this Court to cabin the word "determination" so that it only covers decisions that involve assessments of country conditions. Answering Br.20-22. But the Secretary's actions here would satisfy even Plaintiffs' narrow construction of "determination." The relevant "determination" is the Secretary's vacatur of her predecessor's extension—and an extension necessarily involves whether "the conditions for the designation continued to be met." 90 Fed. Reg. at 8806. After all, the Secretary rescinded Secretary Mayorkas's determination in that respect when she rescinded the extension. *See id*. And just as Secretary Mayorkas's January 17, 2025 action was an unreviewable "determination with respect to an . . . extension," Secretary Noem's vacatur of that action was unreviewable too. 8 U.S.C. § 1254a(b)(5)(A). To hold otherwise would create an

5

unusual disparity: "[D]esignations" are unreviewable, as are "terminations" of those designations. *Id.* But under Plaintiffs' reading, "extensions" are unreviewable, while rescissions of extensions would not be. *See id.* That loophole is even less plausible given that the point of the statute was to "limit[] unwarranted … extensions of TPS." *Ramos* v. *Wolf*, 975 F.3d 872, 891 (9th Cir. 2020), *reh'g en banc granted,* 59 F.4th 1010 (9th Cir. 2023).; *see infra* at 14-15.

In any event, Plaintiffs' observation (at 20-21) that the TPS statute elsewhere uses the words "determine" or "determination" to describe assessments of country conditions does nothing to advance their position. The TPS statute calls on the Secretary to make "determinations" regarding whether a country continues to meet the conditions for designation, *see* 8 U.S.C. § 1254a(b)(3)(A)-(B)—including, in this case, whether "permitting the aliens to remain temporarily in the United States is contrary to the national interest of the United States," 8 U.S.C. § 1254a(b)(1)(C)— and those determinations are undoubtedly protected from judicial review. But the statute does not preclude review *only* of determinations with respect to country conditions. It plainly forbids review of "any determinations . . . with respect to the . . . extension of a designation." 8 U.S.C. § 1254a(b)(5)(A). Moreover, Congress' use of the term "any" reflects its intent to bar review of determinations "of whatever kind." *Patel v. Garland*, 596 U.S. 328, 338 (2022).

Meanwhile, Plaintiffs' arguments as to why judicial review is available as to their arbitrary-and-capricious claim (at 22-23) relies on a theory the district court did not reach: they argue that the 2025 Vacatur "concerns the exercise of registration authority, which is addressed in subsection 1254a(c) of the statute," rather than subsection (b) of Section 1254a. Plaintiffs thus depict the Secretary's action as a determination with respect to "registration" under Section 1254a(c), not a determination with respect to an "extension" under Section 1254a(b)(3)(C).

That is wrong. That one aspect of the Secretary's reasoning for the 2025 Vacatur touched on registration does not transform the vacatur of an extension into something other than a "determination" "with respect to" an "extension." Her operative legal act was to "vacate the January [17], 2025 decision of [the] former Secretary," in which he announced that he would "*extend*[ ] the 2023 designation of Venezuela for TPS for 18 months." 90 Fed. Reg. at 8806 (Feb. 3, 2025) (emphasis added); *see id*. at 8807. Indeed, that was how Plaintiffs understood the Secretary's action below: They attacked her decision to "vacate the *extension*" as "arbitrary and capricious." 8-ER-1404 (emphasis added). Plaintiffs sought postponement of that vacatur so that Secretary Mayorkas's *extension* could take effect. Plaintiffs cannot now claim that the agency action at issue is somehow no longer a "determination . . . with respect to . . . [an] extension." 8 U.S.C. § 1254a(b)(5)(A).

7

Borrowing from this Court's later-vacated decision in *Ramos*, Plaintiffs argue that judicial review is available, despite the bar, for a "challenge to a collateral agency practice or policy under the TPS statute." *Id*. at 892; *see* Answering Br.23-28. This Court in *Ramos* had drawn that line by comparing Section 1254a to the judicial review scheme previously provided under the Immigration Reform and Control Act of 1986 ("IRCA"). *Ramos*, 975 F.3d at 888-92. But that principle does not help Plaintiffs here, because that is not the nature of their challenge. And, in any case, *Ramos* erred by grafting this limitation onto the statute.

*First*, even if a challenge to a "collateral agency practice or policy" could be reviewed, that exception would not apply to Plaintiffs' claims. Rather, Plaintiffs' arbitrary-and-capricious claim here merely challenges the Secretary's reasoning (at 44-45)—the precise kind of challenge to a TPS determination that lies at the core of the statutory review bar. *See Ramos*, 975 F.3d at 891 (agreeing that the statute "generally precludes courts from inquiring into the underlying conditions and reasoning employed by the Secretary in reaching her country-specific TPS determinations").

Plaintiffs' other APA claim, too, is similar to the claim this Court refused to consider in *Ramos*. The Court there noted that simply characterizing a claim as a collateral challenge "is not an automatic shortcut to federal court jurisdiction." 975 F.3d at 893 (citing *Gebhardt v. Nielsen*, 879 F.3 980, 987 (9th Cir. 2018)). It then

recognized that the plaintiffs' assertion of a "new and unexplained practice" was tantamount to a claim that the agency acted "arbitrarily and capriciously," because the TPS statute did not expressly preclude the Secretary's actions. *Id*. ("the alleged illegality of the agency action here is based solely on the APA and its requirement that agencies not 'arbitrarily and capriciously' depart from past practice"). Here too, Plaintiffs argue that the Secretary violated the law by vacating a TPS extension just because the statute does not expressly confer that power. That is not "collateral," it is not a "pattern or practice," and it does not evade Section 1254a's review bar on determinations with respect to TPS extensions.

In all events, the Court in *Ramos* erred by reading this "collateral" exception into Section 1254a. Unlike Section 1254a(b)(5)(A), the IRCA's review provisions aimed to *channel*—but not foreclose—challenges to individual denials of adjustment of status. *See McNary v. Haitian Refugee Center, Inc.*, 498 U.S. 479, 492 n.12 (1991) (describing the IRCA's judicial review procedures and noting that they were intended to provide the "exclusive method of judicial review"). *McNary* and its progeny thus reflect the Court's aim to ensure an appropriate judicial forum for pattern-or-practice claims that would otherwise escape review. *Id*. at 496-98; *Reno v. Catholic Social Servs., Inc.*, 509 U.S. 43, 60-65 (1993). Precluding review of such claims was untenable because "it [was] most unlikely that Congress intended to foreclose all forms of meaningful judicial review" given the statute's "limited review

9

provisions." *McNary*, 498 U.S. at 496. But *McNary* also recognized that Congress *could* use "more expansive language" in fashioning a bar to judicial review—and that is precisely what Congress did in Section 1254a(b)(5)(A).

Indeed, here, unlike under IRCA, allowing "collateral" challenges to an otherwise-unreviewable TPS determination "would eviscerate the statutory bar, for almost any challenge to [a determination] could be recast as a challenge to its underlying methodology." *DCH Reg'l Med. Ctr.* v. *Azar*, 925 F.3d 503, 505-507 (D.C. Cir. 2019). That is implausible when the point of the statute was to "limit[] unwarranted . . . extensions of TPS." *Ramos*, 975 F.3d at 891.

Finally, in the absence of any real textual arguments, Plaintiffs resort (at 31-32) to the general presumption in favor of judicial review. But "[t]his presumption . . . may be overcome by 'clear and convincing indications, drawn from specific statutory language, specific legislative history, and inferences of intent drawn from the statutory scheme as a whole that Congress intended to bar review." *Cuozzo Speed Techs., LLC v. Lee*, 579 U.S. 261, 273 (2016). Like the statute in *Cuozzo*, Section 1254a(b)(5)(A)'s bar on judicial review is expressed in exceedingly clear terms. It is also supported by legislative history, *see* H.R. Rep. No. 101-245, at 14 (1989) ("Moreover, none of the [Secretary's] decisions with regard to granting, extending, or terminating TPS will be subject to judicial review"), and was enacted

10

as part of a scheme that provides the Executive Branch with "broad latitude in enforcing the immigration laws." *Hotel & Rest. Emps. Union*, 846 F.2d at 1510.

That leaves Plaintiffs to object (at 30) that the Government's position would bar review of decisions "granting TPS to Mexico for 50 years" or "to sweeten a trade deal." But there is nothing especially shocking about exempting those actions from judicial review. And even if the statute authorized review in those circumstances, Plaintiffs here raise a very different challenge: "an attack on the substantive considerations underlying the Secretary's specific TPS determinations." *Ramos*, 975 F.3d at 893. Such a challenge falls squarely within the judicial-review bar. For that reason alone, this Court should reverse the decision below.

## II.     PLAINTIFFS' APA CLAIMS WILL FAIL ON THE MERITS

### A.     The Secretary Lawfully Vacated a Premature Extension

The TPS statute's silence as to the authority of a Secretary to vacate an extension, especially before it goes into effect, does not mean the Secretary lacks this authority. Rather, as the district court acknowledged, "administrative agencies are assumed to possess at least some inherent authority to revisit their prior positions, at least if done in a timely fashion." 1-ER-47 (quoting *Ivy Sports Med., LLC v. Burwell*, 767 F.3d 81, 86 (D.C. Cir. 2014)). And this Court recently recognized as much by holding that a "statute's grant of authority to 'issue' certificates to telecommunications carriers must be understood as carrying with it an implied

incidental authority to revoke such documents." *China Unicom (Ams.) Ops. Ltd. v. FCC*, 124 F.4th 1128, 1143 (9th Cir. 2024) ("*CUA*").

Plaintiffs' view that the TPS statute foreclosed the 2025 Vacatur rests entirely on the faulty premise that the 2025 Vacatur was effectively a "termination" under 8 U.S.C. § 1254a(b)(3) and thus could only be effectuated consistent with certain time constraints. Answering Br.37; *see also* 1-ER-51 (asserting that 2025 Vacatur "in practical terms terminate[d] the [2023] TPS designation"). But the 2025 Vacatur did not have the effect of terminating *any* TPS designation. Indeed, the 2025 Vacatur stated that the 2021 and 2023 Designations "*remain[ed] in effect* and their associated statutory deadlines *remain[ed] in effect*." 90 Fed. Reg. 8805, 8807 (Feb. 3, 2025) (emphasis added). The fact that the Secretary later took an entirely separate action to terminate the 2023 Designation underscores that the 2025 Vacatur was not the functional equivalent of a termination under 8 U.S.C. § 1254a(b)(3)(B). Indeed, if the Secretary had not separately acted to terminate the TPS designation after the vacatur, Venezuela's TPS designation would have automatically *renewed*. The 2025 Vacatur thus simply served to restore the status quo as it existed seventeen days earlier, when former Secretary Mayorkas announced an extension of TPS that would not take effect until April 3, 2025. 90 Fed. Reg. 5961, 5962 (Jan. 17, 2025).

For that reason, Plaintiffs are misguided in invoking cases (at 35-39) where courts have held that statutory schemes foreclosed an asserted implied authority. In

one case, for example, the FDA took an action that "*automatically* reclassified" a medical device, thereby bypassing "the carefully prescribed statutory reclassification process"; the court held that the agency could not claim "inherent reconsideration authority" that "short circuited" the process in that way. *Ivy Sports Med.*, 767 F.3d at 82, 87 (emphasis added). Likewise, in *Gorbach v. Reno*, this Court rejected an assertion of implied authority to denaturalize because Congress expressly provided a specific process—"actions by United States attorneys in courts"—for achieving precisely the same result. 219 F.3d 1087, 1091 (9th Cir. 2000). Here, by contrast, while the TPS statute provides a mechanism for "terminat[ing] [a] designation" once it has taken effect, 8 U.S.C. 1254a(b)(3)(B), it provides no mechanism for vacating a seriously flawed determination to extend the designation on a future date. The Secretary therefore acted well within her implied authority in vacating an unwarranted extension before it took effect. *Cf. Chen v. INS*, 95 F.3d 801, 805 (9th Cir. 1996) (holding that rule that was withdrawn before it became effective was not enforceable and "ha[d] no legal effect"). This case is thus governed by *CUA*: "if there is no statutory procedure for revocation that the agency could be said to be evading by relying on implied authority, then the entire predicate for

13

[challenging implied authority based on] statutory structure . . . is lacking." 124 F.4th at 1128.[1]

The authority of a Secretary to vacate a not yet effective extension is also fully consistent with the "legislative intent to limit the designation, redesignation, and extension of TPS by requiring periodic review as well as termination when [the requisite] conditions are no longer met." *Ramos*, 975 F.3d at 891. Importantly, the TPS statute uses the word "may" when describing the Secretary's authority to designate countries for TPS or extend TPS designations, 8 U.S.C. § 1254a(b)(1), but provides that the Secretary "shall" terminate a designation if the foreign state no longer meets the requisite conditions. 8 U.S.C. § 1254a(b)(3). This Court thus observed in *Ramos* that "to the extent the TPS statute places constraints on the Secretary's discretion, it does so in favor of *limiting unwarranted designations or*

---

[1] Like the district court, Plaintiffs rely on *CUA* as suggesting the TPS statute's provision for designations or extensions of TPS status for fixed terms forecloses inherent vacatur authority. Answering Br.37 (citing 1-ER-52). In upholding the agency's use of implicit authority in *CUA*, the Court described several reasons why the statutory scheme was distinct from one at issue in another case, *United States v. Seatrain Lines, Inc.*, 329 U.S. 424 (1947). *CUA*, 124 F.4th at 1145-49. It was in the context of distinguishing *Seatrain*—which rejected the agency's use of inherent authority to revoke a certificate issued to a "water carrier"—that the Court observed the certificates at issue there (in *Seatrain*) were for "fixed, renewable terms." *Id.* at 1148. The Court then observed that "use of a fixed term is affirmatively inconsistent with positing an implied power to revoke a license at any time." *Id.* at 1148. To the extent the TPS statute provides for "fixed terms," it does so in the context of designations or extensions that are already *in effect*. 8 U.S.C. § 1254a(b)(3). The statute provides no such "fixed terms" applicable to the scenario at issue here: an announced extension that has not yet gone into effect. *See infra* at 16.

14

*extensions* of TPS." *Id*. (emphasis added). Construing the TPS statute as foreclosing the Secretary's authority to vacate an announced extension that has not yet gone into effect is directly at odds with that clearly expressed intent.

The district court's understanding of the statute would allow an outgoing administration to issue a seriously flawed or legally deficient determination binding its successors to an extension of a designation for more than 20 months—nearly half a Presidential term. Indeed, that is precisely what former Secretary Mayorkas unsubtly attempted to do here: He extended the 2023 Designation for 18 months— the outer bound of the statutory limit—adopting a novel, unreasoned approach with respect to registration and publishing the determination on the last full business day of the Biden Administration. *See* 8 U.S.C. § 1254a(b)(3)(C). Even more, he effectively extended the 2021 Designation six months before the statute required him to act, transparently delaying for at least a year any practical effect of Secretary Noem's impending determination with regard to country conditions and the national interest in relation to the 2021 Designation. 8 U.S.C. § 1254a(b)(1).

The district court's reasoning would also foreclose the Secretary from correcting errors in a TPS decision—a position even Plaintiffs do not try to defend, instead admitting (at 39) that the Secretary has authority to correct "ministerial" errors. Plaintiffs do not explain, however, how to reconcile that concession with their view that the TPS statute blocks correction of more significant errors.

Recognizing that implied authority to reconsider is at its apex before the act being reconsidered has even taken effect, Plaintiffs argue (at 40-42) that former Secretary Mayorkas's extension became effective *immediately* upon being announced on January 17, 2025. The most glaring problem with these arguments is that they ignore the plain terms of the Federal Register Notice, which stated that the extension "*begins on April 3, 2025.*" 90 Fed. Reg. at 5962 (emphasis added). Indeed, the extension could not have taken effect sooner, as the original 2023 Designation "remain[ed] in effect" until "April 2, 2025," and was therefore the operative designation when Secretary Noem acted. *Extension and Redesignation of Venezuela for Temporary Protected Status*, 88 Fed. Reg. 68,130, 68,130 (Oct. 3, 2023); 8 U.S.C. § 1254a(b)(3)(C).

Although Plaintiffs suggest the statute's use of the present tense in providing that a designation "*is extended*" implies that extensions take effect immediately (at 41), that is not how former Secretary Mayorkas interpreted the statute when he specified that the extension would not take effect until April 3, 2025. 90 Fed. Reg. at 5962. Likewise, the fact that the extension purported to "automatically" extend certain employment authorization documents (at 41), does not change the fact that the extension itself did not "begin [until] April 3, 2025." 90 Fed. Reg. at 5962. In the real world, the extension had no effect on the 2023 Designation until April 2025; at minimum, Secretary Noem was empowered to reconsider it before then.

16

## B.     Plaintiffs' Arbitrary and Capricious Claim Lacks Merit

Plaintiffs' attack on the Secretary's rationale for the 2025 Vacatur is precisely the kind of claim that Congress intended to preclude in 8 U.S.C. § 1254a(b)(5)(A). But even if this claim were somehow reviewable, Plaintiffs are still not likely to succeed. The district court's decision misapplied the "narrow" arbitrary and capricious standard and instead "substitut[ed] [its] judgment for that of the agency." *Mt. St. Helens Mining and Recovery Ltd. P'ship v. United States*, 384 F.3d 721, 728 (9th Cir. 2004); *see* 1-ER-56-60.[2]

Like the district court, Plaintiffs focus (at 44-45) largely on the Secretary's characterization of former Secretary Mayorkas's extension as "novel." 1-ER-56-59. But they ignore the Secretary's concern that "the practical effect of Secretary Mayorkas's decision was to combine both designations and to provide an extension until October 2, 2026, for the population of both designations." 90 Fed. Reg. at 8807. The 2025 Vacatur further noted that, by combining the two designations, the former Secretary made an implicit decision to "extend the 2021 designation by up to 13 months," without explaining how this approach was "consistent with the TPS

---

[2] Although Plaintiffs claim in their Answering Brief that Defendants "ignore" this part of the district court's decision, that is not the case. *See* Opening Br.22-23 (arguing that the Secretary "permissibly exercised her reconsideration authority" and that vacatur was "necessary in order to 'untangle the confusion' caused by the 2025 Extension," and to "provid[e] an opportunity for . . . clear guidance"); Opening Br.25-26 (arguing that district court's conclusion that the Secretary failed to account for "alternatives short of termination" was erroneous).

17

statute." *Id*. (citing 8 U.S.C. § 1254a(b)(2)(B) (governing "the effective date of the termination of a designation")). The Secretary then concluded that because "the explanation for the operational impacts" was "thin and inadequately developed," vacatur was "warranted to untangle the confusion." *Id*. In addition, the Secretary determined that vacatur was appropriate so that the new administration could have its own "opportunity for informed determinations regarding the TPS designations." *Id*.

Regardless of whether there is precedent for consolidating designations, the concerns articulated in the 2025 Vacatur are sensible, and there is a "rational connection between the facts and the choice made," *Mt. St. Helens Mining*, 384 F.3d at 728, which is more than sufficient to withstand APA review.

## III. PLAINTIFFS ARE UNLIKELY TO SUCCEED ON THEIR EQUAL PROTECTION CLAIMS

### A. At Most, Rational Basis Review Applies

The Supreme Court's decision in *Trump v. Hawaii* reflects the Court's understanding that rational basis review applies "across different contexts and constitutional claims" because "'*[a]ny policy* toward aliens is vitally and intricately interwoven with contemporaneous policies in regard to the conduct of foreign relations [and] war power.'" 585 U.S. 667, 702, 703 (2018) (emphasis added) (quoting *Harisiades v. Shaughnessy*, 342 U.S. 580, 588-89 (1952)). Plaintiffs' attempt (at 48-49) to limit *Hawaii's* holding is not credible. The Court did not, as

18

Plaintiffs imply (at 49-51), suggest that rational basis review may be appropriate in the context of a selective enforcement claim such as *Rajah v. Mukasey*, 544 F.3d 427 (2d Cir. 2008), but inapplicable to other challenges to immigration policy decisions. *Hawaii*, 585 U.S. at 702-05. The Court's citation to *Mathews v. Diaz* as describing the "upshot of [its] cases" on this issue is particularly instructive. *Id*. at 704 (citing 426 U.S. 67, 81-82 (1976)). Again, *Mathews* upheld as not "wholly irrational" a limitation on eligibility for federal medical insurance against a constitutional challenge brought by resident aliens. 426 U.S. at 83. Plaintiffs briefly attempt (at 51) to distinguish *Mathews* as "raising no animus claim." But the district court decision that the Supreme Court reversed in *Mathews did* conclude that the challenged statute was contaminated by "invidious discrimination." 426 U.S. at 73.

In their attempt to distinguish *Hawaii*, Plaintiffs express doubt about the extent to which the challenged TPS determinations were truly predicated on considerations of "national interest" and "national security." Answering Br.48-49 (arguing that the "vacatur never mentions even 'national interest,' let alone 'national security'"). But TPS actions by definition involve determinations regarding the current state of emergencies within particular foreign countries, their nationals, and the effect of the TPS program on this country's national interests—all delicate foreign policy judgments that the Constitution entrusts to the Executive, not the courts. Foreign policy concerns do not disappear from a program inherently laden with

foreign-policy considerations simply because the Secretary did not state the obvious in the particular action.

Plaintiffs also rely (at 47-48) on out-of-circuit precedent for the proposition that there is "no general rule that federal immigration laws challenged for violating the constitution should receive rational basis review." But this Court has held that "[w]hen challenged under equal protection, line-drawing decisions made by Congress or the President in the context of immigration and naturalization must be upheld if they are rationally related to a legitimate government purpose." *See Masnauskas v. Gonzales*, 432 F.3d 1067, 1070-71 (9th Cir. 2005); *see also Ram v. INS*, 243 F.3d 510, 517 (9th Cir. 2001); *Hernandez-Mancilla v. Holder*, 633 F.3d 1182, 1186 (9th Cir. 2011).

In sum, rational basis review applies, and the Secretary's determination readily passes muster for the reasons explained already. *See* Opening Br.32-33.

## B. Plaintiffs' Constitutional Claim Fails Even Under the *Arlington Heights* Standard.

The Secretary provided a reasoned explanation for her decision to vacate former Secretary Mayorkas's extension announcement. *See supra* at 17-18; *see also* Opening Br.22-23. The same is true with respect to her subsequent decision to terminate the 2023 Designation. 90 Fed. Reg. 9040, 9042-44 (Feb. 5, 2025). The Secretary consulted with the appropriate governmental agencies, including the Department of State, and determined that prolonging Venezuela's TPS designation

20

was contrary to the national interest. *Id*. That determination was based on the Secretary's concerns with the "sheer numbers" of "inadmissible or illegal aliens" that had entered the United States due to the prior administration's border policies, *id*. at 9042; the presence of members of Tren de Aragua, who may be drawn to the country due to the "magnet" effect of a TPS extension, *id*. at 9042-43; the burdening of "city shelters, police stations, and aid services" that had reached "maximum capacity" due to the influx of immigration, *id*. at 9043; and the President's policy of promoting the national interest by discouraging "illegal and destabilizing migration," *id*. The Secretary's reasoning does not permit any inference of impermissible intent. *See Hawaii*, 585 U.S. at 707 (observing that the challenged Presidential Proclamation was "expressly premised on legitimate purposes" and said "nothing about religion").

Instead of focusing on the Secretary's stated justifications, the district court cherry-picked statements the Secretary made in social media posts and public appearances, where she advocated for and promoted policies that curb immigration and decrease crime, and portrayed those comments as racially tinged. 1-ER-65-66. As Defendants explained previously (at 34-35), none of the statements highlighted by the district court say anything about the racial or ethnic character of people from Venezuela. The statements instead reflect forceful condemnations of gang violence and broad questioning of the integrity of the prior administration's immigration

practices, including potential abuses of the TPS program. Those statements are plainly non-discriminatory when read in proper context.

Plaintiffs do not even attempt to identify further evidence of discrimination.[3] *See* Answering Br.55-58. Instead, they retreat to the position that it was at least "not '[im]plausible'" to reject Defendants' interpretation of the statements. Answering Br.57 (citing *Cooper v. Harris*, 581 U.S. 285, 293 (2017)). But to the extent there was doubt about the Secretary's meaning, the district court was obligated to apply the presumption of regularity accorded to the Executive Branch. *United States v. Chemical Found., Inc.*, 272 U.S. 1, 14 (1926). The court instead construed the Secretary's statements in the worst possible light absent "any declaration under oath elucidating her intended message," a proposal far exceeding the needs of the case. 1-ER-66; *see United States v. Morgan*, 313 U.S. 409, 422 (1941) (holding district court erred in ordering deposition of Secretary of Agriculture). Although Plaintiffs contend (at 46, 57) that the district court's findings of fact are reviewed for clear error, when a factual finding is based on an incorrect application of a legal

---

[3] Plaintiffs claim that the district court "relied on at least nine statements it found were 'discriminatory,'" but do not discuss any of these statements in their Response Brief and simply cite a single page of the district court's decision. Answering Br. 57, n.19 (citing 1-ER-65). To the extent Plaintiffs are referencing the district court's citation to certain paragraphs of the MacLean Declaration, *see* 1-ER-65 (citing MacLean Decl. ¶¶ 2-7, 12, 14-15), paragraphs 12 and 14 of that declaration describe statements by President Trump, not the Secretary. 5-ER-588-92. And the remaining paragraphs essentially repeat the four statements discussed by the district court. 1-ER-65; 5-ER-588-89.

22

principle—including failure to apply the presumption of regularity—"the finding cannot stand." *Abbott v. Perez*, 585 U.S. 579, 607 (2018).

Finally, Plaintiffs hyperbolically invoke (at 58) *Korematsu v. United States*, 323 U.S. 214 (1944), in response to Defendants' observation that a claim of discrimination based on "national origin" has little place in an equal protection challenge to a TPS determination. But *Korematsu* involved national origin-based distinctions among U.S. *citizens*. 323 U.S. at 194. In the realm of immigration policies that apply to non-citizens like Plaintiffs, nationality-based classifications are an inherent part of the "power to expel or exclude aliens," and "largely immune from judicial control." *Masnauskas*, 432 F.3d at 1070-71 (citing *Fiallo*, 430 U.S. at 792).

In sum, the Secretary's statements should be read for what they are: statements of a public official in media appearances to promote the immigration policies of this administration. Read in that light, and with due regard for the presumption of regularity, the Secretary's statements in no way "raise a plausible inference that an 'invidious discriminatory purpose was a motivating factor' in the relevant decision." *DHS v. Regents of the Univ. of Cal.*, 591 U.S. 1, 34 (2020) (citation omitted). It is telling that, rather than identify actual evidence of discriminatory animus, Plaintiffs devote (at 53-55, 59-61) the majority of their *Arlington Heights* analysis to challenging the Secretary's stated rationale for her determinations. In so doing, they tip their hand as to their true purpose in bringing a discriminatory animus claim:

attempting to circumvent the jurisdictional bar that clearly precludes review of a Secretary's rationale for terminating the TPS designation. 8 U.S.C. § 1254a(b)(5)(A). The Court should recognize this maneuver for what it is and not permit the kind of second-guessing of a Secretary's rationale for TPS determinations that Congress expressly barred.

## IV.  SECTION 1252(f)(1) DEPRIVES THE DISTRICT COURT OF JURISDICTION TO ENTER ITS ORDER

Regardless of how the district court characterized it, the order granting Plaintiffs' "motion to postpone" the Secretary's actions plainly had the effect of enjoining or restraining the Government's implementation of the TPS statute. Until it was later stayed by the Supreme Court, the district court's order in this case had the effect of nullifying the 2025 Vacatur and forcing the Government to allow the Secretary's January 17, 2025 extension to go into effect. The order was therefore issued in violation of 8 U.S.C. § 1252(f)(1). *See* Opening Br.40-45.

In response, Plaintiffs echo (at 34) the district court's reasoning by distinguishing a stay from the kind of "injunctive relief" barred by 8 U.S.C. § 1252(f)(1). 1-ER-18-23. But as the Government previously noted, "the label attached to an order is not dispositive," and district courts should not be permitted to "shield their orders from appellate review by avoiding the label 'injunction'"

24

*Abbott*, 585 U.S. at 594, 595; *see* Opening Br.42.[4] Moreover, Section 705 expressly incorporates equitable principles and focuses on the parties challenging the agency action by authorizing interim relief only "to the extent necessary to prevent irreparable injury," and "necessary and appropriate to postpone the effective date of an agency action or to preserve status or rights pending conclusion of the review proceeding." 5 U.S.C. § 705; *cf. Starbucks Corp. v. McKinney*, 602 U.S. 339, 347 (2024) (statutory reference to "proper" relief requires courts to apply "normal equitable rules"). As the House Report explained, the authority granted by Section 705 "is equitable" in nature, and Congress intended that it "would normally, if not always, be limited to the parties complainant." H.R. Rep. No. 79-1980 233, 277-78 (1946).

---

[4] Plaintiffs argue that Defendants' reliance on the word "restrain" in Section 1252(f)(1) is "foreclosed by *Rodriguez v. Hayes*," Answering Br.34, which interpreted "restrain" to mean "temporary injunctive relief." 591 F.3d 1105, 1119 (9th Cir. 2010). The Supreme Court did not adopt that limited interpretation in *Garland v. Aleman Gonzalez*, instead observing that it had "suggested in another context that 'restrain' sometimes has a 'broad meaning' that refers to judicial orders that 'inhibit' particular actions, and at other times it has a 'narrower meaning' that includes 'orders that stop (or perhaps compel)' such acts." 596 U.S. 543, 549 (2022) (citation omitted).

## V. THE DISTRICT COURT ABUSED ITS DISCRETION BY GRANTING UNIVERSAL RELIEF

### A. The Balance of Equities Weighs Against Postponement

In granting preliminary relief to Plaintiffs, the district court found that the balance of equities weighed in favor of Plaintiffs. Plaintiffs now concede (at 62) that "the Supreme Court obviously reached a contrary conclusion." Just so: In staying the district court's grant of preliminary relief, the Supreme Court necessarily concluded that the Government would suffer irreparable harm absent a stay and concluded that the balance of equities tipped in the Government's favor. *Hollingsworth*, 558 U.S. at 190. That is baked into the stay standard, and Plaintiffs' complaint that the Court "provided no reasons" (at 62) is no basis to ignore its ruling. It controls here.

In any event, Plaintiffs' arguments are unpersuasive on their own terms. In attempting to minimize the harm to Defendants, Plaintiffs suggest the Government "may pursue and vindicate its [institutional injury] interests in the full course of this litigation." Answering Br.63 (quoting *E. Bay Sanctuary Covenant v. Trump*, 932 F.3d 742, 778 (9th Cir. 2018)). But that ignores that the Secretary terminated the 2023 Designation because she determined that continuing to permit the Venezuelan nationals to remain temporarily in the United States —even for six months—would be contrary to the United States' "national interest." 90 Fed. Reg. 9040, 9041 (Feb. 5, 2025) (quoting 8 U.S.C. § 1254a(b)(1)(C)). In particular, the Secretary determined

26

that an 18-month extension would harm the United States' "national security" and "public safety," while also straining police stations, city shelters, and aid services in local communities that had reached a breaking point. 90 Fed. Reg. at 9044. Delay of the Secretary's decisions threatens to undermine the United States' foreign policy as the Government is engaged in complex and ongoing negotiations with Venezuela, including with respect to "an agreement … to resume deportations" to that country." 1-ER-43. By ostensibly "postponing" the Secretary's actions, the district court effectively stepped into the role of the Secretary and decided on its own to extend the 2023 Designation for as many months (or years) as it takes for this litigation to conclude. Such a ruling was squarely at odds with Congress' intent to limit unwarranted TPS extensions and therefore constitutes irreparable injury. *Maryland v. King*, 567 U.S. 1301, 1303 (2012) (government suffers irreparable injury "[a]ny time" it is "enjoined by a court from effectuating statutes by enacted by representatives of [the] people.").

Plaintiffs, meanwhile, cite (at 61-63) potential harms to beneficiaries. But whenever a Secretary terminates TPS, beneficiaries will lose work authorization and protected status under the program. *See* 8 U.S.C. § 1254a(a)(2). None of the individual Plaintiffs allege that they are currently subject to a final order of removal, and many allege that they have alternative grounds for immigration status. 3-ER-294-98. Thus, each Plaintiff will have the ability to challenge on an individual

basis whether removal is proper—or seek to stay, withhold, or otherwise obtain relief from any order of removal—through ordinary Title 8 proceedings. This Court should reject district court's decision to extend an additional, and nationwide, layer of protection, contrary to the Secretary's determination that doing so was "contrary to the national interest." 8 U.S.C. § 1254a(b)(1)(C). Further, Congress has already balanced the equities: When the Secretary concludes that a TPS designation under 8 U.S.C. § 1254a(b)(1)(C) is "contrary to the national interest," she must terminate it, 8 U.S.C. § 1254a(b)(3)(B), and a court has no basis for second-guessing that determination.

## B.    Universal Relief Was Unwarranted

Plaintiffs do not dispute that the relief here extends far beyond what is necessary to address their alleged harms. *See* Answering Br.64-67. They instead contend (at 65) that universal relief is particularly appropriate here because of the need for uniformity, and because practical difficulties may arise if the Government had to distinguish individuals covered by the court's order. Those supposedly case-specific justifications "lack[] a limiting principle and would make nationwide injunctions the rule rather than the exception with respect to all actions of federal agencies." *Arizona v. Biden*, 40 F.4th 375, 397 (6th Cir. 2022) (Sutton, C.J., concurring). Rather than authorizing a single district court judge to decide immigration policy for the country, Article III promotes uniformity by establishing

"one Supreme Court" to resolve conflicts among the lower courts. U.S. Const. Art. III, § 1.

## CONCLUSION

The Court should vacate the district court's postponement order and remand with instructions to dismiss this case.

Respectfully submitted,

BRETT A. SHUMATE
*Assistant Attorney General*
*Civil Division*

YAAKOV M. ROTH
*Principal   Deputy   Assistant   Attorney*
*General*

DREW C. ENSIGN
*Deputy Assistant Attorney General*

SARAH L. VUONG
*Assistant Director*

WILLIAM H. WEILAND
*Senior Litigation Counsel*

/s/ Carlton F. Sheffield
*Trial Attorney*
Office of Immigration Litigation
U.S. Department of Justice
P.O. Box 878, Ben Franklin Station
Washington, DC 20044
Telephone: (202) 353-9822
Email: Carlton.f.sheffield2@usdoj.gov

ANNA DICHTER
ERIC SNYDERMAN
JEFFREY M. HARTMAN
LAUREN BRYANT
AMANDA SAYLOR
CATHERINE ROSS

*Trial Attorneys*

## <u>BRIEF FORMAT CERTIFICATION</u>

Pursuant to Federal Rule of Appellate Procedure 32(g)(1) and Ninth Circuit

Rule 32-1(b), I certify that Appellants' Reply Brief:

(1) was prepared 14-point Times New Roman type using Microsoft Word;

(2) is proportionally spaced; and,

(3) contains 6,759 words, exclusive of tables of contents and authorities, and

certificates of counsel.

/s/ Carlton F. Sheffield
CARLTON F. SHEFFIELD
Trial Attorney
Office of Immigration Litigation

## <u>CERTIFICATE OF SERVICE</u>

I certify that on June 18, 2025, I electronically filed this brief with the Clerk of the Court for the United States Court of Appeals for the Ninth Circuit using the ACMS system. All parties were served electronically through the ACMS system.

*/s/ Carlton F. Sheffield*
Carlton F. Sheffield
Trial Attorney
Office of Immigration Litigation