**FOR PUBLICATION**

# UNITED STATES COURT OF APPEALS
## FOR THE NINTH CIRCUIT

| NATIONAL TPS ALLIANCE; MARIELA GONZALEZ; FREDDY ARAPE RIVAS; M.H.; CECILIA GONZALEZ HERRERA; ALBA PURICA HERNANDEZ; E. R.; HENDRINA VIVAS CASTILLO; VILES DORSAINVIL; A.C.A.; SHERIKA BLANC, | No. 25-2120 D.C. No. 3:25-cv-01766-EMC |
|---|---|
| *Plaintiffs - Appellees*, | |
| v. | |
| KRISTI NOEM, in her official capacity as Secretary of Homeland Security; UNITED STATES DEPARTMENT OF HOMELAND SECURITY; UNITED STATES OF AMERICA, | OPINION |
| *Defendants - Appellants*. | |

Appeal from the United States District Court
for the Northern District of California
Edward M. Chen, District Judge, Presiding

Argued and Submitted July 16, 2025
Pasadena, California

August 29, 2025

Before: Kim McLane Wardlaw, Salvador Mendoza, Jr., and
Anthony D. Johnstone, Circuit Judges.

Opinion by Judge Wardlaw

## SUMMARY[*]

### Immigration

The panel affirmed the district court's order granting
preliminary relief in the form of a postponement of the
effective dates of actions by the Secretary of Homeland
Security to terminate Temporary Protected Status ("TPS")
for Venezuelan nationals.

The district court postponed the agency's actions under
Administrative Procedure Act section 705. Applying the
test set out in *Winter v. Nat. Res. Def. Council, Inc.,* 555 U.S.
7 (2008), for the grant of preliminary relief, the district court
held that (1) Plaintiffs established a likelihood of success on
the merits; (2) TPS beneficiaries would suffer irreparable
injury if relief were not granted; and (3) the public interest

---

[*] This summary constitutes no part of the opinion of the court. It has
been prepared by court staff for the convenience of the reader.

and balance of equities tipped sharply in favor of postponement.

The panel held that it had appellate jurisdiction to consider this appeal, explaining that the Government had shown that the order (1) had the practical effect of the grant of an injunction; (2) had serious, perhaps irreparable consequences; and (3) could be effectively challenged only by immediate appeal.

The panel also concluded that neither the TPS statute nor 8 U.S.C. § 1252(f)(1) precluded the court's power to review the merits of Plaintiffs' claim that the Secretary exceeded her statutory authority.

Turning to the merits, the panel held that Plaintiffs are likely to succeed on the merits of their claim that the Secretary lacked authority to vacate a prior extension of TPS. The panel explained that agencies lack the authority to undo their actions where, as here, Congress has spoken and said otherwise. The panel held that it need not proceed to Plaintiffs' additional claims because the panel's holding that the Secretary lacks vacatur authority under the TPS statute moots Plaintiffs' other claims.

Addressing the remaining *Winter* factors, the panel held that the district court did not abuse its discretion by determining that Plaintiffs face irreparable harm based on the vacatur of the extension of Venezuelan TPS, and that the balance of equities and the public interest favored Plaintiffs.

With respect to the scope of the injunction, the panel held that anything short of a nationwide postponement is incongruent with the TPS statute, and it would not provide Plaintiffs with the complete relief they seek.

Accordingly, the panel held that the district court did not abuse its discretion by postponing the vacatur and termination of Venezuelan TPS.

---

**COUNSEL**

Ahilan T. Arulanantham (argued), Center for Immigration Law and Policy, UCLA School of Law, Los Angeles, California; Eva L. Bitran, ACLU Foundation of Southern California, Riverside, California; Michelle Y. Cho, Emilou MacLean, and Amanda Young, ACLU Foundation of Northern California, San Francisco, California; Jessica K. Bansal and Lauren M. Wilfong, National Day Laborer Organizing Network, Pasadena, California; Erik Crew, Haitian Bridge Alliance, San Diego, California; for Plaintiffs-Appellees.

Drew C. Ensign (argued), Deputy Assistant Attorney General; Amanda Saylor, Carlton F. Sheffield, Jeffrey M. Hartman, Lauren Bryant, Anna Dichter, Eric M. Snyderman, Catherine Ross and Luz M. Restrepo, Trial Attorneys; Craig A. Newell Jr. and William H. Weiland, Senior Litigation Counsel; Sarah L. Vuong, Assistant Director; Office of Immigration Litigation; Yaakov M. Roth, Principal Deputy Assistant Attorney General; Brett A. Shumate, Assistant Attorney General; Civil Division, United States Department of Justice, Washington, D.C.; for Defendants-Appellants.

Matt A. Crapo and Christopher J. Hajec, Immigration Reform Law Institute, Washington, D.C., for Amicus Curiae Immigration Reform Law Institute.

Jeremiah L. Morgan and William J. Olson, William J. Olson PC, Vienna, Virginia; Rick Boyer, Integrity Law Firm, Lynchburg, Virginia; Patrick M. McSweeney, Powhatan, Virginia; Michael Boos, Citizens United, Washington, D.C.; for Amicus Curiae America's Future, Citizens United, and Conservative Legal Defense and Education Fund.

Steven K. Ury, Elena Medina, Deborah L. Smith, and Nathanial Putnam, Service Employees International Union, Washington, D.C.; Daniel B. Rojas, Rothner, Segall & Greenstone, Pasadena, California; Matthew Holder, Communications Workers of America, Washington, D.C.; Mario Martinez, United Farm Workers of America, Keene, California; for Amici Curiae Service Employees International Union, Communications Workers of America, and United Farm Workers of America.

Anne Lai, UC Irvine School of Law, Irvine, California; Andrew I. Schoenholtz, Georgetown University Law Center, Washington, D.C.; Jaya Ramji-Nogales, Beasley School of Law, Temple University, Philadelphia, Pennsylvania; for Amici Curiae Immigration Law Scholars.

Jesse P. Basbaum, Alex Flores, and Annabelle Wilmott, Deputy Attorneys General; Vilma Palma-Solana, Supervising Deputy Attorney General; Michael Newman, Senior Assistant Attorney General; Rob Bonta, California Attorney General; Office of the California Attorney General, Oakland, California; Cleland B. Welton II, Assistant Solicitor General; Zoe Levine, Special Counsel for Immigrant Justice; Judith N. Vale, Deputy Solicitor General; Barbara D. Underwood, Solicitor General; Letitia James, New York Attorney General; Office of the New York Attorney General, New York, New York; William Tong, Connecticut Attorney General, Office of the Connecticut

Attorney General, Hartford, Connecticut; Kathleen
Jennings, Delaware Attorney General, Office of the
Delaware Attorney General, Wilmington, Delaware; Brian
L. Schwalb, District of Columbia Attorney General, Office
of the District of Columbia Attorney General, Washington,
D.C.; Anne E. Lopez, Hawaiʻi Attorney General, Office of
the Hawaiʻi Attorney General, Honolulu, Hawaiʻi; Kwame
Raoul, Illinois Attorney General, Office of the Illinois
Attorney General, Chicago, Illinois; Aaron M. Frey, Maine
Attorney General, Office of the Maine Attorney General,
Augusta, Maine; Dana Nessel, Michigan Attorney General,
Office of the Michigan Attorney General, Lansing,
Michigan; Keith Ellison, Minnesota Attorney General,
Office of the Minnesota Attorney General, St. Paul,
Minnesota; Aaron D. Ford, Nevada Attorney General, Office
of the Nevada Attorney General, Carson City, Nevada;
Matthew J. Platkin, New Jersey Attorney General, Office of
the New Jersey Attorney General, Trenton, New Jersey; Dan
Rayfield, Oregon Attorney General, Office of the Oregon
Attorney General, Salem, Oregon; Peter F. Neronha, Rhode
Island Attorney General, Office of the Rhode Island
Attorney General, Providence, Rhode Island; Anthony G.
Brown, Maryland Attorney General, Office of the Maryland
Attorney General, Baltimore, Maryland; Andrea J.
Campbell, Commonwealth of Massachusetts Attorney
General, Office of the Commonwealth of Massachusetts
Attorney General, Boston, Massachusetts; Charity R. Clark,
Vermont Attorney General, Office of the Vermont Attorney
General, Montpelier, Vermont; Nicholas W. Brown,
Washington Attorney General, Office of the Washington
Attorney General, Olympia, Washington; for Amici Curiae
States of California, New York, Connecticut, Delaware,
Hawaiʻi, Illinois, Maine, Maryland, Massachusetts,

Michigan, Minnesota, Nevada, New Jersey, Oregon, Rhode Island, Vermont, Washington, and the District of Columbia.

Robert S. Chang and Shaleen Shanbhag, Fred T. Korematsu Center for Law and Equality, UC Irvine School of Law, Irvine, California; Rose Cuison-Villazor, Center for Immigrant Justice, Rutgers Law School, Newark, New Jersey; for Amici Curiae Members of Congress.

---

## OPINION

WARDLAW, Circuit Judge:

Since 2021, over 600,000 Venezuelan citizens living in the United States have received immigration status under the Temporary Protected Status ("TPS") program. This status provides eligible Venezuelans with work authorization and temporary protection from deportation. 8 U.S.C. § 1254a(a)(1). While their home country experienced "the worst humanitarian crisis in the Western Hemisphere in recent memory," Deferred Enforced Departure for Certain Venezuelans, 86 Fed. Reg. 6845, 6845 (Jan. 19, 2021), Venezuelan TPS holders were given protection to build their lives in the United States for renewable periods of six to eighteen months, 8 U.S.C. § 1254a(b)(2)–(3). Some hoped to return to Venezuela after the crisis subsided. Others awaited the adjudication of their applications for asylum or for other long-term immigration status in the United States. Each discrete extension of TPS allowed them to take jobs, sign leases, enroll in schools, and raise their families with the knowledge that although their status was temporary, they

8          NATIONAL TPS ALLIANCE V. NOEM

were authorized to remain in the United States until the expiration of their lawful status.

On January 17, 2025, then-Secretary of the Department of Homeland Security ("DHS") Alejandro Mayorkas announced an extension, effective immediately, of Venezuelan TPS through October 2, 2026. Extension of the 2023 Designation of Venezuela for Temporary Protected Status, 90 Fed. Reg. 5961, 5961 (Jan. 17, 2025). Secretary Mayorkas cited Venezuela's ongoing "complex, serious and multidimensional humanitarian crisis" marked by the collapse of its healthcare system and the disruption of its basic services, and he concluded that the "extraordinary and temporary conditions supporting Venezuela's TPS designation remain." *Id.* at 5963 (citation omitted). Seventeen days later, newly confirmed DHS Secretary Kristi Noem took the unprecedented action [1] of purporting to vacate this prior extension of TPS. Vacatur of 2025 Temporary Protected Status Decision for Venezuela, 90 Fed. Reg. 8805, 8806 (Feb. 3, 2025) ("Vacatur Notice"). Two days after that, she moved to terminate TPS for one group of Venezuelan TPS holders. Termination of the October 3, 2023 Designation of Venezuela for Temporary Protected Status, 90 Fed. Reg. 9040, 9040 (Feb. 5, 2025) ("Termination Notice"). The Secretary explained this reversal by invoking concerns about "confusion" caused by the prior extension, asserting that there were "notable improvements" in the conditions in Venezuela, and concluding that "[c]ontinuing to permit Venezuelans [with TPS] to remain in the United States does not champion core

---

[1] No administration has attempted to vacate an existing temporary protection status designation in the thirty-five years in which the program has existed.

American interests."  Vacatur Notice, 90 Fed. Reg. 8805, 8807; Termination Notice, 90 Fed. Reg. 9040, 9042–43.

TPS beneficiaries were suddenly faced with the fear of prematurely losing their status within a matter of weeks or months.  For many, this meant the loss of their jobs, and the possibility of deportation to a country that had been declared unsafe just one month earlier, and, for others, the real possibility of family separation from their relatives with more permanent status.  Hundreds of thousands of TPS holders, who had been living in the United States and relying on their legal immigration status for years, could become targets for detention and deportation.

Plaintiffs, the National TPS Alliance ("NTPSA"), an organization with members in all 50 states, and seven individual TPS holders, sued to restore the January 2025 extension of Venezuelan TPS.  They claimed that the DHS Secretary lacks vacatur authority under 8 U.S.C. § 1254a ("TPS statute") and that Secretary Noem's actions otherwise violated the Administrative Procedure Act ("APA") and the Equal Protection Clause of the U.S. Constitution.  On March 31, 2025, the U.S. District Court for the Northern District of California granted preliminary relief, postponing the effective dates of Secretary Noem's vacatur and termination notices under APA section 705.  The Government now appeals.

We hold that Plaintiffs are likely to succeed on their claim that the vacatur of a prior extension of TPS is not permitted by the governing statutory framework.  In enacting the TPS statute, Congress designed a system of temporary status that was predictable, dependable, and insulated from electoral politics.  Congress rejected the prior system of deferred action based on "the vagaries of our domestic

politics," 135 Cong. Rec. H7501 (daily ed. Oct. 25, 1989) (statement of Rep. Meldon Edises Levine), and instead enacted fixed terms of protected status of between six and eighteen months, 8 U.S.C. § 1254a(b)(2), (3)(C). A reading of the statute that allows for vacatur would render these terms—and Congress's design—meaningless. Plaintiffs are therefore likely to succeed on the merits of their first APA claim. Moreover, Plaintiffs have demonstrated that they face irreparable harm to their lives, families, and livelihood, that the balance of equities favors a grant of preliminary relief, and that nationwide relief is appropriate. Accordingly, we affirm the district court's order postponing the vacatur and termination of Venezuelan TPS.

## I. FACTUAL AND LEGAL BACKGROUND

### A. History of Temporary Protection

For about three decades before the enactment of the statute authorizing TPS, presidential administrations exercised prosecutorial discretion to grant protection from deportation to certain groups of noncitizens on an ad hoc basis. H.R. Rep. No. 100-627, at 6 (1988) ("[E]very Administration since and including that of President Eisenhower has permitted one or more groups of otherwise deportable aliens to remain temporarily in the United States out of concern that . . . forced repatriation . . . could endanger their lives or safety."). This type of humanitarian protection—which the Executive premised on its authority to enforce the immigration laws—was termed Extended Voluntary Departure ("EVD"). Andorra Bruno et al., Cong. Rsch. Serv., RS75700, Analysis of June 15, 2012 DHS Memorandum, Exercising Prosecutorial Discretion with Respect to Individuals Who Came to the United States as Children, at 9 (2012). *see* 8 U.S.C. § 1229a, *id.* § 1229c.

Noncitizens protected under EVD received a work authorization and a stay of deportation. Andrew I. Schoenholtz, *The Promise and Challenge of Humanitarian Protection in the United States: Making Temporary Protected Status Work as a Safe Haven*, 15 Nw. J. L. & Soc. Pol'y. 1, 5 (2019). From 1960 to 1989, the Attorney General granted EVD to nationals from at least fourteen different countries. *Id.* Beginning in 1990, President George H.W. Bush began granting Deferred Enforced Departure ("DED"), which effectively provides the same relief as EVD: protection from deportation and the ability to apply for an accompanying work permit. *Id.* at 6. This action, too, is not specifically authorized by statute, rather the Executive has cited its general enforcement authority under the Immigration and Nationality Act ("INA"), *see* 8 U.S.C. §§ 1229a, 1229c, to exercise this discretion. Bruno, *supra*, at 9.

In the late 1980s, Congress considered multiple proposals for alternative mechanisms for granting humanitarian relief to groups of non-U.S. citizens. For instance, the Temporary Safe Haven Act of 1988, a proposed amendment to the INA, was intended to create a "more formal and orderly mechanism for the selection, processing and registration" of foreign citizens in the United States whose countries of nationality were experiencing ongoing armed conflict, natural disaster, or other extraordinary and temporary conditions. H.R. Rep. No. 100-627, at 4 (1988). Several legislators spoke about the need for a statutory EVD- or DED-like procedure, but they voiced concerns about granting unbridled deference to the Executive branch in determining the country designations and time periods for relief. *See, e.g.*, 133 Cong. Rec. 19560 (1987) (statement of Rep. Romano Mazzoli) ("[T]he process by which EVD

12            NATIONAL TPS ALLIANCE V. NOEM

grants are made, extended, or terminated is utterly mysterious, since there exist no statutory criteria to guide the administration."); 133 Cong. Rec. 19559 (1987) (Statement of Rep. Hamilton Fish, Jr.) (decrying the lack of criteria for granting EVD and explaining the need to fill the statutory gap for those who seek temporary refuge in the United States). In discussions about another TPS precursor bill, legislators expressed the same concerns. *See, e.g.*, 135 Cong. Rec. H7501 (daily ed. Oct. 25, 1989) (statement of Rep. William Blaine Richardson) (speaking in favor of the establishment of a systematic procedure for temporary protected status "because we need to replace the current ad hoc, haphazard regulations and procedures that exist today"). Representative Levine stressed the importance of constraining Executive authority and insulating vulnerable noncitizens from politics: "Refugees, spawned by the sad and tragic forces of warfare, should not be subject to the vagaries of our domestic politics as well." 135 Cong. Rec. H7501 (daily ed. Oct. 25, 1989) (statement of Rep. Meldon Edises Levine).

One year later, in 1990, Congress passed, and President George H.W. Bush signed, the Immigration Act of 1990, Pub. L. No. 101-649. This law amended the INA to create the TPS program, which has largely replaced the Executive's prior ad hoc framework for providing relief to nationals of certain designated countries. The law provided a new statutory basis for the temporary protection of certain nationals of foreign countries, now with explicit guidelines, specific procedural steps, and time limitations.

### B. TPS Statutory Framework

Pursuant to the TPS statute, 8 U.S.C. § 1254a, the DHS Secretary may designate a foreign state for TPS when

nationals of that state cannot return there safely due to armed conflict, natural disaster, or other "extraordinary and temporary conditions," unless the Secretary "finds that permitting the [noncitizens] to remain temporarily in the United States is contrary to the national interest of the United States." 8 U.S.C. § 1254a(b)(1)(C); *see also* 8 U.S.C. § 1103(a); 6 U.S.C. § 557 (transferring responsibility for TPS administration from the Attorney General to the Secretary of Homeland Security). A foreign state's initial TPS designation is for a set period of between six and eighteen months, as selected by the Secretary. 8 U.S.C. § 1254a(b)(2). Such a designation permits certain nationals of the foreign state, who have continuously resided in the United States since the effective date of the designation, to register for employment authorization and protection from deportation for the duration of the TPS period. *Id.* § 1254a(a)(1), (b)(2). Other restrictions apply: applicants must be "admissible" under the immigration laws, *id.* § 1254a(c)(1)(A)(iii); they must not have been "convicted of any felony or 2 or more misdemeanors committed in the United States," *id.* § 1254a(c)(2)(B)(i); and they risk revocation of status if the Secretary "finds that the [noncitizen] was not in fact eligible for such status," *id.* § 1254a(c)(3)(A). TPS does not provide beneficiaries with a pathway to permanent resident status, nor does it include any right to petition for visas on behalf of family members in the United States or abroad.

At least sixty days before the end of the designated TPS period, the Secretary, "after consultation with appropriate agencies of the Government," reviews the designation and determines "whether the conditions for such designation under this subsection continue to be met." *Id.* § 1254a(b)(3)(A). If the foreign state no longer meets the

14          NATIONAL TPS ALLIANCE V. NOEM

conditions for TPS designation, the Secretary "shall terminate the designation." *Id.* § 1254a(b)(3)(B). Otherwise, the Secretary may extend the designation for an additional period of six, twelve, or eighteen months. *Id.* § 1254a(b)(3)(C). The statute provides that "[t]here is no judicial review of any determination of the [Secretary] with respect to the designation, or termination or extension of a designation, of a foreign state under this subsection." *Id.* § 1254a(b)(5)(A).

## C. Venezuelan TPS

On January 19, 2021, the last day of his first term, President Donald Trump designated Venezuela for DED, explaining that Venezuela was experiencing the "worst humanitarian crisis in the Western Hemisphere in recent memory." Deferred Enforced Departure for Certain Venezuelans, 86 Fed. Reg. 6845, 6845 (Jan. 19, 2021). President Trump directed the Secretary of Homeland Security to "take appropriate measures to authorize employment" for certain Venezuelans citizens who were present in the United States as of January 20, 2021. *Id.* On March 9, 2021, DHS Secretary Alejandro Mayorkas designated Venezuela for an 18-month period of TPS, effective March 9, 2021 through September 9, 2022. Designation of Venezuela for Temporary Protected Status and Implementation of Employment Authorization for Venezuelans Covered by Deferred Enforced Departure, 86 Fed. Reg. 13574, 13574 (Mar. 9, 2021) ("2021 Designation"). In the Federal Register notice, Secretary Mayorkas cited Venezuela's "severe political and economic crisis" marked by "[e]conomic contraction," "deepening poverty," "a collapse in basic services," and "human rights abuses and repression." *Id.* at 13576. Approximately 323,000 Venezuelan nationals who had continuously resided

in the United States since March 8, 2021 or earlier became eligible to apply for TPS. *Id.* at 13575.

On September 8, 2022, one day before the expiration of Venezuela's 2021 TPS designation, Secretary Mayorkas announced the extension of Venezuelan TPS for an additional eighteen months, from September 10, 2022 through March 10, 2024. Extension of the Designation of Venezuela for Temporary Protected Status, 87 Fed. Reg. 55024, 55024 (Sept. 8, 2022). This extension permitted existing beneficiaries of the 2021 TPS designation to extend their work authorization and protection from removal.[2] *Id.* In the Federal Register notice, Secretary Mayorkas explained that the 18-month extension was warranted because "Venezuela remain[ed] in a humanitarian emergency due to economic and political crises," with "limited access to food, basic services, and adequate healthcare, and the deterioration of the rule of law and protection of human rights." *Id.* at 55026. He concluded that "it is not contrary to the national interest of the United States to permit Venezuelan TPS beneficiaries to remain in the United States temporarily." *Id.* at 55027.

On October 3, 2023, Secretary Mayorkas issued a Federal Register notice in which he took two actions: first, he announced a second 18-month extension of the 2021 Venezuela TPS designation; and second, he redesignated Venezuela for TPS. Extension and Redesignation of

---

[2] Because it was an extension of the existing Venezuela TPS designation, no new TPS applicants could receive status through this notice. Only current TPS beneficiaries who had been continuously present in the United States since March 9, 2021, the date of the initial TPS designation, could seek an extension of status. Thus, any Venezuelans who arrived in the United States on or after March 10, 2021 were unaffected by this extension and remained ineligible for TPS.

Venezuela for Temporary Protected Status, 88 Fed. Reg.
68130, 68130 (Oct. 3, 2023). The redesignation of
Venezuela for TPS allowed eligible Venezuelans who had
continuously resided in the United States since July 31, 2023
to apply for TPS for the first time. *Id.* Secretary Mayorkas
reasoned that both extending and redesignating Venezuelan
TPS was warranted "because extraordinary and temporary
conditions continue to prevent Venezuelan nationals from
returning in safety." *Id.* at 68132. Based on this notice,
beneficiaries of the 2021 Venezuelan TPS designation could
extend their status through September 10, 2025. *Id.* at
68130. Registration for the 2023 Venezuela TPS
redesignation began on October 3, 2023, and the status
continued through April 2, 2025. *Id.* Approximately
472,000 additional people became potentially eligible for
this second Venezuela designation. *Id.* at 68134. This
created a two-track system, with different TPS periods for
the 2021 and 2023 registrants ending on two different dates.

Secretary Mayorkas addressed this two-track system on
January 17, 2025 by extending the 2023 Venezuelan TPS
designation. Extension of the 2023 Designation of
Venezuela for Temporary Protected Status, 90 Fed. Reg.
5961 (Jan. 17, 2025). Through this notice, Secretary
Mayorkas allowed existing beneficiaries of either the 2021
or 2023 TPS designation to seek an 18-month extension of
status through October 2, 2026. *Id.* at 5962. Secretary
Mayorkas explained that there would no longer be two
separate filing processes for the 2021 and 2023 TPS
designations for Venezuela. *Id.* at 5963. Instead, based on
a U.S. Citizenship and Immigration Services ("USCIS")
evaluation of "the operational feasibility and resulting
impact on stakeholders of having two separate filing
processes," including confusion among applicants and

adjudicators, the Secretary determined that it was appropriate to consolidate the two filing processes. *Id.* Secretary Mayorkas justified the extension of Venezuelan TPS by citing the Department of Homeland Security's review of Venezuelan country conditions, "including input received from [the] Department of State" and other agencies. *Id.* He further determined that "it is not contrary to the national interest of the United States to permit Venezuelan TPS beneficiaries to remain in the United States temporarily." *Id.*

Upon taking office on January 20, 2025, President Trump issued Executive Order ("EO") No. 14159, entitled "Protecting the American People Against Invasion," in which he tasked the Secretary of State, the Attorney General, and the Secretary of Homeland Security with "promptly tak[ing] all appropriate action, consistent with law, to rescind the policy decisions of the previous administration that led to the increased or continued presence of illegal aliens in the United States . . . ." Exec. Order No. 14159, § 16 (Jan. 20, 2025), 90 Fed. Reg. 8443, 8446 (Jan. 29, 2025). Specifically, he charged these officials with "ensuring that designations of Temporary Protected Status are consistent with . . . 8 U.S.C. § 1254a[], and that such designations are appropriately limited in scope and made for only so long as may be necessary to fulfill the textual requirements of that statute." *Id.* § 16(b).

On February 3, 2025, newly confirmed DHS Secretary Kristi Noem issued a notice purporting to vacate former Secretary Mayorkas's extension of the 2023 designation and the accompanying consolidation of the two Venezuelan TPS filing systems. Vacatur Notice, 90 Fed. Reg. 8805, 8806. Secretary Noem opined that "[t]he Mayorkas Notice adopted a novel approach of implicitly negating the 2021 Venezuela

18          NATIONAL TPS ALLIANCE V. NOEM

TPS designation by effectively subsuming it within the 2023
Venezuela TPS designation," without "acknowledg[ing] the
novelty of its approach or explain[ing] how it is consistent
with the TPS statute." *Id.* at 8807. The Secretary explained
that Secretary Mayorkas's approach "included multiple
notices, overlapping populations, overlapping dates, and
sometimes multiple actions happening in a single
document." *Id.* The Vacatur Notice described Secretary
Mayorkas's explanations for his "attempts to address"
confusion as "thin and inadequately developed." *Id.* Thus,
Secretary Noem decided that "[g]iven these deficiencies and
lack of clarity, vacatur is warranted to untangle the
confusion, and provide an opportunity for informed
determinations regarding the TPS designations and clear
guidance." *Id.* Without the extensions provided for by
Secretary Mayorkas's extension notice, TPS for 2023
registrants was set to expire on April 2, 2025, and TPS for
2021 registrants was set to expire on September 10, 2025.
*Id.* at 8806.

Two days later, on February 5, 2025, Secretary Noem
issued another notice, this time announcing the termination
of the 2023 TPS designation of Venezuela, which, by statute,
would be effective 60 days later. Termination Notice, 90
Fed. Reg. at 9040. The Termination Notice stated that
"[a]fter reviewing country conditions . . . in consultation
with the appropriate U.S. Government agencies," and
"determin[ing] it is contrary to the national interest" to
extend Venezuelan TPS, the Secretary concluded that
Venezuela no longer met the conditions for TPS designation.
*Id.* at 9040–41. The Secretary defined the term "national
interest" as an "expansive standard," and she provided
several reasons for her determination that an extension of
TPS would be contrary to the national interest: the "sheer

numbers" of TPS holders strained resources in local communities and "cost taxpayers billions of dollars"; the Venezuelan gang "Tren de Aragua" posed a threat to the United States; there was a potential "magnet effect" caused by TPS determinations; and "[c]ontinuing to permit Venezuelans under the 2023 TPS designation to remain in the United States does not champion core American interests or put American interests first." *Id.* at 9042–43 (footnotes and citations omitted). Secretary Noem cited EO 14159 as a justification for "reapprais[ing] the national interest factors and giv[ing] strong consideration to the serious national security, border enforcement, public safety, immigration policy, and economic and public welfare concerns engendered by illegal immigration of Venezuelans." *Id.* at 9043. Because the termination of TPS may not take effect earlier than 60 days after the Federal Register notice is published, 8 U.S.C. § 1254a(b)(3)(B), the effective date of the termination of the 2023 designation of Venezuela for TPS was set for April 7, 2025.

## D. Procedural History

On February 19, 2025, the National TPS Alliance, a member-led organization, and seven individual TPS holders (collectively, "Plaintiffs"), sued Secretary Noem and the United States Government ("the Government") in the U.S. District Court for the Northern District of California on behalf of themselves and all NTPSA members. Plaintiffs asked the court to postpone and invalidate the Vacatur and Termination Notices issued by Secretary Noem, and to restore the prior extension of the 2021 and 2023 TPS designations through October 2, 2026.

On March 31, 2025, the district court granted Plaintiffs' motion for preliminary relief by postponing the Vacatur and

Termination Notices. Applying the *Winter* test for the grant
of preliminary relief, the district court held that (1) Plaintiffs
established a likelihood of success on the merits; (2) TPS
beneficiaries will "suffer irreparable injury" if relief is not
granted; and (3) the public interest and balance of equities
"tip[] sharply" in favor of postponement. *Winter v. Nat. Res.
Def. Council, Inc.*, 555 U.S. 7, 20 (2008). The district court
postponed the agency's Vacatur and Termination Notices
nationwide. On April 2, 2025, the Government appealed.[3]

## II. JURISDICTION – CARSON

28 U.S.C. § 1292(a)(1) grants appellate jurisdiction over
"[i]nterlocutory orders of the district courts . . . granting,
continuing, modifying, refusing or dissolving injunctions."
Here, the district court ordered preliminary relief in the form
of a postponement of agency action under APA section 705.
We may review such a postponement only if the appellant
satisfies the three-part test established in *Carson v. American
Brands, Inc.*, 450 U.S. 79 (1981). *Imm. Defs. Law Ctr. v.
Noem*, No. 25-2581, --- F.4th ---, 2025 WL 2080742, at *5,
(9th Cir. July 18, 2025). "[T]he appealing party must show
that the order (1) has the practical effect of the grant or denial
of an injunction; (2) has serious, perhaps irreparable
consequences; and (3) can be effectively challenged only by

---

[3] The Government sought a stay of the district court's order pending
appeal, which the district court denied. On April 4, 2025, the
Government sought a stay in the Ninth Circuit of the district court
judge's order pending appeal, which a motions panel of our court denied.
On May 1, 2025, Appellants sought a stay from the United States
Supreme Court. Dkt. 1, *Noem v. Nat. TPS All.*, No. 24A1059 (May 1,
2025). On May 19, 2025, the Supreme Court granted a stay pending both
the disposition of the instant appeal and the disposition of a petition for
a writ of certiorari, if any. *Noem v. Nat. TPS All.*, No. 24A1059, 2025
WL 1427560 (U.S. May 19, 2025).

immediate appeal." *United States v. El Dorado County*, 704
F.3d 1261, 1263 (9th Cir. 2013) (quotation marks omitted)
(quoting *Thompson v. Enomoto*, 815 F.2d 1323, 1326–27
(9th Cir.1987)).

First, we have recently held that a section 705
postponement has the practical effect of a preliminary
injunction because it "pauses the []implementation of"
agency action. *Imm. Defs.*, 2025 WL 2080742, at \*5. We
have similarly treated a temporary restraining order as an
injunction "where an adversarial hearing has been held and
the district court's basis for issuing the order is strongly
challenged." *Id.* As in *Immigrant Defenders*, the district
court here held a contested hearing on Plaintiffs' motion to
postpone, and the Government strongly challenged the
postponement order, including by securing a stay on the
Supreme Court's emergency docket. *Id.* The first prong of
the *Carson* test is satisfied.[4]

The second *Carson* factor is the risk of "serious, perhaps
irreparable, consequence[s]" to the appellant. 450 U.S. at 84
(citation omitted). "It is well established that the mere
existence of the Executive Branch's desire to enact a policy
is not sufficient to satisfy the irreparable harm prong." *Imm.
Defs.*, 2025 WL 2080742, at \*6. However, here, the
Government has satisfied this requirement. Because the
Supreme Court granted a stay in favor of the Government,
the Court necessarily held that the Government would face
irreparable harm if the district court's postponement order
were to remain in effect. *See Hollingsworth v. Perry*, 558

---

[4] In *Immigrant Defenders*, we noted that both the Supreme Court and our
circuits "have not hesitated to hear interlocutory appeals of orders
labeled as 5 U.S.C. § 705 stays." *Imm. Defs.*, 2025 WL 2080742, at \*5
n.6.

U.S. 183, 190 (2010) (per curiam) (enumerating the threshold requirement that a party seeking a stay must demonstrate "a likelihood that irreparable harm will result from the denial of a stay"); *Noem v. Nat'l TPS All.*, No. 24A1059, 2025 WL 1427560 (May 19, 2025) (granting the Government's stay request). Thus, the second *Carson* factor is also satisfied.

Finally, the third *Carson* factor requires that the order under appeal can "be effectually challenged only by immediate appeal." 450 U.S. at 84 (citations and quotation marks omitted). Impeding "the government's []ability to fully enact an immigration policy of its choice," can in some situations "compound the harm to the government over time" and thereby satisfy the third *Carson* factor. *Imm. Defs.*, 2025 WL 2080742, at *6. Plaintiffs correctly note that the Government can challenge the postponement order before the district court at the summary judgment stage of litigation. However, TPS presents a unique context because of its temporary nature; it is conceivable that the postponement order, if left in place, would remain in effect throughout much of the challenged extension period.[5] Even

---

[5] Indeed, we have already encountered such a situation. In *Ramos v. Wolf*, we considered the Government's appeal of a district court's 2018 preliminary injunction barring the implementation of the terminations of four TPS country designations. 975 F.3d 872, 878 (9th Cir. 2020). After a panel of our court vacated the preliminary injunction, *id.* at 900, we granted en banc rehearing and vacated the panel opinion, *Ramos v. Wolf*, 59 F.4th 1010 (9th Cir. 2023). Then, nearly five years after the district court issued its preliminary injunction, a new presidential administration took office and changed course. The new administration redesignated two of the relevant countries for TPS and rescinded the terminations of TPS for the two others, and we granted the Government's motion for voluntary dismissal. *Ramos v. Mayorkas*, No. 18-16981, 2023 WL 4363667, at *1 (9th Cir. June 29, 2023). Due to the temporary nature of

a slight delay to allow the district court to rule on summary judgment could prevent the litigants from receiving meaningful appellate review. Accordingly, the Government has made a sufficient showing that the district court's postponement order under section 705 can be effectively challenged only by immediate appeal.

Because the Government has satisfied the three-part *Carson* test, we have jurisdiction to consider this appeal. We therefore proceed to examine the likelihood of success as to the merits of Plaintiffs' challenge to DHS's action.

## III.  STANDARD OF REVIEW

The Government appeals the grant of temporary relief under 5 U.S.C. § 705 of the APA. Section 705 provides:

> When an agency finds that justice so requires, it may postpone the effective date of action taken by it, pending judicial review. On such conditions as may be required and to the extent necessary to prevent irreparable injury, the reviewing court, including the court to which a case may be taken on appeal from or on application for certiorari or other writ to a reviewing court, may issue all necessary and appropriate process to postpone the effective date of an agency

---

TPS and the change in administrations, we never conclusively resolved the merits of the preliminary injunction, much less the final merits determination.

> action or to preserve status or rights pending
> conclusion of the review proceedings.

The postponement of agency action under the APA is governed by the preliminary injunction factors. *Imm. Defs.*, 2025 WL 2080742, at *7. Under that framework, "[a] plaintiff seeking a preliminary injunction must establish that (1) he is likely to succeed on the merits, (2) he is likely to suffer irreparable harm in the absence of preliminary relief, (3) the balance of equities tips in his favor, and (4) an injunction is in the public interest." *E. Bay Sanctuary Covenant v. Biden*, 993 F.3d 640, 668 (9th Cir. 2021) (citation omitted). Where, as here, the Government is a party, the last two factors merge. *Id.* The factors are evaluated on a sliding scale, so "a stronger showing of one element may offset a weaker showing of another." *All. for the Wild Rockies v. Cottrell*, 632 F.3d 1127, 1131 (9th Cir. 2011).

We review the district court's factual findings for clear error, legal determinations de novo, and ultimate resolution of the preliminary injunction factors for abuse of discretion. *Washington v. Trump*, No. 25-807, --- F.4th ---, 2025 WL 2061447, at *3 (9th Cir. July 23, 2025). We review the "district court's choice of equitable remedy" for abuse of discretion. *Mont. Wildlife Fed'n v. Haaland*, 127 F.4th 1, 50 (9th Cir. 2025).

## IV. FIRST APA CLAIM – JURISDICTION

The Government argues that we lack judicial power to review Plaintiffs' first APA claim, which challenges the DHS Secretary's statutory authority to vacate a prior extension of TPS. The Government relies on two statutes: the TPS statute itself, 8 U.S.C. § 1254a; and a provision of

the INA restricting courts from "enjoin[ing] or restrain[ing]" the operation of certain immigration statutes, 8 U.S.C. § 1252(f)(1). However, neither statute prevents us from reaching the merits of this claim.

### A. The TPS Statutory Bar, 8 U.S.C. § 1254a

The TPS statute, 8 U.S.C. § 1254a, provides that:

> There is no judicial review of any determination of the [Secretary of Homeland Security] with respect to the designation, or termination or extension of a designation, of a foreign state under this subsection.

*Id.* § 1254a(b)(5) "Review" (A) "Designations."

Courts strongly presume that Congress intends judicial review of administrative actions. *Hyatt v. Off. of Mgmt. & Budget*, 908 F.3d 1165, 1170-71 (9th Cir. 2018). This presumption can only be overcome by "clear and convincing evidence of a contrary legislative intent." *Id.* at 1171 (quoting *Pinnacle Armor, Inc. v. United States*, 648 F.3d 708, 718 (9th Cir. 2011)). In determining whether the presumption has been overcome, the Supreme Court has noted that "'the clear and convincing evidence standard is not a rigid evidentiary test,' and 'the presumption favoring judicial review [is] overcome, whenever the congressional intent to preclude judicial review is fairly discernible in the statutory scheme.'" *Id.* (quoting *Block v. Cmty. Nutrition Inst.*, 467 U.S. 340, 350–51 (1984)) (alterations in original).

Where, as here, the claim is that "agency action [was] taken in excess of delegated authority," this presumption of reviewability is "particularly strong." *Amgen, Inc. v. Smith*, 357 F.3d 103, 111 (D.C. Cir. 2004) (citing *Leedom v. Kyne*,

358 U.S. 184, 190 (1958)); *Leedom*, 358 U.S. at 190 (Courts "cannot lightly infer that Congress does not intend judicial protection of rights it confers against agency action taken in excess of delegated powers"). The assertion that a statute bars substantial statutory and constitutional claims is "an extreme position." *Bowen v. Mich. Acad. of Fam. Physicians*, 476 U.S. 667, 680–81 (1986).

Courts look to a statute's "express language[,] . . . the structure of the statutory scheme, its objectives, its legislative history, and the nature of the administrative action involved." *Hyatt*, 908 F.3d at 1171 (quoting *Block*, 467 U.S. at 345). We begin, and can end, with the "natural meaning of the text." *Patel v. Garland*, 596 U.S. 328, 340 (2022). If this inquiry reveals clear and convincing evidence that the claim is covered by the jurisdiction-stripping statute, then the jurisdiction-stripping provision applies. *See Amgen*, 357 F.3d at 111. If the jurisdiction-stripping provision does not clearly apply or is ambiguous, we apply the APA's presumption of reviewability. *See Guerrero-Lasprilla v. Barr*, 589 U.S. 221, 229 (2020) ("We have consistently applied the presumption of reviewability to immigration statutes." (citation and quotation marks omitted)).

Textually, Plaintiffs' first APA claim—challenging the Secretary's statutory authority to vacate a prior TPS extension—falls outside the scope of this jurisdiction-stripping provision. [6] The extent of statutory authority

---

[6] The district court noted that the Government conceded in the evidentiary hearing before it that § 1254a(b)(5)(A) does not bar the court from determining whether the Secretary acted beyond the scope of her authority when she vacated the extension of the 2023 Designation. But, "[p]arties 'cannot waive . . . a court's lack of subject matter jurisdiction,'" and "[r]egardless of the parties' concessions, therefore, we must satisfy ourselves" of our subject matter jurisdiction." *Proctor v.*

granted to the Secretary is a first order question that is not a
"determination . . . with respect to the designation, or
termination or extension" of a country for TPS. Nothing
here indicates that Congress's language restricting review of
the Secretary's "determination[s]" of whether to grant TPS
in a particular situation also extends to her conclusion as to
the extent of her power under the TPS statute. *See* 8 U.S.C.
§ 1254a(b)(5)(A).

*Block v. Community Nutrition Institute* is instructive.
There, the Supreme Court considered whether the
Agricultural Marketing Agreement Act of 1937, which
granted the Secretary of Agriculture authority to promulgate
"milk market orders," stripped courts of jurisdiction to
review challenges to milk market orders brought by persons
*other than* "dairy handlers." 467 U.S. at 346. The Court,
reasoning that "[i]t is clear that Congress did not intend to
strip the judiciary of *all* authority to review the . . . orders"
because "Congress added a mechanism by which dairy
handlers could obtain review of the Secretary's market
orders," concluded that "[t]he remainder of the statutory
scheme . . . makes equally clear Congress' intention to limit
the classes entitled to participate in" challenges to market
orders. *Id.* (emphasis added). The Court therefore held that
"[t]he restriction of the administrative remedy to handlers
strongly suggests that Congress intended a similar restriction
of judicial review of market orders." *Id.* at 347. Here, the
text of the TPS statute counsels in favor of drawing the same

---

*Vishay Intertechnology Inc.*, 584 F.3d 1208, 1219 (9th Cir. 2009)
(quoting *Stock W., Inc. v. Confederated Tribes of the Colville Rsrv.*, 873
F.2d 1221, 1228 (9th Cir. 1989)); *see also Richardson v. United States*,
943 F.2d 1107, 1113 (9th Cir. 1991) ("Subject matter jurisdiction cannot
be conferred upon the courts by the actions of the parties and [the]
principle[] of . . . waiver do[es] not apply.").

type of inference—Congress's decision to explicitly carve out from judicial review the Secretary's decisions related to "determination[s] . . . with respect to the designation, or termination or extension" of a country for TPS "strongly suggests" that we may review the Secretary's interpretations of her *authority* under the TPS statute. *Id.*

The legislative history of the TPS statute confirms our understanding that Congress intended to constrain the authority of the Executive, not to render all aspects of the TPS program unreviewable. *Hyatt*, 908 F.3d at 1171. Moreover, we typically do not understand jurisdiction-stripping statutes to bar review of the question of the scope of statutory authority.[7] *See, e.g.*, *Amgen*, 357 F.3d at 113–14 (collecting cases) ("Where, as here, we find that the Commission has acted outside the scope of its statutory mandate, we also find that we have jurisdiction to review the Commission's action." (citation omitted)). Thus, the plain text of the statute, its legislative history, and the strong presumption that the scope of agency authority is reviewable all confirm that we are empowered to answer the question of whether the Secretary has the statutory authority to vacate a prior extension of TPS.

## B.  Judicial Review Under the Immigration and Nationality Act, 8 U.S.C. § 1252(f)(1)

The Government contends that we lack jurisdiction to provide injunctive relief under the Omnibus Consolidated

---

[7] As Plaintiffs point out, holding otherwise would produce absurd results. For instance, the TPS statute limits each TPS designation period to between six and eighteen months, 8 U.S.C. § 1254a(b)(2), but holding that we lack jurisdiction to review questions of statutory interpretation would make unreviewable a Secretary's decision to authorize a statutorily prohibited thirty-year TPS period.

Appropriations Act of 1997, Pub. L. No. 104-208, otherwise known as the Immigration & Naturalization Act ("INA"), 8 U.S.C. § 1252(f)(1) (U.S. Code version). **8** The parties' dispute centers on whether the district court's postponement order in fact "enjoin[ed] or restrain[ed] the operation" of the TPS statute, and therefore whether the district court lacked jurisdiction to grant injunctive relief in the form of a postponement of agency action.

The INA states, in a section entitled "Judicial Review of Orders of Removal," under the heading "Limit on injunctive relief":

> IN GENERAL.—Regardless of the nature of the action or claim or of the identity of the party or parties bringing the action, no court (other than the Supreme Court) shall have jurisdiction or authority to enjoin or restrain the operation of the provisions of chapter 4 of title II, as amended . . . other than with respect to the application of such provisions to an individual alien against whom proceedings under such chapter have been initiated.

Pub. L. No. 104-208, Div. C, § 306(a)(2), 110 Stat. at 3009-611 (1996).

The district court concluded, and we agree for slightly different reasons, that section 1252(f)(1) does not bar

---

[8] We rely on the enacted text, which differs slightly from the U.S. Code version located at 8 U.S.C. § 1252. *See Galvez v. Jaddou*, 52 F.4th 821, 829–30 (9th Cir. 2022). References in this opinion to 8 U.S.C. § 1252 refer to the enacted text of the statute, as rendered above.

Plaintiffs' first APA claim. First, after the district court's March 31, 2025 postponement, our court held that section 1252(f)(1) does not prohibit relief in the form of a stay or postponement of agency action under the APA. *Imm. Defs.*, 2025 WL 2080742, at \*11. Second, even if the district court's order does "enjoin or restrain," it is not barred by section 1252(f)(1) if it affects only agency actions that exceed the agency's statutory authority. In *Ali v. Ashcroft*, we held that:

> [Section] 1252(f)(1) limits the district court's authority to enjoin the INS from carrying out legitimate removal orders. Where, however, a petitioner seeks to enjoin conduct that allegedly is not even authorized by the statute, the court is not enjoining the operation of part IV of subchapter II, and § 1252(f)(1) therefore is not implicated.

346 F.3d 873, 886 (9th Cir. 2003), *vacated on unrelated grounds sub nom. Ali v. Gonzales*, 421 F.3d 795 (9th Cir. 2005). We reaffirmed *Ali v. Ashcroft* in *Rodriguez v. Hayes*, in which we held that the petitioner could "enjoin conduct . . . not authorized by the statutes" despite the restrictions of section 1252(f)(1). 591 F.3d 1105, 1120–21, (9th Circ. 2010), *rev'd on other grounds*, *Jennings v. Rodriguez*, 583 U.S. 281, 313 (2018) (acknowledging our holding that this provision did not affect our jurisdiction over statutory claims (citing *Rodriguez*, 591 F.3d at 1120)).

As such, section 1252(f)(1)'s bar on injunctive relief for claims does not affect challenges to actions that fall outside of a statutory grant of authority. We therefore have jurisdiction to consider Plaintiffs' APA claim that the

Secretary exceeded her statutory authority in vacating the 2023 extension.

## V. FIRST APA CLAIM – EXCEEDED AUTHORITY

Plaintiffs argue that Secretary Noem's vacatur was not authorized by the TPS statute because the TPS statute authorizes only the designation, extension, or termination of TPS, and not the vacatur of an extension. *See* 5 U.S.C. § 706(2)(C) (permitting courts to "hold unlawful and set aside agency action" found "in excess of statutory jurisdiction, authority, or limitations"). The Government counters that because the statute grants the DHS Secretary the authority to designate TPS, she must also have the inherent authority to vacate it. However, agencies lack the authority to undo their actions where, as here, Congress has spoken and said otherwise. Plaintiffs are therefore likely to succeed on the merits of this claim.

Where Congress does not explicitly address the subject, agencies have some authority to reconsider prior decisions. In *China Unicom (Ams.) Ops. Ltd. v. FCC* (*CUA*), 124 F.4th 1128 (9th Cir. 2024), we considered whether the Federal Communications Commission ("FCC") could revoke a certificate issued to China Unicom (Americas) Operations Limited ("CUA") allowing it to provide telecommunications services in the United States. *Id.* at 1132. The relevant statute required those "acquir[ing] or operat[ing] any line" to first obtain a certificate from the FCC, which the FCC could condition on "such terms and conditions as in its judgment the public convenience and necessity may require." *Id.* at 1133–34 (citations omitted). The statute was silent, however, as to whether or how the FCC could revoke previously issued certificates. *Id.* The FCC had issued CUA's certificate in 2002, but by 2020 the national security

environment had changed. *Id.* at 1136–39. After giving CUA an opportunity to respond to its concerns, the FCC revoked the certificate in 2022. *Id.* at 1140–41. We held that the FCC had this revocation power based on the statute's grant of authority to issue certificates, its silence as to revocations, and its language giving the FCC the power to "perform any and all acts" and "issue such orders, . . . as may be necessary in the execution of its functions." *Id.* at 1143–44 (citation omitted). We characterized the latter provision as "in effect, a 'necessary and proper' clause that enables the FCC to carry out its statutory authorities," which allowed it to revoke a certificate for rule violations or when the public interest so required. *Id.* at 1134.

We compared the provisions authorizing these telecommunications certificates to the statutory language regarding broadcast licenses. *Id.* at 1148. We noted that "broadcast licenses are generally issued for *fixed*, renewable terms of up to eight years," and "[t]he use of a fixed term is thus affirmatively inconsistent with positing an implied power to revoke a license at any time." *Id.* (emphasis in original). "By contrast," the statutory framework for the issuance of telecommunications certificates, which provides no time limitation at all, "is a factor that weighs in *favor* of an implied power of revocation." *Id.* (emphasis in original).

However, where Congress has spoken as to the proper procedure for reversing a decision, agencies lack the inherent authority to circumvent the statute. For instance, in *Ivy Sports Medicine, LLC v. Burwell*, 767 F.3d 81 (D.C. Cir. 2014), the D.C. Circuit considered whether the FDA had the inherent authority to reconsider its regulation of a medical device. *Id.* at 82. The court noted that "administrative agencies are assumed to possess at least some inherent authority to revisit their prior decisions, at least if done in a

timely fashion." *Id.* at 86. But the court clarified that "any inherent reconsideration authority does not apply in cases where Congress has spoken." *Id.* "Put more simply, our cases assume that Congress intends to displace an administrative agency's inherent reconsideration authority when it provides statutory authority to rectify the agency's mistakes." *Id.* In *Ivy*, the D.C. Circuit rejected the FDA's claim of inherent authority because Congress specified the statutory mechanism by which the FDA could reclassify the medical device and thereby correct its prior error. *Id.* at 87. The FDA "could not rely on a claimed inherent reconsideration authority to short-circuit that statutory process and revoke its prior . . . determination to achieve th[e] same result." *Id.* The FDA's complaints that the statutory reclassification process took longer, required greater process, and did not achieve an identical result did not change the court's determination that Congress had displaced the FDA's inherent reconsideration authority by providing a separate mechanism for doing so. *Id.* at 87–88.

Similarly, in *Gorbach v. Reno*, 219 F.3d 1087 (9th Cir. 2000) (en banc), we considered whether the Attorney General's statutory authority to naturalize new U.S. citizens under 8 U.S.C. § 1421(a) necessarily conferred on her the power to reopen or vacate prior naturalizations. *Id.* at 1089–90. Congress had explicitly allocated the denaturalization power to the federal judiciary, stating that denaturalization proceedings may be brought "in any district court." *Id.* at 1093–94 (quoting 8 U.S.C. § 1451(a)). Because Congress had spoken on the issue, we rejected the Attorney General's assertion of revocation power, explaining:

> There is no general principle that what one can do, one can undo . . . . But there is no

> statutory confirmation of any inherent power
> the [Attorney General] may have to vacate
> [her] judgments, except for [her] narrow
> authority to cancel certificates without
> affecting citizenship . . . Whether the
> Attorney General can undo what she has the
> power to do, naturalize citizens, depends on
> whether Congress said she could.

*Id.* at 1095. Although we recognized that "[p]ossibly the agency has authority to correct clerical errors shortly after they are made," we held that it lacked statutory authorization to rewrite the Congressional allocation of the denaturalization power to the judiciary. *Id.* at 1098.

In the TPS context, Plaintiffs are likely to succeed in their claim that Congress has displaced any inherent revocation authority by explicitly providing the procedure by which a TPS designation is terminated. The Secretary's assertion of such a power is, as the district court noted, "at odds with the structure of the TPS statute." The TPS statute specifically addresses the time frame within which a TPS designation may be terminated. Section 1254a(b)(3)(B) provides that a termination "shall not be effective earlier than 60 days after the date the notice is published or, if later, the expiration of the most recent previous extension." It expressly provides that the termination of a TPS designation can be no earlier than the expiration of the most recent extension. The statute does not permit the Secretary to terminate a designation "midstream," but that is exactly what the Secretary purports to do here. And while the statute expressly sets forth in detail procedures for "designation," "extension," and "termination," it nowhere mentions a process for "vacatur," which, in this case, has the practical

effect of a "termination" of a TPS designation. Thus, if the Secretary wished to end TPS status for Venezuelans, she is statutorily required to follow the procedures for termination that Congress enacted.

Like in *Ivy* and *Gorbach*, Congress has provided mechanisms for designating, extending, and terminating TPS, and the agency is not free to disregard them by relying on a vague invocation of "inherent authority." Congress has provided a means for the Secretary to account for changes in country conditions or political priorities: she can terminate TPS within the confines of the statute. Holding otherwise, and allowing rescission or vacatur of the TPS designation here, would empower the agency to indirectly take three separate actions that are prohibited by statute: designating countries for TPS for a time period under six months, 8 U.S.C. § 1254a(b)(2)(B), (b)(3)(C), terminating TPS before the expiration of the last extension, § 1254a(b)(3)(B), and terminating TPS with less than sixty days' notice, *id.* Such a dodge of statutory language is impermissible. *See Civ. Aeronautics Bd. v. Delta Air Lines, Inc.*, 367 U.S. 316, 328 (1961) (rejecting agency's assertion of "the power to do indirectly what it cannot do directly"). We may not render the statute a "dead letter" by allowing the agency to act "without complying with the procedural requirements" set forth by Congress. *Ivy*, 767 F.3d at 87.

Thus, our precedent recognizes that the power to do does not necessarily encompass a power to undo. The structure and temporal limitations of the TPS statute protect the important reliance interests of individual TPS holders, and the Government must adhere to these statutory constraints. The Government's arguments to the contrary lack merit.

First, the Government points to Secretary Mayorkas's 2023 reconsideration and rescission of the termination of Salvadoran TPS and argues that this rescission substantiates the existence of vacatur authority. *See* Reconsideration and Rescission of Termination of the Designation of El Salvador for Temporary Protected Status; Extension of the Temporary Protected Status Designation for El Salvador, 88 Fed. Reg. 40282 (June 21, 2023). The prior administration's 2018 termination of Salvadoran TPS had been enjoined for five years and thus had never gone into effect. *Id.* at 40284. Secretary Mayorkas rescinded the termination and extended Salvadoran TPS. *Id.* at 40283. But this rescission does not affect Secretary Noem's statutory vacatur authority. For one, a prior violation of statutory authority does not excuse subsequent violations, nor does it affect the Congressionally-enacted scope of agency authority. *See New Jersey v. EPA*, 517 F.3d 574, 583 (D.C. Cir. 2008) ("[P]revious statutory violations cannot excuse the one now before the court."). Additionally, as Plaintiffs argue, the agency may have the authority to reverse a non-final action where that action is prevented from taking effect by a reviewing court. *United Gas Imp. Co. v. Callery Props., Inc.*, 382 U.S. 223, 229 (1965). This consideration is not present here.

Second, the Government expresses a concern that restricting the Secretary's TPS authority "leads to absurd and extreme results—no Secretary would be empowered to vacate a designation or extension of a designation no matter how grave the threat to national security, U.S. foreign policy, or border security interests." However, this argument ignores that TPS is, by its nature, temporary. And Congress expressly contemplated such situations: the statute renders individuals convicted of certain crimes ineligible for TPS

and provides for the withdrawal of status of others. 8 U.S.C. § 1254a(c)(2)(B), (c)(3). Moreover, concerns about a designated country that no longer meets the conditions for TPS can be addressed within, at most, eighteen months by terminating the designation upon its expiration. *Id.* § 1254a(b)(2), (3)(C). These restrictions on the Secretary's authority are supported by the legislative history of the TPS statute, which demonstrates that Congress sought to limit the previously unfettered executive discretion inherent in the EVD and DED procedures. If, instead, Congress had intended to retain broad executive discretion to designate and terminate countries at will, it is difficult to imagine why it would have enacted the TPS statute in the form that it did, which provides specific timelines and mechanisms for these actions.**[9]** *See also CUA*, 124 F.4th at 1148 (noting that the "[t]he use of a fixed term" in the statute is "affirmatively inconsistent with positing an implied power to revoke a license at any time").

These Congressional limitations on the Secretary's authority are further supported by the reliance issues at play here. *See Gorbach*, 219 F.3d at 1097 (considering the "importance of citizenship and the safeguards against taking

---

[9] The existence of DED at all strongly indicates that Congress intended to provide predictability and certainty to noncitizens relying on TPS status. DED designations are granted pursuant to the executive's constitutional authority to conduct the foreign relations of the United States, *see, e.g.*, 89 Fed. Reg. 26167 (granting DED status to certain Palestinians until August 13, 2025), and are not subject to the same statutory guardrails as are TPS designations. By codifying the TPS statute, Congress provided a different system which balanced predictability and stability with temporal limits—TPS holders can rely on the security of their status but only for a limited period of time. And, the Attorney General may terminate that status, but only with sixty days' notice and not prior to the expiration of the current designation.

it away" in support of the conclusion that the agency lacked
denaturalization power); *Ivy*, 767 F.3d at 87 (rejecting
agency's attempt to avoid the "procedural hoops" because
of, in part, the importance of "ensur[ing] that regulated
parties receive fair treatment"). Congress's time limitations
are meaningful to the regulated parties here—people who
use this guaranteed time with "enough stability to work" and
"a decent standard of living" to obtain employment, seek
educational opportunities, and find long-term housing.[10]
This was Congress's design when it enacted TPS: to
constrain Executive authority and to provide stability for
those with temporary status by insulating them from shifting
political winds. *See* 135 Cong. Rec. H7501 (daily ed. Oct.
25, 1989) (statement of Rep. Meldon Edises Levine).

Third, the Government's argument that an agency can
correct its own errors falls flat. Although agencies may
typically correct clerical or typographical errors in a timely
manner, even if they otherwise do not have rescission or
vacatur authority, they are not empowered to substantively
re-decide issues under this authority. We acknowledged as
much in *Gorbach*, where we squarely rejected the Attorney
General's claimed denaturalization power, although we
noted that the agency could likely correct typographical
errors on naturalization certificates. 219 F.3d at 1098. The

---

[10] Indeed, one TPS holder received notice of the 2023 Designation
extension, and one day afterwards, submitted his renewal application,
received a receipt confirming a 540-day extension of his work
authorization, provided that information to his employer, and renewed
the lease on his home. Another TPS holder, who leased an apartment,
got a job as a child-care provider at a daycare, and is studying to get her
GED, submitted her application for renewal a day after the Secretary
purported to revoke TPS and is awaiting the adjudication of her
application.

Government is correct that this power to correct small errors can exist "even though the applicable statute and regulations do not expressly provide for such reconsideration." *Gun S., Inc. v. Brady*, 877 F.2d 858, 862 (11th Cir. 1989). But agencies may not change course on a substantive policy decision under this error-correcting authority. *See Am. Trucking Ass'ns v. Frisco Transp. Co.*, 358 U.S. 133, 146 (1958) ("Of course, the power to correct inadvertent ministerial errors may not be used as a guise for changing previous decisions because the wisdom of those decisions appears doubtful in the light of changing policies.").[11]

Finally, the Government argues that the TPS statute's limitations did not prevent vacatur here because Secretary Mayorkas's extension of TPS had not yet taken effect. This is factually incorrect: the extension did take effect, and the reregistration period began on January 17, 2025. 90 Fed. Reg. 5961, 5962. TPS holders began applying to extend their status, as the Supreme Court recognized in its stay order

---

[11] The Government citation of *SKF USA Inc. v. United States*, 254 F.3d 1022 (Fed. Cir. 2001), for the proposition that an agency can request remand in a court proceeding to reconsider its prior erroneous decision is inapt. *Id.* at 1029–30. In *SKF*, the Federal Circuit explained in some instances, an "agency may request a remand (without confessing error) in order to reconsider its previous position." *Id.* at 1029. In those circumstances, "the reviewing court has discretion over whether to remand," though doing so is usually appropriate when "the agency's concern is substantial and legitimate." *Id.* However, if the remand is requested for the agency to substantively change a policy decision involving "an issue as to whether the agency is either compelled or forbidden by the governing statute to reach a different result," courts have discretion over whether to decide the statutory question or order a remand. *Id.* This case involves such a question of statutory authority. Moreover, here, DHS is not seeking remand, and its own vacatur of a prior TPS extension is the error subject to review.

in this case, which exempted from that order challenges to
the Secretary's attempt to invalidate already-issued
documents under the extension. *Noem v. Nat. TPS All.*, No.
24A1059, 2025 WL 1427560, at \*1. TPS holders began to
rely upon the extension of their protected status at the
opening of this registration period, giving rise to the strong
reliance interests here at stake. *See Dept. of Homeland Sec.
v. Regents of the Univ. of Cal.*, 591 U.S. 1, 30–31 (2020)
(cataloguing the reliance interests of Deferred Action for
Childhood Arrivals (DACA) recipients). The Government
provides no support for its contention that this period is
somehow exempt from the statutory restriction on
terminating TPS before "the expiration of the most recent
previous extension." 8 U.S.C. § 1254a(b)(3)(B).

In sum, Plaintiffs make out a strong case on the merits
on their APA claim challenging the Secretary's putative
vacatur authority. "Where Congress itself has significantly
limited executive discretion by establishing a detailed
scheme that the Executive must follow in dealing with
[noncitizens], the [Executive] may not abandon that scheme
because he thinks it is not working well." *E. Bay Sanctuary
Covenant v. Trump*, 932 F.3d 742, 774 (9th Cir. 2018)
(quoting *Jama v. Immigr. & Customs Enf't*, 543 U.S. 335,
368 (2005)) (quotation marks and alterations omitted).
Congress created such a detailed scheme when it enacted the
TPS statute, and the Government must follow it. Because
the TPS statute does not authorize the vacatur of a prior grant
of TPS, Plaintiffs are likely to succeed on the merits of this
claim.

\* \* \*

We need not proceed to Plaintiffs' additional claims.
Our holding that the Secretary lacks vacatur authority under

the statute moots Plaintiffs' claims challenging the particular means by which the Secretary reached the vacatur decision.[12] We likewise decline to reach Plaintiffs' Equal Protection Clause challenge to the Termination Notice. If the vacatur is postponed, and the prior extension is restored, the termination cannot go into effect. *See* 8 U.S.C. § 1254a(b)(3)(B) (prohibiting the termination of TPS before

---

[12] We note that the district court correctly held that the basis for the vacatur was predicated on the Secretary's factual and legal misapprehension as to the operation of the TPS statute. Secretary Noem "failed to recognize that a TPS beneficiary under the 2021 Designation was necessarily a TPS beneficiary under the 2023 Designation." Secretary Mayorkas's extension thereof consolidated the two designations, combining the two tracks, thus lessening confusion rather than "creating" confusion as Secretary Noem apparently believed. Indeed, as the district court noted, DHS addressed this exact concern. *See* 90 Fed. Reg. 5961, 5963, (Jan. 17, 2025) (Question: "Will there continue to be two separate filing processes for TPS designations for Venezuela?"; Answer: "No.  USCIS has evaluated the operational feasibility and resulting impact on stakeholders of having two separate filing processes.  Operational challenges in the identification and adjudication of Venezuela TPS filings and confusion among stakeholders exist because of the two separate TPS designations.  To date, USCIS has created operational measures to process Venezuela TPS cases for both designations; however, it can most efficiently process these cases by consolidating the filing processes for the two Venezuela TPS populations.  To decrease confusion among stakeholders, ensure optimal operational processes, and maintain the same eligibility requirements, upon publication of this Notice, individuals registered under either the March 9, 2021 TPS designation or the October 3, 2023 TPS designation will be allowed to re-register under this extension.  This would not, however, require that a beneficiary registered under the March 9, 2021 designation to re-register at this time.  Rather, it would provide such individuals with the option of doing so.  Venezuela TPS beneficiaries who appropriately apply for TPS or re-register under this Notice and are approved by USCIS will obtain TPS through the same extension date of October 2, 2026.").

"the expiration of the most recent previous extension"). And "[a] court presented with both statutory and constitutional grounds to support the relief requested usually should pass on the statutory claim before considering the constitutional question." *Califano v. Yamasaki*, 442 U.S. 682, 692 (1979) (citation omitted).

## VI. REMAINING WINTER FACTORS

We now turn to our review of the remaining factors underlying the district court's grant of preliminary relief under APA section 705: irreparable harm to the party seeking relief, the balance of equities (including the public interest), and the proper scope of relief. 5 U.S.C. § 705 (permitting postponement of agency action "to the extent necessary to prevent irreparable injury"); *see Imm. Defs.*, 2025 WL 2080742, at \*7 (applying *Winter* factors to APA section 705 postponement action) (citing *Winter*, 555 U.S. at 20).

### A. Irreparable Harm

We begin by considering whether Plaintiffs will be irreparably harmed absent a postponement of agency action. "Irreparable harm is harm for which there is no adequate legal remedy, such as an award for damages." *See E. Bay v. Biden*, 993 F.3d at 677 (quotation marks and citation omitted). The district court found, based on Plaintiffs' unrebutted evidence, that Secretary Noem's actions vacating the prior TPS extension and terminating Venezuelan TPS was likely to "inflict irreparable harm on hundreds of thousands of persons whose lives, families, and livelihoods will be severely disrupted." Having reviewed the evidentiary record, we conclude that the district court did not abuse its discretion in determining that Plaintiffs established

a likelihood of irreparable harm absent a postponement of agency action.

For many Venezuelan TPS holders, the termination of their status exposes them to the risk of deportation. Wrongful removal is a relevant factor in the irreparable harm analysis. *Washington v. Trump*, 847 F.3d 1151, 1169 (9th Cir. 2017) (concluding that travel prohibitions which prevented certain noncitizens from traveling to the United States harmed employees and students of state universities, separated families, and stranded states' residents abroad, which constituted "substantial injuries and even irreparable harms" to the states); *see also Nken v. Holder*, 556 U.S. 418, 435–36 (2009) (holding that, although the harm of removal is not sufficient by itself to demonstrate irreparable harm, "there is a public interest in preventing aliens from being wrongfully removed, particularly to countries where they are likely to face substantial harm"). Here, the harm of removal is present, because many TPS holders lack any other form of immigration status. And these harms go beyond the removal of individuals from the United States. TPS holders also face a substantial likelihood of family separation: the district court found that, as of 2022, even before the second TPS designation for Venezuela, approximately 54,000 U.S. citizen children and 80,000 U.S. citizen adults lived with a Venezuelan TPS holder. The record is replete with examples of such mixed-status families whose life together depends on TPS, and who must now plan for whether they will remain together or be forced to separate.

Moreover, TPS holders' potential deportation to Venezuela poses independent risks of harm. Venezuela is rated by the U.S. State Department as a "Level 4: Do Not Travel" country because of the "high risk of wrongful detentions, terrorism, kidnapping, the arbitrary enforcement

of local laws, crime, civil unrest, [and] poor health infrastructure." Many of Plaintiffs' declarations recite the harms they experienced in Venezuela, and that they fear experiencing again if deported: kidnappings, beatings, threats, robbery, harassment, and the inability to make enough money to support themselves or their families.

For those who will remain in the United States without documentation, the loss of legal status presents additional harms. Many newly undocumented former TPS holders will lose their jobs, educational opportunities, and driver's licenses. Others, who have additional forms of temporary immigration status, like a pending asylum application, will lose the stability and reliability of TPS. A pending asylum application only provides a noncitizen with work authorization until that application is adjudicated, whereas TPS provides a discrete and durable form of status for the full designation period.

The Government counters that the temporary nature of TPS is what causes these injuries, not the Vacatur and Termination Notices. By its reasoning, the potential for deportation and the loss of legal status is always present at the end of a given TPS period, so shortening that period of protection does not change the ultimate result. But the district court was correct to reject this argument, reasoning: "[T]ime matters, even if that time is limited. Certainly, anyone who, for instance, has experienced the loss of a loved one to a terminal illness understands the preciousness of time, even if short." This time—in the United States, with their families, and with immigration status—is valuable to TPS holders, and the loss of it can be irreparable. Plaintiffs have made a sufficient showing of irreparable harm.

NATIONAL TPS ALLIANCE v. NOEM                45

### B. The Balance of Equities and the Public Interest

The final two factors of the preliminary relief standard—
the balance of equities and the public interest—merge when
the Government is a party. *E. Bay v. Biden*, 993 F.3d at 668.
In this analysis, we consider the harm to the Government and
the public, the promotion of the efficient administration of
our immigration laws, the value of compliance with the
APA, the public interest in preventing harm to and the
wrongful removal of noncitizens, and the importance of
preserving congressional intent. *Id.* at 678. The district
court found that "the balance of hardships (including
consideration of the public interest) tips sharply in Plaintiffs'
favor." Reviewing the district court's factual findings for
clear error, we agree. *See Washington v. Trump*, No. 25-807,
2025 WL 2061447, at \*3.

First, both sides contend that the public is injured by the
improper application of the laws. The public's interest in the
proper enforcement of the laws effectively tracks the merits
analysis here. *See E. Bay v. Biden*, 993 F.3d at 678–79
("[T]he public has an interest in ensuring that the statutes
enacted by [their] representatives are not imperiled by
executive fiat." (quotation marks and citation omitted)).
Because Plaintiffs have shown a likelihood of success on the
merits, this portion of the analysis favors Plaintiffs.

The district court also determined that stripping work
authorization from Venezuelans in the United States
negatively affects the economy and public safety for several
reasons. The district court specifically found that
Venezuelan TPS holders "work in frontline jobs" and, and it
relied on expert witness declarations to conclude that
Venezuelans "make significant economic contributions to
their communities" and to the overall U.S. economy. The

district court also found that the loss of legal status for
Venezuelans will also increase the number of people relying
on public benefits and publicly funded health care. Finally,
the district court held that the vacatur and termination of
Venezuelan TPS will impede law enforcement because
noncitizens without legal status are less likely to report
crimes or to testify in court.

The Government contends that public hospitals and
police stations are overrun, so eliminating Venezuelan TPS
is in the public interest.[13] In Secretary Noem's Termination
Notice, she cited a report by the Center for Strategic and
International Studies which states that "city shelters, police
stations, and aid services are at a maximum capacity." 90
Fed. Reg. 9040, 9043 & n.13 (citation omitted). However,
the district court, relying on multiple expert witness
declarations and amici, found that terminating Venezuelan
TPS would only exacerbate these problems. Public

---

[13] Although the Government also cites national security concerns, the
Government submitted no evidence that any TPS holder is a member of
the Venezuelan gang Tren de Aragua, nor did it rebut the district court's
finding that immigrants, and particularly TPS holders, are much less
likely to commit crimes than U.S.-born Americans are. And as discussed
above, Congress authorized the Government to address public safety
concerns by withdrawing TPS from recipients who are ineligible due to
convictions for crime or are regarded as a danger to national security. 8
U.S.C. § 1254a(c)(2)(B), (c)(3). But the Government did not identify
anyone subject to such a withdrawal for these reasons at argument.
Absent any evidence that current or former TPS holders implicate
national security concerns, the Government's asserted national security
concerns do not tip the public interest in the Government's favor *See
Washington v. Trump*, 847 F.3d at 1168–69, 1168 n.7 (explaining that
while the "public has a powerful interest in national security," that
interest can be outweighed, especially when "the Government has not
offered any evidence or even an explanation" of its "national security
concerns").

assistance programs and public healthcare would face increased demand from former TPS holders who had lost their employment authorization and employer-sponsored health insurance. Indeed, the report cited by Secretary Noem rejects the idea that terminating Venezuelan TPS would solve these problems. Instead, the report suggests that "longer-term solutions" include "expediting mechanisms to grant work authorizations so that migrants can escape informal labor[] and advocating for a more permanent extension of temporary protective status for all Venezuelans." Betilde Muñoz-Pogossian & Alexandra Winkler, *The Persistence of the Venezuelan Migrant and Refugee Crisis*, Center for Strategic & International Studies (Nov. 27, 2023).

Finally, we note that the Government has never, in the thirty-five-year history of TPS, sought to vacate a prior extension of TPS. The Government's assertion that such a vacatur is necessary now is undermined by the fact that it has never attempted to take such an action before.

Accordingly, we find no clear error in the district court's factual findings, nor do we find an abuse of discretion in its weighing of the balance of equities. Thus, because Plaintiffs demonstrated that all four *Winter* factors are aligned in favor of the postponement of Secretary Noem's Vacatur Notice, we hold that district court did not abuse its discretion by granting preliminary relief.

## C. Scope of Relief

Our final consideration is the proper scope of relief. Preliminary relief "must be narrowly tailored to remedy the specific harm shown." *E. Bay Sanctuary Covenant v. Barr*, 934 F.3d 1026, 1029 (9th Cir. 2019) (quotation marks and citation omitted). Broad nationwide injunctions must have

"an articulated connection to a plaintiff's particular harm." *Id.* Here, the district court postponed the Vacatur and Termination Notices nationwide based on section 705 of the APA, which allows courts to "issue all necessary and appropriate process to postpone the effective date of an agency action or to preserve status or rights pending conclusion of the review proceedings." 5 U.S.C. § 705. The Government asks us to limit the scope of relief to the individual plaintiffs.

Although the Supreme Court explicitly declined to address the proper scope of APA relief in its recent *Trump v. CASA, Inc.* decision, 145 S. Ct. 2540, 2554 n.10 (2025), we have understood the Court's "complete-relief principle for crafting injunctive relief" to "provide[] some useful guidance for crafting interim equitable relief" in the APA context. *Imm. Defs.*, 2025 WL 2080742, at *15. "Under this [complete-relief] principle, the question is not whether an injunction offers complete relief to *everyone* potentially affected by an allegedly unlawful act; it is whether an injunction will offer complete relief *to the plaintiffs before the court.*" *Id.* (citing *CASA*, 145 S. Ct. at 2557). There is no rule, however, that nonparties must remain unaffected by the court's order. *See City & County of San Francisco v. Trump*, 897 F.3d 1225, 1244 (9th Cir. 2018) ("[A]n injunction is not necessarily made overbroad by extending benefit or protection to persons other than the prevailing parties in the lawsuit . . . if such breadth is necessary to give prevailing parties the relief to which they are entitled." (citation omitted)).

Here, Plaintiffs have demonstrated that a postponement of the Vacatur Notice, effective nationwide, is the only remedy that provides complete relief to the parties before the court and complies with the TPS statute. First, Plaintiff

NTPSA, a membership organization, brings this challenge on behalf of its more than 84,000 members who are Venezuelan TPS holders in all fifty states and the District of Columbia. *See Warth v. Seldin*, 422 U.S. 490, 511 (1975) ("[A]n association may have standing solely as the representative of its members."). As the district court reasoned, "[f]ull relief for the NTPSA and its members cannot be obtained absent application to all fifty states and the District of Columbia."

Second, limiting the relief to individual plaintiffs and NTPSA members is not a workable solution under the TPS statute. Plaintiffs challenge a single act: Secretary Noem's vacatur of the prior extension of Venezuelan TPS. They do not challenge the eligibility determination for any particular TPS holder. Limiting Secretary Noem's decision to affect only certain individuals would effectively mean rewriting it in a way that does not comply with the TPS statute. Although the TPS statute contemplates only a single binary determination for each country's TPS designation, we would be replacing Secretary Mayorkas's positive determination, and Secretary Noem's negative determination, with a judicially created patchwork. *See E. Bay v. Biden*, 993 F.3d at 681 ("Our typical response is to vacate the rule and remand to the agency; we ordinarily do not attempt, even with the assistance of agency counsel, to fashion a valid regulation from the remnants of the old rule." (quotation marks and citation omitted)); *see also Washington v. Trump*, 847 F.3d at 1167 ("[E]ven if the TRO might be overbroad in some respects, it is not our role to try, in effect, to rewrite the Executive Order.").

These statutory constraints distinguish this appeal from those arising in otherwise similar contexts. In *Immigrant Defenders*, the plaintiff organization challenged the

enrollment of asylum seekers in the "Remain in Mexico" program. 2025 WL 2080742, at \*3. There, we limited the scope of the order postponing the implementation of the "Remain in Mexico" program to the organization's individual clients, as doing so awarded the plaintiffs complete relief. *Id.* at \*15. The statute at issue in *Immigrant Defenders* stated that the Secretary of Homeland Security "may return the [noncitizen]" to Mexico pending removal proceedings. 2025 WL 2080742, at \*3 (citing 8 U.S.C. § 1225(b)(2)(C)). Thus, the statute did not prohibit the Secretary from adopting a piecemeal approach by returning some, but not all, noncitizens to Mexico. Indeed, the statute specifically contemplated separate actions for each individual asylum seeker, so the piecemeal approach was consistent with the statute's design and purpose. Similarly, the challenge in *East Bay v. Barr* was to a rule limiting the eligibility of certain noncitizens for asylum. 934 F.3d at 1028. We held that the "nationwide scope" of the injunction was "not supported by the record" at that stage in the litigation because the district court failed to discuss why nationwide relief was necessary to remedy Plaintiffs' harm. *Id.* at 1028–29. Again, since the rule at issue dealt with asylum eligibility, it was possible to apply the rule to asylum applicants in some areas but not others, because each person's asylum eligibility is an individual determination. *See* Asylum Eligibility and Procedural Modifications, 84 Fed. Reg. 33829 (July 16, 2019).

"Where relief can be structured on an individual basis, it must be narrowly tailored to remedy the specific harm shown." *Bresgal*, 843 F.2d at 1170. Here, relief cannot be structured on an individual basis. Postponing the rule for just some individuals would require rewriting the statute itself, and a narrower construction is not possible. TPS does

not allow for partial determinations; no Secretary has the authority to designate a country for TPS when it comes to California residents, but not for Pennsylvania residents. And we do not claim the authority to do so judicially.

Thus, the district court did not abuse its discretion in determining that a postponement of agency action under the APA, effective nationwide, was both permissible and necessary to provide complete relief to Plaintiffs. *See E. Bay v. Biden*, 993 F.3d at 680 ("The equitable relief granted by the district court is acceptable where it is 'necessary to give prevailing parties the relief to which they are entitled.'" (citation omitted)).

## VII. CONCLUSION

We have jurisdiction to consider this appeal from the district court's postponement order under APA section 705. Neither the TPS statute nor 8 U.S.C. § 1252(f)(1) precludes our power to review the merits of Plaintiffs' claim that the Secretary exceeded her statutory authority when she purported to vacate TPS status for Venezuelans. And we hold that Plaintiffs are likely to succeed on the merits of that claim. Moreover, the district court did not abuse its discretion by determining that Plaintiffs face irreparable harm based on the vacatur of the extension of Venezuelan TPS, and that the balance of equities and the public interest favor Plaintiffs. Finally, anything short of a nationwide postponement is incongruent with the TPS statute, and it would not provide Plaintiffs with the complete relief they seek. The district court did not abuse its discretion by postponing the Vacatur and Termination Notices.

\* \* \*

The TPS statute is designed to constrain the Executive,
creating predictable periods of safety and legal status for
TPS beneficiaries.    Sudden reversals of prior decisions
contravene the statute's plain language and purpose.  Here,
hundreds of thousands of people have been stripped of status
and plunged into uncertainty.  The stability of TPS has been
replaced by fears of family separation, detention, and
deportation.    Congress did not contemplate this, and the
ongoing irreparable harm to Plaintiffs warrants a remedy
pending a final adjudication on the merits.

**AFFIRMED.**[14]

---

[14] Plaintiff-Appellees' unopposed motion for judicial notice is granted.
*See* Dkt. 49.